IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC,<br>an Alabama limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC CAPITAL<br>CORPORATION,<br>a Delaware corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:07cv522 - MHT

## NOTICE OF REMOVAL

Defendant, General Electric Capital Corporation ("GE Capital"), by its attorneys, pursuant to 28 U.S.C. § 1446, hereby gives notice of its removal of the above-referenced civil action from the Circuit Court of Montgomery County, Alabama, to this Court. In support of this Notice, GE Capital states as follows:

1.    On or about May 25, 2007, Plaintiff, Koch Foods of Alabama, LLC, an Alabama limited liability company ("Koch Foods"), filed an action in the Circuit Court of Montgomery County, Alabama, styled <u>Koch Foods of Alabama, LLC v. General Electric Capital Corporation</u>, CV-07-857 (the "State Court Action").

2.    Also on or about May 25, 2007, counsel for Koch Foods issued a Summons in the State Court Action directed to GE Capital.

3.    GE Capital first received notice of this matter when its counsel received from counsel for Koch Foods copies of the Complaint, the Summons, and the Civil Cover Sheet on June 1, 2007. Accordingly, this Notice is timely filed. Copies of all pleadings, process, and orders in the State Court Action are attached hereto as Exhibit 1 and incorporated herein.

4.      Koch Foods alleges in the Complaint filed by it in the State Court Action that "Koch Foods is a limited liability company duly organized and existing under the laws of the State of Alabama, with its principal place of business in Montgomery, Alabama." Complaint, ¶ 1.  Accordingly, Koch Foods alleges that, for federal diversity purposes, it is a citizen and resident of Alabama.

5.      Koch Foods in the Complaint alleges that GE Capital "is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut." Id., ¶ 2.  This allegation is accurate, and GE Capital, for federal diversity purposes, is a citizen and resident of Connecticut and Delaware.

6.      The matter in controversy as addressed in the State Court Action Complaint exceeds the sum of $75,000, exclusive of interest and costs.  In particular, the original "Capitalized Lessor's Cost" of the Equipment alleged by Koch Foods to be at issue was $2,018,453 (See Complaint, ¶ 5 and Exhibit A annexed thereto) and the monthly rent reserved under the Equipment Lease was, therefore, $35,482.95 per month ($2,018,453 times the "Basic Tenant Lease Rate Factor:  .01757928, See Complaint, Exhibit A).  Koch Foods came into possession of the Equipment in or about May 2006 (See Complaint, ¶ 9) and continues to possess the same one (1) year later.  Therefore, the amount in controversy is not less than $425,795.40.[1]

7.      The above-stated action is a civil action wherein the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and involves a dispute between citizens of different states.

---

[1]      Although Koch Foods' Complaint places at issue Equipment having a Capitalized Lessor's Cost of $2,018,453, GE Capital's Counterclaim, subject to amendment, places at issue only a portion of the Equipment having capitalized Lessor's Cost of $846,545, a monthly rental of $14,881.65 leading to a twelve (12) month total of $178,579.80.  Regardless of which Equipment is ultimately determined to be at issue, the amount in controversy substantially exceeds $75,000.

8.    There is complete diversity of citizenship between the parties. Koch Foods, as the plaintiff, is a citizen of Alabama. GE Capital, as the defendant, is a citizen of both Delaware and Connecticut.

9.    This action is one over which this Court has original jurisdiction under the provisions of 28 U.S.C. § 1332.

10.    The State Court Action is properly removed to this Court pursuant to 28 U.S.C. § 1441(a).

11.    Pursuant to 28 U.S.C. § 1446(d), a Notice of Filing of Notice of Removal is being filed with the Clerk of the Circuit Court of Montgomery, Alabama, and served upon counsel for all adverse parties. A copy of this Notice of Filing of Notice of Removal is attached hereto as Exhibit 2.

Dated: June 13, 2007

Respectfully submitted,

*Rusha C. Smith*

Rusha C. Smith
Attorney for Defendant General Electric
Capital Corporation

OF COUNSEL:
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

OF COUNSEL:
Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312)207-1000
Facsimile: (312) 207-6400

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading has been served upon counsel of record addressed as follows:

Thomas G. Mancuso, Esq.
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, AL 36117

Eugene J. Geekie, Jr., Esq.
Mike Xu, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606

by placing same in the United States mail, postage prepaid, on this the <u>13th</u> day of June, 2007.



OF COUNSEL

- 4 -

# EXHIBIT 1

CV-07-857

| State of Alabama Unified Judicial System | **COVER SHEET** **CIRCUIT COURT – CIVIL CASE** (Not For Domestic Relations Cases) | Case Number |  |  |
|---|---|---|---|---|
| Form ARCiv-93    Rev.5/99 | | Date of Filing: Judge Code: |  |  |
| | | Month    Day    Year | | |

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF _____ MONTGOMERY _____, ALABAMA
*(Name of County)*

Koch Foods of Alabama LLC          v.          General Electric Capital Corporation

| **Plaintiff** | | | **Defendant** | | |
|---|---|---|---|---|---|
| **First Plaintiff** | ☑ Business    ☐ Individual ☐ Government    ☐ Other | | **First Defendant** | ☑ Business    ☐ Individual ☐ Government    ☐ Other | |

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA  -  Wrongful Death
- ☐ TONG  -  Negligence: General
- ☐ TOMV  -  Negligence: Motor Vehicle
- ☐ TOWA  -  Wantonness
- ☐ TOPL  -  Product Liability/AEMLD
- ☐ TOMM  -  Malpractice-Medical
- ☐ TOLM  -  Malpractice-Legal
- ☐ TOOM  -  Malpractice-Other
- ☐ TBFM  -  Fraud/Bad Faith/Misrepresentation
- ☐ TOXX  -  Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE  -  Personal Property
- ☐ TORE  -  Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN  -  Abandoned Automobile
- ☐ ACCT  -  Account & Nonmortgage
- ☐ APAA  -  Administrative Agency Appeal
- ☐ ADPA  -  Administrative Procedure Act
- ☐ ANPS  -  Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX  -  Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT  -  Civil Rights
- ☐ COND  -  Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP  -  Contempt of Court
- ☐ CONT  -  Contract/Ejectment/Writ of Seizure
- ☐ TOCN  -  Conversion
- ☐ EQND  -  Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD  -  Eviction Appeal/Unlawful Detainer
- ☐ FORJ  -  Foreign Judgment
- ☐ FORF  -  Fruits of Crime Forfeiture
- ☐ MSHC  -  Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB  -  Protection From Abuse
- ☐ FELA  -  Railroad/Seaman (FELA)
- ☐ RPRO  -  Real Property
- ☐ WTEG  -  Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP  -  Workers' Compensation
- ☑ CVXX  -  Miscellaneous Circuit Civil Case

**ORIGIN** *(check one):*   F ☑ INITIAL FILING      A ☐ APPEAL FROM DISTRICT COURT      O ☐ OTHER: _____
R ☐ REMANDED      T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ YES  ☐ NO      Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ P, for procedure)

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED      ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

| M | A | N | 0 | 1 | 8 | May 25, 2007 | |
|---|---|---|---|---|---|---|---|
| | | | | | | Date | Signature of Attorney/Party filing this form |

**MEDIATION REQUESTED:**   ☐ YES  ☐ NO  ☐ UNDECIDED

# C I V I L   S U M M O N S

State of Alabama
Unified Judicial System
Form C-34   Rev 6/88

CASE NO:

_Cv-07-857_

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY

Plaintiff(s):  Koch Foods of Alabama, LLC, an Alabama
Limited Liability Company                    vs.  Defendant(s):  General Electric Capital Corporation, a
Delaware Corporation

NOTICE
TO:    General Electric Capital Corporation, 1000 Windward Concourse, Suite 403, Alpharetta, Georgia 30005    D1

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF'S ATTORNEY, **THOMAS G. MANCUSO**, WHOSE ADDRESS IS **MANCUSO & FRANCO, P.C., 7515 HALCYON SUMMIT DRIVE, SUITE 301, MONTGOMERY, ALABAMA 36117.** THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED by the Alabama Rules of Civil Procedure:

☐    You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

☒    Service by certified mail of this summons is initiated upon the written request of plaintiff's attorney pursuant to Rule 4.1© of the Alabama Rules of Civil Procedure.

_05/31/07_                    _Melissa Rittenour_            By:   _X_
DATE                          CLERK/REGISTER

☒    Certified Mail is hereby requested.                    _Thomas G. Mancuso_
                                                            Plaintiff's Attorney's Signature

**RETURN ON SERVICE:**

☐    Return receipt of certified mail received in this office on _____ (Date).

☐    I certify that I personally delivered a copy of the Summons and Complaint to _____ in
_____ County, Alabama, on _____ (Date).

DATE _____                    SERVER SIGNATURE

ADDRESS OF SERVER _____

                                        TYPE OF PROCESS SERVER

article # 7112 3456 7830 0007 5757

# C I V I L   S U M M O N S

State of Alabama
Unified Judicial System
Form C-34   Rev 6/88

CASE NO:

CV-07-857

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY

Plaintiff(s): Koch Foods of Alabama, LLC, an Alabama Limited Liability Company    vs. Defendant(s): General Electric Capital Corporation, a Delaware Corporation

NOTICE TO: The Corporation Company, Suite 204, 2000 Interstate Park Drive, Montgomery, Alabama 36109-5421    DL online

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF'S ATTORNEY, **THOMAS G. MANCUSO**, WHOSE ADDRESS IS **MANCUSO & FRANCO, P.C., 7515 HALCYON SUMMIT DRIVE, SUITE 301, MONTGOMERY, ALABAMA 36117.** THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED by the Alabama Rules of Civil Procedure:**

☐   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

☒   Service by certified mail of this summons is initiated upon the written request of plaintiff's attorney pursuant to Rule 4.1© of the Alabama Rules of Civil Procedure.

05/31/07
DATE

_Melissa Rittenour_    By: _____
CLERK/REGISTER

☒   Certified Mail is hereby requested.

_Thomas G. Mancuso_
Plaintiffs/Attorney's Signature

**RETURN ON SERVICE:**

☐   Return receipt of certified mail received in this office on _____ (Date).

☐   I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama, on _____ (Date).

DATE _____

SERVER SIGNATURE _____

ADDRESS OF SERVER _____

TYPE OF PROCESS SERVER _____

article #7112 3456 7830 0007 5740

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

KOCH FOODS OF ALABAMA, LLC, an )
Alabama Limited Liability Co., )
                                 )
       **Plaintiff,**        )
                                 )
       **v.**              )     **Case No:** $Cv-07-857$
                                 )
General Electric Capital Corporation., a )   **JURY TRIAL DEMANDED**
Delaware Corporation, )
                                 )
       **Defendant.**      )
                                 )

## COMPLAINT FOR DECLARATORY JUDGMENT AND FOR UNJUST ENRICHMENT

      Now comes Koch Foods of Alabama, LLC ("Koch Foods"), pursuant to Alabama Code §

6-6-220 *et seq.*, and files this Complaint for Declaratory Judgment and for Unjust Enrichment

against General Electric Capital Corporation. ("GE Capital").  In support thereof, Koch Foods

states the following:

### PARTIES, JURISDICTION AND VENUE

    1.     Koch Foods is a limited liability company duly organized and existing under the laws

of the State of Alabama, with its principal place of business in Montgomery, Alabama.  At all

times pertinent hereto, Plaintiff has been engaged in the business of processing and selling

poultry products.

    2.     GE Capital is a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business in Stamford, Connecticut.  Upon information and

belief, at all times pertinent hereto, Defendant has been authorized to transact business in the

State of Alabama.

3.    This Court has personal jurisdiction over this matter pursuant to Alabama Rules of Civil Procedure Rule 4.2 in that Defendant is a company doing business within this State.

4.    Venue is proper in this Court pursuant to Alabama Code § 6-3-7(3) because Plaintiff's principal office of business is in Montgomery County and Defendant does business by agent in Montgomery County.

## FACTS

5.    On or about December 28, 2005, Sylvest Farms, Inc. ("Sylvest Farms") entered into an equipment lease ("Equipment Lease") with GE Capital under which Sylvest Farms would lease various poultry processing equipment (the "Equipment"), including a chicken de-boner and a spiral freezer. A copy of the Equipment Lease is attached hereto as Exhibit A.

6.    Koch Foods is not a party to the Equipment Lease agreement.

7.    The Equipment was delivered to a plant of Sylvest Farms located at 3500 Western Blvd., Montgomery, Alabama 36105 (the "Plant"). The Equipment since then has been housed in the Plant.

8.    On April 18, 2006, Sylvest Farms filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. Sylvest Farms remained in possession of its assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

9.    On May 26, 2006, the United States Bankruptcy Court for the Northern District of Alabama entered an order (the "Bankruptcy Court Order") authorizing Sylvest Farms to (i) sell to Koch Foods certain assets of the bankruptcy estate free and clear of liens, claims and interests pursuant to 11 U.S.C. § 363, (ii) designate to Koch Foods the right to assume a contract, and (iii) assign to Koch Foods certain executory contracts. A copy of the Bankruptcy Court Order is attached hereto as Exhibit B.

-2-

10.    Pursuant to the Bankruptcy Court Order and an Amended Asset Purchase Agreement entered between Koch Foods and Sylvest Farms, Koch Foods purchased substantially all the assets of Sylvest Farms, including the Plant at 3500 Western Blvd, Montgomery, Alabama 36105.

11.    Koch Foods did not assume the Equipment Lease that was entered between Sylvest Farms and GE Capital.

12.    Several months after Koch Foods made the purchase of the assets of Sylvest Farms, and after GE Capital claimed that it owned the Equipment, Koch Foods demanded that GE Capital remove the Equipment from the Plant. GE Capital has failed and refused to remove its equipment from the Plant purchased by Koch.

13.    GE Capital demanded, and continues to demand that Koch Foods pay Sylvest Farms' rental charges for the Equipment.

14.    If GE Capital owns the Equipment, it incurred or received a benefit from the ongoing storage of the Equipment at the Plant, and Koch Foods has incurred a detriment and/or storage costs for storing the Equipment at the Plant.

## COUNT I – DECLARATORY JUDGMENT THAT THE EQUIPMENT ARE
## FIXTURES OF THE PLANT, WHICH KOCH FOODS NOW OWNS

15.    Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

16.    An actual controversy exists between Koch Foods and GE Capital, and pursuant to Alabama Code § 6-6-222, this Court is empowered to declare the rights and liabilities of the

parties hereto, to adjudicate the final rights of all, and to enter such other relief as the Court

deems fit and proper.

17.    GE Capital claims that it owns the Equipment.  However, because Sylvest Farms

attached the Equipment to the Plant and intended the Equipment to be the fixtures of the Plant,

Koch Foods, the purchaser and now the owner of the Plant, owns the Equipment as the fixtures

of the Plant.

WHEREFORE, Koch Foods prays that this Court adjudicate and determine the rights and

liabilities of the parties and enter a declaratory judgment pursuant to AL Code § 6-6-222 of the

Alabama Code of Civil Procedure that:

(i)    The Equipment are fixtures of the Plant and Koch Foods owns the Equipment as a

result of its purchase of the Plant; and

(ii)    Koch Foods is entitled to other and further relief as the Court may deem equitable

and just as provided by AL Code § 6-6-231.

## COUNT II– DECLARATORY JUDGMENT THAT KOCH FOODS IS NOT LIABLE

## TO GE CAPTITAL UNDER THE EQUIPMENT LEASE EITHER FOR RENT OR FOR

## UNJUST ENRICHMENT

18.    Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as

if fully set forth herein.

19.    An actual controversy exists between Koch Foods and GE Capital, and pursuant to

Alabama Code § 6-6-222, this Court is empowered to declare the rights and liabilities of the

parties hereto, to adjudicate the final rights of all, and to enter such other relief as the Court

deems fit and proper.

-4-

20.    GE Capital asserts that Koch Foods is liable for and must pay the rental amounts owed under the Equipment Lease.   However, because Koch Foods is not a party to the Equipment Lease and did not assume the Equipment Lease, Koch Foods is not liable to GE Capital under the Equipment Lease, either for rent or for unjust enrichment.

WHEREFORE, Koch Foods prays that this Court adjudicate and determine the rights and liabilities of the parties and enter a declaratory judgment pursuant to AL Code § 6-6-222 of the Alabama Code of Civil Procedure that:

(i)    Koch Foods is not liable to GE Capital under the Equipment Lease for rent or  for unjust enrichment; and

(ii)    Koch Foods is entitled to other and further relief as the Court may deem equitable and just as provided by AL Code § 6-6-231.


## COUNT III – ALTERNATIVE DECLARATORY JUDGMENT THAT GE CAPITAL IS LIABLE TO KOCH FOODS FOR THE STORAGE COSTS

21.    Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

22.    This is an alternative claim if this Court does not determine under Count I that the Equipment was affixed to the Plant and is owned by Koch Foods.

23.    Because GE Capital left the Equipment at the Plant after Koch's purchase of the Plant, then failed to remove the Equipment from the Plant despite Koch Foods' repeated demand, Koch Foods is the bailee for hire of the Equipment.

24.    The storage costs that Koch Foods incurred in housing the Equipment entitles Koch Foods to a possessory lien on the Equipment.

25.     Koch Foods' possessory lien is superior to any other lien on the Equipment under AL Code § 7-9A-333.

WHEREFORE, Koch Foods prays that this Court adjudicate and determine the rights and liabilities of the parties and enter a declaratory judgment pursuant to AL Code § 6-6-222 of the Alabama Code of Civil Procedure that:

(i)     Koch Foods maintains a possessory lien on the Equipment for any and all storage costs that Koch Foods has incurred for housing the Equipment, and to the extent of any benefit or unjust enrichment received by GE Capital;

(ii)    Koch Foods' possessory lien on the Equipment is superior to GE Capital's ownership interest in the Equipment, if any; and

(iii)   Koch Foods is entitled to other and further relief as the Court may deem equitable and just as provided by AL Code § 6-6-231.

## COUNT IV – ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT

26.     Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

27.     This is an alternative claim if this Court does not determine under Count I that the Equipment was affixed to the Plant and is owned by Koch Foods.

28.     Koch Foods provided storage services in maintaining and housing the Equipment for GE Capital, and incurred costs for such services.

29.     GE Capital benefited from these services, to the extent it owns the Equipment, and in equity and good conscience should be responsible and pay for these benefits.

30.     GE Capital would be unjustly enriched if the benefits it received are not paid for.

WHEREFORE, Koch Foods prays that this Court enter a judgment:

(i)    Awarding Koch Foods the value of the amount GE Capital has been unjustly enriched by the services of Koch Foods; and

(ii)    Granting such other and further relief as is just and proper.


**PLAINTIFF DEMANDS TRIAL BY JURY FOR ALL ISSUES**


Dated:  May 25, 2007                    Koch Foods of Alabama, LLC.


By: _Mark J Kaminsky_____
Mark J. Kaminsky
Manager


By: _Thomas G Mancuso_____
Thomas G. Mancuso (MAN018)
As Attorney for Koch Foods of Alabama, LLC


Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive, Suite 301
Montgomery, Alabama  36117
(334) 481-1800


OF COUNSEL:
Eugene J. Geekie, Jr.
Mike Xu
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois 60606
(312) 258-5500


CH2\1826956.3

# Exhibit A

GE Lease
12/28/05

2/98(R090605)X11.)050984202

**\*LEAS1998\***

## MASTER LEASE AGREEMENT

dated as of _____ ("Agreement")

**THIS AGREEMENT** is between General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") and Sylvest Farms, Inc. ("Lessee"). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule ("Schedule").

**1. LEASING:**

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("Equipment") described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier ("Supplier") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

**2. TERM, RENT AND PAYMENT:**

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("Lease Commencement Date"). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and any renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($ .05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

**3. RENT ADJUSTMENT:**

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("Code")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("Effective Rate") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

**4. TAXES:**

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes"). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

**5. REPORTS:**

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6. DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7. MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

## 8. STIPULATED LOSS VALUE: If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9. INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above .

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("**Claims**"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("Tax Benefits") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "**Loss**"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("**Net Economic Return**"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT **IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE.** All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "**Documents**"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessee shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement or any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**General Electric Capital Corporation**

By:_____

Name:_____

Title:_____

LESSEE:
Sylvan Farms, Inc.

By: _Lyman L. Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

CS(R083004) 4171238001

**\*LEAS8760\***

**FOOD PROCESSING EQUIPMENT SCHEDULE**
**SCHEDULE NO. 001**
**DATED THIS _____**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF _____**

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("Agreement" said Agreement and this Schedule being collectively referred to as "Lease"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.   Equipment:**  Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "Equipment").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006   De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500   Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR   · Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.   Financial Terms**

| | | | |
|---|---|---|---|
| 1. | Advance Rent (if any):  **Not Applicable** | 5. | Basic Term Commencement Date: |
| 2. | Capitalized Lessor's Cost: **$ 2,018,453.00** | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months): 60 Months. | 7. | Last Delivery Date: |
| 4. | Basic Term Lease Rate Factor: .01757928 | 8. | Daily Lease Rate Factor: .000468780 |

9.   First Termination Date: Thirty-six (36) months after the Basic Term Commencement Date.

10.   Interim Rent:  For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period.  Interim Rent shall be due on _____.

11.   Basic Term Rent.  Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.   Tax Benefits**     Depreciation Deductions:

1.   Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.
2.   Recovery Period: 7 years.
3.   Basis: 100 % of the Capitalized Lessor's Cost.

**D.   Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor. Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.



**E.   Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS **D&F Equipment Sales, Inc. & Osid Corporation & MTL Installation Services** (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

**F.   Stipulated Loss and Termination Value Table\***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

\*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table.  In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

**G.   Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

**I   EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS:  In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.



(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION: The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS: In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS/ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

### EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By:_____

Name:_____

Title:_____

LESSEE:

Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

# Exhibit B

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| SYLVEST FARMS, INC., et al., | : | CASE NOS. 06-40525 |
| | : | through 06-40527 |
| Debtors. | : | |
| | : | JOINTLY ADMINISTERED |
| | : | |

## ORDER ON DEBTORS' MOTION PURSUANT TO 11 U.S.C. SECTIONS 105, 363 AND 365 FOR ORDER AUTHORIZING (I) SALE OF CERTAIN ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (II) APPROVAL OF DESIGNATION OF RIGHTS AGREEMENT AND (III) SALE, ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES AND EXECUTORY CONTRACTS

This matter is before the Court upon Debtors' Motion pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order (I) Authorizing the Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (II) Approval of Designation of Rights Agreement, and (III) Sale, Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion") (Docket No. 14) dated April 18, 2006 filed by Sylvest Farms, Inc., Sylvest Foods Corporation, and Sylvest Farms Management Services, Inc., debtors and debtors-in-possession (collectively "Debtors"). The Sale Motion seeks this Court's authorization to (a) sell substantially all of the Debtors' assets (the "Purchased Assets") free and clear of Liens, Claims and Interests (the "Sale") to Koch Foods of Alabama, LLC and Koch Farms of Alabama, LLC (collectively, the "Buyer") pursuant to that certain Amended Asset Purchase Agreement dated as of April 27, 2006, by and among the Buyer and the Debtors, a copy of which has been filed in connection with the Notice of Filing Revised Attachment to Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363 and 365 for Order Authorizing (I) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims, and Interests, (II) Approval of Designation of Rights Agreement and (III) Sale,

Assumption and Assignment of Certain Leases and Executory Contracts (including all amendments, schedules, exhibits, and agreements ancillary thereto) (the "Asset Purchase Agreement") (Docket No. 93); (b) approval of the Designation of Rights Agreement with respect to a dedicated transportation agreement with Worldwide Dedicated Services, Inc. ("WDS"), as modified herein (the "Designation of Rights Agreement") until such time as it is determined whether the Buyer will assume and assign the WDS Agreement; and (c) to assume and sell and assign to the Buyer certain executory contracts and unexpired leases that are identified on the Notice of Assumption and Assignment of Unexpired Leases or Executory Contracts (other than the contracts identified in paragraphs (d), (e), (f), (g), (h), (i), (j), and (k) therein) effective at the Closing (as such term is defined in the Asset Purchase Agreement) in accordance with Section 1.3 of the Asset Purchase Agreement (Collectively, the "Assumed Contracts").

The Court has entered an Order (I) Establishing Bidding and Auction Procedures in Connection with Proposed Sale of Certain Assets, (II) Providing Notice Thereof, and (III) Approving Form and Manner of Notice of Sale, Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Bid Procedures Order") (Docket No. 96) on April 28, 2006, pursuant to which the Court, inter alia, (i) established the date and time for the Auction to be conducted, (ii) established the date and time for the hearing on the Sale Motion (the "Sale Hearing"), (iii) approved the notice and procedures for the Auction, (iv) approved the bidding procedures substantially in the form specified in the Bid Procedures Motion, and (v) approved the form and manner of notice for the sale and assumption and assignment of executory contracts or unexpired leases, requisite notice of the Sale Motion having been provided as set forth in the Bid Procedures Order, the Sale Hearing having been held on May 26, 2006, at which time all parties-in-interest were afforded an opportunity to be heard; the Court having considered the Sale

Motion and the Asset Purchase Agreement; and, in accordance with Bankruptcy Rules 6004, 6006, and 9008, the Court having received evidence in support of the Sale and the Sale Motion, being advised that no other bids were received by the deadline established by the Bid Procedures Order, and having heard the arguments of counsel for the Debtors, the Buyer and various other parties in interest; all the objections to the relief requested in the Sale Motion having been withdrawn, resolved, or overruled by the court; and it appearing to the Court that, upon all of the pleadings filed with the Court and the record of the Sale Hearing before the Court, the relief requested by the Sale Motion is in the best interests of the Debtors and their respective estates,

THE COURT HEREBY FINDS that:

A.      Notice of the Sale Motion was adequate under the circumstances, and no other or further notice is necessary.

B.      On April 18, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code. The Debtors remain in possession of their assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N), and (O). The statutory and rule predicates for the relief requested herein are Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

E.      Proper, timely, adequate and sufficient notice of the Sale Motion and the Bidding Procedures Motion have been provided in accordance with the terms of the Bid Procedures

3

Order, and such notice constitutes due and proper notice for purposes of Sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, and 9008, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this order is required.

F.    Pursuant to the Bid Procedures Order, the deadline for Buyer to submit a bid to the Debtors was May 23, 2006. No bids were received prior to the deadline.

G.    Since the entry of the Bid Procedures Order, the only bid received by the Debtors was the bid from the Buyer who made a bid of $58,000,000, subject to certain adjustments. The procedures followed were required by the Bid Procedures Order and afforded a full, fair, and reasonable opportunity for any entity to make a higher and better offer to purchase the Purchased Assets and no higher or better offer has been made.

H.    The Debtors have complied with the procedures set forth in the Bid Procedures Order. The sale and auction process conducted by the Debtors was fair and reasonable, and conducted in good faith.

I.    A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all parties, if any, who are known to claim a property interest in or Lien (as defined in the Bankruptcy Code) upon any Purchased Asset; (b) all parties, if any, who are known to claim an interest in any Assumed Contracts; (c) all governmental taxing authorities who have, or as a result of the Sale of the Purchased Assets may have, Claims (as defined in the Bankruptcy Code), contingent or otherwise, against the Debtors; (d) all potential purchasers known to the Debtors, (e) the parties listed on all known creditors, including without limitation all creditors and other parties who have filed a Notice of Appearance in these cases; (f) the Bankruptcy Administrator for the

4

Northern District of Alabama, and (g) the Counsel to the Official Committee of Unsecured Creditors Committee.

J.      Each of the Debtors has full corporate power and authority to execute, deliver and perform the Asset Purchase Agreement and all other documents contemplated thereby and to consummate the transactions contemplated thereby; the execution, delivery and performance by each of the Debtors of the Asset Purchase Agreement and all other documents contemplated thereby and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of each of the Debtors; no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required to consummate the Sale; and all consents and approvals necessary for the assignment of the Assumed contracts have been obtained.

K.      The Sale is in the best interests of the Debtors and their estates. The Debtors have an adequate business justification to sell the Debtors' Assets pursuant to the terms of the Asset Purchase Agreement. Such business justification includes, but is not limited to, the following factors: (i) there is a significant risk of immediate and irreparable deterioration in the value of the Debtors' Assets if the sale is not consummated quickly; (ii) the consummation of the Asset Purchase Agreement presents the best opportunity to realize the value of the Debtors' Assets and avoid further decline and devaluation thereof; and (iii) the sale pursuant to the Asset Purchase Agreement is in the public interest, as it will result in the continued operation of the Debtors' assets and the Buyer's assumption of all obligations relating thereto. After consideration of the circumstances described in the Sale Motion, the Court determined that the procedures described in the Bid Procedures Order presented the best opportunity for the Debtors' estates to realize the highest distribution possible to creditors.

L.     In light of the Debtors compliance with the Bid Procedures Order and the absence of alternative offers other than the Asset Purchase Agreement, the Purchase Price (as defined and set forth in the Asset Purchase Agreement) constitutes fair and reasonable consideration and reasonably equivalent value for the Purchased Assets.

M.     The Debtors have, or will have on the closing of the Sale, good title to the Debtors' Assets and, accordingly, the transfer of the Debtors' Assets to the Buyer pursuant to the Asset Purchase Agreement will be a legal, valid and effective transfer of the Debtors' Assets. Notwithstanding the foregoing, and except as may be specifically provided otherwise in the Asset Purchase Agreement, the Debtors' Assets and the Assumed Contracts are being sold and assigned to the Buyer "AS IS, WHERE IS." The Debtors have made no representations or warranties as to the condition of the Purchased Assets and have specifically disclaimed any expressed or implied representation or warranty, including, without limitation, any representation or warranty related to (a) the quality, character or condition of the Purchased Assets, including without limitation the fitness or suitability for any particular trade or use or the merchantability of, any of the Purchased Assets and Assumed Contracts, (b) the compliance of the use of the Purchased Assets with any and all federal, state or local environmental or other laws or regulations, or (c) the income to be derived from, or the expense to be incurred with respect to, the Purchased Assets.

N.     As a condition to the Sale, the Buyer requires that the Purchased Assets be sold to it free and clear of all Liens, Claims and encumbrances, other than the Assumed Liabilities (which term, as used in this Order, means all liabilities or obligations which the Buyer is or may be obligated to assume and pay under the Asset Purchase Agreement and all Cure Amounts relating to Assumed Contracts), and that the Buyer shall have no liability or obligation for any

Excluded Liabilities. The Buyer would not enter into the Asset Purchase Agreement or consummate the Sale, thus adversely affecting the Debtors' estates if the Sale were not free and clear of all Liens, Claims and encumbrances, (other than the Assumed Liabilities), or if the Buyer were or would be liable for any Excluded Liabilities.

O.    Each entity with a Lien on the Debtors' Assets has consented to the Sale or is deemed to have consented to the Sale or the transfer is proper pursuant to Section 363(f) of the Bankruptcy Code.

P.    All of the actions disclosed to the Court that were taken by the Debtors, and their respective officers, directors, employees, counsel, financial advisors and other professionals in connection with the Asset Purchase Agreement and the Sale Motion have been taken in good faith. The Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code because:

> (a)    The Buyer is unrelated to the Debtors;
>
> (b)    The Buyer, the Debtors, and their respective counsel and financial advisors engaged in good faith arm's-length negotiations in arriving at the Asset Purchase Agreement; and
>
> (c)    In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Asset Purchase Agreement, including the assumption and assignment of the Assumed Contracts, at any time after the entry of this Order and, accordingly, such closing in the face of an appeal will not deprive the Buyer of its status as a good-faith purchaser.

Q.    Except for the Assumed Liabilities expressly assumed by Buyer pursuant to the Asset Purchase Agreement, neither the Buyer nor any of its successors and assigns is assuming any of the Debtors' obligations or liabilities.

R.     There is no common identity among the Buyer's and the Debtors' incorporators, officers, directors or material stockholders.

S.     No bulk sales law or any similar law applies in any way to the transfer of the Purchased Assets under the Asset Purchase Agreement.

T.     The applicable Cure Amounts (which are to be paid by the Buyer) are the sole amounts necessary to cure any defaults by any of the Debtors under the Assumed Contracts.

U.     The Buyer has provided adequate assurance of the Buyer's future performance under the Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

V.     The assumption by the Debtors and assignment to the Buyer of the Assumed Contracts and the assumption by the Buyer of the Assumed Liabilities is in the best interest of the Debtors, their creditors, and their estates and represents a prudent exercise of the Debtors' business judgment.

W.     The transfer of the Purchased Assets and the assignment, sale and assumption of the Assumed Contracts as contemplated by the Asset Purchase Agreement (a) are or will be legal, valid, and effective transfers of property of the Debtors' estates to the Buyer, and (b) vest or will vest in the Buyer all right, title, and interest of the Debtors in and to all of the Purchased Assets and the Assumed Contracts free and clear of all Liens, Claims and encumbrances, other than the Assumed Liabilities, under Sections 363(f) and 105 of the Bankruptcy Code.

X.     All of the provisions of this Order are nonseverable and mutually dependent.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1.     The Sale Motion is granted in all respects.

8

2.       All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits.

3.       The provisions of the Asset Purchase Agreement and the Designation of Rights Agreement are hereby approved, as modified by this Order.  The Debtors are authorized and directed to enter into the Asset Purchase Agreement and the Designation of Rights Agreement pursuant to Sections 363(b) and (f) of the Bankruptcy Code.  The terms of the Asset Purchase Agreement and the Designation of Rights Agreement shall be enforceable by and against the Debtors and their successors and assigns, including any chapter 7 or 11 trustee appointed or elected in the Debtors' bankruptcy cases.

4.       By the issuance of this Order, each of the Debtors are authorized and directed to execute and deliver, and empowered to fully perform under, consummate and implement, the Asset Purchase Agreement and the Designation of Rights Agreement and all additional amendments, instruments, and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Designation of Rights Agreement, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to the Buyer's possession, any or all of the Purchased Assets.

5.       Section 2.3 of the Asset Purchase Agreement shall be amended by Agreement among the Buyer and the Debtor to provide for a Three Million Dollar (rather than Two Million Dollar) deposit into an escrow account.

6.       To the fullest extent permitted by law, pursuant to Sections 363(f) and 105(a) of the Bankruptcy Code, title to all of the Purchased Assets shall be transferred to the Buyer at the

9

Closing in accordance with the terms and conditions of the Asset Purchase Agreement (or thereafter as provided therein), free and clear of all Liens, Claims and encumbrances (including, without limitation all post-petition obligations and liabilities of the Debtors), other than the Assumed Liabilities, with all such Liens, Claims, encumbrances, obligations and liabilities released, terminated and discharged as to the Buyer (and its successors and assigns) and the Purchased Assets. All Claims, Liens and encumbrances will attach to the proceeds from the Sale, in the order of their priority, with the same validity, force, and effect that they had against the Purchased Assets immediately prior to the Sale; provided, however, that the rights and priorities of alleged materialmen's liens of Horn Enterprises and Cimco Refrigerator as they existed immediately prior to the Petition Date, shall be preserved in and to the sale proceeds. This Court shall determine their amounts and priorities.

7.      The following amounts shall be distributed by the Debtors at the Closing: (i) $35,880,000 to Wachovia Bank, N.A. ("Wachovia"), to be applied under the Debtor-in-Possession Credit and Security Agreement dated April 18, 2006 (the "DIP Credit Agreement") which was approved by that certain Final Order (1) Authorizing Debtors-in-Possession to Obtain Financing, Grant Priority Security Interests and Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); and (2) Modifying Automatic Stay (the "DIP Financing Order") (Docket No. 283), to pay the Obligations (as defined in the DIP Credit Agreement, including all unpaid fees and loans), (ii) $1,000,000 from amounts loaned under the DIP Credit Agreement to pay the Carve-Out described in paragraph 8(b) of the DIP Financing Order for all of the reasonable hourly fees and expenses (as determined by the Bankruptcy Court) incurred by the Debtors' Professionals and Committee Counsel prior to the Closing, which funds shall be held in a Baker & Hostetler LLP trust account solely for purposes of paying the foregoing professional fees and

10

expenses consistent with Court Order concerning the payment of those fees and expenses, (iii) $659,250 to a segregated bank account to pay the Carve-Out described in paragraph 8(a)(a), 8(a)(d) and 8(a)(e) of the DIP Financing Order, (iv) $3,000,000 to fund the Escrow Account contemplated by Section 2.3 of the Asset Purchase Agreement,  (v) $802,000 to a segregated bank account to pay the "Retention/Success Fee Payable" as contemplated by Section 5.3 of the Asset Purchase Agreement, and (vi) the balance of the sales proceeds (less all actual and normal charges, costs, and expenses attendant to the Sale which are to be paid or reserved for at Closing by the Debtors from the gross sale proceeds) to be provisionally paid to Wachovia in payment of its pre-petition secured claims. Wachovia shall provisionally apply the amount described in 7(vi) above to its pre-petition secured claims, subject to all rights and remedies of the Debtors and their estates under the Bankruptcy Code and applicable law, including any right they may have to seek a Court order requiring disgorgement of such funds.  By accepting a provisional distribution, Wachovia shall be deemed to have submitted to the jurisdiction of this Court in respect of any action to recover such distribution. The allocation of sale proceeds and payments to Wachovia provided in paragraph 7(vi) shall be provisional and shall not constitute a determination of this Court, or otherwise be construed as an admission by any party, as to the final allocation of such sale proceeds or of the extent, validity or priority of Wachovia's Liens and Claims.

8.    All persons and entities holding Liens and Claims of any kind and nature with respect to the Purchased Assets or the Debtors hereby are barred from asserting such Liens and Claims against the Buyer, its successors and assigns, or against the Purchased Assets.

9.    The Debtors are hereby authorized and directed in accordance with Section 365 of the Bankruptcy Code to (a) assume, sell and assign to the Buyer each of the Assumed

Contracts free and clear of all Liens, Claims and encumbrances, other than Cure Amounts included in the Assumed Liabilities, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

10.    The Assumed Contracts shall, upon assignment to the Buyer and the payment of the applicable Cure Amounts, be valid and binding and in full force and effect and enforceable in accordance with their respective terms.

11.    If any defaults under any Assumed Contracts or any objections to any applicable Cure Amounts existing as of the date of the Sale Hearing have not been raised or asserted prior to the Sale Hearing, the non-debtor parties to each such Assumed Contract are hereby barred and enjoined from asserting against the Debtors or the Buyer (and their respective successors and assigns) any such defaults or objections. The Buyer shall pay any amounts accruing under the Assumed Contracts on or after the date of the Sale Hearing.

12.    If any person or entity that has filed any mortgages, deeds of trust, financing statements, or other documents or agreements evidencing Liens on any Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to any Purchased Assets, then the Buyer hereby is authorized to execute and file statements, instruments, releases, and other documents on behalf of the person or entity with respect to such Purchased Assets, provided that, in respect of the Wachovia's Liens, the Buyer shall consult with Wachovia's counsel in the preparation of any such documents. The foregoing notwithstanding, the provisions of the Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, Claims and encumbrances (other

12

than the Assumed Liabilities) shall be self-executing, and notwithstanding the failure of any of the Debtors, the Buyer, or any other party to execute, file or obtain releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof or the Asset Purchase Agreement with respect to the sale and assignment of the Purchased Assets, all Liens on the Purchased Assets shall be deemed divested, void and unenforceable. All persons or entities who are presently, or at any time hereafter prior to the transfer to the Buyer, in possession of any of the Purchased Assets are hereby directed to surrender possession of any of the Purchased Assets to the Buyer at the Closing.

13. This Order shall be binding upon the Debtors, their respective successors and assigns and any trustee that may be appointed in these cases or in any case under Chapter 7 of the Bankruptcy Code to which any such case may be converted, and any affected third parties, including without limitation all non-Debtor parties to any Assumed Contracts, all persons and entities asserting any Claims against or interests in the Debtors' estates or any of the Purchased Assets, and all other persons and entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law or by the duties of their office or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Purchased Assets.

14. Upon the Closing, the Buyer shall assume the Assumed Liabilities in accordance with the terms of the Asset Purchase Agreement. Other than the Assumed Liabilities, none of the Buyer, its successors and assigns, or any affiliate of such entity shall have

any liability, duty or responsibility for any Claims, administrative expenses, or other liabilities against the Debtors or any of the Debtors' predecessors or affiliates of any kind or character, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent.

15.    From and after entry of this Order, no Debtor or any of its respective creditors or other parties in interest shall take or cause to be taken any action that would interfere with the transfer of the Purchased Assets to the Buyer in accordance with the terms of this Order.

16.    The Buyer is a purchaser in good faith of the Purchased Assets and the Assumed Contracts and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

17.    In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Asset Purchase Agreement, including the assumption, sale and assignment of the Assumed Contracts, at any time after the entry of this Order and, accordingly, such closing in the face of an appeal will not deprive the Buyer of its status as a good-faith purchaser. If the parties to the Sale consummate the transactions contemplated thereby while an appeal of this Order is pending, the Buyer shall be entitled to rely upon the protections of Section 363(m) of the Bankruptcy Code, absent any stay pending appeal granted by a court of competent jurisdiction prior to such consummation.

18.    As of the time and date of the Closing, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the Sale and the other transactions contemplated by the Asset Purchase Agreement.

14

19.    This Court retains jurisdiction to (i) enforce and implement the terms and provisions of the Asset Purchase Agreement and the Designation of Rights Agreement, all amendments thereto and any waivers and consents thereunder, (ii) compel delivery of the Purchased Assets to the Buyer, (iii) resolve any disputes arising under or related to the Asset Purchase Agreement and Designation of Rights Agreement, except as otherwise provided therein, and (iv) interpret, implement and enforce the provisions of this Order.

20.    The Asset Purchase Agreement and Designation of Rights Agreement and any related agreements, documents, or other instruments may be waived, modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such waiver, modification, amendment, or supplement (a) does not adversely affect either of the Debtors or their estates, or (b) is agreed to in writing by the Debtors and the Committee.

21.    Nothing contained in any plan of reorganization (or liquidation) confirmed in any of the Debtors' cases or the Order of Confirmation confirming any plan of reorganization (or liquidation), or any Order dismissing any of the Debtors' cases or converting any of the Debtors' cases to a Chapter 7 liquidation, shall conflict with or derogate from the provisions of the Asset Purchase Agreement, the Designation of Rights Agreement or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any Order which may be entered confirming any plan of reorganization (or liquidation) for the Debtors or converting any of the Debtors' cases from Chapter 11 to a case under Chapter 7 of the Bankruptcy Code.

22.  In the event that there are any inconsistencies between the terms of this Order, the Asset Purchase Agreement, and the Designation Rights Agreement, the provisions of this Order shall control.

23.  No later than the Closing, the Buyer makes a cash deposit with WDS, for the benefit of WDS in the amount of $250,000 to secure the Buyer's payment obligations under the terms of the WDS Agreement with such deposit to bear interest at the rate of five percent per annum.  Such deposit shall be promptly paid to Buyer with accrued interest upon the expiration of the Designation of Rights Agreement, should no amounts remain owing to WDS by Buyer under the WDS Agreement.

24.  During the Designation Period under the Designation of Rights Agreement, the Buyer (i) shall have the sole, exclusive, and continuing right to receive all services under the WDS Agreement and to determine whether the Debtors shall assume and assign the WDS Agreement to the Buyer or its designee(s) or reject such agreement, and (ii) shall perform all obligations of the Debtors under the terms of the WDS Agreement, inlcuding all payment obligations required thereunder, and WDS shall perform all obligations it has under the terms of the WDS Agreement.

25.  The Designation Period shall consist of a period of thirty (30) days beginning on the Closing Date.  Prior to the conclusion of the Designation Period, the Buyer shall deliver to WDS and the Debtors a written notice specifying whether the Buyer has designated that the Debtors either (i) assume the WDS Agreement and assign such agreement to the Buyer or its designee(s), or (ii) reject the WDS Agreement.

26.  In the event that the Buyer has designated the WDS Agreement for assumption and assignment, (i) the Buyer and the Debtors promptly shall cause a Designation Motion to be

16

filed seeking such assumption and assignment and shall continue to perform all obligations of the Debtors under the terms of the WDS Agreement until the entry of on order by the Bankruptcy Court approving such Designation Motion (the "Approval Order"), and (ii) WDS shall perform its obligations under the terms of the WDS Agreement. Upon entry of the Approval Order, the Buyer immediately shall (1) pay any cure amounts agreed to by WDS or determined by the Bankruptcy Court, and (2) provide a deposit as specified in paragraph 23 above. If the Buyer has elected to require that the WDS Agreement be assigned to a designee, then WDS reserves the right to seek a letter of credit or deposit in a greater amount or such additional adequate assurance as the Bankruptcy Court may order.

27.   In the event that the Buyer has designated the WDS Agreement for rejection, or the Buyer has failed to provide written notice as specified above, then the Buyer shall continue to perform all of the Debtors' obligations under the WDS Agreement for an additional period of sixty (60) days (including all payment obligations that relate to the performance by WDS during such period); at the conclusion of such period, the WDS Agreement shall be deemed rejected. Upon such rejection, WDS shall have all of its rights to file a rejection damages claim pursuant to the provisions of the Bankruptcy Code, and no provision of either the Asset Purchase Agreement or the Designation of Rights Agreement shall limit such rejection damages claim.

28.   In connection with the performance of its duties under the WDS Agreement, WDS from time to time purchased fuel from the Debtors; as of the Petition Date, WDS owed certain amounts to the Debtors for such fuel purchases (the "WDS/Sylvest Receivable"), and the Debtors owed certain amounts to WDS for its performance under the terms of the WDS Agreement (the "WDS/Sylvest Payable"). Simultaneously with the entry of this Order, the Bankruptcy Court has entered an order approving a stipulation between WDS and the Debtors

17

(the "WDS Agreement") approving and effectuating the recoupment or setoff of the WDS/Sylvest Receivable against the WDS/Sylvest Payable. The Sale Motion and the WDS Response and Limited Objection to the Sale Motion (Docket No. 257) were sufficient, pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, to afford reasonable notice of the material provisions of the WDS Agreement and an opportunity for a hearing, and therefore the procedures in Rule 4001(d)(1)-(3) shall not apply to the WDS Agreement.

29. Notwithstanding anything which is, or which could be construed to be, to the contrary in this Order, the Asset Purchase Agreement, the Designation of Rights Agreement, or otherwise, (i) the sale to the Buyer is not free and clear of the claims, rights of setoff or recoupment, defense, counterclaim, cross-claim or interest of WDS of any kind or nature, arising after the Petition Date, if any, and whether arising under any contract, tort, law, equity or otherwise (collectively, the "Rights"), but it is explicitly subject to any and all such Rights, if any, and (ii) such Rights are neither extinguished (or otherwise diminished) or enhanced by this Order and such Rights survive with the same validity, force, effect, and extent as existed prior to the sale contemplated by the Asset Purchase Agreement.

30. Upon receiving notice as provided in section 12.15(a) of the Asset Purchase Agreement of the Buyer's intent to destroy business records or documents purchased from Debtors, the Debtors' (or their successors) shall file such notice with the court within fifteen (15) days of receipt of such notice. Further, any party who objects to the destruction of any such business records or documents, shall provide written notice to Debtors (or their successors) and Buyer within the 90 day period set forth in section 12.15(a) of the Amended Asset Purchase Agreement, indicating the objecting party's desire to take possession and ownership of any documents or records to be destroyed, and, absent objection, at the end of the 90 day period, the

party shall take possession and ownership in accordance with section 12.15(a). If there is any dispute as to who can take possession and ownership of such documents or records, the dispute shall be submitted to the Court.

31.    The Closing of the Sale shall occur on Wednesday, May 31, 2006 in Alabama. The Accounting Date for purposes of Section 2.4 of the Asset Purchase Agreement shall be Sunday, May 28, 2006. The Buyer shall be responsible for funding all operating costs of the Debtors (including insurance) from the day after Accounting Date until the Closing, and all gains or losses resulting from the day after Accounting Date until the Closing shall inure to the benefit or detriment, as applicable, of Buyer. Notwithstanding the foregoing, the Debtor shall have title to the Purchased Asset and shall remain in possession and control of the Purchased Assets until the Closing.

32.    As provided by Bankruptcy Rule 6004(g), this Order shall be effective and enforceable immediately upon entry. The Objection of National Warehouse, Inc. is overruled to the extent it is an objection to the sale. All other objections to the sale have been withdrawn.

Dated: May 26, 2006

/s/ Thomas B. Bennett
United States Bankruptcy Judge

19

# EXHIBIT 2

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

RECEIVED

| | |
|---|---|
| KOCH FOODS OF ALABAMA LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GENERAL ELECTRIC CAPITAL | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

2007 JUN 13 P 2:53

2.07cv522-MHT

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DIST. ALA.

CIVIL ACTION NUMBER: CV-07-857

## NOTICE OF FILING OF NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1446(d), Defendant General Electric Capital Corporation ("Defendant") hereby gives notice to the Circuit Court of Montgomery County, Alabama, and to Thomas G. Mancuso, Eugene J. Geekie, Jr., and Mike Xu, as attorneys for Plaintiff, that Defendant filed a Notice of Removal with the United States District Court for the Middle District of Alabama, Northern Division, and that this case has been removed to that Court. Attached is a copy of this Notice of Removal stamped with the federal court civil action number.

This the 13th day of June, 2007.

Respectfully submitted,

Rusha C. Smith
Rusha C. Smith
Attorney for Defendant General Electric Capital Corporation

OF COUNSEL
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL  35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing pleading has been served upon counsel of record addressed as follows:

     Thomas G. Mancuso, Esq.
     Mancuso & Franco, P.C.
     7515 Halcyon Summit Drive
     Suite 301
     Montgomery, AL  36117

     Eugene J. Geekie, Jr., Esq.
     Mike Xu, Esq.
     Schiff Hardin LLP
     6600 Sears Tower
     Chicago, IL  60606

by placing same in the United States mail, postage prepaid, on this the 13th day of June, 2007.

Rusha C. Smith
OF COUNSEL

2

1/1588031.1