**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| KOCH FOODS OF ALABMA, LLC, ) | |
| an Alabama Limited Liability company ) | Case No. 07-cv-522-MHT |
| ) | |
| Plaintiff and Counterclaim-defendant, ) | |
| ) | Honorable Myron H. Thompson |
| v. ) | Honorable Terry F. Moorer |
| ) | |
| GENERAL ELECTRIC CAPITAL ) | |
| CORPORATION, ) | |
| a Delaware corporation, ) | |
| ) | |
| Defendant and Counterclaim-plaintiff. ) | |

**MOTION FOR PROTECTIVE ORDER, AND FOR SANCTIONS AGAINST
COUNSEL FOR GENERAL ELECTRIC CAPITAL CORPORATION**

Plaintiff, Koch Foods of Alabama, LLC ("Koch Foods"), respectfully requests this Court enter a protective order compelling Defendant, General Electric Capital Corporation ("GE Capital"), to return all copies of an inadvertently produced attorney-client privileged document and prohibiting Defendant from using or disclosing the information on the document, and imposing sanctions against Defendant's counsel, Timothy S. Harris, for deliberate violations of ethical rules regarding the inadvertently produced document.

1.      On September 7, Koch Foods delivered approximately 3758 pages of documents in response to GE Capital's first set of Document Requests.  These pages were Bates-stamped from "KOCH 00000001" to "KOCH 00003758."

2.      On September 10, Koch Foods' counsel produced to GE Capital's counsel Koch Foods' privilege log detailing all the communications that were withheld in the document production as privileged.  Koch Foods' privilege log is attached hereto as **Exhibit A**.

3.      On October 19, 2007, Defendant's counsel, Mr. Harris, took the deposition of Mark Kaminskly, which was also attended by Eugene Geekie, Jr., counsel for Koch Foods.

During the deposition, Mr. Harris presented KOCH 939 as a deposition exhibit to Mr. Kaminsky and attempted to ask questions concerning the contents of the two e-mails on KOCH 939. (Attached as **Exhibit B** is a redacted version of KOCH 939 and Koch Foods will provide a complete copy of KOCH 939 for the Court's examination in camera)

4.     Mr. Geekie, recognizing that KOCH 939 contained attorney-client privileged e-mails, immediately claimed that KOCH 939 was privileged and requested that GE Capital immediately return all copies of KOCH 939. Mr. Harris refused to return KOCH 939 and continued to attempt to question Mr. Kaminsky about the document. Mr. Geekie repeatedly demand that Mr. Harris cease his questioning. When the Kaminsky deposition concluded, Mr. Harris had still not agreed to return KOCH 939.

5.     Immediately after the Kaminsky deposition, Koch Foods' counsel investigated the contents of KOCH 939 and how and why it was produced. The investigation revealed that, among the 3758-page documents produced, pages KOCH 921 through KOCH 956, except KOCH 939, are pages of a copy of the equipment lease between GE Capital and Sylvest Farms, Inc. Pages KOCH 921 through KOCH 956 are attached hereto as **Exhibit C** with certain contents of KOCH 939 redacted.

6.     KOCH 939 is a single page document that has nothing to do with the equipment lease. On its face, KOCH 939 is one of the three-page printout of an e-mail chain as indicated by "Page 2 of 3" on the right-hand top of the page. This page, for some unknown reason, was apparently inadvertently inserted in the middle of the lease, 19 pages from the beginning of the lease and 18 pages from the end of the lease.

7.     On its face, KOCH 939 shows two short e-mails between Mr. Geekie and Mr. Kaminsky. Defendant's counsel had known since the beginning of this case – actually nearly a

year before this case was filed – that Mr. Geekie is the counsel for Koch Foods and Mr. Kaminsky is the CFO of Koch Foods.

8.      Koch Foods has specifically identified these two e-mails with their dates, times, authors, recipients, and subjects on its privilege log and claimed them as privileged attorney-client communications.  *See* items 19 and 20 on Koch Foods' privilege log, Exhibit A hereto.

9.      On October 22, 2007, Mr. Geekie sent Mr. Harris a letter demanding the return of KOCH 939.  Mr. Harris still refuses to return KOCH 939.

10.     Communications are attorney-client privileged if they are confidential and made for the purpose of facilitating the rendition of professional legal services to the client between the client or a representative of the client and the client's attorney or a representative of the attorney. Ala. R. Evid. Rule 502(b); *Rounds v. Jackson Park Hosp. and Medical Center*, 319 Ill.App.3d 280, 286, 745 N.E.2d 561, 566 (Ill.App. 1 Dist.,2001).

11.     The two e-mails on KOCH 939 were communications between Koch Foods' counsel and Koch Foods' CFO for the purpose of facilitating the rendition of legal services, specifically about the equipment and issues in this lawsuit.  They clearly and unequivocally fall within the definition of privileged attorney-client communications.

12.     The Eleventh Circuit has not decided the issue of whether inadvertent disclosure waives the attorney-client privilege.  The majority of courts, however, have adopted an approach which takes into account the facts surrounding a particular disclosure, including the Fifth Circuit. *See Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993) (citations omitted).

13.     These courts apply a multi-factor test to the facts surrounding the disclosure, including (1) the reasonableness of precaution taken to prevent disclosure; (2) the amount of time

taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Id*. at 1433.

14.     The application of all these factors mandates a finding that the disclosure of KOCH 939 did not waive the attorney-client privilege.  KOCH 939 is a single page containing two short e-mails in a 3758-page document production.  Koch Foods' counsel have went through the documents several times and did not discover the single page printout buried in the lease. Koch Foods produced all non-privileged e-mails together in two bundles and they are separated and apart from the lease.  Koch Foods' counsel did not intend to produce KOCH 939 and would have removed the e-mail from production had he saw it.  *See* Affidavit of Zhiyuan Xu, which is attached hereto as **Exhibit D**.  In addition, Koch Foods' counsel immediately demanded return after learning of the disclosure.  In short, these circumstances dictate that the inadvertent disclosure did not waive the privilege.

15.     Because the disclosure did not waive the privilege inherent in the two e-mails on KOCH 939, pursuant to Rule 26(b)(5)(B) of Federal Rules of Civil Procedure, GE Capital must promptly return or destroy KOCH 939 and all copies it has, and must not use or disclose the information on KOCH 939.

16.     Moreover, Mr. Harris's conduct calls for sanctions.  RULE 4.4 of ABA Model Rules of Professional Conduct (2002 ed.) provides:

> (a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.
> (b) A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender.

17.     Rule 4.4(b) requires that a lawyer promptly notify the sender of the inadvertently sent document.  In fact, "[a] lawyer who receives materials that on their face appears to be

subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them." ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 92-368 (1992).  The Opinions are attached here as **Exhibit E**.

18.     In addition, Rule 4.4(a) prohibits a lawyer from using means that have no substantial purpose other than to embarrass and burden a third person, which is exactly what Mr. Harris did here.

19.     Courts have sanctioned against or admonished lawyers who deliberately use inadvertently disclosed material for their advantage.  *See American Express v. Accu-Wether, Inc*., 1996 WL 346388 (S.D. N.Y. 1996) (imposing sanctions against the lawyers who, despite the sender's prior warning, opened and examined the privileged materials inadvertently sent); *Allen v. Int'l Truck and Engine*, 2006 WL 2578896 (S.D. Ind. 2006) (the magistrate judge admonished the lawyer who deliberately used inadvertently disclosed billing records for his advantage).

20.     In our case, it should be obvious to Mr. Harris that KOCH 939 was a privileged document that was inadvertently produced given the circumstances described above.  It should also be obvious to Mr. Harris that the two e-mails in KOCH 939 are privileged attorney-client communications because Mr. Harris had known of the attorney-client relationship between Mr. Geekie and Mr. Kaminsky in this lawsuit.

21.     Not only did Mr. Harris not notify Mr. Geekie of the inadvertently produced document as the ethical rules require him to do, but also he used the document in Mr. Kaminsky's deposition for no other purpose than to surprise and ambush Mr. Kaminsky and embarrass Mr. Geekie.

22.     This Court should not tolerate such deliberate violations of ethical rules governing professional conduct of lawyers; if it does, such conduct by Mr. Harris will continue unabated. This Court should, therefore, impose sanctions against Mr. Harris to prevent any further violations of ethical rules while this case is pending.  Such sanctions could be an admonishment or a nominal fine – or a fine of Koch Foods' costs in bringing this motion – so that Mr. Harris understands that his ambush litigation tactics are improper and will not be tolerated.

WHEREFORE, Koch Foods respectfully requests that this Court enter an order (1) compelling GE Capital to return KOCH 939 and all copies it has; (2) prohibiting GE Capital from using or disclosing any of the information on KOCH 939; (3) imposing sanctions against Mr. Harris for violations of ethical rules; and (4) granting any other relief that is just and proper.

**Dated:  October 24, 2007**                    **KOCH FOODS OF ALABAMA, LLC**

                                        By: **/s/   Zhiyuan Xu                        **
                                             **One of Its Attorneys**

Eugene J. Geekie, Jr. (ARDC # 6195060)
Zhiyuan "Mike" Xu (ARDC # 6292094)
**SCHIFF HARDIN LLP**
6600 Sears Tower
Chicago, Illinois  60606-6473
(312) 258-5500 (phone)
(312) 258-5700 (fax)

-and-

Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive, Suite 301
Montgomery, Alabama 36117
(334)481-1800

**Counsel for Koch Foods of Alabama, LLC**

### CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on October 24, 2007, copies of *Motion for Protective Order, and Sanction against Counsel for General Electric Capital Corporation* were caused to be served via e-mail and U.S. mail, to the following:

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
Email: tharris@reedsmith.com

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com


/s/    Zhiyuan Xu
        Zhiyuan Xu

CH2\ 2141443.3

# Exhibit A

Koch Foods v. GE Capital
Summary of Privileged Documents

| # | type | date | author | recipient | cc | subject | basis | attachment |
|---|---|---|---|---|---|---|---|---|
| 1 | e-mail | 1/3/2007 7:55am | Eugene J. Geekie | Mark Kaminsky | Thomas Wecheter, Robert Adams, Jayna Lamar | Sylvest | Attorney-client | no |
| 2 | e-mail | 1/3/2007 8:51am | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 3 | e-mail | 1/8/2007 8:33am | Eugene J. Geekie | Mark Kaminsky | Thomas Wecheter | Sylvest | Attorney-client | no |
| 4 | e-mail | 1/8/2007 8:29am | Mark Kaminsky | Eugene J. Geekie | | Sylvest | Attorney-client | no |
| 5 | e-mail | 1/8/2007 8:38am | Eugene J. Geekie | Mark Kaminsky | Thomas Wecheter | Sylvest | Attorney-client | no |
| 6 | e-mail | 2/13/2007 1:51pm | Eugene J. Geekie | Mark Kaminsky | Thomas Wecheter | Sylvest/GE | Attorney-client | no |
| 7 | e-mail | 2/13/2007 3:51pm | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 8 | e-mail | 2/14/2007 7:13am | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 9 | e-mail | 2/14/2007 8:50am | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 10 | e-mail | 2/14/2007 10:09am | Eugene J. Geekie | Mark Kaminsky | | Sylvest/GE | Attorney-client | no |
| 11 | e-mail | 2/14/2007 1:54pm | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 12 | e-mail | 2/15/2007 3:54pm | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 13 | e-mail | 2/23/2007 2:47pm | Mark Kaminsky | Mark Kaminsky | | ge | Attorney-client | no |
| 14 | e-mail | 2/23/2007 3:01pm | Eugene J. Geekie | Eugene J. Geekie | | ge | Attorney-client | no |
| 15 | e-mail | 2/26/2007 8:38am | Mark Kaminsky | Eugene J. Geekie | | ge | Attorney-client | no |
| 16 | e-mail | 3/20/2007 9:54am | Mark Kaminsky | Eugene J. Geekie | | Debone lines in montgomery | Attorney-client | no |
| 17 | e-mail | 3/20/2007 10:06am | Eugene J. Geekie | Mark Kaminsky | | Debone lines in montgomery | Attorney-client | no |
| 18 | e-mail | 3/20/2007 10:05am | Eugene J. Geekie | Eugene J. Geekie | | Debone lines in montgomery | Attorney-client | no |
| 19 | e-mail | 4/17/2007 1:19pm | Eugene J. Geekie | Mark Kaminsky | | Sylvest/GE | Attorney-client | no |
| 20 | e-mail | 4/17/2007 5:11pm | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 21 | e-mail | 4/18/2007 6:59am | Eugene J. Geekie | Mark Kaminsky | | Sylvest/GE | Attorney-client | no |
| 22 | e-mail | 4/18/2007 8:07am | Thomas Wechter | Eugene J. Geekie | Thomas Wechter | Sylvest/GE | Attorney-client | no |
| 23 | e-mail | 4/18/2007 6:21pm | Mark Kaminsky | Thomas Whechter, Eugene J. Geekie | Mark Kaminsky | Sylvest/GE | Attorney-client | no |
| 24 | 4/18/2007 6:24pm | | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 25 | e-mail | 4/19/2007 8:56am | Eugene J. Geekie | Mark Kaminsky | | Sylvest/GE | Attorney-client | no |

| No. | Type | Date/Time | From | To | CC | Subject | Privilege | Attachment |
|---|---|---|---|---|---|---|---|---|
| 26 | e-mail | 4/20/2007 9:37am | Mark Kaminsky | Eugene J. Geekie | Lyman Campbell | Sylvest/GE | Attorney-client | no |
| 27 | e-mail | 4/19/2007 7:32am | Eugene J. Geekie | Mark Kaminsky | Thomas Wechter | Sylvest/GE | Attorney-client | no |
| 28 | e-mail | 4/20/2007 9:38am | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GE | Attorney-client | no |
| 29 | e-mail | 4/20/2007 9:46am | Eugene J. Geekie | Mark Kaminsky | Lyman Campbell | Sylvest/GE | Attorney-client | no |
| 30 | e-mail | 4/20/2007 9:51am | Lyman Campbell | Eugene J. Geekie, Mark Kaminsky | Mike Z. Xu | Sylvest/GE | Attorney-client | yes |
| 31 | e-mail | 4/20/2007 9:51am | Soula Bradley | Eugene J. Geekie, Mark Kaminsky | Mark Kaminsky | Document.pdf | Attorney-client | yes |
| 32 | e-mail | 4/30/2007 7:25pm | Mark Kaminsky | Eugene J. Geekie | | ge | Attorney-client | no |
| 33 | e-mail | 4/28/2006 3:59pm | Eugene J. Geekie | Mark Kaminsky | | RE | Attorney-client | no |
| 34 | e-mail | 5/1/2006 8:42am | Mark Kaminsky | Eugene J. Geekie | | RE | Attorney-client | no |
| 35 | e-mail | 5/1/2006 9:05am | Eugene J. Geekie | Mark Kaminsky | | RE | Attorney-client | no |
| 36 | e-mail | 5/22/2007 8:09am | Eugene J. Geekie | Mark Kaminsky | Mike Z. Xu | Flat Product Freezer project/other equipment with MEL Services | Attorney-client | no |
| 37 | e-mail | 5/22/2007 8:44am | Mark Kaminsky | Eugene J. Geekie | | Flat Product Freezer project/other equipment with MEL Services | Attorney-client | no |
| 38 | e-mail | 5/22/2007 8:53am | Eugene J. Geekie | Mark Kaminsky | | Flat Product Freezer project/other equipment with MEL Services | Attorney-client | no |
| 39 | e-mail | 5/22/2007 4:13pm | Mark Kaminsky | Eugene Geekie | | Flat Product Freezer project/other equipment with MEL Services | Attorney-client | no |
| 40 | e-mail | 5/22/2007 4:24pm | Eugene J. Geekie | Mark Kaminsky | | Flat Product Freezer project/other equipment with MEL Services | Attorney-client | no |
| 41 | e-mail | 5/24/2007 8:26am | Eugene J. Geekie | Mark Kaminsky | Mike Z. Xu | Sylvest/GECC | Attorney-client | no |
| 42 | e-mail | 5/24/2007 10:32am | Mark Kaminsky | Eugene J. Geekie | | Sylvest/GECC | Attorney-client | no |
| 43 | e-mail | 5/24/2007 2:57pm | Eugene J. Geekie | Mark Kaminsky | Mike Z. Xu | FW: Koch | Attorney-client | Yes |
| 44 | e-mail | 5/24/2007 3:34pm | Mark Kaminsky | Eugene J. Geekie | | RE: Koch | Attorney-client | no |
| 45 | e-mail | 5/30/2007 1:31pm | Mark Kaminsky | Tomas Wechter | Gene Abner | Attached is a notice of complaint | Attorney-client | no |
| 46 | e-mail | 5/30/2007 1:42pm | Thomas Wechter | Mark Kaminsky | | Attached is a notice of complaint | Attorney-client | no |
| 47 | e-mail | 5/30/2007 2:52pm | Mark Kaminsky | Thomas Whecher | | Attached is a notice of complaint | Attorney-client | no |

| No. / Type | Date | From | To | CC | Subject | Privilege | Produced? |
|---|---|---|---|---|---|---|---|
| 48 e-mail | 6/14/2007 4:14pm | Eugene J. Geekie | Mark Kaminsky | | FW: General Electric Capital Corporation v. Koch Foods Incorporated et al. | Attorney-client | Yes |
| 49 e-mail | 6/14/2007 4:25pm | Mark Kaminsky | | Thomas Wechter,Tommy Mancuso, Eugene Geekie, Mike Z. Xu | FW: General Electric Capital Corporation v. Koch Foods Incorporated et al. 2007L005482 | Attorney-client | no |
| 50 e-mail | 6/14/2007 4:36am | Eugene J. Geekie | Mark Kaminsky | | FW: General Electric Capital Corporation v. Koch Foods Incorporated et al. 2007L005482 | Attorney-client | no |
| 51 e-mail | 6/14/2007 5:48pm | Mark Kaminsky | Eugene J. Geekie | | FW: General Electric Capital Corporation v. Koch Foods Incorporated et al. 2007L005482 | Attorney-client | no |
| 52 e-mail | 6/15/2007 2:54pm | Tommy Mancuso | Eugene J. Geekie,Mark Kaminsky | Thomas Wechter, Mike Z. Xu | FW: General Electric Capital Corporation v. Koch Foods Incorporated et al. 2007L005482 | Attorney-client | no |
| 53 e-mail | 7/9/2007 1:21pm | Eugene J. Geekie | Mark Kaminsky | Mike Z. Xu, Joe Grendys | GECC | Attorney-client | no |
| 54 portion of an e-mail chain | 7/9/2007 (11:39pm 11:33am 10:54am 4:23am) 7/03/2007 (5:07pm 8:02am 8:01am 7:18am) | Eugene J. Geekie, Mark Kaminsky, Mike Z. Xu | Eugene J. Geekie, Mark Kaminsky, Mike Z. Xu | | Koch/GECC | Attorney-client/Attorney workproduct | no |
| 55 e-mail | 7/9/2007 1:41pm | Mark Kaminsky | Eugene J. Geekie | | GECC | Attorney-client | no |
| 56 e-mail | 7/30/2007 2:31pm | Eugene J. Geekie | Mark Kaminsky | Mike Z. Xu, Eugene J. Geekie | GECC Lawsuit/Record retention | Attorney-client | yes |
| 57 e-mail | 8/6/2007 4:15pm | Mike Z. Xu | Mark Kaminsky | Eugene J. Geekie | Koch Foods v. GECC/Responses to Discovery and Disclosure | Attorney-client | yes |
| 58 memo | 5/3/2006 | Ralph A. Morris | Eugene J. Geekie | | Summary of the Worker Adjustment and Retraining Notification Act | Attorney workproduct | no |

# Exhibit B

Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

---

**From:** Mark Kaminsky [mailto:markam@kochfoods.com]
**Sent:** Tuesday, April 17, 2007 5:11 PM
**To:** Geekie Jr., Eugene J.
**Subject:** RE: Sylvest/GE

*REDACTED*

---

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Tuesday, April 17, 2007 1:19 PM
**To:** Mark Kaminsky
**Subject:** Sylvest/GE

*REDACTED*

Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

---

Tax Matters: To the extent this message or any attachment concerns

tax matters, it is not intended or written to be used, and cannot

be used by a taxpayer, for the purpose of avoiding penalties

that may be imposed on the taxpayer under law.

---

This message and any attachments may contain confidential

information protected by the attorney-client or other privilege.

If you believe that it has been sent to you in error,

please reply to the sender that you received the message in

4/20/2007

KOCH 00000939

Exhibit C

*GE Lease*
*12/28/05*

2/98(R090605)(11.)050984202

## *LEAS1998*

# MASTER LEASE AGREEMENT

dated as of _____ ("Agreement")

**THIS AGREEMENT** is between General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") and Sylvest Farms, Inc. ("Lessee"). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule ("Schedule").

## 1. LEASING:

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("Equipment") described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier ("Supplier") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

## 2. TERM, RENT AND PAYMENT:

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("Lease Commencement Date"). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and any renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($.05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

## 3. RENT ADJUSTMENT:

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("Code")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("Effective Rate") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

## 4. TAXES:

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes"). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

## 5. REPORTS:

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.

KOCH 00000921

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6. DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7. MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

## 8. STIPULATED LOSS VALUE: If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ("Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9. INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

KOCH 00000922

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessee, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above.

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

KOCH 00000923

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("Claims"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("**Tax Benefits**") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "**Loss**"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("**Net Economic Return**"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by, Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "**Documents**"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

KOCH 00000924

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any other outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or appropriate for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now or hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement or any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**General Electric Capital Corporation**

By:_____

Name:_____

Title:_____

LESSEE:
Sylvest Farms, Inc.

By: _Lyman L. Campbell_

Name: _Lyman L. Campbell_

Title: _Executive Vice President_

KOCH 00000926

2001 (6/87) 050984202

**\*MULT2001\***

## CORPORATE LESSEE'S
## BOARD OF DIRECTORS RESOLUTION

The undersigned hereby certifies: (i) that she/he is the Secretary of Sylvest Farms, Inc.; (ii) that the following is a true and correct copy of resolutions duly adopted at a meeting of the Board of Directors of said Corporation duly held on the ____14th____ day of ____December  2005____ and (iii) that said resolutions have not been amended, rescinded, modified or revoked, and are in full force and effect.

**"RESOLVED,** that each of the officers of this Corporation, whose name and signature appears below:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|
| Dean E. Falk | President & CEO | Dean E. Falk |
| Lyman L. Campbell | Executive Vice Pres. | Lyman L Campbell |

or the duly elected or appointed successor in office of any or all of them, be, and hereby is, authorized and empowered in the name and on behalf of this Corporation to enter into, execute and deliver a master lease agreement with General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") as Lessor, providing for the leasing to (or sale and leaseback by) this Corporation, from time to time, of certain equipment, and further providing for this Corporation to indemnify said Lessor against certain occurrences and against the loss of contemplated tax treatment; and

**FURTHER RESOLVED,** that each officer of this Corporation be, and hereby is, authorized and empowered in the name and on behalf of this Corporation to enter into, execute and deliver any documents and to do and perform all other acts and deeds which may be necessary or appropriate to effectuate the lease (or sale and leaseback) of equipment from Lessor; and

**FURTHER RESOLVED,** that the Lessor may rely upon the aforesaid resolutions until receipt by it of written notice of any change.

**IN WITNESS WHEREOF,** I have set my hand and affixed the seal of said Corporation this ____28th____ day of ____December 2005____

(CORPORATE SEAL)

Secretary

KOCH 00000927

CS(R083004) 4171238001

**\*LEAS8760\***

### FOOD PROCESSING EQUIPMENT SCHEDULE
### SCHEDULE NO. 001
### DATED THIS _____
### TO MASTER LEASE AGREEMENT
### DATED AS OF _____

<u>Lessor & Mailing Address:</u>

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

<u>Lessee & Mailing Address:</u>

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("Agreement" said Agreement and this Schedule being collectively referred to as "Lease"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.** **Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "Equipment").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006    De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500    Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR   · Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.** **Financial Terms**

| | | | |
|---|---|---|---|
| 1. | Advance Rent (if any): Not Applicable | 5. | Basic Term Commencement Date: |
| 2. | Capitalized Lessor's Cost: $ 2,018,453.00 | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months): 60 Months. | 7. | Last Delivery Date: |
| 4. | Basic Term Lease Rate Factor: .01757928 | 8. | Daily Lease Rate Factor: .000468780 |

9.   First Termination Date: Thirty-six (36) months after the Basic Term Commencement Date.

10.   Interim Rent: For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on _____

11.   Basic Term Rent. Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.** **Tax Benefits**        Depreciation Deductions:

1.   Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.
2.   Recovery Period: 7 years.
3.   Basis: 100 % of the Capitalized Lessor's Cost.

**D.** **Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor. Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

E.  **Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS D&F Equipment Sales, Inc. & Ossid Corporation & MTL Installation Services (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

F.  **Stipulated Loss and Termination Value Table\***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

\*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

G.  **Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

I  **EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS: In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.

KOCH 00000929

(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION: The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS: In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS/ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: _____

Title: _____

LESSEE:

Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

KOCH 00000931

(R050205)  4171238001                                              **\*MULT2103\***

## PURCHASE ORDER ASSIGNMENT AND CONSENT

**THIS ASSIGNMENT AGREEMENT,** dated as of _____ ("Agreement"), between General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") and Sylvest Farms, Inc. ("Lessee").

### WITNESSETH:

Lessee desires to lease from Lessor certain equipment ("**Equipment**"), pursuant to a certain Master Lease Agreement entered into, or which may hereafter be entered into, by and between Lessee and Lessor, a Schedule to such Master Lease Agreement, entered into, or which may hereafter be entered into, by and between Lessee and Lessor, and all other documents as Lessor requires relating thereto, including but not limited to a Certificate of Acceptance, all in form and substance acceptable to Lessor, in its sole discretion (such Schedule, together with the Master Lease Agreement insofar as it relates to such Schedule, and all such other documents and certificates, being hereinafter referred to collectively as the "**Lease**").  All terms used herein which are not otherwise defined shall have the meaning ascribed to them in the Lease.

Lessee desires to assign, and Lessor is willing to acquire, certain of Lessee's rights and interests under the purchase order(s), agreement(s) and/or document(s) (copies of which are attached hereto as Exhibit A and hereinafter referred to as the "**Purchase Orders**") Lessee has heretofore issued to **MTL Installation Services**, the Supplier of such Equipment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, Lessor and Lessee hereby agree as follows:

## SECTION 1.  ASSIGNMENT.

(a)     Lessee does hereby assign and set over to Lessor all of Lessee's rights and interests in and to such Equipment and the Purchase Orders as the same relate thereto including, without limitation, (i) the rights to purchase, to take title, and to be named the purchaser in the bill of sale for, such Equipment, (ii) all claims for damages in respect of such Equipment arising as a result of any default by the Supplier (including, without limitation, all warranty and indemnity claims) and (iii) any and all rights of Lessee to compel performance by the Supplier.

(b)     If, and so long as, no default exists under the Lease, Lessee shall be, and is hereby, authorized during the term of the Lease to assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

## SECTION 2.  CONTINUING LIABILITY OF LESSEE.

It is expressly agreed that, anything herein contained to the contrary notwithstanding:  (a) Lessee shall at all times remain liable to the Supplier to perform all of the duties and obligations of the purchaser under the Purchase Orders to the same extent as if this Agreement had not been executed, (b) the execution of this Agreement shall not modify any contractual rights of the Supplier under the Purchase Orders and the liabilities of the Supplier under the Purchase Orders shall be to the same extent and continue as if this Agreement had not been executed, (c) the exercise by the Lessor of any of the rights hereunder shall not release Lessee from any of its duties or obligations to the Supplier under the Purchase Orders, and (d) Lessor shall not have any obligation or liability under the Purchase Orders by reason of, or arising out of, this Agreement or be obligated (i) enter into the Lease or any Schedule, (ii) perform any of the obligations or duties of Lessee under the Purchase Orders, (iii) make any payment (other than under the terms and conditions set forth in a Lease), (iv) to make any inquiry of the sufficiency of or authorization for any payment received by any Supplier, or (v) present or file any claim or to take any other action to collect or enforce any claim for any payment assigned hereunder.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LESSOR:                                          LESSEE:

General Electric Capital Corporation             Sylvest Farms, Inc.

By:_____                     By: _Norman L Campbell_

Name:_____                     Name: _LYMAN L. CAMPBELL_

Title:_____                    Title: _Executive Vice President_

KOCH 00000932

(R050205)  4171238001                                    **\*MULT2103\***

## PURCHASE ORDER ASSIGNMENT AND CONSENT

**THIS ASSIGNMENT AGREEMENT,** dated as of _____ ("Agreement"), between General Electric Capital Corporation (together with its successors and assigns, if any, **"Lessor"**) and Sylvest Farms, Inc. (**"Lessee"**).

### WITNESSETH:

Lessee desires to lease from Lessor certain equipment (**"Equipment"**), pursuant to a certain Master Lease Agreement entered into, or which may hereafter be entered into, by and between Lessee and Lessor, a Schedule to such Master Lease Agreement, entered into, or which may hereafter be entered into, by and between Lessee and Lessor, and all other documents as Lessor requires relating thereto, including but not limited to a Certificate of Acceptance, all in form and substance acceptable to Lessor, in its sole discretion (such Schedule, together with the Master Lease Agreement insofar as it relates to such Schedule, and all such other documents and certificates, being hereinafter referred to collectively as the **"Lease"**).   All terms used herein which are not otherwise defined shall have the meaning ascribed to them in the Lease.

Lessee desires to assign, and Lessor is willing to acquire, certain of Lessee's rights and interests under the purchase order(s), agreement(s) and/or document(s) (copies of which are attached hereto as Exhibit A and hereinafter referred to as the **"Purchase Orders"**) Lessee has heretofore issued to **Ossid Corporation**, the Supplier of such Equipment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, Lessor and Lessee hereby agree as follows:

## SECTION 1.  ASSIGNMENT.

(a)     Lessee does hereby assign and set over to Lessor all of Lessee's rights and interests in and to such Equipment and the Purchase Orders as the same relate thereto including, without limitation, (i) the rights to purchase, to take title, and to be named the purchaser in the bill of sale for, such Equipment, (ii) all claims for damages in respect of such Equipment arising as a result of any default by the Supplier (including, without limitation, all warranty and indemnity claims) and (iii) any and all rights of Lessee to compel performance by the Supplier.

(b)     If, and so long as, no default exists under the Lease, Lessee shall be, and is hereby, authorized during the term of the Lease to assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

## SECTION 2.  CONTINUING LIABILITY OF LESSEE.

It is expressly agreed that, anything herein contained to the contrary notwithstanding:  (a) Lessee shall at all times remain liable to the Supplier to perform all of the duties and obligations of the purchaser under the Purchase Orders to the same extent as if this Agreement had not been executed, (b) the execution of this Agreement shall not modify any contractual rights of the Supplier under the Purchase Orders and the liabilities of the Supplier under the Purchase Orders shall be to the same extent and continue as if this Agreement had not been executed, (c) the exercise by the Lessor of any of the rights hereunder shall not release Lessee from any of its duties or obligations to the Supplier under the Purchase Orders, and (d) Lessor shall not have any obligation or liability under the Purchase Orders by reason of, or arising out of, this Agreement or be obligated (i) enter into the Lease or any Schedule, (ii) perform any of the obligations or duties of Lessee under the Purchase Orders, (iii) make any payment (other than under the terms and conditions set forth in a Lease), (iv) to make any inquiry of the sufficiency of or authorization for any payment received by any Supplier, or (v) present or file any claim or to take any other action to collect or enforce any claim for any payment assigned hereunder.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LESSOR:                                                    LESSEE:

**General Electric Capital Corporation**                  Sylvest Farms, Inc.

By:_____                        By: _Lyman L. Campbell_

Name:_____                        Name _LYMAN L. CAMPBELL_

Title:_____                        Title: _Executive Vice President_

KOCH 00000933

(R050205)  4171238001                                        **\*MULT2103\***

## PURCHASE ORDER ASSIGNMENT AND CONSENT

**THIS ASSIGNMENT AGREEMENT,** dated as of _____ ("Agreement"), between **General Electric Capital Corporation** (together with its successors and assigns, if any, "Lessor") and Sylvest Farms, Inc. ("Lessee").

### WITNESSETH:

Lessee desires to lease from Lessor certain equipment ("Equipment"), pursuant to a certain Master Lease Agreement entered into, or which may hereafter be entered into, by and between Lessee and Lessor, a Schedule to such Master Lease Agreement, entered into, or which may hereafter be entered into, by and between Lessee and Lessor, and all other documents as Lessor requires relating thereto, including but not limited to a Certificate of Acceptance, all in form and substance acceptable to Lessor, in its sole discretion (such Schedule, together with the Master Lease Agreement insofar as it relates to such Schedule, and all such other documents and certificates, being hereinafter referred to collectively as the "Lease").  All terms used herein which are not otherwise defined shall have the meaning ascribed to them in the Lease.

Lessee desires to assign, and Lessor is willing to acquire, certain of Lessee's rights and interests under the purchase order(s), agreement(s) and/or document(s) (copies of which are attached hereto as Exhibit A and hereinafter referred to as the "Purchase Orders") Lessee has heretofore issued to **D&F Equipment Sales, Inc.,** the Supplier of such Equipment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, Lessor and Lessee hereby agree as follows:

## SECTION 1.  ASSIGNMENT.

(a)  Lessee does hereby assign and set over to Lessor all of Lessee's rights and interests in and to such Equipment and the Purchase Orders as the same relate thereto including, without limitation, (i) the rights to purchase, to take title, and to be named the purchaser in the bill of sale for, such Equipment, (ii) all claims for damages in respect of such Equipment arising as a result of any default by the Supplier (including, without limitation, all warranty and indemnity claims) and (iii) any and all rights of Lessee to compel performance by the Supplier.

(b)  If, and so long as, no default exists under the Lease, Lessee shall be, and is hereby, authorized during the term of the Lease to assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

## SECTION 2.  CONTINUING LIABILITY OF LESSEE.

It is expressly agreed that, anything herein contained to the contrary notwithstanding: (a) Lessee shall at all times remain liable to the Supplier to perform all of the duties and obligations of the purchaser under the Purchase Orders to the same extent as if this Agreement had not been executed, (b) the execution of this Agreement shall not modify any contractual rights of the Supplier under the Purchase Orders and the liabilities of the Supplier under the Purchase Orders shall be to the same extent and continue as if this Agreement had not been executed, (c) the exercise by the Lessor of any of the rights hereunder shall not release Lessee from any of its duties or obligations to the Supplier under the Purchase Orders, and (d) Lessor shall not have any obligation or liability under the Purchase Orders by reason of, or arising out of, this Agreement or be obligated (i) enter into the Lease or any Schedule, (ii) perform any of the obligations or duties of Lessee under the Purchase Orders, (iii) make any payment (other than under the terms and conditions set forth in a Lease), (iv) to make any inquiry of the sufficiency of or authorization for any payment received by any Supplier, or (v) present or file any claim or to take any other action to collect or enforce any claim for any payment assigned hereunder.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LESSOR:                                        LESSEE:

**General Electric Capital Corporation**         Sylvest Farms, Inc.

By:_____         By:_~Lyman L. Campbell~_____

Name:_____         Name:_LYMAN L. CAMPBELL_____

Title:_____         Title:_Executive Vice President_____

KOCH 00000934

4171238001                                           *MULT1015*

### IMPORTANT! YOUR INVOICE INFORMATION

**DIRECTIONS:** Please complete and return with your signed deal documents or FAX to 770 999-3925

| If you have completed this form in the past and would like to be invoiced the same way, please check the YES box. | ☐ **YES**, please invoice me the same way as my prior account.<br>☑ **NO**, please see below invoice requirements. |
|---|---|

Please make any necessary corrections to the following information:

Customer name          Sylvest Farms, Inc.

Customer e-mail address    _Bonnie - MB SylvestFarms.Com_

Contact name    _Bonnie Mann_                Title _A/P manager_

Contact phone # _334-281-0400 x 285_   Cell phone # _____   FAX # _334-284-2998_

**REQUIRED SECTION:**

**1.  Where would you like your invoice sent?**

Billing name (only if different than the Customer name shown above) _____

Billing address _____   City/State/Zip _____

Attention _____   Phone _____   Billing e-mail address _____

Is this the same person who will access Manage Accounts, our web-based account management tool?  ☑ Yes   ☐ No
If no, please indicate the person who will be the primary user for your company:

User's Name  _/_                             User's Phone _____

User's Email _____                  User's Title _____

**OPTIONAL SECTION:**

**2.  What information would you like on your invoice?**

| | **Asset Description** | **Asset Location** |
|---|---|---|
| ☐ Company Purchase Order Number<br>(if checked, list PO number: _____ ) | ☐ Description of first asset only | ☐ Location of first asset only |
| ☐ Company Reference Number<br>(if checked, list reference number: _____ ) | ☑ Description of all assets * | ☑ Location of all assets * |
| | ☐ Breakdown of payment and tax by asset | |

*If you choose to receive a description and/or location of all assets, please be aware that a large number of assets will produce a multiple/many page invoice.

**3.  INVOICING ROLL-UP**

**Would you like to receive one combined invoice by Customer Number?**  ☑ Yes   ☐ No
If you have one customer number with multiple accounts, this option will allow all of your accounts to be grouped on one invoice if the DUE DATE and BILLING ADDRESS are the same for each account. For example: 6566559-001, 7784913-001, 5655599-005

**Would you like to receive one combined invoice by Account Number?**  ☐ Yes   ☐ No
This option will allow all of your accounts with the same account number to be grouped on one invoice if the DUE DATE and BILLING ADDRESS are the same for each account. This is helpful when you can't combine by Customer Number due to differences in Due Dates or Billing Addresses which are the same for one account but different across your entire list of accounts.

**4.  To help us plan for possible future enhancements to invoices, what other information would you like to see on your invoice?**

Carey Brock
Deal Closer

                                      Account Schedule #  4171238001

KOCH 00000935

4171238001                                                    *MULT2600*

Date:  December 20, 2005

Name of Agent:  Trey Starke
Agency:  Starke Agency
Address:  P.o.Box 459, Montgomery Al 36103
Phone: 334-263-5535        Fax: 334-264-3375

Dear Trey Starke:

The below-referenced insured has entered into certain financial accommodations with General Electric Capital Corporation.

**THE FOLLOWING INFORMATION AND COVERAGES ARE REQUIRED:**

INSURED:              Sylvest Farms, Inc.
                      3500 Western Blvd.
                      Montgomery, AL 36105

INSURED PROPERTY:     (Complete description including serial #'s)

1  2005 Ossid model Ossid 500  Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer
1  2006 D & F Equipment Sales De-boner w/ double cone line, product conveyors, and loading bin  serial number 36019-01B
1  GYRoCOMPACT model GCM76-08-40-26 NS CCR  Spiral Freezer  serial number 00530143

LOCATION:

3500 Western Blvd., Montgomery, AL 36108

COVERAGE:

o     Physical Damage and/or Property Coverage "All Risk"        $2,168,585.53
       In any event for an amount not less than the actual replacement cost

o     Liability – Bodily Insurance                    $ 1,000,000.00 (minimum)

o     Liability – Property Damage                     $ 1,000,000.00 (minimum)

o     Deductibles for each respective coverage must be shown (i.e. Property and Liability Deductibles)

o     GENERAL ELECTRIC CAPITAL CORPORATION AND/OR ITS ASSIGNS MUST BE NAMED AS ADDITIONAL INSURED

o     GENERAL ELECTRIC CAPITAL CORPORATION AND/OR ITS ASSIGNS MUST BE NAMED AS LOSS PAYEE

o     30 days notice of cancellation or material alteration (with no restriction)

       IMPORTANT:  The Notice of Cancellation must be a FIRM 30-day commitment.  Should the cancellation clause include language referring to "endeavor to..." this language must be stricken from the certificate. Should the cancellation clause include language referring to " but failure to mail such notice shall impose no obligation or liability of any kind upon the company, it's agents, or representatives" this language must be stricken from the certificate.

o     The interests of GE Capital shall be enforced irrespective of any breach of warranty or other act or omission of the Insured.

o     The coverage shall not be subject to any co-insurance clause.

Upon issuance of the coverages outlined above, please fax a copy of the Certificate to my attention at 770 999-3925 and then please mail the original Certificate to:

                      General Electric Capital Corporation
                      Insurance Department 4171238001
                      Plaza at Las Colinas
                      300 E. John Carpenter Freeway, Suite 206
                      Irving, TX 75062

NOTE: All future renewals should be sent to this same address:

       Your promptness in issuing the requested certificate as soon as possible will be greatly appreciated.  If you have any questions please contact me at 770-999-4925.

KOCH 00000936

*GE*

*MULT2007*

*GE Commercial Finance*

| **EPS Account Management Form** |
|---|

Commercial Equipment Finance
44 Old Ridgebury Road
Danbury, CT 06810-5105

**PLEASE TYPE ALL INFORMATION OR PRINT CLEARLY**

- **Do you currently have other accounts on EPS?**  ☐ Yes  ☑ No

   **If Yes, do you want to use the same bank information?**  ☐ Yes  ☐ No

   **If Yes, please provide Account Number** _____

- **Are you changing bank information on accounts currently setup on EPS?**  ☐ Yes  ☐ No
   **If Yes, complete sections B & C**

**A.  OBLIGOR DETAILS**

| Setup Name | **Requestor** Lyman Campbell | **Job Title** CFO |
|---|---|---|

**Are you authorized to setup this/these account(s) on EPS?**  ☐ Yes  ☑ No

**Obligor Address**  3500 Western Blvd., Montgomery

*(Street, Suite # & City)*

AL  36105                                    **Email**
*(State & 5-digit Zip Code)*

**Phone**  (334) 281-0400            **Fax**  (334) 288-5915

**B.  GE CONTRACT DETAILS**

**Name as on Contract**  Sylvest Farms, Inc.

| | **Account Number(s)** | **Effective Pull Date** | | **Account Number(s)** | **Effective Pull Date** |
|---|---|---|---|---|---|
| Account Number or Billing Id you would like to setup on EPS (Example - 1234567-001) | 1.4171238001 | | 2. | | |
| | 3. | | 4. | | |
| | 5. | | 6. | | |

**C.  BANK/FINANCIAL INSTITUTION INFORMATION**

**Bank Name** _____        **Is this a Joint Account?**  ☐ Yes  ☐ No

**Bank Account Number** _____    **ABA Routing Number** _____

**Address** _____
*(Street, Suite # & City)*

_____  **Is your bank aware that this account will be used to initiate debit entries?**  ☐ Yes  ☐ No

KOCH 00000937

*(State & 5-digit Zip Code)*

## D.  OTHER DETAILS

Would you like "GE Capital" to automatically debit all Property Taxes due on the above accounts?      ☐ Yes  ☑ No

Would you like to receive a complimentary invoice?      ☐ Yes  ☐ No

## E.  AUTHORIZATION AGREEMENT FOR PRE-ARRANGED PAYMENT PLAN

- Sylvest Farms, Inc. ("Obligor") authorizes General Electric Capital Corporation ("GE Capital") to initiate debit entries for payment becoming due for the above accounts referenced in Section B pursuant to the terms and conditions set forth in the lease or loan agreement(s) ("Agreement(s)").
- Obligor understands that the basic term rent/loan payment and all applicable taxes are solely their responsibility.  If payment is not satisfied due to bank account closure, insufficient funds or cancellation of any required automated payment services, Obligor agrees to remit payment plus any applicable late charges, as set forth in the Agreement(s).
- It is incumbent upon the Obligor to give written notice to "GE Capital" of any changes to this authorization or the above referenced bank account information 10 days prior to payment date; Obligor may revoke this authorization by giving 10 days written notice to "GE Capital" unless otherwise stipulated in the Agreement(s).
- If a deduction is made in error, Obligor has the right to be paid within five business days by "GE Capital" the amount of the erroneous deduction, provided "GE Capital" is notified in writing of such error.

**Do you agree to the above Authorization Agreement For Pre-Arranged Payment Plan?**  ☐ Yes  ☑ No *(By selecting YES, you (and the Joint Account Holder, where applicable) are deemed to have provided written consent to act on the request above).*

Have you completed ALL Sections of this form?  ☐ Yes  ☐ No     *Tyman Campbell*  12/28/05
                                                                   Authorized Signatory          Date

> **FOR FASTER SERVICE**

**EMAIL to cefeps@gecapital.com OR FAX to (888) 301-7960**

| INTERNAL USE ONLY | • Is this setup a condition of approval requirement?  • How many float days are required? (Circle One) | ☐ Yes  ☐ No  0  1  2  3  4  5  6  7 |
| --- | --- | --- |

KOCH 00000938

Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

---

**From:** Mark Kaminsky [mailto:markam@kochfoods.com]
**Sent:** Tuesday, April 17, 2007 5:11 PM
**To:** Geekie Jr., Eugene J.
**Subject:** RE: Sylvest/GE

*REDACTED*

---

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Tuesday, April 17, 2007 1:19 PM
**To:** Mark Kaminsky
**Subject:** Sylvest/GE

*REDACTED*

Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

---

Tax Matters: To the extent this message or any attachment concerns

tax matters, it is not intended or written to be used, and cannot

be used by a taxpayer, for the purpose of avoiding penalties

that may be imposed on the taxpayer under law.

---

This message and any attachments may contain confidential

information protected by the attorney-client or other privilege.

If you believe that it has been sent to you in error,

please reply to the sender that you received the message in

4/20/2007

KOCH 00000939

CS(R083004) 4171238001

**\*LEAS8760\***

**FOOD PROCESSING EQUIPMENT SCHEDULE**
**SCHEDULE NO. 001**
**DATED THIS _____**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF _____**

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("Agreement" said Agreement and this Schedule being collectively referred to as "**Lease**"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.   Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "**Equipment**").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006   De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500     Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR   Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.   Financial Terms**

| | | | |
|---|---|---|---|
| 1. | Advance Rent (if any):  Not Applicable | 5. | Basic Term Commencement Date: |
| 2. | Capitalized Lessor's Cost : $ 2,018,453.00 | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months):  60 Months. | 7. | Last Delivery Date: |
| 4. | Basic Term Lease Rate Factor: .01757928 | 8. | Daily Lease Rate Factor:  .000468780 |

9.   First Termination Date:  **Thirty-six (36)** months after the Basic Term Commencement Date.

10.   Interim Rent:  For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on _____

11.   Basic Term Rent.  Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.   Tax Benefits**      Depreciation Deductions:

1.   Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.

2.   Recovery Period:  7 years.

3.   Basis: 100 % of the Capitalized Lessor's Cost.

**D.   Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor. Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

*MULT2600*

4171238001

Date: December 20, 2005

Name of Agent: Trey Starke
Agency: Starke Agency
Address: _____, _____ _____ _____
Phone: 334-263-5535        Fax: _____

Dear Trey Starke:

The below referenced insured has entered into certain financial accommodations with General Electric Capital Corporation.

THE FOLLOWING INFORMATION AND COVERAGES ARE REQUIRED:

INSURED:          Sylvest Farms, Inc.
                  3500 Western Blvd.
                  Montgomery, AL 36105

INSURED PROPERTY:    (Complete description including serial#'s)

1 2005 Ossid model Ossid 500  Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end
 seal shrinks and automatic indexer
1 2006 D & F Equipment Sales De-boner w/ double cone line, product conveyors, and loading bin  serial number 36019-01B
1 GYRoCOMPACT model GCM76-08-40-26 NS CCR  Spiral Freezer  serial number 00530143

LOCATION:

3500 Western Blvd., Montgomery, AL 36108

COVERAGE:

o    Physical Damage and/or Property Coverage: "All Risk"          $2,168,585.53
         In any event for an amount not less than the actual replacement cost

o    Liability - Bodily Insurance                                  $ 1,000,000.00 (minimum)

o    Liability - Property Damage                                   $ 1,000,000.00 (minimum)

o    Deductibles for each respective coverage must be shown (i.e. Property and Liability Deductibles)

o    GENERAL ELECTRIC CAPITAL CORPORATION AND/OR ITS ASSIGNS MUST BE NAMED AS ADDITIONAL INSURED

o    GENERAL ELECTRIC CAPITAL CORPORATION AND/OR ITS ASSIGNS MUST BE NAMED AS LOSS PAYEE

o    30 days notice of cancellation or material alteration (with no restriction)

     IMPORTANT:  The Notice of Cancellation must be a FIRM 30-day commitment.  Should the cancellation clause include language referring to
     "endeavor to..." this language must be stricken from the certificate. Should the cancellation clause include language referring to * but failure to
     mail such notice shall impose no obligation or liability of any kind upon the company, it's agents, or representatives" this language must be
     stricken from the certificate.

o    The interests of GE Capital shall be enforced irrespective of any breach of warranty or other act or omission of the Insured.

o    The coverage shall not be subject to any co-insurance clause.

Upon issuance of the coverages outlined above, please fax a copy of the Certificate to my attention at 770 999-3925 and then please mail the original Certificate
to:

                  General Electric Capital Corporation
                  Insurance Department 4171238001
                  Plaza at Las Colinas
                  300 E. John Carpenter Freeway, Suite 206
                  Irving, TX  75062

NOTE: All future renewals should be sent to this same address.

     Your promptness in issuing the requested certificate as soon as possible will be greatly appreciated.  If you have any questions please contact me at
770-999-4925.

KOCH 00000941


**EQUIPMENT SALES, INC.**

NOVEMBER 23, 2005

Telephone: (256) 528-7842
Toll Free: (800) 282-7842
FAX: (256) 528-7171
P.O. Box 275
Crossville, AL 35962

PRELIMINARY QUOTE # A1123506

TO:     DAVE BROMLEY
        SYLVEST FOODS
        PO BOX 250050
        MONTGOMERY, AL 36125

        FAX:  334-284-2915

FROM:   LENNIE FERGUSON

SUBJECT:    REVISION OF QUOTE #A1123503 - DEBONE PROJECT

1.  1 - DOUBLE CONE LINE
    A. STAINLESS STEEL CONSTRUCTION
    B. 58' LONG (FRAME TO FRAME)
    C. KNUCKLE CHAIN
    D. 4" STAINLESS STEEL CONE
    E. (2) FIXED SPEED SHAFT MOUNT DRIVES
       AND TAKE-UP ASSEMBLIES
    F. ADJUSTABLE LEGS
    G. (2) 8" WIDE X 18' LONG UHMW TRIM
       BOARDS
    H. (38) ERGO STANDS, (28) CONVEYOR MOUNT
       AND (10) FREE STANDING
    I. DRIP PAN BETWEEN CONE LINES ..........     63,820.00

2.  2 - DOUBLE TOTE DUMPERS
    A. STAINLESS STEEL CONSTRUCTION
    B. PNEUMATIC OPERATED
    C. MANUAL CONTROLS
    D. DUMP (2) TOTES AT A TIME
       @ $7,500.00 EA .............          15,000.00

3.  2 - DE-ICE BINS
    A. STAINLESS STEEL CONSTRUCTION
    B. 3' WIDE X 4' LONG
    C. ADJUSTABLE LEGS
       @ $700.00 EA ...............          1,400.00

4.  2 - RECIRCULATING CONVEYORS
    A. STAINLESS STEEL CONSTRUCTION
    B. (2) LANES 24" WIDE X 11' LONG
    C. 800 SERIES INTRALOX BELTS
    D. (2) FIXED SPEED SHAFT MOUNT DRIVES,
       TAKE-UP ASSEMBLIES
    E. ADJUSTABLE LEGS
    F. DRIP PAN
    G. BELT WASHER
       @ $10,070.00 EA .............          20,140.00

5.  3 - WING TIP INCLINE CONVEYORS

KOCH 00000942

*Wing Tip Incline*

A. STAINLESS STEEL CONSTRUCTION
B. 12" WIDE X 16' LONG HORIZONTAL LENGTH
C. 800 SERIES INTRALOX BELT WITH 2"
   FLIGHTS ON 12" CENTERS
D. FIXED SPEED SHAFT MOUNT DRIVE,
   TAKE-UP ASSEMBLY
E. ADJUSTABLE LEGS
F. NO DRIP PAN
G. BELT WASHER
H. (2) HINGE SIDES 13" HIGH X 10' LONG
   ON BOTTOM STRAIGHT
I. UHMW TO FILL INDENT
          @ $6,840.00 EA ...............     20,520.00

*Keep*

6.   4 - WING INCLINE CONVEYORS
     A. STAINLESS STEEL CONSTRUCTION
     B. 8" WIDE X 20' LONG HORIZONTAL LENGTH
     C. 800 SERIES INTRALOX BELT WITH 2"
        FLIGHTS ON 12" CENTERS
     D. FIXED SPEED SHAFT MOUNT DRIVE,
        TAKE-UP ASSEMBLY
     E. ADJUSTABLE LEGS
     F. NO DRIP PAN
     G. BELT WASHER
     H. (2) HINGE SIDES 13" HIGH X 10' LONG
        ON BOTTOM STRAIGHT
     I. UHMW TO FILL INDENT
             @ $7,400.00 EA ...............     29,600.00

*Keep*

7.   1 - WING INCLINE CONVEYOR ([2] BELTS IN ONE
        COMMON FRAME)
     A. STAINLESS STEEL CONSTRUCTION
     B. (2) 8" WIDE LANES X 20' LONG
        HORIZONTAL LENGTH
     C. 800 SERIES INTRALOX BELT WITH 2"
        FLIGHTS ON 12" CENTERS
     D. FIXED SPEED SHAFT MOUNT DRIVE,
        TAKE-UP ASSEMBLY
     E. ADJUSTABLE LEGS
     F. NO DRIP PAN
     G. BELT WASHER
     H. (2) HINGE SIDES 13" HIGH X 10' LONG
        ON BOTTOM STRAIGHT
     I. UHMW TO FILL INDENT ..................     11,100.00

*Keep*

8.   1 - WING COMMON CONVEYOR (FROM SINGLE CONE
        LINE AND [2] BELTS IN ONE COMMON FRAME)
     A. STAINLESS STEEL CONSTRUCTION
     B. (2) 8" WIDE LANES X 46' LONG
     C. 800 SERIES INTRALOX BELT
     D. FIXED SPEED SHAFT MOUNT DRIVE,
        TAKE-UP ASSEMBLY
     E. ADJUSTABLE LEGS
     F. DRIP PAN
     G. BELT WASHER ...........................     17,300.00

*Keep*

9.   1 - WING COMMON CONVEYOR (FROM SINGLE CONE

2

KOCH 00000943

```
         LINE AND [3] BELTS IN ONE COMMON FRAME)
         A. STAINLESS STEEL CONSTRUCTION
         B. (3) 8" WIDE LANES
            > RIGHT HAND LANE 17' LONG
            > MIDDLE LANE 34' LONG
            > LEFT HAND LANE 46' LONG
         C. 800 SERIES INTRALOX BELT                    Keep
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
         F. DRIP PAN
         G. BELT WASHER ........................    14,540.00

10.    1 - SKIN INCLINE CONVEYOR
         A. STAINLESS STEEL CONSTRUCTION
         B. 8" WIDE X 38' LONG HORIZONTAL LENGTH        Keep
         C. 800 SERIES INTRALOX BELT WITH 2"
            FLIGHTS ON 12" CENTERS
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
         F. DRIP PAN
         G. BELT WASHER .........................    9,460.00

11.    4 - FLAT TOP TABLES
         A. STAINLESS STEEL CONSTRUCTION                Keep
         B. 2' WIDE X 6' LONG
         C. ADJUSTABLE LEGS
            @ $600.00 EA ................     2,400.00

12.    2 - TENDER/BREAST INCLINE CONVEYORS
         A. STAINLESS STEEL CONSTRUCTION (FLAT
            BAR SIDES)
         B. 12" WIDE X 32' LONG HORIZONTAL LENGTH
         C. 800 SERIES INTRALOX BELT WITH 3"
            FLIGHTS ON 6" CENTERS
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
         F. DRIP PAN ON INCLINE AND NOSEOVER
         G. BELT WASHER                                 Keep
         H. (1) LEFT HAND DRIVE AND 10" HIGH SIDE
            ON RIGHT HAND SIDE BOTTOM STRAIGHT,
            3" HIGH SIDES ON REST OF CONVEYOR
         I. (1) RIGHT HAND DRIVE AND 10" HIGH
            SIDE ON LEFT HAND SIDE BOTTOM
            STRAIGHT, 3" HIGH SIDES ON REST OF
            CONVEYOR
         J. WRAP-AROUND CHUTE
         K. (1) 18' LONG HINGE LIP ON (1) SIDE
            OF BOTTOM STRAIGHT
         L. UHMW TO FILL INDENT
            @ $10,680.00 EA .............    21,360.00

13.    1 - CARCASS COMMON CONVEYOR
         A. STAINLESS STEEL CONSTRUCTION
         B. 18" WIDE X 46' LONG                         Keep
```

KOCH 00000944

```
            C. 800 SERIES INTRALOX BELT WITH 3"
               FLIGHTS ON 12" CENTERS
            D. FIXED SPEED SHAFT MOUNT DRIVE,
               TAKE-UP ASSEMBLY
            E. ADJUSTABLE LEGS
            F. DRIP PAN
            G. BELT WASHER ......................        12,200.00
    14.   1 - TENDER/BREAST INCLINE CONVEYOR WITH (2)
            90'S TO SINGLE SIZER
            A. STAINLESS STEEL CONSTRUCTION
            B. 8" WIDE X 26' LONG INCLINE SECTION
               HORIZONTAL LENGTH, LEFT HAND 90,
               52'6" LONG, LEFT HAND 90, 10' DECLINE
               SECTION
            C. 800 SERIES INTRALOX BELT WITH 3"
               FLIGHTS ON 6" CENTERS
            D. FIXED SPEED SHAFT MOUNT DRIVE,
               TAKE-UP ASSEMBLY
            E. ADJUSTABLE LEGS
            F. DRIP PAN
            G. BELT WASHER
            H. WRAP-AROUND CHUTE
            I. UHMW TO FILL INDENT .................      26,895.00
    15.   8 - TENDER/BREAST CONVEYORS (UNDER SIZERS)
            A. STAINLESS STEEL CONSTRUCTION
            B. 12" WIDE X 52' LONG
            C. 800 SERIES INTRALOX BELT
            D. FIXED SPEED SHAFT MOUNT CENTER DRIVE,
               TAKE-UP ASSEMBLY
            E. ADJUSTABLE LEGS
            F. DRIP PAN
            G. BELT WASHER
            H. (3) PNEUMATIC DIVERTERS COMPLETE
                    @ $16,560.00 EA .............      132,480.00
    16.   1 - FEED CONVEYOR (TO 624 DSI MACHINE)
            A. STAINLESS STEEL CONSTRUCTION
            B. 18" WIDE X 20' LONG
            C. 800 SERIES INTRALOX BELT
            D. FIXED SPEED SHAFT MOUNT DRIVE,
               TAKE-UP ASSEMBLY
            E. ADJUSTABLE LEGS
            F. DRIP PAN
            G. BELT WASHER ......................         7,000.00
    17.   1 - FEED CONVEYOR (TO SUPER TRIM LINE)
            A. STAINLESS STEEL CONSTRUCTION
            B. 18" WIDE X 32' LONG
            C. 800 SERIES INTRALOX BELT
            D. FIXED SPEED SHAFT MOUNT DRIVE,
               TAKE-UP ASSEMBLY
            E. ADJUSTABLE LEGS
            F. DRIP PAN
            G. BELT WASHER ......................         9,400.00
```

*(Send Back)*

*(Send Back)*

*(Send Back)*

*(Send Back)*

4

KOCH 00000945

DEC-06-2005  13:00        GE CAPITAL                                P.05

18.   1 – CHUTE
         A. STAINLESS STEEL CONSTRUCTION
         B. 3' OPENING ON ENTRANCE END TAPER TO
            A 20" OPENING
         C. 3' LONG
         D. ADJUSTABLE LEGS
         E. 46" BOTTOM OF CHUTE ENTRANCE END TO
            41" BOTTOM OF CHUTE EXIT END .........        430.00

*(Send back)*

19.   4 – EMPLOYEE STANDS AT SIZERS
         A. STAINLESS STEEL CONSTRUCTION
         B. 30" WIDE X 18' LONG
         C. YELLOW SQUARE FIBER GRATE
         D. OSHA APPROVED HANDRAILS AND TOE-KICK
         E. (2) SETS OF STAIRS, (7) STEPS EACH
            @ $6,150.00 EA ..............          24,600.00

*(Send back)*

20.   1 – FLAT TOP TABLE
         A. STAINLESS STEEL CONSTRUCTION
         B. 2' WIDE X 20' LONG
         C. ADJUSTABLE LEGS .....................        1,800.00

*keep*

21.   4 – EMPLOYEE CROSSOVER STANDS
         A. STAINLESS STEEL CONSTRUCTION
         B. 30" WIDE X 4' LONG PLATFORM
         C. STAINLESS STEEL CHECK PLATE
         D. ADJUSTABLE LEGS
         E. OSHA APPROVED HANDRAILS AND TOE-KICK
         F. (2) SETS OF STAIRS, (2) STEPS EACH
            @ $1,850.00 EA ..............          7,400.00

*Keep*

22.   1 – FINISHED PRODUCT INCLINE CONVEYOR WITH
         (2) 90'S
         A. STAINLESS STEEL CONSTRUCTION
         B. 8" WIDE X 21' LONG INCLINE SECTION
            HORIZONTAL LENGTH, LEFT HAND 90,
            17'4" LONG, LEFT HAND 90, 21' LONG
            DECLINE SECTION HORIZONTAL LENGTH
         C. 800 SERIES INTRALOX BELT WITH 3"
            FLIGHTS ON 6" CENTERS
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
         F. DRIP PAN
         G. BELT WASHER
         H. WRAP-AROUND CHUTE
         I. UHMW TO FILL INDENT ..................        20,125.00

*(Send back)*

23.   1 – FINISHED PRODUCT INCLINE CONVEYOR WITH
         (2) 90'S
         A. STAINLESS STEEL CONSTRUCTION
         B. 8" WIDE X 19' LONG INCLINE SECTION
            HORIZONTAL LENGTH, LEFT HAND 90, 3'
            LONG, LEFT HAND 90, 19' LONG,
            DECLINE SECTION HORIZONTAL LENGTH
         C. 800 SERIES INTRALOX BELT WITH 3"
            FLIGHTS ON 6" CENTERS

*keep*

5

KOCH 00000946

```
      D. FIXED SPEED SHAFT MOUNT DRIVE,
         TAKE-UP ASSEMBLY
      E. ADJUSTABLE LEGS
      F. DRIP PAN
      G. BELT WASHER
      H. WRAP-AROUND CHUTE
      I. UHMW TO FILL INDENT ..................        17,240.00

 24.  1 - TRIM INCLINE CONVEYOR
      A. STAINLESS STEEL CONSTRUCTION
      B. 12" WIDE X 38' LONG HORIZONTAL LENGTH
      C. 800 SERIES INTRALOX BELT WITH 3"
         FLIGHTS ON 12" CENTERS
      D. FIXED SPEED SHAFT MOUNT DRIVE,
         TAKE-UP ASSEMBLY
      E. ADJUSTABLE LEGS
      F. DRIP PAN
      G. BELT WASHER
      H. UHMW TO FILL INDENT ..................        10,580.00

 25.  12 - ERGO FREE STANDING STANDS AT DSI MACHINES
      A. STAINLESS STEEL CONSTRUCTION
      B. 20" DEEP X 24" WIDE
      C. ADJUSTABLE LEGS
      D. ADJUSTABLE
      E. YELLOW SQUARE FIBER GRATE
         @ $400.00 EA .................:..         4,800.00

 26.  1 - FULL BOX CONVEYOR
      A. STAINLESS STEEL CONSTRUCTION
      B. 18" WIDE X 60' LONG
      C. (2) KNUCKLE CHAINS
      D. FIXED SPEED SHAFT MOUNT DRIVE,
         TAKE-UP ASSEMBLY
      E. ADJUSTABLE LEGS ......................        14,100.00

 27.  1 - FULL BOX INCLINE CONVEYOR
      A. STAINLESS STEEL CONSTRUCTION
      B. 18" WIDE X 16' LONG HORIZONTAL LENGTH
      C. GUM RUBBER BELT
      D. FIXED SPEED SHAFT MOUNT DRIVE,
         TAKE-UP ASSEMBLY
      E. ADJUSTABLE LEGS ......................         6,200.00

 28.  1 - FULL BOX CONVEYOR WITH OFFSET
      A. STAINLESS STEEL CONSTRUCTION
      B. 18" WIDE X 8' LONG, RIGHT HAND 45,
         8' LONG, LEFT HAND 45, 2' LONG
      C. (2) KNUCKLE CHAINS
      D. FIXED SPEED SHAFT MOUNT DRIVE,
         TAKE-UP ASSEMBLY
      E. ADJUSTABLE LEGS ......................         8,930.00

 29.  1 - FULL BOX CONVEYOR
      A. STAINLESS STEEL CONSTRUCTION
      B. 18" WIDE X 12' LONG
      C. (2) KNUCKLE CHAINS
```

*(Send back)* — handwritten next to item D–I

*(Send back)* — handwritten next to item 24

*(Send back)* — handwritten next to item 25

*keep* — handwritten next to item 26

*keep* — handwritten next to item 27

*keep* — handwritten next to item 28

*keep* — handwritten next to item 29

KOCH 00000947

```
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS ......................        5,220.00

30.   1 - FULL BOX CONVEYOR (BEHIND SINGLE SIZER)
         A. STAINLESS STEEL CONSTRUCTION
         B. 18" WIDE X 27' LONG
         C. 800 SERIES INTRALOX BELT
         D. FIXED SPEED SHAFT MOUNT DRIVE,          Keep
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS ......................        7,995.00

31.   2 - FULL BOX CONVEYORS WITH 90
         A. STAINLESS STEEL CONSTRUCTION
         B. 18" WIDE X 2' LONG, RIGHT HAND 90,
            4' LONG
         C. (2) KNUCKLE CHAINS                      Keep
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
              @ $6,710.00 EA ...............             13,420.00

32.   2 - FULL BOX CONVEYORS WITH 90
         A. STAINLESS STEEL CONSTRUCTION
         B. 18" WIDE X 2' LONG, RIGHT HAND 90,
            10' LONG
         C. (2) KNUCKLE CHAINS                      Keep
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
              @ 7,820.00 EA ...............             15,640.00

33.   1 - PORTIONING CONVEYOR ([2] BELTS IN ONE
         COMMON FRAME)
         A. STAINLESS STEEL CONSTRUCTION
         B. (1) LANE 18" WIDE X 12' LONG;      (Set Back)
            (1) LANE 12" WIDE X 12' LONG
         C. 800 SERIES INTRALOX BELT
         D. FIXED SPEED SHAFT MOUNT DRIVE,
            TAKE-UP ASSEMBLY
         E. ADJUSTABLE LEGS
         F. DRIP PAN
         G. BELT WASHER ...........................        7,100.00

34.   8 - TOTE STANDS
         A. STAINLESS STEEL CONSTRUCTION
         B. 16" WIDE X 25" LONG
         C. ADJUSTABLE LEGS                         Keep
         D. TUBING FRAME
              @ $225.00 EA .................             1,800.00

35.   7 - GRAVITY CONVEYORS
         A. STAINLESS STEEL CONSTRUCTION
         B. 18" WIDE X 5' LONG                      Keep
         C. 2" PVC ROLLERS ON 4" CENTERS
         D. ADJUSTABLE LEGS
              @ $540.00 EA .................             3,780.00
```

7

KOCH 00000948

36.    1 - FULL BOX CONVEYOR (BETWEEN SIZERS)
          A. STAINLESS STEEL CONSTRUCTION
          B. 18" WIDE X 20' LONG
          C. 800 SERIES INTRALOX BELT
          D. FIXED SPEED SHAFT MOUNT DRIVE,
             TAKE-UP ASSEMBLY
          E. ADJUSTABLE LEGS ......................       6,700.00

*(Send Back)*

37.    1 - FULL BOX CONVEYOR (FOR WINGS)
          A. STAINLESS STEEL CONSTRUCTION
          B. 18" WIDE X 28' LONG
          C. 800 SERIES INTRALOX BELT
          D. FIXED SPEED SHAFT MOUNT DRIVE,      *Keep*
             TAKE-UP ASSEMBLY
          E. ADJUSTABLE LEGS ......................       8,180.00

38.    1 - FULL BOX SPUR CONVEYOR WITH 90
          A. STAINLESS STEEL CONSTRUCTION
          B. 18" WIDE X 2' LONG, RIGHT HAND 90,
             19'6" LONG SECTION WITH A RIGHT HAND
             SPUR WITH 2' LONG TAKE-UP
          C. KNUCKLE CHAIN
          D. FIXED SPEED SHAFT MOUNT DRIVE, (2)    *Keep*
             TAKE-UP ASSEMBLIES
          E. ADJUSTABLE LEGS
          F. STAINLESS STEEL TRAFFIC COP ..........      14,200.00

39.    1 - FULL BOX SPUR CONVEYOR
          A. STAINLESS STEEL CONSTRUCTION
          B. 18" WIDE X 8' LONG WITH RIGHT HAND
             SPUR
          C. KNUCKLE CHAIN
          D. FIXED SPEED SHAFT MOUNT DRIVE, (2)    *Keep*
             TAKE-UP ASSEMBLIES
          E. ADJUSTABLE LEGS
          F. STAINLESS STEEL TRAFFIC COP ..........       7,600.00

40.    1 - FULL BOX CONVEYOR
          A. STAINLESS STEEL CONSTRUCTION
          B. 18" WIDE X 40' LONG
          C. KNUCKLE CHAIN                         *Keep*
          D. FIXED SPEED SHAFT MOUNT DRIVE,
             TAKE-UP ASSEMBLY
          E. ADJUSTABLE LEGS ......................      10,400.00

41.    1 - FULL BOX CONVEYOR WITH 90
          A. STAINLESS STEEL CONSTRUCTION
          B. 18" WIDE X 42' LONG, RIGHT HAND 90,
             7' LONG
          C. KNUCKLE CHAIN                         *Keep*
          D. FIXED SPEED SHAFT MOUNT DRIVE,
             TAKE-UP ASSEMBLY
          E. ADJUSTABLE LEGS ......................      14,665.00

42.    1 - FULL BOX CONVEYOR WITH 90
          A. STAINLESS STEEL CONSTRUCTION

8    *Keep*

KOCH 00000949

        B. 18" WIDE X 12' LONG, LEFT HAND 90,
           34' LONG
        C. KNUCKLE CHAIN
        D. FIXED SPEED SHAFT MOUNT DRIVE,
           TAKE-UP ASSEMBLY
        E. ADJUSTABLE LEGS ...................... 14,110.00

43.   1 - FULL BOX CONVEYOR WITH 90
        A. STAINLESS STEEL CONSTRUCTION
        B. 18" WIDE X 27' LONG, RIGHT HAND 90,
           20' LONG
        C. KNUCKLE CHAIN          *Keep*
        D. FIXED SPEED SHAFT MOUNT DRIVE,
           TAKE-UP ASSEMBLY
        E. ADJUSTABLE LEGS ...................... 14,295.00

44.   1 - FULL BOX CONVEYOR WITH 90
        A. STAINLESS STEEL CONSTRUCTION
        B. 18" WIDE X 2' LONG, LEFT HAND 90,
           62' LONG
        C. KNUCKLE CHAIN          *Keep*
        D. FIXED SPEED SHAFT MOUNT DRIVE,
           TAKE-UP ASSEMBLY
        E. ADJUSTABLE LEGS ...................... 17,440.00

45.   2 - 90° GRAVITY CONVEYORS
        A. 18" WIDE
        B. 90°          *Keep*
        C. 2" PVC ROLLERS ON 6" CENTERS
        D. ADJUSTABLE LEGS
           @ $1,100.00 EA .............. 2,200.00

46.   MISCELLANEOUS MATERIAL ..................... 20,000.00   *???*

     TOTAL EQUIPMENT AND MATERIAL .................. $715,565.00

    *NOTE: EMPTY BOX IS NOT INCLUDED IN THIS QUOTE*

    *NOTE: LABOR IS NOT INCLUDED IN THIS QUOTE*

> PRICES BASED ON ABOVE SPECIFICATIONS.
> ANY DEVIATION FROM THIS QUOTE
  (MATERIAL, EQUIPMENT, LABOR, ETC.)
  WILL BE ADDRESSED ON A FIELD
  MODIFICATION FORM WHICH WILL RESULT
  IN PRICE ADJUSTMENT.  THE FIELD
  MODIFICATION FORM MUST BE APPROVED
  AND SIGNED BY BOTH PARTIES BEFORE
  ANY WORK SHALL COMMENCE.

TERMS:    30% DOWN PAYMENT
          30% MIDWAY THROUGH PROJECT
          30% UPON DELIVERY
          BALANCE NET 15 DAYS
          PLUS TAX AND FREIGHT
          VOID 30 DAYS FROM 11/23/05

KOCH 00000950

DEC-06-2005 13:01     GE CAPITAL                              P.11



**EQUIPMENT SALES, INC.**

NOVEMBER 21, 2005

Telephone: (256) 528-7842
Toll Free: (800) 282-7842
FAX: (256) 528-7171
P.O. Box 275
Crossville, AL 35962

PRELIMINARY QUOTE # A1118506
JOB # S36019
DUE DATE: ITEMS 1&2 12-09-05
DUE DATE: ITEMS 3-11 12-16-05

TO:     DAVE BROMLEY
        SYLVEST POULTRY, INC.
        P.O. BOX 250050
        MONTGOMERY, AL 36125

        FAX: 334-284-2915

FROM:   LENNIE FERGUSON

SUBJECT:   PRELIMINARY QUOTATION FOR DEBONE PROJECT, FIRST PHASE

1.   1 - DOUBLE CONE LINE
        A. STAINLESS STEEL CONSTRUCTION
        B. 58' LONG (FRAME TO FRAME)
        C. KNUCKLE CHAIN
        D. 4" STAINLESS STEEL CONE
        E. (2) FIXED SPEED SHAFT MOUNT DRIVES        *Keep*
           AND TAKE-UP ASSEMBLIES
        F. ADJUSTABLE LEGS
        G. (2) 8" WIDE X 18' LONG UHMW TRIM
           BOARDS
        H. (38) ERGO STANDS ([28] CONVEYOR
           MOUNT AND [10] FREE STANDING)
        I. DRIP PAN BETWEEN CONE LINES .......... 63,820.00

2.   2 - TENDER/FILET INCLINE CONVEYORS
        A. STAINLESS STEEL CONSTRUCTION
           (FLAT BAR SIDES)
        B. 12" WIDE X 32' LONG HORIZONTAL LENGTH
        C. 800 SERIES INTRALOX BELT WITH 3"
           FLIGHTS ON 6" CENTERS        *Keep*
        D. FIXED SPEED SHAFT MOUNT DRIVE
           INVERTER DUTY, TAKE-UP ASSEMBLY
        E. NO LEGS
        F. DRIP PAN INCLINE AND NOSEOVER SECTION
           ONLY
        G. BELT WASHER
        H. UHMW TO FILL INDENT
        I. (1) DRIVE LEFT HAND AND 10" HIGH SIDE
           ON RIGHT HAND SIDE BOTTOM STRAIGHT,
           3" HIGH SIDES ON REST OF CONVEYOR,
           (1) DRIVE RIGHT HAND AND 10" HIGH
           SIDE ON LEFT HAND SIDE BOTTOM
           STRAIGHT, 3" HIGH SIDES ON REST OF
           CONVEYOR
        J. WRAP-AROUND CHUTE

KOCH 00000951

```
           K. 18' LONG HINGED LIP
               @ $10,680.00 EA. .............        21,360.00

    3.    2 - FINISHED PRODUCT INCLINE CONVEYORS
             A. STAINLESS STEEL CONSTRUCTION
             B. 8" WIDE X 16' LONG HORIZONTAL LENGTH      Keep
             C. 800 SERIES INTRALOX BELT WITH 2"
                FLIGHTS ON 12" CENTERS
             D. FIXED SPEED SHAFT MOUNT DRIVE,
                TAKE-UP ASSEMBLY
             E. ADJUSTABLE LEGS
             F. DRIP PAN
             G. BELT WASHER
             H. UHMW TO FILL INDENT
             I. HINGED LIP ON DSI MACHINE SIDE
                @ $6,200.00 EA. .............        12,400.00

    4.    1 - SINGLE TOTE DUMPER
             A. STAINLESS STEEL CONSTRUCTION            keep
             B. PNEUMATIC OPERATED
             C. MANUAL CONTROLS
             D. DUMP (1) TOTE AT A TIME .............    4,200.00

    5.    1 - DE-ICE BIN
             A. STAINLESS STEEL CONSTRUCTION            Keep
             B. 3' WIDE X 3' WIDE
             C. ADJUSTABLE LEGS ......................     700.00

    6.    1 - LOADING BIN
             A. STAINLESS STEEL CONSTRUCTION            Keep
             B. 2' WIDE X 7' WIDE
             C. 12" DEEP
             D. TAPERED BOTTOM
             E. ADJUSTABLE LEGS ......................   1,100.00

    7.    1 - FEED CONVEYOR (TO 714 DSI MACHINE)
             A. STAINLESS STEEL CONSTRUCTION
             B. 18" WIDE X 34' LONG
             C. 800 SERIES INTRALOX BELT              (Send Back)
             D. FIXED SPEED SHAFT MOUNT DRIVE,
                TAKE-UP ASSEMBLY
             E. ADJUSTABLE LEGS (56" TOP OF BELT)
             F. DRIP PAN
             G. BELT WASHER .........................    9,400.00

    8.   12 - ERGO FREE STANDING STANDS AT DSI MACHINES
             A. STAINLESS STEEL CONSTRUCTION
             B. 20" DEEP X 24" WIDE                   (Send Back)
             C. ADJUSTABLE LEGS
             D. ADJUSTABLE
             E. YELLOW SQUARE FIBER GRATE
                @ $400.00 EA. ................         4,800.00

    9.    1 - PRODUCT CONVEYOR AT MIXING TANK
             A. STAINLESS STEEL CONSTRUCTION
             B. 18" WIDE X 20' LONG                   (Send Back)
             C. FIXED SPEED SHAFT MOUNT DRIVE RIGHT
```

2

KOCH 00000952

HAND (60:1), TAKE-UP ASSEMBLY    -
   D. ADJUSTABLE LEGS (34" TOP OF BELT)
   E. DRIP PAN
   F. BELT WASHER
   G. RIGHT HAND SIDES 10" HIGH, LEFT HAND
      SIDES 3" HIGH
   H. UHMW TO FILL INDENT ..................       7,000.00

10.   1 - PRODUCT CONVEYOR
   A. STAINLESS STEEL CONSTRUCITON
   B. 12" WIDE X 16' LONG
   C. FIXED SPEED SHAFT MOUNT DRIVE RIGHT
      HAND (60:1), TAKE-UP ASSEMBLY
   D. 2" HIGH SIDES
   E. DRIP PAN
   F. BELT WASHER
   G. MOUNT OVER ITEM 10 CONVEYOR (3'
      HANG-OVER EXIT END OF BOTTOM
      CONVEYOR)
   H. LOW PROFILE
   I. 12" FROM BOTTOM OF DRIP PAN TO TOP OF
      BOTTOM BELT ..........................       5,800.00

11.   1 - PRODUCT CHUTE
   A. STAINLESS STEEL CONSTRUCTION
   B. 3' WIDE ON ENTRANCE END TAPER TO 20"
      WIDE OPENING X 3' LONG
   C. 3" SIDES
   D. ADJUSTABLE LEGS
   E. 46" BOTTOM OF CHUTE ENTRANCE END, 41"
      BOTTOM OF CHUTE EXIT END .............        400.00
                                 =================

TOTAL EQUIPMENT   ..........................    $130,980.00

LABOR
   A. INSTALL NEW EQUIPMENT MENTIONED ABOVE
   B. MISCELLANEOUS WORK
   C. WORK TO BE DONE ON TIME AND MATERIAL .. TIME & MATERIAL

> SYLVEST FARMS TO FURNISH ALL NECESSARY GASES,
  SUCH AS ARGON, ACETYLENE, AND OXYGEN.
> THIS QUOTE DOES NOT INCLUDE ANY ELECTRICAL
  OR PLUMBING WORK.

> PRICES BASED ON ABOVE SPECIFICATIONS.
> ANY DEVIATION FROM THIS QUOTE
  (MATERIAL, EQUIPMENT, LABOR, ETC.)
  WILL BE ADDRESSED ON A FIELD
  MODIFICATION FORM WHICH WILL RESULT
  IN PRICE ADJUSTMENT.  THE FIELD
  MODIFICATION FORM MUST BE APPROVED
  AND SIGNED BY BOTH PARTIES BEFORE
  ANY WORK SHALL COMMENCE.

3

KOCH 00000953



## Quotation

| Quotation Number | 3527-R |
|---|---|
| Quotation Date | October 20, 2005 |

| Payment Terms | 35% due with purchase order Balance due upon delivery |
|---|---|
| Delivery Terms | Ex Works Ossid's Rocky Mount Facility |
| Sales Representative | Jason Angel |

P.O. Box 1968
Rocky Mount, NC  27802-1968
Voice (252)446-6177 • Fax (252)442-7694

**Quotation Prepared For**

| Name | Dean Falk |
|---|---|
| Company | Sylvest Farms |
| Location | Montgomery, AL |

*Send Back All W.I* (handwritten)

| Quantity | Description | Delivery | Unit Price | Total |
|---|---|---|---|---|
| 2 | Ossid 500E Overwrap Machine | | $187,308.00 | $374,616.00 |
| | Electrical : 208/230vac, 30 amp, 3 phase | | | |
| | Compressed Air : 90 psi, one(1) cfm, clean/dry | | | |
| | Water : Two(2) gpm max, gravity drain | | | |
| 2 | Ossid 550 ESS End Seal Shrink | | $37,800.00 | $75,600.00 |
| | Electrical : 208/230vac, 60 amp, 3 phase | | | |
| 2 | Ossid Auto-Indexer | | $20,900.00 | $41,800.00 |
| | **Optional:** | | | |
| 1 | 480V End Seal Shrink Upgrade | | $3,000.00 | $6,000.00 |
| | Electrical : 440/480vac, 60 amp, 3 phase | | | |
| 1 | Spare Parts Kit | | $42,000.00 | $42,000.00 |
| | Installation | | $5,000.00 | $5,000.00 |
| | (start up and training for 2 men not to exceed 5 days) | | | |
| | Delivery | | $3,125.00 | $3,125.00 |

**Ossid Terms and Conditions of Sale**

**SELLER:** The Seller is Ossid Corporation.

**BUYER:** The Buyer is Sylvest Farms.

**TERMS:** Terms of payment are 35% upon order, balance upon delivery. In addition to the price stated herein, Buyer agrees to pay the seller maximum legal interest on accounts past due, all collection costs including attorneys fees, court costs and other costs involved in the collection of past due accounts.

**Lead-Time:** Lead times are based on availability at the time of receipt of a formal order, and the Buyer's accompanying payment. An approximate delivery schedule is eight (8) weeks.

Page 1 of 4

KOCH 00000954

NOV-07-2005  16:25    GE CAPITAL    P.02

*Send back All w.I.*

**OSSID**

**CORPORATION**

P.O. Box 1968
Rocky Mount, NC  27802-1968
Voice (252)446-6177 ● Fax (252)442-7694

Quotation Prepared For

| | |
|---|---|
| Name | Dean Falk |
| Company | Sylvest Farms |
| Location | Montgomery, AL |

### Quotation

| Quotation Number | 3530 |
|---|---|
| Quotation Date | October 20, 2005 |

| Payment Terms | 35% due with purchase order |
|---|---|
| | Balance due upon delivery |
| Delivery Terms | Ex Works Ossid's |
| | Rocky Mount Facility |
| Sales Representative | Jason Angel |

*Will, this quote shows one system, we will need two, one for each tray pack system. So the total here is $202,892.*

| Quantity | Description | Delivery | Unit Price | Extended Price |
|---|---|---|---|---|
| 1 | Integrated Package Infeed Conveyor | | $11,921.00 | $11,921.00 |
| 1 | 1500xA Single Head Weigh/Price/Label machine | | $62,500.00 | $62,500.00 |
| 1 | PA3000AT Top 2nd Printer **(Optional)** | | $17,900.00 | $17,900.00 |
| | Installation Estimated: | | $6,000.00 | $6,000.00 |
| | Travel Time and Expenses | | | |
| | Meals and Lodging | | | |
| | Start Up and Training for 1 Man (5 Days) | | | |
| | (extra training and programming is available at our published rates) | | | |
| | Delivery | | $3,125.00 | $3,125.00 |

**Ossid Terms and Conditions of Sale**    *Total $202,892 00*

**SELLER:** The Seller is Ossid Corporation.

**BUYER:**   The Buyer is Sylvest Farms.

**TERMS:** Terms of payment are 35% upon order, balance upon delivery. In addition to the price stated herein, Buyer agrees to pay the seller maximum legal interest on accounts past due, all collection costs including attorneys fees, court costs and other costs involved in the collection of past due accounts.

**Lead-Time:** Lead times are based on availability at the time of receipt of a formal order, and the Buyer's accompanying payment. An approximate delivery schedule is sixteen (16) weeks.

Page 1 of 3

KOCH 00000955

## SPIRAL TECHNICAL SPECIFICATIONS:

Spiral model number: 76-08-40-26NS CCR
Materials of construction: stainless steel.
Number of tiers: 40.
Belt width: 30".
Useable belt width: 28".
Belt spec: M13-1.5 grid type stainless steel belt.
Active belt length: 1,720 linear feet.
Total belt length: approx.1,800 linear feet.
Infeed elevation: 30".
Discharge elevation: 13' 9".
Side Link spacing: 80 mm.
Product clearance: 2.5".
Dwell time: ?? minutes.
Design belt speed: ?? fpm
Product weight per square foot: 1.2 lbs.
Overall Dimensions: 15' 9" wide x 28' 3" long x 16' 6" tall

## COIL TECHNICAL SPECIFICATIONS:

Evaporator model number: one (1) model 2600m2.
Refrigerant type and feed: R-717 pumped.
Total Coil Capacity: 130.0 TR.
Base load: 20.0 TR.
Evaporator temperature: -40° F.
Defrost type and quantity: water (135 gpm)
Total fan horsepower: 40.0 hp.

*Do Not Need*
*send back*
*WI*

**FOR INSTALLED SPIRAL FREEZING SYSTEM** ----------------- $ 375,000

| Options | Price |
|---|---|
| Complete Air Defrost (ADF) System | $22,000 |
| Complete Clean-In-Place (CIP) System | $25,000 |
| 10 gauge stainless steel (SS) welded to ss floor screed and up the wall to the top of the doors | $18,000 |

**All Options accepted......$10,000 Discount** ............................. **$55,000**

**Total with All Options**...................................................... **$430,000**

## CUSTOMER REPONSIBILITIES FOR SPIRAL SYSTEM:

- Main power connection to control panel.
- Complete access to spiral area and staging area during installation
- All field wiring of such devices as motors, VFD's, control valves, safety switches, interior lights and door heaters.
- Flat concrete foundation or foundation heating
- Water supply and drain lines for belt washer and evaporator defrost, defrost water valves, and enclosure drains. Defrost water requirement is 135 GPM for 20 minutes. Minimum water temperature is 60 deg. F.

GYRoCOMPACT, FRIGoBELT & FRIGoSCAN are registered trademarks of FMC Foodtech INC.          3

KOCH 00000956

Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

KOCH FOODS OF ALABMA, LLC, )
an Alabama Limited Liability company )          Case No. 07-cv-522-MHT
)
    Plaintiff and Counterclaim-defendant, )
)          Honorable Myron H. Thompson
    v. )          Honorable Terry F. Moorer
)
GENERAL ELECTRIC CAPITAL )
CORPORATION, )
a Delaware corporation, )
)
    Defendant and Counterclaim-plaintiff. )

STATE OF ILLINOIS    )
              )   SS:
COUNTY OF COOK    )

I, Zhiyuan Xu, being duly sworn, state the following under penalty of perjury:

1.    I am an associate in the law firm of Schiff Hardin LLP ("Schiff"), located at 6600 Sears Tower, Chicago, Illinois 60606. I am in all respects competent to make this Affidavit in support of Koch Foods' Motion for Protective Order, and Sanctions against Counsel for General Electric Capital Corporation.

2.    I directed the office personnel to make copies and Bates-stamp the documents produced in response to GE Capital's first set of Document Requests.

3.    I went through the documents several times to make sure that all the privileged communications were withheld before the delivery.

4.    In producing the documents, I grouped e-mails together in two bundles, which are separated and apart from the equipment lease in which KOCH 939 was inserted.

5.    I designated the complete e-mail chain, part of which are the two e-mails on KOCH 939, as privileged on Koch Foods' privilege log and withheld all other copies of the same e-mail chain in our document production.

6.    I never intended to produce KOCH 939 and would have removed it if I had seen it in the document production before delivery.

I declare under penalty of perjury that the foregoing is true and correct.

Zhiyuan Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois 60606
312.258.5836
312.258.5600 (fax)

Subscribed and sworn to before me on this _24th_ day of October, 2007

NOTARY PUBLIC
My commission Expires: _3-29-11_

OFFICIAL SEAL
CAROL L. NOETH
Notary Public - State of Illinois
My Commission Expires Mar 29, 2011

Exhibit E

« Previous | Next »

ABA Ethics Opinions > ABA Formal Ethics Opinions > Formal Opinion 92-368 November 10, 1992

**Formal Opinion 92-368**
**November 10, 1992**

### Inadvertent Disclosure of Confidential Materials

*A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.*

The Committee has been asked to opine on the obligations under the Model Rules of Professional Conduct of a lawyer who comes into possession of materials that appear on their face to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear that the materials were not intended for the receiving lawyer. The question posed includes situations in which the sending lawyer has notified the receiving lawyer of the erroneous transmission and has requested return of the materials sent as well as those situations in which the inadvertent sending lawyer and his client remain ignorant that the materials were missent. It also extends to situations in which the receiving lawyer has already reviewed the materials as well as those in which the sending lawyer intercedes before the receiving lawyer has had such an opportunity. This opinion is intended to answer a question which has become increasingly important as the burgeoning of multi-party cases, the availability of xerography and the proliferation of facsimile machines and electronic mail make it technologically ever more likely that through inadvertence, privileged or confidential materials will be produced to opposing counsel by no more than the pushing of the wrong speed dial number on a facsimile machine.

A satisfactory answer to the question cannot be drawn from a narrow, literalistic reading of the black letter of the Model Rules. But it is useful, and necessary, to bear in mind the thoughts in the Preamble to the Model Rules that "many difficult issues of professional discretion ... must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules," and that "the Rules do not exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules." In that larger, and more fundamental, framework, the Committee's views, expressed in this opinion, have been informed by (i) the importance the Model Rules give to maintaining client confidentiality, (ii) the law governing waiver of the attorney-client privilege, (iii) the law governing missent property, (iv) the similarity between the circumstances here addressed and other conduct the profession universally condemns, and (v) the receiving lawyer's obligations to his client.

Giving due weight to each of the foregoing considerations, it is the view of the Committee that the receiving lawyer, as a matter of ethical conduct contemplated by the precepts underlying the Model Rules, (a) should not examine the materials once the inadvertence is discovered, (b) should notify the sending lawyer of their receipt and (c) should abide by the sending lawyer's instructions as to their disposition.

*I. Confidentiality*

The concept of confidentiality is a fundamental aspect of the right to the effective assistance of counsel. As reflected in each iteration of the rules of professional responsibility, the obligation of the lawyer to maintain and to refuse to divulge client confidences is virtually absolute. The confidentiality principle rests on the vital importance society places upon the "full, free and frank" exchange between lawyer and client, shielded from the intrusive eyes and ears of adverse parties, the government, the media and the public. The principle's primary basis is that, absent

the guarantee of confidentiality, critical discussions will be either proscribed, circumscribed or intruded upon in a way that will impact directly on the ability of the lawyer to serve his or her client. If the lawyer cannot gather all the necessary information and is not free to explore with the client the client's options, free from the threat that these confidential communications will be shared with those whose interests may be adverse to the client, the chilling effect on the lawyer-client relationship becomes plain. The benefits of confidentiality were recognized over 150 years ago when Justice Shaw observed in *Hatton v. Robinson*, 31 Mass. (14 Pick.) 416, 422 (1833):

> This principle we take to be this; that so numerous and complex are the laws by which the rights and duties of citizens are governed, so important is it that they should be permitted to avail themselves of the superior skill and learning of [attorneys] both in ascertaining their rights in the country, and maintaining them most safely in court ... that the law has considered it the wisest policy to encourage and sanction this confidence, by requiring that on such facts the mouth of the attorney should be forever sealed.

Model Rule 1.6 codifies a lawyer's obligation to keep the confidences of his client. [1] The rule of keeping client's confidences confidential is mandatory; while section (b) lists limited scenarios in which a lawyer may choose to breach client confidences, such disclosure is not mandatory but optional. The Comment to Rule 1.6 states that the Rule "applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Rule 1.6 broadens the obligations imposed by DR 4-101 of the Model Code of Professional Responsibility, which prohibited only a lawyer's disclosure of a client's "confidence" (defined as "information protected by the attorney client privilege") or "secret" (defined as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client").

---

[1] The full text of Rule 1.6 is as follows:

(a) A lawyer shall not reveal information relating to the representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

---

### A. Competing Principles

If the Committee were to countenance, or indeed encourage, conduct on the part of the receiving lawyer which was in derogation of this strong policy in favor of confidentiality, the Committee would have to identify a more important principle which supports an alternative result. As the Committee examines the potentially competing principles, we conclude that their importance pales in comparison to the importance of maintaining confidentiality.

First, it might be argued that keeping the confidential materials and not letting the sending lawyer know they were received will punish carelessness on the part of the sending lawyer and those with whom that lawyer works. However, loss of confidentiality is a very high penalty to pay for a mere slip, particularly when the person or entity paying the "price" is not the individual lawyer responsible for the inadvertent conduct, but rather the client who

presumably had nothing to do with the mis-sending of the materials.

Second, it could be asserted that letting the receiving lawyer keep the confidential materials in this situation will encourage more careful conduct on the part of other counsel in the future. Once the catastrophic consequences of a misstep are recognized, lawyers and their clients will conform their future conduct to avoid such an unfortunate result. However, this rationale undervalues the lawyer's existing strong motivation.

Lawyers already have significant incentives to protect confidential materials, not the least of which is the mandate of Model Rule 1.6 itself. Having an inadvertent disclosure act as a total waiver of confidentiality can add little to this equation. The argument also ignores the persistence of human frailty. The possibility of "punishment," no matter how severe, will never prevent, in this modern age of electronic transmission, unlimited photocopies and cases with hundreds of parties, accidents from occurring. The wrong number on the facsimile machine will still be "mis-speed-dialed;" the contents of two envelopes will get switched; "send copies to all defense counsel" will be misunderstood as "send copies to all counsel."

Third, it may be asserted that once confidential materials are missent there is nothing really to protect. Of course, this argument does not apply if the receiving lawyer becomes aware of the inadvertence before the materials are examined. If the facsimile cover sheet says "to All Defense Counsel" and the receiving lawyer represents the plaintiff, the confidentiality can be completely protected so long as the lawyer refrains from giving in to temptation. But even where the receiving lawyer examines the materials before discovering that they were missent, there is still value in maintaining what confidentiality remains.

First, disclosure to counsel does not have to result in disclosure to counsel's client. Second, there is a significant difference between a lawyer's knowing the contents of documents and that lawyer's being able to use them, for example, at trial either as a basis for questions or by presentation of them to a fact finder. Third, inadvertent disclosure to one counsel or party does not necessarily lead to disclosure to other parties or their counsel if precautions, such as those in confidentiality orders, are taken.

Finally, it might be urged that a receiving lawyer has an obligation to maximize the advantage his client will gain from careful scrutiny of the missent materials. While the "zealous" representation of Canon 7 of the Model Code of Professional Responsibility does not appear *in haec verba* in the Model Rules, it could be argued that a lawyer's "commitment and dedication to the interests of the client," referred to in the Comment to Model Rule 1.3 (calling on a lawyer to act with "reasonable promptness and diligence"), includes an obligation to capitalize on an error of this sort on the part of opposing counsel.

However, there are many limitations on the extent to which a lawyer may go "all out" for the client. The examples cited in Part IV of this opinion are all "opportunities" the lawyer may not seize. Similarly, the Model Rules carefully circumscribe factual and legal representations a lawyer may make, people counsel may contact and clients counsel can represent. The limitation contemplated by this opinion is entirely consistent with these ethical restraints on uncontrolled advocacy.

   *B. The Analogy to Inadvertent Waiver of the Attorney-Client Privilege*

In concluding that inadvertent disclosure of confidential materials should not result in the loss of their confidential character we find persuasive the manner in which courts have treated the inadvertent disclosure of materials subject to the attorney-client privilege. While the privilege is a rule of evidence which addresses when an attorney can be compelled to disclose otherwise protected material, whereas confidentiality is a principle designed to govern the lawyer's voluntary conduct, both concepts are designed to further the attorney-client relationship in a similar

manner and for the same reasons.

A review of the relevant cases demonstrates, with few exceptions, an unwillingness to permit mere inadvertence to constitute a waiver. [2] Something more, like a failure of counsel to spend any time reviewing the documents to be produced in discovery, is required before a waiver is found. An example of this approach is the decision by the New Mexico Supreme Court in *Hartman v. El Paso Natural Gas Co.*, 107 N.M. 679, 763 P.2d 1144, 1152 (1988), in which the court explained how it would examine counsel's conduct in determining if there is a waiver:

> [2] *See* R. Franco & M. Pringle, *The Inadvertent Waiver of Privilege*, 26 Tort & Ins. L.J. 637 (1991); W. Ayers, *Attorney Client Privilege: The Necessity of Intent to Waive the Privilege in Inadvertent Disclosure Cases*, 18 Pac. L.J. 59 (1986); J. Grippando, *Attorney-Client Privilege: Implied Waiver Through Inadvertent Disclosure of Documents*, 39 U. Miami L. Rev 511 (1985); Note, *Inadvertent Disclosure of Documents Subject to the Attorney-Client Privilege*, 82 Mich. L. Rev. 598 (1983).

> [There are] five factors which should assist a court in determining whether a document has lost its privilege: (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; (5) whether the overriding interests of justice would be served by relieving a party of its error.

The Committee recognizes that the view that inadvertence should not necessarily give rise to a waiver of the attorney-client is not universally accepted. [3] Some cases and commentators endorse Wigmore's view that "the privilege stands in derogation of the public's right to everyman's evidence," that the privilege results in the suppression of evidence, that the cost of the privilege is clear: evidence which would have been used in the search for truth is excluded. This contrary view finds its philosophical expression in the writings of Judge Marvin E. Frankel who observed:

> [3] There are also a minority of cases which would never find waiver unless such a result was intended by counsel.

> We are taught from first year law school that waiver imports the "intentional relinquishment or abandonment of a known right." Inadvertent production is the antithesis of that concept.... Mendenhall's lawyer (not trial counsel) might well have been negligent in failing to cull the files of the letters before turning over the files. But if we are serious about the attorney-client privilege and its relation to the client's welfare, we should require more than such negligence by counsel before the client can be deemed to have given up the privilege.

> *Mendenhall v. Barber-Greene Co.*, 531 F. Supp. 951, 959 (N.D. Ill. 1982).

The effect of every evidentiary privilege, every grant in the law of a right to withhold information, is an added barrier to the search for truth. The lawyer is authorized and required by the privilege to cover up what may be evil and needed facts. The interests injured by the cover-up may be precious ones.

M. Frankel, *Partisan Justice* 64 (1980).

The cases reflecting what appears to be the minority view conclude that any unforced disclosure of attorney-client privileged communications destroys confidentiality and terminates the privilege, not only for the communications disclosed but also for all related communications.

> [I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels—if not crown jewels. Short of court compelled disclosure, [citation omitted] or equally extraordinary circumstances, we will not distinguish between various degrees of "voluntariness" in waivers of the attorney-client privilege. *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).

The fact that this result is reached is not surprising if one starts with hostility to the privilege. However, the Model Rules certainly reflect a far more positive view toward the importance of maintaining the confidentiality of attorney-client communications, one that this Committee must reflect as it interprets and explicates the Model Rules.

### II. Law Governing Missent Property

While the Committee does not answer questions of law, this principle does not preclude consideration, for present purposes, of the black letter of the law of bailment as it applies to missent property. Indeed, examination of the law of bailment proves instructive in suggesting how, as a matter of ethics, the receiving lawyer should conduct himself when he receives materials clearly not intended for him. That law defines the relationship between sending and receiving lawyer, the rights of the receiving lawyer with respect to the missent property and the obligations receiving lawyer has with respect to its use.

In the question presented to the Standing Committee, the receiving lawyer lawfully possesses the missent materials, but the sending lawyer clearly did not intend to relinquish title to them, either the physical objects or the ideas reflected on each page, such that they would become the "property" of the receiving attorney. The common law of bailments characterizes such mistaken possession as a bailment implied by law, or a constructive bailment.

> When possession of personal property of another is acquired and held under circumstances where the recipient, on principles of justice, ought to keep it safely and restore or deliver it to the owner, as, for example where possession has been acquired accidentally, gratuitously, *through mistake*, or by agreement since terminated for some other purpose than bailment, the law, irrespective of any actual meeting of the minds, any voluntary undertaking, or any reasonable basis for implying mutual benefit, imposes on the recipient the duties and obligations of a bailee. Such bailments are known as constructive and involuntary bailments, and ordinarily the party in possession of the property is regarded as a gratuitous bailee....

8 Am. Jur. 2d *Bailments* §64 (1980) (emphasis added).

An essential element of the bailment relationship is the absolute obligation of the bailee to return the subject matter of the bailment upon termination of the bailment. *Id.* §178 (1980). This obligation to return the property is necessarily implied from the mere fact of lawful possession of personal property of another. *Id.* §178. Where the bailment is not for any particular time, the bailor may terminate it at will. *Id.* §292. Indeed, the bailment terminates when an unauthorized use is made of the property. *Id.* §295. If the bailee refuses to return the property, makes an unauthorized disposition of it, or uses it for purposes other than those agreed on, he may be liable for its conversion. *Id.* §178.

The right of a bailee to use the bailed property and the extent to which it may be used is governed by the intention of the parties to the bailment. *Id.* §207. In the absence of any express agreement between the parties, as is the case in the question presented the Committee, no rule of universal application can be laid down:

> Each case must be governed by its own circumstances, such as the character and purpose of the bailment and the nature of the property, in connection with other attending incidents. One test or principle applicable to the subject is whether, from the circumstances, *the consent of the owner to the use may be fairly*

*presumed.*

*Id.* §207 (emphasis added).

The sending lawyer here, of course, cannot begin to be presumed to have consented to any use of the missent materials by the receiving lawyer. Indeed, the only "use" to which the sending lawyer could be presumed to have consented is the immediate return of the missent property. Any attempt by the receiving lawyer to use the missent letter for his own purposes would thus constitute an "unauthorized use."

*III. Analogous Cases*

The present issue is not unlike that presented to the Standing Committee in Informal Opinion 86-1518, Notice to Opposing Counsel of Inadvertent Omission of Contract Provision. (February 9, 1986). In that case a contract was negotiated including one hotly disputed provision insisted upon by B. When B's lawyer forwarded a draft of the agreement to A's lawyer, the key provision, though agreed to, was missing. The Committee was asked what duty, if any, A's lawyer had in the circumstances.

The opinion concluded that A's lawyer had no duty to notify A of the error under Model Rule 1.4 because the client has no decision to make. Nor was the lawyer barred by the confidentiality provisions of Model Rule 1.6 from informing the other side because this disclosure was "impliedly authorized" by the representation. Because under Model Rule 1.2 the lawyer has the authority to decide the technical means to carry out the representation and because the client's right under the same Model Rule to committed and dedicated representation is not unlimited, the opinion concluded that the "error is appropriate for correction between the lawyers without client consultation." In reaching this result the opinion was concerned that to do otherwise and "capitalize on the clerical error," might violate the proscription of Model Rule 1.2(d) not to counsel the client to engage in conduct the lawyer knows is fraudulent as well as the admonishment of Model Rule 4.1(b) not knowingly to fail to disclose a material fact when disclosure is necessary to avoid a client fraud.

While Informal Opinion 86-1516 is not on all fours with the instant situation, its charitable view toward inadvertence, its unwillingness to permit parties to capitalize on errors, its recognition of a limitation on client decision-making authority and its respect for the role of counsel all support the position advanced in this opinion as to counsel's proper conduct upon the inadvertent receipt of confidential information.

The Committee has also considered other hypothetical situations in which an opposing lawyer may have opportunity to "take advantage" of a chance to review and use confidential information. It is the view of the Committee that its dim view of a lawyer's doing so in each of these examples supports the conclusion reached by this opinion. For example, if during a lunch break in a deposition, lawyer B left notes or other materials in a conference room, either in an unlocked briefcase or on the conference room table, there is no respectable argument that competent and diligent representation requires or even permits lawyer A, arriving back from lunch early, to review the materials to which he now has easy access. Nor if, after a closing at lawyer A's office, lawyer B accidentally leaves a file or a briefcase behind would it be proper to assert that lawyer A could take advantage of this inadvertence and rifle the file or inspect the briefcase before returning it. Indeed, in the view of the Committee that lawyer would have an obligation to notify the lawyer who left her briefcase that it had been found. Finally, if in positioning an overhead projector on a shared counsel table in a courtroom during a recess, court personnel inadvertently move the prosecutor's notes into a position in front of the defense counsel's place at the table, it seems clear to the Committee that defense counsel would have an absolute obligation to return the materials without any examination or copying.

*IV. Good Sense and Reciprocity*

The analysis of this issue as an ethical matter should not obscure some more practical considerations that suggest the correct course for the receiving lawyer is to inform sending lawyer and return the documents. The immediate reaction of receiving counsel might be that the use of the missent materials can only serve to advantage his client. Nonetheless, it is clear there are advantages to doing just the opposite. First, instances of inadvertent production of documents tend not to occur only on one side. While a lawyer today may be the beneficiary of the opposing lawyer's misstep, tomorrow the shoe could be on the other foot. Second, when it is discovered that the confidential materials were retained and used the result could be similar to that which occurred recently in Baltimore when the court learned after jury selection that defendants' jury selection strategy was misdirected to plaintiffs' counsel by fax. "I find that the plaintiffs' attorneys have an advantage over the defense attorneys. Specifically, the plaintiffs know pretty well which prospective jurors the defense is going to strike … . They knew the inner-most thinking of the defense counsel." Baltimore City Personal Injury and Wrongful Death Asbestos Cases, Pretrial Hearing, June 5, 1991, Transcript at 4521, Circuit Court for Baltimore City, File No. 89236704. The judge struck the jury and ordered the entire process to begin again, at no small cost to plaintiffs, a cost that would have been expanded exponentially if the judge had not learned of this fact until the trial was over or when it was on appeal. Of similar effect is the recent example involving the Washington, D.C. office of a Texas law firm. Though in that case the confidential materials were intentionally delivered and, because they were from the government, special statutory provisions were involved, the fact that the firm felt compelled to withdraw because the firm was exposed to these materials, suggests the hazardous pathway which one must traverse after receipt of confidential materials. [4] "Taking a bet" on what reaction a court may have when an inadvertent disclosure becomes known can be a risky proposition indeed. Third, the credibility and professionalism inherent in doing the right thing can, in some significant ways, enhance the strength of one's case, one's standing with the other party and opposing counsel, and one's stature before the court.

---

[4] Jonathan Groner, *Akin, Gump Returns "Hot" Documents to Sender*, Legal Times (Washington, D.C.), October 5, 1992, at 8.

---

*Conclusion*

The preamble to the Model Rules correctly notes that "virtually all difficult ethical problems arise from the conflict between a lawyer's responsibility to clients, to the legal system and to the lawyer's interest in remaining an upright person while earning a satisfactory living." Similarly, the same introduction observes that "a lawyer is also guided by personal conscience and the approbation of professional peers." In this instance, those principles, as well as the Model Rules, the law of bailment and good sense all come together to support our conclusion that receiving counsel's obligations under those circumstances are to avoid reviewing the materials, notify sending counsel if sending counsel remains ignorant of the problem and abide sending counsel's direction as to how to treat the disposition of the confidential materials. This result not only fosters the important principle of confidentiality, avoids punishing the innocent client and conforms to the law of bailment, but also achieves a level of professionalism which can only redound to the lawyer's benefit.

**ABA Formal Opinions**

The following formal opinions are issued by the ABA Standing Committee on Ethics and Professional Responsibility. They appear here in full text and are copyrighted by the ABA.

**Related Stories**

Attorney Misconduct in Discovery Overrides Work Product Protection, 19 Law. Man. Prof. Conduct 196 (04/09/2003).

California Court Announces Standard For Inadvertent Document Disclosure Cases, 15 Law. Man. Prof. Conduct 80 (03/17/1999).

Maryland Panel Charts Duties of Lawyer Who Gets Inadvertently Produced Documents, 16 Law. Man. Prof. Conduct 179 (04/26/2000).

ABA Retracts Opinion on Lawyer's Duties Upon Unsolicited Receipt of Secret Materials, 22 Law. Man. Prof. Conduct 358 (07/26/2006).

Conference Panelists Offer Insights On Managing Risks in Law Practice, 18 Law. Man. Prof. Conduct 198 (03/27/2002).

U.S. Prosecutors Argue for Return Of Inadvertently Released Document, 14 Law. Man. Prof. Conduct 43 (02/18/1998).

New York County Panel Adopts ABA View On Proper Response to Inadvertent Disclosure, 18 Law. Man. Prof. Conduct 584 (09/25/2002).

Speakers Describe Tools to Help Firms Assure Ethical Conduct, Handle Tough Issues, 21 Law. Man. Prof. Conduct 134 (03/09/2005).

ABA Revokes Inadvertent Disclosure Opinion As Inconsistent With Amendment to Rule 4.4, 21 Law. Man. Prof. Conduct 584 (11/16/2005).

« Previous | Next »

⌃ top

Contact customer relations at: customercare@bna.com or 1-800-372-1033

ISSN 1545-9845

Copyright © 2007, by the American Bar Association and The Bureau of National Affairs, Inc., Washington, D.C. | Copyright FAQs | Internet Privacy Policy | BNA Accessibility Statement | License

Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V