Mark Kaminsky        October 19, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

KOCH FOODS OF ALABAMA, LLC,       )
An Alabama Limited Liability     )
company,                          )
                                  )  No. 07-cv-522-MHT
     Plaintiff and                )
     Counterclaim-Defendant,      )
                                  )
  vs.                             )
                                  )
GENERAL ELECTRIC CAPITAL          )  Honorable Myron H. Thompson
CORPORATION, A Delaware           )
corporation,                      )  Honorable Terry F. Moorer
                                  )
     Defendant and                )
     Counterclaim-Plaintiff.      )

     The deposition of MARK KAMINSKY, taken before Christina M. Cummins, CSR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 10 South Wacker Drive, 40th Floor, in the City of Chicago, Cook County, Illinois at 10:02 a.m. on the 19th day of October, A.D., 2007.

Page 2

```
 1  PRESENT:
 2  SCHIFF HARDIN LLP
     By MR. EUGENE J. GEEKIE JR.
 3   6600 Sears Tower
     Chicago, Illinois 60606
 4   312.258.5500
 5   appeared on behalf of the Plaintiff and
     Counterclaim-Defendant;
 6
     REED SMITH SACHNOFF & WEAVER
 7   By MR. TIMOTHY S. HARRIS and
     MS. ANN E. PILLE
 8   10 South Wacker Drive
     Chicago, Illinois 60606-7507
 9   312.207.1000
10   appeared on behalf of the Defendant and
     Counterclaim-Plaintiff.
```

Page 3

```
 1              INDEX
 2  WITNESS
 3   MARK KAMINSKY
 4  EXAMINED BY               PAGE
 5   MR. HARRIS                4
 6
 7
 8
 9            EXHIBITS
10  DEPOSITION          FIRST REFERENCE
11    A                    7
12    B                   25
13    C                   81
14    D                   97
15    F                  105
16    G                  120
17    H                   60
18    J                  138
19    O                  142
20    R                   76
21    S                   75
22    T                  145
23    U                   49
24    W                   81
```

Page 4

```
 1              MARK KAMINSKY,
 2  having been first duly sworn, was examined and
 3  testified as follows:
 4              EXAMINATION
 5  BY MR. HARRIS:
 6    Q   Good morning, Mr. Kaminsky. How are you?
 7    A   Good.
 8    Q   This is Ann Pille --
 9    A   Hi.
10    Q   -- one of my colleagues. And are you
11  represented by counsel here today?
12    A   I am.
13    Q   And by whom?
14    A   Gene Geekie.
15    Q   And could you state your name for the
16  record?
17    A   Mark Kaminsky.
18    Q   Could you spell the last name?
19    A   K-a-m-i-n-s-k-y.
20    Q   And what is your date of birth?
21    A   April 27, 1963.
22    Q   Have you ever been deposed before?
23    A   I have.
24    Q   How many times?
```

Page 5

```
 1    A   Three or four.
 2    Q   We'll get to that in a minute. I just
 3  want to give you the ground rules for depositions
 4  and what we plan to do here today. I'm going to ask
 5  you a series of questions, all oral. You need to
 6  give me back oral English responses. In other
 7  words, no nods, no head bobs or anything like that.
 8  And the reason is she needs to type down all the
 9  words that you say.
10         We can only have one person speaking at a
11  time for two reasons. One is that it is a more
12  effective way I think to communicate. Secondly,
13  again, she can only take down one person at a time.
14  If I ask you any questions that are unclear, I want
15  you to say to me that they're unclear, ask me to
16  restate it, ask me whatever it is that you don't
17  understand about the question. If you do answer the
18  question I'm going to assume that you understand it,
19  is that agreeable?
20    A   Yes.
21    Q   If you need a break at anytime, let me
22  know. The only caveat to that would be is if
23  there's a document that we're discussing or if
24  there's a question pending, then we'll finish with
```

Mark Kaminsky          October 19, 2007

Page 94

1  remove the deboning equipment from the facility now?
2    A   If it's a resolution to our conflict, then
3  yes.
4    Q   I'm not sure what that means, so let's
5  break that down. You mean as part of a settlement
6  you might be agreeable to that, is that what you
7  mean?
8    A   Yes.
9    Q   Fine. Understood. Barring settlement, is
10 it Koch Foods' desire that GE Capital remove the
11 deboning equipment now?
12   A   Not at this time.
13   Q   And why is that?
14   A   I think we have to come to some conclusion
15 to our conflict.
16   Q   So your position is that the deboning
17 equipment, while sitting outside in the parking lot,
18 continues to be owned by Koch Foods, is that
19 correct?
20   A   Yes.
21   Q   Now, didn't you tell me this morning that
22 there came a time when Koch Foods demanded that GE
23 remove the deboning equipment?
24   A   Yes.

Page 95

1    Q   And when was that again?
2    A   April of 2007.
3    Q   And what happened between April 2007 and
4  now with respect to that demand?
5        MR. GEEKIE: Objection, vague and
6    ambiguous.
7    A   The conflict did not resolve itself. It's
8  escalated into legal proceedings, so --
9  BY MR. HARRIS:
10   Q   Well, let me ask you this. Was the
11 conflict resolved in April 2007 when you say demand
12 was made on GE Capital to remove that equipment?
13   A   No. They didn't pick it up.
14   Q   Had they picked it up, would that have
15 resolved the conflict?
16       MR. GEEKIE: Objection, calls for a legal
17   conclusion.
18   A   Hard to say. I mean, from my perspective,
19 if I don't have the equipment, I don't owe anything.
20 BY MR. HARRIS:
21   Q   What if you used the equipment?
22       MR. GEEKIE: Objection, calls for a legal
23   conclusion and calls for speculation. There's
24   no factual basis.

Page 96

1    A   My contention is my use of the equipment
2  is incidental.
3  BY MR. HARRIS:
4    Q   Is it also Koch's position that despite
5  its use of the deboner, GE owes it storage fees with
6  respect to the deboner?
7    A   Yes.
8    Q   How do you square that with its claim that
9  it owns the equipment?
10   A   That's what we're trying to determine, who
11 owns it, why, or what is owed by whom to who.
12   Q   Well, if Koch Foods owns the deboner
13 equipment, what is the basis for your belief that GE
14 owes storage fees?
15   A   Ultimately that's what we're going to
16 determine, who owns the equipment. It is my opinion
17 that it is owned by me. If a legal decision is made
18 that I do not, then I'm entitled to storage fees.
19   Q   Understood. So let's be clear. It's not
20 just your opinion, but it's the position of Koch
21 Foods that it owns the deboning equipment, correct?
22   A   It is.
23   Q   Now, it's really not true that Koch Foods
24 wanted GE to remove the equipment, and when I say -

Page 97

1  strike that.
2        It's really not true, is it, that GE
3  Capital -- strike that.
4        It's really not true that Koch Foods
5  wanted GE Capital to remove the deboning equipment
6  back in, say, May 2006, correct?
7        MR. GEEKIE: Objection. It's
8    argumentative and calls -- form, objection as
9    to form.
10   A   It was not our desire to have them remove
11 the equipment in May of 2006.
12 BY MR. HARRIS:
13   Q   And it wasn't the desire to have GE
14 Capital remove the deboner or the spiral freezer
15 equipment for any part of the year of 2006, correct?
16       MR. GEEKIE: Same objection.
17   A   No, we would not have desired to have them
18 remove the equipment.
19 BY MR. HARRIS:
20   Q   In fact, you were trying to hold GE off
21 from picking up the equipment until you got the new
22 deboning equipment installed, isn't that true?
23   A   No, that is not true.
24   Q   Let me introduce a document, Exhibit D.

25 (Pages 94 to 97)

Mark Kaminsky          October 19, 2007

Page 98

1  My question is have you ever seen this document
2  before?
3      A   Yes.
4      MR. GEEKIE: Hold on. Stop. This is
5  attorney-client privilege, and I'm going to
6  instruct him not to answer. And I'm going to
7  ask that you return all copies of this
8  document. I've never been informed that you
9  received this. And it obviously is a document
10 that was produced inadvertently.
11     MR. HARRIS: I don't know that that's
12 obvious at all. It was produced --
13     MR. GEEKIE: And --
14     MR. HARRIS: Well, let me just finish.
15     MR. GEEKIE: And --
16     MR. HARRIS: Well, you go ahead and you
17 finish.
18     MR. GEEKIE: Yes. Thank you, because --
19     MR. HARRIS: I thought you were done.
20     MR. GEEKIE: Can I proceed now?
21     MR. HARRIS: Please.
22     MR. GEEKIE: And we haven't been notified
23 of this. There was no inquiry. But it's
24 obvious that this is a communication from me to

Page 99

1  Mr. Kaminsky. And I'll instruct him not to
2  answer. And I will ask on the record if you
3  will return all copies of this document.
4      MR. HARRIS: I think that the privilege,
5  to the extent one existed on this document, has
6  been waived.
7      MR. GEEKIE: Okay. We'll take it up with
8  the Court then. I take it your response is
9  you'll not return these documents?
10     MR. HARRIS: It's hardly my response.
11 Please don't put words into my mouth.
12     MR. GEEKIE: Well, will you answer my
13 question? Are you going to return them?
14     MR. HARRIS: I don't know. I believe this
15 to be -- to the extent that this may have been,
16 and I don't know that it was, I don't know who
17 else this went to, I don't know that this was
18 inadvertent. Let me ask you this. Did you
19 know you produced this prior to today?
20     MR. GEEKIE: Who are you speaking to?
21     MR. HARRIS: You.
22     MR. GEEKIE: Me?
23     MR. HARRIS: Yes.
24     MR. GEEKIE: No, I didn't.

Page 100

1      MR. HARRIS: We'll need to discuss this.
2      MR. GEEKIE: When will I have a response
3  to my question about returning it?
4      MR. HARRIS: I think we need to discuss
5  the basis -- I have a lot of other questions to
6  ask you. To whom else did this go?
7      MR. GEEKIE: Okay. Submit them in
8  writing.
9      MR. HARRIS: I'm not going to do that.
10 I'm going to ask you now. To whom else did
11 this go?
12     MR. GEEKIE: We'll take it up with the
13 Court, Mr. Harris.
14     MR. HARRIS: You can do as you wish.
15 Write me a letter. I'll ask you to put it in
16 writing, sir. If you write me a letter stating
17 the basis --
18     MR. GEEKIE: I will tell you now on the
19 record --
20     MR. HARRIS: Let me just finish, sir.
21 Wait a minute.
22     MR. GEEKIE: -- that we are going to file
23 a motion --
24     MR. HARRIS: You file whatever you want

Page 101

1  to, Gene.
2      MR. GEEKIE: We're going to file a motion.
3  But I asked you to return the document, and you
4  refuse to even respond to that. So what we
5  will do is we'll file a motion and let the
6  Court decide.
7      MR. HARRIS: Can I speak? I shall speak.
8  For the record, I tried to speak after giving
9  Mr. Geekie a chance to explain his position. I
10 let him do that. I tried to ask a question and
11 explain mine. He interrupted repeatedly.
12     My position is that any waiver -- I'm
13 sorry, excuse me, that any privilege that may
14 properly attach to this document was waived
15 when it was disclosed to us, as I will say that
16 it was. I'm not sure that the genie can be put
17 back into the bottle to the extent that it
18 wasn't -- that it was inadvertently disclosed.
19     But I have a series of questions that I
20 will ask Mr. Geekie to respond to, such as this
21 appears to be only a partial document. It says
22 page two of three. I don't have page one and I
23 don't have page three. And I certainly don't
24 know to whom else this may or may not have been

26 (Pages 98 to 101)

Mark Kaminsky          October 19, 2007

### Page 102

1    distributed.
2        And I will request that Mr. Geekie, to the
3    extent that he believes that the
4    attorney-client privilege in fact does relate
5    to this document, that he assert so in writing
6    and state why it was disclosed, whether that be
7    inadvertently or otherwise. And at that point
8    I will consider Mr. Geekie's request.
9    Q   Sir, you've got Exhibit D in front of you.
10   My question was have you ever seen this document
11   before. You've been instructed not to answer that
12   question. And your response is?
13   A   I'm not answering anything regarding this
14   document.
15       MR. HARRIS: Okay. Let me go back to the
16   immediately, and this may take a while to find,
17   the immediately preceding question and answer
18   before I introduced Exhibit D.
19       (Record read as follows:)
20       "Q   In fact, you were trying to hold GE
21   off from picking up the equipment until you got
22   the new deboning equipment installed, isn't
23   that true?
24   A   No, that is not true."

### Page 103

1    BY MR. HARRIS:
2    Q   Let's go back to my last question and your
3    last answer. Is that still your testimony?
4    A   No, we weren't trying to hold GE off. We
5    have continuously tried to negotiate in good faith
6    with GE. And every attempt at good faith
7    negotiation has been rebutted. So in an effort to
8    protect the company, I did make the decision to put
9    in additional or new equipment into that facility.
10   Q   Tell me a couple things on that. I'm not
11   sure that it really responds to my question. Were
12   you trying to hold GE off from picking up the
13   deboning equipment until you got replacement
14   equipment?
15   A   GE never requested to pick up the
16   equipment, so how was I holding them off?
17   Q   So is the answer to my question yes or no?
18   A   I did nothing to hold GE off from picking
19   up their equipment.
20   Q   And my other question is if Koch Foods
21   owns the equipment, why is it replacing it and why
22   does it care what GE says if it's confident that it
23   owns the equipment?
24   A   That ultimately will be determined by the

### Page 104

1    outcome of these legal proceedings on who owns the
2    equipment. My position is my position. That
3    doesn't mean ultimately that will be founded. It's
4    what I believe, and I believe it is legally correct.
5    Q   Did you have any conversations with anyone
6    at Koch, any employees of Koch Foods, regarding
7    replacing the equipment?
8    A   Yes.
9    Q   Who?
10   A   Wayne Jones.
11   Q   Who else, anyone?
12   A   No.
13   Q   What did you and Mr. Jones discuss
14   regarding replacing the equipment?
15   A   In order to ascertain what a fair offer of
16   settlement in these proceedings would be to GE, I
17   asked Mr. Jones to price new equipment.
18   Q   And did he do so?
19   A   He did.
20   Q   And what was the price that he came up
21   with?
22   A   We had previously discussed in this
23   deposition a price of $450,000. I was not sure if
24   that was inclusive of installation or not.

### Page 105

1    Q   Okay. Did you discuss with anyone else at
2    Koch anything about the installation of new
3    equipment?
4    A   I would have informed Joseph Grendys as to
5    my thought process and plan of action.
6    Q   And what was his response?
7    A   He told me to proceed according to my
8    action plan or what I felt was best. He didn't
9    really have an opinion one way or another.
10   Q   Have you had any conversations -- and
11   pronounce his name again for me, Mr. Grendys?
12   A   Grendys.
13   Q   Grendys. Have you had any conversations
14   with Mr. Grendys regarding the litigation strategy
15   of Koch Foods in this matter?
16   A   No.
17   Q   Have you had any such conversations with
18   anyone else at Koch Foods?
19   A   No.
20   Q   So you're the guy who's running the show,
21   right?
22   A   Yes. From Koch's perspective, yes.
23   Q   Correct. I show you what's been marked as
24   Exhibit F and ask if you've ever seen this document

27 (Pages 102 to 105)

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, </br></br>Plaintiff,</br></br>v.</br>GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation,</br>Defendant. | )</br>)</br>)</br>)</br>)</br>) Case No. 2:07cv522-MHT</br>)</br>)</br>) |

**KOCH FOODS' SUPPLEMENTAL BRIEF ON ALABAMA LAW REGARDING WAIVER OF ATTORNEY-CLIENT PRIVILEGE**

Koch Foods of Alabama, LLC ("Koch") hereby files its supplemental brief, pursuant to this Court's order, regarding Alabama law on the subject of waiver of attorney-client privilege.

1. Alabama Rule of Evidence 510 states that:

> A person whom these rules confer a privilege against disclosure waives the privilege of the person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter.

2. The case of Ex Parte Bettis, 549 So.2d 23 (AL. 1989) is the only Alabama case that Koch could locate dealing with inadvertent disclosure of privileged material and whether that inadvertent disclosure waives the privilege. In Bettis the Alabama Supreme Court affirmed the denial of a writ of mandamus after the trial court had barred the use of a privileged letter that was inadvertently disclosed. Id at 24. The Court observed that:

> [The defendants] further argued that the letter contains privileged communications protected by attorney-client privilege and that the inadvertent disclosure of the letter did not work as a waiver of the right to claim that privilege; that the admission of the letter would inject the issue of insurance into the case; and that the prejudice resulting from admission of the letter would greatly out weigh any probative value it may have. I agree with the arguments of the defendants.

Id at 26. See also Matter of the Reorganization of Elec. Mot. Liability Ins. Co., Ltd., 681 N.E.2d 838, 84, (Mass. 1997) (determining that inadvertent disclosure did not waive privilege under Mass. R. Evid. 510 "[w]here it can be shown...that reasonable precautionary steps were taken, the presumption will be that the disclosure was not voluntary and therefore unlikely that there has been a waiver"); Farm Credit Bank of St. Paul v. Huether, 454 N.W.2d 710, 720 (N.D. 1990) (affirming denial of waiver under North Dakota R. Evid. 510, when letter inadvertently disclosed by counsel "because there was no opportunity for client, as the holder of the privilege, to claim the privilege").

3. Here, the privileged communication at issue – KOCH 939 – was clearly attorney-client communication, and, as this court can observe from the copy of KOCH 939 provided for in camera review, related to settlement discussions between Koch and General Electric Capital.[1] In fact, the deposition testimony of Koch's CFO, Mark Kaminsky, confirms this. See **Ex. A** attached hereto at pages 97-104. To find waiver of the privilege here would inject into this case the extensive settlement discussion between the parties, which are generally inadmissible under the Federal Rules of Evidence. See F.R.E. 408. Moreover, Koch took precautions to protect the privileged KOCH 939 emails, listing them on the privilege log and withholding them from production -- except for the one page that was accidentally placed in a copy of the equipment lease. For the same reasons found in Bettis, the inadvertent disclosure by Koch should be held to not waive Koch's attorney-client privilege with respect to KOCH 939.

4. If this Court does not find Bettis sufficient to guide its ruling, Koch suggests that the five-part balancing test adopted by the Fifth Circuit in Alldread v. City of Grenada, 988 F.2d

---

[1] Koch will not extensively repeat the facts regarding its inadvertent waiver, which are fully set forth in its motion, but will reiterate that KOCH 939 was inadvertently placed inside a copy of a voluminous equipment lease, separate and apart from the other emails that were produced, and Koch identified the two emails contained on KOCH 939 on its privilege log.

2

1425 (5th Cir, 1993), commonly known as the Hydraflow test.[2] See Hydraflow, Inc. v. Enidine, Inc., 145 F.R.D. 626 (W.D.N.Y. 1993). This five-part test has been adopted by numerous Federal and State courts, and would likely be adopted by the Alabama Supreme court because of its focus on the facts surrounding the inadvertent disclosure. See Gray v. Bicknell, 86 F.3d 1472, 1483-84 (8th Cir. 1996) (finding that Missouri Supreme court would adopt Hydraflow test); Truckstop.Net, L.L.C. v. Spring Communic. Co., L.P., 2007 WL 23800001 (D. Id. August 29, 2007) (applying balancing test to Idaho R. Evid. 510); Sterling v. Keidan, 412 N.W.2d 255 (Mich. Ct. App. 1987) (no waiver where attorney inadvertently failed to remove privileged document from "fairly voluminous file").

5.  The Hydraflow/Alldread test is a multi-factor test to the facts surrounding the disclosure, including (1) the reasonableness of precaution taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. Alldread, 988 F2d. at 1433.

6.  The application of all these factors mandates a finding that the disclosure of KOCH 939 did not waive the attorney-client privilege. KOCH 939 is a single page containing two short e-mails in a 3758-page document production. Koch Foods' counsel have went through the documents several times and did not discover the single page printout buried in the lease. Koch Foods produced all non-privileged e-mails together in two bundles and they are separate and apart from the lease. Koch Foods' counsel did not intend to produce KOCH 939 and would have removed the e-mail from production had he saw it. *See* Affidavit of Zhiyuan Xu, which is

---

[2] The Hydraflow test is a middle-of-the-road approach. There is a "lenient" test, where the attorney-client privilege exist for the benefit of the client and cannot be waived except by a knowing and intentional act. See Georgetown Manor, Inc. v. Ethan Allen, Inc., 753 F.Supp. 936 (S.D. Fla. 1991). There is also a "strict" test where any document produced, intentionally or not, loses its privilege. See In re Sealed Case, 676 F2d 793 (D.C. Cir. 1982). See Gray v. Bicknell, 86 F.3d 1472, 1483-84 (8th Cir. 1996) rejects these polar approaches and adopts Hydraflow as the test Missouri Courts would choose.

3

attached as **Exhibit D** to Koch's Motion. In addition, Koch Foods' counsel immediately demanded return after learning of the disclosure. In short, these circumstances dictate that the inadvertent disclosure did not waive the privilege under Hydraflow/Alldread.

7. Because the disclosure did not waive the privilege inherent in the two e-mails on KOCH 939, pursuant to Rule 26(b)(5)(B) of Federal Rules of Civil Procedure, GE Capital must promptly return or destroy KOCH 939 and all copies it has, and must not use or disclose the information on KOCH 939.

November 9th, 2007.

Respectfully submitted,

_____
One of the Attorneys for Plaintiff

OF COUNSEL:
Thomas Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, AL 36117
Telephone: (334)481-1800

Eugene J. Geekie, Jr.
Mike Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
Telephone: (312)258-5500

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on November 9, 2007, copies of *Koch Foods' Supplemental Brief on Alabama Law Regarding Waiver of Attorney-Client Privilege* were caused to be served via email and United States mail, to the following:

Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
Email: tharris@reedsmith.com

Alexander Terras
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com
cmstewart@bradleyarant.com

_____
Of Counsel