# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| KOCH FOODS OF ALABMA, LLC, an Alabama limited liability company ) ) ) | Case No. 07-cv-522-MHT |
| Plaintiff and Counterclaim-defendant, ) ) | |
| v. ) ) | Honorable Myron H. Thompson<br>Honorable Terry F. Moorer |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, ) ) ) ) | |
| Defendant and Counterclaim-plaintiff. ) ) | |

### KOCH FOODS' MOTION TO COMPEL THE DEPOSITIONS OF JIM HANLEY AND CARRIE BROCK, AND TO COMPEL THE PRODUCTION OF DOCUMENTS RELATING TO DEPRECIATION AND TAX DEDUCTIONS

Plaintiff and Counterclaim-Defendant, Koch Foods of Alabama, LLC ("Koch"), through its undersigned counsel, pursuant to Rule 37 of Federal Rules of Civil Procedure ("FRCP"), hereby files this motion (the "Motion") to Compel the Depositions of Jim Hanley and Carrie Brock, and to Compel the Production Of Documents Relating to Depreciation and Tax Deductions. In support of this Motion, Koch Foods states as follows:

1.     Defendant and Counterclaim-Plaintiff General Electric Capital Corporation ("GE Capital") entered into an equipment lease (the "Lease") with Sylvest Farms, Inc. in December 2005. Sylvest went into bankruptcy in April 2006. In the bankruptcy proceeding, Koch purchased substantially all of Sylvest's assets including the facility housing the equipment under the Lease but Koch did not assume the Lease.

2.     Koch brought this lawsuit for declaratory judgment and for unjust enrichment, claiming that certain equipment under the Lease (the "Equipment") are fixtures to Koch's

facility. GE Capital brought a counterclaim in this lawsuit against Koch for conversion of the Equipment.

3.     On July 17, 2007, this Court entered a scheduling order (the "Scheduling Order"), which designated December 4, 2007 as the close date of discovery.

**<u>Depositions of Jim Hanley and Carrie Brock</u>**

4.     On October 4 and 19, 2007, Koch served GE Capital with deposition notices for William Wilson and Joe Di Salvo, both of whom are GE Capital employees located in its Connecticut offices. On December 3, 2007, counsel for GE Capital notified Koch that Mr. Wilson and Mr. Di Salvo would be available on December 17, 2007 for their depositions.

5.     On November 29, Counsel for Koch – after several months of seeking available dates for deposition -- took the depositions of William Perry and John Sutehall of GE Capital in Atlanta, Georgia. In these depositions, counsel for Koch for the first time learned that Carrie Brock of GE Capital has information about the lawsuit.

6.     Carrie Brock was not disclosed on any of GE Capital's discovery responsive documents. Jim Hanley's involvement in this case is broader than what GE Capital has disclosed because, according to John Sutehall's testimony at his deposition, Mr. Hanley was in charge of everything relevant to this case and has the most knowledge of this case. A true copy of GE Capital's initial disclosure statements is attached hereto as **<u>Exhibit A.</u>**

7.     On November 30, promptly after learning about the extent of Brock's and Hanley's actual involvement, Koch served GE Capital with deposition notices for Jim Hanley and Carrie Brock, both of whom are located in the Connecticut offices of GE Capital. The notices requested that Ms. Brock and Mr. Hanley appear for depositions on December 17, which

is the same date GE Capital made Mr. Wilson and Mr. Di Salvo available for depositions. Discovery in this case was scheduled to close on December 4, 2007.

8.      On December 3, 2007, counsel for GE Capital responded via e-mail that GE Capital would not produce either Jim Hanley or Carrie Brock for deposition, stating that discovery closes on December 4 under the Scheduling Order and December 17 was well after the close date of discovery.  A copy of the e-mail is attached hereto as **Exhibit B**

9.      GE Capital has disregarded the close date of discovery of December 4 by providing a deposition date on December 3 and choosing December 17 for depositions, a date well after the close of discovery.  Furthermore, GE Capital disregarded its obligation under the rules of FRCP by failing to disclose Carrie Brock as a witness who may have information about this lawsuit, and not fully disclosing the knowledge and involvement of Jim Hanley.

10.      GE Capital is apparently determined to gain a tactical advantages by refusing to produce Ms. Brock and Mr. Hanley, claiming that it is enforcing the close date of discovery under the Scheduling Order.

11.      Moreover, both Ms. Brock and Mr. Hanley are in the same location as Mr. Wilson and Mr. Di Salvo.  GE Capital will incur little inconvenience to produce two additional witnesses on the same deposition date at the same location.

12.      Therefore, this Court should compel Mr. Hanley and Ms. Brock to appear for their depositions and prevent GE Capital from gaining tactical advantages by abusing the litigation process.

### Production of Documents Relating to Depreciation and Tax Deductions

13.      On October 4, 2007, Koch served GE Capital with its Second Set of Interrogatories, Requests for Production of Documents, and Requests for Admission.  Among

other things, Koch asked for information about the depreciation and tax deductions taken by GE Capital regarding the Equipment.

14.     GE Capital responded to these discovery requests on November 5, 2007.  In its responses, GE Capital refused to provide any information relating to depreciation and tax deductions regarding the Equipment, claiming that the information is irrelevant and production of such information is burdensome.

15.     On November 19, 2007, Counsel for Koch wrote a letter to counsel for GE Capital explaining why GE Capital must produce the tax information requested.  A true cope of the letter is attached hereto as **Exhibit C**.  On November 30, 2007, upon the request of counsel for Koch Foods, counsel for GE Capital participated in a discovery telephone conference regarding the production of information about tax deductions.  GE Capital again refused to produce such information during the conference.

16.     The depreciation and tax deductions are relevant to this lawsuit. First, the party who claimed the tax deductions and benefits of such deductions, be it GE Capital or Sylvest, shows the indicia of the ownership of the Equipment.  In fact, the tax benefits and depreciation deductions were the material terms of the Lease.  A copy of the Lease is attached hereto as **Exhibit D**.  Whether GE was claiming the tax deductions and benefits of such deductions will help Koch to prove the ownership of the Equipment and whether the Lease is a true lease.

17.     Second, the tax cost basis and depreciations reflect the value of the Equipment at the time of the alleged conversion.  For example, the valuation reports produced by GE Capital, part of which is attached hereto as **Exhibit E**, used the depreciation and costs basis method to value the Equipment.

18. In addition, according to the tax law, GE Capital could not make any tax depreciation deductions until the Equipment was installed and in service. Therefore, when GE Capital started taking the depreciation deductions of the Equipment – if it ever did -- helps Koch to determine whether the equipment was installed and operational at the time of the alleged conversion. This in turn helps Koch to determine the value of the Equipment.

19. The standard for whether information is discoverable is not whether it is relevant, but whether it will lead to the discovery of relevant information. Fed. R. Civ. P. 26(b)(1). Clearly here, the tax and depreciation information regarding the equipment, is either relevant or likely to lead to the discovery of relevant information.

20. The information about the depreciation and tax deductions of the Equipment is necessary for Koch to determine the ownership and value of the Equipment and to rebut GE Capital's expert report. This tax information is ready available for GE Capital to produce, or it would have stated otherwise in affidavits in response to Koch's repeated requests. Therefore, this Court should compel GE Capital to produce the information about GE Capital's depreciation and tax deductions of the Equipment.

**WHEREFORE**, Koch respectfully requests that this Court enter an order

(a)    Granting Koch's Motion;

(b)    Compelling Jim Hanley and Carrie Brock to appear for their depositions on a date that is agreeable to both parties;

(c)    Compelling GE Capital to produce any and all information requested by Koch Foods relating to the depreciation and tax deductions of the equipment;

(d)    Awarding Koch attorney's fees and costs for bringing this Motion;

(d)     Granting any other relief this Court deems just and proper.


Dated:  December 5, 2007                    Koch Foods of Alabama, LLC

                                            Respectfully submitted,

                                   By:     /s/ Zhiyuan Xu
                                   Zhiyuan Xu, one of the attorneys

Thomas G. Mancuso
Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104
Telephone: 334-265-8573
tgm@hsy.com

OF COUNSEL
Eugene J. Geekie, Jr.
Zhiyuan "Mike" Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois  60606
(312) 258-5500
(312) 258-5600 (Fax)
egeekie@schiffhardin.com
mxu@schiffhardin.com

<u>CERTIFCATE OF SERVICE</u>

The undersigned, an attorney, certifies that copies of the forgoing *Koch Foods' Motion to Compel the Depositions of Jim Hanley and Carrie Brock, and to Compel the Production of Documents Relating to Depreciation and Tax Deductions* were caused to be served upon counsel of record addressed as follows by email and the ECF system on this 18th day of December 5, 2007.

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
tharris@reedsmith.com
aterras@reedsmith.com

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com

/s/ Zhiyuan Xu
Zhiyuan Xu

CH2\2201930.6

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KOCH FOODS OF ALABAMA, LLC,  )
an Alabama limited liability company,  )
                                 )
        Plaintiff and Counter-  )
        Defendant,  )
                                   )    CIVIL ACTION NO.
   vs.  )    2:07 CV 522-MHT
                                   )
GENERAL ELECTRIC CAPITAL  )
CORPORATION, a Delaware corporation,  )
                                 )
        Defendant and Counter-  )
        Plaintiff,  )
                                 )

## GE CAPITAL'S RULE 26 DISCLOSURES

General Electric Capital Corporation ("GE Capital"), through its attorneys, pursuant to Federal Rule of Civil Procedure 26 and this Court's Order of July 17, 2007, makes the following disclosures:

A.    Names, addresses, and telephone numbers of individuals likely to have discoverable information that GE Capital may use to support its claims and defenses, unless solely for impeachment, and a description of the subjects of the information:

1.    William Wilson
GE Capital
44 Old Ridgebury Road
Danbury, Connecticut 06810

(203) 796-1000

Mr. Wilson has or may have information regarding, among other things, the leasing and delivery of the equipment at issue; its installation at the facility at issue; its use by Sylvest Farms, Inc. ("Sylvest"); its use by Koch Foods of Alabama, LLC and/or its affiliates ("Koch Foods"); and its value at times relevant to this matter.

2.    Bob Breakstone
Equipment Exchange Company of America, Inc.
10042 Keystone Drive
Lake City, Pennsylvania 16423

(814) 774-0888

Mr. Breakstone has or may have information regarding, among other things, the

installation of the equipment at issue in the facility at issue; its use by Sylvest; its

use by Koch Foods; and its value at times relevant to this matter.

3.    Dave Bromley
Sylvest Farms/Koch Foods
4530 Mobile Road
Montgomery, Alabama 36108

(334) 281-0400

Mr. Bromley has or may have information regarding, among other things, the

leasing and receipt of the equipment at issue; its installation at the facility at issue;

its use by Sylvest; its use by Koch Foods; and its value at times relevant to this

matter.

4.    Dan Nicosan
Equipment Exchange Company of America, Inc.
10042 Keystone Drive
Lake City, Pennsylvania 16423

(814) 774-0888

Mr. Nicosan has or may have information regarding, among other things, the

installation of the equipment at issue in the facility at issue; its use by Sylvest; its

use by Koch Foods; and its value at times relevant to this matter.

CHILIB-2099206.1-515998-00011

5.    Mark Kaminsky
      Koch Foods
      4530 Mobile Road
      Montgomery, Alabama 36108

      (334) 281-0400

      Mr. Kaminsky has or may have information regarding, among other things, the

      leasing and receipt of the equipment at issue; its installation at the facility at issue;

      its use by Sylvest; its use by Koch Foods; and its value at times relevant to this

      matter.

6.    Michael Naumann
      Gold Kist (now known as Pilgrim's Pride Corp.)

      (256) 840-0143

      Mr. Naumann may have information regarding, among other things, the

      installation of the equipment at issue at the facility at issue; its use by Sylvest; its

      use by Koch Foods; and its value at times relevant to this matter.

7.    Bill Koss
      GE Capital
      1000 Windward Concourse
      Suite 403
      Alpharetta, Georgia 30005

      (678) 339-9941

      Mr. Koss has or may have information regarding, among other things, the lease of

      the equipment at issue; efforts to release and/or resell the equipment after its use

      by Koch Foods; and its value at times relevant to this matter.

8.    Jim Hanley
      GE Capital
      44 Old Ridgebury Road
      Danbury, Connecticut 06810

      (203) 796-1000

CHILIB-2099206.1-515998-00011

Mr. Hanley has or may have information regarding, among other things, the lease of the equipment at issue; efforts to release and/or resell the equipment after its use by Koch Foods; and its value at times relevant to this matter.

9.     Joe Di Salvo
       GE Capital
       44 Old Ridgebury Road
       Danbury, Connecticut 06810

       (203) 796-1000

       Mr. Di Salvo has or may have information regarding, among other things, the lease of the equipment at issue; efforts to release and/or resell the equipment after its use by Koch Foods; and its value at times relevant to this matter.

10.    John Suteball
       GE Capital
       1000 Windward Concourse
       Suite 403
       Alpharetta, Georgia 30005

       (678) 339-9941

       Mr. Suteball has or may have information regarding, among other things, the lease of the equipment at issue; efforts to release and/or resell the equipment after its use by Koch Foods; and its value at times relevant to this matter.

11.    William Perry
       GE Capital
       31 Inverness Center Parkway
       Suite 500
       Birmingham, Alabama 35242

       (205) 443-0374

       Mr. Perry has or may have information regarding, among other things, the lease of the equipment at issue; efforts to release and/or resell the equipment after its use by Koch Foods; and its value at times relevant to this matter.

CHILIB-2099206.1-515998-00011

B.    A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of GE Capital and that GE Capital may use to support its claims or defenses, unless solely for impeachment:

The categories of the documents are as follows:

1.    The credit file of GE Capital regarding the transactions at issue.

2.    The litigation file of GE Capital regarding this matter.

3.    The asset management files regarding the transactions at issue.

4.    The sales representative and appraisal files regarding the equipment at issue.

These documents are located at the offices of counsel for GE Capital. To the extent discoverable, they are available for inspection and/or copying.

C.    A computation of any category of damages claimed by GE Capital, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, in which such computation is based, including materials bearing on the nature and extent of injuries suffered:

GE Capital's damages are determined in part by the value of the equipment at issue as of the date or dates when Koch Foods began using it. Documents relating to the value of the equipment is included in the documentation described above.

D.    For inspection and copying under Rule 34 any insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or so indemnify or reimburse for payments made to satisfy the judgment:

- 5 -

None known.

Investigation continues as to each of the matters address herein.

These disclosures are based on information reasonably available to GE Capital at this time. GE Capital has not yet received any supporting document from Koch Foods concerning any allegation or denial made by it in this matter. Therefore, GE Capital does not yet know what it must prove or defend against or what witnesses and materials it may use in its defense or proofs. GE Capital hereby gives notice that it intends to rely upon such other supplemental disclosures that may become available or apparent during the course of discovery and thus reserves the right to amend these disclosures accordingly.

GE Capital does not intend these disclosures to be a waiver or limitation of any privilege, immunity, or other right of GE Capital, or of any objection GE Capital has or might have to the admissibility at trial of any of the disclosed information.

Dated: August 7, 2007

Respectfully submitted,

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
Timothy S. Harris
Attorney for General Electric Capital
Corporation

OF COUNSEL:
Rusha C. Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

CHILIB-2099206.1-515998-00011

OF COUNSEL:
Alexander Terras
Timothy S. Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400

CHILIB-2099206.1-515998-00011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing GE Capital's Rule 26 Disclosures as

Directed to Koch Foods has been served upon counsel of record addressed as follows:

> Thomas G. Mancuso, Esq.
> Mancuso & Franco, P.C.
> 7515 Halcyon Summit Drive
> Suite 301
> Montgomery, AL 36177
>
> Eugene J. Geekie, Jr., Esq.
> Mike Xu, Esq.
> Schiff Hardin LLP
> 6600 Sears Tower
> Chicago IL 60606

by placing same in the United States mail, postage prepaid, on this the 7th day of August, 2007.

_____
COUNSEL

# Exhibit B

**Xu, Mike Z.**

**From:**    Pille, Ann E. [APille@ReedSmith.com]
**Sent:**    Monday, December 03, 2007 1:38 PM
**To:**    Geekie Jr., Eugene J.
**Cc:**    Xu, Mike Z.; Harris, Timothy S.
**Subject:** RE: RE:

Gene,

The scheduling order for this case was entered in July, and designates December 4, 2007 as the close of discovery. You first gave notices of the Brock and Hanley depositions on the evening of Friday, November 30, and the depositions were noticed for a time period well after the close of discovery. Under the circumstances, we do not intend to make Brock and Hanley available for the purposes of a deposition.

Feel free to contact me if you have comments or questions.

-Ann

---

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Monday, December 03, 2007 9:03 AM
**To:** Pille, Ann E.
**Cc:** Xu, Mike Z.; Harris, Timothy S.
**Subject:** RE: RE:

What about Brock and Hanley? We'll want to take them either that day, or the next, as well.

Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

---

**From:** Pille, Ann E. [mailto:APille@ReedSmith.com]
**Sent:** Monday, December 03, 2007 9:01 AM
**To:** Geekie Jr., Eugene J.
**Cc:** Xu, Mike Z.; Harris, Timothy S.
**Subject:** RE:

Gene,

Bill Wilson and Joe DiSalvo are available on the 17th in Danbury Connecticut. We can make a conference room available at GE corporate offices for the depositions.

-Ann

12/4/2007

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Monday, December 03, 2007 8:51 AM
**To:** Pille, Ann E.
**Cc:** Xu, Mike Z.
**Subject:**

Ann, any word about the city in CT that would be best for your GE witnesses to be deposed in?  Or would they prefer to come to NYC to do them in our midtown offices?

Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

```
-----------------------------------------------------------------
Tax Matters: To the extent this message or any attachment concerns
tax matters, it is not intended or written to be used, and cannot
be used by a taxpayer, for the purpose of avoiding penalties
that may be imposed on the taxpayer under law.
-----------------------------------------------------------------
This message and any attachments may contain confidential
information protected by the attorney-client or other privilege.
If you believe that it has been sent to you in error,
please reply to the sender that you received the message in
error. Then delete it. Thank you.
-----------------------------------------------------------------
```

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

* * *

To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication  (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03
pdc1

Exhibit C



Zhiyuan "Mike" Xu
312-258-5836
mxu@schiffhardin.com

6600 Sears Tower
Chicago, Illinois  60606
*t* 312.258.5500
*f* 312.258.5600
www.schiffhardin.com

November 19, 2007

**VIA E-MAIL AND U.S. MAIL**

Timothy S. Harris
Reed Smith LLP
10 South Wacker Drive, Suite 4000
Chicago, IL 60606

      Re:    Koch Foods v. GE Capital

Dear Tim:

We received GE Capital's Responses (the "Responses") to Koch Foods' Second Set of Interrogatories, Requests for Production of Documents, and Requests for Admission you served on November 5, 2007. The Responses do not contain a verification as required by Rule 33(b) of the Federal Rules of Civil Procedure. Koch Foods requests that GE Capital supplement the Responses with a verification.

In addition, the Responses are deficient as explained as follows:

**Interrogatory No. 8, Production of Documents Request No. 1, and Request for Admission No. 1.** We asked you for information about the tax deductions and savings relating to the depreciation of the Equipment and the persons who have knowledge about the tax deductions.

(a)    You claimed that this information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. We disagree. The tax deductions and savings are relevant to the damages of the conversion claim. They reflect the cost basis of the Equipment and the value of the Equipment at the time of the alleged conversion. In addition, the way GE Capital claims the tax deductions of the depreciation may help us to determine whether the Equipment was installed and operational at time of the alleged conversion.

(b)    You further objected on the basis that the information about tax deductions and savings would be unduly burdensome to provide and be proprietary and confidential in nature. As you stated in your letter dated August 29, 2007 regarding Koch Foods' responses to GE's discovery requests, such an objection is insufficient to justify GE Capital's lack of response. GE Capital sustains the burden of showing that the discovery requests are burdensome, confidential, and proprietary by answering in affidavits or by supplying other evidence in support thereof.



6600 Sears Tower
Chicago, Illinois  60606
t 312.258.5500
f 312.258.5600
www.schiffhardin.com

Timothy S. Harris
November 19, 2007
Page 2

Therefore, Koch Foods requests that GE Capital supplement its responses to Interrogatory No. 8, Production of Documents Request No. 1, and Request for Admission No. 1, or provide proof in support of its objections thereto.

**Interrogatory No. 4**. We asked: "[i]dentify the visits to the Plant made by GE Capital and/or its agents, including the date and the length of time of each visit and the names of the persons who made the visits. Identify all the activities conducted by GE Capital or its agents during these visits." Your answer includes: "[q]uestions pertain to the date, length, ... are more properly directed at Mr. Breakstone." GE Capital hired Mr. Breakstone and/or his agents to make these visits. Mr. Breakstone is GE Capital's agents in making these visits. Koch Foods is entitled to a response to this interrogatory directly from GE Capital rather than from its agents. *See* Rule 33(b)(1)(B). Koch Foods requests that GE Capital supplement its response to Interrogatory No. 4.

**Interrogatory No. 9**. We asked: "[i]dentify all the transactions in which you sold or leased any poultry processing equipment that is similar to the chicken de-boning or the spiral freezer of the Equipment." You objected "on the basis that is [sic] does not specify any applicable time period that a response should encompass." First, GE Capital needs to provide the legal basis for its lack of response based on an interrogatory's lack of any applicable time period. Second, in the Instructions of Koch Foods' discovery requests, Paragraph 25 instructs: '[i]f an interrogatory, a request for production of documents, or a request for admission does not contain a specified time period, then the applicable time period shall be the time between the date when GE Capital started negotiating the Lease with Sylvest Farms and present." Koch Foods requests that GE Capital supplement its response to Interrogatory No. 9 at least with respect to similar sales and/or leases within the last two years.

Sincerely,

Zhiyuan Xu

CH2\2181886.1

Exhibit D

GE Lease
12/28/05

2/98(R090605)(11.)050984202

**\*LEAS1998\***

## MASTER LEASE AGREEMENT

dated as of _____ ("Agreement")

**THIS AGREEMENT** is between **General Electric Capital Corporation** (together with its successors and assigns, if any, "**Lessor**") and **Sylvest Farms, Inc.** ("**Lessee**"). Lessor has an office at 1000 Windward Concourse  Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama.  Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105.  This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee.  Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule ("**Schedule**").

### 1. LEASING:

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("**Equipment**") described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier ("**Supplier**") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor.  Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

### 2. TERM, RENT AND PAYMENT:

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("**Lease Commencement Date**").  The term of this Agreement shall be the period specified in the applicable Schedule.  The word "term" shall include all basic and any renewal term.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule.  If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule.  In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($ .05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

### 3. RENT ADJUSTMENT:

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("**Code**")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("**Effective Rate**") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made) and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

### 4. TAXES:

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the terms of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "**Taxes**").  Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor.  Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

### 5. REPORTS:

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien  and  the location of such Equipment on the date of  the notice.

KOCH 00000921

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

**6. DELIVERY, USE AND OPERATION:**

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

**7. MAINTENANCE:**

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

**8. STIPULATED LOSS VALUE:** If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

**9. INSURANCE:**

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

KOCH 00000922

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be dismantled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above.

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

KOCH 00000923

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("**Claims**"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("**Tax Benefits**") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "**Loss**"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("**Net Economic Return**"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "**Documents**"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

KOCH 00000925

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes hereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement or any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF**, Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**General Electric Capital Corporation**

By:_____

Name:_____

Title:_____

LESSEE:
Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _Lyman L. Campbell_

Title: _Executive Vice President_

KOCH 00000926

CS(R083004) 4171238001

**\*LEAS8760\***

**FOOD PROCESSING EQUIPMENT SCHEDULE**
**SCHEDULE NO. 001**
**DATED THIS _____**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF _____**

| Lessor & Mailing Address: | Lessee & Mailing Address: |
|---|---|
| General Electric Capital Corporation | Sylvest Farms, Inc. |
| 1000 Windward Concourse Suite 403 | 3500 Western Blvd. |
| Alpharetta, GA 30005 | Montgomery, AL 36105 |

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("**Agreement**" said Agreement and this Schedule being collectively referred to as "**Lease**"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.    Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "**Equipment**").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006    De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005  Ossid 500        Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR    ·Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.    Financial Terms**

| | | | | |
|---|---|---|---|---|
| 1. | Advance Rent (if any):  Not Applicable | 5. | Basic Term Commencement Date: | |
| 2. | Capitalized Lessor's Cost: $ 2,018,453.00 | 6. | Lessee Federal Tax ID No.: 582129705 | |
| 3. | Basic Term (No. of Months): 60 Months. | 7. | Last Delivery Date: | |
| 4. | Basic Term Lease Rate Factor: .01757928 | 8. | Daily Lease Rate Factor: .000468780 | |

9.    First Termination Date: **Thirty-six (36)** months after the Basic Term Commencement Date.

10.    Interim Rent:  For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period.  Interim Rent shall be due on _____.

11.    Basic Term Rent.  Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.    Tax Benefits**        Depreciation Deductions:

1.    Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.

2.    Recovery Period: 7 years.

3.    Basis: 100 % of the Capitalized Lessor's Cost.

**D.    Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA:  Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor.  Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense.  Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

KOCH 00000928

E.    **Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS **D&F Equipment Sales, Inc. & Ossid Corporation & MTL Installation Services** (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OR REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

F.    **Stipulated Loss and Termination Value Table***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

G.    **Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

**I    EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS:  In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.

(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs.  Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed.  This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION:  The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense.  If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing.  The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense.  The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS:  In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF.  FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS/ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE,  AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

EARLY PURCHASE OPTION:

(a)  Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable.  Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement.  (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b)  If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

KOCH 00000930

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: _____

Title: _____

LESSEE:

Sylvest Farms, Inc.

By: *Lyman L Campbell*

Name: *LYMAN L. CAMPBELL*

Title: *Executive Vice President*

KOCH 00000931

Exhibit E

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

**SUMMARY APPRAISAL REPORT
PRIVATE & CONFIDENTIAL**

Subject - Certain Assets of:

**SYLVEST FARMS
4530 MOBILE HIGHWAY
MONTGOMERY, AL 36108**

For the Intended Use of:

**GENERAL ELECTRIC CAPITAL
COMMERCIAL EQUIPMENT FINANCING
44 OLD RIDGEBURY ROAD
DANBURY, CT 06810-5105**

**Purpose of Appraisal**

The purpose of this appraisal is to provide an independent, professional opinion of the Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Sylvest Farms, 4530 Mobile Highway, Montgomery, AL.  This report is intended solely for financing and business decisions of General Electric Capital Corporation and assignees.  Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is May 16, 2006.

**Intended Use of Appraisal**

This report is intended solely for financial and business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts.  If a particular company or individual determined that, the concept fits a particular need and therefore could use it in a way that would be improper.  The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value.  It is up to the user to determine if the defined concept is correct for its purpose.  Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards.  The appraisal is preformed at the request of a client based upon a requested concept of value.  It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value.  Users of this report must do so with the knowledge of the defined concepts of value being utilized.  If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 2 of 7
GECC/Sylvest Farms

## Scope of Appraisal

To appraise certain personal property of the subject company located at Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-Removed and Orderly Liquidation Value.

## Highest and Best Use

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Sylvest Farms are producers of fresh and frozen poultry products. Equipment includes packaging, freezing, cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment. This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

## Value Definitions

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises. The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell. This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards. Since a physical inspection has to be preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below. Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used. This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove. Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |

Value Definitions: provided by General Electric Capital Corporation Letter of Engagement.



**EQUIPMENT**
**EXCHANGE**
**CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
GECC/Syvest Farms

Both stated value considerations represent the normal considerations for the assets being appraised.
The stated values are unaffected by special or creative financing or sale considerations granted by
anyone associated with a possible sale or any other special or creative terms, service fees, costs or
credits.

All values stated are in United States Funds as of effective date of this report. Any users of this
report must assume that the listed "OLV" is based on the fact that a qualified and experienced
broker of the goods is to be used as the marketing agent.  It also does not take into account any
"costs to sell" that would be involved in liquidating the assets.

**Approaches to Value**

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted
approaches to value must be considered.

1) **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being
   appraised for the loss in value caused by physical deterioration, functional obsolescence, or
   economic obsolescence.  The cost approach is based on the principle of substitution: a
   prudent buyer will not pay more for an asset than the cost of acquiring a substitute property
   of equivalent utility.  In its simplest form, the cost approach is the current cost (as if new)
   less all depreciation.

2) **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts
   the prices that have been paid for assets comparable to the asset being appraised, equating
   the comparables to the subject.  This involves analyzing recent sales of properties that are
   similar to the subject property.  If the comparables are not
   identical, the prices are adjusted to equate the various characteristics of the properties.
   Equipment Exchange Company of America, Inc. uses an extensive in-
   house database of sold and brokered equipment, auction-selling prices, and data gathered
   via the Internet and other used equipment dealers to establish comparables.  As in the cost
   approach, the basis is a prudent buyer will not pay more for an asset than the cost of
   acquiring a substitute property of equivalent utility.

3) **Income Approach:** The appraiser determines the present value of the future economic
   benefits of owning the property.  This approach is seldom used in valuing personal property
   and was considered but deemed not applicable in performing this appraisal.

In this summary appraisal and review of assets from Sylvest Farms, the Sales Comparison Approach
was employed to arrive at value conclusions.  Equipment Exchange Company researched the
equipment installed or used at the location. We also paid particular attention to the marketability
of these assets in their current geographic location and the effect that location would have in
developing their probable value.

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
GECC/Sylvest Farms

## Depreciation

Defined as the actual loss in value or worth of a property from all causes including those resulting
from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely
to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself
and due to changes in design, or process resulting in inadequacy, over capacity, excess
construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions.  These
can include such things as the economics of the industry, availability of financing, loss of
material and labor sources, passage of new legislation, and changes in ordinances.

## Summary of Values Conclusions

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion
of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions
and limiting conditions, which the Fair Market Value-Remove and Orderly Liquidation Value of the
machinery and equipment located at Sylvest Farms, Montgomery, AL.

| | **FAIR MARKET VALUE-REMOVE** |
|---|---|
| **TOTAL CURRENT OF EQUIPMENT VALUED** | **$1,119,500.00** |
| | **ORDERLY LIQUIDATION VALUE** |
| **TOTAL CURRENT OF EQUIPMENT VALUED** | **$661,900.00** |

**GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS**

This is a Summary Appraisal Report, which is intended to comply with the reporting requirements
set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for
a Summary Appraisal Report.  As such, it might not include full discussions of the data, reasoning,
and analysis that were used in the appraisal process to
develop the appraiser's opinion of value.  Supporting documentation concerning the data, reasoning
and analyses is retained in the appraiser's file.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 5 of 7
GECC/Sylvest Farms

This appraisal sets forth our findings and conclusions which are based upon an investigation of conditions affecting value and which are subject to the Assumptions, Statements of Limiting Conditions, and Definitions contained in the following report. *Without reading the Assumptions and Statement of Limiting Conditions and Definitions, this report could be erroneously interpreted*.

The legal description given to the appraisers and used in this report is assumed to be correct.  No responsibility is assumed for matters of a legal nature affecting title to the property nor is an opinion of title rendered.  The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection with such matters.  Sketches in this report are included only to assist the reader in visualizing the property.

In conducting this inspection or in gathering information for this report we have assumed that no unreported or hidden conditions exist with the equipment that would render it more or less valuable then reported.

If for some reason we were unable to gather the model number, serial number, age or other pertinent information we assumed that the equipment was similar to other equipment we have appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable.  A reasonable effort has been made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report.  The property is appraised as though under responsible ownership and management.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported.  There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all-applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined, and considered in the appraisal report.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
GECC/Sylvest Farms

It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the appraiser. No responsibility is assumed for latent defect of ANY nature whatsoever which may affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference or appearance required by subpoena, with reference to the property in question, unless timely arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal, and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous material, which may or may not be present on the property. I have no knowledge of the existence of such materials on or in the property and are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation or other potential hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate in the appraisal if any new facts pertinent to the process are discovered which were unknown when the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for any purpose or any function other than the intended use, as stated in the body of the report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report. All conclusions and opinions concerning the analysis as set forth in the report were prepared by the appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s). The appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the report to anyone other then the client or his designee as specified in writing.

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
GECC/Sylvest Farms

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser