UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KOCH FOODS OF ALABAMA, LLC,          )
an Alabama limited liability company, )
                                      )
            Plaintiff and Counter-    )
            Defendant,                )
                                      )      CIVIL ACTION NO.
      vs.                             )      2:07 CV 522-MHT
                                      )
GENERAL ELECTRIC CAPITAL              )
CORPORATION, a Delaware corporation,  )
                                      )
            Defendant and Counter-    )
            Plaintiff,                )
                                      )

## GE CAPITAL'S BRIEF AND EVIDENTIARY SUBMISSIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS AND COUNTERCLAIMS

Defendant and Counter-Plaintiff General Electric Capital Corporation ("GE Capital"),

through its undersigned counsel, hereby submits its Brief and Evidentiary Submissions in

support of its Motion for Summary Judgment, filed contemporaneously herewith, and states as

follows:

I.

STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE OF DISPUTE

1.      On or about August 25, 2005, Sylvest Farms, Inc., and/or certain of its affiliates

(collectively, "Sylvest"), a poultry processor, leased a facility at 4350 Mobile Highway in

Montgomery, Alabama (the "Facility").  *See Real Property Lease Between Hodges Bonded*

*Warehouse, Inc. and Sylvest Farms, Inc., dated August 25, 2005* (the "Facility Lease"), § 2.01, p.

2, a copy of which is annexed hereto as **Exhibit A**.  The Facility Lease commenced in August

2005.  *See Facility Lease.*  Sylvest never owned the Facility.  *See Campbell Dep. Transcript*,

40:14-18, a copy of which is annexed hereto as **Exhibit B**.

2.    On or about December 29, 2005, Sylvest entered into a Master Lease Agreement (the "Master Lease") with GE Capital. *See Master Lease,* a copy of which is annexed hereto as **Exhibit C**. In conjunction therewith, on December 29, 2007, Sylvest and GE Capital also entered into Schedule No. 001 (the "Lease Schedule," and, together with the Master Lease, the "Lease"). *See Lease Schedule,* a copy of which is annexed hereto as **Exhibit D**.

3.    The Lease is a true lease in regard to the equipment covered by the Lease (the "Equipment"). *See Campbell Dep. Transcript* (Ex. B), 48:12-15. In fact, Sylvest specifically desired to lease, and not to own, the Equipment. *Id.*, 47:12-16.

4.    The Equipment leased to Sylvest pursuant to the Lease consisted of the following:

    a. a 2006 Deboner with double cone line, product conveyers, and loading bin, manufactured by D & F Equipment Sales, Inc. (collectively, the "Deboner Equipment");

    b. a 2005 Ossid 500 Shrink Film tunnel with package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer, manufactured by Ossid Corporation (collectively, the "Ossid Equipment"); and

    c. a GCM 76-08-40-26 NS CCR Spiral Freezer, manufactured by GYRoCOMPACT, and supplied by MTL Installation Services (the "Spiral Freezer").

*See Lease Schedule* (Ex. D), Sections A and E.

5.    The capitalized lessor's cost for (a) the Deboner Equipment was $846,545, (b) the Ossid Equipment was $741,908, and (c) the Spiral Freezer was $430,000. *Id.*, Section A.

6.    When purchased by Sylvest, the Deboner Equipment and the Ossid Equipment were new. The Spiral Freezer was used, and had been removed from a plant owned by Brakebush Brothers. *See Campbell Dep. Transcript* (Ex. B), 37:3-14.

7.    At the time the Lease was executed, Sylvest certified and warranted that all the Equipment had been delivered and installed. *See Lease Schedule* (Ex. D), p. 4.

8.      Pursuant to the terms of the Lease, the Equipment was to remain GE Capital's property unless Sylvest purchased the Equipment from GE Capital as provided therein. Until such time, Sylvest would only have the right to use the Equipment as a lessee. *Master Lease* (Ex. C), § 19(b); *see also Campbell Dep. Transcript* (Ex. B), 48:12-21.

9.      Sylvest had an option to purchase the Equipment at the expiration of the Lease for fair market value. *Master Lease* (Ex. C), § 18(a). If, however, Sylvest was in default with respect to the Lease, or if the Lease had already been terminated, Sylvest could not purchase the Equipment. *Id.*

10.     Pursuant to the terms of the Lease, all Equipment was to at all times remain personal property of GE Capital even through it might be attached to real property. *Id.*, § 19(b). The Lease further provided that "[t]he Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property." *Id.*

11.     Because of the nature of the Equipment, it "had to be attached" to the Facility regardless of whether it was leased or not. *See Kaminsky Dep. Transcript*, 69:14-21, a copy of which is annexed hereto as **Exhibit E**. Further, it is customary to attach equipment like the Equipment to a facility in the manner in which the Equipment was attached. *Id.*, 69:9-12.

12.     Sylvest's intention was "to honor the lease for the longevity of the lease." *See Campbell Dep. Transcript* (Ex. B), 56:18-20. In relation thereto, "[a]t the end of the lease, if [Sylvest] so desired to purchase the [E]quipment, then [it] could either pay the residual value or negotiate a better deal." *Id.*, 58:6-8. If Sylvest opted to pay the residual value for the Equipment, "[o]wnership would pass." *Id.*, 58:9-11. Sylvest, however, never reached this point. *Id.*, 58:12-13.

13.    Sometime in the Autumn of 2005, avian influenza negatively impacted the poultry market, and, in turn, impacted Sylvest's profitability. *Id.*, 42:22-43:8; *Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363 and 365 for Order Authorizing (i) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (ii) Approval of Designation of Rights Agreement, and (iii) Sale, Assumption and Assignment of Certain Leases and Executory Contracts* (the "Sale Motion"), ¶¶ 5-7, p. 2, a copy of which is annexed hereto as **Exhibit F**. Thereafter, Sylvest reached the end of its financing arrangement with its bank, and was in a loss position. *See Campbell Dep. Transcript* (Ex. B), 42:10-13.

14.    On April 18, 2006 (the "Petition Date"), Sylvest filed for protection under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"). *See Complaint for Declaratory Judgment and for Unjust Enrichment* (the "Complaint"), ¶ 8, p. 2, a copy of which is annexed hereto as **Exhibit G**. On the Petition Date, Sylvest filed a motion to sell a substantial portion of its assets to Plaintiff and Counter-Defendant Koch Foods of Alabama, LLC ("Koch"). *See Sale Motion* (Ex. F). Koch is a subsidiary of Koch Foods, Inc. *See Kaminski Dep. Transcript* (Ex. E), 20:11-21:14 (Koch and a variety of other limited liability companies all "funnel up ultimately to the holding company," which is Koch Foods Inc.). Koch Foods, Inc. has annual revenues of well in excess of $1 billion. *Id.*, 145:13-146:5.

15.    Pursuant to the Sale Motion, Sylvest asserted that prior to the filing of the Bankruptcy Case it had been marketing its assets for sale and had been in contact with several potential purchasers. *See Sale Motion* (Ex. F), ¶ 8, p. 3. Several potential purchasers had conducted due diligence in relation to the sale. *Id.*

16.    As part of this due diligence, and prior to the contemplated sale of its assets, Sylvest established on a website a data room. *See Campbell Dep. Transcript* (Ex. B), 66:18-

67:5. The Lease was included in the data room, along with other financial statements, contracts, and documents relating to Sylvest's assets and financial obligations. *Id.*

17.    On or about May 18, 2006, prior to the closing of the sale of Sylvest's assets to Koch, GE Capital filed an objection in the Bankruptcy Case to the Sale Motion, based, in part, on the fact that GE Capital had been unable to determine the proposed cure amount identified by Sylvest related to the Lease.[1] *See General Electric's Objection to Assumption, Assignment, and Cure Amount with Respect to Executory Contract* (the "GE Capital Sale Objection"), a copy of which is annexed hereto as **Exhibit H**. A true and correct copy of the Lease was attached to the GE Capital Sale Objection. *See GE Capital Sale Objection,* and *Exhibit A* attached thereto.

18.    Koch's purchase of certain assets of Sylvest closed in May 2006. *See Campbell Dep. Transcript* (Ex. B), 70:19. The terms of this sale were governed by an Amended Asset Purchase Agreement (the "Asset Purchase Agreement"). *See Order on Debtor's Motion Pursuant to 11 U.S.C. Sections 105, 363 and 365 for Order Authorizing (i) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (ii) Approval of Designation of Rights Agreement, and (iii) Sale, Assumption and Assignment of Certain Leases and Executory Contracts* (the "Sale Order"), a copy of which is annexed hereto as **Exhibit I**, p. 1.

19.    The Asset Purchase Agreement provides that, for the purposes of the sale, "Purchased Assets" means "all of the assets, properties, rights and interests of [Sylvest and certain of its affiliates] . . . of whatever kind or nature, real or personal, tangible or intangible and wherever located, as such assets may exist as of the Agreement Date." *Asset Purchase Agreement,* a copy of which is annexed hereto as **Exhibit J**, § 1.1, pp. 2-4.

---

[1] The cure amount would have been important had the Lease been assumed as part of the contemplated sale.

20.     The term "Purchased Assets" also included "[a]ll machinery, equipment, attachments . . . fixtures . . . and all other tangible personal property owned by the Sellers of every kind and nature, including without limitation those set forth on Schedule 1.1." *Id., at* § 1.1(d), p. 2.

21.     Schedule 1.1 to the Asset Purchase Agreement is labeled as "Machinery, Equipment and Rolling Stock." *Id., Schedule 1.1.* It includes an extensive itemized list of assets including, but not limited to, everything from laser printers and plastic totes to roof repair jobs, refrigeration units, air systems upgrades, freezers, and water pre-treatment systems. *Id.* It does not include any reference to the Equipment or any item of the Equipment. *Id*

22.     Koch asserts that it owns the Deboner Equipment and the Spiral Freezer. *See Kaminsky Dep. Transcript* (Ex. E), 29:1-6. Koch asserts that its ownership of the Deboner Equipment and the Spiral Freezer commenced in May 2006. *Id.,* 80:16-21.

23.     Koch's sole basis for asserting ownership over the Deboner Equipment and the Spiral Freezer is that they were installed in or attached to the real property and, so the argument goes, became fixtures. *Id.,* 146:17-147:5.

24.     Koch's sole basis for asserting that the Deboner Equipment and the Spiral Freezer were fixtures is the fact that they were affixed to the Facility. *Id.,* 67:13-68:15. It is Koch's position that once something gets bolted down it necessarily becomes a fixture. *Id.,* 125:8-11.

25.     Koch began using the Deboner Equipment on or about June 1, 2006. *See Koch Food's Responses to GE Capital's First Set of Interrogatories, Document Requests, and Requests to Admit* ("Koch's First Discovery Responses"), a copy of which is annexed hereto as **Exhibit K**, p. 7; *Kaminsky Dep. Transcript* (Ex. E), 42:10-12 (use began in June 2006). During the transition of the Facility from Sylvest to Koch, the use of the Equipment was seamless, and

not a single day of production was missed. *See Bromley Dep. Transcript,* 43:3-10, a copy of which is annexed hereto as **Exhibit L**. Koch's use of the Deboner Equipment was continuous from the time that Koch took over the operation of the Facility from Sylvest to the time the Deboner Equipment was removed from the Facility. *Id.,* 44:11-16. Koch used the Deboner Equipment approximately sixteen (16) hours a day, five days a week, from May 2006 through April 2007. *See Koch's First Discovery Responses* (Ex. K), pp. 7-8.

26.    Mark Kaminsky ("Kaminsky"), the Chief Financial Officer of Koch Foods, Inc., the Des Plaines, Illinois-based parent company of Koch, was the individual solely responsible for dictating Koch's use of the Equipment. *Id.,* p. 8.

27.    On June 15, 2006, Sylvest filed the Debtor's Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Rejection Motion"), a copy of which is annexed hereto as **Exhibit M**. The Lease was included on Exhibit A to the Rejection Motion. *Id.,* Ex. A, p. 1.[2] On July 6, 2006, an order was entered in the Bankruptcy Case rejecting certain leases and executory contracts, including the Lease. *See Order Granting Debtor's Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts* (the "Rejection Order"), a copy of which is annexed hereto as **Exhibit O**. Under the Asset Purchase Agreement, Koch had the right to designate leases which Sylvest would either reject or assume and assign to Koch. Koch determined not to direct Sylvest to assume and assign the Lease.

28.    As a result of the rejection of the Lease and the resulting need to re-market and sell the Equipment, GE Capital engaged the services of Robert Breakstone ("Breakstone") to

---

[2] On June 20, 2006, an amended Exhibit A to the Rejection Motion was filed (the "Amended Exhibit A"). The Lease continued to be listed on the Amended Exhibit A. *See Amended Exhibit A,* a copy of which is annexed hereto as **Exhibit N**, p. 1.

appraise the Equipment. *See Appraisal Valuation Report,* May 2006 (the "May 2006 Breakstone Report"), a copy of which is annexed hereto as **Exhibit P**.

29.    In June 2006, Breakstone prepared an Appraisal Valuation Report of the Equipment, with an effective date of May 2006. *Id.,* pp. 2-3 (GE 0306-0307).

30.    The May 2006 Breakstone Report includes a spreadsheet, listing the value of various pieces of the inventory that make up the Equipment. *Id.,* pp. 13-17 (GE 0317-0321).

31.    Pursuant to this itemized valuation of the Equipment, the following values are associated with the Equipment as of May 2006:

| EQUIPMENT | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|
| Ossid Equipment | $741,658.00 | $461,000.00 | $311,300.00 |
| Spiral Freezer | $430,000.00 | $280,000.00 | $190,000.00 |
| Deboner Equipment | $810,672.50 | $378,500.00 | $160,600.00 |
| **Total** | **$1,982,330.50** | **$1,119,500.00** | **$661,900.00** |
| **Total for the Deboner Equipment and Spiral Freezer** | $1,240,672.50 | $658,000.00 | $350,600.00 |

*Id.,* pp. 13-17 (GE 0317-0321).

32.    Breakstone performed a second appraisal in September 2007, which included information from his May 2006 appraisal. *See Appraisal Valuation Report, September 2007* (the "September 2007 Breakstone Report"), a copy of which is annexed hereto as **Exhibit Q**. The Ossid Equipment is not valued in this second report, as by that time the Ossid Equipment had been sold and was no longer located at the Facility. *See* ¶ 35, *infra.* The aggregate "Fair Market Value - In Place" for the Spiral Freezer and the Deboner Equipment, as of May 2006, is $1,398,068. *Id.,* pp. 3, 5. This is broken down as follows:

| Equipment | Fair Market Value-In Place, Spring 2006 |
|---|---|
| Spiral Freezer | $473,000 |
| Deboner Equipment | $925,068 |
| **Total** | **$1,398,068** |

*Id.,* pp. 5 (providing the total value), 12-15 (providing an itemized value of each component of the Spiral Freezer and the Deboner Equipment).

33.     As used in the September 2007 Breakstone Report, "Fair Market Value - In Place" is defined as the "most probable price . . . that the items appraised could realize if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which they are adapted and for which they are capable of being used, including the benefit of their present location including all costs to design, acquire, install and make operational." *Id.,* p. 3.

34.     Koch has presented no evidence of the value the Deboning Equipment or the Spiral Freezer as of the time that Koch took possession of them in May 2006. *See Kaminsky Dep. Transcript* (Ex. E), 112:17-20. The report provided by David Dalfonso ("Dalfonso"), Koch's designated rebuttal expert, purports only to value the Deboning Equipment and the Spiral Freezer as of October 19, 2007, eighteen (18) months later. *See Expert Report of David Dalfonso,* a copy of which is annexed hereto as **Exhibit R**, p. 2.

35.     GE Capital has recovered the Ossid Equipment. *See Kaminsky Dep. Transcript* (Ex. E), 44:12-16. On or about August 31, 2006, the Ossid Equipment was purchased by Peco Foods, Inc. for the total purchase price of $334,750.00. *See Ossid Equipment Bill of Sale, August 31, 2006,* a copy of which is annexed hereto as **Exhibit S**. The Ossid Equipment is not at issue in this lawsuit.

36.     Koch used the Deboner Equipment from May 2006 through April 2007. *See Bromley Dep. Transcript* (Ex. L), 43:3-10. Koch did not advise GE Capital that it was using the

Equipment. *See Kaminsky Dep. Transcript* (Ex. E), 48:2-8. By January or February 2007, the Deboner Equipment was being used by Koch to process approximately 674,000 chickens a week. *Id.*, 85:8-11.

37.    In January or February 2007, Koch decided to replace the Deboner Equipment by purchasing new equipment. *Id.*, 88:23-89:1.

38.    On February 14, 2007, counsel for Koch sent an e-mail to counsel for GE Capital stating, *inter alia*, that Koch would allow "GE to enter Koch's plant at a reasonable and mutually agreeable time to remove the equipment, and if GE agrees to a mutual release and to indemnify Koch for any damages caused to the plant by GE's removal of the equipment." *Email from E. Geekie to A. Terras, February 14, 2007,* a copy of which is annexed hereto as **Exhibit T**, ¶ 3.

39.    On April 18, 2007, counsel for Koch sent an e-mail to counsel for GE Capital stating, *inter alia*, that "Koch has declined GECC's demand that Koch purchase the equipment left behind at the former Sylvest site . . ." *Email from E. Geekie to A. Terras, April 18, 2007,* a copy of which is annexed hereto as **Exhibit U**, ¶ 1.

40.    In April 2007, Koch removed the Deboner Equipment from the Facility and set it out in the parking lot and/or yard of the Facility. *See Jones Dep. Transcript,* 30:10- 32:16, a copy of which is annexed hereto as **Exhibit V**; *Bromley Dep. Transcript* (Ex. L), 50:9-12. This was done because Koch had purchased replacement equipment. *See Kaminsky Dep. Transcript* (Ex. E), 56:11-14. The Spiral Freezer remains inside the Facility. *See Jones Dep. Transcript* (Ex. V), 30:10- 32:16.

41.    After the Deboner Equipment was removed from the Facility, there were holes that remained in the floor of the Facility. Koch repaired certain of the holes by patching, while not bothering to repair holes over which the replacement equipment was to sit. *See Bromley*

*Dep. Transcript* (Ex. L), 51:11-52:1. With respect to the patches, most of the damage was in the epoxy surface of the floor, not in the concrete underlayer. *Id.,* 52:4. Koch saw no need to resurface the floor in conjunction with the removal of the Deboner Equipment. *Id.,* 52:8-9.

II.

MEMORANDUM OF LAW

A.     INTRODUCTION

Summary judgment in favor of GE Capital is dictated by applicable law and the uncontested facts. Koch has converted equipment owned by GE Capital. Specifically, Koch has converted the Deboner Equipment and the Spiral Freezer (sometimes referred to collectively hereinafter as the "Converted Equipment").[3] Alabama law establishes that the owner of converted property is entitled to the value of the property at the time of the conversion, plus interest, plus punitive damages. The value of the Converted Equipment at the time of conversion is undisputed. Accordingly, the Court should grant summary judgment in favor of GE Capital with respect to all four (4) counts of Koch's Complaint,[4] and should grant summary judgment in favor of GE Capital with respect to GE Capital's Counterclaim.[5]

The facts are not in dispute. GE Capital leased three groups of food processing equipment to Sylvest: the Ossid Equipment, the Spiral Freezer, and the Deboner Equipment.

---

[3] For purposes of clarity, the "Equipment" includes all equipment covered by the Lease, including the Ossid Equipment, the Deboner Equipment, and the Spiral Freezer. The "Converted Equipment" includes only that equipment which Koch claims it owns – namely, the Deboner Equipment and the Spiral Freezer.

[4] Koch's Complaint contains four (4) counts. Count I seeks a declaratory judgment that Koch owns the Converted Equipment on the theory that they are fixtures to the Facility. *See* Complaint (Ex. G), ¶¶ 15-17, pp. 3-4. Count II seeks a declaratory judgment that Koch is not liable to GE Capital for rent or unjust enrichment. *Id.,* ¶¶ 18-20, pp. 4-5. Count III seeks, in the alternative, a declaratory judgment that GE Capital is liable to Koch for storage of the Converted Equipment. *Id.,* ¶¶ 21-25, pp. 5-6. Finally, Count IV contains a claim for unjust enrichment based on storage. *Id.,* ¶¶ 26-30, p. 6.

[5] GE Capital's Counterclaim seeks damages for conversion.

*See* Sec. I, ¶ 4, *supra*.  Subsequently, Sylvest received and installed or partially installed the Deboner Equipment and the Spiral Freezer.  Sylvest then voluntarily filed a Chapter 11 bankruptcy proceeding.  In the course of the bankruptcy proceeding, Koch purchased certain assets owned by Sylvest, including Sylvest's interest in the Facility, while rejecting the Lease.  Koch surrendered the Ossid Equipment.  Despite rejection of the Lease, however, Koch failed to surrender the Converted Equipment and instead has openly and repeatedly asserted a claim of ownership over it.  Koch's claim of ownership of the Converted Equipment has continued throughout this lawsuit, as attested to by the deposition testimony of Kaminsky, the Chief Financial Officer of Koch's parent company and Koch's Rule 30(b)(6) designee.  Consistent with its claim of ownership, Koch has paid GE Capital nothing.

Koch suggests it owns the Converted Equipment because it constitutes fixtures.  As such, Koch's argument goes, the Converted Equipment became part of the Facility when it was installed (in the case of the Deboner Equipment) or partially installed (in the case of the Spiral Freezer), and, *ipso facto*, was purchased by Koch when it purchased Sylvest's leasehold interest in the Facility.

Koch is wrong.  Alabama law applied to the uncontested facts establishes that no item of the Equipment is a fixture.  Further, the Lease unequivocally states that the Equipment shall at all times remain personal property of GE Capital and at no time shall the Equipment be deemed part of any other real or personal property, irrespective of whether it may be installed in or attached to such other property.  It is likewise uncontested that, even absent such express acknowledgement, the manner of installation of the Converted Equipment did not render any part of it a fixture.  Moreover, Koch knew with certainty at the time it purchased Sylvest's leasehold interest in the

Facility that Sylvest did not own the Equipment, and that the Equipment was not and could not be transferred pursuant to the either Asset Purchase Agreement or the Sale Order.

The facts are undisputed as to both liability and the damages suffered by GE Capital. By openly claiming and maintaining ownership of the Converted Equipment, Koch has converted it under Alabama law.[6] Alabama law also establishes that damages for conversion are based on the value of the converted property at the time of conversion, which in this case was May 2006. GE Capital's damages expert, Breakstone, establishes in his report that the value of the Converted Equipment aggregated $1,398,068 as of May 2006. *See* Sec. I, ¶ 32, *supra*. This fact is undisputed, for Koch has chosen not to contest this value by offering any rebuttal evidence of the value of the Converted Equipment as of that date. The deadline by which to submit any such rebuttal evidence has now passed.

Koch's filing of this declaratory judgment action is nothing more than an effort by Koch to use litigation as a business strategy in an effort to enhance its bargaining position and to delay payment of money due GE Capital by claiming ownership of equipment Koch knows it does not own. Koch has asserted its claim of ownership despite clear provisions in the Lease and unequivocal controlling law stating otherwise, and with full knowledge that it was not in fact purchasing any of the Equipment from Sylvest. In so doing it has converted the Converted Equipment, and, pursuant to Alabama law, now owes GE Capital its value as of the May 2006 date of conversion, plus interest and punitive damages as provided under Alabama law.

---

[6] In addition, Koch admits that it used the Deboner Equipment to process well in excess of half a million chickens each week, and that this use continued from May 2006 through April 2007. *See* Sec. I, ¶ 36, *supra*.

B.    STANDARD OF REVIEW

The standard for summary judgment is set forth in Rule 56: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c).

C.    ARGUMENT

1.    The Converted Equipment Is a Trade Fixture, and Was Not a Fixture or Otherwise a Part of the Facility When Koch Purchased the Facility

In the Complaint, Koch alleges that "because Sylvest Farms attached the Equipment to the [Facility] and intended the Equipment to be the fixtures of the [Facility], [Koch], the purchaser and now the owner of the [Facility], owns the Equipment as fixtures of the [Facility]." Complaint (Ex. G), ¶ 17, p. 4. Indeed, Koch's sole basis for asserting ownership over the Deboner Equipment and the Spiral Freezer is that they were attached to the real property and became fixtures. *See Kaminsky Dep. Transcript* (Ex. E)*,* 146:17-147:5.

Koch's assertion of ownership is contrary to the law of Alabama and the undisputed facts of this case. First, Alabama law establishes that the Converted Equipment is not a fixture. Second, the Lease expressly states that the Converted Equipment is not a fixture. Third, the manner of installation of the Converted Equipment establishes that it is not a fixture. Fourth, the Asset Purchase Agreement and the bankruptcy court order approving it establish that ownership of the Converted Equipment did not pass to Koch, whether as a fixture or otherwise.

a.    Alabama Law Establishes That the Converted Equipment Is Not a Fixture

The Converted Equipment is not a fixture. Rather, it is a trade fixture. "A trade fixture is commonly defined as an item affixed to realty for the purpose of enabling the tenant to perform

properly a trade or profession, which can be removed without material or permanent injury to the realty." *LaFarge Building Materials, Inc. v. Stribling*, 880 So. 2d 415, 423 (Ala. 2003) ("Black's Law Dictionary defines trade fixtures as 'removable personal property that a tenant attaches to leased land for business purposes.'"). "Under the general rule of the common law, everything annexed to the freehold estate was treated as part of it. However, tenants placing trade fixtures on the property to be used in connection with trade or manufacturing were excepted from the operation of the foregoing general rule." 880 So. 2d at 419. In the trade fixture context, "[i]t is not so much the manner in which the fixture is attached to the freehold which controls the rights of the parties, as the relation of the parties, the intention in attaching, and the use to which it is put." 880 So. 2d at 419. Rather, "[t]he touchstone for the trade fixtures test . . . is intent. . . ." 880 So. 2d at 423.

For this reason, countless courts have held that equipment similar to the Converted Equipment did not become a fixture as a result of it being installed or affixed to realty. *See, e.g., Wentworth v. Process Installations, Inc.*, 122 Mich. App. 452, 333 N.W.2d 78 (1983) (items of equipment used in connection with the operation of a chemical plant, including but not limited to a boiler, were trade fixtures and were not part of the realty); *In re South Atlantic Pakcer Ass'n Inc.,* 30 B.R. 836 (Bankr. D. S.C. 1983) (a refrigeration compressor, a motor, a condenser, wiring, piping, and controls installed by lessee for use in its meat packing business constituted trade fixtures, not fixtures); *In re Schwen's Inc.,* 20 B.R. 638 (D. Minn. 1982), *aff'd* 693 F.2d 48 (8th Cir. 1982) (ice cream freezers, pasteurizers, evaporation and condensing units, mixers, packaging machines, etc. were trade fixtures, not fixtures); *In re Heat 'N' Eat Brands, Inc.,* 174 F. Supp. 598 (W.D. Ky. 1959), *aff'd* 278 F.2d 426 (6th Cir. 1960) (an automatic filling and

conveying machine which had electricity and water and steam connections and was bolted to the floor was a trade fixture, not a fixture).

Under Alabama law, the owner of a trade fixture continues to own the trade fixture in the event of a subsequent *bona fide* sale of the realty to which the trade fixture is attached. *See W.T. Adams Mach. Co. v. Interstate Building & Loan Ass'n,* 119 Ala. 97, 24 So. 857, 858 (1898) (where a vendor of an engine, boiler, and hot-water heater retained title to that equipment, but consented to the annexation of the equipment to real property in the possession of vendee, that vendor can assert and maintain its title against a subsequent *bona fide* mortgagee of the vendee; the mortgagee has a duty of inquiring and ascertaining for himself the title of the vendor or the vendee); *Mobile Cab and Baggage Co., Inc. v. The Texas Co.,* 61 Ala. 242, 74 So. 2d 498 (1954) (adopting same reasoning and holding in relation to gasoline pump and tanks affixed to concrete slabs and/or buried under the surface of the ground). This is true even if the purchaser has no notice of the ownership of the equipment prior to its purchase. *See W.T. Adams, supra*; *Mobile Cab, supra*.

> b.    The Lease Expressly States That the Converted Equipment Is Not a Fixture

In the instant case, there was no intent for any of the Equipment, including the Converted Equipment, to become a fixture of the Facility. Rather, the Lease states precisely the opposite: "All Equipment shall at all times remain personal property of [GE Capital] even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property." Master Lease (Ex. C), ¶ 19(b).

It is also undisputed that the parties negotiating the Lease did not intend for any of the Equipment, including the Converted Equipment, to become fixtures. Lyman Campbell

("Campbell"), Sylvest's Chief Financial Officer and signatory of the Lease on behalf of Sylvest,
testified that it was Sylvest's studied intention to lease the Equipment, not to own it. *See* Sec. I,
¶ 3, *supra*. Accordingly, as Campbell stated during his deposition testimony, Sylvest never
acquired nor intended to acquire ownership of the Equipment. *See* Sec. I, ¶¶ 3 & 12, *supra*.
Without ownership or even a claim of ownership of the Equipment by Sylvest, it was not
possible for Sylvest to "sell" the Equipment to Koch as part of the Facility.

        c.      The Manner of Installation of the Converted Equipment Establishes That
                It Did Not Become a Fixture

      Koch's sole basis for asserting ownership over the Converted Equipment is that it was
attached to the real property and, as a result, became a fixture. *See Kaminsky Dep. Transcript*
(Ex. E), 146:17-147:5.[7] Yet, as demonstrated above, mere attachment to realty is an insufficient
basis for characterizing personal property as a fixture. Alabama law is clear that, if there is no
intention of the party making the annexation for the property to become a fixture, the personal
property is not a fixture. *See, e.g., Thornton Properties, v. Alabama Power Co.*, 550 So. 2d 1024
(Ala. Civ. App. 1989) (even when all other criteria for characterization as a fixture had been met,

---

[7] Excerpt from the Kaminsky Deposition Transcript:

      T. Harris:      I know that you claim that Koch Foods owns the deboner equipment and
                the spiral freezer on the grounds that they were attached to the real
                property and became fixtures. Is there any other basis upon which Koch
                Foods claims ownership of either of those items of equipment?
    M. Kaminsky: Ownership? No.
      T. Harris:      That's the only basis?
    M. Kaminsky: For ownership?
      T. Harris:      For ownership.
    M. Kaminsky: That's correct.

*Kaminsky Dep. Transcript* (Ex. E), 146:17-147:5.

if, under the terms of the agreement between the parties, it was the vendor's intent to retain the rights of ownership with respect to the equipment, the property remains personal property and all the vendor's rights of ownership are preserved).

Moreover, there was nothing permanent about Sylvest's installation of the Converted Equipment. The Spiral Freezer was bought used, having been dis-installed from a plant owned by Brakebush Brothers and partially re-installed in Sylvest's plant. *See Campbell Dep. Transcript* (Ex. B), 37:3-14. Sylvest never even fully installed it, leaving the electrical and plumbing installation incomplete when it decided to file bankruptcy. *See Bromley Dep. Transcript* (Ex. L), 40:21-41:5. This is precisely the type of equipment which "can be [and, in fact, was] removed without material or permanent injury to the realty." *LaFarge*, 880 So. 2d at 423. As such, it is a trade fixture, not a fixture.

The same analysis applies to the Deboner Equipment. The Deboner Equipment was bought new, and Sylvest attached it to the floor of the Facility by bolting it down. *See Bromley Dep. Transcript* (Ex. L), 34:1-3. After Sylvest installed it, Koch operated it for nearly a year and then removed it. *See Sec. I, ¶¶ 36 & 40, supra.* In removing the Deboner Equipment, Koch simply unbolted it from the floor, junked it in the Facility's parking lot, and patched the latex flooring where the bolts had been.[8] *See Sec. I, ¶¶ 40-41, supra.* Again, this establishes that the Deboner Equipment, like the Spiral Freezer, is the type of equipment which "can be [and, in fact, was] removed without material or permanent injury to the realty." *LaFarge*, 880 So. 2d at 423.

---

[8] Not even all the holes were deemed necessary of patching. As Mr. Bromley testified at his deposition, Koch did not bother to patch where the new replacement equipment covered the hole, but only where the hole was left uncovered. *See Sec. I, ¶ 41, supra.*

       d.     The Asset Purchase Agreement and the Sale Order Approving It Establish That Ownership of the Equipment Did Not Pass to Koch

Koch had notice that the Equipment was leased, and was not owned, by Sylvest. The Lease was included in the data room established prior to the sale of Sylvest to Koch for the purposes of conducting due diligence. *See Campbell Dep. Transcript* (Ex. B), 66:18-67:5.[9] In addition, on May 18, 2006, GE Capital filed the Sale Objection, and attached a copy of the Lease thereto. *See Sale Objection* (Ex. H). As such, Koch was aware of the Lease — and of GE Capital's ownership of the Equipment — well in advance of the closing of the sale of Sylvest's assets.[10]

Given the foregoing, it is disingenuous for Koch to contend that Sylvest intended the Equipment to become a fixture of the Facility. Without this requisite intent, the Equipment is not a fixture, and GE Capital retains its ownership interest in the Equipment.

      2.     Koch Has Converted the Deboner Equipment and the Spiral Freezer

Under Alabama law, "a conversion is said to consist either in the appropriation of a thing to the party's own use and beneficial enjoyment, or its destruction, or in exercising dominion over it, in exclusion or defiance of the plaintiff's right, or in withholding the possession from the plaintiff, under a claim of title inconsistent with his own." *White v. Drivas*, 954 So. 2d 1119, 1123 (Ala. Civ. App. 2006) (internal citations omitted). Four different actions may constitute conversion: a wrongful taking, a wrongful detention, an illegal assumption of ownership, or an illegal use or misuse. *White*, 954 So. 2d at 1123; *see also Ott v. Fox*, 362 So. 2d 836, 839 (Ala.

---

[9] In addition, the data room contained a depreciation schedule that would not have included the Equipment nor any other equipment that was a true operating lease. *See Campbell Dep. Transcript* (Ex. B), 67:6-20. As testified by Campbell, the Equipment was not included in the depreciation schedule because Sylvest did not own the Equipment. *Id.*

[10] Koch does not allege that it was not aware of the Lease. To the contrary, Koch states that it reviewed the Lease in conjunction with its decision to direct Sylvest to reject the same. *See Kaminsky Dep. Transcript* (Ex. E), 144:5-16.

1978) ("[T]o constitute a conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse.").

In the instant case, Koch asserts that it owns the Converted Equipment based upon its flawed fixture position. *See Complaint* (Ex. G), ¶ 17, p. 4; *see also Kaminsky Dep. Transcript* (Ex. E), 29:1-9. Its exclusive basis for this assertion is the fact that the Converted Equipment was annexed to the Facility. *See Kaminsky Dep. Transcript* (Ex. E), 146:19-147:5. As such, because Koch's claim of ownership is baseless, Koch's assertion of ownership of the Converted Equipment constitutes a wrongful taking and illegal assumption of ownership.

In addition, Koch admits that it used the Deboner Equipment since the first day it took possession of the Facility. *See Sec. I, ¶ 36, supra*. Koch used the Deboner Equipment without notifying GE Capital of the use. *Id*. Koch used the Deboner Equipment every day it was open from May 2006 until April 2007, when it replaced the Deboner Equipment. *See Sec. I, ¶ 25, supra*. When Koch received the replacement equipment, it removed the Deboner Equipment from the Facility and tossed it in Koch's parking lot outside the Facility. *See Sec. I, ¶ 40, supra*. In doing so, it never advised GE Capital that it was about to junk the Deboner Equipment. *See Jones Dep. Transcript* (Ex. V), 34:3-14.

Koch's actions with respect to the Converted Equipment constitute conversion as a matter at law. Koch "exercise[d] dominion and control over the property inconsistent with the rights of the owner," GE Capital. *See Citizens Bank*, 431 So. 2d at 1207. Koch "appropriat[ed] a thing to [its] own use and enjoyment," or caused "its destruction," or "exercise[d] dominion over it, in exclusion or defiance of the plaintiff's right, . . . under a claim of title inconsistent with" the rightful ownership of GE Capital. *See White*, 954 So. 2d at 1123.

- 20 -

3.    The Amount of GE Capital's Damages Is Uncontested

Under Alabama law, the general measure of damages for a conversion claim is the value of property at the time of conversion, plus 6% interest from the date of the conversion to the date of the trial. *See, e.g., Charter Hospital of Mobile v. Weinberg*, 558 So. 2d 909, 912 (Ala. 1990) (allowing damages in the amount of the value of the property at the time of conversion, or up until the time of trial, whichever is greater, plus 6% interest from the date of the conversion to the date of the trial); *Driver v. Hice*, 618 So. 2d 129 (Ala. Civ. App. 1993) (measure of compensatory damages in a conversion claim is the value of the property at the time of conversion, plus interest).

In the instant case, the values contained in the September 2007 Breakstone Report are uncontested with respect to the value of the Converted Equipment at the time of conversion. Breakstone conducted appraisals of the Equipment at the time of the conversion in May 2006 and again in September 2007. Those appraisals, which rely on factual information gathered in May 2006 and September 2007, establish the Fair Market Value – In Place of the Converted Equipment as $1,398,068 as of the May 2006 conversion by Koch. *See* September 2007 Breakstone Report (Ex. Q), pp. 2, 4; *see also* Sec. I, ¶¶ 32-33, *supra*.

The Fair Market Value – In Place is the appropriate measure of damages in this case. By openly claiming ownership of the Converted Equipment as it exists in-place in the Facility, and by using the Deboner Equipment in its in-place location at the Facility for approximately one year during which time Koch used it to process well in excess of 25 million chickens, Koch has claimed and utilized the Converted Equipment as it exists in-place. As such, Koch has had benefit of "all the uses to which [the items of the Converted Equipment] are adapted and for

which they are capable of being used, including the benefit of their present location including all costs to design, acquire, install and make operational." *See* Sec. I, ¶ 33, *supra*.

Koch has chosen not to contest Breakstone's value as of the time of conversion. Although Koch has supplied an appraisal of the value of the Converted Equipment as of October 2007, this was a year and a half after the conversion and six months after Koch junked the Deboner Equipment.[11]  Accordingly, since Koch has failed to offer any evidence which would rebut Breakstone's values, the appraisal values stated by Breakstone at the time of conversion stand as undisputed. *See also Kaminsky Dep. Transcript* (Ex. E), 112:17-20 (Koch has no basis to value the Deboner Equipment as of the time that Koch took possession of it).

As stated in Breakstone's Report, the value of the Converted Equipment at the time of its conversion by Koch aggregated $1,398,068.  Interest on this amount, at six percent (6%) per annum, from June 1, 2006, through December 31, 2007, totals $132,816.  Per diem is $229.82.

4.    Alabama Law Entitles GE Capital to Punitive Damages

In addition to these compensatory damages, GE Capital is entitled to an award of punitive damages as a matter of law.  "Conversion is an intentional tort.  The intent required is not necessarily a matter of conscious wrongdoing.  It is rather an intent to exercise a dominion or control over the goods of the plaintiff which is in fact inconsistent with the plaintiffs rights." *Industrial Technologies, Inc. v. Jacobs Bank*, 872 So. 2d 819, 826 (Ala. 2003) (internal citations omitted).  "[P]unitive damages are recoverable in a conversion case where the evidence shows legal malice, willfulness, insult, or other aggravating circumstances." *Id.*  "The conversion

---

[11]  Pursuant to the Scheduling Order previously entered by the Court, Koch was obligated to submit a report containing all expert evidence intended to rebut that of Breakstone not later than November 1, 2007.  Dalfonso's Report was all that Koch submitted, and it does not seek to rebut the evidence contained in Breakstone's Report regarding the value of the Converted Equipment at the time of the conversion.

committed in known violation of the law and of plaintiffs' rights *is itself* legal insult, contumely, or malice sufficient to justify an award of punitive damages." 872 So. 2d at 826 (finding that continued withholding of property without legal justification justifies a punitive damages award in relation to a conversion claim).

Section 6-11-20(a) of the Alabama Code similarly provides that punitive damages may be awarded in a civil action "where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in . . . wantonness or malice with regard to the plaintiff." Ala. Code § 6-11-20(a). For the purposes of interpreting this section, the term malice is defined as "the intentional doing of a wrongful action without just causes or excuse, either: (a) with an intent to injure the person or property of another person or entity, or (b) under such circumstances that the law will imply an evil intent." Ala. Code § 6-11-20(b)(2). Similarly, 'wantonness' is defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3).

Here, it is uncontroverted that Koch's conduct with respect to the Converted Equipment embodies a "known violation" of GE Capital's ownership of the Converted Equipment and "conscious disregard" of the rights of GE Capital. Specifically:

1. Koch was aware of the Lease, yet used and asserted a right of ownership over the Converted Equipment.

2. Koch was aware that the Asset Purchase Agreement and the Sale Order did not establish that the Equipment was being purchased by Koch in the sale, yet used and asserted a right of ownership over the Converted Equipment.

3. Koch was aware that even in the absence of numbers 1 and 2 above, the manner of installation of the Converted Equipment did not, under Alabama law, render it a fixture, yet used and asserted a right of ownership over the Converted Equipment.

4. Koch, without notice to GE Capital, removed the Deboner Equipment from the Facility and junked it in the parking lot, without compensating GE Capital in any way for its use or destruction.

5.    Summary Judgment Likewise Should Be Entered in Favor of GE Capital on Koch's Remaining Counts

As established above, no genuine issue of material fact exist with respect to Koch's claim in Count I of its Complaint that the Deboner Equipment and Spiral Freezer are fixtures, or regarding GE Capital's claim of conversion. With a finding that the Converted Equipment is not a fixture and that Koch has instead converted it, Koch's other claims for rent and unjust enrichment are likewise properly resolved by a ruling of summary judgment in favor of GE Capital.

III.

CONCLUSION

For the reasons stated above, GE Capital requests the Court to enter summary judgment in its favor and against Koch on each and every count of Koch's Complaint, and that it enter summary judgment in favor of GE Capital and against Koch on GE Capital's Counterclaim consistent with the proofs as stated herein.

Dated:  December 7, 2007.                Respectfully submitted,

GENERAL ELECTRIC CAPITAL CORPORATION

By:    /s/ Timothy S. Harris
       Attorney for General Electric Capital
       Corporation


       /s/ Rusha C. Smith
       Attorney for General Electric Capital
       Corporation

OF COUNSEL:
Rusha C. Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

OF COUNSEL:
Alexander Terras
Timothy S. Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Thomas G. Mancuso, Esq.
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, AL 36177

Eugene J. Geekie, Jr., Esq.
Mike Xu, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago IL 60606

/s/ Rusha C. Smith
COUNSEL

INDEX OF EXHIBITS IN SUPPORT OF GE CAPITAL'S MOTION FOR
SUMMARY JUDGMENT AS TO ALL ISSUES AND ALL CLAIMS

| | |
|---|---|
| Exhibit A | Real Property Lease Between Hodges Bonded Warehouse, Inc., as landlord, and Sylvest Farms, Inc., as tenant, dated August 25, 2005. |
| Exhibit B | Transcript of Deposition of Lyman Campbell, as given on November 27, 2007. |
| Exhibit C | Master Lease Agreement, dated as of December 29, 2005, between General Electric Capital Corporation, as lessor, and Sylvest Farms, Inc., as lessee. |
| Exhibit D | Lease Schedule 001 dated as of December 29, 2005, between General Electric Capital Corporation, as lessor, and Sylvest Farms, Inc., as lessee. |
| Exhibit E | Transcript of Deposition of Mark Kaminsky, as given on October 19, 2007. |
| Exhibit F | Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363, and 365 for Order Authorizing (i) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (ii) Approval of Designation of Rights Agreement, and (iii) Sale, Assumption and Assignment of Certain Leases and Executory Contracts, dated April 18, 2006. |
| Exhibit G | Complaint for Declaratory Judgment and for Unjust Enrichment, dated May 25, 2007. |
| Exhibit H | General Electric's Objection to Assumption, Assignment, and Cure Amount with Respect to Executory Contract, dated May 18, 2006. |
| Exhibit I | Order on Debtor's Motion Pursuant to 11 U.S.C. Sections 105, 363, and 365 for Order Authorizing (i) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (ii) Approval of Designation of Rights Agreement, and (iii) Sale, Assumption and Assignment of Certain Leases and Executory Contracts, dated May 26, 2006. |
| Exhibit J | Amended Asset Purchase Agreement, dated April 27, 2006. |
| Exhibit K | Koch's Responses to GE Capital's First Set of Interrogatories, Document Requests, and Requests to Admit, dated August 9, 2007. |
| Exhibit L | Transcript of Deposition of David Bromley, as given on November 27, 2007. |
| Exhibit M | Debtor's Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts, dated June 15, 2006. |
| Exhibit N | Amended Exhibit A to the Rejection Motion, dated June 20, 2006. |

| Exhibit O | Order Granting Debtor's Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts, dated July 6, 2006. (Note that the face of the document indicates it was entered on June 6, 2007, but that the document was entered, in actuality, on July 6, 2007. *See In re Sylvest Farms, Inc et al.,* Case No. 06-40525, pending before the United States Bankruptcy Court for the Northern District of Alabama, Docket No. 375, July 6, 2007.) |
| --- | --- |
| Exhibit P | Appraisal Valuation Report prepared by Robert Breakstone, June 2006. |
| Exhibit Q | Appraisal Valuation Report prepared by Robert Breakstone, September 2007. |
| Exhibit R | Expert Report of David Dalfonso, dated October 19, 2007. |
| Exhibit S | Ossid Equipment Bill of Sale, dated August 31, 2006. |
| Exhibit T | Email from E. Geekie to A. Terras, dated February 14, 2007. |
| Exhibit U | Email from E. Geekie to A. Terras, dated April 18, 2007. |
| Exhibit V | Transcript of Deposition of Wayne Jones, as given on November 28, 2007. |

# EXHIBIT A

# REAL PROPERTY LEASE

between

# HODGES BONDED WAREHOUSE, INC.
("Lessor")

and

# SYLVEST FARMS, INC.
("Lessee")

## August 25, 2005

This Instrument Prepared by:
Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, Alabama 36117

KOCH 00000122

REAL PROPERTY LEASE
between
HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
SYLVEST FARMS, INC.
("Lessee")

| **Description** | **Page No.** |
|---|---|

Article I     Definitions and Use of Phrases .................................................. 1

Section 1.01.  Definitions ........................................................... 1
Section 1.02.  Use of Phrases and Capitalized Terms .......................... 2

Article II     Premises, Duration of Term and Rental Provisions ..................... 2

Section 2.01.  Premises .............................................................. 2
Section 2.02.  Term .................................................................. 2
Section 2.03.  Rent .................................................................. 3

Article III     Lessee's Obligations for Utilities, Improvements and Repairs .................. 5

Section 3.01.  Utilities ............................................................. 5
Section 3.02.  Lessee's Improvements .............................................. 5
Section 3.03.  Repairs ............................................................. 5

Article IV     Additions, Easements, Liens, Taxes and Insurance .................................. 6

Section 4.01.  Mechanics' Liens ................................................... 6
Section 4.02.  Taxes ................................................................ 7
Section 4.03.  Insurance ........................................................... 8
              (a)     Fire and All Risk Property Insurance .................. 8
              (b)     Commercial General Liability .......................... 8
              (c)     Employer's Liability .................................. 8
              (d)     Boilers ............................................... 8
              (e)     Flood Insurance ....................................... 8
              (f)     Policy Form ........................................... 9
              (g)     Use of Premises Not to Invalidate Insurance, Waiver
                      of Subrogation ........................................ 9

Article V     Provisions Respecting Damage, Destruction and Condemnation ........... 10

Section 5.01.  Use of Premises .................................................... 10
Section 5.02.  Condition of Premises .............................................. 10
Section 5.03.  Personal Property at Risk of Lessee ................................ 11

-i-

KOCH 00000123

REAL PROPERTY LEASE
between
HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
SYLVEST FARMS, INC.
("Lessee")

**Description**                                                                                                     **Page No.**

Section 5.04.  Indemnity ............................................................................................. 11
Section 5.05.  Environmental ...................................................................................... 11
Section 5.06.  Damage by Fire or Other Casualty ........................................................ 12
Section 5.07.  Condemnation ....................................................................................... 12

Article VI      Certain Provisions Relating to Assignment, Subleasing and Mortgaging ........... 13

Section 6.01.  Provisions Relating to Assignment ....................................................... 13
Section 6.02.  Provisions Relating to Subleasing ........................................................ 14
Section 6.03.  Restriction on Sale or Mortgaging of Leasehold Estate by
                Lessor or Lessee ................................................................................ 14
Section 6.04.  Lessee's Purchase Option ..................................................................... 14

Article VII     Events of Default and Remedies ............................................................ 16

Section 7.01.  Default or Breach ................................................................................. 16
Section 7.02.  Effect of Default ................................................................................... 16
Section 7.03.  Agreement Defining Relationship ........................................................ 17
Section 7.04.  Subordination and Attornment ............................................................. 17
Section 7.05.  Estoppel Certificate .............................................................................. 18
Section 7.06.  Interest on Past Due Obligations .......................................................... 18
Section 7.07.  Liability of Lessor ................................................................................ 18
Section 7.08.  Notices ................................................................................................. 19
Section 7.09.  Tax Covenants of Lessor ...................................................................... 19

Article VIII    Miscellaneous ...................................................................................... 20

Section 8.01.  Covenant of Quite Enjoyment; Surrender of Premises ........................... 20
Section 8.02.  Representations of Lessor's and Lessee's Power and Authority ............. 20
Section 8.03.  This Property Lease is a Triple Net Lease ............................................. 20
Section 8.04.  Certain Prior and Contemporaneous Agreements Cancelled ................... 21
Section 8.05.  Article and Section Captions ................................................................ 21
Section 8.06.  Binding on Assigns .............................................................................. 21
Section 8.07.  Amendment in Writing ......................................................................... 21
Section 8.08.  Waiver-None ........................................................................................ 21
Section 8.09.  No Surrender ........................................................................................ 22

-ii-

KOCH 00000124

REAL PROPERTY LEASE
between
HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
SYLVEST FARMS, INC.
("Lessee")

<u>Description</u>                                                                                                                <u>Page No.</u>

Section 8.10.  Captions ................................................................................. 22
Section 8.11.  Brokers .................................................................................. 22
Section 8.12.  Applicable Law ...................................................................... 22
Section 8.13.  Partial Invalidation of Property Lease ................................ 22
Section 8.14.  Counterparts .......................................................................... 22
Section 8.15.  Late Fee ................................................................................. 22
Section 8.16.  Exculpation Clause ............................................................... 22
Section 8.17.  Right of Entry ....................................................................... 23

Signatures ........................................................................................................ 23

-iii-

KOCH 00000125

### REAL PROPERTY LEASE

THIS REAL PROPERTY LEASE ("Property Lease") is made and entered into as of the 25th day of August, 2005, between **HODGES BONDED WAREHOUSE, INC.**, an Alabama corporation ("Lessor") and **SYLVEST FARMS, INC.**, an Alabama corporation ("Lessee").

### ARTICLE I
### DEFINITIONS AND USE OF PHRASES

Section 1.01.  **Definitions.**   The following words and phrases and others evidently intended as the equivalent thereof shall, in the absence of clear implication herein otherwise, be given the following respective interpretations herein:

"**Additional Rent or Rent**" means any additional monies paid or discharged by Lessee to Lessor or to a third party hereunder.

"**Base Rent**" means the amount paid by Lessee to Lessor each month commencing on September 25, 2005.

"**Commencement Date**" means the term commencing on the date set forth above and ending on August 25, 2012, unless sooner terminated as herein provided.

"**Lessee**" means Sylvest Farms, Inc., an Alabama corporation having its principal office in Montgomery, Alabama.

"**Lessor**" means Hodges Bonded Warehouse, Inc., an Alabama corporation having its principal office in Montgomery, Alabama.

"**Premises**" means the real property specifically described on Exhibit A hereto.

"<u>Property Lease</u>" means this Real Property Lease dated August 25, 2005 between Hodges Bonded Warehouse, Inc., as Lessor and Sylvest Farms, Inc., as Lessee.

"<u>Term</u>" means the date set forth above and ending on August 25, 2012, unless sooner terminated as herein provided.

Section 1.02. <u>Use of Phrases and Capitalized Terms</u>.     "Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter," and other equivalent words refer to this Property Lease and not solely to the particular portion thereof in which any such word is used. The definitions set forth in Section 1.01 hereof include both the singular and the plural. Except for those terms defined herein, the capitalized terms used herein shall have the meaning ascribed to them in the Agreement Defining Relationship between Sylvest Farms, Inc. and Hodges Bonded Warehouse, Inc. ("Agreement Defining Relationship") dated as of August 25, 2005. Any pronominal references used herein shall be deemed to include the masculine, feminine, and neuter, and the singular and plural as the context requires.

## ARTICLE II
## PREMISES, DURATION OF TERM AND RENTAL PROVISIONS

Section 2.01. <u>PREMISES</u>.  Lessor hereby leases to Lessee and Lessee hereby rents and leases from Lessor the land, building and related improvements located at 4530 Mobile Highway, Montgomery, Alabama and more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof ("Premises"), subject to the terms and conditions set forth herein.

Section 2.02. <u>TERM</u>.  This Property Lease shall be for a term commencing on the date set forth above (the "Commencement Date") and ending on August 25, 2012, unless sooner terminated as herein provided.

2

KOCH 00000127

Section 2.03.  <u>RENT.</u>

(a)     Commencing on September 25, 2005, Base Rent shall be paid by Lessee to Lessor in the amount of seventy one thousand three hundred ninety-seven dollars and 99/100 ($71,397.99) per month, in addition to all other sums payable to Lessor by Lessee hereunder. All rent due herein shall be payable at the office of Lessor at the address set forth in Section 29 below or at such other place as Lessor may from time to time designate in writing, in lawful money of the United States, in monthly installments, on the 25th day of each month thereafter. Lessor and Lessee acknowledge and confirm to each other that this Agreement constitutes a so-called capitalized lease and is a financing lease pursuant to which Lessor is selling its interest in the Premises to Lessee in accordance with the Purchase Price and Amortization Schedule attached hereto as Exhibit B. In addition, as set forth herein, this Property Lease shall be net to the Lessor.

(b)     Base Rent shall be absolutely net to Lessor so that this Property Lease shall yield, net to Lessor, the Base Rent specified in this Section 2.03, and that all impositions, taxes, assessments, insurance premiums, utility charges, maintenance, repair and replacement expenses, all expenses related to compliance with laws and all other costs, fees, charges, expenses, reimbursements and obligations of every kind and nature whatsoever relating to the Premises which may arise or become due during the Term of this Property Lease or by reason of events occurring during the Term shall be paid or discharged by Lessee, whether or not payable to Lessor or to a third party hereunder, shall be considered as additional rent (hereinafter referred to as "Additional Rent" or "rent").

(c)     All payments of Base Rent and Additional Rent shall be payable without previous demand therefore and without any right of set-off or deduction whatsoever, and in the case of non-payment of any item of Additional Rent by Lessee when the same is due, Lessor shall have, in addition to all its other rights and remedies, all of the rights and remedies available to Lessor under the provisions of this Property Lease or by law in the case of non-payment of Base Rent. The performance and observance by Lessee of all the terms, covenants, conditions

3

and agreements to be performed or observed by Lessee hereunder shall be performed and observed by Lessee at Lessee's sole cost and expense.

(d)    If at any time any method of taxation shall be such that there shall be levied, assessed or imposed on Lessor, or on the Base Rent or Additional Rent, a capital levy, gross receipts or sales tax or other tax on the rents received therefrom, Lessee shall pay and discharge the same, it being the intention of the parties hereto that the rent to be paid hereunder shall be paid to Lessor absolutely net without deduction or charge of any nature whatsoever. Nothing in this Property Lease shall require Lessee to pay any income taxes assessed against Lessor or any estate, succession or inheritance taxes of Lessor, or any of its successors or assigns or any of its stockholders or distributees upon Lessor's liquidation.

(e)    The amortization schedule attached hereto as Exhibit B has been calculated assuming that Lessee shall make improvements to the Premises at a cost not to exceed Seven Hundred Thousand and 00/100 ($700,000.00) Dollars. Lessee has heretofore notified Lessor of the nature of the improvements and Lessor has consented that Lessee may make such improvements to the Premises and, in addition, Lessor has agreed to fund the cost of such improvements up to Seven Hundred Thousand and 00/100 ($700,000.00) Dollars and all such costs shall be recoverable by Lessor under this Property Lease as part of the Base Rent. Lessee shall submit invoices to Lessor for such improvements and Lessor covenants that it will pay such invoices in a timely manner so that no liens or encumbrances are asserted against the Premises relative to such improvements. In the event that Lessee has not caused such improvements to be completed prior to the due date of the first installment of Rent on September 25, 2005, Lessor and Lessee through their respective financial officers shall agree on the rental payment to be made as Base Rent for such period or any other period through the date on which Lessee has expended Seven Hundred Thousand and 00/100 ($700,000.00) Dollars and thereafter the Base Rent shall be as specified in Exhibit B.

4

# ARTICLE III

## LESSEE'S OBLIGATIONS FOR UTILITIES, IMPROVEMENTS AND REPAIRS

Section 3.01. **UTILITIES.** Lessee shall pay for all gas, water, electricity, telephone, and other utility services or trash disposal services used or consumed in or allocable to the Premises during the term of this Property Lease and shall pay all sewer use fees or charges made or imposed with respect to or against the Premises during the Term of this Property Lease. Lessee shall hold Lessor and the Premises harmless for all liens, charges, and costs with respect to same. If any equipment installed by Lessee requires additional utility facilities, such additional facilities shall be installed at Lessee's expense. During the term hereof, the utility services shall be placed in Lessee's name, and Lessee shall be responsible for all invoices for utility services and Lessee's payments for all utility services shall be made directly to the utility or other provider of such service as and when due. Lessor shall not be responsible for any interruption or discontinuance of utility services to the Premises.

Section 3.02. **LESSEE'S IMPROVEMENTS.** After the completion of the improvements to the Premises contemplated by Section 2.03(e) above, Lessee shall also be permitted to make other improvements or alterations in the Premises with the prior written consent of Lessor (other than equipment installations or modifications) at Lessee's expense. In the event of any such modification, all work shall be performed at the expense of Lessee and under Lessee's supervision and all such work will be completed free and clear of liens. Upon termination of this Property Lease, all such modifications shall be treated as part of the Premises to be conveyed to Lessee.

Section 3.03. **REPAIRS.** Lessee, at its sole cost and expense, throughout the term of this Property Lease, shall take good care of the Premises, including the equipment (and including any improvements or equipment hereafter erected or installed on the Premises), and shall keep the same in working order and condition, and shall make and perform all routine maintenance thereof and all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, of every nature, kind and description. Lessor understands and agrees that the condition of the Premises is subject to reasonable wear

5

KOCH 00000130

and tear in the ordinary course of business. When used in this Section 6, "repairs" shall include all necessary replacements, renewals, alterations, additions and betterments. All repairs made by Lessee shall be at least equal in quality to the original work, measured from and after the Commencement Date of this Property Lease and shall be made by Lessee in accordance with all laws, ordinances and regulations whether heretofore or hereafter enacted. Lessee, at its sole cost and expense shall take good care of, repair and maintain all driveways, pathways, roadways, sidewalks, curbs, spur tracks, parking areas, loading areas, landscaped areas, entrances and passageways on or appurtenant to the Premises in good order and repair and shall promptly remove accumulated snow, ice and debris from any and all driveways, pathways, roadways, sidewalks, curbs, parking areas, loading areas, entrances and passageways and keep all portions of the Premises, including areas appurtenant thereto, in a clean and orderly condition free of snow, ice, dirt, rubbish, debris and unlawful obstructions. Lessee shall not do or suffer any waste or damage or injury to the Premises or any improvements hereafter erected thereon, or to the fixtures or equipment therein. Lessee shall comply with all laws and regulations of any governmental authority with respect to the Premises, and the manner of using and operating the same and with all restrictive covenants, if any, affecting the title to the Premises or any part thereof.

## ARTICLE IV

## ADDITIONS, EASEMENTS, LIENS, TAXES AND INSURANCE

Section 4.01. **MECHANICS' LIENS.** Lessee shall not suffer or permit any mechanic's lien or other lien to be filed against the Premises, or any portion thereof, by reason of work, labor, skill, services, equipment or materials supplied or claimed to have been supplied to the Premises at the request of Lessee, or anyone holding the Premises, or any portion thereof, through or under Lessee. If any such mechanic's lien or other lien shall at any time be filed against the Premises, or any portion thereof, Lessee shall cause the same to be discharged of record within thirty (30) days after the date of filing the same. If Lessee shall fail to discharge such mechanic's lien or liens or other lien within such period, then in addition to any other right or remedy of Lessor, Lessor may, but shall not be obligated to, discharge the same by paying to the claimant the amount claimed to be due or by procuring the discharge of such lien as to the

6

Premises by deposit in the court having jurisdiction of such lien, the foreclosure thereof or other proceedings with respect thereto, of a cash sum sufficient to secure the discharge of the same, or by the deposit of a bond or other security with such court sufficient in form, content and amount to procure the discharge of such lien. Any amount paid by Lessor, or the value of any deposit so made by Lessor, together with all costs, fees and expenses in connection therewith (including reasonable attorney's fees of Lessor), together with interest thereon at the rate of 12% per annum, shall be repaid by Lessee to Lessor on demand by Lessor and if unpaid may be treated as Additional Rent. Lessee shall indemnify and defend Lessor against and save Lessor and the Premises, and any portion thereof, harmless from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including, without limitation, reasonable attorney's fees resulting from the assertion, filing foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien.

All materialmen, contractors, artisans, mechanics, laborers and any other person now or hereafter furnishing any labor, services, materials, supplies or equipment to Lessee with respect to the Premises, or any portion thereof, are hereby charged with notice that they must look exclusively to Lessee to obtain payment for the same. Notice is hereby given that Lessor shall not be liable for any labor, services, materials, supplies, skill, machinery, fixtures or equipment furnished or to be furnished to Lessee upon credit, and that no mechanic's lien or other lien for any such labor, services, materials, supplies, machinery, fixtures or equipment shall attach to or affect the estate or interest of Lessor in an to the Premises, or any portion thereof.

Section 4.02. **TAXES.** Lessee shall pay all real estate and personal property taxes which become a lien against the Premises or any equipment, when due and before such taxes become delinquent each calendar year or portion thereof during the term of this Property Lease to the extent such taxes cover periods during which Lessee has been in possession of the Premises and shall provide Lessor evidence of such payment within ten (10) days of Lessor's request therefor. All special assessments applicable to the Premises shall be paid by Lessee prior to delinquency. Personal property taxes on personal property of Lessee located on the Premises shall be paid by Lessee.

KOCH 00000132

Section 4.03. INSURANCE.  Lessee shall carry and maintain, at its sole cost and expense, the following types of insurance, in the amount specified and in the form hereafter provided during the Term of this Property Lease:

(a)     Fire and All Risk Property Insurance.  "All risk" property insurance against fire, theft, and all other risks with vandalism and malicious mischief endorsements in an amount not less than $4,300,000.00 on a stated value policy, subject to deductible amounts not in excess of $50,000.00, such coverage to include all buildings, appurtenances, and other improvements on the Premises.  Lessee shall keep all trade fixtures, equipment and inventories insured with fire and "all risks" coverage insurance for the full replacement cost thereof and shall furnish Lessor with evidence of such insurance coverage.

(b)     Commercial General Liability.   Commercial general liability and property damage insurance with a combined single limit of at least Five Million Dollars ($5,000,000) per occurrence insuring against any and all liability of the insured with respect to said Premises or arising out of the maintenance, use or occupancy thereof.  All such bodily injury liability insurance and property damage liability insurance shall specifically insure the performance by Lessee of the indemnity provisions as to liability for injury to or death of persons and injury or damage to property contained herein.

(c)     Employer's Liability.  Workers' compensation insurance in accordance with the statutory requirements of the state where the Premises are located and employer's liability insurance in the minimum amount of $1,000,000 for all employees of Lessee at the Premises.  If Lessee leases its workers from a third party, then Lessee shall provide Lessor, upon request, with reasonable evidence that such workers are covered under such third party's workers' compensation insurance policy.

(d)     Boilers.  Lessee shall procure and maintain in full force and effect boiler and machinery insurance on all boilers, air conditioning equipment, and other pressure vessels and systems, located in, on, or about the Premises; and if the said objects and the damage that may be caused by them or result from them are not covered by Lessee's standard fire and "all

8

KOCH 00000133

risk" coverage insurance then such boiler insurance shall be in an amount not less than One Hundred Thousand Dollars ($100,000) per occurrence.

        (e)    **Flood Insurance**.  Lessee shall procure and maintain a flood insurance policy in full force and effect subject to the limitations imposed by the National Flood Insurance Program.

        (f)    **Policy Form**.  All policies of insurance provided for herein shall be issued by insurance companies with general policyholders' rating of not less than A- and financial class size VIII or larger as rated in the most current available "Best's Insurance Guide", and qualified to do business in the State of Alabama, and shall be issued in the names of Lessor, Lessee and such other persons or firms as Lessor specifies from time to time as insureds and shall contain a waiver of subrogation.  Lessor's lender, if any is also to be loss payee and additional insured.  The all risk property and boiler insurance shall be for Lessor as the loss payee, and the liability policies shall be for the mutual and joint benefit and protection of Lessor and Lessee, and executed copies of such policies of insurance or certificates thereof shall be delivered to the Lessor prior to delivery of possession of the Premises to Lessee and thereafter within thirty (30) days prior to the expiration of the term of each such policy.  All public liability and property damage policies shall contain a provision that the Lessor, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Lessee or Lessor.  As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Lessee in like manner and to like extent.  All policies of insurance or certificates thereof delivered to Lessor must contain a provision that the company writing said policy will give Lessor thirty (30) days notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the amounts of insurance.  All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which Lessor may carry.

        (g)    **Use of Premises Not to Invalidate Insurance, Waiver of Subrogation**. Lessee shall not use or occupy the Premises or any part thereof in any manner which could

9

invalidate any policies of insurance now or hereafter placed on the Premises or increase the risks covered by insurance on the Premises or necessitate additional insurance premiums or policies of insurance, even if such use may be in furtherance of Lessee's business purposes. In the event any policies of insurance are invalidated by acts or omissions of Lessee, Lessor shall have the right to terminate this Property Lease, or at Lessor's option, to charge Lessee for extra insurance premiums required on the Premises on account of the increased risk caused by Lessee's use and occupancy of the Premises. Lessee waives all claims for recovery from Lessor for any loss or damage to any of its property insured under valid and collectible insurance policies.

### ARTICLE V

### PROVISIONS RESPECTING DAMAGE, DESTRUCTION AND CONDEMNATION

Section 5.01. **USE OF PREMISES.** The Premises are leased to Lessee, and are to be used by Lessee, for the purposes of food processing or cooking of poultry products, freezer storage or for Lessee's general business purposes as the same may be constituted from time to time. Lessee agrees to use the Premises in such a manner as to comply with all applicable governmental laws, ordinances and regulations in connection with its use of the Premises, and to keep the Premises in a clean and sanitary condition, and to use all reasonable precaution to prevent waste, damage or injury to the Premises.

Section 5.02. **CONDITION OF PREMISES.** Lessee agrees that no promises, representations, statements or warranties have been made on behalf of Lessor to Lessee respecting the condition of the Premises or any equipment therein, or the making, at Lessor's cost, of any repairs to the Premises and the taking of possession of the Premises and all equipment therein by Lessee shall be construed as recognition by Lessee that the Premises and equipment were in good and satisfactory condition when possession of same was taken. Lessee shall, at the termination of this Property Lease, by lapse of time or otherwise, remove all of Lessee's property therefrom and surrender the Premises to Lessor in as good condition as when Lessee took possession, normal wear and tear in the ordinary course of business excepted. Lessee shall repair any damages done removing equipment.

10

KOCH 00000135

Section 5.03. **PERSONAL PROPERTY AT RISK OF LESSEE.** All personal property in the Premises shall be at the risk of Lessee only. . Lessor shall not be liable for any damage to any personal property or any property of Lessee or its agents or employees in the Premises caused by steam, electricity, sewage, gas or odors, or from water, rain or snow which may leak into, issue or flow into the Premises from any part of the Premises, or from any other place or quarter, or for any damage done to Lessee's property in moving same to or from the Premises. Lessee shall give Lessor, or its agents, prompt written notice of any damage to or defects in water pipes, gas or warming or cooling apparatus in the Premises.

Section 5.04. **INDEMNITY.** Lessee shall indemnify, hold harmless and defend Lessor from and against, and Lessor shall not be liable to Lessee on account of, any and all costs, expenses, liabilities, losses, damages, suits, actions, fines, penalties, demands or claims of any kind, including reasonable attorney's fees, asserted by or on behalf of any person, entity or governmental authority arising out of or in any way connected with either (a) a failure by Lessee to perform any of the agreements, terms, or conditions of this Property Lease required to be performed by Lessee, (b) a failure by Lessee to comply with any laws, statutes, ordinances, regulations or orders of any governmental authority, or (c) any accident, death, or personal injury, or damage to, or loss or theft of property which shall occur on or about the Premises, except as the same may be the result of the gross negligence of Lessor, its employees (other than its maintenance personnel at the Premises) or agents.

Section 5.05. **ENVIRONMENTAL.** From and after the Commencement Date, Lessee hereby indemnifies and holds Lessor harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims, environmental response and cleanup costs, fines, and actions, suits, costs, taxes, expenses, of whatsoever kind or nature imposed on, incurred by, or served against Lessor in any way relating to or arising out of the management, mismanagement, presence, use, possession, generation, transportation, removal, treatment, storage, disposal, migration, or remedy of any "Regulated Substance" as defined herein, now or hereafter in, on, under or from the Premises, in each case to the extent accruing on or after the Commencement Date.

11

KOCH 00000136

For the purposes of this Property Lease, the term "Regulated Substance" shall include substances defined as "regulated substances," "hazardous waste," "hazardous substances," "hazardous materials," "toxic substances, " "pesticides" or terms of similar import or effect in the Resource Conservation and Recovery Act, as amended by the Hazardous Solid Waste Amendments of 1984, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, Federal and state environmental laws, any future local, state or federal law or ordinance, or the regulations, rules, and ordinances adopted and publications from time to time promulgated pursuant to said local, state, and federal laws or ordinances. The indemnity in this Section 14 shall survive the expiration or termination of this Property Lease and shall continue to run in favor of each successive owner of the Premises, notwithstanding that, at the time the right to indemnity is claimed, the party seeking the indemnity is no longer Lessor under this Property Lease for a period of thirty-six (36) months after termination of the Property Lease.

Section 5.06.  **DAMAGE BY FIRE OR OTHER CASUALTY.** If, during the Term of this Property Lease, the Premises, or any portion thereof, shall be damaged by fire or any other cause, at Lessor's election Lessee shall repair the Premises (as long as Lessor agrees to let any available insurance proceeds be used for such repair), and the work or repair shall begin promptly and shall be carried on without unnecessary delay. In the event Lessor elects not to have Lessee repair the Premises, the proceeds of the fire and "all risks" coverage policy shall be paid over to Lessor. Any such damage shall not extend the Property Lease Term. Lessee shall not be entitled to any damages by reason of any inconvenience or loss sustained by Lessee as a result of the Premises or any portion thereof being untenantable while the Premises are being repaired or in the event the Lessor elects not to have the Premises repaired as provided above.

Section 5.07  **CONDEMNATION.** If the whole or any part of the Premises shall be taken by public authority under the power of eminent domain, then the term of this Property Lease shall cease on that portion of the Premises so taken, from the date of possession, and the rent shall be paid to that date, with a proportionate refund by Lessor to Lessee of such rent as

12

may have been paid by Lessee in advance. If the portion of the Premises taken is such that it prevents the practical use of the Premises for Lessee's purposes, then Lessee shall have the right to continue in possession of the remainder of the Premises, except that the rent shall be reduced in proportion to the area of the Premises taken. In the event of any taking or condemnation of the Premises, in whole or in part, the entire resulting award of damages shall be the exclusive property of Lessor, including all damages awarded as compensation for diminution in value to the leasehold, without any deduction for the value of any unexpired term of this Property Lease, or for any other estate or interest in the Premises now or hereafter vested in Lessee.

## ARTICLE VI
## CERTAIN PROVISIONS RELATING TO
## ASSIGNMENT, SUBLEASING AND MORTGAGING

Section 6.01. **Provisions Relating to Assignment.**

(a)    Lessee may assign its rights and obligations hereunder to Sylvest Foods Corporation, and any successor to the business of Lessee by merger, consolidation or acquisition of all or substantially all of Lessee's assets.

(b)    Lessor shall have the right to assign its rights and obligations hereunder to Regions Bank as collateral security for Lessor's financing with such Bank. In addition, Lessor shall have the right to assign its interest (whether by merger, consolidation, sale of assets or otherwise) under this Property Lease provided that the assignee expressly assumes the rights and obligations of Lessor under this Property Lease and under the Agreement Defining Relationship between Lessor and Lessee.

(c)    No assignee or anyone claiming by, through or under any permitted assignment shall by virtue thereof acquire any greater rights in the Premises or in any part thereof than Lessee then has under this Property Lease, nor shall any such assignment or any dealings or

13

KOCH 00000138

transactions between Lessor or its assignee in any way relieve Lessee from primary liability for any of its obligations hereunder. Thus, in the event of any such assignment, should Lessee's assignee fail to perform such obligation as and when due, Lessee shall continue to remain liable for payment of the rentals herein provided to be paid by it and for performance and observance of the other agreements and covenants on Lessee's part herein provided to be performed and observed by them.

Section 6.02. __Provisions Relating to Subleasing.__   Lessee may sublet the Premises or any portion thereof to Sylvest Foods Corporation, and any successor thereto by merger, consolidation or acquisition of all or substantially all of Lessee's assets. No sublessee or anyone claiming by, through or under the sublease shall by virtue thereof acquire any greater rights in the Premises or any part thereof than Lessee then has under this Property Lease. Any further sublease shall, by its terms, specify that such sublease shall terminate conterminously with the termination of this Property Lease. No sublease made by Lessee or Sublessee shall relieve Lessee from any obligation under this Property Lease.

Section 6.03   __Restriction on Sale or Mortgaging of Leasehold Estate by Lessor or Lessee.__   Neither the Lessor nor the Lessee may sell its leasehold estate acquired hereby to any person or persons prior to the expiration of Lessee's Purchase Option without the written consent of the other party not to be unreasonably withheld.   In all events any purchaser of Lessor's or Lessee's interest in the Property Lease or the leasehold estate created hereby with respect to the Premises shall agree in writing to be bound by all of the terms, covenants and conditions of this Property Lease. Each party agrees to give the other not less than thirty (30) days notice of any such proposed sale. Further, except as contemplated by the financing documents respecting the Regions Bank financing being obtained concurrently with the execution of this Property Lease, neither the Lessor nor the Lessee may mortgage the Premises or its interest therein to a lender as security for the payment of any loan (other than Lessor to Regions Bank).

Section 6.04. __Lessee's Purchase Option.__

(a)     At any time after the Commencement Date of this Property Lease, Lessee shall have the right to purchase the Premises by prepaying all of the Base Rent (indebtedness)

14

KOCH 00000139

then due to Lessor as reflected on the amortization schedule attached hereto as Exhibit A. **This option to Purchase is a material inducement to Lessee for executing this Property Lease and such option may not be altered, amended or rescinded by Lessor without the express written consent of Lessee.** In addition Lessor and Lessee agree that in the event of a prepayment of the Property Lease during the first twelve (12) months following the Commencement Date of the Property Lease, and Lessee prepays the Base Rent (indebtedness) under such Property Lease in full, Lessor shall be entitled to a prepayment fee in the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars; if prepayment should occur at any time during months thirteen through twenty-four following the Commencement Date Lessee shall pay to Lessor a prepayment fee in the amount of be One Hundred Thousand and 00/100 ($100,000.00) Dollars and in months twenty-five through thirty-six following the Commencement Date the prepayment fee shall be Fifty Thousand and 00/100 ($50,000.00) Dollars. Following the thirty-sixth month aftrthe Commencement Date there shall be no prepayment fee with respect to the Property Lease.

(b)     In the event that Lessee elects to prepay the indebtedness due under this Property Lease, Lessee shall give ten (10) days notice to Lessor that it intends to make a prepayment of all the Base Rent (including wihtout limitation all principal, interest, indebtedness and Additional Rent) then due however, in no event less than the outstanding balance as shown in Exhibit B. Such payment shall be made on the second business day following the expiration of the notice to be given to Lessor and Lessor shall immediately and concurrently deliver to Lessee a statutory warranty deed to the Premises conveying merchantable title free and clear of all liens and encumbrances (other than exceptions as reflected in the owner's title policy being delivered to Lessor in connection with the consummation of the transactions contemplated by the Asset Purchse Agreement or such other exceptions that are reasonably acceptable to Lessee). Furthermore, immediately upon payment of the final installment due under the amortization schedule, Lessor shall likewise convey the Premises to Lessee as herein provided.

15

KOCH 00000140

## ARTICLE VII

## EVENTS OF DEFAULT AND REMEDIES

Section 7.01. **DEFAULT OR BREACH.** Each of the following events shall constitute a default or a breach of this Property Lease by Lessee:

(a)    If Lessee fails to pay Lessor any Base Rent, Additional Rent or other rent when due hereunder;

(b)    If Lessee fails to perform or comply with any other term or condition of this Property Lease and if such nonperformance shall continue for a period of 15 days after notice thereof by Lessor to Lessee, time being of the essence.

(c)    If Lessee vacates or abandons the Premises;

(d)    If Lessee files a petition in bankruptcy or insolvency or for reorganization under any Bankruptcy Act, or voluntarily takes advantage of any such act by answer or otherwise, or makes an assignment for the benefit of creditors;

(e)    If involuntary proceedings under any bankruptcy or insolvency act shall be instituted against Lessee, or if a receiver or trustee shall be appointed for all or substantially all of the property of Lessee, and such proceedings shall not be dismissed or the receivership or trusteeship vacated within 30 days after the institution or appointment; or

(f)    The Lessee's estate created by this Property Lease is taken in execution or by other process of law.

Section 7.02. **EFFECT OF DEFAULT.**    In the event of any default or breach hereunder, in addition to any other right or remedy available to Lessor, either at law or in equity, Lessor may exert any one or more of the following rights:

(a)    Cure any default of Lessee hereunder, in which case Lessee shall reimburse any costs incurred by Lessor in curing such default, together with interest charged

16

KOCH 00000141

thereon at the rate of 12% per annum, which amount shall be paid by Lessee to Lessor within 15 days after demand on Lessee therefore.

(b)     Lessor may retake the Premises and may terminate this Property Lease by giving notice of termination to Lessee not less than fifteen (15) days prior to any such retaking. Without such notice, Lessor's retaking will not terminate the Property Lease.  On termination, Lessor may recover from Lessee all damages proximately resulting from the breach, including the cost of recovering the Premises and the Base Rent for the balance of the Property Lease which sum shall be immediately due Lessor from Lessee, provided however, Lessor must mitigate its damages by immediately selling or taking steps to sell the Premises and any damages to be asserted against Lessee shall be mitigated or set off by the proceeds from Lessor's sale.

(c)     Lessor may relet the Premises or any part thereof for any term without terminating this Property Lease, at such rent and on such terms as it may choose.  Lessor may make alterations and repairs to the Premises.  In addition to Lessee's liability to Lessor for breach of this Property Lease, Lessee shall be liable for all expenses of the reletting, for any alterations and repairs made, and for the difference between the rent received by Lessor under the new lease agreement and the rent installments that are due for the same period under this Property Lease.

Section 7.03.  **AGREEMENT DEFINING RELATIONSHIP.**  Lessor and Lessee have concurrently with the execution of the Property Lease entered into an Agreement Defining Relationship between Sylvest Farms, Inc. and Hodges Bonded Warehouse, Inc. the provisions of which are incorporated hereby reference.  The benefits and obligations of each party are subject to the remedy of specific performance in the Circuit Court of Montgomery County, Alabama in addition to all other remedies at law or in equity.

Section 7.04.  **SUBORDINATION AND ATTORNMENT.**  Lessor reserves the right to place liens and encumbrances on the Premises in favor of Regions Bank, solely superior in lien and effect to this Property Lease and not to any other lender or lienholder or claimant.  This Property Lease, and all rights of Lessee hereunder shall be subject and subordinate to any liens and encumbrances now or hereafter imposed by Lessor upon the Premises or any part thereof. Lessor and Lessee agree to execute, acknowledge and deliver to Regions Bank a Subordination,

17

Nondisturbance and Attornment Agreement in the form attached hereto as Exhibit C, upon demand, any and all instruments that may be necessary or proper to subordinate this Property Lease and all rights herein to any such lien or encumbrance as may be required by Lessor. In no event shall Lessor have the right to terminate this Property Lease upon Lessor's default under any mortgage or security agreement with Regions Bank with respect to the Premises.

Section 7.05.  **ESTOPPEL CERTIFICATE.**  Lessee agrees that at any time and from time to time during the term of this Property Lease, and within ten (10) days after demand therefor by Lessor, to execute and deliver to Lessor or to any proposed mortgagee, trustee, beneficiary or purchaser, a certificate in recordable form certifying that this Property Lease is in full force and effect, that the Property Lease is unmodified, or if modified state any such modifications, and that there are no defenses or offsets thereto, or stating such defenses or offsets as are claimed by Lessee, and the dates to which all rentals have been paid.

Section 7.06.  **INTEREST ON PAST DUE OBLIGATIONS.**  Whenever under any provision of this Property Lease Lessee shall be obligated to make any payment or expenditure, or to do any act or thing, or to incur any liability whatsoever, and Lessee fails, refuses or neglects to perform as herein required, Lessor shall be entitled but shall not be obligated to make any such payment or expenditure, or do any such act or thing, or to incur any such liability, all on behalf of and at the cost and for the account of Lessee, and in such event the amount thereof with interest thereon as hereinafter provided shall be deemed Additional Rental hereunder and shall be added to and deemed a part of the next installment of rent thereafter becoming due from Lessee to Lessor hereunder. Any amount due from Lessee to Lessor under this Property Lease which is not paid when due shall bear interest at the rate of 12 percent per annum from the date due until paid, but the payment of such interest shall not excuse or cure any default by Lessee under this Property Lease. The interest provided for in this Section 7.06 shall be in addition to any latefee owed Lessor by Lessee.

Section 7.07.  **LIABILITY OF LESSOR.**  If Lessor shall fail to perform any covenant, term or condition of this Property Lease upon Lessors part to be performed and, as a consequence of such default, Lessee shall recover a money judgment against Lessor, such judgment shall be

18

KOCH 00000143

satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Lessor in the Premises and out of rents or other income from such property receivable by Lessor or out of the consideration received by Lessor from the sale or other disposition of all or any part of Lessor's right, title and interest in the Premises, and the Lessor shall not be liable for any deficiency.

Section 7.08.  **NOTICES.**  Any notice of demands to be given hereunder shall be given in writing and sent by recognized national overnight courier to:

|  |  |
|---|---|
| Lessor: | Hodges Bonded Warehouse, Inc.<br>4590 Mobile Highway<br>Montgomery, Alabama 36108<br>Attention:  Lance Hunter, Chief Executive Officer |
| Copy to: | William I. Eskridge, Esq.<br>Rushton Stakely Johnston & Garrett, PA<br>Post Office Box 270<br>Montgomery, AL 36101-0270 |
| Lessee: | Sylvest Foods Corporation<br>Attention: Dean E. Falk<br>President and CEO<br>3500 Western Boulevard<br>Montgomery, Alabama  36064 |
| Copy to: | Thomas G. Mancuso, Esq.<br>Mancuso & Franco, P.C.<br>Post Office Box 240489<br>Montgomery, Alabama  36124-0489 |

or at such other address as either party may from time to time designate in writing.  Each such notice shall be deemed to have been given at the time it shall be delivered to the other party by such courier in the manner prescribed herein.  Nothing contained herein shall be construed to preclude personal service of any notice in the manner prescribed by law for personal service of a summons or other legal process.

Section 7.09.  **TAX COVENANTS OF LESSOR.**  Lessor covenants and agrees with Lessee with respect to certain tax matters as follows:

19

KOCH 00000144

(a)  All tax abatement agreements held by S&C Beef Processors, LLC have been or will be assigned to Lessee and are the sole property of Lessee. Lessor will not knowingly take any action of any nature to mitigate, reduce or cancel such abatement agreements in effect on the Commencement Date of this Property Lease, with the Alabama Department of Revenue or local governmental authorities.

(b)  All tax incentives under the Mercedes Act of the State of Alabama and held by S&C Beef Processors, LLC have been or will be assigned to Lessee and are the sole property of Lessee. Lessor will not knowingly take any action of any nature to mitigate, reduce or cancel all such incentive agreements in effect on the Commencement Date of this Property Lease, with the Alabama Department of Revenue or local governmental authorities.

## ARTICLE VIII

## MISCELLANEOUS.

Section 8.01. **Covenant of Quite Enjoyment; Surrender of Premises.** So long as Lessee performs and observes all the covenants and agreements on its part herein contained, Lessee shall peaceably and quietly have, hold and enjoy the Premises during the Term, subject to all the terms and provisions hereof. Upon any termination of this Property Lease prior to its term, Lessee will surrender possession of the Premises peaceably and promptly to Lessor in as good condition as can reasonably be expected as at the completion of the construction of the Premises, excepting only (a) loss by fire or other casualty, (b) alterations, changes or improvements made in accordance with the provisions of this Property Lease, (c) acts of governmental or condemning authorities, and (d) ordinary wear and tear and obsolescence.

Section 8.02. **Representation of Lessor's and Lessee's Power and Authority.** Lessor and Lessee represent and warrant to each other that each has full power and authority to execute, deliver and perform this Property Lease and that the execution and delivery hereof has been duly authorized by all necessary action.

Section 8.03. **This Property Lease is a Triple Net Lease.** Lessee recognizes and understands that it is the intention hereof that this Property Lease be a "triple net" lease during its

20

term and that no cost or expense will be incurred by Lessor for ad valorem taxes, insurance, maintenance, repair, utilities or any other expense of ownership or operation of the Premises or Premises Site during the Term of the Property Lease. This Property Lease shall be construed to effectuate such intent.

Section 8.04. **Certain Prior and Contemporaneous Agreements Cancelled.** This Property Lease shall completely and fully supersede all other prior or contemporaneous agreements, both written and oral, between Lessor and Lessee relating to the construction of the Premises, and the leasing of the Premises. Neither Lessor nor Lessee shall hereafter have any rights under any such prior or contemporaneous agreement but shall look solely to this Property Lease for definition and determination of all their respective rights, liabilities and responsibilities respecting the construction of the Premises, and the leasing of the Premises.

Section 8.05. **Article and Section Captions.** The article and section headings and captions contained herein are included for convenience only and shall not be considered a part hereof or affect in any manner the construction nor interpretation hereof.

Section 8.06. **Binding on Assigns.** Except as hereinabove provided, all terms, conditions and agreements of this Property Lease shall be binding upon, apply and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.

Section 8.07. **Amendment in Writing.** This Property Lease contains the entire agreement between the parties and may be amended only by subsequent written agreement.

Section 8.08. **Waiver-None.** The failure of Lessor to insist upon strict performance of any of the terms, conditions and agreements of this Property Lease shall not be deemed a waiver of any of its rights or remedies hereunder and shall not be deemed a waiver of any subsequent breach or default of any of such terms, conditions and agreements. The doing of anything by Lessor which Lessor is not obligated to do hereunder shall not impose any future obligation on Lessor nor otherwise amend any provision of this Property Lease.

21

Section 8.09.  **No Surrender.**  No surrender of the Premises by Lessee shall be effected by Lessor's acceptance of the keys to the Premises or of the rent due hereunder, or by any other means whatsoever, without Lessor's written acknowledgment that such acceptance constitutes a surrender.

Section 8.10.  **Captions.**  The captions of the various paragraphs in this Property Lease are for convenience only and do not define, limit, describe or construe the contents of such paragraphs.

Section 8.11.  **Brokers.**  Lessee hereby warrants that no real estate broker has or will represent it in this transaction and that no finder's fees have been earned by a third party.

Section 8.12.  **Applicable Law.**  This Property Lease shall be governed by and construed in accordance with the laws of the State of Alabama.

Section 8.13.  **Partial Invalidation of Property Lease.**  If any term, covenant or condition of this Property Lease is determined by any court of competent jurisdiction to be invalid or unenforceable, the remainder of this Property Lease shall remain in full force and effect.

Section 8.14.  **Counterparts.**  This Property Lease may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  A facsimile copy of this Property Lease and any signature thereon shall be considered for all purposes an original.

Section 8.15.  **Late Fee.**  In the event any monetary obligation, including but not limited to fixed annual rent, percentage rent or additional rent, of Lessee is not paid within fifteen (15) days after its due date, Lessee shall pay to Lessor a late fee equal to two (2%) percent of the delinquent payment

Section 8.16.  **Exculpation Clause.**  Notwithstanding anything in this Property Lease to the contrary and to the extent that may otherwise be required by applicable law, Lessor, its

22

KOCH 00000147

agents, servants, employees, or any other person for whom Lessor is in law responsible, shall not be liable, responsible or accountable in damages or otherwise to Lessee or any other person for any acts or omissions related to the Premises or Lessee's business activities" Such exculpation of liability shall be absolute and without any exception whatsoever except in the event of fraud or gross negligence.

Section 8.17.    **Right of Entry**.  Lessor and its agents shall have the right, and during Lessee's business hours and after notice to Lessee, to enter the Premises to examine them or to make any necessary repairs thereto or to show the Premises to prospective purchasers or lessees, provided such activities do not interfere with Lessee's use of the Leased Premises

IN WITNESS WHEREOF, the parties hereto have executed this Property Lease as of the day and year first above written.

LESSOR:

HODGES BONDED WAREHOUSE, INC.

ATTEST:

By:_____

By: _____

Title:_____

LESSEE:

SYLVEST FARMS, INC.

ATTEST:

By: _____
Its:    Secretary

By: _____
Dean E. Falk
Title:    President and Chief Executive Officer

23

KOCH 00000148

**<u>Exhibit A</u>**

**<u>Legal Description</u>**

KOCH 00000149

## Exhibit A

## Legal Description

Lot A, according to the Map of Morrell Plat No. 1 as recorded in the Office of the Judge of Probate, Montgomery County, Alabama, in Plat Book 41 at Page 145, being further described as follows:

Commence at the intersection of the Eastern ROW of CSX Railroad (100' ROW) with the Northern Right of Way of U.S. Highway 80 (ROW varies); thence run along said Eastern ROW N 18° 16' E, 1068.8 feet (per Deed) to a concrete monument, said point being the Point of Beginning; thence from said Point of Beginning, continue along said Eastern Right of Way N 18° 12' 04" E, 805.61 feet to a found 5/8" rebar (GMC Cap CA00156); thence leave said Eastern Right of Way and run S 83° 22' 00" E, 964.07 feet to a found 5/8" rebar (GMC Cap CA00156) lying on the West Right of Way of the aforementioned U.S. Highway 80; thence run along said West Right of Way, S 06° 57' 16" W, 595.48 feet to a point of curvature; thence continue along said West Right of Way and said curve (concave westerly, R=1069.59'), a chord of S 11° 52' 10" W, 194.59 feet to a found concrete monument; thence leave said West Right of Way and run N 83° 22' 00" W, 1104.52 feet to the Point of Beginning.

Said described property lying and being situated in the Southwest Quarter of Section 34, T-16-N, R-17-E, and in the Northwest Quarter of Section 3, T-15-N, R-17-E, Montgomery County, Alabama, and contains 18.867 acres, more or less.

Together, with a 30' access and utility easement as recorded in Real Property Book 1458 at Page 948, being further described as follows:

Commence at a found iron pin (GMC CAP CA00156) lying at the Northeast corner of Lot A, according to the Map of Morrell Plat No. 1, as recorded in the Office of the Judge of Probate, Montgomery County, Alabama, in Plat Book 41 at Page 145, said Point lying on the West Right of Way of U.S. Highway 80 (ROW varies); thence run along the North line of said Lot A, N 83° 22' 00" W, 88.75 feet to the Point of Beginning; thence from said Point of Beginning, continue along said North line, N 83° 22' 00" W, 448.28 feet to a point; thence leave said North line and run N 54° 28' 45" E, 44.71 feet to a point; thence run S 83° 22' 00" E, 366.06 feet to a point; thence run S 51° 55' 15" E, 57.51 feet to the Point of Beginning.

Said described easement lying and being situated in the Southwest Quarter of Section 34, T-16-N, R-17-E, Montgomery County, Alabama, and contains 0.280 acres, more or less.

Together with Lessor's right, title and interest in and to any lands conveyed from S&C Beef Processors, L.L.C. unto Lessor pursuant to a Statutory Warranty Deed dated contemporaneously with this Lease and to be recorded in the Office of the Judge of Probate of Montgomery County, Alabama.

Exhibit B

Amortization Schedule

KOCH 00000151

08/09/2005   Page 1

Building

Compound Period  ........ : Monthly

| | | |
|---|---|---|
| .ominal Annual Rate ....: | 15.000 | % |
| Effective Annual Rate ... : | 16.075 | % |
| Periodic Rate ..................: | 1.2500 | % |
| Daily Rate ......................: | 0.04110 | % |

CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|
| 1 Loan | 08/25/2005 | 3,700,000.00 | 1 | | |
| 2 Payment | 09/25/2005 | 71,397.99 | 84 | Monthly | 08/25/2012 |

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 08/25/2005 | | | | 3,700,000.00 |
| 1 | 09/25/2005 | 71,397.99 | 46,250.00 | 25,147.99 | 3,674,852.01 |
| 2 | 10/25/2005 | 71,397.99 | 45,935.65 | 25,462.34 | 3,649,389.67 |
| 3 | 11/25/2005 | 71,397.99 | 45,617.37 | 25,780.62 | 3,623,609.05 |
| 4 | 12/25/2005 | 71,397.99 | 45,295.11 | 26,102.88 | 3,597,506.17 |
| 2005 | Totals | 285,591.96 | 183,098.13 | 102,493.83 | |
| | | | | | |
| 5 | 01/25/2006 | 71,397.99 | 44,968.83 | 26,429.16 | 3,571,077.01 |
| 6 | 02/25/2006 | 71,397.99 | 44,638.46 | 26,759.53 | 3,544,317.48 |
| 7 | 03/25/2006 | 71,397.99 | 44,303.97 | 27,094.02 | 3,517,223.46 |
| 8 | 04/25/2006 | 71,397.99 | 43,965.29 | 27,432.70 | 3,489,790.76 |
| 9 | 05/25/2006 | 71,397.99 | 43,622.38 | 27,775.61 | 3,462,015.15 |
| 10 | 06/25/2006 | 71,397.99 | 43,275.19 | 28,122.80 | 3,433,892.35 |
| 11 | 07/25/2006 | 71,397.99 | 42,923.65 | 28,474.34 | 3,405,418.01 |
| 12 | 08/25/2006 | 71,397.99 | 42,567.73 | 28,830.26 | 3,376,587.75 |
| 13 | 09/25/2006 | 71,397.99 | 42,207.35 | 29,190.64 | 3,347,397.11 |
| 14 | 10/25/2006 | 71,397.99 | 41,842.46 | 29,555.53 | 3,317,841.58 |
| 15 | 11/25/2006 | 71,397.99 | 41,473.02 | 29,924.97 | 3,287,916.61 |
| 16 | 12/25/2006 | 71,397.99 | 41,098.96 | 30,299.03 | 3,257,617.58 |
| 2006 | Totals | 856,775.88 | 516,887.29 | 339,888.59 | |
| | | | | | |
| 17 | 01/25/2007 | 71,397.99 | 40,720.22 | 30,677.77 | 3,226,939.81 |
| 18 | 02/25/2007 | 71,397.99 | 40,336.75 | 31,061.24 | 3,195,878.57 |
| 19 | 03/25/2007 | 71,397.99 | 39,948.48 | 31,449.51 | 3,164,429.06 |
| 20 | 04/25/2007 | 71,397.99 | 39,555.36 | 31,842.63 | 3,132,586.43 |
| 21 | 05/25/2007 | 71,397.99 | 39,157.33 | 32,240.66 | 3,100,345.77 |
| 22 | 06/25/2007 | 71,397.99 | 38,754.32 | 32,643.67 | 3,067,702.10 |
| 23 | 07/25/2007 | 71,397.99 | 38,346.28 | 33,051.71 | 3,034,650.39 |
| 24 | 08/25/2007 | 71,397.99 | 37,933.13 | 33,464.86 | 3,001,185.53 |
| 25 | 09/25/2007 | 71,397.99 | 37,514.82 | 33,883.17 | 2,967,302.36 |
| 26 | 10/25/2007 | 71,397.99 | 37,091.28 | 34,306.71 | 2,932,995.65 |
| 27 | 11/25/2007 | 71,397.99 | 36,662.45 | 34,735.54 | 2,898,260.11 |
| 28 | 12/25/2007 | 71,397.99 | 36,228.25 | 35,169.74 | 2,863,090.37 |
| 2007 | Totals | 856,775.88 | 462,248.67 | 394,527.21 | |

KOCH 00000152

08/09/2005   Page 2

## Building

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 29 | 01/25/2008 | 71,397.99 | 35,788.63 | 35,609.36 | 2,827,481.01 |
| 30 | 02/25/2008 | 71,397.99 | 35,343.51 | 36,054.48 | 2,791,426.53 |
| 31 | 03/25/2008 | 71,397.99 | 34,892.83 | 36,505.16 | 2,754,921.37 |
| 32 | 04/25/2008 | 71,397.99 | 34,436.52 | 36,961.47 | 2,717,959.90 |
| 33 | 05/25/2008 | 71,397.99 | 33,974.50 | 37,423.49 | 2,680,536.41 |
| 34 | 06/25/2008 | 71,397.99 | 33,506.71 | 37,891.28 | 2,642,645.13 |
| 35 | 07/25/2008 | 71,397.99 | 33,033.06 | 38,364.93 | 2,604,280.20 |
| 36 | 08/25/2008 | 71,397.99 | 32,553.50 | 38,844.49 | 2,565,435.71 |
| 37 | 09/25/2008 | 71,397.99 | 32,067.95 | 39,330.04 | 2,526,105.67 |
| 38 | 10/25/2008 | 71,397.99 | 31,576.32 | 39,821.67 | 2,486,284.00 |
| 39 | 11/25/2008 | 71,397.99 | 31,078.55 | 40,319.44 | 2,445,964.56 |
| 40 | 12/25/2008 | 71,397.99 | 30,574.56 | 40,823.43 | 2,405,141.13 |
| 2008 | Totals | 856,775.88 | 398,826.64 | 457,949.24 | |
| 41 | 01/25/2009 | 71,397.99 | 30,064.26 | 41,333.73 | 2,363,807.40 |
| 42 | 02/25/2009 | 71,397.99 | 29,547.59 | 41,850.40 | 2,321,957.00 |
| 43 | 03/25/2009 | 71,397.99 | 29,024.46 | 42,373.53 | 2,279,583.47 |
| 44 | 04/25/2009 | 71,397.99 | 28,494.79 | 42,903.20 | 2,236,680.27 |
| 45 | 05/25/2009 | 71,397.99 | 27,958.50 | 43,439.49 | 2,193,240.78 |
| 46 | 06/25/2009 | 71,397.99 | 27,415.51 | 43,982.48 | 2,149,258.30 |
| 47 | 07/25/2009 | 71,397.99 | 26,865.73 | 44,532.26 | 2,104,726.04 |
| 48 | 08/25/2009 | 71,397.99 | 26,309.08 | 45,088.91 | 2,059,637.13 |
| 49 | 09/25/2009 | 71,397.99 | 25,745.46 | 45,652.53 | 2,013,984.60 |
| 50 | 10/25/2009 | 71,397.99 | 25,174.81 | 46,223.18 | 1,967,761.42 |
| 51 | 11/25/2009 | 71,397.99 | 24,597.02 | 46,800.97 | 1,920,960.45 |
| 52 | 12/25/2009 | 71,397.99 | 24,012.01 | 47,385.98 | 1,873,574.47 |
| 2009 | Totals | 856,775.88 | 325,209.22 | 531,566.66 | |
| 53 | 01/25/2010 | 71,397.99 | 23,419.68 | 47,978.31 | 1,825,596.16 |
| 54 | 02/25/2010 | 71,397.99 | 22,819.95 | 48,578.04 | 1,777,018.12 |
| 55 | 03/25/2010 | 71,397.99 | 22,212.73 | 49,185.26 | 1,727,832.86 |
| 56 | 04/25/2010 | 71,397.99 | 21,597.91 | 49,800.08 | 1,678,032.78 |
| 57 | 05/25/2010 | 71,397.99 | 20,975.41 | 50,422.58 | 1,627,610.20 |
| 58 | 06/25/2010 | 71,397.99 | 20,345.13 | 51,052.86 | 1,576,557.34 |
| 59 | 07/25/2010 | 71,397.99 | 19,706.97 | 51,691.02 | 1,524,866.32 |
| 60 | 08/25/2010 | 71,397.99 | 19,060.83 | 52,337.16 | 1,472,529.16 |
| 61 | 09/25/2010 | 71,397.99 | 18,406.61 | 52,991.38 | 1,419,537.78 |
| 62 | 10/25/2010 | 71,397.99 | 17,744.22 | 53,653.77 | 1,365,884.01 |
| 63 | 11/25/2010 | 71,397.99 | 17,073.55 | 54,324.44 | 1,311,559.57 |
| 64 | 12/25/2010 | 71,397.99 | 16,394.49 | 55,003.50 | 1,256,556.07 |
| 2010 | Totals | 856,775.88 | 239,757.48 | 617,018.40 | |
| 65 | 01/25/2011 | 71,397.99 | 15,706.95 | 55,691.04 | 1,200,865.03 |
| 66 | 02/25/2011 | 71,397.99 | 15,010.81 | 56,387.18 | 1,144,477.85 |
| 67 | 03/25/2011 | 71,397.99 | 14,305.97 | 57,092.02 | 1,087,385.83 |
| 68 | 04/25/2011 | 71,397.99 | 13,592.32 | 57,805.67 | 1,029,580.16 |
| 69 | 05/25/2011 | 71,397.99 | 12,869.75 | 58,528.24 | 971,051.92 |
| 0 | 06/25/2011 | 71,397.99 | 12,138.15 | 59,259.84 | 911,792.08 |
| 71 | 07/25/2011 | 71,397.99 | 11,397.40 | 60,000.59 | 851,791.49 |
| 72 | 08/25/2011 | 71,397.99 | 10,647.39 | 60,750.60 | 791,040.89 |

KOCH 00000153

08/09/2005    Page 3

### Building

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 73 | 09/25/2011 | 71,397.99 | 9,888.01 | 61,509.98 | 729,530.91 |
| 74 | 10/25/2011 | 71,397.99 | 9,119.14 | 62,278.85 | 667,252.06 |
| 75 | 11/25/2011 | 71,397.99 | 8,340.65 | 63,057.34 | 604,194.72 |
| 76 | 12/25/2011 | 71,397.99 | 7,552.43 | 63,845.56 | 540,349.16 |
| 2011 | Totals | 856,775.88 | 140,568.97 | 716,206.91 | |
| | | | | | |
| 77 | 01/25/2012 | 71,397.99 | 6,754.36 | 64,643.63 | 475,705.53 |
| 78 | 02/25/2012 | 71,397.99 | 5,946.32 | 65,451.67 | 410,253.86 |
| 79 | 03/25/2012 | 71,397.99 | 5,128.17 | 66,269.82 | 343,984.04 |
| 80 | 04/25/2012 | 71,397.99 | 4,299.80 | 67,098.19 | 276,885.85 |
| 81 | 05/25/2012 | 71,397.99 | 3,461.07 | 67,936.92 | 208,948.93 |
| 82 | 06/25/2012 | 71,397.99 | 2,611.86 | 68,786.13 | 140,162.80 |
| 83 | 07/25/2012 | 71,397.99 | 1,752.04 | 69,645.95 | 70,516.85 |
| 84 | 08/25/2012 | 71,397.99 | 881.14 | 70,516.85 | 0.00 |
| 2012 | Totals | 571,183.92 | 30,834.76 | 540,349.16 | |
| | | | | | |
| Grand Totals | | 5,997,431.16 | 2,297,431.16 | 3,700,000.00 | |

KOCH 00000154

08/09/2005   Page 4

Building

st interest amount decreased by 0.32 due to rounding.

KOCH 00000155

08/09/2005  Page 1

Equipment

Compound Period ........ : Monthly

Nominal Annual Rate ... : 15.000 %
Effective Annual Rate ... : 16.075 %
Periodic Rate ................ : 1.2500 %
Daily Rate ..................... : 0.04110 %

15,750

CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|-------|-----------|--------|--------|--------|----------|
| 1 Loan | 08/25/2005 | 870,000.00 | 1 | | |
| 2 Payment | 09/25/2005 | 42,183.38 | 24 | Monthly | 08/25/2007 |

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|------|---------|----------|-----------|---------|
| Loan | 08/25/2005 | | | | 870,000.00 |
| 1 | 09/25/2005 | 42,183.38 | 10,875.00 | 31,308.38 | 838,691.62 |
| 2 | 10/25/2005 | 42,183.38 | 10,483.65 | 31,699.73 | 806,991.89 |
| 3 | 11/25/2005 | 42,183.38 | 10,087.40 | 32,095.98 | 774,895.91 |
| 4 | 12/25/2005 | 42,183.38 | 9,686.20 | 32,497.18 | 742,398.73 |
| 2005 | Totals | 168,733.52 | 41,132.25 | 127,601.27 | |
| 5 | 01/25/2006 | 42,183.38 | 9,279.98 | 32,903.40 | 709,495.33 |
| 6 | 02/25/2006 | 42,183.38 | 8,868.69 | 33,314.69 | 676,180.64 |
| 7 | 03/25/2006 | 42,183.38 | 8,452.26 | 33,731.12 | 642,449.52 |
| 8 | 04/25/2006 | 42,183.38 | 8,030.62 | 34,152.76 | 608,296.76 |
| 9 | 05/25/2006 | 42,183.38 | 7,603.71 | 34,579.67 | 573,717.09 |
| 10 | 06/25/2006 | 42,183.38 | 7,171.46 | 35,011.92 | 538,705.17 |
| 11 | 07/25/2006 | 42,183.38 | 6,733.81 | 35,449.57 | 503,255.60 |
| 12 | 08/25/2006 | 42,183.38 | 6,290.70 | 35,892.68 | 467,362.92 |
| 13 | 09/25/2006 | 42,183.38 | 5,842.04 | 36,341.34 | 431,021.58 |
| 14 | 10/25/2006 | 42,183.38 | 5,387.77 | 36,795.61 | 394,225.97 |
| 15 | 11/25/2006 | 42,183.38 | 4,927.82 | 37,255.56 | 356,970.41 |
| 16 | 12/25/2006 | 42,183.38 | 4,462.13 | 37,721.25 | 319,249.16 |
| 2006 | Totals | 506,200.56 | 83,050.99 | 423,149.57 | |
| 17 | 01/25/2007 | 42,183.38 | 3,990.61 | 38,192.77 | 281,056.39 |
| 18 | 02/25/2007 | 42,183.38 | 3,513.20 | 38,670.18 | 242,386.21 |
| 19 | 03/25/2007 | 42,183.38 | 3,029.83 | 39,153.55 | 203,232.66 |
| 20 | 04/25/2007 | 42,183.38 | 2,540.41 | 39,642.97 | 163,589.69 |
| 21 | 05/25/2007 | 42,183.38 | 2,044.87 | 40,138.51 | 123,451.18 |
| 22 | 06/25/2007 | 42,183.38 | 1,543.14 | 40,640.24 | 82,810.94 |
| 23 | 07/25/2007 | 42,183.38 | 1,035.14 | 41,148.24 | 41,662.70 |
| 24 | 08/25/2007 | 42,183.38 | 520.68 | 41,662.70 | 0.00 |
| 2007 | Totals | 337,467.04 | 18,217.88 | 319,249.16 | |
| | and Totals | 1,012,401.12 | 142,401.12 | 870,000.00 | |

08/09/2005   Page 2

Equipment

t interest amount decreased by 0.10 due to rounding.

KOCH 00000157

# FIRST AMENDMENT TO
# REAL PROPERTY LEASE

### Between

## HODGES BONDED WAREHOUSE, INC.
### ("Lessor")

### And

## SYLVEST FARMS, INC.
### ("Lessee")

This First Amendment to Property Lease is made and entered into on the 26th day of January, 2006, by and between Hodges Bonded Warehouse, Inc. (the "Lessor") and Sylvest Farms, Inc. (the "Lessee"). Lessor and Lessee agree to modify the Property Lease as herein provided to be effective on and as of August 25, 2005 for all purposes and in all respects.

### R E C I T A L S :

A.    Capitalized terms which are not otherwise defined in this First Amendment shall be given the meaning ascribed to them in the Property Lease.

B.    Lessor and Lessee desire to amend Section 6.04 of the Property Lease by deleting it in its entirety and substituting a new Section 6.04 as hereinafter stated in order to correctly reflect the agreement of the Parties with respect to the Lessee's purchase option with respect to the Premises.

NOW, THEREFORE, for and in consideration of the foregoing recitals and other good and valuable consideration acknowledged by each Party, Lessor and Lessee agree as follows:

1.    Section 6.04. of the Property Lease is hereby deleted in its entirety and in lieu and substitution therefore the following Section 6.04 is adopted and agreed to:

KOCH 00000119

"Section 6.04. **Lessee's Purchase Option.**

   (a) At any time after the commencement date of this Property Lease, Lessee shall have the right to purchase the Premises for a Purchase Price equal to the sum of the following:

     (i) the unpaid principal balance reflected on the Amortization Schedule attached as Exhibit "B" to the Property Lease through the Closing Date on which Lessee will acquire the Premises from Lessor.

     (ii) any accrued interest reflected on the Amortization Schedule which is accrued but unpaid through the Closing Date on which Lessee will acquire the Premises from Lessor.

     (iii) a prepayment fee in the amount of $150,000 in the event that Lessee purchases the Premises during the first twelve months following the commencement date of the Property Lease or a prepayment fee in the amount of $100,000 in the event that Lessee purchases the Premises during months thirteen through twenty-four following the commencement date of the Property Lease or a prepayment fee in the amount of $50,000 in the event that Lessee purchases the Premises during months twenty-five through thirty-six following the commencement date of the Property Lease. Following the thirty-six month after the commencement date of the Property Lease there shall be no prepayment fee with respect to the purchase option described in this Section 6.04.

   (b) In the event that Lessee elects to purchase the Premises as provided herein, Lessee shall give ten (10) days notice to Lessor that it intends to purchase the Premises and Lessee shall calculate the Purchase Price determined in accordance with this Section 6.04 and which shall be forwarded to Lessor. The Purchase Price shall be paid on the second business day following the expiration of the notice to be given to Lessor and concurrently with such payment Lessor shall immediately deliver to Lessee a statutory warranty deed to the Premises conveying merchantable title, free and clear of all liens and encumbrances (other than the exceptions as reflected in the Owner's Title Policy being delivered to Lessor in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement between the Parties dated as of August 25, 2005 or such other exceptions that are reasonably acceptable to Lessee).

2

Furthermore, immediately upon payment of the final installment due under the Amortization Schedule, Lessor shall likewise convey the Premises to Lessee as herein provided.

2.     Lessor and Lessee agree that the provisions of this First Amendment are to be incorporated by reference into the Asset Purchase Agreement between the Parties and the Agreement Defining Relationship between the Parties dated as of August 25, 2005, it being the express intention of the Parties that this First Amendment correctly reflects the business intention of the Parties and shall control over any other agreement or document between them with respect to the Premises.

3.     Except as modified by this First Amendment, the Parties ratify and confirm the provisions of the Property Lease.

IN WITNESS WHEREOF the Parties have caused this First Amendment to be executed by a duly authorized officer of each Party.

LESSOR:

HODGES BONDED WAREHOUSE, INC.

By: _____

Title:     C E O _____

LESSEE:

SYLVEST FARMS, INC.

By: _____

~~Dean F. Falk~~  LYMAN L. CAMPBELL

Title: ~~President and Chief Executive Officer~~ EXECUTIVE VICE PRESIDENT

3

KOCH 00000121

# EXHIBIT B

ORIGINAL[1]

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4    KOCH FOODS OF ALABAMA,
     LLC, an Alabama limited liability
5    company,

6              Plaintiff and Counter-Defendant,

7    Vs.                          CIVIL ACTION NO.
                                  07-CV-522-MHT
8    GENERAL ELECTRIC CAPITAL
     CORPORATION, a Delaware
9    corporation,

10             Defendant and Counter-Plaintiff.

11

12              * * * * * * * * * * * *

13

14        **DEPOSITION OF LYMAN CAMPBELL**, taken pursuant to

15   stipulation and agreement before Pamela A. Wilbanks,

16   Certified Court Reporter, ACCR# 391, Registered

17   Professional Reporter and Commissioner for the State of

18   Alabama at Large, in the Law Offices of Bradley, Arant,

19   Rose & White, 401 Adams Avenue, Montgomery, Alabama, on

20   Tuesday, November 27, 2007, commencing at approximately

21   11:10 a.m.

22

23              * * * * * * * * * * * *

1    new equipment covered by the lease.

2  Q.   Tell me about that.

3  A.   The D & F equipment was new equipment.   The

4       Ossid equipment was new equipment.   The spiral

5       freezer was a used spiral freezer.

6  Q.   And from where did it come?

7  A.   It came through an equipment broker but had been

8       removed from a plant owned by Brakebush

9       Brothers.

10 Q.   Brakebush?

11 A.   Correct.

12 Q.   All one word?

13 A.   Correct.

14 Q.   Brothers.

15       Were they poultry processors or what were

16       they?

17 A.   They are further processors.

18 Q.   Say it again.

19 A.   Further, F-U-R-T-H-E-R.

20 Q.   What is that?

21 A.   They do multiple things, one of which would be

22       they debone chicken front halves to create

23       boneless breasts.   Then they further process

40

1       happen.

2   A.   The Ossid equipment was put in -- delivered.

3        The par fry equipment -- We took out some par

4        fry equipment.  The plant that we bought -- that

5        houses this debone facility had some cooking

6        equipment in it that was removed because it

7        wasn't conducive to what we wanted to do.  We

8        never purchased the par fry equipment.  The

9        plant started and the deboning process started

10       in late January.  We filed for Chapter 11

11       protection on April 18.

12  Q.   So the bankruptcy got in the way?

13  A.   It got in the way.

14  Q.   Tell me about the facility itself.  It was

15       purchased by Sylvest when?

16  A.   Sylvest never owned the facility.  Sylvest

17       negotiated with ConAgra for a third party to buy

18       the facility and do a capital lease to Sylvest.

19  Q.   Who was that third party?

20  A.   Hodges Bonded Warehouse.

21  Q.   And that occurred when?

22  A.   The actual closing was either August or

23       September 2005.

42

1   A.   That is correct.

2   Q.   And did that ever occur?

3   A.   It did not.

4   Q.   Why is that?

5   A.   The negotiations broke down when we -- when the

6        decision was made to file for Chapter 11.

7   Q.   Why was it that decision to file for Chapter 11

8        was made?

9   A.   Pardon me?

10  Q.   Why did Sylvest decide to file for Chapter 11?

11  A.   The primary reason was that we were at the end

12       of our financing arrangement with our bank or

13       banks, and we were in a loss position.

14  Q.   What do you mean by that?

15  A.   The company was losing money.  You have reached

16       your borrowing limits.  There's nowhere else to

17       go.

18  Q.   Why was Sylvest Farms losing money?

19  A.   The entire industry was losing money at this

20       time.

21  Q.   And why was that?

22  A.   Sometime in the fall of 2005, the avian

23       influenza was running rampant in Asia.  A few

43

1      cases developed in Europe.  Sometime around the

2      first of the year, exports of dark meat to Asia

3      and Euopre dried up, and it caused a glut of

4      meat in the United States because this industry

5      depends on its exports to hold markets up.  At

6      that point the dark meat that we were selling in

7      September of '05 for 30 to 40 cents we're now

8      selling for 7 cents.

9   Q.  In fiscal year 2004, did Sylvest turn a profit?

10  A.  From memory, yes.

11  Q.  And had it in the prior 20 years turned a profit

12      every year?

13  A.  It had not.

14  Q.  What were its bad years, if you remember?

15  A.  I couldn't name them off.

16  Q.  I guess what I'm getting at, was this a

17      profitable company that the bird flu -- I guess

18      we can almost call it hysteria now in

19      retrospect; it wasn't at the time -- but the

20      bird flu problem caused a profitable company to

21      become quite quickly unprofitable or was this a

22      company that was kind of limping along anyway

23      and this was the final straw?

47

```
1   A.   Let me -- I am uncertain of that from this

2        perspective.  We submitted financial data to

3        GE.  And whether or not Will and I were on a

4        conference call with somebody on GE's regional

5        credit committee, I'm uncertain, because with

6        the other lease companies I talked to, that did

7        happen.

8   Q.   Let me ask this.  Do you remember any specific

9        individuals, their names, from GE other than

10       Mr. Perry with whom you may have talked?

11  A.   I do not.

12  Q.   Did you and Mr. Perry discuss a purchase --

13       financing of a purchase by Sylvest?

14  A.   No.  We discussed a lease.

15  Q.   And why didn't you discuss a purchase?

16  A.   Because we wanted it off balance sheet.

17  Q.   Tell me what you mean by that.

18  A.   If I could lease -- This lease was in the

19       neighborhood of 2.1 million dollars.

20  Q.   That was for all three pieces of equipment?

21  A.   That is correct.

22  Q.   Okay.

23  A.   I could lease that from GE under a true
```

48

1     operating lease as defined by federal tax law.

2     And under GAAP, if I do that and it meets

3     certain other criteria, I do not show it as a

4     liability on my balance sheet.

5  Q.  When you say GAAP, you mean generally accepted

6     accounting principals, correct?

7  A.  That is correct.

8  Q.  G-A-A-P.

9     And that was to the advantage of Sylvest,

10    correct?

11  A.  That is correct.

12  Q.  And so Sylvest wanted to do a true lease?

13  A.  Correct.

14  Q.  And is that what, in fact, was negotiated?

15  A.  Yes.

16  Q.  Is that what, in fact, was signed?

17  A.  The --

18         MR. GEEKIE:  Objection.  Calls for a

19           legal conclusion.

20  Q.  Go ahead and answer.

21  A.  The lease that was signed is what the lease is.

22  Q.  And do you understand --

23  A.  Did it meet the criteria under GAAP and federal

56

Q.    And you did not try to negotiate that out in any
      way?

A.    Did not negotiate that one way or the other.

Q.    And are you aware of any intention by Sylvest
      Farms at any time to violate that provision?

              MR. GEEKIE:  Objection.  Foundation
                  and form.

A.    I can only speak for my part of Sylvest Farms,
      and there wasn't any intent one way or the
      other.

Q.    There was no intent to violate that provision?
      Is that your testimony?

              MR. GEEKIE:  Objection.  Asked and
                  answered.

Q.    I don't understand your answer.

              MR. GEEKIE:  And mischaracterizes his
                  statement.

A.    Once the lease was negotiated, Sylvest's intent
      was to honor the lease for the longevity of the
      lease.  At the end of that period, then we would
      see where it went.

Q.    What do you mean by that?

A.    Experience over the years has shown that at the

58

1          correct?

2     A.   Well, I think my intent would be knowing that it

3          was a true operating lease, there was a residual

4          value.

5     Q.   Right.

6     A.   At the end of the lease, if we so desired to

7          purchase the equipment, then we could either pay

8          the residual value or negotiate a better deal.

9     Q.   And if you paid the residual value, what would

10         happen then?

11    A.   Ownership would pass.

12    Q.   And you never got to that point, correct?

13    A.   We did not.

14    Q.   Did Sylvest Farms make any payments under this

15         lease?

16    A.   It did.

17    Q.   When did those begin -- When was the first

18         payment?

19    A.   I couldn't answer that.  I'm uncertain.

20    Q.   And they stopped at the time of the bankruptcy

21         or perhaps before?

22    A.   They would have stopped at the time of the

23         bankruptcy filing I would think.

66

1       room.

2   Q.   Understood.

3        What documents -- sorts of documents did you

4        contribute into that data room?

5                MR. GEEKIE:  Objection.  Form and

6                    foundation.

7   A.   There would have been multiple years of audited

8        financial statements.  There would have been a

9        copy of every contract, whether with a customer

10       or vendor, that was in place at the time the

11       data room was established.

12  Q.   And when was it?  This was in April of '06?

13  A.   The data room was -- would have been established

14       in late February up through mid-March.

15  Q.   Of '06?

16  A.   Of '06.

17  Q.   Thank you.  I'm sorry I interrupted.

18  A.   So there would have been financial statements.

19       There would have been contracts both with

20       vendors and/or customers.  There would -- A copy

21       of every lease agreement would have been placed

22       in the data room.  Statistical data, financial

23       projections, bios on management.  Off the top of

67

1      my head, that's all I can remember specifically

2      being there.

3   Q.  And was a copy of the GE Sylvest lease included

4      in that information?

5   A.  Yes.

6   Q.  Was any document included in that information

7      that would suggest or indicate that Sylvest

8      Farms at that time owned any piece of the

9      equipment?

10             MR. GEEKIE:  Objection.  Form and

11                  foundation.

12   A.  Based on your question jogging my memory, there

13      would have been a depreciation schedule --

14   Q.  Tell me about that.

15   A.  -- in the data room.

16        That depreciation schedule would not have

17      included the GE equipment nor any other

18      equipment that was on a true operating lease.

19   Q.  Why is that?

20   A.  Because we didn't own it.

21   Q.  Did you, yourself, participate in fielding any

22      questions from prospective purchasers regarding

23      those documents?

70

```
 1         Harold Sylvest's three sisters owned minority
 2     interests.
 3   Q.  Who were the beneficiaries of the trust, the
 4     three sisters as well?
 5   A.  I have never read the trust document.  My
 6     understanding is that the beneficiaries of the
 7     trust were Harold's widow, his three children,
 8     and possibly his grandchildren.
 9   Q.  Did they get any money out of the sale?  When I
10     say they, I mean the equitable holders, the
11     equitable --
12   A.  None of the stockholders got any money from the
13     sale.
14   Q.  And Dean Falk was not an equity holder?
15   A.  He was not.
16   Q.  And when did he leave Sylvest?
17   A.  Dean left within 90 days after Koch's purchase.
18   Q.  Which was the end of May?
19   A.  The purchase was -- effective date was May 29th.
20   Q.  Did Sylvest maintain insurance on the equipment
21     prior to its bankruptcy filing?
22             MR. GEEKIE:  Objection.  Foundation.
23             Calls for a legal conclusion.
```

# EXHIBIT C

2/98(R090605) : .050984202

*LEAS1998*

# MASTER LEASE AGREEMENT

dated as of ___12 | 29 | 05___  ("Agreement")

**THIS AGREEMENT** is between General Electric Capital Corporation (together with its successors and assigns, if any, "**Lessor**") and Sylvest Farms, Inc. ("**Lessee**"). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule ("**Schedule**").

## 1. LEASING:

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("**Equipment**") described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier ("**Supplier**") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

## 2. TERM, RENT AND PAYMENT:

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("**Lease Commencement Date**"). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and any renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($ .05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

## 3. RENT ADJUSTMENT:

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("**Code**")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("**Effective Rate**") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

## 4. TAXES:

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "**Taxes**"). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessee. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

## 5. REPORTS:

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6. DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7. MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

**8. STIPULATED LOSS VALUE:** If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "**Casualty Occurrences**") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9. INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("**Guarantor**"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above .

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT: LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR.** Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

## 14. INDEMNIFICATION:

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("**Claims**"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("**Tax Benefits**") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "**Loss**"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("**Net Economic Return**"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

## 15. DISCLAIMER: LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS, WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

## 16. REPRESENTATIONS AND WARRANTIES OF LESSEE: Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "**Documents**"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC") or (X) owned or controlled by or acting for or on behalf of any person, entity, or government that is listed on any such list maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement or any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "**Transactions**"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF**, Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
General Electric Capital Corporation

By: _____

Name: ____JOHN C. SUTEHALL____
____SENIOR RISK ANALYST____
Title: _____

LESSEE:
Sylvest Farms, Inc.

By: _____

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

# EXHIBIT D

CS(R083004) 4171238001

*LEAS8760*

### FOOD PROCESSING EQUIPMENT SCHEDULE
### SCHEDULE NO. 001
DATED THIS __12/29/05__
TO MASTER LEASE AGREEMENT
DATED AS OF __12/29/05__

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("Agreement" said Agreement and this Schedule being collectively referred to as "Lease"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.     Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "**Equipment**").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006    De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500    Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR    Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.     Financial Terms**

| | | | | |
|---|---|---|---|---|
| 1. | Advance Rent (if any):   Not Applicable | | 5. | Basic Term Commencement Date: 2/06 |
| 2. | Capitalized Lessor's Cost: $ 2,018,453.00 | | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months): 60 Months. | | 7. | Last Delivery Date: 12/29/05 |
| 4. | Basic Term Lease Rate Factor: .01757928 | | 8. | Daily Lease Rate Factor: .000468780 |

9.   First Termination Date: **Thirty-six (36)** months after the Basic Term Commencement Date.

10.   Interim Rent: For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on __2/06__ .

11.   Basic Term Rent. Commencing on __2/3/06__ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.     Tax Benefits**     Depreciation Deductions:

1.   Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.

2.   Recovery Period: **7 years**.

3.   Basis: 100 % of the Capitalized Lessor's Cost.

**D.     Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor. Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

**E.   Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS **D&F Equipment Sales, Inc. & Osid Corporation & MTL Installation Services** (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

**F.   Stipulated Loss and Termination Value Table***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

**G.   Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

**1   EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS: In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.

(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION: The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS: In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS/ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2  LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.  Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: JOHN C. SUTEHALL

Title: SENIOR RISK ANALYST

LESSEE:

Sylvest Farms, Inc.

By: _____

Name: LYMAN L. CAMPBELL

Title: Executive Vice President

# EXHIBIT E

Mark Kaminsky        October 19, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

KOCH FOODS OF ALABAMA, LLC,  )
An Alabama Limited Liability )
company,                     )
                             )  No. 07-cv-522-MHT
     Plaintiff and           )
     Counterclaim-Defendant, )
                             )
   vs.                       )
                             )
GENERAL ELECTRIC CAPITAL     )  Honorable Myron H. Thompson
CORPORATION, A Delaware      )
corporation,                 )  Honorable Terry F. Moorer
                             )
     Defendant and           )
     Counterclaim-Plaintiff. )


        The deposition of MARK KAMINSKY, taken

before Christina M. Cummins, CSR and Notary Public,

pursuant to the Federal Rules of Civil Procedure for

the United States District Courts pertaining to the

taking of depositions, at 10 South Wacker Drive,

40th Floor, in the City of Chicago, Cook County,

Illinois at 10:02 a.m. on the 19th day of October,

A.D., 2007.

Mark Kaminsky    October 19, 2007

Page 20

1      A    Some of them are, yes.

2      Q    And some of them are not?

3      A    Correct.

4      Q    Okay.  Now, let's talk about the Koch

5  Foods, Inc. side.  Are you the CFO, secretary and

6  treasurer of Koch Foods, Inc.?

7      A    Yes.

8      Q    Any other positions that you hold with

9  Koch Foods, Inc.?

10     A    No.

11     Q    Now, explain to me if you would, as you

12 put it, the family of organizations of Koch Foods,

13 Inc.

14     A    Koch Foods has many facilities or

15 processing plants or complexes throughout the United

16 States.  And each one has its own legal entity.

17     Q    Understood.

18     A    And each one of those funnels up

19 ultimately to the holding company.

20     Q    And when you say funnel up, what do you

21 mean by that?

22     A    Essentially the holding company -- in one

23 way or another everything eventually winds up so

24 that it's ultimately owned by Koch Foods,

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 29

1    Q    Does Koch Foods currently claim ownership
2    of the deboner line?
3    A    Yes.
4    Q    Does it currently claim ownership of the
5    spiral freezer?
6    A    Yes.
7    Q    Does it currently claim ownership of the
8    Ossid equipment?
9    A    No.
10    Q    Now I'm going to ask you some questions
11    about some people, some of whom I'm very familiar
12    with, some of whom I'm not.  And for each I want
13    you -- as I give you a name I'm going to ask you a
14    series of questions.  The first one is David
15    Bromley.  Can you tell me who he is?
16    A    David Bromley is a plant engineer in
17    Montgomery, Alabama.
18    Q    Is he an engineer at the Foods Plant?
19    A    I'm not really sure if he has other
20    responsibilities other than the Foods Plant.
21    Q    But he is involved as an engineer at the
22    Foods Plant?
23    A    Yes.
24    Q    And who is his current employer?

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 42

1    Mr. Geekie ever made that demand?

2        A    No.

3        Q    Do you know when the first demand was

4    made?

5        A    I do not recall.

6        Q    Was it in 2006?

7        A    No.

8        Q    Was it only in 2007?

9        A    Yes.

10        Q    When did Koch begin using the deboner

11    line?

12        A    June of 2006.

13        Q    So your testimony is that Koch Foods began

14    using the deboner line before it demanded that GE

15    remove it?

16        A    Yes.

17        Q    And why was that?  Strike that.

18            Why did they start using the deboner?

19        A    As is typical when you buy a company out

20    of bankruptcy, you have to settle certain matters

21    that are part of the process.  We were aware there

22    was a lease between Sylvest and GE.  And we

23    attempted to make payment to GE to settle any

24    possible conflicts regarding the property, the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 44

1    mutually agreeable conclusion to the potential

2    conflict that could arise in terms of this

3    equipment.

4        Q    And did you make an offer of what that

5    might be?

6        A    At first we probably outlined what our

7    intentions were towards the equipment, specifically

8    the Ossid equipment.

9        Q    Okay.

10       A    The vast majority of it was never even

11   uncartoned.

12       Q    And what was Koch Foods' intentions with

13   respect to that equipment?

14       A    We told them to come and get it.

15       Q    And what happened, did they do that?

16       A    They came and got it.

17       Q    What was Koch Foods' intention with

18   respect to the deboner line?  And this is in June of

19   2006.

20       A    Yes, absolutely.  Being that it was

21   attached to the facility, not very easy to remove or

22   take out, but also understanding that to move the

23   process forward, some sort of offer to GE would be

24   appropriate, but also having to go through the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 48

1    A    That is my understanding.

2    Q    When did you advise GE that you began

3    using the deboning equipment?

4    A    I don't think we ever specifically advised

5    GE that we were using it.

6    Q    Is there a reason for that?

7    A    We didn't feel obligated that we had to

8    tell them.   Our position was we owned the equipment.

9    Q    Well, you had just made them an offer of

10   over a hundred thousand dollars, right?

11   A    In settlement, yes.

12   Q    Did Koch Foods ever tell GE Capital that

13   it could keep the equipment at the facility while it

14   marketed it?

15   A    I don't recall.

16   Q    You don't know one way or another?

17   A    I do not.

18   Q    Did you ever tell anyone at GE that?

19   A    I don't recall saying that.

20   Q    In your conversations with this Michael

21   fellow from GE, did you tell him that?

22   A    I do not recall telling him that.

23   Q    Are you aware that Mr. Geekie stated to

24   Ann Pille, who at the time and still is representing

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 56

1    property.

2        Q    This is after it had been used by Koch

3    Foods?

4        A    That is correct.

5        Q    And the initial demand that GE come and

6    pick up the deboner line was made when?

7        A    Would have been in the April/May

8    timeframe.  I don't know the exact date.

9        Q    And that's of 2007?

10       A    Yes.

11       Q    And that's because Koch Foods had already

12   found replacement equipment, correct?

13       A    We had replaced the deboning equipment,

14   yes.

15       Q    Now, there's a claim in this complaint

16   also for storage, correct?

17       A    Yes.

18       Q    Does that storage claim also go to the

19   deboning line?

20       A    Yes.

21       Q    So then the position of Koch is that while

22   it was using the deboning line to its benefit, GE

23   Capital is obligated to pay for storage fees?

24       A    Within the context of our conflict, yes.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 67

1    Q    And has that been done?

2    A    Yes.

3    Q    And how much did that cost?

4    A    I don't know the specific dollar amount.

5    Q    Who would know that?

6    A    Wayne Jones.

7    Q    And was it repaired by the same entity

8    that removed the deboning line or do you know?

9    A    It was repaired by the same entity that

10   removed the deboning line.

11   Q    Were any walls removed?

12   A    No.

13   Q    What is the basis for the statement there

14   that Sylvest intended for the equipment to become

15   fixtures?

16        MR. GEEKIE:  Are you referring to

17        paragraph 17?

18        MR. HARRIS:  I am.

19   A    They affixed it to the facility.

20   BY MR. HARRIS:

21   Q    Did you have any conversations with anyone

22   at Sylvest regarding whether they intended it to

23   become fixtures?

24   A    My visual observation was that it was, not

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 68

1    my conversation with Sylvest.

2         Q    Understood.  My question is did you

3    have --

4         A    No.

5         Q    -- any conversations -- okay.

6              Did anyone at Koch that you know of have

7    any conversations with anyone at Sylvest regarding

8    whether they intended it to become fixtures?

9         A    I am not aware of anybody.

10         Q    So then the basis of that statement is

11    solely the -- in placement of the equipment at the

12    time?

13              MR. GEEKIE:  Objection, foundation.  The

14         complaint speaks for itself.

15         A    Yes.

16    BY MR. HARRIS:

17         Q    Who installed the equipment, if you know?

18         A    I don't know.

19         Q    Do you know when it was installed?

20         A    Prior to our closing on the purchase of

21    Sylvest.

22         Q    Okay.  So it was not installed by -- none

23    of it was installed by Koch?

24         A    Not to my knowledge.

Mark Kaminsky     October 19, 2007

Page 69

1      Q     And when did Koch take possession of the
2  facility?

3      A     The end of May 2006.

4      Q     Now, did you see the deboning line prior
5  to its removal?

6      A     Yes.

7      Q     And have you seen the spiral freezer?

8      A     Yes.

9      Q     And are the attachments for both of those
10  items customary in the industry?

11           MR. GEEKIE:  Objection, foundation.

12      A     Yes.

13  BY MR. HARRIS:

14      Q     Would it be typical to attach equipment
15  like this in the manner in which it was attached
16  even if it were leased equipment?

17           MR. GEEKIE:  Same objection.

18      A     Yes, the equipment has to be attached.

19  BY MR. HARRIS:

20      Q     Whether it's leased or not, correct?

21      A     Yes.

22      Q     Has Koch Foods ever itself leased
23  equipment?

24      A     Yes.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 80

1    was that you?

2        A    Yes.

3        Q    And when I say this deal, I mean this

4    acquisition of Sylvest.

5        A    Yes, it was me.

6        Q    And at the time that Koch Foods entered

7    into the amended asset purchase agreement of the

8    various assets listed by Koch Food -- I'm sorry,

9    listed by Sylvest in that asset agreement, did you

10   believe at that point that Koch was purchasing the

11   deboning line and the spiral freezer?

12       A    Yes.

13       Q    And why was that?

14       A    Because they were fixtures attached to the

15   facility.

16       Q    And on what date then did Koch gain

17   ownership of the equipment?  And when I say the

18   equipment, in this instance I mean only the deboner

19   and the spiral freezer.

20       A    Upon the closing of the deal for Sylvest,

21   which was approximately the end of May of 2006.

22       Q    And has Koch maintained insurance with

23   respect to the deboner and the spiral freezer?

24       A    Yes.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 85

1     A     Yes.

2     Q     And when was that?

3     A     Probably into 2007.  That's how long it
4   took.

5     Q     And when, early, January, February?

6     A     January, February, that's probably
7   accurate.

8     Q     So by January or February of 2007, that
9   deboning equipment was processing approximately
10  674,000 chickens per week?

11    A     Yes.

12    Q     Now, we talked about the goal is to keep
13  up with the number of chickens being killed,
14  correct?

15    A     Yes.

16    Q     And when that was not occurring during the
17  summer, what was the result, were fewer chickens
18  then killed, did you tell the kill farm to stop --
19  or the kill plant I should say to stop killing so
20  many or did you send them to somewhere else to be
21  processed or a combination or what?

22    A     We would have sent them somewhere else.
23  We would not have slowed down the slaughter
24  facility.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 88

1    Q    It wasn't leased?

2    A    No.

3    Q    Was it financed?

4    A    No.  We wrote a check.

5    Q    Okay.  So there's no security agreement

6    covering it?

7    A    Well, we're subject to a blanket security

8    agreement.

9    Q    Okay.

10    A    It's part of our debt deal.

11    Q    Okay.  But with respect to the

12    manufacturer, there's no lien held by the

13    manufacturer?

14    A    No.

15    Q    Is it less equipment than that which was

16    taken out?

17    A    Yes.

18    Q    So then not all of the lines of the GE

19    leased equipment were replaced, correct?

20    A    Correct.

21    Q    Only the ones that you deemed you needed?

22    A    Correct.

23    Q    And when was this new equipment purchased?

24    A    It's been purchased January, February

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 89

1  timeframe of '07.

2      Q    And when was the, I'll call it the old

3  equipment, the deboning equipment that was being

4  replaced, when was that actually removed from the

5  plant and put out into the parking lot?

6          MR. GEEKIE:  Objection, foundation as to

7      location.

8      A    I have no idea where the old equipment is.

9  BY MR. HARRIS:

10     Q    You don't know?

11     A    No.

12     Q    Okay.  Well, let me ask you this.  When

13  was it taken out of the plant?

14     A    April of '07.

15     Q    When was GE advised that it was taken out

16  of the plant?

17     A    April of '07.

18         MR. GEEKIE:  Objection, foundation.

19  BY MR. HARRIS:

20     Q    By whom was GE advised of this?

21     A    Gene Geekie.

22     Q    So you believe that Gene Geekie advised GE

23  in April of '07 that the equipment, the deboning

24  equipment that was being replaced, was being removed

Mark Kaminsky      October 19, 2007

Page 112

1    facts not in evidence.

2        A    I don't know where the equipment currently

3    resides.

4    BY MR. HARRIS:

5        Q    Let me ask you this.  In your experience

6    has exposure of the belting equipment to sunlight

7    and the elements decreased its value?

8        A    Not to my knowledge.

9        MR. GEEKIE:  Mark, since there are no

10       questions pending, let me remind you not to

11       speculate.  We're getting into that area

12       talking about equipment valuations.  I don't

13       know that you have any kind of experience or

14       certification in appraisals.  Only testify

15       about what you know.

16   BY MR. HARRIS:

17       Q    Do you have any basis to value the

18   deboning equipment as of the time that Koch Foods

19   took possession of it?

20       A    As of the time we took possession, no.

21       Q    So you don't know what the value was?

22       MR. GEEKIE:  I should have jumped in

23       earlier.  By you do you mean Mr. Kaminsky or

24       Koch Foods?

Mark Kaminsky     October 19, 2007

Page 125

1     Q     No, I'm referring to that facility and all
2     the equipment --
3     A     Yes, there would be equipment in there
4     that would not be fixtures.
5     Q     And what would those be?
6     A     Forklifts, tables that are not bolted
7     down.
8     Q     So is it your understanding and is it the
9     position of Koch Foods that once something gets
10    bolted down it becomes a fixture?
11    A     Yes.
12    Q     And does it ever become not a fixture once
13    it's become a fixture by that definition?
14         MR. GEEKIE:  Objection, calls for a legal
15         conclusion.
16    A     I'm not sure if it could once be a fixture
17    and then not.
18    BY MR. HARRIS:
19    Q     That's my question.
20    A     Yes, I'm not sure.
21    Q     You don't know.
22    A     Don't know.
23    Q     But the facility has not to date been
24    dismantled, correct?

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 144

1    these are accepted or rejected.

2        Q    And did you yourself personally have any

3    input into those decisions?

4        A    Yes.

5        Q    And what was the extent of that input?

6        A    Reviewed the executory contracts and chose

7    to either accept them or reject them.

8        Q    So you personally did that?

9        A    Along with others, yes.

10       Q    Okay.  Did you personally have any such

11   impact with respect to No. 6?

12       A    Yes.

13       Q    Okay.  So there came some time when you

14   reviewed the master lease between GE --

15       A    Or certainly knew that there was a lease

16   between Sylvest and GE, and we chose to reject it.

17       Q    Well, okay.  Koch Foods chose to reject

18   it.  Do you agree with that choice?

19       A    Yes.

20       Q    And why is that?

21       A    Felt it was a overvalued, overmarket lease

22   that Koch did not want to be tied to.

23       Q    Okay.  Other than the inquiry from Michael

24   Leonard, have you received any inquiries in the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 146

1           Is 2007 on target to meet a billion

2      dollars in sales?

3           A    We will exceed a billion dollars in 2007.

4           Q    In sales?

5           A    Yes, in sales.

6           Q    Is the Montgomery facility profitable?

7           A    No.

8           Q    And why not?

9           A    Those assets were challenged going into

10     the purchase.  Those assets continue to be

11     challenged.  We've made improvements, but we do not

12     have it quite where we'd like it to be.

13          Q    Do you expect to?

14          A    Yes.

15          Q    At some point?

16          A    Yes.

17          Q    One final thing on the fixture point.  I

18     know that you claim that you own -- strike that.

19          I know that you claim that Koch Foods owns

20     the deboner equipment and the spiral freezer on the

21     grounds that they were attached to the real property

22     and became fixtures.  Is there any other basis upon

23     which Koch Foods claims ownership of either of those

24     items of equipment?

Mark Kaminsky    October 19, 2007

Page 147

1    A    Ownership?  No.

2    Q    That's the only basis?

3    A    For ownership?

4    Q    For ownership.

5    A    That's correct.

6        MR. HARRIS:  I don't have any other

7    further questions.  Mr. Geekie, I will tender

8    the witness to you.

9        MR. GEEKIE:  I have no questions and we'll

10   reserve signature.

11       MR. HARRIS:  Okay.  And I will expect

12   whatever correspondence, Mr. Geekie, you plan

13   to give me on that Exhibit D.  That said, until

14   that issue has been resolved, we'll have to

15   keep the deposition open as to that aspect to

16   the extent it's not resolved.

17

18

19            (WITNESS EXCUSED.)

20

21

22

23

24

c2df77b2-2f34-4fa8-b280-8970fc664af6

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | CASE NO. 06-40525-11 |
| SYLVEST FARMS, INC., | : | |
| | : | |
| Debtor. | : | |
| | : | |
| IN RE: | : | CHAPTER 11 |
| | : | CASE NO. 06-40526-11 |
| SYLVEST FOODS CORPORATION, | : | |
| | : | |
| Debtor. | : | |
| | : | |
| IN RE: | : | CHAPTER 11 |
| | : | CASE NO. 06-40527-11 |
| SYLVEST FARMS MANAGEMENT | : | |
| SERVICES, INC. | : | |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. SECTIONS 105, 363 AND 365 FOR
ORDER AUTHORIZING (I) SALE OF CERTAIN ASSETS OF THE ESTATES FREE
AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (II) APPROVAL OF
DESIGNATION OF RIGHTS AGREEMENT AND (III) SALE, ASSUMPTION
AND ASSIGNMENT OF CERTAIN LEASES AND EXECUTORY CONTRACTS**

Sylvest Farms, Inc., Sylvest Foods Corporation, and Sylvest Farms Management

Services, Inc., debtors and debtors-in-possession (collectively, the "Debtors"), hereby file

Debtors' Motion, Pursuant to 11 U.S.C. Sections 105, 363 and 365 for Order Authorizing

(I) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (II)

Approval of Designation of Rights Agreement and (III) Sale, Assumption and Assignment of

Certain Leases and Executory Contracts (the "Sale Motion"), and respectfully aver in support

thereof as follows:

## JURISDICTION

1.       This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 503(b) and 546(c).

## BACKGROUND

2.      On April 18, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      The Debtors continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.   No committees, trustees or examiners have been appointed in these bankruptcy cases.

4.      The Debtors are in the business of producing, processing and marketing high quality poultry products.  The Debtors employ approximately 1,500 individuals and, in each of their last two fiscal years, have had annual sales of in excess of $190,000,000.

5.      Even though people do not contract Avian Influenza (commonly referred to as the "bird flu") by consuming cooked poultry products, the Debtors' current financial difficulties are largely the result of historically low commodity pricing for chicken due to adverse global consumer reaction to the bird flu.  At the time when the bird flu concerns began to impact the market, the Debtors were in the process of restructuring their businesses to reduce dependency on commodity pricing.

6.      In these cases, the Debtors seek to maximize value by preserving their assets while pursuing a sale of all or substantially all of their assets through an orderly sales process approved by the Bankruptcy Court.

7.      The Debtors businesses are resulting in operating losses in excess of $800,000.00 per week.  In light of the Debtors' mounting losses, it is crucial that a sale be consummated as soon as possible.

2

**Marketing Efforts**

8.    Prior to the filing of these bankruptcy cases, the Debtors, with the assistance of their financial advisors, Focus Management Group, USA, Inc., ("Focus") have been marketing their assets. The Debtors have been in contact with several potential purchasers during the last several months, and several of them have conducted due diligence. The Debtors and Focus notified the entities which they believed were the most likely buyers of the assets.

9.    To date, the highest and best offer received by the Debtors to purchase substantially all of the Debtors' assets was received from Koch Foods of Alabama, LLC and Koch Farms of Alabama, LLC (collectively, the "Buyer"), affiliates of Koch Foods, Inc., one of the largest poultry companies in the United States. The agreement is reflected in the proposed Asset Purchase Agreement (the "Purchase Agreement") attached hereto. The Purchase Agreement does not contemplate a sale to the Buyer of the Debtors' rights with respect to the facility in Montgomery, Alabama formerly known as the S&C Beef Processing Plant. The foregoing processing plant, the assets subject to the Purchase Agreement, and all other non-cash assets, of the Debtors shall be referred to hereinafter as, the "Assets."

10.    Attached to the Purchase Agreement is a Designation of Rights Agreement (the "WDS Designation of Rights Agreement") with respect to a Dedicated Transportation Agreement with Worldwide Dedicated Services, Inc. ("WDS") dated June 23, 2004 (the "WDS Agreement"). Through the Designation of Rights Agreement, the Buyer shall, after the Closing, designate the right to receive the services of WDS and the obligation to make payment to WDS, until such time as it is determined whether the Buyer will assume and assign the WDS Agreement.

11.    In light of the risk that the value of the Assets will erode, and in an effort to maximize value by proceeding with the best available offer to purchase the Assets, the Debtors

3

seek in this Motion to sell the Assets free and clear of liens and claims, and to sell, assume and assign certain leases and executory contracts.   It is important the sale be approved and consummated as soon as possible in light of the Debtors mounting losses.

12.     The Debtors have determined that it is in the best interests of their respective creditors and estates to sell the Assets pursuant to the terms of the Purchase Agreement, subject to higher and/or better offers in a public auction.

13.     In discussions with potential purchasers, including the Buyer, the Debtors have learned that potential purchasers expect the purchase of the Assets to be conditioned on the sale being made pursuant to the protections afforded by Sections 105, 363 and 365 of the Bankruptcy Code.

### The Proposed Sale

14.     Contemporaneously with the filing of this Motion, the Debtors are filing Debtors' Motion for Order (I) Establishing Bidding and Auction Procedures, (II) Providing Notice Thereof, and (III) Approving Form and Manner of Notice of Sale, Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Bid Procedures Motion").   Included in the Bid Procedures Motion is information relating to the Purchase Agreement.   The Debtors have, and continue to actively solicit bids with respect to the Assets.

15.     It is anticipated that an order granting the Bid Procedures Motion and establishing bidding procedures will be approved approximately twenty five days prior to the date of the hearing on this Motion.   The terms of the Bid Procedures Motion are incorporated herein by reference and will govern the auction sale unless otherwise ordered by the Court.   The Debtors expect to have a period of approximately thirty days from the Petition Date in which to receive competing bids and conduct the auction sale prior to a hearing on the proposed sale and this Motion.

4

16.    In accordance with the Bid Procedures Motion, the successful bidder or bidders will be required, <u>inter</u> <u>alia</u>, to execute a Purchase Agreement substantially in the form attached to the Bid Procedures Motion or such other form that is acceptable to Debtors.

17.    The Debtors will sell, assume and assign any or all of the unexpired leases or executory contracts to which any of the Debtors is a party (the "Assumed Contracts"), if so requested by the successful bidder(s).

18.    Any Cure Amounts (as defined in the Bid Procedures Motion)  will be paid by the purchaser at the closing of the sale to the extent such amounts are necessary to cure the Assumed Contracts and allow their sale, assumption and assignment under Sections 363 and  365 of the Bankruptcy Code.

19.    Pursuant to Section 365(k) of the Bankruptcy Code, the Assumed Contracts shall, upon assignment to the successful bidder, be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms, and the Debtors' estates shall be relieved from any further liability with respect thereto after their assignment.

20.    Except to the extent as may be expressly set forth in the Purchase Agreement, the Assets are being sold **"AS IS,  WHERE IS"** and the *inter* alia, Debtors have made no representations or warranties as to the condition thereof with respect to any of the following matters:

a.    The quality, character and condition of the Assets, including without limitation the fitness or suitability of any Asset for any particular trade or use or the merchantability of any of the Assets; and

b.    the income to be derived, or the expenses to be incurred with respect to the Assets.

21.    In light of the foregoing negotiations and marketing efforts, the Debtors submit

that at the hearing on this Motion, evidence will be given that the proposed sale is being undertaken in good faith and will be for fair value within the meaning of Section 363(m) of the Bankruptcy Code.

22.    At closing, except to the extent otherwise provided in the applicable agreement, the Assets shall be conveyed to the successful bidder free and clear of all liens, debts, and claims (each as defined in Section 101 of the Bankruptcy Code, "Liens", "Claims" and "Debts", respectively) and other interests and encumbrances (collectively, the "Liens and Claims") to the fullest extent permitted by the Bankruptcy Code.

23.    Any valid Liens and Claims shall attach to the proceeds of the sale of the Assets in the order of their priority.    The Debtors reserve their right to dispute the validity or enforceability of any Liens and Claims.

24.    The Debtors submit that good business reasons exist for this Court to approve the proposed auction sale.  The Debtors submit that an auction sale is expected to bring a fair and reasonable price under the circumstances and, therefore, the sale is in the best interest of the Debtors' estates and their respective creditors.

### RELIEF REQUESTED

25.    Through this Motion, the Debtors seek, <u>inter alia</u>, approval of the sale of assets on the terms and conditions set forth in the Purchase Agreement and approval of the WDS Agreement The relief requested in this Motion is authorized pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.  Through this Motion, the Debtors also seek approval of the WDS Designation Agreement.

### APPLICABLE AUTHORITY

**A.    Sale Of Property Pursuant To
Section 363(b) Of Bankruptcy Code**

26.    The Debtors' request authorization to sell the Assets to the Buyer, pursuant to

6

Sections 105(a) and 363(b) of the Code.

27.      Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

28.      Section 363(b)(1) provides, in relevant part, that a "trustee, after notice and a hearing, may . . . sell . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

29.      If a sound business purpose exists, the sale of property of the estate should be authorized pursuant to Section 363 of the Bankruptcy Code. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991).   In this case, the "sound business justification" test is easily met.

30.      Courts have applied four (4) factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided.   Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (setting forth the "sound business purpose" test); Abbotts Dairies, 788 F.2d at 145-47 (implicitly adopting the articulated business justification test of Lionel and adding the "good faith" requirement); In re Delaware & Hudson Ry. Co., 124 B.R. at 176 (adopting Lionel in this District).

### Sound Business Purpose

31.      The Debtors have adequate business justification to sell the Assets to the Buyer.

32.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See e.g., In re TWA, 2001 Bankr. LEXIS 980, *32-33 (Bankr. D. Del. 2001) ("The purpose of a § 363(b) sale is to maximize the benefit to the debtor's entire estate.");

33.    The value of the Debtors' businesses may erode over time.  The Debtors' losses continue to accelerate due to historically low commodity pricing in the chicken industry.  In these circumstances, prompt approval of the sale is the best way to preserve the enterprise value of the Assets for the benefit of the Debtors' estates, their creditors and all parties in interest.

34.    Approval of the Purchase Agreement, or such higher or otherwise better offer for the Assets that may be received, is in the best interests of the Debtors, their creditors and all other parties in interest.

### Fair and Reasonable Consideration

35.    The proposed sale will provide fair and reasonable consideration to the Debtors' estates.

36.    The Purchase Agreement represents the best offer received to date by the Debtors for the Assets.  It was entered into after an extensive and a thorough marketing process under the circumstances and given the precarious financial condition of the Debtors, and the consideration to be paid under the Purchase Agreement is fair and reasonable.  Any doubt as to the reasonableness of such consideration should be dispelled by the fact that the sale is subject to competitive bidding, thereby enhancing the Debtors' ability to receive the highest and best value for the Assets.  The fairness and reasonableness of the consideration to be received by the Debtors ultimately will be demonstrated by the "market" through the auction process -- which is the best means for establishing whether a fair and reasonable price is being paid.

**Good Faith**

37.    The Court should make a finding regarding the Buyer's "good faith" pursuant to Section 363(m) of the Bankruptcy Code. The Purchase Agreement is the product of significant arm's-length negotiations between the Buyer and the Debtors. These negotiations involved substantial time and effort by all the parties and their professionals, and the Purchase Agreement reflects compromises by both sides. The Purchase Agreement and the sale are the products of the parties' good faith arm's-length negotiations and the Buyer should be entitled to all of the protections of Section 363(m) of the Bankruptcy Code.

**B.    The Sale of the Property Satisfies the Requirements of Section 363(f)
for a Sale Free and Clear of Liens, Claims and Encumbrances**

38.    Section 363(f) provides, in relevant part, that a trustee may sell property under subsection (b) . . . free and clear of any interest in such property of an entity other than the estate, only if --

        (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

        (2)    such entity consents;

        (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

        (4)    such interest is in bona fide dispute; or

        (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

39.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all Liens and Claims. See 11 U.S.C. § 363(f); Michigan Employment Security Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991)

9

(Section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met); <u>Citicorp Homeowners Servs. Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343 (E.D.Pa. 1988) (same).

40.     To the extent that any Liens and Claims encumber the Assets, the lien holders could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interests in the Assets. <u>See</u> 11 U.S.C. § 363(f)(5).  In addition, by definition, the purchase price will equal or exceed the aggregate value of all Liens and Claims on the Assets as those interests cannot exceed the value of the Debtors' interest in the Assets. <u>See</u> 11 U.S.C. §§ 363(f)(3) and 506(a) and (d).

41.     Valid, enforceable Liens and Claims against or in the Assets shall attach to the proceeds of the sale in the order of their relative priority. <u>See</u> 11 U.S.C. § 363(e) (on request of party holding interest in property of the estate, court shall condition sale under Section 363 "as is necessary to provide adequate protection of such interest"); <u>In re P.K.R. Convalescent Ctrs, Inc.</u>, 189 B.R. 90, 94 (Bankr. E.D.Va. 1995) (a sale under Section 363(f) is subject to the adequate protection requirement); S.Rep. No. 989, 95th Cong., 2d Sess. 345 (1978) ("Most often, adequate protection in connection with a sale free and clear of other interests will be held to have those interests attach to the proceeds of the sale.").

42.     Accordingly, the Debtors should be authorized to sell the Assets to the Buyer free and clear of all Liens and Claims pursuant to Section 363(f)(3) and (5) of the Bankruptcy Code.

### C.     Sale, Assumption And Assignment Of Contracts And Leases Pursuant To <u>Sections 363(b) And 365(a) Of Bankruptcy Code</u>

43.     The Debtors request authorization to sell, assume, and assign (subject to closing of the sale) the Assumed Contracts to the Buyer or other successful bidder, pursuant to Sections 363 and 365(a) of the Bankruptcy Code.  The Debtors further request that the Sale Order provide

10

that the Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of the Buyer (or other successful bidder) notwithstanding any provisions in the Assumed Contracts, including those described in Sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

44.    Section 363(f) of the Bankruptcy Code provides, in certain instances, that a debtor in possession may sell "property of the estate" outside the ordinary course of business "free and clear of any interest in such property of an entity other than the estate." See 11 U.S.C. § 363(f). "Property of the estate" includes all "legal or equitable" interests of a debtor in property. See 11 U.S.C. § 541(a). Thus, a trustee or debtor in possession may sell various types of property interests, including interests in unexpired leases and executory contracts under Section 363(f). See In re Rickel Home Ctrs., Inc., 209 F.3d 299, 300-01 (3d Cir. 2000) (regarding sale of unexpired leases under Section 363); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998) (regarding sale of executory contracts under Section 363).

45.    Where a trustee or debtor in possession sells an unexpired lease or executory contract, the sale is also subject to the terms of Section 365 of the Bankruptcy Code. See Rickel, 209 F.3d at 299; Krebs, 141 F.3d at 497-98; see Cinicola v. Scharffenberger, 248 F.2d 110, 124 (3d Cir. 2001)("assignments are in fact just a type of sale" as an "assignee purchases a lease").

46.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The proposed sale, assumption and assignment of the Assumed Contracts is consistent with the Bankruptcy Code and an integral requirement of the proposed sale pursuant to the Purchase Agreement. The proposed sale, assumption and assignment of the Assumed Contracts therefore are well within the ambit of the Debtors' sound business judgment. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon

11

Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984).

47.    Section 365(b)(1) codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

48.    Section 365(f)(2) of the Bankruptcy Code, in turn, permits assignment of executory contracts and unexpired leases:

The trustee may assign an executory contract or unexpired lease of the debtor only if:

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

49.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

50.     Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

51.     The Debtors will present facts at the sale hearing to show the financial credibility, willingness, and ability of the Buyer or other successful bidder to perform under the Assumed Contracts. The sale hearing will provide the Court and other interested parties with an opportunity to evaluate the ability of the Buyer or any successful bidder to provide adequate assurance of future performance under the Assumed Contracts, as required under 11 U.S.C. § 365(b)(1)(C).

52.     Moreover, as set forth below, the Debtors will give notice to all parties to the Assumed Contracts of the Debtors' intention to sell, assume and assign the Assumed Contracts -- and of the Debtors' views of applicable cure amounts that must be paid. The Court therefore should authorize the Debtors to sell, assume and assign the Assumed Contracts to the Buyer.

### D.    Good Faith Pursuant To Section 363(m)

53.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit

in In re Abbotts Dairies of Pennsylvania Inc., 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity
> of his conduct in the course of the sale proceedings. Typically, the
> misconduct that would destroy a Buyer's good faith status at a judicial sale
> involves fraud, collusion between the Buyer and other bidders or the
> trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

54.     The Debtors submit, and will present evidence at the sale hearing, that the

Purchase Agreement embodies a negotiated, arm's-length transaction, in which the Buyer has at

all times acted in good faith under the Abbotts Dairy standards. The Debtors thus request that

the Court make a finding that the Buyer has acted and purchased the Assets and assumed the

Assumed Contracts in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

Further, the Debtors submit that any alternative asset purchase agreement with a successful

bidder will constitute, and should be deemed to be, the product of an arm's-length, negotiated

transaction entitling the successful bidder to the protections offered by Section 363(m) of the

Bankruptcy Code.

### E.    Waiver of Ten Day Stay of Sale Order

55.     Pursuant to Fed.R.Bankr.P. 6004 and 6006, an order authorizing the sale of a

debtor's assets or the sale, assumption and assignment of an executory contract "is stayed until

the expiration of 10 days after the date of the entry of the order, unless the court orders

otherwise." See Fed.R.Bankr.P. 6004(g) and 6006(d).

56.    Due to the potential deterioration of the Debtors' assets pending closing of a sale and the terms of the Purchase Agreement, the Debtors seek entry of a Sale Order waiving the 10-day stay provided in Bankruptcy Rules 6004(g) and 6006(g).

### NOTICE

57.    Notice of this Motion is being provided in the manner indicated on the certificate of service being filed contemporaneously herewith to the following parties or, in lieu thereof, to their counsel, if known: (i) Wachovia Bank, National Association; (ii) Federal Land Bank Association of South Alabama, FLCA; (iii) each of the Debtors' twenty largest unsecured creditors; (iv) the Bankruptcy Administrator; and (v) the Director of Internal Revenue Services for the Northern District of Alabama. The Debtors believe that such notice is sufficient and adequate under the circumstances.

WHEREFORE, the Debtors respectfully request that this Honorable Court enter an Order, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) approving the sale of the Assets on the terms and conditions set forth in the Purchase Agreement or such other higher or better offer, (ii) authorizing Debtors to proceed with such sale free and clear of all Liens and Claims, to the fullest extent permitted by the Bankruptcy Code, (iii) approving the WDS Designation of Rights Agreement; (iv) fixing cure amounts for each Assumed Contract, (v) approving Debtors' sale, assumption, and assignment to the purchaser of the Assumed Contracts, (vi) ordering the successful bidder to pay the Cure Amounts as a condition to such sale, assumption and assignment; (vii) including a specific finding and conclusion of law that the successful bidder has acted in good faith in connection with its purchase of the Assets and is entitled to all protections of Section 363(m) of the Bankruptcy Code, (viii) waiving the ten day stay pursuant to Fed.R.Bankr.P. 6004(g) and 6006(d), (ix) authorizing the Debtors to take all

15

actions necessary to consummate the sale, and (x) for such other and further relief as is necessary and appropriate.

Respectfully submitted this 18th day of April, 2006.

By:    /s/ Richard A. Robinson
Richard A. Robinson, Esquire
Florida Bar No. 0041238
Eric S. Golden, Esquire
Florida Bar No. 0146846
BAKER & HOSTETLER LLP
Post Office Box 112
Orlando, Florida 32802-0112
Telephone: (407) 649-4000
Telecopier: (407) 841-0168
Email: rrobinson@bakerlaw.com
**Proposed Counsel for Debtors and Debtors-in-Possession**

and

 /s/ Thomas G. Mancuso
Thomas G. Mancuso, Esquire
Alabama Bar No.: 6179-053T
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, Alabama  36117
Telephone:  (334) 481-1800
Telecopier:  (334) 481-1810
E-mail:  tgm@mancusofranco.com
**Proposed Special  Counsel for Debtors and Debtors-in-Possession**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of April 18, 2006 (the "Effective Date"), is by and between KOCH FOODS OF ALABAMA, LLC, and KOCH FARMS OF ALABAMA, LLC, both Alabama limited liability companies (the "Buyers"), KOCH FOODS INCORPORATED, as guarantor pursuant to Section 12.4 ("Guarantor"), and SYLVEST FARMS, INC., and Sylvest Farms Management Services, Inc., both Alabama corporations, individually and as debtors-in-possession (the "Sellers").

### RECITALS:

**WHEREAS,** the Sellers are engaged in the business of producing, processing and marketing fresh and frozen chicken products (the "Business");

**WHEREAS,** as soon as practical following the Effective Date, the Sellers will file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court") (the "Bankruptcy Case");

**WHEREAS,** Buyers and Sellers understand and contemplate that this Agreement shall be subject to higher and better offers at an auction to be approved by the Bankruptcy Court; and

**WHEREAS,** the Buyers desire to purchase from the Sellers, and the Sellers desire to sell to the Buyers, substantially all of the assets of the Sellers used in connection with the Business, free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement;

**NOW, THEREFORE,** in consideration of the mutual agreements contained herein, the parties hereby agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF ASSETS

1.1    Agreement to Purchase and Sell Assets. Subject to the conditions set forth below, at the Closing (as defined in **Section 9.1**), the Sellers shall sell and deliver to the Buyers, and the Buyers shall purchase from the Sellers, all of the Sellers' right, title and interest in and to the Purchased Assets. As used in this Agreement, the term "Purchased Assets" shall mean all of the assets, properties, rights and interests of the Sellers (other than the Excluded Assets described in **Section 1.2**) used in or held for use by the Business of whatever kind or nature, real or personal, tangible or intangible and wherever located, as such assets may exist at the Effective Date. The Purchased Assets shall include, without limitation, all of the Sellers' right, title and interest in and to the following (other than Excluded Assets):

(a)    All real property, and all improvements and buildings thereon, of the Sellers located in Montgomery (kill plant), Sylacauga, Mobile, Greenville, and Tyson, Alabama, and Bainbridge, Georgia, and all related rights and authorizations associated with the fee ownership thereof (collectively, the "Real Property");

(b)     All transferable rights under non-executory contracts, agreements, instruments, policies, understandings, commitments and other arrangements, whether oral or written, including without limitation, any and all warranties (express or implied) or product agreements of any manufacturer, supplier, vendor or other person or entity relating to any Purchased Assets, to the extent that such warranty rights can be so legally conveyed by the Sellers, all insurance policies related to Purchased Assets, and all life insurance policies owned by the Sellers;

(c)     All inventories of the Sellers (whether or not allocated to contracts in process and notwithstanding how classified in the financial records of the Sellers), including without limitation processed poultry, parts, components, supplies, packing crates, packaging materials, raw materials, work in process and finished products, items purchased for resale or lease by the Sellers and items which have been ordered and purchased by the Sellers and are in transit to the Sellers at the Effective Date (collectively, the "Inventory");

(d)     All machinery, equipment, attachments, motors, chains, conveyors and parts therefore, tools, leasehold improvements, fixtures, office furniture, artwork, computer equipment (including all hardware and software related thereto), supplies, rolling stock, trucks, cars, trailers, and other vehicles, and all other tangible personal property owned by the Sellers of every kind and nature, including without limitation those set forth on **Schedule 1.1**;

(e)     All amounts and accounts receivable (other than Not Accepted Accounts Receivable as set forth in **Section 2.4**, and intercompany accounts receivable owed by one Seller, or its affiliate, to the other Seller, or its affiliate ("Intercompany Accounts Receivable"), which are specifically excluded, promissory notes of other parties and other rights to receive payments from any person or entity as of the Closing, including without limitation rights to payments arising from the sale or lease of goods and services (whether current or non-current);

(f)     All Accepted Executory Contracts, including insurance policies or contracts related to Purchase Assets, and all life insurance policies owned by the Sellers, assumed and assigned by the Sellers pursuant to **Section 1.3**;

(g)     All rights and interests in and to, and to determine whether to assume and assign or reject, that certain contract with Worldwide Dedicated Services, Inc. ("WDS"), dated June 23, 2004 (the "WDS Contract") pursuant to the terms of a Designation of Rights Agreement of even date herewith ("Designation Agreement"), attached as Schedule 1.1(g), the approval of which by the Bankruptcy Court will be promptly sought by Sellers and obtained on or before the date of the Bankruptcy Court's approval of this Agreement, with the form of the Court's order subject to Buyers' Satisfaction;

(i)     At Closing, Sellers shall submit to Buyers the prepetition amount due and owing to WDS for goods and services provided to Sellers (the "WDS Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the WDS Payable and Buyers shall assume any responsibility to

pay the WDS Payable in accordance with the terms of the Designation Agreement;

(ii)    In the event that the WDS Contract is rejected, Buyers agree to pay to Sellers ½ of any amount that Buyers would have been required to pay to WDS as a cure cost for assumption under Section 365 of the Bankrutpcy Code;

(h)    All intellectual property, patents, trademarks, service marks, trade names and trade styles, including the tradename "Superchicken", whether registered or not (including without limitation all rights to and interests in the names "*Sylvest Farms, Inc.*", and all variations thereof, including any name containing "*Sylvest*"), all logos, drawings, technical data, product specifications, computer software, source codes, object codes, computer files, programs, blueprints, know-how, trade secrets and other proprietary rights and all goodwill associated therewith, whether or not set forth on **Schedule 3.12**;

(i)    All rights in incomplete or unfilled contracts, commitments and orders issued for the purchase or lease of inventory or other goods or services by the Sellers, including without limitation parts, components and supplies which will be assumed by the Buyers and assigned by the Sellers pursuant to **Section 1.3**;

(j)    All rights against suppliers of inventory or other goods or services, including without limitation any express or implied warranties and any entitlement to volume or other discounts or rebates;

(k)    All transferable authorizations, permits, franchises and licenses, if any;

(l)    All claims, refunds, causes of action, choses in action, rights of recovery and rights of set-off or offset of every kind and nature arising on or after the Effective Date;

(m)    All goodwill, going-concern value and all other intangible property;

(n)    All capital stock or other equity interests in affiliated entities or joint ventures, including any and all interest in Southern Hens, Inc. and excluding the stock and assets of Sylvest Foods Corporation;

(o)    All marketing plans, marketing manuals, sales materials, promotional materials, catalogues and advertising and marketing literature and materials;

(p)    Those business records and files reasonably necessary for the Buyers to continue the Business of the Sellers, including without limitation customer lists and other identifications of former, existing and potential customers and suppliers, mailing lists, sales information, customer and supplier records, cost and pricing information, billing records, employment and personnel records and other records (including without limitation those maintained in computer tapes, disks or other computer retrievable formats), in each case whether maintained by the Sellers or by others for the Sellers, for which Sellers shall have access to pursuant to **Section 12.15**, and the Sellers' main

3

telephone numbers and post office boxes at which the Sellers receive correspondence or remittances from customers; and

(q)     Any other assets of the Sellers related to the Business and which are of a nature not customarily reflected in the books and records of a business, including without limitation assets which have been written off for accounting purposes but which are still used by or are of value to the Business.

1.2     Excluded Assets.  Notwithstanding **Section 1.1**, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)     The Sellers' rights under this Agreement;

(b)     The Sellers' interests in Sylvest Foods Corporation, including the stock in such corporation and the assets it owns, and Buyers waive any right to direct Sellers to assume or reject the lease and sublease regarding the facility formerly known as S&C Beef Processing Plant;

(c)     The Sellers' corporate minute books, corporate seal, charter documents and stock records;

(d)     Any rights under any insurance contracts maintained by the Sellers to the extent related to the Excluded Assets and the Excluded Liabilities (as defined in **Section 1.4**);

(e)     Any rights or claims, including rights or claims arising under express or implied warranties, necessary to protect or defend the Sellers against any claim or any litigation matter described in **Section 1.4(j)** but only to the extent that there is no resulting prejudice or disadvantage to the Buyers with respect to the Purchased Assets.

(f)     All cash, cash equivalents, marketable securities and amounts representing customer deposits, prepayments and prepaid expenses;

(g)     Those business records and files to the extent related to only the Excluded Assets or the Excluded Liabilities or not reasonably necessary for the Buyers to continue the Business of the Sellers;

(h)     Inventory sold or used by the Sellers in the ordinary course of the Business prior to the Closing;

(i)     Any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing in accordance with its terms or in the ordinary course of the Business except as set forth in **Section 1.3**;

(j)     All preference or avoidance claims and actions of the Sellers, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549 and 550 of the United States Bankruptcy Code;

(k)     Not Accepted Accounts Receivable pursuant to **Section 2.4** and Intercompany Accounts Receivable;

(l)     All rights under executory contracts and unexpired leases rejected by Sellers pursuant to Section 365 of the Bankruptcy Code in accordance with **Section 1.3**; and such other assets as Buyers shall designate in writing as Excluded Assets prior to the Closing; provided, however, there shall be no adjustment to the Purchase Price as a result of such designation; provided, further, the Buyers and Sellers agree to amend this Agreement to so designate additional Excluded Assets hereunder.

(m)     All claims, refunds, causes of action, choses in action, rights of recovery and rights of set-off or offset of every kind and nature arising before the Effective Date;

1.3     Assignment of Contracts.   The Sellers shall set forth on **Schedule 1.3** all executory contracts, insurance policies and unexpired leases, and Sellers shall assume and assign, pursuant to Section 365 of the Bankruptcy Code, only those executory contracts, insurance policies or contracts, and unexpired leases, that the Buyers request the Sellers to assume and assign ("Accepted Executory Contracts") by notification in writing, received by the Sellers on or before the fourteenth (14th) calendar day after the Effective Date, and the Sellers shall reject pursuant to Section 365 of the Bankruptcy Code all other executory contracts and unexpired leases, except the WDS Contract (the status of which shall be determined pursuant to the terms of the Designation Agreement).   The Buyers shall assume all of Sellers' obligations and duties under the Accepted Executory Contracts and shall have sole responsibility for paying all amounts due under Sections 365 (b)(1)(A) and (B) or the Bankruptcy Code in connection with the assumption of the Accepted Executory Contracts.

1.4     Excluded Liabilities.   Except as specifically assumed pursuant to **Section 1.3, Section 1.5,** or **Section 1.6,** Buyers shall not assume nor be responsible for any obligation or liability of the Sellers, and the Sellers shall continue to be responsible for all their obligations and liabilities, whether known or unknown, fixed or contingent, liquidated or unliquidated and secured or unsecured, whether arising prior to, at or subsequent to the Closing, whether or not related to the Business and whether or not disclosed to the Buyers (collectively, the "Excluded Liabilities").   Any real estate taxes, personal property taxes or assessments with respect to Purchased Assets, any charges for utilities or similar costs or assessments, local business or other license fees or taxes and similar periodic charges shall be prorated through the Closing Date (based upon estimates or the most recent amount paid) with the Sellers being responsible for all prorated charges attributable to the period prior to the Closing Date and the Buyers being responsible for all prorated charges attributable to the period subsequent to and including the Closing Date. Without limiting the generality of the foregoing, the Excluded Liabilities include any obligations or liabilities of the Sellers:

(a)     Arising out of or relating to this Agreement or the transactions contemplated hereby, including without limitation the preparation, negotiation or execution of this Agreement and any legal, accounting, brokerage, finder, investment banking, advisory, intermediary or other fees or expenses incurred in connection therewith;

5

(b)    Constituting indebtedness, including without limitation obligations or liabilities on account of borrowed money, the deferred purchase price of any property, letters of credit or guarantees;

(c)    For federal, state, local or foreign taxes arising out of or relating to the operation of the Business or ownership of any real property, including without limitation the Real Property, by the Sellers or any activity or event occurring or condition or state of facts existing at or prior to the date of the Closing or arising out of, resulting from or incident to the consummation of the transactions contemplated by this Agreement;

(d)    Arising out of or relating to any actual or alleged breach or failure to perform by the Sellers, or any other person or entity for which the Sellers may be liable, under any contract, commitment, arrangement or understanding;

(e)    Resulting from any violation by the Sellers, or any other person or entity for which the Sellers may be liable, of any legal duty or any applicable federal, state, local or foreign law, statute, ordinance, rule, regulation, judgment, order or decree, including without limitation ally environmental laws, rules or regulations;

(f)    To any present or former shareholder, officer or director of the Sellers, including any management incentive plan, except as provided in **Sections 5.2** and **5.3**;

(g)    To any present or former employee of the Sellers (or their dependents or beneficiaries), including without limitation obligations for wages, bonuses, employee benefits, fringe benefits, severance pay or worker's compensation, or under any federal, state, local or foreign law, statute, ordinance, rule or regulation relating to employment or liabilities or obligations with respect to any 401(k), pension, benefit, retirement, or other Plans (as defined in **Section 3.11**), except as provided in **Sections 5.2** and **5.3**;

(h)    Relating to any accounts payable, note payable or other payable of the Sellers other than those expressly assumed pursuant to **Sections 1.3** and **1.5**;

(i)    Relating to any litigation pending or threatened against the Sellers;

(j)    Resulting from any product liability claims or other claims with respect to products sold or leased or services rendered by the Sellers;

(k)    Relating to any activities or businesses of the Sellers other than that arise out of the normal conduct of the Business; and

(l)    Relating to any Excluded Asset.

1.5    Liabilities to Growers.    Attached hereto as **Schedule 1.5** is a listing of all poultry growers utilized by Sellers within the twelve (12) months prior to the date hereof including any amounts due and owing to such poultry growers for goods or services provided to Sellers as of the date of such **Schedule 1.5**. At the Closing, Sellers shall submit to Buyers a listing of all amounts then due and payable to any poultry grower as of the Closing Date (the "Grower Closing Date Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by

6

the amount of the Grower Closing Date Payable and the Buyers shall assume sole responsibility for paying all amounts listed in the Grower Closing Date Payable.

1.6     Liabilities to Cold Storage Providers. Attached hereto as **Schedule 1.6** is a listing of all cold storage providers and amounts due and owing to such cold storage providers for goods or services provided to Sellers as of the date of such **Schedule 1.6**. At the Closing, Sellers shall submit to Buyers a listing of all amounts then due and payable to any cold storage provider as of the Closing Date (the "Cold Storage Closing Date Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Cold Storage Closing Date Payable and the Buyers shall assume sole responsibility for the Cold Storage Closing Date Payable.

1.7     Inventory Items. Concurrent with the closing date, Sellers shall provide to Buyer a listing of each category of inventory items, including broiler inventory, pullets, breeders, eggs, feed ingredients and finished feed, fresh and frozen poultry inventory and supplies, parts, packing materials and ingredients and determine the physical count of each such category as of the Accounting Date. Each category of inventory shall be valued as of the Accounting Date at Sellers' cost thereof on a first-in-first-out basis on a category-by-category basis, except for the fresh and frozen inventory which shall be valued on a category-by-category basis at the lower of the Sellers' cost or market. Market shall be defined as the Sellers' selling price of such category of poultry inventory for fresh commodity sales, net of freight costs to deliver, marketing programs, rebates, broker commissions and outside cold storage costs to arrive at a f.o.b. the plant net selling price. Poultry leg quarters shall be valued at the current negotiated export price, less the cost of any additional freight and cold storage expense to be incurred to move the product to port. In determining the value of each inventory category, the Sellers' cost of each inventory category computed on a first-in-first-out basis shall include only the following costs with respect to each inventory category.

(a)     Pullet Inventory. The value of the pullet inventory shall be based upon the actual costs incurred from placement to capitalization, including pullet chick cost from the primary breeder, cost of feed delivered to the pullet houses, grower compensation paid to the pullet growers, cost of servicing, and cost of medication and vaccination.

(b)     Breeder Inventory. The value of the breeder inventory shall be based upon the cost of the flock transferred from the pullet farm less the applicable amortization of the capitalized costs of the flock over a thirty-seven (37) week useful life, plus the unconsumed feed on the breeder farms plus the value of any undelivered eggs on the breeder farms.

(c)     Egg Inventory. The value of the egg inventory shall be determined by taking into consideration the actual egg cost from the breeder, plus the delivery cost of transporting the egg inventory to the hatchery. The actual egg cost shall include breeder flock amortization expense, cost of feed fed to the flock, grower compensation, hen servicing costs and cost of sanitation supplies.

(d)     Broiler Inventory. The value of the broiler inventory shall include the costs of the chicks from the hatchery, delivery cost to the farm, finished feed costs delivered to the farm, and medications, veterinary and vaccination costs.

(e)    Feed Ingredient Inventory.  The value of the feed ingredient inventory shall be the actual cost of the feed ingredient delivered at the mill.

(f)    Finished Feed Inventory.  The value of the finished feed inventory shall be the cost of the feed ingredient and the cost of milling.

(g)    Poultry Inventory.  Subject to the foregoing provisions of Section 2.4(b) at the poultry inventory shall be valued at the lower of cost or market.  The cost of the poultry inventory shall include the actual live weight costs, taking into consideration yields, additional ingredients and the cost of conversion.

(h)    Miscellaneous Inventory.    The miscellaneous inventory shall include supplies, parts, packing materials, labels, boxes, ingredients and crates.  Ingredients, including spices, breading, and batter shall be valued at Sellers' cost for such category of inventory; packaging inventory, including boxes, labels, and bags shall be valued by Sellers and Buyers consulting and all other miscellaneous inventory shall be valued at 60 cents on the dollar of cost of such items.

The aggregate value of the Inventory Items calculated in accordance with **Section 2.4(b)(i)** through **(viii)** shall constitute the "Final Inventory Value".  The Purchase Price shall be reduced or increased, in accordance with **Section 2.1** by the difference between $15,300,000.00 and the Final Inventory Value (the "Inventory Differential").

## ARTICLE II
## PURCHASE PRICE

2.1    Purchase Price.  The purchase price for the sale and transfer of the Purchased Assets shall be Fifty Two Million Dollars ($52,000,000.00) which amount shall be (a) reduced by the Grower Closing Date Payable; (b) reduced by the Cold Storage Closing Date Payable; (c) reduced by the Unpaid Employee Wage Payable; (d) reduced by the Retention/Success Fee Payable, (e) reduced by the WDS Payable, (f) reduced or increased, as the case may be, by the Inventory Differential, and (g) reduced or increased by the adjustment as provided in **Section 2.4** (the "Purchase Price").

2.2    Allocation.  The aggregate consideration delivered pursuant to **Section 2.1** shall be allocated among the Purchased Assets as set forth in **Schedule 2.2** and the Buyers and Sellers agree to act in a manner consistent with such allocation.  Each party shall reflect such allocation in any filings required pursuant to Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), or any similar provisions of state, local or foreign law, and in all tax returns.

2.3    Payment of Purchase Price.    At the Closing, (i) Two Million Dollars ($2,000,000.00) of the Purchase Price shall be deposited by Buyers into an Escrow Account to be established in accordance with the terms of a joint, ninety (90) day, escrow agreement as mutually agreed to by the Sellers and the Buyers (the "Escrow Agreement"), and (ii) the balance of the Purchase Price shall be paid by the Buyers to the Sellers in cash or immediately available funds to such account or accounts as may be designated in writing by the Sellers to the Buyers at last two (2) business days prior to the Closing.

8

2.4    Adjustment to and Payment of the Balance of the Purchase Price. The Purchase Price is based, in part, on Sellers having trade accounts receivable and inventories (the "Current Assets") with a value as of the close of business on the day immediately preceding the Closing Date (the "Accounting Date") of no less than Twenty Four Million Three Hundred Thousand Dollars ($24,300,000.00). In the event that the Current Assets as of the Accounting Date have a value less than the Current Asset Value (herein called a "Deficiency"), the Purchase Price shall be reduced dollar for dollar by the amount of the Deficiency. In the event that the Current Assets as of the Accounting Date have a value greater than the Current Asset Value (herein called an "Overage"), the Purchase Price shall be increased dollar for dollar by the amount of the Overage. The Deficiency or Overage shall be determined as follows:

(a)    Accounts Receivable. At the Closing, the Sellers shall deliver to the Buyers a full and complete, aged list of all of Sellers' trade accounts receivable (and excluding all intercompany accounts receivable) as of the Accounting Date, together with marketing programs, rebates, other discounts and set offs associated therewith (the "Accounting Date Trade Receivables"). The Buyers will accept all Accounting Date Trade Receivables and use their reasonable best efforts to collect such Accounting Date Trade Receivables until July 15, 2006 (the "A/R Collection Deadline"). On the A/R Collection Deadline, title to any uncollected Accounting Date Trade Receivables shall be transferred to Sellers. The difference between the collected Accounting Date Trade Receivables collected by Koch and the Accounting Trade Receivables amount shall be considered a Deficiency or Overage, as the case may be, to which Buyers, or Sellers, as the case may be, shall be entitled to a Purchase Price Adjustment from the Escrow Account.

(b)    Undisclosed Lease Items. In the event that Buyers determine within 90 days following the Closing that any assets represented by Sellers on Schedule 1.1 as being owned by Sellers are, in fact, not owned by Sellers, then the amount of that item's value on Sellers' books shall be considered a Deficiency to which Koch shall be entitled to a Purchase Price Adjustment from the Escrow Account.

(c)    Upon the determination of any revision to the Deficiency or Overage pursuant to Section 2.4 after the resolution of any disputes pursuant to Section 2.4 (e), the Purchase Price shall be adjusted and Sellers shall pay the amount of the Deficiency to the Buyers by directing the Escrow Agent to make payment in the amount of the Deficiency from the Escrow to Buyers. The balance of any amount remaining in the Escrow after payment of any sums required pursuant to Section 2.4 shall be paid to the Sellers. If there is an Overage, the Buyers will immediately make payment to the Sellers in the amount of the Overage.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

The Sellers represent and warrant to the Buyers as follows:

9

3.1     Organization and Qualification.  Sellers are corporations duly organized, validly existing and in good standing under the laws of the State of Alabama and has all requisite corporate power and authority to own, lease and operate its properties and assets and to conduct the Business as currently conducted or proposed to be conducted.  Sellers have delivered to the Buyers a complete and correct copy of its articles of incorporation and by-laws, as amended to date, and such articles of incorporation and by-laws are in full force and effect.

3.2     Authority.  Sellers have all requisite power and authority to execute, deliver and perform its obligations under this Agreement and the other agreements being executed and delivered to the Buyers in connection with this Agreement (collectively, together with this Agreement, the "Transaction Documents") and to consummate the transactions contemplated hereby and thereby, subject to applicable provisions of the Bankruptcy Code.  The execution, delivery and performance of this Agreement and the other Transaction Documents by the Sellers and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by all requisite corporate action on the part of the Sellers.  This Agreement and the other Transaction Documents to which Sellers are a party constitute the legal, valid and binding obligation of Sellers, enforceable against the Sellers in accordance with their respective terms, subject to applicable provisions of the Bankruptcy Code

3.3     No Conflicts.  The execution, delivery and performance of this Agreement and the other Transaction Documents by the Sellers and the consummation of the transactions contemplated by the Transaction Documents shall not constitute a default, breach or violation under the Sellers' articles of incorporation or by-laws, as amended to date, or any agreement or commitment to which the Sellers are a party or by which they or any of their assets and properties may be bound.

3.4     Title to Purchased Assets.  The Sellers have, to the best of their knowledge good and marketable title to the Purchased Assets.

3.5     Personal Property.  **Schedule 1.1** lists, in reasonable detail, all rolling stock, trucks, cars, trailers and other vehicles of any kind owned by the Sellers, regardless of value, and all other personal property owned by the Sellers, as of the date hereof, with an individual book value or market value in excess of $10,000.00.  All of the tangible personal property (other than the Inventory) owned by the Sellers have been reasonably maintained and is in good working order and condition, ordinary wear and tear excepted.  All personal property leased by the Sellers under an Accepted Executory Contract has been reasonably maintained and is in good working order and condition, ordinary wear and tear excepted and is in the condition required by the applicable Accepted Executory Contract and all such Accepted Executory Contracts are in full force and effect and constitute the legal valid and binding agreements of the parties.  The Sellers are not in material default or breach under such Accepted Executory Contracts, other than the failure to make all payments due thereunder.

3.6     Real Property.  **Schedule 3.6** lists all real property owned, leased, subleased, used or otherwise occupied by the Sellers in the conduct of their business and all leases or other agreements in respect of such real property, other than Excluded Assets.  All such real property is in the condition required by all Applicable Laws (as defined in **Section 3.7**), and any applicable leases or other agreements, and all leases and other agreements included on **Schedule**

10

**3.6** are in full force and effect and constitute legal, valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms. True and correct copies of all leases have been delivered or made available to the Buyers. The Sellers are not in material default or breach under any Accepted Executory Contract with respect to any real estate, other than the failure to make all payments due thereunder.

3.7     Compliance with Law and Licenses. The Purchased Assets and the operation of the Business are in compliance in all material respects with all applicable laws, statutes, ordinances, rules, regulations, codes, permits, licenses and authorizations (collectively, "Applicable Laws"). The Sellers hold the permits, licenses and authorizations set forth on **Schedule 3.7** with respect to the Business, which are all of the permits, licenses and authorizations required to conduct the Business and all of which are, to the extent assignable, included in the Purchased Assets. The Sellers have not received any notice that any governmental authority intends to cancel, terminate or not renew any such permit, license or authorization.

3.8     Litigation and Orders. Other than the Bankruptcy Case and as set forth in **Schedule 3.8**, there is no material action, suit, claim, hearing, arbitration, proceeding or investigation in any court or before any arbitrator or government agency or instrumentality pending or, to the knowledge of the Sellers, threatened against or affecting the Sellers, any of the Purchased Assets or the Business. Other than as set forth in **Schedule 3.8** there are no judgments, orders, writs, injunctions or decrees binding upon or applicable to the Sellers or the Purchased Assets.

3.9     Environmental Matters. The Sellers have delivered or made available to the Buyers all environmental documents, studies and reports in their possession relating to any facilities or real property ever owned, operated or leased by the Sellers or the Business and any environmental liability or obligation of the Sellers or the Business. Other than as set forth in **Schedule 3.9**, since December 31, 1995, the Sellers have not received any written or oral notice, claim, subpoena, or summons, or been threatened orally or in writing with any notice, claim, subpoena, or summons, alleging any environmental liability or obligation of the Sellers.

3.10    Organized Labor Matters. Other than as set forth on **Schedule 3.10**, (a) the Sellers are not bound by or subject to any arrangement or agreement with any labor union, (b) no employees of the Sellers are represented by any labor union or covered by any collective bargaining agreement, (c) to the knowledge of the Sellers, no campaign to establish such representation has been commenced or is currently in progress, and (d) there has not been nor is there currently any pending or, to the knowledge of the Sellers, threatened labor dispute involving the Sellers and any group of their respective employees nor have the Sellers experienced any labor interruptions.

3.11    Employee Benefit Plans. **Schedule 3.11** lists all "Employee Welfare Benefit Plans" and "Employee Pension Benefit Plans" (as defined in Sections 3(1) and 3(2) respectively of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), and all retirement, pension or deferred compensation plans or arrangements, savings, incentive or non-qualified stock option, restricted stock, stock appreciation rights, stock purchase or phantom stock plans, unemployment compensation plans, salary reduction agreements, change-in-control

or golden or tin parachute agreements, severance plans or agreements, employment agreements, consulting agreements, personnel policies (including without limitation holiday pay, moving expense reimbursement, sick leave, vacation pay, bonus or benefit arrangement), insurance or hospitalization programs or any other fringe benefit arrangements, whether written or oral (collectively, the "Plans"), existing on the date hereof or at any time preceding the Closing that are or have been maintained or contributed to by the Sellers for the benefit of any employees working in connection with the Business. There have been no "prohibited transactions" (as described in Section 406 of ERISA or Section 4975 of the Code) at any time with respect to any of the Plans maintained by the Sellers or to which the Sellers have been a party that could result in the imposition of any material excise tax.

3.12   Intellectual Property. **Schedule 3.12** sets forth (a) all trademarks, service marks, trade names, trade styles, copyrights and all registrations or applications therefor, (b) all patents, inventions and all registrations or applications therefor, and (c) all licenses, sublicenses and other agreements to which the Sellers are a party, either as licensee or licensor or otherwise, related to any intangible or intellectual property used in the Business (all intangible or intellectual property owned, held for use or used in the Business, whether or not listed, the "Intellectual Property"). Sellers are not required to pay any royalty, license, fee or other similar compensation with respect to the Intellectual Property in connection with the current or prior conduct of the Business. As used in the Business of the Sellers, none of the Intellectual Property infringes or misappropriates or otherwise violates or has been alleged to infringe, misappropriate or otherwise violate any propriety rights of any other person or entity, nor are the Sellers otherwise in the conduct of their business infringing upon, or alleged to be infringing upon, any propriety rights of any other person or entity. No person or entity has been granted the right to use the names "*Sylvest Farms*", "*Sylvest*" or any variation thereof by the Sellers.

3.13   Products Liability. The Sellers have not received any notice or otherwise become aware of any claim by any customer or any other person or entity against the Sellers, other than those minor claims generally to be expected in the industry, based in any way on or related to any theory of product liability or any material defect or problem with respect to any of goods or services provided by the Sellers at ally time during the past three (3) years.

3.14   Adequacy of Purchased Assets. The Purchased Assets, together with the Excluded Assets, constitute all of the assets held for use or used in connection with the Business as currently conducted and the Purchased Assets, together with the Excluded Assets, are adequate to enable the Buyers to conduct after the Closing the Business as currently conducted by the Sellers.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYERS

The Buyers represent and warrant to the Sellers as follows:

4.1   Organization and Qualification. Each Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Alabama and has all requisite power and authority to own, lease and operate its properties and assets and to conduct its business as currently conducted or proposed to be conducted.

12

4.2 Authority. Each Buyer has all requisite power and authority to execute and deliver and perform its obligations under this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby, subject to applicable provisions of the Bankruptcy Code. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Buyers and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by all requisite action on the part of the Buyers. This Agreement and the other Transaction Documents to which the Buyers are parties constitute the legal, valid and binding obligations of the Buyers, enforceable against the Buyers in accordance with their respective terms.

4.3 No Conflicts. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Buyers and the consummation of the transactions contemplated hereby shall not constitute a default, breach or violation under the Buyers' respective certificates or articles of organization or operating agreements, as amended to date, or any agreement or commitment to which a Buyer is a party or by which a Buyer or any of its properties may be bound.

**ARTICLE V**
**EMPLOYEE MATTERS**

5.1 Subject to the limitations set forth in the Bankruptcy Code, the Sellers shall pay to all of their employees who are to be employed by the Buyers upon and after the Closing all compensation and employee benefits earned or accrued from the Effective Date through the date of the Closing.

5.2 At Closing, Sellers shall deliver to Buyers a list of all employees who are to be employed by the Buyers and the amounts of all unpaid wages and vacation pay that was earned but unpaid by such employees prior to the Closing (the "Unpaid Employee Wage Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Unpaid Employee Wage Payable and the Buyers shall assume sole responsibility for paying the Unpaid Employee Wage Payable. Sellers explicitly retain all obligations to pay any workers' compensation and/or Employee Welfare and Pension Benefit Plan amount owed to its employees.

5.3 Within ten (10) business days following the effective date, Sellers shall submit to Buyers a list of company executives whom Sellers believes are entitled to a retention/success fee. Buyers agrees to negotiate in good faith with Sellers and each respective company executive regarding a reasonable and fair retention/success fee, subject to the respective executive agreeing to an employment contract with Buyers, with the retention/success fee to be paid on a date mutually agreed between the respective executive and Buyers (and in no case later than one year following the Closing). Two (2) business days prior to the Closing, Buyers shall submit to Sellers a schedule of the retention/success fees agreed upon with each respective executive previously designated by Sellers (the "Retention/Success Fee Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Retention/Success Fee Payable and the Buyers shall assume sole responsibility for the Retention/Success Fee Payable.

13

## ARTICLE VI
## AGREEMENTS PRIOR TO THE CLOSING

The parties hereto covenant and agree as follows:

6.1    Actions Pending Closing. Except for actions taken in accordance with the orders of the Bankruptcy Court and as otherwise contemplated by this Agreement and as the Buyers may otherwise consent, pending the Closing:

(a)    The Sellers shall conduct and carry on the Business in the ordinary and regular course consistent with past practice, except as a result of the commencement and pendency of the Bankruptcy Case;

(b)    The Sellers shall use their best efforts to preserve the Purchased Assets, the Business, and the relationships with employees, customers, suppliers and others;

(c)    The Sellers shall not enter into, or become obligated under, any contract, agreement, commitment, arrangement or plan with respect to the Business or the Purchased Assets, except in the ordinary course of business or as contemplated by this Agreement;

(d)    The Sellers shall not change, amend, terminate or otherwise modify any contract, agreement, commitment, arrangement or plan to be included in the Purchased Assets, except in the ordinary course of business or as contemplated by this Agreement; and

(e)    The Sellers shall not make any change of a material nature in its practices regarding levels of the Inventory.

6.2    Updates to Schedules. From time to time prior to the Closing, the parties shall update the schedules to this Agreement as necessary to preserve the true, accurate and not misleading nature of their respective representations and warranties.

6.3    Access and Rights of Inspection. The Sellers shall afford the Buyers and their counsel, accountants and other representatives reasonable access, during normal business hours and so as not to interfere with the business operations of the Sellers, to all properties, contracts, books and records used in or relating to the Business. The Sellers shall furnish the Buyers copies of such documents and such information with respect to the affairs of the Business as the Buyers may reasonably request from time to time before the Closing. The Buyers and their counsel and accountants shall have the right to examine and review, at the Buyers' expense, all aspects of the operation of the Business and the Purchased Assets, including obtaining satisfaction that major customers would not view unfavorably the Buyers' ownership of the Business.

6.4    Consents to Assignment of Contracts. The Sellers shall have sent or obtained, prior to the Closing, all notices or consents required under the Accepted Executory Contracts or received an Order from the Bankruptcy Court approving the assignment of the Accepted Executory Contracts to the Buyers.

14

6.5     Fulfillment of Conditions. Each party hereto shall use its best efforts to take or cause to be taken all actions reasonably necessary or appropriate to cause the conditions set forth in **Article VII** and **Article VIII** to be satisfied at or prior to the Closing.

6.6     Risk of Loss. Risk of loss for each of the Purchased Assets shall be borne by the Sellers until the Closing, after which time the Buyers shall bear the risk of loss for each of the Purchased Assets. In the event of any material damage to the Purchased Assets prior to the Closing and/or the Sellers' gaining knowledge or receiving notice that condemnation or eminent domain proceedings are to be instituted with respect to any of the Real Property, the Buyers shall have the option to accept any collectible insurance proceeds and/or any condemnation award, as full compensation for such damage and to proceed to the Closing of the transactions contemplated under this Agreement or to terminate this Agreement pursuant to **Article XI**.

6.7     Bankruptcy Court Approval. As soon as practical, the Sellers shall submit this Agreement to the Bankruptcy Court for approval ("Bankruptcy Court Approval") pursuant to the terms of 11 U.S.C. Section 363 (b) and (f) with the conditions that any competing bids or offers must be (a) not materially less favorable to the Sellers than this Agreement, and (b) increase the Purchase Price, by Two Million Five Hundred Thousand Dollars ($2,500,000.00), in the first instance and each bid or offer thereafter must be in increased increments of not less than Two Hundred Fifty Thousand Dollars ($250,000.00). Competing bidders will be required to post a deposit of Two Million Dollars ($2,000,000.00) or supply an affidavit of its chief financial officer that its available cash, borrowing availability and non-revocable borrowing commitments total not less than the relevant bid or offer. Notwithstanding any other provision of this Agreement, neither the Sellers nor the Buyers shall have any obligation to consummate the transactions contemplated by Article I of this Agreement without prior Bankruptcy Court Approval and the entry, prior to the Closing, of an order issued by the Bankruptcy Court under the Bankruptcy Code (the "Order") which (w) approves the sale of the Purchased Assets to the Buyers on substantially the same terms and conditions set forth in this Agreement and authorizes the Sellers to proceed with the transaction, (x) includes a specific finding that the Buyers are good faith purchasers of the Purchased Assets, (y) states that the sale of the Purchased Assets to the Buyers shall be free and clear of all liens, claims, interest and encumbrances to the maximum extent permitted by the Bankruptcy Code (except as expressly provided in this Agreement), and (z) approves the Sellers' assumption and assignment of the Accepted Executory Contracts pursuant to Section 365 of the Bankruptcy Code. Both the Buyers and the Sellers shall use reasonable efforts to obtain entry of the Order and such order shall be entered by May 30, 2006.

6.8     Certain Filings. The parties hereto shall cooperate with one another in determining whether any action by or in respect of, or filing with, any governmental authority is required or reasonably appropriate, or any action, consent, approval or waiver from any party to any contract is required or reasonably appropriate, in connection with the consummation of the transactions contemplated by this Agreement. Subject to the terms and conditions of this Agreement, in taking such actions or making any such filings, the parties hereto shall furnish information required in connection therewith and seek timely to obtain any such actions, consents, approvals or waivers.

**ARTICLE VII**
**CONDITIONS TO THE OBLIGATIONS**
**OF THE BUYERS**

All obligations of the Buyers hereunder are subject to the fulfillment in accordance with the provisions of this Agreement, on or prior to the Closing, of each of the following conditions, each of which may be waived in writing at the sole discretion of the Buyers:

7.1     Representations and Warranties; Agreements.  All representations and warranties of the Sellers hereunder shall be true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing.  All agreements to be performed hereunder by the Sellers at or prior to the Closing shall have been performed in all material respects.

7.2     Certificate.  The Buyers shall have received certificates dated the Closing signed by an officer of the Sellers stating that:

(a)     The representations and warranties of the Sellers made herein are true and correct in all material respects as of the date of the Closing; and

(b)     The Sellers have complied with its agreements to be performed on or prior to the Closing in all material respects.

7.3     Deliveries.  The Sellers shall have made all deliveries and satisfied all obligations required of them pursuant to **Section 9.2** below.

7.4     No Injunctions.  No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the date of the Closing and which prohibits the consummation of the Closing.

7.5     Entry of the Order.  The Bankruptcy Court shall have entered the Order, and the Order, as so entered, shall not either be stayed or modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material fashion.

**ARTICLE VIII**
**CONDITIONS TO THE OBLIGATIONS**
**OF THE SELLERS**

All obligations of the Sellers hereunder are subject to the fulfillment in accordance with the provisions of this Agreement, on or prior to the Closing, of each of the following conditions, each of which may be waived in writing at the sole discretion of the Sellers:

8.1     Representations and Warranties; Agreements.  All representations and warranties of the Buyers hereunder shall be true and correct as of the date hereof and shall be true and correct as of the Closing as if repeated as of the Closing.  All agreements to be performed hereunder by the Buyers at or prior to the Closing shall have been performed in all material respects.

8.2     Certificate.  The Sellers shall have received a certificate dated the Closing signed by an officer of each Buyers stating that:

(a)     The representations and warranties of such Buyers made herein are true and correct in all material respects as of the date of the Closing; and

(b)     Such Buyers have complied in all material respects with its agreements to be performed on or prior to the Closing.

8.3     Deliveries.  The Buyers shall have made all deliveries and satisfied all obligations required of them pursuant to **Section 9.3** below.

8.4     No Injunctions.  No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the date of the Closing and which prohibits the consummation of the Closing.

8.5     Entry of the Order.  The Bankruptcy Court shall have entered the Order by the specified date, and the Order, as so entered, shall not either be stayed or modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material fashion.

## ARTICLE IX
## CLOSING

9.1     Time and Place of Closing.  The consummation of the purchase and sale of the Purchased Assets is called the "Closing."  The Closing shall take place at the offices of the Sellers in Montgomery, Alabama, on or before the second business day after the Order is entered in the Bankruptcy Case (the "Closing Date"), or at such other place or on such other date as the parties may agree.  The Closing may take place by the exchange of executed documents by overnight delivery or telecopier.

9.2     Deliveries by the Sellers.  At the Closing, the Sellers shall deliver to the Buyers:

(a)     A Bill of Sale and General Assignment in the form attached hereto as **Exhibit A** (the "Bill of Sale"), duly executed by the Sellers and transferring those Purchased Assets as directed in writing by the Buyers to the Sellers prior to Closing to the Buyer or Buyers named in such direction by the Buyers, free and clear of all liens, security interest, charges, claims and other encumbrances to the maximum extent permitted by the Bankruptcy Code, except as expressly provided in this Agreement;

(b)     Real estate transfer documents for the Real Property, including without limitation, Warranty Deeds and Affidavits of Title and all other documents that are normal and customary in the closing of real estate transactions in Alabama or otherwise required by the relevant title company;

(c)     Any other instruments of transfer and assignment for the Purchased Assets that the Buyers may reasonably request to vest the Purchased Assets in the Buyers, free and clear of all liens, security interests, charges, claims and other encumbrances to the

maximum extent permitted by the Bankruptcy Code, except as expressly provided in this Agreement;

(d)    A certificate of existence of the Sellers, certified as of a date not more than seven (7) days prior to the Closing, from the Secretary of State of Alabama;

(e)    A certificate of the Secretary(s) of the Sellers certifying: (i) a copy of the Sellers' by-laws, (ii) a copy of the articles of incorporation of the Sellers, and the incumbency and signatures of the respective Sellers' officers;

(f)    Originals or copies of all notices and consents described in **Section 6.4**;

(g)    The certificate described in **Section 7.2**; and

(h)    Such other certificates and documents as the Buyers may reasonably request, including without limitation evidence of Bankruptcy Court Approval in form and substance reasonably acceptable to the Buyers and a copy of the Order as entered by the Bankruptcy Court.

9.3    Deliveries by the Buyers.  At the Closing, the Buyers shall deliver to the Sellers:

(a)    The cash consideration referred to in **Section 2.1**, less the amount deposited into the Escrow Account under **Section 2.3**, payable by wire transfer to an account or accounts specified by the Sellers;

(b)    A certificate of existence of the Buyers, certified as of a date not more than seven (7) days prior to the Closing, from the Secretary of State of Alabama;

(c)    A certificate of the Secretary of each Buyers, certifying: (i) a copy of such Buyers' operating agreement, (ii) a copy of the certificate or articles of organization of such Buyers, and (iii) the incumbency and signatures of such Buyer's manager;

(d)    The certificate described in **Section 8.2**; and

(e)    Such other certificates and documents as the Sellers may reasonably request.

## ARTICLE X
## ADDITIONAL AGREEMENTS

10.1    Turnover of Payments.  On and after the Closing, in the event that any party receives any payment or instrument of payment of any amount to which the other party is entitled, the receiving party shall deliver the same promptly to the other party (with endorsement if necessary but otherwise in the same form as received) and, until so delivered, hold the same in trust for the other party's benefit and as the property of the other party.

10.2    Cooperation.  On and after the Closing, the Sellers and the Buyers shall each deliver or cause to be delivered to the other such additional documents, releases, assignments and

18

instruments as the other parties may reasonably request for the purpose of carrying out the purposes of this Agreement.

10.3    Cessation of Use of Names. Immediately after the Closing, the Sellers shall cease doing business under the name "*Sylvest Farms*", "*Sylvest*", or any similar names.

## ARTICLE XI
## TERMINATION

11.1    Termination. At any time prior to the Closing, this Agreement may be terminated (a) by mutual consent of the parties, (b) by either the Buyers or the Sellers, if there has been a material misrepresentation, breach of warranty or breach of agreement by the other party in its representations, warranties and agreements set forth herein that cannot be cured in all material respects on or prior to the Closing, (c) by the Buyers, if the conditions stated in **Article VII** have not been satisfied at or prior to the Closing, (d) by the Sellers, if the conditions stated in **Article VIII** have not been satisfied at or prior to the Closing, (e) by the Sellers, if the Bankruptcy Court approves a competing bid or offer, or (f) by the Buyers or the Sellers, if the Closing has not occurred by the close of business on May 30, 2006, provided that the delay is not caused by the willful action of the terminating party.

11.2    Effect of Termination. If this Agreement shall be terminated pursuant to **Section 11.1**, all obligations of the parties hereunder (except the obligations set forth in this **Article XI** and **Section 12.1**) shall terminate; provided, however, such termination shall not affect any party's right to pursue a claim for damages as a result of any breach or failure to perform by such other party occurring prior to such termination. In the event that this Agreement is terminated, each party shall return to the other all papers, documents, financial statements and other data furnished to it by or with respect to such other party (including any copies thereof).

11.3    Break-Up Fee. In recognition of the Buyers' time and effort in examining the Business, its due diligence in respect thereof by its employees, agents and other representatives, and the loss of opportunity that the expenditure of such time and effort has caused, in the event of any termination pursuant to **Section 11.1(e)** and the transaction so approved by the Bankruptcy Court closes as provided by its terms, the Sellers shall compensate the Buyers in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00). Such compensation shall be paid to the Buyers within two (2) business days of any such closing.

## ARTICLE XII
## MISCELLANEOUS

12.1    Expenses and Taxes. Whether or not the transactions herein contemplated shall be consummated, and except as otherwise more specifically provided herein, the Buyers and the Sellers shall each pay their own fees, expenses and disbursements incurred in collection with the subject matter of this Agreement, including all costs and expenses incurred in the performance and compliance with all conditions to be performed by such party under this Agreement. Without limiting the generality of the immediately preceding sentence, the fees, costs and expenses of the accountants, attorneys and other financial advisors to the Sellers in connection with the preparation or negotiation of, or consummation of the transactions contemplated by, this

Agreement shall be borne by the Sellers and none of such fees, costs or expenses shall be paid or assumed by the Buyers. The Buyers shall pay all sales, use, transfer, stamp, recording, gains and other similar taxes and fees ("Transfer Taxes") imposed in connection with the transactions contemplated by this Agreement; provided, however, any taxes imposed on an annual or other periodic basis, including the real estate property tax and the ad valorem tax, shall be prorated between the Buyers and the Sellers on the basis of the Closing Date, with the Sellers responsible for the payment of all such prorated taxes attributable to the period prior to the Closing Date and the Buyers being responsible for all such prorated taxes attributable to the period subsequent to and including the Closing Date. The Sellers and the Buyers shall cooperate to file, or cause to be filed, all necessary documentation and tax returns with respect to such Transfer Taxes and to any similar fees imposed with respect to the Purchased Assets.

12.2   Notices. All notices required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) as of the date delivered if delivered personally, by courier or by facsimile (provided that a copy of such notice is promptly thereafter mailed in accordance with the provisions of clause (c) below), (b) one (1) day after transmittal by overnight delivery service under circumstances in which such service guarantees overnight delivery, or (c) three (3) business days after deposit in the United States mail, registered or certified mail, postage prepaid, return receipt requested, to the parties at the following addresses:

If to the Buyers, addressed as follows:

> Koch Foods of Alabama, LLC
> c/o Koch Foods Incorporated
> 1300 West Higgins Road # 119
> Park Ridge, Illinois 60068
> Attn: Mr. Mark Kaminsky
> Telephone No.: 847-384-5940
> Facsimile No.: 847-384-5972

With a copy to:

> Thomas R. Wechter, Esq.
> Eugene T. Geekie, Jr.
> Schiff Hardin & Waite
> 6600 Sears Tower
> Chicago, Illinois 60606
> Telephone No.: 312-258-5756
> Facsimile No.: 312-258-5600

If to the Sellers, addressed as follows:

> Dean E. Falk, President/
> Chief Executive Officer
> Sylvest Farms, Inc.
> Post Office Box 230050
> Montgomery, Alabama 36125
> Telephone No: 334/281-0400
> Facsimile No.: 334/288-5915

With a copy to:

> Thomas G. Mancuso, Esq.
> Mancuso & Franco, P.C.
> 7515 Halcyon Summit Drive
> Suite 301
> Montgomery, Alabama 36117
> (Post Office Box 240489
> Montgomery, Alabama 36124-0489)
> Telephone No: 334-481-1800
> Facsimile No.: 334-481-1 810

or to such other address or number as any party hereto shall specify for itself by notice given pursuant to this **Section 12.2** from time to time; *provided, however,* that notices of any change in an address or number shall not be effective until receipt.

 12.3 Severability. In the event that any of the provisions contained in this Agreement shall, for any reason, be declared or held to be unreasonable, unlawful, unenforceable or otherwise invalid in any respect, such term or provision shall be deemed modified to the extent necessary to make it enforceable, and in no event shall such declaration or holding affect the validity of any other provision of this Agreement, all of which provisions shall continue in effect in accordance with their terms.

 12.4 Interpretation. The representations, warranties, agreements and covenants of the parties made in the Transaction Documents shall survive the consummation of the transactions contemplated hereby and the consummation of such transactions shall not be deemed a waiver of a breach of or inaccuracy in any representation, warranty, agreement or covenant or of any party's rights and remedies with regard thereto. No specific representation, warranty, agreement or covenant contained herein shall limit the applicability of a more general representation, warranty, agreement or covenant contained herein.

 12.5 Exercise of Rights and Remedies. No delay or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

12.6    Remedies Cumulative.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but each shall be cumulative with all other rights, remedies and elections available at law or in equity.

12.7    Governing Law; Retention of Jurisdiction.  This Agreement shall be construed in accordance with and governed by the laws of the State of Alabama, without giving effect to the principles of conflict of laws thereof.  Furthermore, the parties acknowledge and agree that the Bankruptcy Court shall retain jurisdiction over the transactions contemplated by this Agreement and the other Transaction Documents and any disputes between the parties arising therefrom shall, in the first instance, be submitted to the Bankruptcy Court for adjudication.

12.8    Assignment, Binding Effect and Entire Agreement.  This Agreement and the rights and obligations of the parties hereunder may not be assigned without the prior written consent of the other parties hereto, but shall be binding upon and inure to the benefit of the parties hereto and their successors and any permitted assigns.  Notwithstanding the foregoing, the Buyers may with five (5) days prior written notice to Sellers, assign their rights to any of their affiliates or lenders or other financing sources without the prior written consent of the Sellers; provided, however, notwithstanding any such assignment, Buyers and the Guarantor shall remain liable for performance hereunder.  This Agreement sets forth the entire agreement of the parties hereto concerning the subject matter of this Agreement.  This Agreement may only be modified or amended by an instrument in writing executed by each of the parties hereto and any term of this Agreement may be waived only with the written consent of the party sought to be bound.

12.9    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and, to the extent provided herein, their successors and permitted assigns, and no provision of this Agreement shall be deemed to confer upon other third parties, including without limitation, any employees or former employees of either the Sellers or the Buyer, any remedy, claim, liability, reimbursement, cause of action or other right.

12.10    Counterparts.  This Agreement may be executed in any number of counterparts, by facsimile signature or using separate signature pages.  Each such executed counterpart and each counterpart to which such signature pages are attached shall be deemed to be an original instrument, and all such counterparts together shall constitute one and the same instrument.

12.11    Captions.  The section headings in this Agreement are provided for convenience only and are not to be considered in the interpretation of this Agreement.

12.12    Incorporation of Schedules and Exhibits.  The schedules and exhibits identified in this Agreement are incorporated herein by reference and expressly made a part hereof.

12.13    Time of Essence.  The parties agree that time is of the essence for purposes of this Agreement and all of the transactions contemplated hereby.

12.14    Guaranty.  Guarantor hereby guarantees the representations and warranties of Article IV and agrees to cause Buyers to timely perform all of their obligations under this Agreement and other agreements executed by Buyers pursuant hereto.

22

12.15 Access. During the two-year period following the Closing Date and during normal business hours, Buyers will, and will cause their affiliates, successors and assigns to, permit upon reasonable advance, at least five (5) days, prior written notice (a) Sellers and their representatives to have access to the books, documents and records (including tax returns, files, papers and related items) of, and relating to Sellers, their business or their employees, in each case to the extent relating to any period prior to the Closing or the legitimate business needs of Sellers or any of their Affiliates, and permit Sellers and their representatives to make copies of such books, documents and records at Sellers' expense and (b) Sellers and their representatives to have reasonable access to the employees of Buyers and their affiliates, and direct such employees to cooperate with each of them, for Sellers or any of its affiliates' resolution of tax, audit, litigation, accounting, securities or similar matters that relate to any period prior to the Closing (whether such matters arose before or after the Closing). Without limiting the generality of the foregoing, Buyers agree that such legitimate business needs include (i) defending or pursuing claims, litigation or similar proceedings, (ii) preparing or making filings contemplated by securities laws or stock exchange rules, (iii) preparing or filing tax returns or responding to audits, and (iv) administering Sellers' bankruptcy estate.

(a)     Notwithstanding the foregoing, beginning on the month anniversary following the Closing, Buyers shall have the unilateral right and sole discretion to determine whether they will destroy any business records or documents purchased from Sellers. Should Buyers make such determination, they will provide Sellers with 90 days written notice of their intent to destroy such records. During such 90 day period, Sellers may elect, upon written notice to Buyers delivered with the 90 day notice period, to take possession and ownership of any documents or records to be destroyed, at no cost to Sellers, although Sellers shall pay all transportation or future storage charges for such documents or records.

12.16 Survival. None of the representations or warranties contained herein or in any instrument or document delivered pursuant thereto, other than those pertaining to the Designation Agreement, will survive the Closing, and none of the Parties nor any of their respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof.

12.17 "AS IS" TRANSACTION. BUYERS HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS MAKE NO (AND SELLERS EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS OR ANY OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ASSETS, THE PHYSICAL CONDITION OF ANY PART OF THE ASSETS, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OWNED BY SELLERS OR WHICH ARE THE SUBJECT OF ANY ASSUMED CONTRACT AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY, THE VALUE OF THE ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ASSETS (OR

23

ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS. BUYERS FURTHER ACKNOWLEDGE THAT BUYERS HAVE CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS AS BUYERS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYERS ARE DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO BUYERS' RIGHTS UNDER THIS AGREEMENT, BUYERS WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND WITHOUT RECOURSE TO SELLERS.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

KOCH FOODS OF ALABAMA, LLC

By: _Joseph C Grendys_
    J oseph C Grendys
    Manager

KOCH FARMS OF ALABAMA, LLC

By: _Joseph C Grendys_
    Joseph C Grendys
    Manager

SYLVEST FARMS, INC.

By: _Dean E Falk_
    Dean E. Falk
    President and Chief Executive Officer

SYLVEST FARMS MANAGEMENT SERVICES, INC.

By: _Dean E Falk_
    President & CEO

WITH RESPECT TO ARTICLE IV AND SECTION 12.14 OF THE ASSET PURCHASE AGREEMENT

KOCH FOODS INCORPORATED

By: _Joseph C Grendys_
Its: Chief Executive Officer

## EXHIBIT A

### BILL OF SALE AND GENERAL ASSIGNMENT

See attached.

## BILL OF SALE AND GENERAL ASSIGNMENT

Reference is made to that certain Asset Purchase Agreement dated as of April ___, 2006 (the "Agreement") by and between KOCH FOODS OF ALABAMA LLC and KOCH FARMS OF ALABAMA LLC, both Alabama limited liability companies (the "Buyers"), and SYLVEST FARMS, INC. and SYLVEST FARMS MANAGEMENT SERVICES, INC., both Alabama corporation (the "Sellers"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Agreement to the extent defined therein.

Pursuant to the terms of the Agreement and by this Bill of Sale and General Assignment and certain other agreements being executed and delivered simultaneously herewith, the Sellers is selling, transferring, assigning, conveying and delivering the Purchased Assets to the Buyers.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the terms and conditions of the Agreement, the Sellers hereby sell, transfer, assign, convey and deliver to the Buyers all of the Purchased Assets, free and clear of all security interests, liens, charges, claims or other encumbrances of any kind or character to the maximum extent permitted by the Bankruptcy Code (except as expressly provided in the Agreement), to have and to hold forever.

This Bill of Sale and General Assignment may be executed and accepted in any number of counterparts and each such executed counterpart shall be deemed to be an original instrument, and all such counterparts together shall constitute one and the same instrument. This Bill of Sale and General Assignment is delivered pursuant to the Agreement and shall be construed consistently therewith. This Bill of Sale and General Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without giving effect to the principles of conflicts of laws thereof

27

**IN WITNESS WHEREOF,** the undersigned have executed this Bill of Sale and General Assignment as of this _____ day of May ___, 2006.

SYLVEST FARMS, INC.

By: _____

       Dean E. Falk, President and
       Chief Executive Officer

Agreed to and accepted by:

SYLVEST FARMS MANAGEMENT
SERVICES, INC.

By: _____

KOCH FOODS OF ALABAMA, LLC     _____

                                    _____

By: _____

       _____

       Manager

KOCH FARMS OF ALABAMA, LLC

By: _____

       _____

       Manager

28

## SCHEDULE 1.1

### MACHINERY, EQUIPMENT AND ROLLING STOCK

## SCHEDULE 1.1(g)

### DESIGNATION OF RIGHTS AGREEMENT

## SCHEDULE 1.3

### EXECUTORY CONTRACTS AND INSURANCE POLICIES

## SCHEDULE 1.5

**POULTRY GROWER PAYABLES**

## SCHEDULE 1.6

### COLD STORAGE PAYABLES

## SCHEDULE 2.2

### ALLOCATIONS

| | |
|---|---|
| Accounts Receivable | $9,000,000 |
| Inventory | $15,300,000 |
| Property, Plant and Equipment | $27,400,000 |
| Other Long Term Assets | $300,000 |

## SCHEDULE 3.6

### REAL PROPERTY

<u>SCHEDULE 3.7</u>

PERMITS, LICENSES AND AUTHORIZATIONS

## SCHEDULE 3.8

### THREATENED OR PENDING LITIGATION, ADR, OR GOVERNMENT ACTION

<u>SCHEDULE 3.9</u>

ENVIRONMENTAL LIABILITIES/NOTICES

## SCHEDULE 3.10

### ORGANIZED LABOR MATTERS

## SCHEDULE 3.11

### EMPLOYEE WELFARE AND PENSION BENEFIT PLANS

**SCHEDULE 3.12**

**INTELLECTUAL PROPERTY**

CH2\ 1409486.5

DESIGNATION OF RIGHTS AGREEMENT

*th* THIS DESIGNATION OF RIGHTS AGREEMENT, is made and entered into on April *18*, 2006 between the Sylvest Farms, Inc. and Sylvest Farms Management Services, Inc. (the "Sellers"), and Koch Foods of Alabama, LLC and Koch Farms of Alabama, LLC ("Buyers").

RECITALS

WHEREAS, Sellers and Buyers have entered into an Asset Purchase Agreement of even date herewith for the sale of Sellers' assets;

WHEREAS, pursuant to the Asset Purchase Agreement the parties have agreed that Sellers will file a Chapter 11 Bankruptcy petition and petition the Court to approve the sale to Buyers pursuant to Section 363 of the Bankruptcy Code;

WHEREAS, Sellers are a party to a Dedicated Transportation Agreement with Worldwide Dedicated Services, Inc. ("WDS")dated June 23, 2004 for the provision of transportation services to the Sellers (the "WDS Contract"), which Sellers would have the right to assume and assign or reject, pursuant to Section 365 of the Bankruptcy Code;

WHEREAS, due to the need to expeditiously close the sale of assets to Buyers before Buyers can determine whether they require the assumption and assignment of the WDS Contract, the parties desire to designate and assign to Buyers the Sellers' rights under Section 365 of the Bankruptcy Code to assume/assign or reject the WDS Contract, and designate the right to receive the services of WDS and the obligation to make the payments to WDS, until such time as it is determined whether the WDS Contract will be assumed and assigned or rejected.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties covenant and agree as follows:

ARTICLE I

CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Agreement" means this Designation Rights Agreement.

"Approval Order" means the final and nonappealable order entered by the Court approving the Asset Purchase Agreement and this Agreement in a form that is satisfactory to Buyers.

"Authorized Officer" of any Person means the chief executive officer, the president, any vice president or any secretary of that Person.

"Bankruptcy Code" means 11 U.S.C. §101 et. seq. and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

"Closing Date" shall have the same meaning as that term has in Section 2 of the Asset Purchase Agreement.

"Court" means the Bankruptcy Court in which Sellers' bankruptcy case is pending.

"Cure Costs" means all actions and monetary payments necessary to cure any defaults (monetary or otherwise) in the WDS Contract. In the event that the Buyers and WDS disagree as to the Cure Costs of the WDS Contract, in the event that the Buyers seek to assume such contract, the Cure Costs shall be the amount determined by the Court after notice and hearing, as necessary to cure any defaults (monetary or otherwise) in the WDS Contract. Under no circumstances shall the Sellers have any obligations whatsoever to pay any Cure Costs.

"Designation Period" has the meaning set forth in Section 2.1(b) below.

"Designation Rights" has the meaning set forth in Section 2.1(b) below.

"Effective Date" has the meaning set forth in Article III below.

"Objection Period" has the meaning set forth in Section 2.1(d) below.

"Order" means an order entered by the Court.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust union, association, court, agency, governmental, tribunal, instrumentality or other entity or authority.

"Purchase Price" has the meaning set forth in Section 2.3 below.,

## ARTICLE II

## THE TRANSACTION

2.1    Purchase and Sale of Designation Rights and Properties.

(a)    On the terms and subject to the conditions contained in this Agreement and the Approval Order, on the Closing Date, Buyers shall purchase from Sellers and Sellers shall sell, convey, assign, transfer and deliver to Buyers pursuant to Section 105, 363 and 365 of the Bankruptcy Code, the Sellers' right, title and interest, if any, in and to the Designation Rights for the WDS Contract, free and clear of all liens of any kind whatsoever and to the fullest extent permissible pursuant to the Bankruptcy Code, but subject to Cure Costs and the provisions of this Agreement.

(b)    During the Designation Period, and on the terms and subject to the conditions contained in this Agreement and the Approval Order, the Buyers shall have the sole, exclusive and continuing right to (i) receive all services under the WDS Contract; (ii) make all payments to WDS for the services Buyers' receive, and (iii) determine whether the WDS Contract shall be assumed and assigned by Sellers in connection with an assumption and assignment, and to whom; and (iv) whether the WDS Contract shall be rejected (all of which rights are referred to herein as the "Designation Rights"). Buyer's Designation Rights shall expire on the later of (i)

the date of the expiration of the applicable Section 365 of the Bankruptcy Code period for the assumption or rejection of the WDS Contract, including any further extension granted by order of the Court, or (ii) the date of the termination of this Agreement (the "Designation Period"). Notwithstanding anything contained herein, Sellers shall not reject the WDS Contract unless and until Buyers, in accordance with this Agreement, notify Sellers to reject such WDS Contract. The Designation Rights to be acquired shall include, among other things, the exclusive power to designate to a designee (and to have Sellers convey and assign to such designee) all rights, title, interests, options, contract rights, if any, of the Sellers in and to one the WDS Contract of the Sellers.    Notwithstanding any provisions to the contrary, any costs, expenses or claims attributable to a time period after the entry of the Approval Order and the Closing of the asset sale to Buyers shall be deemed the sole obligation of Buyers.

(c)    Notwithstanding subsections (a) and (b) above, in order to effectuate either an assumption and assignment or rejection of the WDS Contract, the Buyer shall draft prior to the expiration of the Designation Period within sufficient time for filing and presentation to the Court prior to the expiration of the Designation Period, a motion (the "Designation Motion"), and such Designation Motion shall: (i) state whether the Buyers intend to assume and assign or reject the WDS Contract; (ii) state the identity of Buyers' designee, if any; (iii) state the proposed use of the WDS Contract by the Buyers' designee, (iv) provide documentation or other information from Buyers' designee relating to "adequate assurance of future performance" by the designee as required by Section 365 of the Bankruptcy Code; (v) identify the WDS Contract and all of the documents amending, modifying, supplementing or restating the Contract; (vi) request Court approval of the assumption and assignment or rejection of the WDS Contract, at the Buyers' election; (vii) request a hearing before the Court on the relief requested including without limitation a hearing to determine Cure Costs, the adequacy of the Buyers and/or its designee's assurance of future performance under the WDS Contract and satisfaction of Cure Costs; and (viii) include as an attachment a proposed Order. The Sellers shall use reasonable efforts to file the Designation Motion within two (2) business days of receipt from the Purchase for presentment to the Court within the Designation Period. The Sellers shall serve a copy of the Designation Motion on all parties entitled to notice. The Sellers shall not have any liability with respect to Cure Costs or other assurances of the future performance.

(d)    WDS shall have ten (10) days from the receipt of the Designation Motion (the "Objection Period") to file with the Court an objection in writing to the proposed assignment of the WDS Contract (and concurrently deliver a copy of the said objection to the Buyers, Sellers, and such other parties as are specified in the notice of the Designation Motion).

(e)    Any Designation Motion and notice thereof shall provide that if an objection to any assumption and assignments is not timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue," the objection will not preclude the assumption and assignment of the WDS Contract, the assumption and assignment shall be deemed effective and binding (without further Order) contingent upon the determination of any Cure Costs by the Court and the satisfaction of such Cure Costs in accordance with an Order. Notwithstanding the foregoing, WDS shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed within the Objection Period. The Designation Motion must clearly state that the failure to object may result in the entry of an Order allowing assumption and assignment of

- 3 -

the WDS Contract without any obligations on the part of the Buyers for adequate assurance of future performance.

(f)    In a timely filed Designation Motion is not filed, the WDS Contract shall be deemed rejected as of the expiration of the Designation Period; provided, however, Sellers shall be prohibited from rejecting the WDS Contract until such time as Buyers have designated the WDS Contract for rejection or the period to assume and assign such Contract, as provided under section 365(d)(1), (d)(4) has expired and has not been further extended by the Court.

(g)    Notwithstanding the above, the Sellers shall use reasonable efforts to file and present the Designation Motion.  However, the Sellers shall have no obligation or liability whatsoever to present any evidence or argument in favor or against assumption or assignment of the WDS Contract, Cure Costs, and/or adequate assurance of future performance by the Buyers or their designee.  Buyers shall have the right to petition the Court to compel the Sellers to comply with the Buyers' direction to designate.

(h)    The Sellers shall bear no liability for Cure Costs or for adequate assurance of future performance costs or obligations relating to the WDS Contract, or any other costs or expenses relating thereto.

2.2    Assumption and Assignment of Contracts.  An assumption and assignment of the WDS Contract, pursuant to Section 365 of the Bankruptcy Code, shall be effective only upon the entry of a final and nonappealable Order approving the assumption and assignment of the WDS Contract after notice and hearing on a timely filed and served Designation Motion; provided, however, if no such objection to the assumption and assignment is timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue" which, pursuant to the Designation Order, will not preclude the assumption and assignment of the WDS Contract, and the assumption and assignment shall be deemed effective and binding (without further Order) upon the Court's determination of the Cure Costs and the Buyers' satisfaction of same.  Notwithstanding the foregoing, WDS shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed prior to the expiration of the Objection Period.

2.3    Purchase Price.  The purchase price for the Designation Rights (the "Purchase Price") is included in the consideration paid or to be paid by Buyers pursuant to the Asset Purchase Agreement.  Except for the Purchase Price in the Asset Purchase Agreement, the Buyers shall have no obligation to pay the Sellers or their Estate any other funds in order to assume, assign, or reject the WDS Contract.  Notwithstanding the foregoing, the Purchase Price shall specifically include any obligations of the Buyers as to the WDS Contract, including but not limited to, Cure Costs, adequate assurance of future performance, and the payment of Chapter 7 Operating Expenses.

2.4    Buyers shall use their best efforts to determine whether they will seek assignment/assumption or rejection of the WDS Contract before the expiration of the Designation Period; provided, however, Buyers shall have the right to request that Sellers obtain an Order extending the Designation Period for an additional period reasonably requested by Buyers.  Should Buyers make any such request, Sellers shall use its reasonable efforts to obtain promptly such an Order.  If the Court denies to extend the Designation Period, the Designation

Period is terminated at the later of (i) the date of docketing of the Order denying the extension of the Extension Period; or (i) the date set forth in Section 2.1(b).

## ARTICLE III

### CONDITIONS FOR EFFECTIVE DATE, CLOSING DATE AND APPROVAL ORDER

3.1    The Effective Date of this Agreement is the date of the Closing.

3.2    The Closing Date of this Agreement shall be the Closing Date as defined by the Asset Purchase Agreement.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

4.1    Sellers represent that the WDS Contract is unexpired and has not been terminated. Sellers make no other representations or warranties with respect to the WDS Contract.

(a)    Buyers hereby represent and warrant to Sellers that they have the power and authority, to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement by Buyers and the consummation by Buyers of the transactions contemplated hereby have been duly authorized by all requisite (and to the extent applicable to Buyers) corporate, partnership or limited liability corporation action.

## ARTICLE V

### COVENANTS

5.1    Further Transfers and Assurances. Sellers and Buyers will execute and deliver such further instruments of conveyance and transfer and take such additional action as Buyers may reasonably request to effect, consummate, confirm or evidence the assignment to Buyers' (or their designees) of the WDS Contract. This Section 5.1 shall survive for six (6) months following the expiration of the Designation Period.

5.2    Taxes. All charges for or in connection with the recording of any document or instrument contemplated hereby shall be paid by Buyers' or their designees. Sellers and Buyers (or Buyers' designees), as required by local law, will file all necessary tax returns and other documentation in connection with the taxes and fees encompassed in this Section 5.2 relating to the assignment of the WDS Contract.

## ARTICLE VI

### MISCELLANEOUS

6.1    Termination: Other Remedies.

(a)    This Agreement may be terminated by the mutual consent of Buyers and Sellers.

- 5 -

(b)    Upon termination of this Agreement pursuant to Section 6.1(a) above, the WDS Contract is immediately deemed rejected without further Order.

6.2    Default and Remedies.

(a)    The Court shall retain jurisdiction over this Agreement in the event of any default by either Party.

(b)    In the event of a material breach of, or material default under, this Agreement by Buyers prior to the Closing Date, Sellers shall, provided Sellers are not in material breach of or material default under, this Agreement, be entitled, as its sole and exclusive remedy, either (i) to terminate this Agreement or (ii) to seek specific performance of this Agreement. In the event of a material breach of, or material default under, this Agreement by Buyers after the Closing Date, Sellers shall, provided Sellers are not in material breach of or material default under this Agreement, be entitled, as its sole and exclusive remedy, to seek specific performance of this Agreement.

6.3    Successors and Assigns. This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective successors and assigns.

6.4    Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission, or mailed, by certified or registered mail, return receipt requested, first class postage prepaid, or by Federal Express or some other reputable overnight carrier, to the Parties at the following addresses and facsimile numbers:

If to Sellers:

> Thomas G. Mancuso, Esq.
> Mancuso & Franco, P.C.
> 7515 Halcyon Summit Drive, Suite 301
> Montgomery, Alabama 36117
> (P.O. Box 240489
> Montgomery, Alabama 36124-0489)
> Telephone Number: 334-481-1800
> Facsimile Number: 334-481-1810

If to Buyers addressed to:

> Thomas R. Wechter, Esq.
> Eugene J. Geekie, Esq.
> Schiff Hardin LLP
> 6600 Sears Tower
> Chicago, IL 60606
> Telephone Number: 312-258-5756
> Facsimile Number: 312-258-5600

or such other place and with such other copies as any Party may indicate by written note to the other Party provided in the manner set forth above.

- 6 -

6.5     Entire Agreement.   This Agreement, and the agreements referenced herein (including without limitation, the Asset Purchase Agreement and the exhibits to the Asset Purchase Agreement) supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof.   This Agreement and other documents to be delivered in connection herewith, including without limitation the Asset Purchase Agreement, contains the sole and entire agreement between the Parties with respect to the subject matter hereof. Notwithstanding the foregoing, the Asset Purchase Agreement shall continue to be a binding agreement between the Parties.  To the extent that there are any discrepancies between the Asset Purchase Agreement and this Agreement, the terms of the Asset Purchase Agreement shall control.

6.6     Waiver.   Except as otherwise specifically provided for in this Agreement, any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an Authorized Officer of such Party.  A waiver on one occasion shall not be deemed a waiver of the same or any other breach on a future occasion.

6.7     Amendment.   This Agreement my be modified or amended only in writing duly executed by or on behalf of each of the Parties.

6.8     Counterparts: Facsimile Signatures.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

6.9     Invalid Provisions.   If any provisions of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully servable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof.  The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

6.10     Heading, Gender, Etc.   The headings used in this Agreement have been inserted for convenience, do not modify the terms of this Agreement and do not constitute matter to be construed or interpreted in connection with this Agreement.   Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other Gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement, and (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation."  The language used in this Agreement shall be deemed to the language chosen by the Parties to express their mutual intent and no rule of strict construction shall be applied against any Person.

6.11    Continuing Jurisdiction.  The Parties agree that the Court shall retain jurisdiction over the enforcement of this Agreement, including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

6.12    Choice of Law.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Alabama.  In the event of any litigation concerning this Agreement, proper venue shall be in the Court and the Parties consent to such jurisdiction.

6.13    No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of sellers and buyers between the Parties.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed as of the date first above written.

BUYER:                                          SELLERS:
KOCH FOODS OF ALABAMA, LLC                      SYLVEST FARMS, INC.

By: _____                      By: _____
        Manager                                     Its:  President/CEO
    Member

KOCH FARMS OF ALABAMA, LLC

By: _____
        Manager
    Member

CH2\1410501.2

- 8 -

# EXHIBIT G

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

KOCH FOODS OF ALABAMA, LLC, an )
Alabama Limited Liability Co., )
)
          **Plaintiff,** )
)
    **v.** )      **Case No:** $Cv-07-857$
)
General Electric Capital Corporation., a )   **JURY TRIAL DEMANDED**
Delaware Corporation, )
)
         **Defendant.** )
)

## COMPLAINT FOR DECLARATORY JUDGMENT AND FOR UNJUST ENRICHMENT

    Now comes Koch Foods of Alabama, LLC ("Koch Foods"), pursuant to Alabama Code §
6-6-220 *et seq.*, and files this Complaint for Declaratory Judgment and for Unjust Enrichment
against General Electric Capital Corporation. ("GE Capital"). In support thereof, Koch Foods
states the following:

### PARTIES, JURISDICTION AND VENUE

    1.    Koch Foods is a limited liability company duly organized and existing under the laws
of the State of Alabama, with its principal place of business in Montgomery, Alabama. At all
times pertinent hereto, Plaintiff has been engaged in the business of processing and selling
poultry products.

    2.    GE Capital is a corporation organized and existing under the laws of the State of
Delaware, with its principal place of business in Stamford, Connecticut. Upon information and
belief, at all times pertinent hereto, Defendant has been authorized to transact business in the
State of Alabama.

3.    This Court has personal jurisdiction over this matter pursuant to Alabama Rules of Civil Procedure Rule 4.2 in that Defendant is a company doing business within this State.

4.    Venue is proper in this Court pursuant to Alabama Code § 6-3-7(3) because Plaintiff's principal office of business is in Montgomery County and Defendant does business by agent in Montgomery County.

**FACTS**

5.    On or about December 28, 2005, Sylvest Farms, Inc. ("Sylvest Farms") entered into an equipment lease ("Equipment Lease") with GE Capital under which Sylvest Farms would lease various poultry processing equipment (the "Equipment"), including a chicken de-boner and a spiral freezer. A copy of the Equipment Lease is attached hereto as Exhibit A.

6.    Koch Foods is not a party to the Equipment Lease agreement.

7.    The Equipment was delivered to a plant of Sylvest Farms located at 3500 Western Blvd., Montgomery, Alabama 36105 (the "Plant"). The Equipment since then has been housed in the Plant.

8.    On April 18, 2006, Sylvest Farms filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. Sylvest Farms remained in possession of its assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

9.    On May 26, 2006, the United States Bankruptcy Court for the Northern District of Alabama entered an order (the "Bankruptcy Court Order") authorizing Sylvest Farms to (i) sell to Koch Foods certain assets of the bankruptcy estate free and clear of liens, claims and interests pursuant to 11 U.S.C. § 363, (ii) designate to Koch Foods the right to assume a contract, and (iii) assign to Koch Foods certain executory contracts. A copy of the Bankruptcy Court Order is attached hereto as Exhibit B.

10.     Pursuant to the Bankruptcy Court Order and an Amended Asset Purchase Agreement entered between Koch Foods and Sylvest Farms, Koch Foods purchased substantially all the assets of Sylvest Farms, including the Plant at 3500 Western Blvd, Montgomery, Alabama 36105.

11.     Koch Foods did not assume the Equipment Lease that was entered between Sylvest Farms and GE Capital.

12.     Several months after Koch Foods made the purchase of the assets of Sylvest Farms, and after GE Capital claimed that it owned the Equipment, Koch Foods demanded that GE Capital remove the Equipment from the Plant. GE Capital has failed and refused to remove its equipment from the Plant purchased by Koch.

13.     GE Capital demanded, and continues to demand that Koch Foods pay Sylvest Farms' rental charges for the Equipment.

14.     If GE Capital owns the Equipment, it incurred or received a benefit from the ongoing storage of the Equipment at the Plant, and Koch Foods has incurred a detriment and/or storage costs for storing the Equipment at the Plant.

## COUNT I – DECLARATORY JUDGMENT THAT THE EQUIPMENT ARE FIXTURES OF THE PLANT, WHICH KOCH FOODS NOW OWNS

15.     Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

16.     An actual controversy exists between Koch Foods and GE Capital, and pursuant to Alabama Code § 6-6-222, this Court is empowered to declare the rights and liabilities of the

parties hereto, to adjudicate the final rights of all, and to enter such other relief as the Court deems fit and proper.

17.    GE Capital claims that it owns the Equipment.  However, because Sylvest Farms attached the Equipment to the Plant and intended the Equipment to be the fixtures of the Plant, Koch Foods, the purchaser and now the owner of the Plant, owns the Equipment as the fixtures of the Plant.

WHEREFORE, Koch Foods prays that this Court adjudicate and determine the rights and liabilities of the parties and enter a declaratory judgment pursuant to AL Code § 6-6-222 of the Alabama Code of Civil Procedure that:

(i)    The Equipment are fixtures of the Plant and Koch Foods owns the Equipment as a result of its purchase of the Plant; and

(ii)    Koch Foods is entitled to other and further relief as the Court may deem equitable and just as provided by AL Code § 6-6-231.

## COUNT II– DECLARATORY JUDGMENT THAT KOCH FOODS IS NOT LIABLE TO GE CAPTITAL UNDER THE EQUIPMENT LEASE EITHER FOR RENT OR FOR UNJUST ENRICHMENT

18.    Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

19.    An actual controversy exists between Koch Foods and GE Capital, and pursuant to Alabama Code § 6-6-222, this Court is empowered to declare the rights and liabilities of the parties hereto, to adjudicate the final rights of all, and to enter such other relief as the Court deems fit and proper.

20.    GE Capital asserts that Koch Foods is liable for and must pay the rental amounts owed under the Equipment Lease. However, because Koch Foods is not a party to the Equipment Lease and did not assume the Equipment Lease, Koch Foods is not liable to GE Capital under the Equipment Lease, either for rent or for unjust enrichment.

WHEREFORE, Koch Foods prays that this Court adjudicate and determine the rights and liabilities of the parties and enter a declaratory judgment pursuant to AL Code § 6-6-222 of the Alabama Code of Civil Procedure that:

(i)    Koch Foods is not liable to GE Capital under the Equipment Lease for rent or for unjust enrichment; and

(ii)    Koch Foods is entitled to other and further relief as the Court may deem equitable and just as provided by AL Code § 6-6-231.

## COUNT III – ALTERNATIVE DECLARATORY JUDGMENT THAT GE CAPITAL IS LIABLE TO KOCH FOODS FOR THE STORAGE COSTS

21.    Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

22.    This is an alternative claim if this Court does not determine under Count I that the Equipment was affixed to the Plant and is owned by Koch Foods.

23.    Because GE Capital left the Equipment at the Plant after Koch's purchase of the Plant, then failed to remove the Equipment from the Plant despite Koch Foods' repeated demand, Koch Foods is the bailee for hire of the Equipment.

24.    The storage costs that Koch Foods incurred in housing the Equipment entitles Koch Foods to a possessory lien on the Equipment.

25.     Koch Foods' possessory lien is superior to any other lien on the Equipment under AL Code § 7-9A-333.

WHEREFORE, Koch Foods prays that this Court adjudicate and determine the rights and liabilities of the parties and enter a declaratory judgment pursuant to AL Code § 6-6-222 of the Alabama Code of Civil Procedure that:

(i)     Koch Foods maintains a possessory lien on the Equipment for any and all storage costs that Koch Foods has incurred for housing the Equipment, and to the extent of any benefit or unjust enrichment received by GE Capital;

(ii)    Koch Foods' possessory lien on the Equipment is superior to GE Capital's ownership interest in the Equipment, if any; and

(iii)   Koch Foods is entitled to other and further relief as the Court may deem equitable and just as provided by AL Code § 6-6-231.

## COUNT IV – ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT

26.     Koch Foods realleges and incorporates Paragraphs 1 through 14 of this Complaint as if fully set forth herein.

27.     This is an alternative claim if this Court does not determine under Count I that the Equipment was affixed to the Plant and is owned by Koch Foods.

28.     Koch Foods provided storage services in maintaining and housing the Equipment for GE Capital, and incurred costs for such services.

29.     GE Capital benefited from these services, to the extent it owns the Equipment, and in equity and good conscience should be responsible and pay for these benefits.

30.     GE Capital would be unjustly enriched if the benefits it received are not paid for.

-6-

WHEREFORE, Koch Foods prays that this Court enter a judgment:

(i)     Awarding Koch Foods the value of the amount GE Capital has been unjustly enriched by the services of Koch Foods; and

(ii)    Granting such other and further relief as is just and proper.

## PLAINTIFF DEMANDS TRIAL BY JURY FOR ALL ISSUES

Dated: May 25, 2007

Koch Foods of Alabama, LLC.

By: _Mark J. Kaminsky_
Mark J. Kaminsky
Manager

By: _Thomas G. Mancuso_
Thomas G. Mancuso (MAN018)
As Attorney for Koch Foods of Alabama, LLC

Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive, Suite 301
Montgomery, Alabama  36117
(334) 481-1800

OF COUNSEL:
Eugene J. Geekie, Jr.
Mike Xu
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois 60606
(312) 258-5500

CH2\1826956.3

# Exhibit A



2/98(R090605)X11.\050984202

**\*LEAS1998\***

## MASTER LEASE AGREEMENT

dated as of _____ ("Agreement")

**THIS AGREEMENT** is between General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") and Sylvest Farms, Inc. ("Lessee"). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule ("Schedule").

**1. LEASING:**

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("Equipment") described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier ("Supplier") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

**2. TERM, RENT AND PAYMENT:**

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("Lease Commencement Date"). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and any renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($.05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

**3. RENT ADJUSTMENT:**

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("Code")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("Effective Rate") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

**4. TAXES:**

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes"). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

**5. REPORTS:**

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.



(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6. DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7. MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

## 8. STIPULATED LOSS VALUE: If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9. INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment shall be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above .

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement



by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("Claims"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("Tax Benefits") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "Loss"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("Net Economic Return"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THIS EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following: (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment, (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "Documents"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, UPON THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement or any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**General Electric Capital Corporation**

By: _____

Name: _____

Title: _____

LESSEE:
Sylvest Farms, Inc.

By: *Lyman L. Campbell*

Name: *LYMAN L. CAMPBELL*

Title: *Executive Vice President*

CS(R083004) 4171238001

# *LEAS8760*

## FOOD PROCESSING EQUIPMENT SCHEDULE
### SCHEDULE NO. 001
### DATED THIS _____
### TO MASTER LEASE AGREEMENT
### DATED AS OF _____

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("Agreement" said Agreement and this Schedule being collectively referred to as "Lease"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.    Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "Equipment").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006    De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500    Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR    Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.    Financial Terms**

| | | | |
|---|---|---|---|
| 1. | Advance Rent (if any):  Not Applicable | 5. | Basic Term Commencement Date: |
| 2. | Capitalized Lessor's Cost:  $ 2,018,453.00 | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months):  60 Months | 7. | Last Delivery Date: |
| 4. | Basic Term Lease Rate Factor:  .01757928 | 8. | Daily Lease Rate Factor:  .000468780 |

9.    First Termination Date: Thirty-six (36) months after the Basic Term Commencement Date.

10.    Interim Rent: For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on _____

11.    Basic Term Rent. Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.    Tax Benefits**    Depreciation Deductions:

1.    Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.
2.    Recovery Period: 7 years.
3.    Basis: 100 % of the Capitalized Lessor's Cost.

**D.    Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor. Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

E. **Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS D&F Equipment Sales, Inc. & Quail Corporation & MTL Installation Services (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

F. **Stipulated Loss and Termination Value Table\***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

\*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

G. **Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

I  **EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS:  In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.



(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION: The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS: In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS/ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inn. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Oasid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By:_____

Name:_____

Title:_____

LESSEE:

Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

# Exhibit B

●                    ●

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ALABAMA**
SOUTHERN DIVISION

IN RE:                                          :          CHAPTER 11
                                                :
SYLVEST FARMS, INC., et al.,                    :          CASE NOS. 06-40525
                                                :          through 06-40527
       Debtors.                                 :
                                                :          JOINTLY ADMINISTERED
                                                :

───────────────────────────────────

**ORDER ON DEBTORS' MOTION PURSUANT TO 11 U.S.C. SECTIONS 105, 363**
**AND 365 FOR ORDER AUTHORIZING (I) SALE OF CERTAIN ASSETS OF THE**
**ESTATE FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (II) APPROVAL**
**OF DESIGNATION OF RIGHTS AGREEMENT AND (III) SALE, ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN LEASES AND EXECUTORY CONTRACTS**

       This matter is before the Court upon Debtors' Motion pursuant to 11 U.S.C. §§ 105, 363

and 365 for an Order (I) Authorizing the Sale of Certain Assets of the Estates Free and Clear of

Liens, Claims and Interests, (II) Approval of Designation of Rights Agreement, and (III) Sale,

Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion")

(Docket No. 14) dated April 18, 2006 filed by Sylvest Farms, Inc., Sylvest Foods Corporation,

and Sylvest Farms Management Services, Inc., debtors and debtors-in-possession (collectively

"Debtors"). The Sale Motion seeks this Court's authorization to (a) sell substantially all of the

Debtors' assets (the "Purchased Assets") free and clear of Liens, Claims and Interests (the

"Sale") to Koch Foods of Alabama, LLC and Koch Farms of Alabama, LLC (collectively, the

"Buyer") pursuant to that certain Amended Asset Purchase Agreement dated as of April 27,

2006, by and among the Buyer and the Debtors, a copy of which has been filed in connection

with the Notice of Filing Revised Attachment to Debtors' Motion Pursuant to 11 U.S.C. Sections

105, 363 and 365 for Order Authorizing (I) Sale of Certain Assets of the Estates Free and Clear

of Liens, Claims, and Interests, (II) Approval of Designation of Rights Agreement and (III) Sale,

Assumption and Assignment of Certain Leases and Executory Contracts (including all amendments, schedules, exhibits, and agreements ancillary thereto) (the "Asset Purchase Agreement") (Docket No. 93); (b) approval of the Designation of Rights Agreement with respect to a dedicated transportation agreement with Worldwide Dedicated Services, Inc. ("WDS"), as modified herein (the "Designation of Rights Agreement") until such time as it is determined whether the Buyer will assume and assign the WDS Agreement; and (c) to assume and sell and assign to the Buyer certain executory contracts and unexpired leases that are identified on the Notice of Assumption and Assignment of Unexpired Leases or Executory Contracts (other than the contracts identified in paragraphs (d), (e), (f), (g), (h), (i), (j), and (k) therein) effective at the Closing (as such term is defined in the Asset Purchase Agreement) in accordance with Section 1.3 of the Asset Purchase Agreement (Collectively, the "Assumed Contracts").

The Court has entered an Order (I) Establishing Bidding and Auction Procedures in Connection with Proposed Sale of Certain Assets, (II) Providing Notice Thereof, and (III) Approving Form and Manner of Notice of Sale, Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Bid Procedures Order") (Docket No. 96) on April 28, 2006, pursuant to which the Court, inter alia, (i) established the date and time for the Auction to be conducted, (ii) established the date and time for the hearing on the Sale Motion (the "Sale Hearing"), (iii) approved the notice and procedures for the Auction, (iv) approved the bidding procedures substantially in the form specified in the Bid Procedures Motion, and (v) approved the form and manner of notice for the sale and assumption and assignment of executory contracts or unexpired leases, requisite notice of the Sale Motion having been provided as set forth in the Bid Procedures Order, the Sale Hearing having been held on May 26, 2006, at which time all parties-in-interest were afforded an opportunity to be heard; the Court having considered the Sale

2

Motion and the Asset Purchase Agreement; and, in accordance with Bankruptcy Rules 6004, 6006, and 9008, the Court having received evidence in support of the Sale and the Sale Motion, being advised that no other bids were received by the deadline established by the Bid Procedures Order, and having heard the arguments of counsel for the Debtors, the Buyer and various other parties in interest; all the objections to the relief requested in the Sale Motion having been withdrawn, resolved, or overruled by the court; and it appearing to the Court that, upon all of the pleadings filed with the Court and the record of the Sale Hearing before the Court, the relief requested by the Sale Motion is in the best interests of the Debtors and their respective estates,

THE COURT HEREBY FINDS that:

A.      Notice of the Sale Motion was adequate under the circumstances, and no other or further notice is necessary.

B.      On April 18, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code. The Debtors remain in possession of their assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N), and (O). The statutory and rule predicates for the relief requested herein are Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

E.      Proper, timely, adequate and sufficient notice of the Sale Motion and the Bidding Procedures Motion have been provided in accordance with the terms of the Bid Procedures

Order, and such notice constitutes due and proper notice for purposes of Sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, and 9008, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this order is required.

F.    Pursuant to the Bid Procedures Order, the deadline for Buyer to submit a bid to the Debtors was May 23, 2006. No bids were received prior to the deadline.

G.    Since the entry of the Bid Procedures Order, the only bid received by the Debtors was the bid from the Buyer who made a bid of $58,000,000, subject to certain adjustments. The procedures followed were required by the Bid Procedures Order and afforded a full, fair, and reasonable opportunity for any entity to make a higher and better offer to purchase the Purchased Assets and no higher or better offer has been made.

H.    The Debtors have complied with the procedures set forth in the Bid Procedures Order. The sale and auction process conducted by the Debtors was fair and reasonable, and conducted in good faith.

I.    A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all parties, if any, who are known to claim a property interest in or Lien (as defined in the Bankruptcy Code) upon any Purchased Asset; (b) all parties, if any, who are known to claim an interest in any Assumed Contracts; (c) all governmental taxing authorities who have, or as a result of the Sale of the Purchased Assets may have, Claims (as defined in the Bankruptcy Code), contingent or otherwise, against the Debtors; (d) all potential purchasers known to the Debtors, (e) the parties listed on all known creditors, including without limitation all creditors and other parties who have filed a Notice of Appearance in these cases; (f) the Bankruptcy Administrator for the

4

Northern District of Alabama, and (g) the Counsel to the Official Committee of Unsecured Creditors Committee.

      J.    Each of the Debtors has full corporate power and authority to execute, deliver and perform the Asset Purchase Agreement and all other documents contemplated thereby and to consummate the transactions contemplated thereby; the execution, delivery and performance by each of the Debtors of the Asset Purchase Agreement and all other documents contemplated thereby and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of each of the Debtors; no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required to consummate the Sale; and all consents and approvals necessary for the assignment of the Assumed contracts have been obtained.

      K.    The Sale is in the best interests of the Debtors and their estates. The Debtors have an adequate business justification to sell the Debtors' Assets pursuant to the terms of the Asset Purchase Agreement. Such business justification includes, but is not limited to, the following factors: (i) there is a significant risk of immediate and irreparable deterioration in the value of the Debtors' Assets if the sale is not consummated quickly; (ii) the consummation of the Asset Purchase Agreement presents the best opportunity to realize the value of the Debtors' Assets and avoid further decline and devaluation thereof; and (iii) the sale pursuant to the Asset Purchase Agreement is in the public interest, as it will result in the continued operation of the Debtors' assets and the Buyer's assumption of all obligations relating thereto. After consideration of the circumstances described in the Sale Motion, the Court determined that the procedures described in the Bid Procedures Order presented the best opportunity for the Debtors' estates to realize the highest distribution possible to creditors.

L.    In light of the Debtors compliance with the Bid Procedures Order and the absence of alternative offers other than the Asset Purchase Agreement, the Purchase Price (as defined and set forth in the Asset Purchase Agreement) constitutes fair and reasonable consideration and reasonably equivalent value for the Purchased Assets.

M.    The Debtors have, or will have on the closing of the Sale, good title to the Debtors' Assets and, accordingly, the transfer of the Debtors' Assets to the Buyer pursuant to the Asset Purchase Agreement will be a legal, valid and effective transfer of the Debtors' Assets. Notwithstanding the foregoing, and except as may be specifically provided otherwise in the Asset Purchase Agreement, the Debtors' Assets and the Assumed Contracts are being sold and assigned to the Buyer "AS IS, WHERE IS." The Debtors have made no representations or warranties as to the condition of the Purchased Assets and have specifically disclaimed any expressed or implied representation or warranty, including, without limitation, any representation or warranty related to (a) the quality, character or condition of the Purchased Assets, including without limitation the fitness or suitability for any particular trade or use or the merchantability of, any of the Purchased Assets and Assumed Contracts, (b) the compliance of the use of the Purchased Assets with any and all federal, state or local environmental or other laws or regulations, or (c) the income to be derived from, or the expense to be incurred with respect to, the Purchased Assets.

N.    As a condition to the Sale, the Buyer requires that the Purchased Assets be sold to it free and clear of all Liens, Claims and encumbrances, other than the Assumed Liabilities (which term, as used in this Order, means all liabilities or obligations which the Buyer is or may be obligated to assume and pay under the Asset Purchase Agreement and all Cure Amounts relating to Assumed Contracts), and that the Buyer shall have no liability or obligation for any

Excluded Liabilities. The Buyer would not enter into the Asset Purchase Agreement or consummate the Sale, thus adversely affecting the Debtors' estates if the Sale were not free and clear of all Liens, Claims and encumbrances, (other than the Assumed Liabilities), or if the Buyer were or would be liable for any Excluded Liabilities.

O.    Each entity with a Lien on the Debtors' Assets has consented to the Sale or is deemed to have consented to the Sale or the transfer is proper pursuant to Section 363(f) of the Bankruptcy Code.

P.    All of the actions disclosed to the Court that were taken by the Debtors, and their respective officers, directors, employees, counsel, financial advisors and other professionals in connection with the Asset Purchase Agreement and the Sale Motion have been taken in good faith. The Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code because:

(a)    The Buyer is unrelated to the Debtors;

(b)    The Buyer, the Debtors, and their respective counsel and financial advisors engaged in good faith arm's-length negotiations in arriving at the Asset Purchase Agreement; and

(c)    In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Asset Purchase Agreement, including the assumption and assignment of the Assumed Contracts, at any time after the entry of this Order and, accordingly, such closing in the face of an appeal will not deprive the Buyer of its status as a good-faith purchaser.

Q.    Except for the Assumed Liabilities expressly assumed by Buyer pursuant to the Asset Purchase Agreement, neither the Buyer nor any of its successors and assigns is assuming any of the Debtors' obligations or liabilities.

R.    There is no common identity among the Buyer's and the Debtors' incorporators, officers, directors or material stockholders.

S.    No bulk sales law or any similar law applies in any way to the transfer of the Purchased Assets under the Asset Purchase Agreement.

T.    The applicable Cure Amounts (which are to be paid by the Buyer) are the sole amounts necessary to cure any defaults by any of the Debtors under the Assumed Contracts.

U.    The Buyer has provided adequate assurance of the Buyer's future performance under the Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

V.    The assumption by the Debtors and assignment to the Buyer of the Assumed Contracts and the assumption by the Buyer of the Assumed Liabilities is in the best interest of the Debtors, their creditors, and their estates and represents a prudent exercise of the Debtors' business judgment.

W.    The transfer of the Purchased Assets and the assignment, sale and assumption of the Assumed Contracts as contemplated by the Asset Purchase Agreement (a) are or will be legal, valid, and effective transfers of property of the Debtors' estates to the Buyer, and (b) vest or will vest in the Buyer all right, title, and interest of the Debtors in and to all of the Purchased Assets and the Assumed Contracts free and clear of all Liens, Claims and encumbrances, other than the Assumed Liabilities, under Sections 363(f) and 105 of the Bankruptcy Code.

X.    All of the provisions of this Order are nonseverable and mutually dependent.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1.    The Sale Motion is granted in all respects.

8

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The provisions of the Asset Purchase Agreement and the Designation of Rights Agreement are hereby approved, as modified by this Order.  The Debtors are authorized and directed to enter into the Asset Purchase Agreement and the Designation of Rights Agreement pursuant to Sections 363(b) and (f) of the Bankruptcy Code.  The terms of the Asset Purchase Agreement and the Designation of Rights Agreement shall be enforceable by and against the Debtors and their successors and assigns, including any chapter 7 or 11 trustee appointed or elected in the Debtors' bankruptcy cases.

4.      By the issuance of this Order, each of the Debtors are authorized and directed to execute and deliver, and empowered to fully perform under, consummate and implement, the Asset Purchase Agreement and the Designation of Rights Agreement and all additional amendments, instruments, and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Designation of Rights Agreement, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to the Buyer's possession, any or all of the Purchased Assets.

5.      Section 2.3 of the Asset Purchase Agreement shall be amended by Agreement among the Buyer and the Debtor to provide for a Three Million Dollar (rather than Two Million Dollar) deposit into an escrow account.

6.      To the fullest extent permitted by law, pursuant to Sections 363(f) and 105(a) of the Bankruptcy Code, title to all of the Purchased Assets shall be transferred to the Buyer at the

Closing in accordance with the terms and conditions of the Asset Purchase Agreement (or thereafter as provided therein), free and clear of all Liens, Claims and encumbrances (including, without limitation all post-petition obligations and liabilities of the Debtors), other than the Assumed Liabilities, with all such Liens, Claims, encumbrances, obligations and liabilities released, terminated and discharged as to the Buyer (and its successors and assigns) and the Purchased Assets. All Claims, Liens and encumbrances will attach to the proceeds from the Sale, in the order of their priority, with the same validity, force, and effect that they had against the Purchased Assets immediately prior to the Sale; provided, however, that the rights and priorities of alleged materialmen's liens of Horn Enterprises and Cimco Refrigerator as they existed immediately prior to the Petition Date, shall be preserved in and to the sale proceeds. This Court shall determine their amounts and priorities.

7.    The following amounts shall be distributed by the Debtors at the Closing: (i) $35,880,000 to Wachovia Bank, N.A. ("Wachovia"), to be applied under the Debtor-in-Possession Credit and Security Agreement dated April 18, 2006 (the "DIP Credit Agreement") which was approved by that certain Final Order (1) Authorizing Debtors-in-Possession to Obtain Financing, Grant Priority Security Interests and Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); and (2) Modifying Automatic Stay (the "DIP Financing Order") (Docket No. 283), to pay the Obligations (as defined in the DIP Credit Agreement, including all unpaid fees and loans), (ii) $1,000,000 from amounts loaned under the DIP Credit Agreement to pay the Carve-Out described in paragraph 8(b) of the DIP Financing Order for all of the reasonable hourly fees and expenses (as determined by the Bankruptcy Court) incurred by the Debtors' Professionals and Committee Counsel prior to the Closing, which funds shall be held in a Baker & Hostetler LLP trust account solely for purposes of paying the foregoing professional fees and

10

expenses consistent with Court Order concerning the payment of those fees and expenses, (iii) $659,250 to a segregated bank account to pay the Carve-Out described in paragraph 8(a)(a), 8(a)(d) and 8(a)(e) of the DIP Financing Order, (iv) $3,000,000 to fund the Escrow Account contemplated by Section 2.3 of the Asset Purchase Agreement, (v) $802,000 to a segregated bank account to pay the "Retention/Success Fee Payable" as contemplated by Section 5.3 of the Asset Purchase Agreement, and (vi) the balance of the sales proceeds (less all actual and normal charges, costs, and expenses attendant to the Sale which are to be paid or reserved for at Closing by the Debtors from the gross sale proceeds) to be provisionally paid to Wachovia in payment of its pre-petition secured claims. Wachovia shall provisionally apply the amount described in 7(vi) above to its pre-petition secured claims, subject to all rights and remedies of the Debtors and their estates under the Bankruptcy Code and applicable law, including any right they may have to seek a Court order requiring disgorgement of such funds. By accepting a provisional distribution, Wachovia shall be deemed to have submitted to the jurisdiction of this Court in respect of any action to recover such distribution. The allocation of sale proceeds and payments to Wachovia provided in paragraph 7(vi) shall be provisional and shall not constitute a determination of this Court, or otherwise be construed as an admission by any party, as to the final allocation of such sale proceeds or of the extent, validity or priority of Wachovia's Liens and Claims.

8.    All persons and entities holding Liens and Claims of any kind and nature with respect to the Purchased Assets or the Debtors hereby are barred from asserting such Liens and Claims against the Buyer, its successors and assigns, or against the Purchased Assets.

9.    The Debtors are hereby authorized and directed in accordance with Section 365 of the Bankruptcy Code to (a) assume, sell and assign to the Buyer each of the Assumed

11

Contracts free and clear of all Liens, Claims and encumbrances, other than Cure Amounts included in the Assumed Liabilities, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

10.     The Assumed Contracts shall, upon assignment to the Buyer and the payment of the applicable Cure Amounts, be valid and binding and in full force and effect and enforceable in accordance with their respective terms.

11.     If any defaults under any Assumed Contracts or any objections to any applicable Cure Amounts existing as of the date of the Sale Hearing have not been raised or asserted prior to the Sale Hearing, the non-debtor parties to each such Assumed Contract are hereby barred and enjoined from asserting against the Debtors or the Buyer (and their respective successors and assigns) any such defaults or objections. The Buyer shall pay any amounts accruing under the Assumed Contracts on or after the date of the Sale Hearing.

12.     If any person or entity that has filed any mortgages, deeds of trust, financing statements, or other documents or agreements evidencing Liens on any Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to any Purchased Assets, then the Buyer hereby is authorized to execute and file statements, instruments, releases, and other documents on behalf of the person or entity with respect to such Purchased Assets, provided that, in respect of the Wachovia's Liens, the Buyer shall consult with Wachovia's counsel in the preparation of any such documents. The foregoing notwithstanding, the provisions of the Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, Claims and encumbrances (other

12

than the Assumed Liabilities) shall be self-executing, and notwithstanding the failure of any of the Debtors, the Buyer, or any other party to execute, file or obtain releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof or the Asset Purchase Agreement with respect to the sale and assignment of the Purchased Assets, all Liens on the Purchased Assets shall be deemed divested, void and unenforceable. All persons or entities who are presently, or at any time hereafter prior to the transfer to the Buyer, in possession of any of the Purchased Assets are hereby directed to surrender possession of any of the Purchased Assets to the Buyer at the Closing.

13.     This Order shall be binding upon the Debtors, their respective successors and assigns and any trustee that may be appointed in these cases or in any case under Chapter 7 of the Bankruptcy Code to which any such case may be converted, and any affected third parties, including without limitation all non-Debtor parties to any Assumed Contracts, all persons and entities asserting any Claims against or interests in the Debtors' estates or any of the Purchased Assets, and all other persons and entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law or by the duties of their office or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Purchased Assets.

14.     Upon the Closing, the Buyer shall assume the Assumed Liabilities in accordance with the terms of the Asset Purchase Agreement. Other than the Assumed Liabilities, none of the Buyer, its successors and assigns, or any affiliate of such entity shall have

any liability, duty or responsibility for any Claims, administrative expenses, or other liabilities against the Debtors or any of the Debtors' predecessors or affiliates of any kind or character, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent.

15.    From and after entry of this Order, no Debtor or any of its respective creditors or other parties in interest shall take or cause to be taken any action that would interfere with the transfer of the Purchased Assets to the Buyer in accordance with the terms of this Order.

16.    The Buyer is a purchaser in good faith of the Purchased Assets and the Assumed Contracts and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

17.    In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Asset Purchase Agreement, including the assumption, sale and assignment of the Assumed Contracts, at any time after the entry of this Order and, accordingly, such closing in the face of an appeal will not deprive the Buyer of its status as a good-faith purchaser. If the parties to the Sale consummate the transactions contemplated thereby while an appeal of this Order is pending, the Buyer shall be entitled to rely upon the protections of Section 363(m) of the Bankruptcy Code, absent any stay pending appeal granted by a court of competent jurisdiction prior to such consummation.

18.    As of the time and date of the Closing, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the Sale and the other transactions contemplated by the Asset Purchase Agreement.

14

19.     This Court retains jurisdiction to (i) enforce and implement the terms and provisions of the Asset Purchase Agreement and the Designation of Rights Agreement, all amendments thereto and any waivers and consents thereunder, (ii) compel delivery of the Purchased Assets to the Buyer, (iii) resolve any disputes arising under or related to the Asset Purchase Agreement and Designation of Rights Agreement, except as otherwise provided therein, and (iv) interpret, implement and enforce the provisions of this Order.

20.     The Asset Purchase Agreement and Designation of Rights Agreement and any related agreements, documents, or other instruments may be waived, modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such waiver, modification, amendment, or supplement (a) does not adversely affect either of the Debtors or their estates, or (b) is agreed to in writing by the Debtors and the Committee.

21.     Nothing contained in any plan of reorganization (or liquidation) confirmed in any of the Debtors' cases or the Order of Confirmation confirming any plan of reorganization (or liquidation), or any Order dismissing any of the Debtors' cases or converting any of the Debtors' cases to a Chapter 7 liquidation, shall conflict with or derogate from the provisions of the Asset Purchase Agreement, the Designation of Rights Agreement or the terms of this Order. Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any Order which may be entered confirming any plan of reorganization (or liquidation) for the Debtors or converting any of the Debtors' cases from Chapter 11 to a case under Chapter 7 of the Bankruptcy Code.

22. In the event that there are any inconsistencies between the terms of this Order, the Asset Purchase Agreement, and the Designation Rights Agreement, the provisions of this Order shall control.

23. No later than the Closing, the Buyer makes a cash deposit with WDS, for the benefit of WDS in the amount of $250,000 to secure the Buyer's payment obligations under the terms of the WDS Agreement with such deposit to bear interest at the rate of five percent per annum. Such deposit shall be promptly paid to Buyer with accrued interest upon the expiration of the Designation of Rights Agreement, should no amounts remain owing to WDS by Buyer under the WDS Agreement.

24. During the Designation Period under the Designation of Rights Agreement, the Buyer (i) shall have the sole, exclusive, and continuing right to receive all services under the WDS Agreement and to determine whether the Debtors shall assume and assign the WDS Agreement to the Buyer or its designee(s) or reject such agreement, and (ii) shall perform all obligations of the Debtors under the terms of the WDS Agreement, inlcuding all payment obligations required thereunder, and WDS shall perform all obligations it has under the terms of the WDS Agreement.

25. The Designation Period shall consist of a period of thirty (30) days beginning on the Closing Date. Prior to the conclusion of the Designation Period, the Buyer shall deliver to WDS and the Debtors a written notice specifying whether the Buyer has designated that the Debtors either (i) assume the WDS Agreement and assign such agreement to the Buyer or its designee(s), or (ii) reject the WDS Agreement.

26. In the event that the Buyer has designated the WDS Agreement for assumption and assignment, (i) the Buyer and the Debtors promptly shall cause a Designation Motion to be

16

filed seeking such assumption and assignment and shall continue to perform all obligations of the Debtors under the terms of the WDS Agreement until the entry of on order by the Bankruptcy Court approving such Designation Motion (the "Approval Order"), and (ii) WDS shall perform its obligations under the terms of the WDS Agreement. Upon entry of the Approval Order, the Buyer immediately shall (1) pay any cure amounts agreed to by WDS or determined by the Bankruptcy Court, and (2) provide a deposit as specified in paragraph 23 above. If the Buyer has elected to require that the WDS Agreement be assigned to a designee, then WDS reserves the right to seek a letter of credit or deposit in a greater amount or such additional adequate assurance as the Bankruptcy Court may order.

27. In the event that the Buyer has designated the WDS Agreement for rejection, or the Buyer has failed to provide written notice as specified above, then the Buyer shall continue to perform all of the Debtors' obligations under the WDS Agreement for an additional period of sixty (60) days (including all payment obligations that relate to the performance by WDS during such period); at the conclusion of such period, the WDS Agreement shall be deemed rejected. Upon such rejection, WDS shall have all of its rights to file a rejection damages claim pursuant to the provisions of the Bankruptcy Code, and no provision of either the Asset Purchase Agreement or the Designation of Rights Agreement shall limit such rejection damages claim.

28. In connection with the performance of its duties under the WDS Agreement, WDS from time to time purchased fuel from the Debtors; as of the Petition Date, WDS owed certain amounts to the Debtors for such fuel purchases (the "WDS/Sylvest Receivable"), and the Debtors owed certain amounts to WDS for its performance under the terms of the WDS Agreement (the "WDS/Sylvest Payable"). Simultaneously with the entry of this Order, the Bankruptcy Court has entered an order approving a stipulation between WDS and the Debtors

17

(the "WDS Agreement") approving and effectuating the recoupment or setoff of the WDS/Sylvest Receivable against the WDS/Sylvest Payable. The Sale Motion and the WDS Response and Limited Objection to the Sale Motion (Docket No. 257) were sufficient, pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, to afford reasonable notice of the material provisions of the WDS Agreement and an opportunity for a hearing, and therefore the procedures in Rule 4001(d)(1)-(3) shall not apply to the WDS Agreement.

29.   Notwithstanding anything which is, or which could be construed to be, to the contrary in this Order, the Asset Purchase Agreement, the Designation of Rights Agreement, or otherwise, (i) the sale to the Buyer is not free and clear of the claims, rights of setoff or recoupment, defense, counterclaim, cross-claim or interest of WDS of any kind or nature, arising after the Petition Date, if any, and whether arising under any contract, tort, law, equity or otherwise (collectively, the "Rights"), but it is explicitly subject to any and all such Rights, if any, and (ii) such Rights are neither extinguished (or otherwise diminished) or enhanced by this Order and such Rights survive with the same validity, force, effect, and extent as existed prior to the sale contemplated by the Asset Purchase Agreement.

30.   Upon receiving notice as provided in section 12.15(a) of the Asset Purchase Agreement of the Buyer's intent to destroy business records or documents purchased from Debtors, the Debtors' (or their successors) shall file such notice with the court within fifteen (15) days of receipt of such notice. Further, any party who objects to the destruction of any such business records or documents, shall provide written notice to Debtors (or their successors) and Buyer within the 90 day period set forth in section 12.15(a) of the Amended Asset Purchase Agreement, indicating the objecting party's desire to take possession and ownership of any documents or records to be destroyed, and, absent objection, at the end of the 90 day period, the

party shall take possession and ownership in accordance with section 12.15(a). If there is any dispute as to who can take possession and ownership of such documents or records, the dispute shall be submitted to the Court.

31.    The Closing of the Sale shall occur on Wednesday, May 31, 2006 in Alabama. The Accounting Date for purposes of Section 2.4 of the Asset Purchase Agreement shall be Sunday, May 28, 2006. The Buyer shall be responsible for funding all operating costs of the Debtors (including insurance) from the day after Accounting Date until the Closing, and all gains or losses resulting from the day after Accounting Date until the Closing shall inure to the benefit or detriment, as applicable, of Buyer. Notwithstanding the foregoing, the Debtor shall have title to the Purchased Asset and shall remain in possession and control of the Purchased Assets until the Closing.

32.    As provided by Bankruptcy Rule 6004(g), this Order shall be effective and enforceable immediately upon entry. The Objection of National Warehouse, Inc. is overruled to the extent it is an objection to the sale. All other objections to the sale have been withdrawn.

Dated: May 26, 2006

/s/ Thomas B. Bennett
United States Bankruptcy Judge

19

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Sylvest Farms, Inc., et al., | ) | Case Nos. 06 B 40525 through |
| | ) | 06 B 40527 |
| | ) | Jointly Administered |
| Debtor. | ) | |
| | ) | Chapter 11 |
| | ) | |

**GENERAL ELECTRIC CAPITAL CORPORATION'S OBJECTION TO ASSUMPTION,
ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO ASSUMED CONTRACT**

General Electric Capital Corporation ("GECC"), by and through its undersigned counsel,

and pursuant to 11 U.S.C. § 365(b), hereby objects to the Debtors' Motion Pursuant to 11 U.S.C.

Sections 105, 363, and 365 for Order Authorizing (I) Sale of Certain Assets of the Estates Free

and Clear of Liens, Claims and Interests, (II) Approval of Designation Of Rights Agreement and

(III) Sale, Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale

Motion") filed on or about April 18, 2006, and in support thereof states as follows:

I.    **Factual Background**

1.    On or about December 29, 2005, GECC and Sylvest Farms, Inc. ("Sylvest")

executed a certain Master Lease Agreement (the "Master Lease") pursuant to which GECC

leased to Sylvest certain equipment defined more fully on Schedule 001 ("Schedule 1") to the

Master Lease (hereinafter, the Master Lease and Schedule 1 are collectively referred to as the

"GECC Lease").  A copy of the GECC Lease is attached hereto as Exhibit A.

2.     On April 18, 2006, Sylvest, along with Sylvest Foods Corporation and Sylvest Farms Management Services, Inc. (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.     On that same date, the Debtors filed the Sale Motion seeking, *inter alia,* to assume, and thereafter assign, certain executory contracts.  The executory contracts which the Debtors will ultimately assume and assign were not designated in the Sale Motion, and instead will be selected by the successful buyer of the Debtors' assets at a later date.

4.     On or about April 28, 2006, this Court entered the Order (I) Establishing Bidding and Auction Procedures In Connection With Proposed Sale of Certain Assets (II) Providing Notice Thereof, and (III) Approving Form and Manner of Notice of Sale, Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Bid Procedures Order").

5.     The Bid Procedures Order provides that:

"On or before May 3, 2006, . . . the Debtors shall serve on all non-Debtor parties to unexpired leases and executory contracts . . . a notice . . . of the Debtors' intent to sell, assume and assign that party's Assumed Contract . . . and (ii) the Debtors' calculation of the amount outstanding under the Assumed Contract, including all arrearages, amounts that will accrue as of the date of the sale, assumption and assignment of the Assumed Contract, and any such other amounts required to be paid for the Assumed Contract to be assumed and assigned under Section 365 of the Bankruptcy Code (the "Cure Amount")."

Bid Procedures Order, ¶ 18.

6.     GECC has either not received, or has been unable to locate, any notice regarding the proposed Cure Amount with respect to the possible assumption and assignment of the GECC Lease.

7.     The Bid Procedures Order provides that the deadline for objecting to the Debtors' proposed Cure Amount is May 19, 2006.  As such, in the interest of preserving its rights, GECC objects to the Sale Motion to the extent that the proposed Cure Amount with respect to the GECC Lease is anything less than $39,402.27.

8.     This amount arises from the following: (i) an obligation of $32,485.92, which came due under the GECC Lease on May 3, 2006 and has not yet been paid; (ii) $1,419.32 in sales tax, also due under the GECC Lease; and (iii) $2,500 in legal expenses incurred to date.

9.     To the extent the Cure Amount proposed by the Debtors with respect to the GECC Lease is less than this amount, GECC hereby objects to the Sale Motion and requests that the Cure Amount be modified to reflect the $39,402.27 that remains outstanding under the GECC Lease, and which GECC should be paid before the GECC Lease can be assumed and assigned.

Dated: May 18, 2006              Respectfully submitted,

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____
            One of its Attorneys

Alexander Terras (ARDC # 2810700)
Ann E. Pille (ARDC # 6283759)
DLA PIPER RUDNICK GRAY CARY US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516

3

EXHIBIT A

2/98(R090605) 1 1 050984202                                                    *LEAS1998*

## MASTER LEASE AGREEMENT
### dated as of __12|29|05__ ("Agreement")

**THIS AGREEMENT** is between General Electric Capital Corporation (together with its successors and assigns, if any, **"Lessor"**) and Sylvest Farms, Inc. (**"Lessee"**). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule (**"Schedule"**).

### 1. LEASING:

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property (**"Equipment"**) described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier (**"Supplier"**) and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

### 2. TERM, RENT AND PAYMENT:

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance (**"Lease Commencement Date"**). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($ .05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

### 3. RENT ADJUSTMENT:

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, (**"Code"**)), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers (**"Effective Rate"**) is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

### 4. TAXES:

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively **"Taxes"**). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

### 5. REPORTS:

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6.  DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7.  MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

8.  STIPULATED LOSS VALUE:  If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9.  INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above .

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct (**"Claims"**). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule (**"Tax Benefits"**) in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a **"Loss"**), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail each Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction (**"Net Economic Return"**). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the **"Documents"**). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("**Termination Date**"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement or any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: ____ JOHN C. SUTEHALL _____
                SENIOR RISK ANALYST

Title: _____

LESSEE:

Sylvest Farms, Inc.

By: _____

Name: _____ LYMAN L. CAMPBELL _____

Title: ____ Executive Vice President ____

CS(R083004) 4171238001

*LEAS8760*

## FOOD PROCESSING EQUIPMENT SCHEDULE
### SCHEDULE NO. 001
DATED THIS ___12/29/05___
TO MASTER LEASE AGREEMENT
DATED AS OF ___12/29/05___

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("Agreement" said Agreement and this Schedule being collectively referred to as "Lease"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A. Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "**Equipment**").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006      De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500       Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR      Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd.,  Montgomery, Montgomery County, AL 36108

## B.    Financial Terms

| | | | | |
|---|---|---|---|---|
| 1. | Advance Rent (if any):  Not Applicable | | 5. | Basic Term Commencement Date: 2/1/06 |
| 2. | Capitalized Lessor's Cost: $ 2,018,453.00 | | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months): 60 Months. | | 7. | Last Delivery Date: 12/29/05 |
| 4. | Basic Term Lease Rate Factor: .01757928 | | 8. | Daily Lease Rate Factor: .000468780 |

9.    First Termination First: **Thirty-six (36)** months after the Basic Term Commencement Date.

10.   Interim Rent: For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on ___2/1/06___.

11.   Basic Term Rent.  Commencing on ___2/3/06___ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

## C.    Tax Benefits          Depreciation Deductions:

1.    Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.

2.    Recovery Period: **7 years**.

3.    Basis: 100 % of the Capitalized Lessor's Cost.

## D.    Property Tax

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor.  Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense.  Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

**E.    Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS **D&F Equipment Sales, Inc. & Osuid Corporation & MTL Installation Services (THE "SUPPLIER(S)")**, (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

**F.    Stipulated Loss and Termination Value Table\***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

\*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

**G.    Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

**1    EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS:  In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.

(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION: The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS: In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS/ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: _____JOHN C. SUTEHALL_____

Title: _____SENIOR RISK ANALYST_____

LESSEE:

Sylvest Farms, Inc.

By: _____

Name: _____LYMAN L. CAMPBELL_____

Title: _____Executive Vice President_____

## CERTIFICATE OF SERVICE

Ann E. Pille, an attorney, certifies that on May 18, 2006, she caused *General Electric Capital Corporation's Objection To Assumption, Assignment and Cure Amount With Respect to Assumed Contract* (the "Objection") to be filed with the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, by mailing a copy, via FedEx, to:

United States Bankruptcy Court, Southern Division
Office of the Clerk
1800 5th Avenue North
Birmingham, AL 35203

In addition, copies of the Objection were mailed via electronic mail to the following on May 18, 2006:

**Richard A Robinson**
Baker & Hostetler LLP
Email: rrobinson@bakerlaw.com

**Eric S. Golden**
Baker & Hostetler, LLP
Email: egolden@bakerlaw.com

**R. Scott Williams**
Haskell Slaughter Young & Rediker, LLC
Email: rsw@hsy.com

**Thomas G. Mancuso**
Mancuso & Franco, P.C.
tgm@mancusofranco.com

_____
Ann E. Pille

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| SYLVEST FARMS, INC., et al., | : | CASE NOS. 06-40525 |
| | : | through 06-40527 |
| Debtors. | : | |
| | : | JOINTLY ADMINISTERED |
| | : | |

**ORDER ON DEBTORS' MOTION PURSUANT TO 11 U.S.C. SECTIONS 105, 363 AND 365 FOR ORDER AUTHORIZING (I) SALE OF CERTAIN ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (II) APPROVAL OF DESIGNATION OF RIGHTS AGREEMENT AND (III) SALE, ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES AND EXECUTORY CONTRACTS**

This matter is before the Court upon Debtors' Motion pursuant to 11 U.S.C. §§ 105, 363 and 365 for an Order (I) Authorizing the Sale of Certain Assets of the Estates Free and Clear of Liens, Claims and Interests, (II) Approval of Designation of Rights Agreement, and (III) Sale, Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion") (Docket No. 14) dated April 18, 2006 filed by Sylvest Farms, Inc., Sylvest Foods Corporation, and Sylvest Farms Management Services, Inc., debtors and debtors-in-possession (collectively "Debtors"). The Sale Motion seeks this Court's authorization to (a) sell substantially all of the Debtors' assets (the "Purchased Assets") free and clear of Liens, Claims and Interests (the "Sale") to Koch Foods of Alabama, LLC and Koch Farms of Alabama, LLC (collectively, the "Buyer") pursuant to that certain Amended Asset Purchase Agreement dated as of April 27, 2006, by and among the Buyer and the Debtors, a copy of which has been filed in connection with the Notice of Filing Revised Attachment to Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363 and 365 for Order Authorizing (I) Sale of Certain Assets of the Estates Free and Clear of Liens, Claims, and Interests, (II) Approval of Designation of Rights Agreement and (III) Sale,

Assumption and Assignment of Certain Leases and Executory Contracts (including all amendments, schedules, exhibits, and agreements ancillary thereto) (the "Asset Purchase Agreement") (Docket No. 93); (b) approval of the Designation of Rights Agreement with respect to a dedicated transportation agreement with Worldwide Dedicated Services, Inc. ("WDS"), as modified herein (the "Designation of Rights Agreement") until such time as it is determined whether the Buyer will assume and assign the WDS Agreement; and (c) to assume and sell and assign to the Buyer certain executory contracts and unexpired leases that are identified on the Notice of Assumption and Assignment of Unexpired Leases or Executory Contracts (other than the contracts identified in paragraphs (d), (e), (f), (g), (h), (i), (j), and (k) therein) effective at the Closing (as such term is defined in the Asset Purchase Agreement) in accordance with Section 1.3 of the Asset Purchase Agreement (Collectively, the "Assumed Contracts").

The Court has entered an Order (I) Establishing Bidding and Auction Procedures in Connection with Proposed Sale of Certain Assets, (II) Providing Notice Thereof, and (III) Approving Form and Manner of Notice of Sale, Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Bid Procedures Order") (Docket No. 96) on April 28, 2006, pursuant to which the Court, inter alia, (i) established the date and time for the Auction to be conducted, (ii) established the date and time for the hearing on the Sale Motion (the "Sale Hearing"), (iii) approved the notice and procedures for the Auction, (iv) approved the bidding procedures substantially in the form specified in the Bid Procedures Motion, and (v) approved the form and manner of notice for the sale and assumption and assignment of executory contracts or unexpired leases, requisite notice of the Sale Motion having been provided as set forth in the Bid Procedures Order, the Sale Hearing having been held on May 26, 2006, at which time all parties-in-interest were afforded an opportunity to be heard; the Court having considered the Sale

2

Motion and the Asset Purchase Agreement; and, in accordance with Bankruptcy Rules 6004, 6006, and 9008, the Court having received evidence in support of the Sale and the Sale Motion, being advised that no other bids were received by the deadline established by the Bid Procedures Order, and having heard the arguments of counsel for the Debtors, the Buyer and various other parties in interest; all the objections to the relief requested in the Sale Motion having been withdrawn, resolved, or overruled by the court; and it appearing to the Court that, upon all of the pleadings filed with the Court and the record of the Sale Hearing before the Court, the relief requested by the Sale Motion is in the best interests of the Debtors and their respective estates,

THE COURT HEREBY FINDS that:

A.     Notice of the Sale Motion was adequate under the circumstances, and no other or further notice is necessary.

B.     On April 18, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code. The Debtors remain in possession of their assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N), and (O). The statutory and rule predicates for the relief requested herein are Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

E.     Proper, timely, adequate and sufficient notice of the Sale Motion and the Bidding Procedures Motion have been provided in accordance with the terms of the Bid Procedures

Order, and such notice constitutes due and proper notice for purposes of Sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, and 9008, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this order is required.

F.    Pursuant to the Bid Procedures Order, the deadline for Buyer to submit a bid to the Debtors was May 23, 2006. No bids were received prior to the deadline.

G.    Since the entry of the Bid Procedures Order, the only bid received by the Debtors was the bid from the Buyer who made a bid of $58,000,000, subject to certain adjustments. The procedures followed were required by the Bid Procedures Order and afforded a full, fair, and reasonable opportunity for any entity to make a higher and better offer to purchase the Purchased Assets and no higher or better offer has been made.

H.    The Debtors have complied with the procedures set forth in the Bid Procedures Order. The sale and auction process conducted by the Debtors was fair and reasonable, and conducted in good faith.

I.    A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all parties, if any, who are known to claim a property interest in or Lien (as defined in the Bankruptcy Code) upon any Purchased Asset; (b) all parties, if any, who are known to claim an interest in any Assumed Contracts; (c) all governmental taxing authorities who have, or as a result of the Sale of the Purchased Assets may have, Claims (as defined in the Bankruptcy Code), contingent or otherwise, against the Debtors; (d) all potential purchasers known to the Debtors, (e) the parties listed on all known creditors, including without limitation all creditors and other parties who have filed a Notice of Appearance in these cases; (f) the Bankruptcy Administrator for the

4

Northern District of Alabama, and (g) the Counsel to the Official Committee of Unsecured Creditors Committee.

   J.  Each of the Debtors has full corporate power and authority to execute, deliver and perform the Asset Purchase Agreement and all other documents contemplated thereby and to consummate the transactions contemplated thereby; the execution, delivery and performance by each of the Debtors of the Asset Purchase Agreement and all other documents contemplated thereby and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of each of the Debtors; no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required to consummate the Sale; and all consents and approvals necessary for the assignment of the Assumed contracts have been obtained.

   K.  The Sale is in the best interests of the Debtors and their estates. The Debtors have an adequate business justification to sell the Debtors' Assets pursuant to the terms of the Asset Purchase Agreement. Such business justification includes, but is not limited to, the following factors: (i) there is a significant risk of immediate and irreparable deterioration in the value of the Debtors' Assets if the sale is not consummated quickly; (ii) the consummation of the Asset Purchase Agreement presents the best opportunity to realize the value of the Debtors' Assets and avoid further decline and devaluation thereof; and (iii) the sale pursuant to the Asset Purchase Agreement is in the public interest, as it will result in the continued operation of the Debtors' assets and the Buyer's assumption of all obligations relating thereto. After consideration of the circumstances described in the Sale Motion, the Court determined that the procedures described in the Bid Procedures Order presented the best opportunity for the Debtors' estates to realize the highest distribution possible to creditors.

L.    In light of the Debtors compliance with the Bid Procedures Order and the absence of alternative offers other than the Asset Purchase Agreement, the Purchase Price (as defined and set forth in the Asset Purchase Agreement) constitutes fair and reasonable consideration and reasonably equivalent value for the Purchased Assets.

M.    The Debtors have, or will have on the closing of the Sale, good title to the Debtors' Assets and, accordingly, the transfer of the Debtors' Assets to the Buyer pursuant to the Asset Purchase Agreement will be a legal, valid and effective transfer of the Debtors' Assets. Notwithstanding the foregoing, and except as may be specifically provided otherwise in the Asset Purchase Agreement, the Debtors' Assets and the Assumed Contracts are being sold and assigned to the Buyer "AS IS, WHERE IS." The Debtors have made no representations or warranties as to the condition of the Purchased Assets and have specifically disclaimed any expressed or implied representation or warranty, including, without limitation, any representation or warranty related to (a) the quality, character or condition of the Purchased Assets, including without limitation the fitness or suitability for any particular trade or use or the merchantability of, any of the Purchased Assets and Assumed Contracts, (b) the compliance of the use of the Purchased Assets with any and all federal, state or local environmental or other laws or regulations, or (c) the income to be derived from, or the expense to be incurred with respect to, the Purchased Assets.

N.    As a condition to the Sale, the Buyer requires that the Purchased Assets be sold to it free and clear of all Liens, Claims and encumbrances, other than the Assumed Liabilities (which term, as used in this Order, means all liabilities or obligations which the Buyer is or may be obligated to assume and pay under the Asset Purchase Agreement and all Cure Amounts relating to Assumed Contracts), and that the Buyer shall have no liability or obligation for any

6

Excluded Liabilities. The Buyer would not enter into the Asset Purchase Agreement or consummate the Sale, thus adversely affecting the Debtors' estates if the Sale were not free and clear of all Liens, Claims and encumbrances, (other than the Assumed Liabilities), or if the Buyer were or would be liable for any Excluded Liabilities.

O.    Each entity with a Lien on the Debtors' Assets has consented to the Sale or is deemed to have consented to the Sale or the transfer is proper pursuant to Section 363(f) of the Bankruptcy Code.

P.    All of the actions disclosed to the Court that were taken by the Debtors, and their respective officers, directors, employees, counsel, financial advisors and other professionals in connection with the Asset Purchase Agreement and the Sale Motion have been taken in good faith. The Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code because:

> (a)    The Buyer is unrelated to the Debtors;
>
> (b)    The Buyer, the Debtors, and their respective counsel and financial advisors engaged in good faith arm's-length negotiations in arriving at the Asset Purchase Agreement; and
>
> (c)    In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Asset Purchase Agreement, including the assumption and assignment of the Assumed Contracts, at any time after the entry of this Order and, accordingly, such closing in the face of an appeal will not deprive the Buyer of its status as a good-faith purchaser.

Q.    Except for the Assumed Liabilities expressly assumed by Buyer pursuant to the Asset Purchase Agreement, neither the Buyer nor any of its successors and assigns is assuming any of the Debtors' obligations or liabilities.

R.    There is no common identity among the Buyer's and the Debtors' incorporators, officers, directors or material stockholders.

S.    No bulk sales law or any similar law applies in any way to the transfer of the Purchased Assets under the Asset Purchase Agreement.

T.    The applicable Cure Amounts (which are to be paid by the Buyer) are the sole amounts necessary to cure any defaults by any of the Debtors under the Assumed Contracts.

U.    The Buyer has provided adequate assurance of the Buyer's future performance under the Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

V.    The assumption by the Debtors and assignment to the Buyer of the Assumed Contracts and the assumption by the Buyer of the Assumed Liabilities is in the best interest of the Debtors, their creditors, and their estates and represents a prudent exercise of the Debtors' business judgment.

W.    The transfer of the Purchased Assets and the assignment, sale and assumption of the Assumed Contracts as contemplated by the Asset Purchase Agreement (a) are or will be legal, valid, and effective transfers of property of the Debtors' estates to the Buyer, and (b) vest or will vest in the Buyer all right, title, and interest of the Debtors in and to all of the Purchased Assets and the Assumed Contracts free and clear of all Liens, Claims and encumbrances, other than the Assumed Liabilities, under Sections 363(f) and 105 of the Bankruptcy Code.

X.    All of the provisions of this Order are nonseverable and mutually dependent.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1.    The Sale Motion is granted in all respects.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits.

3.    The provisions of the Asset Purchase Agreement and the Designation of Rights Agreement are hereby approved, as modified by this Order. The Debtors are authorized and directed to enter into the Asset Purchase Agreement and the Designation of Rights Agreement pursuant to Sections 363(b) and (f) of the Bankruptcy Code. The terms of the Asset Purchase Agreement and the Designation of Rights Agreement shall be enforceable by and against the Debtors and their successors and assigns, including any chapter 7 or 11 trustee appointed or elected in the Debtors' bankruptcy cases.

4.    By the issuance of this Order, each of the Debtors are authorized and directed to execute and deliver, and empowered to fully perform under, consummate and implement, the Asset Purchase Agreement and the Designation of Rights Agreement and all additional amendments, instruments, and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Designation of Rights Agreement, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to the Buyer's possession, any or all of the Purchased Assets.

5.    Section 2.3 of the Asset Purchase Agreement shall be amended by Agreement among the Buyer and the Debtor to provide for a Three Million Dollar (rather than Two Million Dollar) deposit into an escrow account.

6.    To the fullest extent permitted by law, pursuant to Sections 363(f) and 105(a) of the Bankruptcy Code, title to all of the Purchased Assets shall be transferred to the Buyer at the

Closing in accordance with the terms and conditions of the Asset Purchase Agreement (or thereafter as provided therein), free and clear of all Liens, Claims and encumbrances (including, without limitation all post-petition obligations and liabilities of the Debtors), other than the Assumed Liabilities, with all such Liens, Claims, encumbrances, obligations and liabilities released, terminated and discharged as to the Buyer (and its successors and assigns) and the Purchased Assets. All Claims, Liens and encumbrances will attach to the proceeds from the Sale, in the order of their priority, with the same validity, force, and effect that they had against the Purchased Assets immediately prior to the Sale; provided, however, that the rights and priorities of alleged materialmen's liens of Horn Enterprises and Cimco Refrigerator as they existed immediately prior to the Petition Date, shall be preserved in and to the sale proceeds. This Court shall determine their amounts and priorities.

7.     The following amounts shall be distributed by the Debtors at the Closing: (i) $35,880,000 to Wachovia Bank, N.A. ("Wachovia"), to be applied under the Debtor-in-Possession Credit and Security Agreement dated April 18, 2006 (the "DIP Credit Agreement") which was approved by that certain Final Order (1) Authorizing Debtors-in-Possession to Obtain Financing, Grant Priority Security Interests and Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); and (2) Modifying Automatic Stay (the "DIP Financing Order") (Docket No. 283), to pay the Obligations (as defined in the DIP Credit Agreement, including all unpaid fees and loans), (ii) $1,000,000 from amounts loaned under the DIP Credit Agreement to pay the Carve-Out described in paragraph 8(b) of the DIP Financing Order for all of the reasonable hourly fees and expenses (as determined by the Bankruptcy Court) incurred by the Debtors' Professionals and Committee Counsel prior to the Closing, which funds shall be held in a Baker & Hostetler LLP trust account solely for purposes of paying the foregoing professional fees and

expenses consistent with Court Order concerning the payment of those fees and expenses, (iii) $659,250 to a segregated bank account to pay the Carve-Out described in paragraph 8(a)(a), 8(a)(d) and 8(a)(e) of the DIP Financing Order, (iv) $3,000,000 to fund the Escrow Account contemplated by Section 2.3 of the Asset Purchase Agreement, (v) $802,000 to a segregated bank account to pay the "Retention/Success Fee Payable" as contemplated by Section 5.3 of the Asset Purchase Agreement, and (vi) the balance of the sales proceeds (less all actual and normal charges, costs, and expenses attendant to the Sale which are to be paid or reserved for at Closing by the Debtors from the gross sale proceeds) to be provisionally paid to Wachovia in payment of its pre-petition secured claims. Wachovia shall provisionally apply the amount described in 7(vi) above to its pre-petition secured claims, subject to all rights and remedies of the Debtors and their estates under the Bankruptcy Code and applicable law, including any right they may have to seek a Court order requiring disgorgement of such funds. By accepting a provisional distribution, Wachovia shall be deemed to have submitted to the jurisdiction of this Court in respect of any action to recover such distribution. The allocation of sale proceeds and payments to Wachovia provided in paragraph 7(vi) shall be provisional and shall not constitute a determination of this Court, or otherwise be construed as an admission by any party, as to the final allocation of such sale proceeds or of the extent, validity or priority of Wachovia's Liens and Claims.

8.      All persons and entities holding Liens and Claims of any kind and nature with respect to the Purchased Assets or the Debtors hereby are barred from asserting such Liens and Claims against the Buyer, its successors and assigns, or against the Purchased Assets.

9.      The Debtors are hereby authorized and directed in accordance with Section 365 of the Bankruptcy Code to (a) assume, sell and assign to the Buyer each of the Assumed

Contracts free and clear of all Liens, Claims and encumbrances, other than Cure Amounts included in the Assumed Liabilities, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

10.    The Assumed Contracts shall, upon assignment to the Buyer and the payment of the applicable Cure Amounts, be valid and binding and in full force and effect and enforceable in accordance with their respective terms.

11.    If any defaults under any Assumed Contracts or any objections to any applicable Cure Amounts existing as of the date of the Sale Hearing have not been raised or asserted prior to the Sale Hearing, the non-debtor parties to each such Assumed Contract are hereby barred and enjoined from asserting against the Debtors or the Buyer (and their respective successors and assigns) any such defaults or objections. The Buyer shall pay any amounts accruing under the Assumed Contracts on or after the date of the Sale Hearing.

12.    If any person or entity that has filed any mortgages, deeds of trust, financing statements, or other documents or agreements evidencing Liens on any Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to any Purchased Assets, then the Buyer hereby is authorized to execute and file statements, instruments, releases, and other documents on behalf of the person or entity with respect to such Purchased Assets, provided that, in respect of the Wachovia's Liens, the Buyer shall consult with Wachovia's counsel in the preparation of any such documents. The foregoing notwithstanding, the provisions of the Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, Claims and encumbrances (other

12

than the Assumed Liabilities) shall be self-executing, and notwithstanding the failure of any of the Debtors, the Buyer, or any other party to execute, file or obtain releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof or the Asset Purchase Agreement with respect to the sale and assignment of the Purchased Assets, all Liens on the Purchased Assets shall be deemed divested, void and unenforceable. All persons or entities who are presently, or at any time hereafter prior to the transfer to the Buyer, in possession of any of the Purchased Assets are hereby directed to surrender possession of any of the Purchased Assets to the Buyer at the Closing.

13.    This Order shall be binding upon the Debtors, their respective successors and assigns and any trustee that may be appointed in these cases or in any case under Chapter 7 of the Bankruptcy Code to which any such case may be converted, and any affected third parties, including without limitation all non-Debtor parties to any Assumed Contracts, all persons and entities asserting any Claims against or interests in the Debtors' estates or any of the Purchased Assets, and all other persons and entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law or by the duties of their office or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Purchased Assets.

14.    Upon the Closing, the Buyer shall assume the Assumed Liabilities in accordance with the terms of the Asset Purchase Agreement. Other than the Assumed Liabilities, none of the Buyer, its successors and assigns, or any affiliate of such entity shall have

13

any liability, duty or responsibility for any Claims, administrative expenses, or other liabilities against the Debtors or any of the Debtors' predecessors or affiliates of any kind or character, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent.

15.    From and after entry of this Order, no Debtor or any of its respective creditors or other parties in interest shall take or cause to be taken any action that would interfere with the transfer of the Purchased Assets to the Buyer in accordance with the terms of this Order.

16.    The Buyer is a purchaser in good faith of the Purchased Assets and the Assumed Contracts and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

17.    In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Asset Purchase Agreement, including the assumption, sale and assignment of the Assumed Contracts, at any time after the entry of this Order and, accordingly, such closing in the face of an appeal will not deprive the Buyer of its status as a good-faith purchaser. If the parties to the Sale consummate the transactions contemplated thereby while an appeal of this Order is pending, the Buyer shall be entitled to rely upon the protections of Section 363(m) of the Bankruptcy Code, absent any stay pending appeal granted by a court of competent jurisdiction prior to such consummation.

18.    As of the time and date of the Closing, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the Sale and the other transactions contemplated by the Asset Purchase Agreement.

19.     This Court retains jurisdiction to (i) enforce and implement the terms and provisions of the Asset Purchase Agreement and the Designation of Rights Agreement, all amendments thereto and any waivers and consents thereunder, (ii) compel delivery of the Purchased Assets to the Buyer, (iii) resolve any disputes arising under or related to the Asset Purchase Agreement and Designation of Rights Agreement, except as otherwise provided therein, and (iv) interpret, implement and enforce the provisions of this Order.

20.     The Asset Purchase Agreement and Designation of Rights Agreement and any related agreements, documents, or other instruments may be waived, modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such waiver, modification, amendment, or supplement (a) does not adversely affect either of the Debtors or their estates, or (b) is agreed to in writing by the Debtors and the Committee.

21.     Nothing contained in any plan of reorganization (or liquidation) confirmed in any of the Debtors' cases or the Order of Confirmation confirming any plan of reorganization (or liquidation), or any Order dismissing any of the Debtors' cases or converting any of the Debtors' cases to a Chapter 7 liquidation, shall conflict with or derogate from the provisions of the Asset Purchase Agreement, the Designation of Rights Agreement or the terms of this Order. Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any Order which may be entered confirming any plan of reorganization (or liquidation) for the Debtors or converting any of the Debtors' cases from Chapter 11 to a case under Chapter 7 of the Bankruptcy Code.

22.   In the event that there are any inconsistencies between the terms of this Order, the Asset Purchase Agreement, and the Designation Rights Agreement, the provisions of this Order shall control.

23.   No later than the Closing, the Buyer makes a cash deposit with WDS, for the benefit of WDS in the amount of $250,000 to secure the Buyer's payment obligations under the terms of the WDS Agreement with such deposit to bear interest at the rate of five percent per annum.  Such deposit shall be promptly paid to Buyer with accrued interest upon the expiration of the Designation of Rights Agreement, should no amounts remain owing to WDS by Buyer under the WDS Agreement.

24.   During the Designation Period under the Designation of Rights Agreement, the Buyer (i) shall have the sole, exclusive, and continuing right to receive all services under the WDS Agreement and to determine whether the Debtors shall assume and assign the WDS Agreement to the Buyer or its designee(s) or reject such agreement, and (ii) shall perform all obligations of the Debtors under the terms of the WDS Agreement, inlcuding all payment obligations required thereunder, and WDS shall perform all obligations it has under the terms of the WDS Agreement.

25.   The Designation Period shall consist of a period of thirty (30) days beginning on the Closing Date.  Prior to the conclusion of the Designation Period, the Buyer shall deliver to WDS and the Debtors a written notice specifying whether the Buyer has designated that the Debtors either (i) assume the WDS Agreement and assign such agreement to the Buyer or its designee(s), or (ii) reject the WDS Agreement.

26.   In the event that the Buyer has designated the WDS Agreement for assumption and assignment, (i) the Buyer and the Debtors promptly shall cause a Designation Motion to be

filed seeking such assumption and assignment and shall continue to perform all obligations of the Debtors under the terms of the WDS Agreement until the entry of on order by the Bankruptcy Court approving such Designation Motion (the "Approval Order"), and (ii) WDS shall perform its obligations under the terms of the WDS Agreement. Upon entry of the Approval Order, the Buyer immediately shall (1) pay any cure amounts agreed to by WDS or determined by the Bankruptcy Court, and (2) provide a deposit as specified in paragraph 23 above. If the Buyer has elected to require that the WDS Agreement be assigned to a designee, then WDS reserves the right to seek a letter of credit or deposit in a greater amount or such additional adequate assurance as the Bankruptcy Court may order.

27.    In the event that the Buyer has designated the WDS Agreement for rejection, or the Buyer has failed to provide written notice as specified above, then the Buyer shall continue to perform all of the Debtors' obligations under the WDS Agreement for an additional period of sixty (60) days (including all payment obligations that relate to the performance by WDS during such period); at the conclusion of such period, the WDS Agreement shall be deemed rejected. Upon such rejection, WDS shall have all of its rights to file a rejection damages claim pursuant to the provisions of the Bankruptcy Code, and no provision of either the Asset Purchase Agreement or the Designation of Rights Agreement shall limit such rejection damages claim.

28.    In connection with the performance of its duties under the WDS Agreement, WDS from time to time purchased fuel from the Debtors; as of the Petition Date, WDS owed certain amounts to the Debtors for such fuel purchases (the "WDS/Sylvest Receivable"), and the Debtors owed certain amounts to WDS for its performance under the terms of the WDS Agreement (the "WDS/Sylvest Payable"). Simultaneously with the entry of this Order, the Bankruptcy Court has entered an order approving a stipulation between WDS and the Debtors

17

(the "WDS Agreement") approving and effectuating the recoupment or setoff of the WDS/Sylvest Receivable against the WDS/Sylvest Payable. The Sale Motion and the WDS Response and Limited Objection to the Sale Motion (Docket No. 257) were sufficient, pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, to afford reasonable notice of the material provisions of the WDS Agreement and an opportunity for a hearing, and therefore the procedures in Rule 4001(d)(1)-(3) shall not apply to the WDS Agreement.

29. Notwithstanding anything which is, or which could be construed to be, to the contrary in this Order, the Asset Purchase Agreement, the Designation of Rights Agreement, or otherwise, (i) the sale to the Buyer is not free and clear of the claims, rights of setoff or recoupment, defense, counterclaim, cross-claim or interest of WDS of any kind or nature, arising after the Petition Date, if any, and whether arising under any contract, tort, law, equity or otherwise (collectively, the "Rights"), but it is explicitly subject to any and all such Rights, if any, and (ii) such Rights are neither extinguished (or otherwise diminished) or enhanced by this Order and such Rights survive with the same validity, force, effect, and extent as existed prior to the sale contemplated by the Asset Purchase Agreement.

30. Upon receiving notice as provided in section 12.15(a) of the Asset Purchase Agreement of the Buyer's intent to destroy business records or documents purchased from Debtors, the Debtors' (or their successors) shall file such notice with the court within fifteen (15) days of receipt of such notice. Further, any party who objects to the destruction of any such business records or documents, shall provide written notice to Debtors (or their successors) and Buyer within the 90 day period set forth in section 12.15(a) of the Amended Asset Purchase Agreement, indicating the objecting party's desire to take possession and ownership of any documents or records to be destroyed, and, absent objection, at the end of the 90 day period, the

party shall take possession and ownership in accordance with section 12.15(a). If there is any dispute as to who can take possession and ownership of such documents or records, the dispute shall be submitted to the Court.

31.     The Closing of the Sale shall occur on Wednesday, May 31, 2006 in Alabama. The Accounting Date for purposes of Section 2.4 of the Asset Purchase Agreement shall be Sunday, May 28, 2006. The Buyer shall be responsible for funding all operating costs of the Debtors (including insurance) from the day after Accounting Date until the Closing, and all gains or losses resulting from the day after Accounting Date until the Closing shall inure to the benefit or detriment, as applicable, of Buyer. Notwithstanding the foregoing, the Debtor shall have title to the Purchased Asset and shall remain in possession and control of the Purchased Assets until the Closing.

32.     As provided by Bankruptcy Rule 6004(g), this Order shall be effective and enforceable immediately upon entry. The Objection of National Warehouse, Inc. is overruled to the extent it is an objection to the sale. All other objections to the sale have been withdrawn.

        Dated: May 26, 2006

                                        /s/ Thomas B. Bennett
                                        United States Bankruptcy Judge

# EXHIBIT J

## AMENDED ASSET PURCHASE AGREEMENT

This Amended and Restated Asset Purchase Agreement (this "Agreement"), dated as of April 27, 2006 (the "Agreement Date"), is by and between KOCH FOODS OF ALABAMA, LLC, and KOCH FARMS OF ALABAMA, LLC, both Alabama limited liability companies (the "Buyers"), KOCH FOODS INCORPORATED, as guarantor pursuant to Section 12.4 ("Guarantor"),and SYLVEST FARMS, INC., SYLVEST FOODS CORPORATION and SYLVEST FARMS MANAGEMENT SERVICES, INC., all Alabama corporations, individually and as debtors-in-possession (the "Sellers").

### RECITALS:

**WHEREAS,** the Sellers are engaged in the business of producing, processing and marketing fresh and frozen chicken products (the "Business");

**WHEREAS,** the Sellers have filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court") (the "Bankruptcy Case");

**WHEREAS,** Buyers and Sellers understand and contemplate that this Agreement shall be subject to higher and better offers at an auction to be approved by the Bankruptcy Court;

**WHEREAS,** the Buyers desire to purchase from the Sellers, and the Sellers desire to sell to the Buyers, substantially all of the assets of the Sellers used in connection with the Business, free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement;

**WHEREAS**, this Agreement is intended and does hereby amend and supersede the Asset Purchase Agreement heretofore executed between the parties (excluding Sylvest Foods Corporation) dated April 18, 2006;

**WHEREAS**, the Buyers and the Sellers desire to amend and restate the Asset Purchase Agreement dated April 18, 2006 in order to set forth the parties agreements with respect to the sale of all or substantially all of the assets of Sylvest Foods Corporation on the terms and condition herein stated; and

**WHEREAS**, the Buyers have deposited the sum of Two Million Dollars ($2,000,000.00) as good faith earnest money which is subject to an escrow agreement between the parties pending the Closing (as herein defined).[The escrow agreement is available upon request made to the Sellers or the Buyers.]

**NOW, THEREFORE,** in consideration of the mutual agreements contained herein and the recitals contained herein, the parties hereby agree as follows:

# ARTICLE I
## PURCHASE AND SALE OF ASSETS

1.1    Agreement to Purchase and Sell Assets. Subject to the conditions set forth below, at the Closing (as defined in **Section 9.1**), the Sellers shall sell and deliver to the Buyers, and the Buyers shall purchase from the Sellers, all of the Sellers' right, title and interest in and to the Purchased Assets. As used in this Agreement, the term "Purchased Assets" shall mean all of the assets, properties, rights and interests of the Sellers (other than the Excluded Assets described in **Section 1.2**) used in or held for use by the Business of whatever kind or nature, real or personal, tangible or intangible and wherever located, as such assets may exist at the Agreement Date. The Purchased Assets shall include, without limitation, all of the Sellers' right, title and interest in and to the following (other than Excluded Assets):

(a)    All real property, and all improvements and buildings thereon, of the Sellers located in Montgomery (the "kill" plant and the "further processing" plant), Sylacauga, Mobile, Greenville, and Tyson, Alabama, and Bainbridge, Georgia, and all related rights and authorizations associated with the fee or leasehold ownership thereof (collectively, the "Real Property");

(b)    All transferable rights under non-executory contracts, agreements, instruments, policies, understandings, commitments and other arrangements, whether oral or written, including without limitation, any and all warranties (express or implied) or product agreements of any manufacturer, supplier, vendor or other person or entity relating to any Purchased Assets, to the extent that such warranty rights can be so legally conveyed by the Sellers, all insurance policies related to Purchased Assets, and all life insurance policies owned by the Sellers;

(c)    All inventories of the Sellers (whether or not allocated to contracts in process and notwithstanding how classified in the financial records of the Sellers), including without limitation processed poultry, parts, components, supplies, packing crates, packaging materials, raw materials, work in process and finished products, items purchased for resale or lease by the Sellers and items which have been ordered, purchased and paid by the Sellers and are in transit to the Sellers at the Agreement Date (collectively, the "Inventory");

(d)    All machinery, equipment, attachments, motors, chains, conveyors and parts therefore, tools, leasehold improvements, fixtures, office furniture, artwork, computer equipment (including all hardware and software related thereto), supplies, rolling stock, trucks, cars, trailers, and other vehicles, and all other tangible personal property owned by the Sellers of every kind and nature, including without limitation those set forth on **Schedule 1.1;**

(e)    All amounts and accounts receivable (other than Not Accepted Accounts Receivable) as set forth in **Section 2.4**, and intercompany accounts receivable owed by one Seller, or its affiliate, to the other Seller, or its affiliate ("Intercompany Accounts Receivable"), which are specifically excluded, promissory notes of other parties and other rights to receive payments from any person or entity as of the Closing, including

2

without limitation rights to payments arising from the sale or lease of goods and services (whether current or non-current);

(f)    All Accepted Executory Contracts, including insurance policies or contracts related to Purchase Assets, and all life insurance policies owned by the Sellers, assumed and assigned by the Sellers pursuant to **Section 1.3**;

(g)    All rights and interests in and to, and to determine whether to assume and assign or reject, that certain contract with Worldwide Dedicated Services, Inc. ("WDS"), dated June 23, 2004 (the "WDS Contract") pursuant to the terms of a Designation of Rights Agreement of even date herewith ("Designation Agreement"), attached as Schedule 1.1(g), the approval of which by the Bankruptcy Court will be promptly sought by Sellers and obtained on or before the date of the Bankruptcy Court's approval of this Agreement, with the form of the Court's order subject to Buyers' Satisfaction;

(i)    At Closing, Sellers shall submit to Buyers the prepetition amount due and owing to WDS for goods and services provided to Sellers (the "WDS Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the WDS Payable and Buyers shall assume any responsibility to pay the WDS Payable in accordance with the terms of the Designation Agreement;

(ii)    In the event that the WDS Contract is rejected, Buyers agree to pay to Sellers ½ of any amount that Buyers would have been required to pay to WDS as a cure cost for assumption under Section 365 of the Bankruptcy Code;

(h)    All intellectual property, patents, trademarks, service marks, trade names and trade styles, including the tradename "Superchicken", whether registered or not (including without limitation all rights to and interests in the names "*Sylvest Farms, Inc.*", and all variations thereof, including any name containing "*Sylvest*"), all logos, drawings, technical data, product specifications, computer software, source codes, object codes, computer files, programs, blueprints, know-how, trade secrets and other proprietary rights and all goodwill associated therewith, whether or not set forth on **Schedule 3.12**;

(i)    All rights in incomplete or unfilled contracts, commitments and orders issued for the purchase or lease of inventory or other goods or services by the Sellers, including without limitation parts, components and supplies which will be assumed by the Buyers and assigned by the Sellers pursuant to **Section 1.3**;

(j)    All rights against suppliers of inventory or other goods or services, including without limitation any express or implied warranties and any entitlement to volume or other discounts or rebates;

(k)    All transferable authorizations, permits, franchises and licenses, if any;

(l)    All claims, refunds, causes of action, choses in action, rights of recovery and rights of set-off or offset of every kind and nature arising on or after the Agreement Date;

3

(m)    All goodwill, going-concern value and all other intangible property and any tax incentives under state or local laws to the extent the same are assignable;

(n)    All capital stock or other equity interests in affiliated entities or joint ventures, including any and all interest in Southern Hens, Inc. and excluding the capital stock of Sylvest Foods Corporation and the capital stock of Sylvest Farms Management Services, Inc.;

(o)    All marketing plans, marketing manuals, sales materials, promotional materials, catalogues and advertising and marketing literature and materials;

(p)    Those business records and files reasonably necessary for the Buyers to continue the Business of the Sellers, including without limitation customer lists and other identifications of former, existing and potential customers and suppliers, mailing lists, sales information, customer and supplier records, cost and pricing information, billing records, employment and personnel records and other records (including without limitation those maintained in computer tapes, disks or other computer retrievable formats), in each case whether maintained by the Sellers or by others for the Sellers, for which Sellers shall have access to pursuant to **Section 12.15**, and the Sellers' main telephone numbers and post office boxes at which the Sellers receive correspondence or remittances from customers; and

(q)    Any other assets of the Sellers related to the Business and which are of a nature not customarily reflected in the books and records of a business, including without limitation assets which have been written off for accounting purposes but which are still used by or are of value to the Business.

1.2    Excluded Assets.  Notwithstanding **Section 1.1**, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)    The Sellers' rights under this Agreement;

(b)    The capital stock of Sylvest Foods Corporation and the capital stock of Sylvest Farms Management Services, Inc.;

(c)    The Sellers' corporate minute books, corporate seal, charter documents and stock records;

(d)    Any rights under any insurance contracts maintained by the Sellers to the extent related to the Excluded Assets and the Excluded Liabilities (as defined in **Section 1.4**);

(e)    Any rights or claims, including rights or claims arising under express or implied warranties, necessary to protect or defend the Sellers against any claim or any litigation matter described in **Section 1.4(j)** but only to the extent that there is no resulting prejudice or disadvantage to the Buyers with respect to the Purchased Assets.

4

(f)     All cash, cash equivalents, marketable securities and amounts representing customer deposits, prepayments and prepaid expenses;

(g)     Those business records and files to the extent related to only the Excluded Assets or the Excluded Liabilities or not reasonably necessary for the Buyers to continue the Business of the Sellers;

(h)     Inventory sold or used by the Sellers in the ordinary course of the Business prior to the Closing;

(i)     Any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing in accordance with its terms or in the ordinary course of the Business except as set forth in **Section 1.3**;

(j)     All preference or avoidance claims and actions of the Sellers, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549 and 550 of the United States Bankruptcy Code;

(k)     Intercompany Accounts Receivable;

(l)     All rights under executory contracts and unexpired leases rejected by Sellers pursuant to Section 365 of the Bankruptcy Code in accordance with **Section 1.3**; and such other assets as Buyers shall designate in writing as Excluded Assets prior to the Closing; provided, however, there shall be no adjustment to the Purchase Price as a result of such designation; provided, further, the Buyers and Sellers agree to amend this Agreement to so designate additional Excluded Assets hereunder.

(m)     All claims, refunds, causes of action, choses in action, rights of recovery and rights of set-off or offset of every kind and nature arising before the Agreement Date;

1.3     Assignment of Contracts.  The Sellers shall set forth on **Schedule 1.3** all executory contracts, insurance policies and unexpired leases, and Sellers shall assume and assign, pursuant to Section 365 of the Bankruptcy Code, only those executory contracts, insurance policies or contracts, and unexpired leases, that the Buyers request the Sellers to assume and assign ("Accepted Executory Contracts") by notification in writing, received by the Sellers on or before the fourteenth (14th) calendar day after the Agreement Date, and the Sellers shall reject pursuant to Section 365 of the Bankruptcy Code all other executory contracts and unexpired leases, except the WDS Contract (the status of which shall be determined pursuant to the terms of the Designation Agreement). The Buyers shall assume all of Sellers' obligations and duties under the Accepted Executory Contracts and shall have sole responsibility for paying all amounts due under Sections 365 (b)(1)(A) and (B) or the Bankruptcy Code in connection with the assumption of the Accepted Executory Contracts.

1.4     Excluded Liabilities.  Except as specifically assumed pursuant to **Section 1.3, Section 1.5,** or **Section 1.6,** Buyers shall not assume nor be responsible for any obligation or liability of the Sellers, and the Sellers shall continue to be responsible for all their obligations and liabilities, whether known or unknown, fixed or contingent, liquidated or unliquidated and secured or unsecured, whether arising prior to, at or subsequent to the Closing, whether or not

related to the Business and whether or not disclosed to the Buyers (collectively, the "Excluded Liabilities"). Any real estate taxes, personal property taxes or assessments with respect to Purchased Assets, any charges for utilities or similar costs or assessments, local business or other license fees or taxes and similar periodic charges shall be prorated through the Closing Date (based upon estimates or the most recent amount paid) with the Sellers being responsible for all prorated charges attributable to the period prior to the Closing Date and the Buyers being responsible for all prorated charges attributable to the period subsequent to and including the Closing Date. Without limiting the generality of the foregoing, the Excluded Liabilities include any obligations or liabilities of the Sellers:

(a)     Arising out of or relating to this Agreement or the transactions contemplated hereby, including without limitation the preparation, negotiation or execution of this Agreement and any legal, accounting, brokerage, finder, investment banking, advisory, intermediary or other fees or expenses incurred in connection therewith;

(b)     Constituting indebtedness, including without limitation obligations or liabilities on account of borrowed money, the deferred purchase price of any property, letters of credit or guarantees;

(c)     For federal, state, local or foreign taxes arising out of or relating to the operation of the Business or ownership of any real property, including without limitation the Real Property, by the Sellers or any activity or event occurring or condition or state of facts existing at or prior to the date of the Closing or arising out of, resulting from or incident to the consummation of the transactions contemplated by this Agreement;

(d)     Arising out of or relating to any actual or alleged breach or failure to perform by the Sellers, or any other person or entity for which the Sellers may be liable, under any contract, commitment, arrangement or understanding;

(e)     Resulting from any violation by the Sellers, or any other person or entity for which the Sellers may be liable, of any legal duty or any applicable federal, state, local or foreign law, statute, ordinance, rule, regulation, judgment, order or decree, including without limitation ally environmental laws, rules or regulations;

(f)     To any present or former shareholder, officer or director of the Sellers, including any management incentive plan, except as provided in **Sections 5.2** and **5.3**;

(g)     To any present or former employee of the Sellers (or their dependents or beneficiaries), including without limitation obligations for wages, bonuses, employee benefits, fringe benefits, severance pay or worker's compensation, or under any federal, state, local or foreign law, statute, ordinance, rule or regulation relating to employment or liabilities or obligations with respect to any 401(k), pension, benefit, retirement, or other Plans (as defined in **Section 3.11**), except as provided in **Sections 5.2** and **5.3**;

(h)     Relating to any accounts payable, note payable or other payable of the Sellers other than those expressly assumed pursuant to **Sections 1.3** and **1.5**;

6

(i)      Relating to any litigation pending or threatened against the Sellers;

(j)      Resulting from any product liability claims or other claims with respect to products sold or leased or services rendered by the Sellers;

(k)      Relating to any activities or businesses of the Sellers other than that arise out of the normal conduct of the Business; and

(l)      Relating to any Excluded Asset.

1.5      Liabilities to Growers. Attached hereto as **Schedule 1.5** is a listing of all poultry growers utilized by Sellers within the twelve (12) months prior to the date hereof including any amounts due and owing to such poultry growers for goods or services provided to Sellers as of the date of such **Schedule 1.5**. At the Closing, Sellers shall submit to Buyers a listing of all amounts then due and payable to any poultry grower as of the Closing Date (the "Grower Closing Date Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Grower Closing Date Payable and the Buyers shall assume sole responsibility for paying all amounts listed in the Grower Closing Date Payable.

1.6      Liabilities to Cold Storage Providers. Attached hereto as **Schedule 1.6** is a listing of all cold storage providers and amounts due and owing to such cold storage providers for goods or services provided to Sellers as of the date of such **Schedule 1.6**. At the Closing, Sellers shall submit to Buyers a listing of all amounts then due and payable to any cold storage provider as of the Closing Date (the "Cold Storage Closing Date Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Cold Storage Closing Date Payable and the Buyers shall assume sole responsibility for the Cold Storage Closing Date Payable.

1.7      Inventory Items. Concurrent with the closing date, Sellers shall provide to Buyer a listing of each category of inventory items, including broiler inventory, pullets, breeders, eggs, feed ingredients and finished feed, fresh and frozen poultry inventory and supplies, parts, packing materials and ingredients and determine the physical count of each such category as of the Accounting Date. Each category of inventory shall be valued as of the Accounting Date at Sellers' cost thereof on a first-in-first-out basis on a category-by-category basis, except for the fresh and frozen inventory which shall be valued on a category-by-category basis at the lower of the Sellers' cost or market. Market shall be defined as the Sellers' selling price of such category of poultry inventory for fresh commodity sales, net of freight costs to deliver, marketing programs, rebates, broker commissions and outside cold storage costs to arrive at a f.o.b. the plant net selling price. Poultry leg quarters shall be valued at the current negotiated export price, less the cost of any additional freight and cold storage expense to be incurred to move the product to port. In determining the value of each inventory category, the Sellers' cost of each inventory category computed on a first-in-first-out basis shall include only the following costs with respect to each inventory category.

(a)      Pullet Inventory. The value of the pullet inventory shall be based upon the actual costs incurred from placement to capitalization, including pullet chick cost from the primary breeder, cost of feed delivered to the pullet houses, grower compensation paid to the pullet growers, cost of servicing, and cost of medication and vaccination.

(b)     Breeder Inventory.  The value of the breeder inventory shall be based upon the cost of the flock transferred from the pullet farm less the applicable amortization of the capitalized costs of the flock over a thirty-seven (37) week useful life, plus the unconsumed feed on the breeder farms plus the value of any undelivered eggs on the breeder farms.

(c)     Egg Inventory.  The value of the egg inventory shall be determined by taking into consideration the actual egg cost from the breeder, plus the delivery cost of transporting the egg inventory to the hatchery.  The actual egg cost shall include breeder flock amortization expense, cost of feed fed to the flock, grower compensation, hen servicing costs and cost of sanitation supplies.

(d)     Broiler Inventory.  The value of the broiler inventory shall include the costs of the chicks from the hatchery, delivery cost to the farm, finished feed costs delivered to the farm, and medications, veterinary and vaccination costs.

(e)     Feed Ingredient Inventory.  The value of the feed ingredient inventory shall be the actual cost of the feed ingredient delivered at the mill.

(f)     Finished Feed Inventory.  The value of the finished feed inventory shall be the cost of the feed ingredient and the cost of milling.

(g)     Poultry Inventory.  Subject to the foregoing provisions of Section 2.4(b) at the poultry inventory shall be valued at the lower of cost or market.  The cost of the poultry inventory shall include the actual live weight costs, taking into consideration yields, additional ingredients and the cost of conversion.

(h)     Miscellaneous Inventory.   The miscellaneous inventory shall include supplies, parts, packing materials, labels, boxes, ingredients and crates.  Ingredients, including spices, breading, and batter shall be valued at Sellers' cost for such category of inventory; packaging inventory, including boxes, labels, and bags shall be valued by Sellers and Buyers consulting and all other miscellaneous inventory shall be valued at 60 cents on the dollar of cost of such items.

The aggregate value of the Inventory Items calculated in accordance with **Section 1.7 (a)** through **(h)** shall constitute the "Final Inventory Value".  The Purchase Price shall be reduced or increased, in accordance with **Section 2.1** by the difference between $15,300,000.00 and the Final Inventory Value (the "Inventory Differential").

## ARTICLE II
## PURCHASE PRICE

2.1     Purchase Price.  The purchase price for the sale and transfer of the Purchased Assets shall be Fifty Eight Million Dollars ($58,000,000.00) which amount shall be (a) reduced by the Grower Closing Date Payable; (b) reduced by the Cold Storage Closing Date Payable; (c) reduced by the Unpaid Employee Wage Payable; (d) reduced by the Retention/Success Fee Payable, (e) reduced by the WDS Payable, (f) reduced or increased, as the case may be, by the

Inventory Differential, and (g) reduced or increased by the adjustment as provided in **Section 2.4** (the "Purchase Price").

2.2     Allocation. The aggregate consideration delivered pursuant to **Section 2.1** shall be allocated among the Purchased Assets as set forth in **Schedule 2.2** and the Buyers and Sellers agree to act in a manner consistent with such allocation. Each party shall reflect such allocation in any filings required pursuant to Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), or any similar provisions of state, local or foreign law, and in all tax returns.

2.3     Payment of Purchase Price.   At the Closing, (i) Two Million Dollars ($2,000,000.00) of the Purchase Price shall be deposited by Buyers into an Escrow Account to be established in accordance with the terms of a joint, two hundred seventy (270) day, escrow agreement as mutually agreed to by the Sellers and the Buyers (the "Escrow Agreement"), and (ii) the balance of the Purchase Price shall be paid by the Buyers to the Sellers in cash or immediately available funds to such account or accounts as may be designated in writing by the Sellers to the Buyers at last two (2) business days prior to the Closing.

2.4     Adjustment to and Payment of the Balance of the Purchase Price. The Purchase Price is based, in part, on Sellers having trade accounts receivable ("Accounting Date Trade Receivables") with a value as of the close of business on the day immediately preceding the Closing Date (the "Accounting Date") of no less than Nine Million Dollars ($9,000,000.00). In the event that the Accounting Date Trade Receivables have a value less than Nine Million Dollars ($9,000,000.00) (herein called a "Deficiency"), the Purchase Price shall be reduced dollar for dollar by the amount of the Deficiency. In the event that the Accounting Date Trade Receivables have a value greater than Nine Million Dollars ($9,000,000.00) (herein called an "Overage"), the Purchase Price shall be increased dollar for dollar by the amount of the Overage. After Closing, any Deficiency or Overage shall be determined as follows:

(a)     Accounts Receivable. At the Closing, the Sellers shall deliver to the Buyers a full and complete, aged list of all Accounting Date Trade Receivables (and excluding all intercompany accounts receivable), together with marketing programs, rebates, other discounts and set offs associated therewith. The Buyers will accept all Accounting Date Trade Receivables and use their reasonable best efforts to collect such Accounting Date Trade Receivables until July 15, 2006 (the "A/R Collection Deadline"). On the A/R Collection Deadline, title to any uncollected Accounting Date Trade Receivables shall be transferred to Sellers.   The difference between the collected Accounting Date Trade Receivables collected by Koch and the Accounting Trade Receivables amount shall be considered a Deficiency or Overage, as the case may be, to which Buyers, or Sellers, as the case may be, shall be entitled to a Purchase Price Adjustment from the Escrow Account.

(b)     Undisclosed Lease Items. In the event that Buyers determine within 90 days following the Closing that any assets represented by Sellers on **Schedule 1.1** as being owned by Sellers are, in fact, not owned by Sellers, then the amount of that item's value on Sellers' books shall be considered a Deficiency to which Koch shall be entitled to a Purchase Price Adjustment from the Escrow Account.

9

(c)     Upon the determination of any revision to the Deficiency or Overage pursuant to **Section 2.4**, the Purchase Price shall be adjusted and Sellers shall pay the amount of the Deficiency to the Buyers by directing the Escrow Agent to make payment in the amount of the Deficiency from the Escrow to Buyers. The balance of any amount remaining in the Escrow after payment of any sums required pursuant to **Section 2.4** shall be paid to the Sellers. If there is an Overage, the Buyers will immediately make payment to the Sellers in the amount of the Overage.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES
### OF THE SELLERS

The Sellers represent and warrant to the Buyers as follows:

3.1     Organization and Qualification. Sellers are corporations duly organized, validly existing and in good standing under the laws of the State of Alabama and has all requisite corporate power and authority to own, lease and operate its properties and assets and to conduct the Business as currently conducted or proposed to be conducted. Sellers have delivered to the Buyers a complete and correct copy of its articles of incorporation and by-laws, as amended to date, and such articles of incorporation and by-laws are in full force and effect.

3.2     Authority. Sellers have all requisite power and authority to execute, deliver and perform its obligations under this Agreement and the other agreements being executed and delivered to the Buyers in connection with this Agreement (collectively, together with this Agreement, the "Transaction Documents") and to consummate the transactions contemplated hereby and thereby, subject to applicable provisions of the Bankruptcy Code. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Sellers and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by all requisite corporate action on the part of the Sellers. This Agreement and the other Transaction Documents to which Sellers are a party constitute the legal, valid and binding obligation of Sellers, enforceable against the Sellers in accordance with their respective terms, subject to applicable provisions of the Bankruptcy Code

3.3     No Conflicts. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Sellers and the consummation of the transactions contemplated by the Transaction Documents shall not constitute a default, breach or violation under the Sellers' articles of incorporation or by-laws, as amended to date, or any agreement or commitment to which the Sellers are a party or by which they or any of their assets and properties may be bound.

3.4     Title to Purchased Assets. The Sellers have, to the best of their knowledge, good and marketable title to the Purchased Assets.

3.5     Personal Property. **Schedule 1.1** lists, in reasonable detail, all rolling stock, trucks, cars, trailers and other vehicles of any kind owned by the Sellers, regardless of value, and all other personal property owned by the Sellers, as of the date hereof, with an individual book value or market value in excess of $10,000.00. All of the tangible personal property (other than

10

the Inventory) owned by the Sellers have been reasonably maintained and is in good working order and condition, ordinary wear and tear excepted. All personal property leased by the Sellers under an Accepted Executory Contract has been reasonably maintained and is in good working order and condition, ordinary wear and tear excepted and is in the condition required by the applicable Accepted Executory Contract and all such Accepted Executory Contracts are in full force and effect and constitute the legal valid and binding agreements of the parties. The Sellers are not in material default or breach under such Accepted Executory Contracts, other than the failure to make all payments due thereunder.

3.6     Real Property. **Schedule 3.6** lists all real property owned, leased, subleased, used or otherwise occupied by the Sellers in the conduct of their business and all leases or other agreements in respect of such real property, other than Excluded Assets. All such real property is in the condition required by all Applicable Laws (as defined in **Section 3.7**), and any applicable leases or other agreements, and all leases and other agreements included on **Schedule 3.6** are in full force and effect and constitute legal, valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms. True and correct copies of all leases have been delivered or made available to the Buyers. The Sellers are not in material default or breach under any Accepted Executory Contract with respect to any real estate, other than the failure to make all payments due thereunder.

3.7     Compliance with Law and Licenses. The Purchased Assets and the operation of the Business are in compliance in all material respects with all applicable laws, statutes, ordinances, rules, regulations, codes, permits, licenses and authorizations (collectively, "Applicable Laws"). The Sellers hold the permits, licenses and authorizations set forth on **Schedule 3.7** with respect to the Business, which are all of the permits, licenses and authorizations required to conduct the Business and all of which are, to the extent assignable, included in the Purchased Assets. The Sellers have not received any notice that any governmental authority intends to cancel, terminate or not renew any such permit, license or authorization.

3.8     Litigation and Orders. Other than the Bankruptcy Case and as set forth in **Schedule 3.8**, there is no material action, suit, claim, hearing, arbitration, proceeding or investigation in any court or before any arbitrator or government agency or instrumentality pending or, to the knowledge of the Sellers, threatened against or affecting the Sellers, any of the Purchased Assets or the Business. Other than as set forth in **Schedule 3.8** there are no judgments, orders, writs, injunctions or decrees binding upon or applicable to the Sellers or the Purchased Assets.

3.9     Environmental Matters. The Sellers have delivered or made available to the Buyers all environmental documents, studies and reports in their possession relating to any facilities or real property ever owned, operated or leased by the Sellers or the Business and any environmental liability or obligation of the Sellers or the Business. Other than as set forth in **Schedule 3.9**, since December 31, 1995, the Sellers have not received any written or oral notice, claim, subpoena, or summons, or been threatened orally or in writing with any notice, claim, subpoena, or summons, alleging any environmental liability or obligation of the Sellers.

3.10   Organized Labor Matters.  Other than as set forth on **Schedule 3.10,** (a) the Sellers are not bound by or subject to any arrangement or agreement with any labor union, (b) no employees of the Sellers are represented by any labor union or covered by any collective bargaining agreement, (c) to the knowledge of the Sellers, no campaign to establish such representation has been commenced or is currently in progress, and (d) there has not been nor is there currently any pending or, to the knowledge of the Sellers, threatened labor dispute involving the Sellers and any group of their respective employees nor have the Sellers experienced any labor interruptions.

3.11   Employee Benefit Plans.  **Schedule 3.11** lists all "Employee Welfare Benefit Plans" and "Employee Pension Benefit Plans" (as defined in Sections 3(1) and 3(2) respectively of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), and all retirement, pension or deferred compensation plans or arrangements, savings, incentive or non-qualified stock option, restricted stock, stock appreciation rights, stock purchase or phantom stock plans, unemployment compensation plans, salary reduction agreements, change-in-control or golden or tin parachute agreements, severance plans or agreements, employment agreements, consulting agreements, personnel policies (including without limitation holiday pay, moving expense reimbursement, sick leave, vacation pay, bonus or benefit arrangement), insurance or hospitalization programs or any other fringe benefit arrangements, whether written or oral (collectively, the "Plans"), existing on the date hereof or at any time preceding the Closing that arc or have been maintained or contributed to by the Sellers for the benefit of any employees working in connection with the Business.  There have been no "prohibited transactions" (as described in Section 406 of ERISA or Section 4975 of the Code) at any time with respect to any of the Plans maintained by the Sellers or to which the Sellers have been a party that could result in the imposition of any material excise tax.

3.12   Intellectual Property.  **Schedule 3.12** sets forth (a) all trademarks, service marks, trade names, trade styles, copyrights and all registrations or applications therefor, (b) all patents, inventions and all registrations or applications therefor, and (c) all licenses, sublicenses and other agreements to which the Sellers are a party, either as licensee or licensor or otherwise, related to any intangible or intellectual property used in the Business (all intangible or intellectual property owned, held for use or used in the Business, whether or not listed, the "Intellectual Property").  Sellers are not required to pay any royalty, license, fee or other similar compensation with respect to the Intellectual Property in connection with the current or prior conduct of the Business.  As used in the Business of the Sellers, none of the Intellectual Property infringes or misappropriates or otherwise violates or has been alleged to infringe, misappropriate or otherwise violate any propriety rights of any other person or entity, nor are the Sellers otherwise in the conduct of their business infringing upon, or alleged to be infringing upon, any propriety rights of any other person or entity.  No person or entity has been granted the right to use the names "*Sylvest Farms*", "*Sylvest*" or any variation thereof by the Sellers.

3.13   Products Liability. The Sellers have not received any notice or otherwise become aware of any claim by any customer or any other person or entity against the Sellers, other than those minor claims generally to be expected in the industry, based in any way on or related to any theory of product liability or any material defect or problem with respect to any of goods or services provided by the Sellers at ally time during the past three (3) years.

3.14    Adequacy of Purchased Assets.    The Purchased Assets, together with the Excluded Assets, constitute all of the assets held for use or used in connection with the Business as currently conducted and the Purchased Assets, together with the Excluded Assets, are adequate to enable the Buyers to conduct after the Closing the Business as currently conducted by the Sellers.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYERS

The Buyers represent and warrant to the Sellers as follows:

4.1    Organization and Qualification.    Each Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Alabama and has all requisite power and authority to own, lease and operate its properties and assets and to conduct its business as currently conducted or proposed to be conducted.

4.2    Authority.    Each Buyer has all requisite power and authority to execute and deliver and perform its obligations under this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby, subject to applicable provisions of the Bankruptcy Code. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Buyers and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by all requisite action on the part of the Buyers. This Agreement and the other Transaction Documents to which the Buyers are parties constitute the legal, valid and binding obligations of the Buyers, enforceable against the Buyers in accordance with their respective terms.

4.3    No Conflicts. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Buyers and the consummation of the transactions contemplated hereby shall not constitute a default, breach or violation under the Buyers' respective certificates or articles of organization or operating agreements, as amended to date, or any agreement or commitment to which a Buyer is a party or by which a Buyer or any of its properties may be bound.

## ARTICLE V
## EMPLOYEE MATTERS

5.1    Subject to the limitations set forth in the Bankruptcy Code, the Sellers shall pay to all of their employees who are to be employed by the Buyers upon and after the Closing all compensation and employee benefits earned or accrued from the Agreement Date through the date of the Closing.

5.2    At Closing, Sellers shall deliver to Buyers a list of all employees who are to be employed by the Buyers and the amounts of all unpaid wages and vacation pay that was earned but unpaid by such employees prior to the Closing (the "Unpaid Employee Wage Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Unpaid Employee Wage Payable and the Buyers shall assume sole responsibility for paying the Unpaid Employee Wage Payable.    Sellers explicitly retain all obligations to pay any workers'

13

compensation and/or Employee Welfare and Pension Benefit Plan amount owed to its employees.

5.3    Within ten (10) business days following the Agreement date, Sellers shall submit to Buyers a list of company executives whom Sellers believes are entitled to a retention/success fee. Buyers agrees to negotiate in good faith with Sellers and each respective company executive regarding a reasonable and fair retention/success fee, subject to the respective executive agreeing to an employment contract with Buyers, with the retention/success fee to be paid on a date mutually agreed between the respective executive and Buyers (and in no case later than one year following the Closing). Two (2) business days prior to the Closing, Buyers shall submit to Sellers a schedule of the retention/success fees agreed upon with each respective executive previously designated by Sellers (the "Retention/Success Fee Payable"). The Purchase Price shall be reduced in accordance with **Section 2.1** by the amount of the Retention/Success Fee Payable and the Buyers shall assume sole responsibility for the Retention/Success Fee Payable.

**ARTICLE VI**
**AGREEMENTS PRIOR TO THE CLOSING**

The parties hereto covenant and agree as follows:

6.1    Actions Pending Closing. Except for actions taken in accordance with the orders of the Bankruptcy Court and as otherwise contemplated by this Agreement and as the Buyers may otherwise consent, pending the Closing:

(a)    The Sellers shall conduct and carry on the Business in the ordinary and regular course consistent with past practice, except as a result of the commencement and pendency of the Bankruptcy Case;

(b)    The Sellers shall use their best efforts to preserve the Purchased Assets, the Business, and the relationships with employees, customers, suppliers and others;

(c)    The Sellers shall not enter into, or become obligated under, any contract, agreement, commitment, arrangement or plan with respect to the Business or the Purchased Assets, except in the ordinary course of business or as contemplated by this Agreement;

(d)    The Sellers shall not change, amend, terminate or otherwise modify any contract, agreement, commitment, arrangement or plan to be included in the Purchased Assets, except in the ordinary course of business or as contemplated by this Agreement; and

(e)    The Sellers shall not make any change of a material nature in its practices regarding levels of the Inventory.

6.2    Updates to Schedules. From time to time prior to the Closing, the parties shall update the schedules to this Agreement as necessary to preserve the true, accurate and not misleading nature of their respective representations and warranties.

14

6.3    Access and Rights of Inspection. The Sellers shall afford the Buyers and their counsel, accountants and other representatives reasonable access, during normal business hours and so as not to interfere with the business operations of the Sellers, to all properties, contracts, books and records used in or relating to the Business. The Sellers shall furnish the Buyers copies of such documents and such information with respect to the affairs of the Business as the Buyers may reasonably request from time to time before the Closing. The Buyers and their counsel and accountants shall have the right to examine and review, at the Buyers' expense, all aspects of the operation of the Business and the Purchased Assets, including obtaining satisfaction that major customers would not view unfavorably the Buyers' ownership of the Business.

6.4    Consents to Assignment of Contracts. The Sellers shall have sent or obtained, prior to the Closing, all notices or consents required under the Accepted Executory Contracts or received an Order from the Bankruptcy Court approving the assignment of the Accepted Executory Contracts to the Buyers.

6.5    Fulfillment of Conditions. Each party hereto shall use its best efforts to take or cause to be taken all actions reasonably necessary or appropriate to cause the conditions set forth in **Article VII** and **Article VIII** to be satisfied at or prior to the Closing.

6.6    Risk of Loss. Risk of loss for each of the Purchased Assets shall be borne by the Sellers until the Closing, after which time the Buyers shall bear the risk of loss for each of the Purchased Assets. In the event of any material damage to the Purchased Assets prior to the Closing and/or the Sellers' gaining knowledge or receiving notice that condemnation or eminent domain proceedings are to be instituted with respect to any of the Real Property, the Buyers shall have the option to accept any collectible insurance proceeds and/or any condemnation award, as full compensation for such damage and to proceed to the Closing of the transactions contemplated under this Agreement or to terminate this Agreement pursuant to **Article XI**.

6.7    Bankruptcy Court Approval. As soon as practical, the Sellers shall submit this Agreement to the Bankruptcy Court for approval ("Bankruptcy Court Approval") pursuant to the terms of 11 U.S.C. Section 363 (b) and (f) with the conditions that any competing bids or offers must be (a) not materially less favorable to the Sellers than this Agreement, and (b) increase the Purchase Price, by Two Million Five Hundred Thousand Dollars ($2,500,000.00), in the first instance and each bid or offer thereafter must be in increased increments of not less than Two Hundred Fifty Thousand Dollars ($250,000.00). Competing bidders will be required to post a deposit of Two Million Dollars ($2,000,000.00) or supply an affidavit of its chief financial officer that its available cash, borrowing availability and non-revocable borrowing commitments total not less than the relevant bid or offer. Notwithstanding any other provision of this Agreement, neither the Sellers nor the Buyers shall have any obligation to consummate the transactions contemplated by Article I of this Agreement without prior Bankruptcy Court Approval and the entry, prior to the Closing, of an order issued by the Bankruptcy Court under the Bankruptcy Code (the "Order") which (w) approves the sale of the Purchased Assets to the Buyers on substantially the same terms and conditions set forth in this Agreement and authorizes the Sellers to proceed with the transaction, (x) includes a specific finding that the Buyers are good faith purchasers of the Purchased Assets, (y) states that the sale of the Purchased Assets to the Buyers shall be free and clear of all liens, claims, interest and encumbrances to the maximum extent permitted by the Bankruptcy Code (except as expressly provided in this Agreement), and

(z) approves the Sellers' assumption and assignment of the Accepted Executory Contracts pursuant to Section 365 of the Bankruptcy Code. Both the Buyers and the Sellers shall use reasonable efforts to obtain entry of the Order and such order shall be entered by May 30, 2006.

6.8    Certain Filings.    The parties hereto shall cooperate with one another in determining whether any action by or in respect of, or filing with, any governmental authority is required or reasonably appropriate, or any action, consent, approval or waiver from any party to any contract is required or reasonably appropriate, in connection with the consummation of the transactions contemplated by this Agreement. Subject to the terms and conditions of this Agreement, in taking such actions or making any such filings, the parties hereto shall furnish information required in connection therewith and seek timely to obtain any such actions, consents, approvals or waivers.

## ARTICLE VII
## CONDITIONS TO THE OBLIGATIONS
## OF THE BUYERS

All obligations of the Buyers hereunder are subject to the fulfillment in accordance with the provisions of this Agreement, on or prior to the Closing, of each of the following conditions, each of which may be waived in writing at the sole discretion of the Buyers:

7.1    Representations and Warranties; Agreements. All representations and warranties of the Sellers hereunder shall be true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing. All agreements to be performed hereunder by the Sellers at or prior to the Closing shall have been performed in all material respects.

7.2    Certificate. The Buyers shall have received certificates dated the Closing signed by an officer of the Sellers stating that:

(a)    The representations and warranties of the Sellers made herein are true and correct in all material respects as of the date of the Closing; and

(b)    The Sellers have complied with its agreements to be performed on or prior to the Closing in all material respects.

7.3    Deliveries. The Sellers shall have made all deliveries and satisfied all obligations required of them pursuant to **Section 9.2** below.

7.4    No Injunctions. No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the date of the Closing and which prohibits the consummation of the Closing.

7.5    Entry of the Order. The Bankruptcy Court shall have entered the Order, and the Order, as so entered, shall not either be stayed or modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material fashion.

## ARTICLE VIII
## CONDITIONS TO THE OBLIGATIONS
## OF THE SELLERS

All obligations of the Sellers hereunder are subject to the fulfillment in accordance with the provisions of this Agreement, on or prior to the Closing, of each of the following conditions, each of which may be waived in writing at the sole discretion of the Sellers:

8.1    Representations and Warranties; Agreements.  All representations and warranties of the Buyers hereunder shall be true and correct as of the date hereof and shall be true and correct as of the Closing as if repeated as of the Closing. All agreements to be performed hereunder by the Buyers at or prior to the Closing shall have been performed in all material respects.

8.2    Certificate.  The Sellers shall have received a certificate dated the Closing signed by an officer of each Buyers stating that:

(a)    The representations and warranties of such Buyers made herein are true and correct in all material respects as of the date of the Closing; and

(b)    Such Buyers have complied in all material respects with its agreements to be performed on or prior to the Closing.

8.3    Deliveries.  The Buyers shall have made all deliveries and satisfied all obligations required of them pursuant to **Section 9.3** below.

8.4    No Injunctions.  No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the date of the Closing and which prohibits the consummation of the Closing.

8.5    Entry of the Order.  The Bankruptcy Court shall have entered the Order by the specified date, and the Order, as so entered, shall not either be stayed or modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material fashion.

## ARTICLE IX
## CLOSING

9.1    Time and Place of Closing.  The consummation of the purchase and sale of the Purchased Assets is called the "Closing." The Closing shall take place at the offices of the Sellers in Montgomery, Alabama, on or before the second business day after the Order is entered in the Bankruptcy Case (the "Closing Date"), or at such other place or on such other date as the parties may agree. The Closing may take place by the exchange of executed documents by overnight delivery or telecopier.

9.2    Deliveries by the Sellers.  At the Closing, the Sellers shall deliver to the Buyers:

17

(a)     A Bill of Sale and General Assignment in the form attached hereto as **Exhibit A** (the "Bill of Sale"), duly executed by the Sellers and transferring those Purchased Assets as directed in writing by the Buyers to the Sellers prior to Closing to the Buyer or Buyers named in such direction by the Buyers, free and clear of all liens, security interest, charges, claims and other encumbrances to the maximum extent permitted by the Bankruptcy Code, except as expressly provided in this Agreement;

(b)     Real estate transfer documents for the Real Property, including without limitation, Statutory Warranty Deeds and Affidavits of Title and all other documents that are normal and customary in the closing of real estate transactions in Alabama or otherwise required by the relevant title company;

(c)     Any other instruments of transfer and assignment for the Purchased Assets that the Buyers may reasonably request to vest the Purchased Assets in the Buyers, free and clear of all liens, security interests, charges, claims and other encumbrances to the maximum extent permitted by the Bankruptcy Code, except as expressly provided in this Agreement;

(d)     A certificate of existence of the Sellers, certified as of a date not more than seven (7) days prior to the Closing, from the Secretary of State of Alabama;

(e)     A certificate of the Secretary(s) of the Sellers certifying: (i) a copy of the Sellers' by-laws, (ii) a copy of the articles of incorporation of the Sellers, and the incumbency and signatures of the respective Sellers' officers;

(f)     Originals or copies of all notices and consents described in **Section 6.4**;

(g)     The certificate described in **Section 7.2**; and

(h)     Such other certificates and documents as the Buyers may reasonably request, including without limitation evidence of Bankruptcy Court Approval in form and substance reasonably acceptable to the Buyers and a copy of the Order as entered by the Bankruptcy Court.

9.3     Deliveries by the Buyers. At the Closing, the Buyers shall deliver to the Sellers:

(a)     The cash consideration referred to in **Section 2.1**, less the amount deposited into the Escrow Account under **Section 2.3**, payable by wire transfer to an account or accounts specified by the Sellers;

(b)     A certificate of existence of the Buyers, certified as of a date not more than seven (7) days prior to the Closing, from the Secretary of State of Alabama;

(c)     A certificate of the Secretary of each Buyers, certifying: (i) a copy of such Buyers' operating agreement, (ii) a copy of the certificate or articles of organization of such Buyers, and (iii) the incumbency and signatures of such Buyer's manager;

(d)     The certificate described in **Section 8.2**; and

18

(e)    Such other certificates and documents as the Sellers may reasonably request.

## ARTICLE X
## ADDITIONAL AGREEMENTS

10.1    Turnover of Payments.  On and after the Closing, in the event that any party receives any payment or instrument of payment of any amount to which the other party is entitled, the receiving party shall deliver the same promptly to the other party (with endorsement if necessary but otherwise in the same form as received) and, until so delivered, hold the same in trust for the other party's benefit and as the property of the other party.

10.2    Cooperation.  On and after the Closing, the Sellers and the Buyers shall each deliver or cause to be delivered to the other such additional documents, releases, assignments and instruments as the other parties may reasonably request for the purpose of carrying out the purposes of this Agreement.

10.3    Cessation of Use of Names.  Immediately after the Closing, the Sellers shall cease doing business under the name *"Sylvest Farms"*, *"Sylvest"*, or any similar names.

## ARTICLE XI
## TERMINATION

11.1    Termination.  At any time prior to the Closing, this Agreement may be terminated (a) by mutual consent of the parties, (b) by either the Buyers or the Sellers, if there has been a material misrepresentation, breach of warranty or breach of agreement by the other party in its representations, warranties and agreements set forth herein that cannot be cured in all material respects on or prior to the Closing, (c) by the Buyers, if the conditions stated in **Article VII** have not been satisfied at or prior to the Closing, (d) by the Sellers, if the conditions stated in **Article VIII** have not been satisfied at or prior to the Closing, (e) by the Sellers, if the Bankruptcy Court approves a competing bid or offer, or (f) by the Buyers or the Sellers, if the Closing has not occurred by the close of business on May 30, 2006, provided that the delay is not caused by the willful action of the terminating party.

11.2    Effect of Termination.  If this Agreement shall be terminated pursuant to **Section 11.1**, all obligations of the parties hereunder (except the obligations set forth in this **Article XI** and **Section 12.1**) shall terminate; provided, however, such termination shall not affect any party's right to pursue a claim for damages as a result of any breach or failure to perform by such other party occurring prior to such termination.  In the event that this Agreement is terminated, each party shall return to the other all papers, documents, financial statements and other data furnished to it by or with respect to such other party (including any copies thereof).

11.3    Break-Up Fee.  In recognition of the Buyers' time and effort in examining the Business, its due diligence in respect thereof by its employees, agents and other representatives, and the loss of opportunity that the expenditure of such time and effort has caused, in the event of any termination pursuant to **Section 11.1(e)** and the transaction so approved by the Bankruptcy Court closes as provided by its terms, the Sellers shall compensate the Buyers in the

19

amount of One Million Seven Hundred Thousand Dollars ($1,700,000.00). Such compensation shall be paid to the Buyers within two (2) business days of any such closing.

## ARTICLE XII
## MISCELLANEOUS

12.1    Expenses and Taxes.  Whether or not the transactions herein contemplated shall be consummated, and except as otherwise more specifically provided herein, the Buyers and the Sellers shall each pay their own fees, expenses and disbursements incurred in collection with the subject matter of this Agreement, including all costs and expenses incurred in the performance and compliance with all conditions to be performed by such party under this Agreement. Without limiting the generality of the immediately preceding sentence, the fees, costs and expenses of the accountants, attorneys and other financial advisors to the Sellers in connection with the preparation or negotiation of, or consummation of the transactions contemplated by, this Agreement shall be borne by the Sellers and none of such fees, costs or expenses shall be paid or assumed by the Buyers. The Buyers shall pay all sales, use, transfer, stamp, recording, gains and other similar taxes and fees ("Transfer Taxes") imposed in connection with the transactions contemplated by this Agreement; provided, however, any taxes imposed on an annual or other periodic basis, including the real estate property tax and the ad valorem tax, shall be determined based on the applicable fiscal period and prorated between the Buyers and the Sellers through the Closing Date, with the Sellers responsible for the payment of all such prorated taxes attributable to the period prior to the Closing Date and the Buyers being responsible for all such prorated taxes attributable to the period subsequent to and including the Closing Date. The Sellers and the Buyers shall cooperate to file, or cause to be filed, all necessary documentation and tax returns with respect to such Transfer Taxes and to any similar fees imposed with respect to the Purchased Assets.

12.2    Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) as of the date delivered if delivered personally, by courier or by facsimile (provided that a copy of such notice is promptly thereafter mailed in accordance with the provisions of clause (c) below), (b) one (1) day after transmittal by overnight delivery service under circumstances in which such service guarantees overnight delivery, or (c) three (3) business days after deposit in the United States mail, registered or certified mail, postage prepaid, return receipt requested, to the parties at the following addresses:

If to the Buyers, addressed as follows:

Koch Foods of Alabama, LLC
c/o Koch Foods Incorporated
1300 West Higgins Road # 119
Park Ridge, Illinois 60068
Attn: Mr. Mark Kaminsky
Telephone No.: 847-384-5940
Facsimile No.: 847-384-5972

With a copy to:

    Thomas R. Wechter, Esq.
    Eugene J. Geekie, Jr., Esq.
    Schiff Hardin & Waite
    6600 Sears Tower
    Chicago, Illinois 60606
    Telephone No.:  312-258-5756
    Facsimile No.:  312-258-5600

If to the Sellers, addressed as follows:

    Dean E. Falk, President/
    Chief Executive Officer
    Sylvest Farms, Inc.
    Post Office Box 230050
    Montgomery, Alabama 36125
    Telephone No:  334/281-0400
    Facsimile No.:  334/288-5915

With a copy to:

    Thomas G. Mancuso, Esq.
    Mancuso & Franco, P.C.
    7515 Halcyon Summit Drive
    Suite 301
    Montgomery, Alabama 36117
    (Post Office Box 240489
    Montgomery, Alabama 36124-0489)
    Telephone No:  334-481-1800
    Facsimile No.:  334-481-1810

    Richard A. Robinson, Esq.
    Baker & Hostetler, LLP
    Post Office Box 112
    Orlando, FL 32802-0112
    Telephone No: (407) 649-4000
    Facsimile No: (407) 841-0168

or to such other address or number as any party hereto shall specify for itself by notice given pursuant to this **Section 12.2** from time to time; *provided, however,* that notices of any change in an address or number shall not be effective until receipt.

    12.3    Severability. In the event that any of the provisions contained in this Agreement shall, for any reason, be declared or held to be unreasonable, unlawful, unenforceable or otherwise invalid in any respect, such term or provision shall be deemed modified to the extent necessary to make it enforceable, and in no event shall such declaration or holding affect the

21

validity of any other provision of this Agreement, all of which provisions shall continue in effect in accordance with their terms.

12.4     Interpretation.  The representations, warranties, agreements and covenants of the parties made in the Transaction Documents shall survive the consummation of the transactions contemplated hereby and the consummation of such transactions shall not be deemed a waiver of a breach of or inaccuracy in any representation, warranty, agreement or covenant or of any party's rights and remedies with regard thereto.  No specific representation, warranty, agreement or covenant contained herein shall limit the applicability of a more general representation, warranty, agreement or covenant contained herein.

12.5     Exercise of Rights and Remedies.  No delay or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

12.6     Remedies Cumulative.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but each shall be cumulative with all other rights, remedies and elections available at law or in equity.

12.7     Governing Law; Retention of Jurisdiction.  This Agreement shall be construed in accordance with and governed by the laws of the State of Alabama and applicable federal laws, without giving effect to the principles of conflict of laws thereof.  Furthermore, the parties acknowledge and agree that the Bankruptcy Court shall retain jurisdiction over the transactions contemplated by this Agreement and the other Transaction Documents and any disputes between the parties arising therefrom shall, in the first instance, be submitted to the Bankruptcy Court for adjudication.

12.8     Assignment, Binding Effect and Entire Agreement.  This Agreement and the rights and obligations of the parties hereunder may not be assigned without the prior written consent of the other parties hereto, but shall be binding upon and inure to the benefit of the parties hereto and their successors and any permitted assigns.  Notwithstanding the foregoing, the Buyers may with five (5) days prior written notice to Sellers, assign their rights to any of their affiliates or lenders or other financing sources without the prior written consent of the Sellers; provided, however, notwithstanding any such assignment, Buyers and the Guarantor shall remain liable for performance hereunder.  This Agreement sets forth the entire agreement of the parties hereto concerning the subject matter of this Agreement.  This Agreement may only be modified or amended by an instrument in writing executed by each of the parties hereto and any term of this Agreement may be waived only with the written consent of the party sought to be bound.

12.9     No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and, to the extent provided herein, their successors and permitted assigns, and no provision of this Agreement shall be deemed to confer upon other third parties, including without

limitation, any employees or former employees of either the Sellers or the Buyer, any remedy, claim, liability, reimbursement, cause of action or other right.

12.10  Counterparts.  This Agreement may be executed in any number of counterparts, by facsimile signature or using separate signature pages.  Each such executed counterpart and each counterpart to which such signature pages are attached shall be deemed to be an original instrument, and all such counterparts together shall constitute one and the same instrument.

12.11  Captions.  The section headings in this Agreement are provided for convenience only and are not to be considered in the interpretation of this Agreement.

12.12  Incorporation of Schedules and Exhibits.  The schedules and exhibits identified in this Agreement are incorporated herein by reference and expressly made a part hereof.

12.13  Time of Essence.  The parties agree that time is of the essence for purposes of this Agreement and all of the transactions contemplated hereby.

12.14  Guaranty.  Guarantor hereby guarantees the representations and warranties of Article IV and agrees to cause Buyers to timely perform all of their obligations under this Agreement and other agreements executed by Buyers pursuant hereto.

12.15  Access.  During the two-year period following the Closing Date and during normal business hours, Buyers will, and will cause their affiliates, successors and assigns to, permit upon reasonable advance, at least five (5) days, prior written notice (a) Sellers and their representatives to have access to the books, documents and records (including tax returns, files, papers and related items) of, and relating to Sellers, their business or their employees, in each case to the extent relating to any period prior to the Closing or the legitimate business needs of Sellers or any of their Affiliates, and permit Sellers and their representatives to make copies of such books, documents and records at Sellers' expense and (b) Sellers and their representatives to have reasonable access to the employees of Buyers and their affiliates, and direct such employees to cooperate with each of them, for Sellers or any of its affiliates' resolution of tax, audit, litigation, accounting, securities or similar matters that relate to any period prior to the Closing (whether such matters arose before or after the Closing).  Without limiting the generality of the foregoing, Buyers agree that such legitimate business needs include (i) defending or pursuing claims, litigation or similar proceedings, (ii) preparing or making filings contemplated by securities laws or stock exchange rules, (iii) preparing or filing tax returns or responding to audits, and (iv) administering Sellers' bankruptcy estate.

(a)  Notwithstanding the foregoing, beginning on the month anniversary following the Closing, Buyers shall have the unilateral right and sole discretion to determine whether they will destroy any business records or documents purchased from Sellers.  Should Buyers make such determination, they will provide Sellers with 90 days written notice of their intent to destroy such records.  During such 90 day period, Sellers may elect, upon written notice to Buyers delivered with the 90 day notice period, to take possession and ownership of any documents or records to be destroyed, at no cost to Sellers, although Sellers shall pay all transportation or future storage charges for such documents or records.

23

12.16 Survival. None of the representations or warranties contained herein or in any instrument or document delivered pursuant thereto, other than those pertaining to the Designation Agreement, will survive the Closing, and none of the Parties nor any of their respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof.

12.17 "AS IS" TRANSACTION.  BUYERS HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS MAKE NO (AND SELLERS EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS OR ANY OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ASSETS, THE PHYSICAL CONDITION OF ANY PART OF THE ASSETS, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OWNED BY SELLERS OR WHICH ARE THE SUBJECT OF ANY ASSUMED CONTRACT AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY, THE VALUE OF THE ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS.  BUYERS FURTHER ACKNOWLEDGE THAT BUYERS HAVE CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS AS BUYERS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYERS ARE DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO BUYERS' RIGHTS UNDER THIS AGREEMENT, BUYERS WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND WITHOUT RECOURSE TO SELLERS.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

KOCH FOODS OF ALABAMA, LLC

By: _____

    <u>Manager</u>

KOCH FARMS OF ALABAMA, LLC

By: _____

    <u>Manager</u>

WITH RESPECT TO ARTICLE IV AND
SECTION 12.14 OF THE ASSET
PURCHASE AGREEMENT

KOCH FOODS INCORPORATED


By: _____
Its: _____

SYLVEST FARMS, INC.

By: _____ *Dean E. Falls* _____
Its _____ *President & CEO* _____

SYLVEST FARMS MANAGEMENT
SERVICES, INC.

By: _____ *Dean E. Falls* _____
Its _____ *President & CEO* _____

SYLVEST FOODS CORPORATION

By: _____ *Dean E. Falls* _____
Its _____ *President & CEO* _____

1459048 v4

## **EXHIBIT A**

### **BILL OF SALE AND GENERAL ASSIGNMENT**

See attached.

## BILL OF SALE AND GENERAL ASSIGNMENT

Reference is made to that certain Amended Asset Purchase Agreement dated as of April 27, 2006 (the "Agreement") by and between KOCH FOODS OF ALABAMA LLC and KOCH FARMS OF ALABAMA LLC, both Alabama limited liability companies (the "Buyers"), and SYLVEST FARMS, INC., SYLVEST FARMS MANAGEMENT SERVICES, INC., and SYLVEST FOODS CORPORATION, each of which is an Alabama corporation (the "Sellers"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Agreement to the extent defined therein.

Pursuant to the terms of the Agreement and by this Bill of Sale and General Assignment and certain other agreements being executed and delivered simultaneously herewith, the Sellers is selling, transferring, assigning, conveying and delivering the Purchased Assets to the Buyers.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the terms and conditions of the Agreement, the Sellers hereby sell, transfer, assign, convey and deliver to the Buyers all of the Purchased Assets, free and clear of all security interests, liens, charges, claims or other encumbrances of any kind or character to the maximum extent permitted by the Bankruptcy Code (except as expressly provided in the Agreement), to have and to hold forever.

This Bill of Sale and General Assignment may be executed and accepted in any number of counterparts and each such executed counterpart shall be deemed to be an original instrument, and all such counterparts together shall constitute one and the same instrument. This Bill of Sale and General Assignment is delivered pursuant to the Agreement and shall be construed consistently therewith. This Bill of Sale and General Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without giving effect to the principles of conflicts of laws thereof

**IN WITNESS WHEREOF,** the undersigned have executed this Bill of Sale and General Assignment as of this _____ day of May ___, 2006.

**SYLVEST FARMS, INC.**

By: _____
           Dean E. Falk, President and
           Chief Executive Officer

Agreed to and accepted by:

**SYLVEST FARMS MANAGEMENT
SERVICES, INC.**

**KOCH FOODS OF ALABAMA, LLC**

By: _____
           Dean E. Falk, President and
           Chief Executive Officer

By: _____
      _____

**SYLVEST FOODS CORPORATION**

      Manager

By: _____
           Dean E. Falk, President and
           Chief Executive Officer

**KOCH FARMS OF ALABAMA, LLC**

By: _____
      _____

      Manager

28

## SCHEDULE 1.1

### MACHINERY, EQUIPMENT AND ROLLING STOCK

See <u>Annex 1.1</u> attached hereto.

8441B  SYLVEST FARMS, INC. - PROCESSING DIV.          04/14/2006  2:38 PM
**Template Book Asset Detail**
FYE: 3/31/2006

| Asset * | Property Description | Date In Service |
|---------|---------------------|-----------------|
| **Group:** | | |
| 0 * | | |
| 0 * | | No Group |

**Group:  BUILDINGS-SYLACAUGA**

| | | |
|------|---------------------------------------------------|----------|
| 158 | JOB 1498 3RD DOCK DOOR | 8/31/98 |
| 640 | BUILDING | 2/28/91 |
| 641 | REMOD OFC J329 | 3/31/91 |
| 642 | ROOFING REPAIRS | 3/26/91 |
| 643 | IMPROV J#329 | 1/06/92 |
| 644 | PARKING LOT | 8/17/92 |
| 645 | INSULATION | 1/03/93 |
| 646 | REMODEL STORAGE | 11/30/92 |
| 647 | BLDG INSULATION | 4/30/93 |
| 648 | REMODEL OFFICE JOB 1334 | 1/31/95 |
| 649 | PARKING LOT SYLACAUGA | 9/30/96 |
| 696 | DRAINAGE WORK AT LOADING DOCKS | 11/30/98 |
| 806 | DSI ROOM EXPANSION SYLA | 8/01/00 |
| 830 | JOB 1601 DSI ROOM EXPANSION | 10/28/00 |
| 850 | JOB 1637 MODULAR OFFICE | 11/25/00 |
| 853 | JOB 1633 CONE/DSI/SCAN/GRADER | 1/27/01 |
| 893 | JOB 1705 Air Conditioning - Sylacauga | 8/01/01 |
| 949 | JOB 1716 Installation of Rollup doors | 12/01/01 |
| 952 | JOB 1746 Roof Repair | 12/21/01 |
| 979 | Dock drains | 6/18/02 |
| 980 | VCT Tiles & Cove base | 5/27/02 |
| 992 | Job 1775 Roof Repair | 8/12/02 |
| 1000 | Job# 1775 Roof Repair | 9/05/02 |
| 1001 | Job# 1781 Roof Project | 9/30/02 |
| 1038 | Job#1814 Fence and Gate | 4/24/03 |
| 1067 | Install curbs in cooler | 8/08/03 |
| 1086 | Job# 1818 Loading pad | 8/28/03 |
| 1087 | Job# 1820 Ammonia coil system | 7/23/03 |
| 1133 | Trash dumpster dock | 4/05/04 |
| 1154 | Job# 1846 Remove shipping doors & rebuild wal | 6/18/04 |
| 1155 | Job# 1848 Resurface debone floor | 6/14/04 |
| 1181 | Cut wall and install exhaust fan | 7/13/04 |
| 1184 | Awning over break area | 8/05/04 |
| 1186 | Addn to Job# 1846(removed ship.drs/blt.wall) | 7/21/04 |
| 1187 | Addn to Job# (resurface debone floor) | 7/31/04 |
| 1190 | Job# 1868 Install cooler doors, walls, ceilin | 9/01/04 |
| 1191 | Job# 1869 Ice room/apron room ceiling repair | 7/21/04 |
| 1192 | Job# 1870 Plant ceiling repair | 8/10/04 |
| 1193 | Job# 1871 Outside roofing project | 7/23/04 |
| 1194 | Replumb water mains & install new mixing valv | 7/11/04 |

| Asset * | Property Description | Service |
|---|---|---|
| 1229 | Addn to Job# 1848(resurface debone floor) | 10/11/04 |
| 1231 | Addn to Job# 1870 (Plant ceiling repair) | 10/05/04 |
| 1232 | Addn to Job# 1871 (Outside Roofing Project) | 10/15/04 |
| 1263 | Job# 1870 Plant ceiling repair | 11/08/04 |
| 1264 | Job# 1871 Outside roofing project | 11/02/04 |
| 1273 | Job# 1887 Plant curbing | 10/23/04 |
| 1276 | 2 Dock levelers | 10/20/04 |
| 1278 | Water heater enclosure | 2/07/05 |
| 1284 | Addn to Job# 1870 | 1/13/05 |
| 1312 | Concrete slab for chemical storage | 5/01/05 |
| 1317 | Addn to Job# 1870 | 5/04/05 |
| 1323 | Addn to Job# 1846 | 5/17/05 |
| 1326 | Addn to Job# 1870 | 5/24/05 |
| 1328 | Addn to Job# 1887 | 6/03/05 |
| | | **BUILDINGS-SYLACAUGA** |

**Group: ELECTRICAL EQUIPMENT**

| | | |
|---|---|---|
| 423 | ELECTRICAL EQUIP | 4/01/69 |
| 424 | SEVERE DUTY LT FIXT | 3/31/85 |
| 425 | NEW METER BOX | 3/31/85 |
| 426 | ELEC CH WAT SYS J173 | 9/02/86 |
| 427 | ENG RM REWIRING 198 | 2/09/87 |
| 428 | OFFAL RM EL IMP J326 | 1/31/91 |
| 429 | PARKING LOT LIGHT J#355 | 7/20/93 |
| 430 | AMP BRK HLDG SHED J#350 | 10/31/92 |
| 882 | J 1690 REWIRE 110 AMP PANEL | 3/31/01 |
| 1026 | Generator | 5/20/03 |
| 1027 | 3 Generators | 5/22/03 |
| 1078 | 2 Pulse generators | 10/08/03 |
| | | **ELECTRICAL EQUIPMENT** |

**Group: ENERGY CONSERVATION EQUIP**

| | | |
|---|---|---|
| 461 | LIGHT FIXTURES | 11/17/82 |
| | | **ENERGY CONSERVATION EQUIP** |

**Group: EQUIPMENT-MOBILE**

| | | |
|---|---|---|
| 1169 | 3 hand wash basins | 6/16/04 |
| | | **EQUIPMENT-MOBILE** |

**Group: EQUIPMENT-SYLACAUGA**

| | | |
|---|---|---|
| 89 | JOB 1475 GREASE TRAP | 4/30/98 |
| 167 | SCALE PRINTER - SYLACAUGA | 10/14/98 |
| 193 | J1504 FLOOR SCALE - SYLACAUGA | 11/30/98 |
| 197 | J1515 RECONDITIONED COMPRESSOR-SYLACAUGA | 11/30/98 |
| 650 | REFRIGERATION | 2/28/91 |
| 653 | REFRIG JOB 331 | 2/28/92 |
| 654 | DYNALIFT BATT CHRGER | 6/17/91 |
| 657 | REFRIGERATION EQUIPMENT | 6/30/92 |
| 659 | EVAPORATIVE CONDENSER | 12/31/92 |
| 660 | AT&T PHONE SYSTEM | 9/13/93 |
| 661 | BLAST FREEZER J#359 | 10/18/93 |
| 664 | CONZINI KNIFE SHARPENER JOB 1325 | 10/31/94 |

| Asset * | Property Description | Service |
|---|---|---|
| 665 | CLEANUP SYSTEM J#1310 | 11/30/94 |
| 666 | HEATING & AIR COND. | 8/01/94 |
| 667 | DYNA LIFT PALLET JACK | 8/31/94 |
| 668 | REFRIGERATION FOR WING CUTTING ROOM JOB 1329 | 1/31/95 |
| 669 | 20' MVG CONE LN 148 | 10/10/85 |
| 670 | COMPAQ 286E J#301 | 2/26/90 |
| 671 | SOFTWARE JOB 301 | 2/26/90 |
| 674 | JOB 1392 INFEED CONY/PACKING STD | 4/01/96 |
| 675 | JOB 1401 CVP MACHINE | 9/30/96 |
| 676 | SCALE ADDITION | 1/23/97 |
| 677 | JOB 1408 #3 CONE LINE | 4/30/97 |
| 718 | j-1533 Recondition Mycom Comp. | 7/01/99 |
| 779 | LIGHTING FIXTURES | 3/31/00 |
| 818 | JOB 1642 NISSAN PALLET JACK | 8/01/00 |
| 819 | FENCE SYLACAUGA | 8/01/00 |
| 821 | JOB 1646 HOWE COMPRESSOR | 8/01/00 |
| 826 | SENSORS | 10/28/00 |
| 834 | JOB 1633 CONE/DSI/SCAN GRADER LAYOUT | 10/28/00 |
| 844 | JOB 1659TELEPHONE INSTALLATION | 10/28/00 |
| 876 | J 1671 QUINCY AIR COMPRESSOR | 3/31/01 |
| 883 | J 1633 CONE BONING LINE | 3/31/01 |
| 885 | SCAN GRADER | 8/27/98 |
| 888 | MURZAN PUMP J1389 | 4/01/96 |
| 889 | SEALER JOB | 8/31/95 |
| 892 | JOB 1698 Skin Hoppers | 8/01/01 |
| 896 | Battery Powered QA Scale | 8/01/01 |
| 917 | JOB 1710 Mepsco Batch Controller-Marination | 10/01/01 |
| 918 | JOB 1712 Starflex Bagger System | 10/01/01 |
| 946 | JOB 1706 Mixing Tanks/Liquid Marination | 12/01/01 |
| 947 | JOB 1709 Cantrell 3-PC Wing Portioner | 12/01/01 |
| 950 | JOB 1721 Frick Screw Compressor Repair | 12/01/01 |
| 951 | JOB 1742 Transfer of Marel Sizer | 12/01/01 |
| 956 | Job#1760 New furnace | 12/31/01 |
| 957 | Freezer dividers | 12/28/01 |
| 975 | 2HP Busch Pump | 4/29/02 |
| 977 | Job#1769 - Trash Compactor | 5/28/02 |
| 981 | CVP Rebuild | 6/07/02 |
| 997 | Electric Panel Assembly | 10/25/02 |
| 1011 | Job 1779 2nd Processing change | 2/01/03 |
| 1056 | Job# 1804 Sigma Scale System | 6/12/03 |
| 1061 | Rebuild compressor | 7/02/03 |
| 1084 | Job# 1816 Flattner and cuber | 8/29/03 |
| 1091 | CVP Fresh vac | 9/26/03 |
| 1093 | Floor scale - flip top | 10/01/03 |
| 1094 | Vacuum pump | 8/11/03 |
| 1110 | Plant remodel | 2/03/04 |
| 1122 | Job# 1836 Pedco upgrade | 1/16/04 |
| 1126 | Job# 1838 Addn to hot water system | 1/16/04 |
| 1132 | Plant remodel | 2/12/04 |
| 1134 | Addn to Plant remodel | 4/01/04 |
| 1135 | Floor scale | 6/14/04 |
| 1166 | Floor grates | 5/26/04 |
| 1167 | 3 fans | 6/21/04 |
| 1168 | Water heater | 6/07/04 |
| 1170 | 4 scales | 6/03/04 |
| 1171 | 25 hp Grundfous water pump | 6/15/04 |

| Asset | Property Description | Service |
|---|---|---|
| 1172 | Pallet jack | 6/15/04 |
| 1188 | Job# 1862 Debone change over | 8/05/04 |
| 1189 | Job# 1864 Rebuild refrig compressor | 6/29/04 |
| 1195 | Board cabinet | 8/11/04 |
| 1211 | Install conduit for telephone | 8/25/04 |
| 1212 | Drain chutes, covers and stands | 8/26/04 |
| 1213 | Gear reducer | 8/31/04 |
| 1214 | Quincy 25hp compressor | 7/23/04 |
| 1215 | Gravel - drive and parking | 8/20/04 |
| 1216 | 2 micro-weigh scales | 8/31/04 |
| 1223 | Hollow grinder | 9/22/04 |
| 1242 | Hand rails, guards, door locks, pan chutes | 10/14/04 |
| 1243 | Carcass conveyor | 10/18/04 |
| 1244 | 2 weigh tables | 10/22/04 |
| 1245 | 2 Micro weigh scales | 10/01/04 |
| 1251 | Carcass conveyor | 10/21/04 |
| 1252 | Microweigh scale | 11/05/04 |
| 1253 | Hollow grinder | 9/20/04 |
| 1262 | Job# 1867 Refrigeration unit in shipping area | 8/31/04 |
| 1277 | Water heating system | 2/16/05 |
| 1300 | Rebuild Howe ice maker | 3/24/05 |
| 1301 | Water heating system | 3/01/05 |
| 1303 | 200' chainlink fence | 2/23/05 |
| 1322 | Job# 1898 - Wing saw | 1/19/05 |
| 1331 | 2 fans, air curtains & cabinets | 6/20/05 |
| 1357 | Job # 1912 - Refrigeration project upgrade | 9/07/05 |
| 1364 | Job # 1927 - Bagged wing project | 7/20/05 |
| 1366 | Job # 1931 - Desiccant Air Dryer | 9/06/05 |
| 1370 | Addn to Job# 1912 | 10/31/05 |
| 1375 | Job # 1988 - Tender/Boneless sizer | 12/28/05 |
| 1376 | CVP A-200 packaging machine | 11/28/05 |
| 1380 | Addn to Job# 1927 | 7/13/05 |
| 1381 | Addn to Job# 1988 | 1/25/06 |
| 1382 | Water heating system | 12/31/04 |
| | | **EQUIPMENT-SYLACAUGA** |

**Group: EVISCERATION**

| Asset | Property Description | Service |
|---|---|---|
| 8 | 2 GAMCO PICKERS | 11/01/76 |
| 68 | 2 SP 1900 SAWS | 4/03/81 |
| 77 | TRUCK SCALES | 3/26/82 |
| 95 | BRIGHT DUMP0 SYSTM 31883 | 3/28/83 |
| 104 | FAIRBANKS TRUCK SC | 12/05/83 |
| 135 | JOB 1458 HIGH PRESSURE PIPING | 3/31/98 |
| 136 | JOB 1459 HIGH PRESSURE CLEAN UP EQUIPMENT | 3/31/98 |
| 142 | NCK CHILLER CONV 139 | 5/28/85 |
| 143 | SWF BOX MACH JOB 140 | 9/23/85 |
| 144 | HAND HELD RADIO | 6/03/98 |
| 145 | REBUILT COMPRESSOR XJS95S | 6/03/98 |
| 153 | JOB 1483 REPLACE 9 BY 9 COMPRESSOR | 8/31/98 |
| 155 | CO2 MACHINE J #161 | 3/19/86 |
| 157 | JOB 1497 8" WASTE WATER PUMP | 8/31/98 |
| 168 | 6 VATS JOB 168 | 4/30/86 |
| 170 | CHILL WTR SYS 172 | 9/02/86 |
| 175 | CIP SYS RECIR WTR179 | 9/10/86 |
| 177 | CO2 MACHINE JOB 184 | 9/30/86 |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 180 | CVP SYS MACH #3 189 | 12/31/86 |
| 182 | WTR PRES RED VLV 192 | 12/22/86 |
| 183 | PCKG RM EQUIPMT 193 | 3/30/87 |
| 185 | STUNNER/KILLER 196 | 2/13/87 |
| 187 | J1494 REPLACE TACK @ DAF | 10/31/98 |
| 189 | HANG CONV LV DK 203 | 2/25/87 |
| 191 | J1500 DRAW MACHINE | 11/30/98 |
| 198 | J1526 CANTRELL AUTOVISC. HARVESTER | 11/30/98 |
| 203 | WT DIST SYS J197 | 4/08/87 |
| 205 | VNT OPENER/EVIS J205 | 4/10/87 |
| 208 | LC02 COMBO HD J212 | 6/30/87 |
| 210 | MODIFY EVIS LN J214 | 9/30/87 |
| 212 | 3 BIRD UNLDERS J219 | 7/24/87 |
| 213 | CONTACT WTR HTR J220 | 12/17/87 |
| 214 | 3 VISCERA HRVST J221 | 8/20/87 |
| 215 | 2 DEFATT348/549 J224 | 11/30/87 |
| 219 | INST LUDELL EQU J229 | 3/07/88 |
| 220 | MOD PART CUT UP J230 | 10/20/87 |
| 226 | INSTL CROPPERS J240 | 2/28/88 |
| 228 | CROPPRS/BRKERS J225 | 2/09/88 |
| 232 | DRAIN CONVEYOR | 4/22/88 |
| 236 | LINCO CROPPER | 12/12/88 |
| 239 | 10' SEPARATOR-J 253 | 8/25/88 |
| 241 | MODIFICATIONS L3 | 1/25/89 |
| 247 | J261 CANTR OPEN MA#1 | 1/25/89 |
| 248 | J 262 CENTEN OIL SAC MACH #1 | 12/20/88 |
| 249 | J 263 SWF 6" BOX MACHINE | 3/22/89 |
| 251 | J 266 CANTRELL OPEN MACH #2 | 3/22/89 |
| 252 | J 267 CENTEN OIL SAC MACH #2 | 2/22/89 |
| 254 | J 273 CENTEN OIL SAC MACH #3 | 3/07/89 |
| 263 | CVP MACH/MODIF J278 | 4/28/89 |
| 265 | NELS EQUIP J#280 | 9/21/89 |
| 267 | ZN MDL R75A J#283 | 5/31/89 |
| 268 | INSTALL JOB 277 | 1/23/90 |
| 269 | MDF-GIZ HARV#286 | 6/06/89 |
| 270 | CO2 HOOD #3 J#287 | 9/21/89 |
| 273 | NELS EQUIP #3 J290 | 7/19/89 |
| 277 | INSUL/PIPING J#294 | 2/12/90 |
| 279 | INSTALL #291 J#296 | 10/06/89 |
| 285 | BOX ELEV. J#302 | 3/12/90 |
| 286 | FAN MODIF JOB 304 | 3/15/90 |
| 289 | NELS EQUIP #1 J#307 | 2/14/90 |
| 290 | POLYCLIP MCH J#308 | 2/15/90 |
| 291 | INSTALL #307 J#309 | 2/20/90 |
| 293 | LUD.MDL 15000 J311 | 11/30/90 |
| 295 | PROPANE TANK J#314 | 10/31/90 |
| 297 | STFLX BAG. #1 J#318 | 7/31/90 |
| 298 | STRFLX BAG.#2 J#319 | 8/31/90 |
| 299 | PWRD CONVEY.J# 320 | 7/31/90 |
| 300 | PLY CLIP MAC. J#322 | 8/31/90 |
| 301 | INSTALL J311/J323 | 12/31/90 |
| 302 | REP LNE IMPRV J325 | 9/30/90 |
| 308 | S.FLEX BAG J328/J328 | 4/30/91 |
| 310 | MURZAN PUMPS J#335 | 9/30/91 |
| 311 | DAPEC/EQUIP J# 333 | 6/30/91 |
| 312 | DAPEC CUT MAC.J#332 | 5/26/91 |

| Asset * | Property Description | Service |
|---------|---------------------|---------|
| 313 | 2 D16 PIKRS J#338 | 10/31/91 |
| 317 | D 16 PICKER J#338 | 8/31/92 |
| 318 | KNIFE SHARPENERS J#347 | 8/31/92 |
| 319 | KUHL TUB WASHER J#342 | 8/31/92 |
| 324 | SCALE LOADER J#358 | 2/26/93 |
| 325 | GIZZARD TABLE J#356 | 3/12/93 |
| 327 | LIVER HARVESTER #3 J#361 | 3/24/93 |
| 328 | BAGGER J#352 | 3/26/93 |
| 330 | FOOD CRAFT HALVING MACHINE # 362 | 5/10/93 |
| 332 | DELL COMPUTER | 9/16/93 |
| 333 | PLANT SCALE UPGRADE J#345 | 7/30/93 |
| 336 | CHECKWAY OVERHEAD SIZER J#357 | 7/30/93 |
| 337 | LIVER HARVESTERS J#361 | 4/08/93 |
| 340 | PAW OPERATIONS J#1269 | 10/31/93 |
| 341 | SCALE LDR J#1273 | 7/30/93 |
| 342 | QUINCY SCREW A/C J#1275 | 9/01/93 |
| 346 | WATER LINE TO LUDELL J#1284 | 10/06/93 |
| 348 | QUINCY AIR COMP J#1294 | 3/14/94 |
| 349 | CHEM PRE TREATMENT SYSTEM J#1272 | 12/28/93 |
| 350 | ICE MAKING ADDITION JOB 1290 | 5/31/94 |
| 356 | 3 GIZZARD HARVESTERS JOB 1305 | 10/31/94 |
| 358 | WASTE WATER PUMP JOB 1312 | 1/31/95 |
| 359 | VACUUM PUMP JOB 1311 | 1/31/95 |
| 361 | JOB 1347 BETT.SCISSORS | 5/08/95 |
| 363 | J 1327 MULTI SCALDERS | 5/15/95 |
| 365 | J 1365 DUST COLLECTOR | 12/31/95 |
| 367 | QMA SCR AIR COM 336 | 7/31/91 |
| 368 | JOB 1388 CANTRELL BIRD INDEXER | 4/01/96 |
| 373 | JOB 1411 AUGER OFFAL ROOM | 9/30/96 |
| 374 | JOB 1416 ICE AUGER ELEVATOR | 11/30/96 |
| 375 | ALLSCAN CAMERA BREAKROOM | 1/15/97 |
| 378 | JOB 1430 HOWE COMPRESSOR | 7/23/97 |
| 381 | GORRIE REGAN UPGRADE | 9/26/97 |
| 382 | TWO WAY RADIO | 9/16/97 |
| 387 | JOB 1447 EVIS LINE #1 | 9/30/97 |
| 389 | OVERHEAD MONITOR | 12/12/97 |
| 390 | CONCRETE DRAINS JOB 1462 | 1/31/98 |
| 394 | UPGRADE TIME CLOCKS | 3/31/98 |
| 395 | JOB 1448 MOVE REPROC LINE | 3/31/98 |
| 415 | 2 NECK SKIN CUTTERS | 1/06/78 |
| 416 | FOOT UNLOADER | 11/10/78 |
| 417 | GIBLET WRAPPING SYSTEM | 1/16/79 |
| 418 | KILLING MACHINE | 9/11/79 |
| 420 | NECK CUTTER | 3/31/80 |
| 421 | #50 BAG AIR COMPR | 10/06/80 |
| 422 | 3 INSPECTOR STANDS | 3/11/81 |
| 460 | SWS PH CONTROLLER PUMP | 12/31/97 |
| 686 | PICKING SHACKLES | 2/25/99 |
| 697 | SHACKLES-JOB 1518 | 10/31/98 |
| 706 | J-1512 CANTRELL OPENER | 11/30/98 |
| 710 | 3-VENTOR V 16HD KIT | 4/08/99 |
| 711 | CONDENSOR UNIT | 4/21/99 |
| 714 | Job 1538 Waste Water | 4/01/99 |
| 720 | J-1530 HACP/PLANT | 9/01/99 |
| 721 | J-1534 WHOLE BIRD CONTAMINATION L#3 | 6/01/99 |
| 723 | J-1537 AUTOMATED GIBLET OPERATION | 7/01/99 |

| Asset * | Property Description | Service |
|---|---|---|
| 724 | J-1540 STORK GAMCO D-16S PICKERS | 8/01/99 |
| 725 | J-1543 WHOLE BIRD CONT. L#1 & L#2 | 7/01/99 |
| 735 | HI CORE ROTARY SCREEN | 9/22/99 |
| 736 | STARTER CABLE | 10/22/99 |
| 739 | MOTOR PUMP | 10/05/99 |
| 741 | LIV/GIZ MACH PARTS | 11/18/99 |
| 742 | MORSE GEAR BOX | 11/17/99 |
| 743 | AIRCOMPRESSOR | 9/15/99 |
| 744 | STORK GAMCO MACH PARTS | 11/05/99 |
| 749 | JOB 1547 BRIGHT DUMP SYSTEM | 10/31/99 |
| 751 | JOB 1568 MORRIS CHILLER | 11/09/99 |
| 753 | JOB 1593 BLOOD TROUGH EXPANSION | 11/30/99 |
| 755 | BRIGHT HYDRAULIC PUMP | 1/31/00 |
| 758 | JOB 1548 TSP PROC SYSTEM | 3/01/00 |
| 761 | JOB 1555 8" G RUPP WASTE WATER PUMP | 3/01/00 |
| 764 | JOB 1572 QUINCY AIR COMP | 3/01/00 |
| 766 | JOB 1576 LIVE HAND DOCK FANS | 3/01/00 |
| 769 | JOB 1591 QA ANALYTICAL BALANCE | 3/01/00 |
| 778 | LIGHT FIXTURES | 3/31/00 |
| 783 | CAPITALIZED LABOR | 1/01/00 |
| 784 | JOB 1547 CAP LABOR | 4/01/00 |
| 785 | JOB 1568 CAP LABOR | 4/01/00 |
| 791 | MISC PROC EQUIPMENT | 7/01/00 |
| 794 | WITTICHEN COMPRESSOR | 7/29/00 |
| 795 | JOB 1587 SCALDER | 8/01/00 |
| 796 | JOB 1588 JOHNSON TAIL PICKER | 8/01/00 |
| 798 | JOB 1592 LINE #1 EVIS DRIVE | 8/01/00 |
| 799 | JOB 1594 SANITATION HIGH PRESSURE PUMP | 8/01/00 |
| 801 | JOB 1596 LUDELL HOT WATER SYSTEM | 8/01/00 |
| 802 | JOB 1597 JOHNSON TAIL PICKER LINE #2 | 8/01/00 |
| 804 | JOB 1599 HVAC LIVE HANG UNIT | 8/01/00 |
| 808 | JOB 1613 NASH VACUUM PUMP | 8/01/00 |
| 809 | JOB 1614 #1 REHANG CONVEYOR | 8/01/00 |
| 811 | JOB 1619 LEWIS HOCK CUTTERS | 8/01/00 |
| 812 | JOB 1620 FRICK COMPRESSOR OVERHAUL | 8/01/00 |
| 815 | JOB 1634 STORK GAMCO D161 PICKER | 8/01/00 |
| 829 | JOB 1597 JOHNSON TAIL PICKER L 2 | 10/28/00 |
| 832 | JOB 1619 LEWIS HOCK CUTTERS | 10/28/00 |
| 835 | 1534 SG D 161 PICKER | 10/28/00 |
| 836 | JOB 1644 REHANG CONVEYOR | 10/28/00 |
| 846 | JOB 1661 EYE WASH STATIONS | 10/28/00 |
| 848 | MISC PROC INVOICES | 11/25/00 |
| 851 | MISC PROC INVOICES | 12/01/00 |
| 852 | MISC PROC INVOICES | 1/27/01 |
| 857 | JOB 1654 SIZER FOR PICKING LINE | 1/27/01 |
| 861 | MISC PROC INVOICES | 2/24/01 |
| 863 | VARIABLE SPEED DRIVE | 3/01/01 |
| 865 | DRIVE WHEEL | 3/01/01 |
| 866 | VARIABLE SPEED DRIVE | 3/01/01 |
| 867 | PICKER CATCH RACK | 3/01/01 |
| 868 | RACKS FOR CUTTER HOPPERS | 3/01/01 |
| 872 | J 1663 HYDRAULIC LIFTS FOR DOCKS | 3/31/01 |
| 879 | J 1689 GORMAN RUPP PUMP FOR OFFAL | 3/31/01 |
| 880 | J 1682 FEATHER PUMP | 3/31/01 |
| 881 | J 1683 FRICK COMPRESSOR | 3/31/01 |
| 884 | JOHNSON HIGH SPEED SANI-VIS LINE | 11/01/00 |

| Asset * | Property Description | Service |
|---|---|---|
| 890 | JOB 1696 Relocation of Ammonia Coil | 8/01/01 |
| 891 | JOB 1697 Recirculator Relocation | 8/01/01 |
| 894 | JOB 1713 Line#1 Cropper Rebuild | 8/01/01 |
| 903 | JOB 1677 High Pressure Water System | 9/01/01 |
| 907 | JOB 1694 Install New Trash Compactor | 9/01/01 |
| 919 | JOB 1715 Dripline Chains | 10/01/01 |
| 920 | JOB 1717 Box Labeling Scale System | 10/01/01 |
| 942 | Addn to JOB 1677 High Pressure Water System | 12/01/01 |
| 944 | JOB 1702 Reinstall Paw Operation Equipment | 12/01/01 |
| 945 | JOB 1703 Neck Chiller #2 | 12/01/01 |
| 948 | JOB 1713 Line #1 Cropper Rebuild | 12/01/01 |
| 955 | Job#1738 Gear boxes for picking lines | 9/28/01 |
| 960 | Job 1723 Overhead scale system | 2/01/02 |
| 961 | Job 1732 Conveyor realignment | 2/01/02 |
| 962 | Job 1737 Evis chain | 2/01/02 |
| 963 | Job 1732 Capitalized labor | 2/01/02 |
| 965 | Job#1736 Johnson equipment rebuilds | 9/13/01 |
| 970 | Job#1758 Chiller #2 & #3 Rechillers | 3/15/02 |
| 973 | Addn to Job 1758 | 3/26/02 |
| 990 | Addn to Job 1736 | 5/24/02 |
| 991 | Addn to Job 1758 | 6/25/02 |
| 1002 | Job# 1784 Extend Cone Lines | 11/19/02 |
| 1003 | Job# 1786 Rendering Auger Conveyor | 11/27/02 |
| 1004 | Job# 1788 Robot Vertical Coupe Cutter | 12/10/02 |
| 1007 | Job# 1766 Install new computer to outconveyor | 6/14/02 |
| 1010 | Job 1755 Starflex/Dapec | 10/16/02 |
| 1012 | Job 1785 Evis Line chain | 2/26/03 |
| 1013 | Addn to Job 1788 | 1/07/03 |
| 1014 | Job 1789 Picking Line chain | 12/10/02 |
| 1018 | New drains & covers | 4/10/03 |
| 1019 | Job#1782 Breast Deboning | 4/01/03 |
| 1021 | Job#1790 Mepsco double head conversion | 4/01/03 |
| 1022 | Job#1791 Dapec 3 extension & marination | 4/01/03 |
| 1025 | 4 Hand held radios | 5/21/03 |
| 1028 | 2 Worm gear reducers | 5/19/03 |
| 1029 | Guide shackle/idler wheel | 5/19/03 |
| 1030 | Atek Box & 2 Reducers | 5/07/03 |
| 1031 | Addn to Job 1785 | 5/29/03 |
| 1033 | Job# 1792 High Pressure Pump Package | 5/06/03 |
| 1034 | Job# 1796 Johnson Neckbreaker Combos | 5/24/03 |
| 1037 | Job#1801 Chickway Whole Bird, WOG, Thigh Debo | 6/19/03 |
| 1039 | Rebuild Dapec#3 Fat Puller | 5/22/03 |
| 1042 | 110' Tabletop Chain | 5/28/03 |
| 1043 | 120' Intralox Belting | 6/27/03 |
| 1044 | 2 Radios | 6/12/03 |
| 1045 | 4 Radios | 6/12/03 |
| 1046 | 2 Radios | 6/16/03 |
| 1050 | Keel deflector | 6/13/03 |
| 1051 | Addn to Job 1782 | 6/30/03 |
| 1052 | Addn to Job 1791 | 4/01/03 |
| 1053 | Addn to Job 1792 | 5/06/03 |
| 1054 | Addn to Job 1801 | 6/25/03 |
| 1058 | Cone Line chain 154 ft | 7/11/03 |
| 1059 | Rebuild compressor | 7/28/03 |
| 1062 | Foot Unloader with picking fingers | 8/19/03 |
| 1065 | Quantum controller | 7/11/03 |

| Asset * | Property Description | Service |
|---|---|---|
| 1068 | 50Hp pump | 7/17/03 |
| 1075 | 16 Ergonomic stands | 9/03/03 |
| 1077 | Wilden Cat pump | 10/21/03 |
| 1079 | Washdown unit heater | 10/10/03 |
| 1080 | Addn to Job# 1782 | 10/01/03 |
| 1081 | Addn to Job# 1801 | 9/12/03 |
| 1083 | Job# 1813 8/5 Drumsticks and wings | 10/21/03 |
| 1085 | Job# 1817 Sorting system | 5/28/03 |
| 1088 | Job# 1822 New Chickway Wolf | 6/30/03 |
| 1089 | Job# 1824 Stunner project | 9/16/03 |
| 1092 | Automatic foot unloader | 10/03/03 |
| 1095 | 3 printers | 10/01/03 |
| 1096 | Motor control - size 3 | 10/29/03 |
| 1104 | Sales/Use tax on jobs | 12/27/03 |
| 1108 | Water flow magnetic meter | 1/27/04 |
| 1109 | Waste water pump | 2/23/04 |
| 1111 | Addn to Job 1792 | 11/24/03 |
| 1112 | Job# 1797 Picking Room renovation | 2/01/04 |
| 1113 | Addn to Job# 1801 | 5/30/03 |
| 1116 | Job# 1828 Wizzard knife system | 12/02/03 |
| 1117 | Job# 1829 Weiler West grinder & installation | 12/03/03 |
| 1119 | Job# 1832 Thigh Debone project & installation | 2/02/04 |
| 1120 | Job# 1833 Flex Line | 12/01/03 |
| 1123 | Addn to Job# 1797 | 3/01/04 |
| 1124 | Addn to Job# 1832 | 3/08/04 |
| 1125 | Job# 1837 Johnson Baader venting machines | 3/01/04 |
| 1127 | Job# 1839 Thigh debone ergo stands | 2/19/04 |
| 1128 | Job# 1841 Evis chain | 1/28/04 |
| 1129 | Job# 1842 Picking line chain | 2/26/04 |
| 1130 | Rebuild gizzard machine | 3/02/04 |
| 1136 | Addn to Job# 1832(Thigh debone equip/install) | 4/08/04 |
| 1137 | Job# 1840 Russian project | 4/01/04 |
| 1138 | Install water flow meter | 4/14/04 |
| 1139 | Gorman Rupp pump | 5/11/04 |
| 1140 | 6 pneumatic scissors | 5/13/04 |
| 1141 | Metal detector | 6/08/04 |
| 1142 | Scale equipment | 6/14/04 |
| 1152 | Addn to Job# 1840 (Russian Project) | 6/17/04 |
| 1153 | Job# 1845 New Chiller addition | 6/02/04 |
| 1158 | Job# 1858 20,000 gallon chiller tank install | 5/25/04 |
| 1161 | 2 effluent pumps | 6/23/04 |
| 1162 | Chiller parts | 6/16/04 |
| 1164 | New motor for dumping system | 6/24/04 |
| 1165 | New pump vacuum system | 5/26/04 |
| 1177 | Chiller repairs - larger valves and piping | 6/15/04 |
| 1178 | 2 refurbished vacuum pumps | 6/24/04 |
| 1179 | Vacuum pump | 7/16/04 |
| 1180 | Feather leveling conveyor | 7/14/04 |
| 1182 | Propane pump | 8/03/04 |
| 1196 | Addn to Job# 1840 (Russian Project) | 9/17/04 |
| 1197 | Job# 1843 Dapec expansion(Fst fd Proc. Equip) | 8/24/04 |
| 1198 | Addn to Job# 1845(Chiller addition) | 6/15/04 |
| 1199 | Job# 1872 Chiller water pipe replacement | 7/14/04 |
| 1202 | 7 - 30" fans | 7/29/04 |
| 1203 | 6 halophane light fixtures | 7/29/04 |
| 1204 | Add hoses at dock doors | 8/03/04 |

| Asset * | Property Description | Service |
|---|---|---|
| 1206 | Scalder modification | 8/11/04 |
| 1207 | Rebuilt compressor | 7/27/04 |
| 1208 | 3 metering pumps | 8/25/04 |
| 1209 | Mechanical shackle detector | 7/29/04 |
| 1210 | 4 air shears | 6/18/04 |
| 1217 | Pump conversion kit | 9/20/04 |
| 1220 | Quincy compressor rebuild | 7/26/04 |
| 1221 | Modify bleed time | 8/17/04 |
| 1224 | CEIA metal detector | 8/25/04 |
| 1226 | Addn to Job# 1840(Russian Project) | 9/27/04 |
| 1227 | Addn to Job# 1843( Fast Food Proc. ) | 10/07/04 |
| 1228 | Addn to Job# 1845(New Chiller Addition) | 9/23/04 |
| 1230 | Addn to Job# 1858 (20,000 gal. Chiller Tank) | 7/21/04 |
| 1233 | Addn to Job# 1872(Chiller Water Pipe Rplcmnt) | 10/14/04 |
| 1240 | Gorman Rupp pump | 10/22/04 |
| 1241 | 8 radios and chargers | 10/07/04 |
| 1246 | 21 temperature recorders | 10/15/04 |
| 1247 | Receptacles - hanging bay & picking room | 10/27/04 |
| 1249 | 400' Knuckle chain | 11/01/04 |
| 1250 | Vacuum pump | 11/03/04 |
| 1254 | 29 temperature recorders | 12/14/04 |
| 1255 | Addn to Job# 1840(Russian Project) | 10/29/04 |
| 1256 | Addn to Job# 1843 (Equip for fast food proc.) | 9/28/04 |
| 1257 | Implementation of PMS program | 8/03/04 |
| 1258 | Job# 1856 mech audit compressor vibration ana | 9/20/04 |
| 1265 | Job# 1874 Re-chiller | 10/15/04 |
| 1270 | Job# 1880 Overhead chain in Evis | 10/18/04 |
| 1271 | Job# 1881 KFC saws | 8/26/04 |
| 1272 | Job# 1886 Evisceration birdwashers | 10/21/04 |
| 1274 | Job# 1889 Heat exchanger | 11/12/04 |
| 1279 | Addn to Job# 1843 (Equip. fast food process.) | 9/28/04 |
| 1280 | Addn to Job# 1845 (New Chiller Addition) | 10/27/04 |
| 1281 | Addn to Job#1856(Audit Compression VAR Valve) | 9/30/04 |
| 1285 | Addn to Job# 1872(Chiller Wter Pipe Replcmnt) | 10/08/04 |
| 1288 | Addn to Job# 1881 (KFC Saws) | 12/06/04 |
| 1289 | Job# 1885 Montgomery wing saws | 11/28/04 |
| 1290 | Addn to Job# 1886 (Evisceration Birdwashers) | 12/03/04 |
| 1292 | Job# 1891 Relocation of Dapec 4 | 10/22/04 |
| 1293 | Job# 1892 Install insect lights | 11/29/04 |
| 1294 | Job# 1894 Cone line counters | 11/22/04 |
| 1297 | Job# 1897 Picking/hanging bay realignment | 12/09/04 |
| 1304 | Addn to Job# 1845 (New Chiller Addition) | 2/01/05 |
| 1306 | Job# 1875 - Installation air compressors | 2/09/05 |
| 1307 | Job# 1882-Air system upgrade(purifier/exhaust | 2/28/05 |
| 1308 | Job# 1893 - Install new evacuation system | 9/30/04 |
| 1315 | Addn to Job# 1840 (Russian Project) | 5/05/05 |
| 1318 | Addn to Job# 1882 | 1/11/05 |
| 1319 | Job# 1884 Waste water upgrade | 3/10/05 |
| 1320 | Addn to Job# 1885 | 3/17/05 |
| 1321 | Addn to Job# 1889 | 1/11/05 |
| 1327 | Addn to Job# 1872 | 4/11/05 |
| 1332 | Job# 1903 - Gizzard harvester Gaines machine | 2/25/05 |
| 1335 | Job# 1911 - Main switchgear replacement | 4/11/05 |
| 1336 | Murzan pump | 7/08/05 |
| 1337 | 5 used cutup saws | 7/14/05 |
| 1338 | 2 rebuilt bagger assemblies | 5/25/05 |

| Asset | * | Property Description | Service |
|-------|---|----------------------|---------|
| 1340 | | Gearbox & drive to rework line 2 | 7/01/05 |
| 1346 | | Job# 1913 Hand saw upgrade | 5/16/05 |
| 1347 | | Job# 1916 CO2 Exhaust blowers | 5/03/05 |
| 1350 | | Install conactors for new CO2 exhaust fans | 7/08/05 |
| 1351 | | New circuits for hand saws, lighting & fans | 8/15/05 |
| 1352 | | Monyo sludge pump | 6/16/05 |
| 1354 | | Reconditioned hand wash stations | 8/25/05 |
| 1355 | | Gearbox | 8/18/05 |
| 1356 | | Rotary knife sharpener | 9/01/05 |
| 1359 | | Job # 1920 - Birdwasher | 8/24/05 |
| 1360 | | Job # 1921 - Online reprocessing | 8/24/05 |
| 1372 | | Job # 1940 - Dapec #7, dark meat conversion | 9/28/05 |
| 1374 | | Job # 1926 - Johnson transfer machines | 1/10/06 |
| 1378 | | Addn to Job# 1921 | 2/14/06 |
| 1379 | | Addn to Job# 1926 | 2/10/06 |
| | | | **EVISCERATION** |

## Group: FAST FOOD

| 352 | AUTOMATIC SCALE LOADER JOB 1304 | 6/30/94 |
|-----|----------------------------------|---------|
| 353 | PACKOUT CONVEYOR JOB 1307 | 6/30/94 |
| 371 | JOB 1402 CVP MACHINE | 9/30/96 |
| 708 | JOB 1528 JOHNSON MULTI-CUT | 1/31/99 |
| 763 | JOB 1564 RE-ALIGN PROC CONVEYORS | 3/01/00 |
| 775 | ADDN TO JOB 1564 REALIGN 2ND PROC CONV | 3/31/00 |
| 797 | JOB 1589 JOHNSON MULTI CUT UPGRADE | 8/01/00 |
| 807 | JOB 1610 JOHNSON MULTI CUT | 8/01/00 |
| | | **FAST FOOD** |

## Group: FORKLIFT EQUIPMENT

| 201 | DYNA LIFT PALLET JACK | 12/22/98 |
|-----|------------------------|----------|
| 569 | NISSAN FKLFT J311 | 10/13/87 |
| 576 | DYNA LIFT PALLET JACK | 8/31/94 |
| 577 | DYNA LIFT PALLET JACK | 1/31/95 |
| 578 | 2 DYNA LIFT PALLET JACKS | 3/28/95 |
| 579 | DYNA LIFT PALLET JACK | 9/08/97 |
| 580 | DYNA LIFT PALLET JACK | 10/16/97 |
| 581 | DYNA LIFT PALLET JACK | 1/09/98 |
| 1074 | 10 Pallet jack batteries | 7/28/03 |
| | | **FORKLIFT EQUIPMENT** |

## Group: FRONT HALVES

| 72 | BUCKHORN TOTES | 4/30/98 |
|----|----------------|---------|
| 688 | PLASTIC CONTAINERS | 2/01/99 |
| 817 | JOB 1641 DAPEC FRONT HALVER | 8/01/00 |
| 860 | PLASTIC TOTES | 1/01/01 |
| | | **FRONT HALVES** |

## Group: LAND

| 1 | LAND | 7/01/68 |
|---|------|---------|
| 2 | TRIPLE S SKYARD LAND | 11/30/80 |
| | | **LAND** |

| Asset * | Property Description | Service |
|---|---|---|
| **Group: LAND-SYLACAUGA** | | |
| 680 | LAND | 2/01/91 |
| 681 | LAND 3.6 ACRES | 3/09/92 |
| | | **LAND-SYLACAUGA** |

| Asset | Property Description | Service |
|---|---|---|
| **Group: LEGS** | | |
| 97 | STARFLEX HOPPER SCALE | 3/31/98 |
| 192 | J1503 BOX STRAPPER | 11/30/98 |
| 196 | J1516 12 STATION WEIGH GRADER | 11/30/98 |
| 246 | CO2 TANK - J 260 | 12/30/88 |
| 366 | J 1382 STARFLEX BAGGER | 3/31/96 |
| 393 | JOB 1468 60' CONVEYOR | 2/28/98 |
| 700 | J-1518 SADDLE SPLITTER & CRAMMING SYSTEM | 10/31/98 |
| 701 | J-1518 HI-SPEED INFEED UNIT | 11/30/98 |
| 702 | J-1518 INFEED COMPUTER EQUIPMENT | 11/30/98 |
| 704 | J-1518 CHAIN | 11/30/98 |
| 705 | J-1518 INSTALLATION COSTS | 11/30/98 |
| 707 | JOB-1519 CVP MACHINE | 12/31/98 |
| 788 | POLYCLIP MACHINE | 7/01/00 |
| 810 | JOB 1615 LEG QUARTER SCALE BAGGER | 8/01/00 |
| | | **LEGS** |

| Asset | Property Description | Service |
|---|---|---|
| **Group: MARINATION** | | |
| 149 | JOB 1467 MARINATION EQUIP | 8/31/98 |
| 792 | MEPSCO BRINE TANK | 7/29/00 |
| 847 | JOB 1664 UPGRADE CHILL WATER  MARINATION | 10/28/00 |
| 859 | PLASTIC TOTES | 1/01/01 |
| 870 | PLASTIC TOTES | 3/31/01 |
| 897 | Plastic Totes | 8/01/01 |
| 901 | JOB 1664 Upgrade Chill Water for Marination | 9/01/01 |
| 908 | Plastic Totes | 9/17/01 |
| 909 | Plastic Totes | 9/05/01 |
| 910 | Plastic Totes | 9/10/01 |
| 911 | Plastic Totes | 9/26/01 |
| 927 | JOB 1741 Relocation of Marinaters | 10/01/01 |
| 928 | Plastic Totes | 10/01/01 |
| 929 | Plastic Totes | 10/05/01 |
| 930 | Plastic Totes | 10/11/01 |
| 931 | Plastic Totes | 10/12/01 |
| 932 | Plastic Totes | 10/19/01 |
| 959 | Plastic totes | 2/04/02 |
| 976 | Plastic Totes | 6/24/02 |
| 982 | Plastic Totes | 6/25/02 |
| 983 | Plastic Totes | 6/27/02 |
| 984 | Plastic Totes | 6/27/02 |
| 985 | Plastic Totes | 6/28/02 |
| 986 | Plastic Totes | 7/02/02 |
| 987 | Plastic Totes | 7/10/02 |
| 1036 | Job#1800 Mepsco Inline Marinator | 5/16/03 |
| 1339 | Complete rebuild - 2 marinators | 7/01/05 |
| 1343 | Job# 1900 Marination mix/chill system | 4/07/05 |
| | | **MARINATION** |

| Asset * | Property Description | Service |
|---|---|---|
| **Group: OFFAL EQUIPMENT** | | |
| 52 | NEW OFFAL SCRN J200 | 1/19/87 |
| 151 | JOB 1476 OFFAL SECONDARY SCREEN | 8/31/98 |
| 457 | PROD RECLAM FACIL | 3/01/78 |
| 770 | JOB 1606 HYCOR SCREEN | 3/01/00 |
| 776 | ADDN TO JOB 1606 HYCOR SCREEN | 3/31/00 |
| 780 | ADDITION TO JOB 1606 | 3/31/00 |
| 831 | 1606 HYCOR SCREEN | 10/28/00 |
| 988 | Job 1762 Secondary screen | 6/04/02 |
| 1057 | Job# 1823 Offal Augers | 6/25/03 |
| 1114 | Job# 1826 Offal Electrical | 12/23/03 |
| 1143 | Addn to Job# 1826 (Offal Electrical) | 4/01/04 |
| 1151 | Addn to Job# 1826 | 5/14/04 |
| | | **OFFAL EQUIPMENT** |

| | | |
|---|---|---|
| **Group: OFFICE BUILDING** | | |
| 4 | J 1434 NEW ADMIN BLDG | 10/24/97 |
| 5 | CAP INT JOB 1434 | 10/24/97 |
| 396 | OFFICE BUILDING | 9/30/81 |
| 397 | TWO NEW OFFICES | 3/17/86 |
| 713 | Job 1522-Renovate Admin Bldg | 4/01/99 |
| 895 | JOB 1714 Air Conditioner Upgrade-Admin. Build | 8/01/01 |
| 1314 | Canopy - admin building walkway | 5/24/05 |
| | | **OFFICE BUILDING** |

| | | |
|---|---|---|
| **Group: OFFICE EQP HUMAN RESOURCE** | | |
| 898 | Gorrie Reagan Time/Attendance Manager | 8/01/01 |
| 1105 | Laserjet Printer-HR | 12/04/03 |
| 1353 | Change out time clock to photo eye | 7/08/05 |
| | | **OFFICE EQP HUMAN RESOURCE** |

| | | |
|---|---|---|
| **Group: OFFICE EQUIP ACCOUNTING** | | |
| 69 | CANON TYPEWRITER | 11/07/83 |
| 70 | AUDIO METRIC EXAMINER | 7/13/82 |
| 73 | LAWN TRACTOR | 3/31/98 |
| 80 | OFFICE FURNITURE | 1/29/86 |
| 90 | PLNT/TM ATTN SYS 182 | 3/09/87 |
| 91 | OFC REMOD/FIXT J185 | 2/10/87 |
| 92 | SALES/PERS REMOD 191 | 2/10/87 |
| 93 | ADDN. TO ASSET# 90 | 4/29/87 |
| 96 | CENTEL LNE PLNT/T | 8/20/87 |
| 99 | CHAIR,DESK | 8/02/88 |
| 102 | CHAIR | 11/02/88 |
| 105 | SWIVEL CHAIR | 1/31/90 |
| 106 | CREDENZA | 1/31/90 |
| 109 | EXECUTIVE DESK | 7/15/90 |
| 111 | CABINET | 9/11/90 |
| 113 | CHAIR | 1/07/91 |
| 115 | TYPEWRITER | 2/25/91 |
| 117 | 2 CHAIRS | 3/31/91 |
| 124 | FURNITURE OLD COMPUTER ROOM | 1/31/93 |
| 133 | BLINDS ADMIN BLDG | 10/21/97 |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 134 | DATA COMM LINES ADMIN BLDG | 11/06/97 |
| 462 | OFFICE FURNITURE | 8/07/78 |
| 463 | FILE CABINETS | 6/06/79 |
| 464 | CHAIRS/TABLES/DESK | 3/31/80 |
| 465 | CONFERENCE DESK | 4/30/81 |
| 466 | CONF TABLE | 4/30/81 |
| 467 | 2 END TABLES | 4/30/81 |
| 468 | DESK | 4/30/81 |
| 469 | DESK | 4/30/81 |
| 470 | 2 TABLES | 4/30/81 |
| 471 | 2 LEATHER CHAIRS | 4/30/81 |
| 472 | 2 BRASS LAMPS | 4/30/81 |
| 473 | OVEN | 6/08/81 |
| 474 | ICEMAKER | 6/08/81 |
| 475 | REFRIGERATOR | 6/08/81 |
| 476 | SOFA | 5/22/81 |
| 477 | 2 WING CHAIRS | 5/22/81 |
| 478 | 2 TABLES | 5/22/81 |
| 479 | 18 CHAIRS CONF ROOM | 7/06/81 |
| 480 | DESK | 7/07/81 |
| 481 | DESK | 7/07/81 |
| 482 | 2 POSTURE CHAIRS | 7/15/81 |
| 483 | SWIVEL CHAIR | 7/22/81 |
| 484 | BOOKCASES | 7/10/81 |
| 485 | 13 FILE CABINETS | 7/27/81 |
| 486 | DESK | 7/14/81 |
| 487 | 3 STIFFELL LAMPS | 7/22/81 |
| 488 | DESK | 7/22/81 |
| 489 | DESK | 7/22/81 |
| 490 | SOFA LOBBY | 7/27/81 |
| 491 | 4 FILE CABINETS | 2/17/82 |
| 492 | DESK | 9/30/82 |
| 493 | PAINTING | 7/07/82 |
| 494 | DESK/FILING CABINET | 8/14/83 |
| 495 | DOOR LOCKS OFC BLDG | 8/29/83 |
| 502 | EXECUTIVE DESK | 1/29/90 |
| 504 | COMPUTER ROOM REMODELING | 4/01/92 |
| 685 | PANELS-ACCOUNTING OFFICE | 11/21/98 |
| 747 | ADT CAMERA | 12/21/99 |
| 754 | PANELS ACCT OFFICE | 2/07/00 |
| 1024 | Job#1815 M-Tech systems SQL update | 4/01/03 |
| 1330 | 12 leather chairs - board room | 5/23/05 |

**OFFICE EQUIP ACCOUNTING**

## Group: OFFICE EQUIP G AND A

| | | |
|-------|---------------------|---------|
| 127 | LATERAL FILE CABINET | 8/23/95 |
| 130 | ENTRECOMPUTER LASER PRINTER | 1/31/96 |
| 132 | ICE MACHINE OFFICE | 9/26/97 |
| 899 | Meridian 1 Option 11 System (Phone System) | 8/01/01 |
| 969 | Ticket printer | 2/18/02 |
| 971 | Audiometric equipment | 4/01/02 |
| 974 | 2 Laserjet 4100N printers | 4/18/02 |
| 998 | Label printer | 11/21/02 |
| 1005 | Job# 1794 Hazwopper Equipment Trailer | 1/16/03 |
| 1006 | Scale repair/upgrade | 12/09/02 |

| Asset | * | Property Description | Service |
|-------|---|---------------------|---------|
| 1106 | | 2 Dell computers-Dean & Lyman | 1/13/04 |
| 1183 | | Audiometric equipment | 8/01/04 |
| 1225 | | Ticket printer | 8/30/04 |
| 1341 | | Infocus projector | 7/01/05 |
| | | | **OFFICE EQUIP G AND A** |

## Group:  OFFICE EQUIP MIS

| | | |
|------|-----------------------------------|---------|
| 131 | JOB 1385 TEL/COMP WIRING MT PLANT | 4/29/96 |
| 772 | DELL SERVER&LAPTOPS | 3/31/00 |
| 773 | SDS UPS UNITS | 3/31/00 |
| 933 | Laserjet 4550N | 10/10/01 |
| 935 | MS OLB server upgrad | 10/01/01 |
| 999 | Job# 1674 AFS Software Upgrade | 1/01/03 |
| 1090 | Job# 1825 Cisco equipment - main switch | 8/26/03 |
| 1131 | 2 Dell servers | 1/28/04 |
| 1144 | Barcode scanner software | 5/12/04 |
| 1145 | 2 Dell servers | 5/28/04 |
| 1185 | Minitab upgrade | 8/01/04 |
| 1222 | 1750 server and tape drive | 8/26/04 |
| 1295 | Job# 1895 Gainco sorter software upgrade | 12/08/04 |
| 1298 | Dell laptop | 12/12/04 |
| 1342 | Plotter for blueprints | 7/19/05 |
| 1362 | Job # 1924 - Upgrade printers | 7/08/05 |
| 1363 | Job # 1925 - Upgrade Sylacauga network | 10/07/05 |
| 1365 | Job # 1928 - Computers/laptop/plotter | 7/06/05 |
| | | **OFFICE EQUIP MIS** |

## Group:  OFFICE EQUIP-SYLACAUGA

| | | |
|------|-------------------|---------|
| 678 | BRANNONS OFC FURN | 4/30/91 |
| 679 | OFFICE FURNITURE | 10/28/91 |
| | | **OFFICE EQUIP-SYLACAUGA** |

## Group:  OTHER BUILDINGS

| | | |
|------|------------------------------------------------|----------|
| 412 | MAINTENANCE SHOP | 3/30/79 |
| 413 | TOOL/PARTS ROOM J145 | 12/31/85 |
| 414 | MAINTENANCE SHOP ADDN | 9/30/83 |
| 1234 | Fence in maintenance bldg | 10/20/04 |
| 1268 | Job# 1878 UPS renovations (old hatchery) | 9/08/04 |
| 1287 | Addn to Job# 1878(UPS Renovations-old hatcher | 8/31/04 |
| 1302 | Portable building - maintenance | 3/03/05 |
| | | **OTHER BUILDINGS** |

## Group:  PACKOUT

| | | |
|------|------------------------------|----------|
| 146 | CONVEYOR-PACK OUT | 6/30/98 |
| 184 | J1491 BOX COMPACTOR | 10/31/98 |
| 369 | JOB 1393 EMPTY BOX CONVEYOR | 4/25/96 |
| 377 | JOB 1429 SPRINKLER BOX ROOM | 4/30/97 |
| 388 | JOB 1441 LID MACHINE | 10/31/97 |
| 740 | J1493 STRAP MACHINE | 11/30/99 |
| 765 | JOB01575 ICE CONVEYOR SYSTEM | 3/01/00 |
| 787 | WITTCHEN COMPRESSOR | 7/01/00 |
| 793 | COMPUTERWAY TRACK SET | 7/29/00 |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 803 | JOB 1598 REALIGN 2ND PROCESSING CONVEYOR | 8/01/00 |
| 825 | DORAN PLATFORM | 10/28/00 |
| 840 | JOB 1652 AUT GIB WRAP | 10/28/00 |
| 843 | JOB 1658 LUG WASHER RELOCATION | 10/28/00 |
| 877 | J 1679 OVAL STRAPPER | 3/31/01 |
| 915 | 2 Vertical Base Polyclip | 9/01/01 |
| 921 | JOB 1719 Box Strappers | 10/01/01 |
| 922 | JOB 1720 Tubwasher Boiler | 10/01/01 |
| 924 | JOB 1731 Ice Auger | 10/01/01 |
| 943 | Addn to JOB 1679 Oval Strapper | 12/01/01 |
| 966 | Job#1759 False ceiling in blast freezer | 2/23/02 |
| 972 | Addn to Job 1719 | 10/09/01 |
| 993 | Poly Clip machine | 8/21/02 |
| 1009 | Addn to Job 1598 | 10/25/00 |
| 1020 | Job#1787 Addtl Packaging machinery | 4/01/03 |
| 1032 | Addn to Job 1787 | 4/16/03 |
| 1035 | Job# 1798 Box Machine Upgrade | 5/12/03 |
| 1066 | RH vertical clippers - 3 | 8/01/03 |
| 1118 | Job# 1830 Strapper 3/8" | 12/08/03 |
| 1159 | Job# 1863 Tipper Tie machine | 5/20/04 |
| | | **PACKOUT** |

### Group: PARKING LOT

| | | |
|-------|---------------------|---------|
| 21 | PARKING LOT GRADING | 5/19/82 |
| 23 | ASPHALT PAVING | 6/11/82 |
| 24 | OFFICE PARKING LOT | 12/31/84 |
| 25 | PLT ACCESS PVING 153 | 11/11/85 |
| 26 | CONCRETE LDG PAD 154 | 1/22/86 |
| 30 | ASPHALT DRIVE 175 | 6/04/86 |
| 406 | CHAIN LINK FENCE | 6/30/82 |
| 407 | PLANT FENCE | 9/30/85 |
| 408 | DIRT/GRAD E SIDE PLNT | 11/30/86 |
| 409 | DRV/DRAINAGE IMPR 315 | 11/30/90 |
| 410 | PAVING - PARKING LOT # 364 | 6/30/93 |
| 411 | FENCE J 1434 | 7/25/97 |
| 936 | Job 1722 Front gate exit driveway repair | 11/01/01 |
| 958 | Job 1541 Construction Front entrance | 12/01/01 |
| 1334 | Job# 1910 - Paving at holding shed | 7/13/05 |
| | | **PARKING LOT** |

### Group: PARTS

| | | |
|-------|---------------------|---------|
| 156 | JOB 1492 REBUILD DAPEC | 8/31/98 |
| 194 | J1510 DAPEC PRE-CUTTER | 11/30/98 |
| 357 | BOX ICER JOB 1314 | 10/31/94 |
| 362 | JOB 1336 BAADER FILER | 6/06/95 |
| 689 | POLY CHIP MACHINE | 12/18/98 |
| 690 | SCALE PRINTER | 1/19/99 |
| 752 | JOB 1574 DAPEC MACHINE | 12/05/99 |
| 756 | ADD TO JOB 1574 | 2/28/00 |
| 767 | JOB 1578 DAPEC LUG WASHER | 3/01/00 |
| 771 | JOB 1609 CVP MACHINE | 3/01/00 |
| 774 | ADDN TO JOB 1574 DAPEC | 3/31/00 |
| 786 | JOB 1574 CAP LABOR | 4/01/00 |
| 823 | JOB 1648 DAPEC CUT UP MACHINE | 8/01/00 |

| Asset * | Property Description | Service |
|---|---|---|
| 828 | CLOSE 1574 DAPEC MACHINE | 10/28/00 |
| 838 | JOB 1648 DAPEC CUT UP MACHINE | 10/28/00 |
| 855 | JOB 1648 DAPEC CUT UP MACHINE | 1/27/01 |
| | | **PARTS** |

**Group: PAWS**

| 1121 | Job# 1835 Paw operation | 12/10/03 |
|---|---|---|
| 1361 | Job # 1922 - Line 1 shielded paws | 4/08/05 |
| | | **PAWS** |

**Group: PLANT OFFICES**

| 172 | OFFICE RENOV - QC OFFICE | 11/30/98 |
|---|---|---|
| 400 | USDA REFRIG/RANGE | 10/18/85 |
| 401 | SALES/SHIP REMOD 101 | 3/28/83 |
| 402 | SALES/SHIP OFC REMOD | 4/01/83 |
| 403 | PERS OFC REMOD 102 | 3/28/83 |
| 404 | PERSONNEL OFS REMODELNG | 4/01/83 |
| 405 | RENOV SALE/PERS 191 | 12/31/86 |
| 768 | JOB 1586 PRODUCTION OFFICES | 3/01/00 |
| 1313 | Remodel plant managers office | 5/24/05 |
| | | **PLANT OFFICES** |

**Group: PROCESSING BUILDING**

| 6 | LOADING DOCK | 1/01/76 |
|---|---|---|
| 7 | IMPROVEMENTS | 2/01/76 |
| 9 | CHILL PAK ADDITION | 1/01/77 |
| 10 | FREEZER | 10/01/76 |
| 12 | BRKRM/BOXRM ADDN | 8/30/77 |
| 17 | OFFICE ADDITION | 7/03/78 |
| 19 | PLANT ADDITION | 5/11/79 |
| 22 | BUILDING | 3/01/80 |
| 27 | METAL SHED | 3/31/80 |
| 31 | LD DK IMPRV #104 | 3/28/83 |
| 32 | CONDEMN ROOM IMPROVEMNTS | 12/27/82 |
| 33 | BUILDING INSULATION | 10/31/83 |
| 34 | NEW ROOF | 12/15/83 |
| 35 | NEW ELEC MAIN #131 | 9/30/84 |
| 36 | FURTHER PROC #118 | 7/31/84 |
| 37 | WEST ADDN JOB 124 | 3/31/86 |
| 38 | PLNT FIREWALL J141 | 1/16/86 |
| 39 | HYDR PUMP RM #149 | 2/28/86 |
| 40 | BATHRM RENOV #151 | 2/28/86 |
| 41 | FIREWALL PROC #141 | 7/17/86 |
| 42 | SE WALL ENC CH #156 | 9/15/86 |
| 43 | PICKING RM ADDN #159 | 3/11/87 |
| 44 | LIGHTS - JOB 160 | 5/27/86 |
| 45 | FIRE ESC O/S #166 | 10/27/86 |
| 46 | RELOC FIRE HYD #169 | 4/25/86 |
| 47 | PAD/PMPHOU CH #171 | 9/02/86 |
| 48 | GRD HS2 BK GATE 186 | 12/15/86 |
| 49 | WIRING NEW PCKG 201 | 3/31/87 |
| 50 | ADDN. TO ASSET # 43 | 4/14/87 |
| 51 | REN TO LIVE HLDG 222 | 2/08/88 |

| Asset * | Property Description | Service |
|---|---|---|
| 53 | ADDN. TO ASSET #49 | 4/30/87 |
| 54 | LIVE HOLDING SHED | 9/08/88 |
| 55 | PARKING LOT LOAD OUT | 10/15/88 |
| 56 | RAW MAT LDING 249 | 10/31/88 |
| 57 | S COOL SHED DR 251 | 9/25/88 |
| 58 | COMP BLDG ADDN 298 | 1/02/90 |
| 59 | EAST SIDE LOADING DOCK | 8/31/92 |
| 60 | ICE ROOM ADDITTION J#353 | 11/16/93 |
| 61 | WATER PRE TREATMENT SYSTEM J#1279 | 12/09/93 |
| 62 | ICE MAKING ADDITION JOB 1292 | 4/30/94 |
| 63 | CHILLER ROOF # 360 | 5/21/93 |
| 64 | JOB 1413 ROOF EVIS AREA | 11/30/96 |
| 65 | CAPITALIZED INTEREST ON JOB 353/ICE ROOM ADDN | 11/16/93 |
| 66 | CAPITALIZED INTEREST JOB 1279 WATER PRE TREAM | 12/09/93 |
| 67 | RE-ROOF PICKING AREA | 1/31/98 |
| 138 | JOB 1449 STOR TANK FOUNDATION | 4/01/98 |
| 150 | JOB 1473 3 DOCK LEVELERS | 8/31/98 |
| 160 | JOB 1502 DRAIN COVERS SECTION 1 | 8/31/98 |
| 161 | JOB 1514 DRAIN COVERS SECT 2 | 10/31/98 |
| 162 | JOB 1487 RE-ROOF MAIN PLANT | 10/31/98 |
| 169 | RESURFACE PLANT FLOOR | 11/09/98 |
| 176 | REPLACE DRAINS IN COOLERS | 11/19/98 |
| 181 | J1490 COOLER DOORS | 10/31/98 |
| 195 | J1511 ROOF PLANT | 11/30/98 |
| 199 | J1527 HEAT A/C HATCHERY | 11/30/98 |
| 202 | SHIPPING DECK PLANNING CONCEPTS | 12/31/98 |
| 398 | NEW PLANT | 1/01/70 |
| 399 | IMPROVEMENTS | 3/01/71 |
| 682 | FRENCH DRAIN-PLANT | 12/31/98 |
| 683 | REFURBISH BATHROOMS | 12/31/98 |
| 715 | Job 1529 Renovate Plant | 4/01/99 |
| 728 | J-1551 MNTC PARTS ROOM EXPANSION | 8/01/99 |
| 729 | J-1557 FLOOR REPAIR IN 1ST PROCESSING | 6/01/99 |
| 757 | JOB 1546 COOLER DOORS | 3/01/00 |
| 762 | JOB 1560 ROOF PHASE I | 3/01/00 |
| 839 | JOB 1649 FLOOR EPOXY COATING USDA | 10/28/00 |
| 845 | JOB 1659 TELEPHONE INSTALLATION HODGES | 10/28/00 |
| 849 | REWORK FLOOR COOLER 4 | 11/25/00 |
| 862 | MAINTENANCE SHED | 3/01/01 |
| 871 | J 1581 PLANT EXPANSION BLDG | 3/31/01 |
| 873 | J 1670 DRAINS MARINATION ROOM | 3/31/01 |
| 874 | J 1671 PAD FOR ELECTRICAL ROOM | 3/31/01 |
| 878 | J 1681 REPAIR ROOF SHIPPING DOCK | 3/31/01 |
| 902 | JOB 1669 Emergency Lighting for Plant | 9/01/01 |
| 904 | JOB 1680 Ice Room Wall | 9/01/01 |
| 905 | JOB 1691 Replace 480/120 Volt Breaker Box | 9/01/01 |
| 906 | JOB 1692 Install Evacuation Homs & Strobes | 9/01/01 |
| 912 | Rolling Service Door | 9/01/01 |
| 913 | 8x8 Sheet Door | 9/01/01 |
| 914 | 8x8 Push-Up Door | 9/01/01 |
| 923 | JOB 1727 Grating for slip protection | 10/01/01 |
| 925 | JOB 1734 Relocate pipe to chillers | 10/01/01 |
| 926 | JOB 1735 Resurfacing of floor in prod. area | 10/01/01 |
| 934 | Two impact doors | 10/08/01 |
| 937 | Job 1751 Floor drain | 11/18/01 |
| 953 | JOB 1753 Concrete Area - Lug Dock | 12/01/01 |

| Asset | * | Property Description | Service |
|-------|---|---------------------|---------|
| 954 | | JOB 1754 Concrete Area outside of 2nd Process | 12/01/01 |
| 964 | | Resurface floors | 1/21/02 |
| 967 | | Job#1763 Shipping dock upgrade | 2/04/02 |
| 978 | | Job#1768 - Aro-Surf flooring | 5/14/02 |
| 1015 | | Iron floor grates | 3/14/03 |
| 1016 | | Ceiling panels - truck dock | 3/05/03 |
| 1017 | | Insulated panel around heat exchangers | 3/05/03 |
| 1023 | | Job#1795 Second Processing expansion | 4/01/03 |
| 1040 | | 4 fans - Holding Shed | 6/02/03 |
| 1041 | | 5 fans - Holding Shed | 6/17/03 |
| 1047 | | 4 fans - Holding Shed | 7/15/03 |
| 1048 | | Ceiling support - Cooler | 6/04/03 |
| 1049 | | Drain in Boxroom | 6/04/03 |
| 1060 | | Pipe ballards & curbs at new process room | 7/09/03 |
| 1063 | | 4 Fans - Holding Shed | 8/18/03 |
| 1064 | | Drain - loading dock | 8/08/03 |
| 1069 | | 4 Air curtains | 8/28/03 |
| 1070 | | A/C unit - Quality Control office | 9/04/03 |
| 1071 | | 8 - Halophane quartz light fixtures | 9/23/03 |
| 1072 | | Storage area - First processing | 9/17/03 |
| 1073 | | 4 fans - Holding shed | 9/23/03 |
| 1076 | | New roof at Offal | 10/12/03 |
| 1097 | | Install counter top - box room | 10/12/03 |
| 1098 | | Pipe and caps | 11/18/03 |
| 1099 | | Remove condenser | 11/18/03 |
| 1100 | | Install 7 doors | 11/18/03 |
| 1101 | | Grating for drains | 11/18/03 |
| 1102 | | Install frames and plate | 11/18/03 |
| 1103 | | Enclose canopy and build room | 11/18/03 |
| 1107 | | Install curbs in cooler | 1/21/04 |
| 1115 | | Job# 1827 2nd Processing floor repair | 10/06/03 |
| 1146 | | Job# 1844 Roofing for plant | 5/11/04 |
| 1147 | | Job# 1847 Install drains in debone | 4/01/04 |
| 1148 | | 5 fans - Holding shed | 4/08/04 |
| 1149 | | Ceiling panels & resurface walls | 4/01/04 |
| 1156 | | Job# 1850 Loading dock repair | 4/26/04 |
| 1160 | | Remove wall & install door | 5/25/04 |
| 1163 | | 3 fans - Holding shed | 6/11/04 |
| 1173 | | Rework walls and ceiling | 4/12/04 |
| 1174 | | Install 2" panels | 7/07/04 |
| 1176 | | 8 fans - Holding shed | 7/23/04 |
| 1200 | | Remodel restroom walls & ceiling | 4/22/04 |
| 1201 | | Removal of collapsed wall | 7/26/04 |
| 1205 | | Electrical equipment at offal area | 7/16/04 |
| 1218 | | Install circuits for KFC saws | 8/27/04 |
| 1219 | | Install electrical for vending machines | 9/20/04 |
| 1235 | | 2 cooler doors and plates | 10/05/04 |
| 1236 | | 2 rollup doors | 10/20/04 |
| 1237 | | Rework ceiling - cooler 4 | 10/20/04 |
| 1238 | | 3 fans - holding shed | 9/03/04 |
| 1248 | | Ceiling tile in 1st proc office | 11/09/04 |
| 1260 | | Job# 1859 Frick engine room expansion | 11/09/04 |
| 1266 | | Job# 1876 Breakroom ceiling repair | 11/12/04 |
| 1267 | | Job# 1877 Cooler 5 ceiling repair | 11/01/04 |
| 1269 | | Job# 1879 Resurface floor of Mtgy plant | 9/27/04 |
| 1286 | | Addn to Job# 1876 | 12/14/04 |

| Asset * | Property Description | Service |
|---|---|---|
| 1291 | Job# 1890 - Saw room curbing | 12/01/04 |
| 1296 | Job# 1896 Repaint cooling tower structure | 12/01/04 |
| 1299 | Emergency light fixtures | 3/11/05 |
| 1309 | New roof & gutter at plant managers office | 4/11/05 |
| 1310 | Canopy at shipping & plant managers office | 4/25/05 |
| 1311 | Framework for fans & canopy at holding shed | 4/25/05 |
| 1329 | Emergency light fixtures | 3/23/05 |
| 1333 | Job# 1908 - Roofing Hatchery, cooler 4 & ship | 5/10/05 |
| 1344 | Job# 1909 Upgrade holding shed nozzles & fans | 6/29/05 |
| 1349 | Job# 1930 Insulation of pipes - 2nd processin | 7/24/05 |
| 1358 | Job # 1917 - Repair cooler 4 | 8/24/05 |
| 1367 | Job # 1934 - Waste and Chill water roofing | 8/29/05 |
| 1368 | Job # 1936 - Marination room drain replacemen | 9/12/05 |
| 1371 | Job # 1929 - Flooring in Plant | 10/12/05 |
| 1377 | Addn to Job# 1917 | 10/04/05 |
| 1383 | Job # 1945 - Revitalization of Cooler 1 | 1/31/06 |

**PROCESSING BUILDING**

**Group: REFRIGERATION**

| | | |
|---|---|---|
| 15 | DEBN RM REF ADDN 180 | 11/30/86 |
| 18 | REFR ADDN #1 ICEMKR | 6/30/87 |
| 154 | JOB 1485 FREEZER TO COOLER CONV | 8/31/98 |
| 431 | REFRIGERATION | 4/01/69 |
| 432 | ICE EQUIPMENT | 3/01/69 |
| 433 | ADDITION | 3/01/69 |
| 434 | REFRIGERATION | 1/01/80 |
| 435 | REFRIGERATION FRAME | 3/01/80 |
| 436 | AMMONIA COMPRESSOR | 3/31/81 |
| 438 | MOD AMMON COMP J238 | 2/28/88 |
| 439 | FRICK EVAP COND 234 | 1/20/88 |
| 440 | FRICK EVAP COND 312 | 9/30/90 |
| 441 | COOL #2 IMPRVMT 337 | 10/31/91 |
| 442 | WTR CHILL MOD J#270 | 8/01/89 |
| 443 | WTR COOL TANK J#274 | 4/07/89 |
| 444 | TRICK RWB III J#341 | 7/31/92 |
| 722 | J-1535 MAKE UP WATER HEATEAR EXCHANGER | 8/01/99 |
| 750 | JOB1556 REFR COMP/CONDENSOR | 8/31/99 |
| 759 | JOB 1550 COOLER EVAPORATOR UNITS | 3/01/00 |
| 760 | JOB 1553 IC AUGER | 3/01/00 |
| 800 | JOB 1595 AMMONIA TRANSFER SYSTEM | 8/01/00 |
| 814 | JOB 1631 COOLER #4 USDA | 8/01/00 |
| 816 | JOB 1638 CHILLER 2 AND 3 PRECHILLING | 8/01/00 |
| 820 | JOB 1645 AMMONIA LIQUID LINE TO CHILLERS | 8/01/00 |
| 822 | JOB 1647 COOLER #3 USDA | 8/01/00 |
| 824 | JOB 1650 COOLER #2 | 8/01/00 |
| 833 | J 1631 COOLER 4 USDA | 10/28/00 |
| 837 | JOB 1645 AMMONIA LINE TO CHILLERS | 10/28/00 |
| 841 | JOB 1655 50 TON ICE MAKER | 10/28/00 |
| 842 | JOB 1656 AMMONIA VENTILATOR | 10/28/00 |
| 854 | J 1645 AMMMONIA LIQ LINE TO CHILLERS | 1/27/01 |
| 856 | JOB 1650 COOLER #2 | 1/27/01 |
| 858 | JOB 1656 AMMONIA VENTILATOR | 1/27/01 |
| 869 | REFRIGERATION EQUIP | 3/01/01 |
| 875 | J 1672 AMMONIA LEAK DETECTORS | 3/31/01 |
| 900 | JOB 1650 Cooler #2 | 9/01/01 |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 994 | Addtn to Asset#869 | 4/01/02 |
| 995 | Addn to Asset #841 | 4/01/02 |
| 996 | Refrigeration Equipment | 4/01/02 |
| 1008 | Job#1581 Refrigeration equip & install | 12/01/02 |
| 1055 | Job# 1802 Refrigeration for Shipping Dock | 6/26/03 |
| 1082 | Addn to Job# 1802 | 6/30/03 |
| 1150 | Breaker and starter comp-500 hp co | 4/28/04 |
| 1157 | Job# 1852 Evaporater cooler 5 | 4/01/04 |
| 1175 | Compressor rebuild | 6/29/04 |
| 1239 | Ice auger | 10/08/04 |
| 1259 | Job# 1857 2nd processing refrigeration addtn | 10/29/04 |
| 1261 | Job# 1860 Refrigeration system electrical wor | 9/03/04 |
| 1275 | Addn to Job# 1857 | 1/31/05 |
| 1282 | Addn to Job# 1857 | 2/09/05 |
| 1283 | Addn to Job# 1860 (Refrigerator System) | 12/10/04 |
| 1305 | Addn to Job# 1857 | 2/28/05 |
| 1316 | Addn to Job# 1857 | 4/29/05 |
| 1324 | Addn to Job# 1857 | 5/16/05 |
| 1325 | Addn to Job# 1860 | 5/16/05 |
| 1345 | Job# 1907 Rebuild #2 Frick comprressor | 2/25/05 |
| 1348 | Job# 1918 New condenser #2 | 8/15/05 |
| 1369 | Addn to Job# 1857 | 6/22/05 |
| 1373 | Addn to Job # 1907 | 3/10/05 |
| | | **REFRIGERATION** |

**Group:  SHOP EQUIPMENT**

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 11 | BOX AND PAN BRAKE | 3/21/84 |
| 20 | CK SYS SOFTWARE | 5/08/95 |
| 445 | WELDER CONTR SOURCE | 3/31/79 |
| 447 | MB3 BEVERLY SHEAR | 2/12/81 |
| 448 | RIGID PIPE 3RD MACH | 2/12/81 |
| 452 | DRILLING MACHINE | 1/31/85 |
| 455 | DELL COMPUTER | 10/27/94 |
| 684 | AIR CONDITIONER-MNTCE SHOP | 2/28/99 |
| | | **SHOP EQUIPMENT** |

## SCHEDULE 1.1

### MACHINERY, EQUIPMENT AND ROLLING STOCK

See Annex 1.1 attached hereto.

8441B  SYLVEST FARMS, INC. - PROCESSING DIV.                04/14/2006  2:38 PM
**Template Book Asset Detail**
FYE: 3/31/2006

| Asset | Property Description | Date In Service |
|---|---|---|
| **Group:** | | |
| 0 * | | |
| 0 * | | |
| | | **No Group** |
| **Group:  BUILDINGS-SYLACAUGA** | | |
| 158 | JOB 1498 3RD DOCK DOOR | 8/31/98 |
| 640 | BUILDING | 2/28/91 |
| 641 | REMOD OFC J329 | 3/31/91 |
| 642 | ROOFING REPAIRS | 3/26/91 |
| 643 | IMPROV J#329 | 1/06/92 |
| 644 | PARKING LOT | 8/17/92 |
| 645 | INSULATION | 1/03/93 |
| 646 | REMODEL STORAGE | 11/30/92 |
| 647 | BLDG INSULATION | 4/30/93 |
| 648 | REMODEL OFFICE JOB 1334 | 1/31/95 |
| 649 | PARKING LOT SYLACAUGA | 9/30/96 |
| 696 | DRAINAGE WORK AT LOADING DOCKS | 11/30/98 |
| 806 | DSI ROOM EXPANSION SYLA | 8/01/00 |
| 830 | JOB 1601 DSI ROOM EXPANSION | 10/28/00 |
| 850 | JOB 1637 MODULAR OFFICE | 11/25/00 |
| 853 | JOB 1633 CONE/DSI/SCAN/GRADER | 1/27/01 |
| 893 | JOB 1705 Air Conditioning - Sylacauga | 8/01/01 |
| 949 | JOB 1716 Installation of Rollup doors | 12/01/01 |
| 952 | JOB 1746 Roof Repair | 12/21/01 |
| 979 | Dock drains | 6/18/02 |
| 980 | VCT Tiles & Cove base | 5/27/02 |
| 992 | Job 1775 Roof Repair | 8/12/02 |
| 1000 | Job# 1775 Roof Repair | 9/05/02 |
| 1001 | Job# 1781 Roof Project | 9/30/02 |
| 1038 | Job#1814 Fence and Gate | 4/24/03 |
| 1067 | Install curbs in cooler | 8/08/03 |
| 1086 | Job# 1818 Loading pad | 8/28/03 |
| 1087 | Job# 1820 Ammonia coil system | 7/23/03 |
| 1133 | Trash dumpster dock | 4/05/04 |
| 1154 | Job# 1846 Remove shipping doors & rebuild wal | 6/18/04 |
| 1155 | Job# 1848 Resurface debone floor | 6/14/04 |
| 1181 | Cut wall and install exhaust fan | 7/13/04 |
| 1184 | Awning over break area | 8/05/04 |
| 1186 | Addn to Job# 1846(removed ship.drs/blt.wall) | 7/21/04 |
| 1187 | Addn to Job# (resurface debone floor) | 7/31/04 |
| 1190 | Job# 1868 Install cooler doors, walls, ceilin | 9/01/04 |
| 1191 | Job# 1869 Ice room/apron room ceiling repair | 7/21/04 |
| 1192 | Job# 1870 Plant ceiling repair | 8/10/04 |
| 1193 | Job# 1871 Outside roofing project | 7/23/04 |
| 1194 | Replumb water mains & install new mixing valv | 7/11/04 |

| Asset * | Property Description | Service |
|---------|---------------------|---------|
| 1229 | Addn to Job# 1848(resurface debone floor) | 10/11/04 |
| 1231 | Addn to Job# 1870 (Plant ceiling repair) | 10/05/04 |
| 1232 | Addn to Job# 1871 (Outside Roofing Project) | 10/15/04 |
| 1263 | Job# 1870 Plant ceiling repair | 11/08/04 |
| 1264 | Job# 1871 Outside roofing project | 11/02/04 |
| 1273 | Job# 1887 Plant curbing | 10/23/04 |
| 1276 | 2 Dock levelers | 10/20/04 |
| 1278 | Water heater enclosure | 2/07/05 |
| 1284 | Addn to Job# 1870 | 1/13/05 |
| 1312 | Concrete slab for chemical storage | 5/01/05 |
| 1317 | Addn to Job# 1870 | 5/04/05 |
| 1323 | Addn to Job# 1846 | 5/17/05 |
| 1326 | Addn to Job# 1870 | 5/24/05 |
| 1328 | Addn to Job# 1887 | 6/03/05 |
| | | BUILDINGS-SYLACAUGA |

**Group: ELECTRICAL EQUIPMENT**

| 423 | ELECTRICAL EQUIP | 4/01/69 |
|-----|------------------|---------|
| 424 | SEVERE DUTY LT FIXT | 3/31/85 |
| 425 | NEW METER BOX | 3/31/85 |
| 426 | ELEC CH WAT SYS J173 | 9/02/86 |
| 427 | ENG RM REWIRING 198 | 2/09/87 |
| 428 | OFFAL RM EL IMP J326 | 1/31/91 |
| 429 | PARKING LOT LIGHT J#355 | 7/20/93 |
| 430 | AMP BRK HLDG SHED J#350 | 10/31/92 |
| 882 | J 1690 REWIRE 110 AMP PANEL | 3/31/01 |
| 1026 | Generator | 5/20/03 |
| 1027 | 3 Generators | 5/22/03 |
| 1078 | 2 Pulse generators | 10/08/03 |
| | | ELECTRICAL EQUIPMENT |

**Group: ENERGY CONSERVATION EQUIP**

| 461 | LIGHT FIXTURES | 11/17/82 |
|-----|----------------|----------|
| | | ENERGY CONSERVATION EQUIP |

**Group: EQUIPMENT-MOBILE**

| 1169 | 3 hand wash basins | 6/16/04 |
|------|--------------------|---------|
| | | EQUIPMENT-MOBILE |

**Group: EQUIPMENT-SYLACAUGA**

| 89 | JOB 1475 GREASE TRAP | 4/30/98 |
|----|----------------------|---------|
| 167 | SCALE PRINTER - SYLACAUGA | 10/14/98 |
| 193 | J1504 FLOOR SCALE - SYLACAUGA | 11/30/98 |
| 197 | J1515 RECONDITIONED COMPRESSOR-SYLACAUGA | 11/30/98 |
| 650 | REFRIGERATION | 2/28/91 |
| 653 | REFRIG JOB 331 | 2/28/92 |
| 654 | DYNALIFT BATT CHRGER | 6/17/91 |
| 657 | REFRIGERATION EQUIPMENT | 6/30/92 |
| 659 | EVAPORATIVE CONDENSER | 12/31/92 |
| 660 | AT&T PHONE SYSTEM | 9/13/93 |
| 661 | BLAST FREEZER J#359 | 10/18/93 |
| 664 | CONZINI KNIFE SHARPENER JOB 1325 | 10/31/94 |

| Asset * | Property Description | Service |
|---|---|---|
| 665 | CLEANUP SYSTEM J#1310 | 11/30/94 |
| 666 | HEATING & AIR COND. | 8/01/94 |
| 667 | DYNA LIFT PALLET JACK | 8/31/94 |
| 668 | REFRIGERATION FOR WING CUTTING ROOM JOB 1329 | 1/31/95 |
| 669 | 20' MVG CONE LN 148 | 10/10/85 |
| 670 | COMPAQ 286E J#301 | 2/26/90 |
| 671 | SOFTWARE JOB 301 | 2/26/90 |
| 674 | JOB 1392 INFEED CONY/PACKING STD | 4/01/96 |
| 675 | JOB 1401 CVP MACHINE | 9/30/96 |
| 676 | SCALE ADDITION | 1/23/97 |
| 677 | JOB 1408 #3 CONE LINE | 4/30/97 |
| 718 | j-1533 Recondition Mycom Comp. | 7/01/99 |
| 779 | LIGHTING FIXTURES | 3/31/00 |
| 818 | JOB 1642 NISSAN PALLET JACK | 8/01/00 |
| 819 | FENCE SYLACAUGA | 8/01/00 |
| 821 | JOB 1646 HOWE COMPRESSOR | 8/01/00 |
| 826 | SENSORS | 10/28/00 |
| 834 | JOB 1633 CONE/DSI/SCAN GRADER LAYOUT | 10/28/00 |
| 844 | JOB 1659TELEPHONE INSTALLATION | 10/28/00 |
| 876 | J 1671 QUINCY AIR COMPRESSOR | 3/31/01 |
| 883 | J 1633 CONE BONING LINE | 3/31/01 |
| 885 | SCAN GRADER | 8/27/98 |
| 888 | MURZAN PUMP J1389 | 4/01/96 |
| 889 | SEALER JOB | 8/31/95 |
| 892 | JOB 1698 Skin Hoppers | 8/01/01 |
| 896 | Battery Powered QA Scale | 8/01/01 |
| 917 | JOB 1710 Mepsco Batch Controller-Marination | 10/01/01 |
| 918 | JOB 1712 Starflex Bagger System | 10/01/01 |
| 946 | JOB 1706 Mixing Tanks/Liquid Marination | 12/01/01 |
| 947 | JOB 1709 Cantrell 3-PC Wing Portioner | 12/01/01 |
| 950 | JOB 1721 Frick Screw Compressor Repair | 12/01/01 |
| 951 | JOB 1742 Transfer of Marel Sizer | 12/01/01 |
| 956 | Job#1760 New furnace | 12/31/01 |
| 957 | Freezer dividers | 12/28/01 |
| 975 | 2HP Busch Pump | 4/29/02 |
| 977 | Job#1769 - Trash Compactor | 5/28/02 |
| 981 | CVP Rebuild | 6/07/02 |
| 997 | Electric Panel Assembly | 10/25/02 |
| 1011 | Job 1779 2nd Processing change | 2/01/03 |
| 1056 | Job# 1804 Sigma Scale System | 6/12/03 |
| 1061 | Rebuild compressor | 7/02/03 |
| 1084 | Job# 1816 Flattner and cuber | 8/29/03 |
| 1091 | CVP Fresh vac | 9/26/03 |
| 1093 | Floor scale - flip top | 10/01/03 |
| 1094 | Vacuum pump | 8/11/03 |
| 1110 | Plant remodel | 2/03/04 |
| 1122 | Job# 1836 Pedco upgrade | 1/16/04 |
| 1126 | Job# 1838 Addn to hot water system | 1/16/04 |
| 1132 | Plant remodel | 2/12/04 |
| 1134 | Addn to Plant remodel | 4/01/04 |
| 1135 | Floor scale | 6/14/04 |
| 1166 | Floor grates | 5/26/04 |
| 1167 | 3 fans | 6/21/04 |
| 1168 | Water heater | 6/07/04 |
| 1170 | 4 scales | 6/03/04 |
| 1171 | 25 hp Grundfous water pump | 6/15/04 |

| Asset * | Property Description | Service |
|---|---|---|
| 1172 | Pallet jack | 6/15/04 |
| 1188 | Job# 1862 Debone change over | 8/05/04 |
| 1189 | Job# 1864 Rebuild refrig compressor | 6/29/04 |
| 1195 | Board cabinet | 8/11/04 |
| 1211 | Install conduit for telephone | 8/25/04 |
| 1212 | Drain chutes, covers and stands | 8/26/04 |
| 1213 | Gear reducer | 8/31/04 |
| 1214 | Quincy 25hp compressor | 7/23/04 |
| 1215 | Gravel - drive and parking | 8/20/04 |
| 1216 | 2 micro-weigh scales | 8/31/04 |
| 1223 | Hollow grinder | 9/22/04 |
| 1242 | Hand rails, guards, door locks, pan chutes | 10/14/04 |
| 1243 | Carcass conveyor | 10/18/04 |
| 1244 | 2 weigh tables | 10/22/04 |
| 1245 | 2 Micro weigh scales | 10/01/04 |
| 1251 | Carcass conveyor | 10/21/04 |
| 1252 | Microweigh scale | 11/05/04 |
| 1253 | Hollow grinder | 9/20/04 |
| 1262 | Job# 1867 Refrigeration unit in shipping area | 8/31/04 |
| 1277 | Water heating system | 2/16/05 |
| 1300 | Rebuild Howe ice maker | 3/24/05 |
| 1301 | Water heating system | 3/01/05 |
| 1303 | 200' chainlink fence | 2/23/05 |
| 1322 | Job# 1898 - Wing saw | 1/19/05 |
| 1331 | 2 fans, air curtains & cabinets | 6/20/05 |
| 1357 | Job # 1912 - Refrigeration project upgrade | 9/07/05 |
| 1364 | Job # 1927 - Bagged wing project | 7/20/05 |
| 1366 | Job # 1931 - Desiccant Air Dryer | 9/06/05 |
| 1370 | Addn to Job# 1912 | 10/31/05 |
| 1375 | Job # 1988 - Tender/Boneless sizer | 12/28/05 |
| 1376 | CVP A-200 packaging machine | 11/28/05 |
| 1380 | Addn to Job# 1927 | 7/13/05 |
| 1381 | Addn to Job# 1988 | 1/25/06 |
| 1382 | Water heating system | 12/31/04 |
|  |  | EQUIPMENT-SYLACAUGA |

Group: **EVISCERATION**

| 8 | 2 GAMCO PICKERS | 11/01/76 |
|---|---|---|
| 68 | 2 SP 1900 SAWS | 4/03/81 |
| 77 | TRUCK SCALES | 3/26/82 |
| 95 | BRIGHT DUMP0 SYSTM 31883 | 3/28/83 |
| 104 | FAIRBANKS TRUCK SC | 12/05/83 |
| 135 | JOB 1458 HIGH PRESSURE PIPING | 3/31/98 |
| 136 | JOB 1459 HIGH PRESSURE CLEAN UP EQUIPMENT | 3/31/98 |
| 142 | NCK CHILLER CONV 139 | 5/28/85 |
| 143 | SWF BOX MACH JOB 140 | 9/23/85 |
| 144 | HAND HELD RADIO | 6/03/98 |
| 145 | REBUILT COMPRESSOR XJS95S | 6/03/98 |
| 153 | JOB 1483 REPLACE 9 BY 9 COMPRESSOR | 8/31/98 |
| 155 | CO2 MACHINE J #161 | 3/19/86 |
| 157 | JOB 1497 8" WASTE WATER PUMP | 8/31/98 |
| 168 | 6 VATS JOB 168 | 4/30/86 |
| 170 | CHILL WTR SYS 172 | 9/02/86 |
| 175 | CIP SYS RECIR WTR179 | 9/10/86 |
| 177 | CO2 MACHINE JOB 184 | 9/30/86 |

| Asset | Property Description | Service |
|---|---|---|
| 180 | CVP SYS MACH #3 189 | 12/31/86 |
| 182 | WTR PRES RED VLV 192 | 12/22/86 |
| 183 | PCKG RM EQUIPMT 193 | 3/30/87 |
| 185 | STUNNER/KILLER 196 | 2/13/87 |
| 187 | J1494 REPLACE TACK @ DAF | 10/31/98 |
| 189 | HANG CONV LV DK 203 | 2/25/87 |
| 191 | J1500 DRAW MACHINE | 11/30/98 |
| 198 | J1526 CANTRELL AUTOVISC. HARVESTER | 11/30/98 |
| 203 | WT DIST SYS J197 | 4/08/87 |
| 205 | VNT OPENER/EVIS J205 | 4/10/87 |
| 208 | LC02 COMBO HD J212 | 6/30/87 |
| 210 | MODIFY EVIS LN J214 | 9/30/87 |
| 212 | 3 BIRD UNLDERS J219 | 7/24/87 |
| 213 | CONTACT WTR HTR J220 | 12/17/87 |
| 214 | 3 VISCERA HRVST J221 | 8/20/87 |
| 215 | 2 DEFATT348/549 J224 | 11/30/87 |
| 219 | INST LUDELL EQU J229 | 3/07/88 |
| 220 | MOD PART CUT UP J230 | 10/20/87 |
| 226 | INSTL CROPPERS J240 | 2/28/88 |
| 228 | CROPPRS/BRKERS J225 | 2/09/88 |
| 232 | DRAIN CONVEYOR | 4/22/88 |
| 236 | LINCO CROPPER | 12/12/88 |
| 239 | 10' SEPARATOR-J 253 | 8/25/88 |
| 241 | MODIFICATIONS L3 | 1/25/89 |
| 247 | J261 CANTR OPEN MA#1 | 1/25/89 |
| 248 | J 262 CENTEN OIL SAC MACH #1 | 12/20/88 |
| 249 | J 263 SWF 6" BOX MACHINE | 3/22/89 |
| 251 | J 266 CANTRELL OPEN MACH #2 | 3/22/89 |
| 252 | J 267 CENTEN OIL SAC MACH #2 | 2/22/89 |
| 254 | J 273 CENTEN OIL SAC MACH #3 | 3/07/89 |
| 263 | CVP MACH/MODIF J278 | 4/28/89 |
| 265 | NELS EQUIP J#280 | 9/21/89 |
| 267 | ZN MDL R75A J#283 | 5/31/89 |
| 268 | INSTALL JOB 277 | 1/23/90 |
| 269 | MDF-GIZ HARV#286 | 6/06/89 |
| 270 | CO2 HOOD #3 J#287 | 9/21/89 |
| 273 | NELS EQUIP #3 J290 | 7/19/89 |
| 277 | INSUL/PIPING J#294 | 2/12/90 |
| 279 | INSTALL #291 J#296 | 10/06/89 |
| 285 | BOX ELEV. J#302 | 3/12/90 |
| 286 | FAN MODIF JOB 304 | 3/15/90 |
| 289 | NELS EQUIP #1 J#307 | 2/14/90 |
| 290 | POLYCLIP MCH J#308 | 2/15/90 |
| 291 | INSTALL #307 J#309 | 2/20/90 |
| 293 | LUD.MDL 15000 J311 | 11/30/90 |
| 295 | PROPANE TANK J#314 | 10/31/90 |
| 297 | STFLX BAG. #1 J#318 | 7/31/90 |
| 298 | STRFLX BAG.#2 J#319 | 8/31/90 |
| 299 | PWRD CONVEY.J# 320 | 7/31/90 |
| 300 | PLY CLIP MAC. J#322 | 8/31/90 |
| 301 | INSTALL J311/J323 | 12/31/90 |
| 302 | REP LNE IMPRV J325 | 9/30/90 |
| 308 | S.FLEX BAG J328/J328 | 4/30/91 |
| 310 | MURZAN PUMPS J#335 | 9/30/91 |
| 311 | DAPEC/EQUIP J# 333 | 6/30/91 |
| 312 | DAPEC CUT MAC.J#332 | 5/26/91 |

| Asset * | Property Description | Service |
|---|---|---|
| 313 | 2 D16 PIKRS J#338 | 10/31/91 |
| 317 | D 16 PICKER J#338 | 8/31/92 |
| 318 | KNIFE SHARPENERS J#347 | 8/31/92 |
| 319 | KUHL TUB WASHER J#342 | 8/31/92 |
| 324 | SCALE LOADER J#358 | 2/26/93 |
| 325 | GIZZARD TABLE J#356 | 3/12/93 |
| 327 | LIVER HARVESTER #3 J#361 | 3/24/93 |
| 328 | BAGGER J#352 | 3/26/93 |
| 330 | FOOD CRAFT HALVING MACHINE # 362 | 5/10/93 |
| 332 | DELL COMPUTER | 9/16/93 |
| 333 | PLANT SCALE UPGRADE J#345 | 7/30/93 |
| 336 | CHECKWAY OVERHEAD SIZER J#357 | 7/30/93 |
| 337 | LIVER HARVESTERS J#361 | 4/08/93 |
| 340 | PAW OPERATIONS J#1269 | 10/31/93 |
| 341 | SCALE LDR J#1273 | 7/30/93 |
| 342 | QUINCY SCREW A/C J#1275 | 9/01/93 |
| 346 | WATER LINE TO LUDELL J#1284 | 10/06/93 |
| 348 | QUINCY AIR COMP J#1294 | 3/14/94 |
| 349 | CHEM PRE TREATMENT SYSTEM J#1272 | 12/28/93 |
| 350 | ICE MAKING ADDITION JOB 1290 | 5/31/94 |
| 356 | 3 GIZZARD HARVESTERS JOB 1305 | 10/31/94 |
| 358 | WASTE WATER PUMP JOB 1312 | 1/31/95 |
| 359 | VACUUM PUMP JOB 1311 | 1/31/95 |
| 361 | JOB 1347 BETT.SCISSORS | 5/08/95 |
| 363 | J 1327 MULTI SCALDERS | 5/15/95 |
| 365 | J 1365 DUST COLLECTOR | 12/31/95 |
| 367 | QMA SCR AIR COM 336 | 7/31/91 |
| 368 | JOB 1388 CANTRELL BIRD INDEXER | 4/01/96 |
| 373 | JOB 1411 AUGER OFFAL ROOM | 9/30/96 |
| 374 | JOB 1416 ICE AUGER ELEVATOR | 11/30/96 |
| 375 | ALLSCAN CAMERA BREAKROOM | 1/15/97 |
| 378 | JOB 1430 HOWE COMPRESSOR | 7/23/97 |
| 381 | GORRIE REGAN UPGRADE | 9/26/97 |
| 382 | TWO WAY RADIO | 9/16/97 |
| 387 | JOB 1447 EVIS LINE #1 | 9/30/97 |
| 389 | OVERHEAD MONITOR | 12/12/97 |
| 390 | CONCRETE DRAINS JOB 1462 | 1/31/98 |
| 394 | UPGRADE TIME CLOCKS | 3/31/98 |
| 395 | JOB 1448 MOVE REPROC LINE | 3/31/98 |
| 415 | 2 NECK SKIN CUTTERS | 1/06/78 |
| 416 | FOOT UNLOADER | 11/10/78 |
| 417 | GIBLET WRAPPING SYSTEM | 1/16/79 |
| 418 | KILLING MACHINE | 9/11/79 |
| 420 | NECK CUTTER | 3/31/80 |
| 421 | #50 BAG AIR COMPR | 10/06/80 |
| 422 | 3 INSPECTOR STANDS | 3/11/81 |
| 460 | SWS PH CONTROLLER PUMP | 12/31/97 |
| 686 | PICKING SHACKLES | 2/25/99 |
| 697 | SHACKLES-JOB 1518 | 10/31/98 |
| 706 | J-1512 CANTRELL OPENER | 11/30/98 |
| 710 | 3-VENTOR V 16HD KIT | 4/08/99 |
| 711 | CONDENSOR UNIT | 4/21/99 |
| 714 | Job 1538 Waste Water | 4/01/99 |
| 720 | J-1530 HACP/PLANT | 9/01/99 |
| 721 | J-1534 WHOLE BIRD CONTAMINATION L#3 | 6/01/99 |
| 723 | J-1537 AUTOMATED GIBLET OPERATION | 7/01/99 |

| Asset * | Property Description | Service |
|---|---|---|
| 724 | J-1540 STORK GAMCO D-16S PICKERS | 8/01/99 |
| 725 | J-1543 WHOLE BIRD CONT. L#1 & L#2 | 7/01/99 |
| 735 | HI CORE ROTARY SCREEN | 9/22/99 |
| 736 | STARTER CABLE | 10/22/99 |
| 739 | MOTOR PUMP | 10/05/99 |
| 741 | LIV/GIZ MACH PARTS | 11/18/99 |
| 742 | MORSE GEAR BOX | 11/17/99 |
| 743 | AIRCOMPRESSOR | 9/15/99 |
| 744 | STORK GAMCO MACH PARTS | 11/05/99 |
| 749 | JOB 1547 BRIGHT DUMP SYSTEM | 10/31/99 |
| 751 | JOB 1568 MORRIS CHILLER | 11/09/99 |
| 753 | JOB 1593 BLOOD TROUGH EXPANSION | 11/30/99 |
| 755 | BRIGHT HYDRAULIC PUMP | 1/31/00 |
| 758 | JOB 1548 TSP PROC SYSTEM | 3/01/00 |
| 761 | JOB 1555 8" G RUPP WASTE WATER PUMP | 3/01/00 |
| 764 | JOB 1572 QUINCY AIR COMP | 3/01/00 |
| 766 | JOB 1576 LIVE HAND DOCK FANS | 3/01/00 |
| 769 | JOB 1591 QA ANALYTICAL BALANCE | 3/01/00 |
| 778 | LIGHT FIXTURES | 3/31/00 |
| 783 | CAPITALIZED LABOR | 1/01/00 |
| 784 | JOB 1547 CAP LABOR | 4/01/00 |
| 785 | JOB 1568 CAP LABOR | 4/01/00 |
| 791 | MISC PROC EQUIPMENT | 7/01/00 |
| 794 | WITTICHEN COMPRESSOR | 7/29/00 |
| 795 | JOB 1587 SCALDER | 8/01/00 |
| 796 | JOB 1588 JOHNSON TAIL PICKER | 8/01/00 |
| 798 | JOB 1592 LINE #1 EVIS DRIVE | 8/01/00 |
| 799 | JOB 1594 SANITATION HIGH PRESSURE PUMP | 8/01/00 |
| 801 | JOB 1596 LUDELL HOT WATER SYSTEM | 8/01/00 |
| 802 | JOB 1597 JOHNSON TAIL PICKER LINE #2 | 8/01/00 |
| 804 | JOB 1599 HVAC LIVE HANG UNIT | 8/01/00 |
| 808 | JOB 1613 NASH VACUUM PUMP | 8/01/00 |
| 809 | JOB 1614 #1 REHANG CONVEYOR | 8/01/00 |
| 811 | JOB 1619 LEWIS HOCK CUTTERS | 8/01/00 |
| 812 | JOB 1620 FRICK COMPRESSOR OVERHAUL | 8/01/00 |
| 815 | JOB 1634 STORK GAMCO D161 PICKER | 8/01/00 |
| 829 | JOB 1597 JOHNSON TAIL PICKER L 2 | 10/28/00 |
| 832 | JOB 1619 LEWIS HOCK CUTTERS | 10/28/00 |
| 835 | 1534 SG D 161 PICKER | 10/28/00 |
| 836 | JOB 1644 REHANG CONVEYOR | 10/28/00 |
| 846 | JOB 1661 EYE WASH STATIONS | 10/28/00 |
| 848 | MISC PROC INVOICES | 11/25/00 |
| 851 | MISC PROC INVOICES | 12/01/00 |
| 852 | MISC PROC INVOICES | 1/27/01 |
| 857 | JOB 1654 SIZER FOR PICKING LINE | 1/27/01 |
| 861 | MISC PROC INVOICES | 2/24/01 |
| 863 | VARIABLE SPEED DRIVE | 3/01/01 |
| 865 | DRIVE WHEEL | 3/01/01 |
| 866 | VARIABLE SPEED DRIVE | 3/01/01 |
| 867 | PICKER CATCH RACK | 3/01/01 |
| 868 | RACKS FOR CUTTER HOPPERS | 3/01/01 |
| 872 | J 1663 HYDRAULIC LIFTS FOR DOCKS | 3/31/01 |
| 879 | J 1689 GORMAN RUPP PUMP FOR OFFAL | 3/31/01 |
| 880 | J 1682 FEATHER PUMP | 3/31/01 |
| 881 | J 1683 FRICK COMPRESSOR | 3/31/01 |
| 884 | JOHNSON HIGH SPEED SANI-VIS LINE | 11/01/00 |

| Asset * | Property Description | Service |
|---|---|---|
| 890 | JOB 1696 Relocation of Ammonia Coil | 8/01/01 |
| 891 | JOB 1697 Recirculator Relocation | 8/01/01 |
| 894 | JOB 1713 Line#1 Cropper Rebuild | 8/01/01 |
| 903 | JOB 1677 High Pressure Water System | 9/01/01 |
| 907 | JOB 1694 Install New Trash Compactor | 9/01/01 |
| 919 | JOB 1715 Dripline Chains | 10/01/01 |
| 920 | JOB 1717 Box Labeling Scale System | 10/01/01 |
| 942 | Addn to JOB 1677 High Pressure Water System | 12/01/01 |
| 944 | JOB 1702 Reinstall Paw Operation Equipment | 12/01/01 |
| 945 | JOB 1703 Neck Chiller #2 | 12/01/01 |
| 948 | JOB 1713 Line #1 Cropper Rebuild | 12/01/01 |
| 955 | Job#1738 Gear boxes for picking lines | 9/28/01 |
| 960 | Job 1723 Overhead scale system | 2/01/02 |
| 961 | Job 1732 Conveyor realignment | 2/01/02 |
| 962 | Job 1737 Evis chain | 2/01/02 |
| 963 | Job 1732 Capitalized labor | 2/01/02 |
| 965 | Job#1736 Johnson equipment rebuilds | 9/13/01 |
| 970 | Job#1758 Chiller #2 & #3 Rechillers | 3/15/02 |
| 973 | Addn to Job 1758 | 3/26/02 |
| 990 | Addn to Job 1736 | 5/24/02 |
| 991 | Addn to Job 1758 | 6/25/02 |
| 1002 | Job# 1784 Extend Cone Lines | 11/19/02 |
| 1003 | Job# 1786 Rendering Auger Conveyor | 11/27/02 |
| 1004 | Job# 1788 Robot Vertical Coupe Cutter | 12/10/02 |
| 1007 | Job# 1766 Install new computer to outconveyor | 6/14/02 |
| 1010 | Job 1755 Starflex/Dapec | 10/16/02 |
| 1012 | Job 1785 Evis Line chain | 2/26/03 |
| 1013 | Addn to Job 1788 | 1/07/03 |
| 1014 | Job 1789 Picking Line chain | 12/10/02 |
| 1018 | New drains & covers | 4/10/03 |
| 1019 | Job#1782 Breast Deboning | 4/01/03 |
| 1021 | Job#1790 Mepsco double head conversion | 4/01/03 |
| 1022 | Job#1791 Dapec 3 extension & marination | 4/01/03 |
| 1025 | 4 Hand held radios | 5/21/03 |
| 1028 | 2 Worm gear reducers | 5/19/03 |
| 1029 | Guide shackle/Idler wheel | 5/19/03 |
| 1030 | Atek Box & 2 Reducers | 5/07/03 |
| 1031 | Addn to Job 1785 | 5/29/03 |
| 1033 | Job# 1792 High Pressure Pump Package | 5/06/03 |
| 1034 | Job# 1796 Johnson Neckbreaker Combos | 5/24/03 |
| 1037 | Job#1801 Chickway Whole Bird, WOG, Thigh Debo | 6/19/03 |
| 1039 | Rebuild Dapec#3 Fat Puller | 5/22/03 |
| 1042 | 110' Tabletop Chain | 5/28/03 |
| 1043 | 120' Intralox Belting | 6/27/03 |
| 1044 | 2 Radios | 6/12/03 |
| 1045 | 4 Radios | 6/12/03 |
| 1046 | 2 Radios | 6/16/03 |
| 1050 | Keel deflector | 6/13/03 |
| 1051 | Addn to Job 1782 | 6/30/03 |
| 1052 | Addn to Job 1791 | 4/01/03 |
| 1053 | Addn to Job 1792 | 5/06/03 |
| 1054 | Addn to Job 1801 | 6/25/03 |
| 1058 | Cone Line chain 154 ft | 7/11/03 |
| 1059 | Rebuild compressor | 7/28/03 |
| 1062 | Foot Unloader with picking fingers | 8/19/03 |
| 1065 | Quantum controller | 7/11/03 |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 1068 | 50Hp pump | 7/17/03 |
| 1075 | 16 Ergonomic stands | 9/03/03 |
| 1077 | Wilden Cat pump | 10/21/03 |
| 1079 | Washdown unit heater | 10/10/03 |
| 1080 | Addn to Job# 1782 | 10/01/03 |
| 1081 | Addn to Job# 1801 | 9/12/03 |
| 1083 | Job# 1813 8/5 Drumsticks and wings | 10/21/03 |
| 1085 | Job# 1817 Sorting system | 5/28/03 |
| 1088 | Job# 1822 New Chickway Wolf | 6/30/03 |
| 1089 | Job# 1824 Stunner project | 9/16/03 |
| 1092 | Automatic foot unloader | 10/03/03 |
| 1095 | 3 printers | 10/01/03 |
| 1096 | Motor control - size 3 | 10/29/03 |
| 1104 | Sales/Use tax on jobs | 12/27/03 |
| 1108 | Water flow magnetic meter | 1/27/04 |
| 1109 | Waste water pump | 2/23/04 |
| 1111 | Addn to Job 1792 | 11/24/03 |
| 1112 | Job# 1797 Picking Room renovation | 2/01/04 |
| 1113 | Addn to Job# 1801 | 5/30/03 |
| 1116 | Job# 1828 Wizzard knife system | 12/02/03 |
| 1117 | Job# 1829 Weiler West grinder & installation | 12/03/03 |
| 1119 | Job# 1832 Thigh Debone project & installation | 2/02/04 |
| 1120 | Job# 1833 Flex Line | 12/01/03 |
| 1123 | Addn to Job# 1797 | 3/01/04 |
| 1124 | Addn to Job# 1832 | 3/08/04 |
| 1125 | Job# 1837 Johnson Baader venting machines | 3/01/04 |
| 1127 | Job# 1839 Thigh debone ergo stands | 2/19/04 |
| 1128 | Job# 1841 Evis chain | 1/28/04 |
| 1129 | Job# 1842 Picking line chain | 2/26/04 |
| 1130 | Rebuild gizzard machine | 3/02/04 |
| 1136 | Addn to Job# 1832(Thigh debone equip/install) | 4/08/04 |
| 1137 | Job# 1840 Russian project | 4/01/04 |
| 1138 | Install water flow meter | 4/14/04 |
| 1139 | Gorman Rupp pump | 5/11/04 |
| 1140 | 6 pneumatic scissors | 5/13/04 |
| 1141 | Metal detector | 6/08/04 |
| 1142 | Scale equipment | 6/14/04 |
| 1152 | Addn to Job# 1840 (Russian Project) | 6/17/04 |
| 1153 | Job# 1845 New Chiller addition | 6/02/04 |
| 1158 | Job# 1858 20,000 gallon chiller tank install | 5/25/04 |
| 1161 | 2 effluent pumps | 6/23/04 |
| 1162 | Chiller parts | 6/16/04 |
| 1164 | New motor for dumping system | 6/24/04 |
| 1165 | New pump vacuum system | 5/26/04 |
| 1177 | Chiller repairs - larger valves and piping | 6/15/04 |
| 1178 | 2 refurbished vacuum pumps | 6/24/04 |
| 1179 | Vacuum pump | 7/16/04 |
| 1180 | Feather leveling conveyor | 7/14/04 |
| 1182 | Propane pump | 8/03/04 |
| 1196 | Addn to Job# 1840 (Russian Project) | 9/17/04 |
| 1197 | Job# 1843 Dapec expansion(Fst fd Proc. Equip) | 8/24/04 |
| 1198 | Addn to Job# 1845(Chiller addition) | 6/15/04 |
| 1199 | Job# 1872 Chiller water pipe replacement | 7/14/04 |
| 1202 | 7 - 30" fans | 7/29/04 |
| 1203 | 6 halophane light fixtures | 7/29/04 |
| 1204 | Add hoses at dock doors | 8/03/04 |

| Asset * | Property Description | Service |
|---|---|---|
| 1206 | Scalder modification | 8/11/04 |
| 1207 | Rebuilt compressor | 7/27/04 |
| 1208 | 3 metering pumps | 8/25/04 |
| 1209 | Mechanical shackle detector | 7/29/04 |
| 1210 | 4 air shears | 6/18/04 |
| 1217 | Pump conversion kit | 9/20/04 |
| 1220 | Quincy compressor rebuild | 7/26/04 |
| 1221 | Modify bleed time | 8/17/04 |
| 1224 | CEIA metal detector | 8/25/04 |
| 1226 | Addn to Job# 1840(Russian Project) | 9/27/04 |
| 1227 | Addn to Job# 1843( Fast Food Proc. ) | 10/07/04 |
| 1228 | Addn to Job# 1845(New Chiller Addition) | 9/23/04 |
| 1230 | Addn to Job# 1858 (20,000 gal. Chiller Tank) | 7/21/04 |
| 1233 | Addn to Job# 1872(Chiller Water Pipe Rplcmnt) | 10/14/04 |
| 1240 | Gorman Rupp pump | 10/22/04 |
| 1241 | 8 radios and chargers | 10/07/04 |
| 1246 | 21 temperature recorders | 10/15/04 |
| 1247 | Receptacles - hanging bay & picking room | 10/27/04 |
| 1249 | 400' Knuckle chain | 11/01/04 |
| 1250 | Vacuum pump | 11/03/04 |
| 1254 | 29 temperature recorders | 12/14/04 |
| 1255 | Addn to Job# 1840(Russian Project) | 10/29/04 |
| 1256 | Addn to Job# 1843 (Equip for fast food proc.) | 9/28/04 |
| 1257 | Implementation of PMS program | 8/03/04 |
| 1258 | Job# 1856 mech audit compressor vibration ana | 9/20/04 |
| 1265 | Job# 1874 Re-chiller | 10/15/04 |
| 1270 | Job# 1880 Overhead chain in Evis | 10/18/04 |
| 1271 | Job# 1881 KFC saws | 8/26/04 |
| 1272 | Job# 1886 Evisceration birdwashers | 10/21/04 |
| 1274 | Job# 1889 Heat exchanger | 11/12/04 |
| 1279 | Addn to Job# 1843 (Equip. fast food process.) | 9/28/04 |
| 1280 | Addn to Job# 1845 (New Chiller Addition) | 10/27/04 |
| 1281 | Addn to Job#1856(Audit Compression VAR Valve) | 9/30/04 |
| 1285 | Addn to Job# 1872(Chiller Wter Pipe Replcmnt) | 10/08/04 |
| 1288 | Addn to Job# 1881 (KFC Saws) | 12/06/04 |
| 1289 | Job# 1885 Montgomery wing saws | 11/28/04 |
| 1290 | Addn to Job# 1886 (Evisceration Birdwashers) | 12/03/04 |
| 1292 | Job# 1891 Relocation of Dapec 4 | 10/22/04 |
| 1293 | Job# 1892 Install insect lights | 11/29/04 |
| 1294 | Job# 1894 Cone line counters | 11/22/04 |
| 1297 | Job# 1897 Picking/hanging bay realignment | 12/09/04 |
| 1304 | Addn to Job# 1845 (New Chiller Addition) | 2/01/05 |
| 1306 | Job# 1875 - Installation air compressors | 2/09/05 |
| 1307 | Job# 1882-Air system upgrade(purifier/exhaust | 2/28/05 |
| 1308 | Job# 1893 - Install new evacuation system | 9/30/04 |
| 1315 | Addn to Job# 1840 (Russian Project) | 5/05/05 |
| 1318 | Addn to Job# 1882 | 1/11/05 |
| 1319 | Job# 1884 Waste water upgrade | 3/10/05 |
| 1320 | Addn to Job# 1885 | 3/17/05 |
| 1321 | Addn to Job# 1889 | 1/11/05 |
| 1327 | Addn to Job# 1872 | 4/11/05 |
| 1332 | Job# 1903 - Gizzard harvester Gaines machine | 2/25/05 |
| 1335 | Job# 1911 - Main switchgear replacement | 4/11/05 |
| 1336 | Murzan pump | 7/08/05 |
| 1337 | 5 used cutup saws | 7/14/05 |
| 1338 | 2 rebuilt bagger assemblies | 5/25/05 |

| Asset | * | Property Description | Service |
|-------|---|---------------------|---------|
| 1340 | | Gearbox & drive to rework line 2 | 7/01/05 |
| 1346 | | Job# 1913 Hand saw upgrade | 5/16/05 |
| 1347 | | Job# 1916 CO2 Exhaust blowers | 5/03/05 |
| 1350 | | Install conactors for new CO2  exhaust fans | 7/08/05 |
| 1351 | | New circuits for hand saws, lighting & fans | 8/15/05 |
| 1352 | | Monyo sludge pump | 6/16/05 |
| 1354 | | Reconditioned hand wash stations | 8/25/05 |
| 1355 | | Gearbox | 8/18/05 |
| 1356 | | Rotary knife sharpener | 9/01/05 |
| 1359 | | Job # 1920 - Birdwasher | 8/24/05 |
| 1360 | | Job # 1921 - Online reprocessing | 8/24/05 |
| 1372 | | Job # 1940 - Dapec #7, dark meat conversion | 9/28/05 |
| 1374 | | Job # 1926 - Johnson transfer machines | 1/10/06 |
| 1378 | | Addn to Job# 1921 | 2/14/06 |
| 1379 | | Addn to Job# 1926 | 2/10/06 |
| | | | **EVISCERATION** |

## Group: FAST FOOD

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 352 | AUTOMATIC SCALE LOADER JOB 1304 | 6/30/94 |
| 353 | PACKOUT CONVEYOR JOB 1307 | 6/30/94 |
| 371 | JOB 1402 CVP MACHINE | 9/30/96 |
| 708 | JOB 1528 JOHNSON MULTI-CUT | 1/31/99 |
| 763 | JOB 1564 RE-ALIGN PROC CONVEYORS | 3/01/00 |
| 775 | ADDN TO JOB 1564 REALIGN 2ND PROC CONV | 3/31/00 |
| 797 | JOB 1589 JOHNSON MULTI CUT UPGRADE | 8/01/00 |
| 807 | JOB 1610 JOHNSON MULTI CUT | 8/01/00 |
| | | **FAST FOOD** |

## Group: FORKLIFT EQUIPMENT

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 201 | DYNA LIFT PALLET JACK | 12/22/98 |
| 569 | NISSAN FKLFT J311 | 10/13/87 |
| 576 | DYNA LIFT PALLET JACK | 8/31/94 |
| 577 | DYNA LIFT PALLET JACK | 1/31/95 |
| 578 | 2 DYNA LIFT PALLET JACKS | 3/28/95 |
| 579 | DYNA LIFT PALLET JACK | 9/08/97 |
| 580 | DYNA LIFT PALLET JACK | 10/16/97 |
| 581 | DYNA LIFT PALLET JACK | 1/09/98 |
| 1074 | 10 Pallet jack batteries | 7/28/03 |
| | | **FORKLIFT EQUIPMENT** |

## Group: FRONT HALVES

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 72 | BUCKHORN TOTES | 4/30/98 |
| 688 | PLASTIC CONTAINERS | 2/01/99 |
| 817 | JOB 1641 DAPEC FRONT HALVER | 8/01/00 |
| 860 | PLASTIC TOTES | 1/01/01 |
| | | **FRONT HALVES** |

## Group: LAND

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 1 | LAND | 7/01/68 |
| 2 | TRIPLE S SKYARD LAND | 11/30/80 |
| | | **LAND** |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| **Group: LAND-SYLACAUGA** | | |
| 680 | LAND | 2/01/91 |
| 681 | LAND 3.6 ACRES | 3/09/92 |
| | | **LAND-SYLACAUGA** |

**Group: LEGS**

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 97 | STARFLEX HOPPER SCALE | 3/31/98 |
| 192 | J1503 BOX STRAPPER | 11/30/98 |
| 196 | J1516 12 STATION WEIGH GRADER | 11/30/98 |
| 246 | CO2 TANK - J 260 | 12/30/88 |
| 366 | J 1382 STARFLEX BAGGER | 3/31/96 |
| 393 | JOB 1468 60' CONVEYOR | 2/28/98 |
| 700 | J-1518 SADDLE SPLITTER & CRAMMING SYSTEM | 10/31/98 |
| 701 | J-1518 HI-SPEED INFEED UNIT | 11/30/98 |
| 702 | J-1518 INFEED COMPUTER EQUIPMENT | 11/30/98 |
| 704 | J-1518 CHAIN | 11/30/98 |
| 705 | J-1518 INSTALLATION COSTS | 11/30/98 |
| 707 | JOB-1519 CVP MACHINE | 12/31/98 |
| 788 | POLYCLIP MACHINE | 7/01/00 |
| 810 | JOB 1615 LEG QUARTER SCALE BAGGER | 8/01/00 |
| | | **LEGS** |

**Group: MARINATION**

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 149 | JOB 1467 MARINATION EQUIP | 8/31/98 |
| 792 | MEPSCO BRINE TANK | 7/29/00 |
| 847 | JOB 1664 UPGRADE CHILL WATER  MARINATION | 10/28/00 |
| 859 | PLASTIC TOTES | 1/01/01 |
| 870 | PLASTIC TOTES | 3/31/01 |
| 897 | Plastic Totes | 8/01/01 |
| 901 | JOB 1664 Upgrade Chill Water for Marination | 9/01/01 |
| 908 | Plastic Totes | 9/17/01 |
| 909 | Plastic Totes | 9/05/01 |
| 910 | Plastic Totes | 9/10/01 |
| 911 | Plastic Totes | 9/26/01 |
| 927 | JOB 1741 Relocation of Marinaters | 10/01/01 |
| 928 | Plastic Totes | 10/01/01 |
| 929 | Plastic Totes | 10/05/01 |
| 930 | Plastic Totes | 10/11/01 |
| 931 | Plastic Totes | 10/12/01 |
| 932 | Plastic Totes | 10/19/01 |
| 959 | Plastic totes | 2/04/02 |
| 976 | Plastic Totes | 6/24/02 |
| 982 | Plastic Totes | 6/25/02 |
| 983 | Plastic Totes | 6/27/02 |
| 984 | Plastic Totes | 6/27/02 |
| 985 | Plastic Totes | 6/28/02 |
| 986 | Plastic Totes | 7/02/02 |
| 987 | Plastic Totes | 7/10/02 |
| 1036 | Job#1800 Mepsco Inline Marinator | 5/16/03 |
| 1339 | Complete rebuild - 2 marinators | 7/01/05 |
| 1343 | Job# 1900 Marination mix/chill system | 4/07/05 |
| | | **MARINATION** |

| Asset * | Property Description | Service |
|---------|---------------------|---------|
| **Group: OFFAL EQUIPMENT** | | |
| 52 | NEW OFFAL SCRN J200 | 1/19/87 |
| 151 | JOB 1476 OFFAL SECONDARY SCREEN | 8/31/98 |
| 457 | PROD RECLAM FACIL | 3/01/78 |
| 770 | JOB 1606 HYCOR SCREEN | 3/01/00 |
| 776 | ADDN TO JOB 1606 HYCOR SCREEN | 3/31/00 |
| 780 | ADDITION TO JOB 1606 | 3/31/00 |
| 831 | 1606 HYCOR SCREEN | 10/28/00 |
| 988 | Job 1762 Secondary screen | 6/04/02 |
| 1057 | Job# 1823 Offal Augers | 6/25/03 |
| 1114 | Job# 1826 Offal Electrical | 12/23/03 |
| 1143 | Addn to Job# 1826 (Offal Electrical) | 4/01/04 |
| 1151 | Addn to Job# 1826 | 5/14/04 |
| | | **OFFAL EQUIPMENT** |

| Asset * | Property Description | Service |
|---------|---------------------|---------|
| **Group: OFFICE BUILDING** | | |
| 4 | J 1434 NEW ADMIN BLDG | 10/24/97 |
| 5 | CAP INT JOB 1434 | 10/24/97 |
| 396 | OFFICE BUILDING | 9/30/81 |
| 397 | TWO NEW OFFICES | 3/17/86 |
| 713 | Job 1522-Renovate Admin Bldg | 4/01/99 |
| 895 | JOB 1714 Air Conditioner Upgrade-Admin. Build | 8/01/01 |
| 1314 | Canopy - admin building walkway | 5/24/05 |
| | | **OFFICE BUILDING** |

| Asset * | Property Description | Service |
|---------|---------------------|---------|
| **Group: OFFICE EQP HUMAN RESOURCE** | | |
| 898 | Gorrie Reagan Time/Attendance Manager | 8/01/01 |
| 1105 | Laserjet Printer-HR | 12/04/03 |
| 1353 | Change out time clock to photo eye | 7/08/05 |
| | | **OFFICE EQP HUMAN RESOURCE** |

| Asset * | Property Description | Service |
|---------|---------------------|---------|
| **Group: OFFICE EQUIP ACCOUNTING** | | |
| 69 | CANON TYPEWRITER | 11/07/83 |
| 70 | AUDIO METRIC EXAMINER | 7/13/82 |
| 73 | LAWN TRACTOR | 3/31/98 |
| 80 | OFFICE FURNITURE | 1/29/86 |
| 90 | PLNT/TM ATTN SYS 182 | 3/09/87 |
| 91 | OFC REMOD/FIXT J185 | 2/10/87 |
| 92 | SALES/PERS REMOD 191 | 2/10/87 |
| 93 | ADDN. TO ASSET# 90 | 4/29/87 |
| 96 | CENTEL LNE PLNT/T | 8/20/87 |
| 99 | CHAIR,DESK | 8/02/88 |
| 102 | CHAIR | 11/02/88 |
| 105 | SWIVEL CHAIR | 1/31/90 |
| 106 | CREDENZA | 1/31/90 |
| 109 | EXECUTIVE DESK | 7/15/90 |
| 111 | CABINET | 9/11/90 |
| 113 | CHAIR | 1/07/91 |
| 115 | TYPEWRITER | 2/25/91 |
| 117 | 2 CHAIRS | 3/31/91 |
| 124 | FURNITURE OLD COMPUTER ROOM | 1/31/93 |
| 133 | BLINDS ADMIN BLDG | 10/21/97 |

| Asset | Property Description | Service |
|-------|---------------------|---------|
| 134 | DATA COMM LINES ADMIN BLDG | 11/06/97 |
| 462 | OFFICE FURNITURE | 8/07/78 |
| 463 | FILE CABINETS | 6/06/79 |
| 464 | CHAIRS/TABLES/DESK | 3/31/80 |
| 465 | CONFERENCE DESK | 4/30/81 |
| 466 | CONF TABLE | 4/30/81 |
| 467 | 2 END TABLES | 4/30/81 |
| 468 | DESK | 4/30/81 |
| 469 | DESK | 4/30/81 |
| 470 | 2 TABLES | 4/30/81 |
| 471 | 2 LEATHER CHAIRS | 4/30/81 |
| 472 | 2 BRASS LAMPS | 4/30/81 |
| 473 | OVEN | 6/08/81 |
| 474 | ICEMAKER | 6/08/81 |
| 475 | REFRIGERATOR | 6/08/81 |
| 476 | SOFA | 5/22/81 |
| 477 | 2 WING CHAIRS | 5/22/81 |
| 478 | 2 TABLES | 5/22/81 |
| 479 | 18 CHAIRS CONF ROOM | 7/06/81 |
| 480 | DESK | 7/07/81 |
| 481 | DESK | 7/07/81 |
| 482 | 2 POSTURE CHAIRS | 7/15/81 |
| 483 | SWIVEL CHAIR | 7/22/81 |
| 484 | BOOKCASES | 7/10/81 |
| 485 | 13 FILE CABINETS | 7/27/81 |
| 486 | DESK | 7/14/81 |
| 487 | 3 STIFFELL LAMPS | 7/22/81 |
| 488 | DESK | 7/22/81 |
| 489 | DESK | 7/22/81 |
| 490 | SOFA LOBBY | 7/27/81 |
| 491 | 4 FILE CABINETS | 2/17/82 |
| 492 | DESK | 9/30/82 |
| 493 | PAINTING | 7/07/82 |
| 494 | DESK/FILING CABINET | 8/14/83 |
| 495 | DOOR LOCKS OFC BLDG | 8/29/83 |
| 502 | EXECUTIVE DESK | 1/29/90 |
| 504 | COMPUTER ROOM REMODELING | 4/01/92 |
| 685 | PANELS-ACCOUNTING OFFICE | 11/21/98 |
| 747 | ADT CAMERA | 12/21/99 |
| 754 | PANELS ACCT OFFICE | 2/07/00 |
| 1024 | Job#1815 M-Tech systems SQL update | 4/01/03 |
| 1330 | 12 leather chairs - board room | 5/23/05 |

**OFFICE EQUIP ACCOUNTING**

## Group:  OFFICE EQUIP G AND A

| | | |
|-----|---------------------|---------|
| 127 | LATERAL FILE CABINET | 8/23/95 |
| 130 | ENTRECOMPUTER LASER PRINTER | 1/31/96 |
| 132 | ICE MACHINE OFFICE | 9/26/97 |
| 899 | Meridian 1 Option 11 System (Phone System) | 8/01/01 |
| 969 | Ticket printer | 2/18/02 |
| 971 | Audiometric equipment | 4/01/02 |
| 974 | 2 Laserjet 4100N printers | 4/18/02 |
| 998 | Label printer | 11/21/02 |
| 1005 | Job# 1794 Hazwopper Equipment Trailer | 1/16/03 |
| 1006 | Scale repair/upgrade | 12/09/02 |

| Asset * | Property Description | Service |
|---|---|---|
| 1106 | 2 Dell computers-Dean & Lyman | 1/13/04 |
| 1183 | Audiometric equipment | 8/01/04 |
| 1225 | Ticket printer | 8/30/04 |
| 1341 | Infocus projector | 7/01/05 |
| | | **OFFICE EQUIP G AND A** |

### Group:  OFFICE EQUIP MIS

| | | |
|---|---|---|
| 131 | JOB 1385 TEL/COMP WIRING MT PLANT | 4/29/96 |
| 772 | DELL SERVER&LAPTOPS | 3/31/00 |
| 773 | SDS UPS UNITS | 3/31/00 |
| 933 | Laserjet 4550N | 10/10/01 |
| 935 | MS OLB server upgrad | 10/01/01 |
| 999 | Job# 1674 AFS Software Upgrade | 1/01/03 |
| 1090 | Job# 1825 Cisco equipment - main switch | 8/26/03 |
| 1131 | 2 Dell servers | 1/28/04 |
| 1144 | Barcode scanner software | 5/12/04 |
| 1145 | 2 Dell servers | 5/28/04 |
| 1185 | Minitab upgrade | 8/01/04 |
| 1222 | 1750 server and tape drive | 8/26/04 |
| 1295 | Job# 1895 Gainco sorter software upgrade | 12/08/04 |
| 1298 | Dell laptop | 12/12/04 |
| 1342 | Plotter for blueprints | 7/19/05 |
| 1362 | Job # 1924 - Upgrade printers | 7/08/05 |
| 1363 | Job # 1925 - Upgrade Sylacauga network | 10/07/05 |
| 1365 | Job # 1928 - Computers/laptop/plotter | 7/06/05 |
| | | **OFFICE EQUIP MIS** |

### Group:  OFFICE EQUIP-SYLACAUGA

| | | |
|---|---|---|
| 678 | BRANNONS OFC FURN | 4/30/91 |
| 679 | OFFICE FURNITURE | 10/28/91 |
| | | **OFFICE EQUIP-SYLACAUGA** |

### Group:  OTHER BUILDINGS

| | | |
|---|---|---|
| 412 | MAINTENANCE SHOP | 3/30/79 |
| 413 | TOOL/PARTS ROOM J145 | 12/31/85 |
| 414 | MAINTENANCE SHOP ADDN | 9/30/83 |
| 1234 | Fence in maintenance bldg | 10/20/04 |
| 1268 | Job# 1878 UPS renovations (old hatchery) | 9/08/04 |
| 1287 | Addn to Job# 1878(UPS Renovations-old hatcher | 8/31/04 |
| 1302 | Portable building - maintenance | 3/03/05 |
| | | **OTHER BUILDINGS** |

### Group:  PACKOUT

| | | |
|---|---|---|
| 146 | CONVEYOR-PACK OUT | 6/30/98 |
| 184 | J1491 BOX COMPACTOR | 10/31/98 |
| 369 | JOB 1393 EMPTY BOX CONVEYOR | 4/25/96 |
| 377 | JOB 1429 SPRINKLER BOX ROOM | 4/30/97 |
| 388 | JOB 1441 LID MACHINE | 10/31/97 |
| 740 | J1493 STRAP MACHINE | 11/30/99 |
| 765 | JOB01575 ICE CONVEYOR SYSTEM | 3/01/00 |
| 787 | WITTCHEN COMPRESSOR | 7/01/00 |
| 793 | COMPUTERWAY TRACK SET | 7/29/00 |

| Asset | * | Property Description | Service |
|-------|---|---------------------|---------|
| 803 | | JOB 1598 REALIGN 2ND PROCESSING CONVEYOR | 8/01/00 |
| 825 | | DORAN PLATFORM | 10/28/00 |
| 840 | | JOB 1652 AUT GIB WRAP | 10/28/00 |
| 843 | | JOB 1658 LUG WASHER RELOCATION | 10/28/00 |
| 877 | | J 1679 OVAL STRAPPER | 3/31/01 |
| 915 | | 2 Vertical Base Polyclip | 9/01/01 |
| 921 | | JOB 1719 Box Strappers | 10/01/01 |
| 922 | | JOB 1720 Tubwasher Boiler | 10/01/01 |
| 924 | | JOB 1731 Ice Auger | 10/01/01 |
| 943 | | Addn to JOB 1679 Oval Strapper | 12/01/01 |
| 966 | | Job#1759 False ceiling in blast freezer | 2/23/02 |
| 972 | | Addn to Job 1719 | 10/09/01 |
| 993 | | Poly Clip machine | 8/21/02 |
| 1009 | | Addn to Job 1598 | 10/25/00 |
| 1020 | | Job#1787 Addtl Packaging machinery | 4/01/03 |
| 1032 | | Addn to Job 1787 | 4/16/03 |
| 1035 | | Job# 1798 Box Machine Upgrade | 5/12/03 |
| 1066 | | RH vertical clippers - 3 | 8/01/03 |
| 1118 | | Job# 1830 Strapper 3/8" | 12/08/03 |
| 1159 | | Job# 1863 Tipper Tie machine | 5/20/04 |
| | | | **PACKOUT** |

**Group: PARKING LOT**

| | | | |
|------|---|---------------------|---------|
| 21 | | PARKING LOT GRADING | 5/19/82 |
| 23 | | ASPHALT PAVING | 6/11/82 |
| 24 | | OFFICE PARKING LOT | 12/31/84 |
| 25 | | PLT ACCESS PVING 153 | 11/11/85 |
| 26 | | CONCRETE LDG PAD 154 | 1/22/86 |
| 30 | | ASPHALT DRIVE 175 | 6/04/86 |
| 406 | | CHAIN LINK FENCE | 6/30/82 |
| 407 | | PLANT FENCE | 9/30/85 |
| 408 | | DIRT/GRAD E SIDE PLNT | 11/30/86 |
| 409 | | DRV/DRAINAGE IMPR 315 | 11/30/90 |
| 410 | | PAVING - PARKING LOT # 364 | 6/30/93 |
| 411 | | FENCE J 1434 | 7/25/97 |
| 936 | | Job 1722 Front gate exit driveway repair | 11/01/01 |
| 958 | | Job 1541 Construction Front entrance | 12/01/01 |
| 1334 | | Job# 1910 – Paving at holding shed | 7/13/05 |
| | | | **PARKING LOT** |

**Group: PARTS**

| | | | |
|------|---|---------------------|---------|
| 156 | | JOB 1492 REBUILD DAPEC | 8/31/98 |
| 194 | | J1510 DAPEC PRE-CUTTER | 11/30/98 |
| 357 | | BOX ICER JOB 1314 | 10/31/94 |
| 362 | | JOB 1336 BAADER FILER | 6/06/95 |
| 689 | | POLY CHIP MACHINE | 12/18/98 |
| 690 | | SCALE PRINTER | 1/19/99 |
| 752 | | JOB 1574 DAPEC MACHINE | 12/05/99 |
| 756 | | ADD TO JOB 1574 | 2/28/00 |
| 767 | | JOB 1578 DAPEC LUG WASHER | 3/01/00 |
| 771 | | JOB 1609 CVP MACHINE | 3/01/00 |
| 774 | | ADDN TO JOB 1574 DAPEC | 3/31/00 |
| 786 | | JOB 1574 CAP LABOR | 4/01/00 |
| 823 | | JOB 1648 DAPEC CUT UP MACHINE | 8/01/00 |

| Asset * | Property Description | Service |
|---|---|---|
| 828 | CLOSE 1574 DAPEC MACHINE | 10/28/00 |
| 838 | JOB 1648 DAPEC CUT UP MACHINE | 10/28/00 |
| 855 | JOB 1648 DAPEC CUT UP MACHINE | 1/27/01 |
| | | **PARTS** |

**Group: PAWS**

| 1121 | Job# 1835 Paw operation | 12/10/03 |
|---|---|---|
| 1361 | Job # 1922 - Line 1 shielded paws | 4/08/05 |
| | | **PAWS** |

**Group: PLANT OFFICES**

| 172 | OFFICE RENOV - QC OFFICE | 11/30/98 |
|---|---|---|
| 400 | USDA REFRIG/RANGE | 10/18/85 |
| 401 | SALES/SHIP REMOD 101 | 3/28/83 |
| 402 | SALES/SHIP OFC REMOD | 4/01/83 |
| 403 | PERS OFC REMOD 102 | 3/28/83 |
| 404 | PERSONNEL OFS REMODELNG | 4/01/83 |
| 405 | RENOV SALE/PERS 191 | 12/31/86 |
| 768 | JOB 1586 PRODUCTION OFFICES | 3/01/00 |
| 1313 | Remodel plant managers office | 5/24/05 |
| | | **PLANT OFFICES** |

**Group: PROCESSING BUILDING**

| 6 | LOADING DOCK | 1/01/76 |
|---|---|---|
| 7 | IMPROVEMENTS | 2/01/76 |
| 9 | CHILL PAK ADDITION | 1/01/77 |
| 10 | FREEZER | 10/01/76 |
| 12 | BRKRM/BOXRM ADDN | 8/30/77 |
| 17 | OFFICE ADDITION | 7/03/78 |
| 19 | PLANT ADDITION | 5/11/79 |
| 22 | BUILDING | 3/01/80 |
| 27 | METAL SHED | 3/31/80 |
| 31 | LD DK IMPRV #104 | 3/28/83 |
| 32 | CONDEMN ROOM IMPROVEMNTS | 12/27/82 |
| 33 | BUILDING INSULATION | 10/31/83 |
| 34 | NEW ROOF | 12/15/83 |
| 35 | NEW ELEC MAIN #131 | 9/30/84 |
| 36 | FURTHER PROC #118 | 7/31/84 |
| 37 | WEST ADDN JOB 124 | 3/31/86 |
| 38 | PLNT FIREWALL J141 | 1/16/86 |
| 39 | HYDR PUMP RM #149 | 2/28/86 |
| 40 | BATHRM RENOV #151 | 2/28/86 |
| 41 | FIREWALL PROC #141 | 7/17/86 |
| 42 | SE WALL ENC CH #156 | 9/15/86 |
| 43 | PICKING RM ADDN #159 | 3/11/87 |
| 44 | LIGHTS - JOB 160 | 5/27/86 |
| 45 | FIRE ESC O/S #166 | 10/27/86 |
| 46 | RELOC FIRE HYD #169 | 4/25/86 |
| 47 | PAD/PMPHOU CH #171 | 9/02/86 |
| 48 | GRD HS2 BK GATE 186 | 12/15/86 |
| 49 | WIRING NEW PCKG 201 | 3/31/87 |
| 50 | ADDN. TO ASSET # 43 | 4/14/87 |
| 51 | REN TO LIVE HLDG 222 | 2/08/88 |

| Asset * | Property Description | Service |
|---|---|---|
| 53 | ADDN. TO ASSET #49 | 4/30/87 |
| 54 | LIVE HOLDING SHED | 9/08/88 |
| 55 | PARKING LOT LOAD OUT | 10/15/88 |
| 56 | RAW MAT LDING 249 | 10/31/88 |
| 57 | S COOL SHED DR 251 | 9/25/88 |
| 58 | COMP BLDG ADDN 298 | 1/02/90 |
| 59 | EAST SIDE LOADING DOCK | 8/31/92 |
| 60 | ICE ROOM ADDITTION J#353 | 11/16/93 |
| 61 | WATER PRE TREATMENT SYSTEM J#1279 | 12/09/93 |
| 62 | ICE MAKING ADDITION JOB 1292 | 4/30/94 |
| 63 | CHILLER ROOF # 360 | 5/21/93 |
| 64 | JOB 1413 ROOF EVIS AREA | 11/30/96 |
| 65 | CAPITALIZED INTEREST ON JOB 353/ICE ROOM ADDN | 11/16/93 |
| 66 | CAPITALIZED INTEREST JOB 1279 WATER PRE TREAM | 12/09/93 |
| 67 | RE-ROOF PICKING AREA | 1/31/98 |
| 138 | JOB 1449 STOR TANK FOUNDATION | 4/01/98 |
| 150 | JOB 1473 3 DOCK LEVELERS | 8/31/98 |
| 160 | JOB 1502 DRAIN COVERS SECTION 1 | 8/31/98 |
| 161 | JOB 1514 DRAIN COVERS SECT 2 | 10/31/98 |
| 162 | JOB 1487 RE-ROOF MAIN PLANT | 10/31/98 |
| 169 | RESURFACE PLANT FLOOR | 11/09/98 |
| 176 | REPLACE DRAINS IN COOLERS | 11/19/98 |
| 181 | J1490 COOLER DOORS | 10/31/98 |
| 195 | J1511 ROOF PLANT | 11/30/98 |
| 199 | J1527 HEAT A/C HATCHERY | 11/30/98 |
| 202 | SHIPPING DECK PLANNING CONCEPTS | 12/31/98 |
| 398 | NEW PLANT | 1/01/70 |
| 399 | IMPROVEMENTS | 3/01/71 |
| 682 | FRENCH DRAIN-PLANT | 12/31/98 |
| 683 | REFURBISH BATHROOMS | 12/31/98 |
| 715 | Job 1529 Renovate Plant | 4/01/99 |
| 728 | J-1551 MNTC PARTS ROOM EXPANSION | 8/01/99 |
| 729 | J-1557 FLOOR REPAIR IN 1ST PROCESSING | 6/01/99 |
| 757 | JOB 1546 COOLER DOORS | 3/01/00 |
| 762 | JOB 1560 ROOF PHASE I | 3/01/00 |
| 839 | JOB 1649 FLOOR EPOXY COATING USDA | 10/28/00 |
| 845 | JOB 1659 TELEPHONE INSTALLATION HODGES | 10/28/00 |
| 849 | REWORK FLOOR COOLER 4 | 11/25/00 |
| 862 | MAINTENANCE SHED | 3/01/01 |
| 871 | J 1581 PLANT EXPANSION BLDG | 3/31/01 |
| 873 | J 1670 DRAINS MARINATION ROOM | 3/31/01 |
| 874 | J 1671 PAD FOR ELECTRICAL ROOM | 3/31/01 |
| 878 | J 1681 REPAIR ROOF SHIPPING DOCK | 3/31/01 |
| 902 | JOB 1669 Emergency Lighting for Plant | 9/01/01 |
| 904 | JOB 1680 Ice Room Wall | 9/01/01 |
| 905 | JOB 1691 Replace 480/120 Volt Breaker Box | 9/01/01 |
| 906 | JOB 1692 Install Evacuation Horns & Strobes | 9/01/01 |
| 912 | Rolling Service Door | 9/01/01 |
| 913 | 8x8 Sheet Door | 9/01/01 |
| 914 | 8x8 Push-Up Door | 9/01/01 |
| 923 | JOB 1727 Grating for slip protection | 10/01/01 |
| 925 | JOB 1734 Relocate pipe to chillers | 10/01/01 |
| 926 | JOB 1735 Resurfacing of floor in prod. area | 10/01/01 |
| 934 | Two impact doors | 10/08/01 |
| 937 | Job 1751 Floor drain | 11/18/01 |
| 953 | JOB 1753 Concrete Area - Lug Dock | 12/01/01 |

| Asset | Property Description | Service |
|---|---|---|
| 954 | JOB 1754 Concrete Area outside of 2nd Process | 12/01/01 |
| 964 | Resurface floors | 1/21/02 |
| 967 | Job#1763 Shipping dock upgrade | 2/04/02 |
| 978 | Job#1768 - Aro-Surf flooring | 5/14/02 |
| 1015 | Iron floor grates | 3/14/03 |
| 1016 | Ceiling panels - truck dock | 3/05/03 |
| 1017 | Insulated panel around heat exchangers | 3/05/03 |
| 1023 | Job#1795 Second Processing expansion | 4/01/03 |
| 1040 | 4 fans - Holding Shed | 6/02/03 |
| 1041 | 5 fans - Holding Shed | 6/17/03 |
| 1047 | 4 fans - Holding Shed | 7/15/03 |
| 1048 | Ceiling support - Cooler | 6/04/03 |
| 1049 | Drain in Boxroom | 6/04/03 |
| 1060 | Pipe ballards & curbs at new process room | 7/09/03 |
| 1063 | 4 Fans - Holding Shed | 8/18/03 |
| 1064 | Drain - loading dock | 8/08/03 |
| 1069 | 4 Air curtains | 8/28/03 |
| 1070 | A/C unit - Quality Control office | 9/04/03 |
| 1071 | 8 - Halophane quartz light fixtures | 9/23/03 |
| 1072 | Storage area - First processing | 9/17/03 |
| 1073 | 4 fans - Holding shed | 9/23/03 |
| 1076 | New roof at Offal | 10/12/03 |
| 1097 | Install counter top - box room | 10/12/03 |
| 1098 | Pipe and caps | 11/18/03 |
| 1099 | Remove condenser | 11/18/03 |
| 1100 | Install 7 doors | 11/18/03 |
| 1101 | Grating for drains | 11/18/03 |
| 1102 | Install frames and plate | 11/18/03 |
| 1103 | Enclose canopy and build room | 11/18/03 |
| 1107 | Install curbs in cooler | 1/21/04 |
| 1115 | Job# 1827 2nd Processing floor repair | 10/06/03 |
| 1146 | Job# 1844 Roofing for plant | 5/11/04 |
| 1147 | Job# 1847 Install drains in debone | 4/01/04 |
| 1148 | 5 fans - Holding shed | 4/08/04 |
| 1149 | Ceiling panels & resurface walls | 4/01/04 |
| 1156 | Job# 1850 Loading dock repair | 4/26/04 |
| 1160 | Remove wall & install door | 5/25/04 |
| 1163 | 3 fans - Holding shed | 6/11/04 |
| 1173 | Rework walls and ceiling | 4/12/04 |
| 1174 | Install 2" panels | 7/07/04 |
| 1176 | 8 fans - Holding shed | 7/23/04 |
| 1200 | Remodel restroom walls & ceiling | 4/22/04 |
| 1201 | Removal of collapsed wall | 7/26/04 |
| 1205 | Electrical equipment at offal area | 7/16/04 |
| 1218 | Install circuits for KFC saws | 8/27/04 |
| 1219 | Install electrical for vending machines | 9/20/04 |
| 1235 | 2 cooler doors and plates | 10/05/04 |
| 1236 | 2 rollup doors | 10/20/04 |
| 1237 | Rework ceiling - cooler 4 | 10/20/04 |
| 1238 | 3 fans - holding shed | 9/03/04 |
| 1248 | Ceiling tile in 1st proc office | 11/09/04 |
| 1260 | Job# 1859 Frick engine room expansion | 11/09/04 |
| 1266 | Job# 1876 Breakroom ceiling repair | 11/12/04 |
| 1267 | Job# 1877 Cooler 5 ceiling repair | 11/01/04 |
| 1269 | Job# 1879 Resurface floor of Mtgy plant | 9/27/04 |
| 1286 | Addn to Job# 1876 | 12/14/04 |

| Asset | * | Property Description | Service |
|-------|---|---------------------|---------|
| 1291 | | Job# 1890 - Saw room curbing | 12/01/04 |
| 1296 | | Job# 1896 Repaint cooling tower structure | 12/01/04 |
| 1299 | | Emergency light fixtures | 3/11/05 |
| 1309 | | New roof & gutter at plant managers office | 4/11/05 |
| 1310 | | Canopy at shipping & plant managers office | 4/25/05 |
| 1311 | | Framework for fans & canopy at holding shed | 4/25/05 |
| 1329 | | Emergency light fixtures | 3/23/05 |
| 1333 | | Job# 1908 - Roofing Hatchery, cooler 4 & ship | 5/10/05 |
| 1344 | | Job# 1909 Upgrade holding shed nozzles & fans | 6/29/05 |
| 1349 | | Job# 1930 Insulation of pipes - 2nd processin | 7/24/05 |
| 1358 | | Job # 1917 - Repair cooler 4 | 8/24/05 |
| 1367 | | Job # 1934 - Waste and Chill water roofing | 8/29/05 |
| 1368 | | Job # 1936 - Marination room drain replacemen | 9/12/05 |
| 1371 | | Job # 1929 - Flooring in Plant | 10/12/05 |
| 1377 | | Addn to Job# 1917 | 10/04/05 |
| 1383 | | Job # 1945 - Revitalization of Cooler 1 | 1/31/06 |
| | | | PROCESSING BUILDING |

**Group: REFRIGERATION**

| | | |
|-----|-----------------------------------|----------|
| 15 | DEBN RM REF ADDN 180 | 11/30/86 |
| 18 | REFR ADDN #1 ICEMKR | 6/30/87 |
| 154 | JOB 1485 FREEZER TO COOLER CONV | 8/31/98 |
| 431 | REFRIGERATION | 4/01/69 |
| 432 | ICE EQUIPMENT | 3/01/69 |
| 433 | ADDITION | 3/01/69 |
| 434 | REFRIGERATION | 1/01/80 |
| 435 | REFRIGERATION FRAME | 3/01/80 |
| 436 | AMMONIA COMPRESSOR | 3/31/81 |
| 438 | MOD AMMON COMP J238 | 2/28/81 |
| 439 | FRICK EVAP COND 234 | 1/20/88 |
| 440 | FRICK EVAP COND 312 | 9/30/90 |
| 441 | COOL #2 IMPRVMT 337 | 10/31/91 |
| 442 | WTR CHILL MOD J#270 | 8/01/89 |
| 443 | WTR COOL TANK J#274 | 4/07/89 |
| 444 | TRICK RWB III J#341 | 7/31/92 |
| 722 | J-1535 MAKE UP WATER HEATEAR EXCHANGER | 8/01/99 |
| 750 | JOB1556 REFR COMP/CONDENSOR | 8/31/99 |
| 759 | JOB 1550 COOLER EVAPORATOR UNITS | 3/01/00 |
| 760 | JOB 1553 IC AUGER | 3/01/00 |
| 800 | JOB 1595 AMMONIA TRANSFER SYSTEM | 8/01/00 |
| 814 | JOB 1631 COOLER #4 USDA | 8/01/00 |
| 816 | JOB 1638 CHILLER 2 AND 3 PRECHILLING | 8/01/00 |
| 820 | JOB 1645 AMMONIA LIQUID LINE TO CHILLERS | 8/01/00 |
| 822 | JOB 1647 COOLER #3 USDA | 8/01/00 |
| 824 | JOB 1650 COOLER #2 | 8/01/00 |
| 833 | J 1631 COOLER 4 USDA | 10/28/00 |
| 837 | JOB 1645 AMMONIA LINE TO CHILLERS | 10/28/00 |
| 841 | JOB 1655 50 TON ICE MAKER | 10/28/00 |
| 842 | JOB 1656 AMMONIA VENTILATOR | 10/28/00 |
| 854 | J 1645 AMMMONIA LIQ LINE TO CHILLERS | 1/27/01 |
| 856 | JOB 1650 COOLER #2 | 1/27/01 |
| 858 | JOB 1656 AMMONIA VENTILATOR | 1/27/01 |
| 869 | REFRIGERATION EQUIP | 3/01/01 |
| 875 | J 1672 AMMONIA LEAK DETECTORS | 3/31/01 |
| 900 | JOB 1650 Cooler #2 | 9/01/01 |

| Asset * | Property Description | Service |
|---|---|---|
| 994 | Addtn to Asset#869 | 4/01/02 |
| 995 | Addn to Asset #841 | 4/01/02 |
| 996 | Refrigeration Equipment | 4/01/02 |
| 1008 | Job#1581 Refrigeration equip & install | 12/01/02 |
| 1055 | Job# 1802 Refrigeration for Shipping Dock | 6/26/03 |
| 1082 | Addn to Job# 1802 | 6/30/03 |
| 1150 | Breaker and starter comp-500 hp co | 4/28/04 |
| 1157 | Job# 1852 Evaporater cooler 5 | 4/01/04 |
| 1175 | Compressor rebuild | 6/29/04 |
| 1239 | Ice auger | 10/08/04 |
| 1259 | Job# 1857 2nd processing refrigeration addtn | 10/29/04 |
| 1261 | Job# 1860 Refrigeration system electrical wor | 9/03/04 |
| 1275 | Addn to Job# 1857 | 1/31/05 |
| 1282 | Addn to Job# 1857 | 2/09/05 |
| 1283 | Addn to Job# 1860 (Refrigerator System) | 12/10/04 |
| 1305 | Addn to Job# 1857 | 2/28/05 |
| 1316 | Addn to Job# 1857 | 4/29/05 |
| 1324 | Addn to Job# 1857 | 5/16/05 |
| 1325 | Addn to Job# 1860 | 5/16/05 |
| 1345 | Job# 1907 Rebuild #2 Frick comprressor | 2/25/05 |
| 1348 | Job# 1918 New condenser #2 | 8/15/05 |
| 1369 | Addn to Job# 1857 | 6/22/05 |
| 1373 | Addn to Job # 1907 | 3/10/05 |
|  |  | **REFRIGERATION** |

**Group: SHOP EQUIPMENT**

| | | |
|---|---|---|
| 11 | BOX AND PAN BRAKE | 3/21/84 |
| 20 | CK SYS SOFTWARE | 5/08/95 |
| 445 | WELDER CONTR SOURCE | 3/31/79 |
| 447 | MB3 BEVERLY SHEAR | 2/12/81 |
| 448 | RIGID PIPE 3RD MACH | 2/12/81 |
| 452 | DRILLING MACHINE | 1/31/85 |
| 455 | DELL COMPUTER | 10/27/94 |
| 684 | AIR CONDITIONER-MNTCE SHOP | 2/28/99 |
|  |  | **SHOP EQUIPMENT** |

## SCHEDULE 1.1(g)

### DESIGNATION OF RIGHTS AGREEMENT

See Annex 1.1(g) attached hereto.

## DESIGNATION OF RIGHTS AGREEMENT

THIS DESIGNATION OF RIGHTS AGREEMENT, is made and entered into on April ___, 2006 between the Sylvest Farms, Inc. (the "Sellers"), and Koch Foods of Alabama, LLC and Koch Farms of Alabama, LLC ("Buyers").

## RECITALS

WHEREAS, Sellers and Buyers have entered into an Asset Purchase Agreement of even date herewith for the sale of Sellers' assets;

WHEREAS, pursuant to the Asset Purchase Agreement the parties have agreed that Sellers will file a Chapter 11 Bankruptcy petition and petition the Court to approve the sale to Buyers pursuant to Section 363 of the Bankruptcy Code;

WHEREAS, Sellers are a party to a Dedicated Transportation Agreement with Worldwide Dedicated Services, Inc. ("WDS")dated June 23, 2004 for the provision of transportation services to the Sellers (the "WDS Contract"), which Sellers would have the right to assume and assign or reject, pursuant to Section 365 of the Bankruptcy Code;

WHEREAS, due to the need to expeditiously close the sale of assets to Buyers before Buyers can determine whether they require the assumption and assignment of the WDS Contract, the parties desire to designate and assign to Buyers the Sellers' rights under Section 365 of the Bankruptcy Code to assume/assign or reject the WDS Contract, and designate the right to receive the services of WDS and the obligation to make the payments to WDS, until such time as it is determined whether the WDS Contract will be assumed and assigned or rejected.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties covenant and agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Agreement" means this Designation Rights Agreement.

"Approval Order" means the final and nonappealable order entered by the Court approving the Asset Purchase Agreement and this Agreement in a form that is satisfactory to Buyers.

"Authorized Officer" of any Person means the chief executive officer, the president, any vice president or any secretary of that Person.

"Bankruptcy Code" means 11 U.S.C. §101 et. seq. and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

"Closing Date" shall have the same meaning as that term has in Section 2 of the Asset Purchase Agreement.

"Court" means the Bankruptcy Court in which Sellers' bankruptcy case is pending.

"Cure Costs" means all actions and monetary payments necessary to cure any defaults (monetary or otherwise) in the WDS Contract. In the event that the Buyers and WDS disagree as to the Cure Costs of the WDS Contract, in the event that the Buyers seek to assume such contract, the Cure Costs shall be the amount determined by the Court after notice and hearing, as necessary to cure any defaults (monetary or otherwise) in the WDS Contract. Under no circumstances shall the Sellers have any obligations whatsoever to pay any Cure Costs.

"Designation Period" has the meaning set forth in Section 2.1(b) below.

"Designation Rights" has the meaning set forth in Section 2.1(b) below.

"Effective Date" has the meaning set forth in Article III below.

"Objection Period" has the meaning set forth in Section 2.1(d) below.

"Order" means an order entered by the Court.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust union, association, court, agency, governmental, tribunal, instrumentality or other entity or authority.

"Purchase Price" has the meaning set forth in Section 2.3 below.,

## ARTICLE II

## THE TRANSACTION

2.1     Purchase and Sale of Designation Rights and Properties.

(a)     On the terms and subject to the conditions contained in this Agreement and the Approval Order, on the Closing Date, Buyers shall purchase from Sellers and Sellers shall sell, convey, assign, transfer and deliver to Buyers pursuant to Section 105, 363 and 365 of the Bankruptcy Code, the Sellers' right, title and interest, if any, in and to the Designation Rights for the WDS Contract, free and clear of all liens of any kind whatsoever and to the fullest extent permissible pursuant to the Bankruptcy Code, but subject to Cure Costs and the provisions of this Agreement.

(b)     During the Designation Period, which shall be from the date of the closing of the sale contemplated by the Amended Asset Purchase Agreement until the date the Buyer's Designation Rights expire (as provided below) and on the terms and subject to the conditions contained in this Agreement and the Approval Order, the Buyers shall have the sole, exclusive and continuing right to (i) receive all services under the WDS Contract; (ii) make all payments to WDS for the services Buyers' receive, and (iii) determine whether the WDS Contract shall be assumed and assigned by Sellers in connection with an assumption and assignment, and to

whom; and (iv) whether the WDS Contract shall be rejected (all of which rights are referred to herein as the "Designation Rights"). Buyer's Designation Rights shall expire on the later of (i) the date of the expiration of the applicable Section 365 of the Bankruptcy Code period for the assumption or rejection of the WDS Contract, including any further extension granted by order of the Court, or (ii) the date of the termination of this Agreement (the "Designation Period"). Notwithstanding anything contained herein, Sellers shall not reject the WDS Contract unless and until Buyers, in accordance with this Agreement, notify Sellers to reject such WDS Contract. The Designation Rights to be acquired shall include, among other things, the exclusive power to designate to a designee (and to have Sellers convey and assign to such designee) all rights, title, interests, options, contract rights, if any, of the Sellers in and to one the WDS Contract of the Sellers.    Notwithstanding any provisions to the contrary, any costs, expenses or claims attributable to a time period after the entry of the Approval Order and the Closing of the asset sale to Buyers shall be deemed the sole obligation of Buyers.

(c)     Notwithstanding subsections (a) and (b) above, in order to effectuate either an assumption and assignment or rejection of the WDS Contract, the Buyer shall draft prior to the expiration of the Designation Period within sufficient time for filing and presentation to the Court prior to the expiration of the Designation Period, a motion (the "Designation Motion"), and such Designation Motion shall: (i) state whether the Buyers intend to assume and assign or reject the WDS Contract; (ii) state the identity of Buyers' designee, if any; (iii) state the proposed use of the WDS Contract by the Buyers' designee, (iv) provide documentation or other information from Buyers' designee relating to "adequate assurance of future performance" by the designee as required by Section 365 of the Bankruptcy Code; (v) identify the WDS Contract and all of the documents amending, modifying, supplementing or restating the Contract; (vi) request Court approval of the assumption and assignment or rejection of the WDS Contract, at the Buyers' election; (vii) request a hearing before the Court on the relief requested including without limitation a hearing to determine Cure Costs, the adequacy of the Buyers and/or its designee's assurance of future performance under the WDS Contract and satisfaction of Cure Costs; and (viii) include as an attachment a proposed Order. The Sellers shall use reasonable efforts to file the Designation Motion within two (2) business days of receipt from the Purchase for presentment to the Court within the Designation Period. The Sellers shall serve a copy of the Designation Motion on all parties entitled to notice. The Sellers shall not have any liability with respect to Cure Costs or other assurances of the future performance.

(d)     WDS shall have ten (10) days from the receipt of the Designation Motion (the "Objection Period") to file with the Court an objection in writing to the proposed assignment of the WDS Contract (and concurrently deliver a copy of the said objection to the Buyers, Sellers, and such other parties as are specified in the notice of the Designation Motion).

(e)     Any Designation Motion and notice thereof shall provide that if an objection to any assumption and assignments is not timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue," the objection will not preclude the assumption and assignment of the WDS Contract, the assumption and assignment shall be deemed effective and binding (without further Order) contingent upon the determination of any Cure Costs by the Court and the satisfaction of such Cure Costs in accordance with an Order. Notwithstanding the foregoing, WDS shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed within the Objection Period. The Designation Motion must clearly state that

the failure to object may result in the entry of an Order allowing assumption and assignment of the WDS Contract without any obligations on the part of the Buyers for adequate assurance of future performance.

(f)   In a timely filed Designation Motion is not filed, the WDS Contract shall be deemed rejected as of the expiration of the Designation Period; provided, however, Sellers shall be prohibited from rejecting the WDS Contract until such time as Buyers have designated the WDS Contract for rejection or the period to assume and assign such Contract, as provided under section 365(d)(1), (d)(4) has expired and has not been further extended by the Court.

(g)   Notwithstanding the above, the Sellers shall use reasonable efforts to file and present the Designation Motion.   However, the Sellers shall have no obligation or liability whatsoever to present any evidence or argument in favor or against assumption or assignment of the WDS Contract, Cure Costs, and/or adequate assurance of future performance by the Buyers or their designee.   Buyers shall have the right to petition the Court to compel the Sellers to comply with the Buyers' direction to designate.

(h)   The Sellers shall bear no liability for Cure Costs or for adequate assurance of future performance costs or obligations relating to the WDS Contract, or any other costs or expenses relating thereto.

2.2   Assumption and Assignment of Contracts.   An assumption and assignment of the WDS Contract, pursuant to Section 365 of the Bankruptcy Code, shall be effective only upon the entry of a final and nonappealable Order approving the assumption and assignment of the WDS Contract after notice and hearing on a timely filed and served Designation Motion; provided, however, if no such objection to the assumption and assignment is timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue" which, pursuant to the Designation Order, will not preclude the assumption and assignment of the WDS Contract, and the assumption and assignment shall be deemed effective and binding (without further Order) upon the Court's determination of the Cure Costs and the Buyers' satisfaction of same.   Notwithstanding the foregoing, WDS shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed prior to the expiration of the Objection Period.

2.3   Purchase Price.   The purchase price for the Designation Rights (the "Purchase Price") is included in the consideration paid or to be paid by Buyers pursuant to the Asset Purchase Agreement.   Except for the Purchase Price in the Asset Purchase Agreement, the Buyers shall have no obligation to pay the Sellers or their Estate any other funds in order to assume, assign, or reject the WDS Contract.   Notwithstanding the foregoing, the Purchase Price shall specifically include any obligations of the Buyers as to the WDS Contract, including but not limited to, Cure Costs, adequate assurance of future performance, and the payment of Chapter 11 Operating Expenses after Closing.

2.4   Buyers shall use their best efforts to determine whether they will seek assignment/assumption or rejection of the WDS Contract before the expiration of the Designation Period; provided, however, Buyers shall have the right to request that Sellers obtain an Order extending the Designation Period for an additional period reasonably requested by Buyers.   Should Buyers make any such request, Sellers shall use its reasonable efforts to obtain promptly such an Order.   If the Court denies to extend the Designation Period, the Designation

Period is terminated at the later of (i) the date of docketing of the Order denying the extension of the Extension Period; or (i) the date set forth in Section 2.1(b).

## ARTICLE III

### CONDITIONS FOR EFFECTIVE DATE, CLOSING DATE AND APPROVAL ORDER

3.1    The Effective Date of this Agreement is the date of the Closing.

3.2    The Closing Date of this Agreement shall be the Closing Date as defined by the Asset Purchase Agreement.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

4.1    Sellers represent that the WDS Contract is unexpired and has not been terminated. Sellers make no other representations or warranties with respect to the WDS Contract.

(a)    Buyers hereby represent and warrant to Sellers that they have the power and authority, to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement by Buyers and the consummation by Buyers of the transactions contemplated hereby have been duly authorized by all requisite (and to the extent applicable to Buyers) corporate, partnership or limited liability corporation action.

## ARTICLE V

### COVENANTS

5.1    Further Transfers and Assurances.  Sellers and Buyers will execute and deliver such further instruments of conveyance and transfer and take such additional action as Buyers may reasonably request to effect, consummate, confirm or evidence the assignment to Buyers' (or their designees) of the WDS Contract.  This Section 5.1 shall survive for six (6) months following the expiration of the Designation Period.

5.2    Taxes.  All charges for or in connection with the recording of any document or instrument contemplated hereby shall be paid by Buyers' or their designees.  Sellers and Buyers (or Buyers' designees), as required by local law, will file all necessary tax returns and other documentation in connection with the taxes and fees encompassed in this Section 5.2 relating to the assignment of the WDS Contract.

## ARTICLE VI

### MISCELLANEOUS

6.1    Termination: Other Remedies.

(a)    This Agreement may be terminated by the mutual consent of Buyers and Sellers.

1459049 v2                                          - 5 -

(b)     Upon termination of this Agreement pursuant to Section 6.1(a) above, the WDS Contract is immediately deemed rejected without further Order.

6.2     Default and Remedies.

(a)     The Court shall retain jurisdiction over this Agreement in the event of any default by either Party.

(b)     In the event of a material breach of, or material default under, this Agreement by Buyers prior to the Closing Date, Sellers shall, provided Sellers are not in material breach of or material default under, this Agreement, be entitled, as its sole and exclusive remedy, either (i) to terminate this Agreement or (ii) to seek specific performance of this Agreement.  In the event of a material breach of, or material default under, this Agreement by Buyers after the Closing Date, Sellers shall, provided Sellers are not in material breach of or material default under this Agreement, be entitled, as its sole and exclusive remedy, to seek specific performance of this Agreement.

6.3     Successors and Assigns.  This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective successors and assigns.

6.4     Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission, or mailed, by certified or registered mail, return receipt requested, first class postage prepaid, or by Federal Express or some other reputable overnight carrier, to the Parties at the following addresses and facsimile numbers:

If to Sellers:

> Thomas G. Mancuso, Esq.
> Mancuso & Franco, P.C.
> 7515 Halcyon Summit Drive, Suite 301
> Montgomery, Alabama 36117
> (P.O. Box 240489
> Montgomery, Alabama 36124-0489)
> Telephone Number: 334-481-1800
> Facsimile Number: 334-481-1810

If to Buyers addressed to:

> Thomas R. Wechter, Esq.
> Eugene J. Geekie, Esq.
> Schiff Hardin LLP
> 6600 Sears Tower
> Chicago, IL  60606
> Telephone Number: 312-258-5756
> Facsimile Number:  312-258-5600

or such other place and with such other copies as any Party may indicate by written note to the other Party provided in the manner set forth above.

6.5     Entire Agreement.    This Agreement, and the agreements referenced herein (including without limitation, the Asset Purchase Agreement and the exhibits to the Asset Purchase Agreement) supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement and other documents to be delivered in connection herewith, including without limitation the Asset Purchase Agreement, contains the sole and entire agreement between the Parties with respect to the subject matter hereof. Notwithstanding the foregoing, the Asset Purchase Agreement shall continue to be a binding agreement between the Parties. To the extent that there are any discrepancies between the Asset Purchase Agreement and this Agreement, the terms of the Asset Purchase Agreement shall control.

6.6     Waiver.  Except as otherwise specifically provided for in this Agreement, any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof. To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an Authorized Officer of such Party.  A waiver on one occasion shall not be deemed a waiver of the same or any other breach on a future occasion.

6.7     Amendment. This Agreement my be modified or amended only in writing duly executed by or on behalf of each of the Parties.

6.8     Counterparts: Facsimile Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

6.9     Invalid Provisions.  If any provisions of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully servable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof. The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

6.10    Heading, Gender, Etc. The headings used in this Agreement have been inserted for convenience, do not modify the terms of this Agreement and do not constitute matter to be construed or interpreted in connection with this Agreement.    Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other Gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement, and (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation." The language used in this Agreement shall be deemed to the language chosen by the Parties to express their mutual intent and no rule of strict construction shall be applied against any Person.

6.11    Continuing Jurisdiction.  The Parties agree that the Court shall retain jurisdiction over the enforcement of this Agreement, including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

6.12    Choice of Law.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Alabama.  In the event of any litigation concerning this Agreement, proper venue shall be in the Court and the Parties consent to such jurisdiction.

6.13    No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of sellers and buyers between the Parties.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed as of the date first above written.

BUYER:                                          SELLERS:

KOCH FOODS OF ALABAMA, LLC                      SYLVEST FARMS, INC.

By: _____                 By: _____
                                                    Its:

    _____
    Member

KOCH FARMS OF ALABAMA, LLC

By: _____

    _____
    Member

CH2\1410501.2

## SCHEDULE 1.3

### EXECUTORY CONTRACTS AND INSURANCE POLICIES

1. Agreement by and between Sylvest Farms, Inc. and the Retail, Wholesale and Department Store Union, effective October 3, 2005 to October 2, 2011

2. Real Property Lease, made and entered into as of August 25, 2005, by and between Hodges Bonded Warehouse, Inc. and Sylvest Farms, Inc., as amended by that certain First Amendment to Real Property Lease, made and entered into on January 26, 2006, by and between Hodges Bonded Warehouse, Inc. and Sylvest Farms, Inc.

3. Lease For Real Property, Lease Number C10, dated October 8, 1992, by and between WSFA-TV and Sylvest Farms, Inc.

4. Dedicated Transportation Agreement, made June 23, 2004, between Worldwide Dedicated Services, Inc. and Sylvest Farms, Inc.

5. Retail Installment Sale Contract GMAC Flexible Finance Plan, Dealer Number 57076 re: New 2002 GMC Sonoma Vehicle ID # 1GTCS19W328184391, with payments beginning March 9, 2002

6. Master Lease Agreement, undated, between General Electric Capital Corporation and Sylvest Farms, Inc.

7. DSI Portioning System Lease Agreement, Lease Number 121905-1522-714, effective May 1, 2005, between FMC FoodTech, Inc. (acting through and by its Stein-DSI business) and Sylvest Farms, Inc.

8. Master Lease Agreement #227110, between CIT Technology Financing Services, Inc. and Sylvest Farms, Inc. including Equipment Schedule #177734 to Master Lease Agreement #227110

9. Equipment Lease Agreement, executed July 29, 2004, between De Lage Landen Financial Services, Inc. and Sylvest Farms, Inc. regarding one new Nissan model PL30LP, Serial # PL01-9G0041

10. Equipment Lease Agreement, executed July 29, 2004, between De Lage Landen Financial Services, Inc. and Sylvest Farms, Inc. regarding one used Nissan model E35Y, Serial # CUM01-002674

11. Equipment Lease Agreement, executed July 29, 2004, between De Lage Landen Financial Services, Inc. and Sylvest Farms, Inc. regarding one new Nissan model WPN-60, Serial # 1W16-9300357

12. Equipment Lease Agreement, executed July 29, 2004, between De Lage Landen Financial Services, Inc. and Sylvest Farms, Inc. regarding one used Nissan model RPN60, Serial # 1W26-9301811

13. Equipment Quotation Quote No. JM0614Q between Carolina Handling, LLC and Sylvest Farms, Inc.

14. Equipment Lease Agreement by and between Airgas Carbonic, Inc. and Sylvest Foods Corporation re: (1) one 50 ton horz receiver and (2) one 28 kw vaporizer

15. FlexCopy Program Agreement No. 6729911 by and between Berney Office Solutions and Sylvest Farms

16. Total Copy Agreement, Agreement # 6729911020, among Berney Office Solutions and Sylvest Farms and General Electric Capital Corporation

17. Alabama Power Company Electric System Lease Agreement, made April 3, 2005, by and between Alabama Power Company and Sylvest Farms, Inc.

18. Each of the insurance policies described on <u>Annex 1.3</u> attached hereto

19. Life insurance Policy on H. Maynard Sylvest

20. Term Life Insurance Policy on Margaret Sylvest

21. Term Life Insurance Policy on Dean Falk

22. Any contracts with (a) Logan's Roadhouse, (b) Outback Steakhouse, (c) Ryan's, (d) Popeye's, and (e) Church's, and any and all affiliates, franchisees or buying groups of such entities

ANNEX 1.3

Sylvest Farms, Inc.
Insurance Summary
4/17/06

All policies have effective dates of 4/1/06 to 4/1/07.

| Type | Company | Limit |
|---|---|---|
| Property | Mt. Hawley, RSUI Indemnity, Essex, Arch, Great American (Layered property program) | $70,000,000 Blanket Limit of Liability, including B.I. |
| Equipment | Mt. Hawley | $993,960 |
| Live Birds | Mt. Hawley | $850,000 |
| (Pullets & Breeders only) | Mt. Hawley policy #MCP0134530 | $2,500,000 limits |
| | RSUI Indemnity policy #346117 | $5,000,000 excess $2,500,000 |
| | Essex Ins. Co. policy #ESP4511 | $6,250,000 excess $7,500,000 |
| | Homeland Ins. Co.,pol.#Z7XSP3360 | $6,250,000 excess $7,500,000 |
| | Great American Ins.,policy #CPP112002 | $30,000,000 excess $20,000,0 |
| | RSUI Indemnity, policy #346118 | $20,000,000 excess $50,000,0 |
| Boiler & Machinery | St. Paul/Travelers (don't have this pol. No. yet.) | $10,000,000 |
| General Liability | Cincinnati Insurance Co. Policy #CAP5457323 (This policy also provides property coverage for the office | $1,000,000 per occurrence/ $2,000,000 aggregate |

Sylvest Farms, Inc.
Insurance Summary
4/17/06

| Type | Company | Limit |
|---|---|---|
| | bldg. At 3500 Western Blvd. - $995,212) | |
| Automobile | QBE Insurance Company (Covers private passenger & pickups) Policy #ANA16568 | $1,000,000 |
| Excess Workers Comp (Alabama) | Safety National - Pol. #SP9476-AL | Statutory (Employers Lia. - $1M; $350,000 Retention) |
| Workers Comp, Georgia | Pacific Employers (ACE) Policy #C44653904 | Statutory ($500,000 Limits) |
| Management Liability, Incl. D&O, Crime, EPLI, and Fiduciary | Federal Insurance Co. (Chubb Group) Pol. #8181739 | $2,000,000; Crime $600,000 |
| Umbrella | Ohio Casualty Policy #UUO53248337 | $10,000,000 |
| Difference in Conditions | Landmark American Ins. Co. Policy #LHQ346116 | $2,500,000 per occ. And in the aggregate in respect of Flood & Earthquake. Sublimit - $1,000,000 annual aggregate Flood Zone A or any zone prefixed with A; $2,500,000 occ/annual aggregate for P.D./BI on Earthquake |

Sylvest Farms, Inc.
Insurance Summary
4/17/06

| Premium |
|---|
| $426,374 |
| $140,000 |
| $84,005 |
| $84,005 |
| $43,799 |
| $31,625 |
| $30,777 |
| $197,822 |

Sylvest Farms, Inc.
Insurance Summary
4/17/06

| Premium |
| --- |
| $41,237 |
| $81,726 |
| $4,593 |
| $50,000 |
| $96,449 |
| $58,883 |

## SCHEDULE 1.5

### POULTRY GROWER PAYABLES

See <u>Annex 1.5</u> attached hereto.

### Broilers

| Farm | Farm Name | Address1 | City | State | Zip | Settled 4/12/06 |
|------|-----------|----------|------|-------|-----|-----------------|
| 5 | JAMES ALTIERE | 618 COBB LANE | GEORGIANA | AL | 36033 | |
| 12 | MICHAEL R BAGENT | S  6480 GREENVILLE HWY | LUVERNE | AL | 36049 | |
| 19 | BEES FARM | 341 BOYD RD | RUTLEDGE | AL | 36071 | |
| 21 | BRENT BLACK | 1732 MASON ROAD | HOPE HULL | AL | 36043 | |
| 26 | MAXINE BLACK | 1732 MASON ROAD | HOPE HULL | AL | 36043 | |
| 28 | ULYSIS BLACK | 2429 STARLINGTON RD | GEORGIANA | AL | 36033 | |
| 30 | WAYNE BLACK | 1732 MASON ROAD | HOPE HULL | AL | 36043 | |
| 40 | DARREN BOLLING | 356 DRY LAKE RD | LUVERNE | AL | 36049 | |
| 50 | MICHAEL R BRIGHT | WELL 6573 BOWDEN ROAD | HONORAVILL | AL | 36042 | |
| 51 | ELTON BROWN | 1120 PUSLEY RIDGE RD | HIGHLAND H | AL | 36041 | |
| 53 | KENNETH BURKETT | 9832 WESLEY CHAPEL RD | GEORGIANA | AL | 36033 $ | 30,260.18 |
| 54 | KENNETH BURKHALT | ER  3216 FORT DALE RD | GREENVILLE | AL | 36037 | |
| 55 | JEREMY BROWN | 12773 MT ZION RD | RAMER | AL | 36069 $ | 45,548.39 |
| 56 | CAMPBELL FARMS | P O BOX 34 | MCKENZIE | AL | 36456 | |
| 58 | JOHNNY CARPENTER | 1284 NEW HOME RD | GEORGIANA | AL | 36033 | |
| 60 | DON CASEY | 8500 SELMA HIGHWAY | MONTGOMERY | AL | 36108 | |
| 62 | CRENSHAW FARMS | 1708 DICKENS FIELD RD | GREENVILLE | AL | 36037 $ | 39,309.19 |
| 63 | LADONNA CASEY | 3950 ROBERT C HAM RD | MONTGOMERY | AL | 36108 | |
| 65 | JUDY CASEY | 8500 SELMA HIGHWAY | MONTGOMERY | AL | 36108 | |
| 66 | CIRCLE E | P O BOX 381 | FT DEPOSIT | AL | 36032 | |
| 69 | CHARLIE W CRANE, | JR  437 HOWARD STEEN RD | FOREST HOM | AL | 36030 | |
| 70 | DALE DAVIS | 4907 CO RD 1107 BRIARHILL RA | NC GOSHEN | AL | 36035 | |
| 71 | KEVIN DAVIS | 4907 CO RD 1107 BRIARHILL RA | NC GOSHEN | AL | 36035 | |
| 73 | DOUBLE O FARMS | PO BOX 275 | LOWNDESBOR | AL | 38752 | |
| 78 | NED ELLIS | P O BOX 381 | FT DEPOSIT | AL | 36032 | |
| 80 | THOMAS ELLIS | 3500 MASON RD | HOPE HULL | AL | 36043 | |
| 81 | THOMAS ELLIS #2 | 3500 MASON RD | HOPE HULL | AL | 36043 | |
| 82 | FARON FRAZIER | 742 GREENLEAF RD | HONORAVILL | AL | 36042 | |
| 83 | HUBERT FRAZIER | 6468 BOWDEN RD | HONORAVILL | AL | 36042 | |
| 84 | EDDIE PAUL FRAZI | ER  5993 OLD STAGE RD | GREENVILLE | AL | 36037 | |
| 85 | J & L FARMS | 6593 MERRIWETHER RD | HONORAVILL | AL | 36042 $ | 24,128.15 |
| 86 | FOWLER FARM | 869 FOWLER RD | LUVERNE | AL | 36049 | |
| 89 | KRISTY FRAZIER | 6746 MERRIWETHER TRAIL | HONORAVILL | AL | 36042 | |
| 91 | GREGORY A GAFFOR | D  2551 NORRELL AVE | GEORGIANA | AL | 36033 | |
| 92 | COUNTYLINE FARMS | 2555 BETHEL CHURCH RD | FT DEPOSIT | AL | 36032 | |
| 96 | C & S POULTRY | 1017 BOWDEN RD | HONORAVILL | AL | 36042 | |
| 105 | GRANT FARMS | 10643 STEINER STORE RD | FT DEPOSIT | AL | 36032 | |
| 108 | HESTER FARMS | 3323 CENTER RIDGE RD | LUVERNE | AL | 36049 | |
| 109 | JONES POULTRY | 122 HORSE FARM RD | GEORGIANA | AL | 36033 | |
| 110 | A & J FARMS | 2249 S MOODYS CROSSRD RD | RUTLEDGE | AL | 36071 | |
| 111 | JOHN HOFFMAN | 1368 SAVILLE ROAD | HIGHLAND H | AL | 36041 | |
| 112 | HOFFMAN POULTRY | FARM 3276 MAGNOLIA SHORES RD | LAPINE | AL | 36046 $ | 14,070.83 |
| 113 | HOLLADAY FARMS | 416 HORSECREEK RD | RUTLEDGE | AL | 36071 $ | 51,658.89 |
| 114 | GRADY HOLLEY | 1371 PERDUE RD | LUVERNE | AL | 36049 | |
| 115 | RICKY JEFFCOAT | 305 JEFFCOAT RD | RUTLEDGE | AL | 36071 | |
| 119 | HORSE CREEK FARM | S  680 S MOODYS CROSSRDS RD | RUTLEDGE | AL | 36071 | |
| 121 | TROY HUSBAND | 2782 QUAIL TOWER RD | LUVERNE | AL | 36049 | |
| 123 | GLYNN D KING | PO BOX 1085 | MCKENZIE | AL | 36456 | |
| 124 | WILLIAM KILPATRI | CK  182 GREENVILLE RACEWAY | FOREST HOM | AL | 36030 | |
| 125 | INGE FARMS | 1555 DAUPHIN ST | MOBILE | AL | 36604 | |
| 127 | DEBBIE KENT | 840 SHAMROCK RD | LUVERNE | AL | 36049 | |
| 129 | CHARLES KILPATRI | CK  1285 SEVENTH AVE | FOREST HOM | AL | 36030 | |
| 131 | MARSHA D LOFTIN | 3611 CO RD 4 | FT DEPOSIT | AL | 36032 | |
| 133 | LONNIE LESTER | 1911 RUTLEDGE LOOP RD | LUVERNE | AL | 36049 | |
| 134 | PAUL LOWERY | 1771 SEVENTH AVE | FOREST HOM | AL | 36030 | |
| 135 | MARK KNOX | 523 GIN CREEK RD | GOSHEN | AL | 36035 | |
| 137 | LANGFORD FARMS | 5444 SAND CUT RD | GEORGIANA | AL | 36033 | |
| 138 | RAY MCCULLOUGH | 4705 SWEETWATER RD | HIGHLAND H | AL | 36041 | |
| 139 | RAY MCCULLOUGH # | 2  4705 SWEETWATER RD | HIGHLAND H | AL | 36041 | |
| 140 | SHEILA MCELWAIN | 15864 MONTGOMERY HWY | HIGHLAND H | AL | 36041 | |
| 141 | JOE MCGOUGH | 2217 DANIELSVILLE RD | HONORAVILL | AL | 36042 | |
| 142 | LOWES POULTRY FA | RM  588 WALSH STREET | MCKENZIE | AL | 36456 | |
| 146 | DAWARD MCNAUGHTO | N  1318 JASMIN HILL RD | GREENVILLE | AL | 36037 | |
| 151 | JOYCE H MADDOX | 6173 W HICKORY GROVE RD | LETOHATCHE | AL | 36047 | |
| 154 | CHARLES MATTHEWS | 2865 DANIEL BRANCH RD | HIGHLAND H | AL | 36041 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 155 | MACK MEADOWS | 2432 MEADOWS DR | LOWNDESBOR | AL | 36752 | $ 44,882.88 |
| 156 | KIRK MEADOWS | 1128 ST CLAIR PLACE | LOWNDESBOR | AL | 36752 | |
| 157 | MIXON FARMS LLC | 1818 ASHBURY CHURCH RD | PINEAPPLE | AL | 36768 | |
| 158 | WILLIAM A MITCHE | LL   336 MITCHELL ROAD | FT DEPOSIT | AL | 36032 | |
| 159 | ALAN P MOBLEY | 1763 WILLIAMSON RD | LUVERNE | AL | 36049 | |
| 160 | MILLER FARMS | 5388 S. MT. ZION RD | GREENVILLE | AL | 36037 | |
| 162 | DAVIS MOORER | 891 KNIGHT PLACE | FT DEPOSIT | AL | 36032 | |
| 167 | J MIKE MOORER | 660 KNIGHT PLACE RD | FT DEPOSIT | AL | 36032 | $ 11,581.97 |
| 170 | SHELLEY MOORER | 660 KNIGHT PLACE RD | FT DEPOSIT | AL | 36037 | |
| 172 | EVELYN MOSELEY | 407 ROCK HILL RD | HONORAVILL | AL | 36042 | |
| 174 | MICHAEL MOSELEY | 1727 RAMER NAFTEL RD | RAMER | AL | 36069 | |
| 178 | ROBERT C NICHOLS | , JR 8450 HWY 97 S | LETOHATCHE | AL | 36047 | |
| 180 | DOROTHY G  NICHO | LAS  2868 STEINER STORE ROAD | GREENVILLE | AL | 36037 | $ 56,619.11 |
| 181 | CHARLES NIXON | 893 GORUM RD | MCKENZIE | AL | 36456 | |
| 182 | NOLAN FARMS | P O BOX 437 | FT DEPOSIT | AL | 36032 | |
| 183 | ROBERT PARMER | 510 GREENMORE RD | GREENVILLE | AL | 36037 | |
| 184 | WILLIAM R PIERSO | N   594 SKIPPER FARM RD | GEORGIANA | AL | 36033 | |
| 185 | DIXIE FARMS | 3808 MURPHY RD | GEORGIANA | AL | 36033 | |
| 187 | H & K FARMS,INC | 218 PALMER RD | GEORGIANA | AL | 36033 | |
| 188 | HAROLD PARMER | 532 WILDFORK RD | GREENVILLE | AL | 36037 | |
| 189 | PARTRIDGE FARMS | 463 COUNTY RD 1117 | TROY | AL | 36079 | $ 13,379.29 |
| 190 | RILEY PERRETT | 12317 MONTGOMERY HWY | LUVERNE | AL | 36049 | |
| 191 | RONALD H PETREY | 10541 PETREY HWY | LUVERNE | AL | 36049 | |
| 194 | LARRY PETTY | 538 POSEY ROAD | LAPINE | AL | 36046 | |
| 196 | FRANK PROCHAZKA | 598 COUNTY RD 1108 | GOSHEN | AL | 36035 | |
| 203 | GEORGE REID | 1138 OLD REID RD | FT DEPOSIT | AL | 36032 | |
| 205 | STEVE ROGERS | 3954 LUVERNE HWY | GREENVILLE | AL | 36037 | |
| 206 | ROGERS FARMS | 2361 AIRPORT RD | GREENVILLE | AL | 36037 | |
| 207 | WILLIAM E ROPER | 698 NEW BETHEL CHURCH RD | LAPINE | AL | 36046 | |
| 208 | LARRY E ROSIER | 374 ROSIER LANE | GEORGIANA | AL | 36033 | |
| 209 | DARIN SANDERS | 781 MILTON RD | RUTLEDGE | AL | 36049 | |
| 210 | WILLIAM F SINGLE | TON  15 E ROGER RD | FT DEPOSIT | AL | 36032 | |
| 211 | JAMES SEALE | 1821 MONTEREY RD | FOREST HOM | AL | 36030 | |
| 212 | BOBBY SASSER | 386 TAYLOR CROSSING RD | LAPINE | AL | 36046 | |
| 214 | ALVIN SEXTON | 5163 SWEETWATER RD | HIGHLAND H | AL | 36041 | |
| 216 | LLOYD SHELL | 473 BRUSHY CREEK RD | GEORGIANA | AL | 36033 | |
| 218 | JERRY O STINSON | 5557 STARLINGTON RD | GEORGIANA | AL | 36033 | |
| 222 | BELINDA STRICKLA | ND   15293 HWY 21 SOUTH | MINTER | AL | 36761 | |
| 224 | TAYLOR FARMS | 7796 OLD STAGE RD | GREENVILLE | AL | 36037 | |
| 226 | GLYN STRINGER | 1880 ROPER RD | HONORAVILL | AL | 36042 | |
| 228 | THOMAS L STRINGE | R   RT 2 BOX 185 | HONORAVILL | AL | 36042 | $ 26,597.99 |
| 230 | TOMMY THOMPSON | 432 SUNSET DRIVE | FOREST HOM | AL | 36030 | |
| 232 | THOMAS ENTERPRIS | ES  1390 SWEETWATER RD | HIGHLAND H | AL | 36041 | |
| 233 | WINDY RIDGE FARM | LLC 961 CO RD 33 | HAYNEVILLE | AL | 36064 | |
| 234 | L & N FARMS INC | 3068 THOMAS RD | LUVERNE | AL | 36049 | |
| 235 | GEORGE A TILL | 416 TILL RD | MINTER | AL | 36761 | |
| 236 | T & T FARM | 2991 HONORAVILLE RD | LUVERNE | AL | 36049 | |
| 238 | WINSTON/MONTEZ T | UR   4003 AIRPORT RD | GREENVILLE | AL | 36037 | |
| 240 | LINDA FAYE WATSO | N   816 CO RD 29 | PINEAPPLE | AL | 36768 | $ 40,058.13 |
| 245 | RONALD G WILKINS | ON   601 DEAN RD | HOPE HULL | AL | 36043 | |
| 246 | MARY F WILLIAMSO | N   1997 CENTENARY RD | LUVERNE | AL | 36049 | |
| 247 | MARIE WILKERSON | 8191 PETREY HWY | LUVERNE | AL | 36049 | |
| 248 | STEVE WHITTINGTO | N #2 6774 FORT DALE RD | GREENVILLE | AL | 36037 | |
| 249 | WHEELER FARMS | 1438 WOOD ROAD | BRANTLEY | AL | 36009 | |
| 250 | RANDY P WILLIAMS | ON  2180 CENTNARY RD | LUVERNE | AL | 36049 | |
| 251 | WIGGINS FARM | 404 HASSEY RD | RAMER | AL | 36069 | |
| 252 | WOOD FARMS | 8324 IVY CREEK RD | BRANTLEY | AL | 36009 | |
| 253 | TOMMY WHITTLE | 6814 PINE APPLE HWY | GREENVILLE | AL | 36037 | |
| 254 | RUSS WILKERSON | 8469 PETREY HWY | LUVERNE | AL | 36049 | |
| 255 | DOUG STEPHENS | 1193 COUNTY RD 1137 | GOSHEN | AL | 36035 | |
| 350 | SYLVEST FARMS IN | C   BREEDER FARM # 3 | | | | |

$ 398,095.00

## PULLET AND BREEDER GROWERS

| FARM # | FARM NAME | Address | City | State | Zip | Paid 4/6/06 |
|---|---|---|---|---|---|---|
| 302 | BETTY FAULK | 1583 FAULK ROAD | HONORAVILL | AL. | 36042 | 1700.8 |
| 304 | TOM DUNCAN | 3622 HONORAVILLE ROAD | GREENVILLE | AL. | 36037 | 5717.36 |
| 305 | JOHNNY BOYD | 1076 REDLAND ROAD | WETUMPKA | AL. | 36092 | 7467.8 |
| 308 | JAMES L. REEVES | 4516 BURGAMY SWAMP ROAD | HIGHLAND H | AL. | 36041 | 7766.69 |
| 310 | RONALD & LYNDA FLOYD | PO BOX 546 | TROY | AL. | 36081 | 2235.19 |
| 311 | RONALD & LYNDA FLOYD | PO BOX 546 | TROY | AL. | 36081 | 0 |
| 320 | SANDERS FARM | RT. 1 BOX 10 | GOSHEN | AL. | 36036 | 5433.62 |
| 321 | SANDERS FARM | RT. 1 BOX 10 | GOSHEN | AL. | 36035 | 0 |
| TOTAL PULLETS | | | | | | 30321.46 |
| 330 | COLVIN FARMS | 36036 BOYKIN ROAD | RED LEVEL | AL. | 36474 | 5100.81 |
| 333 | FLOYD FARMS | 6071 WORLY ROAD | RED LEVEL | AL. | 36474 | 1819.16 |
| 334 | FLOYD FARMS | 6071 WORLEY RD. | RED LEVEL | AL. | 36474 | 0 |
| 335 | F & S FARMS PARTNERS | 31214 FOLEY RD. | RED LEVEL | AL. | 36474 | 2465.27 |
| 336 | F&S FARMS PARTNERS | 31214 FOLEY RD. | RED LEVEL | AL. | 36474 | 617.97 |
| 338 | FLOYD FARM | 7514 US HWY 29 S. | GOSHEN | AL. | 36035 | 2843.22 |
| 341 | BUCK CREEK FARMS | 8144 PERRETTE RD. | RED LEVEL | AL. | 36474 | 11490.33 |
| 342 | BUCK CREEK FARMS | 8144 PERRETTE RD. | RED LEVEL | AL. | 36474 | 0 |
| 355 | GRAYSON FARMS | 276 RIGSBY ROAD | GEORGIANA | AL. | 36033 | 0 |
| 356 | J & C FARMS | 37372 HESTER STORE RD. | RED LEVEL | AL. | 36474 | 3082.32 |
| 360 | LUCKIE FARM 1&2 | 4572 LUNERNE HWY | GREENVILLE | AL. | 36037 | 7083.45 |
| 362 | LUCKIE FARM 3&4 | 4572 LUVERNE HWY | GREENVILLE | AL. | 36037 | 0 |
| 363 | MORGAN FARMS | 3615 LIVE OAK ROAD | LUVERNE | AL. | 36049 | 11356.4 |
| 364 | WINDY RIDGE FARMS | 980 WILLIAMSON RD. | LUVERNE | AL. | 36049 | 4521.14 |
| 365 | ERIC KILLOUGH | PO BOX 223 | RUTLEDGE | AL. | 36071 | 4026.03 |
| 366 | THOMAS CROSSROAD COR | 4041 CO. RD. 2201 | GOSHEN | AL. | 36035 | 8203.39 |
| 367 | THOMAS CROSSROAD COR | 4041 CO. RD. 2201 | GOSHEN | AL. | 36035 | 0 |
| 368 | S AND J FARM | 954 CO. RD. 2219 | GOSHEN | AL. | 36035 | 6139.09 |
| 370 | NED SANDERS | 2968 CO RD 2243 | GOSHEN | AL | 36035 | 9118.16 |
| 372 | NED SANDERS | 2968 CO RD 2243 | GOSHEN | AL | 36035 | 0 |
| 373 | RODGERS POULTRY FARM | P.O. BOX 52 | RED LEVEL | AL | 36474 | 8880.04 |
| 374 | RODGERS POULTRY FARM | P.O. BOX 52 | RED LEVEL | AL | 36474 | 0 |

| 380 | TED & FAYE POULTRY | 1553 CO. RD. 2281 | GLENWOOD | AL | 36034 | 11108.34 |
| 382 | TED SANDERS | 1553 CO. RD. 2281 | GLENWOOD | AL | 36034 | 0 |
| 385 | BARBARA K SEALE | 60 HOWARD STEEN RD. | FOREST HOM | AL | 36030 | 0 |
| 387 | B. W. THOMPSON | 13461 GANTT REDLEVEL ROAD | ANDALUSIA | AL | 36420 | 7824.17 |
| 388 | B. W. THOMPSON | 13461 GANTT REDLEVEL ROAD | ANDALUSIA | AL | 36420 | 0 |
| 390 | TILL FARM | 220 DUSTY TRAIL | GREENVILLE | AL | 36037 | 5561.51 |
| 392 | CEDARSVILLE FARMS | PO BOX 196 | GLENWOOD | AL | 36034 | 1443.6 |
| 396 | TURKEY TROT FARMS | 2047 N GLENWOOD RD | GOSHEN | AL | 36035 | 9787.53 |
| 397 | JERROD WOOD | 72 E. 1ST. STREET | LUVERNE | AL | 36049 | 0 |
| 398 | J DICK WOOD | 649 LITTLE HORSE CREEK RD | RUTLEDGE | AL | 36071 | 3567.34 |
| 399 | 4 M FARMS | 1085 N MOODY'S CROSSROAD RD | LUVERNE | AL | 36049 | 4893.38 |

TOTAL BREEDERS 130,932.65

## SCHEDULE 1.6

### COLD STORAGE PAYABLES

See <u>Annex 1.6</u> attached hereto.

## OUTSIDE FREEZERS

|   | | |
|---|---|---|
| | AMERICOLD COLD STORAGE<br>4550 NEWCOMB AVE<br>MONTGOMERY, ALABAMA<br>MAILING ADDRESS FOR PAYMENTS:<br>P O BOX 5000<br>PORTLAND, OREGON  97208 | $ 485,959.33 |
| | NATIONAL FREEZER<br>1301 NORTH THREE NOTCH ST<br>P O BOX 682<br>TROY, ALABAMA 36081 | $  40,696.75 |
| (A) | GEORGIA COLD STORAGE<br>193 BASKET FACTORY ROAD<br>AMERICUS, GEORGIA  31709 | $  35,255.51 |
| (A) | GEORGIA COLD STORAGE<br>600 ANDREWS ROAD<br>COLUMBUS, GEORGIA | $      - |
| (A) | GULF STATES COLD STORAGE<br>272 SAM HOUSTON BLVD<br>DOTHAN, ALABAMA | $      - |
| | IMPERIAL FREEZER SERVICES<br>111 IMPERIAL DRIVE<br>SANFORD, NORTH CAROLINA  27330 | $   2,120.76 |

A) All 3 of these owned by same company and use the Americus mailing address

## SCHEDULE 2.2

### ALLOCATIONS

| | |
|---|---|
| Accounts Receivable | $9,000,000 |
| Inventory | $15,300,000 |
| Property, Plant and Equipment | $27,400,000 |
| Other Long Term Assets | $300,000 |
| Assets of Sylvest Foods Corporation | $6,000,000 |
| Total | $58,000,000 |

## SCHEDULE 3.6

## REAL PROPERTY

Owned Real Property

See Annex 3.6 attached hereto.

Leased Real Property

1.  Real Property Lease, made and entered into as of August 25, 2005, by and between Hodges Bonded Warehouse, Inc. and Sylvest Farms, Inc., as amended by that certain First Amendment to Real Property Lease, made and entered into on January 26, 2006, by and between Hodges Bonded Warehouse, Inc. and Sylvest Farms, Inc.

2.  Lease For Real Property, Lease Number C10, dated October 8, 1992, by and between WSFA-TV and Sylvest Farms, Inc.



ANNEX 3.6

EXHIBIT "A"

PARCEL 1: (Montgomery County, Alabama)

TRACT 1 - Commence at the Southwest corner of Section 27, Township 16 North, Range 17 East, Montgomery County, Alabama; thence run S 88 degrees 56' 26" E, 540.95 feet to the point of beginning; thence from said point of beginning, run N 01 degrees 26' 58" W, 858.02 feet to an iron pin lying in a curve on the South Right of Way of West Boulevard (200' ROW); thence run along said Right of Way and said curve, a chord of S 70 degrees 49' 06', E, 564.08 feet to a point; thence run a chord of S 74 degrees 22' 58" E, 300.00 feet to an iron pin; thence run a chord of S 75 degrees 52' 03" E, 268.26 feet to a concrete monument at the end of said curve; thence continue along said South Right of Way S 77 degrees 29' 17" E, 505.52 feet to an iron pin; thence run S 77 degrees 16' 0" E, 52.61 feet to a concrete monument; thence run S 12 degrees 35' 28" W, 29.89 feet to a concrete monument; thence run S 77 degrees 29' 17" E, 85.70 feet to a concrete monument at a point of right of way change; thence leave said South Right of Way and run S 12 degrees 56' 47" W, 5.00 feet to a point; thence continue S 12 degrees 56' 47" W, 874.70 feet to a point; thence run S 19 degrees 05' 36" W, 1559.22 feet to a point lying on the North margin of and existing 187.5 foot wide Alabama Power Company Easement (Point "A" for future reference); thence run along said North margin N 81 degrees 12' 25" W, 902.28 feet to a point; thence run N 02 degrees 00' 52" W, 1053.60 feet to an iron pin; thence run N 03 degrees 21' 34" W, 784.58 feet to the point of beginning.

Said described property lying and being situated in the Northwest Quarter of Section 34 and in the Southwest Quarter of Section 27, Township 16 North, Range 17 East, Montgomery County, Alabama, and contains 78.47 acres, more or less.

Said property also known as a portion of Lot A, Sylvest Subdivision Plat No. 4, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 35, at Page 123.

TRACT II - Commencing at Point "A" as described above, said point lying on the North margin of a 187.5' wide Alabama Power Company easement, run S 19 degrees 05' 36" W, 264.99 feet to a point lying in the centerline of Catoma Creek; thence meandering along said centerline, which generally follows the following twelve (12) courses and distances: (1) N 37 degrees 49' 21" W, 137.69 feet; (2) N 61 degrees 57' 26" W, 142.97 feet; (3) S 74 degrees 09' 13" W, 221.86 feet; (4) S 09 degrees 11' 18" W, 149.06 feet; (5) S 25 degrees 45' 13" E, 169.61 feet; (6) S 13 degrees 57' 35" E, 157.81 feet; (7) S 06 degrees 37' 05" E, 66.48 feet; (8) S 06 degrees 11' 27" W, 183.09 feet; (9) S 31 degrees 00' 24" W, 76.73 feet; (10) S 41 degrees 15' 25" W, 133.73 feet; (11) S 66 degrees 47' 58" W, 82.24 feet; (12) S 81 degrees 31' 54" W, 213.57 feet to a point; thence run N 02 degrees 00' 54" W, 1205.06 feet to a point, said point located on the North line of said Alabama Power Company easement; thence S 81 degrees 12' 25" E, 902.28 feet to the point of beginning.

Said described property lying and being situated in the West Half of Section 34, Township 16 North, Range 17 East, Montgomery County, Alabama and contains 12.19 acres, more or less.

Said property also known as a portion of Lot A, Sylvest Subdivision Plat No. 4, as recorded in

the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 35, at Page 123.

PARCEL 2 - (Lowndes County, Alabama) - Commence at an iron pin known as the Southeast corner of the Southeast Quarter of the Southeast Quarter of Section 11, Township 14 North, Range 16 East, Lowndes County, Alabama; thence run S 86 degrees 43' 58" W, 1971.84 feet to a point; thence run North 1105.36 feet to an iron pin located on the West Right of Way of the Louisville and Nashville Railroad, said point being the point of beginning; thence from said point of beginning, leave said railroad Right of Way and run S 85 degrees 59' 43" W, 1516.59 feet to an iron pin; thence run N 03 degrees 04' 56" W, 510.78 feet to an iron pin; thence run N 86 degrees 04' 53" E, 1917.89 feet to an iron pin lying on the aforementioned West Right of Way of the Louisville and Nashville Railroad; thence run along said Right of Way, S 34 degrees 52' 19" W, 652.32 feet to the point of beginning.

Said described property lying and being situated in the Southwest Quarter of Section 11, Township 14 North, Range 16 East, Lowndes County, Alabama, and contains 20.08 acres, more or less.

PARCEL 3 - (Lowndes County, Alabama) - Commencing at the Southeast corner of Section 10, Township 14 North, Range 16 East, as the same is located and described in all of the adjoining deeds; thence run N 02 degrees 18' 26" E, for 1114.85 feet to an iron pin on the east margin of Lowndes County Road 26, said point being the point of beginning; thence run S 89 degrees 00' 10" E along the property line for 2025.01 feet to intersect the Northwest margin of the CSX Railroad; thence run S 39 degrees 50' 33" W along the Northwest margin for 3685.89 feet to intersect the Southeast margin of County Road 26; thence run N 13 degrees 52' 04" W across said Right of Way for 101.20 feet to a point on the Northwest margin of the road at the Northeast corner of the Miriam Black property; thence run N 87 degrees 51' 13" W, along the property line for 2397.11 feet to the Southwest corner of the property herein described on the quarter-section line; thence run N 00 degrees 58' 31" E, along said line for 1748.43 feet; thence run N 01 degrees 33' 39" E, along said line for 976.50 feet to the Northwest corner; and thence run S 89 degrees 00' 10" E, along the property line and across County Road 26 for 2700.50 feet to the Point of Beginning. Said described tract lies partly in the SE 1/4 of Section 10, partly in the SW 1/4 of Section 11, partly in the NW 1/4 of Section 14, and partly in the NE 1/4 of Section 15; all in Township 14 North, Range 16 East, Lowndes County, Alabama; LESS AND EXCEPT THEREFROM the Rights of Way of Lowndes County Roads 26 and 6 which cross or extend into said property; LESS AND EXCEPT that certain 8.35 acre parcel conveyed to Maynard Sylvest in DB 5A at Page 359, as recorded in the Office of the Judge of Probate, Lowndes County, Alabama, said parcel being bounded on the North by Lowndes County Road 6, on the East by the CSX Railroad and on the West by Lowndes County Road 26, leaving a net area of 213.84 acres, more or less.

PARCEL 4 - (Montgomery County, Alabama) - Begin at a concrete marker being the Southeast corner of the Southwest Quarter of Section 26, Township 13 North, Range 17 East, Montgomery County, Alabama; thence along the South line of said Section 26, N 85 degrees 12' 20" W, 1313.67 feet to a 40" hickory at a fence corner; thence N 04 degrees 04' 44" E, 1407.31 feet to a point lying in the center of Butler Mill Road being designated "Point "A" for future reference;

thence continue N 04 degrees 04' 44" E, 1258.53 feet to an iron pin; thence S 85 degrees 21' 08" E, 1313.57 feet to a fence corner; thence S 84 degrees 27' 16" E, 1335.52 feet to a sweet gum at a fence corner; thence S 04 degrees 12' 29" W, 1329.03 feet to a point; thence N 84 degrees 34' 36" W, 1334.68 feet to an iron pin; thence S 03 degrees 58' 19" W, 1337.31 feet to the point of beginning; LESS AND EXCEPT the following described 80.00 foot Right of Way for Butler Mill Road; begin at the previously described "Point A"; thence along the center line of said Butler Mill Road the following courses and distances: (1) N 76 degrees 40' 06" E, 12.60 feet to the beginning of a curve (concave Northwesterly, R= 774.81'); (2) a chord of N 60 degrees 21' 47" E, 407.96 feet to the end of said curve; (3) N 46 degrees 08' 26" E, 431.44 feet to the beginning of a curve (concave Southeasterly, R=585.51'); (4) a chord of N 62 degrees 46' 55" E, 312.35 feet to the end of said curve; (5) N 77 degrees 04' 50" E, 151.02 feet to beginning of a curve (concave Northwesterly, R=5808.55'); (6) A chord of N 71 degrees 46' 00" E, 493.93 feet to the end of said curve; and (7) N 66 degrees 55' 35" E, 617.76 feet to the point of ending.

Said described property lying and being situated in the East Half of the Southwest Quarter and in the Northwest Quarter of the Southeast Quarter of Section 26, Township 13 North, Range 17 East, Montgomery County, Alabama and contains a net area of (not including Butler Mill Road) of 116.972 acres, more or less.

PARCEL 5 - (Montgomery County, Alabama)

TRACT 1 - Commence at an iron pin lying at the Northwest corner of the Northeast Quarter of the Southwest Quarter of Section 1, Township 13 North, Range 17 East, Montgomery County, Alabama; thence run S 02 degrees 40' 55" E, 1322.43 feet to an iron pin, said point being the point of beginning; thence from said point of beginning, run S 87 degrees 56' 17" E, 1278.66 feet to an iron pin lying on the West Right of Way of Butler Mill Road; thence run along said West Right of Way the following courses and distances: (1) S 00 degrees 33' 38" W, 1261.58 feet; (2) S 05 degrees 16' 44" W, 113.78 feet; (3) S 13 degrees 40' 12" W, 67.35 feet; (4) S 17 degrees 06' 24" W, 186.06 feet; (5) S 35 degrees 29' 27" W, 211.18 feet; (6) S 48 degrees 56' 24" W, 851.79 feet; (7) S 42 degrees 22' 32" W, 223.09 feet; (8) S 33 degrees 32' 38" W, 593.67 feet; (9) S 26 degrees 14' 42" W, 137.96 feet; (10) S 19 degrees 52' 50" W, 348.45 feet; (11) S 26 degrees 02' 07" W, 151.92 feet; (12) S 30 degrees 45' 09" W, 251.50 feet; (13) S 26 degrees 49' 51" W, 286.62 feet; (14) S 23 degrees 30' 09" W, 175.59 feet; (15) S 19 degrees 49" 51" W, 594.90 feet; thence leave said West Right of Way and run N 89 degrees 05' 08" W, 3030.98 feet to an iron pin; thence run N 00 degrees 01' 10" E, 4717.00 feet to a point; thence run S 89 degrees 09' 47" E, 1310.66 feet to a point; thence run S 02 degrees 14' 57" E, 1323.21 feet to a point; thence run N 89 degrees 47' 23" E, 2557.98 feet to an iron pin; thence run N 02 degrees 18' 29" W, 1403.33 feet to the point of beginning.

Said described property lying and being situated in the South Half of Section 1, the South Half of Section 2, the East Half of Section 11 and the West Half of Section 12, Township 13 North, Range 17 East, Montgomery County, Alabama, and contains 387.38 acres, more or less.

TRACT 2 - Begin at an iron pin lying at the Northeast corner of the Northwest Quarter of the Southeast Quarter of Section 1, Township 13 North, Range 17 East, Montgomery County, Alabama; thence run S 00 degrees 01' 29" E, 539.75 feet to an iron pin; thence run S 01 degrees

14' 39" E, 319.72 feet to an iron pin; thence run S 01 degrees 28' 40" E, 427.14 feet to a point lying on a fence line; thence run along said fence line, S 00 degrees 40' 33" E, 456.55 feet to point; thence continue along said fence line, S 06 degrees 17' 37" E, 395.44 feet to a point; thence run N 89 degrees 55' 56" W, 1310.00 feet to an iron pin lying on the East Right of Way of Butler Mill Road; thence run along said East Right of Way the following courses and distances: (1) N 00 degrees 33' 37" E, 737.12 feet; (2) N 03 degrees 27' 34" E, 408.31 feet; (3) N 21 degrees 09' 01" E, 440.59 feet; (4) N 42 degrees 58' 55" E, 483.07 feet; (5) N 34 degrees 26' 07" E, 269.48 feet to an iron pin; thence leave said East Right of Way and run N 89 degrees 40' 47" E, 570.54 feet to the point of beginning.

Said described property lying and being situated in the Southeast Quarter of Section 1, Township 13 North, Range 17 East, Montgomery County, Alabama, and contains 54.42 acres more or less.

PARCEL 6 (Montgomery County and Lowndes County, Alabama) - Commencing at the old concrete monument located at the Northwest corner of Section 11, Township 14 North, Range 16 East; thence run S 88 degrees 22' 29" E, along the section line for 986.94 feet to intersect the east margin of Lowndes County Road 26, said point being the point of beginning; thence continue along said line S 88 degrees 22' 29" E, 2112.54 feet to a stone monument; thence continue along said line S 88 degrees 22' 59" E, 860.54 feet to a 4" iron pipe on the West line of the E 1/2 of the E 1/2 of Section 11; thence S 01 degrees 59' 53" W, along the West line, 1800.86 feet to intersect the Northwest margin of the CSX Railroad; thence N 39 degrees 46' 59" E, along said Northwest margin, 1236.46 feet (Point A); thence S 45 degrees 59' 17" E, across the railroad right of way, 100 feet the Northeast corner of the Hargrove 20-acre parcel; thence run by the following 5 calls around the East boundary of said parcel: (1) S 45 degrees 59' 17" E, 249.4 feet; (2) S 09 degrees 21' 05" E, 351.73 feet; (3) S 29 degrees 24' 33" W, 981.66 feet (4) S 75 degrees 18' 24" W, 252.06 feet; and (5) S 82 degrees 02' 42" W, 395.87 feet to intersect the West line of the E 1/2 of the E 1/2 of Section 11; thence S 01 degrees 26' 17" W, along said line, 2908.14 feet to the South line of Section 11; thence S 88 degrees 03' 43" E, along said line, 1006.06 feet to intersect the West margin of the right of way of Interstate Highway 65; thence run in a Northeasterly direction along a denied-access right of way margin and along the arc of a curve which is concave Easterly and has a Radius of 23,043.3 feet, for 8154.0 feet to a concrete monument at the end of said curve (said curve segment has a 8111.56-foot chord which bears N 35 degrees 50' 05" E; thence continue along said margin N 45 degrees 58' 38" E, 928.24 feet to an old iron pin on the South boundary of the Seithalil property; thence leave the highway N 86 degrees 43' 43" W, along said South boundary, 2639.91 feet to an old iron pin on the East line of Section 1; thence N 01 degrees 41' 17" E, along said line and crossing the railroad, 653.46 feet to the South line of Rolling Acres Subdivision (Plat Book 22, Page 200, Montgomery County Probate Records - Point B); thence N 89 degrees 43' 22" W along said line, 793.09 feet to an old iron pin; thence continue along said line S 89 degrees 40' 21" W, 1499.62 feet to the 1/4 section corner on the East side of Section 2; thence N 89 degrees 30' 07" W, along the Quarter Section Line, 2145.05 feet to a stone monument; thence N 88 degrees 01' 25" W along the Quarter Section Line and crossing County Road 26, 1764.62 feet to a concrete monument on the West line of the E 1/2 of the SW 1/4 of Section 2; thence S 01 degrees 54' 29" W, along said line, 837.50 feet to intersect the West margin of County Road 26; thence S 70 degrees 38' 24" E across said Road, 80 feet to the East margin; thence run by the following 3 calls along said East margin: (1) Southerly along the arc of a 1392.4 foot radius curve which is concave Easterly to a concrete monument at the

end of said curve (said curve segment has a 404.47 foot chord which bears S 11 degrees 00' 36" W); (2) S 02 degrees 42' 42" W, 338.58 feet to a concrete monument at the beginning of a curve; and (3) Southerly along the arc of a 1949.9-foot curve which is concave Westerly to the point of beginning (said curve segment has a 1126.77-foot chord which bears S 19 degrees 30' 18" W). Said described tract lies in Sections 1, 2, 11 and 12, Township 14 North, Range 16 East, Lowndes County, Alabama; and in Sections 6 and 7, Township 14 North, Range 17 East, in Montgomery County, Alabama; LESS AND EXCEPT THEREFROM the right of way of County Road 26 across the Northwest corner, the 30-foot right of way of Hargrove Lane, the right of way of the CSX Railroad which extends Northeastwardly from Point A to Point B, and a 50 x 50 foot lot owned by Dixie Electric Cooperative; is subject to several APCO high-voltage power line easements, to dyke and drainage easements near the Interstate, and subject to the right of ingress and egress from the south end of Hargrove Lane along a farm road to the Hargrove 20-acre parcel; leaving a net area of 735.38 acres, more or less.

PARCEL 7 - Begin at an iron pin lying at the Southeast corner of Section 12, Township 13 North, Range 17 East, Montgomery County, Alabama; thence run S 00 degrees 11' 19" E, 2320.18 feet to an iron pin lying in a curve on the North Right of Way of Montgomery County Highway No. 14 (Ada Road); thence run along said Right of Way and said curve, a chord of S 51 degrees 27' 45" W, 353.86 feet to an iron pin; thence run S 44 degrees 33' 47" W, 715.19 feet to a point lying at the beginning of a curve; thence run along said Right of Way and said curve, a chord of S 64 degrees 21' 06" W, 1167.48 feet to an iron pin; thence leave said Right of Way and run N 01 degrees 54' 17" E, 892.21 feet to an iron pin; thence run N 88 degrees 48' 37" W, 2172.12 feet to  an iron pin lying on the aforementioned North Right of Way of Montgomery County Highway No. 14; thence run along said Right of Way N 57 degrees 25' 38" W, 519.20 feet to an iron pin; thence leave said Right of Way and run N 00 degrees 56' 20" W, 879.05 feet to an iron pin; thence run N 01 degrees 09' 37" W, 400.15 feet to an iron pin; thence run S 89 degrees 25' 31" W, 1172.53 feet to an iron pin lying on the East Right of Way of Butler Mill Road; thence run along said Right of Way N 13 degrees 52' 42" W, 121.51 feet to an iron pin; thence run N 08 degrees 29' 44" W, 285.03 feet to an iron pin; thence run N 00 degrees 10' 35" W, 128.17 feet to a point; thence run N 11 degrees 56' 16" E, 123.66 feet to a point; thence run N 20 degrees 08' 19" E, 1290.17 feet to a point; thence run N 18 degrees 59' 38" E, 1102.03 feet to an iron pin; thence leave said Right of Way and run S 79 degrees 54' 30" E, 667.33 feet to an iron pin; thence run N 29 degrees 06' 42" E, 438.30 feet to an iron pin; thence run N 53 degrees 19' 32" W, 633.41 feet to an iron pin; thence run S 82 degrees 39' 10" W, 144.71 feet to an iron pin lying on the aforementioned East Right of Way of Butler Mill Road; thence run along said Right of Way N 29 degrees 05' 47" E, 43.82 feet to a point; thence run N 25 degree 48' 29" E, 391.85 feet to a point; thence run N 30 degrees 00' 09" E, 259.82 feet to a point; thence run N 25 degrees 58' 18" E, 189.17 feet to a point; thence run  N 17 degrees 36' 31" E, 154.25 feet to a point; thence run N 17 degrees 01' 12" E, 172.02 feet to a point; thence run N 38 degrees 53' 01" E, 149.44 feet to a point; thence run N 31 degrees 08' 13" E, 515.13 feet to a point; thence run N 39 degrees 42' 44" E, 170.16 feet to a point; thence run N 48 degrees 02' 49" E, 952.94 feet to an iron pin; thence run N 68 degrees 55' 13" E, 709.57 feet  to a point lying at the approximate intersection of said Butler Mill Road and Sprague Junction Road; thence run along the South Right of Way of said Sprague Junction Road, S 82 degrees 40' 50" E, 738.83 feet to a point; thence run S 87 degrees 34' 12" E, 119.08 feet to an iron pin; thence leave said South Right of Way and run S 01 degrees 28' 17" E, 1055.21 feet to an iron pin; thence run S 02 degrees 05' 24" E, 1362.23 feet to a concrete monument; thence run S 89 degrees 36' 33" W, 1292.67 feet to a

concrete monument; thence run S 00 degrees 33' 30" E, 2639.85 feet to a concrete monument; thence run S 89 degrees 36' 33" E, 2607.03 feet to the point of beginning.

Said described property lying and being situated in the West Half of the Northeast Quarter and the West Half of Section 12, and the North Half of the Southeast Quarter and the North Half of Section 13, and the Northeast Quarter of the Northeast Quarter of Section 14, all in Township 13 North, Range 17 East, Montgomery County, Alabama, and contains 581.74 acres, more or less.

PARCEL 8 - (Montgomery County, Alabama) - Commence at the Southeast corner of the Northeast Quarter of the Northeast Quarter of Section 12, Township 13 North, Range 17 East, Montgomery County, Alabama; thence run S 88 degrees 31' 43" W, 990.00 feet to the point of beginning; thence from said point of beginning, continue S 88 degrees 31' 43" W, 330.00 feet to a fence line; thence run along said fence line, N 01 degrees 28' 17" W, 1057.00 feet to an iron pin lying on the South margin of Sprague Junction Road (R.O.W. varies); thence run along said South margin N 73 degrees 35' 50" E, 341.53 feet to a point; thence leave said Right of Way and run S 01 degrees 28' 17" W, 1145.00 feet to the point of beginning.

Said described property lying in and being situated in the Northeast Quarter of Section 12, Township 13 North, Range 17 East, Montgomery County, Alabama and contains 8.43 acres, more or less.

PARCEL 9 (Crenshaw County, Alabama)

TRACT I - Commencing North 919.95 feet along the west side of Joseph Street from the southeast corner of the SW 1/4 of the SW 1/4 of Section 33, Township 8 North, Range 18 East; thence continue along west side of Joseph Street (20 feet from centerline) North 197.05 feet; thence North 89 degrees 19' 00" West 312.40 feet; thence South 02 degrees 30' 00" East 167.28 feet; thence South 83 degrees 43' 25" East 307.04 feet to the west side of Joseph Street and the point of beginning. Said land lying and being situated in the SW 1/4 of the SW 1/4 of Section 33, Township 8 North, Range 18 East, Crenshaw County, Luverne, Alabama, and containing 1.29 acres, more or less, together with all improvements thereon.

TRACT 2 - Lots 8 and 9 of Park Hill Plat, as recorded in the Office of the Judge of Probate of Crenshaw County, Luverne, Alabama in Deed Book 29, at Page 229; being more particularly described as follows: Beginning at the southeast corner of Block C of said Park Hill Plat; thence North 89 degrees 19' 57" West 100 feet; thence North 00 degrees 00' 52" East 199.90 feet to the centerline of Spring Street (not open); thence South 89 degrees 19' 57" East, 24.02 feet to the south right of way of Glenwood Road (25 feet from centerline); thence along said Glenwood Road, South 70 degrees 06' 15" East, 80.78 feet, to the west right of way of Joseph Street (25 feet from centerline); thence along said Joseph Street South 00 degrees 00' 52" West 173.30 feet, to the point of beginning, containing 0.44 acres, more or less, LESS AND EXCEPT that portion of said lot lying within the right of way of Spring Street which is unopened on the North side thereof.

PARCEL 10 (Talladega County, Alabama) - Commence at a 1/2" open top pipe accepted as the Southwest corner of the Southeast one-fourth of Section 30, Township 21 South, Range 4 East, Talladega County, Alabama; thence proceed North 02 degrees 06' East along the West boundary

of said quarter-quarter section for a distance of 297.40 feet; thence proceed South 89 degrees 28' East for a distance of 196.30 feet; thence proceed North 03 degrees 57' East for a distance of 50.0 feet to a 1" capped pipe in concrete being located on the North right of way of the L & N Railroad and being the point of beginning. From this beginning point continue North 03 degrees 57' East for a distance of 413.24 feet to a 1" open top pipe in place; thence proceed North 04 degrees 01' 06" East for a distance of 370.37 feet to a 1" capped pipe in concrete; thence proceed North 87 degrees 13' 02" West for a distance of 107.84 feet to a 1" capped pipe in concrete; thence proceed North 03 degrees 21' 52" East for a distance of 236.18 feet to a 1" capped pipe in concrete being located on the South right of way of the Old Sylacauga Birmingham Highway; thence proceed South 69 degrees 04' 17" East along the South right of way of said highway for a distance of 398.32 feet; thence proceed South 02 degrees 00' 35" East for a distance of 325.44 feet to a 1/4" open top pipe in place; thence proceed South 83 degrees 27' 25" West for a distance of 197.19 feet to a 1/2" crimp top pipe in place; thence proceed South 02 degrees 03' 36" West for a distance of 123.79 feet to a 1/2" rebar in place; thence proceed South 88 degrees 23' 32" East for a distance of 35.31 feet to the centerline of Darby Branch, as now located, thence proceed South 44 degrees 06' 58" East along the centerline of Darby Branch for a distance of 101.20 feet; thence proceed South 15 degrees 29' 49" East along the centerline of said Darby Branch for a distance of 52.43 feet; thence proceed South 02 degrees 47' 44" East along the centerline of said Darby Branch for a distance of 199.34 feet; thence proceed South 08 degrees 30' 44" West along the centerline of said Darby Branch for a distance of 89.13 feet to its point of intersection with the North right of way of the said L& N Railroad; thence proceed North 89 degrees 28' West along the North right of way of said railroad for a distance of 259.95 feet to the point of beginning.

The above described land is located in the Southwest one-fourth of the Southeast one-fourth and the Northeast one-fourth of the Southeast one-fourth of Section 30, Township 21 South, Range 4 East, Talladega County, Alabama, and contains 5.73 acres, more or less.

PARCEL 11 (Mobile County, Alabama) - Commencing at the Northwest corner of Section 7, Township 4 South, Range 1 West, Mobile County, Alabama; run thence Eastwardly along the North line of Section 7, a distance of 1059.93 feet to a point on the East right of way line of Interstate Highway 65; thence along the East right of way line of Interstate 65, run S 02 degrees 50' W, 1162.47 feet to a concrete monument marking the P.T. of a curve, said curve having a central angle of 07 degrees 40' and a radius of 11,609.20 feet; thence along the arc of said curve run Southwardly 300.05 feet to the intersection of the East right of way line of Interstate 65 and the South right of way line of Georgia Pacific Avenue; thence along the South right of way line of Georgia Pacific Avenue run S 87 degrees 10' E, 453.88 feet to the point of beginning of the property herein described; thence continuing along the South right of way line of Georgia Pacific Avenue run S 87 degrees 10' E, 446.65 feet to the P.C. of a curve to the right, said curve having a central angle of 90 degrees 09' 01", and a radius of 43.50 feet; thence along the arc of said curve run Southeasterwardly 68.44 feet to the P.T. of said curve; thence run along the West line of Armour Avenue a 50 foot street run S 02 degrees 48' 46" W, 194.83 feet to the P.C. of a curve to the right, said curve having a central angle of 2 degree 34' 16" and a radius of 261.67 feet; thence along the curve and along the west line of said 50 foot street run Southwestwardly 11.74 feet to a point; thence run N 87 degrees 11' 14" W, 489.77 feet to a point; thence run N 2 degrees 48' 46" E, 250.22 feet to the point of beginning.

PARCEL 12 (Butler County, Alabama)

TRACT 1 - Begin at the Northwest Corner of the Northeast Quarter of the Northwest Quarter of Section Twenty-Seven, Township Ten North, Range Fourteen East, Greenville, Butler County, Alabama, run thence S 02 degrees 50' 00" W, 2,638.00 feet to a concrete marker; thence S 89 degrees 48' 00" E, 88.62 feet a point on the West right of way line of the Industrial Park Road; thence following chord bearings and chord distances along said West right of way to the South right of way line of an Industrial Park Spur Access Road, N 15 degrees 59' 04" E, 405.44 feet, N 21 degrees 58' 53" E, 583.78 feet, N 35 degrees 00' 23" E, 274.48 feet, N 52 degrees 15' 42" E, 332.82 feet, N 53 degrees 27' 44" E, 247.97 feet, N 37 degrees 56' 42" E, 223.83 feet, N 16 degrees 34' 38" E, 344.78 feet; thence N 85 degrees 26' 52" W along the South right of way line of said Industrial Park Spur Access Road 439.13 feet to a point; thence N 88 degrees 06' 15" W, along the South right of way line of said Industrial Park Spur Access Road 301.00 feet to a point; thence N 01 degrees 54' 21" E along the West right of way line of said Industrial Park Spur Access Road 100.00 feet to a point; thence S 88 degrees 05' 03" E, along the North right of way line of said Industrial Park Spur Access Road 305.61 feet to a point; thence S 85 degrees 26' 48" E along the North right of way line of said Industrial Park Spur Access Road 141.69 feet to a point on the West right of way line of Industrial Park Road; thence the following chord bearings and chord distances along said West right of way line to a point on the East line of the Northeast Quarter of the Northwest Quarter of said Section, N 12 degrees 19' 13" E, 293.45 feet, N 28 degrees 26' 47" E, 212.68 feet; thence N 02 degrees 50' 00" E, 24.67 feet to a point; thence N 89 degrees 00' 00" W, 1320.10 feet to the point of beginning, situated, lying and being in the East One-Half of the Northwest Quarter of Section Twenty-Seven, Township Ten North, Range Fourteen East, Greenville, Butler County, Alabama, and containing 41.79 acres, more or less.

TRACT 2 - Commence at the Northwest corner of the Northeast Quarter of the Northwest Quarter of Section Twenty-Seven, Township Ten North, Range Fourteen East, Butler County, Alabama, said point being the point of beginning; thence along the westerly property line of Sylvest Farms Greenville location South 02 degrees 50' 00" West 440.00 feet to a set iron pin; thence North 87 degrees 10' 00" West, 99.00 feet to a set iron pin; thence North 02 degrees 50' 00" East 440.00 feet to a set iron pin; thence South 87 degrees 10' 00" East, 99.00 feet to the point of beginning.

Said described parcel of land lies in the Northwest Quarter of the Northwest Quarter of Section Twenty-Seven, Township Ten North, Range Fourteen East, Butler County, Alabama and contains 1.00 acres, more or less.

## EXHIBIT "A"

### LEGAL DESCRIPTION

Tract I:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 107 OF DISTRICT 9F, FULTON COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

To find the true point of beginning, commence at an iron pin found at the intersection of the southern right of way line of Stacks Road (60 foot width) and the eastern right of way line of Mallory Road (60 foot width); thence following the arc of a counter-clockwise curve along the eastern right of way line of Mallory Road an arc distance of 446.69 feet (said arc having a radius of 11281.77 feet and being sub-tended by a chord bearing South 17 degrees 36 minutes 53 seconds East a chord distance of 446.66 feet); thence continuing along said eastern right of way line of Mallory Road South 16 degrees 28 minutes 52 seconds East a distance of 18.74 feet to an iron pin found and the TRUE POINT OF BEGINNING; thence North 73 degrees 04 minutes 00 seconds East a distance of 484.48 feet to an iron pin found; thence South 13 degrees 28 minutes 20 seconds East a distance of 570.02 feet to an iron pin found on the northern right of way line of the Atlantic Coast Line Railroad (100 foot width); thence following said northern right of way line of the Atlantic Coastline Railroad and the arc of a clockwise curve an arc distance of 319.25 feet (said arc having a radius of 1378.95 feet and being sub-tended by a chord bearing South 65 degrees 15 minutes 10 seconds West a chord distance of 318.54 feet) thence continuing along said railroad right of way line and following the arc of a clockwise curve an arc distance of 99.20 feet (said arc having a radius of 2690.54 feet and being sub-tended by a chord bearing South 71 degrees 51 minutes 48 seconds West a chord distance of 99.19 feet); thence continuing along said railroad right of way line South 72 degrees 55 minutes 09 seconds West a distance of 40.16 feet to an iron pin found on the eastern right of way line of Mallory Road; thence North 16 degrees 28 minutes 52 seconds West along said eastern right of way line of Mallory Road a distance of 614.49 feet to an iron pin found and the TRUE POINT OF BEGINNING.

Said parcel containing 282,187 square feet or 6.478 acres.

Tract II:

All that tract of land in Land Lot 407 of the 15th Land District of Decatur County, Georgia described as follows. The point of beginning is the intersection of the south right of way of Brison Airbase Road with the northwest right of way of Jabara Avenue. From said point of beginning run south 33'49'25" west along the northwest right of way of Jabara Avenue a distance of 496.33 feet; run thence north 56'25'02" west a distance of 276.52 feet to the southeast right of way of State Hospital Road; run thence north 49'41'21" east along the southeast right of way of State Hospital Road a distance of 177.9 feet; continue along State Hospital Road on a curve to the left having an arch distance of 65.46 feet, a chord distance of 63.92 feet and a chord bearing north 28'03'47" east; run thence north 06'26'13" east along the east right of way of State Hospital Road a distance of 37.92 feet to the south right of way of Brison Airbase Road; run thence north 80'07'10" east along the south right of way of Brison Airbase Road a distance of 287.83 feet; run thence north 84'27'14" east along the south right of way of Brison Airbase Road a distance of 102.12 feet to the point of beginning at the intersection of Jabara Avenue. Said property contains 2.19 acres and it is shown as Lot "A" on a plat of survey prepared by John T. Clark, III dated June 7, 1990.

# FIRST AMENDMENT TO
# REAL PROPERTY LEASE

### Between

## HODGES BONDED WAREHOUSE, INC.
### ("Lessor")

### And

## SYLVEST FARMS, INC.
### ("Lessee")

This First Amendment to Property Lease is made and entered into on the 26th day of January, 2006, by and between Hodges Bonded Warehouse, Inc. (the "Lessor") and Sylvest Farms, Inc. (the "Lessee"). Lessor and Lessee agree to modify the Property Lease as herein provided to be effective on and as of August 25, 2005 for all purposes and in all respects.

### R E C I T A L S:

A.      Capitalized terms which are not otherwise defined in this First Amendment shall be given the meaning ascribed to them in the Property Lease.

B.      Lessor and Lessee desire to amend Section 6.04 of the Property Lease by deleting it in its entirety and substituting a new Section 6.04 as hereinafter stated in order to correctly reflect the agreement of the Parties with respect to the Lessee's purchase option with respect to the Premises.

**NOW, THEREFORE,** for and in consideration of the foregoing recitals and other good and valuable consideration acknowledged by each Party, Lessor and Lessee agree as follows:

1.      Section 6.04. of the Property Lease is hereby deleted in its entirety and in lieu and substitution therefore the following Section 6.04 is adopted and agreed to:

"Section 6.04. **Lessee's Purchase Option.**

(a)     At any time after the commencement date of this Property Lease, Lessee shall have the right to purchase the Premises for a Purchase Price equal to the sum of the following:

(i)     the unpaid principal balance reflected on the Amortization Schedule attached as Exhibit "B" to the Property Lease through the Closing Date on which Lessee will acquire the Premises from Lessor.

(ii)     any accrued interest reflected on the Amortization Schedule which is accrued but unpaid through the Closing Date on which Lessee will acquire the Premises from Lessor.

(iii)     a prepayment fee in the amount of $150,000 in the event that Lessee purchases the Premises during the first twelve months following the commencement date of the Property Lease or a prepayment fee in the amount of $100,000 in the event that Lessee purchases the Premises during months thirteen through twenty-four following the commencement date of the Property Lease or a prepayment fee in the amount of $50,000 in the event that Lessee purchases the Premises during months twenty-five through thirty-six following the commencement date of the Property Lease. Following the thirty-six month after the commencement date of the Property Lease there shall be no prepayment fee with respect to the purchase option described in this Section 6.04.

(b)     In the event that Lessee elects to purchase the Premises as provided herein, Lessee shall give ten (10) days notice to Lessor that it intends to purchase the Premises and Lessee shall calculate the Purchase Price determined in accordance with this Section 6.04 and which shall be forwarded to Lessor. The Purchase Price shall be paid on the second business day following the expiration of the notice to be given to Lessor and concurrently with such payment Lessor shall immediately deliver to Lessee a statutory warranty deed to the Premises conveying merchantable title, free and clear of all liens and encumbrances (other than the exceptions as reflected in the Owner's Title Policy being delivered to Lessor in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement between the Parties dated as of August 25, 2005 or such other exceptions that are reasonably acceptable to Lessee).

2

Furthermore, immediately upon payment of the final installment due under the Amortization Schedule, Lessor shall likewise convey the Premises to Lessee as herein provided.

2.     Lessor and Lessee agree that the provisions of this First Amendment are to be incorporated by reference into the Asset Purchase Agreement between the Parties and the Agreement Defining Relationship between the Parties dated as of August 25, 2005, it being the express intention of the Parties that this First Amendment correctly reflects the business intention of the Parties and shall control over any other agreement or document between them with respect to the Premises.

3.     Except as modified by this First Amendment, the Parties ratify and confirm the provisions of the Property Lease.

IN WITNESS WHEREOF the Parties have caused this First Amendment to be executed by a duly authorized officer of each Party.

LESSOR:

HODGES BONDED WAREHOUSE, INC.

By: _____

Title: _____C E O_____

LESSEE:

SYLVEST FARMS, INC.

By: _____

~~Dean F. Falk~~  LYMAN L. CAMPBELL

Title: ~~President and Chief Executive Officer~~ EXECUTIVE VICE PRESIDENT

3

# REAL PROPERTY LEASE

between

# HODGES BONDED WAREHOUSE, INC.
("Lessor")

and

# SYLVEST FARMS, INC.
("Lessee")

## August 25, 2005

This Instrument Prepared by:
Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, Alabama 36117

## REAL PROPERTY LEASE
between
### HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
### SYLVEST FARMS, INC.
("Lessee")

**Description**                                                                                            **Page No.**

Article I        Definitions and Use of Phrases ................................................................. 1

         Section 1.01.  Definitions ................................................................................ 1
         Section 1.02.  Use of Phrases and Capitalized Terms ........................................... 2

Article II       Premises, Duration of Term and Rental Provisions ..................................... 2

         Section 2.01.  Premises ................................................................................... 2
         Section 2.02.  Term ........................................................................................ 2
         Section 2.03.  Rent ......................................................................................... 3

Article III      Lessee's Obligations for Utilities, Improvements and Repairs ................. 5

         Section 3.01.  Utilities ..................................................................................... 5
         Section 3.02.  Lessee's Improvements ................................................................ 5
         Section 3.03.  Repairs ..................................................................................... 5

Article IV       Additions, Easements, Liens, Taxes and Insurance ................................... 6

         Section 4.01.  Mechanics' Liens ........................................................................ 6
         Section 4.02.  Taxes ........................................................................................ 7
         Section 4.03.  Insurance ................................................................................... 8
                       (a)    Fire and All Risk Property Insurance .................................. 8
                       (b)    Commercial General Liability ........................................... 8
                       (c)    Employer's Liability ....................................................... 8
                       (d)    Boilers ....................................................................... 8
                       (e)    Flood Insurance ............................................................ 8
                       (f)    Policy Form ................................................................. 9
                       (g)    Use of Premises Not to Invalidate Insurance, Waiver
                              of Subrogation ............................................................ 9

Article V        Provisions Respecting Damage, Destruction and Condemnation ............ 10

         Section 5.01.  Use of Premises ......................................................................... 10
         Section 5.02.  Condition of Premises ................................................................. 10
         Section 5.03.  Personal Property at Risk of Lessee ............................................. 11

-i-

**REAL PROPERTY LEASE**
between
HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
SYLVEST FARMS, INC.
("Lessee")

**Description**                                                                                     **Page No.**

Section 5.04.  Indemnity ............................................................................. 11
Section 5.05.  Environmental ....................................................................... 11
Section 5.06.  Damage by Fire or Other Casualty ........................................ 12
Section 5.07.  Condemnation ....................................................................... 12

Article VI     Certain Provisions Relating to Assignment, Subleasing and Mortgaging .......... 13

Section 6.01.  Provisions Relating to Assignment ........................................ 13
Section 6.02.  Provisions Relating to Subleasing ......................................... 14
Section 6.03.  Restriction on Sale or Mortgaging of Leasehold Estate by
               Lessor or Lessee ................................................................. 14
Section 6.04.  Lessee's Purchase Option ...................................................... 14

Article VII    Events of Default and Remedies ............................................................. 16

Section 7.01.  Default or Breach .................................................................. 16
Section 7.02.  Effect of Default ................................................................... 16
Section 7.03.  Agreement Defining Relationship ......................................... 17
Section 7.04.  Subordination and Attornment .............................................. 17
Section 7.05.  Estoppel Certificate .............................................................. 18
Section 7.06.  Interest on Past Due Obligations .......................................... 18
Section 7.07.  Liability of Lessor ................................................................. 18
Section 7.08.  Notices ................................................................................. 19
Section 7.09.  Tax Covenants of Lessor ...................................................... 19

Article VIII   Miscellaneous ................................................................................... 20

Section 8.01.  Covenant of Quite Enjoyment; Surrender of Premises ............ 20
Section 8.02.  Representations of Lessor's and Lessee's Power and  Authority ............. 20
Section 8.03.  This Property Lease is a Triple Net Lease ............................. 20
Section 8.04.  Certain Prior and Contemporaneous Agreements Cancelled ................. 21
Section 8.05.  Article and Section Captions ................................................ 21
Section 8.06.  Binding on Assigns ............................................................... 21
Section 8.07.  Amendment in Writing .......................................................... 21
Section 8.08.  Waiver-None ........................................................................ 21
Section 8.09.  No Surrender ........................................................................ 22

**REAL PROPERTY LEASE**
between
**HODGES BONDED WAREHOUSE, INC.**
("Lessor")
and
**SYLVEST FARMS, INC.**
("Lessee")

<u>Description</u>                                                                                          <u>Page No.</u>

Section 8.10.  Captions ....................................................................................... 22
Section 8.11.  Brokers ......................................................................................... 22
Section 8.12.  Applicable Law ............................................................................. 22
Section 8.13.  Partial Invalidation of Property Lease ........................................... 22
Section 8.14.  Counterparts ................................................................................. 22
Section 8.15.  Late Fee ........................................................................................ 22
Section 8.16.  Exculpation Clause ....................................................................... 22
Section 8.17.  Right of Entry ............................................................................... 23

Signatures ....................................................................................................... 23

-iii-

## REAL PROPERTY LEASE

THIS REAL PROPERTY LEASE ("Property Lease") is made and entered into as of the 25th day of August, 2005, between **HODGES BONDED WAREHOUSE, INC.,** an Alabama corporation ("Lessor") and **SYLVEST FARMS, INC.,** an Alabama corporation ("Lessee").

### ARTICLE I
### DEFINITIONS AND USE OF PHRASES

Section 1.01. **Definitions**.   The following words and phrases and others evidently intended as the equivalent thereof shall, in the absence of clear implication herein otherwise, be given the following respective interpretations herein:

"**Additional Rent or Rent**" means any additional monies paid or discharged by Lessee to Lessor or to a third party hereunder.

"**Base Rent**" means the amount paid by Lessee to Lessor each month commencing on September 25, 2005.

"**Commencement Date**" means the term commencing on the date set forth above and ending on August 25, 2012, unless sooner terminated as herein provided.

"**Lessee**" means Sylvest Farms, Inc., an Alabama corporation having its principal office in Montgomery, Alabama.

"**Lessor**" means Hodges Bonded Warehouse, Inc., an Alabama corporation having its principal office in Montgomery, Alabama.

"**Premises**" means the real property specifically described on Exhibit A hereto.

"**Property Lease**" means this Real Property Lease dated August 25, 2005 between Hodges Bonded Warehouse, Inc., as Lessor and Sylvest Farms, Inc., as Lessee.

"**Term**" means the date set forth above and ending on August 25, 2012, unless sooner terminated as herein provided.

Section 1.02. **Use of Phrases and Capitalized Terms**.    "Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter," and other equivalent words refer to this Property Lease and not solely to the particular portion thereof in which any such word is used. The definitions set forth in Section 1.01 hereof include both the singular and the plural. Except for those terms defined herein, the capitalized terms used herein shall have the meaning ascribed to them in the Agreement Defining Relationship between Sylvest Farms, Inc. and Hodges Bonded Warehouse, Inc. ("Agreement Defining Relationship") dated as of August 25, 2005. Any pronominal references used herein shall be deemed to include the masculine, feminine, and neuter, and the singular and plural as the context requires.

## ARTICLE II
## PREMISES, DURATION OF TERM AND RENTAL PROVISIONS

Section 2.01. **PREMISES.** Lessor hereby leases to Lessee and Lessee hereby rents and leases from Lessor the land, building and related improvements located at 4530 Mobile Highway, Montgomery, Alabama and more particularly described on Exhibit A attached hereto and made a part hereof ("Premises"), subject to the terms and conditions set forth herein.

Section 2.02. **TERM.** This Property Lease shall be for a term commencing on the date set forth above (the "Commencement Date") and ending on August 25, 2012, unless sooner terminated as herein provided.

2

Section 2.03. **RENT**.

(a)     Commencing on September 25, 2005, Base Rent shall be paid by Lessee to Lessor in the amount of seventy one thousand three hundred ninety-seven dollars and 99/100 ($71,397.99) per month, in addition to all other sums payable to Lessor by Lessee hereunder. All rent due herein shall be payable at the office of Lessor at the address set forth in Section 29 below or at such other place as Lessor may from time to time designate in writing, in lawful money of the United States, in monthly installments, on the 25th day of each month thereafter. Lessor and Lessee acknowledge and confirm to each other that this Agreement constitutes a so-called capitalized lease and is a financing lease pursuant to which Lessor is selling its interest in the Premises to Lessee in accordance with the Purchase Price and Amortization Schedule attached hereto as Exhibit B. In addition, as set forth herein, this Property Lease shall be net to the Lessor.

(b)     Base Rent shall be absolutely net to Lessor so that this Property Lease shall yield, net to Lessor, the Base Rent specified in this Section 2.03, and that all impositions, taxes, assessments, insurance premiums, utility charges, maintenance, repair and replacement expenses, all expenses related to compliance with laws and all other costs, fees, charges, expenses, reimbursements and obligations of every kind and nature whatsoever relating to the Premises which may arise or become due during the Term of this Property Lease or by reason of events occurring during the Term shall be paid or discharged by Lessee, whether or not payable to Lessor or to a third party hereunder, shall be considered as additional rent (hereinafter referred to as "Additional Rent" or "rent").

(c)     All payments of Base Rent and Additional Rent shall be payable without previous demand therefore and without any right of set-off or deduction whatsoever, and in the case of non-payment of any item of Additional Rent by Lessee when the same is due, Lessor shall have, in addition to all its other rights and remedies, all of the rights and remedies available to Lessor under the provisions of this Property Lease or by law in the case of non-payment of Base Rent. The performance and observance by Lessee of all the terms, covenants, conditions

3

and agreements to be performed or observed by Lessee hereunder shall be performed and observed by Lessee at Lessee's sole cost and expense.

(d)    If at any time any method of taxation shall be such that there shall be levied, assessed or imposed on Lessor, or on the Base Rent or Additional Rent, a capital levy, gross receipts or sales tax or other tax on the rents received therefrom, Lessee shall pay and discharge the same, it being the intention of the parties hereto that the rent to be paid hereunder shall be paid to Lessor absolutely net without deduction or charge of any nature whatsoever. Nothing in this Property Lease shall require Lessee to pay any income taxes assessed against Lessor or any estate, succession or inheritance taxes of Lessor, or any of its successors or assigns or any of its stockholders or distributees upon Lessor's liquidation.

(e)    The amortization schedule attached hereto as Exhibit B has been calculated assuming that Lessee shall make improvements to the Premises at a cost not to exceed Seven Hundred Thousand and 00/100 ($700,000.00) Dollars.  Lessee has heretofore notified Lessor of the nature of the improvements and Lessor has consented that Lessee may make such improvements to the Premises and, in addition, Lessor has agreed to fund the cost of such improvements up to Seven Hundred Thousand and 00/100 ($700,000.00) Dollars and all such costs shall be recoverable by Lessor under this Property Lease as part of the Base Rent.  Lessee shall submit invoices to Lessor for such improvements and Lessor covenants that it will pay such invoices in a timely manner so that no liens or encumbrances are asserted against the Premises relative to such improvements. In the event that Lessee has not caused such improvements to be completed prior to the due date of the first installment of Rent on September 25, 2005, Lessor and Lessee through their respective financial officers shall agree on the rental payment to be made as Base Rent for such period or any other period through the date on which Lessee has expended Seven Hundred Thousand and 00/100 ($700,000.00) Dollars and thereafter the Base Rent shall be as specified in Exhibit B.

4

## ARTICLE III

### LESSEE'S OBLIGATIONS FOR UTILITIES, IMPROVEMENTS AND REPAIRS

Section 3.01. **UTILITIES.**  Lessee shall pay for all gas, water, electricity, telephone, and other utility services or trash disposal services used or consumed in or allocable to the Premises during the term of this Property Lease and shall pay all sewer use fees or charges made or imposed with respect to or against the Premises during the Term of this Property Lease. Lessee shall hold Lessor and the Premises harmless for all liens, charges, and costs with respect to same.  If any equipment installed by Lessee requires additional utility facilities, such additional facilities shall be installed at Lessee's expense.  During the term hereof, the utility services shall be placed in Lessee's name, and Lessee shall be responsible for all invoices for utility services and Lessee's payments for all utility services shall be made directly to the utility or other provider of such service as and when due.  Lessor shall not be responsible for any interruption or discontinuance of utility services to the Premises.

Section 3.02. **LESSEE'S IMPROVEMENTS.**    After the completion of the improvements to the Premises contemplated by Section 2.03(e) above, Lessee shall also be permitted to make other improvements or alterations in the Premises with the prior written consent of Lessor (other than equipment installations or modifications) at Lessee's expense.  In the event of any such modification, all work shall be performed at the expense of Lessee and under Lessee's supervision and all such work will be completed free and clear of liens.  Upon termination of this Property Lease, all such modifications shall be treated as part of the Premises to be conveyed to Lessee.

Section 3.03.  **REPAIRS.**  Lessee, at its sole cost and expense, throughout the term of this Property Lease, shall take good care of the Premises, including the equipment (and including any improvements or equipment hereafter erected or installed on the Premises), and shall keep the same in working order and condition, and shall make and perform all routine maintenance thereof and all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, of every nature, kind and description. Lessor understands and agrees that the condition of the Premises is subject to reasonable wear

5

and tear in the ordinary course of business. When used in this Section 6, "repairs" shall include all necessary replacements, renewals, alterations, additions and betterments. All repairs made by Lessee shall be at least equal in quality to the original work, measured from and after the Commencement Date of this Property Lease and shall be made by Lessee in accordance with all laws, ordinances and regulations whether heretofore or hereafter enacted. Lessee, at its sole cost and expense shall take good care of, repair and maintain all driveways, pathways, roadways, sidewalks, curbs, spur tracks, parking areas, loading areas, landscaped areas, entrances and passageways on or appurtenant to the Premises in good order and repair and shall promptly remove accumulated snow, ice and debris from any and all driveways, pathways, roadways, sidewalks, curbs, parking areas, loading areas, entrances and passageways and keep all portions of the Premises, including areas appurtenant thereto, in a clean and orderly condition free of snow, ice, dirt, rubbish, debris and unlawful obstructions. Lessee shall not do or suffer any waste or damage or injury to the Premises or any improvements hereafter erected thereon, or to the fixtures or equipment therein. Lessee shall comply with all laws and regulations of any governmental authority with respect to the Premises, and the manner of using and operating the same and with all restrictive covenants, if any, affecting the title to the Premises or any part thereof.

## ARTICLE IV
## ADDITIONS, EASEMENTS, LIENS, TAXES AND INSURANCE

Section 4.01. **MECHANICS' LIENS**. Lessee shall not suffer or permit any mechanic's lien or other lien to be filed against the Premises, or any portion thereof, by reason of work, labor, skill, services, equipment or materials supplied or claimed to have been supplied to the Premises at the request of Lessee, or anyone holding the Premises, or any portion thereof, through or under Lessee. If any such mechanic's lien or other lien shall at any time be filed against the Premises, or any portion thereof, Lessee shall cause the same to be discharged of record within thirty (30) days after the date of filing the same. If Lessee shall fail to discharge such mechanic's lien or liens or other lien within such period, then in addition to any other right or remedy of Lessor, Lessor may, but shall not be obligated to, discharge the same by paying to the claimant the amount claimed to be due or by procuring the discharge of such lien as to the

6

Premises by deposit in the court having jurisdiction of such lien, the foreclosure thereof or other proceedings with respect thereto, of a cash sum sufficient to secure the discharge of the same, or by the deposit of a bond or other security with such court sufficient in form, content and amount to procure the discharge of such lien. Any amount paid by Lessor, or the value of any deposit so made by Lessor, together with all costs, fees and expenses in connection therewith (including reasonable attorney's fees of Lessor), together with interest thereon at the rate of 12% per annum, shall be repaid by Lessee to Lessor on demand by Lessor and if unpaid may be treated as Additional Rent. Lessee shall indemnify and defend Lessor against and save Lessor and the Premises, and any portion thereof, harmless from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including, without limitation, reasonable attorney's fees resulting from the assertion, filing foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien.

All materialmen, contractors, artisans, mechanics, laborers and any other person now or hereafter furnishing any labor, services, materials, supplies or equipment to Lessee with respect to the Premises, or any portion thereof, are hereby charged with notice that they must look exclusively to Lessee to obtain payment for the same. Notice is hereby given that Lessor shall not be liable for any labor, services, materials, supplies, skill, machinery, fixtures or equipment furnished or to be furnished to Lessee upon credit, and that no mechanic's lien or other lien for any such labor, services, materials, supplies, machinery, fixtures or equipment shall attach to or affect the estate or interest of Lessor in an to the Premises, or any portion thereof.

Section 4.02. **TAXES.**  Lessee shall pay all real estate and personal property taxes which become a lien against the Premises or any equipment, when due and before such taxes become delinquent each calendar year or portion thereof during the term of this Property Lease to the extent such taxes cover periods during which Lessee has been in possession of the Premises and shall provide Lessor evidence of such payment within ten (10) days of Lessor's request therefor. All special assessments applicable to the Premises shall be paid by Lessee prior to delinquency. Personal property taxes on personal property of Lessee located on the Premises shall be paid by Lessee.

7

Section 4.03. <u>INSURANCE.</u>  Lessee shall carry and maintain, at its sole cost and expense, the following types of insurance, in the amount specified and in the form hereafter provided during the Term of this Property Lease:

(a)    <u>Fire and All Risk Property Insurance.</u>  "All risk" property insurance against fire, theft, and all other risks with vandalism and malicious mischief endorsements in an amount not less than $4,300,000.00 on a stated value policy, subject to deductible amounts not in excess of $50,000.00, such coverage to include all buildings, appurtenances, and other improvements on the Premises.  Lessee shall keep all trade fixtures, equipment and inventories insured with fire and "all risks" coverage insurance for the full replacement cost thereof and shall furnish Lessor with evidence of such insurance coverage.

(b)    <u>Commercial General Liability.</u>    Commercial general liability and property damage insurance with a combined single limit of at least Five Million Dollars ($5,000,000) per occurrence insuring against any and all liability of the insured with respect to said Premises or arising out of the maintenance, use or occupancy thereof.  All such bodily injury liability insurance and property damage liability insurance shall specifically insure the performance by Lessee of the indemnity provisions as to liability for injury to or death of persons and injury or damage to property contained herein.

(c)    <u>Employer's Liability.</u>  Workers' compensation insurance in accordance with the statutory requirements of the state where the Premises are located and employer's liability insurance in the minimum amount of $1,000,000 for all employees of Lessee at the Premises.  If Lessee leases its workers from a third party, then Lessee shall provide Lessor, upon request, with reasonable evidence that such workers are covered under such third party's workers' compensation insurance policy.

(d)    <u>Boilers</u>.  Lessee shall procure and maintain in full force and effect boiler and machinery insurance on all boilers, air conditioning equipment, and other pressure vessels and systems, located in, on, or about the Premises; and if the said objects and the damage that may be caused by them or result from them are not covered by Lessee's standard fire and "all

8

risk" coverage insurance then such boiler insurance shall be in an amount not less than One Hundred Thousand Dollars ($100,000) per occurrence.

      (e)    **Flood Insurance**. Lessee shall procure and maintain a flood insurance policy in full force and effect subject to the limitations imposed by the National Flood Insurance Program.

      (f)    **Policy Form**. All policies of insurance provided for herein shall be issued by insurance companies with general policyholders' rating of not less than A- and financial class size VIII or larger as rated in the most current available "Best's Insurance Guide", and qualified to do business in the State of Alabama, and shall be issued in the names of Lessor, Lessee and such other persons or firms as Lessor specifies from time to time as insureds and shall contain a waiver of subrogation. Lessor's lender, if any is also to be loss payee and additional insured. The all risk property and boiler insurance shall be for Lessor as the loss payee, and the liability policies shall be for the mutual and joint benefit and protection of Lessor and Lessee, and executed copies of such policies of insurance or certificates thereof shall be delivered to the Lessor prior to delivery of possession of the Premises to Lessee and thereafter within thirty (30) days prior to the expiration of the term of each such policy. All public liability and property damage policies shall contain a provision that the Lessor, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Lessee or Lessor. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Lessee in like manner and to like extent. All policies of insurance or certificates thereof delivered to Lessor must contain a provision that the company writing said policy will give Lessor thirty (30) days notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the amounts of insurance. All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which Lessor may carry.

      (g)    **Use of Premises Not to Invalidate Insurance, Waiver of Subrogation**. Lessee shall not use or occupy the Premises or any part thereof in any manner which could

invalidate any policies of insurance now or hereafter placed on the Premises or increase the risks covered by insurance on the Premises or necessitate additional insurance premiums or policies of insurance, even if such use may be in furtherance of Lessee's business purposes. In the event any policies of insurance are invalidated by acts or omissions of Lessee, Lessor shall have the right to terminate this Property Lease, or at Lessor's option, to charge Lessee for extra insurance premiums required on the Premises on account of the increased risk caused by Lessee's use and occupancy of the Premises. Lessee waives all claims for recovery from Lessor for any loss or damage to any of its property insured under valid and collectible insurance policies.

## ARTICLE V

## PROVISIONS RESPECTING DAMAGE, DESTRUCTION AND CONDEMNATION

Section 5.01. **USE OF PREMISES.** The Premises are leased to Lessee, and are to be used by Lessee, for the purposes of food processing or cooking of poultry products, freezer storage or for Lessee's general business purposes as the same may be constituted from time to time. Lessee agrees to use the Premises in such a manner as to comply with all applicable governmental laws, ordinances and regulations in connection with its use of the Premises, and to keep the Premises in a clean and sanitary condition, and to use all reasonable precaution to prevent waste, damage or injury to the Premises.

Section 5.02. **CONDITION OF PREMISES.** Lessee agrees that no promises, representations, statements or warranties have been made on behalf of Lessor to Lessee respecting the condition of the Premises or any equipment therein, or the making, at Lessor's cost, of any repairs to the Premises and the taking of possession of the Premises and all equipment therein by Lessee shall be construed as recognition by Lessee that the Premises and equipment were in good and satisfactory condition when possession of same was taken. Lessee shall, at the termination of this Property Lease, by lapse of time or otherwise, remove all of Lessee's property therefrom and surrender the Premises to Lessor in as good condition as when Lessee took possession, normal wear and tear in the ordinary course of business excepted. Lessee shall repair any damages done removing equipment.

10

Section 5.03.  **PERSONAL PROPERTY AT RISK OF LESSEE.**  All personal property in the Premises shall be at the risk of Lessee only.  Lessor shall not be liable for any damage to any personal property or any property of Lessee or its agents or employees in the Premises caused by steam, electricity, sewage, gas or odors, or from water, rain or snow which may leak into, issue or flow into the Premises from any part of the Premises, or from any other place or quarter, or for any damage done to Lessee's property in moving same to or from the Premises.  Lessee shall give Lessor, or its agents, prompt written notice of any damage to or defects in water pipes, gas or warming or cooling apparatus in the Premises.

Section 5.04.  **INDEMNITY.**  Lessee shall indemnify, hold harmless and defend Lessor from and against, and Lessor shall not be liable to Lessee on account of, any and all costs, expenses, liabilities, losses, damages, suits, actions, fines, penalties, demands or claims of any kind, including reasonable attorney's fees, asserted by or on behalf of any person, entity or governmental authority arising out of or in any way connected with either (a) a failure by Lessee to perform any of the agreements, terms, or conditions of this Property Lease required to be performed by Lessee, (b) a failure by Lessee to comply with any laws, statutes, ordinances, regulations or orders of any governmental authority, or (c) any accident, death, or personal injury, or damage to, or loss or theft of property which shall occur on or about the Premises, except as the same may be the result of the gross negligence of Lessor, its employees (other than its maintenance personnel at the Premises) or agents.

Section 5.05.  **ENVIRONMENTAL.**  From and after the Commencement Date, Lessee hereby indemnifies and holds Lessor harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims, environmental response and cleanup costs, fines, and actions, suits, costs, taxes, expenses, of whatsoever kind or nature imposed on, incurred by, or served against Lessor in any way relating to or arising out of the management, mismanagement, presence, use, possession, generation, transportation, removal, treatment, storage, disposal, migration, or remedy of any "Regulated Substance" as defined herein, now or hereafter in, on, under or from the Premises, in each case to the extent accruing on or after the Commencement Date.

For the purposes of this Property Lease, the term "Regulated Substance" shall include substances defined as "regulated substances," "hazardous waste," "hazardous substances," "hazardous materials," "toxic substances, " "pesticides" or terms of similar import or effect in the Resource Conservation and Recovery Act, as amended by the Hazardous Solid Waste Amendments of 1984, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, Federal and state environmental laws, any future local, state or federal law or ordinance, or the regulations, rules, and ordinances adopted and publications from time to time promulgated pursuant to said local, state, and federal laws or ordinances.   The indemnity in this Section 14 shall survive the expiration or termination of this Property Lease and shall continue to run in favor of each successive owner of the Premises, notwithstanding that, at the time the right to indemnity is claimed, the party seeking the indemnity is no longer Lessor under this Property Lease for a period of thirty-six (36) months after termination of the Property Lease.

Section 5.06.  **DAMAGE BY FIRE OR OTHER CASUALTY.**  If, during the Term of this Property Lease, the Premises, or any portion thereof, shall be damaged by fire or any other cause, at Lessor's election Lessee shall repair the Premises (as long as Lessor agrees to let any available insurance proceeds be used for such repair), and the work or repair shall begin promptly and shall be carried on without unnecessary delay.  In the event Lessor elects not to have Lessee repair the Premises, the proceeds of the fire and "all risks" coverage policy shall be paid over to Lessor.  Any such damage shall not extend the Property Lease Term.  Lessee shall not be entitled to any damages by reason of any inconvenience or loss sustained by Lessee as a result of the Premises or any portion thereof being untenantable while the Premises are being repaired or in the event the Lessor elects not to have the Premises repaired as provided above.

Section 5.07  **CONDEMNATION.**  If the whole or any part of the Premises shall be taken by public authority under the power of eminent domain, then the term of this Property Lease shall cease on that portion of the Premises so taken, from the date of possession, and the rent shall be paid to that date, with a proportionate refund by Lessor to Lessee of such rent as

may have been paid by Lessee in advance. If the portion of the Premises taken is such that it prevents the practical use of the Premises for Lessee's purposes, then Lessee shall have the right to continue in possession of the remainder of the Premises, except that the rent shall be reduced in proportion to the area of the Premises taken. In the event of any taking or condemnation of the Premises, in whole or in part, the entire resulting award of damages shall be the exclusive property of Lessor, including all damages awarded as compensation for diminution in value to the leasehold, without any deduction for the value of any unexpired term of this Property Lease, or for any other estate or interest in the Premises now or hereafter vested in Lessee.

## ARTICLE VI
## CERTAIN PROVISIONS RELATING TO
## ASSIGNMENT, SUBLEASING AND MORTGAGING

Section 6.01.  **Provisions Relating to Assignment.**

(a)     Lessee may assign its rights and obligations hereunder to Sylvest Foods Corporation, and any successor to the business of Lessee by merger, consolidation or acquisition of all or substantially all of Lessee's assets.

(b)     Lessor shall have the right to assign its rights and obligations hereunder to Regions Bank as collateral security for Lessor's financing with such Bank. In addition, Lessor shall have the right to assign its interest (whether by merger, consolidation, sale of assets or otherwise) under this Property Lease provided that the assignee expressly assumes the rights and obligations of Lessor under this Property Lease and under the Agreement Defining Relationship between Lessor and Lessee.

(c)     No assignee or anyone claiming by, through or under any permitted assignment shall by virtue thereof acquire any greater rights in the Premises or in any part thereof than Lessee then has under this Property Lease, nor shall any such assignment or any dealings or

13

transactions between Lessor or its assignee in any way relieve Lessee from primary liability for any of its obligations hereunder. Thus, in the event of any such assignment, should Lessee's assignee fail to perform such obligation as and when due, Lessee shall continue to remain liable for payment of the rentals herein provided to be paid by it and for performance and observance of the other agreements and covenants on Lessee's part herein provided to be performed and observed by them.

Section 6.02. **Provisions Relating to Subleasing.** Lessee may sublet the Premises or any portion thereof to Sylvest Foods Corporation, and any successor thereto by merger, consolidation or acquisition of all or substantially all of Lessee's assets. No sublessee or anyone claiming by, through or under the sublease shall by virtue thereof acquire any greater rights in the Premises or any part thereof than Lessee then has under this Property Lease. Any further sublease shall, by its terms, specify that such sublease shall terminate conterminously with the termination of this Property Lease. No sublease made by Lessee or Sublessee shall relieve Lessee from any obligation under this Property Lease.

Section 6.03    **Restriction on Sale or Mortgaging of Leasehold Estate by Lessor or Lessee.** Neither the Lessor nor the Lessee may sell its leasehold estate acquired hereby to any person or persons prior to the expiration of Lessee's Purchase Option without the written consent of the other party not to be unreasonably withheld. In all events any purchaser of Lessor's or Lessee's interest in the Property Lease or the leasehold estate created hereby with respect to the Premises shall agree in writing to be bound by all of the terms, covenants and conditions of this Property Lease. Each party agrees to give the other not less than thirty (30) days notice of any such proposed sale. Further, except as contemplated by the financing documents respecting the Regions Bank financing being obtained concurrently with the execution of this Property Lease, neither the Lessor nor the Lessee may mortgage the Premises or its interest therein to a lender as security for the payment of any loan (other than Lessor to Regions Bank).

Section 6.04. **Lessee's Purchase Option.**

(a)    At any time after the Commencement Date of this Property Lease, Lessee shall have the right to purchase the Premises by prepaying all of the Base Rent (indebtedness)

14

then due to Lessor as reflected on the amortization schedule attached hereto as Exhibit A. **This option to Purchase is a material inducement to Lessee for executing this Property Lease and such option may not be altered, amended or rescinded by Lessor without the express written consent of Lessee.** In addition Lessor and Lessee agree that in the event of a prepayment of the Property Lease during the first twelve (12) months following the Commencement Date of the Property Lease, and Lessee prepays the Base Rent (indebtedness) under such Property Lease in full, Lessor shall be entitled to a prepayment fee in the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars; if prepayment should occur at any time during months thirteen through twenty-four following the Commencement Date Lessee shall pay to Lessor a prepayment fee in the amount of be One Hundred Thousand and 00/100 ($100,000.00) Dollars and in months twenty-five through thirty-six following the Commencement Date the prepayment fee shall be Fifty Thousand and 00/100 ($50,000.00) Dollars. Following the thirty-sixth month aftrthe Commencement Date there shall be no prepayment fee with respect to the Property Lease.

(b)    In the event that Lessee elects to prepay the indebtedness due under this Property Lease, Lessee shall give ten (10) days notice to Lessor that it intends to make a prepayment of all the Base Rent (including wihtout limitation all principal, interest, indebtedness and Additional Rent) then due however, in no event less than the outstanding balance as shown in Exhibit B. Such payment shall be made on the second business day following the expiration of the notice to be given to Lessor and Lessor shall immediately and concurrently deliver to Lessee a statutory warranty deed to the Premises conveying merchantable title free and clear of all liens and encumbrances (other than exceptions as reflected in the owner's title policy being delivered to Lessor in connection with the consummation of the transactions contemplated by the Asset Purchse Agreement or such other exceptions that are reasonably acceptable to Lessee). Furthermore, immediately upon payment of the final installment due under the amortization schedule, Lessor shall likewise convey the Premises to Lessee as herein provided.

15

## ARTICLE VII
## EVENTS OF DEFAULT AND REMEDIES

Section 7.01.  **DEFAULT OR BREACH.**  Each of the following events shall constitute a default or a breach of this Property Lease by Lessee:

    (a)    If Lessee fails to pay Lessor any Base Rent, Additional Rent or other rent when due hereunder;

    (b)    If Lessee fails to perform or comply with any other term or condition of this Property Lease and if such nonperformance shall continue for a period of 15 days after notice thereof by Lessor to Lessee, time being of the essence.

    (c)    If Lessee vacates or abandons the Premises;

    (d)    If Lessee files a petition in bankruptcy or insolvency or for reorganization under any Bankruptcy Act, or voluntarily takes advantage of any such act by answer or otherwise, or makes an assignment for the benefit of creditors;

    (e)    If involuntary proceedings under any bankruptcy or insolvency act shall be instituted against Lessee, or if a receiver or trustee shall be appointed for all or substantially all of the property of Lessee, and such proceedings shall not be dismissed or the receivership or trusteeship vacated within 30 days after the institution or appointment; or

    (f)    The Lessee's estate created by this Property Lease is taken in execution or by other process of law.

Section 7.02.  **EFFECT OF DEFAULT.**  In the event of any default or breach hereunder, in addition to any other right or remedy available to Lessor, either at law or in equity, Lessor may exert any one or more of the following rights:

    (a)    Cure any default of Lessee hereunder, in which case Lessee shall reimburse any costs incurred by Lessor in curing such default, together with interest charged

16

thereon at the rate of 12% per annum, which amount shall be paid by Lessee to Lessor within 15 days after demand on Lessee therefore.

(b)    Lessor may retake the Premises and may terminate this Property Lease by giving notice of termination to Lessee not less than fifteen (15) days prior to any such retaking. Without such notice, Lessor's retaking will not terminate the Property Lease.  On termination, Lessor may recover from Lessee all damages proximately resulting from the breach, including the cost of recovering the Premises and the Base Rent for the balance of the Property Lease which sum shall be immediately due Lessor from Lessee, provided however, Lessor must mitigate its damages by immediately selling or taking steps to sell the Premises and any damages to be asserted against Lessee shall be mitigated or set off by the proceeds from Lessor's sale.

(c)    Lessor may relet the Premises or any part thereof for any term without terminating this Property Lease, at such rent and on such terms as it may choose.  Lessor may make alterations and repairs to the Premises.  In addition to Lessee's liability to Lessor for breach of this Property Lease, Lessee shall be liable for all expenses of the reletting, for any alterations and repairs made, and for the difference between the rent received by Lessor under the new lease agreement and the rent installments that are due for the same period under this Property Lease.

Section 7.03.  **AGREEMENT DEFINING RELATIONSHIP.**  Lessor and Lessee have concurrently with the execution of the Property Lease entered into an Agreement Defining Relationship between Sylvest Farms, Inc. and Hodges Bonded Warehouse, Inc. the provisions of which are incorporated hereby reference.  The benefits and obligations of each party are subject to the remedy of specific performance in the Circuit Court of Montgomery County, Alabama in addition to all other remedies at law or in equity.

Section 7.04.  **SUBORDINATION AND ATTORNMENT.**  Lessor reserves the right to place liens and encumbrances on the Premises in favor of Regions Bank, solely superior in lien and effect to this Property Lease and not to any other lender or lienholder or claimant.  This Property Lease, and all rights of Lessee hereunder shall be subject and subordinate to any liens and encumbrances now or hereafter imposed by Lessor upon the Premises or any part thereof. Lessor and Lessee agree to execute, acknowledge and deliver to Regions Bank a Subordination,

17

Nondisturbance and Attornment Agreement in the form attached hereto as Exhibit C, upon demand, any and all instruments that may be necessary or proper to subordinate this Property Lease and all rights herein to any such lien or encumbrance as may be required by Lessor. In no event shall Lessor have the right to terminate this Property Lease upon Lessor's default under any mortgage or security agreement with Regions Bank with respect to the Premises.

Section 7.05. **ESTOPPEL CERTIFICATE**. Lessee agrees that at any time and from time to time during the term of this Property Lease, and within ten (10) days after demand therefor by Lessor, to execute and deliver to Lessor or to any proposed mortgagee, trustee, beneficiary or purchaser, a certificate in recordable form certifying that this Property Lease is in full force and effect, that the Property Lease is unmodified, or if modified state any such modifications, and that there are no defenses or offsets thereto, or stating such defenses or offsets as are claimed by Lessee, and the dates to which all rentals have been paid.

Section 7.06. **INTEREST ON PAST DUE OBLIGATIONS**. Whenever under any provision of this Property Lease Lessee shall be obligated to make any payment or expenditure, or to do any act or thing, or to incur any liability whatsoever, and Lessee fails, refuses or neglects to perform as herein required, Lessor shall be entitled but shall not be obligated to make any such payment or expenditure, or do any such act or thing, or to incur any such liability, all on behalf of and at the cost and for the account of Lessee, and in such event the amount thereof with interest thereon as hereinafter provided shall be deemed Additional Rental hereunder and shall be added to and deemed a part of the next installment of rent thereafter becoming due from Lessee to Lessor hereunder. Any amount due from Lessee to Lessor under this Property Lease which is not paid when due shall bear interest at the rate of 12 percent per annum from the date due until paid, but the payment of such interest shall not excuse or cure any default by Lessee under this Property Lease. The interest provided for in this Section 7.06 shall be in addition to any latefee owed Lessor by Lessee.

Section 7.07. **LIABILITY OF LESSOR**. If Lessor shall fail to perform any covenant, term or condition of this Property Lease upon Lessors part to be performed and, as a consequence of such default, Lessee shall recover a money judgment against Lessor, such judgment shall be

18

satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Lessor in the Premises and out of rents or other income from such property receivable by Lessor or out of the consideration received by Lessor from the sale or other disposition of all or any part of Lessor's right, title and interest in the Premises, and the Lessor shall not be liable for any deficiency.

Section 7.08.  **NOTICES.**  Any notice of demands to be given hereunder shall be given in writing and sent by recognized national overnight courier to:

| | |
|---|---|
| Lessor: | Hodges Bonded Warehouse, Inc. <br> 4590 Mobile Highway <br> Montgomery, Alabama 36108 <br> Attention:  Lance Hunter, Chief Executive Officer |
| Copy to: | William I. Eskridge, Esq. <br> Rushton Stakely Johnston & Garrett, PA <br> Post Office Box 270 <br> Montgomery, AL 36101-0270 |
| Lessee: | Sylvest Foods Corporation <br> Attention: Dean E. Falk <br> President and CEO <br> 3500 Western Boulevard <br> Montgomery, Alabama  36064 |
| Copy to: | Thomas G. Mancuso, Esq. <br> Mancuso & Franco, P.C. <br> Post Office Box 240489 <br> Montgomery, Alabama  36124-0489 |

or at such other address as either party may from time to time designate in writing.  Each such notice shall be deemed to have been given at the time it shall be delivered to the other party by such courier in the manner prescribed herein.  Nothing contained herein shall be construed to preclude personal service of any notice in the manner prescribed by law for personal service of a summons or other legal process.

Section 7.09.  **TAX COVENANTS OF LESSOR.**  Lessor covenants and agrees with Lessee with respect to certain tax matters as follows:

(a)    All tax abatement agreements held by S&C Beef Processors, LLC have been or will be assigned to Lessee and are the sole property of Lessee. Lessor will not knowingly take any action of any nature to mitigate, reduce or cancel such abatement agreements in effect on the Commencement Date of this Property Lease, with the Alabama Department of Revenue or local governmental authorities.

(b)    All tax incentives under the Mercedes Act of the State of Alabama and held by S&C Beef Processors, LLC have been or will be assigned to Lessee and are the sole property of Lessee. Lessor will not knowingly take any action of any nature to mitigate, reduce or cancel all such incentive agreements in effect on the Commencement Date of this Property Lease, with the Alabama Department of Revenue or local governmental authorities.

## ARTICLE VIII
## MISCELLANEOUS.

Section 8.01.  **Covenant of Quite Enjoyment; Surrender of Premises.**  So long as Lessee performs and observes all the covenants and agreements on its part herein contained, Lessee shall peaceably and quietly have, hold and enjoy the Premises during the Term, subject to all the terms and provisions hereof.  Upon any termination of this Property Lease prior to its term, Lessee will surrender possession of the Premises peaceably and promptly to Lessor in as good condition as can reasonably be expected as at the completion of the construction of the Premises, excepting only (a) loss by fire or other casualty, (b) alterations, changes or improvements made in accordance with the provisions of this Property Lease, (c) acts of governmental or condemning authorities, and (d) ordinary wear and tear and obsolescence.

Section 8.02.  **Representation of Lessor's and Lessee's Power and Authority.**  Lessor and Lessee represent and warrant to each other that each has full power and authority to execute, deliver and perform this Property Lease and that the execution and delivery hereof has been duly authorized by all necessary action.

Section 8.03.  **This Property Lease is a Triple Net Lease.**  Lessee recognizes and understands that it is the intention hereof that this Property Lease be a "triple net" lease during its

term and that no cost or expense will be incurred by Lessor for ad valorem taxes, insurance, maintenance, repair, utilities or any other expense of ownership or operation of the Premises or Premises Site during the Term of the Property Lease. This Property Lease shall be construed to effectuate such intent.

Section 8.04. **Certain Prior and Contemporaneous Agreements Cancelled**. This Property Lease shall completely and fully supersede all other prior or contemporaneous agreements, both written and oral, between Lessor and Lessee relating to the construction of the Premises, and the leasing of the Premises. Neither Lessor nor Lessee shall hereafter have any rights under any such prior or contemporaneous agreement but shall look solely to this Property Lease for definition and determination of all their respective rights, liabilities and responsibilities respecting the construction of the Premises, and the leasing of the Premises.

Section 8.05. **Article and Section Captions**. The article and section headings and captions contained herein are included for convenience only and shall not be considered a part hereof or affect in any manner the construction nor interpretation hereof.

Section 8.06. **Binding on Assigns**. Except as hereinabove provided, all terms, conditions and agreements of this Property Lease shall be binding upon, apply and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.

Section 8.07. **Amendment in Writing**. This Property Lease contains the entire agreement between the parties and may be amended only by subsequent written agreement.

Section 8.08. **Waiver-None**. The failure of Lessor to insist upon strict performance of any of the terms, conditions and agreements of this Property Lease shall not be deemed a waiver of any of its rights or remedies hereunder and shall not be deemed a waiver of any subsequent breach or default of any of such terms, conditions and agreements. The doing of anything by Lessor which Lessor is not obligated to do hereunder shall not impose any future obligation on Lessor nor otherwise amend any provision of this Property Lease.

21

Section 8.09.  **No Surrender.**  No surrender of the Premises by Lessee shall be effected by Lessor's acceptance of the keys to the Premises or of the rent due hereunder, or by any other means whatsoever, without Lessor's written acknowledgment that such acceptance constitutes a surrender.

Section 8.10.  **Captions.**  The captions of the various paragraphs in this Property Lease are for convenience only and do not define, limit, describe or construe the contents of such paragraphs.

Section 8.11.  **Brokers.**  Lessee hereby warrants that no real estate broker has or will represent it in this transaction and that no finder's fees have been earned by a third party.

Section 8.12.  **Applicable Law.**  This Property Lease shall be governed by and construed in accordance with the laws of the State of Alabama.

Section 8.13.  **Partial Invalidation of Property Lease.**  If any term, covenant or condition of this Property Lease is determined by any court of competent jurisdiction to be invalid or unenforceable, the remainder of this Property Lease shall remain in full force and effect.

Section 8.14.  **Counterparts.**  This Property Lease may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  A facsimile copy of this Property Lease and any signature thereon shall be considered for all purposes an original.

Section 8.15.  **Late Fee.**  In the event any monetary obligation, including but not limited to fixed annual rent, percentage rent or additional rent, of Lessee is not paid within fifteen (15) days after its due date, Lessee shall pay to Lessor a late fee equal to two (2%) percent of the delinquent payment

Section 8.16.  **Exculpation Clause.**  Notwithstanding anything in this Property Lease to the contrary and to the extent that may otherwise be required by applicable law, Lessor, its

agents, servants, employees, or any other person for whom Lessor is in law responsible, shall not be liable, responsible or accountable in damages or otherwise to Lessee or any other person for any acts or omissions related to the Premises or Lessee's business activities" Such exculpation of liability shall be absolute and without any exception whatsoever except in the event of fhud or gross negligence.

Section 8.17.  **Right of Entry**.  Lessor and its agents shall have the right, and during Lessee's business hours and after notice to Lessee, to enter the Premises to examine them or to make any necessary repairs thereto or to show the Premises to prospective purchasers or lessees, provided such activities do not interfere with Lessee's use of the Leased Premises

IN WITNESS WHEREOF, the parties hereto have executed this Property Lease as of the day and year first above written.

LESSOR:

ATTEST:
By:

HODGES BONDED WAREHOUSE, INC.

By: _____

Title: _____ C E O _____

LESSEE:

ATTEST:
By: _____
Its:   Secretary

SYLVEST FARMS, INC.

By: _____
Dean E. Falk
Title:   President and Chief Executive Officer

23

**Exhibit A**

**Legal Description**

Lot A, according to the Map of Morrell Plat No. 1 as recorded in the Office of the Judge of Probate, Montgomery County, Alabama, in Plat Book 41 at Page 145, being further described as follows:

Commence at the intersection of the Eastern ROW of CSX Railroad (100' ROW) with the Northern Right of Way of U.S. Highway 80 (ROW varies); thence run along said Eastern ROW N 18° 16' E, 1068.8 feet (per Deed) to a concrete monument, said point being the Point of Beginning; thence from said Point of Beginning, continue along said Eastern Right of Way N 18° 12' 04" E, 805.61 feet to a found 5/8" rebar (GMC Cap CA00156); thence leave said Eastern Right of Way and run S 83° 22' 00" E, 964.07 feet to a found 5/8" rebar (GMC Cap CA00156) lying on the West Right of Way of the aforementioned U.S. Highway 80; thence run along said West Right of Way, S 06° 57' 16" W, 595.48 feet to a point of curvature; thence continue along said West Right of Way and said curve (concave westerly, R=1069.59'), a chord of S 11° 52' 10" W, 194.59 feet to a found concrete monument; thence leave said West Right of Way and run N 83° 22' 00" W, 1104.52 feet to the Point of Beginning.

Said described property lying and being situated in the Southwest Quarter of Section 34, T-16-N, R-17-E, and in the Northwest Quarter of Section 3, T-15-N, R-17-E, Montgomery County, Alabama, and contains 18.867 acres, more or less.

Together, with a 30' access and utility easement as recorded in Real Property Book 1458 at Page 948, being further described as follows:

Commence at a found iron pin (GMC CAP CA00156) lying at the Northeast corner of Lot A, according to the Map of Morrell Plat No. 1, as recorded in the Office of the Judge of Probate, Montgomery County, Alabama, in Plat Book 41 at Page 145, said Point lying on the West Right of Way of U.S. Highway 80 (ROW varies); thence run along the North line of said Lot A, N 83° 22' 00" W, 88.75 feet to the Point of Beginning; thence from said Point of Beginning, continue along said North line, N 83° 22' 00" W, 448.28 feet to a point; thence leave said North line and run N 54° 28' 45" E, 44.71 feet to a point; thence run S 83° 22' 00" E, 366.06 feet to a point; thence run S 51° 55' 15" E, 57.51 feet to the Point of Beginning.

Said described easement lying and being situated in the Southwest Quarter of Section 34, T-16-N, R-17-E, Montgomery County, Alabama, and contains 0.280 acres, more or less.

Together with Lessor's right, title and interest in and to any lands conveyed from S&C Beef Processors, L.L.C. unto Lessor pursuant to a Statutory Warranty Deed dated contemporaneously with this Lease and to be recorded in the Office of the Judge of Probate of Montgomery County, Alabama.

**Exhibit B**

**Amortization Schedule**

| Building | | | | 08/09/2005   Page 1 |
|---|---|---|---|---|

Compound Period ........ : Monthly

Nominal Annual Rate .... : 15.000   %
Effective Annual Rate ... : 16.075   %
Periodic Rate ................. : 1.2500   %
Daily Rate ....................... : 0.04110 %

CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|
| 1 Loan | 08/25/2005 | 3,700,000.00 | 1 | | |
| 2 Payment | 09/25/2005 | 71,397.99 | 84 | Monthly | 08/25/2012 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan 08/25/2005 | | | | |
| 1   09/25/2005 | 71,397.99 | 46,250.00 | 25,147.99 | 3,700,000.00 |
| 2   10/25/2005 | 71,397.99 | 45,935.65 | 25,462.34 | 3,674,852.01 |
| 3   11/25/2005 | 71,397.99 | 45,617.37 | 25,780.62 | 3,649,389.67 |
| 4   12/25/2005 | 71,397.99 | 45,295.11 | 26,102.88 | 3,623,609.05 |
| 2005 Totals | 285,591.96 | 183,098.13 | 102,493.83 | 3,597,506.17 |
| | | | | |
| 5   01/25/2006 | 71,397.99 | 44,968.83 | 26,429.16 | 3,571,077.01 |
| 6   02/25/2006 | 71,397.99 | 44,638.46 | 26,759.53 | 3,544,317.48 |
| 7   03/25/2006 | 71,397.99 | 44,303.97 | 27,094.02 | 3,517,223.46 |
| 8   04/25/2006 | 71,397.99 | 43,965.29 | 27,432.70 | 3,489,790.76 |
| 9   05/25/2006 | 71,397.99 | 43,622.38 | 27,775.61 | 3,462,015.15 |
| 10  06/25/2006 | 71,397.99 | 43,275.19 | 28,122.80 | 3,433,892.35 |
| 11  07/25/2006 | 71,397.99 | 42,923.65 | 28,474.34 | 3,405,418.01 |
| 12  08/25/2006 | 71,397.99 | 42,567.73 | 28,830.26 | 3,376,587.75 |
| 13  09/25/2006 | 71,397.99 | 42,207.35 | 29,190.64 | 3,347,397.11 |
| 14  10/25/2006 | 71,397.99 | 41,842.46 | 29,555.53 | 3,317,841.58 |
| 15  11/25/2006 | 71,397.99 | 41,473.02 | 29,924.97 | 3,287,916.61 |
| 16  12/25/2006 | 71,397.99 | 41,098.96 | 30,299.03 | 3,257,617.58 |
| 2006 Totals | 856,775.88 | 516,887.29 | 339,888.59 | |
| | | | | |
| 17  01/25/2007 | 71,397.99 | 40,720.22 | 30,677.77 | 3,226,939.81 |
| 18  02/25/2007 | 71,397.99 | 40,336.75 | 31,061.24 | 3,195,878.57 |
| 19  03/25/2007 | 71,397.99 | 39,948.48 | 31,449.51 | 3,164,429.06 |
| 20  04/25/2007 | 71,397.99 | 39,555.36 | 31,842.63 | 3,132,586.43 |
| 21  05/25/2007 | 71,397.99 | 39,157.33 | 32,240.66 | 3,100,345.77 |
| 22  06/25/2007 | 71,397.99 | 38,754.32 | 32,643.67 | 3,067,702.10 |
| 23  07/25/2007 | 71,397.99 | 38,346.28 | 33,051.71 | 3,034,650.39 |
| 24  08/25/2007 | 71,397.99 | 37,933.13 | 33,464.86 | 3,001,185.53 |
| 25  09/25/2007 | 71,397.99 | 37,514.82 | 33,883.17 | 2,967,302.36 |
| 26  10/25/2007 | 71,397.99 | 37,091.28 | 34,306.71 | 2,932,995.65 |
| 27  11/25/2007 | 71,397.99 | 36,662.45 | 34,735.54 | 2,898,260.11 |
| 28  12/25/2007 | 71,397.99 | 36,228.25 | 35,169.74 | 2,863,090.37 |
| 2007 Totals | 856,775.88 | 462,248.67 | 394,527.21 | |

Building                                                                                            08/09/2005  Page 2

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| 29  01/25/2008 | 71,397.99 | 35,788.63 | 35,609.36 | 2,827,481.01 |
| 30  02/25/2008 | 71,397.99 | 35,343.51 | 36,054.48 | 2,791,426.53 |
| 31  03/25/2008 | 71,397.99 | 34,892.83 | 36,505.16 | 2,754,921.37 |
| 32  04/25/2008 | 71,397.99 | 34,436.52 | 36,961.47 | 2,717,959.90 |
| 33  05/25/2008 | 71,397.99 | 33,974.50 | 37,423.49 | 2,680,536.41 |
| 34  06/25/2008 | 71,397.99 | 33,506.71 | 37,891.28 | 2,642,645.13 |
| 35  07/25/2008 | 71,397.99 | 33,033.06 | 38,364.93 | 2,604,280.20 |
| 36  08/25/2008 | 71,397.99 | 32,553.50 | 38,844.49 | 2,565,435.71 |
| 37  09/25/2008 | 71,397.99 | 32,067.95 | 39,330.04 | 2,526,105.67 |
| 38  10/25/2008 | 71,397.99 | 31,576.32 | 39,821.67 | 2,486,284.00 |
| 39  11/25/2008 | 71,397.99 | 31,078.55 | 40,319.44 | 2,445,964.56 |
| 40  12/25/2008 | 71,397.99 | 30,574.56 | 40,823.43 | 2,405,141.13 |
| 2008  Totals | 856,775.88 | 398,826.64 | 457,949.24 | |
| | | | | |
| 41  01/25/2009 | 71,397.99 | 30,064.26 | 41,333.73 | 2,363,807.40 |
| 42  02/25/2009 | 71,397.99 | 29,547.59 | 41,850.40 | 2,321,957.00 |
| 43  03/25/2009 | 71,397.99 | 29,024.46 | 42,373.53 | 2,279,583.47 |
| 44  04/25/2009 | 71,397.99 | 28,494.79 | 42,903.20 | 2,236,680.27 |
| 45  05/25/2009 | 71,397.99 | 27,958.50 | 43,439.49 | 2,193,240.78 |
| 46  06/25/2009 | 71,397.99 | 27,415.51 | 43,982.48 | 2,149,258.30 |
| 47  07/25/2009 | 71,397.99 | 26,865.73 | 44,532.26 | 2,104,726.04 |
| 48  08/25/2009 | 71,397.99 | 26,309.08 | 45,088.91 | 2,059,637.13 |
| 49  09/25/2009 | 71,397.99 | 25,745.46 | 45,652.53 | 2,013,984.60 |
| 50  10/25/2009 | 71,397.99 | 25,174.81 | 46,223.18 | 1,967,761.42 |
| 51  11/25/2009 | 71,397.99 | 24,597.02 | 46,800.97 | 1,920,960.45 |
| 52  12/25/2009 | 71,397.99 | 24,012.01 | 47,385.98 | 1,873,574.47 |
| 2009  Totals | 856,775.88 | 325,209.22 | 531,566.66 | |
| | | | | |
| 53  01/25/2010 | 71,397.99 | 23,419.68 | 47,978.31 | 1,825,596.16 |
| 54  02/25/2010 | 71,397.99 | 22,819.95 | 48,578.04 | 1,777,018.12 |
| 55  03/25/2010 | 71,397.99 | 22,212.73 | 49,185.26 | 1,727,832.86 |
| 56  04/25/2010 | 71,397.99 | 21,597.91 | 49,800.08 | 1,678,032.78 |
| 57  05/25/2010 | 71,397.99 | 20,975.41 | 50,422.58 | 1,627,610.20 |
| 58  06/25/2010 | 71,397.99 | 20,345.13 | 51,052.86 | 1,576,557.34 |
| 59  07/25/2010 | 71,397.99 | 19,706.97 | 51,691.02 | 1,524,866.32 |
| 60  08/25/2010 | 71,397.99 | 19,060.83 | 52,337.16 | 1,472,529.16 |
| 61  09/25/2010 | 71,397.99 | 18,406.61 | 52,991.38 | 1,419,537.78 |
| 62  10/25/2010 | 71,397.99 | 17,744.22 | 53,653.77 | 1,365,884.01 |
| 63  11/25/2010 | 71,397.99 | 17,073.55 | 54,324.44 | 1,311,559.57 |
| 64  12/25/2010 | 71,397.99 | 16,394.49 | 55,003.50 | 1,256,556.07 |
| 2010  Totals | 856,775.88 | 239,757.48 | 617,018.40 | |
| | | | | |
| 65  01/25/2011 | 71,397.99 | 15,706.95 | 55,691.04 | 1,200,865.03 |
| 66  02/25/2011 | 71,397.99 | 15,010.81 | 56,387.18 | 1,144,477.85 |
| 67  03/25/2011 | 71,397.99 | 14,305.97 | 57,092.02 | 1,087,385.83 |
| 68  04/25/2011 | 71,397.99 | 13,592.32 | 57,805.67 | 1,029,580.16 |
| 69  05/25/2011 | 71,397.99 | 12,869.75 | 58,528.24 | 971,051.92 |
| 70  06/25/2011 | 71,397.99 | 12,138.15 | 59,259.84 | 911,792.08 |
| 71  07/25/2011 | 71,397.99 | 11,397.40 | 60,000.59 | 851,791.49 |
| 72  08/25/2011 | 71,397.99 | 10,647.39 | 60,750.60 | 791,040.89 |

08/09/2005  Page 3

Building

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 73 | 09/25/2011 | 71,397.99 | 9,888.01 | 61,509.98 | 729,530.91 |
| 74 | 10/25/2011 | 71,397.99 | 9,119.14 | 62,278.85 | 667,252.06 |
| 75 | 11/25/2011 | 71,397.99 | 8,340.65 | 63,057.34 | 604,194.72 |
| 76 | 12/25/2011 | 71,397.99 | 7,552.43 | 63,845.56 | 540,349.16 |
| 2011 | Totals | 856,775.88 | 140,568.97 | 716,206.91 | |
| 77 | 01/25/2012 | 71,397.99 | 6,754.36 | 64,643.63 | 475,705.53 |
| 78 | 02/25/2012 | 71,397.99 | 5,946.32 | 65,451.67 | 410,253.86 |
| 79 | 03/25/2012 | 71,397.99 | 5,128.17 | 66,269.82 | 343,984.04 |
| 80 | 04/25/2012 | 71,397.99 | 4,299.80 | 67,098.19 | 276,885.85 |
| 81 | 05/25/2012 | 71,397.99 | 3,461.07 | 67,936.92 | 208,948.93 |
| 82 | 06/25/2012 | 71,397.99 | 2,611.86 | 68,786.13 | 140,162.80 |
| 83 | 07/25/2012 | 71,397.99 | 1,752.04 | 69,645.95 | 70,516.85 |
| 84 | 08/25/2012 | 71,397.99 | 881.14 | 70,516.85 | 0.00 |
| 2012 | Totals | 571,183.92 | 30,834.76 | 540,349.16 | |
| Grand Totals | | 5,997,431.16 | 2,297,431.16 | 3,700,000.00 | |

Building                                        08/09/2005  Page 4

ᴸast interest amount decreased by 0.32 due to rounding.

| Equipment | | | | 08/09/2005  Page 1 |

Compound Period ........ : Monthly

Nominal Annual Rate .... : 15.000 %
Effective Annual Rate ... : 16.075 %
Periodic Rate ................. : 1.2500 %
Daily Rate ...................... : 0.04110 %

CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|
| 1 Loan | 08/25/2005 | 870,000.00 | 1 | | |
| 2 Payment | 09/25/2005 | 42,183.38 | 24 | Monthly | 08/25/2007 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan 08/25/2005 | | | | 870,000.00 |
| 1 09/25/2005 | 42,183.38 | 10,875.00 | 31,308.38 | 838,691.62 |
| 2 10/25/2005 | 42,183.38 | 10,483.65 | 31,699.73 | 806,991.89 |
| 3 11/25/2005 | 42,183.38 | 10,087.40 | 32,095.98 | 774,895.91 |
| 4 12/25/2005 | 42,183.38 | 9,686.20 | 32,497.18 | 742,398.73 |
| 2005 Totals | 168,733.52 | 41,132.25 | 127,601.27 | |
| | | | | |
| 5 01/25/2006 | 42,183.38 | 9,279.98 | 32,903.40 | 709,495.33 |
| 6 02/25/2006 | 42,183.38 | 8,868.69 | 33,314.69 | 676,180.64 |
| 7 03/25/2006 | 42,183.38 | 8,452.26 | 33,731.12 | 642,449.52 |
| 8 04/25/2006 | 42,183.38 | 8,030.62 | 34,152.76 | 608,296.76 |
| 9 05/25/2006 | 42,183.38 | 7,603.71 | 34,579.67 | 573,717.09 |
| 10 06/25/2006 | 42,183.38 | 7,171.46 | 35,011.92 | 538,705.17 |
| 11 07/25/2006 | 42,183.38 | 6,733.81 | 35,449.57 | 503,255.60 |
| 12 08/25/2006 | 42,183.38 | 6,290.70 | 35,892.68 | 467,362.92 |
| 13 09/25/2006 | 42,183.38 | 5,842.04 | 36,341.34 | 431,021.58 |
| 14 10/25/2006 | 42,183.38 | 5,387.77 | 36,795.61 | 394,225.97 |
| 15 11/25/2006 | 42,183.38 | 4,927.82 | 37,255.56 | 356,970.41 |
| 16 12/25/2006 | 42,183.38 | 4,462.13 | 37,721.25 | 319,249.16 |
| 2006 Totals | 506,200.56 | 83,050.99 | 423,149.57 | |
| | | | | |
| 17 01/25/2007 | 42,183.38 | 3,990.61 | 38,192.77 | 281,056.39 |
| 18 02/25/2007 | 42,183.38 | 3,513.20 | 38,670.18 | 242,386.21 |
| 19 03/25/2007 | 42,183.38 | 3,029.83 | 39,153.55 | 203,232.66 |
| 20 04/25/2007 | 42,183.38 | 2,540.41 | 39,642.97 | 163,589.69 |
| 21 05/25/2007 | 42,183.38 | 2,044.87 | 40,138.51 | 123,451.18 |
| 22 06/25/2007 | 42,183.38 | 1,543.14 | 40,640.24 | 82,810.94 |
| 23 07/25/2007 | 42,183.38 | 1,035.14 | 41,148.24 | 41,662.70 |
| 24 08/25/2007 | 42,183.38 | 520.68 | 41,662.70 | 0.00 |
| 2007 Totals | 337,467.04 | 18,217.88 | 319,249.16 | |
| | | | | |
| Grand Totals | 1,012,401.12 | 142,401.12 | 870,000.00 | |

Equipment

Last interest amount decreased by 0.10 due to rounding.

## Exhibit C

## [Form of Subordination, Nondisturbance and Attornment Agreement]

REGIONS BANK

- and -

SYLVEST FARMS, INC.

- and -

HODGES BONDED WAREHOUSE, INC.

SUBORDINATION, NONDISTURBANCE AND
ATTORNMENT AGREEMENT

Dated:       August 25, 2005

Location:    4530 Mobile Highway
Montgomery, Alabama

UPON RECORDATION
RETURN TO:

Thomas G. Mancuso, Esq.
Mancuso & Franco, P.C.
Post Office Box 240489
Montgomery, Alabama 36124-0489

THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made as of the 25th day of August, 2005 by and between **Regions Bank**, an Alabama banking corporation, having an address at 8 Commerce Street, Montgomery, Alabama 36104, Attn: Mike Solomon, Senior Vice President, as mortgagee ("Lender"), **Sylvest Farms, Inc.**, an Alabama corporation, having a principal place of business in Montgomery, Alabama ("Lessee"), and **Hodges Bonded Warehouse, Inc.**, an Alabama corporation having a principal place of business in Montgomery, Alabama ("Lessor").

## RECITALS:

A.      Lessee is the lessee under a certain Property Lease (the "Property Lease") dated August 25, 2005, with Lessor with respect to real property and equipment located at 4530 Mobile Highway, Montgomery, Alabama 36108 (hereinafter sometimes referred to as the "Premises" or the "Property") and more particularly described in Exhibit "A" attached hereto and made a part hereof.

B.      This Agreement is being entered into in connection with a mortgage loan (the "Loan") being made by Lender to Lessor, to be secured by, among other things: (a) a first mortgage on and of the Property (the "Mortgage") to be recorded with the office of the Judge of Probate of Montgomery County, Alabama; and (b) a first assignment of leases and rents on the Property (the "Assignment of Leases and Rents are hereinafter collectively referred to as the "Security Documents").

C.      Lessee acknowledges that Lender will rely on this Agreement in making the Loan to Lessor.

## AGREEMENT:

For mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Lessee agrees that the Lease is and shall subject and subordinate to the Security Documents and to all present or future advances under the obligations secured thereby and all renewals, amendments, modifications, consolidations, replacements and extensions of the secured obligations and the Security Documents, to the full extent of all amounts secured by the Security Documents from time to time.  Said subordination is to have the same force and effect as if the Security Documents and such renewals, modifications, consolidations, replacements and extensions thereof had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

2.      Lender agrees that, if the Lender exercises any of its rights under the Security Documents, including an entry by Lender pursuant to the Mortgage or a foreclosure of the Mortgage,

1

Lender shall not disturb Lessee's right of quiet possession of the Premises under the terms of the Lease so long as Lessee pays all rent and other charges under the Lease and is not in default beyond any applicable grace period of any other term, covenant or condition of the Lease.

3.      Lessee agrees that, in the event of a foreclosure of the Mortgage by Lender, or the acceptance of a deed in lieu of foreclosure by Lender or any other succession of Lender to fee ownership, Lessee will attorn to and recognize Lender as its landlord under the Lease for the remainder of the term of the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions as are set forth in the Lease, and Lessee hereby agrees to pay and perform all of the obligations of Lessee pursuant to the Lease. Lessee agrees, however, to execute and deliver, at anytime and from time to time, upon the request of Lender any reasonable instrument which may be necessary or appropriate to evidence such attornment.

4.      Lessee agrees that, in the event Lender succeeds to the interest of Lessor under the Lease, Lender shall not be bound by any surrender, termination, amendment or modification of the Lease made without the consent of Lender. Notwithstanding anything to the contrary contained herein or in the Lease, it is specifically understood and agreed that Lender shall not be:

(a)      liable for any act, omission, negligence or default of any prior landlord (other than to cure defaults of a continuing nature with respect to the maintenance or repair of the demised premises or the Property); provided, however, that Lender shall be liable and responsible for the performance of all covenants and obligations of landlord under the Lease accruing nom and after the date that it takes title to the Property; or

(b)      except as set forth in (a), above, liable for any failure of any prior landlord to construct any improvements;

(c)      subject to any offsets, credits, claims or defenses which Lessee might have against any prior landlord; or

(d) bound by any rent or additional rent which is payable on a monthly basis and which Lessee might have paid for more than one (1) month in advance to any prior landlord; or

(e) be liable to Lessee hereunder or under the terms of the Lease beyond its interest in the Property.

5.      Lessee agrees that, notwithstanding any provision herein to the contrary, the terms of the Mortgage shall continue to govern with respect to the disposition of any insurance proceeds or eminent domain awards, and any obligations of Lessor to restore the real estate of which the Premises are a part shall, insofar as they apply to Lender, be limited to insurance proceeds or eminent domain awards received by Lender after the deduction of all costs and expenses incurred in obtaining such proceeds or awards.

2

6.    Lessee hereby agrees to give to Lender copies of all notices of Lessor default(s) under the Lease in the same manner as, and whenever, Lessee shall give any such notice of default to Lessor, and no such notice of default shall be deemed given to Lessor unless and until a copy of such notice shall have been so delivered to Lender. Lender shall have the right to remedy any Lessor default under the Lease, or to cause any default of Lessor under the Lease to be remedied, and for such purpose Lessee hereby grants Lender such additional period of time as may be reasonable to enable Lessor to remedy, or cause to be remedied, any such default but in no event less than thirty (30) days. Lessee shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Lessor under the Lease with the same force and effect as though performed by Lessor. No Lessor default under the Lease shall exist or shall be deemed to exist (i) as long as Lender, in good faith, shall have commenced to cure such default within the above referenced time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, as long as Lender, in good faith, shall have notified Lessee that Lender intends to institute proceedings under the Security Documents, and thereafter, so long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. In the event of the termination of the Lease by reason of any default thereunder by Lessor, upon Lender's written request, given within thirty (30) days after any such termination, Lessee, within fifteen (15) days after receipt of such request, shall execute and deliver to Lender or its designee or nominee a new lease of the Premises for the remainder of the term of the Lease upon all of the terms, covenants and conditions of the Lease. Lender shall have the right, without Lessee's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or to exercise any other remedies under the Security Documents.

7.    Lessee hereby consents to the Assignment of Leases and Rents from Lessor to Lender in connection with the Loan. Lessee acknowledges that the interest of the Lessor under the Lease is to be assigned to Lender solely as security for the purposes specified in said assignments, and Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignments or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing or unless Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee becomes, the fee owner of the Premises. Lessee agrees that upon receipt of a written notice from Lender of a default by Lessor under the Loan, Lessee will thereafter, if requested by Lender, pay rent to Lender in accordance with the terms of the Lease.

8.    The Lease shall not be assigned by Lessee, modified, amended or terminated (except a termination that is permitted in the Lease without Lessor's consent) without Lender's prior written consent in each instance.

9.    Any notice, election, communication, request or other documents or demand required or permitted under this Agreement shall be in writing and shall be deemed delivered on the earlier to occur of (a) receipt or (b) the date of delivery, refusal or nondelivery indicated on the return receipt, if deposited in a United States Postal Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via a recognized commercial courier service providing for a

3

receipt, addressed to Lessee or Lessor, as the case may be, at the following address:

If to Lessee:
Sylvest Farms, Inc.
Post Office Box 250050
Montgomery, Alabama 36125-0050
Attention: Dean E. Falk, President/CEO

If to Lender:
Regions Bank
8 Commerce Street
Montgomery, Alabama 36104
Attention: Mr. Mike Solomon, Senior Vice President

10.    The term "Lender" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and their successors and assigns, and the terms "Lessee" and "Lessor" as used herein include any successor and assign of the named Lessee or Lessor herein, respectively; provided, however, that such reference to Lessee's or Lessor's successors and assigns shall not be construed as Lessor's consent to any assignment or other transfer by Lessee or Lessor.

11.    If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect, and shall be liberally construed in favor of Lender.

12.    Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of this termination, amendment, supplement, waiver or modification is sought.

This Agreement shall be construed in accordance with the laws of the state in which the Property is located.

The person executing this Agreement on behalf of Lessee is authorized by Lessee to do so and execution hereby is the binding act of Lessee enforceable against Lessee.

4

**IN WITNESS WHEREOF,** Lender and Lessee have duly executed this Agreement as of the date first above written.

**LESSEE:**

**SYLVEST FARMS, INC.**

**ATTEST:**

By: _____          By:  _____
Its:   Secretary                            Dean E. Falk
                                       Title:  President and Chief Executive Officer

**LESSOR:**

**HODGES BONDED WAREHOUSE, INC.**

**ATTEST:**

By:_____          By: _____
Its:   Secretary
                                       Title:   Chief Executive Officer

**LENDER:**

Regions Bank, an Alabama banking corporation

By:_____
Mike Solomon, as its Senior Vice President

The undersigned accepts and agrees to
the provisions of Paragraph 7 hereof:

**LESSOR:**

**HODGES BONDED WAREHOUSE, INC.**

By:_____
As its Chief Executive Officer

5

STATE OF ALABAMA
MONTGOMERY COUNTY

I, the undersigned, a Notary Public in and for said County and State, hereby certify that _____, whose name as _____ of Hodges Bonded Warehouse, Inc., an Alabama corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of said instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and official seal this ____ day of _____, 2005.

(NOTARIAL SEAL)                    _____
                                   Notary Public
                                   My commission expires_____

STATE OF ALABAMA
MONTGOMERY COUNTY

I, the undersigned, a Notary Public in and for said County and State, hereby certify that Dean E. Falk, whose name as President and Chief Executive Officer of Sylvest Farms, Inc., an Alabama corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this ____ day of _____, 2005.

(NOTARIAL SEAL)                    _____
                                   Notary Public
                                   My commission expires_____

6

STATE OF ALABAMA
MONTGOMERY COUNTY

     I, the undersigned, a Notary Public in and for said County and State, hereby certify that Mike Solomon, whose name as Senior Vice President of Regions Bank, an Alabama banking corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and official seal this _____ day of _____, 2005.


(NOTARIAL SEAL)

                      _____
                      Notary Public
                      My commission expires_____

7

# EXHIBIT A

## DESCRIPTION OF PROPERTY

P:\kph\Sylvest-ConAgra\Subordination, NonDistur, Attornment\Attornment.2.doc

8

## SCHEDULE 3.7

### PERMITS, LICENSES AND AUTHORIZATIONS

1. Alabama Department of Environmental Management State Indirect Discharge Permit, Permit Number IU 37-51-00107, issued May 23, 2006

2. Alabama Department of Environmental Management National Pollutant Discharge Elimination System General Permit, Permit Number ALG 15-0094, issued August 31, 2001

3. Alabama Department of Environmental Management National Pollutant Discharge Elimination System General Permit, Permit Number ALG 15-0095, issued August 31, 2001

4. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X006, issued November 6, 1990

5. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X007, issued June 9, 1992

6. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X008, issued June 9, 1992

7. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X009, issued August 17, 1992

8. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X010, issued July 8, 1993

9. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X011, issued October 24, 1996

10. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X012, issued September 16, 1999

11. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X013, issued March 5, 2003

12. Alabama Department of Environmental Management Air Permit, Permit Number 207-0004-X014, issued March 5, 2003

13. State of Alabama Air Pollution Control Commission Permit to Construct, Permit Numbers 2-07-0004-X001, 2-07-0004-X002, 2-07-0004-X003, and 2-07-0004-X004, issued September 8, 1976

14. State of Alabama Air Pollution Control Commission Permit to Operate, Permit Numbers 2-07-0004-Z001 and 2-07-0004-Z002, issued June 15, 1977

15. State of Alabama Air Pollution Control Commission Permit to Operate, Permit Numbers 2-07-0004-Z003 and 2-07-0004-Z004, issued June 15, 1977

16. State of Alabama Air Pollution Control Commission Temporary Permit to Operate, Permit Numbers 2-07-0004-Y001, 2-07-0004-Y002, 2-07-0004-Y003, and 2-07-0004-Y005, issued February 7, 1977

## SCHEDULE 3.8

### THREATENED OR PENDING LITIGATION,
### ADR, OR GOVERNMENT ACTION

Threatened or Pending Actions

See Annex 3.8 attached hereto.

Judgments, Orders, Writs, Injunctions or Decrees

None

## ANNEX 3.8

**Matter Name:**    *Joann Vincent v. Sylvest Farms, Inc.*
**Civil Action Number:** *CV-05-053 Talladega County Circuit Court*
**Our File Number:**    *35-019*
Status:    This case was settled on April 11, 2006 for the amount of $5,952.81, with medical benefits left open Settlement Hearing is not yet set due to Bob Lee's schedule.


**Matter Name:**    *Ricky T. Feagin v. Sylvest Farms, Inc.*

**Civil Action Number:** *CV-05-1018, Montgomery County Circuit Court*

**Supreme Court No.:** *2050053*

**Our File Number:**    *35-026*

Status:    We are currently waiting on a decision from the Supreme Court.


**Matter name:**    *Jacquelyn Culpepper v. Sylvest Farms*

**Civil Action Number:** *CV-05-251, Talladega County Circuit Court*

**Our File Number:**    *35-027*

Status:    There is a mediation set up for July 21, 2006 at 9:30 am. Neal Davis is the scheduled Ombudsman. No demand or offer has been made.


**Matter Name:**    *Ivin Watson  v. Sylvest Farm*

**Civil Action Number:** *CV-2005-1756, Montgomery County Circuit Court*

**Our File Number:**    *35-028*

Status:    Mr. Watson's attorney, Cathy Donohoe has demanded $7,500 to settle all issues including medicals. Mr. Watson's mediation is set for June 13, 2006. Neal Davis is the scheduled Ombudsman.


**Matter name:**    *Brenda Robinson v. Sylvest Farms, Inc.*

**Civil Action Number:** *CV-05-2745, Montgomery County Circuit Court*

**Our File Number:**    *35-033*

Status:    Deposition is scheduled for May 5th at Cathy Donohoe's office. Mediation is set June 13, 2006. No demand or offer has been made.. Neal Davis is the scheduled Ombudsman.

| | |
|---|---|
| *Matter Name* | *Jerome Gachett v. Sylvest Farms, Inc.* |
| *Civil Action Number:* | *CV-2005-2852, Montgomery County Circuit Court* |
| *Our File Number:* | *35-034* |
| Status: | Deposition is set for May 11, 2006 at Cathy Donohoe's office.  Ms. Donohoe has made a  of $ 5,000.00 to settle. |

| | |
|---|---|
| *Matter Name* | *Valencia King v. Sylvest Farms, Inc.* |
| *Civil Action Number:* | *CV-2005-2928, Montgomery County Circuit Court* |
| *Our File Number:* | *35-035* |
| Status: | Plaintiff's deposition has been taken. Mediation is set for June 20, 2006. Neal Davis is the scheduled Ombudsman.  No demand or offer has been made. |

| | |
|---|---|
| *Matter Name:* | *Tubie Adams v. Sylvest Farms* |
| *Civil Action Number:* | *CV-06-19, Butler County Circuit Court* |
| *Our File Number:* | *35-036* |
| Status: | Plaintiff's deposition is set for May 2, 2006 at Cathy Donohoe's office. No demand or offer has been made. |

| | |
|---|---|
| *Matter name:* | *Calotina Hooks v. Sylvest Farms* |
| *Civil Action Number:* | *CV-06-205, Montgomery County Circuit Court* |
| *Our File Number:* | *35-037* |
| Status: | Plaintiff's deposition is set for April 28, 2006 at Cathy Donohoe's office. No demand or offer has been made. |

| | |
|---|---|
| *Matter Name:* | *Jannie Osborne v. Sylvest Farms, Inc.* |
| *Civil Action Number:* | *None as of yet....* |
| *Our File Number:* | *35-038* |
| Status: | This case has not been filed with the Circuit court. Ms. Osborne has retained an attorney, Kenneth Shinbaum. No demand or offer has been made at this time. |

| | |
|---|---|
| *Matter Name:* | *Quarmine Stoutmire v. Sylvest Farms, Inc.* |
| *Civil Action Number:* | *CV-06-047 Butler County Circuit Court* |
| *Our File Number:* | *35-040* |
| Status: | This file was received April 12, 2006. Answer will be due May 10th There is no deposition set t this time. No demand or offer has been made. |

## SCHEDULE 3.9

### ENVIRONMENTAL LIABILITIES/NOTICES

None.

**SCHEDULE 3.10**

**ORGANIZED LABOR MATTERS**

(a) Agreement by and between Sylvest Farms, Inc. and the Retail, Wholesale and Department Store Union, effective October 3, 2005 to October 2, 2011

(b) Agreement by and between Sylvest Farms, Inc. and the Retail, Wholesale and Department Store Union, effective October 3, 2005 to October 2, 2011

(c) None

(d) None

**SCHEDULE 3.11**

**EMPLOYEE WELFARE AND PENSION BENEFIT PLANS**

1.  Sylvest Farms, Inc. 401(k) Retirement Plan for Non-Union Employees

2.  Sylvest Farms, Inc. 401(k) Retirement Plan for Union Employees

3.  Sylvest Farms, Inc. Cafeteria Plan

4.  Sylvest Farms, Inc. Life Insurance, Dependent Life Insurance, Accidental Death & Dismemberment Coverage, and Dependent Accidental Death & Dismemberment Coverage (for union employees only), Group Policy GP-890992, Issue Date June 25, 2004, Effective Date May 1, 2004

5.  Sylvest Farms, Inc. Life Insurance, Dependent Life Insurance, Accidental Death & Dismemberment Coverage, and Dependent Accidental Death & Dismemberment Coverage (for company-paid administrative employees only), Group Policy GP-890992, Issue Date June 25, 2004, Effective Date May 1, 2004

6.  Sylvest Farms, Inc. BlueCross BlueShield of Alabama Group Health Care Plan, effective June 1, 2005 *{Note: Sellers to provide a copy of this plan}*

7.  Sylvest Farms, Inc. BlueCross BlueShield of Alabama Group Dental Care Plan, effective June 1, 2005 *{Note: Sellers to provide a copy of this plan}*

## SCHEDULE 3.12

### INTELLECTUAL PROPERTY

(a)

1.    Sylvest Farms, Inc.

2.    Sylvest Foods Corporation

3.    Sylvest Farms Management Services, Inc.

4.    Superchicken

(b)    None

(c)    None

CH1\4529732.2

# EXHIBIT K

8/9/07

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC, ) | |
| An Alabama Limited Liability company ) | Case No. 07-cv-522-MHT |
| ) | |
| Plaintiff and Counterclaim-defendant, ) | |
| ) | Honorable Myron H. Thompson |
| v. ) | Honorable Terry F. Moorer |
| ) | |
| GENERAL ELECTRIC CAPITAL ) | |
| CORPORATION, ) | |
| A Delaware corporation, ) | |
| ) | |
| Defendant and Counterclaim-plaintiff. ) | |

## KOCH FOODS' RESPONSES TO GE CAPITAL'S FIRST SET OF INTERROGATORIES, DOCUMENT REQUESTS, AND REQUESTS TO ADMIT

Pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure, Koch Foods of Alabama LLC ("Koch Foods") hereby responds to the First Set of Interrogatories, Document Requests, and Requests to Admit (collectively, the "Requests") of General Electric Capital Corporation ("GE Capital") as follows:

### GENERAL OBJECTIONS AND RESPONSES

1.    Koch Foods objects to the Requests to the extent that they seek discovery or purport to impose duties and obligations beyond the scope of, or not required by, the Federal Rules of Civil Procedure.

2.    Koch Foods objects to the Requests to the extent that they seek information not relevant to the claim or defense of any party to this lawsuit or reasonably calculated to lead to the discovery of admissible evidence.

3.    Koch Foods objects to the Requests to the extent that they seek information that is proprietary, confidential, sensitive, or competitive in nature.

1

4.    Koch Foods objects to the Requests to the extent that they seek information covered by the attorney-client privilege or work product doctrine, or any other privilege or immunity, including common or joint defense and/or joint interest privileges.

5.    Koch Foods reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material or information produced. The production of any material or information does not constitute an admission by Koch Foods that such material or information is relevant to this action or admissible in evidence.

6.    Koch Foods objects to the Requests to the extent that they seek information generally available to the public and/or in the public domain.

7.    Koch Foods objects to the Requests to the extent that they purport to require Koch Foods to seek documents in possession of third parties.

8.    Inadvertent production of any material subject to the attorney-client privilege, prepared in anticipation of litigation or for trial, common or joint defense and/or joint interest privileges, or otherwise protected or immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to discovery of such material, its subject matter or information contained therein or of Koch Foods' right to objection to the use of such material during any later proceeding.

9.    Koch Foods objects to the Requests to the extent that they are redundant and duplicative.

10.    Koch Foods objects to the Requests to the extent that they contain vague and undefined terms.

11.    Koch Foods objects to Plaintiff's definition of "document" to the extent that it is broader than the definition of "document" contained in the Federal Rules of Civil Procedure.

2

12.     Koch Foods objects to the Requests to the extent that the Requests seek admissions that Koch Foods has not yet been able to ascertain.

13.     Koch Foods objects to the Requests to the extent that they seek admissions regarding wholly irrelevant matters.

14.     Koch Foods objects to the Requests to the extent that they relate to written documents which speak for themselves.

15.     Koch Foods objects to the Requests to the extent that they ask for the creation of documents. Koch Foods will only produce documents that currently exist.

16.     Koch Foods will make the responsive documents, including its electronic database, available for inspection at the law offices of Schiff Hardin LLP, 6600 Sears Tower, Chicago, Illinois 60606, or at such other location as the parties mutually agree.

17.     Koch Foods has just begun its investigation and all responsive and relevant documents may have not yet been discovered. Koch Foods reserves the right to supplement and/or amend its responses.

18.     Koch Foods objects to the Requests to the extent that they use terms "item of information" or "intended benefit" because these terms are vague and ambiguous.

## ANSWER TO INTERROGATORRIES
## SUBJECT TO GENERAL OBJECTIONS

1.     Identify each and every fact or item of information, if any, which you contend supports your claim, as stated in Count I of the Complaint, that the Equipment (or any item thereof has been "attached" to the Facility and was "intended" by Sylvest Farms to become "fixtures" of the Facility, including but not limited to the nature, method(s), actor(s), and act(s) constituting said alleged "attachment" and said alleged "inten[tion]," all facts or statements which you contend constitute evidence of said alleged "inten[tion]" of Sylvest Farms, and any and all consent(s) requested by Sylvest Foods (or anyone else) and/or provided by GE Capital

3

pursuant to Section 7(b) of the Master Lease (or otherwise) with respect to said alleged "attachment."

**ANSWER:** In addition to its General Objections, Koch Foods further objects to this Interrogatory to the extent that the answer to this Interrogatory can be better obtained from Sylvest Farms or through deposition questions. Koch Foods further objects to this Interrogatory to the extent that the term "Sylvest Foods" is ambiguous and undefined. Subject to the aforesaid objections, Koch Foods states that the Equipment has been bolted to the floor and integrated within the walls of the Facility. The Facility was built to accommodate the Equipment, and the Facility would not have been in its current form, had the Equipment not been attached to the Facility. The Equipment is permanently installed in the Facility and is impossible to remove the Equipment from the Facility without dismantling the Facility. Sylvest Farms had attached the Equipment to the Facility prior to the sale of the Facility to Koch Foods. GE Capital allowed Sylvest Farms to attach the Equipment to the Facility when GE Capital did not protest the way the Equipment was built into the Facility by Sylvest Farms, nor did it at any time demand that Sylvest Farms detach the Equipment from the Facility.


2.    Identify each and every fact or item of information, if any, which you contend supports your claim, as stated in Count II of the Complaint, that Koch Foods has not benefited by its use of the Equipment or any item thereof.

**ANSWER:** In addition to its General Objections, Koch Foods objects to this Interrogatory because it has never made such an allegation in its Complaint. Koch Foods further objects to this Interrogatory because it requires proof of a negative assertion.


4

3.       Identify each and every fact and item of information, if any, which you contend supports your claim, as stated in Count III of the Complaint, that Koch Foods possesses a possessory lien on the Equipment or any item thereof.

**ANSWER:** Subject to its General Objections, Koch Foods states that, in the event that it is determined that GE Capital owns the Equipment, GE Capital never paid Koch Foods for the storage costs of the Equipment that GE Capital has left behind in Koch Foods' Facility for more than one year after Koch Foods acquired the Facility and the Equipment, and began using some of the Equipment openly and with GE Capital's knowledge. GE Capital failed and refused to remove Equipment despite Koch Foods' demands. Koch Foods kept the Equipment safely in its Facility and took due care of the Equipment. GE Capital never requested that Koch Foods allow GE Capital to inspect the Equipment or take possession of the Equipment. It is customary for the owner of equipment to pay for storage costs to a party who takes due care of the owner's equipment, specially equipment as large-scale and sophisticated as the Equipment in this lawsuit. Because the Equipment occupied and continues to occupy a substantial portion of the Facility, Koch Foods incurs costs of storage and utilities related to the Equipment.

4.       Identify each and every fact or item of information, if any, which you contend supports your claim, as stated in Count IV of the Complaint, that GE Capital is liable to Koch Foods for storage of the Equipment or any item thereof.

**ANSWER:** Subject to its General Objections, Koch Foods states that the answer to this Interrogatory has been included in the answer to Interrogatory No. 3.

5

5.    To the extent not already specifically identified above, identify each and every

defense, if any, which you contend you possess to the claims of GE Capital as set forth in the

Counterclaim, and each and every fact or item of information, if any, which you contend

supports each such defense.

ANSWER: In addition to its General Objections, Koch Foods objects to this Interrogatory

because it is vague, overbroad, and unduly burdensome and because Koch Foods is still

investigating the allegations of the Counterclaim. Koch Foods further objects to this

Interrogatory to the extent that answer to this Interrogatory can be better obtained through

deposition testimony.

6.    Identify with particularity which items of the Equipment were in use or had

been used by Sylvest Farms at the time that Koch Foods took over operation of the Facility, and

identify with particularity the manner and nature of the installation of each such item of the

Equipment, the manner and nature of the subsequent use by Sylvest Foods of each such item of

the Equipment, and the total number of hours of use by Sylvest Farms of each such item of the

Equipment.

ANSWER: In addition to its General Objections, Koch Foods objects to this Interrogatory to the

extent that the answer to this Interrogatory can be better obtained from Sylvest Farms or through

deposition questions. Koch Foods further objects to this Interrogatory to the extent that the term

"Sylvest Foods" is ambiguous and undefined. Subject to the aforesaid objections, Koch Foods

states that, at the time that Koch Foods took over the Facility, the Chicken De-boner was in use

by Sylvest Farms and the Spiral Freezer was not in use. At the time that Koch Foods took over

the Facility, the Spiral Freezer and the Chicken De-boner were installed but the Conveyor was

6

never installed.

7.    Identify with particularity which items of the Equipment were not in use by Sylvest Farms at the time that Koch Foods took over operation of the Facility, and identify with particularity the manner and nature of any subsequent installation of each such item of the equipment by Koch Foods or others and the manner and nature of any subsequent use of each such item of the Equipment by Koch Foods or others.

**ANSWER:** In addition to its General Objections, Koch Foods objects to this Interrogatory to the extent that the term "manner and nature" of installation is vague and overbroad. Subject to the aforesaid objections, Koch Foods states that Koch Foods never installed any items of the Equipment.

8.    Identify with particularity the date(s) on which Koch Foods first began using each item of the Equipment, and identify the manner and nature of use(s) of each item of the Equipment and the total number of hours of use incurred by each item of the Equipment beginning with the date(s) on which Koch Foods took over operation of the Facility up through the present.

**ANSWER:** In addition to its General Objections, Koch Foods objects to the identification of total number of hours because it is irrelevant to this Lawsuit or unlikely to lead to the discovery of admissible evidence, and is unduly burdensome. Koch Foods further objects to the term of "manner and nature" of use(s) because the term is vague and overbroad. Subject to the aforesaid objections, Koch Foods states that Koch Foods has no information regarding the exact number of hours of its use of the Chicken De-boner. Koch Foods further states that, on or around June 1, 2006, it began using the Chicken De-boner, which had already been in use by Sylvest Farms before Koch Foods took over the Facility. Koch Foods used the Chicken De-boner

7

approximately 16 hours a day and five days a week for approximately ten months.

9.    Identify with particularity any and all persons responsible for or otherwise involved in the decision by Koch Foods to use the Equipment or any item thereof, stating the particular involvement of each such person, the title and job description of each such person, and the scope and nature of his or her involvement in such decision and the date(s) thereof.

ANSWER: Subject to its General Objections, Koch Foods states that Mark Kaminsky, CFO of Koch Foods, Inc., alone was involved in the decision by Koch Foods regarding the Equipment. His information can be found in the answer to Interrogatory No. 14.

10.    Identify with particularity any and all persons who installed or operated the Equipment or any item thereof during the period December 1, 2005, through present, stating each such person's employment or affiliation (Sylvest Farms, Koch Foods, or otherwise), the title and job description of each such person, whether such person assisted in the installation or operation of the Equipment or any item thereof, and the scope and nature of his or her involvement in such installation or operation and the date(s) thereof.

ANSWER: In addition to its General Objections, Koch Foods objects to this Interrogatory to the extent that the answer to this Interrogatory concerning Sylvest Farms' installation and operation of the Equipment can be better obtained through deposition questions or from Sylvest Farms. Koch Foods further objects to this Interrogatory to the extent it seeks information about every employee who operated the Equipment because this information is irrelevant to this Lawsuit or unlikely to lead to the discovery of admissible evidence, and is overbroad and unduly burdensome. Subject to the aforesaid objections, Koch Foods states that it never installed any

8

items of the Equipment.

11.    Identify with particularity any and all demands by Koch Foods to GE Capital that GE Capital remove the Equipment or any item thereof, including who made each such demand, to whom it was made, the manner in which it was communicated, the contents of the demand, the date of the demand, and any response(s) to the demand:

ANSWER: Subject to its General Objections, Koch Foods states that, on April 18, 2007, Eugene J. Geekie, Jr., attorney for Koch Foods, emailed Alexander Terras, attorney for GE Capital, requesting GE Capital to remove the Equipment from the Facility. Koch Foods further states that Mr. Geekie requested the same through regular voicemails and phone calls to Mr. Terras. The details of the communications of demand are produced according to the Requests for Documents.

12.    State the fair market value, at an orderly sale, of each item of the Equipment as of (a) the date that Koch Foods took over the Facility; (b) the date upon which Koch Foods began using the items of the Equipment (for those items which Koch Foods has used); and (c) present.

ANSWER: In addition to its General Objections, Koch Foods objects to the term "at an orderly sale" because it is vague and ambiguous. Koch Foods further objects to this Interrogatory to the extent that the answer to this Interrogatory can be better obtained from other sources or experts, because Koch Foods is not in the business of leasing or marketing equipment. Subject to the aforesaid objections, Koch Foods responds that it presently does not have any valuations for the Equipment.

13.    For each and every of your responses to the Requests to Admit (as stated

9

below) which is other than an unequivocal admission, identify with particularity the entirety of the factual and/or legal basis for each and every such response and the reason(s) for the absence of an unequivocal admission.

**ANSWER:** Subject to its General Objection, Koch Foods identifies:

a.    Request to Admit No. 8. The Rejection Order was entered on July 6, 2006.

b.    Request to Admit No. 9. No one at Koch Foods has advised GE Capital that it would not be necessary to relocate the Equipment at that time, or that it could remain stored at the Facility while GE Capital marketed it for resale.

c.    Request to Admit No. 10. Koch Foods began using the Chicken De-boner before the entry of the Rejection Order.

d.    Request to Admit No. 11. Koch Foods never used the Spiral Freezer.

e.    Request to Admit No. 12. Koch Foods began using the Chicken de-boner before the entry of the Rejection Order.

f.    Request to Admit No. 13. Koch Foods never used the Spiral Freezer.

g.    Request to Admit No. 14. Koch Foods never installed any items of the Equipment.

h.    Request to Admit No. 15. Koch Foods never used any items of the Equipment that had not been previously used by Sylvest Farms prior to the date that Koch Foods purchased the Facility.

i.    Request to Admit No. 16. Koch Foods never installed the Chicken De-boner.

j.    Request to Admit No. 17. Koch Foods never installed the Spiral Freezer.

k.    Request to Admit No. 19. Koch Foods never used the Spiral Freezer.

l.    Request to Admit No. 20: GE Capital knew that Koch Foods was using the

Chicken De-boner but never made any request that Koch Foods stop using the Chicken De-boner.

m. Request to Admit No. 21. This Request is based on a false premise because Koch Foods never used the Spiral Freezer.

n. Request to Admit No. 22. Koch Foods stopped using the Chicken De-boner around April 27, 2007.

o. Request to Admit No. 23. Koch Foods never used the Spiral Freezer.

p. Request to Admit No. 28. Koch Foods owns the De-boner because it is a fixture attached to the Facility that Koch Foods purchased.

q. Request to Admit No. 29. Koch Foods owns the Spiral Freezer because it is a fixture attached to the Facility that Koch Foods purchased.

r. Request to Admit No. 30. GE Capital knew that Koch Foods was using the Chicken De-boner but never asked Koch Foods to cease using it. GE Capital implicitly consented to Koch Foods' use of the Chicken De-boner.

s. Request to Admin No. 31. This Request is based on a false premise because Koch Foods never used the Spiral Freezer.

t. Request to Admit No. 32. GE Capital never requested that Koch Foods allow GE Capital to inspect or take possession of the Chicken De-boner. In fact, GE Capital refused and failed to remove the Chicken De-boner from the Facility despite Koch Foods' demands.

u. Request to Admit No. 33. GE Capital never requested that Koch Foods allow GE Capital to inspect or take possession of the Spiral Freezer. In fact, GE Capital refused and failed to remove the Spiral Freezer from the Facility despite Koch Foods' demands.

11

v.    Request to Admit No. 34. GE Capital never made such demands and Koch Foods never in any way prevented GE Capital from taking possession of the Chicken De-boner.

w.    Request to Admit No. 35. GE Capital never made such demands and Koch Foods never in any way prevented GE Capital from taking possession of the Spiral Freezer.

x.    Request to Admit No. 37. GE Capital implicitly consented to Sylvest Farms' attachment of the Equipment to its real property because GE Capital was aware of the way the Equipment is permanently installed in the Facility and because it is common in poultry industry to attach the poultry processing equipment to the processing facility, notwithstanding any provisions in the lease disallowing such attachment.

14.    Identify each and every person who has knowledge of the facts at issue in the Lawsuit and/or assisted in preparing your responses to these Interrogatories, Document Requests, and Requests to Admit or provided information set forth in your responses, and, with respect to each, state with particularity the extent and nature of such knowledge and/or participation.

**ANSWER:** Subject to its General Objections, Koch Foods identifies:

| Name | Subjects of Possible Discoverable Information |
|------|----------------------------------------------|
| Mark Kaminsky<br>Wayne Jones<br>Gary Davis<br>Lyman Campbell<br>Koch Foods, Inc.<br><br>c/o Eugene J. Geekie, Jr., Esq.<br>Schiff Hardin LLP<br>6600 Sears Tower<br>Chicago, Illinois 60606<br>(312) 258-5500 | Mr. Kaminsky has or may have information relating to the purchase of all the assets of Sylvest Farms, the interactions with GE Capital, the equipment, the lease, and the lawsuit.<br><br>Mr. Jones, Mr. Davis, and Mr. Campbell have or may have information relating to the installation, the use, and the operation of the equipment at issue. |
| Dean Falk,<br>a former Sylvest Farms employee<br>(address unknown) | Mr. Falk has or may have information relating to the equipment and the lease. |

15.     Identify each and every person whom you expect to call as a fact or expert witness at trial, and for each identify the subject matter on which the witness is expected to testify, the substance of the facts and opinions of such testimony, and the grounds for each such opinion.

**ANSWER:**  In addition to its General Objections, Koch Foods objects to this Interrogatory because this Interrogatory is premature.  Koch Foods will identify its witnesses when it makes a determination who it will call at trial, and pursuant to the procedure established by the Court.

## ANSWER TO DOCUMENT REQUESTS
### SUBJECT TO GENERAL OBJECTIONS

1.     Please produce any and all notices or demands received or sent by Koch Foods regarding the Equipment or any item thereof.

13

ANSWER: Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

2.    Please produce any and all communications, correspondence, and other documents exchanged between Koch Foods and GE Capital relating to the issues raised and/or allegations asserted in the Lawsuit.

ANSWER: Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

3.    Please produce any and all communications, correspondences, and other documents exchanged between Koch Foods and Sylvest Farms regarding the sale by Sylvest Farms of its assets; the sale by Sylvest Farms of the Facility; the Master Lease; the Equipment or any item thereof; the claims and defenses set forth in the Complaint, the Counterclaim, and/or the Affirmative Defenses; and/or the facts or issues raised in the Lawsuit.

ANSWER: Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

4.    Please produce any and all communications, correspondences, and other documents relating to the allegations and claims made in the Complaint, the Counterclaim, and/or the Affirmative Defenses.

ANSWER: Subject to its General Objections, Koch Foods will produce all documents

14

responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

5.    Please produce any and all communications, correspondences, and other documents constituting or relating to any request by Sylvest Farms or any other party that Sylvest Farms be permitted to "attach" the Equipment or any item thereof to or in any other personal or real property.

**ANSWER:** Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

6.    Please produce any and all communications, correspondences, and other documents constituting or relating to any response by GE Capital or any other party to any document described in the immediately preceding document request.

**ANSWER:** Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

7.    Please produce any and all communications, correspondences, and other documents evidencing or otherwise relating to the "inten[tion] of Sylvest Farms that the Equipment or any item thereof became "attached" to the Facility or otherwise became "fixtures" thereof.

**ANSWER:** Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent

15

that such documents exist.

8.    Please produce the entire file maintained by you or any or your agents or representatives with respect to the purchase of the Facility by Koch Foods.

**ANSWER:** In addition to its General Objections, Koch Foods objects to this Request because it is overbroad and burdensome.

9.    Please produce any and all appraisals, statements, itemizations, or other documents relating to the value of the Equipment or any item thereof at any time.

**ANSWER:** Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

10.    Please produce any and all records or other documents relating to installation of the Equipment or any item or part thereof, including but not limited to invoices, receipts, employee time records, employee time logs, production reports, etc.

**ANSWER:** In addition to its General Objections, Koch Foods objects to this response to the extent that the response to this Request can be better obtained from Sylvest Farms because Sylvest Farms installed the Equipment.

11.    Please produce any and all records or other documents relating to use or operation of the Equipment or any item thereof, including but not limited to invoices, receipts, employee time records, employee time logs, production reports, etc.

16

ANSWER: In addition to its General Objections, Koch Foods objects to this Request to the extent that the time records, time logs, production reports are irrelevant to this lawsuit, unlikely to lead the discovery of admissible evidence, burdensome, and proprietary. Subject to the aforesaid objections, Koch Foods will produce all relevant documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

12.    Please produce any and all documents referenced in or related to these Interrogatories and/or Requests to Admit and/or your answers thereto.

ANSWER: Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

13.    Please produce any and all witness statements, affidavits, or transcripts relating to the claims and/or defenses asserted by either party in the Lawsuit.

ANSWER: Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

14.    Please produce any and all documents relating to the claims and/or defenses asserted by either party to the Lawsuit not produced pursuant to the requests stated above.

ANSWER:

Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents

17

exist.

15.    Please produce any and all drafts of any of the documents referenced above.

ANSWER: Subject to its General Objections, Koch Foods will produce all documents responsive to this Request to the extent that they are in Koch Foods' possession, to the extent that such documents exist.

## ANSWER TO REQUESTS TO ADMIT
## SUBJECT TO GENERAL OBJECTIONS

1.    On or about December 29, 2005, GE Capital, as lessor, and Sylvest Farms, as lessee, entered into the Master Lease.

ANSWER: Koch Foods admits Request to Admit No. 1.


2.    Pursuant to the Master Lease, Sylvest Farms leased from GE Capital the Equipment, as listed on Schedule 001.

ANSWER: Koch Foods admits Request to Admit No. 2.


3.    On or shortly after the date of the Master Lease, Sylvest Farms took possession of the Equipment at the Facility.

ANSWER: Koch Foods cannot truthfully admit or deny this Request because Koch Foods does not have sufficient information to admit or deny the matter. Koch Foods has made a reasonable inquiry into the matter and the information known or readily obtainable by Koch Foods is insufficient to enable Koch Foods to admit or deny whether Sylvest Farms took possession of the Equipment on or shortly after the date of the Master Lease.

18

4.    True and correct copies of the Master Lease and Schedule 001 are attached to the Complaint.

**ANSWER:** Koch Foods admits Request to Admit No. 4 to the extent that GE Capital, the party to the Lease, admits that they are true and correct copies of the Master Lease and Schedule 001.

5.    On or about April 18, 2006, Sylvest Farms filed a voluntary petition for bankruptcy in the Bankruptcy Case.

**ANSWER:** Koch Foods admits Request to Admit No. 5.

6.    Also on or about April 18, 2006, Sylvest Farms, as seller, and Koch Foods, as buyer, entered into an Asset Purchase Agreement of that date, which provided for the sale of substantially all of the assets of Sylvest Farms. This sale included the Facility.

**ANSWER:** Koch Foods admits Request to Admit No. 6

7.    On or about May 26, 2006, the Bankruptcy Court approved the Asset Purchase Agreement, and, at that time, Koch Foods purchased substantially all of the assets of Sylvest Farms, including the Facility.

**ANSWER:** Koch Foods admits Request to Admit No. 7.

8.    On or about June 6, 2006, the Bankruptcy Court entered the Rejection Order. The Master Lease was rejected pursuant to Rejection Order.

**ANSWER:** Koch Foods denies Request to Admit No. 8.

19

9.    Following entry of the Rejection Order and the rejection of the Master Lease, Koch Foods advised GE Capital that it would not be necessary to relocate the Equipment at that time, and that it could remain stored at the Facility while GE Capital marketed it for resale.

ANSWER:  Koch Foods denies Request to Admit No. 9.

10.    Following the entry of the Rejection Order and the rejection of the Master Lease, Koch Foods began using the Chicken De-boner to its own intended benefit.

ANSWER:  Koch Foods denies Request to Admit No. 10.

11.    Following the entry of the Rejection Order and the rejection of the Master Lease, Koch Foods began using the Spiral Freezer to its own intended benefit.

ANSWER:  Koch Foods denies Request to Admit No. 11.

12.    Following entry of the Rejection Order and rejection of the Master Lease, Koch Foods began using the Chicken De-boner for the deboning of chicken.

ANSWER:  Koch Foods denies Request to Admit No. 12.

13.    Following entry of the Rejection Order and the rejection of the Master Lease, Koch Foods began using the Spiral Freezer for the freezing of chicken.

ANSWER:  Koch Foods denies Request to Admit No. 13.

14.    Koch Foods installed and made operational, either itself or through an agent, items of the Equipment which had not been installed at the time Koch Foods purchased the

20

Facility.

ANSWER: Koch Foods denies Request to Admit No. 14.

15.    Koch Foods has used for its own intended benefit items of the Equipment which had not been used by Sylvest Farms at the time Koch Foods purchased the Facility.

ANSWER: Koch Foods objects to the term "intended benefit" because it is vague. Subject to the aforesaid objection, Koch Foods denies Request to Admit No. 15.

16.    Koch Foods installed or had installed the Chicken De-boner or parts thereof.

ANSWER: Koch Foods object to the term "parts thereof" because it is vague and undefined. Subject to the aforesaid objection, Koch Foods denies Request to Admit No. 16.

17.    Koch Foods installed or had installed the Spiral Freezer or parts thereof.:

ANSWER: Koch Foods object to the term "parts thereof" because it is vague and undefined. Subject to the aforesaid objection, Koch Foods denies Request to Admit No. 17.

18.    Koch Foods has used the Chicken De-boner for its own intended benefit.

ANSWER: Koch Foods objects to this request because it is redundant and duplicative with respect to Request to Admit No. 12. Subject to the aforesaid objection, Koch Foods admits Request to Admit No. 18.

19.    Koch Foods has used the Spiral Freezer for its own intended benefit.

ANSWER: Koch Foods objects to this Request because it is redundant and duplicative with

21

respect to Request to Admit No. 13.  Subject to the aforesaid objection, Koch Foods denies

Request to Admit No. 19.


20.     The use of the Chicken De-boner by Koch Foods was and has been without the

consent or agreement of GE Capital.

ANSWER:  Koch Foods denies Request to Admit No. 20.


21.     The use of the Spiral Freezer by Koch Foods was and has been without the

consent or agreement of GE Capital.

ANSWER:  Koch Foods denies Request to Admit No. 21.


22.     Koch Foods continues to use the Chicken De-boner.

ANSWER:  Koch Foods denies Request to Admit No. 22.


23.     Koch Foods continues to use the Spiral Freezer.

ANSWER:  Koch Foods denies Request to Admit No. 23.


24.     Koch Foods has not made any payments to GE Capital for its use of the Chicken

De-boner.

ANSWER:  Koch Foods admits Request to Admit No. 24.


25.     Koch Foods has not made any payments to GE Capital for its use of the Spiral

Freezer.

ANSWER:  Koch Foods objects to this Request to the extent that it is based on a false premise

that Koch Foods used the Spiral Freezer. Subject to the aforesaid objection, Koch Foods admits Request to Admit No. 25 to the extent that it has not made any payments to GE.

26.     Koch Foods currently possesses the Chicken De-boner.

**ANSWER:** Koch Foods objects to this Request to the extent that the term "possess" is vague and undefined. Subject to the aforesaid objection, Koch Foods admits that the Equipment is located on the grounds of the Facility.

27.     Koch Foods currently possesses the Spiral Freezer.

**ANSWER:** Koch Foods objects to this Request to the extent that the term "possess" is vague and undefined. Subject to the aforesaid objection, Koch Foods admits that the Equipment is located on the grounds of the Facility.

28.     GE Capital owns the Chicken De-boner and has owned the Chicken De-boner at all times relevant hereto.

**ANSWER:** Koch Foods denies Request to Admit No. 28.

29.     GE Capital owns the Spiral Freezer and has owned the Spiral Freezer at all times relevant hereto.

**ANSWER:** Koch Foods denies Request to Admit No. 29.

30.     At no time has GE Capital consented to use of the Chicken De-boner by Koch Foods.

**ANSWER:** Koch Foods objects to this Request because it is redundant and duplicative with

23

respect to Request to Admit No. 20. Subject to the aforesaid objection, Koch Foods denies Request to Admit No. 30.

31.     At no time has GE Capital consented to use of the Spiral Freezer by Koch Foods.

ANSWER: Koch Foods objects to this Request because it is redundant and duplicative with respect to Request to Admit No. 21. Subject to the aforesaid objection, Koch Foods denies Request to Admit No. 31.

32.     GE Capital has made demand upon Koch Foods for return and surrender of the Chicken De-boner.

ANSWER: , Koch Foods denies Request to Admit No. 32.

33.     GE Capital has made demand upon Koch Foods for return and surrender of the Spiral Freezer.

ANSWER: Koch Foods denies Request to Admit No. 33.

34.     Despite demand, Koch Foods has failed to surrender the Chicken De-boner and instead has used it for its own purposes.

ANSWER: Koch Foods denies Request to Admit No. 34.

35.     Despite demand, Koch Foods has failed to surrender the Spiral Freezer and instead has used it for its own purposes.

ANSWER: Koch Foods denies Request to Admit No. 35.

24

36.    Sylvest Farms never requested the consent of GE Capital to attach any item of the Equipment to or in any other personal or real property.

**ANSWER:** Koch Foods cannot truthfully admit or deny this Request because Koch Foods does not have sufficient information to admit or deny the matter. Koch Foods has made a reasonable inquiry into the matter and the information known or readily obtainable by Koch Foods is insufficient to enable Koch Foods to admit or deny Request to Admit No. 36.

37.    GE Capital never gave its consent to Sylvest Farms for it to attach any item of the Equipment to or in any other personal or real property.

**ANSWER:** Koch Foods denies Request to Admit No. 37.

Dated: August _9_, 2007                    Respectfully submitted,

                                           SCHIFF HARDIN LLP

                                           By: _____
                                               Eugene J. Geekie, Jr.
                                               Zhiyuan "Mike" Xu
                                               6600 Sears Tower
                                               Chicago, IL 60606
                                               (312) 258-5500
                                               Attorney for Koch Foods

25

## VERIFICATION

Mark Kaminsky, having been duly sworn and on oath, states that he is authorized by Koch Foods of Alabama LLC to state that he has reviewed the aforesaid Responses to the Requests, and that based upon his personal knowledge and the records of Koch Foods, those Responses are true and correct to the best of his knowledge, information and belief.

Mark Kaminsky

SUBSCRIBED AND SWORN TO
before me, August __8th__, 2007

Notary Public

OFFICIAL SEAL
**BONNIE DIVIESTI**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-21-2010

26

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that copies of *Koch Foods' Responses to GE Capital's First Set of Interrogatories, Document Requests, and Requests to Admit* were served by e-mail and were mailed, first class U.S. mail, postage prepaid, this 4th day of August, 2007 to the following:

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
Email: tharris@reedsmith.com

*Counsel For Defendant*

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com
*Counsel For Defendant*

/s/ _____
        Zhiyuan Xu

CH2\ 1976343.8

27

# EXHIBIT L

ORIGINAL 1

1         IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4   KOCH FOODS OF ALABAMA,
    LLC, an Alabama limited liability
5   company,

6         Plaintiff and Counter-Defendant,

7   Vs.                          CIVIL ACTION NO.
                                 07-CV-522-MHT
8   GENERAL ELECTRIC CAPITAL
    CORPORATION, a Delaware
9   corporation,

10        Defendant and Counter-Plaintiff.

11

12              * * * * * * * * * * * *

13

14        **DEPOSITION OF DAVID BROMLEY**, taken pursuant to

15   stipulation and agreement before Pamela A. Wilbanks,

16   Certified Court Reporter, ACCR# 391, Registered

17   Professional Reporter and Commissioner for the State of

18   Alabama at Large, in the Law Offices of Bradley, Arant,

19   Rose & White, 401 Adams Avenue, Montgomery, Alabama, on

20   Tuesday, November 27, 2007, commencing at approximately

21   9:10 a.m.

22

23              * * * * * * * * * * * *

34

| | | |
|---|---|---|
| 1 | Q. | And the equipment was bolted into the floor, |
| 2 | | correct? |
| 3 | A. | That's correct. |
| 4 | Q. | And so when you took the bolts out, there was a |
| 5 | | hole? |
| 6 | A. | Yes. |
| 7 | Q. | And then you trucked or carried or however you |
| 8 | | got it out into the yard -- |
| 9 | A. | Uh-huh (positive response). |
| 10 | Q. | And then before you installed the D & F |
| 11 | | equipment that you bought in late 2005, you |
| 12 | | first resurfaced the floor? |
| 13 | A. | We fixed the floor.  That's correct. |
| 14 | Q. | Did you have to put more concrete in or just |
| 15 | | more of the epoxy finish? |
| 16 | A. | To fix that it was just redo the epoxy. |
| 17 | Q. | Was it the whole floor that was done or did you |
| 18 | | just do the spots where the holes were? |
| 19 | A. | We did the whole floor. |
| 20 | Q. | Did you first fill in the holes and then redo |
| 21 | | the whole floor? |
| 22 | A. | That's correct. |
| 23 | Q. | How old was the epoxy floor that was there when |

40

1   A.   Bolted to the floor.  Anchored to the floor.

2   Q.   Was it done in the same manner that the

3        previously removed equipment --

4   A.   Yes.

5   Q.   So there was a bolt that was bolted through

6        epoxy floor into the concrete floor underneath,

7        correct?

8   A.   That's correct.

9   Q.   And the installed deboning equipment was

10       installed in the same fashion as the previously

11       removed ConAgra equipment had been installed,

12       correct?

13   A.   That's correct.

14   Q.   Has the spiral freezer ever been used by

15       Sylvest?

16   A.   No.  It was never completed.  The installation

17       was never completed.

18   Q.   Has the spiral freezer ever been used by Koch

19       Foods?

20   A.   No, sir.

21   Q.   When you say it wasn't completed -- the

22       installation was not completed, in what way was

23       it not completed?

41

| | | |
|---|---|---|
| 1 | A. | Mike Leonard's part was complete.  He put the |
| 2 | | machine in.  The refrigeration was never tied to |
| 3 | | it and the electrical was never finished. |
| 4 | Q. | And why is that? |
| 5 | A. | Bankruptcy. |
| 6 | Q. | When you say bankruptcy, you mean the bankruptcy |
| 7 | | filed by Sylvest? |
| 8 | A. | By Sylvest, yes.  That's correct. |
| 9 | Q. | Were you involved in any way in the negotiation |
| 10 | | of the sale of the D & F equipment to Sylvest? |
| 11 | | Strike that. |
| 12 | | Were you involved in negotiating the price? |
| 13 | A. | Yes. |
| 14 | Q. | And you did this with Lenny -- |
| 15 | A. | Lenny Ferguson. |
| 16 | Q. | Were you involved in the documentation regarding |
| 17 | | that lease? |
| 18 | A. | I didn't have anything to do with it being |
| 19 | | leased, no, if that's what you're asking. |
| 20 | Q. | Thank you.  That was a bad question. |
| 21 | | You purchased it from D & F, but it was done |
| 22 | | in the form of a lease from GE Capital.  Is that |
| 23 | | your understanding? |

43

1        employees were hired by Koch; is that right?

2    A.    That's correct.

3    Q.    And did there ever come a time during that

4        transition from Sylvest to Koch where the

5        deboning line portion that was being used was

6        not being used?

7    A.    No.  It was pretty much seamless.  We just kept

8        going.

9    Q.    So you never missed a day or anything?

10   A.    No.

11   Q.    You just kept doing it every day and the

12       ownership changed, correct?

13   A.    That's correct.

14   Q.    Are you aware of any demands by Koch Foods that

15       GE Capital remove the deboning equipment?

16   A.    No.

17   Q.    Did you make any?

18   A.    No.

19   Q.    Have you ever talked to anybody from GE Capital?

20   A.    No.

21   Q.    Are you aware of any demands by Koch Foods that

22       GE Capital pay it rent for either the spiral

23       freezer or the deboning equipment?

44

1   A.   No.

2   Q.   How long did Koch Foods use the deboning

3        equipment?

4   A.   I'm trying to think of when we took it out.   I

5        would guess it was probably about nine months.

6   Q.   And when was it removed?

7   A.   About four months ago, something like that.

8        Three or four months ago.

9   Q.   So early summer of 2007?

10  A.   I would say that's right.

11  Q.   Was it continuously used by Koch Foods from the

12       time that Koch Foods took over from Sylvest in

13       the late spring or early summer of 2006 until

14       the time that it was removed nine or ten months

15       later?

16  A.   Yes.

17  Q.   Was any rent paid by Koch Foods to GE for that

18       equipment?   Do you know?

19  A.   I do not know.

20  Q.   I want to talk to you about the decision to

21       remove the equipment, not the actual removal --

22       we'll get to that -- but the decision to remove

23       it.   When did you first learn that Koch Foods

50

1 Q. And so to remove them, they had to be unwelded

2   back to their original state, correct?

3 A. They would be cut apart to where they were --

4   where we could handle them to get them out of

5   the plant.

6 Q. And they were unbolted from the floor?

7 A. That's correct.

8 Q. And then what was done with it?

9 A. They were picked up and taken out, and we put

10   them in the yard.

11 Q. And at that time you already had the replacement

12   equipment on site?

13 A. Yes.

14 Q. And who manufactured that?

15 A. Fabco.

16 Q. They are the millwrights.  Who is the

17   manufacturer of the replacement equipment?

18 A. Fabco.

19 Q. Still Fabco?

20 A. Yeah.  They do the same thing.

21 Q. So you replaced the D & F equipment with Fabco

22   equipment?

23 A. That's correct.

51

1  Q.  Do you know how much that cost?

2  A.  No, sir.

3  Q.  Do you know how much the installation cost and

4      the deinstallation cost?

5  A.  That was all figured in -- They did a blanket

6      price, but I don't recall what it was.

7  Q.  I see.

8          After the D & F equipment was removed, there

9      were holes in the floor, right?

10 A.  Excuse me?

11 Q.  After the D & F equipment was removed, there

12     were holes in the floor, correct?

13 A.  That's correct.

14 Q.  And what was done about that?

15 A.  Some of the equipment sat right back over some

16     of it, and then the others we had to come back

17     and patch because water would puddle in it.

18 Q.  When you say some of the equipment, some of the

19     replacement equipment sat over some of those

20     holes.  Those were never repaired?

21 A.  Not if they sat right back in the same holes.

22 Q.  But then there are other holes that remained

23     exposed, correct?

52

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | And when you say patched, you would fill in the |
| 3 | | concrete then and put epoxy on it? |
| 4 | A. | Most of the damage is in the epoxy.  It's not |
| 5 | | all the way down in the concrete. |
| 6 | Q. | And so there was an epoxy patch put there? |
| 7 | A. | That's correct. |
| 8 | Q. | And the floor was not resurfaced, correct -- |
| 9 | A. | No. |
| 10 | Q. | -- the whole floor? |
| 11 | A. | No. |
| 12 | Q. | So it wasn't like when the ConAgra equipment was |
| 13 | | removed, correct? |
| 14 | A. | That's correct. |
| 15 | Q. | And, again, this is all done -- Strike that. |
| 16 | | This was done in two weekends, correct? |
| 17 | A. | Yes. |
| 18 | Q. | Was GE given notice of this removal beforehand? |
| 19 | A. | I do not know. |
| 20 | Q. | Was it given -- Do you know if it was ever given |
| 21 | | notice? |
| 22 | A. | No.  I don't know. |
| 23 | Q. | Is all of the D & F equipment currently sitting |

# EXHIBIT M

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| SYLVEST FARMS, INC., et al.,[1] | : | CASE NO. 06-40525 |
| | : | through 06-40527 |
| Debtors. | : | |
| | : | JOINTLY ADMINISTERED |

## DEBTORS' MOTION FOR ENTRY OF ORDER AUTHORIZING THE REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS

Sylvest Farms, Inc., Sylvest Foods Corporation, and Sylvest Farms Management Services, Inc., debtors and debtors-in-possession (collectively, the "Debtors"), by and through their attorneys, Baker & Hostetler LLP, hereby file Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Motion") and respectfully aver in support thereof as follows:

### JURISDICTION

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Application is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. §§ 105, 362 and 365.

### BACKGROUND

2.      On April 18, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      The Debtors continue to operate their businesses and manage their assets as

---

[1] The Debtors in these jointly administered chapter 11 cases also include Sylvest Foods Corporation, Case No. 06-40526, and Sylvest Farms Management Services, Inc., Case No. 06-40527. The Debtors' cases are being jointly administered pursuant to the Final Order Granting Joint Administration of Cases (Docket No. 77) entered on April

(continue)

debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.     On May 3, 2006, an Official Committee of Unsecured Creditors (the "Committee") was formed in these cases.

5.     No trustees or examiners have been appointed in these bankruptcy cases.

6.     The Debtors were in the business of producing, processing and marketing high quality poultry products. The Debtors employed approximately 1,500 individuals and, in each of their last two fiscal years, had annual sales of in excess of $190,000,000.

7.     Even though people do not contract Avian Influenza (commonly referred to as the "bird flu") by consuming cooked poultry products, the Debtors' current financial difficulties are largely the result of historically low commodity pricing for chicken due to adverse global consumer reaction to the bird flu. At the time when the bird flu concerns began to impact the market, the Debtors were in the process of restructuring their businesses to reduce dependency on commodity pricing.

8.     On May 26, 2006, the Bankruptcy Court entered the Order on Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363 and 365 for Order Authorizing (I) Sale of Certain Assets of the Estate Free and Clear of Liens, Claims and Interests, (II) Approval of Designation of Rights Agreement and (III) Sale, Assumption and Assignment of Certain Leases and Executory Contracts (Docket No. 294) (the "Sale Order"). Consistent with the Sale Order, on June 1, 2006, the Debtors sold substantially all of their assets to Koch Farms of Alabama, LLC and Koch Foods of Alabama, LLC (the "Sale").

## RELIEF REQUESTED

9.     By this Motion and for the reasons set forth below, the Debtors respectfully

---

(continued)
27, 2006.

2

request entry of an order (i) pursuant to section 365(a) of the Bankruptcy Code, authorizing the rejection of the contracts listed on Exhibit "A," and lifting the automatic stay to allow equipment lessors to retrieve their equipment; and (ii) pursuant to section 1113 of the Bankruptcy Code, authorizing the rejection of the Agreement by and between Sylvest Farms, Inc. and the Retail, Wholesale and Department Store Union (the "Collective Bargaining Agreement").

10.    The Debtors believe that certain of these contracts may not be executory, but are filing this motion in an abundance of caution.

## REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES SHOULD BE APPROVED

11.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The purpose behind allowing the assumption or rejection of executory contracts is to permit the debtor-in-possession to use valuable property of the estate or to renounce title to and abandon burdensome property. 2 Collier on Bankruptcy ¶ 365.0111 (15th ed. 1993).

12.    In considering a motion to assume or reject an executory contract, a bankruptcy court "should examine [the] contract and the surrounding circumstances" and ascertain whether the debtor has used its "best 'business judgment' to determine if [the contract] would be beneficial or burdensome to the estate." In re Orion Pictures Corp. 4 F. 3d 1095, 1099 (2d Cir. 1993).

13.    The business judgment test affords the trustee or debtor broad discretion. Approval of the trustee or debtors' decision to reject is only withheld if the debtors' judgment is clearly erroneous, a gross abuse of discretion, or is in bad faith.  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985) (approval withheld only if clearly erroneous); Lubirizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal

3

Finishers, Inc.), 756 F.2d 1043, 1047 (4th Cir. 1985) (approval withheld only if bad faith or gross abuse of discretion).

14.    In the instant case, the Debtors have sold all of their assets and no longer have a need for the referenced unexpired leases and executory contracts. Keeping these leases and contracts would be a burden on the estate. In view of the foregoing, the Debtors' determination to reject the referenced contracts is the result of sound business judgment and should be approved by this Court pursuant to Section 365(a) of the Bankruptcy Code.

15.    The Debtors request that this Court approve the rejection of the referenced contracts by the Debtors effective as of the date of this Motion. The Debtors further request that the Court lift the automatic stay so as to allow equipment lessors to retrieve their property.

16.    The facts supporting rejection of the referenced contracts demonstrate the Company's sound business judgment in determining to reject the referenced contracts. Thus, Debtors submit that Court authorization of the rejection of the referenced contracts is in the best interest of their estates and creditors.

## REJECTION OF THE COLLECTIVE BARGAINING AGREEMENT SHOULD BE APPROVED

17.    Sylvest Farms, Inc., entered into the Collective Bargaining Agreement with the Retail, Wholesale and Department Store Union, affiliated with the Alabama & Mid-South RWDSU Council, consisting of the bargaining unit employees of Sylvest Farms, Inc. at its plant located at Montgomery, Alabama (the "Union"), effective October 3, 2005 to October 2, 2011. The Debtors believe that they were current on all obligations arising under and related to the Collective Bargaining Agreement on the Petition Date, and at all times up to the closing of the sale.

18.    A debtor in a chapter 11 case is permitted to reject collective bargaining agreements pursuant to Section 1113 of the Bankruptcy Code which provides that "the debtor in

4

possession ... may assume or reject a collective bargaining agreement only in accordance with the provisions of this section."

19.     Section 1113(b) of the Bankruptcy Code provides as follows:

> (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section trustee" shall include a debtor in possession), shall—

>> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated failure and equitable; and

>> (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

> (2) During the period beginning on the date of the making of a proposal provided for in paragraphs (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

20.     As a result of the Sale, the Debtors have made a proposal to the union concerning a modification to the Collective Bargaining Agreement consistent with the language of Section 1113 of the Bankruptcy Code. See e.g., In re GF Corporation, 115 B.R. 579, 585 (Bankr. N.D.Ohio 1990) ("In addition, § 1114, like its cousin, § 1113, does not contemplate a liquidating Chapter 11 plan, which is undoubtedly permitted under the Code.") opinion Vacated in part on Reconsideration, 120 B.R. 421 (modifying holding to allow for payment of retiree benefits pursuant to compromise). See also In re Ionosphere Clubs, Inc., 134 B.R. 515, 522 (Bankr. S.D.N.Y. 1991) (interpreting similar language in Section 1114 of the Bankruptcy Code and stating that "[i]t is evident from the statute itself that Congress glossed over the fact that while

5

chapter 11 cases are usually nonliquidating rehabilitative reorganizations, this is not always, or necessarily, the case. *See 11 U.S.C. § 1123(b)(4)* (liquidation of all or substantially all of the property of the estate). Where a moribound debtor, like Eastern, is liquidating under Chapter 11, "necessary to permit the reorganization of the debtor," construed literally, does not provide a meaningful standard for this Court to apply."). Under the circumstances, the Debtors have made the only viable proposal – that the Collective Bargaining Agreement be consensually terminated. Rejection of the Collective Bargaining Agreement is in the best interests of creditors.

21. As a result, this Court should approve the rejection of the Collective Bargaining Agreement.

WHEREFORE, the Debtors respectfully request that this Court enter an order (i) allowing the Debtors to reject the contracts listed on Exhibit "A" and lifting the automatic stay to permit equipment lessors to take their property; (ii) rejecting the Collective Bargaining Agreement; and (iii) granting such other and further relief as is just and proper under the circumstances.

Dated this 15th day of June, 2006.          Respectfully submitted,

By:    /s/ Richard A. Robinson
       Richard A. Robinson, Esquire
       Florida Bar No. 0041238
       Eric S. Golden, Esquire
       Florida Bar No. 0146846
       BAKER & HOSTETLER LLP
       Post Office Box 112
       Orlando, Florida 32802-0112
       Telephone: (407) 649-4000
       Telecopier: (407) 841-0168
       Email: rrobinson@bakerlaw.com
       **Counsel for Debtors and**
       **Debtors-in-Possession**

6

And

/s/ Thomas G. Mancuso
Thomas G. Mancuso, Esquire
Alabama Bar No.: 6179-053T
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, Alabama  36117
Telephone:  (334) 481-1800
Telecopier:  (334) 481-1810
E-mail: tgm@mancusofranco.com
**Special Counsel for**
**Debtors and Debtors-in-Possession**

## CERTIFICATE OF SERVICE

This is to certify that on the 15th day of June, 2006, I served a true and correct copy of the foregoing *Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts* upon all parties listed on the attached Master Service List and to all parties to contracts listed on the attached Service List – Parties to Contracts via First Class U.S. Mail, postage prepaid, and via the Court's electronic filing system.

/s/ Richard A. Robinson
Richard A. Robinson

BARRISTERS,  79689, 00001, 501085323.2, Motion to Reject Leases and Unxecutory Contracts

# EXHIBIT "A"

Sylvest Farms - Leases and Service Agreements to be
Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| RETAIL, WHOLESALE AND DEPARTMENT STORE UNION<br>1901 10TH AVENUE<br>BIRMINGHAM, AL 35205 | Agreement by and between Sylvest Farms, Inc. and the Retail,<br>Wholesale and Department Store Union, effective October 3, 2005 to<br>October 2, 2011, and all related Contracts and Agreements. | |
| GENERAL ELECTRIC CAPITAL CORPORATION<br>PO BOX 740423<br>ATLANTA, GA 30374-0423 | Master Lease Agreement, undated between General Electric Capital<br>Corporation and Sylvest Farms, Inc. | 4171238-001 |
| DSI PORTIONING SYSTEM<br>PO BOX 98635<br>CHICAGO, IL 60693-8635 | DSI Portioning System Lease Agreement, Lease Number 121905-1522-<br>714, effective May 1, 2005 between FMC FoodTech, Inc. (acting<br>through and by its Stein-DSI business) and Sylvest Farms, Inc. | |
| THE CIT GROUP(ADT)<br>PO BOX 371967<br>PITTSBURGH, PA 15250-7967 | Master Lease Agreement #227110, between CIT Technology<br>Financing Services, Inc. and Sylvest Farms, Inc including Equipment<br>Schedule #177734 to Master Lease Agreement #227110 | |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between<br>DeLage Landen Financial Services, Inc and Sylvest Farms, Inc.<br>regarding one new Nissan model PL30LP, Serial # PL01-9G0041 | 200071 |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between<br>DeLage Landen Financial Services, Inc and Sylvest Farms, Inc.<br>regarding one used Nissan model E35Y, Serial # CUM01-002674 | 329914 |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between<br>DeLage Landen Financial Services, Inc and Sylvest Farms, Inc.<br>regarding one new Nissan model WPN-60, Serial # 1W16-9300357 | 193933 |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed September 24, 2003, between<br>DeLage Landen Financial Services, Inc and Sylvest Farms, Inc.<br>regarding two new Nissan Model WPN40, serial nos. 44-42239 and 44-<br>32240. | |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between<br>DeLage Landen Financial Services, Inc and Sylvest Farms, Inc.<br>regarding one used Nissan model RPN60, Serial # 1W26-9301811 | 344057 |
| CAROLINA HANDLING(RAYMOND)<br>PO BOX 890352<br>CHARLOTTE, NC 28289-0352 | Equipment Quotation Quote No. JM0614Q between Carolina Handling<br>LLC and Sylvest Farms, Inc., dated February 21, 2006 | 138262 |
| AIRGAS<br>DEPT 0822 P.O. BOX 120001<br>DALLAS, TX 75312-0822 | Equipment Lease Agreement by and between Airgas Carbonic, Inc.<br>and Sylvest Foods Corporation re: (1) one 50 ton horz receiver and (2)<br>one 28 kw vaporizer | |
| BERNEY OFFICE SOLUTIONS<br>PO BOX 210699<br>MONTGOMERY, AL 36121-0699 | Flex Copy Agreement Agreement No. 6729911 by and between<br>Berney Office Solutions and Sylvest Farms | |
| BERNEY OFFICE SOLUTIONS<br>PO BOX 210699<br>MONTGOMERY, AL 36121-0699 | Total Copy Agreement, Agreement # 6729911020, among Berney<br>Office Solutions and Sylvest Farms and General Electric Capital<br>Corporation | |
| ALABAMA POWER<br>PO BOX 242<br>BIRMINGHAM, AL 35292 | Alabama Power Company Electric System Lease Agreement, made<br>April 3, 2005, by and between Alabama Power Company and Sylvest<br>Farms, Inc. | |
| LOGAN'S ROADHOUSE<br>3011 ARMORY DRIVE, STE 300<br>NASHVILLE, TN 37204 | Supplier Request Forms (2: (1) V-Wings; (2) Fresh 6 oz and 8 oz<br>Boneless Chicken Breast) between Logan's Roadhouse and Sylvest<br>Farms for the period starting January 1, 2006 and ending December<br>31, 2007 | |

[1] Inclusion of any particular agreement on this list shall not be construed as an admission by the Debtors that any such agreement is an executory
contract or unexpired lease and the Debtors reserve their rights to take any position with respect to all agreements listed herein.

Sylvest Farms - Leases and Service Agreements to be Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| ALABAMA POWER<br>PO BOX 242<br>BIRMINGHAM, AL 35292 | Alabama Power Company Electric System Lease Agreement, made April 3, 2005, by and between Alabama Power Company and Sylvest Farms, Inc. | |
| LOGAN'S ROADHOUSE<br>3011 ARMORY DRIVE, STE 300<br>NASHVILLE, TN 37204 | Supplier Request Forms (2: (1) V-Wings; (2) Fresh 6 oz and 8 oz Boneless Chicken Breast) between Logan's Roadhouse and Sylvest Farms for the period starting January 1, 2006 and ending December 31, 2007 | |
| QSI<br>P O BOX 531<br>SIGNAL MOUNTAIN, TN 37377 | This Service Agreement, dated May 1, 1998, made and entered into by and between STELLAR MANAGEMENT GROUP, INC. d/b/a QSI, a Tennessee corporation and Sylvest Farms, Inc., and Alabama Corporation, whereas QSI will provide the Sylvest the cleaning and sanitation services for the procession operations at the plant for 24 months continued on a year-to-year basis by agreement. | |
| ASHLAND SPECIALTY CHEMICAL COMPANY<br>DREW INDUSTRIAL PO BOX 102433<br>ATLANTA, GA 30368-2433 | Treatment Program Services Agreement, made as fo March 15, 2005 by and between DREW INDUSTRIAL DIVISION, ASHLAND SPECIALTY CHEMICAL COMPANY, a division of Ashland, Inc., a Kentucky corporation and SYLVEST FARMS that will have an initial term of 3 years, starting on the Effective Date. | |
| GEORGIA PACIFIC<br>PO BOX 102574<br>ATLANTA, GA 30368-2574 | Corrugated Partnership Proposal between Sylvest Farms, Inc. and Georgia Pacific for the period July 1, 2005 through June 20, 2007. | |
| GEORGIA PACIFIC<br>PO BOX 102574<br>ATLANTA, GA 30368-2574 | Equipment Lease Contract, dated May 31, 2005, between GEORGIA PACIFIC CORPORATION and SYLVEST FARMS, INC. for equipment as described: one (1) SWF Model TF 400V, Tray-Matic Machine Serial No. 050365-01. Term of lease will be 3 years beginning July 1, 2005 and ending June 30, 2008. | |
| ALABAMA POWER<br>PO BOX 242<br>BIRMINGHAM, AL 35292 | Contract for Electric Service entered into the 15th day of September, 2005 between Alabama Power Company and SYLVEST FOODS CORPORATION, with a term of 5 years from the commencement of electric service under the contract. | |
| CROSSTOWN<br>PO BOX 849<br>BAINBRIDGE, GA 39818 | Lease Agreement to Rent Office Space, entered into on 2nd day of May, 2005 by and between Crosstown LLC and Sylvest Farms for 36 months. Office space is located at 220 River Street, Bainbridge, GA. | |
| GREATER BAY CAPITAL<br>ACCOUNTS RECEIVABLE P O BOX 7777<br>SAN FRANCISCO, CA 94120-7777 | Equipment Lease, dated July, 7, 2003 and with a term for 36 months, between Greater Bay Capital and Sylvest Farms, Inc. for equipment as described: 1 Kalmar AC Pallet Truck WF45C, Serial No. 33174001 | 200527409 |
| GREATER BAY CAPITAL<br>ACCOUNTS RECEIVABLE P O BOX 7777<br>SAN FRANCISCO, CA 94120-7777 | Equipment Lease, dated July, 7, 2003 and with a term for 36 months, between Greater Bay Capital and Sylvest Farms, Inc. for equipment as described: 1 Kalmar AC Pallet Truck WF45C, Serial No. 33174001 | 200527409 |
| CAROLINA HANDLING(RAYMOND)<br>PO BOX 890352<br>CHARLOTTE, NC 28289-0352 | Equipment Master Lease Agreement, dated February 21, 2006 and with a term of 36 months, between Sylvest Farms, Inc and Raymond Leasing Corporation for Poultry Package Models 111 and 112. | 138261 |
| AIRGAS DRY ICE<br>3700 CRESTWOOD PARKWAY, SUITE 200<br>DULUTH, GA 30096 | Dry Ice Sales Agreement, dated March 23, 2003 and with a term of 3 years, by and between AIRGAS CARBONIC, INC., d.n.a.Airgas Dry Ice and Sylvest Farms, Inc. Upon expiration of initial term, contract will continue on a year-to-year by agreement unless writen notice is provided. | |
| AIRGAS CARBONIC INC.<br>3700 CRESTWOOD PARKWAY, SUITE 200<br>DULUTH, GA 30096 | Liquid $CO_2$ Purchase Agreement, dated April 24, 2003 and with a term of three (3) years, by and between Airgas Carbonic, Inc. and Sylvest Poultry, Inc. whose address is 3500 Western Blvd., Montgomery, AL 36125. Upon expiration of initial term, contract will continue on a year-to-year basis by agreement unless writen notice is provided. | |
| ARAMARK<br>PO BOX 10722<br>BIRMINGHAM, AL 35202-0000 | Service Agreement for Uniforms between Aramark Uniform Services and Sylvest Farms, dated 3/12/04 and with a term of 36 months. | |

Sylvest Farms - Leases and Service Agreements to be
Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| TRIPLE POINT<br>PO BOX 36423<br>BIRMINGHAM, AL 35236 | Service Agreement (to provide materials for the cooling tower system), with a start date of January 28, 2005 for a period of one year between Triple Point Industries, LLC and Sylvest Poultry for the Montgomery plant. | |
| TRIPLE POINT<br>PO BOX 36423<br>BIRMINGHAM, AL 35236 | Service Agreement (to provide materials for the cooling tower system), between Triple Point Industries, LLC and Sylvest Poultry for the Sylacauga plant. | |
| SILENT SENTRY<br>311 W. MENDEL PKWY<br>MONTGOMERY, AL 36117 | Service Agreement (to monitor fire alarm system), dated January 10, 2006 and with a term of 24 months, by and between Silent Sentry Electronic Security, Inc. and Sylvest Foods. | MTG |
| US SECURITY<br>PO BOX 931703<br>ATLANTA, GA 31193 | Security And/Or Patrol Service Agreement dated January 27, 2006, by and between US Security and Sylvest Farms. | FOODS |
| US SECURITY<br>PO BOX 931703<br>ATLANTA, GA 31193 | Security And/Or Patrol Service Agreement by and between US Security and Sylvest Foods. | FOODS |
| CSX<br>P.O.BOX 532652<br>ATLANTA, GA 30353-2652 | Service Agreement: Amendment 3 to Contract: Sylvest Farms, Inc. CSX Transporation, Inc. and Alabama & Tennessee River Railway LLC, Chicago, Ft Wayne & Eastern and Western Railway agree to amend Contract which has been in effect since December 2, 1992. Amendment will have an effective date of October 1, 2005, ending on September 30, 2006. | 40065654 |
| BARLOWORLD HYSTER<br>PO BOX 402473<br>ATLANTA, GA 30384-2473 | Equipment Lease Agreement with Maintenance between Barloworld Fleet Leasing, LLC and Sylvest Farms, Inc, dated May 15th 2002, and with a terms of 48 months.  Equipment delivered and located at 3500 Western Blvd., Mongomery, AL.  Upon expiration of initial term, contract will continue on month-to-month basis by agreement until written notice provided. | 40041662 |
| BARLOWORLD HYSTER<br>PO BOX 402473<br>ATLANTA, GA 30384-2473 | Equipment Lease Agreement with Maintenance between Barloworld Fleet Leasing, LLC and Sylvest Farms, Inc, dated May 15th 2002, and with a terms of 48 months.  Equipment delivered and located at Box 109 Tyson Rd, Hope Hull AL 30013.  Upon expiration of initial term, contract will continue on month-to-month basis by agreement until written notice provided. | 40041662 |
| CRYSTAL SPRINGS OF ALABAMA<br>P O BOX 11786<br>BIRMINGHAM, AL 35202-1786 | Customer Agreement (water cooler lease), dated February 24, 2006 and with a term of month-to-month, between Sylvest Farms Food and Crystal Springs of Alabama. | |
| PITNEY BOWES<br>PO BOX 856460<br>LOUISVILLE, KY 40285-6460 | Equipment Lease (for mailing machine), dated January 21, 2003 with 21 quarterly payments, by and between Pitney Bowes Credit Corporation and Sylvest Farms, Inc. | |
| BRIGHT COOP<br>PO BOX 635001<br>NACOGDOCHES, TX 75963-5001 | Equipment Lease, dated May 22, 2003 and with a term of 28 months, by an between Sylvest Farms, Inc. and Bright Coop, Inc.  The lease pertains to: K-D Manitou, M30-2H Poultry, and Serial No. 181966. Contract has been extended another 8 months per letter dated January 20, 2006. | |
| EMBREX<br>P. O. BOX 890379<br>CHARLOTTE, NC 28289-0379 | Inovoject Egg Injection/Egg Remover Sytem Lease, dated December 7, 2004 and with a through January 31, 2008, by and between Embrex and Sylvest Farms, Inc. | |

**Sylvest Farms - Leases and Service Agreements to be Rejected**

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| NOMESS<br>PO BOX 242181<br>MONTGOMERY, AL 36124 | Janitorial Service & Hard Floor Care Program, letter proposal dated August 4, 2004 and with a term of one year, by and between Sylvest Farms, Inc. and Nomess Commercial Cleaning Services. Upon expiration of the initial term, contract will continue by agreement until either party provides a 30 day notice of cancellation. | |
| List of Breeders Provided Separately | Breeder Hen Agreements by and between Sylvest Farms, Inc and the Independent Contractor Producers identified on Attachment 1. | |
| List of Broilers Growers Provided Separately | Poultry Production Agreements by and between Sylvest Farms, Inc. and Independent Contractor Producers identified on Attachment 2. | |
| List of Pullet Flock Growers Provided Separately. | Pullet Flock Agreements by and between Sylvest Farms, Inc. and Independent Contractor Growers identified on Attachment 3. | |

## ATTACHMENT 1 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 330 | COLVIN FARMS<br>36036 BOYKIN ROAD<br>RED LEVEL, AL. 36474 |
| 333 | FLOYD FARMS<br>6071 WORLY ROAD<br>RED LEVEL, AL. 36474 |
| 334 | FLOYD FARMS<br>6071 WORLEY RD.<br>RED LEVEL, AL 36474 |
| 335 | F & S FARMS PARTNERS<br>31214 FOLEY RD.<br>RED LEVEL, AL 36474 |
| 336 | F&S FARMS PARTNERS<br>31214 FOLEY RD.<br>RED LEVEL, AL 36474 |
| 338 | FLOYD FARM<br>7514 US HWY 29 S.<br>GOSHEN, AL 36035 |
| 341 | BUCK CREEK FARMS<br>8144 PERRETTE RD.<br>RED LEVEL, AL 36474 |
| 342 | BUCK CREEK FARMS<br>8144 PERRETTE RD.<br>RED LEVEL, AL 36474 |
| 355 | GRAYSON FARMS<br>276 RIGSBY ROAD<br>GEORGIANA, AL 36033 |
| 356 | J & C FARMS<br>37372 HESTER STORE RD.<br>RED LEVEL, AL 36474 |
| 360 | LUCKIE FARM 1&2<br>4572 LUVERNE HWY<br>GREENVILLE, AL 36037 |
| 362 | LUCKIE FARM 3&4<br>4572 LUVERNE HWY<br>GREENVILLE, AL 36037 |
| 363 | MORGAN FARMS<br>3615 LIVE OAK ROAD<br>LUVERNE, AL 36049 |

## ATTACHMENT 1 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 400 | MORGAN FARMS<br>3615 LIVE OAK ROAD<br>LUVERNE, AL 36049 |
| 364 | WINDY RIDGE FARMS<br>980 WILLIAMSON RD.<br>LUVERNE, AL 36049 |
| 365 | ERIC KILLOUGH<br>PO BOX 223<br>RUTLEDGE, AL 36071 |
| 366 | THOMAS CROSSROAD COR<br>4041 CO. RD. 2201<br>GOSHEN, AL 36035 |
| 367 | THOMAS CROSSROAD COR<br>4041 CO. RD. 2201<br>GOSHEN, AL 36035 |
| 368 | S AND J FARM<br>954 CO. RD. 2219<br>GOSHEN, AL 36035 |
| 370 | NED SANDERS<br>2968 CO RD 2243<br>GOSHEN, AL 36035 |
| 372 | NED SANDERS<br>2968 CO RD 2243<br>GOSHEN, AL 36035 |
| 373 | RODGERS POULTRY FARM<br>P.O. BOX 52<br>RED LEVEL, AL 36474 |
| 374 | RODGERS POULTRY FARM<br>P.O. BOX 52<br>RED LEVEL, AL 36474 |
| 380 | TED & FAYE POULTRY<br>1553 CO. RD. 2281<br>GLENWOOD, AL 36034 |
| 382 | TED SANDERS<br>1553 CO. RD. 2281<br>GLENWOOD, AL 36034 |
| 385 | BARBARA K SEALE<br>60 HOWARD STEEN RD.<br>FOREST HOM, AL 36030 |
| 387 | B. W. THOMPSON<br>13461 GANTT REDLEVEL ROAD<br>ANDALUSIA, AL 36420 |

# ATTACHMENT 1 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 388 | B. W. THOMPSON<br>13461 GANTT REDLEVEL ROAD<br>ANDALUSIA, AL 36420 |
| 390 | TILL FARM<br>220 DUSTY TRAIL<br>GREENVILLE, AL 36037 |
| 392 | CEDARSVILLE FARMS<br>PO BOX 196<br>GLENWOOD, AL 36034 |
| 396 | TURKEY TROT FARMS<br>2047 N GLENWOOD RD<br>GOSHEN, AL 36035 |
| 397 | JERROD WOOD<br>72 E. 1ST. STREET<br>LUVERNE, AL 36049 |
| 398 | J DICK WOOD<br>649 LITTLE HORSE CREEK RD<br>RUTLEDGE, AL 36071 |
| 399 | 4 M FARMS<br>1085 N MOODYS CROSSROAD RD<br>LUVERNE, AL 36049 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 5 | JAMES ALTIERE<br>618 COBB LANE<br>GEORGIANA, AL 36033 |
| 12 | MICHAEL R BAGENTS<br>6480 GREENVILLE HWY<br>LUVERNE, AL 36049 |
| 19 | BEES FARM<br>341 BOYD RD<br>RUTLEDGE, AL 36071 |
| 21 | BRENT BLACK<br>1732 MASON ROAD<br>HOPE HULL, AL 36043 |
| 26 | MAXINE BLACK<br>1732 MASON ROAD<br>HOPE HULL, AL 36043 |
| 28 | ULYSIS BLACK<br>2429 STARLINGTON RD<br>GEORGIANA, AL 36033 |
| 30 | WAYNE BLACK<br>1732 MASON ROAD<br>HOPE HULL, AL 36043 |
| 40 | DARREN BOLLING<br>356 DRY LAKE RD<br>LUVERNE, AL 36049 |
| 50 | MICHAEL R BRIGHTWELL<br>6573 BOWDEN ROAD<br>HONORAVILL, AL 36042 |
| 51 | ELTON BROWN<br>1120 PUSLEY RIDGE RD<br>HIGHLAND H, AL 36041 |
| 53 | KENNETH BURKETT<br>9832 WESLEY CHAPEL RD<br>GEORGIANA, AL 36033 |
| 54 | KENNETH BURKHALTER<br>3216 FORT DALE RD<br>GREENVILLE, AL 36037 |
| 55 | JEREMY BROWN<br>12773 MT ZION RD<br>RAMER, AL 36069 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 56 | CAMPBELL FARMS<br>P O BOX 34<br>MCKENZIE, AL 36456 |
| 58 | JOHNNY CARPENTER<br>1284 NEW HOME RD<br>GEORGIANA, AL 36033 |
| 60 | DON CASEY<br>8500 SELMA HIGHWAY<br>MONTGOMERY, AL 36108 |
| 62 | CRENSHAW FARMS<br>1706 DICKENS FIELD RD<br>GREENVILLE, AL 36037 |
| 63 | LADONNA CASEY<br>3950 ROBERT C HAM RD<br>MONTGOMERY, AL 36108 |
| 65 | JUDY CASEY<br>8500 SELMA HIGHWAY<br>MONTGOMERY, AL 36108 |
| 66 | CIRCLE E<br>P O BOX 381<br>FT DEPOSIT, AL 36032 |
| 69 | CHARLIE W CRANE, JR<br>437 HOWARD STEEN RD<br>FOREST HOM, AL 36030 |
| 70 | DALE DAVIS<br>4907 CO RD 1107 BRIARHILL RA<br>NC GOSHEN, AL 36035 |
| 71 | KEVIN DAVIS<br>4907 CO RD 1107 BRIARHILL RA<br>NC GOSHEN, AL 36035 |
| 73 | DOUBLE O FARMS<br>PO BOX 275<br>LOWNDESBOR, AL 36752 |
| 78 | NED ELLIS<br>P O BOX 381<br>FT DEPOSIT, AL 36032 |
| 80 | THOMAS ELLIS<br>3500 MASON RD<br>HOPE HULL, AL 36043 |

# ATTACHMENT 2 TO EXHIBIT "A"
# OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 81 | THOMAS ELLIS #2<br>3500 MASON RD<br>HOPE HULL, AL 36043 |
| 82 | FARON FRAZIER<br>742 GREENLEAF RD<br>HONORAVILL, AL 36042 |
| 83 | HUBERT FRAZIER<br>6468 BOWDEN RD<br>HONORAVILL, AL 36042 |
| 84 | EDDIE PAUL FRAZIER<br>5993 OLD STAGE RD<br>GREENVILLE, AL 36037 |
| 85 | J & L FARMS<br>6593 MERRIWETHER RD<br>HONORAVILL, AL 36042 |
| 86 | FOWLER FARM<br>869 FOWLER RD<br>LUVERNE, AL 36049 |
| 89 | KRISTY FRAZIER<br>6746 MERRIWETHER TRAIL<br>HONORAVILL, AL 36042 |
| 91 | GREGORY A GAFFORD<br>2551 NORRELL AVE<br>GEORGIANA, AL 36033 |
| 92 | COUNTYLINE FARMS<br>2555 BETHEL CHURCH RD<br>FT DEPOSIT, AL 36032 |
| 96 | C & S POULTRY<br>1017 BOWDEN RD<br>HONORAVILL, AL 36042 |
| 105 | GRANT FARMS<br>10643 STEINER STORE RD<br>FT DEPOSIT, AL 36032 |
| 108 | HESTER FARMS<br>3323 CENTER RIDGE RD<br>LUVERNE, AL 36049 |
| 109 | JONES POULTRY<br>122 HORSE FARM RD<br>GEORGIANA, AL 36033 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 110 | A & J FARMS<br>2249 S MOODYS CROSSRD RD<br>RUTLEDGE, AL 36071 |
| 111 | JOHN HOFFMAN<br>1368 SAVILLE ROAD<br>HIGHLAND H, AL 36041 |
| 112 | HOFFMAN POULTRY FARM<br>3276 MAGNOLIA SHORES RD<br>LAPINE, AL 36046 |
| 113 | HOLLADAY FARMS<br>416 HORSECREEK RD<br>RUTLEDGE, AL 36071 |
| 114 | GRADY HOLLEY<br>1371 PERDUE RD<br>LUVERNE, AL 36049 |
| 115 | RICKY JEFFCOAT<br>305 JEFFCOAT RD<br>RUTLEDGE, AL 36071 |
| 119 | HORSE CREEK FARMS<br>680 S MOODYS CROSSRDS RD<br>RUTLEDGE, AL 36071 |
| 121 | TROY HUSBAND<br>2782 QUAIL TOWER RD<br>LUVERNE, AL 36049 |
| 123 | GLYNN D KING<br>PO BOX 1085<br>MCKENZIE, AL 36456 |
| 124 | WILLIAM KILPATRICK<br>182 GREENVILLE RACEWAY<br>FOREST HOM, AL 36030 |
| 125 | INGE FARMS<br>1555 DAUPHIN ST<br>MOBILE, AL 36604 |
| 127 | DEBBIE KENT<br>840 SHAMROCK RD<br>LUVERNE, AL 36049 |
| 129 | CHARLES KILPATRICK<br>1285 SEVENTH AVE<br>FOREST HOM, AL 36030 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 131 | MARSHA D LOFTIN<br>3611 CO RD 4<br>FT DEPOSIT, AL 36032 |
| 133 | LONNIE LESTER<br>1911 RUTLEDGE LOOP RD<br>LUVERNE, AL 36049 |
| 134 | PAUL LOWERY<br>1771 SEVENTH AVE<br>FOREST HOM, AL 36030 |
| 135 | MARK KNOX<br>523 GIN CREEK RD<br>GOSHEN, AL 36035 |
| 137 | LANGFORD FARMS<br>5444 SAND CUT RD<br>GEORGIANA, AL 36033 |
| 138 | RAY MCCULLOUGH<br>4705 SWEETWATER RD<br>HIGHLAND H, AL 36041 |
| 139 | RAY MCCULLOUGH # 2<br>4705 SWEETWATER RD<br>HIGHLAND H, AL 36041 |
| 140 | SHEILA MCELWAIN<br>15964 MONTGOMERY HWY<br>HIGHLAND H, AL 36041 |
| 141 | JOE MCGOUGH<br>2217 DANIELSVILLE RD<br>HONORAVILL, AL 36042 |
| 142 | LOWES POULTRY FARM<br>588 WALSH STREET<br>MCKENZIE, AL 36456 |
| 146 | DAWARD MCNAUGHTON<br>1318 JASMIN HILL RD<br>GREENVILLE, AL 36037 |
| 151 | JOYCE H MADDOX<br>6173 W HICKORY GROVE RD<br>LETOHATCHE, AL 36047 |

# ATTACHMENT 2 TO EXHIBIT "A"
# OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 154 | CHARLES MATTHEWS<br>2865 DANIEL BRANCH RD<br>HIGHLAND H, AL 36041 |
| 155 | MACK MEADOWS<br>2432 MEADOWS DR<br>LOWNDESBOR, AL 36752 |
| 156 | KIRK MEADOWS<br>1128 ST CLAIR PLACE<br>LOWNDESBOR, AL 36752 |
| 157 | MIXON FARMS LLC<br>1818 ASHBURY CHURCH RD<br>PINEAPPLE, AL 36768 |
| 158 | WILLIAM A MITCHELL<br>336 MITCHELL ROAD<br>FT DEPOSIT, AL 36032 |
| 159 | ALAN P MOBLEY<br>1763 WILLIAMSON RD<br>LUVERNE, AL 36049 |
| 160 | MILLER FARMS<br>5388 S. MT. ZION RD<br>GREENVILLE, AL 36037 |
| 162 | DAVIS MOORER<br>891 KNIGHT PLACE<br>FT DEPOSIT, AL 36032 |
| 167 | J MIKE MOORER<br>660 KNIGHT PLACE RD<br>FT DEPOSIT, AL 36032 |
| 170 | SHELLEY MOORER<br>660 KNIGHT PLACE RD<br>FT DEPOSIT, AL 36037 |
| 172 | EVELYN MOSELEY<br>407 ROCK HILL RD<br>HONORAVILL, AL 36042 |
| 174 | MICHAEL MOSELEY<br>1727 RAMER NAFTEL RD<br>RAMER, AL 36069 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 178 | ROBERT C NICHOLS, JR<br>8450 HWY 97 S<br>LETOHATCHE, AL 36047 |
| 180 | DOROTHY G  NICHOLAS<br>2856 STEINER STORE ROAD<br>GREENVILLE, AL 36037 |
| 181 | CHARLES NIXON<br>893 GORUM RD<br>MCKENZIE, AL 36456 |
| 182 | NOLAN FARMS<br>P O BOX 437<br>FT DEPOSIT, AL 36032 |
| 183 | ROBERT PARMER<br>510 GREENMORE RD<br>GREENVILLE, AL 36037 |
| 184 | WILLIAM R PIERSON<br>594 SKIPPER FARM RD<br>GEORGIANA, AL 36033 |
| 185 | DIXIE FARMS<br>3608 MURPHY RD<br>GEORGIANA, AL 36033 |
| 187 | H & K FARMS,INC<br>218 PALMER RD<br>GEORGIANA, AL 36033 |
| 188 | HAROLD PARMER<br>532 WILDFORK RD<br>GREENVILLE, AL 36037 |
| 189 | PARTRIDGE FARMS<br>463 COUNTY RD 1117<br>TROY, AL 36079 |
| 190 | RILEY PERRETT<br>12317 MONTGOMERY HWY<br>LUVERNE, AL 36049 |
| 191 | RONALD H PETREY<br>10541 PETREY HWY<br>LUVERNE, AL 36049 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 194 | LARRY PETTY<br>538 POSEY ROAD<br>LAPINE, AL 36046 |
| 196 | FRANK PROCHAZKA<br>598 COUNTY RD 1108<br>GOSHEN, AL 36035 |
| 203 | GEORGE REID<br>1138 OLD REID RD<br>FT DEPOSIT, AL 36032 |
| 205 | STEVE ROGERS<br>3954 LUVERNE HWY<br>GREENVILLE, AL 36037 |
| 206 | ROGERS FARMS<br>2361 AIRPORT RD<br>GREENVILLE, AL 36037 |
| 207 | WILLIAM E ROPER<br>698 NEW BETHEL CHURCH RD<br>LAPINE, AL 36046 |
| 208 | LARRY E ROSIER<br>374 ROSIER LANE<br>GEORGIANA, AL 36033 |
| 209 | DARIN SANDERS<br>781 MILTON RD<br>RUTLEDGE, AL 36049 |
| 210 | WILLIAM F SINGLETON<br>15 E ROGER RD<br>FT DEPOSIT, AL 36032 |
| 211 | JAMES SEALE<br>1821 MONTEREY RD<br>FOREST HOM, AL 36030 |
| 212 | BOBBY SASSER<br>385 TAYLOR CROSSING RD<br>LAPINE, AL 36046 |
| 214 | ALVIN SEXTON<br>5163 SWEETWATER RD<br>HIGHLAND H, AL 36041 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 216 | LLOYD SHELL<br>473 BRUSHY CREEK RD<br>GEORGIANA, AL 36033 |
| 218 | JERRY O STINSON<br>5557 STARLINGTON RD<br>GEORGIANA, AL 36033 |
| 222 | BELINDA STRICKLAND<br>15293 HWY 21 SOUTH<br>MINTER, AL 36761 |
| 224 | TAYLOR FARMS<br>7796 OLD STAGE RD<br>GREENVILLE, AL 36037 |
| 226 | GLYN STRINGER<br>1880 ROPER RD<br>HONORAVILL, AL 36042 |
| 228 | THOMAS L STRINGER<br>RT 2 BOX 185<br>HONORAVILL, AL 36042 |
| 230 | TOMMY THOMPSON<br>432 SUNSET DRIVE<br>FOREST HOM, AL 36030 |
| 232 | THOMAS ENTERPRISES<br>1390 SWEETWATER RD<br>HIGHLAND H, AL 36041 |
| 233 | WINDY RIDGE FARM<br>LLC 961 CO RD 33<br>HAYNEVILLE, AL 36064 |
| 234 | L & N FARMS INC<br>3068 THOMAS RD<br>LUVERNE, AL 36049 |
| 235 | GEORGE A TILL<br>416 TILL RD<br>MINTER, AL 36761 |
| 236 | T & T FARM<br>2991 HONORAVILLE RD<br>LUVERNE, AL 36049 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|---|---|
| 238 | WINSTON/MONTEZ TUR<br>4003 AIRPORT RD<br>GREENVILLE, AL 36037 |
| 240 | LINDA FAYE WATSON<br>816 CO RD 29<br>PINEAPPLE, AL 36768 |
| 245 | RONALD G WILKINSON<br>601 DEAN RD<br>HOPE HULL, AL 36043 |
| 246 | MARY F WILLIAMSON<br>1997 CENTENARY RD<br>LUVERNE, AL 36049 |
| 247 | MARIE WILKERSON<br>8191 PETREY HWY<br>LUVERNE, AL 36049 |
| 248 | STEVE WHITTINGTON # 2<br>6774 FORT DALE RD<br>GREENVILLE, AL 36037 |
| 249 | WHEELER FARMS<br>1438 WOOD ROAD<br>BRANTLEY, AL 36009 |
| 250 | RANDY P WILLIAMSON<br>2160 CENTNARY RD<br>LUVERNE, AL 36049 |
| 251 | WIGGINS FARM<br>404 HASSEY RD<br>RAMER, AL 36069 |
| 252 | WOOD FARMS<br>8324 IVY CREEK RD<br>BRANTLEY, AL 36009 |
| 253 | TOMMY WHITTLE<br>6814 PINE APPLE HWY<br>GREENVILLE, AL 36037 |
| 254 | RUSS WILKERSON<br>8469 PETREY HWY<br>LUVERNE, AL 36049 |
| 255 | DOUG STEPHENS<br>1193 COUNTY RD 1137<br>GOSHEN, AL 36035 |

## ATTACHMENT 3 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**Farm #    Name of Independent Contractor**

302    BETTY FAULK
       1583 FAULK ROAD
       HONORAVILLE, AL. 36042

304    TOM DUNCAN
       3622 HONORAVILLE ROAD
       GREENVILLE, AL. 36037

305    JOHNNY BOYD
       1076 REDLAND ROAD
       WETUMPKA, AL 36092

308    JAMES L. REEVES
       4516 BURGAMY SWAMP ROAD
       HIGHLAND H, AL. 36041

310    RONALD & LYNDA FLOYD
       PO BOX 546
       TROY, AL. 36081

311    RONALD & LYNDA FLOYD
       PO BOX 546
       TROY, AL. 36081

320    SANDERS FARM
       RT. 1 BOX 10
       GOSHEN, AL. 36036

321    SANDERS FARM
       RT. 1 BOX 10
       GOSHEN, AL. 36035

MASTER SERVICE LIST – 06/15/06

Wachovia Bank, N.A.
c/o Michael L. Hall, Esquire
Burr & Forman, LLP
Wachovia Tower
420 North Twentieth Street
Suite 3100
Birmingham, AL  35203

Office of the Bankruptcy
Administrator
Robert S. Vance Federal Building
1800 5th Avenue North
Birmingham, AL  35203

District Director Internal Revenue
Service for Northern District of
Alabama
801 Tom Martin Drive, Rm 126
Birmingham, AL  35211-6425

AirGas Carbonic
P.O. Box 120001
Dallas, TX 75312-0822

Custom Graphic Products
P.O. Box 680575
Prattville, AL 36068

Romero Trucking, Inc.
367 G&S Road
Prattville, AL 36067

AirGas Dry Ice
P.O. Box 166
Star, MS 39167

Dapec, Inc.
P.O. Box 101120
Atlanta, GA 30392-1120

Simplex Grinnell
Dept. Ch 10156
Palatine, IL 60055-0156

Al Hill's Boiler & Sales
P.O. Box 662
Theodore, AL 36590

Degussa Corporation
Chemical Group
P.O. Box 905424
Charlotte, NC 29290-5424

Southeastern Energy
P.O. Box 9309
Montgomery, AL 36108-0000

ALPHARMA, Inc.
P.O. Box 23072
Newark, NJ  07189

Dyna Lift, Inc.
P.O. Box 1348
Montgomery, AL 36102-1348

Southeastern Mineral
P.O. Box  1650
Bainbridge, GA  39818

American Proteins
P.O. Box  930394
Atlanta, GA  31193

Ed's Electric Motor Serv
513 North Hull Street
Montgomery, AL 36104

Southland Industrial
P.O. Box 1474
Gainesville, GA 30503

Americold Logistics
Unit 04
P.O. Box  5000
Portland, OR  97208-5000

Farmers Grain Dealers, Inc.
19901 North Dixie Highway
Bowling Green, OH 43402

Starke Agency
P.O. Box 4359
Montgomery, AL 36103

Aviagen, Inc.
P.O. Box 11407
Birmingham, AL 35246-0389

FMC FoodTech, Inc.
P.O. Box 98635
Chicago, IL 60693

Stellar Group
2900 Hartley Road
Jacksonville, AL 32557

Bunge Corporation
P.O. Box 952397
St. Louis, MO 63195

Georgia-Pacific Corporation
P.O. Box 102574
Atlanta, GA 30368-2574

Stewart Stainless Supply
3660 Swiftwater Park drive
Suwanee, GA 30024

Cagle's, Inc.
P.O. Box 1070
Charlotte, NC 28201-1070

H.J. Baker & Bro., Inc.
Attn:  Scott Michelsen
228 Saugatuck Avenue
Westport, CT  06880

Tremco, Inc.
7418 Wimberly Lane
Montgomery, AL 36617

Carolina Handling
P.O. Box 890352
Charlotte, NC 28289-0352

CIMCO Refrigeration
2502 Commercial Park
Mobile, AL 36606

Cobb-Vantress, Inc.
P.O. Box 1030
Siloam Springs, AR 72761-1030

COPACO-Montgomery
3325 Aronov Avenue
Montgomery, AL 36108

Columbus Paper Company, Inc.
c/o Richard P. Carmody, Esq.
Adams & Reese/Lange Simpson LLP
2100 3rd Avenue North
Suite 1100
Birmingham, AL 35203

Wachovia Bank, National Association
c/o Jason D. Woodard, Esq.
Burr & Forman, LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203

David Boyle
AirGas, Inc.
259 Radnor-Chester Road
Suite 100
Radnor, PA 19087-8675

Dixie Electric Cooperative
c/o J. Theodore Jackson, Jr.
P.O. Box 270
Montgomery, AL 36101-0270

H. Maynard Sylvest
c/o J. Flynn Mozingo
Melton, Espy & Williams, P.C.
P.O Drawer 5130
Montgomery, AL 36103

Horn Enterprises
10325 US Hwy 231 South
Cropwell, AL 35054

Johnson Food Equipment
4162 Payshere Circle
Chicago, IL 60674

Mayer Electric Supply
P.O. Box 1328
Birmingham, AL 35201-1328

QSI
P.O. Box 531
Signal Mountain, TN 37377

Federal Land Bank Association of
South Alabama,FLCA
c/o W. Clark Watson, Esq.
Balch & Bingham, LLP
Post Office Box 306
Birmingham, Alabama 35201

D. Christopher Carson, Esq.
Burr & Forman, LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203

Farmers Grain Dealers, Inc.
c/o Donald M. Wright, Esq.
Sirote & Permutt, P.C.
2311 Highland Avenue South
P.O. Box 55727
Birminham, AL 35355-5727

Jayna Partain Lamar
Maynard, Cooper & Gale PC
1901 6th Avenue North
Suite 2400
Birmingham, AL 35203

Federal Land Bank Association of
South Alabama, FLCA
c/o Jesse S. Vogtle, Jr.
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201-0306

U.S. Security Assoc. Inc.
P.O. Box 931703
Atlanta, GA 31193

Wesco Receivables Corp.
P.O. Box 530409
Atlanta, GA 03053-0409

Worldwide Dedicated Services
c/o Upslogistics
636 Sandy Lake Rd.
Coppell, TX 75019

Zee Company, Inc.
407 East 5th Street
Chattanooga, TN 37403

Jeremy L. Retherford, Esq.
Balch & Bingham, LLP
Post Office Box 306
Birmingham, Alabama 35201

Airgas, Inc.
c/o Kathleen M. Miller, Esq.
Smith, Katzenstein & Furlow
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899

Matthew W. Grill
Maynard Cooper & Gale PC
1901 6th Avenue North
Suite 2400
Birmingham, AL 35203-2602

Amick-OSI Processing, LLC
c/o Julio E. Mendoza, Jr.
Nexsen Pruet Adams Kleemeier, LLC
P.O Drawer 2426
Columbia, SC 29202

Matthew Q. Tompkins, Esq.
Rosen, Cook, Sledge, Davis, Shattuck
& Oldshue, P.A.
2117 Jack Warner Parkway (35401)
Post Office Box 2727
Tuscalossa, AL 35403-2727

2

Michael H. Taison, Esq.
Miller, Canfield, Paddock & Stone, PLC
150 West Jefferson Avenue
Suite 2500
Detroit, MI 48226

Gilbert B. Weisman, Esq.
Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

Gwen Sylvst
P.O. Box 1223
Wetumpka, AL 36092

Lenora Lewis
3509 McGehee Place Court
Montgomery, AL 36111

Chris Lester
28 Prestwick Drive
Jackson, TN 38305

Carl Watson
302 Arrowhead Drive
Montgomery, AL 36117

Myrtle Sylvest
3442 Summerhill Drive
Montgomery, AL 36111

Stephen B. Porterfield, Esq.
Sirote & Permutt, P.C.
2311 Highland Avenue South
Birmingham, AL 35205

Wanda Borges, Esquire
Borges & Associates, LLC
575 Underhill Blvd.
Syosset, NY 11791

R. Scott Williams, Esq., Haskell
Slaughter Young & Rediker, LLC,
Counsel for the Committee
2001 Park Place North, Suite 1400,
Birmingham, AL 35203

BARRISTERS, 79689, 00001, 501060159.4, Master Service List - Sylvest Farms (6/15/06)

## SERVICE LIST – PARTIES TO CONTRACTS

4 M FARMS
1085 N MOODYS CROSSROAD
RD
LUVERNE, AL 36049

A & J FARMS
2249 S MOODYS CROSSRD RD
RUTLEDGE, AL 36071

AIRGAS
DEPT 0822
PO BOX 120001
DALLAS, TX 75312-0822

AIRGAS DRY ICE
3700 CRESTWOOD PKWY, STE
200
DULUTH, GA 30096

ALABAMA POWER
PO BOX 242
BIRMINGHAM, AL 35292

ALAN P MOBLEY
1763 WILLIAMSON RD
LUVERNE, AL 36049

ALVIN SEXTON
5163 SWEETWATER RD
HIGHLAND H, AL 36041

ARAMARK
PO BOX 10722
BIRMINGHAM, AL 35202

ASHLAND SPECIALTY CHEMICAL
COMPANY
DREW INDUSTRIAL
PO BOX 102433
ATLANTA, GA 30368-2433

B. W. THOMPSON
13461 GANTT REDLEVEL ROAD
ANDALUSIA, AL 36420

BARBARA K SEALE
60 HOWARD STEEN RD.
FOREST HOM, AL 36030

BARLOWORLD HYSTER
PO BOX 402473
ATLANTA, GA 30384-2473

BEES FARM
341 BOYD RD
RUTLEDGE, AL 36071

BELINDA STRICKLAND
15293 HWY 21 SOUTH
MINTER, AL 36761

BERNEY OFFICE SOLUTIONS
PO BOX 210699
MONTGOMERY, AL 36121-0699

BETTY FAULK
1583 FAULK ROAD
HONORAVILLE, AL. 36042

BOBBY SASSER
385 TAYLOR CROSSING RD
LAPINE, AL 36046

BRENT BLACK
1732 MASON ROAD
HOPE HULL, AL 36043

BRIGHT CORP
PO BOX 635001
NACOGDOCHES, TX 75963-5001

BUCK CREEK FARMS
8144 PERRETTE RD.
RED LEVEL, AL 36474

C & S POULTRY
1017 BOWDEN RD
HONORAVILL, AL 36042

CAMPBELL FARMS
P O BOX 34
MCKENZIE, AL 36456

CAROLINA HANDLING
(RAYMOND)
PO BOX 890352
CHARLOTTE, NC 28289-0352

CEDARSVILLE FARMS
PO BOX 196
GLENWOOD, AL 36034

CHARLES KILPATRICK
1285 SEVENTH AVE
FOREST HOM, AL 36030

CHARLES MATTHEWS
2865 DANIEL BRANCH RD
HIGHLAND H, AL 36041

CHARLES NIXON
893 GORUM RD
MCKENZIE, AL 36456

CHARLIE W CRANE, JR
437 HOWARD STEEN RD
FOREST HOM, AL 36030

CIRCLE E
P O BOX 381
FT DEPOSIT, AL 36032

COUNTYLINE FARMS
2555 BETHEL CHURCH RD
FT DEPOSIT, AL 36032

## SERVICE LIST – PARTIES TO CONTRACTS

CRENSHAW FARMS
1706 DICKENS FIELD RD
GREENVILLE, AL 36037

CROSSTOWN
PO BOX 849
BAINBRIDGE, GA 39818

CRYSTAL SPRINGS OF ALABAMA
PO BOX 11786
BIRMINGHAM, AL 35202-1786

CSX
PO BOX 532652
ATLANTA, GA 30353-2652

DALE DAVIS
4907 CO RD 1107 BRIARHILL RA
NC GOSHEN, AL 36035

DARIN SANDERS
781 MILTON RD
RUTLEDGE, AL 36049

DARREN BOLLING
356 DRY LAKE RD
LUVERNE, AL 36049

DAVIS MOORER
891 KNIGHT PLACE
FT DEPOSIT, AL 36032

DAWARD MCNAUGHTON
1318 JASMIN HILL RD
GREENVILLE, AL 36037

DEBBIE KENT
840 SHAMROCK RD
LUVERNE, AL 36049

DELAGE LANDEN
PO BOX 41601
PHILADELPHIA, PA 19101-1601

DIXIE FARMS
3608 MURPHY RD
GEORGIANA, AL 36033

DON CASEY
8500 SELMA HIGHWAY
MONTGOMERY, AL 36108

DOROTHY G NICHOLAS
2856 STEINER STORE ROAD
GREENVILLE, AL 36037

DOUBLE O FARMS
PO BOX 275
LOWNDESBOR, AL 36752

DOUG STEPHENS
1193 COUNTY RD 1137
GOSHEN, AL 36035

COLVIN FARMS
36036 BOYKIN ROAD
RED LEVEL, AL. 36474

DSI PORTIONING SYSTEM
PO BOX 98635
CHICAGO, IL 60693-8635

DYNA-LIFT, INC.
184 WESTERN BLVD
MONTGOMERY, AL 38108

EDDIE PAUL FRAZIER
5993 OLD STAGE RD
GREENVILLE, AL 36037

ELTON BROWN
1120 PUSLEY RIDGE RD
HIGHLAND H, AL 36041

EMBREX
PO BOX 890379
CHARLOTTE, NC 28289-0379

ERIC KILLOUGH
PO BOX 223
RUTLEDGE, AL 36071

EVELYN MOSELEY
407 ROCK HILL RD
HONORAVILL, AL 36042

F & S FARMS PARTNERS
31214 FOLEY RD.
RED LEVEL, AL 36474

FARON FRAZIER
742 GREENLEAF RD
HONORAVILL, AL 36042

FLOYD FARM
7514 US HWY 29 S.
GOSHEN, AL 36035

FLOYD FARMS
6071 WORLEY RD.
RED LEVEL, AL 36474

FOWLER FARM
869 FOWLER RD
LUVERNE, AL 36049

FRANK PROCHAZKA
598 COUNTY RD 1108
GOSHEN, AL 36035

## SERVICE LIST – PARTIES TO CONTRACTS

GENERAL ELECTRIC CAPITAL
CORPORATION
PO BOX 740423
ATLANTA, GA  30374-0423

GEORGE A TILL
416 TILL RD
MINTER, AL 36761

GEORGE REID
1138 OLD REID RD
FT DEPOSIT, AL 36032

GEORGIA PACIFIC
PO BOX 102574
ATLANTA, GA  30368-2574

GLYN STRINGER
1880 ROPER RD
HONORAVILL, AL 36042

GLYNN D KING
PO BOX 1085
MCKENZIE, AL 36456

GRADY HOLLEY
1371 PERDUE RD
LUVERNE, AL 36049

GRANT FARMS
10643 STEINER STORE RD
FT DEPOSIT, AL 36032

GRAYSON FARMS
276 RIGSBY ROAD
GEORGIANA, AL 36033

GREATER BAY CAPITAL
ACCOUNTS RECEIVABLE
PO BOX 7777
SAN FRANCISCO, CA  94120-7777

GREGORY A GAFFORD
2551 NORRELL AVE
GEORGIANA, AL 36033

H & K FARMS,INC
218 PALMER RD
GEORGIANA, AL 36033

HAROLD PARMER
532 WILDFORK RD
GREENVILLE, AL 36037

HESTER FARMS
3323 CENTER RIDGE RD
LUVERNE, AL 36049

HOFFMAN POULTRY FARM
3276 MAGNOLIA SHORES RD
LAPINE, AL 36046

HOLLADAY FARMS
416 HORSECREEK RD
RUTLEDGE, AL 36071

HORSE CREEK FARMS
680 S MOODYS CROSSRDS RD
RUTLEDGE, AL 36071

HUBERT FRAZIER
6468 BOWDEN RD
HONORAVILL, AL 36042

INGE FARMS
1555 DAUPHIN ST
MOBILE, AL 36604

J & C FARMS
37372 HESTER STORE RD.
RED LEVEL, AL 36474

J & L FARMS
6593 MERRIWETHER RD
HONORAVILL, AL 36042

J DICK WOOD
649 LITTLE HORSE CREEK RD
RUTLEDGE, AL 36071

J MIKE MOORER
660 KNIGHT PLACE RD
FT DEPOSIT, AL 36032

JAMES ALTIERE
618 COBB LANE
GEORGIANA, AL 36033

JAMES L. REEVES
4516 BURGAMY SWAMP ROAD
HIGHLAND H, AL. 36041

JAMES SEALE
1821 MONTEREY RD
FOREST HOM, AL 36030

JEREMY BROWN
12773 MT ZION RD
RAMER, AL 36069

JERROD WOOD
72 E. 1ST. STREET
LUVERNE, AL 36049

JERRY O STINSON
5557 STARLINGTON RD
GEORGIANA, AL 36033

JOE MCGOUGH
2217 DANIELSVILLE RD
HONORAVILL, AL 36042

## SERVICE LIST – PARTIES TO CONTRACTS

JOHN HOFFMAN
1368 SAVILLE ROAD
HIGHLAND H, AL 36041

JOHNNY BOYD
1076 REDLAND ROAD
WETUMPKA, AL 36092

JOHNNY CARPENTER
1284 NEW HOME RD
GEORGIANA, AL 36033

JONES POULTRY
122 HORSE FARM RD
GEORGIANA, AL 36033

JOYCE H MADDOX
6173 W HICKORY GROVE RD
LETOHATCHE, AL 36047

JUDY CASEY
8500 SELMA HIGHWAY
MONTGOMERY, AL 36108

KENNETH BURKETT
9832 WESLEY CHAPEL RD
GEORGIANA, AL 36033

KENNETH BURKHALTER
3216 FORT DALE RD
GREENVILLE, AL 36037

KEVIN DAVIS
4907 CO RD 1107 BRIARHILL RA
NC GOSHEN, AL 36035

KIRK MEADOWS
1128 ST CLAIR PLACE
LOWNDESBOR, AL 36752

KRISTY FRAZIER
6746 MERRIWETHER TRAIL
HONORAVILL, AL 36042

L & N FARMS INC
3068 THOMAS RD
LUVERNE, AL 36049

LADONNA CASEY
3950 ROBERT C HAM RD
MONTGOMERY, AL 36108

LANGFORD FARMS
5444 SAND CUT RD
GEORGIANA, AL 36033

LARRY E ROSIER
374 ROSIER LANE
GEORGIANA, AL 36033

LARRY PETTY
538 POSEY ROAD
LAPINE, AL 36046

LINDA FAYE WATSON
816 CO RD 29
PINEAPPLE, AL 36768

LLOYD SHELL
473 BRUSHY CREEK RD
GEORGIANA, AL 36033

LOGAN'S ROADHOUSE
3011 ARMORY DRIVE, STE 300
NASHVILLE, TN 37204

LONNIE LESTER
1911 RUTLEDGE LOOP RD
LUVERNE, AL 36049

LOWES POULTRY FARM
588 WALSH STREET
MCKENZIE, AL 36456

LUCKIE FARM 1&2
4572 LUVERNE HWY
GREENVILLE, AL 36037

LUCKIE FARM 3&4
4572 LUVERNE HWY
GREENVILLE, AL 36037

MACK MEADOWS
2432 MEADOWS DR
LOWNDESBOR, AL 36752

MARIE WILKERSON
8191 PETREY HWY
LUVERNE, AL 36049

MARK KNOX
523 GIN CREEK RD
GOSHEN, AL 36035

MARSHA D LOFTIN
3611 CO RD 4
FT DEPOSIT, AL 36032

MARY F WILLIAMSON
1997 CENTENARY RD
LUVERNE, AL 36049

MAXINE BLACK
1732 MASON ROAD
HOPE HULL, AL 36043

MICHAEL MOSELEY
1727 RAMER NAFTEL RD
RAMER, AL 36069

## SERVICE LIST – PARTIES TO CONTRACTS

MICHAEL R BAGENTS
6480 GREENVILLE HWY
LUVERNE, AL 36049

MICHAEL R BRIGHTWELL
6573 BOWDEN ROAD
HONORAVILL, AL 36042

MILLER FARMS
5388 S. MT. ZION RD
GREENVILLE, AL 36037

MIXON FARMS LLC
1818 ASHBURY CHURCH RD
PINEAPPLE, AL 36768

MORGAN FARMS
3615 LIVE OAK ROAD
LUVERNE, AL 36049

MORGAN FARMS
3615 LIVE OAK ROAD
LUVERNE, AL 36049

NED ELLIS
P O BOX 381
FT DEPOSIT, AL 36032

NED SANDERS
2968 CO RD 2243
GOSHEN, AL 36035

NOLAN FARMS
P O BOX 437
FT DEPOSIT, AL 36032

NOMESS
PO BOX 242181
MONTGOMERY, AL  36124

PARTRIDGE FARMS
463 COUNTY RD 1117
TROY, AL 36079

PAUL LOWERY
1771 SEVENTH AVE
FOREST HOM, AL 36030

PITNEY BOWES
PO BOX 856460
LOUISVILLE, KY  40285-6460

QSI
PO BOX 531
SIGNAL MOUNTAIN, TN  37377

RANDY P WILLIAMSON
2160 CENTNARY RD
LUVERNE, AL 36049

RAY MCCULLOUGH # 2
4705 SWEETWATER RD
HIGHLAND H, AL 36041

RAY MCCULLOUGH
4705 SWEETWATER RD
HIGHLAND H, AL 36041

RETAIL, WHOLESALE AND DEPT.
OF STORE UNION
1901 10TH AVENUE
BIRMINGHAM, AL  35205

RICKY JEFFCOAT
305 JEFFCOAT RD
RUTLEDGE, AL 36071

RILEY PERRETT
12317 MONTGOMERY HWY
LUVERNE, AL 36049

ROBERT C NICHOLS, JR
8450 HWY 97 S
LETOHATCHE, AL 36047

ROBERT PARMER
510 GREENMORE RD
GREENVILLE, AL 36037

RODGERS POULTRY FARM
P.O. BOX 52
RED LEVEL, AL 36474

ROGERS FARMS
2361 AIRPORT RD
GREENVILLE, AL 36037

RONALD & LYNDA FLOYD
PO BOX 546
TROY, AL. 36081

RONALD G WILKINSON
601 DEAN RD
HOPE HULL, AL 36043

RONALD H PETREY
10541 PETREY HWY
LUVERNE, AL 36049

RUSS WILKERSON
8469 PETREY HWY
LUVERNE, AL 36049

S AND J FARM
954 CO. RD. 2219
GOSHEN, AL 36035

SANDERS FARM
RT. 1 BOX 10
GOSHEN, AL. 36036

## SERVICE LIST – PARTIES TO CONTRACTS

SHEILA MCELWAIN
15964 MONTGOMERY HWY
HIGHLAND H, AL 36041

SHELLEY MOORER
660 KNIGHT PLACE RD
FT DEPOSIT, AL 36037

SILENT SENTRY
311 W. MENDEL PKWY
MONTGOMERY, AL 36117

STEVE ROGERS
3954 LUVERNE HWY
GREENVILLE, AL 36037

STEVE WHITTINGTON # 2
6774 FORT DALE RD
GREENVILLE, AL 36037

T & T FARM
2991 HONORAVILLE RD
LUVERNE, AL 36049

TAYLOR FARMS
7796 OLD STAGE RD
GREENVILLE, AL 36037

TED & FAYE POULTRY
1553 CO. RD. 2281
GLENWOOD, AL 36034

TED SANDERS
1553 CO. RD. 2281
GLENWOOD, AL 36034

THE CIT GROUP (ADT)
PO BOX 371967
PITTSBURGH, PA 15250-7967

THOMAS CROSSROAD COR
4041 CO. RD. 2201
GOSHEN, AL 36035

THOMAS ELLIS #2
3500 MASON RD
HOPE HULL, AL 36043

THOMAS ELLIS
3500 MASON RD
HOPE HULL, AL 36043

THOMAS ENTERPRISES
1390 SWEETWATER RD
HIGHLAND H, AL 36041

THOMAS L STRINGER
RT 2 BOX 185
HONORAVILL, AL 36042

TILL FARM
220 DUSTY TRAIL
GREENVILLE, AL 36037

TOM DUNCAN
3622 HONORAVILLE ROAD
GREENVILLE, AL. 36037

TOMMY THOMPSON
432 SUNSET DRIVE
FOREST HOM, AL 36030

TOMMY WHITTLE
6814 PINE APPLE HWY
GREENVILLE, AL 36037

TRIPLE POINT
PO BOX 36423
BIRMINGHAM, AL 35236

TROY HUSBAND
2782 QUAIL TOWER RD
LUVERNE, AL 36049

TURKEY TROT FARMS
2047 N GLENWOOD RD
GOSHEN, AL 36035

ULYSIS BLACK
2429 STARLINGTON RD
GEORGIANA, AL 36033

US SECURITY
PO BOX 931703
ATLANTA, GA 31193

WAYNE BLACK
1732 MASON ROAD
HOPE HULL, AL 36043

WHEELER FARMS
1438 WOOD ROAD
BRANTLEY, AL 36009

WIGGINS FARM
404 HASSEY RD
RAMER, AL 36069

WILLIAM A MITCHELL
336 MITCHELL ROAD
FT DEPOSIT, AL 36032

WILLIAM E ROPER
698 NEW BETHEL CHURCH RD
LAPINE, AL 36046

WILLIAM F SINGLETON
15 E ROGER RD
FT DEPOSIT, AL 36032

## SERVICE LIST – PARTIES TO CONTRACTS

WILLIAM KILPATRICK
182 GREENVILLE RACEWAY
FOREST HOM, AL 36030

WILLIAM R PIERSON
594 SKIPPER FARM RD
GEORGIANA, AL 36033

WINDY RIDGE FARM
LLC 961 CO RD 33
HAYNEVILLE, AL 36064

WINDY RIDGE FARMS
980 WILLIAMSON RD.
LUVERNE, AL 36049

WINSTON/MONTEZ TUR
4003 AIRPORT RD
GREENVILLE, AL 36037

WOOD FARMS
8324 IVY CREEK RD
BRANTLEY, AL 36009

MR. HENRY JENKINS
RWDSU
1901 10TH AVENUE SOUTH
BIRMINGHAM, AL 35205

SANJAY THAPAR, ESQ.
PROSKAUER ROSE, LLP
1585 BROADWAY
NEW YORK, NY 10036-8299

# EXHIBIT N

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| SYLVEST FARMS, INC., et al.,[1] | : | CASE NOS. 06-40525 |
| | : | through 06-40527 |
| Debtors. | : | |
| | : | JOINTLY ADMINISTERED |
| | : | |

**NOTICE OF FILING CORRECTED EXHIBIT "A" TO DEBTOR'S MOTION FOR
ENTRY OF ORDER AUTHORIZING THE REJECTION OF CERTAIN UNEXPIRED
LEASES AND EXECUTORY CONTRACTS**

NOTICE IS HEREBY GIVEN that the Debtors are filing the attached Corrected Exhibit "A," which shall replace the Exhibit A that was originally filed along with the Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Motion"), which was filed on June 15, 2006 (Docket No. 334).

Dated this 20th day of June, 2006.          Respectfully submitted,

                                    By:    /s/ Richard A. Robinson
                                           Richard A. Robinson, Esquire
                                           Florida Bar No. 0041238
                                           Eric S. Golden, Esquire
                                           Florida Bar No. 0146846
                                           BAKER & HOSTETLER LLP
                                           Post Office Box 112
                                           Orlando, Florida 32802-0112
                                           Telephone: (407) 649-4000
                                           Telecopier: (407) 841-0168
                                           Email: rrobinson@bakerlaw.com
                                           **Counsel for Debtors and
                                           Debtors-in-Possession**

---

[1] The Debtors in these jointly administered chapter 11 cases also include Sylvest Foods Corporation, Case No. 06-40526, and Sylvest Farms Management Services, Inc., Case No. 06-40527. The Debtors' cases are being jointly administered pursuant to the Final Order Granting Joint Administration of Cases (Docket No. 77) entered on April 27, 2006.

And

/s/ Thomas G. Mancuso
Thomas G. Mancuso, Esquire
Alabama Bar No.: 6179-053T
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, Alabama 36117
Telephone: (334) 481-1800
Telecopier: (334) 481-1810
E-mail: tgm@mancusofranco.com
**Special Counsel for**
**Debtors and Debtors-in-Possession**

## CERTIFICATE OF SERVICE

This is to certify that on the 20th day of June, 2006, I served a true and correct copy of the foregoing *Notice of Filing Corrected Exhibit "A" to Debtor's Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts* upon all parties listed on the attached Master Service List and to all parties to contracts listed on the attached Service List – Parties to Contracts via first class U.S. mail, postage prepaid, and via the Court's electronic filing system.

/s/ Richard A. Robinson
Richard A. Robinson

BARRISTERS, 79689, 00001, 501099047.1, Notice of Filing Corrected Exhibit A to Motion to Reject Leases and Contracts

# CORRECTED EXHIBIT "A"

Sylvest Farms - Leases and Service Agreements to be
Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| RETAIL, WHOLESALE AND DEPARTMENT STORE UNION<br>1901 10TH AVENUE<br>BIRMINGHAM, AL 35205 | Agreement by and between Sylvest Farms, Inc. and the Retail, Wholesale and Department Store Union, effective October 3, 2005 to October 2, 2011, and all related Contracts and Agreements. | |
| GENERAL ELECTRIC CAPITAL CORPORATION<br>PO BOX 740423<br>ATLANTA, GA 30374-0423 | Master Lease Agreement, undated between General Electric Capital Corporation and Sylvest Farms, Inc. | 4171238-001 |
| DSI PORTIONING SYSTEM<br>PO BOX 98635<br>CHICAGO, IL 60693-8635 | DSI Portioning System Lease Agreement, Lease Number 121905-1522-714, effective May 1, 2005 between FMC FoodTech, Inc. (acting through and by its Stein-DSI business) and Sylvest Farms, Inc. | |
| THE CIT GROUP(ADT)<br>PO BOX 371967<br>PITTSBURGH, PA 15250-7967 | Master Lease Agreement #227110, between CIT Technology Financing Services, Inc. and Sylvest Farms, Inc including Equipment Schedule #177734 to Master Lease Agreement #227110 | |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between DeLage Landen Financial Services, Inc and Sylvest Farms, Inc. regarding one new Nissan model PL30LP, Serial # PL01-9G0041 | 200071 |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between DeLage Landen Financial Services, Inc and Sylvest Farms, Inc. regarding one used Nissan model E35Y, Serial # CUM01-002674 | 329914 |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between DeLage Landen Financial Services, Inc and Sylvest Farms, Inc. regarding one new Nissan model WPN-60, Serial # 1W16-9300357 | 193933 |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed September 24, 2003, between DeLage Landen Financial Services, Inc and Sylvest Farms, Inc. regarding two new Nissan Model WPN40, serial nos. 44-42239 and 44-32240. | |
| DELAGE LANDEN<br>P.O. BOX 41601<br>PHILADELPHIA, PA 19101-1601 | Equipment Lease Agreement, executed July 29, 2004, between DeLage Landen Financial Services, Inc and Sylvest Farms, Inc. regarding one used Nissan model RPN60, Serial # 1W26-9301811 | 344057 |
| CAROLINA HANDLING(RAYMOND)<br>PO BOX 890352<br>CHARLOTTE, NC 28289-0352 | Equipment Quotation Quote No. JM0614Q between Carolina Handling LLC and Sylvest Farms, Inc., dated February 21, 2006 | 138262 |
| AIRGAS<br>DEPT 0822 P.O. BOX 120001<br>DALLAS, TX 75312-0822 | Equipment Lease Agreement by and between Airgas Carbonic, Inc. and Sylvest Foods Corporation re: (1) one 50 ton horz receiver and (2) one 28 kw vaporizer | |
| BERNEY OFFICE SOLUTIONS<br>PO BOX 210699<br>MONTGOMERY, AL 36121-0699 | Flex Copy Agreement Agreement No. 6729911 by and between Berney Office Solutions and Sylvest Farms | |
| BERNEY OFFICE SOLUTIONS<br>PO BOX 210699<br>MONTGOMERY, AL 36121-0699 | Total Copy Agreement, Agreement # 6729911020, among Berney Office Solutions and Sylvest Farms and General Electric Capital Corporation | |
| ALABAMA POWER<br>PO BOX 242<br>BIRMINGHAM, AL 35292 | Alabama Power Company Electric System Lease Agreement, made April 3, 2005, by and between Alabama Power Company and Sylvest Farms, Inc. | |
| LOGAN'S ROADHOUSE<br>3011 ARMORY DRIVE, STE 300<br>NASHVILLE, TN 37204 | Supplier Request Forms (2: (1) V-Wings; (2) Fresh 6 oz and 8 oz Boneless Chicken Breast) between Logan's Roadhouse and Sylvest Farms for the period starting January 1, 2006 and ending December 31, 2007 | |

[1] Inclusion of any particular agreement on this list shall not be construed as an admission by the Debtors that any such agreement is an executory contract or unexpired lease and the Debtors reserve their rights to take any position with respect to all agreements listed herein.

Sylvest Farms - Leases and Service Agreements to be
Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| QSI<br>P O BOX 531<br>SIGNAL MOUNTAIN, TN 37377 | This Service Agreement, dated May 1, 1998, made and entered into by and between STELLAR MANAGEMENT GROUP, INC. d/b/a QSI, a Tennessee corporation and Sylvest Farms, Inc., and Alabama Corporation, whereas QSI will provide the Sylvest the cleaning and sanitation services for the procession operations at the plant for 24 months continued on a year-to-year basis by agreement. | |
| ASHLAND SPECIALTY CHEMICAL COMPANY<br>DREW INDUSTRIAL PO BOX 102433<br>ATLANTA, GA 30368-2433 | Treatment Program Services Agreement, made as fo March 15, 2005 by and between DREW INDUSTRIAL DIVISION, ASHLAND SPECIALTY CHEMICAL COMPANY, a division of Ashland, Inc., a Kentucky corporation and SYLVEST FARMS that will have an initial term of 3 years, starting on the Effective Date. | |
| GEORGIA PACIFIC<br>PO BOX 102574<br>ATLANTA, GA 30368-2574 | Corrugated Partnership Proposal between Sylvest Farms, Inc. and Georgia Pacific for the period July 1, 2005 through June 20, 2007. | |
| GEORGIA PACIFIC<br>PO BOX 102574<br>ATLANTA, GA 30368-2574 | Equipment Lease Contract, dated May 31, 2005, between GEORGIA PACIFIC CORPORATION and SYLVEST FARMS, INC. for equipment as described: one (1) SWF Model TF 400V, Tray-Matic Machine Serial No. 050365-01. Term of lease will be 3 years beginning July 1, 2005 and ending June 30, 2008. | |
| ALABAMA POWER<br>PO BOX 242<br>BIRMINGHAM, AL 35292 | Contract for Electric Service entered into the 15th day of September, 2005 between Alabama Power Company and SYLVEST FOODS CORPORATION, with a term of 5 years from the commencement of electric service under the contract. | |
| CROSSTOWN<br>PO BOX 849<br>BAINBRIDGE, GA 39818 | Lease Agreement to Rent Office Space, entered into on 2nd day of May, 2005 by and between Crosstown LLC and Sylvest Farms for 36 months. Office space is located at 220 River Street, Bainbridge, GA. | |
| GREATER BAY CAPITAL<br>ACCOUNTS RECEIVABLE P O BOX 7777<br>SAN FRANCISCO, CA 94120-7777 | Equipment Lease, dated July, 7, 2003 and with a term for 36 months, between Greater Bay Capital and Sylvest Farms, Inc. for equipment as described: 1 Kalmar AC Pallet Truck WF45C, Serial No. 33174001 | 200527409 |
| CAROLINA HANDLING(RAYMOND)<br>PO BOX 890352<br>CHARLOTTE, NC 28289-0352 | Equipment Master Lease Agreement, dated February 21, 2006 and with a term of 36 months, between Sylvest Farms, Inc and Raymond Leasing Corporation for Poultry Package Models 111 and 112. | 138261 |
| AIRGAS DRY ICE<br>3700 CRESTWOOD PARKWAY, SUITE 200<br>DULUTH, GA 30096 | Dry Ice Sales Agreement, dated March 23, 2003 and with a term of 3 years, by and between AIRGAS CARBONIC, INC., d.n.a.Airgas Dry Ice and Sylvest Farms, Inc. Upon expiration of initial term, contract will continue on a year-to-year by agreement unless writen notice is provided. | |
| AIRGAS CARBONIC INC.<br>3700 CRESTWOOD PARKWAY, SUITE 200<br>DULUTH, GA 30096 | Liquid $CO_2$ Purchase Agreement, dated April 24, 2003 and with a term of three (3) years, by and between Airgas Carbonic, Inc. and Sylvest Poultry, Inc. whose address is 3500 Western Blvd., Montgomery, AL 36125. Upon expiration of initial term, contract will continue on a year-to-year basis by agreement unless writen notice is provided. | |
| ARAMARK<br>PO BOX 10722<br>BIRMINGHAM, AL 35202-0000 | Service Agreement for Uniforms between Aramark Uniform Services and Sylvest Farms, dated 3/12/04 and with a term of 36 months. | |
| TRIPLE POINT<br>PO BOX 36423<br>BIRMINGHAM, AL 35236 | Service Agreement (to provide materials for the cooling tower system), with a start date of January 28, 2005 for a period of one year between Triple Point Industries, LLC and Sylvest Poultry for the Montgomery plant. | |
| TRIPLE POINT<br>PO BOX 36423<br>BIRMINGHAM, AL 35236 | Service Agreement (to provide materials for the cooling tower system), between Triple Point Industries, LLC and Sylvest Poultry for the Sylacauga plant. | |

Sylvest Farms - Leases and Service Agreements to be
Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| SILENT SENTRY<br>311 W. MENDEL PKWY<br>MONTGOMERY, AL 36117 | Service Agreement (to monitor fire alarm system), dated January 10, 2006 and with a term of 24 months, by and between Silent Sentry Electronic Security, Inc. and Sylvest Foods. | MTG |
| US SECURITY<br>PO BOX 931703<br>ATLANTA, GA 31193 | Security And/Or Patrol Service Agreement dated January 27, 2006, by and between US Security and Sylvest Farms. | FOODS |
| US SECURITY<br>PO BOX 931703<br>ATLANTA, GA 31193 | Security And/Or Patrol Service Agreement by and between US Security and Sylvest Foods. | FOODS |
| CSX<br>P.O.BOX 532652<br>ATLANTA, GA 30353-2652 | Service Agreement: Amendment 3 to Contract: Sylvest Farms, Inc. CSX Transporation, Inc. and Alabama & Tennessee River Railway LLC, Chicago, Ft Wayne & Eastern and Western Railway agree to amend Contract which has been in effect since December 2, 1992. Amendment will have an effective date of October 1, 2005, ending on September 30, 2006. | 40065654 |
| BARLOWORLD HYSTER<br>PO BOX 402473<br>ATLANTA, GA 30384-2473 | Equipment Lease Agreement with Maintenance between Barloworld Fleet Leasing, LLC and Sylvest Farms, Inc, dated May 15th 2002, and with a terms of 48 months. Equipment delivered and located at 3500 Western Blvd., Mongomery, AL. Upon expiration of initial term, contract will continue on month-to-month basis by agreement until written notice provided. | 40041662 |
| BARLOWORLD HYSTER<br>PO BOX 402473<br>ATLANTA, GA 30384-2473 | Equipment Lease Agreement with Maintenance between Barloworld Fleet Leasing, LLC and Sylvest Farms, Inc, dated May 15th 2002, and with a terms of 48 months. Equipment delivered and located at Box 109 Tyson Rd, Hope Hull AL 30013. Upon expiration of initial term, contract will continue on month-to-month basis by agreement until written notice provided. | 40041662 |
| CRYSTAL SPRINGS OF ALABAMA<br>P O BOX 11786<br>BIRMINGHAM, AL 35202-1786 | Customer Agreement (water cooler lease), dated February 24, 2006 and with a term of month-to-month, between Sylvest Farms Food and Crystal Springs of Alabama. | |
| PITNEY BOWES<br>PO BOX 856460<br>LOUISVILLE, KY 40285-6460 | Equipment Lease (for mailing machine), dated January 21, 2003 with 21 quarterly payments, by and between Pitney Bowes Credit Corporation and Sylvest Farms, Inc. | |
| BRIGHT COOP<br>PO BOX 635001<br>NACOGDOCHES, TX 75963-5001 | Equipment Leases, dated October 4, 2004 and with a term of 28 months, by an between Sylvest Farms, Inc. and Bright Coop, Inc. Contract for Bright Bullet B260 H-F-77 S# 104011M3. Contract has 15 months remaining. | |
| BRIGHT COOP<br>PO BOX 635001<br>NACOGDOCHES, TX 75963-5001 | Equipment Leases, dated November 8, 2004 and with a term of 28 months, by an between Sylvest Farms, Inc. and Bright Coop, Inc. Contract for Bright Bullet B260 H-F-77 S# 104012M3. Contract has 17 months remaining. | |
| BRIGHT COOP<br>PO BOX 635001<br>NACOGDOCHES, TX 75963-5001 | 6 Equipment Leases between Sylvest Farms, Inc. and Bright Coop, Inc. For KD Manitou M30--2H Poultry Equipment. Contracts have expired. | |
| EMBREX<br>P. O. BOX 890379<br>CHARLOTTE, NC 28289-0379 | Inovoject Egg Injection/Egg Remover Sytem Lease, dated December 7, 2004 and with a through January 31, 2008, by and between Embrex and Sylvest Farms, Inc. | |

Sylvest Farms - Leases and Service Agreements to be
Rejected

| UNEXPIRED LEASES AND EXECUTORY CONTRACTS[1] | DESCRIPTION | Contract # |
|---|---|---|
| NOMESS<br>PO BOX 242181<br>MONTGOMERY, AL 36124 | Janitorial Service & Hard Floor Care Program, letter proposal dated August 4, 2004 and with a term of one year, by and between Sylvest Farms, Inc. and Nomess Commercial Cleaning Services. Upon expiration of the initial term, contract will continue by agreement until either party provides a 30 day notice of cancellation. | |
| DYNA-LIFT, INC.<br>184 WESTERN BLVD.<br>MONTGOMERY, AL 38108 | Equipment Lease dated 7/19/05 between Sylvest Farms, Inc. and Dyna-Lift, Inc. for the lease of a Fork Lift. | |
| DYNA-LIFT, INC.<br>184 WESTERN BLVD.<br>MONTGOMERY, AL 38108 | Equipment Lease dated 7/19/05 between Sylvest Farms, Inc. and Dyna-Lift, Inc. for the lease of pallet jack. | |
| List of Breeders Provided Separately | Breeder Hen Agreements by and between Sylvest Farms, Inc and the Independent Contractor Producers identified on Attachment 1. | |
| List of Broilers Growers Provided Separately | Poultry Production Agreements by and between Sylvest Farms, Inc. and Independent Contractor Producers identified on Attachment 2. | |
| List of Pullet Flock Growers Provided Separately. | Pullet Flock Agreements by and between Sylvest Farms, Inc. and Independent Contractor Growers identified on Attachment 3. | |

## ATTACHMENT 1 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 330 | COLVIN FARMS<br>36036 BOYKIN ROAD<br>RED LEVEL, AL. 36474 |
| 333 | FLOYD FARMS<br>6071 WORLY ROAD<br>RED LEVEL, AL. 36474 |
| 334 | FLOYD FARMS<br>6071 WORLEY RD.<br>RED LEVEL, AL 36474 |
| 335 | F & S FARMS PARTNERS<br>31214 FOLEY RD.<br>RED LEVEL, AL 36474 |
| 336 | F&S FARMS PARTNERS<br>31214 FOLEY RD.<br>RED LEVEL, AL 36474 |
| 338 | FLOYD FARM<br>7514 US HWY 29 S.<br>GOSHEN, AL 36035 |
| 341 | BUCK CREEK FARMS<br>8144 PERRETTE RD.<br>RED LEVEL, AL 36474 |
| 342 | BUCK CREEK FARMS<br>8144 PERRETTE RD.<br>RED LEVEL, AL 36474 |
| 355 | GRAYSON FARMS<br>276 RIGSBY ROAD<br>GEORGIANA, AL 36033 |
| 356 | J & C FARMS<br>37372 HESTER STORE RD.<br>RED LEVEL, AL 36474 |
| 360 | LUCKIE FARM 1&2<br>4572 LUVERNE HWY<br>GREENVILLE, AL 36037 |
| 362 | LUCKIE FARM 3&4<br>4572 LUVERNE HWY<br>GREENVILLE, AL 36037 |
| 363 | MORGAN FARMS<br>3615 LIVE OAK ROAD<br>LUVERNE, AL 36049 |

## ATTACHMENT 1 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 400 | MORGAN FARMS<br>3615 LIVE OAK ROAD<br>LUVERNE, AL 36049 |
| 364 | WINDY RIDGE FARMS<br>980 WILLIAMSON RD.<br>LUVERNE, AL 36049 |
| 365 | ERIC KILLOUGH<br>PO BOX 223<br>RUTLEDGE, AL 36071 |
| 366 | THOMAS CROSSROAD COR<br>4041 CO. RD. 2201<br>GOSHEN, AL 36035 |
| 367 | THOMAS CROSSROAD COR<br>4041 CO. RD. 2201<br>GOSHEN, AL 36035 |
| 368 | S AND J FARM<br>954 CO. RD. 2219<br>GOSHEN, AL 36035 |
| 370 | NED SANDERS<br>2968 CO RD 2243<br>GOSHEN, AL 36035 |
| 372 | NED SANDERS<br>2968 CO RD 2243<br>GOSHEN, AL 36035 |
| 373 | RODGERS POULTRY FARM<br>P.O. BOX 52<br>RED LEVEL, AL 36474 |
| 374 | RODGERS POULTRY FARM<br>P.O. BOX 52<br>RED LEVEL, AL 36474 |
| 380 | TED & FAYE POULTRY<br>1553 CO. RD. 2281<br>GLENWOOD, AL 36034 |
| 382 | TED SANDERS<br>1553 CO. RD. 2281<br>GLENWOOD, AL 36034 |
| 385 | BARBARA K SEALE<br>60 HOWARD STEEN RD.<br>FOREST HOM, AL 36030 |
| 387 | B. W. THOMPSON<br>13461 GANTT REDLEVEL ROAD<br>ANDALUSIA, AL 36420 |

## ATTACHMENT 1 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 388 | B. W. THOMPSON<br>13461 GANTT REDLEVEL ROAD<br>ANDALUSIA, AL 36420 |
| 390 | TILL FARM<br>220 DUSTY TRAIL<br>GREENVILLE, AL 36037 |
| 392 | CEDARSVILLE FARMS<br>PO BOX 196<br>GLENWOOD, AL 36034 |
| 396 | TURKEY TROT FARMS<br>2047 N GLENWOOD RD<br>GOSHEN, AL 36035 |
| 397 | JERROD WOOD<br>72 E. 1ST. STREET<br>LUVERNE, AL 36049 |
| 398 | J DICK WOOD<br>649 LITTLE HORSE CREEK RD<br>RUTLEDGE, AL 36071 |
| 399 | 4 M FARMS<br>1085 N MOODYS CROSSROAD RD<br>LUVERNE, AL 36049 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 5 | JAMES ALTIERE<br>618 COBB LANE<br>GEORGIANA, AL 36033 |
| 12 | MICHAEL R BAGENTS<br>6480 GREENVILLE HWY<br>LUVERNE, AL 36049 |
| 19 | BEES FARM<br>341 BOYD RD<br>RUTLEDGE, AL 36071 |
| 21 | BRENT BLACK<br>1732 MASON ROAD<br>HOPE HULL, AL 36043 |
| 26 | MAXINE BLACK<br>1732 MASON ROAD<br>HOPE HULL, AL 36043 |
| 28 | ULYSIS BLACK<br>2429 STARLINGTON RD<br>GEORGIANA, AL 36033 |
| 30 | WAYNE BLACK<br>1732 MASON ROAD<br>HOPE HULL, AL 36043 |
| 40 | DARREN BOLLING<br>356 DRY LAKE RD<br>LUVERNE, AL 36049 |
| 50 | MICHAEL R BRIGHTWELL<br>6573 BOWDEN ROAD<br>HONORAVILL, AL 36042 |
| 51 | ELTON BROWN<br>1120 PUSLEY RIDGE RD<br>HIGHLAND H, AL 36041 |
| 53 | KENNETH BURKETT<br>9832 WESLEY CHAPEL RD<br>GEORGIANA, AL 36033 |
| 54 | KENNETH BURKHALTER<br>3216 FORT DALE RD<br>GREENVILLE, AL 36037 |
| 55 | JEREMY BROWN<br>12773 MT ZION RD<br>RAMER, AL 36069 |

# ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|---|---|
| 56 | CAMPBELL FARMS<br>P O BOX 34<br>MCKENZIE, AL 36456 |
| 58 | JOHNNY CARPENTER<br>1284 NEW HOME RD<br>GEORGIANA, AL 36033 |
| 60 | DON CASEY<br>8500 SELMA HIGHWAY<br>MONTGOMERY, AL 36108 |
| 62 | CRENSHAW FARMS<br>1706 DICKENS FIELD RD<br>GREENVILLE, AL 36037 |
| 63 | LADONNA CASEY<br>3950 ROBERT C HAM RD<br>MONTGOMERY, AL 36108 |
| 65 | JUDY CASEY<br>8500 SELMA HIGHWAY<br>MONTGOMERY, AL 36108 |
| 66 | CIRCLE E<br>P O BOX 381<br>FT DEPOSIT, AL 36032 |
| 69 | CHARLIE W CRANE, JR<br>437 HOWARD STEEN RD<br>FOREST HOM, AL 36030 |
| 70 | DALE DAVIS<br>4907 CO RD 1107 BRIARHILL RA<br>NC GOSHEN, AL 36035 |
| 71 | KEVIN DAVIS<br>4907 CO RD 1107 BRIARHILL RA<br>NC GOSHEN, AL 36035 |
| 73 | DOUBLE O FARMS<br>PO BOX 275<br>LOWNDESBOR, AL 36752 |
| 78 | NED ELLIS<br>P O BOX 381<br>FT DEPOSIT, AL 36032 |
| 80 | THOMAS ELLIS<br>3500 MASON RD<br>HOPE HULL, AL 36043 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|---|---|
| 81 | THOMAS ELLIS #2<br>3500 MASON RD<br>HOPE HULL, AL 36043 |
| 82 | FARON FRAZIER<br>742 GREENLEAF RD<br>HONORAVILL, AL 36042 |
| 83 | HUBERT FRAZIER<br>6468 BOWDEN RD<br>HONORAVILL, AL 36042 |
| 84 | EDDIE PAUL FRAZIER<br>5993 OLD STAGE RD<br>GREENVILLE, AL 36037 |
| 85 | J & L FARMS<br>6593 MERRIWETHER RD<br>HONORAVILL, AL 36042 |
| 86 | FOWLER FARM<br>869 FOWLER RD<br>LUVERNE, AL 36049 |
| 89 | KRISTY FRAZIER<br>6746 MERRIWETHER TRAIL<br>HONORAVILL, AL 36042 |
| 91 | GREGORY A GAFFORD<br>2551 NORRELL AVE<br>GEORGIANA, AL 36033 |
| 92 | COUNTYLINE FARMS<br>2555 BETHEL CHURCH RD<br>FT DEPOSIT, AL 36032 |
| 96 | C & S POULTRY<br>1017 BOWDEN RD<br>HONORAVILL, AL 36042 |
| 105 | GRANT FARMS<br>10643 STEINER STORE RD<br>FT DEPOSIT, AL 36032 |
| 108 | HESTER FARMS<br>3323 CENTER RIDGE RD<br>LUVERNE, AL 36049 |
| 109 | JONES POULTRY<br>122 HORSE FARM RD<br>GEORGIANA, AL 36033 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|---|---|
| 110 | A & J FARMS<br>2249 S MOODYS CROSSRD RD<br>RUTLEDGE, AL 36071 |
| 111 | JOHN HOFFMAN<br>1368 SAVILLE ROAD<br>HIGHLAND H, AL 36041 |
| 112 | HOFFMAN POULTRY FARM<br>3276 MAGNOLIA SHORES RD<br>LAPINE, AL 36046 |
| 113 | HOLLADAY FARMS<br>416 HORSECREEK RD<br>RUTLEDGE, AL 36071 |
| 114 | GRADY HOLLEY<br>1371 PERDUE RD<br>LUVERNE, AL 36049 |
| 115 | RICKY JEFFCOAT<br>305 JEFFCOAT RD<br>RUTLEDGE, AL 36071 |
| 119 | HORSE CREEK FARMS<br>680 S MOODYS CROSSRDS RD<br>RUTLEDGE, AL 36071 |
| 121 | TROY HUSBAND<br>2782 QUAIL TOWER RD<br>LUVERNE, AL 36049 |
| 123 | GLYNN D KING<br>PO BOX 1085<br>MCKENZIE, AL 36456 |
| 124 | WILLIAM KILPATRICK<br>182 GREENVILLE RACEWAY<br>FOREST HOM, AL 36030 |
| 125 | INGE FARMS<br>1555 DAUPHIN ST<br>MOBILE, AL 36604 |
| 127 | DEBBIE KENT<br>840 SHAMROCK RD<br>LUVERNE, AL 36049 |
| 129 | CHARLES KILPATRICK<br>1285 SEVENTH AVE<br>FOREST HOM, AL 36030 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|---|---|
| 131 | MARSHA D LOFTIN<br>3611 CO RD 4<br>FT DEPOSIT, AL 36032 |
| 133 | LONNIE LESTER<br>1911 RUTLEDGE LOOP RD<br>LUVERNE, AL 36049 |
| 134 | PAUL LOWERY<br>1771 SEVENTH AVE<br>FOREST HOM, AL 36030 |
| 135 | MARK KNOX<br>523 GIN CREEK RD<br>GOSHEN, AL 36035 |
| 137 | LANGFORD FARMS<br>5444 SAND CUT RD<br>GEORGIANA, AL 36033 |
| 138 | RAY MCCULLOUGH<br>4705 SWEETWATER RD<br>HIGHLAND H, AL 36041 |
| 139 | RAY MCCULLOUGH # 2<br>4705 SWEETWATER RD<br>HIGHLAND H, AL 36041 |
| 140 | SHEILA MCELWAIN<br>15964 MONTGOMERY HWY<br>HIGHLAND H, AL 36041 |
| 141 | JOE MCGOUGH<br>2217 DANIELSVILLE RD<br>HONORAVILL, AL 36042 |
| 142 | LOWES POULTRY FARM<br>588 WALSH STREET<br>MCKENZIE, AL 36456 |
| 146 | DAWARD MCNAUGHTON<br>1318 JASMIN HILL RD<br>GREENVILLE, AL 36037 |
| 151 | JOYCE H MADDOX<br>6173 W HICKORY GROVE RD<br>LETOHATCHE, AL 36047 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 154 | CHARLES MATTHEWS<br>2865 DANIEL BRANCH RD<br>HIGHLAND H, AL 36041 |
| 155 | MACK MEADOWS<br>2432 MEADOWS DR<br>LOWNDESBOR, AL 36752 |
| 156 | KIRK MEADOWS<br>1128 ST CLAIR PLACE<br>LOWNDESBOR, AL 36752 |
| 157 | MIXON FARMS LLC<br>1818 ASHBURY CHURCH RD<br>PINEAPPLE, AL 36768 |
| 158 | WILLIAM A MITCHELL<br>336 MITCHELL ROAD<br>FT DEPOSIT, AL 36032 |
| 159 | ALAN P MOBLEY<br>1763 WILLIAMSON RD<br>LUVERNE, AL 36049 |
| 160 | MILLER FARMS<br>5388 S. MT. ZION RD<br>GREENVILLE, AL 36037 |
| 162 | DAVIS MOORER<br>891 KNIGHT PLACE<br>FT DEPOSIT, AL 36032 |
| 167 | J MIKE MOORER<br>660 KNIGHT PLACE RD<br>FT DEPOSIT, AL 36032 |
| 170 | SHELLEY MOORER<br>660 KNIGHT PLACE RD<br>FT DEPOSIT, AL 36037 |
| 172 | EVELYN MOSELEY<br>407 ROCK HILL RD<br>HONORAVILL, AL 36042 |
| 174 | MICHAEL MOSELEY<br>1727 RAMER NAFTEL RD<br>RAMER, AL 36069 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 178 | ROBERT C NICHOLS, JR<br>8450 HWY 97 S<br>LETOHATCHE, AL 36047 |
| 180 | DOROTHY G NICHOLAS<br>2856 STEINER STORE ROAD<br>GREENVILLE, AL 36037 |
| 181 | CHARLES NIXON<br>893 GORUM RD<br>MCKENZIE, AL 36456 |
| 182 | NOLAN FARMS<br>P O BOX 437<br>FT DEPOSIT, AL 36032 |
| 183 | ROBERT PARMER<br>510 GREENMORE RD<br>GREENVILLE, AL 36037 |
| 184 | WILLIAM R PIERSON<br>594 SKIPPER FARM RD<br>GEORGIANA, AL 36033 |
| 185 | DIXIE FARMS<br>3608 MURPHY RD<br>GEORGIANA, AL 36033 |
| 187 | H & K FARMS,INC<br>218 PALMER RD<br>GEORGIANA, AL 36033 |
| 188 | HAROLD PARMER<br>532 WILDFORK RD<br>GREENVILLE, AL 36037 |
| 189 | PARTRIDGE FARMS<br>463 COUNTY RD 1117<br>TROY, AL 36079 |
| 190 | RILEY PERRETT<br>12317 MONTGOMERY HWY<br>LUVERNE, AL 36049 |
| 191 | RONALD H PETREY<br>10541 PETREY HWY<br>LUVERNE, AL 36049 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|--------------------------------|
| 194 | LARRY PETTY<br>538 POSEY ROAD<br>LAPINE, AL 36046 |
| 196 | FRANK PROCHAZKA<br>598 COUNTY RD 1108<br>GOSHEN, AL 36035 |
| 203 | GEORGE REID<br>1138 OLD REID RD<br>FT DEPOSIT, AL 36032 |
| 205 | STEVE ROGERS<br>3954 LUVERNE HWY<br>GREENVILLE, AL 36037 |
| 206 | ROGERS FARMS<br>2361 AIRPORT RD<br>GREENVILLE, AL 36037 |
| 207 | WILLIAM E ROPER<br>698 NEW BETHEL CHURCH RD<br>LAPINE, AL 36046 |
| 208 | LARRY E ROSIER<br>374 ROSIER LANE<br>GEORGIANA, AL 36033 |
| 209 | DARIN SANDERS<br>781 MILTON RD<br>RUTLEDGE, AL 36049 |
| 210 | WILLIAM F SINGLETON<br>15 E ROGER RD<br>FT DEPOSIT, AL 36032 |
| 211 | JAMES SEALE<br>1821 MONTEREY RD<br>FOREST HOM, AL 36030 |
| 212 | BOBBY SASSER<br>385 TAYLOR CROSSING RD<br>LAPINE, AL 36046 |
| 214 | ALVIN SEXTON<br>5163 SWEETWATER RD<br>HIGHLAND H, AL 36041 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|---|---|
| 216 | LLOYD SHELL<br>473 BRUSHY CREEK RD<br>GEORGIANA, AL 36033 |
| 218 | JERRY O STINSON<br>5557 STARLINGTON RD<br>GEORGIANA, AL 36033 |
| 222 | BELINDA STRICKLAND<br>15293 HWY 21 SOUTH<br>MINTER, AL 36761 |
| 224 | TAYLOR FARMS<br>7796 OLD STAGE RD<br>GREENVILLE, AL 36037 |
| 226 | GLYN STRINGER<br>1880 ROPER RD<br>HONORAVILL, AL 36042 |
| 228 | THOMAS L STRINGER<br>RT 2 BOX 185<br>HONORAVILL, AL 36042 |
| 230 | TOMMY THOMPSON<br>432 SUNSET DRIVE<br>FOREST HOM, AL 36030 |
| 232 | THOMAS ENTERPRISES<br>1390 SWEETWATER RD<br>HIGHLAND H, AL 36041 |
| 233 | WINDY RIDGE FARM<br>LLC 961 CO RD 33<br>HAYNEVILLE, AL 36064 |
| 234 | L & N FARMS INC<br>3068 THOMAS RD<br>LUVERNE, AL 36049 |
| 235 | GEORGE A TILL<br>416 TILL RD<br>MINTER, AL 36761 |
| 236 | T & T FARM<br>2991 HONORAVILLE RD<br>LUVERNE, AL 36049 |

## ATTACHMENT 2 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Farm # | Name of Independent Contractor |
|--------|-------------------------------|
| 238 | WINSTON/MONTEZ TUR<br>4003 AIRPORT RD<br>GREENVILLE, AL 36037 |
| 240 | LINDA FAYE WATSON<br>816 CO RD 29<br>PINEAPPLE, AL 36768 |
| 245 | RONALD G WILKINSON<br>601 DEAN RD<br>HOPE HULL, AL 36043 |
| 246 | MARY F WILLIAMSON<br>1997 CENTENARY RD<br>LUVERNE, AL 36049 |
| 247 | MARIE WILKERSON<br>8191 PETREY HWY<br>LUVERNE, AL 36049 |
| 248 | STEVE WHITTINGTON # 2<br>6774 FORT DALE RD<br>GREENVILLE, AL 36037 |
| 249 | WHEELER FARMS<br>1438 WOOD ROAD<br>BRANTLEY, AL 36009 |
| 250 | RANDY P WILLIAMSON<br>2160 CENTNARY RD<br>LUVERNE, AL 36049 |
| 251 | WIGGINS FARM<br>404 HASSEY RD<br>RAMER, AL 36069 |
| 252 | WOOD FARMS<br>8324 IVY CREEK RD<br>BRANTLEY, AL 36009 |
| 253 | TOMMY WHITTLE<br>6814 PINE APPLE HWY<br>GREENVILLE, AL 36037 |
| 254 | RUSS WILKERSON<br>8469 PETREY HWY<br>LUVERNE, AL 36049 |
| 255 | DOUG STEPHENS<br>1193 COUNTY RD 1137<br>GOSHEN, AL 36035 |

# ATTACHMENT 3 TO EXHIBIT "A"
## OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**Farm #**      **Name of Independent Contractor**

302      BETTY FAULK
         1583 FAULK ROAD
         HONORAVILLE, AL. 36042

304      TOM DUNCAN
         3622 HONORAVILLE ROAD
         GREENVILLE, AL. 36037

305      JOHNNY BOYD
         1076 REDLAND ROAD
         WETUMPKA, AL. 36092

308      JAMES L. REEVES
         4516 BURGAMY SWAMP ROAD
         HIGHLAND H, AL. 36041

310      RONALD & LYNDA FLOYD
         PO BOX 546
         TROY, AL. 36081

311      RONALD & LYNDA FLOYD
         PO BOX 546
         TROY, AL. 36081

320      SANDERS FARM
         RT. 1 BOX 10
         GOSHEN, AL. 36036

321      SANDERS FARM
         RT. 1 BOX 10
         GOSHEN, AL. 36035

## MASTER SERVICE LIST – 06/15/06

Wachovia Bank, N.A.
c/o Michael L. Hall, Esquire
Burr & Forman, LLP
Wachovia Tower
420 North Twentieth Street
Suite 3100
Birmingham, AL 35203

AirGas Carbonic
P.O. Box 120001
Dallas, TX 75312-0822

AirGas Dry Ice
P.O. Box 166
Star, MS 39167

Al Hill's Boiler & Sales
P.O. Box 662
Theodore, AL 36590

ALPHARMA, Inc.
P.O. Box 23072
Newark, NJ 07189

American Proteins
P.O. Box 930394
Atlanta, GA 31193

Americold Logistics
Unit 04
P.O. Box 5000
Portland, OR 97208-5000

Aviagen, Inc.
P.O. Box 11407
Birmingham, AL 35246-0389

Bunge Corporation
P.O. Box 952397
St. Louis, MO 63195

Cagle's, Inc.
P.O. Box 1070
Charlotte, NC 28201-1070

Office of the Bankruptcy
Administrator
Robert S. Vance Federal Building
1800 5th Avenue North
Birmingham, AL 35203

Custom Graphic Products
P.O. Box 680575
Prattville, AL 36068

Dapec, Inc.
P.O. Box 101120
Atlanta, GA 30392-1120

Degussa Corporation
Chemical Group
P.O. Box 905424
Charlotte, NC 29290-5424

Dyna Lift, Inc.
P.O. Box 1348
Montgomery, AL 36102-1348

Ed's Electric Motor Serv
513 North Hull Street
Montgomery, AL 36104

Farmers Grain Dealers, Inc.
19901 North Dixie Highway
Bowling Green, OH 43402

FMC FoodTech, Inc.
P.O. Box 98635
Chicago, IL 60693

Georgia-Pacific Corporation
P.O. Box 102574
Atlanta, GA 30368-2574

H.J. Baker & Bro., Inc.
Attn: Scott Michelsen
228 Saugatuck Avenue
Westport, CT 06880

District Director Internal Revenue
Service for Northern District of
Alabama
801 Tom Martin Drive, Rm 126
Birmingham, AL 35211-6425

Romero Trucking, Inc.
367 G&S Road
Prattville, AL 36067

Simplex Grinnell
Dept. Ch 10156
Palatine, IL 60055-0156

Southeastern Energy
P.O. Box 9309
Montgomery, AL 36108-0000

Southeastern Mineral
P.O. Box 1650
Bainbridge, GA 39818

Southland Industrial
P.O. Box 1474
Gainesville, GA 30503

Starke Agency
P.O. Box 4359
Montgomery, AL 36103

Stellar Group
2900 Hartley Road
Jacksonville, AL 32557

Stewart Stainless Supply
3660 Swiftwater Park drive
Suwanee, GA 30024

Tremco, Inc.
7418 Wimberly Lane
Montgomery, AL 36617

Carolina Handling
P.O. Box 890352
Charlotte, NC 28289-0352

CIMCO Refrigeration
2502 Commercial Park
Mobile, AL 36606

Cobb-Vantress, Inc.
P.O. Box 1030
Siloam Springs, AR 72761-1030

COPACO-Montgomery
3325 Aronov Avenue
Montgomery, AL 36108

Columbus Paper Company, Inc.
c/o Richard P. Carmody, Esq.
Adams & Reese/Lange Simpson LLP
2100 3rd Avenue North
Suite 1100
Birmingham, AL 35203

Wachovia Bank, National Association
c/o Jason D. Woodard, Esq.
Burr & Forman, LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203

David Boyle
AirGas, Inc.
259 Radnor-Chester Road
Suite 100
Radnor, PA 19087-8675

Dixie Electric Cooperative
c/o J. Theodore Jackson, Jr.
P.O. Box 270
Montgomery, AL 36101-0270

H. Maynard Sylvest
c/o J. Flynn Mozingo
Melton, Espy & Williams, P.C.
P.O Drawer 5130
Montgomery, AL 36103

Horn Enterprises
10325 US Hwy 231 South
Cropwell, AL 35054

Johnson Food Equipment
4162 Paysphere Circle
Chicago, IL 60674

Mayer Electric Supply
P.O. Box 1328
Birmingham, AL 35201-1328

QSI
P.O. Box 531
Signal Mountain, TN 37377

Federal Land Bank Association of
South Alabama,FLCA
c/o W. Clark Watson, Esq.
Balch & Bingham, LLP
Post Office Box 306
Birmingham, Alabama 35201

D. Christopher Carson, Esq.
Burr & Forman, LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203

Farmers Grain Dealers, Inc.
c/o Donald M. Wright, Esq.
Sirote & Permutt, P.C.
2311 Highland Avenue South
P.O. Box 55727
Birminham, AL 35355-5727

Jayna Partain Lamar
Maynard, Cooper & Gale PC
1901 6th Avenue North
Suite 2400
Birmingham, AL 35203

Federal Land Bank Association of
South Alabama, FLCA
c/o Jesse S. Vogtle, Jr.
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201-0306

U.S. Security Assoc. Inc.
P.O. Box 931703
Atlanta, GA 31193

Wesco Receivables Corp.
P.O. Box 530409
Atlanta, GA 03053-0409

Worldwide Dedicated Services
c/o Upslogistics
636 Sandy Lake Rd.
Coppell, TX 75019

Zee Company, Inc.
407 East 5th Street
Chattanooga, TN 37403

Jeremy L. Retherford, Esq.
Balch & Bingham, LLP
Post Office Box 306
Birmingham, Alabama 35201

Airgas, Inc.
c/o Kathleen M. Miller, Esq.
Smith, Katzenstein & Furlow
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899

Matthew W. Grill
Maynard Cooper & Gale PC
1901 6th Avenue North
Suite 2400
Birmingham, AL 35203-2602

Amick-OSI Processing, LLC
c/o Julio E. Mendoza, Jr.
Nexsen Pruet Adams Kleemeier, LLC
P.O Drawer 2426
Columbia, SC 29202

Matthew Q. Tompkins, Esq.
Rosen, Cook, Sledge, Davis, Shattuck
& Oldshue, P.A.
2117 Jack Warner Parkway (35401)
Post Office Box 2727
Tuscalossa, AL 35403-2727

Michael H. Taison, Esq.
Miller, Canfield, Paddock & Stone, PLC
150 West Jefferson Avenue
Suite 2500
Detroit, MI 48226

Lenora Lewis
3509 McGehee Place Court
Montgomery, AL 36111

Myrtle Sylvest
3442 Summerhill Drive
Montgomery, AL 36111

R. Scott Williams, Esq., Haskell
Slaughter Young & Rediker, LLC,
Counself or the Committee
2001 Park Place North, Suite 1400,
Birmingham, AL 35203

Gilbert B. Weisman, Esq.
Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

Chris Lester
28 Prestwick Drive
Jackson, TN 38305

Stephen B. Porterfield, Esq.
Sirote & Permutt, P.C.
2311 Highland Avenue South
Birmingham, AL 35205

Gwen Sylvst
P.O. Box 1223
Wetumpka, AL 36092

Carl Watson
302 Arrowhead Drive
Montgomery, AL 36117

Wanda Borges, Esquire
Borges & Associates, LLC
575 Underhill Blvd.
Syosset, NY 11791

BARRISTERS, 79689, 00001, 501060159.4, Master Service List - Sylvest Farms (6/15/06)

3

## SERVICE LIST – PARTIES TO CONTRACTS

4 M FARMS
1085 N MOODYS CROSSROAD
RD
LUVERNE, AL 36049

A & J FARMS
2249 S MOODYS CROSSRD RD
RUTLEDGE, AL 36071

AIRGAS
DEPT 0822
PO BOX 120001
DALLAS, TX 75312-0822

AIRGAS DRY ICE
3700 CRESTWOOD PKWY, STE
200
DULUTH, GA 30096

ALABAMA POWER
PO BOX 242
BIRMINGHAM, AL 35292

ALAN P MOBLEY
1763 WILLIAMSON RD
LUVERNE, AL 36049

ALVIN SEXTON
5163 SWEETWATER RD
HIGHLAND H, AL 36041

ARAMARK
PO BOX 10722
BIRMINGHAM, AL 35202

ASHLAND SPECIALTY CHEMICAL
COMPANY
DREW INDUSTRIAL
PO BOX 102433
ATLANTA, GA 30368-2433

B. W. THOMPSON
13461 GANTT REDLEVEL ROAD
ANDALUSIA, AL 36420

BARBARA K SEALE
60 HOWARD STEEN RD.
FOREST HOM, AL 36030

BARLOWORLD HYSTER
PO BOX 402473
ATLANTA, GA 30384-2473

BEES FARM
341 BOYD RD
RUTLEDGE, AL 36071

BELINDA STRICKLAND
15293 HWY 21 SOUTH
MINTER, AL 36761

BERNEY OFFICE SOLUTIONS
PO BOX 210699
MONTGOMERY, AL 36121-0699

BETTY FAULK
1583 FAULK ROAD
HONORAVILLE, AL. 36042

BOBBY SASSER
385 TAYLOR CROSSING RD
LAPINE, AL 36046

BRENT BLACK
1732 MASON ROAD
HOPE HULL, AL 36043

BRIGHT CORP
PO BOX 635001
NACOGDOCHES, TX 75963-5001

BUCK CREEK FARMS
8144 PERRETTE RD.
RED LEVEL, AL 36474

C & S POULTRY
1017 BOWDEN RD
HONORAVILL, AL 36042

CAMPBELL FARMS
P O BOX 34
MCKENZIE, AL 36456

CAROLINA HANDLING
(RAYMOND)
PO BOX 890352
CHARLOTTE, NC 28289-0352

CEDARSVILLE FARMS
PO BOX 196
GLENWOOD, AL 36034

CHARLES KILPATRICK
1285 SEVENTH AVE
FOREST HOM, AL 36030

CHARLES MATTHEWS
2865 DANIEL BRANCH RD
HIGHLAND H, AL 36041

CHARLES NIXON
893 GORUM RD
MCKENZIE, AL 36456

CHARLIE W CRANE, JR
437 HOWARD STEEN RD
FOREST HOM, AL 36030

CIRCLE E
P O BOX 381
FT DEPOSIT, AL 36032

COUNTYLINE FARMS
2555 BETHEL CHURCH RD
FT DEPOSIT, AL 36032

## SERVICE LIST – PARTIES TO CONTRACTS

CRENSHAW FARMS
1706 DICKENS FIELD RD
GREENVILLE, AL 36037

CROSSTOWN
PO BOX 849
BAINBRIDGE, GA 39818

CRYSTAL SPRINGS OF ALABAMA
PO BOX 11786
BIRMINGHAM, AL 35202-1786

CSX
PO BOX 532652
ATLANTA, GA 30353-2652

DALE DAVIS
4907 CO RD 1107 BRIARHILL RA
NC GOSHEN, AL 36035

DARIN SANDERS
781 MILTON RD
RUTLEDGE, AL 36049

DARREN BOLLING
356 DRY LAKE RD
LUVERNE, AL 36049

DAVIS MOORER
891 KNIGHT PLACE
FT DEPOSIT, AL 36032

DAWARD MCNAUGHTON
1318 JASMIN HILL RD
GREENVILLE, AL 36037

DEBBIE KENT
840 SHAMROCK RD
LUVERNE, AL 36049

DELAGE LANDEN
PO BOX 41601
PHILADELPHIA, PA 19101-1601

DIXIE FARMS
3608 MURPHY RD
GEORGIANA, AL 36033

DON CASEY
8500 SELMA HIGHWAY
MONTGOMERY, AL 36108

DOROTHY G NICHOLAS
2856 STEINER STORE ROAD
GREENVILLE, AL 36037

DOUBLE O FARMS
PO BOX 275
LOWNDESBOR, AL 36752

DOUG STEPHENS
1193 COUNTY RD 1137
GOSHEN, AL 36035

COLVIN FARMS
36036 BOYKIN ROAD
RED LEVEL, AL. 36474

DSI PORTIONING SYSTEM
PO BOX 98635
CHICAGO, IL 60693-8635

DYNA-LIFT, INC.
184 WESTERN BLVD
MONTGOMERY, AL 38108

EDDIE PAUL FRAZIER
5993 OLD STAGE RD
GREENVILLE, AL 36037

ELTON BROWN
1120 PUSLEY RIDGE RD
HIGHLAND H, AL 36041

EMBREX
PO BOX 890379
CHARLOTTE, NC 28289-0379

ERIC KILLOUGH
PO BOX 223
RUTLEDGE, AL 36071

EVELYN MOSELEY
407 ROCK HILL RD
HONORAVILL, AL 36042

F & S FARMS PARTNERS
31214 FOLEY RD.
RED LEVEL, AL 36474

FARON FRAZIER
742 GREENLEAF RD
HONORAVILL, AL 36042

FLOYD FARM
7514 US HWY 29 S.
GOSHEN, AL 36035

FLOYD FARMS
6071 WORLEY RD.
RED LEVEL, AL 36474

FOWLER FARM
869 FOWLER RD
LUVERNE, AL 36049

FRANK PROCHAZKA
598 COUNTY RD 1108
GOSHEN, AL 36035

## SERVICE LIST – PARTIES TO CONTRACTS

GENERAL ELECTRIC CAPITAL
CORPORATION
PO BOX 740423
ATLANTA, GA  30374-0423

GEORGE A TILL
416 TILL RD
MINTER, AL 36761

GEORGE REID
1138 OLD REID RD
FT DEPOSIT, AL 36032

GEORGIA PACIFIC
PO BOX 102574
ATLANTA, GA  30368-2574

GLYN STRINGER
1880 ROPER RD
HONORAVILL, AL 36042

GLYNN D KING
PO BOX 1085
MCKENZIE, AL 36456

GRADY HOLLEY
1371 PERDUE RD
LUVERNE, AL 36049

GRANT FARMS
10643 STEINER STORE RD
FT DEPOSIT, AL 36032

GRAYSON FARMS
276 RIGSBY ROAD
GEORGIANA, AL 36033

GREATER BAY CAPITAL
ACCOUNTS RECEIVABLE
PO BOX 7777
SAN FRANCISCO, CA  94120-7777

GREGORY A GAFFORD
2551 NORRELL AVE
GEORGIANA, AL 36033

H & K FARMS,INC
218 PALMER RD
GEORGIANA, AL 36033

HAROLD PARMER
532 WILDFORK RD
GREENVILLE, AL 36037

HESTER FARMS
3323 CENTER RIDGE RD
LUVERNE, AL 36049

HOFFMAN POULTRY FARM
3276 MAGNOLIA SHORES RD
LAPINE, AL 36046

HOLLADAY FARMS
416 HORSECREEK RD
RUTLEDGE, AL 36071

HORSE CREEK FARMS
680 S MOODYS CROSSRDS RD
RUTLEDGE, AL 36071

HUBERT FRAZIER
6468 BOWDEN RD
HONORAVILL, AL 36042

INGE FARMS
1555 DAUPHIN ST
MOBILE, AL 36604

J & C FARMS
37372 HESTER STORE RD.
RED LEVEL, AL 36474

J & L FARMS
6593 MERRIWETHER RD
HONORAVILL, AL 36042

J DICK WOOD
649 LITTLE HORSE CREEK RD
RUTLEDGE, AL 36071

J MIKE MOORER
660 KNIGHT PLACE RD
FT DEPOSIT, AL 36032

JAMES ALTIERE
618 COBB LANE
GEORGIANA, AL 36033

JAMES L. REEVES
4516 BURGAMY SWAMP ROAD
HIGHLAND H, AL. 36041

JAMES SEALE
1821 MONTEREY RD
FOREST HOM, AL 36030

JEREMY BROWN
12773 MT ZION RD
RAMER, AL 36069

JERROD WOOD
72 E. 1ST. STREET
LUVERNE, AL 36049

JERRY O STINSON
5557 STARLINGTON RD
GEORGIANA, AL 36033

JOE MCGOUGH
2217 DANIELSVILLE RD
HONORAVILL, AL 36042

## SERVICE LIST – PARTIES TO CONTRACTS

JOHN HOFFMAN
1368 SAVILLE ROAD
HIGHLAND H, AL 36041

JOHNNY BOYD
1076 REDLAND ROAD
WETUMPKA, AL 36092

JOHNNY CARPENTER
1284 NEW HOME RD
GEORGIANA, AL 36033

JONES POULTRY
122 HORSE FARM RD
GEORGIANA, AL 36033

JOYCE H MADDOX
6173 W HICKORY GROVE RD
LETOHATCHE, AL 36047

JUDY CASEY
8500 SELMA HIGHWAY
MONTGOMERY, AL 36108

KENNETH BURKETT
9832 WESLEY CHAPEL RD
GEORGIANA, AL 36033

KENNETH BURKHALTER
3216 FORT DALE RD
GREENVILLE, AL 36037

KEVIN DAVIS
4907 CO RD 1107 BRIARHILL RA
NC GOSHEN, AL 36035

KIRK MEADOWS
1128 ST CLAIR PLACE
LOWNDESBOR, AL 36752

KRISTY FRAZIER
6746 MERRIWETHER TRAIL
HONORAVILL, AL 36042

L & N FARMS INC
3068 THOMAS RD
LUVERNE, AL 36049

LADONNA CASEY
3950 ROBERT C HAM RD
MONTGOMERY, AL 36108

LANGFORD FARMS
5444 SAND CUT RD
GEORGIANA, AL 36033

LARRY E ROSIER
374 ROSIER LANE
GEORGIANA, AL 36033

LARRY PETTY
538 POSEY ROAD
LAPINE, AL 36046

LINDA FAYE WATSON
816 CO RD 29
PINEAPPLE, AL 36768

LLOYD SHELL
473 BRUSHY CREEK RD
GEORGIANA, AL 36033

LOGAN'S ROADHOUSE
3011 ARMORY DRIVE, STE 300
NASHVILLE, TN 37204

LONNIE LESTER
1911 RUTLEDGE LOOP RD
LUVERNE, AL 36049

LOWES POULTRY FARM
588 WALSH STREET
MCKENZIE, AL 36456

LUCKIE FARM 1&2
4572 LUVERNE HWY
GREENVILLE, AL 36037

LUCKIE FARM 3&4
4572 LUVERNE HWY
GREENVILLE, AL 36037

MACK MEADOWS
2432 MEADOWS DR
LOWNDESBOR, AL 36752

MARIE WILKERSON
8191 PETREY HWY
LUVERNE, AL 36049

MARK KNOX
523 GIN CREEK RD
GOSHEN, AL 36035

MARSHA D LOFTIN
3611 CO RD 4
FT DEPOSIT, AL 36032

MARY F WILLIAMSON
1997 CENTENARY RD
LUVERNE, AL 36049

MAXINE BLACK
1732 MASON ROAD
HOPE HULL, AL 36043

MICHAEL MOSELEY
1727 RAMER NAFTEL RD
RAMER, AL 36069

## SERVICE LIST – PARTIES TO CONTRACTS

MICHAEL R BAGENTS
6480 GREENVILLE HWY
LUVERNE, AL 36049

MICHAEL R BRIGHTWELL
6573 BOWDEN ROAD
HONORAVILL, AL 36042

MILLER FARMS
5388 S. MT. ZION RD
GREENVILLE, AL 36037

MIXON FARMS LLC
1818 ASHBURY CHURCH RD
PINEAPPLE, AL 36768

MORGAN FARMS
3615 LIVE OAK ROAD
LUVERNE, AL 36049

MORGAN FARMS
3615 LIVE OAK ROAD
LUVERNE, AL 36049

NED ELLIS
P O BOX 381
FT DEPOSIT, AL 36032

NED SANDERS
2968 CO RD 2243
GOSHEN, AL 36035

NOLAN FARMS
P O BOX 437
FT DEPOSIT, AL 36032

NOMESS
PO BOX 242181
MONTGOMERY, AL  36124

PARTRIDGE FARMS
463 COUNTY RD 1117
TROY, AL 36079

PAUL LOWERY
1771 SEVENTH AVE
FOREST HOM, AL 36030

PITNEY BOWES
PO BOX 856460
LOUISVILLE, KY  40285-6460

QSI
PO BOX 531
SIGNAL MOUNTAIN, TN  37377

RANDY P WILLIAMSON
2160 CENTNARY RD
LUVERNE, AL 36049

RAY MCCULLOUGH # 2
4705 SWEETWATER RD
HIGHLAND H, AL 36041

RAY MCCULLOUGH
4705 SWEETWATER RD
HIGHLAND H, AL 36041

RETAIL, WHOLESALE AND DEPT.
OF STORE UNION
1901 10TH AVENUE
BIRMINGHAM, AL  35205

RICKY JEFFCOAT
305 JEFFCOAT RD
RUTLEDGE, AL 36071

RILEY PERRETT
12317 MONTGOMERY HWY
LUVERNE, AL 36049

ROBERT C NICHOLS, JR
8450 HWY 97 S
LETOHATCHE, AL 36047

ROBERT PARMER
510 GREENMORE RD
GREENVILLE, AL 36037

RODGERS POULTRY FARM
P.O. BOX 52
RED LEVEL, AL 36474

ROGERS FARMS
2361 AIRPORT RD
GREENVILLE, AL 36037

RONALD & LYNDA FLOYD
PO BOX 546
TROY, AL. 36081

RONALD G WILKINSON
601 DEAN RD
HOPE HULL, AL 36043

RONALD H PETREY
10541 PETREY HWY
LUVERNE, AL 36049

RUSS WILKERSON
8469 PETREY HWY
LUVERNE, AL 36049

S AND J FARM
954 CO. RD. 2219
GOSHEN, AL 36035

SANDERS FARM
RT. 1 BOX 10
GOSHEN, AL. 36036

## SERVICE LIST – PARTIES TO CONTRACTS

SHEILA MCELWAIN
15964 MONTGOMERY HWY
HIGHLAND H, AL 36041

SHELLEY MOORER
660 KNIGHT PLACE RD
FT DEPOSIT, AL 36037

SILENT SENTRY
311 W. MENDEL PKWY
MONTGOMERY, AL 36117

STEVE ROGERS
3954 LUVERNE HWY
GREENVILLE, AL 36037

STEVE WHITTINGTON # 2
6774 FORT DALE RD
GREENVILLE, AL 36037

T & T FARM
2991 HONORAVILLE RD
LUVERNE, AL 36049

TAYLOR FARMS
7796 OLD STAGE RD
GREENVILLE, AL 36037

TED & FAYE POULTRY
1553 CO. RD. 2281
GLENWOOD, AL 36034

TED SANDERS
1553 CO. RD. 2281
GLENWOOD, AL 36034

THE CIT GROUP (ADT)
PO BOX 371967
PITTSBURGH, PA 15250-7967

THOMAS CROSSROAD COR
4041 CO. RD. 2201
GOSHEN, AL 36035

THOMAS ELLIS #2
3500 MASON RD
HOPE HULL, AL 36043

THOMAS ELLIS
3500 MASON RD
HOPE HULL, AL 36043

THOMAS ENTERPRISES
1390 SWEETWATER RD
HIGHLAND H, AL 36041

THOMAS L STRINGER
RT 2 BOX 185
HONORAVILL, AL 36042

TILL FARM
220 DUSTY TRAIL
GREENVILLE, AL 36037

TOM DUNCAN
3622 HONORAVILLE ROAD
GREENVILLE, AL. 36037

TOMMY THOMPSON
432 SUNSET DRIVE
FOREST HOM, AL 36030

TOMMY WHITTLE
6814 PINE APPLE HWY
GREENVILLE, AL 36037

TRIPLE POINT
PO BOX 36423
BIRMINGHAM, AL 35236

TROY HUSBAND
2782 QUAIL TOWER RD
LUVERNE, AL 36049

TURKEY TROT FARMS
2047 N GLENWOOD RD
GOSHEN, AL 36035

ULYSIS BLACK
2429 STARLINGTON RD
GEORGIANA, AL 36033

US SECURITY
PO BOX 931703
ATLANTA, GA 31193

WAYNE BLACK
1732 MASON ROAD
HOPE HULL, AL 36043

WHEELER FARMS
1438 WOOD ROAD
BRANTLEY, AL 36009

WIGGINS FARM
404 HASSEY RD
RAMER, AL 36069

WILLIAM A MITCHELL
336 MITCHELL ROAD
FT DEPOSIT, AL 36032

WILLIAM E ROPER
698 NEW BETHEL CHURCH RD
LAPINE, AL 36046

WILLIAM F SINGLETON
15 E ROGER RD
FT DEPOSIT, AL 36032

## SERVICE LIST – PARTIES TO CONTRACTS

WILLIAM KILPATRICK
182 GREENVILLE RACEWAY
FOREST HOM, AL 36030

WILLIAM R PIERSON
594 SKIPPER FARM RD
GEORGIANA, AL 36033

WINDY RIDGE FARM
LLC 961 CO RD 33
HAYNEVILLE, AL 36064

WINDY RIDGE FARMS
980 WILLIAMSON RD.
LUVERNE, AL 36049

WINSTON/MONTEZ TUR
4003 AIRPORT RD
GREENVILLE, AL 36037

WOOD FARMS
8324 IVY CREEK RD
BRANTLEY, AL 36009

MR. HENRY JENKINS
RWDSU
1901 10TH AVENUE SOUTH
BIRMINGHAM, AL 35205

SANJAY THAPAR, ESQ.
PROSKAUER ROSE, LLP
1585 BROADWAY
NEW YORK, NY 10036-8299

BRITT BATSON GRIGGS, ESQ.
PARNELL & CRUM, P.A.
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL 36104

# EXHIBIT O

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| SYLVEST FARMS, INC., et al., | : | CASE NOS. 06-40525 |
| | : | through 06-40527 |
| Debtors. | : | |
| | : | JOINTLY ADMINISTERED |
| | : | |

### ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF ORDER AUTHORIZING THE REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS

THIS CAUSE came before the Court at a hearing held on June 28, 2006 (the "Hearing"), upon the Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Motion")[1] filed by Sylvest Farms, Inc., Sylvest Foods Corporation and Sylvest Farms Management Services, Inc., debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned chapter 11 cases. The Court has reviewed the Motion, considered the evidence presented at the Hearing including the testimony of Dean E. Falk, and heard representations of counsel present at the Hearing. The Court has found and concluded that (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding, (iii) notice of the Motion was sufficient under the circumstances, and (iv) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein. The Court further finds and concludes that the Debtors have satisfied all of the requirements under Section 365 of the Bankruptcy Code permitting the Debtors to reject the unexpired leases and executory contracts identified on Exhibit "A" to the Motion, as well as any and all other contracts between the Debtors and Alabama Power Company (the

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

"Rejected Leases and Contracts"), and that all of the elements of Section 1113(b) of the Bankruptcy Code have been satisfied permitting the Debtors to reject the Collective Bargaining Agreement with the Retail, Wholesale and Department Store Union, affiliated with the Alabama & Mid-South RWDSU Council, consisting of the bargaining unit employees of Sylvest Farms, Inc. at its plants located at Montgomery, Alabama, effective October 3, 2005 to October 2, 2011 (the "Collective Bargaining Agreement"). The Court, after due deliberation and sufficient cause appearing therefore, hereby determines that granting the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors. Accordingly,

IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.    The Motion shall be, and hereby is, GRANTED.

2.    The Rejected Leases and Contracts are hereby deemed rejected. The automatic stay is hereby lifted to allow any party to the Rejected Leases and Contracts to retrieve from the Debtors any equipment or personal property that is the subject of the Rejected Leases and Contracts.

3.    The Collective Bargaining Agreement is hereby rejected in accordance with Section 1113(b) of the Bankruptcy Code.


DONE this 6th day of June, 2006


/s/ Thomas B. Bennett
United States Bankruptcy Judge


501108554.3, Order-Rejection

# EXHIBIT P

INSPECTION AND VALUATION OF

# SYLVEST FARMS

### 4530 MOBILE HIGHWAY

MONTGOMERY, AL 36108

PREFORMED FOR

# GENERAL ELECTRIC
# CAPITAL CORPORTATION

## COMMERCIAL
## EQUIPMENT FINANCING

BY

# EQUIPMENT EXCHANGE COMPANY
## MAY 2006



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**



**ASSOCIATION OF MACHINERY AND EQUIPMENT APPRAISERS**

GE 0305

# APPRAISAL VALUATION REPORT

OF

## SYLVEST FARMS
4530 MOBILE HWY
MONTGOMERY, AL
36108

## PREPARED JUNE 2006

BY





## APPRAISER'S OPINION LETTER



## APPRAISER'S CERTIFICATION & CERTIFICATION OF VALUE

2



## SCHEDULE OF DETAILED INVENTORY

3



## APPRAISAL PHOTOGRAPHS

4



## APPRAISER'S QUALIFICATIONS

5

GE 0306

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**
10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

### SUMMARY APPRAISAL REPORT
### PRIVATE & CONFIDENTIAL

**Subject - Certain Assets of:**

**SYLVEST FARMS
4530 MOBILE HIGHWAY
MONTGOMERY, AL 36108**

**For the Intended Use of:**

**GENERAL ELECTRIC CAPITAL
COMMERCIAL EQUIPMENT FINANCING
44 OLD RIDGEBURY ROAD
DANBURY, CT 06810-5105**

#### Purpose of Appraisal

The purpose of this appraisal is to provide an independent, professional opinion of the Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Sylvest Farms, 4530 Mobile Highway, Montgomery, AL. This report is intended solely for financing and business decisions of General Electric Capital Corporation and assignees. Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is May 16, 2006.

#### Intended Use of Appraisal

This report is intended solely for financial and business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts. If a particular company or individual determined that, the concept fits a particular need and therefore could use it in a way that would be improper. The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value. It is up to the user to determine if the defined concept is correct for its purpose. Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards. The appraisal is preformed at the request of a client based upon a requested concept of value. It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value. Users of this report must do so with the knowledge of the defined concepts of value being utilized. If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.

GE 0307

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 2 of 7
GECC/Sylvest Farms

## Scope of Appraisal

To appraise certain personal property of the subject company located at Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-Removed and Orderly Liquidation Value.

## Highest and Best Use

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Sylvest Farms are producers of fresh and frozen poultry products. Equipment includes packaging, freezing, cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment. This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

## Value Definitions

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises. The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell. This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards. Since a physical inspection has to be preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below. Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used. This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove. Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |

Value Definitions: provided by General Electric Capital Corporation Letter of Engagement.

GE 0308



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA. 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
GECC/Syvest Farms

Both stated value considerations represent the normal considerations for the assets being appraised. The stated values are unaffected by special or creative financing or sale considerations granted by anyone associated with a possible sale or any other special or creative terms, service fees, costs or credits.

All values stated are in United States Funds as of effective date of this report. Any users of this report must assume that the listed "OLV" is based on the fact that a qualified and experienced broker of the goods is to be used as the marketing agent. It also does not take into account any "costs to sell" that would be involved in liquidating the assets.

### Approaches to Value

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted approaches to value must be considered.

1) **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being appraised for the loss in value caused by physical deterioration, functional obsolescence, or economic obsolescence. The cost approach is based on the principle of substitution: a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility. In its simplest form, the cost approach is the current cost (as if new) less all depreciation.

2) **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts the prices that have been paid for assets comparable to the asset being appraised, equating the comparables to the subject. This involves analyzing recent sales of properties that are similar to the subject property. If the comparables are not identical, the prices are adjusted to equate the various characteristics of the properties. Equipment Exchange Company of America, Inc. uses an extensive in-house database of sold and brokered equipment, auction-selling prices, and data gathered via the Internet and other used equipment dealers to establish comparables. As in the cost approach, the basis is a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.

3) **Income Approach:** The appraiser determines the present value of the future economic benefits of owning the property. This approach is seldom used in valuing personal property and was considered but deemed not applicable in performing this appraisal.

In this summary appraisal and review of assets from Sylvest Farms, the Sales Comparison Approach was employed to arrive at value conclusions. Equipment Exchange Company researched the equipment installed or used at the location. We also paid particular attention to the marketability of these assets in their current geographic location and the effect that location would have in developing their probable value.

GE 0309



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
GECC/Sylvest Farms

### Depreciation

Defined as the actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself and due to changes in design, or process resulting in inadequacy, over capacity, excess construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions. These can include such things as the economics of the industry, availability of financing, loss of material and labor sources, passage of new legislation, and changes in ordinances.

### Summary of Values Conclusions

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions and limiting conditions, which the Fair Market Value-Remove and Orderly Liquidation Value of the machinery and equipment located at Sylvest Farms, Montgomery, AL.

**FAIR MARKET VALUE-REMOVE**

TOTAL CURRENT OF EQUIPMENT VALUED          $1,119,500.00

**ORDERLY LIQUIDATION VALUE**

TOTAL CURRENT OF EQUIPMENT VALUED          $661,900.00

### GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS

This is a Summary Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it might not include full discussions of the data, reasoning, and analysis that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning and analyses is retained in the appraiser's file.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)·774-0888 • Fax (814) 774·0880 •
info@eeclink.com

Page 5 of 7
GECC/Sylvest Farms

This appraisal sets forth our findings and conclusions which are based upon an investigation of conditions affecting value and which are subject to the Assumptions, Statements of Limiting Conditions, and Definitions contained in the following report. *Without reading the Assumptions and Statement of Limiting Conditions and Definitions, this report could be erroneously interpreted.*

The legal description given to the appraisers and used in this report is assumed to be correct. No responsibility is assumed for matters of a legal nature affecting title to the property nor is an opinion of title rendered. The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection with such matters. Sketches in this report are included only to assist the reader in visualizing the property.

In conducting this inspection or in gathering information for this report we have assumed that no unreported or hidden conditions exist with the equipment that would render it more or less valuable then reported.

If for some reason we were unable to gather the model number, serial number, age or other pertinent information we assumed that the equipment was similar to other equipment we have appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable. A reasonable effort has been made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report. The property is appraised as though under responsible ownership and management. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported. There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined, and considered in the appraisal report.

GE 0311



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
GECC/Sylvest Farms

It is assumed that all required licenses, consents or other legislative or administrative authority
from any local, state or national governmental or private entity or organization have been or can be
obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the
appraiser.  No responsibility is assumed for latent defect of ANY nature whatsoever which may
affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference
or appearance required by subpoena, with reference to the property in question, unless timely
arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal,
and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value
opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous
material, which may or may not be present on the property.  I have no knowledge of the existence
of such materials on or in the property and are not qualified to detect such substances. The
presence of substances such as asbestos, urea formaldehyde foam insulation or other potential
hazardous materials may affect the value of the property.  The value estimate is predicated on the
assumption that there is no such material on or in the property that would cause a loss in value.  No
responsibility is assumed for any such conditions, or for any expertise or engineering knowledge
required to discover them.  The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate
in the appraisal if any new facts pertinent to the process are discovered which were unknown when
the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may
it be used for any purpose or any function other than the intended use, as stated in the body of the
report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report.
All conclusions and opinions concerning the analysis as set forth in the report were prepared by the
appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s).  The
appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the
analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the
report to anyone other then the client or his designee as specified in writing.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
GECC/Sylvest Farms

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser

*EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC*
*10042 KEYSTONE DRIVE*
*LAKE CITY, PA 16423*

Does

# -Certify-

That on May 16, 2006 that certain property of:

## SYLVEST FARMS
## 4530 MOBILE HIGHWAY
## MONTGOMERY, AL 36108

HAS WELL AND REASONABLE WORTH:

VALUE IS AS FOLLOWS:

FAIR MARKET VALUE-REMOVE

TOTAL CURRENT OF EQUIPMENT VALUED          $1,119,500.00

ORDERLY LIQUIDATION VALUE

TOTAL CURRENT OF EQUIPMENT VALUED          $661,900.00

EFFECTIVE DATE OF APPRAISAL: May 16, 2006

BY:     ROBERT BREAKSTONE, CEA

GE 0314



**EQUIPMENT
EXCHANGE
CO. OF AMERICA. INC.**

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX     (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

## Appraiser's Certification:

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

❖ I have made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____

Daniel R. Nicoson, Report Date:

**GE 0315**



**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX   (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

**Appraiser's Certification:**

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report, analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have NOT made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____
Robert Breakstone, CEA, CSA

GE 0316

Private Confidential

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | FAIR MARKE |
|---|---|---|---|---|
| | | **OSSID PACKAGING EQUIPMENT** | | |
| | | Ossid Invoice #3295-F, invoice date 12/19/05, equipment installed in early 2006 and minimal production use. Equipment seemed to be in 'like new' condition. | | |
| 2 | 1 | Integrated Package infeed conveyors, 10" wide x 87" long, with low-friction conveyor belt, AC variable speed drive. No ID tags, installed 2006 | $23,842.00 | $15,00 |
| 2 | 2 & 3 | WPL Single Head Check-Weigh System, model WPL1500xA, serial# A022I06 & A023I06. Units are capable of belt speeds of up to 35inches/second. Installed 2006 | $125,000.00 | $69,00 |
| 2 | 4 | SATA Barcode Printers, model M-8485Se, serial# 4L0A0024 & 4L0A0017. Installed 2006, (Invoice shows Md #PA300AT- this replaces) | $35,800.00 | $16,00 |
| 2 | 5 | ID Technology Top Printers, model M1.5, serial# 57612-02 & 57612-03. Installed 2006. | $15,000.00 | $7,000 |
| 1 | 7 | Ossid Automatic Indexer (mounted to overwrapper) no separate ID plate, installed 2006. | $20,900.00 | $14,00 |
| 1 | 6 & 8 | Ossid Overwrap System model 500E, serial# EF 050432. Unit appears new, possibly ran tests, remains in "like-new" condition. Installed 2006. | $187,308.00 | $122,00 |
| 1 | 9 | Ossid End Seal Shrink, model ESS 550, sn: A06066-480. Unit appears new, possibly ran tests, remains in "like-new" condition. | $37,800.00 | $25,00 |
| 1 | 10 | Cryovac Shrink Tunnel, model 3472G-1317, serial# 060 116155101. Tunnel includes pneumatic blow-off discharge section. Unit appears new, possibly ran tests, remains in "like-new" condition. | $25,000.00 | $16,00 |
| 1 | 11 | Ossid Automatic Indexer (mounted to overwrapper) no separate ID plate, installed 2006. | $20,900.00 | $14,00 |
| 1 | 12 | Ossid Overwrap System model 500E, serial# EF 050431. Unit appears new, possibly ran tests, remains in "like-new" condition. Installed 2006. | $187,308.00 | $122,00 |
| 1 | 13 | Ossid End Seal Shrink, model ESS 550, sn: A06065-480. Unit appears new, possibly ran tests, remains in "like-new" condition. | $37,800.00 | $25,00 |

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

## SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 14 | Cryovac Shrink Tunnel, model 3472G-1317, serial# 051 116032201. Tunnel includes pneumatic blow-off discharge section. Unit appears new, possibly ran tests, remains in "like-new" condition. Installed 2006. | $25,000.00 | $16,000.00 | $11,300.00 |
| | | **Frigoscandia Spiral Freezer** | | | |
| | | A reconditioned Frigoscandia spiral freezer with reconditioning and installation work done by MTL Installation Services, Proposal #051014C, December 8, 2005. Freezer has been completely installed and not used in production. | | | |
| 1 | 15, 16, 17, 18 & 19 | Frigoscandia spiral freezer, model GC-76, project# 10185, Date 6-7-95. Unit has 28' wide self-stacking product belt, 40 tiers, 3" product clearance, 3.25" per tier. Unit has North/South belt orientation, infeed low right, discharge high right, counter-clockwise rotation. Belt cross rods are 1.25" apart, mesh is 1/2" apart. Cabinet is made of 4" thick insulated panels with stainless steel skin inside and out. Cabinet is 16' wide x 28.5' long x 15.5' high. Freezer is installed on a 8" deep insulated floor that could be moved with. Freezer has been installed with most wiring and plumbing completed but freezer has not been run or tested. Evaporator coil capacity is not known. Freezer appears to be in excellent condition. | $430,000.00 | $280,000.00 | $190,000.00 |
| | | D & F Equipment Sales, Inc. invoice #53128, invoice date: December 19, 2006. The majority of this equipment in installed and was in operation during inspection. Some items are not installed and noted on individual item. | | | |
| 1 | 28 | SERIAL# 36019-01A, 01B; DOUBLE CONE LINE, DFPC1015 | $63,820.00 | $35,000.00 | $26,000.00 |
| 2 | 32 | SERIAL# 36019-02A, 02B TENDER/FILLET INCLINE CONVEYORS, DFM500 | $10,680.00 | $5,000.00 | $2,000.00 |
| 1 | 35 & 36 | SERIAL# 36019-03A; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $3,100.00 | $1,000.00 | $0.00 |
| 1 | 35 & 36 | SERIAL# 36019-03B; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $3,100.00 | $1,000.00 | $400.00 |
| 1 | 29 | SERIAL# 36019-X1; TOTE DUMPER, DFTD276 | $4,200.00 | $2,000.00 | $1,000.00 |
| 1 | 29 | SERIAL# 36019-05; DE-ICE BIN, DFDTD276 | $700.00 | $300.00 | $100.00 |

GE 0318

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

## SYLVEST FARMS

4530 MOBILE ROAD, MONTGOMERY, AL 36108

ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
| --- | --- | --- | --- | --- | --- |
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 34 | SERIAL# 36019-06; LOADING BIN, DFM391, NO IS TAG ON UNIT | $1,100.00 | $600.00 | $200.00 |
| 1 | 45 | SERIAL# 36019-07 FEED CONVEYOR, DFM500 | $9,400.00 | $4,200.00 | $1,500.00 |
| 12 | 53 | SERIAL# 36019-08A; THROUGH DBL ERGO STANDS, DFESF52100, NO ID TAGS | $4,800.00 | $2,200.00 | $800.00 |
| 1 | 42 | SERIAL# 36019-09 PRODUCT CONVEYOR, DFM500 | $7,000.00 | $3,200.00 | $1,100.00 |
| 1 | 42 | SERIAL# 36019-10-S PRODUCT CONVEYOR, DFM500 | $5,800.00 | $2,600.00 | $900.00 |
| 1 | 43 | SERIAL# 36019-11 PRODUCT CHUTE, DFC378 (NO ID TAG) | $400.00 | $200.00 | $100.00 |
| 1 | 31 | SERIAL# 36019A-01A, 01B; DOUBLE CONE LINE, DFDC1015 | $63,820.00 | $35,000.00 | $26,000.00 |
| 2 | 30 | SERIAL# 36019A-02A, 02B DOUBLE TOTE DUMPERS, DFTD275 | $15,000.00 | $8,000.00 | $2,800.00 |
| 2 | 30 | SERIAL# 36019A-03A, 03B DE-ICE BINS, DFDT1002 | $1,400.00 | $1,000.00 | $400.00 |
| 1 | 64 & 65 | SERIAL# 36019A-04A-1, D4A-2; RECIRCULATION CONVEYORS, DFM500 | $10,070.00 | $4,500.00 | $1,600.00 |
| 1 | 64 & 65 | SERIAL# 36019A-04B-1, D4B-2; RECIRCULATION CONVEYORS, DFM500 | $10,070.00 | $4,500.00 | $1,600.00 |
| 3 | 61 | SERIAL# 36019A-05A, 05B, 05C; WING TIP INCLINE CONVEYORS, DFM500 | $20,520.00 | $9,200.00 | $3,200.00 |
| 4 | 62 | SERIAL# 36019A-06A, 06B, 06C, 06D WING INCLINE CONVEYORS, DFM500, THESE UNITS ARE NOT INSTALLED, PRESENTLY OUTSIDE | $29,600.00 | $13,300.00 | $4,700.00 |
| 1 | 63 | SERIAL# 36019A-07; WING INCLINE CONVEYOR, DFM500 | $11,100.00 | $5,000.00 | $1,800.00 |
| 1 | 59 | SERIAL# 36019A-08; WING COMMON CONVEYOR, DFM500 | $17,300.00 | $7,800.00 | $2,700.00 |
| 1 | 60 | SERIAL# 36019A-09; WING COMMON CONVEYOR, DFM500 | $14,540.00 | $6,500.00 | $2,300.00 |
| 1 | 52 | SERIAL# 36019-10; SKIN INCLINE CONVEYOR, DFM500 | $9,460.00 | $4,300.00 | $1,500.00 |
| 0 | | SERIAL# 36019A-11A, 11B, 11C, 11D; FLAT TOP TABLES, DFMT382; NEVER RECEIVED | $0.00 | $0.00 | $0.00 |
| 2 | 33 | SERIAL# 36019A-12A, 12B; TENDER/BREAST INCLINE CONVEYOR, DFM500 | $21,360.00 | $9,600.00 | $3,400.00 |
| 1 | 67 | SERIAL# 36019A-13; CARCASS COMMON CONVEYOR, DFM500 | $12,200.00 | $5,500.00 | $1,900.00 |
| 1 | 68 | SERIAL# 36019A-14 TENDER/BREAST INCLINE CONVEYOR, DFM500, (THIS UNIT WAS NOT INSTALLED OR IN USE DURING INSPECTION) | $26,895.00 | $12,100.00 | $4,200.00 |
| 8 | 69 | TENDER/BREAST CONVEYORS, SERIAL# 36019A-15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H | $132,480.00 | $59,600.00 | $20,900.00 |
| 0 | | SERIAL# 36019A-16; FEED CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 46 | SERIAL# 36019A-17; FEED CONVEYOR, DFM500 | $9,400.00 | $4,200.00 | $1,500.00 |

Page 3 of 5

GE 0319

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

4530 MOBILE ROAD, MONTGOMERY, AL 36108

ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 71 | SERIAL# 36019A-CHUTE, DFC378 (NO ID TAG) | $430.00 | $200.00 | $100.00 |
| 4 | 72 | SERIAL# 36019A-19A, 19B, 19C, 19D; EMPLOYEE STANDS, DFMPM179 | $24,600.00 | $11,100.00 | $3,900.00 |
| 1 | 70 | SERIAL# 36019A-20; FLAT TOP TABLE, DMFT382 (NO ID TAG) | $1,800.00 | $800.00 | $300.00 |
| 4 | 73 | SERIAL# 36019A-21A, 21B, 21C, 21D; EMPLOYEE CROSSOVER STANDS, DFMPM179 | $7,400.00 | $3,300.00 | $1,200.00 |
| 0 | | SERIAL# 36019A-22, FINISHED PRODUCT INCLINE CONVEYOR, DFM500 NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 0 | | SERIAL# 36019A-23, FINISHED PRODUCT INCLINE CONVEYOR, DFM500 NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 38 | SERIAL# 36019A-24; S-36019-X5; TRIM INCLINE CONVEYOR, DFM500 | $10,580.00 | $4,800.00 | $1,700.00 |
| 12 | 58 | SERIAL# 36019A-25A THROUGH 25L; ERGO STANDS, DFESF2100, (NO ID TAGS) | $4,800.00 | $2,200.00 | $800.00 |
| 1 | 55 | SERIAL# 36019A-26; FULL BOX CONVEYOR, DFKPC900 | $14,100.00 | $6,300.00 | $2,200.00 |
| 0 | | SERIAL# 36019A-27; FULL BOX INCLINE CONVEYOR, DFKPC900; NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 56 | SERIAL# 36019A-28; FULL BOX CONVEYOR, DFKPC900 | $8,930.00 | $4,000.00 | $1,400.00 |
| 1 | 49 | SERIAL# 36019A-29; FULL BOX CONVEYOR, DFKPC900 | $5,220.00 | $2,300.00 | $800.00 |
| 1 | | SERIAL# 36019A-30; FULL BOX CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 2 | 50 | SERIAL# 36019A-31A, 31B; FULL BOX CONVEYORS, DFKPC900 | $13,420.00 | $6,000.00 | $2,100.00 |
| 2 | 54 | SERIAL# 36019A-32A, 32B; FULL BOX CONVEYORS, DFKPC900 | $15,640.00 | $7,000.00 | $2,500.00 |
| 0 | | SERIAL# 36019A-33; PORTIONING CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 8 | 44 | SERIAL# 36019A-34A, 34B, 34C, 34D, 34E, 34F, 34G, 34H; TOTE STANDS, DFMS380; PERSONNEL WORK STANDS, (NO ID TAGS) | $1,800.00 | $800.00 | $300.00 |
| 7 | 48 | SERIAL# 36019A-35A, 35B, 35C, 35D, 35E, 35F, 35G; GRAVITY CONVEYORS, DFGR50 (NO ID TAGS) | $3,780.00 | $1,700.00 | $600.00 |
| 1 | | SERIAL# 36019A-36 FULL BOX CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 51 | SERIAL# 36019A-37; FULL BOX CONVEYOR, DFM500 | $8,180.00 | $3,700.00 | $1,300.00 |
| 0 | | SERIAL# 36019A-38; FULL BOX SPUR CONVEYOR, DFFB5301, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 57 | SERIAL# 36019A-39; FULL BOX SPUR CONVEYOR, DFFB5301 | $7,600.00 | $3,400.00 | $1,200.00 |
| 0 | | SERIAL# 36019A-40; FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 0 | | SERIAL# 36019A-41, FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |

GE 0320

Private Confidential

6/8/2006

## INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

**ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE**

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 0 | | SERIAL# 36019A-42, FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 39 | SERIAL# 36019A-43, FULL BOX CONVEYOR, DFKPC900 | $14,295.00 | $6,400.00 | $2,200.00 |
| 1 | 40 | SERIAL# 36019A-44, FULL BOX CONVEYOR, DFKPC900 | $17,440.00 | $7,800.00 | $2,700.00 |
| 2 | 74 | SERIAL# 36019A-45A, 45B, 90' GRAVITY CONVEYORS, DFGR50-90 (NO ID TAGS) | $2,200.00 | $1,000.00 | $400.00 |
| | | *ITEMS LISTED BELOW ARE BEING CONSIDERED AS REPLACEMENT OR SUBSTITUTION ITEMS FROM D & K FOR ITEMS LISTED 'NOT RECEIVED' ABOVE* | | | |
| 1 | 77 | SERIAL# 36019A-X44 TENDER/BREAST CONVEYOR | $17,275.00 | $7,800.00 | $2,700.00 |
| 1 | 76 | SERIAL# 36019A-X24, EMPLOYEE STANDS | $3,000.00 | $1,400.00 | $500.00 |
| 2 | 37 | SERIAL# 36019A-X6-S; NUGGET INCLINE OVER DSI CONVEYOR, DFM500 | $5,900.00 | $2,700.00 | $900.00 |
| 1 | 41 | SERIAL# 36019A-X4-S; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $9,700.00 | $4,400.00 | $1,500.00 |
| 4 | 75 | SERIAL# 36019A-X8; WING SAWS, SIGHTED FOUR UNITS | $5,800.00 | $2,600.00 | $900.00 |
| 1 | 78 | SERIAL# 36019A-X43A, X43B DOUBLE CONE LINE FRAME - NO CONES PURCHASED OR INSTALLED (INTENDED TO USE SOME CONES FROM ANOTHER PLANT) | $34,860.00 | $15,700.00 | $5,500.00 |
| 1 | 79 | SERIAL# 36019A-7A; SING INCLINE CONVEYOR | $10,000.00 | $4,500.00 | $1,600.00 |
| 1 | 82 | SERIAL# 36019A-X21; EMPTY BOX CONVEYOR W/TWO 90 DEGREE TURNS | $12,232.50 | $5,500.00 | $1,900.00 |
| 1 | 81 | SERIAL# 36019A-X22, EMPTY BOX CONVEYOR | $14,425.00 | $6,500.00 | $2,300.00 |
| 1 | 83 | SERIAL# 36019A-X23 GRAVITY CONVEYOR | $4,500.00 | $2,000.00 | $700.00 |
| 1 | 80 | SERIAL# 36019A-X20 EMPTY BOX CONVEYOR | $6,000.00 | $2,700.00 | $900.00 |
| 1 | 84 | SERIAL# 36019A-X42 EMPLOYEE STAND | $5,450.00 | $2,500.00 | $900.00 |
| | | TOTAL OF ALL VALUES | $1,982,330.50 | $1,119,500.00 | $661,990.00 |

GE 0321





**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

## APPRAISAL PHOTOGRAPHS

In this appraisal report the appraiser has included a series of photographs for illustration of the equipment inspected. The appraiser has to the best of his ability properly identified the assets with an item number that corresponds to the Detailed Equipment inventory included in this report.

While descriptions are believed to be correct, the appraiser make no warranties or guarantees expressed or implied, as to the genuineness, authenticity of, any photographed item identification and will not be held responsible for discrepancies or inaccuracies. No warranties are made as to the merchantability of any items or their fitness for any purpose.


























































Item #47



Item #48







Item #51



Item #52

GE 0329








GE 0330










GE 0331



Item #68





Item #70











Item #75



Item #77



Item #78



Item #79



GE 0333









GE 0334



**EQUIPMENT
EXCHANGE**
CO. OF AMERICA. INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE  (814)  774-0888
FAX      (814)  774-0880
Website  www.eeclink.com
Email info@eeclink.com

# APPRAISER'S QUALIFICATIONS

Robert Breakstone,
President



**Experience:**
Mr. Robert Breakstone, CSA, CEA our Senior Appraiser, has been President of Equipment Exchange Company of America, Inc. since 1989. Our firm has been in the "used equipment" business since 1979. Having "grown up" in the process business, Robert has a wealth of experience in many facets of food production. He has toured many production plants in United States, Provinces of Canada as well as Puerto Rico and Central America.

Equipment Exchange Company specializes in buying, selling and evaluating meat process, baking, beverage, frozen foods, vegetable, dry goods and related food products and equipment. We also have extensive database of sales history for our in-house sales comparisons.

**Education:**
Mr. Robert Breakstone received his Bachelors Degree from Mercyhurst College, Erie, PA in 1982. In 2001, Mr. Breakstone received his Certificate of Achievement for completing the American Society of Appraiser's (ASA) course in *Uniform Standards of Professional Appraisal Practice* (USPAP).

**Memberships:**
Professional Memberships:
1) Equipment Appraisers Association on North America (EAANA) - Status: Certified Senior Appraiser (CSA).
2) Association of Machinery and Equipment Appraisers (AMEA) - Status: Certified Equipment Appraiser (CEA).
3) American Society of Appraisers (ASA) - Status: Candidate Member

Association Memberships:
Equipment Exchange Company of America, Inc. is a current member of Machinery Dealers National Association (MDNA) of the Equipment Leasing Association (ELA) American Meat Institute (AMI) as well as North American Meat Processors (NAAMP) and American Association of Meat Processors (AAMP).

**Certification:**
In 2002, Mr. Breakstone completed and has been accepted by the Association of Machinery and Equipment Appraisers (AMEA) as a Certified Equipment Appraiser (CEA). In 2005, Mr. Breakstone completed the requirements for Certified Senior Appraiser (CSA) status in Equipment Appraisers Association of North America. These certifications require acceptance to conform in all respects to the designated Codes of Ethics, the appropriate Standards and Procedures of Professional Appraisal Ethics and Practice, certification in *Uniform Standards of Professional Appraisal Practice* (USPAP) as well written exams, submittal of an appraisals for review and acceptance, as well a minimum of five years of appraisal experience. Both designation dictate on-going requirements to maintain accreditation.



# Certified
# Machinery and Equipment
# Appraiser

Recognition Is Hereby Granted To

# *Robert  Breakstone*

by the
## Association of Machinery and Equipment Appraisers
for the period

## October 1, 2004 — September 30, 2005

President

GE 0336

SSN: _____

License Number:



# The American Society of Appraisers

*555 Herndon Parkway, Suite 125, Herndon, VA 20170.*

presents this

## Certificate of Achievement

to

# Robert J. Breakstone

who has attended the class and successfully completed the exam for
the American Society of Appraisers' 15-hour course

## SE100: National Uniform Standards of Professional Appraisal Practice (USPAP)



July 2001
Date

Richard T. Roche, ASA International



GE 0338

Certificate Number

171

INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA

EQUIPMENT APPRAISERS ASSOCIATION OF NORTH AMERICA

*Membership Certificate*

THIS IS TO CERTIFY THAT

*Robert Jay Breakstone*

is a member of the above corporation incorporated under the laws of this state and is entitled
to the full benefits and privileges of such membership, subject to the duties and obligations,
as more fully set forth in the Corporation's By-Laws, Rules and Regulations.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be executed by its
duly authorized officers and its corporate seal to be hereunto affixed.

Dated _December 29, 2003_

SECRETARY

TREASURER



GE 0339

The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

presents this

*Certificate of Achievement*

to

Robert J. Breakstone

who has taken the class and successfully completed the exam for
the American Society of Appraisers' 30-hour course

ME201OL: Introduction to Machinery and Equipment
Valuation - Available August and October 2002.



Robert B. Podwalny, ASA International Education Chair

October 2002
Date

# EXHIBIT Q

INSPECTION AND VALUATION OF

# KOCH FOODS
# FORMER SYLVEST FARMS

4530 MOBILE HIGHWAY

MONTGOMERY, AL 36108

PREFORMED FOR

# GENERAL ELECTRIC
# CAPITAL CORPORTATION

COMMERCIAL
EQUIPMENT FINANCING

BY

EQUIPMENT EXCHANGE COMPANY
SEPTEMBER 2007







**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

**APPRAISAL REPORT**
**PRIVATE & CONFIDENTIAL**

Subject – Certain Assets of:

**KOCH FOODS/FORMER SYLVEST FARMS**
**4530 MOBILE HIGHWAY**
**MONTGOMERY, AL 36108**

For the Intended Use of:

**GENERAL ELECTRIC CAPITAL**
**COMMERCIAL EQUIPMENT FINANCING**
**44 OLD RIDGEBURY ROAD**
**DANBURY, CT 06810-5105**

<u>**Purpose of Appraisal**</u>

The purpose of this appraisal is to provide an independent, professional opinion of the Day One, Year One Fair Market Value-In Place, Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Koch Foods/ Former Sylvest Farms, 4530 Mobile Highway, Montgomery, AL. This report is intended solely for business decisions of General Electric Capital Corporation and assignees. Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Koch Foods/former Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is September 24, 2007.

<u>**Intended Use of Appraisal**</u>

This report is intended solely for business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts. The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value. It is up to the user to determine if the defined concept is correct for its purpose. Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards. The appraisal is preformed at the request of a client based upon a requested concept of value. It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value. Users of this report must do so with the knowledge of the defined concepts of value being utilized. If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 • info@eeclink.com

Page 2 of 7
Koch Foods

## Scope of Appraisal

To appraise certain personal property of the subject company located at Koch Foods/former Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-In Place, Fair Market Value-Removed and Orderly Liquidation Value.

## Highest and Best Use

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Fresh and frozen poultry products. Equipment includes packaging, freezing, and cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment. This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

## Value Definitions

**FAIR MARKET VALUE IN PLACE: (FMV -IN PLACE):** Is defined as the most probable price estimated in terms of money that the items appraised could realize if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which they are adapted and for which they are capable of being used, including the benefit of their present location including all costs to design, acquire, install and make operational. Frequently, it is referred to as the price at which a willing seller would sell and a willing buyer, neither being under abnormal pressure as of a specific date. In this report we are valuing the Fair Market Value In Place as of the actual installation and operational date in Spring 2006. This is a Day One, Year One value or a total cost of project value specific to the items valued and as of a specific date.

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises. The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell. This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards. Since a physical inspection was preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below. Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used. This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove. Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814) 774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
Koch Foods

Both stated value considerations represent the normal considerations for the assets being appraised. The stated values are unaffected by special or creative financing or sale considerations granted by anyone associated with a possible sale or any other special or creative terms, service fees, costs or credits.

All values stated are in United States Funds as of effective date of this report. Any users of this report must assume that the listed "OLV" is based on the fact that a qualified and experienced broker of the goods is to be used as the marketing agent. It also does not take into account any "costs to sell" that would be involved in liquidating the assets.

<u>Approaches to Value</u>

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted approaches to value must be considered.

1)  **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being appraised for the loss in value caused by physical deterioration, functional obsolescence, or economic obsolescence. The cost approach is based on the principle of substitution: a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility. In its simplest form, the cost approach is the current cost (as if new) less all depreciation.

2)  **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts the prices that have been paid for assets comparable to the asset being appraised, equating the comparables to the subject. This involves analyzing recent sales of properties that are similar to the subject property. If the comparables are not identical, the prices are adjusted to equate the various characteristics of the properties. Equipment Exchange Company of America, Inc. uses an extensive in-house database of sold and brokered equipment, auction-selling prices, and data gathered via the Internet and other used equipment dealers to establish comparables. As in the cost approach, the basis is a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.

3)  **Income Approach:** The appraiser determines the present value of the future economic benefits of owning the property. This approach is seldom used in valuing personal property and was considered but deemed not applicable in performing this appraisal.

<u>Scope of Work Rule</u>

The Scope of Work addresses the Type and Extent of Research and Analysis utilized to develop an Opinion of Value. The Data Collected in the Course of Research and Analysis may include, but is not limited to: market Data from used equipment dealers that sell comparable equipment; conversations with new equipment manufacturer's; consultation with auctioneers, liquidators and equipment brokers of comparable equipment; In-House Data Bases; Industry Data Bases; Trade Journals and Industry Periodicals.



10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
Koch Foods

In this appraisal and review of assets from Koch Foods/former Sylvest Farms, the Sales Comparison
Approach was employed to arrive at value conclusions. Equipment Exchange Company researched
the equipment formerly installed or used at the location. We also paid particular attention to the
marketability of these assets in their current geographic location and the effect that location would
have in developing their probable value.

### Depreciation

Defined as the actual loss in value or worth of a property from all causes including those resulting
from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely
to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself
and due to changes in design, or process resulting in inadequacy, over capacity, excess
construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions.  These
can include such things as the economics of the industry, availability of financing, loss of
material and labor sources, passage of new legislation, and changes in ordinances.

### Summary of Values Conclusions

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion
of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions
and limiting conditions, which the Fair Market Value-In Place, Fair Market Value-Remove and
Orderly Liquidation Value of the machinery and equipment located at Koch Foods/former Sylvest
Farms, Montgomery, AL.

|  | FAIR MARKET VALUE-IN PLACE |
|---|---|
| DAY ONE-YEAR ONE OF EQUIPMENT VALUED | $1,398,068.00 |
|  | FAIR MARKET VALUE-REMOVE |
| TOTAL CURRENT OF EQUIPMENT VALUED | $459,380.00 |
|  | ORDERLY LIQUIDATION VALUE |
| TOTAL CURRENT OF EQUIPMENT VALUED | $260,890.00 |

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA. 16423 • (814)-774-0888 • Fax (814) 774-0880 •
Info@eeclink.com

Page 5 of 7
Koch Foods

## GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS

This appraisal sets forth our findings and conclusions which are based upon an investigation of conditions affecting value and which are subject to the Assumptions, Statements of Limiting Conditions, and Definitions contained in the following report. *Without reading the Assumptions and Statement of Limiting Conditions and Definitions, this report could be erroneously interpreted.*

The legal description given to the appraisers and used in this report is assumed to be correct. No responsibility is assumed for matters of a legal nature affecting title to the property nor is an opinion of title rendered. The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection with such matters. Sketches in this report are included only to assist the reader in visualizing the property.

In conducting this inspection or in gathering information for this report we have assumed that no unreported or hidden conditions exist with the equipment that would render it more or less valuable then reported.

If for some reason we were unable to gather the model number, serial number, age or other pertinent information we assumed that the equipment was similar to other equipment we have appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable. A reasonable effort has been made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report. The property is appraised as though under responsible ownership and management. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported. There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined, and considered in the appraisal report.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814) 774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
Koch Foods

It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the appraiser. No responsibility is assumed for latent defect of ANY nature whatsoever which may affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference or appearance required by subpoena, with reference to the property in question, unless timely arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal, and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous material, which may or may not be present on the property. I have no knowledge of the existence of such materials on or in the property and are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation or other potential hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate in the appraisal if any new facts pertinent to the process are discovered which were unknown when the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for any purpose or any function other than the intended use, as stated in the body of the report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report. All conclusions and opinions concerning the analysis as set forth in the report were prepared by the appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s). The appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the report to anyone other then the client or his designee as specified in writing.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
Koch Foods

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser

EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC
10042 KEYSTONE DRIVE
LAKE CITY, PA 16423

Does

## -Certify-

That on September 24, 2007 that certain property of:

### KOCH FOODS
### FORMER SYLVEST FARMS
### 4530 MOBILE HIGHWAY
### MONTGOMERY, AL 36108

HAS WELL AND REASONABLE WORTH:

VALUE IS AS FOLLOWS:

| | FAIR MARKET VALUE-IN PLACE |
|---|---|
| DAY ONE-YEAR ONE OF EQUIPMENT VALUED | $1,398,068.00 |

| | FAIR MARKET VALUE-REMOVE |
|---|---|
| TOTAL CURRENT OF EQUIPMENT VALUED | $459,380.00 |

| | ORDERLY LIQUIDATION VALUE |
|---|---|
| TOTAL CURRENT OF EQUIPMENT VALUED | $260,890.00 |

EFFECTIVE DATE OF APPRAISAL: SEPTEMBER 24, 2007

BY:    ROBERT BREAKSTONE, CEA, CSA



**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

**Appraiser's Certification:**

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have NOT made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____
Robert Breakstone, CEA, CSA



EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

## Appraiser's Certification:

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

❖ I have made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _Daniel R. Nicoson_   9-29-2007

Daniel R. Nicoson, Report Date:

Private Confidential                                                                                              9/27/2007

| | | INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT | | | | |
|---|---|---|---|---|---|---|
| | | **KOCH FOOD - FORMER SYLVEST FARMS** | | | | |
| | | 4530 MOBILE ROAD, MONTGOMERY, AL 36108 | | | | |
| | | INSPECTION DATE: SEPTEMBER 24, 2007 | | | | |
| | | INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. | | | | |
| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| | | **Frigoscandia Spiral Freezer** | | | | |
| | | A reconditioned Frigoscandia spiral freezer with reconditioning and installation work done by NTL Installation Services, Proposal #0510114C, December 8, 2005. Freezer has been completely installed and not used in production. | | | | |
| 1 | 4773 - 4780 | Frigoscandia spiral freezer, model GC-76, project# 10185, Date 6-7-95. Unit has 28" wide self-stacking product belt, 40 tiers, 3" product clearance, 3.25" per tier. Unit has North/South belt orientation, infeed low right, discharge high right, counter-clockwise rotation. Belt cross rods are 1.25" apart, mesh is 1/2" apart. Cabinet is made of 4" thick insulated panels with stainless steel skin inside and out. Cabinet is 16' wide x 28.5' long x 15.5' high. Freezer is installed on a 6" deep insulated floor that could be moved with freezer. Freezer has been installed with most wiring and plumbing completed but freezer has not been run or tested. Evaporator coil capacity is not known. Freezer appears to be in excellent condition but noting that electrical control panel is incomplete as it was in 2006. | Freezer was still in place, no change from 2006 inspection | $430,000.00 | $473,000 | $240,000 | $150,000 |
| | | D & F Equipment Sales, Inc. Invoice #53128, invoice date: December 19, 2006. Inspection of this equipment on September 24, 2007 determined that all equipment has been disassembled and removed from operation, presently stored outside with belting removed and stored outside. | | | | |
| | 4784 | Pallets of plastic food grade belting removed from D & F Equipment Sales Conveyor System | Multiple pallets of plastic belting from the various conveyors. No way of knowing if all the belting is present or actual condition of belting. Belting has been used and has been taken off conveyors when system disassembled. It has been stored outside without protection for undetermined time. | Included in costs and values of conveyors below | Included in costs and values of conveyors below | $0 | $0 |
| 1 | 4858 - 4862 | SERIAL# 36019-01A; DOUBLE CONE LINE, DFDC1015, REMOVED FROM OPERATION, BELTS REMOVED | | $63,820.00 | $73,000 | $22,000 | $11,000 |
| 2 | 4800 | SERIAL# 36019-02A, 02B TENDER/FILLET INCLINE CONVEYORS, DFM500 | | $10,680.00 | $12,000 | $2,700 | $1,400 |
| 1 | 4814 | SERIAL# 36019-03A; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | | $3,100.00 | $4,000 | $800 | $400 |
| 1 | 4814 | SERIAL# 36019-03B; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | | $3,100.00 | $4,000 | $800 | $400 |
| 1 | 4795 | SERIAL# 36019-X1; TOTE DUMPER, DFTD276 | | $4,200.00 | $5,000 | $1,000 | $500 |
| 1 | 4863 | SERIAL# 36019-05; DE-ICE BIN, DFDTD276 | | $700.00 | $1,000 | $180 | $90 |
| 1 | | SERIAL# 36019-06; LOADING BIN, DFM391, NO IS TAG ON UNIT | Not Found | $1,100.00 | $1,000 | | |
| 1 | 4869 | SERIAL# 36019-07 FEED CONVEYOR, DFM500 | 2 sections of horizontal conveyor | $9,400.00 | $11,000 | $2,400 | $1,200 |

Page 1 of 4

Private Confidential                                                                                          9/27/2007

| INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT |
| :---: |

# KOCH FOOD - FORMER SYLVEST FARMS

4530 MOBILE ROAD, MONTGOMERY, AL 36108

INSPECTION DATE: SEPTEMBER 24, 2007

INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| :---: | :---: | :--- | :--- | :---: | :---: | :---: | :---: |
| 12 | 4851, 4852 | SERIAL# 36019-08A; THROUGH 08L ERGO STANDS, DFESFS2100, NO ID TAGS | Quantity and condition of grating for stands not confirmed | $4,800.00 | $5,000 | $1,200 | $600 |
| 12 | 4851, 4852 | SERIAL# 36019A-25A THROUGH 25L; ERGO STANDS, DFESF2100, (NO ID TAGS) | Quantity and condition of grating for stands not confirmed | $4,800.00 | $5,000 | $1,200 | $600 |
| 1 | 4829 | SERIAL# 36019-09 PRODUCT CONVEYOR, DFM500 | Base frame for 36019 10-5 | $7,000.00 | $8,000 | $1,800 | $900 |
| 1 | 4829 | SERIAL# 36019-10-S PRODUCT CONVEYOR, DFM500 | Mounted on 36019-09 | $5,800.00 | $7,000 | $1,500 | $800 |
| 1 | 4796 | SERIAL# 36019-11 PRODUCT CHUTE, DFC378 (NO ID TAG) | | $400.00 | $440 | $100 | $50 |
| 1 | 4858 - 4862 | SERIAL# 36019A-01B; DOUBLE CONE LINE, DFDC1015 | | $63,820.00 | $73,000 | $22,300 | $11,200 |
| 2 | 4793, 4794 | SERIAL# 36019A-02A, 02B DOUBLE TOTE DUMPERS, DFTD275 | | $15,000.00 | $17,000 | $5,300 | $2,700 |
| 2 | 4864, 4866 | SERIAL# 36019A-03A, 03B DE-ICE BINS, DFDT1002 | | $1,400.00 | $2,000 | $400 | $200 |
| 1 | 4788 | SERIAL# 36019A-04A-1; D4A-2; recirculation CONVEYORS, DFM500 | | $10,070.00 | $12,000 | $2,500 | $1,300 |
| 1 | 4789 | SERIAL# 36019A-04B-1, D4B-2; RECIRCULATION CONVEYORS, DFM500 | | $10,070.00 | $12,000 | $2,500 | $1,300 |
| 3 | 4815 | SERIAL# 36019A-05A, 05B, 05C; WING TIP INCLINE CONVEYORS, DFM500 | | $20,520.00 | $24,000 | $5,100 | $2,600 |
| 4 | 4799 | SERIAL# 36019A-06A, 06B, 06C, 06D WING INCLINE CONVEYORS, DFM500 | | $29,600.00 | $34,000 | $7,400 | $3,700 |
| 1 | 4800 | SERIAL# 36019A-07 and 36019A-07A; WING INCLINE CONVEYORS, DFM500 | | $11,100.00 | $13,000 | $2,800 | $1,400 |
| 1 | 4867 | SERIAL# 36019A-08; WING COMMON CONVEYOR, DFM500 | 3 sections | $17,300.00 | $20,000 | $4,300 | $2,200 |
| 1 | 4826, 4812 | SERIAL# 36019A-09; WING COMMON CONVEYOR, DFM500 | 3 sections | $14,540.00 | $17,000 | $3,600 | $1,800 |
| 1 | 4853 | SERIAL# 36019-10; SKIN INCLINE CONVEYOR, DFM500 | 2 sections | $9,460.00 | $11,000 | $2,400 | $1,200 |
| 2 | 4823 | SERIAL# 36019A-12A, 12B; TENDER/BREAST INCLINE CONVEYOR, DFM500 | | $21,360.00 | $25,000 | $5,300 | $2,700 |
| 1 | 4809 - 4811 | SERIAL# 36019A-13; CARCASS COMMON CONVEYOR, DFM500 | | $12,200.00 | $14,000 | $3,100 | $1,600 |
| 1 | 4813 | SERIAL# 36019A-14 TENDER/BREAST INCLINE CONVEYOR, DFM500 | Photo shows 36019A-14 which is one Incline and two S-curves, also shows 36019A-X44 Incline | $26,895.00 | $31,000 | $6,700 | $3,400 |
| 8 | 4820 - 4823 & 4835 | TENDER/BREAST CONVEYORS, SERIAL# 36019A-15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H | This line item represents 8 conveyor lines when installed. (22) segments on site. | $132,480.00 | $152,000 | $33,100 | $16,600 |
| 1 | 4801 | SERIAL# 36019A-17; FEED CONVEYOR, DFM500 | 2 sections | $9,400.00 | $11,000 | $2,400 | $1,200 |
| 1 | | SERIAL# 36019A-CHUTE, DFC378 (NO ID TAG) | Not Found | $430.00 | $470 | | |
| 4 | 4831 | SERIAL# 36019A-19A, 19B, 19C, 19D; EMPLOYEE STANDS, DFMPM179 | | $24,600.00 | $27,000 | $6,200 | $3,100 |
| 1 | 4854 | SERIAL# 36019A-20; FLAT TOP TABLE, DMFT382 (NO ID TAG) | | $1,800.00 | $2,000 | $500 | $300 |

Private Confidential                                                                 9/27/2007

## INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT

# KOCH FOOD - FORMER SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108
### INSPECTION DATE: SEPTEMBER 24, 2007
### INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|---|
| 4 | 4818, 4819 | SERIAL# 36019A-21A, 21B, 21C, 21D; EMPLOYEE CROSSOVER STANDS, DFMPA179 | | $7,400.00 | $8,000 | $1,900 | $1,000 |
| 1 | 4804, 4805 | SERIAL# 36019A-26; S-36019-X5; TRW INCLINE CONVEYOR, DFM500 | | $10,580.00 | $12,000 | $2,600 | $1,300 |
| | 4844, 4838, 4843 | | FULL BOX CONVEYORS there were 13 sections of the Full Box conveyor on hand. Many sections do not have a manufacturer ID plate installed | | | | |
| 1 | 4825 | SERIAL# 36019A-26; FULL BOX CONVEYOR, DFKPC900 | 2-sections | $14,100.00 | $16,000 | $2,800 | $1,400 |
| 1 | | SERIAL# 36019A-28; FULL BOX CONVEYOR, DFKPC900 | No ID plate found | $8,930.00 | $10,000 | $1,800 | $900 |
| 1 | 4830 | SERIAL# 36019A-29; FULL BOX CONVEYOR, DFKPC900 | 2-sections | $5,220.00 | $6,000 | $1,000 | $500 |
| 2 | 4839 | SERIAL# 36019A-31A, 31B; FULL BOX CONVEYORS, DFKPC900 | | $13,420.00 | $15,000 | $2,700 | $1,400 |
| 2 | 4837 | SERIAL# 36019A-32A, 32B; FULL BOX CONVEYORS, DFKPC900 | | $15,640.00 | $18,000 | $3,100 | $1,600 |
| 1 | | SERIAL# 36019A-37; FULL BOX CONVEYOR, DFM500 | No ID plate found | $8,180.00 | $9,000 | $1,600 | $800 |
| 1 | 4841 | SERIAL# 36019A-39; FULL BOX SPUR CONVEYOR, DFFB539I | | $7,600.00 | $9,000 | $1,900 | $800 |
| 1 | 4840 | SERIAL# 36019A-43; FULL BOX CONVEYOR, DFKPC900 | | $14,295.00 | $16,000 | $2,900 | $1,300 |
| 1 | 4827 | SERIAL# 36019A-44; FULL BOX CONVEYOR, DFKPC900 | | $17,440.00 | $20,000 | $3,900 | $1,800 |
| 8 | 4848 - 4850 | SERIAL# 36019A-34A, 34B, 34C, 34D, 34E, 34F, 34G, 34H; TOTE STANDS, DFM5380; PERSONNEL WORK STANDS, (NO ID TAGS) | complete with the yellow plastic grate surfaces | $1,800.00 | $2,000 | $500 | $300 |
| 7 | 4855 | SERIAL# 36019A-35A, 35B, 35C, 35D, 35E, 35F, 35G; GRAVITY CONVEYORS, DFGR50 (NO ID TAGS) | Only (5) conveyors were found. | $3,780.00 | $4,000 | $1,100 | $600 |
| 2 | | SERIAL# 36019A-45A, 45B, 90? GRAVITY CONVEYORS, DFGR50-90 (NO ID TAGS) | Not Found | $2,200.00 | $3,000 | | |
| 1 | 4813 | SERIAL# 36019A-X44 TENDER/BREAST CONVEYOR | | $17,275.00 | $20,000 | $5,200 | $2,600 |
| 2 | 4842, 4847 | SERIAL# 36019A-X24; EMPLOYEE STANDS | | $3,000.00 | $3,000 | $900 | $500 |
| 1 | 4828 | SERIAL# 36019A-X6-S; NUGGET INCLINE OVER DSI CONVEYOR, DFM500 | 2-sections | $5,900.00 | $7,000 | $1,800 | $900 |
| 1 | 4806, 4807 | SERIAL# 36019A-X4-S; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | 2-sections | $9,700.00 | $11,000 | $2,900 | $1,500 |
| 4 | 4845 | SERIAL# 36019A-X8; WING SAWS | Two units are missing their motors. | $5,800.00 | $7,000 | $1,200 | $600 |
| 1 | 4856, 4857 | SERIAL# 36019A-X43A, X43B DOUBLE CONE LINE FRAME - NO CONES PURCHASED OR INSTALLED | 3-sections | $34,860.00 | $40,000 | $12,000 | $6,000 |
| 1 | 4868 | SERIAL# 36019A-7A, 7B INCLINE CONVEYOR | | $10,000.00 | $12,000 | $3,000 | $1,500 |
| 1 | 4834, 4836 | SERIAL# 36019A-X21; EMPTY BOX CONVEYOR W/TWO 90 DEGREE TURNS, (5) STRAIGHT SECTIONS | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $12,232.50 | $12,233 | $3,700 | $1,900 |

Private Confidential

9/27/2007

INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT

# KOCH FOOD - FORMER SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### INSPECTION DATE: SEPTEMBER 24, 2007

INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE – INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 4832 | SERIAL# 36019A-X22, EMPTY BOX CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $14,425.00 | $14,425 | $4,300 | $2,200 |
| 1 | 4832 | SERIAL# 36019A-X23 GRAVITY CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $4,500.00 | $4,500 | $1,400 | $700 |
| 1 | 4833 | SERIAL# 36019A-X20 EMPTY BOX CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $6,000.00 | $6,000 | $1,800 | $900 |
| 1 | 4846 | SERIAL# 36019A-X42 EMPLOYEE STAND | | $5,450.00 | $6,000 | $1,600 | $800 |
| | | TOTAL OF ALL VALUES | | $1,240,672.50 | $1,398,067.50 | $458,580 | $260,440 |



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA. 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

# APPRAISAL PHOTOGRAPHS

In this appraisal report the appraiser has included a large series of photographs for illustration of the equipment inspected. The appraiser has to the best of his ability properly identified the assets with an item number that corresponds to the Detailed Equipment Inventory included in this report.

While descriptions are believed to be correct, the appraiser make no warranties or guarantees expressed or implied, as to the genuineness, authenticity of, any photographed item identification and will not be held responsible for discrepancies or inaccuracies. No warranties are made as to the merchantability of any items or their fitness for any purpose.














Photo# 4785













Photo# 4794



Photo# 4795



Photo# 4796



Photo# 4797



Photo# 4798



Photo# 4799



















































































































**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

# APPRAISER'S QUALIFICATIONS

Robert Breakstone,
President



## Experience:

Mr. Robert Breakstone, CSA, CEA our Senior Appraiser, has been President of Equipment Exchange Company of America, Inc. since 1989. Our firm has been in the "used equipment" business since 1979. Having "grown up" in the process business, Robert has a wealth of experience in many facets of food production. He has toured many production plants in United States, Provinces of Canada as well as Puerto Rico and Central America.

Equipment Exchange Company specializes in buying, selling and evaluating meat process, baking, beverage, frozen foods, vegetable, dry goods and related food products and equipment. We also have extensive database of sales history for our in-house sales comparisons.

## Education:

Mr. Robert Breakstone received his Bachelors Degree from Mercyhurst College, Erie, PA in 1982. In 2001, Mr. Breakstone received his Certificate of Achievement for completing the American Society of Appraiser's (ASA) course in *Uniform Standards of Professional Appraisal Practice* (USPAP) and as per AMEA's regulations Mr. Breakstone successfully completed the 7-hour USPAP Course in October 2006.

## Memberships:

Professional Memberships:
1) Equipment Appraisers Association on North America (EAANA) - Status: Certified Senior Appraiser (CSA)
2) Association of Machinery and Equipment Appraisers (AMEA) - Status: Certified Equipment Appraiser (CEA).
3) American Society of Appraisers (ASA) - Status: Candidate Member

Association Memberships:
Equipment Exchange Company of America, Inc. is a current member of Machinery Dealers National Association (MDNA) of the Equipment Leasing Association (ELA) American Meat Institute (AMI) as well as North American Meat Processors (NAAMP) and American Association of Meat Processors (AAMP).

## Certification:

In 2002, Mr. Breakstone completed and has been accepted by the Association of Machinery and Equipment Appraisers (AMEA) as a Certified Equipment Appraiser (CEA). In 2005, Mr. Breakstone completed the requirements for Certified Senior Appraiser (CSA) status in Equipment Appraisers Association of North America. These certifications require acceptance to conform in all respects to the designated Codes of Ethics, the appropriate Standards and Procedures of Professional Appraisal Ethics and Practice, certification in *Uniform Standards of Professional Appraisal Practice* (USPAP) as well written exams, submittal of an appraisals for review and acceptance, as well as a minimum of five years of appraisal experience. Both designations dictate on-going requirements to maintain accreditation.



Certificate of Completion

for

**Robert Breakstone**

who attended the class and successfully completed the AMEA 7 Hour Refresher Course

<u>Uniform Standards of Professional Appraisal Practice (USPAP)</u>

October 13, 2006
Detroit, Michigan

AMEA President



# Certified
# Machinery and Equipment
# Appraiser

### Recognition Is Hereby Granted To

# *Robert  Breakstone*

by the
## Association of Machinery and Equipment Appraisers
for the period

## October 1, 2004 — September 30, 2005

_____
President

License Number: _____

# The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170.

*presents this*

## Certificate of Achievement

*to*

### Robert J. Breakstone

who has attended the class and successfully completed the exam for the American Society of Appraisers' 15-hour course

**SE100: National Uniform Standards of Professional Appraisal Practice (USPAP)**

Richard T. Roche, ASA International Education Chair

July 2001
Date

SSN: _____



EQUINE & FARM APPRAISERS ASSOCIATION OF NORTH AMERICA

INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA

Membership Certificate

THIS IS TO CERTIFY THAT

Robert Jay Breakstone

is a member of the above corporation incorporated under the laws of this state and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Corporation's By-Laws, Rules and Regulations.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be executed by its duly authorized officers and its corporate seal to be hereunto affixed.

Dated December 29, 2003

TREASURER

SECRETARY

Certificate Number
171



The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

presents this

*Certificate of Achievement*

to

Robert J. Breakstone

who has taken the class and successfully completed the exam for the American Society of Appraisers 30-hour course

ME201©L: Introduction to Machinery and Equipment Valuation - Available August and October 2002.

Robert B. Podwalny, ASA International Education Chair

October 2002
Date

# EXHIBIT R

EFFECTIVE DATE: OCTOBER 19, 2007

## EXPERT REPORT
## OF
## DAVID DALFONSO OF ROSEN SYSTEMS, INC.
## FOR
## SCHIFF HARDIN LLP
## IN THE MATTER OF
## KOCH FOODS OF ALABAMA, LLC V. GENERAL ELECTRIC
## CAPITAL CORPORATION

Case No. 07 C 522

4530 Mobile Highway
Montgomery
Alabama 36108

"ORDERLY LIQUIDATION VALUE"

"FAIR MARKET VALUE"

"FAIR MARKET VALUE IN PLACE"



APPRAISER:        David A. Dalfonso, CEA



# Rosen Systems, Inc.

17744 Preston Road, Suite 100
Dallas, Texas 75252-5736
Office: 972-248-2266
800-527-5134
Fax: 972-248-6687
http://www.rosensys.com

October 29, 2007

Mr. Mike Zhiyuan Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606

## APPRAISAL

As requested, an inspection and appraisal of SELECTED ASSETS OF KOCH FOODS, located 4530 Mobile Highway, Montgomery, Alabama 36108, has been conducted by ROSEN SYSTEMS INC. The equipment was physically inspected OCTOBER 19, 2007, which is the effective date of the appraisal. The purpose of this appraisal is to arrive at a conclusion of Orderly Liquidation Value, Fair Market Value and Fair Market Value In Place for these assets effective the date of inspection; we do not intimate that there could not be any fluctuation of the values in the future. The fee for this report is for our expressed opinion at the time of inspection, with no warranties or guarantees of the outcome if values are tested at any future date.

This appraisal sets forth the findings and conclusions which are based upon our investigation of conditions affecting value and which are subject to the Statement of Limiting Conditions and Definition contained in the following report. Without reading the Statement of Limiting Conditions and Definition, the report could be erroneously interpreted. This is a complete summary appraisal report.

We have made a concerted effort to obtain the most recent comparable information. The values shown in this report are based upon this information and continuous conversations with industry professionals.

This report is intended for use only by the addressee listed above and is intended only for use in financing transactions. Use of this report by others is not intended by the appraiser, nor is the report intended for any other use unless express written consent is further granted.

Thank you for the opportunity to be of service in this matter.

Respectfully submitted,

ROSEN SYSTEMS INC.

David A. Dalfonso, CEA
Vice President

INDEX

|  | PAGE |
|---|---|
| RECAPITULATION | 1 |
| STATEMENT OF LIMITING CONDITIONS | 2 |
| MACHINERY AND EQUIPMENT | |
| Definition | 4 |
| Method of Appraisal | 6 |
| Use & Interpretation | 11 |
| Appearance Codes | 12 |
| Personalty | |
| Computer Listing | 13 |
| Computer Total | 21 |
| PHOTOGRAPHS | 22 |
| CERTIFICATE OF APPRAISER | 37 |
| QUALIFICATIONS | |
| Rosen Systems, Inc. | 38 |
| David A. Dalfonso, CEA | 39 |
| Michael D. Rosen | 40 |

RECAPITULATION


SELECTED ASSETS OF KOCH FOODS
4530 Mobile Highway
Montgomery, Alabama 36108                                        OCTOBER 19, 2007


"ORDERLY LIQUIDATION VALUE"


* * *$175,000* * *

(One Hundred Seventy-Five Thousand Dollars)


"FAIR MARKET VALUE"


* * * $ 300,000* * *

(Three Hundred Thousand Dollars)


"FAIR MARKET VALUE IN PLACE"


* * *$450,000* * *

(Four Hundred Fifty Thousand Dollars)

STATEMENT OF LIMITING CONDITIONS:

All facts and data set forth in this report are true and correct to the best of your appraiser's knowledge and belief.

Personal inspection of fixed assets has been made unless noted otherwise.

The fee for this appraisal report is not contingent upon the results reported. There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

As this report has been purchased by the addressee, we assume it is to be used by the addressee in determination of value at that point in time. This report should be used with the understanding that neither purchase of the report nor payment of the appraisal fee carries with it any guarantees of future tested value, nor does it imply absence of risk regarding possible value change.

Physical condition in most instances either has been determined by inspection or based upon information provided by others. Any unknown or hidden conditions existing at the time of inspection could alter the value.

No consideration has been given to liens or encumbrances which may be against the property.

No investigation of legal fee or title to the property has been made, and the claim to the property has been assumed valid.

Neither the appraiser nor any officer or employee of ROSEN SYSTEMS, INC. has any financial interest in the property appraised.

This appraisal is based upon Orderly Liquidation Value, Fair Market Value and Fair Market Value In Place as defined under the Definition heading.

No additional values or appraisals have been made in regard to such intangibles as patents, rights to manufacture, trademarks, goodwill, going concern, etc.

The valuation concept used in this report is one chosen by the client and should not be considered a recommendation by ROSEN as to what might result in the application of the concept. Concept probability and/or feasibility is beyond the scope of the appraisal. The user of the report is to determine the probability of occurrence. The appraisal is purchased in order to allow an opinion of value under an assumed set of circumstances, as requested and mutually agreed upon by the client and ROSEN SYSTEMS, INC.

-3-

<u>STATEMENT OF LIMITING CONDITIONS (CONTINUED)</u>:

NO ANALYSIS, OBSERVATION, INSPECTION OR STUDY OF ANY KIND OR CHARACTER IS MADE AND NO CONSIDERATION IS IN ANY MANNER TAKEN INTO ACCOUNT WITH RESPECT TO THE POTENTIAL OR POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES OR WASTE ON THE PROPERTY APPRAISED, INCLUDING BUT NOT LIMITED TO EXAMINATION OR INVESTIGATIONS FOR THE PRESENCE OF ASBESTOS, POLYCHLORINATED BIPHENYLS, OR ANY OTHER SUBSTANCE WHICH IS REGULATED BY LAW OR POSES A HAZARD TO HUMAN HEALTH OR THE ENVIRONMENT.

Court testimony shall not be required as a consequence of the performance of this appraisal unless arrangements are made with the appraiser at additional fee.

Other limitations, if any, are clearly defined and individually signified at a point in the appraisal relating to the subject.

## APPRAISAL
## GENERAL INFORMATION

### PURPOSE OF APPRAISAL:

The purpose of this appraisal is to estimate the Orderly Liquidation Value, Fair Market Value and Fair Market Value In Place of the subject personal property. In estimating these values, it has been necessary to make a physical inspection and listing of the property contained in this report. The results are reported in this appraisal.

### FUNCTION OF APPRAISAL:

The property interest (rights) appraised is that of ownership in fee simple (unless otherwise noted), and the subject assets are appraised as if free and clear, without liens or encumbrances (unless otherwise noted).

### ORDERLY LIQUIDATION VALUE CONCEPT:

The estimated gross dollar amount derived from the sale of the assets, given limited time to find a purchaser or purchasers, and considering a completed sale of all assets. No guarantee or warranty is made as to condition, and purchasers are responsible for removal of the purchased assets at their own risk and expense. The concept allows only limited time for market exposure, and also considered is the physical condition, quantity, difficulty of removal, as well as the overall marketability of the asset group. Any deletions or additions to that list could change the psychological and/or monetary appeal necessary to gain the price indicated.

The definition also assumes that all equipment would be sold on a piecemeal basis "as is" and "where is," with the buyers being responsible for the removal at their own risk and expense. It does not assume additional values which could be generated such as product line, equipment in place, going operation, or other types of values which could or may be produced at such an auction sale but could not be realistically anticipated by an appraiser.

No consideration is given to additional value that might be obtained because of product line or other elements of value that could or might be produced at liquidation, but could not be reasonably assumed.

### FAIR MARKET VALUE CONCEPT:

"The price that a willing buyer would be justified in paying and a willing seller would be warranted in accepting if each is: (1) well informed or well advised; (2) motivated by reactions of typical users; (3) free from undue stimulus; (4) financially capable of ownership and/or use; (5) allowed a reasonable length of time in which to test the market."

For all personal property appraised, it also represents the amount a reputable and qualified appraiser, unaffected by personal interest, bias or prejudice, would recommend as a proper selling price in light

of prevailing conditions.

## FAIR MARKET VALUE IN PLACE CONCEPT:

"Market value is the price that a willing buyer would be justified in paying and a willing seller would be warranted in accepting if each is: (1) well informed or well advised; (2) motivated by reactions of typical users; (3) free of undue stimulus; (4) financially capable of ownership and/or use; (5) allowed a reasonable time in which to test the market."

As particularly applied to equipment, the Fair Market Value In Place is the value of a piece of equipment as installed for intended utilization of the date of the appraisal.

## ORDERLY LIQUIDATION VALUE
## PURPOSE AND METHOD OF APPRAISAL

The purpose of this appraisal is to estimate the Orderly Liquidation Value of the subject machinery and equipment.

In estimating Liquidation Value, the appraiser(s) has considered the following approaches in arriving at indicators of value.

COST APPROACH - An estimate of the present replacement cost of the machinery and equipment less accrued depreciation. Depreciation includes loss in value due to physical deterioration as well as functional and economic obsolescence. Functional obsolescence is the decreased capacity of the item to perform the function for which it is intended in terms of current standards and specifications. Functional obsolescence may stem either from a deficiency within the item such as poor design or outmoded style or may result from superadequacy or overdesign. Economic obsolescence represents a loss in value from factors outside the item appraised, such as a depressed market for the end product manufactured by the item of machinery or equipment. These factors generally are characterized as "negative external forces" which have an impact upon the item appraised. The Cost Approach is utilized primarily as a secondary value indicator since it often fails to quantify the inherent loss in value under liquidation conditions.

SALES COMPARISON APPROACH - Comparison with similar items that have sold or are currently offered for sale in the marketplace. By comparing the items appraised with similar items which have recently sold or are currently offered for sale, an estimate can be made of the Orderly Liquidation Value. In these comparable items, pertinent factors of comparison (which include capacity, age, location, and date of sale when applicable) were considered in arriving at an adjusted value for each subject item appraised. Marketability of each item of machinery and equipment is also a determinant of value. Marketability, as a measure of demand, is approximated through recent sales under liquidation conditions of comparable items of machinery and equipment. Where actual sales are not available, relationships are often established based upon used equipment prices for comparable items with subsequent adjustments for liquidation conditions.

DIRECT SALES COMPARISON of similar items of machinery and equipment under liquidation conditions is the preferable and most often used approach used in determining Liquidation Value. The assignment for any liquidation value appraised does not necessarily indicate the concept as a proper method of disposal if market test be required at a future date. These value concepts and their inherent assumptions are requested for various uses or guidelines by the addressee shown on the letter of transmittal. The assumed set of circumstances may not come together to allow the concept to be recommended when and if a liquidation should be required.

In certain instances, as in the case of custom machinery and equipment, a market analysis may be undertaken to ascertain current demand/marketability and subsequent value. Market analysis may also be undertaken if functional or economic obsolescence is a key factor in a major machine tool or piece of equipment.

Certain categories of machinery and equipment are subject to routine loss in value as a result of usage (physical deterioration). In other instances, functional obsolescence in the form of more efficient and cost effective equipment is a factor in loss of value. These reasons, among others, are cited as major factors which limit the applicability of the values shown in regard to the effective date of this appraisal.

Note that the summary value indicated in this report represents an "aggregate" value based upon a items noted herein. For this reason, isolation of any single element as a sole basis of comparison may be inaccurate, and subsequent isolation of any single item appraised, or group of items appraised, could result in a variance from the values reported.

Under any value concept, time plays an important role in the final estimated value. Typically, the Forced Sale Liquidation concept compresses time to a minimum, and consequently values can reflect this. An Orderly Liquidation, if a proper concept and utilizing an experienced liquidator, can realize higher values given the greater length of time involved when contrasted with an auction sale. Naturally, the Fair Market Value, with its often undefined length of time for sale, can yield the highest appraisal value.

## FAIR MARKET VALUE
### PURPOSE AND METHOD OF APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject machinery and equipment.

In estimating Fair Market Value, the appraiser(s) has used either one or a combination of the following approaches in arriving at indicators.

COST APPROACH - An estimate of the present replacement cost of the machinery and equipment less accrued depreciation. Depreciation includes loss in value due to physical deterioration as well as functional and economic obsolescence. Functional obsolescence is the decreased capacity of the item to perform the function for which it is intended in terms of current standards and specifications. Functional obsolescence may stem either from a deficiency within the item such as poor design or outmoded style or may result from superadequacy or overdesign. Economic obsolescence represents a loss in value from factors outside the item appraised, such as a depressed market for the end product manufactured by the item of machinery or equipment. These factors generally are

characterized as "negative external forces" which have an impact upon the item appraised.

SALES COMPARISON APPROACH - Comparison with similar items that have sold or are currently offered for sale in the marketplace. By comparing the items appraised with similar items which have recently sold or are currently offered for sale, an estimate can be made of the Fair Market Value. In these comparable items, pertinent factors of comparison (which include capacity, age, location, and date of sale when applicable) were considered in arriving at an adjusted value for each subject item appraised. Marketability of each item of machinery and equipment is also a determinant of value. Marketability, as a measure of demand, is approximated through recent sales in the marketplace of comparable items of machinery and equipment. Where actual sales are not available, relationships are often established based upon dealer "asking price" for comparable items.

DIRECT SALES COMPARISON of similar items of machinery and equipment under liquidation conditions is the preferable and most often used approach used in determining Liquidation Value. The assignment for any liquidation value appraised does not necessarily indicate the concept as a proper method of disposal if market test be required at a future date. These value concepts and their inherent assumptions are requested for various uses or guidelines by the addressee shown on the letter of transmittal. The assumed set of circumstances may not come together to allow the concept to be recommended when and if a liquidation should be required.

INCOME APPROACH – This approach was considered, but not deemed appropriate for this appraisal.

Values reflected in this report are based primarily upon one or a combination of both of the preceding methods with heavier emphasis on the Sales Comparison Approach, if sufficient data is available. In certain instances, as in the case of custom machinery and equipment, a market FAIR MARKET VALUE - PURPOSE AND METHOD OF APPRAISAL (CONTINUED): analysis may be undertaken to ascertain current demand/marketability and subsequent value. Market analysis may also be undertaken if functional or economic obsolescence is a key factor in a major machine tool or piece of equipment.

Certain categories of machinery and equipment are subject to routine loss in value as a result of usage (physical deterioration). In other instances, functional obsolescence in the form of more efficient and cost effective equipment is a factor in loss of value. These reasons, among others, are cited as major factors which limit the applicability of the values shown in regard to the effective date of this appraisal.

Finally, note that the summary value indicated in this report represents an "aggregate" value based upon all items noted herein. For this reason, isolation of any single element as a sole basis of comparison may be inaccurate, and subsequent isolation of any single item appraised, or group of items appraised, could result in a variance from the values reported.

## FAIR MARKET VALUE IN PLACE
## PURPOSE AND METHOD OF APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject machinery and equipment.

In estimating Fair Market Value, the appraiser(s) has used either one or a combination of the following approaches in arriving at indicators.

COST APPROACH - An estimate of the present replacement cost of the machinery and equipment less accrued depreciation. Depreciation includes loss in value due to physical deterioration as well as functional and economic obsolescence. Functional obsolescence is the decreased capacity of the item to perform the function for which it is intended in terms of current standards and specifications. Functional obsolescence may stem either from a deficiency within the item such as poor design or outmoded style or may result from superadequacy or overdesign. Economic obsolescence represents a loss in value from factors outside the item appraised, such as a depressed market for the end product manufactured by the item of machinery or equipment. These factors generally are characterized as "negative external forces" which have an impact upon the item appraised.

SALES COMPARISON APPROACH - Comparison with similar items that have sold or are currently offered for sale in the marketplace. By comparing the items appraised with similar items which have recently sold or are currently offered for sale, an estimate can be made of the Fair Market Value. In these comparable items, pertinent factors of comparison (which include capacity, age, location, and date of sale when applicable) were considered in arriving at an adjusted value for each subject item appraised. Marketability of each item of machinery and equipment is also a determinant of value. Marketability, as a measure of demand, is approximated through recent sales in the marketplace of comparable items of machinery and equipment. Where actual sales are not available, relationships are often established based upon dealer "asking price" for comparable items.

Values reflected in this report are based primarily upon one or a combination of both of the preceding methods with heavier emphasis on the Sales Comparison Approach, if sufficient data is available. In certain instances, as in the case of custom machinery and equipment, a market analysis may be undertaken to ascertain current demand/marketability and subsequent value. Market analysis may also be undertaken if functional or economic obsolescence is a key factor in a major machine tool or piece of equipment.

Certain categories of machinery and equipment are subject to routine loss in value as a result of usage (physical deterioration). In other instances, functional obsolescence in the form of more efficient and cost effective equipment is a factor in loss of value. These reasons, among others, are cited as major factors which limit the applicability of the values shown in regard to the effective date of this appraisal.

FAIR MARKET VALUE IN PLACE -
PURPOSE AND METHOD OF APPRAISAL (CONTINUED):

Finally, note that the summary value indicated in this report represents an "aggregate" value based upon all items noted herein. For this reason, isolation of any single element as a sole basis of comparison may be inaccurate, and subsequent isolation of any single item appraised, or group of items appraised, could result in a variance from the values reported.

## USE AND INTERPRETATION OF REPORT

Because this is a computer-generated report, minor explanations may be necessary and helpful in utilizing the report to its fullest. Thus, the following instructions are presented, as you would normally read the report from left to right.

From the left, the first number is an entry number. If used, codes appear next and these will be numeric, alpha, or alpha-numeric. Explanations for the codes appear at the top of each page and in the code directory prior to the beginning of the list. The next entry is the quantity column, indicating totals or the word "lot." Numbers greater than one have been extended by the computer.

After the quantity is a description of the item, and beyond that the value or asterisk (*). When used, the asterisk will be explained within the description.

When codes are present, a separate code directory will be entered at the end of the listing, thereby providing one additional area to reference codes and their description.

### APPEARANCE CODES

Throughout the personal property listing, the reader may have noted letters within brackets within the description portion of the listing. These were utilized as an expedient method of describing appearance. Explanations for those letters are listed below.

Please understand that each code refers to appearance of items of similar age. Thus, a 1955 vertical mill with [A] appended indicates a comparison with other mills of that production era.

|     |     |
| --- | --- |
| [A] | Excellent or new appearance |
| [B] | Above average |
| [C] | Average |
| [D] | Below average - "as is" indication |
| [E] | Poor - No relation to condition is intended, however, our experience has been that appearance often leads to conclusions as to condition. |

---

PERSONALTY

---

# APPRAISAL

KOCH FOODS - SELECTED ASSETS

Code 1:
Code 2:

Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|---|---|---|---|---|---|---|---|
| 1 | | | 1 | CHICKEN BREAST DEBONING LINE, DESIGNED AND MFG. BY D & F EQUIPMENT IN CROSSVILLE, AL, MFG. AND INSTALLED LATE 2005, (6) SINGLE OR (3) DOUBLE LINES, EACH LINE SET UP FOR APPROX. (35) - (40) BIRDS PER MIN. CAP., (2) DOUBLE CONE LINES ARE COMPLETE WITH ALL RELATED COMPONENTS AND (1) CONE LINE IS INCOMPLETE WITH ONLY THE CONE SECTIONS AND SOME MINOR COMPONENTS, CURRENTLY LOCATED IN YARD AND DISASSEMBLED, VALUED IN PRESENT CONDITION *VALUED AS COMPLETE LINE | 100,000.00 | 200,000.00 | 225,000.00 |
| 2 | | | 1 | DUMPER, STAINLESS STEEL FRAME, PNEUMATICALLY OPERATED, W/ELEVATOR TYPE DUMP BIN, RELATED EQUIPMENT, COMPONENTS, #019A-02B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 3 | | | 1 | DUMPER, STAINLESS STEEL FRAME, PNEUMATICALLY OPERATED, W/ELEVATOR TYPE DUMP BIN, RELATED EQUIPMENT, COMPONENTS, #019-X1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 4 | | | 1 | DUMPER, STAINLESS STEEL FRAME, PNEUMATICALLY OPERATED, W/ELEVATOR TYPE DUMP BIN, RELATED EQUIPMENT, COMPONENTS, #019A-02A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 5 | | | 1 | DE-ICING BIN, STAINLESS STEEL CONSTRUCTED, TUBULAR MOUNTED, W/ANGLED BAR GRATING, DRIP PAN, RELATED EQUIPMENT, COMPONENTS, #019A-03B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 6 | | | 1 | DE-ICING BIN, STAINLESS STEEL CONSTRUCTED, TUBULAR MOUNTED, W/ANGLED BAR GRATING, DRIP PAN, RELATED EQUIPMENT, COMPONENTS, #019A-03A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 7 | | | 1 | DE-ICING BIN, STAINLESS STEEL CONSTRUCTED, TUBULAR MOUNTED, W/ANGLED BAR GRATING, DRIP PAN, RELATED EQUIPMENT, COMPONENTS, #019-5 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 8 | | | 1 | RECIRCULATING CONVEYOR, DOUBLE LANE, ALL STAINLESS STEEL CONSTRUCTED, HEAVY DUTY STAND MOUNTED, W/MOTOR, DRIVE, APPROX. 48"W X 12'L, D & F MDL. DFM500, S/N S36019A-04A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 9 | | | 1 | RECIRCULATING CONVEYOR, DOUBLE LANE, ALL STAINLESS STEEL CONSTRUCTED, HEAVY DUTY STAND MOUNTED, W/MOTOR, DRIVE, APPROX. 48"W X 12'L, D AND F MDL. DFM500, S/N S36019A-04B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 10 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, APPROX. 20'L INTERMEDIATE SECTION, PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, #019-01-2, W/WING CONVEYOR W/#019A-05A *W/CHICKEN BREAST DEBONING LINE | * | * | * |

Page 13

**APPRAISAL**

KOCH FOODS - SELECTED ASSETS

Code 1:
Code 2:

Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | RMV | EMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 11 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L #019-A-X43#2 | * | * | * |
| 12 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, W/PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 25'L, DOUBLE LANE, W/MOTOR, DRIVE, #019-X43, ENTRY/IDLER SECTION | * | * | * |
| 13 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L, EXIT/DRIVE SECTION, #019X43#1, W/TENDER AND BREAST CONVEYORS W/#019A-X44#1 AND #019A-14#1, W/MOTOR, DRIVE *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 14 | | | 1 | CONE SECTION, ALL STAINLESS STEEL, CONSTRUCTED, DOUBLE LANE, KNUCKLE CHAIN PLASTIC CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L EXIT/DRIVE SECTION, W/MOTORS, DRIVE, #019-01-#1, W/TENDER FILLET CONVEYOR SECTIONS MOUNTED IN MIDDLE, PLATE SHOWS MDL. DFDC1015, S/N S36019A-01, #019-2A AND #019Z-8 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 16 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L ENTRY/IDLER SECTION, W/MOTOR, DRIVE, #019-01-#3, W/MIDDLE MOUNTED A-FRAME BAR GRATING CATCH RACK *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 17 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, DOUBLE LANE, APPROX. 20'L, INTERMEDIATE SECTION, #019A-01#2, W/WINGTIP MIDDLE MOUNTED CONVEYOR SECTION #019A-05#2 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 18 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N 36019A-05B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 19 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N 36019A-05A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 20 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N 36019-2B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 21 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N S36019-2A *W/CHICKEN BREAST DEBONING LINE | * | * | * |

Page 14

APPRAISAL
KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

Code 1:
Code 2:

| Line | C1 | C2 | Qty | Description | %ORD | FMV | FMR |
|------|----|----|-----|-------------|------|-----|-----|
| 22 | | | 1 | FEED CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, EACH SECTION APPROX. 15'L, #19-07B#2, #19-07#1, W/MOTOR, DRIVE *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 23 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19A-06-B#2 AND #019A-06B#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 24 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19A-06D#2 AND #019-06D#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 26 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19-6C#2 AND #019A-06#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 27 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19A-06A#2 AND #019A-06A#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 28 | | | 1 | FEED CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, DRIVE SECTION APPROX. 15'L AND OUTFEED SECTION APPROX. 20'L, W/MOTOR, DRIVE, SINGLE LANE, #019A-17#1 AND #019A-17#2 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 30 | | | 1 | TENDER/BREAST INCLINE CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, L-SHAPED, W/MOTOR, DRIVE, #019A-12A#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 31 | | | 1 | TENDER/BREAST INCLINE CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, L-SHAPED, W/MOTOR, DRIVE, #019A-12B#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 32 | | | 1 | TRIM INCLINE CONVEYOR, (2) PIECES DISASSEMBLED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, MOTOR AND DRIVE SECTION IS S-SHAPED, FEED SECTION APPROX. 15'L, PLATE SHOWS MDL. DFM500, S/N S-36019-X5, TAG SHOWS #019-X5/019-24, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 33 | | | 1 | FINISH PRODUCT CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, S-SHAPED SECTION AND APPROX. 15'L FEED SECTION W/MOTOR, DRIVE #019A-X-X#2 AND #019-X4#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 34 | | | 1 | SKIN CONVEYOR, DISASSEMBLED IN (4) SECTIONS, INCLUDES S-SHAPED SECTION W/MOTOR, DRIVE, (3) APPROX. 10' FEED SECTIONS, SINGLE LANE, #017A-01#1, #019A-10, #019A-10,K #019A-10#2 *W/CHICKEN BREAST DEBONING LINE | * | * | * |

**APPRAISAL**

KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

Code 1:
Code 2:

| Line | C1 | C2 | Qty | Description | VORD | FMV | FMP |
|---|---|---|---|---|---|---|---|
| 35 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X88, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 36 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X8S, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 37 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X8S, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 38 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X8, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 39 | | | 1 | CARCASS CONVEYOR, DISASSEMBLED IN (5) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, DRIVE SECTION SHOWS MDL. DFM 500 WITH S/N S36019A-13, #19A-13#1, (3) SECTIONS W/#19A-13#2, (1) TOP MOUNTED HOOD SECTION W/#019A-13#3 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 40 | | | 1 | WING CONVEYOR LINE, CURRENTLY DISASSEMBLED IN (4) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, (1-1/2) SECTIONS OF SINGLE LANE AND (2-1/2) SECTIONS OF DOUBLE LANE, W/MOTOR, DRIVE, #19A-09, #019A-09#2, #19A-09 AND (1) # NOT AVAILABLE *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 41 | | | 1 | TENDER/BREAST CONVEYOR, CURRENTLY DISASSEMBLED IN (3) SECTIONS, (1) APPROX. 10'L DOUBLE LANE NON-DRIVE SECTION W/#019A-X44#2, (2) S-SHAPED SINGLE LANE CONVEYORS EACH W/MOTOR, DRIVE, #019A-14 AND #019A-X44, PLATE SHOWS MDL. DFM 500 WITH S/N S36019-14, #019A-14#2, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 42 | | | 1 | FULL BOX CONVEYOR, DISASSEMBLED IN (3) SECTIONS, EACH APPROX. 10'L, (1) W/MOTOR, DRIVE, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, APPROX. 18"W, #019A-23#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 43 | | | 1 | FINISHED PRODUCT INCLINE CONVEYOR, ALL STAINLESS STEEL, S-SHAPED, APPROX. 20' TOTAL, SINGLE LANE, APPROX. 8"W PLASTIC BELT, PLATE SHOWS MDL. DFM 500, S/N S-36019-03, #019-3A, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 44 | | | 1 | FINISHED PRODUCT INCLINE CONVEYOR, ALL STAINLESS STEEL, S-SHAPED, APPROX. 20' TOTAL, SINGLE LANE, APPROX. 8"W PLASTIC BELT, PLATE SHOWS MDL. DFM 500, S/N S-36019-03, #019-3B, *W/CHICKEN BREAST DEBONING LINE | * | * | * |

APPRAISAL
KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

Code 1:
Code 2:

| Code 1 | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|--------|----|----|-----|-------------|-----|-----|-----|
| 45 | | | 1 | WING INCLINE CONVEYOR, A-SHAPED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/MOTOR, DRIVE, APPROX. 20'L, PLATE SHOWS MDL. DFM 500, S/N 36019A-07A, #019A-07A *W/CHICKEN BREAST DEBONING LINE | * | | |
| 46 | | | 1 | WING INCLINE CONVEYOR, A-SHAPED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/MOTOR, DRIVE, APPROX. 20'L, PLATE SHOWS MDL. DFM 500, S/N 36019A-07, #019A-07B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 47 | | | 1 | WING TIP INCLINE CONVEYOR, A-SHAPED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/MOTOR, DRIVE, MDL. DFM 500, S/N S-36019A05C W/#019A-05C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 48 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #019A-21B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 49 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #019A-21A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 50 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #19A-21C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 51 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #019A-21D *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 52 | | | 1 | WORK PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, (4) STEPS, WORK PLATFORM, FIBERGLASS INSERTS, #019A-X24 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 53 | | | 1 | WORK PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, (4) STEPS, WORK PLATFORM, FIBERGLASS INSERTS, #019A-X42 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 54 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 55 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15B *W/CHICKEN BREAST DEBONING LINE | * | * | * |

Page 17

**APPRAISAL**

KOCH FOODS - SELECTED ASSETS

Code 1:
Code 2:

Date - 10/19/07

| Line | C45-02 | Qty | Description | ORD? | FMV | FMP |
|---|---|---|---|---|---|---|
| 56 | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 57 | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15D *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 58 | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15E *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 59 | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15F *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 60 | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15G *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 61 | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15H *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 62 | | 1 | WING COMMON CONVEYOR, (3) SECTIONS DISASSEMBLED, DRIVE SECTION APPROX. 20'L, INTERMEDIATE SECTION APPROX. 20'L, IDLER SECTION APPROX. 20'L, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, W/MOTOR, DRIVE, DRIVE SECTION SHOWS PLATE MDL. DFM 500 WITH S/N 36019A-08, #019A-08#1, #019A-08#2, AND #019A-08 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 63 | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, 2-LANE, INCLUDES APPROX. 30'L DRIVE SECTION W/PLASTIC KNUCKLE CHAIN CONVEYOR, MOTOR, DRIVE, PLATE SHOWS MDL. DFKP0900, S/N 36019A44S, #19A-44, ALSO INCLUDES 90° AND IDLER SECTION, 10' 2-LANE INTERMEDIATE SECTION, CURRENTLY DISASSEMBLED, *W/CHICKEN BREAST DEBONING LINE | * | * | * |

Page 18

APPRAISAL
KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

Code 1:
Code 2:

| Line | C1 | C2 | Qty | Description | ORD | RMV | FMP |
|---|---|---|---|---|---|---|---|
| 64 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, 2-LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, APPROX. 10'L DRIVE SECTION W/MOTOR, DRIVE, APPROX. 30'L IDLER SECTION, #019A-26 IDLER, 15' DRIVE SECTION W/MOTOR, DRIVE, DOUBLE LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 65 | | | 1 | NUGGET INCLINE CONVEYOR, DISASSEMBLED IN (2) SECTIONS, ALL STAINLESS STEEL, SINGLE LANE, DRIVE SECTION MOUNTED ON STANDS, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, S/N 36019-X6-S, #019A-X6#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 66 | | | 1 | PRODUCT CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, TOP AND BOTTOM CONVEYORS, INCLUDES APPROX. 18" X 25' PLASTIC BELT CONVEYOR MOUNTED ON BOTTOM, APPROX. 12" X 20' TOP MOUNTED PLASTIC BELT CONVEYOR, W/MOTORS, DRIVES, ALL STAINLESS STEEL FRAME, STAND MOUNTED, PLATE SHOWS MDL. DFM 500, S/N S36019-09, #019-09 AND #019-10 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 67 | | | 1 | BOX CONVEYOR, APPROX. 18" X 20' PLASTIC CONVEYOR, ALL STAINLESS STEEL FRAME, STAND MOUNTED, W/MOTOR, DRIVE, #019A-37 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 68 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 69 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 70 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 71 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19D *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 72 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-X42 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 73 | | | 1 | GRAVITY CONVEYOR SECTION, PLASTIC ROLLERS, APPROX. 12" X 10', ALL STAINLESS STEEL, #019A-X23, (6) TOTAL SECTIONS, CURRENTLY DISASSEMBLED IN YARD *W/CHICKEN BREAST DEBONING LINE | * | * | * |

Page 19

# APPRAISAL

## KOCH FOODS - SELECTED ASSETS

Code 1:
Code 2:                                                                                    Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORG | FMV | FMV |
|------|----|----|-----|-------------|-----|-----|-----|
| 74 | | | 1 | EMPTY BOX CONVEYOR, ALL STAINLESS STEEL, INCLUDES (4) SECTIONS OF 10" X 20' PLASTIC INTERLOCKING CONVEYOR, (1) SECTION OF APPROX. 10" X 15' PLASTIC INTERLOCKING CONVEYOR, (1) S-SHAPED SECTION OF APPROX. 10" X 20' PLASTIC INTERLOCKING CONVEYOR, ALL STAINLESS STEEL FRAME, (1) PLATE SHOWS MDL. DFX 500 WITH S/N 38019A-X22, #019A-X22 AND #019A521, INCLUDES ALL MOTORS, DRIVES, VALUED AS COMPLETE SETUP, CURRENTLY DISASSEMBLED IN YARD, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 75 | | | 1 | EMPTY BOX INCLINE CONVEYOR, APPROX. 16" X 15', STAND MOUNTED, ALL STAINLESS STEEL FRAME, PLATE SHOWS MDL. DFM 500, S/N S36019A-X20, (NO MOTOR OR DRIVE) *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 76 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL FRAME, 2-LANE FEED, 3-LANE OUTFEED, CURVED SECTION, PLASTIC KNUCKLE CONVEYOR, PLATE SHOWS MDL. DFFBS301, S/N S36019A-39, #019A-39, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 77 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, PLASTIC KNUCKLE CHAIN CONVEYOR, INCLUDES 10' DRIVE SECTION W/MOTOR AND DRIVE, 90° SECTION, PLATE SHOWS MDL. DFKPC900, S/N 38019A-32A, #19A-32A, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 78 | | | 1 | FULL BOX CONVEYOR, DOUBLE LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, MOTOR, DRIVE, INCLUDES OFFSET SECTION, APPROX. 15' TOTAL, PLATE SHOWS MDL. DFKPC900, S/N S36019A-28, #019A-28 #1, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 79 | | | 1 | FULL BOX CONVEYOR, 2-LANE, ALL STAINLESS STEEL CONSTRUCTED, PLASTIC KNUCKLE CHAIN CONVEYOR, INCLUDES APPROX. 10' DRIVE SECTION W/MOTOR, DRIVE, 90° SECTION, IDLER SECTION, PLATE SHOWS MDL. DFK9C900, S/N S36019A-43, #019A-43 #1, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 80 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL, DOUBLE LANE, PLASTIC KNUCKLE CHAIN CONVEYOR, PLATE SHOWS MDL. DFKPC900, S/N S36019A-3, APPROX. 4' DRIVE SECTION W/MOTOR, DRIVE, ALSO INCLUDES 10' INTERMEDIATE AND 90° SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 81 | | | LOT | ANCILLARY EQUIPMENT, INCLUDING BUT NOT LIMITED TO ASSORTED ERGO STANDS W/FIBERGLASS INSERTS, BELTING NOT LISTED W/LINES (LOCATED ON SKIDS IN YARD), (2) TABLES W/#019-11 AND #019A-18#1, ASSORTED ELECTRICS, SPARE MOTORS, DRIVES, ALL RELATED PERIPHERAL EQUIPMENT NOT OTHERWISE LISTED, CURRENTLY DISASSEMBLED IN YARD *W/CHICKEN BREAST DEBONING LINE | * | | |

Page 20

# APPRAISAL

## KOCH FOODS - SELECTED ASSETS

Code 1:
Code 2:

Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMV FMI |
|------|----|----|-----|-------------|-----|-----|---------|
| 82 | | | 1 | SPIRAL FREEZER, AGA/FRIGOSCANDIA, DRAWINGS SHOWS #GC-76, PROJECT #Q101-85, GYRO COMPACT GC, DRAWING ALSO SHOWS DATE 6/10/92, LIST SHOWS MDL. GCM-76-08-26-NS-CCR, S/N 00530143, APPROX. 10'H SPIRAL CONVEYOR, APPROX. (40) TIERS, 2-1/2" SPACING, 28"W STAINLESS STEEL CONVEYOR, BOTTOM RIGHT ENTRY/TOP RIGHT EXIT, W/MOTORS, DRIVES, ALL MOUNTED INSIDE APPROX. 30' X 12' X 20'H STAINLESS STEEL PANEL CONSTRUCTED WALK-IN FREEZER, APPROX. 25' X 12' X 15'H INTERIOR DIMENSIONS, REFRIGERATION SYSTEM MOUNTED IN REAR W/REFRIGERATION COILS, BLOWER SYSTEM W/(2) APPROX. 40 HP MOTORS, SELF-STACKING BELT SYSTEM, AIR DEFROST SYSTEM AND C1P SYSTEM MOUNTED ON OUTSIDE OF PANELS, ALL RELATED PIPING, VALVES, FLANGES, ELECTRICS, ALSO INCLUDES STAND ALONE POWER SUPPLY/CONTROL W/SIEMENS COMPUTER CONTROLS, CONTROL CABINET PLATE SHOWS SUPERIOR CUSTOM CONTROLS IN SEATTLE, WA, MDL. 2323/5280, S/N 061493, RELATED HARDWARE, SOFTWARE, ELECTRICS, PRINCIPAL INDICATES NOT COMPLETELY INSTALLED, NOT IN OPERATION AT TIME OF INSPECTION, VALUED IN PRESENT CONDITION | 75,000.00 | 100,000.00 | 225,000.00 |

| Grand Totals : | | | | | 175,000.00 | 300,000.00 | 450,000.00 |

Page 21

PHOTOGRAPHS





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.

## CERTIFICATE OF APPRAISER

I certify that:

1)  I personally examined the property appraised;

2)  the statements contained in this appraisal and upon which the opinions expressed herein are based are true and correct to the best of my knowledge and belief, subject to the limiting conditions set forth;

3)  to the best of my knowledge and belief, no pertinent information has been overlooked or withheld; and

4)  I have no interest either presently or contemplated in the property appraised or in any proceeds to be derived therefrom.  My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

My analysis, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

ROSEN SYSTEMS, INC.

David A. Dalfonso, CEA
Vice President

I hereby certify that I reviewed this appraisal.

Michael D. Rosen
President

---

QUALIFICATIONS

---

# ROSEN SYSTEMS, INC.

Rosen Systems, Inc., is a comprehensive national appraisal organization, evolving from Ralph Rosen Associates which began operations in 1917. Through the years, there has been increasing demand for Rosen Systems, Inc.'s appraisal services as a result of asset-based lending, merger and acquisition activities, and asset management/disposition requirements.

The company's position of eminence within the profession and national acceptance has resulted from:

-Leadership and membership in the National Association of Machinery and Equipment Appraisers organization and CEA certification of M&E appraisers, along with years of practical knowledge of the marketplace and asset valuing experience.
-Commercial/Industrial Real Estate Appraisers with multi-state GREA certification and national property valuation experience.
-Appraiser versatility in multiple value concepts.

Over eighty years of sales and appraisal experience, combined with Rosen Systems, Inc.'s proven valuation techniques, have been carefully coordinated to meet the unique needs of each client. This experience level finds Rosen Systems, Inc.'s appraisals accepted by major lenders in the United States and recommended by them as one of their primary sources for asset value indications. We are particularly well organized to suit the needs of those involved in the financing community generally. We have completed numerous appraisals in both Canada and Mexico.

Rosen Systems, Inc., includes appraisal departments which focus on values for making lending decisions as well as hard asset allocations subsequent to mergers/acquisitions as follows:

-Real Estate
-Machinery and Equipment
-Inventories (Manufacturing, Wholesale and Retail)
-Market Studies

ANCILLARY SERVICES INCLUDE:

-Updating and appraisal revision
-Review of appraisals performed by others
-Desk-Top Opinions or informal value studies
-Market and Industrial Surveys

As a full service organization offering business, industry and financial institutions accurate appraisals, Rosen Systems, Inc. includes in its list of national clients many of the top institutional and commercial lenders, and numerous Fortune 500 companies.

ATLANTA . CHARLOTTE . DALLAS . FORT LAUDERDALE - HOUSTON

*For Further Information Contact:*
Rosen Systems, Inc.
17744 Preston Road, Suite 100
Dallas, Texas 75252-5736
(972) 248-2266 . (800) 527-5134 . FAX: (972) 248-6887
http://www.rosensys.com

**ROSEN SYSTEMS INC.**

## QUALIFICATIONS

David A. Dalfonso, CEA
ROSEN SYSTEMS, INC.

### EXPERIENCE & BUSINESS ASSOCIATIONS:

1. Vice President/Appraiser - Rosen Systems, Inc.
2. Expert Witness, Federal Bankruptcy Courts
3. Senior Market Analyst - Rosen Systems, Inc.
4. Research and Marketing Background
5. Consumer Finance Background
6. Oilfield Experience
7. Steel Production Experience

### EDUCATION:

1. Bachelor of Science - College of Steubenville - Business Management
2. Additional Studies include Economics, Accounting, and Marketing

### MEMBERSHIPS:

1. Machinery Dealers National Association, (MDNA) Member
2. Association of Machinery and Equipment Appraisers (AMEA) - CEA

### APPRAISAL & RESEARCH ASSIGNMENTS:

1. Auction Value
2. Orderly Liquidation Value
3. Fair Market Value
4. Fair Market Value In Place
5. Replacement Value

### ADDITIONAL INFORMATION:

1. *Demystifying The Appraisal Process*, "THE SECURED LENDER," Nov./Dec. '94, Vol. 50, Number 6.
2. Contributor/Associate Editor, Market Update Report -- a value-oriented article generated for major lending institutions.
3. Featured Speaker, Rosen Systems, Inc. - Educational Seminars.

Note: Specific references and/or assignments can be furnished upon request.

**ROSEN SYSTEMS INC.**

## QUALIFICATIONS

Michael D. Rosen, CEA
ROSEN SYSTEMS, INC.

### EXPERIENCE & BUSINESS ASSOCIATIONS:

1. President, Rosen Systems, Inc.
2. Licensed Auctioneer since 1970, TXL 6732
3. Marketing and Merchandising
4. President, Association of Machinery and Equipment Appraisers

### EDUCATION:

1. BBA with Management Emphasis - University of Texas
2. Additional courses - Real Estate and Appraisal

### MEMBERSHIPS:

1. Machinery Dealers National Association, Former Director
2. Association of Machinery and Equipment Appraisers - Certified Machinery and Equipment Appraiser, Past President, Director
3. Industrial Auctioneers Association - Charter Member, Director, Treasurer

### APPRAISAL AND SALE ASSIGNMENTS:

1. Industrial Machinery & Equipment and Inventories

   (a) Metalworking machinery
   (b) Woodworking machinery
   (c) Contractor's equipment
   (d) Transportation
   (e) Oilfield

   (f) Printing
   (g) Electronics
   (h) Textile equipment
   (i) Office furniture and equipment

### APPRAISAL VALUE EXPERIENCE:

1. Insurance Value
2. Fair Market Value
3. Fair Market Value In Place
4. Auction Value
5. Salvage Value

### ADDITIONAL INFORMATION:

1. Real Estate Broker License #191785, File #92631
2. Speaker at National Commercial Finance Association Appraisal & Liquidation Workshops

Note: Specific references and/or assignments can be furnished upon request.

**ROSEN SYSTEMS INC.**



**Rosen Systems, Inc.**

17744 Preston Road, Suite 100
Dallas, Texas 75252-5736
Office: 972-248-2266
800-527-5134
Fax: 972-248-6887
http://www.rosensys.com

October 30, 2007

Mr. Mike Zhiyuan Xu
Schiff Hardin, LLP
6600 Sears Tower
Chicago, IL 60606

      Re:     Selected Assets of Koch Foods

Dear Mr. Xu,

      This letter will serve as an addendum to the machinery and equipment appraisal of selected assets of the above referenced company recently performed by Rosen Systems, Inc. The values presented in the appraisal report are an objective opinion of values based on market research, sales comparisons (where possible) and the current condition of the assets under appraisement. We reviewed trade publications and conferred with industry professionals during the course of our research.

      The chicken breast deboning line is currently disassembled and stored in the Koch Foods yard in Montgomery, Alabama. The spiral freezer is currently partially installed inside the company's plant. It lacks all the necessary piping to the ammonia compressors and the related electrics. The spiral freezer has never been in operation according to company personnel. The values presented in the report are based on the current status of these assets.

      According to the same company personnel the chicken breast deboning line was purchased new and installed in late 2005. It remained in operation until May 2007, when it was dismantled and stored in the yard. We valued this as a complete line as it is our opinion that is how it would be sold to maximize its value.

      The Fair Market Value In Place values assume the equipment will continue to be used at its current location. It adds value for transportation and installation. The fact that the deboning line has been dismantled limits its additional value under this concept. The Fair Market Value assumes that the equipment will be dismantled and transported to another location and is valued accordingly.

      In addition to the work I performed in calculating the values, the appraisal was reviewed by Michael Rosen, President of Rosen Systems, Inc. and a past president of the AMEA. Our firm also conducts public auction sales and liquidations of many types of machinery and equipment in various industries including food processing.

For further information about this appraisal, please read carefully the appraisal report, particularly the Statement of Limiting Conditions, Definitions and Qualifications pages. If you have any further questions, please do not hesitate to call me.

Thank you for the opportunity to be of service in this matter.

Respectfully submitted,

ROSEN SYSTEMS INC.

David A. Dalfonso, CEA
Vice President

# EXHIBIT S

SEP-11-2006 14:34 From:                                    To:203 796 1307    P.2/3

## EQUIPMENT PURCHASE INVOICE AND BILL OF SALE

Account Number: 4171238-001
Invoice Number: AMO-
RSC-DE

BUYER:
Peco Foods, Inc.
1020 Lurleen Wallace Blvd. N.
Tuscaloosa, AL 35403

Selling Price:              $325,000.00
Sales Tax(3%) processing    $9750.00
            equipment
TOTAL:                      $334,750.00

Invoice Date: August 31, 2006
Terms: Due Upon Receipt

SELLER:
GE Commercial Equipment Financing
44 Old Ridgebury Road
Danbury, CT  06810

REMIT TO:
GE Commercial Equipment Financing
44 Old Ridgebury Road
Danbury, CT. 06810
Attn: J. DiSalvo

### Equipment Description
2- Ossid Lines from Sylvest Farms  Per attached spread sheet

By its signature below, Buyer hereby acknowledges receipt and acceptance of the above-described equipment pursuant
to the terms of this Invoice.

SELLER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE EXCEPT THAT (1) BUYER
WILL ACQUIRE BY THE TERMS OF THIS INVOICE GOOD TITLE TO THE EQUIPMENT FREE FROM ALL
ENCUMBRANCES CREATED BY SELLER AND (2) SELLER HAS THE RIGHT TO SELL THE EQUIPMENT. WITHOUT
LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO WARRANTIES WITH RESPECT TO THE
QUALITY, CONTENT, CONDITION, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE
EQUIPMENT AND NO WARRANTIES AGAINST PATENT INFRINGEMENT OR THE LIKE.

Buyer additionally agrees that it shall save and hold harmless Seller from and against any and all federal, state, municipal and local
license fees and taxes personal property, use and sales taxes, and from and against any and all liabilities, obligations, losses, damages,
penalties, claims, actions and suits resulting therefrom and imposed upon, incurred by or asserted as a consequence of, the sale of the
Equipment to, or the ownership, possession, operation or use of the Equipment by, Buyer.

BUYER ACKNOWLEDGES THAT THE ITEMS SOLD HEREUNDER ARE USED AND THAT SELLER IS OR WAS THE LESSOR THEREOF AND DID NOT
USE, MAINTAIN OR HAVE OPERATIONAL CONTROL OF THE EQUIPMENT. BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED AND IS NOT
RELYING ON ANY REPRESENTATION OR STATEMENT OF CONDITION OF THE EQUIPMENT MADE BY SELLER IN CONNECTION WITH BUYER'S
PURCHASE OF THE EQUIPMENT.

If the collateral securing the above-referenced account does not secure any other account(s) that you have with GE
Commercial Equipment Financing, then Certified funds (wire transfer, bank or certified check) are required if you would
like to have any liens/titles released within a commercially reasonable time. Providing that any and all amounts paid
have been recognized as good and available funds, liens/titles will be released thirty days after receipt of your company
check.

BUYER:
Peco Foods, Inc.
By  _Wayne Butts_
Title.  C O O
Date:  9-11-06

SELLER:
GE Commercial Equipment Financing
By  _____
Title.  Remarketing Mgr
Date:  9-15-06

**GE  0673**

9 5.06 OSSID VISIT

**PECO FOODS TAG #**

| | |
|---|---|
| 1 | AUTO INDEXER |
| 2 | OSSID MACHINE 500 E |
| 3 | END SEAL CONVEYOR (HEAT SHRINK) |
| 4 | CRYOVAC SHRINK TUNNEL |
| 5 | VACUMN CANISTER |
| 6 | VACCUMN PUMP |
| | |
| 10 | CRYOVAC SHRINK TUNNEL |
| 11 | END SEAL CONVEYOR / HEAT SHRINK |
| 12 | OSSID MACHINE 500E |
| 13 | INFEED / AUTO INDEXER |
| 14 | VACCUMN CANISTER |
| 15 | VACCUMN PUMP |
| | |
| 7 | PRINTER APPLICATOR |
| 8 | PRINTER APPLICATOR |
| 16 | TRAY SCALE |
| 17 | TRAY SCALE |
| 18 | INFEED CONVEYOR |
| 19 | INFEED CONVEYOR |
| 20 | COUPON APPLICATOR |
| 21 | COUPON APPLICATOR |

(+) SPARE PARTS KIT

GE 0674

# EXHIBIT T

**Xu, Mike Z.**

| | |
|---|---|
| **From:** | Geekie Jr., Eugene J. |
| **Sent:** | Wednesday, February 14, 2007 11:57 AM |
| **To:** | 'alexander.terras@dlapiper.com' |
| **Subject:** | Koch/GE |

Alex: I discussed the deboning line with Koch. I understood from you that GE believes that the line was new when Koch purchased Sylvest's assets. Koch disputes this, and found the line to be used when it acquired Sylvest's assets.. SETTLEMENT FIGURE REDACTED                SETTLEMENT FIGURE REDACTED Koch is willing to increase its offer to GE to          . While Koch cannot justify the          amount demanded by GE because the deboning line is not exactly what Koch would prefer, it is willing to pay a reasonable price -- its offer is above the FMV of comparable equipment available on the used equipment market -- because it can modify the equipment if necessary. Although Koch can purchase used equipment in comparable condition to GE's equipment (and exactly what Koch wants) for less than what Koch has offered today, Koch is willing to offer GE a premium price because the line is already in place.

If GE is unwilling to accept Koch's premium price for the deboning line, however, Koch will purchase other equipment and will gladly allow GE to enter Koch's plant at a reasonable and mutually agreeable time to remove the equipment, and if GE agrees to a mutual release and to indemnify Koch for any damage caused to the plant by GE's removal of the equipment.

Gene

Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

8/15/2007

KOCH 00000014

# EXHIBIT U

## Xu, Mike Z.

**From:** Geekie Jr., Eugene J.
**Sent:** Wednesday, April 18, 2007 7:25 AM
**To:** 'aterras@reedsmith.com'
**Subject:** GECC/Koch

Alex:  This email will confirm my earlier voicemail to you this morning that Koch has declined GECC's demand that Koch purchase the equipment left behind at the former Sylvest site, as well as rental value for the nearly one-year period that the equipment has been at the site.  To say the least, Koch is disappointed that GECC has taken such a heavy-handed approach to a well respected company with a long history of successful credit transactions with GECC.  Your threats of lawsuit in our last conversation were the final straw in what Koch had previously hoped were negotiations that would lead to another mutually satisfactory transaction with GECC.

Please contact me to make arrangements for GECC to remove their equipment from Koch's facility.  As I mentioned in my voicemail, prior to the removal of the equipment, Koch will require proper assurance from GECC that it will repair any damage to Koch's facility caused by the equipment removal.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

KOCH 00000017

# EXHIBIT V



1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4    KOCH FOODS OF ALABAMA,
     LLC, an Alabama limited liability
5    company,

6            Plaintiff and Counter-Defendant,

7    Vs.                           CIVIL ACTION NO.
                                   07-CV-522-MHT
8    GENERAL ELECTRIC CAPITAL
     CORPORATION, a Delaware
9    corporation,

10           Defendant and Counter-Plaintiff.

11

12           * * * * * * * * * * *

13

14

     **DEPOSITION OF WAYNE M. JONES**, taken pursuant to
15
     stipulation and agreement before Pamela A. Wilbanks,
16
     Certified Court Reporter, ACCR# 391, Registered
17
     Professional Reporter and Commissioner for the State of
18
     Alabama at Large, in the Law Offices of Bradley, Arant,
19
     Rose & White, 401 Adams Avenue, Montgomery, Alabama, on
20
     Wednesday, November 28, 2007, commencing at
21
     approximately 9:05 a.m.
22
             * * * * * * * * * * *
23

30

1    Q.    And why not?

2    A.    Because he explained to me that it wasn't

3          working out with GE.

4    Q.    What changed, if anything, that you know in

5          April of 2000 from three months prior to that as

6          to why it needed to be replaced according to

7          Mr. Kaminsky?

8                MR. GEEKIE:  Objection.  Foundation.

9    A.    From April 2000?

10   Q.    Well, it was replaced -- if I said 2000, I

11         didn't mean that.  I meant 2007.  It was

12         replaced in April 2007, correct?

13   A.    Correct.  On or about.

14   Q.    Fine.

15         Are you aware of anything that changed in

16         the prior, say, three months that would have

17         made the April 2000 date critical with respect

18         to the replacement?

19   A.    No.

20   Q.    Are you aware of any demands made by Koch Foods

21         that GE Capital remove any of the equipment

22         located at the Montgomery facility?

23   A.    Only from what my attorney told me yesterday.

31

| | | |
|---|---|---|
| 1 | Q. | So prior to yesterday, you didn't have any |
| 2 | | knowledge of any demands that had been made, |
| 3 | | correct? |
| 4 | A. | Correct. |
| 5 | Q. | You never made any demands? |
| 6 | A. | No. |
| 7 | Q. | And you never instructed anyone else at Koch to |
| 8 | | make any demands, correct? |
| 9 | A. | Correct. |
| 10 | Q. | Were you involved in the decision regarding what |
| 11 | | was to be done with the deboner equipment once |
| 12 | | it was removed? |
| 13 | A. | Yes. |
| 14 | Q. | In what way were you involved? |
| 15 | A. | I instructed Gary to tag the equipment so that |
| 16 | | it would be identified. |
| 17 | Q. | And what, if anything, did you tell him to do |
| 18 | | with it? |
| 19 | A. | I told him to put it in a safe place. |
| 20 | Q. | Did you discuss with him where that safe place |
| 21 | | may be? |
| 22 | A. | Gary discussed it with me. |
| 23 | Q. | And what was discussed? |

32

1    A.    To move some in the parking lot and some was to

2          remain inside the building.

3    Q.    And indeed has some been moved into the parking

4          lot?

5    A.    It's moved out into an area.  It's not actually

6          a parking lot, but it's in a secured area.

7    Q.    Secured how?

8    A.    By fence and security.

9    Q.    And has some, in fact, remained inside the

10         facility?

11    A.    Yes.

12    Q.    And what portions are those?

13    A.    The spiral.

14    Q.    So the spiral freezer remains inside the

15         facility, and the deboning conveyors have been

16         moved outside?

17    A.    Correct.

18    Q.    When Mr. Kaminsky instructed you to have the

19         equipment removed from the facility, were you

20         concerned with whether or not it could be

21         removed?

22               MR. GEEKIE:  Objection.  Relevance.

23                 Form and foundation.

34

1    Q.    You don't know?

2    A.    No.

3    Q.    Did you instruct Mr. Davis to give GE Capital

4          notice of its intent to remove the deboner

5          equipment back in April 2007?

6    A.    I don't recall that, no.

7    Q.    And why not?

8    A.    Because we don't communicate with GE.  We

9          haven't communicated with GE.

10   Q.    Did someone -- Was it your understanding that

11         someone else was going to notify GE Capital of

12         that removal?

13   A.    I wasn't told that, no.

14   Q.    And yet you don't know who owned it, correct?

15   A.    That's correct.

16   Q.    Did you believe that GE Capital might own it at

17         the time of its removal in April of 2007?

18   A.    I did not know.

19   Q.    Did you believe that they might?

20              MR. GEEKIE:  Objection.  Asked and

21                  answered.  Vague and ambiguous,

22                  form, and foundation, and calls

23                  for a legal conclusion.