**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, | ) | |
| an Alabama limited liability company | ) | Case No. 07-cv-522-MHT |
| | ) | |
| Plaintiff and Counterclaim-defendant, | ) | |
| | ) | Honorable Myron H. Thompson |
| v. | ) | Honorable Terry F. Moorer |
| | ) | |
| GENERAL ELECTRIC CAPITAL | ) | |
| CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant and Counterclaim-plaintiff. | ) | |

**KOCH FOODS' MOTION FOR SUMMARY JUDGMENT**
**WITH RESPECT TO GECC'S COUNTERCLAIM FOR CONVERSION**

Counterclaim Defendant, Koch Foods of Alabama, LLC ("Koch"), through its undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this motion (the "Motion") for an order granting summary judgment in its favor with respect to the counterclaim asserted by General Electric Capital Corporation ("GECC"). In support this Motion, Koch respectfully states as follows:

I.    **INTRODUCTION**

On May 15, Koch filed its complaint for declaratory judgment and for unjust enrichment against GECC in the Circuit Court of Montgomery County of Alabama. Among other things, the complaint sought a declaratory judgment that Koch owned certain chicken processing equipment, consisting of a spiral freezer and several chicken de-boning lines, based on the fact that the equipment are affixed to a processing plant purchased by Koch pursuant to 11 U.S.C. § 363 in the bankruptcy of Sylvest Farms, Inc. (Bankr. N.D. Ala., Case No. 06-40525).

GECC removed the state court action to this Court on May 25, 2007.  Three weeks later, GECC filed an answer and a counterclaim against Koch alleging conversion of the chicken de-boning lines (the "Deboner").  Under Fed. R. Civ. P. Rule 56, Koch Foods is entitled to summary judgment as matter of law because there is no genuine issue as to the material facts showing that (i) Koch rightfully acquired the possession of the Deboner, (ii) GECC never demanded possession of the Deboner from Koch, and (iii) Koch never exercised dominion or control over the Deboner in exclusion or defiance of GECC's alleged possessory rights.[1]

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    In December 2005, GECC, as lessor, entered into a lease agreement (the "Lease") with Sylvest Farms Inc. ("Sylvest"), as lessee.  (Ex. 1, GECC Answer and Counter-claim, at 7 ¶ 3). The equipment covered by the Lease included the Deboner, a chicken spiral freezer, and two Ossid shrink-wrap lines.  (Ex. 2, Lease, at Koch 928, ¶ A).  The monthly rent for all the equipment under the Lease was $35,483, which was the product of capitalized costs ($2,018,453.00) multiplied by the basic term lease rate factor (0.0175928) of the Lease. (Ex. 2, Lease, at Koch 928 ¶ B).

2.    The Deboner was installed at Sylvest's facility at 4530 Mobile Road, Montgomery, Alabama (the "Facility") and began operation in late 2005 or early 2006.  (Ex. 1, GECC Answer and Counterclaim, at 7 ¶ 3; Ex 4, Bromley Dep., at 42).  It occupied indoor space at the facility in the approximate size of six thousand square feet.  (Ex. 3, Campbell Affidavit, ¶ 2).  The Deboner was integrated into the plant with air, water, and electrical pipes.  (Ex. 4, Bromley Dep., at 49).  In order to remove the Deboner, someone had to unweld various parts, cut

---

[1]    In this Motion, Koch presumes, pursuant to Fed. R. Civ. P. 56,  that GECC owns the Deboner as alleged in the counterclaim, in order to put the material facts in the light most favorable to the non-moving party.  However, Koch reserves its rights to the ownership claims asserted in its complaint despite this presumption.

some parts apart, and unbolt some parts from the floor, which could cause damages to the floor. (Ex. 4, Bromley Dep., at 49).

3.      On April 18, 2006, Sylvest filed for bankruptcy in the Northern District of Alabama.  (Ex. 1, GECC Answer and Counterclaim, at 7 ¶ 5).  Pursuant to an order entered by the Bankruptcy Court on May 26, 2006 approving the Amended Asset Purchase Agreement between Koch and Sylvest, Koch purchased substantially all of the assets of Sylvest, including the Facility where all the equipment under the Lease was located. (Ex. 1, at 7 ¶¶ 3-7).  Koch, however, did not assume the Lease. (Ex. 1, at 7 ¶ 8).

4.      On June 1, 2006, GECC inquired about Koch's plans with respect to the Facility and the equipment under the Lease, but did not demand possession of the equipment. (Ex. 5, E-mail from Pille to Geekie, at GE 589).  To this date, GECC has never demanded that Koch surrender possession of the Deboner.  (Ex. 6, Kaminsky Affidavit, ¶ 2; Ex. 7, GECC's 1st Discovery Responses, at p. 7 Interrogatory 4).  Koch was willing to surrender the Deboner whenever GECC came to pick it up, subject to GECC agreeing to repair any damages to the Facility caused by removal. [2]  (Ex. 6, Kaminsky Affidavit, ¶ 3).

5.      After Koch's acquisition of Sylvest's Facility, Koch continued to process chickens and use the Deboner.  (Ex. 4, Bromley Dep., at 43).  GECC learned of Koch's use of the Deboner in or around August 2006.  (Ex. 8, GECC's 2nd Discovery Responses, at p. 3 Interrogatory 2). Yet, GECC never made any demands either that Koch stop using the Deboner

---

[2]    Koch has always and openly acted in fairness and good faith towards GECC.  When GECC sold the Ossid lines to Peco Foods on or about August 31, 2006,  Koch voluntarily surrendered the Ossid lines to GECC, when requested by GECC, so GECC could deliver them to Peco.  (Ex. 10, GECC's 3rd Discovery Responses, at p. 4 Interrogatory 2, and at p. 7 Request for Admission No. 3).

or that Koch surrender the Deboner.   (Ex. 7, GECC's 1st Discovery Responses, at p. 7 Interrogatory 4, and at p. 14 Interrogatory 20; Ex. 6, Kaminsky Affidavit, ¶ 2).

6.     In January 2007, counsel for GECC sent a letter to counsel for Koch demanding that Koch pay GECC "Overdue Rent" under the Lease in the amount of $237,493.99 for the seven-month period from June 7, 2006 to January 3, 2007.  (Ex. 9, Pille Letter, at Koch 003).  This amount is approximately seven times the monthly basic rent ($35,483) for using not only the Deboner, but also the spiral freezer and the Ossid lines under the terms of the Lease, (Ex. 9, Pille Letter at Koch 003; Ex. 2, Lease, at Koch 928), even though the spiral freezer was never used by Koch and although the Ossid equipment had been returned to and sold by GECC and had never been used by Koch.  (Ex. 4, Bromley Dep., at 40; Ex. 10, GECC's 3rd Discovery Responses, at p. 4 Interrogatory 2, and at p. 7 Request for Admission No. 3).

7.     The letter from GECC's counsel further demanded that Koch abide by the terms of the Lease on a going forward basis and threatened to sue Koch for conversion if Koch did not meet GECC's demands.  (Ex. 9, Pille Letter, at Koch 003).  Nowhere did GECC's counsel demand return of the Deboner or demand that Koch cease using the Deboner.  (Ex. 9, Pille Letter, at Koch 002-003).

8.     In contrast, Koch unequivocally demanded and continued to demand that GECC remove the Deboner and the spiral freezer with an assurance that GECC would reimburse Koch for any damages caused by the removal.  (Ex. 10, Emails between Geekie and Terras, at Koch 017-018).   GECC never responded to Koch's demand or provided any assurance of reimbursement, and instead sued Koch for conversion.  (Ex. 6, Kaminsky Aff. ¶ 4; Ex. 11, Emails between Geekie and Terras, at Koch 018).

III.    **ARGUMENT**

A.    **Standard of summary judgment**

This court should grant summary judgment when the pleadings along with appropriate affidavits establish that "no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law." *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 636 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

B.    **Plaintiff in a conversion action must prove demand and refusal where defendant rightfully acquired possession and did not exercise control in defiance of plaintiff's rights**

Under Alabama law, in order for the plaintiff to prevail in a conversion action, it must prove that a wrongful taking, detention, or illegal assumption of ownership or use of another's property has taken place. *Ott v. Fox*, 362 So.2d 836, 839 (Ala. 1978). Where the defendant rightfully acquires possession of the property and has not exercised dominion and control over it in defiance of the plaintiff's right to possession, a demand and refusal to deliver the property are necessary before a conversion action can proceed. *Citizens Bank Enterprise v. Coffee County Bank*, 431 So.2d 1203, 1207 (Ala. 1983) (citations omitted); *Ford Motor Credit company v. Sparks*, 597 So.2d 714, 715 (Ala. Civ. App. 1992); *Moore v. Stephens*, 18 So.2d 577, 578 (Ala. Civ. App. 1944).

C.    **No genuine issue exists as to the facts that GECC never demanded and Koch never refused to surrender possession of the Deboner**

GECC never demanded possession of the Deboner. (Statement of Undisputed Material Facts ("S.U.M.F.") ¶ 4). From the very beginning when Koch took over the ownership of the Facility – rightfully, pursuant to the Bankruptcy Court Order -- Koch was willing to surrender the Deboner whenever GECC came to pick it up, and continued to demand that GECC pick up

the Deboner until the time this suit was filed, just as had happened when GECC picked up the Ossid equipment. (S.U.M.F. ¶¶ 4,8).

Although Koch used the Deboner in continuation of the Facility's operations, Koch's use was not in defiance with the possessory rights of GECC.  GECC never requested to pick up the Deboner, which used a large amount of space in Koch's Facility and was integral to the operation of the Facility. (S.U.M.F. ¶¶ 2, 4).  After having discovered Koch's use of the Deboner, GECC did not demand that Koch stop using the Deboner or demand that Koch surrender the Deboner.  (S.U.M.F. ¶ 5).  Rather, GECC demanded rent under the Lease, even including rent for the Ossid lines that GECC had already picked up and sold, and the spiral freezer that Koch never used.

Not only did Koch not act in any way inconsistent with or in defiance of GECC's rights to the Deboner, but Koch has always respected GECC's rights and acted in fairness and good faith.  For example, Koch voluntarily surrendered the Ossid lines when GECC found a buyer for them so that GECC could deliver them. (S.U.M.F. ¶ 4).  Koch merely demanded that GECC make arrangement to remove the Deboner from Koch's Facility and agree to repair or pay for any damage caused to Koch's Facility.  (S.U.M.F. ¶ 8).  But GECC did not respond to Koch's demand.  (S.U.M.F. ¶ 8).  Certainly Koch never acted in defiance of GECC, since GECC never demanded to inspect the Deboner, never demanded its return, and never demanded that Koch cease using the Deboner.  (S.U.M.F. ¶ 5).  In fact, GECC's conduct and exorbitant rent demands seem to indicate that GECC believed it had found the proverbial goose that laid the golden egg – it would charge Koch for all the equipment leased to Sylvest because GECC did not want to pick up equipment attached to the Facility, which would be hard and expensive to remove.

**D.      Even if GECC demanded possession, its conversion action cannot proceed because it failed to provide assurance to reimburse damages**

Even if GECC demanded the surrender of the Deboner, Koch is entitled to reimbursement "for the cost of repair of any physical injury caused by the removal" of the Deboner and may refuse permission to remove it from the facility until GECC gave "adequate assurance for the performance of the obligation to reimburse." Ala. Code § 7-9A-604; *Citizens Bank*, 431 So.2d at 1207.

GECC never provided the required assurance for the performance of the obligation to reimburse, despite Koch's repeated requests. (S. U. M. F. ¶8). Because Alabama commercial law requires assurance from the removing party, GECC cannot claim that its demands have be refused without providing the assurance required by Alabama law. Therefore, GECC's conversion action cannot proceed due to GECC's failure to comply with Section 7-9A-604.

**E.      Koch is entitled to summary judgment**

GECC's conversion claim must fail. Koch rightfully acquired possession of the Deboner and Koch never exercised dominion and control over the Deboner in exclusion of GECC's rights. Under these circumstances, Alabama law requires GECC to prove its demand and Koch's refusal. *Citizens Bank*, 431 So.2d at 1207.

Because there is no material facts that GECC never demanded possession of the Deboner and Koch never refused to surrender the Deboner, Koch is entitled to judgment as matter of law.

WHEREFORE, Koch respectfully requests that this court enter an order granting judgment in favor of Koch with respect to GECC's counterclaim of conversion.


[This Space Intentionally Left Blank]

Dated:  December 7, 2007                    Respectfully submitted,


                                           _____
                                              /s/ Zhiyuan Xu
                                           Zhiyuan Xu

OF COUNSEL
Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive, Suite 301
Montgomery, Alabama 36117
(334)481-1800

OF COUNSEL
Eugene J. Geekie, Jr.
Zhiyuan "Mike" Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois  60606
(312) 258-5500
(312) 258-5600 (Fax)
egeekie@schiffhardin.com
mxu@schiffhardin.com

Counsel for Koch Foods of Alabama, LLC

CERTIFCATE OF SERVICE

The undersigned, an attorney, certifies that copies of the forgoing were caused to be

served upon counsel of record addressed as follows by email and the ECF system on this 7th day

December, 2007.

> Alexander Terras
> Timothy Scott Harris
> Reed Smith Sachnoff & Weaver
> 10 South Wacker Drive
> Chicago, IL 60606
> 312-207-1000
> Fax: 312-207-6400
> tharris@reedsmith.com
> aterras@reedsmith.com
>
> Rusha Christina Smith
> Bradley Arant Rose & White LLP
> One Federal Place
> 1819 Fifth Avenue North
> Birmingham, AL 35203-2104
> 205-521-8010
> Fax: 205-488-6010
> Email: rsmith@bradleyarant.com


> _____/s/ Zhiyuan Xu_____
> Zhiyuan Xu

**EXHIBITS**

<u>**TABLE OF CONTENTS**</u>

<u>**Description**</u>                                                                          **Exhibit No.**

GECC's Answer and Counterclaim ...................................................................... 1

Pages of Lease between GECC and Sylvest ("Lease") .................................................. 2

Affidavit of Lyman Campbell ("Campbell Affidavit") ................................................. 3

Pages of Deposition Transcript of David Bromley ("Bromley Dep.") ........................................ 4

Affidavit of Mark Kaminsky ("Kaminsky Affidavit") .................................................. 5

Email from Ann Pille to Eugene Geekie .................................................................. 6

Pages of GECC's First Set of Discovery Responses ("GECC 1st Discovery Responses") .......... 7

Pages of GECC's Second Set of Discovery Responses ("GECC 2d Discovery Responses") ....... 8

Letter from Ann Pille to Eugene Geekie ("Pille Letter") ............................................. 9

Pages of GECC's Third Set of Discovery Responses ("GECC 3d Discovery Responses") ....... 10

Emails between Eugene Geekie and Alex Terras ("Emails between Geekie and Terras") ......... 11

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, | ) ) 2007 JUN 13 A 11: 45 |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 2:07cv 522-MHT |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) **DEMAND FOR JURY TRIAL** |
| Defendant. | ) |

## ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT AND FOR UNJUST ENRICHMENT AND COUNTERCLAIM FOR CONVERSION

Now comes Defendant General Electric Capital Corporation ("GE Capital") and files its Answer to Plaintiff Koch Foods of Alabama, LLC's ("Koch Foods") Complaint for Declaratory Judgment and for Unjust Enrichment (the "Complaint") and Counterclaim for Conversion (the "Counterclaim") against Koch Foods. In support thereof, GE Capital states as follows:

### ANSWER

1.      GE Capital admits the allegations contained in Paragraph 1 of the Complaint.

2.      GE Capital admits the allegations contained in Paragraph 2 of the Complaint.

3.      Paragraph 3 of the Complaint contains only a legal contention requiring no response; therefore, GE Capital makes none.

4.      Paragraph 4 of the Complaint contains only a legal contention requiring no response; therefore, GE Capital makes none.

5.      GE Capital admits the allegations contained in Paragraph 5 of the Complaint.

6.     GE Capital admits that Koch Foods was not originally a party to the Equipment Lease and denies the remaining allegations contained in Paragraph 6 of the Complaint.

7.     GE Capital admits the allegations contained in Paragraph 7 of the Complaint.

8.     GE Capital admits the allegations contained in Paragraph 8 of the Complaint.

9.     GE Capital admits the allegations contained in Paragraph 9 of the Complaint.

10.     GE Capital admits the allegations contained in Paragraph 10 of the Complaint.

11.     GE Capital admits that Koch Foods did not assume the Equipment Lease under the terms of the Bankruptcy Court Order and denies the remaining allegations contained in Paragraph 11 of the Complaint.

12.     GE Capital states that Koch Foods was aware since a time well prior to the date of the Bankruptcy Court Order (May 26, 2006) that the Equipment was owned by GE Capital as lessor under the Equipment Lease and denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.     GE Capital denies that it has demanded that Koch Foods pay rental charges (other than in the context of pre-litigation settlement negotiations in which the potential amount of such charges was discussed) and states that GE Capital has demanded that Koch Foods pay the value of items and units of the Equipment converted by Koch Foods, as is more particularly alleged in the Counterclaim, and denies the remaining allegations contained in Paragraph 13 of the Complaint.

14.     GE Capital denies the allegations contained in Paragraph 14 of the Complaint.

15.     GE Capital restates its answers to Paragraphs 1 through 14 of the Complaint as its answer to Paragraph 15 of the Complaint.

16.     GE Capital admits the allegations contained in Paragraph 16 of the Complaint.

17.     GE Capital admits that it is the owner of the Equipment as lessor under the Equipment Lease and denies the remaining allegations contained in Paragraph 17 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count I of the Complaint.

18.     GE Capital restates its answers to Paragraphs 1 through 17 of the Complaint as its answer to Paragraph 18 of the Complaint.

19.     GE Capital admits the allegations contained in Paragraph 19 of the Complaint.

20.     GE Capital reaffirms and restates its answer to Paragraph 13 of the Complaint as its answer to Paragraph 20 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count II of the Complaint.

21.     GE Capital restates its answers to Paragraphs 1 through 20 of the Complaint as its answer to Paragraph 21 of the Complaint.

22.     This paragraph does not require a response.

23.     GE Capital denies the allegations contained in Paragraph 23 of the Complaint.

24.     GE Capital denies the allegations contained in Paragraph 24 of the Complaint.

25.     GE Capital denies the allegations contained in Paragraph 25 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count III of the Complaint.

26.     GE Capital restates its answers to Paragraphs 1 through 25 of the Complaint as its answer to Paragraph 26 of the Complaint.

27.     This paragraph does not require a response.

28.     GE Capital denies the allegations contained in Paragraph 28 of the Complaint.

29.     GE Capital denies the allegations contained in Paragraph 29 of the Complaint.

30.     GE Capital denies the allegations contained in Paragraph 30 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count IV of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Koch Foods' Complaint, and each and every count therein, fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Except as expressly admitted herein, GE Capital denies all allegations contained in Koch Foods' Complaint.

### THIRD DEFENSE

Koch Foods' claims are barred, in whole or in part, by the doctrine of unclean hands or failure to do equity.

### FOURTH DEFENSE

Koch Foods' claims are barred pursuant to the equitable doctrines of judicial estoppel, equitable estoppel, and/or collateral estoppel.

### FIFTH DEFENSE

Koch Foods' claims are barred pursuant to the doctrines of waiver and laches.

### SIXTH DEFENSE

Koch Foods' claims, in whole or in part, are barred by lack of standing or lack of capacity.

## SEVENTH DEFENSE

Koch Foods is not entitled to a possessory lien from GE Capital under Alabama law.

## EIGHTH DEFENSE

GE Capital denies that Koch Foods is entitled to damages of the nature, type, and amount sought in the Complaint.

## NINTH DEFENSE

To the extent that discovery may show or demonstrate, Koch Foods, at all relevant times herein, failed to take reasonable action to mitigate the damages alleged in the Complaint.

## TENTH DEFENSE

GE Capital hereby gives notice that it intends to rely upon such other affirmative or supplemental defenses as may become available or apparent during the course of discovery and thus reserves the right to amend its Answer to assert any such defenses.

## **COUNTERCLAIM**

1.      GE Capital is a corporation organized under the laws of Delaware with its principal place of business located in Stamford, Connecticut. At all times relevant hereto, GE Capital was in the business, inter alia, of leasing food processing equipment to food processors.

2.      Koch Foods is a limited liability corporation organized under the laws of Alabama with its headquarters located in Park Ridge, Illinois, and a production facility located in Montgomery, Alabama. At all times relevant hereto, Koch Foods was in the business of processing and selling poultry products.

### GE Capital's Lease of Equipment
### to Sylvest Farms

3.     On or about December 29, 2005, GE Capital, as lessor, and Sylvest Farms, Inc. ("Sylvest Farms"), as lessee, entered into a Master Lease Agreement of that date (the "Master Lease").   Pursuant to the Master Lease, Sylvest Farms leased from GE Capital the food processing equipment and related items listed on Schedule No. 001 to the Master Lease ("Schedule 001").   Sylvest Farms took possession of the equipment listed on Schedule 001 at its chicken de-boning and processing facility located at 4530 Mobile Road, Montgomery, Alabama (the "Facility"), on or shortly after the date of the Master Lease.   True and correct copies of the Master Lease and Schedule 001 are attached to the Complaint.

4.     The equipment listed on Schedule 001 and leased by Sylvest Farms from GE Capital includes the following:   Model 2006 de-boner with double cone lure, product conveyors, and loading bin; serial number 36019-01A; manufactured by D&F Equipment Sales; and having a capitalized lessor's cost of $846,545.00 (collectively, the "Equipment").

### The Bankruptcy and Sale
### of Sylvest Farms

5.     On or about April 18, 2006, Sylvest Farms filed a voluntary petition for bankruptcy in Case No. 06-40525-TBB11 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Alabama, Eastern Division (the "Bankruptcy Court").

6.     Also on or about April 18, 2006, Sylvest Farms, as seller, and Koch Foods, as buyer, entered into an Asset Purchase Agreement of that date, which provided for the sale of substantially all of the assets of Sylvest Farms. This sale included the Facility.

7.     On or about May 26, 2006, the Bankruptcy Court approved the Asset Purchase Agreement, and, at that time, Koch Foods purchased substantially all of the assets of Sylvest Farms.

8.     On or about June 6, 2006, the Bankruptcy Court entered its Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Rejection Order"). The Master Lease was rejected pursuant to the Rejection Order.

Conversion of the Equipment
by Koch Foods

9.     Following entry of the Rejection Order and the rejection of the Master Lease, GE Capital contacted Koch Foods regarding the need to relocate the Equipment from the Facility. Koch Foods advised GE Capital that it would not be necessary to relocate the Equipment at that time, and that it could remain stored at the Facility while GE Capital marketed it for resale.

10.    Following entry of the Rejection Order and the rejection of the Master Lease, and without the consent of GE Capital, Koch Foods began using the Equipment for its own purposes. Specifically, Koch Foods began using the Equipment for the de-boning and processing of chicken. This included the use by Koch Foods of portions of the Equipment that were not previously in use by Sylvest, and indeed had not even been installed and made operational, at the time Koch Foods purchased the Facility.

11.    Koch Foods continues to use the Equipment.

12.    Koch Foods has not made any payments to GE Capital for its continued and continuing use of the Equipment.

13.     Koch Foods is currently exercising dominion and control over the Equipment inconsistent with the rights of GE Capital.

14.     GE Capital owns the Equipment and has owned the Equipment at all times relevant hereto.  At no time has GE Capital consented to use of the Equipment by Koch Foods.

15.     Koch Foods has:

   (a)     committed unauthorized acts by which GE Capital has been deprived of its personal property indefinitely;

   (b)     made an unauthorized assumption or exercise of the right of ownership over personal chattels belonging to GE Capital through the alteration of their condition or the exclusion of GE Capital's rights;

   (c)     exercised dominion over property inconsistent with the rights of GE Capital; and/or

   (d)     exercised unauthorized acts of dominion or ownership over property belonging to GE Capital.

16.     GE Capital has made demand upon Koch Foods for return and surrender of the Equipment, but, despite demand, Koch Foods failed to surrender the Equipment and instead used and converted it to its own purposes.

17.     Koch Foods has knowingly violated GE Capital's rights in the Equipment and continues to do so.

18.     In its conversion of the Equipment, Koch Foods has acted with legal malice, willfulness, insult, and/or other aggravated circumstances.

19.     Under controlling law, Koch Foods is liable to GE Capital for the value of the Equipment as of the date of its conversion, the said amount being at or near its capitalized cost of $846,545.00.

20.     Under controlling law, Koch Foods is liable to GE Capital for interest at the applicable rate on the value of the Equipment as of the date of its conversion.

21.     Under controlling law, Koch Foods is liable to GE Capital for punitive damages.

WHEREFORE, GE Capital prays this Court to enter judgment in its favor and against Koch Foods in an amount equal to the value of the Equipment at the time of its conversion, plus interest at the applicable rate from the date of its conversion, plus punitive damages, said amounts to be proven at trial in this matter, together with any and all other and additional amounts to which justice and equity entitle GE Capital.  GE Capital demands a trial by jury in this matter.

Respectfully submitted,

*Rusha C. Smith*
Rusha C. Smith
Attorney for Defendant General Electric Capital Corporation

OF COUNSEL:
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL  35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

- 9 -

OF COUNSEL:
Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312)207-1000
Facsimile: (312) 207-6400

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel of record addressed as follows:

Thomas G. Mancuso, Esq.
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, AL 36117

Eugene J. Geekie, Jr., Esq.
Mike Xu, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606

by placing same in the United States mail, postage prepaid, on this the 13th day of June, 2007.



OF COUNSEL

Exhibit 2

G E Lease
12/28/05

2/98(R090605)(11.)050984202

*LEAS1998*

## MASTER LEASE AGREEMENT

dated as of _____ ("Agreement")

**THIS AGREEMENT** is between **General Electric Capital Corporation** (together with its successors and assigns, if any, "Lessor") and **Sylvest Farms, Inc.** ("Lessee"). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule ("Schedule").

### 1. LEASING:

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("Equipment") described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier ("Supplier") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

### 2. TERM, RENT AND PAYMENT:

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("Lease Commencement Date"). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and any renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($ .05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

### 3. RENT ADJUSTMENT:

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("Code")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("Effective Rate") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made) and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

### 4. TAXES:

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes"). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

### 5. REPORTS:

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.

KOCH 00000921

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6. DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7. MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

**8. STIPULATED LOSS VALUE:** If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9. INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

KOCH 00000922

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be demasfed, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above .

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

KOCH 00000923

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("**Claims**"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("**Tax Benefits**") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "**Loss**"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("**Net Economic Return**"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "**Documents**"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

KOCH 00000924

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes hereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement and any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "**Transactions**"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**General Electric Capital Corporation**

By: _____

Name: _____

Title: _____

LESSEE:
Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

KOCH 00000926

CS(R083004) 4171238001

**\*LEAS8760\***

### FOOD PROCESSING EQUIPMENT SCHEDULE
### SCHEDULE NO. 001
### DATED THIS _____
### TO MASTER LEASE AGREEMENT
### DATED AS OF _____

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("**Agreement**" said Agreement and this Schedule being collectively referred to as "**Lease**"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.    Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "**Equipment**").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006    De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005 Ossid 500    Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR    Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.    Financial Terms**

| | | | | |
|---|---|---|---|---|
| 1. | Advance Rent (if any):  Not Applicable | 5. | Basic Term Commencement Date: | |
| 2. | Capitalized Lessor's Cost: $ 2,018,453.00 | 6. | Lessee Federal Tax ID No.: 582129705 | |
| 3. | Basic Term (No. of Months): 60 Months. | 7. | Last Delivery Date: | |
| 4. | Basic Term Lease Rate Factor: .01757928 | 8. | Daily Lease Rate Factor: .000468780 | |

9.    First Termination Date: **Thirty-six (36)** months after the Basic Term Commencement Date.

10.    Interim Rent: For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on _____.

11.    Basic Term Rent. Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.    Tax Benefits**        Depreciation Deductions:

1.    Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.
2.    Recovery Period: 7 years.
3.    Basis: 100 % of the Capitalized Lessor's Cost.

**D.    Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA: Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor. Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

E.  **Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS D&F Equipment Sales, Inc. & Ossid Corporation & MTL Installation Services (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

F.  **Stipulated Loss and Termination Value Table***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

G.  **Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

**1  EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS: In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.

KOCH 00000929

(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION: The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS: In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessee, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

#### EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

KOCH 00000930

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: _____

Title: _____

LESSEE:

Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

KOCH 00000931

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC,<br>an Alabama Limited Liability company | ) <br> ) <br> ) | Case No. 07-cv-522-MHT |
| Plaintiff and Counterclaim-defendant, | ) <br> ) | |
| v. | ) <br> ) | Honorable Myron H. Thompson<br>Honorable Terry F. Moorer |
| GENERAL ELECTRIC CAPITAL<br>CORPORATION,<br>a Delaware corporation, | ) <br> ) <br> ) <br> ) <br> ) | |
| Defendant and Counterclaim-plaintiff. | ) | |

**AFFIDAVIT OF LYMAN CAMPBELL**

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | SS: |
| COUNTY OF MONTGOMERY | ) | |

I, Lyman Campbell, being duly sworn, state the following under penalty of perjury:

1.    I am currently an employee of Koch Foods of Alabama, LLC ("Koch") and in all respects competent to make this Affidavit in support of Koch's Motion for Summary Judgment with respect to the counterclaim of conversion asserted by General Electric Capital Corporation ("GECC"). Prior to my employment by Koch, I was employed by Sylvest Farms, Inc. and was and am familiar with the chicken de-boning lines that GECC alleges that Koch converted.

2.    The chicken de-boning lines were installed at Koch's facility, occupying indoor space at the facility in the approximate size of six thousand square feet.

I declare under penalty of perjury that the foregoing is true and correct.

_Lyman Campbell_

Lyman Campbell

Subscribed and sworn to before me on
this _7th_ day of December, 2007

NOTARY PUBLIC
My commission Expires:   7·24·09

# Exhibit 4

# DEPOSITION OF DAVID BROMLEY

## November 27, 2007

## Pages 1 through 61

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 39

1    Q.    Put them inside?

2    A.    -- be installed later.

3          No.  We left them outside.  We unloaded them

4          and left them right outside where we unloaded

5          them.

6    Q.    I see.

7          And they never went inside the building?

8    A.    No.

9    Q.    The other portion of the deboning equipment that

10         was installed, tell me how that was installed.

11   A.    Of course, we had to remove everything that was

12         in there, but then -- and got the floor done and

13         then just bringing everything in and fastening

14         it down.  You had to line it all up, bolt it

15         together.  Everything ties together like a

16         freeway system.  All the product falls on the

17         conveyors.

18   Q.    So --

19   A.    So as these other conveyors were put in, all the

20         pans had to be welded to it.  Everything was all

21         tied together.

22   Q.    And how was the machinery, in fact, fastened to

23         the facility?

Deposition of David Bromley                                    November 27, 2007

Page 40

```
1    A.   Bolted to the floor.  Anchored to the floor.

2    Q.   Was it done in the same manner that the

3         previously removed equipment --

4    A.   Yes.

5    Q.   So there was a bolt that was bolted through the

6         epoxy floor into the concrete floor underneath,

7         correct?

8    A.   That's correct.

9    Q.   And the installed deboning equipment was

10        installed in the same fashion as the previously

11        removed ConAgra equipment had been installed,

12        correct?

13   A.   That's correct.

14   Q.   Has the spiral freezer ever been used by

15        Sylvest?

16   A.   No.  It was never completed.  The installation

17        was never completed.

18   Q.   Has the spiral freezer ever been used by Koch

19        Foods?

20   A.   No, sir.

21   Q.   When you say it wasn't completed -- the

22        installation was not completed, in what way was

23        it not completed?
```

Page 41

```
 1    A.    Mike Leonard's part was complete.  He put the
 2          machine in.  The refrigeration was never tied to
 3          it and the electrical was never finished.
 4    Q.    And why is that?
 5    A.    Bankruptcy.
 6    Q.    When you say bankruptcy, you mean the bankruptcy
 7          filed by Sylvest?
 8    A.    By Sylvest, yes.  That's correct.
 9    Q.    Were you involved in any way in the negotiation
10          of the sale of the D & F equipment to Sylvest?
11          Strike that.
12              Were you involved in negotiating the price?
13    A.    Yes.
14    Q.    And you did this with Lenny --
15    A.    Lenny Ferguson.
16    Q.    Were you involved in the documentation regarding
17          that lease?
18    A.    I didn't have anything to do with it being
19          leased, no, if that's what you're asking.
20    Q.    Thank you.  That was a bad question.
21              You purchased it from D & F, but it was done
22          in the form of a lease from GE Capital.  Is that
23          your understanding?
```

Page 42

```
 1    A.   That's correct.

 2    Q.   Were you involved in the documentation of the

 3         lease from GE Capital to Sylvest?

 4    A.   No.  I had nothing to do with the GE Capital

 5         side.

 6    Q.   Have you ever seen the lease?

 7    A.   No, sir.

 8    Q.   Were you ever asked to review the lease?

 9    A.   No.

10    Q.   Now, when did Sylvest -- did Sylvest ever use

11         any part of the deboning line?

12    A.   Yes.

13    Q.   When did it first begin using it?

14    A.   Around the end of -- I don't remember the exact

15         date, but the end of 2005, beginning of 2006.

16    Q.   And when I say use it, I mean they started

17         deboning chickens.

18    A.   That's correct.

19    Q.   How long did they use it -- did Sylvest use it?

20    A.   Until the sale to Koch.

21    Q.   And when was that?

22    A.   I believe it was May or June 2006.

23    Q.   At that time you and certain other Sylvest
```

Page 43

```
 1              employees were hired by Koch; is that right?
 2     A.       That's correct.
 3     Q.       And did there ever come a time during that
 4              transition from Sylvest to Koch where the
 5              deboning line portion that was being used was
 6              not being used?
 7     A.       No.  It was pretty much seamless.  We just kept
 8              going.
 9     Q.       So you never missed a day or anything?
10     A.       No.
11     Q.       You just kept doing it every day and the
12              ownership changed, correct?
13     A.       That's correct.
14     Q.       Are you aware of any demands by Koch Foods that
15              GE Capital remove the deboning equipment?
16     A.       No.
17     Q.       Did you make any?
18     A.       No.
19     Q.       Have you ever talked to anybody from GE Capital?
20     A.       No.
21     Q.       Are you aware of any demands by Koch Foods that
22              GE Capital pay it rent for either the spiral
23              freezer or the deboning equipment?
```

Page 44

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | How long did Koch Foods use the deboning |
| 3 | | equipment? |
| 4 | A. | I'm trying to think of when we took it out.  I |
| 5 | | would guess it was probably about nine months. |
| 6 | Q. | And when was it removed? |
| 7 | A. | About four months ago, something like that. |
| 8 | | Three or four months ago. |
| 9 | Q. | So early summer of 2007? |
| 10 | A. | I would say that's right. |
| 11 | Q. | Was it continuously used by Koch Foods from the |
| 12 | | time that Koch Foods took over from Sylvest in |
| 13 | | the late spring or early summer of 2006 until |
| 14 | | the time that it was removed nine or ten months |
| 15 | | later? |
| 16 | A. | Yes. |
| 17 | Q. | Was any rent paid by Koch Foods to GE for that |
| 18 | | equipment?  Do you know? |
| 19 | A. | I do not know. |
| 20 | Q. | I want to talk to you about the decision to |
| 21 | | remove the equipment, not the actual removal -- |
| 22 | | we'll get to that -- but the decision to remove |
| 23 | | it.  When did you first learn that Koch Foods |

Deposition of David Bromley                                    November 27, 2007

Page 45

```
 1             was thinking about removing the equipment?

 2    A.       Probably about three weeks before it actually

 3             happened.

 4    Q.       And how did you learn?

 5    A.       I was told that it was going to happen and to go

 6             ahead and set up the contractors to put

 7             everything together to get that change done.

 8    Q.       And from whom did you learn this?

 9    A.       I believe it was Gary Davis, who was the complex

10             manager at that time.

11    Q.       And he's now been replaced by ...

12    A.       David Massey.

13    Q.       Were you involved in the decision to do that or

14             were you just instructed --

15    A.       No, sir.  No, sir.

16    Q.       You weren't involved in the decision?

17    A.       No.

18    Q.       Did you ask Mr. Davis why you were being asked

19             to make the change?

20    A.       No, sir.

21    Q.       Did you talk to anybody else besides Mr. Davis

22             about the decision to make the change?

23    A.       No.
```

Deposition of David Bromley                                          November 27, 2007

Page 46

```
 1    Q.    Was the deboning equipment performing adequately

 2          prior to its deinstallation?

 3    A.    Yes.

 4                    MR. GEEKIE:  Objection.  Vague and

 5                        ambiguous.

 6    A.    Yes.

 7    Q.    Did you have any complaints about it?

 8    A.    No.

 9    Q.    How many people are employed at that facility

10          approximately?  A hundred?

11    A.    Currently or back then?

12    Q.    Currently.

13    A.    Probably about 600.

14    Q.    How about back at the time of the transition

15          from Sylvest to Koch?

16    A.    Probably about 250, 300.

17    Q.    So it's doubled in size approximately?

18    A.    Uh-huh (positive response).

19    Q.    That's a yes?

20    A.    Yes.

21    Q.    I'm sorry.

22    A.    I'm sorry.  Yes.

23    Q.    That's fine.
```

Page 47

1          Tell me about the deinstallation process,

2         then.  About three weeks before you actually

3         removed the equipment, Mr. Davis told you to

4         prepare to do that.  What did you do after he

5         told you to prepare to do that?

6   A.   Contacted electricians, you know, plumbers and

7         millwrights.  Of course, the millwrights had

8         already been determined.  The same people who

9         sold the equipment were the millwrights.  They

10        would come in and actually move the equipment.

11  Q.   Who is that?

12  A.   Fabco, F-A-B-C-O.

13  Q.   Who were the electricians?

14  A.   I believe I used G T Key.

15  Q.   Plumbers?

16  A.   Peterson Industrial.

17  Q.   Anyone else you needed?

18  A.   I believe that was it.

19  Q.   And so you contacted all of these folks, and you

20        chose a date, right, a specific date?

21  A.   I think I was given a date.  I don't remember

22        what that was.

23  Q.   But Mr. Davis said on such-and-such a date, I

Page 48

```
 1              want you to shut down and remove all this
 2              equipment, right?
 3    A.        Well, we don't shut down.  We do it all on the
 4              weekend.  On several weekends, yes.  We came in,
 5              and it took a couple of weekends to get that all
 6              done.
 7    Q.        So this did not interrupt the processing of the
 8              deboning line?
 9    A.        No.
10    Q.        On a normal schedule, like right now, no weekend
11              shifts are worked; is that correct?
12    A.        No.
13    Q.        So they are closed during the weekend?
14    A.        Yes.
15    Q.        So then for the three or four weeks then leading
16              up to the removal, you would shut down portions
17              at a time and remove it and replace it with new
18              stuff or just take out the old stuff?  How did
19              that work?
20    A.        The -- It actually took two weeks, and the first
21              week we removed all the equipment we could do
22              without.  There's some equipment that wasn't
23              running that never did run, and we got all that
```

Deposition of David Bromley                                    November 27, 2007

Page 49

```
 1              out of the way.  And then the second weekend we
 2              came in and did a whole scale tear-out.  Took
 3              everything out and replaced everything.
 4     Q.       So no shifts were missed?
 5     A.       No.
 6     Q.       Correct?
 7     A.       I don't think so.
 8     Q.       Tell me about the removal process.  How was this
 9              removed?
10     A.       Came in and unhooked all the electrical and all
11              the water and air.
12     Q.       When you say air, was that for the pressure?
13     A.       We use air for -- There were air cylinders and
14              air gates that directed product as it went
15              through the process.  We went in and
16              disconnected all of that, and then they would
17              come in and unbolt it from the floor.  A lot of
18              the equipment had to be cut apart.  As I said
19              before, it was all welded together to make one
20              big integral operation.
21     Q.       And these are -- the various pieces that came
22              from the factory were then welded together?
23     A.       That's correct.
```

Deposition of David Bromley                                    November 27, 2007

Page 50

```
 1    Q.    And so to remove them, they had to be unwelded

 2          back to their original state, correct?

 3    A.    They would be cut apart to where they were --

 4          where we could handle them to get them out of

 5          the plant.

 6    Q.    And they were unbolted from the floor?

 7    A.    That's correct.

 8    Q.    And then what was done with it?

 9    A.    They were picked up and taken out, and we put

10          them in the yard.

11    Q.    And at that time you already had the replacement

12          equipment on site?

13    A.    Yes.

14    Q.    And who manufactured that?

15    A.    Fabco.

16    Q.    They are the millwrights.  Who is the

17          manufacturer of the replacement equipment?

18    A.    Fabco.

19    Q.    Still Fabco?

20    A.    Yeah.  They do the same thing.

21    Q.    So you replaced the D & F equipment with Fabco

22          equipment?

23    A.    That's correct.
```

Page 51

```
 1    Q.   Do you know how much that cost?

 2    A.   No, sir.

 3    Q.   Do you know how much the installation cost and

 4         the deinstallation cost?

 5    A.   That was all figured in -- They did a blanket

 6         price, but I don't recall what it was.

 7    Q.   I see.

 8              After the D & F equipment was removed, there

 9         were holes in the floor, right?

10    A.   Excuse me?

11    Q.   After the D & F equipment was removed, there

12         were holes in the floor, correct?

13    A.   That's correct.

14    Q.   And what was done about that?

15    A.   Some of the equipment sat right back over some

16         of it, and then the others we had to come back

17         and patch because water would puddle in it.

18    Q.   When you say some of the equipment, some of the

19         replacement equipment sat over some of those

20         holes.  Those were never repaired?

21    A.   Not if they sat right back in the same holes.

22    Q.   But then there are other holes that remained

23         exposed, correct?
```

Exhibit 5

## Pille, Ann E.

| | |
|---|---|
| **From:** | Geekie Jr., Eugene J. [egeekie@schiffhardin.com] |
| **Sent:** | Thursday, June 01, 2006 3:59 PM |
| **To:** | Pille, Ann E. |
| **Subject:** | Re: Sylvest Farms: GECC Master Lease Agreement |

Thanks.  It has been sent to Koch.


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)



-----Original Message-----
From: Pille, Ann E. <Ann.Pille@dlapiper.com>
To: Geekie Jr., Eugene J.
Sent: Thu Jun 01 15:57:44 2006
Subject: RE: Sylvest Farms:  GECC Master Lease Agreement

I've attached a copy of the Master Lease Agreement and a copy of Schedule 001 executed in conjunction therewith.  Our contact at GECC for this particular equipment lease is William Wilson (william.wilson2@ge.com).  Thank you for passing along the information to the people at Koch.  Let me know if you have additional questions or need additional information.

Regards,

Ann




From: Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
Sent: Thursday, June 01, 2006 3:47 PM
To: Pille, Ann E.
Subject: Re: Sylvest Farms: GECC Master Lease Agreement


I am still at the closing in AL.  Can you .pdf me the leases and I'll pas them on to the client?  Please also give me a name and GECC contact and I will pass it along.


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

GE  0588

-----Original Message-----
From: Pille, Ann E. <Ann.Pille@dlapiper.com>
To: Geekie Jr., Eugene J.
Sent: Thu Jun 01 15:43:44 2006
Subject: Sylvest Farms: GECC Master Lease Agreement

Mr. Geekie,

We have previously spoken in regard to GECC's Master Lease Agreement with Sylvest Farms, which Koch opted not to have the Debtor assume. As it stands, GECC's equipment is still located in the facility that Koch now owns, and the Master Lease Agreement has not yet been rejected by the Debtor. I was wondering if you might have some additional information regarding Koch's intentions with respect to the equipment.

Specifically, GECC would like to know if Koch has any immediate plans for the facility. GECC is obviously trying to determine the next step with respect to the equipment and Koch's plans for the space are integrally related to GECC's decision. Is there a business person at Koch with whom GECC could speak?

Please call me at your convenience to discuss.

Regards,

Ann

Ann Pille
DLA Piper Rudnick Gray Cary US LLP
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601

phone: (312) 368-2189
fax: (312)630-7356

---

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

---

---

Tax Matters: To the extent this message or any attachment concerns

tax matters, it is not intended or written to be used, and cannot

be used by a taxpayer, for the purpose of avoiding penalties

that may be imposed on the taxpayer under law.

---

This message and any attachments may contain confidential

GE 0589

information protected by the attorney-client or other privilege.

If you believe that it has been sent to you in error,

please reply to the sender that you received the message in

error. Then delete it. Thank you.

---------------------------------------------------------------

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

GE 0590

Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC,<br>an Alabama Limited Liability company | ) ) ) | Case No. 07-cv-522-MHT |
| Plaintiff and Counterclaim-defendant, | ) ) | |
| v. | ) ) | Honorable Myron H. Thompson<br>Honorable Terry F. Moorer |
| GENERAL ELECTRIC CAPITAL<br>CORPORATION,<br>a Delaware corporation, | ) ) ) ) | |
| Defendant and Counterclaim-plaintiff. | ) ) | |

### AFFIDAVIT OF MARK KAMINSKY

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | |
| | ) | SS: |
| COUNTY OF COOK | ) | |

I, Mark Kaminsky, being duly sworn, state the following under penalty of perjury:

1.     I am the Chief Financial Officer of Koch Foods of Alabama, LLC ("Koch") and in all respects competent to make this Affidavit in support of Koch's Motion for Summary Judgment with respect to the counterclaim of conversion asserted by General Electric Capital Corporation ("GECC"). I am familiar with the facts in this lawsuit and the chicken deboning lines (the "Deboner") which GECC alleges that Koch converted.

2.     GECC never requested that Koch return the Deboner or requested to inspect it at any time.

3.     Since the date that Koch purchased the plant where the Deboner was located, Koch has been willing to surrender the Deboner if GECC agreed to repair any damages caused by removing the Deboner. Koch used the Deboner because it was an integral part of the plant, and GECC never made any demand that Koch stop using the Deboner.

4.      GECC never provided any assurance that it would reimburse Koch for the cost of repair of any physical injury caused to the plant by the removal of the Deboner.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Mark Kaminsky

Subscribed and sworn to before me on
this _7th_ day of December, 2007

_____
NOTARY PUBLIC
My commission Expires:  9 21- 2010

OFFICIAL SEAL
BONNIE DIVIESTI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-21-2010

Exhibit 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, | ) ) ) Case No. 07-cv-522-MHT |
| Plaintiff and Counter-Defendant, | ) ) ) |
| v. | ) Honorable Myron H. Thompson ) Honorable Terry F. Moorer |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) ) |
| Defendant and Counter-Plaintiff, | ) ) |

## GENERAL ELECTRIC CAPITAL CORPORATION'S RESPONSE TO KOCH FOODS OF ALABAMA, LLC'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION

Defendant and Counter-Plaintiff, General Electric Capital Corporation ("GE Capital"), responds to the First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission (collectively, the "Requests") of Koch Foods of Alabama, LLC ("Koch Foods"), as follows:

## I.    GENERAL OBJECTIONS AND RESPONSES

1.    GE Capital objects to the Requests to the extent that they seek discovery or purport to impose duties and obligations beyond the scope of, or not required by, the Federal Rules of Civil Procedure.

2.    GE Capital objects to the Requests to the extent that they seek information not relevant to the claim or defense of any party to this lawsuit or reasonably calculated to lead to the discovery of admissible evidence.

3.      GE Capital objects to the Requests to the extent that they seek information that is proprietary, confidential, sensitive, or competitive in nature.

4.      GE Capital objects to the Requests to the extent that they seek information covered by the attorney-client privilege or work product doctrine, or any other privilege or immunity, including common or joint defense and/or joint interest privileges.

5.      GE Capital reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material or information produced.  The production of any material or information does not constitute an admission by GE Capital that such material or information is relevant to this action or admissible in evidence.

6.      GE Capital objects to the Requests to the extent that they seek information generally available to the public and/or in the public domain.

7.      GE Capital objects to the Requests to the extent that they purport to require GE Capital to seek documents in the possession of third parties.

8.      GE Capital objects to the interrogatories included in the Requests to the extent that they exceed the maximum number of interrogatories permissible under Rule 33(a) of the Federal Rules of Civil Procedure.

9.      Inadvertent production of any material subject to the attorney-client privilege, prepared in anticipation of litigation or for trial, common or joint defense and/or joint interest privileges, or otherwise protected or immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to discovery of such material, its subject matter or information contained therein or of GE Capital's right to objection to the use of such material during any later proceeding.

CHILIB-2100045.2-515998-00011

10.    GE Capital objects to the Requests to the extent that they are redundant and/or duplicative.

11.    GE Capital objects to the Requests to the extent that they contain vague and undefined terms and/or overly broad requests.

12.    GE Capital objects to Koch Foods's definition of "document" to the extent that it is broader than the definition of "document" contained in the Federal Rules of Civil Procedure.

13.    GE Capital objects to the Requests to the extent that the Requests seek admissions that GE Capital has not yet been able to ascertain.

14.    GE Capital objects to the Requests to the extent that they seek admissions regarding wholly irrelevant matters.

15.    GE Capital objects to the Requests to the extent that they relate to written documents which speak for themselves, and GE Capital incorporates herein as part of its Responses, the contents of the documents produced.

16.    GE Capital objects to the Requests to the extent that they ask for the creation of documents.  GE Capital will only produce documents that currently exist.

17.    GE Capital has just begun its investigation and all responsive and relevant documents may have not yet been discovered.  In addition, Koch Foods has to date failed to supply it with any of the documents requested by GE Capital in its First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission, which GE Capital served upon Koch Foods and to which the responses of Koch Foods were due not later than August 13, 2007.  GE Capital, therefore, reserves the right to amend and/or supplement its responses.

CHILIB-2100045.2-515998-00011

## II.   **INTERROGATORIES**

1.    **Identify each and every fact which you contend supports your claim of any kind of ownership interest, past or present, in the Equipment.**

**Answer to Interrogatory No. 1.**

Subject to the General Objections, GE Capital responds as follows:

- GE Capital and Sylvest Farms, Inc. ("Sylvest") were parties to a certain Master Lease Agreement dated on or about December 29, 2005 (the "Master Lease") and a Food Processing Equipment Schedule (the "Leasing Schedule"), executed the same date, pursuant to which GE Capital leased to Sylvest certain equipment identified more fully in section A of the Leasing Schedule (collectively, the "Equipment");

- Sylvest took possession of the Equipment at its chicken de-boning and processing facility located at 4530 Mobile Road, in Montgomery, Alabama (the "Facility"), on or shortly after the date of the Maser Lease. GE Capital notes, however, that certain of the Equipment may not have been delivered at that time. GE Capital continues to investigate this issue.

- The terms of the Master Lease and the Leasing Schedule are incorporated by reference into GE Capital's response to this interrogatory.

- On April 18, 2006, Sylvest filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code) in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court"), and, on May 26, 2006, the Bankruptcy Court entered its Order on Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363, and 365 for Order Authorizing (i) Sale of Certain Assets of the Estate Free and Clear of Liens, Claims and Interests (ii) Approval of Designation of Rights Agreement, and (iii) Sale, Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Order"), pursuant to which the Bankruptcy Court authorized Sylvest to enter into the Amended Asset Purchase Agreement (the "Purchase Agreement"). The terms of the Sale Order and Purchase Agreement are incorporated into this interrogatory response.

- On July 6, 2006, the Bankruptcy Court entered its Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Rejection Order"), pursuant to which the Master Lease and the Leasing Schedule were rejected.

- Following the entry of the Rejection Order, GE Capital contacted Koch Foods regarding the need to relocate the Equipment from the Facility. Koch Foods advised GE Capital that it would not be necessary to relocate the Equipment at that time, and that it could remain stored at the Facility while GE Capital marketed it for resale.

- On or about January 8, 2007, counsel to Koch Foods contacted counsel to GE Capital to inquire about purchasing the Equipment.

- In or around mid-February 2007, Koch Foods engaged in additional discussions with GE Capital about its interest in purchasing the Equipment.

- No purchase agreement was ever executed regarding the Equipment, and no sale of the Equipment ever occurred.

- 4 -

- Koch Foods failed to make an unconditional offer to return the Equipment, always seeking in conjunction with a surrender of the Equipment indemnities, a release, or both.

- GE Capital is, and at all times relevant hereto has been, the sole owner of the Equipment.

GE Capital's investigation of the facts responsive to this interrogatory continues, and GE Capital reserves the right to supplement this response if and when additional information becomes available.

**2.     Identify each and every communication between GE Capital and Koch Foods concerning the Equipment and the Lease.**

### Answer to Interrogatory No. 2.

GE Capital objects to this Interrogatory on the basis that it requests information more easily obtainable through deposition testimony. Further answering, and subject to the General Objections, GE Capital asserts that, although all exact times and dates of such communications are not currently known to GE Capital, it communicated, through counsel, with Koch Foods prior to May 26, 2006, regarding Koch Foods's intention with respect to the Equipment, and whether Koch Foods would request that Sylvest assume and/or assign the Master Lease and the Leasing Schedule in conjunction with the Purchase Agreement. GE Capital's understanding from these communications was that Koch Foods was attempting to locate a third party purchaser for the Facility, and Koch Foods's need for the Equipment may be based on its success in finding a third party purchaser. Subsequently, GE Capital learned that the Master Lease and the Leasing Schedule would be rejected by Sylvest.

GE Capital also contacted Koch Foods, through their counsel, shortly after the Rejection Order was entered regarding whether the Equipment could remain in the Facility while GE Capital marketed it for resale.

GE Capital continued to engage in multiple discussions with Koch Foods about Koch Foods's contemplated purchase of the Equipment for a period of several months ranging from mid-2006 through April 2007. During that time period, Mark Kaminsky, Koch Foods's CFO, was identified by Koch Foods's counsel as the primary contact at Koch Foods to discuss the potential sale of the Equipment. Again, the exact dates and times of these communications are currently unknown, and GE Capital is continuing its investigation of these facts.

In late December 2006 or early January 2007, counsel to GE Capital sent correspondence to counsel to Koch Foods regarding the Equipment, and demanding rental payments resulting from Koch Foods's use of the same. Koch Foods did not immediately respond to this correspondence, and a follow-up voicemail was left for counsel to Koch Foods on January 5, 2007.

On January 8, 2007, counsel to Koch Foods called counsel to GE Capital and indicated that Koch Foods was interested in speaking with GE Capital about purchasing the Equipment. At that time, counsel for Koch Foods indicated that GE Capital, as opposed to GE Capital's counsel, should call Koch Foods directly.

On February 2, 2007, communications between John Sutehall at GE Capital and Koch Foods revealed that Koch Foods would prefer to purchase the Equipment outright, but no specific monetary offer was made by Koch Foods at that time.

- 5 -

On February 14, 2007, counsel for Koch Foods emailed counsel for GE Capital regarding continued negotiations over a potential sale price for the Equipment.

On or about April 18, 2007, counsel to Koch Foods sent an email to counsel for GE Capital informing GE Capital of Koch Food's decision not to purchase the Equipment, and refusing GE Capital's demand for rental payments. At that time Koch Foods requested that GE Capital remove the Equipment from the Facility.

During approximately the same time period, GE Capital left several voicemail messages for Mark Kaminsky regarding the Equipment, and received no response.

On or about May 2, 2007, counsel to Koch Foods sent an email to counsel for GE Capital confirming that several voicemails had been exchanged since the April 19, 2007 email, and requesting information on the time period in which GE Capital intended to remove the Equipment from the Facility.

GE Capital notes that some information related to the dates and times of the communications listed in this response can be found in the documents being produced in relation to the document requests below. However, many of the specific details are unknown to GE Capital at this time. GE Capital reserves the right to supplement this response as additional information becomes available. In addition, see GE Capital's response to Interrogatory No. 1 above.

**3.    Identify and every communication between GE Capital and Sylvest Farms concerning the Equipment and the Lease.**

**Answer to Interrogatory No. 3.**

GE Capital objects to this Interrogatory on the basis that it requests information more easily obtainable through deposition testimony. Further answering, and subject to the General Objections, GE Capital asserts that, although exact times and dates of such communications are not currently known to GE Capital, it communicated with Sylvest beginning in late 2005 regarding Sylvest's desire to obtain financing through GE Capital for the Equipment. Negotiations occurred through December 2005, and resulted in the execution of the Master Lease and the Leasing Schedule.

Thereafter, GE Capital received periodic payments on the Leasing Schedule from Sylvest. When Sylvest filed for bankruptcy protection, GE Capital received notices of certain of the case filings through service effectuated by Sylvest's bankruptcy counsel.

After the bankruptcy case was filed, but before the Sale Order was entered, GE Capital communicated with Sylvest's bankruptcy counsel to determine whether Sylvest intended to assume and/or assign the Master Lease and Leasing Schedule as a component of the sale of substantially all of Sylvest's assets. In addition, during this time period, GE Capital communicated with Sylvest regarding the status of the Equipment.

On or about May 26, 2006, GE Capital reviewed email correspondence from Dave Bromley, at Sylvest, to Robert Breakstone, an appraiser hired by GE Capital, regarding the estimated value of certain items of the Equipment. Evidence of these communications are found in the documents responsive to the document request that GE Capital has responded to contemporaneously herewith.

- 6 -

On or about May 30, 2006, counsel for GE Capital spoke with Richard Robinson, counsel for Sylvest, regarding the Equipment. At that time, Sylvest confirmed it had no intention of assuming the Master Lease and the Leasing Schedule.

Again, many of the exact dates and times of the communications between Sylvest and GE Capital are currently unknown, and GE Capital's investigation continues. As indicated above, some information related to the dates and times can be found in the documents being produced in relation to the document requests below. GE Capital reserves the right to amend and/or supplement this response in the event that additional information is discovered through its investigation. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**4.    Identify each and every fact which you contend supports the claim that GE Capital has made demands upon Koch Foods for return and surrender of the Equipment, including, who made the demands, to whom the demands were made, the manner in which the demands were made, contents of the demands, the times and places of the demand communications, response(s) to the demand, and any other circumstances concerning the demands.**

**Answer to Interrogatory No. 4.**

GE Capital objects to this interrogatory on the basis that it seeks information that would be better obtained through deposition testimony. Subject to this objection and the General Objections, GE Capital states that it originally made no such demand on Koch Foods because Koch Foods had agreed that the Equipment could remain at the Facility while it was marketed for resale. After GE Capital determined that Koch Foods was, in fact, using the Equipment for its own benefit, GE Capital made a demand that Koch Foods remit payment to GE Capital for its use of the Equipment. At that time, Koch Foods indicated that it was interested in purchasing the Equipment. GE Capital engaged in negotiations regarding the potential purchase of the Equipment. When it became clear that Koch Foods neither intended to purchase the Equipment, nor make payments to GE Capital for its use of the Equipment, GE Capital placed several calls to Mark Kaminsky, the Chief Financial Officer of Koch Foods to arrange the return of the Equipment. These calls were not returned by Mr. Kaminsky.

GE Capital continues to investigate the factual circumstances related to this response, and will supplement the information contained herein when additional information becomes available. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**5.    Identify each and every fact which you contend supports your allegation that Koch Foods advised or communicated to GE Capital that it would not be necessary to relocate the Equipment, including persons who communicated such information to GE Capital, the date and the place of the communication, and any other circumstances concerning the communication.**

**Answer to Interrogatory No. 5.**

Subject to the General Objections, GE Capital states that, shortly after the entry of the Rejection Order, counsel to GE Capital contacted counsel to Koch Foods in order to inquire whether it would be possible for the Equipment to remain at the Facility while GE Capital marketed the same for resale. At that time, counsel to Koch Foods indicated that it would not be necessary for GE Capital to remove the Equipment from the Facility. During the course of that conversation, Koch Foods did not raise the issue of any storage fees that might be incurred by GE Capital as a result of GE Capital's decision to temporarily leave the Equipment in the Facility. Further, during that conversation, Koch Foods did not request permission to use the

CHILIB-2100045.2-515998-00011

Equipment or indicate to GE Capital, explicitly or implicitly, that it was already using the Equipment.

GE Capital's receipt of permission to leave the Equipment at the Facility was reiterated to Koch Foods through written correspondence directed to Koch Food's counsel in early 2007. At that time, Koch Foods voiced no objection to GE Capital's understanding of the circumstances.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**6.    Identify each and every fact which you contend supports your claim that Koch Foods began using the Equipment for the de-boning and processing of chicken and that Koch Foods continues to use the Equipment, and identify all persons with knowledge of such facts.**

**Answer to Interrogatory No. 6.**

GE Capital objects to this interrogatory on the basis that it requires GE Capital to provide information which is more readily available to those persons at Koch Foods that may have used the Equipment, and/or may continue to use the Equipment.

Further answering, and subject to the General Objections, GE Capital states that, in Koch Foods's Responses to GE Capital's First Set of Interrogatories, Document Requests, and Requests to Admit ("Koch's Discovery Responses"), Koch admits that it used certain portions of the Equipment, with such use starting in advance of the Rejection Order.

This comports with GE Capital's belief that the Equipment was being operated through May and June 2006. Prior to the Rejection Order, GE Capital had been informed by an appraiser, sent by GE Capital to examine the Equipment, that the Equipment was being used. Still, GE Capital was not aware of the particular party that was using the Equipment, or whether they had license from Sylvest to use the Equipment.

In Koch's Discovery Responses, Koch denies that it continues to use the Equipment. GE Capital has no basis for denying that this information is currently accurate. At the same time, GE Capital is unaware when Koch Foods discontinued its use of the Equipment.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**7.    Identify each and every fact which you contend supports your claim that Koch Foods installed and used the portions of the Equipment that were not previously in use and have not even been installed and made operational at the time Koch Foods purchased the Plant, and identify all persons with knowledge of such facts.**

**Answer to Interrogatory No. 7.**

GE Capital objects to this interrogatory on the basis that it seeks information which has already been requested in Interrogatory No. 6. To the extent that Interrogatory No. 7 requests information regarding Koch Foods's use of the Equipment, GE Capital incorporates its answer to Interrogatory No. 6 herein. GE Capital further objects to this interrogatory to the extent that it

CHILIB-2100045.2-515998-00011

requests information from GE Capital that is more easily obtainable from Koch Foods. Further answering, GE Capital states that during April 2006 employees from Sylvest informed GE Capital that some portions of the Equipment had not yet been installed.

Pursuant to conversations with Dave Bromley and/or other Sylvest agents, in late April or early May 2006, Sylvest indicated that the deboning equipment was fully in use at that time, and the spiral freezer was fully installed and tested, but had never actually been used. In addition, at that time Sylvest reported that the overwrap line was not fully installed.

GE Capital continues to investigate which portions of the Equipment were in use prior to Koch Foods taking possession of the Facility, and whether Koch Foods took actions to install the Equipment, or make it operational. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**8.    Describe how you learned that Koch Foods used or continues to use the Equipment and how you learned that Koch Foods installed part of the Equipment that had not installed and made operational before.**

**Answer to Interrogatory No. 8.**

GE Capital objects to Interrogatory No. 8 to the extent that it seeks information duplicative of that requested in Interrogatories No. 6 and 7.

Further answering, GE Capital states that, as discussed in the answers to Interrogatories No. 6 and No. 7 above, GE Capital was in communications with Sylvest regarding the status of the Equipment prior to the bankruptcy case being filed. At that time, GE Capital was informed that only portions of the Equipment had been installed for use and/or were in use. Reports from agents of GE Capital that visited the Facility after the bankruptcy filing indicated that the Equipment was being used, but did not make clear which entity was using the Equipment.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**9.    Identify each and every fact which you contend supports your claim in paragraph 15 of your Counterclaim that Koch Foods has: (a) committed unauthorized acts by which GE Capital has been deprived of its personal property indefinitely; (b) made an unauthorized assumption or exercise of the right of ownership over personal chattels belonging to GE Capital through the alteration of their condition or the exclusion of GE Capital's rights; (c) exercised dominion over property inconsistent with the rights of GE Capital; and/or (d) exercised unauthorized acts of dominion or ownership over property belonging to GE Capital.**

**Answer to Interrogatory No. 9.**

Subject to the General Objections, GE Capital states that, through its use of the Equipment, Koch Foods has caused the Equipment to decrease at a faster rate than if the Equipment had not been used during the period of time since Koch Foods took possession of the Facility. This use occurred without the permission or consent of GE Capital, and may have resulted in a decrease in the value of the Equipment.

- 9 -

Furthermore, throughout the period of time that Koch Foods and GE Capital were discussing the potential sale of the Equipment, GE Capital informed Koch Foods that it expected Koch Foods to be responsible for making payments to GE Capital for its use of the Equipment. Nevertheless, Koch Foods responded that it would make no payment for its use of the Equipment, and continued to maintain possession of the Equipment and use the Equipment.

On several occasions during April 2007, GE Capital made calls to Mark Kaminsky at Koch Foods regarding its desire to retrieve the Equipment and/or arrange for its removal from the Facility. Such messages were not returned in a timely manner, and hindered GE Capital's attempts to obtain its Equipment.

Thereafter, Koch Foods has asserted that it owns the Equipment, or, in the alternative, that it has a lien over the Equipment.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**10. Identify each and every fact which you contend supports your claim that Koch Foods has acted with legal malice and identify each and every act of Koch Foods that constituted legal malice involving the Equipment.**

**Answer to Interrogatory No. 10.**

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods's mistaken understanding that the Master Lease had been assumed and/or assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in purchase negotiations is indicative of the fact that it was aware that it had no legitimate ownership interest in the Equipment. Through the use of the Equipment without permission or consent of GE Capital, and instead for the benefit of Koch Foods, Koch Foods demonstrated disregard for GE Capital's ownership interest in the Equipment. In addition, any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional actions.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**11. Identify each and every fact which you contend supports your claim that Koch Foods has acted with willfulness and identify each and every act of Koch Foods that constituted willfulness involving the Equipment.**

**Answer to Interrogatory No. 11.**

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods's mistaken understanding that the Master Lease had been assumed and/or

CHILIB-2100045.2-515998-00011

assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in purchase negotiations is indicative of the fact that it was aware that it had no ownership interest in the Equipment. Through the use of the Equipment without permission or consent of GE Capital, and instead for the benefit of Koch Foods, Koch Foods demonstrated disregard for GE Capital's ownership interest in the Equipment. Further, Koch Foods never informed GE Capital that it was using the Equipment. Any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional actions.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, <u>see</u> GE Capital's responses to prior interrogatories, as stated above.

**12.   Identify each and every fact which you contend supports your claim that Koch Foods has acted with insult and identify each and every act of Koch Foods that constituted insult involving the Equipment.**

<u>**Answer to Interrogatory No. 12.**</u>

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods mistaken understanding that the Master Lease had been assumed and/or assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in purchase negotiations is indicative of the fact that it was aware that it had no ownership interest in the Equipment. Throughout the period in which Koch Foods used the Equipment, it demonstrated disregard for GE Capital's ownership interest in the Equipment. In addition, any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional action.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, <u>see</u> GE Capital's responses to prior interrogatories, as stated above.

**13.   Identify each and every fact which you contend supports your claim that Koch Foods has acted with aggravated circumstances other than those listed in paragraphs from 10, 11, and 12 of these Interrogatories and identify each and every act of Koch Foods that constituted these aggravated circumstances involving the Equipment.**

<u>**Answer to Interrogatory No. 13.**</u>

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods mistaken understanding that the Master Lease had been assumed and/or assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in

- 11 -

purchase negotiations is indicative of the fact that it was aware that it had no ownership interest in the Equipment. Throughout the period in which Koch Foods used the Equipment, it demonstrated disregard for GE Capital's ownership interest in the Equipment. In addition, any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional action.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**14.  Describe the fair market value and the liquidation value, and how you arrived such values, of each item of the Equipment (a) on the date when Koch Foods purchased all assets of Sylvest Farms; (b) on the date immediately before Koch Foods' alleged use of the Equipment; (c) on the date immediately after Koch Foods' alleged use of the Equipment; (d) on the date immediately before Koch Foods' alleged installation of parts of the Equipment; (e) on the date immediately after Koch Foods' alleged installation of parts of the Equipment; (f) on the date(s) when you allegedly made demand for the return or surrender of the Equipment, and (g) present.**

**Answer to Interrogatory No. 14.**

Subject to the General Objections, GE Capital states that an appraisal of certain portions of the Equipment was prepared in June 2006 by Robert Breakstone, who is affiliated with Equipment Exchange Company of America, Inc. The appraisal report is being submitted in conjunction with the document requests below, and is the best evidence of the information contained therein. This appraisal report constitutes the only appraisal that GE Capital has undertaken of the Equipment since the beginning of the Bankruptcy Case. GE Capital is currently not aware of any other official or unofficial valuations of the Equipment since that time. GE Capital's investigation continues, and GE Capital reserves the right to supplement this information with additional valuations of the Equipment.

**15.  Describe how you arrived the capital cost of the Equipment as $846,545.00.**

**Answer to Interrogatory No. 15.**

GE Capital objects to Interrogatory No. 15 on the basis that it is vague and ambiguous, and does not clearly identify in what context it asserts that GE Capital "arrived" at such a number. Further answering, GE Capital states that the $846,545.00 identified in the Answer to Complaint for Declaratory Judgment and for Unjust Enrichment and Counterclaim for Conversion (the "GE Capital Answer") as the capitalized lessor's cost is the same amount designated as the Capitalized Lessor's Cost in the Leasing Schedule for the de-boner with double cone line, product conveyors and loading bin.

**16.  Identify each and every fact which supports your contention that Koch Foods is liable to GE Capital, under the Lease or otherwise, for use of the Equipment.**

CHILIB-2100045.2-515998-00011

**Answer to Interrogatory No. 16.**

GE Capital incorporates herein its responses to each of the interrogatories included in the Requests. Further answering, GE Capital states that Koch Foods admits to using the Equipment, or portions thereof, from a time prior to the Rejection Order. This was done without the consent of GE Capital, and without GE Capital's permission. GE Capital has demanded that Koch Foods make payment to GE Capital for its unauthorized use of the Equipment, and Koch Foods has rejected this demand. Further, Koch Foods's use of the Equipment may have decreased the Equipment value, which fact GE Capital seeks to prove through the discovery process.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

**17.  Identify each and every fact which supports your Answer that the Equipment did not become attached to the Plant.**

**Answer to Interrogatory No. 17.**

GE Capital objects to Interrogatory No. 17 on the basis that it requires GE Capital to prove a negative assertion.

**18.  Identify all your efforts, if any, to mitigate the damages that you allege are caused by Koch Foods.**

**Answer to Interrogatory No. 18.**

GE Capital objects to Interrogatory No. 18 on the basis that it seeks information which is more efficiently obtained through deposition testimony. Further answering, GE Capital asserts that it made efforts following the Rejection Order to resell the Equipment to third parties. Documents evidencing certain of these efforts, some of which were successful, are included in GE Capital's responses to the document requests included below. Further, GE Capital demanded that Koch Foods provide payment for its use of the Equipment, thereby making Koch Foods aware that GE Capital did not consent to the use of the Equipment. Further, GE Capital attempted to negotiate sale of the Equipment to Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**19.  Identify each and every potential purchaser that GE Capital has found while marketing the Equipment for sale, including information about what items of the Equipment and at what prices the purchaser was interested in purchasing.**

**Answer to Interrogatory No. 19.**

Subject to the General Objections, GE Capital states that, in August 2006 GE Capital was in negotiations with PECO Foods, Inc. and had identified PECO Foods, Inc. as a potential purchaser for certain portions of the Equipment. At the same time, Gold Kist had been identified as a potential purchaser for other portions of the Equipment. In May 2006, Michael Fox International also expressed interest in bidding on the Equipment.

- 13 -

Documents related to these potential purchasers are included in GE Capital's responses to the document requests, and constitute the best evidence of the information requested pursuant to this Interrogatory. GE Capital objects to this interrogatory to the extent that it requires GE Capital to reiterate information already included in its responses to the document requests.

**20. Identify any communication in which you demanded that Koch Foods stop using or installing the Equipment.**

Answer to Interrogatory No. 20.

In late December 2006 or early January 2007, GE Capital demanded that Koch Foods remit payment to GE Capital for its use of the Equipment. Thereafter, Koch Foods attempted to negotiate a purchase of the Equipment. When these negotiations failed, GE Capital attempted to contact Koch Foods to arrange for removal of the Equipment, which attempts were unsuccessful.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**21. To the extent not already specifically identified above, identify each and every defense, if any, which you contend you possess against the claims of Koch Foods as set forth in the Complaint, and each and every fact which you contend supports each such defense.**

Answer to Interrogatory No. 21.

Subject to its General Objections, GE Capital asserts that the defenses which GE Capital contends that it possess against the claims of Koch Foods are asserted in the Answer, and are incorporated herein by reference. The interrogatory responses applicable to each of the interrogatory requests above represent the facts which support each such defense. In addition, GE Capital incorporates herein the documents produced in response to the document requests.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

**22. Describe with particularity any facts relating to or supporting any denial, defense or affirmative defense made or to be made by you in your response to the Complaint.**

Answer to Interrogatory No. 22.

GE Capital objects to Interrogatory No. 22 on the basis that the answer to the interrogatory would be better obtained through deposition questions. Further answering, GE Capital incorporates each of the interrogatory responses and responses to document requests contained herein.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

- 14 -

**23.   Identify each person whom you have consulted with concerning, and each person who has contributed or assisted or is responsible for, the creation of all the responses to the Combined Discovery Requests and identify which documents or information each such person created or produced.**

**Answer to Interrogatory No. 23.**

William Wilson contributed, assisted, and was responsible for the creation of the responses to interrogatories and requests to admit contained in the Requests.

The source of documents produced pursuant to the document requests below are largely self-explanatory. To the extent that there are questions about the source of specific documents, that information is available upon request to counsel for GE Capital.

**24.   Identify each and every person having knowledge of any discoverable matter relating to: (i) the Complaint; (ii) your Answer to the Complaint; (iii) the Counterclaim, (iv) Koch Foods' Answer to the Counterclaim, and (iii) your Responses to the Combined Discovery Requests.**

**Answer to Interrogatory No. 24.**

Subject to its General Objections, GE Capital asserts that those individuals included in its initial disclosures, made pursuant to Rule 26(a)(1), along with those individuals specifically mentioned herein, represent all individuals which GE Capital currently believes have knowledge of any discoverable matter. Thus, GE Capital incorporates its Rule 26 disclosures herein by reference.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

**25.   If you fail to unequivocally admit each request for admission in the Requests for Admission, state the factual and legal basis of your response (identified by the number of the Request for Admission which was not unequivocally admitted) and identify each and every person having knowledge relevant to that response.**

**Answer to Interrogatory No. 25.**

Subject to the General Objections, GE Capital answers as follows:

1.   The clear terms of the Purchase Agreement indicate that there were assets of Sylvest that were not purchased by Koch Foods. See, e.g., Purchase Agreement, § 1.2, governing "Excluded Assets."

2.   The basis for GE Capital's denial of Request No. 2 is stated more fully in its response to Request No. 2, which is incorporated by reference herein.

3.   The basis for GE Capital's denial of Request No. 3 is stated more fully in its response to Request No. 3, which is incorporated by reference herein.

CHILIB-2100045.2-515998-00011

Exhibit 8

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KOCH FOODS OF ALABAMA, LLC,  )
an Alabama limited liability company,  )
)
    Plaintiff and Counter-  )
    Defendant,  )
)   CIVIL ACTION NO.
  vs.  )   2:07 CV 522-MHT
)
GENERAL ELECTRIC CAPITAL  )
CORPORATION, a Delaware corporation,  )
)
    Defendant, and Counter-  )
    Plaintiff,  )
)

**GENERAL ELECTRIC CAPITAL CORPORATION'S RESPONSES TO
KOCH FOODS' SECOND SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

Defendant and Counter-Plaintiff, General Electric Capital Corporation ("GE Capital"), responds to the Second Set of Interrogatories, Requests for Production of Documents, and Requests for Admission (collectively, the "Requests") of Koch Foods of Alabama, LLC ("Koch Foods"), as follows:

## I.   GENERAL OBJECTIONS AND RESPONSES

1.   GE Capital objects to the Requests to the extent that the Requests seek discovery or purport to impose duties and obligations beyond the scope of, or not required by, the Federal Rules of Civil Procedure.

2.   GE Capital objects to the Requests to the extent that they seek information not relevant to the claim or defense of any party to this lawsuit or reasonably calculated to lead to the discovery of admissible evidence.

3.     GE Capital objects to the Requests to the extent that they seek information that is proprietary, confidential, sensitive, or competitive in nature.

4.     GE Capital objects to the Requests to the extent that they seek information covered by the attorney-client privilege or work product doctrine, or any other privilege or immunity, including common or joint defense and/or joint interest privileges.

5.     GE Capital reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material or information produced.  The production of any material or information does not constitute an admission by GE Capital that such material or information is relevant to this action or admissible in evidence.

6.     GE Capital objects to the Requests to the extent that they seek information generally available to the public and/or in the public domain.

7.     GE Capital objects to the Requests to the extent that they purport to require GE Capital to seek documents in the possession of third parties.

8.     GE Capital objects to the Requests to the extent that they are redundant and/or duplicative.

9.     GE Capital objects to the Requests to the extent that they contain vague and undefined terms.

10.     GE Capital objects to Koch Foods's definition of "document" to the extent that it is broader than the definition of "document" contained in the Federal Rules of Civil Procedure.

11.     GE Capital objects to the Requests to the extent that the Requests seek admissions that GE Capital has not yet been able to ascertain.

CHILIB-2111965.1-AEPILLE

12.    GE Capital objects to the Requests to the extent that they seek admissions regarding wholly irrelevant matters.

13.    GE Capital objects to the Requests to the extent that they relate to written documents which speak for themselves.

14.    GE Capital objects to the Requests to the extent that they ask for the creation of documents.  GE Capital will only produce documents that currently exist.

15.    GE Capital has just begun its investigation and all responsive and relevant documents may have not yet been discovered.  GE Capital, therefore, reserves the right to amend and/or supplement its responses.

## ANSWERS TO INTERROGATORIES

1.    **Identify any and all communications in which you contacted Koch Foods to arrange for removal of the Equipment, and/or demanded that Koch Foods give you possession of the Equipment. (Please** *see* **Paragraph 12.d above about how to identify a communication).**

### Answer to Interrogatory 1:

In addition to the general objections stated above, GE Capital objects to Interrogatory No. 1 on the basis that it is duplicative of the information requested in Koch Foods's First Set of Interrogatories, Request for Production of Document, and Request for Admission (the "First Discovery Requests").  Further answering, GE Capital incorporates by reference, as though fully set forth herein, its response to Interrogatory No. 4 from the First Discovery Requests, and its supplemental response to Interrogatory No. 4, tendered to Koch Foods through correspondence sent to counsel for Koch Foods on or about October 30, 2007 (the "Supplemental Responses").

2.    **Identify the date when you first learned of Koch Foods' use of the Equipment, and identify the person(s) who first learned of its use, and describe how they learned of the use. If you learned of the use through a communication or communications, please identify the communications.**

### Answer to Interrogatory 2:

GE Capital first became aware of Koch Foods's use of the Equipment in or around August 2006.  Koch Foods's use of the Equipment was brought to GE Capital's attention in a phone call between Joseph Di Salvo and Robert Breakstone.

3.    **Identify all communications or notices you gave demanding that Koch Foods must cease using the Equipment after learning that Koch Foods was using the Equipment.**

CHILIB-2111965.1-AEPILLE

**Answer to Interrogatory 3:**

In addition to the general objections stated above, GE Capital objects to Interrogatory No. 3 on the basis that it is duplicative of the information requested in Koch Foods's First Discovery Requests. Further answering, GE Capital incorporates by reference, as though fully set forth herein, its response to Interrogatory No. 20 from the First Discovery Requests, and its supplemental response to Interrogatory No. 20, tendered to Koch Foods as part of the Supplemental Responses.

4.    **Identify the visits to the Plant made by GE Capital and/or its agents, including the date and the length of time of each visit and the names of the persons who made the visits. Identify all the activities conducted by GE Capital or its agents during these visits.**

**Answer to Interrogatory 4:**

The only visits made to the Plant by GE Capital and/or an agent acting on its behalf were made either by Robert Breakstone, or by his agents, and were made for the purposes of appraising the Equipment. Questions pertaining to the date, length, and time of each visit, the activities conducted during these visits, and any individuals that may have accompanied Mr. Breakstone, or may have gone at his direction, on these visits are more properly directed at Mr. Breakstone.

5.    **Identify the date when the Equipment first became operational.**

**Answer to Interrogatory 5:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 5 on the basis that it requests information beyond the scope of GE Capital's knowledge, and is more appropriately directed at Sylvest Foods. Further answering, GE Capital states that Schedule No. 001 (the "Schedule"), executed on or about December 29, 2005, provided that Sylvest Farms, in executing the same, certified and warranted that all the Equipment had been delivered and installed as of the date of execution of the Schedule.

6.    **Identify all the inspections and valuations of the Equipment you conducted.**

**Answer to Interrogatory 6:**

In addition to the general objections asserted above, GE Capital objects to interrogatory No. 6 on the basis that the terms "inspections," "valuations," and "conducted" are vague and ambiguous. Further answering, GE Capital states that it requested that two appraisals of the Equipment be completed by Robert Breakstone: (a) the first was conducted in May or June of 2006, and (b) the second was conducted in September 2007. GE Capital further answers that, in conjunction with the financing of the Equipment, it collected, in the ordinary course of its business, information related to the value and condition of the Equipment.

7.    **Identify all the steps you have taken to sell the Equipment and mitigate the damages alleged in the Counterclaim. Identify any person who are involved in these efforts.**

- 4 -

Exhibit 9

DLAPIPER          Fax:3122367516          Jan  2 2007  17:49    P.01



**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois, 60601-1263
www.dlapiper.com

Ann Pille
ann.pille@dlapiper.com
T  312.368.2189
F  312.630.7356

# Fax Transmission Cover Sheet

January 2, 2007

To
Eugene J. Geekie
Schiff Hardin LLP

Telephone
312.258.5835

Fax Number
312.258.5600

From:    Ann Pille
         312.368.2189

Client-Matter Number:

Re:      In re Sylvest Farms

Pages:   -  13   - (including this form)        Originals:

If there is a problem with this transmission, please call   312- 368 - 2189        at

Fax Operator/Ext.

Message:

**CONFIDENTIALITY NOTICE**
This communication is ONLY for the person named above. Unless otherwise indicated, it contains information that is confidential, privileged or exempt from disclosure under applicable law. If you are not the person named above, or responsible for delivering it to that person, be aware that disclosure, copying, distribution or use of this communication is strictly PROHIBITED. If you have received it in error, or are uncertain as to its proper handling, please immediately notify us by collect telephone and mail the original to us at the above address. Thank you.

(Form Rev. 8/02/04)

KOCH 00000001



DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1263
www.dlapiper.com

Ann Pille
ann.pille@dlapiper.com
T  312.368.2189
F  312.630.7356

January 2, 2006
*VIA FACSIMILE AND REGULAR MAIL*

Mr. Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, Illinois  60606
Fax: 312.258.5600

**Re:**  __In re Sylvest Farms, Inc. (Case No. 06-4025-TBB11)__

Dear Mr. Geekie:

As you are aware, this firm represents General Electric Capital Corporation ("GECC") in relation to the bankruptcy proceeding initiated by Sylvest Farms, Inc. (the "Debtor"), currently pending before the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court").

On or about December 29, 2005, GECC and the Debtor entered into a Master Lease Agreement (the "Master Lease"), pursuant to which GECC leased certain equipment to the Debtor to be used in a poultry processing facility owned and operated by the Debtor (the "Facility"). The equipment leased by GECC is defined more fully on Schedule 001 ("Schedule 1") to the Master Lease, a copy of which is attached hereto.

On or about May 26, 2006, your clients, Koch Foods of Alabama LLC and Koch Farms of Alabama LLC (collectively, the "Buyers"), purchased substantially all of the assets of the Debtor, including the Facility. Thereafter, on or about June 6, 2006, the Bankruptcy Court entered its *Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts* (the "Rejection Order"), pursuant to which the Master Lease was rejected.

Shortly after the Rejection Order was entered, representatives from this law firm discussed with you the need to relocate the GECC equipment located at the Facility. At that time, you informed GECC that it would not be necessary to relocate the equipment while GECC conducted an inquiry to locate purchasers for the equipment. As such, the equipment is still located at the Facility.

It has come to our attention, however, that, in addition to allowing the GECC equipment to remain at the Facility, the Buyers have also been using the equipment. Portions of the GECC equipment that were not in use, and indeed had not even been installed at the time the Buyers purchased the Facility, are now being operated by the Buyers without the permission of GECC.

KOCH 00000002



Mr. Eugene J. Geekie, Jr.
January 2, 2006
Page Two

GECC believes that the use of the equipment by the Buyers, without GECC's permission, has been occurring for an extended period of time.

Consequently, GECC, by delivery of this letter, demands that the Buyers make a payment to GECC, which payment shall represent the lease payments due and owing on the Master Lease from the date of the Rejection Order to the present. Such lease payments, from June 7, 2006 through January 3, 2007, are equal to $237,493.99 (the "Overdue Rent"), and should be paid to GECC immediately by tendering a check for the amount of the Overdue Rent to the Chicago offices of DLA Piper US LLP, located at 203 N. LaSalle Street, Suite 1900, in Chicago, Illinois. This check shall be sent to the attention of Ann Pille.

In addition, GECC demands that the Buyers continue to abide by the payment and other terms of the Master Lease going forward. Failure to make payments to GECC for the use of the GECC equipment, including, but not limited to, the Overdue Rent, could subject the Buyers to an action for conversion of the Equipment.

Please call me if you have any questions, or if you would like to discuss the matter further. I look forward to hearing from you soon.

Very truly yours,

DLA Piper US LLP

Ann Pille

KOCH 00000003

Exhibit 10

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company,<br><br>　　　　Plaintiff and Counter-<br>　　　　Defendant,<br><br>vs.<br><br>GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation,<br><br>　　　　Defendant, and Counter-<br>　　　　Plaintiff, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>2:07 CV 522-MHT |

**GENERAL ELECTRIC CAPITAL CORPORATION'S RESPONSES TO
KOCH FOODS' THIRD SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

Defendant and Counter-Plaintiff, General Electric Capital Corporation ("GE Capital"), responds to the Third Set of Interrogatories, Requests for Production of Documents, and Requests for Admission (collectively, the "Requests") of Koch Foods of Alabama, LLC ("Koch Foods"), as follows:

## I.　　GENERAL OBJECTIONS AND RESPONSES

1.　　GE Capital objects to the Requests to the extent that the Requests seek discovery or purport to impose duties and obligations beyond the scope of, or not required by, the Federal Rules of Civil Procedure.

2.　　GE Capital objects to the Requests to the extent that they seek information not relevant to the claim or defense of any party to this lawsuit or reasonably calculated to lead to the discovery of admissible evidence.

3.      GE Capital objects to the Requests to the extent that they seek information that is proprietary, confidential, sensitive, or competitive in nature.

4.      GE Capital objects to the Requests to the extent that they seek information covered by the attorney-client privilege or work product doctrine, or any other privilege or immunity, including common or joint defense and/or joint interest privileges.

5.      GE Capital reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material or information produced.  The production of any material or information does not constitute an admission by GE Capital that such material or information is relevant to this action or admissible in evidence.

6.      GE Capital objects to the Requests to the extent that they seek information generally available to the public and/or in the public domain.

7.      GE Capital objects to the Requests to the extent that they purport to require GE Capital to seek documents in the possession of third parties.

8.      GE Capital objects to the Requests to the extent that they are redundant and/or duplicative.

9.      GE Capital objects to the Requests to the extent that they contain vague and undefined terms.

10.      GE Capital objects to Koch Foods's definition of "document" to the extent that it is broader than the definition of "document" contained in the Federal Rules of Civil Procedure.

11.      GE Capital objects to the Requests to the extent that the Requests seek admissions that GE Capital has not yet been able to ascertain.

12.     GE Capital objects to the Requests to the extent that they seek admissions regarding wholly irrelevant matters.

13.     GE Capital objects to the Requests to the extent that they relate to written documents which speak for themselves.

14.     GE Capital objects to the Requests to the extent that they ask for the creation of documents. GE Capital will only produce documents that currently exist.

15.     GE Capital continues to investigate these issues and all responsive and relevant documents may have not yet been discovered. GE Capital, therefore, reserves the right to amend and/or supplement its responses.

## ANSWERS TO INTERROGATORIES

1.     Identify with particularity the indemnities and/or releases which you claim Koch Foods demanded when Koch Foods offered to surrender the Equipment. Identify any person on whom such demands were made and any person who was making such demands.

**Answer to Interrogatory 1:**

In response to Interrogatory No. 1, GE Capital answers that there were multiple conversations between Koch Foods and GE Capital regarding GE Capital's efforts to regain possession of the equipment that is the subject of this litigation (the "Equipment"). Pursuant to telephone conversations that occurred between Eugene Geekie, on behalf of Koch Foods, and Alexander Terras, on behalf of GE Capital, and which took place on or about February 12, 2007, Koch Foods's position was that the Equipment would not be returned without a mutual release. Koch Foods confirmed this position in an email from Eugene Geekie to Alexander Terras on February 14, 2007. GE Capital continues to investigate this issue, and reserves the right to supplement this response.

2.     Describe with particularity all the details of the transaction in which GE Capital sold the Ossid equipment at the Plant in 2006.

**Answer to Interrogatory 2:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 2 on the basis that it us unduly burdensome to answer in the context of an interrogatory response, and is more properly answered as part of deposition testimony. Further answering, GE Capital states that William Perry and Joseph DiSalvo are the individuals at GE Capital with the

most information regarding the sale of the Ossid Equipment to Peco Foods, Inc. The Ossid equipment was sold on or about August 31, 2006 for $325,000 plus $9,750.00 in sales tax, and included two complete Ossid weigh pricing lines and conveyors. Documents related to the sale are being produced herewith and offer additional evidence of the terms and conditions of the sale. The information contained therein is incorporated into this response by reference.

3.      Identify with particularity all the components of the Ossid equipment at the Plant which you sold in 2006, all the considerations that you received in the sale, and all the costs you incurred for the sale, including marketing, commission, transportation, installation, and legal costs.

**Answer to Interrogatory 3:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 3 on the basis that it us unduly burdensome to answer in the context of an interrogatory response, and is more properly answered as part of deposition testimony or by reference to documents. Further answering, GE Capital states that William Perry and Joseph DiSalvo are the individuals at GE Capital with the most information on the sale of the Ossid Equipment to Peco Foods, Inc..

GE Capital asserts that the documents being produced herewith provide information responsive to Interrogatory No. 3, and are the best evidence of that information. As such, GE Capital incorporates the information contained in those documents by reference.

4.      Identify the total amount of payments in each year for the last five years that GE Capital and its subsidiaries have made to Mr. Robert Breakstone and his company, Equipment Exchange of America, Inc.

**Answer to Interrogatory 4:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 4 on the basis that providing a response to the same would be unduly burdensome. GE Capital does not maintain any centralized list of the occasions on which GE Capital has retained either the services of Mr. Breakstone or his company, Equipment Exchange of America, Inc., nor does it maintain a centralized record pertaining to the payments made to Mr. Breakstone or Equipment Exchange as a result of those appraisals. This information is not available to GE Capital without contacting each of the independent divisions of GE Capital, and expending an undue amount of effort and expense. Further answering, GE Capital states that individuals at Equipment Exchange of America are more likely to have more accessible records regarding the information contained in Interrogatory No. 4. Pursuant to conversations that GE Capital and/or its agents have had with Equipment Exchange, GE Capital understands and believes that it has retained the services of Equipment Exchange approximately 15 times in the past 5 years, and that payments provided to Equipment Exchange from GE Capital amount to a nominal portion (approximately 1-2%) of Equipment Exchange's yearly gross revenue.

5.      If you fail to unequivocally admit each request for admission in the Requests for Admission, state the factual and legal basis of your response (identified by the number of the Request for Admission which was not unequivocally admitted) and identify each and every person having knowledge relevant to that response.

**Answer to Interrogatory 5:**

GE Capital asserts, in relation to Requests Nos. 1 through 3 that Peco Foods, Inc., or one of its agents, was the entity responsible for picking up the Ossid equipment in relation to the sale of the same.

In response to Request No. 4, GE Capital believes, based on deposition testimony offered by David Bromley, that portions of the Ossid equipment was uncrated.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     Please produce all the documents and communications relating to the sale of the Ossid equipment at the Plant in 2006.

**Response to Request 1:**

With the exception of those documents subject to any applicable privilege, all documents in the possession of GE Capital that are responsive to Document Request No. 1 are either being produced herewith, or have already been produced to Koch in relation to prior discovery requests.

2.     Please produce the complete and current Curriculum Vitae of Mr. Robert Breakstone, including lists of particularized skills, experiences, training, and education relating to his qualification as an expert.

**Response to Request 2:**

GE Capital objects to Document Request No. 2 to the extent that it requires GE Capital to create or obtain any document not otherwise in its possession. Further answering, GE Capital states that all documents in the possession of GE Capital that are responsive to Document Request No. 2 have already been produced to Koch in relation to prior discovery requests.

3. Please produce all contracts for services, invoices, statements, time records, retainer agreements, and billing records for this case relating to Mr. Robert Breakstone's compensation for preparation, deposition and testimony.

**Response to Request 3:**

To the extent not otherwise privileged, all documents in the possession of GE Capital that are responsive to Document Request No. 3 have already been produced to Koch in relation to prior discovery requests.

4. Please produce all reports, statements and notes; and all diagrams, charts, or other demonstrative exhibits prepared by or at the direction of Mr. Robert Breakstone in connection with this case; please produce all notes, drafts, correspondence, memoranda, data and any other documents, photographs and videos made, taken, created, reviewed, received, requested or referred to by or under the direction of Mr. Robert Breakstone in connection with this case.

**Response to Request 4:**

To the extent not otherwise privileged, all documents in the possession of GE Capital that are responsive to Document Request No. 4 have already been produced to Koch in relation to prior discovery requests.

5.    Please produce a complete and current catalog of all articles and publications, presentations and lectures, awards and recognition Mr. Breakstone has authored, given, or received, in whole or in part

**Response to Request 5:**

All documents in the possession of GE Capital that are responsive to Document Request No. 5 have already been produced to Koch in relation to prior discovery requests.

6.    Please produce a complete and current catalog of all cases in which Mr. Breakstone has testified by deposition or at trial in the past five years; and any reports or appraisals Mr. Breakstone has prepared in anticipation of litigation in the past two years; and any reports or appraisals Mr. Breakstone has prepared for GE Capital in the last five years.

**Response to Request 6:**

GE Capital objects to Document Request No. 6 to the extent that it requires GE Capital to create or obtain any document not otherwise in its possession. In addition, GE Capital objects to Document Request No. 6 on the basis that, for the reasons stated in Interrogatory No. 4, it would be unduly burdensome to compile this information. Further answering, GE Capital states that, with the exception of those documents that would be covered by the foregoing objections, documents in the possession of GE Capital that are responsive to Document Request No. 6 have already been produced to Koch in relation to prior discovery requests.

## REQUESTS FOR ADMISSION

1.    Admit that Koch Foods cooperated when GE Capital removed the Ossid equipment from the Plant.

**Response to Request 1:**

GE Capital objects to Request No. 1 on the basis that the term "cooperated" is vague and ambiguous.  Further answering, GE Capital admits that Koch Foods permitted the Ossid equipment to be removed from the Plant.  To the extent not otherwise admitted by the foregoing, GE Capital denies the remaining allegations in Request No. 1.

2.      Admit that Koch Foods made the offer that GE Capital can enter the Plant and remove the Ossid equipment.

**Response to Request 2:**

GE Capital objects to Request No. 2 on the basis that the term "made the offer" is vague and ambiguous.  Further answering, GE Capital admits that Koch Foods permitted GE Capital, or a party acting on GE Capital's behalf, to enter the Plant and remove the Ossid equipment.  To the extent not otherwise admitted by the foregoing, GE Capital denies the remaining allegations in Request No. 2.

3.      Admit that Koch Foods voluntarily made the Ossid equipment available for GE Capital to transport the Ossid equipment from the Plant.

**Response to Request 3:**

GE Capital admits that that Koch Foods voluntarily made the Ossid equipment available to be transported from the Plant.  GE denies that it was the party that transported the Ossid equipment from the Plant.  To the extent not otherwise admitted by the foregoing, GE Capital denies the remaining allegations included in Request No. 3.

4.      Admit that the Ossid equipment was never uncrated at the Plant.

**Response to Request 4:**

GE Capital denies Request No. 4.

Exhibit 11

**Xu, Mike Z.**

| | |
|---|---|
| **From:** | Geekie Jr., Eugene J. |
| **Sent:** | Wednesday, April 18, 2007 7:25 AM |
| **To:** | 'aterras@reedsmith.com' |
| **Subject:** | GECC/Koch |

Alex:  This email will confirm my earlier voicemail to you this morning that Koch has declined GECC's demand that Koch purchase the equipment left behind at the former Sylvest site, as well as rental value for the nearly one-year period that the equipment has been at the site.  To say the least, Koch is disappointed that GECC has taken such a heavy-handed approach to a well respected company with a long history of successful credit transactions with GECC.  Your threats of lawsuit in our last conversation were the final straw in what Koch had previously hoped were negotiations that would lead to another mutually satisfactory transaction with GECC.

Please contact me to make arrangements for GECC to remove their equipment from Koch's facility.  As I mentioned in my voicemail, prior to the removal of the equipment, Koch will require proper assurance from GECC that it will repair any damage to Koch's facility caused by the equipment removal.

Gene

Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

8/15/2007

KOCH 00000017

**Xu, Mike Z.**

**From:**    Terras, Alexander [ATerras@ReedSmith.com]
**Sent:**    Monday, May 21, 2007 1:15 PM
**To:**      Geekie Jr., Eugene J.
**Subject:** RE: GECC/Koch

Our attempts to settle this matter have not been successful. Koch has converted the equipment. GE Capital will assert a cause of action for conversion against Koch. . Koch's return of the equipment, unconditionally, after Koch has used and operated the equipment without authorization for many, many months would, at best, be in mitigation of GE Capital's damages for a conversion which occurred a year ago, more or less. In order to mitigate its damages and for no other purpose, GE Capital is prepared to accept the equipment, sell it and apply the proceeds in reduction of its existing claim against Koch.

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Monday, May 14, 2007 7:16 AM
**To:** Terras, Alexander
**Subject:** FW: GECC/Koch

Alex: Can you please update me on GECC's intention with regard to the removal of its equipment? Thanks.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)



**From:** Geekie Jr., Eugene J.
**Sent:** Wednesday, May 02, 2007 8:03 AM
**To:** 'aterras@reedsmith.com'
**Subject:** GECC/Koch

Alex: Several weeks ago Koch rejected GECC's demand that Koch pay rent for the equipment GECC left at Koch's Montgomery, AL plant since June 2006. When Koch rejected GECC's demands, we requested that GECC make arrangements to remove its equipment, and we have traded several voicemails since that time.

Please inform me when GECC intends to remove its equipment. Thank you in advance for your anticipated cooperation.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower

8/15/2007

KOCH 00000018

Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

--------------------------------------------------------------

Tax Matters: To the extent this message or any attachment concerns

tax matters, it is not intended or written to be used, and cannot

be used by a taxpayer, for the purpose of avoiding penalties

that may be imposed on the taxpayer under law.

--------------------------------------------------------------

This message and any attachments may contain confidential

information protected by the attorney-client or other privilege.

If you believe that it has been sent to you in error,

please reply to the sender that you received the message in

error. Then delete it. Thank you.

--------------------------------------------------------------

NOT FOR PENALTY PROTECTION
Unless expressly stated otherwise above: (1) nothing contained in this message was intended or written to be used, can be used, nor may be relied upon or used, by any taxpayer for the purpose of avoiding penalties that may be imposed upon the taxpayer under the Internal Revenue Code of 1986, as amended; and (2) any written statement contained in this message relating to any Federal tax transaction or matter may not be used by any person to support the promotion or marketing of, or to recommend any Federal tax transaction(s) or matter(s) addressed in, this message.
IMPORTANT NOTICE:  This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me at (312) 207-1000 and permanently delete the original and any copy of any e-mail and any printout thereof.

Disclaimer Version RS.CHI.1.01.02

8/15/2007

KOCH 00000019