**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, | ) | |
| an Alabama limited liability company | ) | Case No. 07-cv-522-MHT |
| | ) | |
| Plaintiff and Counterclaim-defendant, | ) | |
| | ) | Honorable Myron H. Thompson |
| v. | ) | Honorable Terry F. Moorer |
| | ) | |
| GENERAL ELECTRIC CAPITAL | ) | |
| CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant and Counterclaim-plaintiff. | ) | |

**KOCH FOODS' BRIEF AND EVIDENTIARY MATERIALS
IN OPPOSITION TO GECC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff and Counterclaim Defendant, Koch Foods of Alabama, LLC ("Koch"), through its undersigned counsel, files its Brief and Evidentiary Materials in Opposition to the Motion for Summary Judgment as to All Claims and Counterclaims filed by General Electric Capital Corporation ("GECC").  In support its opposing Brief and Evidentiary Materials, Koch states as follows:

**I.    INTRODUCTION**

On May 15, 2007, Koch filed this action for declaratory judgment and for unjust enrichment in state court.  Koch's complaint, among other things, sought declaratory judgment that a spiral freezer (the "Freezer") and certain chicken deboning lines (the "Deboner," collectively with the Freezer, the "Equipment") are fixtures of a food processing facility purchased by Koch from the bankruptcy estate of Sylvest Farms, Inc. (Bankr., N.D. Ala., Case No. 06-40525).  GECC removed the action to this Court and asserted a counterclaim for conversion of the Deboner.

On December 7, GECC filed its Motion for Summary Judgment for All Claims and Counterclaims ("GECC's Motion)[1] and Koch filed its Motion for Summary Judgment with respect to Counter-Plaintiff's Counterclaim ("Koch's Motion").

This Court must grant Koch's Motion for summary judgment because there are no genuine issues as to the facts that GECC failed to demand the possession of the Deboner and that Koch never refused to surrender the Deboner and, therefore, cannot have converted the Deboner. If this Court denies Koch's Motion, it must also deny GECC's Motion because GECC failed to prove its demand for possession of and Koch's refusal to surrender the Deboner.[2]  Moreover, in light of GECC's admitted failure to demand surrender of the Deboner and/or that Koch cease using the Deboner, whether Koch's use of the Deboner amounts to a conversion is at a minimum a question for a jury.  Therefore, this Court should deny GECC's Motion in its entirety.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Sylvest Farms, Inc., a chicken processing company, had a record financial year for the fiscal year of 2005 (Ex. 1, Campbell Dep., at 44:1-3).  Sylvest was interested in acquiring a food processing facility that was owned by ConAgra Foods, which was located at 4530 Mobile Highway, Montgomery, Alabama (the "Facility"). (Ex. 1, Campbell Dep., at 40:16-18; Ex. 2, Facility Lease § 2.01, at KOCH 127).

---

[1]    Koch's complaint asserts four counts: Count I for Declaratory Judgment that the Freezer and the Deboner are fixtures, Count II for Declaratory Judgment that Koch does not owe GECC either for rent or for unjust enrichment, Count III for alternative declaratory judgment that GECC is liable for storage costs, and Count IV for unjust enrichment.  Although GECC's Motion is styled as "For All Claims,"  GECC appears to have not addressed Koch's Count II, III, and IV in its Motion.

[2]    Although GECC's Motion argued that Koch converted both the Freezer and the Deboner, GECC's initial pleading of the Counterclaim only alleges that Koch converted the Deboner.  GECC has no conversion claim regarding the Freezer and thus cannot obtain summary judgment for conversion of the Freezer.

2.     Sylvest negotiated with ConAgra for a third party, Hodges Bonded Warehouse, to buy the Facility and then do a capital lease to Sylvest. (Ex. 1, Campbell Dep., at 40:16-18, 41:1-9). In August 2005, Hodges Bonded Warehouse ("Hodges"), as the lessor, and Sylvest, as the lessee, entered into the lease (the "Facility Lease"). (Ex. 2, at KOCH 126).

3.     The Facility Lease was intended to be a triple net lease whereby Hodges would incur no cost or expense for taxes, insurance, maintenance, repairs, utilities or any other expense of ownership or operation of the Facility, and Sylvest would pay for all such expenses as though it were already the owner of the Facility. (Ex. 2, § 8.03). Moreover, the Facility Lease provided that upon termination of the Facility Lease, any improvements, alterations, modifications of the Facility would be treated as part of the Facility to be conveyed to Sylvest. (Ex. 2, § 3.02).

4.     Under the terms of the Facility Lease, Sylvest had the right to purchase the Facility at any time during the Facility Lease by prepaying all of the base rent as reflected on the amortization schedule. (Ex. 2, § 6.04). This purchase option effectively would convey the Facility to Sylvest for nothing at the end of the Facility Lease. (Ex. 2, at KOCH 156). Neither Hodges nor Sylvest could sell or encumber its interest in the Facility without written consent of the other. (Ex. 2, § 6.03).

5.     In late 2005, Sylvest contacted two or three leasing companies to finance its purchase of new poultry processing equipment that would be placed in the Facility and eventually selected GECC. (Ex. 1, Campbell Dep., at 45:11-25).

6.     In December 2005, GECC and Sylvest entered into an equipment lease for the Equipment, which was to be delivered and installed at the Facility (the " Equipment Lease"). (Ex. 3, Equipment Lease, at KOCH 921).

7.    In addition to the Deboner and the Freezer, the Equipment Lease also covered two Ossid shrink-wrap lines. (Ex. 3, at Koch 928 ¶ A). The monthly rent for all the equipment under the Equipment Lease was $35,483, which was the product of capitalized costs ($2,018,453.00) multiplied by the basic term lease rate factor (0.0175928) of the Equipment Lease. (Ex. 3, at KOCH 928 ¶ B).

8.    Section 19(b) of the Equipment Lease provides that the equipment would at all times remain personal property even though it might be attached to real property and would not become part of any other property by reason of any installation in, or attachment to, other real or personal property. (Ex. 3, § 19(b) at KOCH 925). However, this provision was boilerplate language on the GECC lease form, and the representatives of GECC and Sylvest never discussed or negotiated any substance contained in this provision during their negotiation of the Equipment Lease. (Ex. 1, Campbell Dep., at 54:17-23, 55:1-15; Ex. 4, Perry Dep., at 62:22-25,63:1-3).

9.    The Deboner was installed at the Facility and began operation in late 2005 or early 2006. (Ex 5, Bromley Dep., at 42:14-18). It occupied an indoor space at the Facility in the approximate size of six thousand square feet. (Ex. 6, Bromley Affidavit, ¶ 2). The Deboner was integrated into the plant with air, water, and electrical pipes. (Ex. 5, Bromley Dep., at 49:8-15). In order to remove the Deboner, someone had to unweld various parts, cut some parts apart, and unbolt some parts from the floor, which would cause damages to the floor. (Ex. 5, Bromley Dep., at 49:15-23, 50:1-7).

10.    The Freezer is about 16.5 foot tall, 15 foot wide, and 28 foot long. (Ex. 7, Leonard Dep., at 16:2-6). Mr. Mike Leonard purchased the Freezer for $25,000 and refurbished it in Arkansas before he sold it to Sylvest. (Ex.7, at 7:1-13). The de-installation of the Freezer from its old site cost about $75,000 and the transportation of the Freezer had to use four flatbed

trucks and cost between $7,000 and $8,000. (Ex. 7, at 10:4-17). Every time the Freezer is installed at new location, it requires a new enclosure that costs between $37,000 and $50,000. (Ex. 7, at 12:3-25, 13:1-7).

11.    The Freezer was installed on a special concrete pad at the Facility. (Ex. 7 at 15:2-6). The installers of the Freezer took stainless steel and weld sheets all the way around the inside of the unit with three feet up the walls and, then, applied an extreme amount of adhesive to glue the walls and enclosures together. (Ex. 7 at 14:1-16). The installation would cost about $100,000. (Ex. 7, 11:10-12). The installation of the Freezer was never completed. (Ex. 5, at 40:14-17). However, to remove the Freezer as it is, someone would have to cut out an large section of the Facility's walls. (Ex. 5 at 55:19-23,56:1-22).

12.    It was Sylvest's intent to install the Equipment in a "hostile environment" – i.e., make it difficult and costly for GECC to remove the Equipment – so that, at the end of the Equipment Lease, Sylvest could negotiate an extremely favorable price to purchase the Equipment. (Ex. 1, Campbell Dep., at 57:1-8, 58:1-8).

13.    The Deboner, the Freezer, and the Ossid lines were intended to be integral parts of the Facility's poultry processing operations. (Ex. 5, Bromley Dep. at 35:8-18). Chickens would be processed in the Deboner, frozen in the Freezer, and then packaged and weighed in the Ossid lines. (Ex. 5, Bromley Dep. at 35:8-18).

14.    After the signing of the Equipment Lease, GECC failed to do a fixture filing for the Equipment even though such a filing would be advisable in case a dispute arises with the landlord, and GECC had a policy requiring fixture filings for leased equipment. (Ex. 8, Sutehall Dep., at 48:2-14, 49:2-4). Importantly, no representative of GECC inspected the Equipment to determine if it might potentially be a fixture, although it was also a standard practice to inspect

GECC leased equipment. (Ex. 8, Sutehall Dep., at 12:20-25, 13:1-4; Ex. 4, Perry Dep., at 70:16-24.) Moreover, GECC failed to obtain a landlord waiver with respect to the Equipment despite the fact that it was a common GECC practice to do so, since such waiver would help GECC if a dispute arose over whether the Equipment was a fixture. (Ex. 8, Sutehall Dep., at 54:17-25,55:1-2).

15.    On April 18, 2006, Sylvest filed for bankruptcy in the Northern District of Alabama. (Ex. 9, GECC Answer and Counterclaim, at 6 ¶ 5). Pursuant to an order entered by the Bankruptcy Court on May 26, 2006, approving the Amended Asset Purchase Agreement between Koch and Sylvest, Koch purchased substantially all of the assets of Sylvest, including the Facility (after Sylvest had exercised its purchase option) where all the equipment under the Equipment Lease was located. (Ex. 9 at 6 ¶ 6, 7 ¶ 7). Koch, however, did not assume the GECC Lease. (Ex. 9, at 7 ¶ 8).

16.    On June 1, 2006, GECC asked Koch about its plans with respect to the Facility and the equipment under the Equipment Lease, but did not demand possession of the Equipment. (Ex. 10, E-mail from Pille to Geekie, at GE 589).

17.    To this date, GECC has never demanded that Koch surrender possession of the Deboner. (Ex. 11, Kaminsky Affidavit, ¶ 2; Ex. 12, GECC's 1st Discovery Responses, at p. 7 Interrogatory 4; Ex. 13, Wilson Dep., at 24:8-10). Koch was willing to surrender the Deboner whenever GECC came to pick it up, subject to GECC agreeing to repair any damages to the Facility caused by removal. (Ex. 11, Kaminsky Affidavit, ¶ 3; Ex. 14, Emails between Geekie and Terras, at Koch 018).

18.    When GECC sold the Ossid lines to Peco Foods on or about August 31, 2006, Koch voluntarily surrendered the Ossid lines to GECC, after requested by GECC, so GECC

could deliver them to Peco.  (Ex. 15, GECC's 3rd Discovery Responses, at p. 4 Interrogatory 2, and at p. 7 Request for Admission No. 3; Ex. 1, Campbell Dep., at 33:4-12).  Unlike the Deboner and the Freezer, however, the Ossid lines were never installed.  (Ex. 1, Campbell Dep., at 34:6-16; Ex. 5, Bromley Dep., at 35:19-23, 36:1-7).

19.     After Koch's acquisition of Sylvest's Facility, Koch continued to use the Deboner to process chickens.  (Ex. 5, Bromley Dep., at 43:3-8).  The Deboner and the Freezer involves a large amount of installation cost and other soft costs and, when removed, would decline significantly in value.  (Ex. 16, DiSalvo Dep., at 58:10-17, 62:13-23).  By leaving the Deboner and the Freezer behind in Koch's Facility, GECC gained financial benefit.  (Ex. 16, at 64:1-7).  In fact, the cost to remove the Freezer would exceed its value.  (Ex. 16, at 66:8-11).  Koch kept up with the maintenance of the Deboner. (Ex. 5, at 59:1-3).  Koch's use and maintenance of the Deboner maintained the value of the Deboner and prevented its value from declining. (Ex. 16, DiSalvo Dep., at 34:24-25; 35:1-9).

20.     GECC learned of Koch's use of the Deboner almost immediately after Koch's acquisition of the Facility.  (Ex. 13, Wilson Dep., at 25:2-7).  Yet, GECC never made one single demand that Koch stop using the Deboner or that Koch surrender the Deboner.  (Ex. 12, GECC's 1st Discovery Responses, at p. 7 Interrogatory 4, and at p. 14 Interrogatory 20; Ex. 11, Kaminsky Affidavit, ¶ 2; Ex. 8, Sutehall Dep. at 66:2-4; Ex. 4, Perry Dep. at 96:10-20).  To this day GECC had not demanded that Koch stop using the Deboner; in early 2007, however, Koch stopped using the Deboner when it purchased its own, customized, deboning Equipment.  (Ex. 17, Kaminsky Dep. at 90:11-13; 120:11-15).

21.     In January 2007, GECC made its only demand to Koch -- that Koch pay GECC "Overdue Rent" under the Lease in the amount of $237,493.99 for the seven-month period from

June 7, 2006 to January 3, 2007. (Ex. 18, Pille Letter, at Koch 003). This amount is approximately seven times the <u>full</u> monthly basic rent ($35,483) for <u>all</u> of the equipment under the Equipment Lease (Ex. 3, Equipment Lease, at Koch 928) -- even though the spiral Freezer was never used by Koch, and the unused Ossid equipment had already been returned by Koch and sold by GECC to Peco Foods several months before. (Ex. 5, Bromley Dep., at 40:14-17; Ex. 15, GECC's 3rd Discovery Responses, at p. 4 Interrogatory 2, and at p. 7 Request for Admission No. 3). GECC now admits that its only demand on Koch should not have been for the Freezer or the Ossid lines and was thus for a mistaken account; but cannot determine to this day what the correct rental amount would have been for Koch's seven month use of the Deboner. (Ex. 13, Wilson Dep. 44:16-22; 46:3-20).

22.    The letter from GECC's counsel further demanded that Koch abide by the terms of the Lease on a going forward basis and threatened to sue Koch for conversion if Koch did not meet GECC's now admittedly demands to pay the <u>full</u> lease amounts. (Ex. 18, Pille Letter, at Koch 003). Notably, nowhere did GECC's counsel demand in her letter return of the Deboner (or the Freezer, which GECC knew was unused and had apparently decided to abandon) or demand that Koch cease using the Deboner. (Ex. 18, Pille Letter, at KOCH 002-003).

23.    In contrast, in order to settle this matter without needless and frivolous litigation, Koch unequivocally demanded and continued to demand that GECC remove the Deboner and the Freezer, subject only to the condition that GECC would reimburse Koch for any damages to the Facility caused by the removal of the Equipment. (Ex. 14, Emails between Geekie and Terras, at Koch 017-018). GECC never responded to Koch's demand that GECC remove the Equipment, and instead sued Koch for conversion. (Ex. 11, Kaminsky Aff. ¶ 4; Ex. 14, Emails between Geekie and Terras, at Koch 018).

24.    To protect its interest, Koch replaced the Deboner with a new deboning line that was designed specifically for Koch's processing operations. (Ex. 17, Kaminsky Dep., at 90:11-13; 120:11-15).  As an indication of the extensive integration of the Deboner into the Facility, it took a team of workers from Koch two full weekends to de-install the Deboner, which was then placed in a neat and orderly way in the yard of the Facility, along with those uninstalled parts of the Deboner. (Ex. 5, Bromley Dep. at 38:1-7, 50:9-10; Ex. 6, Bromley Affidavit ¶ 3).  Exposures in the yard did not damage or reduce the value of the Deboner because it was designed for the wet environment found in a chicken processing plant.  (Ex 5, Bromley Dep. at 53:3-9).  In fact, Koch's use of the Deboner for approximately seven months helped maintain the value of the Deboner.  (Ex. 16, DiSalvo Dep., at 34:24-25; 35:1-9)

25.    Mr. Robert Breakstone, an expert retained by GECC, appraised the Equipment on May 16, 2006. (Ex. 19, Breakstone May 2006 Report, at p. 1).  The following table shows Mr. Breakstone's May 2006 valuations, including Costs as Shown by Invoices, Fair Market Value - Remove, and Fair Orderly Liquidation Value (Ex. 19, at pp. 13-17):

| Equipment | Cost as Shown on Invoices | Fair Market Value- Remove | Orderly Liquidation Value |
|---|---|---|---|
| Freezer | $430,000.00 | $280,000 | $190,000 |
| Deboner | $810,672.50 | $378,500 | $160,600 |
| Total | $1,240,672.50 | $658,000 | $350,600 |

26.    Mr. Breakstone appraised the Equipment in September 2007 again after this litigation was commenced.  (Ex. 20, Breakstone September 2007 Report, at p. 1).  In addition to Fair Market – Remove and Orderly Liquidation Value, Mr. Breakstone's report gave another valuation: Fair Market Value – In Place as of Day One Year One, which means the Fair Market Value In Place as of "the actual installation and operational date in Spring 2006." (Ex. 20, at p. 2).  These valuations are shown in the following table (Ex. 20, at pp. 12-25).

| Equipment | Fair Market Value – In Place as of Day 1 Year 1 | Fair Market Value- Remove | Orderly Liquidation Value |
|-----------|-----------|-----------|-----------|
| Freezer | $473,000 | $240,000 | $150,000 |
| Deboner | $925,068 | $218,580 | $110,400 |
| Total | $1,398,068 | $458.580 | $260,400 |

27.    Mr. David Dalfonso, the expert retained by Koch, appraised the Equipment in October 2007 (Ex. 21, Dalfonso Report, at p. 1).  His valuations are listed in the following table. (Ex. 21, at pp. 13-21).

| Equipment | Fair Market Value – In Place as of Day 1 Year 1 | Fair Market Value- Remove | Orderly Liquidation Value |
|-----------|-----------|-----------|-----------|
| Freezer | $225,000 | $100,000 | $75,000 |
| Deboner | $225,068 | $200,000 | $100,000 |
| Total | $450,000 | $300.000 | $175,000 |

28.    In addition, Mr. Wayne Jones, a Koch vice president who has been employed in the poultry business for approximately 30 years, expressed an opinion that the Deboner's value was about 25 to 35 cents on the dollar of the capital cost of the Deboner.  (Ex. 22, Jones Dep., at 12-18, 38:7-12).   This means that the value of the Deboner in early 2006 was between approximately $202,000 and $283,735, based on the original capitalized cost of $810,672.50. (Ex. 3, Equipment Lease, KOCH 928).

29.    Mr. Michael Leonard, who has 15 years of experience in the food freezing equipment business, and who sold and installed the Freezer at the Facility, originally paid $25,000 for the Freezer before he refurbished it and installed it at the Facility in late 2005.  (Ex. 7, Leonard Dep., at 5:8-25, 6:1-2, 7:1-11).   GECC, recognizing the rapid decrease in the Equipment values at the time of Sylvest's bankruptcy, agreed to sell the Freezer to Mr. Leonard for $50,000.00 in May 2007, even cashing Mr. Leonard's $5,000 deposit check.  (Ex. 7, at 20:19-25, 21:1-2).  The price of $50,000 was the true fair market value of the Freezer.  (Ex. 7, Leonard Dep., at 21:1-12).  After Koch's attorneys pointed out to GECC's attorneys that there was a huge

difference between Mr. Breakstone's appraisal of the Freezer and the $50,000 sale price, GECC canceled the sale to Mr. Leonard and refunded his $5,000 deposit. (Ex. 23, E-mails between Geekie and Harris, Ex. 7, Leonard Dep., 19:2-22).

30.     In fact, in October, 2006, GECC wrote down the combined value of the Freezer and the Deboner to $658,500, which GECC acknowledges was the total value of the Equipment as of October 2006 – not the $1,400,000 that GECC now apparently claims Koch owes. (Ex. 24, Electronic Customer Folder, GE 722; Ex. 13, Wilson Dep., at 53:23-25, 54:18-19).  GECC had received the four months of lease payments from Sylvest before its write-off.  (Ex. 24, Electronic Customer Folder, GEC 722).

## III.    ARGUMENT

### A.    Standard of summary judgment.

This Court must deny summary judgment if a genuine issue of material fact is present. Fed. R. Civ. P. 56(c).  In determining whether genuine issues of material fact exist, this Court must resolve all ambiguities and draw all reasonable inferences in favor of Koch.  *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 840 (11th Cir.2000).  This Court may not "weigh evidence to resolve a factual dispute" in granting a summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

### B.    GECC's Motion should be denied regarding its Conversion claim because, in fact, Koch's motion for summary judgment should be granted.

With respect to GECC's Counterclaim, Koch is entitled to judgment as matter of law because Koch rightfully acquired the possession of the Deboner and GECC never demanded the possession of and Koch never refused to surrender the Deboner.  (Statement of Undisputed Material Facts or S.U.M.F. ¶¶ 15, 17).

Where the defendant rightfully acquires possession of the property and has not exercised dominion and control over it in defiance of the plaintiff's right to possession, a demand and refusal to deliver the property are necessary before a conversion action can proceed. *Citizens Bank Enterprise v. Coffee County Bank*, 431 So.2d 1203, 1207 (Ala. 1983) (citations omitted). Here, Koch rightfully acquired possession of the Deboner through its acquisition of Sylvest. (S.U.M.F ¶ 15). It did not exercise dominion and control in defiance of GECC's right to possession because Koch always stood ready to allow GECC to pick up the Deboner. (S.U.M.F ¶ 17). Finally, except for a letter demanding exorbitant rents and attempting to coerce Koch into the Equipment Lease, GECC never demanded possession of the Deboner and Koch never refused to surrender the Deboner. (S.U.M.F ¶¶ 17, 21, 22). Because no genuine issues exist as to the above facts that GECC failed to demand the Deboner, GECCC's conversion claim cannot lie and Koch is, therefore, entitled to summary judgment.[3]

**C.     If this Court denies Koch's summary judgment motion, this Court should deny GECC's motion because factual issues exist as to whether Koch's use constitutes a conversion.**

Even if this Court found that Koch is not entitled to summary judgment on GECC's conversion claim, a jury should decide whether Koch's use of the Deboner amounts to a conversion because genuine issues exist as to material facts that constitute elements of a conversion claim. In other words, even without considering GECC's failure to prove demand and refusal, genuine issues are still present as to material facts that would prove GECC's conversion claim.

1.     Koch did not assert ownership illegally and Koch removed the Deboner to protect its interest and did not interfere with any of GECC's rights.

_____

[3]  And recall that Koch is, at a minimum, entitled to summary judgment as to the claimed conversion of the Freezer, since GECC has never alleged in its Counterclaim that Koch converted the Freezer.

In addition to alleging that Koch's use of the Deboner constituted a conversion, GECC's Motion also asserted two red herrings. GECC argued that Koch's assertion of ownership and Koch's removal of the Deboner from the indoor space are part of its acts constituting the conversion. Although an illegal assertion of ownership may constitute a conversion, a mere assertion of ownership that in no way injures the owner of the property is not regarded as constituting a conversion. *Desbien v. Penokee Farmers Union Co-op. Ass'n*, 552 P.2d 917 (Kan. 1976); *Union State Bank v. Woell*, 434 N.W.2d 712 (N.D. 1989). Koch never claimed any ownership of the Deboner before this lawsuit was filed. Koch's assertion of ownership in no way injured or interfered with GECC's asserted rights because, from the beginning to this date, GECC is free to pick up the Deboner at any time. (S.U.M.F ¶ 17).

Despite Koch's repeated demand, GECC refused to remove the Deboner from GECC's Facility. (S.U.M.F ¶ 23). The Deboner occupied a large indoor space. (S.U.M.F ¶ 9). To protect and continue its business, Koch had to make a decision to replace the Deboner. (S.U.M.F ¶ 24). Koch removed the Deboner and placed it in a neat and orderly way in the Facility's yard along with those uninstalled parts of the Deboner. (S.U.M.F ¶ 24).[4] Furthermore, the exposures outside did not damage or reduce the value of the Deboner. (S.U.M.F ¶ 24). Moreover, GECC has cited no case law that a landowner's careful removal and storeage of another person's property constitutes conversion.

Because uncontested facts showed that Koch's assertion of ownership is not illegal and Koch's removal did not interfere with GECC's asserted rights, if any, the acts of Koch did not constitute a conversion, nor do they in any way prove GECC's conversion claim.

---

[4] GECC's description of the removal in its Motion using inflammatory words like "toss" and "junk" is not supported by any evidence, and is actually a misrepresentation to this Court, as GECC is prone to do. (S.U.M.F. ¶ 24).

2.    <u>The jury should decide whether Koch's use was a conversion, whether GECC consented to such use, and whether GECC waived any claim and/or is estopped from raising the conversion claim.</u>

The overarching principle regarding conversion is that a jury decides whether an interference with the plaintiff's property rights, being an assertion of ownership, illegal use, or disposition of the property, are serious enough to constitute conversion. *See Citizens Bank Enterprise v. Coffee County Bank*, 431 So.2d 1203, 1207 (Ala. 1983); *Cotton v. Harris Transfer & Warehouse Co*., 106 So. 220, 222 (Ala. App. 1925). Here, even without considering GECC's failure to prove demand and refusal, whether Koch's use constituted a conversion depends upon many facts and circumstances, which must be weighed by a jury.

Conversion may arise from illegal use or misuse of the property. *Ott v. Fox*, 362 So.2d 836, 839 (Ala. 1978). No Alabama cases seem to have addressed the issue of to what extent the defendant's use of the property is serious enough to constitute an illegal use. However, *The Second Restatement of Torts* stated the law as follows: use of a chattel amounts to a conversion only if it so seriously interferes with the right of the plaintiff to control the chattel as to make it just to require the user to pay the property's full value; a temporary use which does not damage the chattel or inconvenience of the owner and is not intended as a defiance of the owner's rights, may not be enough for conversion. *Restatement (Second) of Torts* § 227 cmt. b. (1965). No fixed rules can be stated and each case depends on its facts and circumstances in determining to what extent the use is serious enough to constitute a conversion. *Id.*

Moreover, one is not liable for conversion to the extent that the owner has effectively consented to the interference with the owner's rights. *Id.* § 252. Upon the termination of consent to the use of a chattel in possession of the defendant, the defendant is privileged to continue such use so long as it is reasonably necessary to effect his discontinuance of his use of the chattel. *Id*. § 255. Finally, principles of waiver and estoppel prevent plaintiff from holding

defendant liable for conversion when the plaintiff waives his right to treat the defendant's act as wrongful. *See Zimern v. Southern Ry.* Co., 96 So. 226, 227; 209 Ala. 284 (1924).

Based on the above law regarding the circumstances under which use of a chattel will give rise to a conversion claim, many genuine issues exist as to GECC's counterclaim and these issues are questions for a jury. First, Koch used the Equipment as a continuation of the Facility after its acquisition of Sylvest. (S.U.M.F ¶ 19). Even assuming that GECC's consent to the use of the Deboner was terminated at the time of Koch's Sylvest acquisition, Koch was privileged to continue the use of the Deboner as it was reasonably necessary to effect its discontinuance of the use of the Equipment. *Restatement (Second) of Torts* § 252.

Second, Koch's use did not seriously interfere with GECC's right to control the Deboner nor it was in defiance of GECC's rights. GECC was free to pick up the Equipment and Koch was willing to surrender the Deboner at any time. (S.U.M.F ¶ 15). For example, Koch voluntarily surrendered the Ossid equipment when GECC found a buyer. (S.U.M.F. ¶ 18). Furthermore, given the large sizes of the Deboner and the Freezer and the prohibitive costs of de-installing and transporting of the Equipment, GECC did not want immediate possession after Sylvest's rejection of the Equipment Lease. (S.U.M.F.¶¶ 9,10). By maintaining the Deboner's *status quo*, GECC gained financial benefits because GECC had a place to keep the Deboner, while GECC could re-market the Equipment. (S.U.M.F. ¶ 19). Moreover, Koch's use and maintenance of the Deboner prevented the value of the Deboner from declining. (S.U.M.F. ¶ 19). In other words, maintaining the Deboner's *status quo* was in accordance with, not against, GECC's wishes.

Finally, GECC did not demand that Koch stop using the Deboner or that Koch surrender the possession, even though it knew of Koch's use almost immediately after Koch purchased the

Facility. (S.U.M.F. ¶¶ 17, 20). Rather, GECC demanded the exorbitant rent and attempted to coerce Koch to assume the Equipment Lease. (S.U.M.F. ¶¶ 21-22). GECC's failure to demand that Koch stop using the Deboner constituted consent to Koch's use, or a waiver or estoppel. Furthermore, GECC's demand of rent under the Equipment Lease ratified that Koch's use was not a conversion.

Based on the above facts and the law governing conversion, genuine issues of material facts, even without considering GECC's acknowledged failure to make demand for possession, exist as to GECC's proof of its conversion claim. Therefore, this Court should deny GECC's Motion as to the Counterclaim even if it does not grant Koch's Motion.

3.    <u>GECC's conversion claim is unfair and specious and this Court must grant summary judgment in Koch's favor</u>.

Furthermore, GECC's conversion claim is unfair and inequitable. GECC knew of Koch's use from the very beginning but did not demand either that Koch surrender possession or stop using the Deboner. As discussed above, GECC enjoyed the financial benefits when the Deboner remained *status quo*.[5]

GECC cannot argue both ways regarding the Deboner when GECC never demanded possession or came to the Facility to pick up the Deboner. (S.U.M.F. ¶ 17). On one hand, when Koch used the Deboner because the Deboner occupied a large amount indoor space, and Koch could not stop its operations at the Facility while it waited for GECC to pick up the Deboner, GECC argued that Koch converted the Deboner. On the other hand, when Koch finally replaced the Deboner with its own Deboner, GECC again argued that Koch converted the Deboner by moving it to the yard. According to GECC's nonsensical arguments, GECC, by not picking up

---

[5]    As to the Freezer, costs of removing and transporting it would exceed its value. (S.U.M.F. 19). GECC did not demand possession of the Freezer, nor did it sue Koch for conversion of the Freezer. Therefore, GECC has abandoned the Freezer.

the Deboner, would inevitably have a conversion claim against Koch, no matter what Koch had done. Even GECC's renowned reputation is surpassed by GECC's arguments here; in short, GECC can abandon its equipment and do nothing, and the owner of a facility where GECC leases its equipment is liable for conversion no matter what it does. Therefore, GECC's conversion claim is specious and must fail. Koch's Motion for summary judgment must be granted.

### D.     GECC cannot prove any damages because the appraisal by GECC's expert is unreliable and highly inflated.

Even if GECC can win a summary judgment as to the conversion claim, GECC's damages claim is extremely inflated.[6] The damages of GECC's alleged conversion claim should be, at most, measured by the seven months Koch used the Deboner calculated against the "Fair Market Value – Remove" of the Deboner, the consensus of which is $200,000 based on the proximity of the valuations conducted by Breakstone, Dalfonso, and Wayne Jones. (S.U.M.F. 26, 27, 28). Based on the 5 year term of the Equipment Lease, this amount is approximately $2,333.33. The "Fair Market Value – In Place as of Day One Year One," which GECC argued in its Motion is the measure of GECC's damages, is unreliable and meaningless.

The "Fair Market Value – In Place as Day One Year One" is meaningless and unreliable for several reasons. First, contrary to GECC's claim that Breakstone conducted his appraisals of the Equipment at the time of the alleged conversion, Mr. Breakstone had no knowledge about the in-place value as of "Day One Year One." The conversion allegedly occurred after Koch's

---

[6] GECC alleged in its Answer and Counterclaim that its damages were $846,545 (Ex. 9, p. 9 ¶ 19), the capital costs of the Deboner, but GECC argued in its Motion that its damages were $1,398,068, Breakstone's valuation of the "Fair Market Value – In Place as of Day One Year One." In addition, GECC did not disclose to the Court or Koch that it had filed a claim against the Sylvest bankruptcy estate in the amount of $2,028,989.32 arising from Sylvest's rejection of the Equipment Lease.

acquisition of Sylvest, which was at the end of May and beginning of the June 2006. (S.U.M.F. ¶¶ 15, 19). Breakstone conducted his appraisal on May 16, 2006. (S.U.M.F. ¶ 25). Furthermore, Breakstone's "Fair Market Value – In Place as of Day One Year One" was meant to be the Fair Market Value -- In Place as of "the actual installation and operational date in Spring 2006." (S.U.M.F. ¶ 26). The Deboner actually began operation in January 2006 and the Freezer (which GECC has not brought a conversion for) was never completely installed, let alone operational. (S.U.M.F. ¶¶ 9, 11). As a result, Breakstone's "Fair Market Value – In Place as of Day One Year One" is unreliable and meaningless.

Second, Breakstone valued the Deboner's "Fair Market Value – In Place as of Day One Year One" at $925,068. (S.U.M.F. ¶ 26). This value is about $115,000 more than the Deboner's capital costs, $810,672.50, which presumably also included the installation costs out of GECC's pocket. (S.U.M.F. ¶¶ 25, 26). This valuation means, by putting the Deboner into Koch's Facility, the Deboner had been appreciating rather than depreciating over time. In other words, simply by putting the Deboner into Koch's Facility, GECC can make a profit of $115,000 plus $141,932 (which is the rents paid by Sylvest over four months at $35,483 per month. *See* S.U.M.F. ¶ 30) or about 30% of the Deboner's capital costs in a matter of four months. (S.U.M.F. ¶¶ 7, 25, 26, 30).

Third, the damages of alleged conversion should be based on "Fair Market Value – Remove" rather than "Fair Market Value – In Place." Koch used the Deboner, but the Deboner has no in-place value for Koch because the Deboner was not exactly what Koch wanted and Koch had to replace the Deboner with customized deboning lines to fit its integrated process. (S.U.M.F. ¶ 24). Even GECC itself in its write-off has admitted that the value of the Equipment as of October 2006 was the "Fair Market Value – Removed." (S.U.M.F. ¶ 30) The valuations of

18

Breakstone, Dalfonso and Wayne Jones using the Fair Market Value – Remove approach are close, Breakstone's valuation being $218,580, Dalfonso being $200,000, and Wayne Jones' being $202,000.  (S.U.M.F. ¶¶ 26, 27, 28)

Even if the "Fair Market Value – In Place" is used to measure damages, Dalfonso's valuation of $225,00 is the reasonable one.  Because the consensus of the "Fair Market Value – Remove" is about $200,000 and the reasonable installation costs are about $25,000. (S.U.M.F. ¶¶ 26, 27, 28).  In addition, the value of the Deboner will not change dramatically over a period of one year, even if it was exposed to elements. (S.U.M.F. ¶ 24)  In fact, GECC admitted that Koch's use of the Deboner helped maintain its value by preventing it from becoming rusty and inoperational.  (S.U.M.F. ¶ 24).

In addition to the fact that the "Fair Market Value – In Place" is meaningless and unreliable to measure the damages, Mr. Breakstone's valuations are highly inflated.  Mr. Breakstone valued the Fair Market Value of the Freezer at $240,000 as of September 2007 and $280,000 as of May 2006.  (S.U.M.F. ¶¶ 25, 26)  However, GECC's was willing to sell the Freezer for $50,000, which is the true fair market value for the Freezer.  (S.U.M.F. ¶ 29).  GECC only canceled the sale and refunded the deposit after counsel for Koch pointed out the huge difference between Breakstone's the appraisal and the sale price.  (S.U.M.F. ¶ 29).  Accordingly, Mr. Breakstone's valuation is highly inflated because it is five times the true value of the Freezer.

As for the Deboner, Mr. Breakstone's appraisal as of September 2007 is approximately the same as Mr. Dalfonso's October 2007 appraisal and Mr. Jones's testimony that it was worth 25 cents to 35 cents on the dollar with the dollar referring to the purchase price.  (S.U.M.F. ¶¶ 26, 27, 28).  However, according to Mr. Breakstone's appraisal, while the value of the Freezer

only slightly decreased from May 2006 to September 2007, the value of the Deboner has decreased by more than a half.  (S.U.M.F. ¶¶ 25, 26)  Mr. Breakstone did not explain the inconsistent decreases in value from May 2006 to September 2007 with respect to the Deboner and the Freezer.  On the other hand, Mr. Bromley explained that the exposures of the Deboner outside in the yard would not damage it or decrease its value because it was designed for wet environment.  (S.U.M.F. ¶ 24).  Therefore, Mr. Breakstone's valuations are unreasonable and unreliable.

In sum, in the extremely unlikely event that this Court grants summary judgment for GECC on its conversion claim, the "Fair Market Value – In Place as of Day One Year One" should not be used to calculate GECC's damages for the alleged conversion because such method is unreliable and meaningless.  Contrary to GECC's contention that Mr. Breakstone's appraisals are uncontested and proven, his appraisals are both unreliable and highly inflated.

E.    **GECC is not entitled to punitive damages**

Courts may award punitive damages only if the plaintiff can prove by clear and convincing evidence that "the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala. Code § 6-11-20(b) (1975).  In an action for conversion, punitive damages are awarded only if the plaintiff by clear and convincing evidence proves that the defendant converted the property "in known violation of law and of owner's rights, with circumstances of insult, or contumely, or malice." *Morgan Keegan & Co., Inc. v. Cunningham*, 918 So.2d 897, 902 (Ala. 2005) (citations omitted).

GECC never demanded possession of the Deboner and Koch has always been ready to surrender the Deboner.  (S.U.M.F. ¶ 17).  Koch used the Deboner as part of its continuous operation after the acquisition of Sylvest.  Koch's use and maintenance was beneficial to GECC and was in no way in violation of GECC's rights.  (S.U.M.F. ¶19).  GECC could have picked up

the Deboner at any moment and avoided this lawsuit.  (S.U.M.F. ¶ 17).  Instead, GECC attempted to extort exorbitant "Overdue Rent" and coerce Koch into the obligations under the Equipment Lease.  (S.U.M.F. ¶ 21,22).  When that attempt failed, GECC brought this conversion claim arguing that the damages of its claim are actually more than its capital costs of the Deboner.

Because Koch never engaged in oppression, fraud, wanton, or malice with regard to GECC and GECC was actually benefited from Koch's use and maintenance of the Deboner, GECC's is not entitled to punitive damages.

**F**.    **Genuine issues exist as to the intent of the parties attaching the Equipment to the Facility.**

The common law general rule of fixtures posits that everything annexed to the real property is treated as a part of it.  *LaFarge Building Materials, Inc. v. Stribling*, 880 So.2d 415, 419 (Ala. 2003).  No precise rule can be given in all cases in determining whether any given property is a chattel or a fixture, which depends upon the relationship of the parties and, most importantly,  the intention of the parties as shown or inferred.  *Walker v. Tillis*, 66 So. 54, 57 (1914).  In essence, whether an article is a chattel or a fixture is a mixed question of fact and law. *Milford v. Tennessee River Pulp & Paper Co*., 355 So.2d 687, 690 (Ala.1978).

1.    <u>GECC cannot rely on the trade-fixture exception because GECC is neither a landlord nor a tenant</u>.

When a landlord-tenant relationship exists, there is a trade-fixture exception to the general fixture rule.  *Walker*, 66 So. at 57.  Namely, tenants placing their trade fixtures on the property to be used in connection with trade or manufacturing were excepted from the operation of the general rule of fixtures.  *Id.*

This trade-fixture exception serves as an expedient inference in determining the intentions of tenant and landlord.  *Id*.  When a lease terminates, the tenant's interest in real

property reverts back to the landlord. Presumably, the annexation made by the tenant was to serve the convenience of his trade, and not to enhance someone else's real property. *Id.* Therefore, it was the reasonable "intention of the tenant to place such trade fixtures upon the land, for the purpose of better enjoying the articles annexed, or of using them in his trade as chattels, and to remove them at his pleasure." *Id.*

GECC was neither the tenant nor the landlord of the Facility though, and thus cannot rely on the trade-fixture exception. (S.U.M.F. ¶ 2). In fact, because Sylvest leased the Equipment instead of owned the Equipment outright, the intentions of the parties should be presumptively construed the other way around. (S.U.M.F. ¶ 6) Sylvest arranged with Hodges to purchase the Facility and, then, leased the Facility from Hodges. (S.U.M.F. ¶ 2). This Facility Lease was a triple net lease with a favorable purchase option anytime during the Facility Lease. (S.U.M.F. ¶¶ 3, 4). This arrangement was essentially equivalent to an installment purchase of the Facility but with favorable features in other areas such as taxes, accounting, and insurances. Therefore, Sylvest had the control of and in reality owned the Facility. Moreover, the Facility Lease provided that when the lease terminated, any installation and improvements went to the owner, i.e., Sylvest, then Koch. (S.U.M.F. ¶ 3).

Furthermore, the undisputed facts indicate that Sylvest intended to install the Equipment in a "very hostile environment" and attach the equipment to the Facility it basically owned, making it hard and costly for GECC to remove it, and, at the end of the Equipment Lease, putting GECC in a position that it would sell the Equipment to Sylvest cheap – a fact borne out by GECC's abandonment of the Equipment at the Facility when it refused, after repeated demand by Koch, to remove the Equipment. (S.U.M.F. ¶¶ 12, 19, 23). By contrast, there are no

facts that Sylvest installed the Equipment so that GECC can easily remove it at its pleasure when the Equipment Lease terminates.

GECC cited a few cases in support of its trade-fixture argument. The factual situation in those cases are distinguishable from the relationship between Sylvest, GECC, and Hodges. *E.g., W.T. Adams Mach. Co. v. Interstate Building & Loan Ass'n*, 27 So. 857, 119 Ala. 97 (Ala. 1898)(involving a dispute between the vendor of the land and the vendee's mortgage when the vendor and the vendee stipulated that the vendor retained the title to the machinery until it was fully paid for); *Mobile Cab and Baggage Co. Inc. v. The Texas Co*., 74 So.2d 498, 261 Ala. 242 (Ala. 1954)(the parties to the equipment lease expressly agreed that the equipment should return to the lessor and the court did not mention the trade fixture exception at all).[7]

> 2. <u>Genuine issues as to the intention of the attachment are present under the ordinary fixture rule</u>.

Because the trade-fixture exception does not apply for the benefit of GECC, the rules of ordinary fixtures apply. *See Milford,* 355 So.2d at 690. Ordinary fixtures are chattel that have been so attached to the land that they become a "part and parcel" of the land. *Id*. (citation omitted).

In determining whether an item is a fixture in a context other than a landlord-tenant relationship, several criteria must be weighed: (i) actual annexation to the realty and method of annexation; (ii) appropriateness to the use and purposes of the part of the realty; and (iii) the

---

[7]  GECC also cited several non-Alabama cases that are irrelevant for the same reason. *See Wentworth v. Process Installations, Inc*., 333 N.W.2d 78, 122 Mich. App. 452 (Mich. 1983) (involving a dispute among landlord, tenant, and tenant's assignee); *In re South Atlantic Packers Ass'n, Inc*. 30 B.R. 836 (Bankr. S.C. 1983) (the trustee objected to the creditor's purchase-money security interest in abandoned property); *In re Schwen's Inc.*, 20 B.R. 638 (D. Minn. 1982) (the bankruptcy court, after a two-week trial, found some pieces of equipment to be fixtures and several other pieces to be personal property in an adversary proceeding after the trustee removed and sold the equipment); *In re Heat "N' Eat Brands, Inc*., 174 F.Supp. 598 (W.D. Ky. 1959) (the issue was whether the machinery installed on premises leased to the debtor was subject to the mechanic's and materialmen's lien).

intention of the party making the annexation of the real estate. *Id.* The intention can be inferred from: (a) the nature of the articles annexed; (b) the relation of the party making the annexation; (c) the structure of and mode of annexation; and (d) the purposes and uses for which the annexation has been made. *Id.* (citations omitted).

Genuine issues exist as to the material facts, which to be weighed by a jury according to the above criteria, to determine whether the Equipment are fixtures here. First, the Equipment was attached to the Facility, bolted to the floor, and integrated with the walls. (S.U.M.F. ¶¶ 9, 11). To remove the Freezer, one has to take down a big sections of the walls of the Facility. (S.U.M.F. ¶ 11). The costs of removal, transportation, maintenance, and storage are prohibitive. (S.U.M.F. ¶¶ 10, 11,19). In fact, these costs would exceed the value of the Equipment. (S.U.M.F. ¶ 19). Therefore, the attachment and the manner of installation weigh in favor of a finding of fixtures. GECC argued that, because the Deboner and the Freezer could be de-installed and removed, they are not fixtures. This argument must be rejected, for an air-conditioner, as a simple example, is usually a fixture but can be removed and de-installed easily.

Second, the Deboner and the Freezer are appropriate to the use and purpose of the Facility. The Facility had been a food processing plant when ConAgra owned it. (S.U.M.F. ¶ 1). The Deboner and the Freezer were installed as part of the integrated poultry processing lines. (S.U.M.F. ¶ 13). The chicken products were intended to exit from one processing line and enter into another when they would be deboned, frozen, wrapped, and weighed. (S.U.M.F. ¶ 13).

Finally, the most important criterion in determining whether a personal property is a fixture is the intention of the parties. A jury has to decide the intention of the parties in this case based on the following facts.

As discussed above regarding the trade-fixture exception, given the relationship between GECC, Sylvest, and Hodges, undisputed facts have shown that Sylvest intended to affix the Equipment to the Facility as permanently as possible so that it has as strong a leverage against GECC as possible regarding a fixture argument if such argument ever arises.  (S.U.M.F. ¶ 12).  After Sylvest rejected the Equipment Lease in bankruptcy, GECC did not want to remove the Equipment from the Facility because of the prohibitive removal and storage costs.  (S.U.M.F. ¶ 19).  In fact, the costs to remove the Freezer exceeds its value. (S.U.M.F. ¶ 19).  In essence, GECC has abandoned the Freezer and the Deboner by not demanding possession of them, and, thereby, acknowledged that they were fixtures.

In addition, against its normal practice, GECC in this transaction with Sylvest failed to do a fixture filing and/or obtain a landlord waiver with respect to the Equipment.  (S.U.M.F. ¶ 14).  GECC not only failed to do a fixture filing and a landlord waiver, but also failed to inspect the Equipment to determine whether a fixture filing or a landlord waiver was proper, which was also against GECC's normal practice.   (S.U.M.F. ¶ 14).   These failures indicate that GECC acquiesced in the Equipment becoming fixtures, and that it lacked the intent to object to the Equipment's becoming part of the realty.

Although section 19(b) of the Equipment Lease provides that the Equipment shall not become part of the real property, GECC and Sylvest never discussed any substance of this provision during the negotiation.  (S.U.M.F. ¶ 8).  The provision is merely boilerplate to which no one paid attention.   (S.U.M.F. ¶ 8).   Moreover, the Facility Lease provides that any improvements, modifications, and alteration of the Facility became property of the owner. (S.U.M.F. ¶ 3).  GECC never objected to such provision when the Equipment was installed in the Facility.

In *Milford*, where no landlord/tenant relationship existed, that equipment used to clean coal was a fixture to the land because the washers were set in concrete and had been permanently attached to the land for over 20 years.  355 So.2d at 690.  Similarly, in this case, the Facility has been a food processing facility for years and is an integrated facility to kill, debone, freeze, and wrap chickens.  (S.U.M.F. ¶¶ 1,13).  A reasonably jury can easily make a finding in favor of fixtures.  Therefore, the Court shall not weigh the factors determining fixtures in summary judgment motion but let a jury to weigh the factors and determine whether the Equipment are fixtures.

       3.   <u>Genuine issues still exist as to the intention of the parties even if the trade fixture exception applies for the benefit of GECC</u>.

Even if GECC can enjoy the benefit as a tenant under the trade-fixture exception, the intention of the parties still governs the determination whether the Equipment are fixtures.  *LaFarge,* 880 So.2d at 419.  As discussed above, the facts clearly demonstrate that both Sylvest and GECC intended and knew that the Equipment would and did become fixtures.

**III.**   **<u>CONCLUSION</u>**

Koch's Motion for summary judgment as to the Counterclaim must be granted because GECC failed to prove its demand for possession and that Koch refused to surrender the Deboner.  Even without considering GECC's failure to prove demand and refusal, many factual questions as to the conversion claim are up for a jury to decide, such as whether Koch's use was privileged or consented to, whether Koch's use was serious enough to warrant that Koch has to pay rent for the Deboner, and whether GECC waived its rights by (and whether it is estopped by) failing to demand that Koch stop using the Deboner and by demanding rent (unreasonable as it was in its amount) under the Equipment Lease.

With respect to Koch's fixture claim, a jury must weigh different facts according to the criteria to determine whether the parties intended that the Equipment became fixtures when they attached it to the Facility.  In this case, many facts have shown that the Equipment became fixtures, such as the manner of attachment, the provision in the Facility Lease governing improvements, GECC's failures to do a fixture filing and to obtain a landlord waiver, the appropriateness of the Equipment to the purpose of the Facility, and GECC's abandonment of the Equipment at the Facility.

WHEREFORE, Koch respectfully requests that this Court deny GECC's Summary Judgment Motion in its entirety.


Dated:  January 4, 2008                                          Respectfully submitted,


                                                            /s/ Zhiyuan Xu
                                                            Zhiyuan Xu

OF COUNSEL
Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive, Suite 301
Montgomery, Alabama 36117
(334)481-1800

OF COUNSEL
Eugene J. Geekie, Jr.
Zhiyuan "Mike" Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois  60606
(312) 258-5500
(312) 258-5600 (Fax)
egeekie@schiffhardin.com
mxu@schiffhardin.com

Counsel for Koch Foods of Alabama, LLC

<u>CERTIFCATE OF SERVICE</u>

The undersigned, an attorney, certifies that copies of the forgoing were caused to be served upon counsel of record addressed as follows via the ECF system on this 4th day January 2008.

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
tharris@reedsmith.com
aterras@reedsmith.com

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com


                        /s/ Zhiyuan Xu
                        Zhiyuan Xu

**EXHIBITS**

**TABLE OF CONTENTS**

<u>Description</u>                                                                                    <u>Exhibit No.</u>

Pages of Deposition Transcript of Lyman Campbell ("Campbell Dep.") ..................................... 1

Facility Lease between Sylvest and Hodges Bonded Warehouse ("Facility Lease").................... 2

Equipment Lease between GECC and Sylvest ("Equipment Lease") ........................................... 3

Pages of Deposition Transcript of William Perry ("Perry Dep.") ................................................. 4

Pages of Deposition Transcript of David Bromley ("Bromley Dep.")........................................... 5

Affidavit of David Bromley ("Bromley Affidavit")...................................................................... 6

Pages of Deposition Transcript of Michael Leonard ("Leonard Dep.")........................................ 7

Pages of Deposition Transcript of John Sutehall ("Sutehall Dep.").............................................. 8

GECC's Answer and Counterclaim............................................................................................... 9

Email from Ann Pille to Eugene Geekie ................................................................................... 10

Affidavit of Mark Kaminsky ("Kaminsky Affidavit") ............................................................... 11

Pages of GECC's First Set of Discovery Responses ("GECC 1st Discovery Responses") ........ 12

Pages of Deposition Transcript of William Wilson ("Wilson Dep.") ......................................... 13

Emails between Eugene Geekie and Alex Terras ("Emails between Geekie and Terras") ......... 14

Pages of GECC's Third Set of Discovery Responses ("GECC 3rd Discovery Responses") ...... 15

Pages of Deposition Transcript (Rough Draft) of Joseph DiSalvo ("DiSalvo Dep.")................. 16

Pages of Deposition Transcript of Mark Kaminsky ("Kaminsky Dep.") .................................... 17

Letter from Ann Pille to Eugene Geekie ("Pille Letter") ........................................................... 18

Appraisal Reports by Robert Breakstone in May 2006 ("Breakstone May 2006 Report")......... 19

Appraisal Reports by Robert Breakstone in Sept. 2007 ("Breakstone Sept. 2006 Report") ....... 20

Appraisal Report by David Dalfonso ("Dalfonso Report")...........................................................21

Pages of Deposition Transcript of Wayne Jones ("Jones Dep.")..................................................22

Emails between Eugene Geekie and Timothy Harris ("Emails between Geekie and Harris") ...23

GECC Electronic Customer Folder ("Electronic Customer Folder").........................................24

# Exhibit 1

Page 30

```
 1    Q.    And Gary Davis?

 2    A.    Gary Davis was the complex manager for the

 3          Montgomery -- Koch Foods of Alabama, LLC and

 4          Koch Farms of Alabama, LLC from June '06 through

 5          the first week of September '07.

 6    Q.    And where is he currently employed?

 7    A.    He is still with Koch.

 8    Q.    What is his current position?

 9    A.    He is now a vice president.

10    Q.    So he was promoted?

11    A.    He was.

12    Q.    Where is he officed?

13    A.    Morton, Mississippi.

14    Q.    Michael Leonard, do you know who that is?

15    A.    I didn't hear the last name.

16    Q.    Michael Leonard.

17    A.    I do not.

18    Q.    Here are some GE folks, and I want to ask if you

19          ever talked to or met with them.

20                Will Perry?

21    A.    Yes.

22    Q.    In what regard?

23    A.    Will Perry was a sales representative or lease
```

Page 31

```
 1              representative for GE.  I had talked with and

 2              met with Will over a three- or four-year period

 3              in the early 2000s.

 4       Q.     How about John Suthall?

 5       A.     The name does not ring a bell.

 6       Q.     How about Bill Wilson or William Wilson?

 7       A.     Does not ring a bell.

 8       Q.     Joe Di Salvo?

 9       A.     Does not ring a bell.

10       Q.     Other than Mr. Mancuso and Mr. Geekie, have you

11              discussed your deposition here today with anyone

12              else?

13       A.     No.

14       Q.     You've not discussed it with your immediate

15              superior?

16       A.     No.

17       Q.     Or Mr. Kaminsky?

18       A.     No.

19       Q.     Or Mr. Jones?

20       A.     No.

21       Q.     Have you reviewed any documents in preparation

22              for your deposition here today?

23       A.     I looked through the lease documents, and I
```

Deposition of Lyman Campbell                                    November 28, 2007

Page 32

```
 1                looked through the phone message book that I had

 2                surrounding the time of the lease.

 3    Q.    For what purpose did you review the lease

 4                document?

 5    A.    My assumption was that since I signed the lease

 6                agreement there would be questions concerning

 7                that, and I just wanted to review it.

 8    Q.    And you've done that?

 9    A.    I have looked at it.

10    Q.    And, again, you've not seen the complaint filed

11                in this lawsuit?

12    A.    I have not.

13    Q.    Or the answer or any other pleadings, correct?

14    A.    None.

15    Q.    Do you have any knowledge whether Koch Foods has

16                ever made a demand upon GE Capital to remove any

17                of the equipment?

18    A.    I have no knowledge.

19    Q.    You haven't made such a demand, correct?

20    A.    I have not.

21    Q.    You've just not been involved in that part of

22                the process, right?

23    A.    That's correct.
```

Page 33

1    Q.    Have you been involved in any of the settlement

2          negotiations between Koch and GE Capital

3          regarding the equipment?

4    A.    The only time that I have talked to anyone about

5          it was in the summer of '06 when GE had arranged

6          to sell part of the equipment covered by the

7          lease to another poultry company.  I was advised

8          that they would have a truck there to pick it up

9          and that we were to allow it to leave the

10         premises.

11   Q.    And that would be the Ossid equipment?

12   A.    That's correct.

13   Q.    And that was your only involvement in settlement

14         negotiations, correct?

15   A.    To clarify, that was not a settlement

16         negotiation.  I was simply advised that GE was

17         picking up the equipment.

18   Q.    So you never talked to GE about how much they

19         wanted and you never gave an offer or anything

20         like that to anybody from GE, correct?

21   A.    No.

22   Q.    Are you familiar with what portions of the

23         equipment were used by Koch and what portions

Page 34

```
 1            were not used by Koch?

 2     A.     I have a general idea.

 3     Q.     What is that idea based on?

 4     A.     My knowledge of the production that took place

 5            at that plant.

 6     Q.     What is that general idea?

 7     A.     The equipment -- The deboning lines bought from

 8            D & F and the conveyor systems that were bought

 9            from D & F were used in the deboning process.

10            The Ossid equipment was never used.  It was

11            never uncrated.  The spiral freezer has never

12            been used.  So there were three groupings of

13            equipment under the lease, two of the three were

14            never used, one of which was picked up by GE and

15            sold, and then the third grouping bought from

16            D & F was used.

17     Q.     Was any of that equipment -- any of the three

18            used by Sylvest?

19     A.     Yes.

20     Q.     Which?

21     A.     The D & F equipment.

22     Q.     The deboning equipment?

23     A.     That's correct.
```

Page 35

1    Q.    Are you familiar with the installation of any of

2          the equipment?  I'm sorry.

3                Are you familiar with the process of the

4          installation of the equipment, how it was

5          installed, when it was installed, if it was

6          installed?

7    A.    Yes.  I know that the deboning equipment or the

8          deboning department began operations the latter

9          part of January '06.  So the deboning equipment

10         had to have been installed prior to that.

11   Q.    Do you know how it was installed?

12   A.    I do not.

13   Q.    The methodology?  Whether it's bolted, welded?

14   A.    I don't know.

15   Q.    You don't know?

16   A.    I do not.

17   Q.    Have you ever seen that equipment?

18   A.    I have.

19   Q.    Have you seen it installed or disinstalled or

20         both?

21   A.    Both.

22   Q.    Where is it at now?

23   A.    Sitting in a parking lot at the debone plant.

Deposition of Lyman Campbell                                    November 28, 2007

Page 36

1    Q.    And is that where your office is?

2    A.    It is not.

3    Q.    Where is your office?

4    A.    At the kill facility.

5    Q.    And was it at the kill facility while you were

6          still with Sylvest?

7    A.    My office?

8    Q.    Yes.

9    A.    Yes.

10   Q.    Now let's talk about the deal to purchase the

11         equipment while you were still with Sylvest.

12         Whose idea or instruction was it to purchase new

13         equipment?

14   A.    To purchase new equipment?

15   Q.    New equipment.

16               MR. GEEKIE:   Objection.   Foundation.

17   Q.    This would have been in 2005.   Who decided?

18   A.    Dean Falk.

19   Q.    And were you consulted about the decision

20         whether or not new equipment was necessary?

21   A.    Yes.

22   Q.    By whom and in what way?

23   A.    By Dean Falk.   And all of the equipment is not

Page 37

1        new equipment covered by the lease.

2    Q.   Tell me about that.

3    A.   The D & F equipment was new equipment.  The

4         Ossid equipment was new equipment.  The spiral

5         freezer was a used spiral freezer.

6    Q.   And from where did it come?

7    A.   It came through an equipment broker but had been

8         removed from a plant owned by Brakebush

9         Brothers.

10   Q.   Brakebush?

11   A.   Correct.

12   Q.   All one word?

13   A.   Correct.

14   Q.   Brothers.

15             Were they poultry processors or what were

16        they?

17   A.   They are further processors.

18   Q.   Say it again.

19   A.   Further, F-U-R-T-H-E-R.

20   Q.   What is that?

21   A.   They do multiple things, one of which would be

22        they debone chicken front halves to create

23        boneless breasts.  Then they further process

Page 38

```
 1              that breast either through a marination and/or

 2              cooking process.

 3      Q.      I see.

 4                      Are they still in business, if you know?

 5      A.      As far as I know.

 6      Q.      Where are they located?

 7      A.      I'm not sure which state.

 8      Q.      Do you know what plant this came from?

 9      A.      I do not.

10      Q.      How is it that you're familiar that it came from

11              their plant?

12      A.      In the discussions with Dean Falk concerning a

13              spiral freezer, we looked at the cost of a new

14              spiral compared to could we, in fact, buy a used

15              spiral.  I don't recall how, but an equipment

16              dealer's name and phone number got in our

17              hands.  We called, and he did have a used spiral

18              that could be purchased.

19      Q.      And was it installed at the time you were

20              negotiating for its purchase or had it already

21              been disinstalled?

22      A.      I'm not certain.

23      Q.      Would that have been important to you in the
```

Page 39

1           purchasing process?

2    A.    No.

3    Q.    What was the planned use of the spiral freezer

4          by Sylvest at the time it bought it?

5    A.    Sylvest purchased the Ossid equipment in order

6          to produce overwrap product, tray pack with an

7          overwrap.  That product then has to be blasted.

8    Q.    What does that mean?

9    A.    It means it needs to be crusted or the outer

10         one-quarter inch of the product needs to be

11         somewhat frozen.  The inside of the product

12         would still be fresh and unfrozen.

13   Q.    But that makes the shrink wrap tight?

14   A.    No.  There's another process that does that.

15               So the spiral could have been used for

16         that.  We also had plans of putting in some par

17         fry equipment.

18   Q.    What is that?

19   A.    That's where you would bread products, run them

20         through a fryer for 15 or 20 seconds to set the

21         breading.  They come out, and then they go

22         through a spiral freezer and are quick frozen.

23   Q.    Now, that never happened.  Tell me why it didn't

Page 40

1              happen.

2    A.    The Ossid equipment was put in -- delivered.

3          The par fry equipment -- We took out some par

4          fry equipment.  The plant that we bought -- that

5          houses this debone facility had some cooking

6          equipment in it that was removed because it

7          wasn't conducive to what we wanted to do.  We

8          never purchased the par fry equipment.  The

9          plant started and the deboning process started

10         in late January.  We filed for Chapter 11

11         protection on April 18.

12   Q.    So the bankruptcy got in the way?

13   A.    It got in the way.

14   Q.    Tell me about the facility itself.  It was

15         purchased by Sylvest when?

16   A.    Sylvest never owned the facility.  Sylvest

17         negotiated with ConAgra for a third party to buy

18         the facility and do a capital lease to Sylvest.

19   Q.    Who was that third party?

20   A.    Hodges Bonded Warehouse.

21   Q.    And that occurred when?

22   A.    The actual closing was either August or

23         September 2005.

Page 41

```
 1    Q.    How old was the facility at that time, if you
 2          know?
 3    A.    I would guess 30 years.
 4    Q.    And it had some cooking equipment already in it?
 5    A.    It did.
 6    Q.    So then ConAgra sold it to this third party?
 7    A.    Correct.
 8    Q.    And the third party then leased it to Sylvest?
 9    A.    Correct.
10    Q.    And then the thought was you were going to take
11          out certain of the existing equipment and put in
12          your own equipment or equipment that you were
13          going to lease from GE, correct?
14    A.    We never discussed with GE or any other lease
15          company the par fry equipment.
16    Q.    Was it the intention of Sylvest to put in
17          equipment into the facility other than GE-leased
18          equipment or was it only GE-leased equipment?
19    A.    The intent was that we -- Sylvest would either
20          buy the equipment or obtain use of the equipment
21          through a joint venture.
22    Q.    When you say the equipment, you're talking about
23          the non-GE equipment?
```

Page 42

1   A.   That is correct.

2   Q.   And did that ever occur?

3   A.   It did not.

4   Q.   Why is that?

5   A.   The negotiations broke down when we -- when the

6        decision was made to file for Chapter 11.

7   Q.   Why was it that decision to file for Chapter 11

8        was made?

9   A.   Pardon me?

10  Q.   Why did Sylvest decide to file for Chapter 11?

11  A.   The primary reason was that we were at the end

12       of our financing arrangement with our bank or

13       banks, and we were in a loss position.

14  Q.   What do you mean by that?

15  A.   The company was losing money.  You have reached

16       your borrowing limits.  There's nowhere else to

17       go.

18  Q.   Why was Sylvest Farms losing money?

19  A.   The entire industry was losing money at this

20       time.

21  Q.   And why was that?

22  A.   Sometime in the fall of 2005, the avian

23       influenza was running rampant in Asia.  A few

Page 43

```
1              cases developed in Europe.  Sometime around the

2              first of the year, exports of dark meat to Asia

3              and Euopre dried up, and it caused a glut of

4              meat in the United States because this industry

5              depends on its exports to hold markets up.  At

6              that point the dark meat that we were selling in

7              September of '05 for 30 to 40 cents we're now

8              selling for 7 cents.

9     Q.       In fiscal year 2004, did Sylvest turn a profit?

10    A.       From memory, yes.

11    Q.       And had it in the prior 20 years turned a profit

12             every year?

13    A.       It had not.

14    Q.       What were its bad years, if you remember?

15    A.       I couldn't name them off.

16    Q.       I guess what I'm getting at, was this a

17             profitable company that the bird flu -- I guess

18             we can almost call it hysteria now in

19             retrospect; it wasn't at the time -- but the

20             bird flu problem caused a profitable company to

21             become quite quickly unprofitable or was this a

22             company that was kind of limping along anyway

23             and this was the final straw?
```

Page 44

```
 1    A.   Well, the company had made money in some years

 2         and lost money in some years, but fiscal 2005

 3         was a record year for Sylvest.

 4    Q.   And why is that?

 5    A.   The markets were aligned perfectly, meaning the

 6         grain markets were to our advantage, the export

 7         markets were to our advantage, and the domestic

 8         markets were to our advantage.  So we had

 9         relatively low grain prices and relatively high

10         chicken prices.  So we were able to have a

11         record year as did most of the industry.

12    Q.   And then in 2006 that began to change?

13    A.   That is correct.

14    Q.   Because of the --

15    A.   That's correct.

16    Q.   -- concerns you just related, right?

17    A.   And I want to say that for fiscal 2006, every

18         publicly traded poultry company had red ink.

19    Q.   Now, were you involved in selecting the type of

20         equipment that was going to go into the ConAgra

21         facility?

22    A.   No.

23    Q.   Who was?
```

Page 45

```
 1    A.   Ultimately Dean Falk as president and CEO.

 2         There would have been advisers to him out of

 3         operations.

 4    Q.   So the equipment was selected by someone other

 5         than you, correct?

 6    A.   Correct.

 7    Q.   And there came a time in, would it be, late 2005

 8         or maybe earlier in 2005 when you were advised

 9         of what equipment was desired; is that correct?

10    A.   It would have been late 2005.

11    Q.   So Mr. Falk or someone else said, okay,

12         Mr. Campbell; here's the equipment that we're

13         going to put in; we need your assistance in

14         setting up the financing for that?

15    A.   Correct.

16    Q.   What did you do then?

17    A.   Contacted two or three different lease

18         companies.

19    Q.   And who were they?

20    A.   GE was one.  Without going back and looking, I

21         couldn't tell you the others.

22    Q.   But there were two or three?

23    A.   That's correct.
```

Page 46

1    Q.    And how is it that you came to contact among

2          others GE Capital?

3    A.    Because for the last three or four years prior

4          to this time, Will Perry had called on me either

5          through visits to the facility or staying in

6          touch by telephone wanting to know what our

7          needs might be that he could help us with.

8    Q.    So you had a prior relationship with him.  Is

9          that fair to say?

10   A.    It is.

11   Q.    But you hadn't yet done any dealing with him,

12         correct?

13   A.    That's correct.

14   Q.    Was there any discussion during this process

15         between you -- Strike that.

16             Did you discuss this with anyone other than

17         Mr. Perry, this deal?

18   A.    With other lease companies.  Not within GE,

19         though.

20   Q.    That's my question.

21             So the only contact at GE that you've

22         discussed this deal with at the time was

23         Mr. Perry?

Page 47

1    A.    Let me -- I am uncertain of that from this

2          perspective.  We submitted financial data to

3          GE.  And whether or not Will and I were on a

4          conference call with somebody on GE's regional

5          credit committee, I'm uncertain, because with

6          the other lease companies I talked to, that did

7          happen.

8    Q.    Let me ask this.  Do you remember any specific

9          individuals, their names, from GE other than

10         Mr. Perry with whom you may have talked?

11   A.    I do not.

12   Q.    Did you and Mr. Perry discuss a purchase --

13         financing of a purchase by Sylvest?

14   A.    No.  We discussed a lease.

15   Q.    And why didn't you discuss a purchase?

16   A.    Because we wanted it off balance sheet.

17   Q.    Tell me what you mean by that.

18   A.    If I could lease -- This lease was in the

19         neighborhood of 2.1 million dollars.

20   Q.    That was for all three pieces of equipment?

21   A.    That is correct.

22   Q.    Okay.

23   A.    I could lease that from GE under a true

Page 48

```
1           operating lease as defined by federal tax law.

2           And under GAAP, if I do that and it meets

3           certain other criteria, I do not show it as a

4           liability on my balance sheet.

5    Q.     When you say GAAP, you mean generally accepted

6           accounting principals, correct?

7    A.     That is correct.

8    Q.     G-A-A-P.

9               And that was to the advantage of Sylvest,

10          correct?

11   A.     That is correct.

12   Q.     And so Sylvest wanted to do a true lease?

13   A.     Correct.

14   Q.     And is that what, in fact, was negotiated?

15   A.     Yes.

16   Q.     Is that what, in fact, was signed?

17   A.     The --

18               MR. GEEKIE:  Objection.  Calls for a

19                   legal conclusion.

20   Q.     Go ahead and answer.

21   A.     The lease that was signed is what the lease is.

22   Q.     And do you understand --

23   A.     Did it meet the criteria under GAAP and federal
```

Page 49

```
 1           tax law to be an operating lease, yes, in fact,

 2           it did.

 3    Q.     That's my question.  Thank you.

 4                During the negotiation of this lease, did --

 5           you provided financials to GE, correct?

 6    A.     Correct.

 7    Q.     Did GE have any concerns about those

 8           financials?

 9                     MR. GEEKIE:  Objection.  Foundation.

10    A.     They did not voice any concerns.

11    Q.     So was this an easy negotiation or a

12           difficult --

13                     MR. GEEKIE:  Objection.  Vague and

14                        ambiguous.

15    A.     Easy from the standpoint that it did not take

16           long to put the deal together.

17    Q.     Was it difficult from any other standpoints?

18    A.     Not really.

19    Q.     Now, the vendor, that was selected by Sylvest,

20           correct?

21    A.     Vendor meaning ...

22    Q.     The vendors of the equipment.

23    A.     D & F, Ossid -- That is correct.
```

Page 50

1   Q.   And the dealer from whomever --

2   A.   That's correct.

3   Q.   -- the spiral freezer was obtained.

4        The price of those three pieces of -- sets

5        of equipment, was negotiated -- correct me if

6        I'm wrong -- was negotiated between Sylvest and

7        the various vendors, correct?

8   A.   That would be correct.

9   Q.   GE was not involved in that negotiation,

10       correct?

11  A.   Correct.

12  Q.   So then after you and the various -- Strike

13       that.

14       Did you participate in that negotiation with

15       the vendors?

16  A.   No.

17  Q.   Who would have done that on behalf of Sylvest?

18  A.   Dean Falk.

19  Q.   So then after Mr. Falk and the various vendors

20       agreed on a price -- correct me if I'm wrong

21       again -- you then negotiated with Will Perry

22       regarding the lease of that equipment, correct?

23  A.   Correct.

1    Q.    And the capitalized cost was not something GE

2          had any input in.  That was determined by

3          Mr. Falk and the vendor, right?

4    A.    Correct.  If by capitalized cost you mean the

5          purchase price.

6    Q.    That is what I mean.

7                (Exhibit B marked for identification.)

8    Q.    I'm going to show you what's previously been

9          marked as Exhibit B, which is a copy of the

10         complaint.  I'm not going to ask you any

11         questions on the complaint because you already

12         stated that you've not seen it, but attached as

13         Exhibit A to the complaint is the lease.  I do

14         want to ask you some questions about that.

15              The first one is, is this the -- is this a

16         copy of the lease that you signed with GE

17         Capital?

18   A.    Yes.

19   Q.    And that's your signature on the last page,

20         correct?

21   A.    It is.

22   Q.    If you'll look at the first page, it's undated

23         where it says master lease agreement dated as of

Page 52

```
 1              blank.  But in the upper left-hand corner it

 2              says, GE Lease 12/28/05.  My question is:  Do

 3              you know whose handwriting that is?

 4      A.      I do.

 5      Q.      Whose is that?

 6      A.      Mine.

 7      Q.      Does this indicate this lease was signed on

 8              12/28/05 by you?

 9      A.      It does.

10      Q.      Was this form provided to you by GE Capital or

11              is it provided by you to GE Capital?

12      A.      Provided to me by GE Capital.

13      Q.      Did you negotiate any of the terms or did you

14              just sign the boilerplate language that you

15              received?

16      A.      The only parts of it that I would have

17              negotiated would have been the payments to make

18              sure that it did conform to an operating lease

19              for tax and GAAP purposes, and that would have

20              also included the early purchase options

21              language more than likely.

22      Q.      What section are you looking at there, if you

23              are?
```

Page 53

```
1    A.    G-2.

2    Q.    Of what section?

3    A.    G-2.  It's in the second document.

4    Q.    Oh, I'm sorry.  Okay.  So you're referring to --

5    A.    The heading is lease term options.

6    Q.    So did you discuss those directly with

7          Mr. Perry?

8    A.    I would have simply from the aspect of making

9          sure that there was nothing here that would

10         violate the GAAP or tax consideration for the

11         lease.

12   Q.    And you ascertained that it did not, correct?

13   A.    That is correct.

14   Q.    Outside of those provisions that you just

15         mentioned, do you recall negotiating any of the

16         other --

17   A.    The rest of it is just boilerplate.

18   Q.    When you signed you signed on behalf of Sylvest

19         Farms, Inc., correct?

20   A.    I'm hesitating because we had more than one

21         corporate structure.

22   Q.    Well, the lease is signed by you as executive

23         vice president of --
```

Page 54

| 1 | A. | And I was executive vice president of all three |
| 2 | | corporate structures that we had. |
| 3 | Q. | But it does say Sylvest Farms, Inc., right? |
| 4 | | That was the lessee, if you look at the last |
| 5 | | page. |
| 6 | A. | And even on the first page it does say Sylvest |
| 7 | | Farms, Inc., which is the parent company -- was |
| 8 | | the parent company. |
| 9 | Q. | And that's who you signed on behalf of, correct? |
| 10 | A. | That is correct. |
| 11 | Q. | At the time you signed this, did Sylvest Farms, |
| 12 | | Inc. have any intention that by affixing and/or |
| 13 | | installing the equipment the equipment would |
| 14 | | become owned by Sylvest Farms? |
| 15 | | MR. GEEKIE:  Objection.  Form and |
| 16 | | foundation. |
| 17 | A. | As the negotiator of the lease, I don't think it |
| 18 | | was ever considered. |
| 19 | Q. | And why is that? |
| 20 | A. | We had a boilerplate lease offered to us.  We |
| 21 | | negotiated the financial terms that we were |
| 22 | | satisfied with, and there were no other -- none |
| 23 | | of the other provisions would have been |

Page 55

```
 1              negotiated.  When I say boilerplate, I mean that

 2              if I had laid this document, which I probably

 3              did, next to other lease proposals I had in

 4              hand, they would have been virtually the same.

 5     Q.       If you'll turn your attention to paragraph 19-B,

 6              specifically the last two sentences of 19-B, it

 7              says, quote, all equipment shall at all times

 8              remain personal property of lessor even though

 9              it may be attached to real property.  The

10              equipment shall not become part of any other

11              property by reason of any installation in or

12              attachment to other real or personal property.

13                  Do you recall negotiating that term with

14              Mr. Perry?

15     A.       No, we did not negotiate that term.

16     Q.       And, in fact, that's a common term in the

17              leases -- in the other leases that you just

18              referenced.  Is that your understanding?

19                      MR. GEEKIE:  Objection.  Foundation.

20     A.       I would consider -- The term that I would use

21              would be that this provision, as is all of the

22              other provisions here other than the financial

23              arrangements, would be boilerplate language.
```

Page 56

1    Q.   And you did not try to negotiate that out in any

2         way?

3    A.   Did not negotiate that one way or the other.

4    Q.   And are you aware of any intention by Sylvest

5         Farms at any time to violate that provision?

6                   MR. GEEKIE:  Objection.  Foundation

7                        and form.

8    A.   I can only speak for my part of Sylvest Farms,

9         and there wasn't any intent one way or the

10        other.

11   Q.   There was no intent to violate that provision?

12        Is that your testimony?

13                  MR. GEEKIE:  Objection.  Asked and

14                       answered.

15   Q.   I don't understand your answer.

16                  MR. GEEKIE:  And mischaracterizes his

17                       statement.

18   A.   Once the lease was negotiated, Sylvest's intent

19        was to honor the lease for the longevity of the

20        lease.  At the end of that period, then we would

21        see where it went.

22   Q.   What do you mean by that?

23   A.   Experience over the years has shown that at the

Page 57

```
1              end of the lease, most equipment vendors would

2              not want to take it out and you can buy it at a

3              pretty decent price.  So that's one scenario.

4              Another scenario is that once you realize that

5              all of this equipment is installed in a very

6              hostile environment, it may not be worth

7              anything at the end of the lease or it may be

8              technologically obsolete.

9       Q.     So then is it your testimony -- Let me just see

10             if I'm hearing you correctly.  Is it your

11             testimony -- How long was this lease?  Is it ten

12             years?

13      A.     It is not ten years.

14      Q.     Six years?  Let's go back and look.

15      A.     Sixty months.

16      Q.     So that's five years.  Okay.

17                   So then at the time you signed this on

18             behalf of Sylvest, it was your intention to make

19             the payments required here for five years and

20             then at the end of five years look at the

21             purchase option that you have and at that time

22             decide whether or not Sylvest Farms wanted to

23             own the equipment by purchasing it; is that
```

Page 58

```
 1        correct?

 2   A.   Well, I think my intent would be knowing that it

 3        was a true operating lease, there was a residual

 4        value.

 5   Q.   Right.

 6   A.   At the end of the lease, if we so desired to

 7        purchase the equipment, then we could either pay

 8        the residual value or negotiate a better deal.

 9   Q.   And if you paid the residual value, what would

10        happen then?

11   A.   Ownership would pass.

12   Q.   And you never got to that point, correct?

13   A.   We did not.

14   Q.   Did Sylvest Farms make any payments under this

15        lease?

16   A.   It did.

17   Q.   When did those begin -- When was the first

18        payment?

19   A.   I couldn't answer that.  I'm uncertain.

20   Q.   And they stopped at the time of the bankruptcy

21        or perhaps before?

22   A.   They would have stopped at the time of the

23        bankruptcy filing I would think.
```

Exhibit 2

# REAL PROPERTY LEASE

between

# HODGES BONDED WAREHOUSE, INC.
### ("Lessor")

and

# SYLVEST FARMS, INC.
### ("Lessee")

# August 25, 2005

This Instrument Prepared by:
Thomas G. Mancuso
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, Alabama 36117

KOCH 00000122

# REAL PROPERTY LEASE
between
## HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
## SYLVEST FARMS, INC.
("Lessee")

**Description**                                                                                          **Page No.**

Article I       Definitions and Use of Phrases ................................................................... 1

    Section 1.01.  Definitions ................................................................. 1
    Section 1.02.  Use of Phrases and Capitalized Terms ........................... 2

Article II      Premises, Duration of Term and Rental Provisions ..................................... 2

    Section 2.01.  Premises ................................................................... 2
    Section 2.02.  Term ........................................................................ 2
    Section 2.03.  Rent ......................................................................... 3

Article III     Lessee's Obligations for Utilities, Improvements and Repairs ................... 5

    Section 3.01.  Utilities .................................................................... 5
    Section 3.02.  Lessee's Improvements ............................................... 5
    Section 3.03.  Repairs .................................................................... 5

Article IV      Additions, Easements, Liens, Taxes and Insurance ................................... 6

    Section 4.01.  Mechanics' Liens ...................................................... 6
    Section 4.02.  Taxes ...................................................................... 7
    Section 4.03.  Insurance ................................................................. 8
        (a)  Fire and All Risk Property Insurance ................................. 8
        (b)  Commercial General Liability ........................................... 8
        (c)  Employer's Liability ...................................................... 8
        (d)  Boilers ...................................................................... 8
        (e)  Flood Insurance ........................................................... 8
        (f)  Policy Form ................................................................. 9
        (g)  Use of Premises Not to Invalidate Insurance, Waiver
            of Subrogation ......................................................... 9

Article V       Provisions Respecting Damage, Destruction and Condemnation ........... 10

    Section 5.01.  Use of Premises ...................................................... 10
    Section 5.02.  Condition of Premises ............................................... 10
    Section 5.03.  Personal Property at Risk of Lessee .............................. 11

-i-

KOCH 00000123

REAL PROPERTY LEASE
between
HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
SYLVEST FARMS, INC.
("Lessee")

**Description**                                                                                                    **Page No.**

Section 5.04.  Indemnity ................................................................................ 11
Section 5.05.  Environmental .......................................................................... 11
Section 5.06.  Damage by Fire or Other Casualty ........................................... 12
Section 5.07.  Condemnation ........................................................................... 12

Article VI      Certain Provisions Relating to Assignment, Subleasing and Mortgaging ........... 13

Section 6.01.  Provisions Relating to Assignment ........................................... 13
Section 6.02.  Provisions Relating to Subleasing ............................................ 14
Section 6.03.  Restriction on Sale or Mortgaging of Leasehold Estate by
                      Lessor or Lessee ................................................................... 14
Section 6.04.  Lessee's Purchase Option ......................................................... 14

Article VII     Events of Default and Remedies ............................................... 16

Section 7.01.  Default or Breach ..................................................................... 16
Section 7.02.  Effect of Default ....................................................................... 16
Section 7.03.  Agreement Defining Relationship ............................................ 17
Section 7.04.  Subordination and Attornment ................................................. 17
Section 7.05.  Estoppel Certificate .................................................................. 18
Section 7.06.  Interest on Past Due Obligations .............................................. 18
Section 7.07.  Liability of Lessor ..................................................................... 18
Section 7.08.  Notices ...................................................................................... 19
Section 7.09.  Tax Covenants of Lessor .......................................................... 19

Article VIII    Miscellaneous ......................................................................... 20

Section 8.01.  Covenant of Quite Enjoyment; Surrender of Premises ............. 20
Section 8.02.  Representations of Lessor's and Lessee's Power and Authority ......... 20
Section 8.03.  This Property Lease is a Triple Net Lease ................................. 20
Section 8.04.  Certain Prior and Contemporaneous Agreements Cancelled ........... 21
Section 8.05.  Article and Section Captions ..................................................... 21
Section 8.06.  Binding on Assigns ................................................................... 21
Section 8.07.  Amendment in Writing ............................................................. 21
Section 8.08.  Waiver-None ............................................................................ 21
Section 8.09.  No Surrender ............................................................................. 22

-ii-

KOCH 00000124

REAL PROPERTY LEASE
between
HODGES BONDED WAREHOUSE, INC.
("Lessor")
and
SYLVEST FARMS, INC.
("Lessee")

<u>Description</u>                                                                                                    <u>Page No.</u>

Section 8.10.  Captions ........................................................................... 22
Section 8.11.  Brokers ............................................................................. 22
Section 8.12.  Applicable Law .................................................................. 22
Section 8.13.  Partial Invalidation of Property Lease ............................... 22
Section 8.14.  Counterparts ..................................................................... 22
Section 8.15.  Late Fee ............................................................................ 22
Section 8.16.  Exculpation Clause ........................................................... 22
Section 8.17.  Right of Entry ................................................................... 23

Signatures ............................................................................................... 23

-iii-

KOCH 00000125

## REAL PROPERTY LEASE

THIS REAL PROPERTY LEASE ("Property Lease") is made and entered into as of the 25th day of August, 2005, between **HODGES BONDED WAREHOUSE, INC.**, an Alabama corporation ("Lessor") and **SYLVEST FARMS, INC.**, an Alabama corporation ("Lessee").

## ARTICLE I
## DEFINITIONS AND USE OF PHRASES

Section 1.01.  **Definitions.**   The following words and phrases and others evidently intended as the equivalent thereof shall, in the absence of clear implication herein otherwise, be given the following respective interpretations herein:

"**Additional Rent or Rent**" means any additional monies paid or discharged by Lessee to Lessor or to a third party hereunder.

"**Base Rent**" means the amount paid by Lessee to Lessor each month commencing on September 25, 2005.

"**Commencement Date**" means the term commencing on the date set forth above and ending on August 25, 2012, unless sooner terminated as herein provided.

"**Lessee**" means Sylvest Farms, Inc., an Alabama corporation having its principal office in Montgomery, Alabama.

"**Lessor**" means Hodges Bonded Warehouse, Inc., an Alabama corporation having its principal office in Montgomery, Alabama.

"**Premises**" means the real property specifically described on Exhibit A hereto.

"<u>Property Lease</u>" means this Real Property Lease dated August 25, 2005 between Hodges Bonded Warehouse, Inc., as Lessor and Sylvest Farms, Inc., as Lessee.

"<u>Term</u>" means the date set forth above and ending on August 25, 2012, unless sooner terminated as herein provided.

Section 1.02.   <u>Use of Phrases and Capitalized Terms</u>.    "Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter," and other equivalent words refer to this Property Lease and not solely to the particular portion thereof in which any such word is used. The definitions set forth in Section 1.01 hereof include both the singular and the plural. Except for those terms defined herein, the capitalized terms used herein shall have the meaning ascribed to them in the Agreement Defining Relationship between Sylvest Farms, Inc. and Hodges Bonded Warehouse, Inc. ("Agreement Defining Relationship") dated as of August 25, 2005. Any pronominal references used herein shall be deemed to include the masculine, feminine, and neuter, and the singular and plural as the context requires.

## ARTICLE II
## PREMISES, DURATION OF TERM AND RENTAL PROVISIONS

Section 2.01.   <u>PREMISES</u>.   Lessor hereby leases to Lessee and Lessee hereby rents and leases from Lessor the land, building and related improvements located at 4530 Mobile Highway, Montgomery, Alabama and more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof ("Premises"), subject to the terms and conditions set forth herein.

Section 2.02.   <u>TERM</u>.   This Property Lease shall be for a term commencing on the date set forth above (the "Commencement Date") and ending on August 25, 2012, unless sooner terminated as herein provided.

2

Section 2.03.  __RENT.__

(a)    Commencing on September 25, 2005, Base Rent shall be paid by Lessee to Lessor in the amount of seventy one thousand three hundred ninety-seven dollars and 99/100 ($71,397.99) per month, in addition to all other sums payable to Lessor by Lessee hereunder. All rent due herein shall be payable at the office of Lessor at the address set forth in Section 29 below or at such other place as Lessor may from time to time designate in writing, in lawful money of the United States, in monthly installments, on the 25th day of each month thereafter. Lessor and Lessee acknowledge and confirm to each other that this Agreement constitutes a so-called capitalized lease and is a financing lease pursuant to which Lessor is selling its interest in the Premises to Lessee in accordance with the Purchase Price and Amortization Schedule attached hereto as Exhibit B. In addition, as set forth herein, this Property Lease shall be net to the Lessor.

(b)    Base Rent shall be absolutely net to Lessor so that this Property Lease shall yield, net to Lessor, the Base Rent specified in this Section 2.03, and that all impositions, taxes, assessments, insurance premiums, utility charges, maintenance, repair and replacement expenses, all expenses related to compliance with laws and all other costs, fees, charges, expenses, reimbursements and obligations of every kind and nature whatsoever relating to the Premises which may arise or become due during the Term of this Property Lease or by reason of events occurring during the Term shall be paid or discharged by Lessee, whether or not payable to Lessor or to a third party hereunder, shall be considered as additional rent (hereinafter referred to as "Additional Rent" or "rent").

(c)    All payments of Base Rent and Additional Rent shall be payable without previous demand therefore and without any right of set-off or deduction whatsoever, and in the case of non-payment of any item of Additional Rent by Lessee when the same is due, Lessor shall have, in addition to all its other rights and remedies, all of the rights and remedies available to Lessor under the provisions of this Property Lease or by law in the case of non-payment of Base Rent. The performance and observance by Lessee of all the terms, covenants, conditions

3

KOCH 00000128

and agreements to be performed or observed by Lessee hereunder shall be performed and observed by Lessee at Lessee's sole cost and expense.

(d)    If at any time any method of taxation shall be such that there shall be levied, assessed or imposed on Lessor, or on the Base Rent or Additional Rent, a capital levy, gross receipts or sales tax or other tax on the rents received therefrom, Lessee shall pay and discharge the same, it being the intention of the parties hereto that the rent to be paid hereunder shall be paid to Lessor absolutely net without deduction or charge of any nature whatsoever. Nothing in this Property Lease shall require Lessee to pay any income taxes assessed against Lessor or any estate, succession or inheritance taxes of Lessor, or any of its successors or assigns or any of its stockholders or distributees upon Lessor's liquidation.

(e)    The amortization schedule attached hereto as Exhibit B has been calculated assuming that Lessee shall make improvements to the Premises at a cost not to exceed Seven Hundred Thousand and 00/100 ($700,000.00) Dollars. Lessee has heretofore notified Lessor of the nature of the improvements and Lessor has consented that Lessee may make such improvements to the Premises and, in addition, Lessor has agreed to fund the cost of such improvements up to Seven Hundred Thousand and 00/100 ($700,000.00) Dollars and all such costs shall be recoverable by Lessor under this Property Lease as part of the Base Rent. Lessee shall submit invoices to Lessor for such improvements and Lessor covenants that it will pay such invoices in a timely manner so that no liens or encumbrances are asserted against the Premises relative to such improvements. In the event that Lessee has not caused such improvements to be completed prior to the due date of the first installment of Rent on September 25, 2005, Lessor and Lessee through their respective financial officers shall agree on the rental payment to be made as Base Rent for such period or any other period through the date on which Lessee has expended Seven Hundred Thousand and 00/100 ($700,000.00) Dollars and thereafter the Base Rent shall be as specified in Exhibit B.

4

KOCH 00000129

# ARTICLE III

## LESSEE'S OBLIGATIONS FOR UTILITIES, IMPROVEMENTS AND REPAIRS

Section 3.01. **UTILITIES.** Lessee shall pay for all gas, water, electricity, telephone, and other utility services or trash disposal services used or consumed in or allocable to the Premises during the term of this Property Lease and shall pay all sewer use fees or charges made or imposed with respect to or against the Premises during the Term of this Property Lease. Lessee shall hold Lessor and the Premises harmless for all liens, charges, and costs with respect to same. If any equipment installed by Lessee requires additional utility facilities, such additional facilities shall be installed at Lessee's expense. During the term hereof, the utility services shall be placed in Lessee's name, and Lessee shall be responsible for all invoices for utility services and Lessee's payments for all utility services shall be made directly to the utility or other provider of such service as and when due. Lessor shall not be responsible for any interruption or discontinuance of utility services to the Premises.

Section 3.02. **LESSEE'S IMPROVEMENTS.** After the completion of the improvements to the Premises contemplated by Section 2.03(e) above, Lessee shall also be permitted to make other improvements or alterations in the Premises with the prior written consent of Lessor (other than equipment installations or modifications) at Lessee's expense. In the event of any such modification, all work shall be performed at the expense of Lessee and under Lessee's supervision and all such work will be completed free and clear of liens. Upon termination of this Property Lease, all such modifications shall be treated as part of the Premises to be conveyed to Lessee.

Section 3.03. **REPAIRS.** Lessee, at its sole cost and expense, throughout the term of this Property Lease, shall take good care of the Premises, including the equipment (and including any improvements or equipment hereafter erected or installed on the Premises), and shall keep the same in working order and condition, and shall make and perform all routine maintenance thereof and all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, of every nature, kind and description. Lessor understands and agrees that the condition of the Premises is subject to reasonable wear

5

KOCH 00000130

and tear in the ordinary course of business. When used in this Section 6, "repairs" shall include all necessary replacements, renewals, alterations, additions and betterments. All repairs made by Lessee shall be at least equal in quality to the original work, measured from and after the Commencement Date of this Property Lease and shall be made by Lessee in accordance with all laws, ordinances and regulations whether heretofore or hereafter enacted. Lessee, at its sole cost and expense shall take good care of, repair and maintain all driveways, pathways, roadways, sidewalks, curbs, spur tracks, parking areas, loading areas, landscaped areas, entrances and passageways on or appurtenant to the Premises in good order and repair and shall promptly remove accumulated snow, ice and debris from any and all driveways, pathways, roadways, sidewalks, curbs, parking areas, loading areas, entrances and passageways and keep all portions of the Premises, including areas appurtenant thereto, in a clean and orderly condition free of snow, ice, dirt, rubbish, debris and unlawful obstructions. Lessee shall not do or suffer any waste or damage or injury to the Premises or any improvements hereafter erected thereon, or to the fixtures or equipment therein. Lessee shall comply with all laws and regulations of any governmental authority with respect to the Premises, and the manner of using and operating the same and with all restrictive covenants, if any, affecting the title to the Premises or any part thereof.

## ARTICLE IV

## ADDITIONS, EASEMENTS, LIENS, TAXES AND INSURANCE

Section 4.01. **MECHANICS' LIENS.** Lessee shall not suffer or permit any mechanic's lien or other lien to be filed against the Premises, or any portion thereof, by reason of work, labor, skill, services, equipment or materials supplied or claimed to have been supplied to the Premises at the request of Lessee, or anyone holding the Premises, or any portion thereof, through or under Lessee. If any such mechanic's lien or other lien shall at any time be filed against the Premises, or any portion thereof, Lessee shall cause the same to be discharged of record within thirty (30) days after the date of filing the same. If Lessee shall fail to discharge such mechanic's lien or liens or other lien within such period, then in addition to any other right or remedy of Lessor, Lessor may, but shall not be obligated to, discharge the same by paying to the claimant the amount claimed to be due or by procuring the discharge of such lien as to the

6

Premises by deposit in the court having jurisdiction of such lien, the foreclosure thereof or other proceedings with respect thereto, of a cash sum sufficient to secure the discharge of the same, or by the deposit of a bond or other security with such court sufficient in form, content and amount to procure the discharge of such lien. Any amount paid by Lessor, or the value of any deposit so made by Lessor, together with all costs, fees and expenses in connection therewith (including reasonable attorney's fees of Lessor), together with interest thereon at the rate of 12% per annum, shall be repaid by Lessee to Lessor on demand by Lessor and if unpaid may be treated as Additional Rent. Lessee shall indemnify and defend Lessor against and save Lessor and the Premises, and any portion thereof, harmless from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including, without limitation, reasonable attorney's fees resulting from the assertion, filing foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien.

All materialmen, contractors, artisans, mechanics, laborers and any other person now or hereafter furnishing any labor, services, materials, supplies or equipment to Lessee with respect to the Premises, or any portion thereof, are hereby charged with notice that they must look exclusively to Lessee to obtain payment for the same. Notice is hereby given that Lessor shall not be liable for any labor, services, materials, supplies, skill, machinery, fixtures or equipment furnished or to be furnished to Lessee upon credit, and that no mechanic's lien or other lien for any such labor, services, materials, supplies, machinery, fixtures or equipment shall attach to or affect the estate or interest of Lessor in an to the Premises, or any portion thereof.

Section 4.02. **TAXES.** Lessee shall pay all real estate and personal property taxes which become a lien against the Premises or any equipment, when due and before such taxes become delinquent each calendar year or portion thereof during the term of this Property Lease to the extent such taxes cover periods during which Lessee has been in possession of the Premises and shall provide Lessor evidence of such payment within ten (10) days of Lessor's request therefor. All special assessments applicable to the Premises shall be paid by Lessee prior to delinquency. Personal property taxes on personal property of Lessee located on the Premises shall be paid by Lessee.

7

Section 4.03. INSURANCE.    Lessee shall carry and maintain, at its sole cost and expense, the following types of insurance, in the amount specified and in the form hereafter provided during the Term of this Property Lease:

(a)     Fire and All Risk Property Insurance.    "All risk" property insurance against fire, theft, and all other risks with vandalism and malicious mischief endorsements in an amount not less than $4,300,000.00 on a stated value policy, subject to deductible amounts not in excess of $50,000.00, such coverage to include all buildings, appurtenances, and other improvements on the Premises.  Lessee shall keep all trade fixtures, equipment and inventories insured with fire and "all risks" coverage insurance for the full replacement cost thereof and shall furnish Lessor with evidence of such insurance coverage.

(b)     Commercial General Liability.    Commercial general liability and property damage insurance with a combined single limit of at least Five Million Dollars ($5,000,000) per occurrence insuring against any and all liability of the insured with respect to said Premises or arising out of the maintenance, use or occupancy thereof.  All such bodily injury liability insurance and property damage liability insurance shall specifically insure the performance by Lessee of the indemnity provisions as to liability for injury to or death of persons and injury or damage to property contained herein.

(c)     Employer's Liability.    Workers' compensation insurance in accordance with the statutory requirements of the state where the Premises are located and employer's liability insurance in the minimum amount of $1,000,000 for all employees of Lessee at the Premises.  If Lessee leases its workers from a third party, then Lessee shall provide Lessor, upon request, with reasonable evidence that such workers are covered under such third party's workers' compensation insurance policy.

(d)     Boilers.    Lessee shall procure and maintain in full force and effect boiler and machinery insurance on all boilers, air conditioning equipment, and other pressure vessels and systems, located in, on, or about the Premises; and if the said objects and the damage that may be caused by them or result from them are not covered by Lessee's standard fire and "all

8

KOCH 00000133

risk" coverage insurance then such boiler insurance shall be in an amount not less than One Hundred Thousand Dollars ($100,000) per occurrence.

(e)    **Flood Insurance**.  Lessee shall procure and maintain a flood insurance policy in full force and effect subject to the limitations imposed by the National Flood Insurance Program.

(f)    **Policy Form**.  All policies of insurance provided for herein shall be issued by insurance companies with general policyholders' rating of not less than A- and financial class size VIII or larger as rated in the most current available "Best's Insurance Guide", and qualified to do business in the State of Alabama, and shall be issued in the names of Lessor, Lessee and such other persons or firms as Lessor specifies from time to time as insureds and shall contain a waiver of subrogation.  Lessor's lender, if any is also to be loss payee and additional insured. The all risk property and boiler insurance shall be for Lessor as the loss payee, and the liability policies shall be for the mutual and joint benefit and protection of Lessor and Lessee, and executed copies of such policies of insurance or certificates thereof shall be delivered to the Lessor prior to delivery of possession of the Premises to Lessee and thereafter within thirty (30) days prior to the expiration of the term of each such policy.  All public liability and property damage policies shall contain a provision that the Lessor, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Lessee or Lessor.  As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Lessee in like manner and to like extent.  All policies of insurance or certificates thereof delivered to Lessor must contain a provision that the company writing said policy will give Lessor thirty (30) days notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the amounts of insurance.  All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which Lessor may carry.

(g)    **Use of Premises Not to Invalidate Insurance, Waiver of Subrogation**.  Lessee shall not use or occupy the Premises or any part thereof in any manner which could

9

KOCH 00000134

invalidate any policies of insurance now or hereafter placed on the Premises or increase the risks covered by insurance on the Premises or necessitate additional insurance premiums or policies of insurance, even if such use may be in furtherance of Lessee's business purposes. In the event any policies of insurance are invalidated by acts or omissions of Lessee, Lessor shall have the right to terminate this Property Lease, or at Lessor's option, to charge Lessee for extra insurance premiums required on the Premises on account of the increased risk caused by Lessee's use and occupancy of the Premises. Lessee waives all claims for recovery from Lessor for any loss or damage to any of its property insured under valid and collectible insurance policies.

## ARTICLE V

## PROVISIONS RESPECTING DAMAGE, DESTRUCTION AND CONDEMNATION

Section 5.01. **USE OF PREMISES.** The Premises are leased to Lessee, and are to be used by Lessee, for the purposes of food processing or cooking of poultry products, freezer storage or for Lessee's general business purposes as the same may be constituted from time to time. Lessee agrees to use the Premises in such a manner as to comply with all applicable governmental laws, ordinances and regulations in connection with its use of the Premises, and to keep the Premises in a clean and sanitary condition, and to use all reasonable precaution to prevent waste, damage or injury to the Premises.

Section 5.02. **CONDITION OF PREMISES.** Lessee agrees that no promises, representations, statements or warranties have been made on behalf of Lessor to Lessee respecting the condition of the Premises or any equipment therein, or the making, at Lessor's cost, of any repairs to the Premises and the taking of possession of the Premises and all equipment therein by Lessee shall be construed as recognition by Lessee that the Premises and equipment were in good and satisfactory condition when possession of same was taken. Lessee shall, at the termination of this Property Lease, by lapse of time or otherwise, remove all of Lessee's property therefrom and surrender the Premises to Lessor in as good condition as when Lessee took possession, normal wear and tear in the ordinary course of business excepted. Lessee shall repair any damages done removing equipment.

10

KOCH 00000135

Section 5.03.  **PERSONAL PROPERTY AT RISK OF LESSEE.**  All personal property in the Premises shall be at the risk of Lessee only. . Lessor shall not be liable for any damage to any personal property or any property of Lessee or its agents or employees in the Premises caused by steam, electricity, sewage, gas or odors, or from water, rain or snow which may leak into, issue or flow into the Premises from any part of the Premises, or from any other place or quarter, or for any damage done to Lessee's property in moving same to or from the Premises.  Lessee shall give Lessor, or its agents, prompt written notice of any damage to or defects in water pipes, gas or warming or cooling apparatus in the Premises.

Section 5.04.  **INDEMNITY.**  Lessee shall indemnify, hold harmless and defend Lessor from and against, and Lessor shall not be liable to Lessee on account of, any and all costs, expenses, liabilities, losses, damages, suits, actions, fines, penalties, demands or claims of any kind, including reasonable attorney's fees, asserted by or on behalf of any person, entity or governmental authority arising out of or in any way connected with either (a) a failure by Lessee to perform any of the agreements, terms, or conditions of this Property Lease required to be performed by Lessee, (b) a failure by Lessee to comply with any laws, statutes, ordinances, regulations or orders of any governmental authority, or (c) any accident, death, or personal injury, or damage to, or loss or theft of property which shall occur on or about the Premises, except as the same may be the result of the gross negligence of Lessor, its employees (other than its maintenance personnel at the Premises) or agents,

Section 5.05.  **ENVIRONMENTAL.**  From and after the Commencement Date, Lessee hereby indemnifies and holds Lessor harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims, environmental response and cleanup costs, fines, and actions, suits, costs, taxes, expenses, of whatsoever kind or nature imposed on, incurred by, or served against Lessor in any way relating to or arising out of the management, mismanagement, presence, use, possession, generation, transportation, removal, treatment, storage, disposal, migration, or remedy of any "Regulated Substance" as defined herein, now or hereafter in, on, under or from the Premises, in each case to the extent accruing on or after the Commencement Date.

11

KOCH 00000136

For the purposes of this Property Lease, the term "Regulated Substance" shall include substances defined as "regulated substances," "hazardous waste," "hazardous substances," "hazardous materials," "toxic substances, " "pesticides" or terms of similar import or effect in the Resource Conservation and Recovery Act, as amended by the Hazardous Solid Waste Amendments of 1984, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, Federal and state environmental laws, any future local, state or federal law or ordinance, or the regulations, rules, and ordinances adopted and publications from time to time promulgated pursuant to said local, state, and federal laws or ordinances. The indemnity in this Section 14 shall survive the expiration or termination of this Property Lease and shall continue to run in favor of each successive owner of the Premises, notwithstanding that, at the time the right to indemnity is claimed, the party seeking the indemnity is no longer Lessor under this Property Lease for a period of thirty-six (36) months after termination of the Property Lease.

Section 5.06.  **DAMAGE BY FIRE OR OTHER CASUALTY.** If, during the Term of this Property Lease, the Premises, or any portion thereof, shall be damaged by fire or any other cause, at Lessor's election Lessee shall repair the Premises (as long as Lessor agrees to let any available insurance proceeds be used for such repair), and the work or repair shall begin promptly and shall be carried on without unnecessary delay. In the event Lessor elects not to have Lessee repair the Premises, the proceeds of the fire and "all risks" coverage policy shall be paid over to Lessor. Any such damage shall not extend the Property Lease Term. Lessee shall not be entitled to any damages by reason of any inconvenience or loss sustained by Lessee as a result of the Premises or any portion thereof being untenantable while the Premises are being repaired or in the event the Lessor elects not to have the Premises repaired as provided above.

Section 5.07  **CONDEMNATION.** If the whole or any part of the Premises shall be taken by public authority under the power of eminent domain, then the term of this Property Lease shall cease on that portion of the Premises so taken, from the date of possession, and the rent shall be paid to that date, with a proportionate refund by Lessor to Lessee of such rent as

12

KOCH 00000137

may have been paid by Lessee in advance. If the portion of the Premises taken is such that it prevents the practical use of the Premises for Lessee's purposes, then Lessee shall have the right to continue in possession of the remainder of the Premises, except that the rent shall be reduced in proportion to the area of the Premises taken. In the event of any taking or condemnation of the Premises, in whole or in part, the entire resulting award of damages shall be the exclusive property of Lessor, including all damages awarded as compensation for diminution in value to the leasehold, without any deduction for the value of any unexpired term of this Property Lease, or for any other estate or interest in the Premises now or hereafter vested in Lessee.

## ARTICLE VI
## CERTAIN PROVISIONS RELATING TO
## ASSIGNMENT, SUBLEASING AND MORTGAGING

Section 6.01. **Provisions Relating to Assignment.**

(a)     Lessee may assign its rights and obligations hereunder to Sylvest Foods Corporation, and any successor to the business of Lessee by merger, consolidation or acquisition of all or substantially all of Lessee's assets.

(b)     Lessor shall have the right to assign its rights and obligations hereunder to Regions Bank as collateral security for Lessor's financing with such Bank. In addition, Lessor shall have the right to assign its interest (whether by merger, consolidation, sale of assets or otherwise) under this Property Lease provided that the assignee expressly assumes the rights and obligations of Lessor under this Property Lease and under the Agreement Defining Relationship between Lessor and Lessee.

(c)     No assignee or anyone claiming by, through or under any permitted assignment shall by virtue thereof acquire any greater rights in the Premises or in any part thereof than Lessee then has under this Property Lease, nor shall any such assignment or any dealings or

13

KOCH 00000138

transactions between Lessor or its assignee in any way relieve Lessee from primary liability for any of its obligations hereunder. Thus, in the event of any such assignment, should Lessee's assignee fail to perform such obligation as and when due, Lessee shall continue to remain liable for payment of the rentals herein provided to be paid by it and for performance and observance of the other agreements and covenants on Lessee's part herein provided to be performed and observed by them.

Section 6.02.  **Provisions Relating to Subleasing.**   Lessee may sublet the Premises or any portion thereof to Sylvest Foods Corporation, and any successor thereto by merger, consolidation or acquisition of all or substantially all of Lessee's assets. No sublessee or anyone claiming by, through or under the sublease shall by virtue thereof acquire any greater rights in the Premises or any part thereof than Lessee then has under this Property Lease. Any further sublease shall, by its terms, specify that such sublease shall terminate conterminously with the termination of this Property Lease. No sublease made by Lessee or Sublessee shall relieve Lessee from any obligation under this Property Lease.

Section 6.03    **Restriction on Sale or Mortgaging of Leasehold Estate by Lessor or Lessee.**  Neither the Lessor nor the Lessee may sell its leasehold estate acquired hereby to any person or persons prior to the expiration of Lessee's Purchase Option without the written consent of the other party not to be unreasonably withheld.   In all events any purchaser of Lessor's or Lessee's interest in the Property Lease or the leasehold estate created hereby with respect to the Premises shall agree in writing to be bound by all of the terms, covenants and conditions of this Property Lease. Each party agrees to give the other not less than thirty (30) days notice of any such proposed sale. Further, except as contemplated by the financing documents respecting the Regions Bank financing being obtained concurrently with the execution of this Property Lease, neither the Lessor nor the Lessee may mortgage the Premises or its interest therein to a lender as security for the payment of any loan (other than Lessor to Regions Bank).

Section 6.04.  **Lessee's Purchase Option.**

(a)    At any time after the Commencement Date of this Property Lease, Lessee shall have the right to purchase the Premises by prepaying all of the Base Rent (indebtedness)

14

KOCH 00000139

then due to Lessor as reflected on the amortization schedule attached hereto as Exhibit A. **This option to Purchase is a material inducement to Lessee for executing this Property Lease and such option may not be altered, amended or rescinded by Lessor without the express written consent of Lessee.** In addition Lessor and Lessee agree that in the event of a prepayment of the Property Lease during the first twelve (12) months following the Commencement Date of the Property Lease, and Lessee prepays the Base Rent (indebtedness) under such Property Lease in full, Lessor shall be entitled to a prepayment fee in the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars; if prepayment should occur at any time during months thirteen through twenty-four following the Commencement Date Lessee shall pay to Lessor a prepayment fee in the amount of be One Hundred Thousand and 00/100 ($100,000.00) Dollars and in months twenty-five through thirty-six following the Commencement Date the prepayment fee shall be Fifty Thousand and 00/100 ($50,000.00) Dollars. Following the thirty-sixth month aftrthe Commencement Date there shall be no prepayment fee with respect to the Property Lease.

(b)     In the event that Lessee elects to prepay the indebtedness due under this Property Lease, Lessee shall give ten (10) days notice to Lessor that it intends to make a prepayment of all the Base Rent (including wihtout limitation all principal, interest, indebtedness and Additional Rent) then due however, in no event less than the outstanding balance as shown in Exhibit B. Such payment shall be made on the second business day following the expiration of the notice to be given to Lessor and Lessor shall immediately and concurrently deliver to Lessee a statutory warranty deed to the Premises conveying merchantable title free and clear of all liens and encumbrances (other than exceptions as reflected in the owner's title policy being delivered to Lessor in connection with the consummation of the transactions contemplated by the Asset Purchse Agreement or such other exceptions that are reasonably acceptable to Lessee). Furthermore, immediately upon payment of the final installment due under the amortization schedule, Lessor shall likewise convey the Premises to Lessee as herein provided.

15

**ARTICLE VII**

**EVENTS OF DEFAULT AND REMEDIES**

Section 7.01.  **DEFAULT OR BREACH.**  Each of the following events shall constitute a default or a breach of this Property Lease by Lessee:

(a)     If Lessee fails to pay Lessor any Base Rent, Additional Rent or other rent when due hereunder;

(b)     If Lessee fails to perform or comply with any other term or condition of this Property Lease and if such nonperformance shall continue for a period of 15 days after notice thereof by Lessor to Lessee, time being of the essence.

(c)     If Lessee vacates or abandons the Premises;

(d)     If Lessee files a petition in bankruptcy or insolvency or for reorganization under any Bankruptcy Act, or voluntarily takes advantage of any such act by answer or otherwise, or makes an assignment for the benefit of creditors;

(e)     If involuntary proceedings under any bankruptcy or insolvency act shall be instituted against Lessee, or if a receiver or trustee shall be appointed for all or substantially all of the property of Lessee, and such proceedings shall not be dismissed or the receivership or trusteeship vacated within 30 days after the institution or appointment; or

(f)     The Lessee's estate created by this Property Lease is taken in execution or by other process of law.

Section 7.02.  **EFFECT OF DEFAULT.**     In the event of any default or breach hereunder, in addition to any other right or remedy available to Lessor, either at law or in equity, Lessor may exert any one or more of the following rights:

(a)     Cure any default of Lessee hereunder, in which case Lessee shall reimburse any costs incurred by Lessor in curing such default, together with interest charged

16

KOCH 00000141

thereon at the rate of 12% per annum, which amount shall be paid by Lessee to Lessor within 15 days after demand on Lessee therefore.

(b)     Lessor may retake the Premises and may terminate this Property Lease by giving notice of termination to Lessee not less than fifteen (15) days prior to any such retaking. Without such notice, Lessor's retaking will not terminate the Property Lease. On termination, Lessor may recover from Lessee all damages proximately resulting from the breach, including the cost of recovering the Premises and the Base Rent for the balance of the Property Lease which sum shall be immediately due Lessor from Lessee, provided however, Lessor must mitigate its damages by immediately selling or taking steps to sell the Premises and any damages to be asserted against Lessee shall be mitigated or set off by the proceeds from Lessor's sale.

(c)     Lessor may relet the Premises or any part thereof for any term without terminating this Property Lease, at such rent and on such terms as it may choose. Lessor may make alterations and repairs to the Premises. In addition to Lessee's liability to Lessor for breach of this Property Lease, Lessee shall be liable for all expenses of the reletting, for any alterations and repairs made, and for the difference between the rent received by Lessor under the new lease agreement and the rent installments that are due for the same period under this Property Lease.

Section 7.03.   **AGREEMENT DEFINING RELATIONSHIP.**   Lessor and Lessee have concurrently with the execution of the Property Lease entered into an Agreement Defining Relationship between Sylvest Farms, Inc. and Hodges Bonded Warehouse, Inc. the provisions of which are incorporated hereby reference. The benefits and obligations of each party are subject to the remedy of specific performance in the Circuit Court of Montgomery County, Alabama in addition to all other remedies at law or in equity.

Section 7.04.   **SUBORDINATION AND ATTORNMENT.**   Lessor reserves the right to place liens and encumbrances on the Premises in favor of Regions Bank, solely superior in lien and effect to this Property Lease and not to any other lender or lienholder or claimant. This Property Lease, and all rights of Lessee hereunder shall be subject and subordinate to any liens and encumbrances now or hereafter imposed by Lessor upon the Premises or any part thereof. Lessor and Lessee agree to execute, acknowledge and deliver to Regions Bank a Subordination,

17

Nondisturbance and Attornment Agreement in the form attached hereto as Exhibit C, upon demand, any and all instruments that may be necessary or proper to subordinate this Property Lease and all rights herein to any such lien or encumbrance as may be required by Lessor. In no event shall Lessor have the right to terminate this Property Lease upon Lessor's default under any mortgage or security agreement with Regions Bank with respect to the Premises.

Section 7.05. **ESTOPPEL CERTIFICATE.** Lessee agrees that at any time and from time to time during the term of this Property Lease, and within ten (10) days after demand therefor by Lessor, to execute and deliver to Lessor or to any proposed mortgagee, trustee, beneficiary or purchaser, a certificate in recordable form certifying that this Property Lease is in full force and effect, that the Property Lease is unmodified, or if modified state any such modifications, and that there are no defenses or offsets thereto, or stating such defenses or offsets as are claimed by Lessee, and the dates to which all rentals have been paid.

Section 7.06. **INTEREST ON PAST DUE OBLIGATIONS.** Whenever under any provision of this Property Lease Lessee shall be obligated to make any payment or expenditure, or to do any act or thing, or to incur any liability whatsoever, and Lessee fails, refuses or neglects to perform as herein required, Lessor shall be entitled but shall not be obligated to make any such payment or expenditure, or do any such act or thing, or to incur any such liability, all on behalf of and at the cost and for the account of Lessee, and in such event the amount thereof with interest thereon as hereinafter provided shall be deemed Additional Rental hereunder and shall be added to and deemed a part of the next installment of rent thereafter becoming due from Lessee to Lessor hereunder. Any amount due from Lessee to Lessor under this Property Lease which is not paid when due shall bear interest at the rate of 12 percent per annum from the date due until paid, but the payment of such interest shall not excuse or cure any default by Lessee under this Property Lease. The interest provided for in this Section 7.06 shall be in addition to any latefee owed Lessor by Lessee.

Section 7.07. **LIABILITY OF LESSOR.** If Lessor shall fail to perform any covenant, term or condition of this Property Lease upon Lessors part to be performed and, as a consequence of such default, Lessee shall recover a money judgment against Lessor, such judgment shall be

18

KOCH 00000143

satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Lessor in the Premises and out of rents or other income from such property receivable by Lessor or out of the consideration received by Lessor from the sale or other disposition of all or any part of Lessor's right, title and interest in the Premises, and the Lessor shall not be liable for any deficiency.

Section 7.08.  **NOTICES.**  Any notice of demands to be given hereunder shall be given in writing and sent by recognized national overnight courier to:

| | |
|---|---|
| Lessor: | Hodges Bonded Warehouse, Inc. |
| | 4590 Mobile Highway |
| | Montgomery, Alabama 36108 |
| | Attention:  Lance Hunter, Chief Executive Officer |
| | |
| Copy to: | William I. Eskridge, Esq. |
| | Rushton Stakely Johnston & Garrett, PA |
| | Post Office Box 270 |
| | Montgomery, AL 36101-0270 |
| | |
| Lessee: | Sylvest Foods Corporation |
| | Attention: Dean E. Falk |
| | President and CEO |
| | 3500 Western Boulevard |
| | Montgomery, Alabama  36064 |
| | |
| Copy to: | Thomas G. Mancuso, Esq. |
| | Mancuso & Franco, P.C. |
| | Post Office Box 240489 |
| | Montgomery, Alabama  36124-0489 |

or at such other address as either party may from time to time designate in writing.  Each such notice shall be deemed to have been given at the time it shall be delivered to the other party by such courier in the manner prescribed herein.  Nothing contained herein shall be construed to preclude personal service of any notice in the manner prescribed by law for personal service of a summons or other legal process.

Section 7.09.  **TAX COVENANTS OF LESSOR.**  Lessor covenants and agrees with Lessee with respect to certain tax matters as follows:

19

KOCH 00000144

(a)    All tax abatement agreements held by S&C Beef Processors, LLC have been or will be assigned to Lessee and are the sole property of Lessee. Lessor will not knowingly take any action of any nature to mitigate, reduce or cancel such abatement agreements in effect on the Commencement Date of this Property Lease, with the Alabama Department of Revenue or local governmental authorities.

(b)    All tax incentives under the Mercedes Act of the State of Alabama and held by S&C Beef Processors, LLC have been or will be assigned to Lessee and are the sole property of Lessee. Lessor will not knowingly take any action of any nature to mitigate, reduce or cancel all such incentive agreements in effect on the Commencement Date of this Property Lease, with the Alabama Department of Revenue or local governmental authorities.

## ARTICLE VIII
## MISCELLANEOUS.

Section 8.01.  **Covenant of Quite Enjoyment; Surrender of Premises.**  So long as Lessee performs and observes all the covenants and agreements on its part herein contained, Lessee shall peaceably and quietly have, hold and enjoy the Premises during the Term, subject to all the terms and provisions hereof.  Upon any termination of this Property Lease prior to its term, Lessee will surrender possession of the Premises peaceably and promptly to Lessor in as good condition as can reasonably be expected as at the completion of the construction of the Premises, excepting only (a) loss by fire or other casualty, (b) alterations, changes or improvements made in accordance with the provisions of this Property Lease, (c) acts of governmental or condemning authorities, and (d) ordinary wear and tear and obsolescence.

Section 8.02.  **Representation of Lessor's and Lessee's Power and Authority.**  Lessor and Lessee represent and warrant to each other that each has full power and authority to execute, deliver and perform this Property Lease and that the execution and delivery hereof has been duly authorized by all necessary action.

Section 8.03.  **This Property Lease is a Triple Net Lease.**  Lessee recognizes and understands that it is the intention hereof that this Property Lease be a "triple net" lease during its

20

KOCH 00000145

term and that no cost or expense will be incurred by Lessor for ad valorem taxes, insurance, maintenance, repair, utilities or any other expense of ownership or operation of the Premises or Premises Site during the Term of the Property Lease. This Property Lease shall be construed to effectuate such intent.

Section 8.04. **Certain Prior and Contemporaneous Agreements Cancelled.** This Property Lease shall completely and fully supersede all other prior or contemporaneous agreements, both written and oral, between Lessor and Lessee relating to the construction of the Premises, and the leasing of the Premises. Neither Lessor nor Lessee shall hereafter have any rights under any such prior or contemporaneous agreement but shall look solely to this Property Lease for definition and determination of all their respective rights, liabilities and responsibilities respecting the construction of the Premises, and the leasing of the Premises.

Section 8.05. **Article and Section Captions.** The article and section headings and captions contained herein are included for convenience only and shall not be considered a part hereof or affect in any manner the construction nor interpretation hereof.

Section 8.06. **Binding on Assigns.** Except as hereinabove provided, all terms, conditions and agreements of this Property Lease shall be binding upon, apply and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.

Section 8.07. **Amendment in Writing.** This Property Lease contains the entire agreement between the parties and may be amended only by subsequent written agreement.

Section 8.08. **Waiver-None.** The failure of Lessor to insist upon strict performance of any of the terms, conditions and agreements of this Property Lease shall not be deemed a waiver of any of its rights or remedies hereunder and shall not be deemed a waiver of any subsequent breach or default of any of such terms, conditions and agreements. The doing of anything by Lessor which Lessor is not obligated to do hereunder shall not impose any future obligation on Lessor nor otherwise amend any provision of this Property Lease.

21

KOCH 00000146

Section 8.09.  **No Surrender.**  No surrender of the Premises by Lessee shall be effected by Lessor's acceptance of the keys to the Premises or of the rent due hereunder, or by any other means whatsoever, without Lessor's written acknowledgment that such acceptance constitutes a surrender.

Section 8.10.  **Captions.**  The captions of the various paragraphs in this Property Lease are for convenience only and do not define, limit, describe or construe the contents of such paragraphs.

Section 8.11.  **Brokers.**  Lessee hereby warrants that no real estate broker has or will represent it in this transaction and that no finder's fees have been earned by a third party.

Section 8.12.  **Applicable Law.**  This Property Lease shall be governed by and construed in accordance with the laws of the State of Alabama.

Section 8.13.  **Partial Invalidation of Property Lease.**  If any term, covenant or condition of this Property Lease is determined by any court of competent jurisdiction to be invalid or unenforceable, the remainder of this Property Lease shall remain in full force and effect.

Section 8.14.  **Counterparts.**  This Property Lease may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  A facsimile copy of this Property Lease and any signature thereon shall be considered for all purposes an original.

Section 8.15.  **Late Fee.**  In the event any monetary obligation, including but not limited to fixed annual rent, percentage rent or additional rent, of Lessee is not paid within fifteen (15) days after its due date, Lessee shall pay to Lessor a late fee equal to two (2%) percent of the delinquent payment

Section 8.16.  **Exculpation Clause.**  Notwithstanding anything in this Property Lease to the contrary and to the extent that may otherwise be required by applicable law, Lessor, its

22

KOCH 00000147

agents, servants, employees, or any other person for whom Lessor is in law responsible, shall not be liable, responsible or accountable in damages or otherwise to Lessee or any other person for any acts or omissions related to the Premises or Lessee's business activities" Such exculpation of liability shall be absolute and without any exception whatsoever except in the event of fhud or gross negligence.

Section 8.17.    **Right of Entry**.  Lessor and its agents shall have the right, and during Lessee's business hours and after notice to Lessee, to enter the Premises to examine them or to make any necessary repairs thereto or to show the Premises to prospective purchasers or lessees, provided such activities do not interfere with Lessee's use of the Leased Premises

IN WITNESS WHEREOF, the parties hereto have executed this Property Lease as of the day and year first above written.

LESSOR:

HODGES BONDED WAREHOUSE, INC.

ATTEST:

By:_____

By: _____

Title:_____

LESSEE:

SYLVEST FARMS, INC.

ATTEST:

By: _____
Its:    Secretary

By: _____
Dean E. Falk
Title:  President and Chief Executive Officer

23

KOCH 00000148

**Exhibit A**

**Legal Description**

KOCH 00000149

## Exhibit A

### Legal Description

Lot A, according to the Map of Morrell Plat No. 1 as recorded in the Office of the Judge of Probate, Montgomery County, Alabama, in Plat Book 41 at Page 145, being further described as follows:

Commence at the intersection of the Eastern ROW of CSX Railroad (100' ROW) with the Northern Right of Way of U.S. Highway 80 (ROW varies); thence run along said Eastern ROW N 18° 16' E, 1068.8 feet (per Deed) to a concrete monument, said point being the Point of Beginning; thence from said Point of Beginning, continue along said Eastern Right of Way N 18° 12' 04" E, 805.61 feet to a found 5/8" rebar (GMC Cap CA00156); thence leave said Eastern Right of Way and run S 83° 22' 00" E, 964.07 feet to a found 5/8" rebar (GMC Cap CA00156) lying on the West Right of Way of the aforementioned U.S. Highway 80; thence run along said West Right of Way, S 06° 57' 16" W, 595.48 feet to a point of curvature; thence continue along said West Right of Way and said curve (concave westerly, R=1069.59'), a chord of S 11° 52' 10" W, 194.59 feet to a found concrete monument; thence leave said West Right of Way and run N 83° 22' 00" W, 1104.52 feet to the Point of Beginning.

Said described property lying and being situated in the Southwest Quarter of Section 34, T-16-N, R-17-E, and in the Northwest Quarter of Section 3, T-15-N, R-17-E, Montgomery County, Alabama, and contains 18.867 acres, more or less.

Together, with a 30' access and utility easement as recorded in Real Property Book 1458 at Page 948, being further described as follows:

Commence at a found iron pin (GMC CAP CA00156) lying at the Northeast corner of Lot A, according to the Map of Morrell Plat No. 1, as recorded in the Office of the Judge of Probate, Montgomery County, Alabama, in Plat Book 41 at Page 145, said Point lying on the West Right of Way of U.S. Highway 80 (ROW varies); thence run along the North line of said Lot A, N 83° 22' 00" W, 88.75 feet to the Point of Beginning; thence from said Point of Beginning, continue along said North line, N 83° 22' 00" W, 448.28 feet to a point; thence leave said North line and run N 54° 28' 45" E, 44.71 feet to a point; thence run S 83° 22' 00" E, 366.06 feet to a point; thence run S 51° 55' 15" E, 57.51 feet to the Point of Beginning.

Said described easement lying and being situated in the Southwest Quarter of Section 34, T-16-N, R-17-E, Montgomery County, Alabama, and contains 0.280 acres, more or less.

Together with Lessor's right, title and interest in and to any lands conveyed from S&C Beef Processors, L.L.C. unto Lessor pursuant to a Statutory Warranty Deed dated contemporaneously with this Lease and to be recorded in the Office of the Judge of Probate of Montgomery County, Alabama.

**Exhibit B**

**Amortization Schedule**

KOCH 00000151

08/09/2005   Page 1

## Building

| | |
|---|---|
| Compound Period ........ : | Monthly |

| | | |
|---|---|---|
| Nominal Annual Rate .... : | 15.000 | % |
| Effective Annual Rate ... : | 16.075 | % |
| Periodic Rate ................. : | 1.2500 | % |
| Daily Rate ..................... : | 0.04110 | % |

## CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|
| 1  Loan | 08/25/2005 | 3,700,000.00 | 1 | | |
| 2  Payment | 09/25/2005 | 71,397.99 | 84 | Monthly | 08/25/2012 |

## AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 08/25/2005 | | | | 3,700,000.00 |
| 1 | 09/25/2005 | 71,397.99 | 46,250.00 | 25,147.99 | 3,674,852.01 |
| 2 | 10/25/2005 | 71,397.99 | 45,935.65 | 25,462.34 | 3,649,389.67 |
| 3 | 11/25/2005 | 71,397.99 | 45,617.37 | 25,780.62 | 3,623,609.05 |
| 4 | 12/25/2005 | 71,397.99 | 45,295.11 | 26,102.88 | 3,597,506.17 |
| 2005 | Totals | 285,591.96 | 183,098.13 | 102,493.83 | |
| | | | | | |
| 5 | 01/25/2006 | 71,397.99 | 44,968.83 | 26,429.16 | 3,571,077.01 |
| 6 | 02/25/2006 | 71,397.99 | 44,638.46 | 26,759.53 | 3,544,317.48 |
| 7 | 03/25/2006 | 71,397.99 | 44,303.97 | 27,094.02 | 3,517,223.46 |
| 8 | 04/25/2006 | 71,397.99 | 43,965.29 | 27,432.70 | 3,489,790.76 |
| 9 | 05/25/2006 | 71,397.99 | 43,622.38 | 27,775.61 | 3,462,015.15 |
| 10 | 06/25/2006 | 71,397.99 | 43,275.19 | 28,122.80 | 3,433,892.35 |
| 11 | 07/25/2006 | 71,397.99 | 42,923.65 | 28,474.34 | 3,405,418.01 |
| 12 | 08/25/2006 | 71,397.99 | 42,567.73 | 28,830.26 | 3,376,587.75 |
| 13 | 09/25/2006 | 71,397.99 | 42,207.35 | 29,190.64 | 3,347,397.11 |
| 14 | 10/25/2006 | 71,397.99 | 41,842.46 | 29,555.53 | 3,317,841.58 |
| 15 | 11/25/2006 | 71,397.99 | 41,473.02 | 29,924.97 | 3,287,916.61 |
| 16 | 12/25/2006 | 71,397.99 | 41,098.96 | 30,299.03 | 3,257,617.58 |
| 2006 | Totals | 856,775.88 | 516,887.29 | 339,888.59 | |
| | | | | | |
| 17 | 01/25/2007 | 71,397.99 | 40,720.22 | 30,677.77 | 3,226,939.81 |
| 18 | 02/25/2007 | 71,397.99 | 40,336.75 | 31,061.24 | 3,195,878.57 |
| 19 | 03/25/2007 | 71,397.99 | 39,948.48 | 31,449.51 | 3,164,429.06 |
| 20 | 04/25/2007 | 71,397.99 | 39,555.36 | 31,842.63 | 3,132,586.43 |
| 21 | 05/25/2007 | 71,397.99 | 39,157.33 | 32,240.66 | 3,100,345.77 |
| 22 | 06/25/2007 | 71,397.99 | 38,754.32 | 32,643.67 | 3,067,702.10 |
| 23 | 07/25/2007 | 71,397.99 | 38,346.28 | 33,051.71 | 3,034,650.39 |
| 24 | 08/25/2007 | 71,397.99 | 37,933.13 | 33,464.86 | 3,001,185.53 |
| 25 | 09/25/2007 | 71,397.99 | 37,514.82 | 33,883.17 | 2,967,302.36 |
| 26 | 10/25/2007 | 71,397.99 | 37,091.28 | 34,306.71 | 2,932,995.65 |
| 27 | 11/25/2007 | 71,397.99 | 36,662.45 | 34,735.54 | 2,898,260.11 |
| 28 | 12/25/2007 | 71,397.99 | 36,228.25 | 35,169.74 | 2,863,090.37 |
| 2007 | Totals | 856,775.88 | 462,248.67 | 394,527.21 | |

Building

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 29 | 01/25/2008 | 71,397.99 | 35,788.63 | 35,609.36 | 2,827,481.01 |
| 30 | 02/25/2008 | 71,397.99 | 35,343.51 | 36,054.48 | 2,791,426.53 |
| 31 | 03/25/2008 | 71,397.99 | 34,892.83 | 36,505.16 | 2,754,921.37 |
| 32 | 04/25/2008 | 71,397.99 | 34,436.52 | 36,961.47 | 2,717,959.90 |
| 33 | 05/25/2008 | 71,397.99 | 33,974.50 | 37,423.49 | 2,680,536.41 |
| 34 | 06/25/2008 | 71,397.99 | 33,506.71 | 37,891.28 | 2,642,645.13 |
| 35 | 07/25/2008 | 71,397.99 | 33,033.06 | 38,364.93 | 2,604,280.20 |
| 36 | 08/25/2008 | 71,397.99 | 32,553.50 | 38,844.49 | 2,565,435.71 |
| 37 | 09/25/2008 | 71,397.99 | 32,067.95 | 39,330.04 | 2,526,105.67 |
| 38 | 10/25/2008 | 71,397.99 | 31,576.32 | 39,821.67 | 2,486,284.00 |
| 39 | 11/25/2008 | 71,397.99 | 31,078.55 | 40,319.44 | 2,445,964.56 |
| 40 | 12/25/2008 | 71,397.99 | 30,574.56 | 40,823.43 | 2,405,141.13 |
| 2008 | Totals | 856,775.88 | 398,826.64 | 457,949.24 | |
| 41 | 01/25/2009 | 71,397.99 | 30,064.26 | 41,333.73 | 2,363,807.40 |
| 42 | 02/25/2009 | 71,397.99 | 29,547.59 | 41,850.40 | 2,321,957.00 |
| 43 | 03/25/2009 | 71,397.99 | 29,024.46 | 42,373.53 | 2,279,583.47 |
| 44 | 04/25/2009 | 71,397.99 | 28,494.79 | 42,903.20 | 2,236,680.27 |
| 45 | 05/25/2009 | 71,397.99 | 27,958.50 | 43,439.49 | 2,193,240.78 |
| 46 | 06/25/2009 | 71,397.99 | 27,415.51 | 43,982.48 | 2,149,258.30 |
| 47 | 07/25/2009 | 71,397.99 | 26,865.73 | 44,532.26 | 2,104,726.04 |
| 48 | 08/25/2009 | 71,397.99 | 26,309.08 | 45,088.91 | 2,059,637.13 |
| 49 | 09/25/2009 | 71,397.99 | 25,745.46 | 45,652.53 | 2,013,984.60 |
| 50 | 10/25/2009 | 71,397.99 | 25,174.81 | 46,223.18 | 1,967,761.42 |
| 51 | 11/25/2009 | 71,397.99 | 24,597.02 | 46,800.97 | 1,920,960.45 |
| 52 | 12/25/2009 | 71,397.99 | 24,012.01 | 47,385.98 | 1,873,574.47 |
| 2009 | Totals | 856,775.88 | 325,209.22 | 531,566.66 | |
| 53 | 01/25/2010 | 71,397.99 | 23,419.68 | 47,978.31 | 1,825,596.16 |
| 54 | 02/25/2010 | 71,397.99 | 22,819.95 | 48,578.04 | 1,777,018.12 |
| 55 | 03/25/2010 | 71,397.99 | 22,212.73 | 49,185.26 | 1,727,832.86 |
| 56 | 04/25/2010 | 71,397.99 | 21,597.91 | 49,800.08 | 1,678,032.78 |
| 57 | 05/25/2010 | 71,397.99 | 20,975.41 | 50,422.58 | 1,627,610.20 |
| 58 | 06/25/2010 | 71,397.99 | 20,345.13 | 51,052.86 | 1,576,557.34 |
| 59 | 07/25/2010 | 71,397.99 | 19,706.97 | 51,691.02 | 1,524,866.32 |
| 60 | 08/25/2010 | 71,397.99 | 19,060.83 | 52,337.16 | 1,472,529.16 |
| 61 | 09/25/2010 | 71,397.99 | 18,406.61 | 52,991.38 | 1,419,537.78 |
| 62 | 10/25/2010 | 71,397.99 | 17,744.22 | 53,653.77 | 1,365,884.01 |
| 63 | 11/25/2010 | 71,397.99 | 17,073.55 | 54,324.44 | 1,311,559.57 |
| 64 | 12/25/2010 | 71,397.99 | 16,394.49 | 55,003.50 | 1,256,556.07 |
| 2010 | Totals | 856,775.88 | 239,757.48 | 617,018.40 | |
| 65 | 01/25/2011 | 71,397.99 | 15,706.95 | 55,691.04 | 1,200,865.03 |
| 66 | 02/25/2011 | 71,397.99 | 15,010.81 | 56,387.18 | 1,144,477.85 |
| 67 | 03/25/2011 | 71,397.99 | 14,305.97 | 57,092.02 | 1,087,385.83 |
| 68 | 04/25/2011 | 71,397.99 | 13,592.32 | 57,805.67 | 1,029,580.16 |
| 69 | 05/25/2011 | 71,397.99 | 12,869.75 | 58,528.24 | 971,051.92 |
| 0 | 06/25/2011 | 71,397.99 | 12,138.15 | 59,259.84 | 911,792.08 |
| 71 | 07/25/2011 | 71,397.99 | 11,397.40 | 60,000.59 | 851,791.49 |
| 72 | 08/25/2011 | 71,397.99 | 10,647.39 | 60,750.60 | 791,040.89 |

08/09/2005   Page 3

Building

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 73 | 09/25/2011 | 71,397.99 | 9,888.01 | 61,509.98 | 729,530.91 |
| 74 | 10/25/2011 | 71,397.99 | 9,119.14 | 62,278.85 | 667,252.06 |
| 75 | 11/25/2011 | 71,397.99 | 8,340.65 | 63,057.34 | 604,194.72 |
| 76 | 12/25/2011 | 71,397.99 | 7,552.43 | 63,845.56 | 540,349.16 |
| 2011 | Totals | 856,775.88 | 140,568.97 | 716,206.91 | |
| | | | | | |
| 77 | 01/25/2012 | 71,397.99 | 6,754.36 | 64,643.63 | 475,705.53 |
| 78 | 02/25/2012 | 71,397.99 | 5,946.32 | 65,451.67 | 410,253.86 |
| 79 | 03/25/2012 | 71,397.99 | 5,128.17 | 66,269.82 | 343,984.04 |
| 80 | 04/25/2012 | 71,397.99 | 4,299.80 | 67,098.19 | 276,885.85 |
| 81 | 05/25/2012 | 71,397.99 | 3,461.07 | 67,936.92 | 208,948.93 |
| 82 | 06/25/2012 | 71,397.99 | 2,611.86 | 68,786.13 | 140,162.80 |
| 83 | 07/25/2012 | 71,397.99 | 1,752.04 | 69,645.95 | 70,516.85 |
| 84 | 08/25/2012 | 71,397.99 | 881.14 | 70,516.85 | 0.00 |
| 2012 | Totals | 571,183.92 | 30,834.76 | 540,349.16 | |
| | | | | | |
| Grand Totals | | 5,997,431.16 | 2,297,431.16 | 3,700,000.00 | |

KOCH 00000154

08/09/2005   Page 4

Building

it interest amount decreased by 0.32 due to rounding.

KOCH 00000155

08/09/2005   Page 1

Equipment

Compound Period ........ : Monthly

Nominal Annual Rate ....:   15.000   %
Effective Annual Rate ...:   16.075   %
Periodic Rate ...............:   1.2500   %
Daily Rate ....................:   0.04110 %

CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|-------|-----------|--------|--------|--------|----------|
| 1 Loan | 08/25/2005 | 870,000.00 | 1 | | |
| 2 Payment | 09/25/2005 | 42,183.38 | 24 | Monthly | 08/25/2007 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|------|---------|----------|-----------|---------|
| Loan 08/25/2005 | | | | 870,000.00 |
| 1 09/25/2005 | 42,183.38 | 10,875.00 | 31,308.38 | 838,691.62 |
| 2 10/25/2005 | 42,183.38 | 10,483.65 | 31,699.73 | 806,991.89 |
| 3 11/25/2005 | 42,183.38 | 10,087.40 | 32,095.98 | 774,895.91 |
| 4 12/25/2005 | 42,183.38 | 9,686.20 | 32,497.18 | 742,398.73 |
| 2005 Totals | 168,733.52 | 41,132.25 | 127,601.27 | |
| | | | | |
| 5 01/25/2006 | 42,183.38 | 9,279.98 | 32,903.40 | 709,495.33 |
| 6 02/25/2006 | 42,183.38 | 8,868.69 | 33,314.69 | 676,180.64 |
| 7 03/25/2006 | 42,183.38 | 8,452.26 | 33,731.12 | 642,449.52 |
| 8 04/25/2006 | 42,183.38 | 8,030.62 | 34,152.76 | 608,296.76 |
| 9 05/25/2006 | 42,183.38 | 7,603.71 | 34,579.67 | 573,717.09 |
| 10 06/25/2006 | 42,183.38 | 7,171.46 | 35,011.92 | 538,705.17 |
| 11 07/25/2006 | 42,183.38 | 6,733.81 | 35,449.57 | 503,255.60 |
| 12 08/25/2006 | 42,183.38 | 6,290.70 | 35,892.68 | 467,362.92 |
| 13 09/25/2006 | 42,183.38 | 5,842.04 | 36,341.34 | 431,021.58 |
| 14 10/25/2006 | 42,183.38 | 5,387.77 | 36,795.61 | 394,225.97 |
| 15 11/25/2006 | 42,183.38 | 4,927.82 | 37,255.56 | 356,970.41 |
| 16 12/25/2006 | 42,183.38 | 4,462.13 | 37,721.25 | 319,249.16 |
| 2006 Totals | 506,200.56 | 83,050.99 | 423,149.57 | |
| | | | | |
| 17 01/25/2007 | 42,183.38 | 3,990.61 | 38,192.77 | 281,056.39 |
| 18 02/25/2007 | 42,183.38 | 3,513.20 | 38,670.18 | 242,386.21 |
| 19 03/25/2007 | 42,183.38 | 3,029.83 | 39,153.55 | 203,232.66 |
| 20 04/25/2007 | 42,183.38 | 2,540.41 | 39,642.97 | 163,589.69 |
| 21 05/25/2007 | 42,183.38 | 2,044.87 | 40,138.51 | 123,451.18 |
| 22 06/25/2007 | 42,183.38 | 1,543.14 | 40,640.24 | 82,810.94 |
| 23 07/25/2007 | 42,183.38 | 1,035.14 | 41,148.24 | 41,662.70 |
| 24 08/25/2007 | 42,183.38 | 520.68 | 41,662.70 | 0.00 |
| 2007 Totals | 337,467.04 | 18,217.88 | 319,249.16 | |
| | | | | |
| and Totals | 1,012,401.12 | 142,401.12 | 870,000.00 | |

08/09/2005   Page 2

Equipment

t interest amount decreased by 0.10 due to rounding.

KOCH 00000157

# FIRST AMENDMENT TO
# REAL PROPERTY LEASE

### Between

## HODGES BONDED WAREHOUSE, INC.
## ("Lessor")

### And

## SYLVEST FARMS, INC.
## ("Lessee")

This First Amendment to Property Lease is made and entered into on the 26th day of January, 2006, by and between Hodges Bonded Warehouse, Inc. (the "Lessor") and Sylvest Farms, Inc. (the "Lessee"). Lessor and Lessee agree to modify the Property Lease as herein provided to be effective on and as of August 25, 2005 for all purposes and in all respects.

### RECITALS:

A.    Capitalized terms which are not otherwise defined in this First Amendment shall be given the meaning ascribed to them in the Property Lease.

B.    Lessor and Lessee desire to amend Section 6.04 of the Property Lease by deleting it in its entirety and substituting a new Section 6.04 as hereinafter stated in order to correctly reflect the agreement of the Parties with respect to the Lessee's purchase option with respect to the Premises.

NOW, THEREFORE, for and in consideration of the foregoing recitals and other good and valuable consideration acknowledged by each Party, Lessor and Lessee agree as follows:

1.    Section 6.04. of the Property Lease is hereby deleted in its entirety and in lieu and substitution therefore the following Section 6.04 is adopted and agreed to:

KOCH 00000119

"Section 6.04. **Lessee's Purchase Option.**

(a)    At any time after the commencement date of this Property Lease, Lessee shall have the right to purchase the Premises for a Purchase Price equal to the sum of the following:

(i)    the unpaid principal balance reflected on the Amortization Schedule attached as Exhibit "B" to the Property Lease through the Closing Date on which Lessee will acquire the Premises from Lessor.

(ii)    any accrued interest reflected on the Amortization Schedule which is accrued but unpaid through the Closing Date on which Lessee will acquire the Premises from Lessor.

(iii)    a prepayment fee in the amount of $150,000 in the event that Lessee purchases the Premises during the first twelve months following the commencement date of the Property Lease or a prepayment fee in the amount of $100,000 in the event that Lessee purchases the Premises during months thirteen through twenty-four following the commencement date of the Property Lease or a prepayment fee in the amount of $50,000 in the event that Lessee purchases the Premises during months twenty-five through thirty-six following the commencement date of the Property Lease. Following the thirty-six month after the commencement date of the Property Lease there shall be no prepayment fee with respect to the purchase option described in this Section 6.04.

(b)    In the event that Lessee elects to purchase the Premises as provided herein, Lessee shall give ten (10) days notice to Lessor that it intends to purchase the Premises and Lessee shall calculate the Purchase Price determined in accordance with this Section 6.04 and which shall be forwarded to Lessor. The Purchase Price shall be paid on the second business day following the expiration of the notice to be given to Lessor and concurrently with such payment Lessor shall immediately deliver to Lessee a statutory warranty deed to the Premises conveying merchantable title, free and clear of all liens and encumbrances (other than the exceptions as reflected in the Owner's Title Policy being delivered to Lessor in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement between the Parties dated as of August 25, 2005 or such other exceptions that are reasonably acceptable to Lessee).

2

KOCH 00000120

Furthermore, immediately upon payment of the final installment due under the Amortization Schedule, Lessor shall likewise convey the Premises to Lessee as herein provided.

2.    Lessor and Lessee agree that the provisions of this First Amendment are to be incorporated by reference into the Asset Purchase Agreement between the Parties and the Agreement Defining Relationship between the Parties dated as of August 25, 2005, it being the express intention of the Parties that this First Amendment correctly reflects the business intention of the Parties and shall control over any other agreement or document between them with respect to the Premises.

3.    Except as modified by this First Amendment, the Parties ratify and confirm the provisions of the Property Lease.

IN WITNESS WHEREOF the Parties have caused this First Amendment to be executed by a duly authorized officer of each Party.

LESSOR:

HODGES BONDED WAREHOUSE, INC.

By: _____

Title: _____C E O_____

LESSEE:

SYLVEST FARMS, INC.

By: _____

Dean P. Falk    LYMAN L. CAMPBELL

Title:  President and Chief Executive Officer  EXECUTIVE VICE PRESIDENT

3

KOCH 00000121

Exhibit 3

*G E Lease 12/28/05*

2/98(R090605)(11.)050984202

**\*LEAS1998\***

## MASTER LEASE AGREEMENT

dated as of _____ ("Agreement")

**THIS AGREEMENT** is between **General Electric Capital Corporation** (together with its successors and assigns, if any, **"Lessor"**) and **Sylvest Farms, Inc.** (**"Lessee"**). Lessor has an office at 1000 Windward Concourse Suite 403, Alpharetta, GA 30005. Lessee is a corporation organized and existing under the laws of the state of Alabama. Lessee's mailing address and chief place of business is 3500 Western Blvd., Montgomery, AL 36105. This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee. Additional terms that apply to the Equipment (term, rent, options, etc.) shall be contained on a schedule (**"Schedule"**).

### 1. LEASING:

(a) Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property (**"Equipment"**) described in any Schedule signed by both parties.

(b) Lessor shall purchase Equipment from the manufacturer or supplier (**"Supplier"**) and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request. Each of the documents required above must be in form and substance satisfactory to Lessor. Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Once the Schedule is signed, the Lessee may not cancel the Schedule.

### 2. TERM, RENT AND PAYMENT:

(a) The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance (**"Lease Commencement Date"**). The term of this Agreement shall be the period specified in the applicable Schedule. The word "term" shall include all basic and any renewal terms.

(b) Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor. Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule. If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule. Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule. In no event shall any Advance Rent or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents ($ .05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

### 3. RENT ADJUSTMENT:

(a) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, (**"Code"**)), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers (**"Effective Rate"**) is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum. The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made) and all future years of the lease term). The Termination Values and Tax Benefits are defined on the Schedule. Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(b) Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement.

### 4. TAXES:

(a) If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively **"Taxes"**). Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c). Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor. Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request.

(b) Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement.

### 5. REPORTS:

(a) If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Equipment on the date of the notice.

KOCH 00000921

(b) Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee. Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee. Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment. If Lessor asks, Lessee will promptly notify Lessor in writing of the location of any Equipment.

(e) If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing.

(f) Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30) days after any request by Lessor.

(g) Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization.

## 6.  DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment.

(c) Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of Lessor.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e) Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement.

## 7.  MAINTENANCE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted. The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations. Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor. The tags or labels shall be placed in a prominent position on each unit of Equipment.

(b) Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. All Additions shall be made only in compliance with applicable law. Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor.

**8.  STIPULATED LOSS VALUE:**  If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ( "Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing. Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit. The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

## 9.  INSURANCE:

(a) Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

(b) Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require. All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor. The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage. Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor.

(c) Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Lessee shall not act as Lessee's attorney-in-fact unless Lessee is in default. Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance. Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000). Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

**10. RETURN OF EQUIPMENT:**

(a) At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment. If required the units of Equipment shall be demantled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment. All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used. All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws. Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct. Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment. The transit insurance must name Lessor as the loss payee. The Lessee shall pay for all costs to comply with this section (a).

(b) Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate the Lessee's right to use the Equipment upon ten (10) days notice to Lessee.

(c) Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers. Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination. Lessor shall provide Lessee with reasonable notice prior to any inspection. Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment.

**11. DEFAULT AND REMEDIES:**

(a) Lessee shall be in default under this Agreement and each of the other Documents (as that term is defined in Section 16 below) if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor"), dies or is declared incompetent (if an individual), or dissolves, terminates its existence, becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) a receiver is appointed for all or of any part of the property of Lessee or any Guarantor, or Lessee or any Guarantor makes any assignment for the benefit of creditors; (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; (ix) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; (x) there is an improper filing of an amendment or termination statement relating to a filed financing statement describing the Equipment; (xi) Lessee is declared in default under any contract or obligation requiring the payment of money in an original principal amount greater than $50,000.00; or (xii) there is any dissolution, termination of existence, merger, consolidation or change in controlling ownership of Lessee or any Guarantor. Any default hereunder shall apply to all Schedules unless specifically excepted by Lessor.

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a). Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment. Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules. Lessor may terminate this Agreement as to any or all of the Equipment. A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale. Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment. Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor. Lessee shall immediately pay any deficiency in (i) and (ii) above .

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

**12. ASSIGNMENT:** LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor. Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

**13. NET LEASE:** Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it. Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement

KOCH 00000923

by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise.

**14. INDEMNIFICATION:**

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("**Claims**"). This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee. Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("**Tax Benefits**") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "**Loss**"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("**Net Economic Return**"). If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**15. DISCLAIMER:** LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment. If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear.

**16. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule.

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "**Documents**"). Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change.

KOCH 00000924

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement).

(i) The Equipment will at all times be used for commercial or business purposes.

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date"). Lessee must give Lessor at least ninety (90) days prior written notice of the termination.

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor.

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance. If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement. If the Equipment is installed it shall be valued on an installed basis. The costs of removal from current location shall not be a deduction from the value of the Equipment. If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value. The independent appraiser's determination shall be final, binding and conclusive. Lessee shall bear all costs associated with any such appraisal.

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee.

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee. Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property .

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement. In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information

required by the applicable Uniform Commercial Code. Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment. Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing. This Agreement and any Schedule and Annexes hereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor. Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Agreement or any Schedule, in no event shall this Agreement and any Schedule require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessors Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessors Cost. Lessor shall send Lessee a written notice stating the final Capitalized Lessors Cost, if it has changed.

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT.

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate".

(j) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "**Transactions**"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions. The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**General Electric Capital Corporation**

By:_____

Name:_____

Title:_____

LESSEE:
Sylvest Farms, Inc.

By: _Lyman L Campbell_

Name: _LYMAN L. CAMPBELL_

Title: _Executive Vice President_

KOCH 00000926

CS(R083004) 4171238001

**\*LEAS8760\***

## FOOD PROCESSING EQUIPMENT SCHEDULE
### SCHEDULE NO. 001
DATED THIS _____
TO MASTER LEASE AGREEMENT
DATED AS OF _____

**Lessor & Mailing Address:**

General Electric Capital Corporation
1000 Windward Concourse Suite 403
Alpharetta, GA 30005

**Lessee & Mailing Address:**

Sylvest Farms, Inc.
3500 Western Blvd.
Montgomery, AL 36105

This Schedule is executed pursuant to, and incorporates by reference the terms and conditions of, and capitalized terms not defined herein shall have the meanings assigned to them in, the Master Lease Agreement identified above ("**Agreement**" said Agreement and this Schedule being collectively referred to as "**Lease**"). This Schedule, incorporating by reference the Agreement, constitutes a separate instrument of lease.

**A.** **Equipment:** Subject to the terms and conditions of the Lease, Lessor agrees to Lease to Lessee the Equipment described below (the "**Equipment**").

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $846,545.00 | D & F Equipment Sales | 36019-01A | 2006        De-boner w/ double cone line, product conveyors, and loading bin |
| 1 | $741,908.00 | Ossid | | 2005  Ossid 500        Shrink film tunnel w/ package infeed conveyor, 1500xA single head WPL system, Ossid 500 overwrap, Ossid 500 end seal shrinks and automatic indexer |
| 1 | $430,000.00 | GYRoCOMPACT | 00530143 | GCM76-08-40-26 NS CCR    Spiral Freezer |

Equipment immediately listed above is located at: 3500 Western Blvd., Montgomery, Montgomery County, AL 36108

**B.** **Financial Terms**

| | | | | |
|---|---|---|---|---|
| 1. | Advance Rent (if any):  Not Applicable | | 5. | Basic Term Commencement Date: |
| 2. | Capitalized Lessor's Cost: **$ 2,018,453.00** | | 6. | Lessee Federal Tax ID No.: 582129705 |
| 3. | Basic Term (No. of Months): **60 Months.** | | 7. | Last Delivery Date: |
| 4. | Basic Term Lease Rate Factor: **.01757928** | | 8. | Daily Lease Rate Factor:  **.000468780** |

9.   First Termination Date: **Thirty-six (36)** months after the Basic Term Commencement Date.

10.   Interim Rent:  For the period from and including the Lease Commencement Date to but not including the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period.  Interim Rent shall be due on _____.

11.   Basic Term Rent.  Commencing on _____ and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**C.** **Tax Benefits**        Depreciation Deductions:

1.   Depreciation method is the 200 % declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.
2.   Recovery Period: **7 years.**
3.   Basis: 100 % of the Capitalized Lessor's Cost.

**D.** **Property Tax**

APPLICABLE TO EQUIPMENT LOCATED IN ALABAMA:  Lessee agrees that it will not list any of such Equipment for property tax purposes or report any property tax assessed against such Equipment until otherwise directed in writing by Lessor.  Upon receipt of any property tax bill pertaining to such Equipment from the appropriate taxing authority, Lessor will pay such tax and will invoice Lessee for the expense.  Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

Lessor may notify Lessee (and Lessee agrees to follow such notification) regarding any changes in property tax reporting and payment responsibilities.

E.    **Article 2A Notice**

IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE APPLICABLE STATE, LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION OF THE LEASE, (A) THE PERSON(S) SUPPLYING THE EQUIPMENT IS **D&F Equipment Sales, Inc. & Ossid Corporation & MTL Installation Services** (THE "SUPPLIER(S)"), (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES, INCLUDING THOSE OF ANY THIRD PARTY, PROVIDED TO THE LESSOR BY SUPPLIER(S), WHICH IS SUPPLYING THE EQUIPMENT IN CONNECTION WITH OR AS PART OF THE CONTRACT BY WHICH LESSOR ACQUIRED THE EQUIPMENT AND (C) WITH RESPECT TO SUCH EQUIPMENT, LESSEE MAY COMMUNICATE WITH SUPPLIER(S) AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF THEM OR OF REMEDIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY LIMIT OR MODIFY ANY OF LESSOR'S RIGHTS OR REMEDIES UNDER THE DEFAULT AND REMEDIES SECTION OF THE AGREEMENT.

F.    **Stipulated Loss and Termination Value Table\***

| Rental Basic | Termination Value Percentage | Stipulated Loss Value Percentage | Rental | Termination Value Percentage | Stipulated Loss Value Percentage |
|---|---|---|---|---|---|
| 1 | | 106.332 | 31 | | 68.035 |
| 2 | | 105.202 | 32 | | 66.628 |
| 3 | | 104.046 | 33 | | 65.215 |
| 4 | | 102.881 | 34 | | 63.792 |
| 5 | | 101.706 | 35 | | 62.362 |
| 6 | | 100.522 | 36 | | 60.924 |
| 7 | | 99.329 | 37 | 53.798 | 59.477 |
| 8 | | 98.126 | 38 | 52.295 | 58.020 |
| 9 | | 96.913 | 39 | 50.786 | 56.556 |
| 10 | | 95.692 | 40 | 49.271 | 55.087 |
| 11 | | 94.461 | 41 | 47.750 | 53.611 |
| 12 | | 93.220 | 42 | 46.222 | 52.129 |
| 13 | | 91.969 | 43 | 44.684 | 50.636 |
| 14 | | 90.710 | 44 | 43.140 | 49.138 |
| 15 | | 89.443 | 45 | 41.589 | 47.633 |
| 16 | | 88.168 | 46 | 40.032 | 46.121 |
| 17 | | 86.885 | 47 | 38.469 | 44.604 |
| 18 | | 85.594 | 48 | 36.897 | 43.078 |
| 19 | | 84.293 | 49 | 35.317 | 41.543 |
| 20 | | 82.984 | 50 | 33.728 | 40.000 |
| 21 | | 81.668 | 51 | 32.130 | 38.448 |
| 22 | | 80.341 | 52 | 30.524 | 36.887 |
| 23 | | 79.007 | 53 | 28.908 | 35.317 |
| 24 | | 77.664 | 54 | 27.284 | 33.738 |
| 25 | | 76.312 | 55 | 25.651 | 32.151 |
| 26 | | 74.950 | 56 | 24.009 | 30.554 |
| 27 | | 73.581 | 57 | 22.357 | 28.948 |
| 28 | | 72.206 | 58 | 20.697 | 27.333 |
| 29 | | 70.823 | 59 | 19.029 | 25.711 |
| 30 | | 69.434 | 60 | 17.272 | 24.000 |

\*The Stipulated Loss Value or Termination Value for any unit of Equipment shall be the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

G.    **Modifications and Additions for This Schedule Only**

For purposes of this Schedule only, the Agreement is amended as follows:

I    **EQUIPMENT SPECIFIC PROVISIONS**

MAINTENANCE PROVISIONS: In addition to the provisions provided for in the MAINTENANCE Section of the Lease, Lessee shall, at its expense:

(a) maintain the Equipment in a manner and frequency suggested by the manufacturer.

(b) maintain the Equipment in an operable state and shall not discontinue operation of the Equipment throughout the Lease term.

(c) maintain the Equipment to industry standards.

KOCH 00000929

(d) maintain the Equipment in a similar manner and fashion as if the Equipment were owned by the Lessee.

(e) maintain the Equipment under a preventive maintenance program by qualified professionals who possess a working knowledge of the mechanical operation of the Equipment including electrical systems, motors, drives, controls, accessories, lubricants and all other items necessary to make the machine operate to its original manufacturer's specifications.

(f) have the Equipment meet all local, state, and federal laws, regulations and codes that regulate the use and operation of such Equipment and will not contribute to or be used in any way as to directly or indirectly violate any local, state or federal law including Food and Drug Administration and Environmental Protection Agency.

(g) maintain a maintenance log on the Equipment showing all routine and non-routine maintenance and repairs. Said log shall list in summary form maintenance, repairs or modifications performed on the Equipment, the date any and all of such service and by whom the service was performed. This log shall be made available to the Lessor at its request during normal working hours or the Lessee.

INSPECTION:  The REPORTS Section subsection (c) of the Lease is deleted and replaced with the following:

(c) Lessor at its sole discretion, may from time to time, inspect the Equipment at the Lessor's sole expense. If any discrepancies are found as they pertain to the general condition of the Equipment as required hereunder, the Lessor will, communicate these discrepancies to the Lessee in writing. The Lessee shall have thirty (30) days to rectify these discrepancies at his sole expense. The Lessee should pay all expenses for a re-inspection by a Lessor appointed expert if corrective measures are required.

RETURN PROVISIONS:  In addition to the provisions provided for in the RETURN OF EQUIPMENT Section of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense:

(a) At least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination: (i) ensure Equipment has been maintained, and is operating within manufacturer's specifications, as well as all local, state and federal laws and regulations, including those of the Food and Drug Administration and Environmental Protection Agency and; (ii) cause manufacturer's representative or other qualified maintenance provider, acceptable to Lessor, to perform a physical inspection and test of all the components and capabilities of the Equipment and to provide a full inspection report to Lessor.

(b) Upon lease termination: (i) fill to operation levels all internal fluids, secure filler caps, seal disconnection hoses, reinstall, and match mark all connections; (ii) have the manufacturer de-install all equipment; (iii) properly skid and pack and transport the Equipment per the manufacturer's requirements to any location(s) within the continental United States as Lessor shall direct; (iv) at Lessor's choice, either (1) allow Lessor, at Lessor's expense, and provided Lessor has provided reasonable notice to Lessee, arrange for an on-site auction of the Equipment which will be conducted in a manner which will not interfere with Lessee's business operations, or (2) at the request of Lessor, provide safe, secure storage for the Equipment for sixty (60) days after expiration or earlier termination of the Lease at an accessible location satisfactory to Lessor.

(c) LESSEE SHALL BE RESPONSIBLE TO RETURN THE EQUIPMENT FREE FROM CONTAMINATION OF ANY HAZARDOUS SUBSTANCE AND SHALL BE SOLELY RESPONSIBLE FOR ANY EXPENSES AND COSTS ASSOCIATED WITH THE CLEAN-UP THEREOF. FOR THE PURPOSE OF THIS LEASE, THE TERM "HAZARDOUS SUBSTANCE" SHALL MEAN AND INCLUDE ANY HAZARDOUS SUBSTANCE, HAZARDOUS WASTE, CONTAMINANT, TOXIC SUBSTANCE, AND/OR DANGEROUS GOODS WHICH IS ARE REGULATED UNDER ANY ENVIRONMENTAL, HEALTH AND/OR SAFETY LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW, OR WHICH MAY FORM THE BASIS OF LIABILITY UNDER ANY SUCH LAW, REGULATION, GUIDELINE, POLICY AND/OR BY-LAW OR COMMON OR CIVIL LAW AND SHALL INCLUDE, WITHOUT LIMITATION, ASBESTOS, POLYCHLORINATED BIPHENYLS, UREA FORMALDEHYDE, AND/OR FLAMMABLE, EXPLOSIVE AND RADIOACTIVE SUBSTANCES.

## 2   LEASE TERM OPTIONS

### Early Lease Term Options

The Lease is amended by adding the following thereto:

### EARLY PURCHASE OPTION:

(a)  Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase on an AS IS BASIS all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is 48 months from the Basic Term Commencement Date for a price equal to THIRTY-THREE AND 90/100 percent (33.90%) of the Capitalized Lessor's Cost (the "FMV Early Option Price"), plus all applicable sales taxes.

Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in the PURCHASE OPTION Section subsection (b) of the Lease hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by the MAINTENANCE Section or the RETURN OF EQUIPMENT Section of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b)  If Lessee exercises its Early Purchase Option with respect to the Equipment leased hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

## H.   Payment Authorization

You are hereby irrevocably authorized and directed to deliver and apply the proceeds due under this Schedule as follows:

| Company Name | Address | Amount |
|---|---|---|
| D&F Equipment Sales, Inc. | P.O. Box 275, Crossville, AL 35962 | $846,545.00 |
| Ossid Corporation | P.O. Box Drawer 1968, Rocky Mount, NC 27802 | $741,908.00 |
| MTL Installation Services | 2301 Towne Lake Heights, Woodstock, GA 30189 | $215,000.00 |
| Sylvest Farms, Inc. | 3500 Western Blvd., Montgomery, AL 36108 | $215,000.00 |

This authorization and direction is given pursuant to the same authority authorizing the above-mentioned financing.

Pursuant to the provisions of the lease, as it relates to this Schedule, Lessee hereby certifies and warrants that (i) all Equipment listed above has been delivered and installed (if applicable) as of the date stated above, and copies of the Bill(s) of Lading or other documentation acceptable to Lessor which show the date of delivery are attached hereto; (ii) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; and (iii) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

General Electric Capital Corporation

By: _____

Name: _____

Title: _____

LESSEE:

Sylvest Farms, Inc.

By: _Lyman L Campbell_____

Name: _LYMAN L. CAMPBELL_____

Title: _Executive Vice President_____

KOCH 00000931

Exhibit 4

Page 60

1    proposal back from -- that was signed by Lyman

2    Campbell at Sylvest, correct?

3        A.    Yes.

4        Q.    What did you do next?

5        A.    Prepared some of these documents that we

6    just previously reviewed, submitted the supporting

7    documentation, financials, company information to

8    John for underwriting.  It was subsequently approved,

9    so then I draft -- or I put together the pricing run

10   with the economics.  I forward that to our

11   documentation folks, I give them an outline of the

12   transaction, they prepare these documents, return

13   them to me.

14       Q.    When you say these documents, you mean the

15   lease?

16       A.    Or loan.

17       Q.    The necessary transaction documents?

18       A.    Right.

19       Q.    So then you get back from documentation,

20   the master lease here?

21       A.    Yes.

22       Q.    And then do you review it, and then submit

23   it, do you submit it to Mr. Sutehall for execution?

24       A.    No.

25       Q.    What was the next step after you got

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 61

1    back --

2         A.    I get this document, the master lease,

3    unless specifically negotiated, is a boilerplate

4    document, both boilerplate English.  The schedule

5    pertains specifically to the transaction of the

6    equipment.  You could have numerous schedules fall

7    under one master lease.

8              Once receiving the schedule and the master

9    lease, I would have reviewed the master lease, if

10   there were any changes made, negotiations to ensure

11   that those changes were in there.  I don't recall

12   that there were in this instance.

13             I would also look at the schedule and

14   ensure that the economics were consistent with what I

15   expected.  I would then take these documents, contact

16   Lyman or the other -- or the individual that is going

17   to execute them, and walk them through them, answer

18   any questions that he has.  We do that in person or

19   over the phone on conference call.

20             He would execute them.  He would send them

21   back Fed Ex'd to Alpharetta.  Alpharetta would get

22   these documents.  We would review that they were

23   executed correctly, that there were no liens on any

24   equipment, everything was -- no blanket filings.  If

25   there were, have those removed.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 62

1             Then we would subsequently fund on the

2    transaction.  John would receive these documents post

3    funding.  He would review them, and it would be

4    booked into our system and executed; subsequent to

5    that, a copy of this would be forwarded out to Lyman

6    or the individual or company.

7        Q.    Is that your understanding of what took

8    place here regarding the Sylvest deal?

9        A.    That would be my understanding.

10       Q.    Turning to GE 101, the first page of

11   schedule one, there are some handwritten dates on

12   that document.  Do you recognize who -- GE 100?

13       A.    Oh, 100.

14       Q.    Do you recognize whose handwriting that

15   is?

16       A.    No.  No.

17       Q.    Were any provisions of the master lease

18   agreement, which you called the boilerplate, were any

19   of those provisions negotiated between GE and Sylvest

20   in this transaction?

21       A.    As I stated earlier, I don't recall any

22   negotiations.

23       Q.    And you don't recall any changes --

24       A.    Right, correct.

25       Q.    -- to the boilerplate form?  Would you

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 63

1    turn to paragraph 19 B of the master lease.  Would

2    you review that, and tell me if you're familiar with

3    that provision.

4        A.    19 B, specifically?

5        Q.    Yes.

6        A.    And you want me to tell you if I've ever

7    read this before.

8        Q.    Are you familiar with it?

9        A.    I'm familiar with the whole document.

10       Q.    Okay.  What is your understanding of what

11   19 B means?

12            MR. HARRIS:  Objection, the lease speaks

13       for itself, goes to a legal conclusion.

14            THE WITNESS:  Just talks about personal

15       to -- personal and real property.

16       Q.    (By Mr. Geekie)  Other than what you just

17   said, do you have any understanding -- any other

18   understanding regarding 19 B?

19       A.    No.

20            MR. HARRIS:  Same objection.

21            THE WITNESS:  No.

22       Q.    (By Mr. Geekie)  Did you ever discuss

23   paragraph 19 B with anybody from Sylvest?

24       A.    No.

25       Q.    Did you ever discuss paragraph 19 B, as it

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 64

1    relates to Sylvest and this lease transaction, with

2    anyone else?

3        A.    No.

4        Q.    If you turn to page -- the page marked GE

5    100, the first page of schedule one, do you see where

6    it says, tax benefits, depreciation, deductions?

7        A.    Yes.

8        Q.    Can you explain to me why that was put in

9    schedule one?

10       A.    Why that's in schedule one?

11       Q.    Yes.

12       A.    I don't know why it's in there.

13       Q.    Is that a standard form?

14       A.    Yes.

15       Q.    Are you familiar at all with accounting

16   standards for depreciation?

17       A.    Yes.

18       Q.    How do you come by that knowledge or

19   familiarity?

20       A.    Understanding over just daily course of

21   business.

22       Q.    Did you have any specialized training or

23   education while at GE regarding depreciation and tax

24   benefits?

25       A.    No.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 65

1      Q.     Regarding leased equipment?

2      A.     No.

3      Q.     Have you ever discussed with anyone the

4   depreciation of the equipment lease to Sylvest in

5   this transaction?

6      A.     No.

7      Q.     Do you have any understanding when a

8   lessor takes depreciation of leased equipment,

9   whether that equipment needs to be installed or in

10  operation?

11         MR. HARRIS:   Objection, vague, answer if

12      you can.

13         THE WITNESS:   I don't understand the

14      question.

15      Q.    (By Mr. Geekie)  Before a lessor takes any

16  depreciation of leased equipment, do you have an

17  understanding or any knowledge regarding whether that

18  lessor can only take the depreciation after the

19  equipment that's leased has been installed or placed

20  in operation?

21         MR. HARRIS:   Same objection.

22         THE WITNESS:   I do not know specifically.

23      I do know that Lyman indicated through the

24      execution of these documents that the equipment

25      had been delivered and installed.

Page 66

1      Q.    (By Mr. Geekie)  He told you that it had

2   been delivered, correct?

3      A.    He executes a delivery and acceptance

4   certificate, which on that certificate states that

5   the equipment has been delivered and installed, and

6   is working and in working order.

7      Q.    I haven't seen that in the production from

8   GE, that delivery and installation certificate.  Did

9   you ever see one come back from Mr. Campbell?

10      A.    I don't recall specifically.

11      Q.    Now, at some time, GE learned that the

12   equipment hadn't been installed, or at least not all

13   the equipment; isn't that right?

14      A.    Yes.

15      Q.    Do you recall when that was?

16      A.    It would have been subsequent to Lyman

17   notifying us of the bankruptcy, which I thought was

18   interesting.

19      Q.    What do you mean by interesting?

20      A.    They were in a big rush to get the

21   equipment into the facility, and then when I heard

22   that there was a portion of it that was not

23   installed, it was surprising.

24      Q.    How did you learn of the noninstalled

25   equipment?

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 67

1      A.      I believe he told me, because they made

2    modifications to some equipment, because during the

3    engineering of putting the equipment together, they

4    figured that it -- they figured that part of it would

5    not work without adding, if I remember, a "T" in the

6    conveying system.

7      Q.      Was that the cone line that you're talking

8    about?

9      A.      I don't recall.

10     Q.      Mr. Campbell told you that there was some

11   modification to the system, though; is that right?

12     A.      Yes.  Yes.

13     Q.      Did he describe for you or inform you that

14   that modification to that equipment was with

15   equipment that GE had financed or leased?

16     A.      Say the question again?

17     Q.      When Mr. Campbell informed you of the

18   modifications to the GE leased equipment, did he also

19   inform you that that modification included equipment

20   that GE had leased or financed?

21     A.      Are you asking that the equipment, the

22   additional equipment that came in to modify our

23   leased equipment, did he inform me that we did not

24   own that equipment?

25     Q.      Yes.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 68

1       A.      No, he did not inform me of that.

2       Q.      In this conversation you had with

3   Mr. Campbell that you just described, in addition to

4   telling you of the modification, did he also tell you

5   that some of the equipment had actually been

6   installed?

7       A.      I don't recall.

8       Q.      How did you learn -- I asked you earlier

9   how you learned that there was equipment that hadn't

10  been installed.

11      A.      I believe the MTL guy, when he went out

12  there to look at the equipment, stated that it had

13  not been installed.

14      Q.      Was that the freezer?

15      A.      Yeah, it could be.

16      Q.      What about the Ossid equipment?  Everybody

17  acknowledges that that wasn't installed or maybe a

18  part of it was installed, and then removed.  But it

19  was pretty readily available for GE to come and pick

20  up, do you know that?

21      A.      No.

22      Q.      Did anybody ever tell you that the Ossid

23  equipment wasn't installed?

24      A.      No.

25      Q.      Did you ever discuss the sale or removal

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 69

1    of the Ossid equipment?

2        A.    We discussed the sale of the Ossid

3    equipment to --

4        Q.    That was the sale to Peco?

5        A.    Yes.

6        Q.    Did you handle that sale?

7        A.    Was it sold?

8        Q.    Yes.

9        A.    I didn't know that.

10       Q.    Do you know who would have handled that

11   sale of equipment to Peco?

12       A.    No.  Should have gotten credit for that.

13   I'm going to have to call them.

14       Q.    Other than getting a delivery and

15   installation or delivery and acceptance certificate

16   from Mr. Campbell, did GE do anything else to assure

17   or confirm that Sylvest had received the lease

18   equipment and had installed it?

19            MR. HARRIS:  Objection to form.  Answer if

20       you can.

21            THE WITNESS:  Outside of the delivery and

22       acceptance certificate, no, we would have -- we

23       would have received at some point wiring

24       instructions to the vendor.  They would have

25       acknowledged they had delivered the equipment.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 70

1       Q.      (By Mr. Geekie)  GE didn't send out any

2    auditor to actually look at the equipment to see if

3    it was installed?

4       A.      A third-party auditor, no.

5       Q.      What about an internal auditor?

6       A.      I, typically, in transactions like this,

7    will on occasion go down and view the equipment,

8    verify serial numbers, take pictures.

9       Q.      Did you do that here?

10      A.      No.

11      Q.      Why not?

12      A.      It was December 29th, so I think we had

13   planned to do that in the first quarter, and we

14   received the phone call prior to having the

15   opportunity to do that.

16      Q.      But it is your standard practice in

17   transactions of this size to go out and inspect it,

18   look at it, take pictures of the equipment?

19      A.      Yes.

20      Q.      Have you ever had any discussions with

21   anyone whether GE improperly took tax deductions

22   related to the depreciation of the equipment leased

23   to Sylvest?

24      A.      No.

25              (Koch Exhibit No. 7 was marked for

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 71

1          identification.)

2          Q.    (By Mr. Geekie)  I've now handed you Koch

3     Exhibit 7, stamped GE 376 through 384.  Have you ever

4     seen this document before?

5          A.    No.

6          Q.    Do you know what this document is?

7          A.    No -- yes.  Third page goes into UCC file.

8          Q.    Okay.  If this was leased equipment from

9     GE to Sylvest, do you know why a UCC search would

10    have been done regarding Sylvest at or about the time

11    that the lease was entered into?

12               MR. HARRIS:  Objection, foundation, form.

13         Answer if you can.

14               THE WITNESS:  No.

15               MR. GEEKIE:  Why don't we take a short

16         break.

17               (A recess was taken.)

18         Q.    (By Mr. Geekie)  We talked a little bit

19    about this before, so I apologize if I'm redundant,

20    but I wanted to cover your knowledge of the payments

21    that were made.  And I take it, it was your

22    understanding that until you heard from Lyman

23    Campbell about the bankruptcy filing, that Sylvest

24    was current on its payments; is that right?

25         A.    Yes.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 72

1     Q.    Do you know if a default letter was ever

2  prepared by GE to Sylvest?

3     A.    No.

4     Q.    If one had been prepared, do you know

5  whose responsibility at GE it would have been to

6  prepare one?

7     A.    Who actually physically prepares the

8  default letter?

9     Q.    Yes.  Who would do that?

10     A.    Our underwriting group would prepare it.

11     Q.    After the bankruptcy filing by Sylvest,

12  did GE move to lift the automatic stay in the

13  bankruptcy, so it could take back its equipment?

14     A.    I don't know.

15     Q.    Who would know that, or who would have

16  responsibility for seeing to that, if it was done?

17     A.    Seeing to GE -- tell me again.

18     Q.    Whose responsibility would it have been

19  for -- to see that if it was going to be done, that

20  GE moved to lift the automatic stay, so it could

21  retake its equipment?

22     A.    I don't know what an automatic stay is.

23     Q.    Okay.  Whose responsibility would it have

24  been within GE to take whatever steps were necessary

25  to recover the leased equipment, obtain its

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 96

1       A.      No.

2       Q.      You've now been handed Koch Exhibit Number

3    20, which is stamped GE 617 through 621.  Do you

4    recognize this document?

5       A.      No.

6       Q.      Are you aware of any efforts that we

7    haven't discussed here today by GE to sell the

8    freezer, the Ossid equipment, or the cone lines?

9       A.      No.

10       Q.      Are you aware of any demand by GE that

11    Koch return the equipment that is the subject of this

12    lawsuit?

13       A.      No, not to my understanding.

14       Q.      What do you base that understanding on?

15       A.      I mean, that's why I understand that I'm

16    here today.

17       Q.      Are you aware of any demand by GE that

18    Koch cease the use of the cone lines that are the

19    subject of this dispute?

20       A.      No.

21       Q.      Are you aware of any demand by GE to Koch

22    that it be allowed, GE be allowed to inspect the

23    equipment after Koch purchased Sylvest assets on or

24    about May 29th, 2006?

25       A.      No.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
William Perry

07-cv-522-MHT
November 29, 2007

Page 97

1      Q.    Are you aware of any offers of judgment or

2   offers to sell this case that have been made by Koch?

3      A.    No.

4            MR. GEEKIE:   I have no further questions.

5            MR. HARRIS:   Nothing.

6            (Deposition concluded at 11:32 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 5

Page 34

1    Q.   And the equipment was bolted into the floor,

2         correct?

3    A.   That's correct.

4    Q.   And so when you took the bolts out, there was a

5         hole?

6    A.   Yes.

7    Q.   And then you trucked or carried or however you

8         got it out into the yard --

9    A.   Uh-huh (positive response).

10   Q.   And then before you installed the D & F

11        equipment that you bought in late 2005, you

12        first resurfaced the floor?

13   A.   We fixed the floor.  That's correct.

14   Q.   Did you have to put more concrete in or just

15        more of the epoxy finish?

16   A.   To fix that it was just redo the epoxy.

17   Q.   Was it the whole floor that was done or did you

18        just do the spots where the holes were?

19   A.   We did the whole floor.

20   Q.   Did you first fill in the holes and then redo

21        the whole floor?

22   A.   That's correct.

23   Q.   How old was the epoxy floor that was there when

Page 35

| | | |
|---|---|---|
| 1 | | you folks moved in? |
| 2 | A. | I do not know.  ConAgra did that. |
| 3 | Q. | Tell me about the installation of the D & F |
| 4 | | equipment.  Were you involved in that? |
| 5 | A. | Yes. |
| 6 | Q. | How was that installed? |
| 7 | A. | Are you talking about the fastening of it or -- |
| 8 | Q. | Let's be specific.  There were three sets. |
| 9 | | There was the Ossid equipment.  That was never |
| 10 | | installed, correct? |
| 11 | A. | It was set in line, and probably on one of the |
| 12 | | lines we ran about 25 packages just to show |
| 13 | | somebody and to prove that we could run them. |
| 14 | Q. | When you say set in line, what does that mean? |
| 15 | A. | You just organize all the equipment.  It's |
| 16 | | individual pieces of equipment.  And as you |
| 17 | | enter one, you have to -- you exit into another |
| 18 | | piece of equipment and on down the line. |
| 19 | Q. | But they weren't bolted in? |
| 20 | A. | Those were not. |
| 21 | Q. | We're just talking about just the Ossid |
| 22 | | equipment. |
| 23 | A. | No.  The Ossids were not. |

Page 36

```
 1    Q.    But some of it was operated for demonstration?

 2    A.    About 25 packages or so, yes.

 3    Q.    And was that then recrated at some point?

 4    A.    I'm going to say yes.  I do not remember them

 5          taking it out.  I remember it happening.  I

 6          don't know where I was during that time, but I

 7          know that --

 8    Q.    It's not there now.

 9    A.    No.  Oh, no.

10    Q.    Right.

11          The spiral freezer, was that installed?

12    A.    Yes.

13    Q.    By whom?

14    A.    That was Mike Leonard.

15    Q.    Did you participate in the installation process?

16    A.    I had to install a concrete pad -- a special

17          concrete pad for it to sit on and then set up

18          the electric contractors and worked with the

19          refrigeration guys.  But as far as the actual

20          freezer itself, Mike did that.

21    Q.    Did you observe how he did it?

22    A.    Yeah.  A little bit off and on.

23    Q.    How was it installed?
```

Page 37

```
1    A.   Oh, he would bring it in, and it comes in in
2         several different pieces.  And they start
3         assembling it, and then they put up the walls.
4         And then they had to weld all the seams in the
5         walls.  Very intensive.
6    Q.   Is it still there?
7    A.   Yes.
8    Q.   Tell me about the deboning equipment.  How is --
9         Strike that.
10             Was that installed?
11   A.   Yes.
12   Q.   All of it?
13   A.   Not all the equipment that was on the original
14        purchase, no, sir.  Now, the actual debone lines
15        themselves, yes.  There were some conveyors that
16        weren't installed.
17   Q.   So there were some conveyors that weren't
18        installed.  What happened to those conveyors
19        that weren't installed?
20   A.   They are still over there.  They sat out on the
21        yard.  And eventually when we took the other
22        equipment out, we moved it all back with those.
23        It's sitting out on the yard.
```

Deposition of David Bromley                                            November 27, 2007

Page 38

```
 1   Q.   The conveyor belts that were never used, when

 2        were they first moved into the yard?

 3   A.   At the same time the other equipment was taken

 4        out, I believe.  It showed up on site, and it

 5        sat out in front of the plant.  And eventually

 6        we moved it to the back with all the rest of the

 7        equipment.

 8   Q.   I'm a little unclear.  This stuff arrived when?

 9   A.   Probably early 2006, January, something like

10        that.

11   Q.   And at that point there were certain conveyor

12        belts of the deboning line that were not

13        installed and never have been, correct?

14   A.   That's correct.

15   Q.   For a time did they sit inside the facility in

16        line?

17   A.   No, sir.

18   Q.   Did they sit in crates?

19   A.   They weren't -- never were in crates.

20   Q.   So they came and they were just kind of shoved

21        off to the side?

22   A.   We took them -- unloaded them off the truck

23        to --
```

Page 39

1    Q.    Put them inside?

2    A.    -- be installed later.

3          No.  We left them outside.  We unloaded them

4          and left them right outside where we unloaded

5          them.

6    Q.    I see.

7          And they never went inside the building?

8    A.    No.

9    Q.    The other portion of the deboning equipment that

10         was installed, tell me how that was installed.

11   A.    Of course, we had to remove everything that was

12         in there, but then -- and got the floor done and

13         then just bringing everything in and fastening

14         it down.  You had to line it all up, bolt it

15         together.  Everything ties together like a

16         freeway system.  All the product falls on the

17         conveyors.

18   Q.    So --

19   A.    So as these other conveyors were put in, all the

20         pans had to be welded to it.  Everything was all

21         tied together.

22   Q.    And how was the machinery, in fact, fastened to

23         the facility?

Page 40

```
 1    A.    Bolted to the floor.  Anchored to the floor.
 2    Q.    Was it done in the same manner that the
 3          previously removed equipment --
 4    A.    Yes.
 5    Q.    So there was a bolt that was bolted through the
 6          epoxy floor into the concrete floor underneath,
 7          correct?
 8    A.    That's correct.
 9    Q.    And the installed deboning equipment was
10          installed in the same fashion as the previously
11          removed ConAgra equipment had been installed,
12          correct?
13    A.    That's correct.
14    Q.    Has the spiral freezer ever been used by
15          Sylvest?
16    A.    No.  It was never completed.  The installation
17          was never completed.
18    Q.    Has the spiral freezer ever been used by Koch
19          Foods?
20    A.    No, sir.
21    Q.    When you say it wasn't completed -- the
22          installation was not completed, in what way was
23          it not completed?
```

Page 41

```
 1    A.    Mike Leonard's part was complete.  He put the
 2          machine in.  The refrigeration was never tied to
 3          it and the electrical was never finished.
 4    Q.    And why is that?
 5    A.    Bankruptcy.
 6    Q.    When you say bankruptcy, you mean the bankruptcy
 7          filed by Sylvest?
 8    A.    By Sylvest, yes.  That's correct.
 9    Q.    Were you involved in any way in the negotiation
10          of the sale of the D & F equipment to Sylvest?
11          Strike that.
12              Were you involved in negotiating the price?
13    A.    Yes.
14    Q.    And you did this with Lenny --
15    A.    Lenny Ferguson.
16    Q.    Were you involved in the documentation regarding
17          that lease?
18    A.    I didn't have anything to do with it being
19          leased, no, if that's what you're asking.
20    Q.    Thank you.  That was a bad question.
21              You purchased it from D & F, but it was done
22          in the form of a lease from GE Capital.  Is that
23          your understanding?
```

1   A.   That's correct.

2   Q.   Were you involved in the documentation of the

3        lease from GE Capital to Sylvest?

4   A.   No.  I had nothing to do with the GE Capital

5        side.

6   Q.   Have you ever seen the lease?

7   A.   No, sir.

8   Q.   Were you ever asked to review the lease?

9   A.   No.

10  Q.   Now, when did Sylvest -- did Sylvest ever use

11       any part of the deboning line?

12  A.   Yes.

13  Q.   When did it first begin using it?

14  A.   Around the end of -- I don't remember the exact

15       date, but the end of 2005, beginning of 2006.

16  Q.   And when I say use it, I mean they started

17       deboning chickens.

18  A.   That's correct.

19  Q.   How long did they use it -- did Sylvest use it?

20  A.   Until the sale to Koch.

21  Q.   And when was that?

22  A.   I believe it was May or June 2006.

23  Q.   At that time you and certain other Sylvest

Deposition of David Bromley                                      November 27, 2007

Page 43

1              employees were hired by Koch; is that right?

2     A.    That's correct.

3     Q.    And did there ever come a time during that

4           transition from Sylvest to Koch where the

5           deboning line portion that was being used was

6           not being used?

7     A.    No.  It was pretty much seamless.  We just kept

8           going.

9     Q.    So you never missed a day or anything?

10    A.    No.

11    Q.    You just kept doing it every day and the

12          ownership changed, correct?

13    A.    That's correct.

14    Q.    Are you aware of any demands by Koch Foods that

15          GE Capital remove the deboning equipment?

16    A.    No.

17    Q.    Did you make any?

18    A.    No.

19    Q.    Have you ever talked to anybody from GE Capital?

20    A.    No.

21    Q.    Are you aware of any demands by Koch Foods that

22          GE Capital pay it rent for either the spiral

23          freezer or the deboning equipment?

Page 44

```
 1    A.    No.

 2    Q.    How long did Koch Foods use the deboning

 3          equipment?

 4    A.    I'm trying to think of when we took it out.  I

 5          would guess it was probably about nine months.

 6    Q.    And when was it removed?

 7    A.    About four months ago, something like that.

 8          Three or four months ago.

 9    Q.    So early summer of 2007?

10    A.    I would say that's right.

11    Q.    Was it continuously used by Koch Foods from the

12          time that Koch Foods took over from Sylvest in

13          the late spring or early summer of 2006 until

14          the time that it was removed nine or ten months

15          later?

16    A.    Yes.

17    Q.    Was any rent paid by Koch Foods to GE for that

18          equipment?  Do you know?

19    A.    I do not know.

20    Q.    I want to talk to you about the decision to

21          remove the equipment, not the actual removal --

22          we'll get to that -- but the decision to remove

23          it.  When did you first learn that Koch Foods
```

Deposition of David Bromley                                                    November 27, 2007

Page 45

1          was thinking about removing the equipment?

2     A.   Probably about three weeks before it actually

3          happened.

4     Q.   And how did you learn?

5     A.   I was told that it was going to happen and to go

6          ahead and set up the contractors to put

7          everything together to get that change done.

8     Q.   And from whom did you learn this?

9     A.   I believe it was Gary Davis, who was the complex

10         manager at that time.

11    Q.   And he's now been replaced by ...

12    A.   David Massey.

13    Q.   Were you involved in the decision to do that or

14         were you just instructed --

15    A.   No, sir.  No, sir.

16    Q.   You weren't involved in the decision?

17    A.   No.

18    Q.   Did you ask Mr. Davis why you were being asked

19         to make the change?

20    A.   No, sir.

21    Q.   Did you talk to anybody else besides Mr. Davis

22         about the decision to make the change?

23    A.   No.

Page 46

1    Q.    Was the deboning equipment performing adequately

2          prior to its deinstallation?

3    A.    Yes.

4                    MR. GEEKIE:   Objection.   Vague and

5                       ambiguous.

6    A.    Yes.

7    Q.    Did you have any complaints about it?

8    A.    No.

9    Q.    How many people are employed at that facility

10         approximately?   A hundred?

11   A.    Currently or back then?

12   Q.    Currently.

13   A.    Probably about 600.

14   Q.    How about back at the time of the transition

15         from Sylvest to Koch?

16   A.    Probably about 250, 300.

17   Q.    So it's doubled in size approximately?

18   A.    Uh-huh (positive response).

19   Q.    That's a yes?

20   A.    Yes.

21   Q.    I'm sorry.

22   A.    I'm sorry.   Yes.

23   Q.    That's fine.

Page 47

1          Tell me about the deinstallation process,

2          then.  About three weeks before you actually

3          removed the equipment, Mr. Davis told you to

4          prepare to do that.  What did you do after he

5          told you to prepare to do that?

6     A.   Contacted electricians, you know, plumbers and

7          millwrights.  Of course, the millwrights had

8          already been determined.  The same people who

9          sold the equipment were the millwrights.  They

10         would come in and actually move the equipment.

11    Q.   Who is that?

12    A.   Fabco, F-A-B-C-O.

13    Q.   Who were the electricians?

14    A.   I believe I used G T Key.

15    Q.   Plumbers?

16    A.   Peterson Industrial.

17    Q.   Anyone else you needed?

18    A.   I believe that was it.

19    Q.   And so you contacted all of these folks, and you

20         chose a date, right, a specific date?

21    A.   I think I was given a date.  I don't remember

22         what that was.

23    Q.   But Mr. Davis said on such-and-such a date, I

Page 48

```
 1              want you to shut down and remove all this

 2              equipment, right?

 3    A.    Well, we don't shut down.  We do it all on the

 4              weekend.  On several weekends, yes.  We came in,

 5              and it took a couple of weekends to get that all

 6              done.

 7    Q.    So this did not interrupt the processing of the

 8              deboning line?

 9    A.    No.

10    Q.    On a normal schedule, like right now, no weekend

11              shifts are worked; is that correct?

12    A.    No.

13    Q.    So they are closed during the weekend?

14    A.    Yes.

15    Q.    So then for the three or four weeks then leading

16              up to the removal, you would shut down portions

17              at a time and remove it and replace it with new

18              stuff or just take out the old stuff?  How did

19              that work?

20    A.    The -- It actually took two weeks, and the first

21              week we removed all the equipment we could do

22              without.  There's some equipment that wasn't

23              running that never did run, and we got all that
```

Page 49

```
 1              out of the way.  And then the second weekend we

 2              came in and did a whole scale tear-out.  Took

 3              everything out and replaced everything.

 4    Q.        So no shifts were missed?

 5    A.        No.

 6    Q.        Correct?

 7    A.        I don't think so.

 8    Q.        Tell me about the removal process.  How was this

 9              removed?

10    A.        Came in and unhooked all the electrical and all

11              the water and air.

12    Q.        When you say air, was that for the pressure?

13    A.        We use air for -- There were air cylinders and

14              air gates that directed product as it went

15              through the process.  We went in and

16              disconnected all of that, and then they would

17              come in and unbolt it from the floor.  A lot of

18              the equipment had to be cut apart.  As I said

19              before, it was all welded together to make one

20              big integral operation.

21    Q.        And these are -- the various pieces that came

22              from the factory were then welded together?

23    A.        That's correct.
```

Page 50

1    Q.   And so to remove them, they had to be unwelded

2         back to their original state, correct?

3    A.   They would be cut apart to where they were --

4         where we could handle them to get them out of

5         the plant.

6    Q.   And they were unbolted from the floor?

7    A.   That's correct.

8    Q.   And then what was done with it?

9    A.   They were picked up and taken out, and we put

10        them in the yard.

11   Q.   And at that time you already had the replacement

12        equipment on site?

13   A.   Yes.

14   Q.   And who manufactured that?

15   A.   Fabco.

16   Q.   They are the millwrights.  Who is the

17        manufacturer of the replacement equipment?

18   A.   Fabco.

19   Q.   Still Fabco?

20   A.   Yeah.  They do the same thing.

21   Q.   So you replaced the D & F equipment with Fabco

22        equipment?

23   A.   That's correct.

Deposition of David Bromley                                    November 27, 2007

Page 51

```
 1    Q.   Do you know how much that cost?

 2    A.   No, sir.

 3    Q.   Do you know how much the installation cost and

 4         the deinstallation cost?

 5    A.   That was all figured in -- They did a blanket

 6         price, but I don't recall what it was.

 7    Q.   I see.

 8              After the D & F equipment was removed, there

 9         were holes in the floor, right?

10    A.   Excuse me?

11    Q.   After the D & F equipment was removed, there

12         were holes in the floor, correct?

13    A.   That's correct.

14    Q.   And what was done about that?

15    A.   Some of the equipment sat right back over some

16         of it, and then the others we had to come back

17         and patch because water would puddle in it.

18    Q.   When you say some of the equipment, some of the

19         replacement equipment sat over some of those

20         holes.  Those were never repaired?

21    A.   Not if they sat right back in the same holes.

22    Q.   But then there are other holes that remained

23         exposed, correct?
```

Deposition of David Bromley                                    November 27, 2007

Page 52

| 1 | A. | That's correct. |
| 2 | Q. | And when you say patched, you would fill in the |
| 3 |  | concrete then and put epoxy on it? |
| 4 | A. | Most of the damage is in the epoxy.  It's not |
| 5 |  | all the way down in the concrete. |
| 6 | Q. | And so there was an epoxy patch put there? |
| 7 | A. | That's correct. |
| 8 | Q. | And the floor was not resurfaced, correct -- |
| 9 | A. | No. |
| 10 | Q. | -- the whole floor? |
| 11 | A. | No. |
| 12 | Q. | So it wasn't like when the ConAgra equipment was |
| 13 |  | removed, correct? |
| 14 | A. | That's correct. |
| 15 | Q. | And, again, this is all done -- Strike that. |
| 16 |  | This was done in two weekends, correct? |
| 17 | A. | Yes. |
| 18 | Q. | Was GE given notice of this removal beforehand? |
| 19 | A. | I do not know. |
| 20 | Q. | Was it given -- Do you know if it was ever given |
| 21 |  | notice? |
| 22 | A. | No.  I don't know. |
| 23 | Q. | Is all of the D & F equipment currently sitting |

Page 53

1          in the yard?

2     A.   Yes.

3     Q.   Does exposure to the elements damage the value

4          of the equipment, reduce the value of the

5          equipment?

6               MR. GEEKIE:  Objection.  Foundation.

7     A.   I would say no.  Most of this equipment was

8          designed for a wet environment and the elements

9          of a chicken plant so it holds up rather well.

10    Q.   Tell me about the conveyor belts.  Does exposure

11         to the elements damage the conveyor belts?

12              MR. GEEKIE:  Same objection.

13    A.   It can, yes.

14    Q.   And are the conveyor belts sitting outside too?

15    A.   The belts themselves, yes.

16    Q.   Are you aware if Koch Foods maintains insurance

17         on the equipment?

18    A.   I don't know.

19    Q.   You don't know?

20    A.   I don't know.

21    Q.   The equipment that's installed there now, is it

22         better than the old stuff?

23              MR. GEEKIE:  Objection.  Vague and

Page 54

1                          ambiguous.  Foundation.

2   A.   I'd say it's about equal.

3   Q.   Do you know why it was replaced?

4   A.   (Witness nods head negatively.)  No.  I'm sorry.

5   Q.   Did you have any conversations with anyone at

6        Koch Foods about why the decision was made to

7        replace it?

8   A.   After it had been replaced, and it was just -- I

9        inquired as to why.

10  Q.   Of whom did you inquire?

11  A.   I want to say Gary Davis.

12  Q.   And did Mr. Davis give you an answer?

13  A.   Just about a dispute with GE.

14  Q.   And that's your understanding of it?

15  A.   Yes.

16  Q.   You don't know the nature of that dispute?

17  A.   No, sir.

18  Q.   Did you ask anyone else besides Mr. Davis why it

19       was removed?

20  A.   No.

21  Q.   Are you aware of any efforts that Koch Foods has

22       made to sell the removed deboner equipment?

23  A.   No.

Page 55

 1    Q.    Have you been asked to participate in any

 2          efforts to sell that equipment?

 3    A.    No.

 4    Q.    Whose decision was it to put it in the parking

 5          lot?

 6    A.    It's the only place we had so guess I got it.

 7    Q.    Did Mr. Davis tell you to remove it and put it

 8          in the parking lot?

 9    A.    Yeah.

10    Q.    Have you seen any of the pleadings involved in

11          the lawsuit we're here on today?  When I say

12          pleadings, I mean the papers filed with the

13          Court.

14    A.    No, sir.

15    Q.    After you unbolted the old equipment and were

16          preparing to remove it, did you have to remove

17          any walls or doors to get it outside?

18    A.    No, sir.

19    Q.    If you wanted to remove the spiral freezer,

20          would you need to remove any doors or walls to

21          get it outside?

22    A.    Yes, sir.

23    Q.    Tell me about that.

Page 56

| 1 | A. | The coils and things are so big, we would take |
| 2 | | down a wall and replace that wall. |
| 3 | Q. | Would that be an interior wall? |
| 4 | A. | Exterior wall to get it outside. |
| 5 | Q. | How was it gotten in?  Do you know? |
| 6 | A. | Same way. |
| 7 | Q. | So somebody removed an exterior wall to get it |
| 8 | | in? |
| 9 | A. | That's correct. |
| 10 | Q. | And what is the wall made of, brick? |
| 11 | A. | No.  It's Isopanel.  It's a freezer panel wall, |
| 12 | | metal on both sides with foam in the middle. |
| 13 | Q. | And this is -- when I say exterior wall, I mean |
| 14 | | between the facility and the outside. |
| 15 | A. | That's correct. |
| 16 | Q. | So the freezer is in a location that one of its |
| 17 | | walls faces the outside? |
| 18 | A. | That's correct. |
| 19 | Q. | Oh.  So that's how it gets in and out? |
| 20 | A. | Right.  We cut a big section of the wall out, |
| 21 | | brought everything in, and then you put the wall |
| 22 | | back. |
| 23 | Q. | Got it. |

Page 57

1          And you moved it then just inside the

2          building and put the wall back?

3     A.   Yes.

4     Q.   I understand.

5          Would it be possible to remove the spiral

6          freezer?

7               MR. GEEKIE:   Objection.  Vague and

8                    ambiguous and foundation.

9     A.   Yes, it's possible.

10    Q.   Have you ever participated in the removal of a

11         spiral freezer?

12    A.   No, sir.

13    Q.   And it's not completely installed right now,

14         correct?

15    A.   All but the pipe and the electrical.

16    Q.   Are you aware of any agreements that exist

17         between Sylvest and GE regarding whether the

18         installed equipment does or does not constitute

19         a fixture?

20    A.   No.

21    Q.   You were never consulted regarding any such

22         agreements?

23    A.   No.

Page 58

1    Q.    Do you have any knowledge of the current value

2          of the now removed chicken deboning equipment?

3    A.    No, sir.

4    Q.    That's not something that you know, correct?

5    A.    No.

6    Q.    Do you know anyone at Koch Foods who does have

7          such knowledge?

8    A.    I don't know of anyone.  I'm sure someone does.

9    Q.    But if they did, you wouldn't know their name?

10   A.    I do not know.

11   Q.    Are you familiar with B. C. Rogers?

12   A.    I've heard of them.

13   Q.    What is your understanding?

14   A.    All I know is they were a poultry company that's

15         similar to Sylvest that went through bankruptcy,

16         and Koch bought them as well.

17   Q.    And they are located in Morton, Mississippi?

18   A.    That's correct.

19   Q.    Do you perform any maintenance on the spiral

20         freezer?

21   A.    We've not had to.  It wasn't running.

22   Q.    I didn't hear the last part.

23   A.    It wasn't running so no.

Page 59

1    Q.    You did perform maintenance on the deboning line

2          while it was operating, correct?

3    A.    Correct.

4    Q.    And you don't anymore?

5    A.    No.

6    Q.    And you haven't since it was removed from the

7          facility, correct?

8    A.    That's correct.

9    Q.    And you never performed any maintenance on the

10         Ossid equipment, correct?

11   A.    That's correct.

12                    MR. HARRIS:  I don't have anything

13                        else of Mr. Bromley unless you

14                        gentlemen have questions.

15                    MR. GEEKIE:  No, we don't.  Thank

16                        you.

17                    (Deposition concluded at approximately

18                        10:30 a.m.)

19

              * * * * * * * * * * * *

20

              FURTHER DEPONENT SAITH NOT

21

              * * * * * * * * * * * *

22

23              REPORTER'S CERTIFICATE

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

KOCH FOODS OF ALABAMA, LLC, )
an Alabama Limited Liability company )       Case No. 07-cv-522-MHT
)
Plaintiff and Counterclaim-defendant, )
)       Honorable Myron H. Thompson
v. )       Honorable Terry F. Moorer
)
GENERAL ELECTRIC CAPITAL )
CORPORATION, )
a Delaware corporation, )
)
Defendant and Counterclaim-plaintiff. )

### AFFIDAVIT OF DAVID BROMLEY

STATE OF ALABAMA )
)       SS:
COUNTY OF MONTGOMERY )

I, David Bromley, being duly sworn, state the following under penalty of perjury:

1.     I am currently an employee of Koch Foods of Alabama, LLC ("Koch") and in all respects competent to make this Affidavit in support of Koch's Brief and Evidentiary Materials in Opposition to the Summary Judgment Motion filed by General Electric Capital Corporation ("GECC"). Prior to my employment by Koch, I was employed by Sylvest Farms, Inc. ("Sylvest") and was and am familiar with the chicken de-boning lines that GECC alleges that Koch converted.

2.     The chicken de-boning lines (the "Deboner") were installed at Koch's facility, occupying an indoor space in the approximate size of six thousand square feet.

3.     After Koch removed the Deboner from the indoor space to the yard of the facility, Koch placed them in a neat and orderly way so that it could keep its value.

1

I declare under penalty of perjury that the foregoing is true and correct.

_____
David Bromley

Subscribed and sworn to before me on
this 4th day of January, 2008

_____
NOTARY PUBLIC
My commission Expires: 7-24-09

# Exhibit 7

Koch Foods of Alabama, LLC v. General Electric Capital Corporation
Michael T. Leonard

07-cv-522-MHT
January 3, 2008

Page 5

```
 1    the evidence and reports previously disclosed
 2    by GE Capital.
 3    BY MR. GEEKIE:
 4        Q.   And Mr. Leonard, what is your current
 5    employment position?
 6        A.   I'm an owner of MTL Services.
 7        Q.   And what business is MTL Services in?
 8        A.   We purchase used spiral freezers and
 9    other freezing equipment and processing
10    equipment from the food industry, and
11    sometimes we sell it used and sometimes we
12    purchase the equipment, refurbish it, and
13    resell it.
14        Q.   And do you have experience then in
15    selling food processing equipment?
16        A.   Yes.  I worked for Frigoscandia, which
17    is now FMC FoodTech, for about ten years --
18    about nine years, sorry, and then I've worked
19    for RMF Freezers for about six years.  And
20    then after that, I've had my own company now
21    for about two years with MTL Services.
22        Q.   And with Scandia and RMF, did you have
23    experience in buying and/or selling food
24    processing equipment?
25        A.   Yes.  With RMF and Frigoscandia FMC I
```

Page 6

1    sold new equipment, which was spiral freezers

2    specifically.

3         Q.   Okay.  And the spiral freezers, are

4    they used in the poultry processing business?

5         A.   Yes, they are.

6         Q.   And with MTL Services, have you bought

7    and sold used equipment?

8         A.   Yes, used spiral freezers and flat

9    products freezers and contact freezers for the

10   food freezing industry for the poultry

11   industry and beef industry.

12        Q.   Do you have knowledge about whether or

13   not poultry equipment -- or food processing

14   equipment depreciates in market value when

15   it's placed into service?

16        A.   Yes, it does.

17        Q.   And what is your knowledge of that

18   based on?

19        A.   Well, I could tell you that the first

20   unit that I purchased was a unit that I

21   purchased from Brakebush Brothers that I sold

22   later to Sylvest Farms.  This was also the

23   unit that's in question here or in litigation,

24   and that unit is a GYRoCOMPACT 76, the model

25   number is 76-08-40-26.  And that unit probably

Page 7

1    sells new for 650 to 700 thousand dollars.  I

2    purchased that unit for $25,000 from Brakebush

3    Brothers and then removed it.  One reason they

4    saw the value in selling it for the price that

5    it was purchased for was that my old company,

6    FMC FoodTech, was going to charge them

7    $100,000 to remove it.  So in their opinion,

8    they just made $125,000.

9        And so I purchased the unit, removed it,

10   sold it to Sylvest Farms, took the unit to

11   Arkansas, refurbished it, shipped it to

12   Sylvest and -- Sylvest Farms at the plant that

13   the unit is at now, and then reinstalled it.

14       Q.   Now, this freezer you're describing,

15   when did you purchase it from Brakebush?

16       A.   I don't have the date right here, but

17   it was back on I think in October of 2005, I

18   think.

19       Q.   And how old was that freezer when you

20   purchased it?

21       A.   It was a 1993, I believe.

22       Q.   Okay.  And at that time that you

23   purchased it, you said you purchased it for

24   $25,000?

25       A.   That's correct.

1          Q.    And I think you said you're familiar
2     with Sylvest Farms?
3          A.    Yes, I worked with their president and
4     top management there to -- you know, to
5     develop a contract and worked with them during
6     the installation with their engineers and so
7     forth.
8          Q.    Now, the freezer that you described,
9     is that the first piece of equipment that you
10    sold to Sylvest Farms?
11         A.    Yes, sir.
12         Q.    Did you sell Sylvest Farms any other
13    equipment?
14         A.    No, sir.
15         Q.    Okay.  And can you describe for me how
16    the transaction came about where you sold the
17    freezer to Sylvest Farms?
18         A.    Well, I just made a contact with them
19    by phone and talked with them and developed a
20    proposal, sent that in to them and, you know,
21    agreed on a price and put everything together
22    and consummated the deal.
23         Q.    And would you please look at Exhibit
24    19, previously marked as Exhibit 19, which
25    also has the GE stamps on it, GE 499 through

Page 9

1    GE 503.

2        A.    Okay, I've got it.

3        Q.    Can you identify that document for me,

4    Mr. Leonard?

5        A.    Yes, that's my document.

6        Q.    When you say it's your document, is

7    this the proposal that you sent to Sylvest

8    Farms for the refurbished freezer?

9        A.    That's correct.

10        Q.    And is this then the proposal

11    regarding the freezer that you had repurchased

12    from -- or purchased from Brakebush for

13    $25,000?

14        A.    That's correct.

15        Q.    And if you turn to the third page

16    that's marked GE 0501.

17        A.    Okay.

18        Q.    I see a price total with all options

19    of $430,000.  Is that the price that the

20    freezer was then sold to Sylvest Farms for?

21        A.    That's correct.

22        Q.    And that seems to be a significant

23    price above and beyond what you had paid for

24    it.  Can you describe for me what went into

25    the price sold to Sylvest Farms that added or

Page 10

1    increased the price from the 25,000 you paid
2    to the 430,000 you delivered it for, or sold
3    it for?
4         A.   Well, the first thing, of course, is
5    that the equipment had to be removed.  And,
6    you know, that was probably in the range of
7    $75,000 or so to remove that unit.  And then
8    the unit --
9         Q.   And that's remove it from Brakebush?
10        A.   From Brakebush, correct.  And then
11   once the unit was removed, it had to be
12   trucked to Arkansas, which is four flatbed
13   trucks, which I don't remember all these
14   numbers exactly but I can give you some
15   estimates.  It was probably, you know, seven
16   or eight thousand dollars to do that.  And
17   then once the equipment was sent there, we
18   refurbished the unit, which was probably
19   another, I don't know, maybe $100,000.  We had
20   to buy several new components for the unit,
21   including a new drive system, all new what
22   they call ball rails and balls and chains,
23   which was about $50,000.  A new enclosure has
24   to be purchased every time you remove a
25   freezer, take it apart and put it back

Page 11

1    together.  That was about 50 to 60 thousand

2    dollars.  And the installation, the labor and

3    all that was about $100,000.

4        And you know, there's markup applied to

5    all, this but if you look at the $430,000, all

6    of that costs should have come up -- I have a

7    cost sheet but didn't bring it with me.  I'm

8    happy to get that for you guys on the project.

9    But it came up to be about $330,000, and we

10   made about $100,000 profit, which is about a

11   25 percent gross margin; should have done

12   better.

13       Q.   Then it's your testimony that the

14   installation price at Sylvest or the

15   installation cost was approximately $100,000?

16       A.   Yes.

17       Q.   Now, I think you also said that when a

18   new freezer is removed and then installed, you

19   need to include a new housing, is that right?

20       A.   Yes, sir, you have to have a new

21   enclosure.  In this case, it was a stainless

22   steel enclosure inside and outside because

23   they were going to do par-fried products and

24   may have done fully cooked later, so we have

25   stainless steel on the inside and the outside.

Page 12

1      Q.   And what did you estimate the cost of

2   a new enclosure would be?

3      A.   Well, the cost of it is, I think at

4   that time was about 38,000 or so, but with the

5   markup, it's going to be over -- a little over

6   probably $50,000.  But the cost actually is

7   37,000.

8      Q.   And if the freezer was removed from

9   the Sylvest facility where you installed it

10   and taken to another location and installed

11   there, would it need another housing, or I

12   should say enclosure?

13          MR. HARRIS:   Objection, calls for

14   speculation and opinion.

15   BY MR. GEEKIE:

16      Q.   Go ahead.

17      A.   Well, to me, that's not speculation.

18   I mean, this is what I do for a living.  And

19   every time that a unit is taken apart, it has

20   to be -- the enclosure is going to be

21   destroyed.  And the way that these units are

22   put together, they are put together with an

23   adhesive that goes between each enclosure

24   section as they are cam locked together.  And

25   that adhesive is a big time adhesive, however,

Page 13

1    whatever the right word is that you want to

2    use.  And when you take these panels apart,

3    they tear all over the foam or polyurethane

4    that's in there.

5        Also, this unit was done very unique

6    because he wanted to have stainless steel up

7    the walls.  So we went up the walls about 36

8    inches with stainless steel, and then had to

9    adhere the unit with adhesive, the enclosure

10   to the unit itself, the way it was all welded

11   together and sandwiched together.  So, you

12   know, that -- people can try to take those

13   apart, but I have never seen that successfully

14   done.

15       Q.  And have you ever installed a freezer

16   without a new enclosure?

17       A.  No.

18       Q.  Can you describe -- you briefly

19   described the installation of the freezer at

20   Sylvest where you said that it was I think

21   customized with stainless steel up the wall.

22   Can you describe what was involved in

23   installing this freezer at the Sylvest

24   facility?

25       A.  Well, first off, you have to take the

Koch Foods of Alabama, LLC v. General Electric Capital Corporation
Michael T. Leonard

07-cv-522-MHT
January 3, 2008

Page 14

1    stainless steel and weld sheets all the way

2    around the inside of the unit.  And then what

3    you have to do is you literally have a sheet

4    that's sticking up around the outside of the

5    unit, going three feet up vertically, and then

6    when you attach the enclosure and start

7    building the enclosure, that has to be

8    literally bolted and fastened to the enclosure

9    in the middle.  You know, you bolt those

10   together.  And in doing that, you have to

11   apply an extreme amount of adhesive in between

12   the two, to seal that, and also to glue it,

13   but also to seal it so that water can't get in

14   there behind it because that can cause

15   listeria and other issues that can affect food

16   quality and safety.

17              MR. HARRIS:  I'm sorry, I missed

18   that word, can cause what?

19              THE WITNESS:  Can cause listeria,

20   which is a food safety issue.

21              MR. HARRIS:  Thank you.

22   BY MR. GEEKIE:

23      Q.   And was anything done to the building,

24   either adjustments made or changes made in the

25   building to accommodate the freezer or allow

Page 15

1    the freezer to be installed?

2        A.    There is a concrete pad that has to be

3    laid down, which is 4 inches thick, that they

4    put right down on top of the existing floor.

5    And that's very common in all of those -- in

6    any kind of spiral freezer that's built.

7        Q.    Do you know anything else that was

8    done to the building?

9        A.    No, sir.

10       Q.    Was the freezer itself attached to the

11   building with pipes or electrical lines or

12   anything else?

13       A.    Well, I don't think that they actually

14   finished the installation on that equipment.

15   The last time I was there, the refrigeration

16   was never completely hooked up and insulated

17   because Sylvest went into bankruptcy.  So the

18   installation was never completed, with

19   electrical or with refrigeration.

20       Q.    Okay.  And I think you said that when

21   you originally trucked it to Arkansas to be

22   refurbished, it was on four truckloads, is

23   that right?

24       A.    That's correct.  And then we also, one

25   thing I didn't mention is then we had to truck

Page 16

1    it from Arkansas to Alabama as well.

2         Q.    And installed, what is the approximate

3    dimension of the freezer assembly?

4         A.    It's 15 foot 9 inches wide by 28 foot

5    2 and a half inches long, by 16 foot 6 inches

6    tall.

7         Q.    And do you know how much that entire

8    assembled freezer weighs?

9         A.    I don't have a number for that.  I

10   would say probably -- I mean, I could guess

11   for you but I don't know what that is off the

12   top of my head.

13        Q.    Okay.  And how long did it take to

14   install that freezer at the Sylvest facility?

15        A.    It took, I was trying to think, I

16   think about four weeks.

17        Q.    And would you now turn to Exhibit 8,

18   Koch Exhibit 18, please.

19        A.    Okay.

20        Q.    And this document is marked GE 370

21   through 375.  Can you identify this document,

22   please?

23        A.    Yes.  Yes, this is a document that I

24   sent to -- must have been a document that I

25   sent to them early.  Let's see, who is -- who

Page 17

1    is this.  Oh, I'm sorry, I'm sorry, I was

2    thinking this was for Sylvest, but I see,

3    yeah, this is something that I sent to GE.

4         Q.   Okay.  Is this an e-mail and an

5    attachment that you sent to William Perry at

6    GE?

7         A.   Yes, sir.  I'm trying to remember but

8    I'm sure that I sent this, but I don't

9    remember.  I don't remember it off the top of

10   my head.

11        Q.   Okay.  Do you remember making a

12   proposal to GE to either purchase or remove

13   and install the freezer for the --

14        A.   Oh, that's right, yes, I do, yes,

15   because I just sent this to them because I was

16   talking about -- you know, I was talking with

17   them about the time that, you know, I could

18   offer that service.

19        Q.   Okay.  Well, at the time that Sylvest

20   filed bankruptcy, did you contact GE about the

21   freezer?

22        A.   Yes, sir, I did.

23        Q.   And can you describe what took place?

24        A.   You know, all I remember was, you

25   know, I guess I had sent them this and that in

Page 18

1    case they sold the freezer and they wanted me

2    to -- you know, if they were interested in me

3    purchasing the unit or just moving that unit

4    for them if they found a buyer themselves.

5    And then also I had been in contact, of

6    course, with Joe DeSalvo to purchase the unit

7    outright.

8         Q.    Before we go on to your conversations

9    with Mr. DeSalvo, if you'll turn in Exhibit 18

10   to page GE 373.

11        A.    Okay.

12        Q.    And I see that there's a line that

13   says removal and installation, $175,000.

14        A.    Right.

15        Q.    Can you describe for me what that line

16   is intended to indicate?

17        A.    Well, that was for us to go into the

18   factory and completely disassemble the unit

19   and -- you know, and then I'm not sure if

20   freight was included in that or not right off

21   the top of my head.  But that was for us to

22   disassemble it and then reinstall it at

23   another location.

24        Q.    And then you mentioned conversations

25   you had with Mr. DeSalvo.  Can you describe

Page 19

1    what those conversations were about?

2         A.    Well, I've known Joe DeSalvo for a

3    little while and, you know, called him because

4    I knew that he was involved in the surplus

5    equipment or whatever it should be called, and

6    had called him up and just tried to see if I

7    could purchase this unit from GE Capital.  And

8    during the conversations, we went back and

9    forth on it and agreed on a price.  And he

10   sent me a contract that stated what we had

11   agreed to.  We went back and forth on that a

12   couple of times to get all the wording

13   correct, and then agreed on a price of

14   $50,000.

15        And I sent him a deposit, which we had

16   agreed on, of $5,000 and sent that in to him,

17   and then later on was informed by Joe that

18   there was litigation between Koch Foods and GE

19   and that the equipment may not be available,

20   at which time I requested to get my deposit

21   back, which was returned to me, you know, very

22   quickly.

23        Q.   Now, you said this unit.  Are you

24   speaking about the freezer that was installed

25   at Sylvest Farms?

Page 20

1      A.    Yes.

2      Q.    And it was your understanding that GE,

3   through Mr. DeSalvo, had agreed to sell that

4   freezer to you for $50,000?

5      A.    Yes.  I actually signed the contract

6   and sent that back in to them with a deposit

7   check.

8      Q.    And what time period was this?

9      A.    I would have to go back and -- hold

10  on, I'll look at the -- this was in May of

11  2007.

12     Q.    And if you'll turn to Koch Exhibit 21.

13     A.    Okay, I have it.

14     Q.    Can you identify that document for me?

15     A.    Yes.  That's the document that Joe

16  DeSalvo and General Electric sent to me by

17  e-mail, at which time I signed it and sent in

18  a deposit for $5,000.

19     Q.    And did General Electric cash your

20  check for $5,000?

21     A.    Yes, they did.

22     Q.    Okay.  And in discussing the purchase

23  of the freezer with Mr. DeSalvo, did

24  Mr. DeSalvo indicate to you that GE had been

25  making any other efforts to sell the freezer?

Page 21

1         A.    No, we really didn't discuss that.    I

2    mean, it was -- I was just trying to buy the

3    equipment.

4         Q.    When you discussed the $50,000

5    purchase price, did Mr. DeSalvo indicate to

6    you that he believed that that was the fair

7    market value of the spiral freezer located at

8    Sylvest Farms?

9         A.    Well, I took it that he did because he

10    felt very comfortable with, you know, with

11    selling it to me at that price.    And, you

12    know, I -- it was pretty clear to me.

13         Q.    Now, have you received and reviewed an

14    appraisal by a Mr. Robert Breakstone from

15    Equipment Exchange regarding the equipment

16    located at Sylvest Farms?

17         A.    I did look at it briefly, just at the

18    numbers on it, but yes, I did review it

19    quickly.

20         Q.    And are you familiar with the

21    equipment that was described in that

22    appraisal?

23         A.    My understanding is that it's the same

24    equipment that's at the Koch Foods facility in

25    Alabama that we're talking about today.

Page 22

```
 1        Q.   And have you inspected that equipment
 2   before?
 3        A.   Yes.  Yes, I went back and looked at
 4   it when I was looking at, you know, at
 5   purchasing it back, to make sure it was still
 6   in the same condition that we had left it in.
 7   And it was at that time.
 8        Q.   And do you have any reaction to or
 9   view regarding the amounts that Mr. Breakstone
10   expressed in his appraisal --
11             MR. HARRIS:  I'm sorry, go ahead.
12   BY MR. GEEKIE:
13        Q.   -- regarding this equipment?
14             MR. HARRIS:  All right.  Let me
15   re-interject my continuing objection to
16   opinion testimony.
17             MR. GEEKIE:  Tim, you made it
18   before and I'll give it to you again.  You've
19   objected to it.
20             MR. HARRIS:  I'll keep making it,
21   too.
22             MR. GEEKIE:  Okay.
23   BY MR. GEEKIE:
24        Q.   Go ahead, Mr. Leonard.
25        A.   Well, you know, I just -- you know,
```

Page 23

```
 1      I've been in this business, as I've said, and
 2      I've purchased this equipment, this type of
 3      equipment a lot, whether it's that size or
 4      bigger or smaller, and the one thing that I
 5      just noticed was that it was an extremely high
 6      price as far as I'm concerned.  You know,
 7      if -- there's different values I guess
 8      associated with whether it's a -- you know, a
 9      third-party that actually produces food that,
10      you know, maybe there's a price that they
11      would pay, and then there's a fair market
12      value that I would pay for it.
13          But in my opinion, you know, you cannot go
14      out and purchase this equipment anywhere near
15      the pricing that they are talking about,
16      refurbish the unit, you know, remove the unit,
17      refurbish the unit, reinstall the unit and
18      make any money at all at a price of, I can't
19      remember, $280,000 or whatever that number
20      was, or even the other value, which was a
21      lower value, I can't remember what that value
22      was, a hundred and something thousand dollars.
23          I mean, by the time I got through selling
24      this unit, even if I purchased it at $50,000
25      and, you know, sold it for whatever that price
```

Page 24

1    would be, you know, $400,000 or whatever in

2    that range that it was, you know, if you made

3    $100,000 or so on the unit, that would be a

4    good price.  And at the pricing that we're

5    talking about here, there's no way that you

6    could make any profit whatsoever.  It would

7    just -- it would be doing it at cost, which of

8    course isn't good business and would never be

9    associated with that.

10        Q.   And are your statements based upon

11    then what you knew to be the cost of

12    installation, removal and installation of this

13    freezer?

14             MR. HARRIS:  Let me restate my

15    objection again.  You're asking him for

16    opinion testimony.

17    BY MR. GEEKIE:

18        Q.   Go ahead.

19        A.   Would you repeat the question?

20             MR. GEEKIE:  Would you read it

21    back?

22             (The record was read.)

23             THE WITNESS:  Yes.

24             MR. GEEKIE:  I have no further

25    questions.  And for the record, I will state

Page 25

1    that this opinion testimony is proper.

2    Mr. Leonard is a material witness here, he was

3    not identified by GE, as obligation was, under

4    Rule 26 and under the discovery requests

5    served upon GE, and it was improper that they

6    did not disclose him.  They have had advanced

7    notice of Mr. Leonard's opinion testimony and

8    experience based upon GE's dealings with

9    Mr. Leonard and their knowledge regarding

10   Mr. Leonard at and before the time that this

11   litigation arose.

12            MR. HARRIS:  Well, let me just

13   respond by saying that Mr. Leonard was indeed

14   disclosed by Koch Foods.  And clearly, they

15   knew well about Mr. Leonard, and the time for

16   disclosing both the identity of experts, the

17   subject matter of their testimony, and

18   providing reports pursuant to Rule 26

19   regarding that testimony has long since come

20   and gone pursuant to the Court's previously

21   entered scheduling order.

22            MR. GEEKIE:  And that doesn't

23   excuse GE from its obligations under the

24   Federal Rules.  If you have any questions,

25   would you pose them now, please.

# Exhibit 8

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 10

```
 1    involved in or were involved in prior to the Sylvest
 2    bankruptcy?
 3         A.    No, not that I recall.
 4         Q.    The next item on the document in front of
 5    you, the 30(b)(6) notice, there -- item 2 A, you've
 6    been identified as someone with knowledge regarding 2
 7    A, and that is GE Capital's knowledge of Koch Foods'
 8    use of the equipment before the lawsuit.  What
 9    knowledge or information do you have regarding Koch's
10    use of the equipment?
11         A.    It's my understanding that Koch occupied
12    the building, I don't recall specifically, but I
13    believe via bankruptcy sale, and took the -- acquired
14    the building and had physical possession of all the
15    machinery in the building.
16         Q.    How did you come by that understanding?
17         A.    I believe Bill Wilson, litigation manager
18    in Connecticut.
19         Q.    He told you that?
20         A.    Right.
21         Q.    Do you recall when he told you that?
22         A.    I don't.
23         Q.    Did he tell you that in a phone call or an
24    e-mail?
25         A.    Phone call, possibly more than one phone
```

REPORTED BY: F. Renee Finkley, RPR, CRR, CCR-B-2289
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 11

1   call.

2       Q.    Other than telling you what you just
3   described, did he tell you anything else, for
4   example, that Koch was actually using the equipment?

5       A.    I don't recall that.

6       Q.    Do you recall anything else regarding your
7   conversations with Mr. Wilson about Koch's acquiring
8   Sylvest's assets, property, the GE equipment, the use
9   of GE equipment, their possession, their refusal to
10  turn it over, anything like that?

11      A.    At some point, I became aware that there
12  was litigation to, I believe, secure possession of
13  the equipment.  Again, I don't do that, I just get
14  word second, third hand.

15      Q.    Do you recall how you got word of that?

16      A.    Not specifically.

17      Q.    Items 2 B through G, do you have any
18  knowledge on those topics?

19      A.    E, I was aware of negotiations, but that's
20  the extent of it.

21      Q.    How did you come by that information?

22      A.    Probably -- I don't recall specifically,
23  probably a phone call.

24      Q.    Do you recall from whom?

25      A.    Joe DiSalvo.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 12

1       Q.      Do you recall what Mr. DiSalvo told you?

2       A.      Not really, no.

3       Q.      Do you remember anything else about that

4    subject matter or that information, that conversation

5    with Mr. DiSalvo?

6       A.      There were attempts to sell the machinery

7    to any interested party is all I recall about it.

8    That's Joe's job, to try to sell the machinery.

9       Q.      Any other topic under 2 that you have any

10   knowledge of?

11      A.      No.

12      Q.      You're not identified as a person with

13   knowledge regarding items in 3, but do you have any

14   knowledge or information regarding the inspection and

15   valuation of the equipment?

16      A.      Only that it occurred, only that somebody

17   went in there.  Again, I just heard verbally that

18   someone was either inspecting or attempting to

19   inspect the equipment.

20      Q.      Let me ask you this, before -- after the

21   lease documents were executed, but before the lease

22   was funded, did you or anybody from GE make an effort

23   to inspect the equipment and determine if it had been

24   received and installed at Sylvest?

25      A.      I don't recall that I -- no, I don't

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 13

1   believe I did specifically.

2        Q.    Is it a normal practice for GE to do that?

3        A.    As a function of the dollar amount

4   involved, yes, it would be.

5        Q.    Do you know whose responsibility that

6   would have been at GE to do that?

7        A.    Combination of the sales representative

8   and a transaction coordinator.

9        Q.    The sales representative in this

10  transaction was Will Perry, correct?

11       A.    Yes.

12       Q.    And then you mentioned a transaction

13  coordinator.  Do you know who that was in this

14  transaction?

15       A.    I'd have to guess.  I believe Carrie

16  Brock.

17       Q.    Is that a man or woman?

18       A.    Woman.

19       Q.    And is Ms. Brock still employed by GE?

20       A.    Yes, she is.

21       Q.    Do you know where her office is located?

22       A.    My office.

23       Q.    You don't know for sure that she was the

24  transaction coordinator?

25       A.    I do not know.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 47

1       Q.      What's your cursory knowledge?

2       A.      Asset has a useful life, can be

3    depreciated on an accelerated basis over that useful

4    life.  That's not part of my job description.

5       Q.      Okay.  Do you have any knowledge regarding

6    policies in GE leases related to whether or not

7    leased equipment can become a fixture?

8       A.      Yes.

9       Q.      What's that knowledge?

10      A.      Uniform Commercial Code.

11      Q.      Can you elaborate on that?

12      A.      Well, I am aware that certain types of

13   equipment could be considered fixtures.  The

14   air-conditioning system built into this building, not

15   going to remove that.

16      Q.      Beyond that, general knowledge that you

17   have that some equipment can become fixtures, do you

18   have any more specific knowledge about GE policies or

19   practices regarding fixtures and leased equipment?

20              MR. HARRIS:  Objection, foundation.  Go

21          ahead and answer if you can.

22              THE WITNESS:  We have operating

23          instructions that address fixture filings, UCC

24          filings.

25      Q.      (By Mr. Geekie)  What is your

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 48

1    understanding of those procedures?

2         A.    As a function of the dollar amount and the

3    type of equipment, it may or may not be advisable or

4    necessary to secure a fixture filing from the

5    landlord or owner of the building.

6         Q.    Is it your understanding that a fixture

7    filing serves to protect GE in case a leased or

8    financed equipment would be deemed to be a fixture?

9         A.    Yes.

10        Q.    And you mentioned a dollar amount.  Is

11   there -- is it your understanding that there's a

12   policy that at a certain dollar limit or amount, a

13   fixture filing is done or should be considered?

14        A.    Yes.

15        Q.    What amount is that?

16        A.    The policy changed, and I don't recall at

17   that time.

18        Q.    When did it change?

19        A.    Last year or so.

20        Q.    In 2005, do you recall the limit or the

21   requirement?

22        A.    The dollar limit?

23        Q.    Yes.

24        A.    I don't.

25        Q.    Was it under $2 million?

Page 49

 1      A.    No, I think it was more.

 2      Q.    Did you consider doing fixture filings

 3   with respect to the Sylvest lease in late 2005?

 4      A.    Don't remember.

 5      Q.    Do you think it would have been advisable

 6   to do fixture filings regarding the Sylvest lease?

 7           MR. HARRIS:  Objection, vague.  Go ahead

 8       and answer if you can.

 9           THE WITNESS:  This type of equipment is

10       readily moveable, you're not going to rip the

11       building apart, basic rule of thumb.  The real

12       issue is whether a landlord is going to suffer

13       damage to the real estate that it's attached to.

14       Highly unlikely that you're going to damage any

15       of the landlord's property extracting the

16       machinery.

17      Q.    (By Mr. Geekie)  But if you think that

18   there might be damage to the property or to the

19   building, then it's your understanding that it might

20   be a fixture?

21           MR. HARRIS:  Objection.

22           THE WITNESS:  No.

23           MR. HARRIS:  That goes to a legal

24       conclusion, but go ahead and answer if you can.

25           THE WITNESS:  No, I would say no.  I mean,

Koch Foods of Alabama, LLC v. General Electric Capital Corp.    07-cv-522-MHT
John Sutehall    November 29, 2007

Page 50

```
 1         if I have to jack four bolts out of the floor to
 2         remove a machine tool, I have the millwright put
 3         the bolts back when I'm done, and we leave.  I
 4         mean, it's a very straightforward transaction.
 5         Q.   (By Mr. Geekie)  Sure.  But I didn't ask
 6    that.  I asked if there would be damage to the
 7    building, for example, let's say you had to remove a
 8    wall, an exterior wall to remove equipment, in a
 9    situation like that, would you deem it advisable to
10    do a fixture filing?
11         MR. HARRIS:  Same objection.  Goes to
12         legal conclusion.  Answer if you can.
13         THE WITNESS:  I'm not sure I understand
14         the question.  You're asking, would I have to
15         remove a wall?
16         Q.   (By Mr. Geekie)  If you had to --
17         A.   If I had to remove a wall, what kind of
18    building is it?  I mean, it's still too vague a
19    question.  If it's a metal throw-up building, you
20    could remove a wall in 30 minutes.
21         Q.   What if you had to cut the wall away, had
22    to cut --
23         MR. GEEKIE:  I'll give you a standing
24         objection.
25         MR. HARRIS:  Standing objection to this
```

Koch Foods of Alabama, LLC v. General Electric Capital Corp.    07-cv-522-MHT
John Sutehall    November 29, 2007

Page 51

```
 1      whole line.
 2              THE  WITNESS:   Can the wall be replaced to
 3      its prior load bearing and function on the way
 4      out?
 5      Q.    (By Mr. Geekie)  So what you're -- what
 6  you're saying is, I take it, that determining whether
 7  or not it's a fixture or a fixture filing would be
 8  advisable as an underwriter risk, credit risk person,
 9  you need to know the specifics about the equipment,
10  its size, whether it's readily removeable or moveable
11  and the kind of building it's stored in; is that
12  right?
13      A.    I would focus on the size of the
14  equipment.
15      Q.    Okay.  Good.  And with respect to the
16  equipment at issue here, the leased equipment, what
17  inspection or due diligence or investigation did you
18  do to determine the size of the equipment or any
19  other factors that might have an impact on whether
20  you would deem a fixture filing advisable?
21      A.    I would see pictures of the equipment on
22  the invoices, basically.  Beyond that, I don't -- in
23  this particular case, I don't remember.
24      Q.    You don't remember doing any other
25  investigation of what items might play a role in
```

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 52

1  whether fixture filing is advisable?

2      A.    No, I don't recall.

3      Q.    Did you see pictures of this equipment?

4      A.    Pretty sure I did, some of it.  I mean,

5  you know, it's a -- like a manufacturer's brochure on

6  an invoice or something.

7      Q.    I haven't seen any of those pictures in

8  GE's production.  Do you know where they are?

9      A.    They may not exist.  Again, I do 200 deals

10 a year, and it may have been the Gold Kist machine

11 that I recall looking at.

12     Q.    You're not sure, then?

13     A.    I'm not sure.

14     Q.    You have no recollection, as you sit here,

15 specifically as to whether or not you looked at

16 pictures regarding this equipment?

17     A.    Correct.

18     Q.    The Sylvest equipment?

19     A.    Correct.

20     Q.    Did you do any other investigation or

21 undertake any other efforts to determine whether or

22 not it would be advisable to do a fixture filing in

23 this case?

24     A.    I don't recall.

25     Q.    Now, from looking at the GE master lease,

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 53

 1    there's a provision in there that attempts to

 2    preclude personal property from becoming a fixture.

 3    Are you aware of that provision in the lease?

 4        A.    Uh-huh.

 5        Q.    Yes?

 6        A.    Yes.

 7        Q.    And is it your testimony that despite that

 8    provision being in there in the master leases,

 9    there's still a GE policy that in certain situations,

10    GE considered doing a fixture filing?

11             MR. HARRIS:   I'm going to object to its

12        lack of foundation.   Go ahead and answer the

13        question.

14             THE WITNESS:   I think the issue is more

15        one of the dollar amount of exposure.

16        Q.    (By Mr. Geekie)   Okay.   I understand

17    that --

18        A.    Putting $20 million worth of machinery

19    into a building makes it more likely that the

20    equipment will be subject to a dispute, and it just

21    simply caps the problem by getting a landlord waiver.

22        Q.    Was --

23        A.    Then it's beyond question, despite relying

24    on the master lease nonfixture clause.

25        Q.    So it's really, then, what you're telling

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 54

 1    me is a dollar issue.  At a certain dollar level --

 2         A.    It's a business issue.

 3         Q.    Okay, a business issue.  You mentioned a

 4    landlord waiver.  Is that a landlord waiver that's

 5    separate and apart from the master lease provision?

 6         A.    Yes.

 7         Q.    And would you describe for me what that

 8    landlord waiver is?

 9              MR. HARRIS:  Objection, vague.

10         Q.    (By Mr. Geekie)  Do you know what the

11    landlord waiver is?

12         A.    Do I know what a landlord waiver is?

13         Q.    Yes.

14         A.    It's -- yes.

15         Q.    And would you tell me what your

16    understanding of a landlord waiver is?

17         A.    The landlord acknowledges that the asset

18    belongs to General Electric.

19         Q.    And --

20         A.    And that it's not a fixture.

21         Q.    And are landlord waivers obtained in some

22    GE credit transactions?

23         A.    Yes.

24         Q.    And is there a GE policy, or was there a

25    GE policy in December of 2005 regarding when a

Koch Foods of Alabama, LLC v. General Electric Capital Corp.                07-cv-522-MHT
John Sutehall                                                              November 29, 2007

Page 55

1    landlord waiver should be obtained?

2          A.     Don't recall specifically.

3          Q.     Was a landlord waiver obtained by GE in

4    the Sylvest lease transaction?

5          A.     Don't recall.

6          Q.     Did you consider obtaining or requesting a

7    landlord waiver in the GE lease transaction?

8          A.     Don't remember that either.

9          Q.     Did you investigate to determine who the

10   landlord was for the Sylvest plant in which the GE

11   leased equipment would be placed?

12         A.     Don't remember that.

13         Q.     Koch Exhibit 4, which I've handed you,

14   stamped GE 428 through 430, is that a document you

15   prepared?

16         A.     Yes.

17         Q.     Can you tell me why this document was

18   prepared?

19         A.     This is the investment request.

20         Q.     What purpose does it serve?

21         A.     Characterizes the transaction.

22         Q.     Is this what you prepare after you've

23   completed your due diligence or your risk analysis?

24         A.     Yes.

25         Q.     And would a document -- this document

Page 56

```
 1   contain what you believe to be all relevant or

 2   pertinent matters regarding the underwriting risk in

 3   entering into the Sylvest credit transaction?

 4       A.    Repeat the question.

 5            MR. GEEKIE:  Read it back please.

 6            THE REPORTER:  "Question:  And would a

 7       document -- this document contain what you

 8       believe to be all relevant or pertinent matters

 9       regarding the underwriting risk in entering into

10       the Sylvest credit transaction?"

11            THE WITNESS:  Do I believe it to be all,

12       yes.  I'll rephrase that.  I'm not being

13       facetious.  As an underwriter, I hope I captured

14       everything.  That's what we do for a living.

15       Q.    (By Mr. Geekie)  The intent is to list

16   everything in this type of document?

17       A.    Right.

18       Q.    Have you subsequently learned that there

19   was any information that wasn't included in this

20   Exhibit 4 that should have been included?

21       A.    I don't believe so.  I don't recall that,

22   other than the fact that they filed.

23       Q.    In this document, Exhibit 4, there is a --

24   in the upper left-hand portion of the document, there

25   is a spot, where it says, KMV, colon, BBB.  And I
```

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 57

1    understand from Mr. Perry that's the credit rating,

2    is that right?

3         A.    Correct.

4         Q.    Do you know who determines what that

5    credit rating is or -- who determined it in this

6    case, this BBB rating?

7         A.    A software system provided by a company, I

8    believe called KMV.

9         Q.    I've handed you what's marked as Koch

10   Exhibit 7.  Are you familiar with this document?

11        A.    No.

12        Q.    Do you --

13        A.    Well, rephrase the question.  Do I

14   remember this document, no, I don't remember seeing

15   this document.

16        Q.    You recognize this document as the results

17   of the Uniform Commercial Code search; is that right?

18        A.    Yes.

19        Q.    Do you know why a Uniform Commercial Code

20   search was done regarding Sylvest in December of

21   2005?  What you were looking for?

22        A.    The master lease.  I'm going to guess that

23   it was a post funding gap search to ensure that our

24   precautionary filing took.

25        Q.    Had the funding actually occurred on the

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 58

```
 1   date of this document, January 14th, 2005?
 2        A.    I don't know.
 3        Q.    Is it standard practice at GE to do a UCC
 4   search when the credit transaction is a $2 million
 5   true lease transaction?
 6        A.    Yes.
 7        Q.    Why is that?
 8        A.    Knowledge, awareness, there is a blanket
 9   filing looking for evidence of any sort of lien on
10   the equipment that may be in place already.
11        Q.    Now, you mentioned a short time ago that
12   you thought it was a post funding search.  Why would
13   that be?
14        A.    That's what I was looking at.  This is
15   dated 12/14.  This would appear to be a pre search.
16   We're looking for blanket filings and checking to see
17   if any of the equipment referenced in our invoices
18   had already been encumbered by someone.  Standard due
19   diligence.
20        Q.    What is the standard practice at GE
21   regarding doing these UCC searches with transactions
22   similar to the Sylvest transaction.  Do you do the
23   UCC search pre funding or post funding?
24        A.    We would do UCC search pre funding.
25        Q.    I may have asked you this earlier, and I
```

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 59

1    apologize.  Did you play any role in the negotiation

2    of the Sylvest lease?

3         A.    I did not.

4         Q.    Do you have any knowledge regarding

5    payments that Sylvest made after the lease was

6    entered into?

7         A.    What kind of payments?

8         Q.    Lease payments.

9         A.    My recollection is -- no, I don't

10   remember, I don't remember.

11        Q.    Do you know if a default letter to Sylvest

12   was ever issued by GE?

13        A.    I don't remember.

14        Q.    Do you have any knowledge or did you ever

15   participate in any discussions or communication

16   regarding GE's consideration to move to lift the

17   automatic stay and bankruptcy?

18        A.    I don't remember that.

19        Q.    You understand what the automatic stay is

20   in bankruptcy?

21        A.    Yes.

22        Q.    Did you ever advise anyone in these weekly

23   conversations that you had regarding Sylvest post

24   bankruptcy with Mr. Wilson and others that GE should

25   move to lift the automatic stay to take its equipment

Koch Foods of Alabama, LLC v. General Electric Capital Corp.                    07-cv-522-MHT
John Sutehall                                                                    November 29, 2007

Page 60

1    back?

2         A.    Do I remember providing instruction like

3    that?  I don't.

4         Q.    Do you recall if anybody else did?

5         A.    No.  I don't recall.  I don't remember any

6    conversations with anybody in Atlanta that would have

7    issued that.

8         Q.    In all your years of experience as a

9    customer service manager and a collections

10   supervisor, you have had experience, haven't you, in

11   bankruptcies of customers, where you instructed

12   people to go out and get the automatic stay lifted;

13   is that right?

14        A.    Yes.

15        Q.    Is there a reason why here you didn't

16   chime in or speak up, and ask if that had been done

17   or advise it to be done?

18        A.    There's a litigation specialist and a

19   collection manager, whose primary job responsibility

20   is to do that.

21        Q.    Was Mr. Wilson the litigation specialist

22   on this Sylvest transaction?

23        A.    I don't remember if he was from the start

24   on this transaction.

25        Q.    He was at some time, though?

Page 61

```
 1        A.    Yes.

 2        Q.    Do you know -- do you recall who was at

 3   the start, if it was somebody other than Mr. Wilson?

 4        A.    That I don't.  It might have been him from

 5   the start.  I just don't remember.

 6        Q.    And who was the collection specialist

 7   involved?

 8        A.    Don't remember.

 9        Q.    Would it have been either, or both, the

10   responsibility of the litigation and collection

11   specialist to make a decision on whether or not to

12   lift the automatic stay?

13        A.    I don't believe the collection specialist

14   would make that decision.  The collections manager

15   working with the litigation specialist would make

16   that decision.

17        Q.    Do you know who the collections manager

18   was regarding the Sylvest transaction or default?

19        A.    I don't remember back then.  I could throw

20   a name out.  It's just a guess.  It might have been

21   Mike Plumeau.  I don't know how long he's been there.

22   Big turnovers.  Nobody can do that job more than

23   about two years, before they can start losing their

24   marbles.  Except attorneys, I mean.

25        Q.    You don't have any familiarity or
```

Koch Foods of Alabama, LLC v. General Electric Capital Corp.          07-cv-522-MHT
John Sutehall                                    November 29, 2007

Page 62

1    information regarding the involvement of Bob

2    Breakstone in the Sylvest matter, do you?

3          A.    No.

4          Q.    Have you had any dealings with or

5    communications regarding a Jonathan Reich or Michael

6    Fox International regarding the Sylvest equipment?

7          A.    Not that I recall.

8          Q.    After the Sylvest default and the

9    bankruptcy filing, other than people making efforts

10   to find purchasers or new lessors -- new lessees for

11   the equipment, are you aware of anything else GE did

12   with respect to the leased equipment?

13         A.    No, I don't remember anything else like

14   that.

15         Q.    Now hand to you -- do you want to take a

16   break?

17               MR. HARRIS:   You know, I would like to

18         take a break.

19               MR. GEEKIE:   Five minutes.

20               (A recess was taken.)

21         Q.    (By Mr. Geekie)  I've given you what's

22   marked as Koch Exhibit 14, GE 348 through 354.  Have

23   you seen this document before?

24         A.    I don't remember seeing this document

25   before.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 63

1        Q.     And this document pertains to the deboning

2    lines, the cone lines.  Do you recall or did you

3    participate in any communications regarding the sale

4    or leasing of the deboning lines to Peco?

5        A.     Not that I recall.

6        Q.     Did you do any underwriting regarding

7    Peco?

8        A.     No, not that I recall.

9        Q.     Let me show you Exhibit 15, which is GE

10   355 through 361.  This relates to the Ossid shrink

11   wrap line proposal.  Do you recall seeing this

12   document before?

13       A.     No, I do not.

14       Q.     Let's go to --

15       A.     Will Perry prepared these, right?

16       Q.     Yes.  Koch 16, which is GE 564 through

17   569.  The front page is an e-mail, I don't see your

18   name on it anywhere.  You may not have gotten that,

19   but I'd appreciate you looking through the rest of

20   the pages, because they may be pages that you saw

21   regarding Peco at some time.

22       A.     Okay.

23       Q.     Any of those pages in Exhibit 16 that

24   you've seen before?

25       A.     No, not that I recall.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.
John Sutehall

07-cv-522-MHT
November 29, 2007

Page 64

1      Q.     Now --

2      A.     Possibly that page, the equipment list.

3      Q.     That's the page GE 568?

4      A.     Yes.  I may have seen that.  I don't

5    recall specifically, but that looks like the

6    equipment description.

7      Q.     It looks like from the bill of sale page

8    567, GE 567, that GE outright sold the Ossid lines to

9    Peco, do you have any knowledge of that?

10     A.     No.  I don't think I've ever seen this.

11     Q.     Exhibit 18 is an e-mail and a document

12   from Michael Leonard.  Have you ever seen it, either

13   of these documents before?

14     A.     Not that I recall.

15     Q.     Do you recall any discussions, dealings or

16   conversations that anybody may have had with

17   Mr. Leonard?

18     A.     Is that MTL?

19     Q.     Yes.

20     A.     I don't remember that.

21     Q.     To the best of your knowledge here today

22   in your deposition, have you described all the

23   efforts by GE that you're aware of to sell the

24   freezer, the Ossid lines and/or the cone lines?

25     A.     As best as I can remember.

Koch Foods of Alabama, LLC v. General Electric Capital Corp.                07-cv-522-MHT
John Sutehall                                                        November 29, 2007

Page 65

1       Q.      Yes.

2       A.      Did that encompass all of their efforts, I

3   don't know.

4       Q.      But to the best of your knowledge?

5       A.      To the best of my knowledge.

6       Q.      Okay.  Are you aware of any demand by GE

7   that Koch return the equipment that is subject to

8   this lawsuit?

9       A.      Am I aware of the existence of a demand?

10      Q.      Yes.

11      A.      Yes.

12      Q.      And what is your knowledge of that?

13      A.      That's about the extent of it.  At some

14  point, we made demand on Koch to give the machines

15  back.  That's really all I knew about it.

16      Q.      How did you come by that knowledge?

17      A.      Possibly in one of the weekly trend

18  reviews.

19      Q.      Do you remember when?

20      A.      No.

21      Q.      Do you remember who would have said that?

22      A.      Do not specifically remember.  I would

23  guess that it would be Wilson, but again --

24      Q.      Okay.  Do you know when that demand was

25  made?

Page 66

```
 1      A.    No.

 2      Q.    Are you aware of any demands by GE that

 3   Koch cease use of the cone lines?

 4      A.    Not that I remember.

 5      Q.    Are you aware of any demands by GE that it

 6   be allowed to inspect the equipment after Koch

 7   purchased Sylvest assets on or about May 29th, 2006?

 8      A.    Not that I remember.

 9            MR. GEEKIE:  I have no more questions.

10            MR. HARRIS:  I've got one or two.

11                          EXAMINATION

12   BY MR. HARRIS:

13      Q.    You were testifying previously,

14   Mr. Sutehall, regarding fixture filing.  What is your

15   understanding of the purpose of a fixture filing?

16      A.    Addresses the relationship between me, as

17   the owner of the equipment, and the lessee, as the

18   user of the equipment.

19      Q.    In what way?

20      A.    Fixture filing --

21      Q.    Yes.

22      A.    Would spell out the fact that GE, as the

23   owner, has the legal claim on the equipment.

24      Q.    Is that what's done in the lease?

25      A.    Yes.
```

Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC,<br>an Alabama limited liability company, | ) | 2007 JUN 13  A 11: 45 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:07cv 522 - MHT |
| GENERAL ELECTRIC CAPITAL | ) | |
| CORPORATION, | ) | |
| a Delaware corporation, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |

## ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT AND FOR UNJUST ENRICHMENT AND COUNTERCLAIM FOR CONVERSION

Now comes Defendant General Electric Capital Corporation ("GE Capital") and files its Answer to Plaintiff Koch Foods of Alabama, LLC's ("Koch Foods") Complaint for Declaratory Judgment and for Unjust Enrichment (the "Complaint") and Counterclaim for Conversion (the "Counterclaim") against Koch Foods.  In support thereof, GE Capital states as follows:

### ANSWER

1.      GE Capital admits the allegations contained in Paragraph 1 of the Complaint.

2.      GE Capital admits the allegations contained in Paragraph 2 of the Complaint.

3.      Paragraph 3 of the Complaint contains only a legal contention requiring no response; therefore, GE Capital makes none.

4.      Paragraph 4 of the Complaint contains only a legal contention requiring no response; therefore, GE Capital makes none.

5.      GE Capital admits the allegations contained in Paragraph 5 of the Complaint.

6.      GE Capital admits that Koch Foods was not originally a party to the Equipment Lease and denies the remaining allegations contained in Paragraph 6 of the Complaint.

7.      GE Capital admits the allegations contained in Paragraph 7 of the Complaint.

8.      GE Capital admits the allegations contained in Paragraph 8 of the Complaint.

9.      GE Capital admits the allegations contained in Paragraph 9 of the Complaint.

10.     GE Capital admits the allegations contained in Paragraph 10 of the Complaint.

11.     GE Capital admits that Koch Foods did not assume the Equipment Lease under the terms of the Bankruptcy Court Order and denies the remaining allegations contained in Paragraph 11 of the Complaint.

12.     GE Capital states that Koch Foods was aware since a time well prior to the date of the Bankruptcy Court Order (May 26, 2006) that the Equipment was owned by GE Capital as lessor under the Equipment Lease and denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.     GE Capital denies that it has demanded that Koch Foods pay rental charges (other than in the context of pre-litigation settlement negotiations in which the potential amount of such charges was discussed) and states that GE Capital has demanded that Koch Foods pay the value of items and units of the Equipment converted by Koch Foods, as is more particularly alleged in the Counterclaim, and denies the remaining allegations contained in Paragraph 13 of the Complaint.

14.     GE Capital denies the allegations contained in Paragraph 14 of the Complaint.

15.     GE Capital restates its answers to Paragraphs 1 through 14 of the Complaint as its answer to Paragraph 15 of the Complaint.

16.     GE Capital admits the allegations contained in Paragraph 16 of the Complaint.

17.  GE Capital admits that it is the owner of the Equipment as lessor under the Equipment Lease and denies the remaining allegations contained in Paragraph 17 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count I of the Complaint.

18.  GE Capital restates its answers to Paragraphs 1 through 17 of the Complaint as its answer to Paragraph 18 of the Complaint.

19.  GE Capital admits the allegations contained in Paragraph 19 of the Complaint.

20.  GE Capital reaffirms and restates its answer to Paragraph 13 of the Complaint as its answer to Paragraph 20 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count II of the Complaint.

21.  GE Capital restates its answers to Paragraphs 1 through 20 of the Complaint as its answer to Paragraph 21 of the Complaint.

22.  This paragraph does not require a response.

23.  GE Capital denies the allegations contained in Paragraph 23 of the Complaint.

24.  GE Capital denies the allegations contained in Paragraph 24 of the Complaint.

25.  GE Capital denies the allegations contained in Paragraph 25 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count III of the Complaint.

26.  GE Capital restates its answers to Paragraphs 1 through 25 of the Complaint as its answer to Paragraph 26 of the Complaint.

27.  This paragraph does not require a response.

28.    GE Capital denies the allegations contained in Paragraph 28 of the Complaint.

29.    GE Capital denies the allegations contained in Paragraph 29 of the Complaint.

30.    GE Capital denies the allegations contained in Paragraph 30 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count IV of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Koch Foods' Complaint, and each and every count therein, fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Except as expressly admitted herein, GE Capital denies all allegations contained in Koch Foods' Complaint.

### THIRD DEFENSE

Koch Foods' claims are barred, in whole or in part, by the doctrine of unclean hands or failure to do equity.

### FOURTH DEFENSE

Koch Foods' claims are barred pursuant to the equitable doctrines of judicial estoppel, equitable estoppel, and/or collateral estoppel.

### FIFTH DEFENSE

Koch Foods' claims are barred pursuant to the doctrines of waiver and laches.

### SIXTH DEFENSE

Koch Foods' claims, in whole or in part, are barred by lack of standing or lack of capacity.

## SEVENTH DEFENSE

Koch Foods is not entitled to a possessory lien from GE Capital under Alabama law.

## EIGHTH DEFENSE

GE Capital denies that Koch Foods is entitled to damages of the nature, type, and amount sought in the Complaint.

## NINTH DEFENSE

To the extent that discovery may show or demonstrate, Koch Foods, at all relevant times herein, failed to take reasonable action to mitigate the damages alleged in the Complaint.

## TENTH DEFENSE

GE Capital hereby gives notice that it intends to rely upon such other affirmative or supplemental defenses as may become available or apparent during the course of discovery and thus reserves the right to amend its Answer to assert any such defenses.

## **COUNTERCLAIM**

1.      GE Capital is a corporation organized under the laws of Delaware with its principal place of business located in Stamford, Connecticut. At all times relevant hereto, GE Capital was in the business, inter alia, of leasing food processing equipment to food processors.

2.      Koch Foods is a limited liability corporation organized under the laws of Alabama with its headquarters located in Park Ridge, Illinois, and a production facility located in Montgomery, Alabama. At all times relevant hereto, Koch Foods was in the business of processing and selling poultry products.

- 5 -

### GE Capital's Lease of Equipment
### to Sylvest Farms

3.      On or about December 29, 2005, GE Capital, as lessor, and Sylvest Farms, Inc. ("Sylvest Farms"), as lessee, entered into a Master Lease Agreement of that date (the "Master Lease").  Pursuant to the Master Lease, Sylvest Farms leased from GE Capital the food processing equipment and related items listed on Schedule No. 001 to the Master Lease ("Schedule 001").  Sylvest Farms took possession of the equipment listed on Schedule 001 at its chicken de-boning and processing facility located at 4530 Mobile Road, Montgomery, Alabama (the "Facility"), on or shortly after the date of the Master Lease.  True and correct copies of the Master Lease and Schedule 001 are attached to the Complaint.

4.      The equipment listed on Schedule 001 and leased by Sylvest Farms from GE Capital includes the following:   Model 2006 de-boner with double cone lure, product conveyors, and loading bin; serial number 36019-01A; manufactured by D&F Equipment Sales; and having a capitalized lessor's cost of $846,545.00 (collectively, the "Equipment").

### The Bankruptcy and Sale
### of Sylvest Farms

5.      On or about April 18, 2006, Sylvest Farms filed a voluntary petition for bankruptcy in Case No. 06-40525-TBB11 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Alabama, Eastern Division (the "Bankruptcy Court").

6.      Also on or about April 18, 2006, Sylvest Farms, as seller, and Koch Foods, as buyer, entered into an Asset Purchase Agreement of that date, which provided for the sale of substantially all of the assets of Sylvest Farms.  This sale included the Facility.

- 6 -

7.      On or about May 26, 2006, the Bankruptcy Court approved the Asset Purchase Agreement, and, at that time, Koch Foods purchased substantially all of the assets of Sylvest Farms.

8.      On or about June 6, 2006, the Bankruptcy Court entered its Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Rejection Order"). The Master Lease was rejected pursuant to the Rejection Order.

Conversion of the Equipment<br>by Koch Foods

9.      Following entry of the Rejection Order and the rejection of the Master Lease, GE Capital contacted Koch Foods regarding the need to relocate the Equipment from the Facility. Koch Foods advised GE Capital that it would not be necessary to relocate the Equipment at that time, and that it could remain stored at the Facility while GE Capital marketed it for resale.

10.     Following entry of the Rejection Order and the rejection of the Master Lease, and without the consent of GE Capital, Koch Foods began using the Equipment for its own purposes. Specifically, Koch Foods began using the Equipment for the de-boning and processing of chicken. This included the use by Koch Foods of portions of the Equipment that were not previously in use by Sylvest, and indeed had not even been installed and made operational, at the time Koch Foods purchased the Facility.

11.     Koch Foods continues to use the Equipment.

12.     Koch Foods has not made any payments to GE Capital for its continued and continuing use of the Equipment.

13.    Koch Foods is currently exercising dominion and control over the Equipment inconsistent with the rights of GE Capital.

14.    GE Capital owns the Equipment and has owned the Equipment at all times relevant hereto. At no time has GE Capital consented to use of the Equipment by Koch Foods.

15.    Koch Foods has:

(a)    committed unauthorized acts by which GE Capital has been deprived of its personal property indefinitely;

(b)    made an unauthorized assumption or exercise of the right of ownership over personal chattels belonging to GE Capital through the alteration of their condition or the exclusion of GE Capital's rights;

(c)    exercised dominion over property inconsistent with the rights of GE Capital; and/or

(d)    exercised unauthorized acts of dominion or ownership over property belonging to GE Capital.

16.    GE Capital has made demand upon Koch Foods for return and surrender of the Equipment, but, despite demand, Koch Foods failed to surrender the Equipment and instead used and converted it to its own purposes.

17.    Koch Foods has knowingly violated GE Capital's rights in the Equipment and continues to do so.

18.    In its conversion of the Equipment, Koch Foods has acted with legal malice, willfulness, insult, and/or other aggravated circumstances.

19.     Under controlling law, Koch Foods is liable to GE Capital for the value of the Equipment as of the date of its conversion, the said amount being at or near its capitalized cost of $846,545.00.

20.     Under controlling law, Koch Foods is liable to GE Capital for interest at the applicable rate on the value of the Equipment as of the date of its conversion.

21.     Under controlling law, Koch Foods is liable to GE Capital for punitive damages.

WHEREFORE, GE Capital prays this Court to enter judgment in its favor and against Koch Foods in an amount equal to the value of the Equipment at the time of its conversion, plus interest at the applicable rate from the date of its conversion, plus punitive damages, said amounts to be proven at trial in this matter, together with any and all other and additional amounts to which justice and equity entitle GE Capital.  GE Capital demands a trial by jury in this matter.

Respectfully submitted,

*Rusha C. Smith*

Rusha C. Smith
Attorney for Defendant General Electric Capital Corporation

OF COUNSEL:
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

OF COUNSEL:
Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312)207-1000
Facsimile: (312) 207-6400

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel of record addressed as follows:

Thomas G. Mancuso, Esq.
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, AL 36117

Eugene J. Geekie, Jr., Esq.
Mike Xu, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606

by placing same in the United States mail, postage prepaid, on this the 13th day of June, 2007.

_Rusha C. Smith_
OF COUNSEL

# Exhibit 10

## Pille, Ann E.

**From:** Geekie Jr., Eugene J. [egeekie@schiffhardin.com]
**Sent:** Thursday, June 01, 2006 3:59 PM
**To:** Pille, Ann E.
**Subject:** Re: Sylvest Farms: GECC Master Lease Agreement

Thanks.  It has been sent to Koch.


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)



-----Original Message-----
From: Pille, Ann E. <Ann.Pille@dlapiper.com>
To: Geekie Jr., Eugene J.
Sent: Thu Jun 01 15:57:44 2006
Subject: RE: Sylvest Farms:  GECC Master Lease Agreement

I've attached a copy of the Master Lease Agreement and a copy of Schedule 001 executed in conjunction therewith.  Our contact at GECC for this particular equipment lease is William Wilson (william.wilson2@ge.com).  Thank you for passing along the information to the people at Koch.  Let me know if you have additional questions or need additional information.

   Regards,

   Ann




From: Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
Sent: Thursday, June 01, 2006 3:47 PM
To: Pille, Ann E.
Subject: Re: Sylvest Farms: GECC Master Lease Agreement


I am still at the closing in AL.  Can you .pdf me the leases and I'll pas them on to the client?  Please also give me a name and GECC contact and I will pass it along.


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

GE  0588

09/06/2007

-----Original Message-----
From: Pille, Ann E. <Ann.Pille@dlapiper.com>
To: Geekie Jr., Eugene J.
Sent: Thu Jun 01 15:43:44 2006
Subject: Sylvest Farms: GECC Master Lease Agreement

Mr. Geekie,

We have previously spoken in regard to GECC's Master Lease Agreement with Sylvest Farms, which Koch opted not to have the Debtor assume. As it stands, GECC's equipment is still located in the facility that Koch now owns, and the Master Lease Agreement has not yet been rejected by the Debtor. I was wondering if you might have some additional information regarding Koch's intentions with respect to the equipment.

Specifically, GECC would like to know if Koch has any immediate plans for the facility. GECC is obviously trying to determine the next step with respect to the equipment and Koch's plans for the space are integrally related to GECC's decision. Is there a business person at Koch with whom GECC could speak?

Please call me at your convenience to discuss.

Regards,

Ann

Ann Pille
DLA Piper Rudnick Gray Cary US LLP
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601

phone: (312) 368-2189
fax: (312)630-7356

------------------------------------------------------------

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

------------------------------------------------------------


--------------------------------------------------------------

Tax Matters: To the extent this message or any attachment concerns

tax matters, it is not intended or written to be used, and cannot

be used by a taxpayer, for the purpose of avoiding penalties

that may be imposed on the taxpayer under law.

--------------------------------------------------------------

This message and any attachments may contain confidential

GE 0589

information protected by the attorney-client or other privilege.

If you believe that it has been sent to you in error,

please reply to the sender that you received the message in

error. Then delete it. Thank you.

------------------------------------------------------------------

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

Exhibit 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama Limited Liability company | ) ) ) | Case No. 07-cv-522-MHT |
| Plaintiff and Counterclaim-defendant, | ) ) | |
| v. | ) ) | Honorable Myron H. Thompson Honorable Terry F. Moorer |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendant and Counterclaim-plaintiff. | ) ) | |

### <u>AFFIDAVIT OF MARK KAMINSKY</u>

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | |
| | ) | SS: |
| COUNTY OF COOK | ) | |

I, Mark Kaminsky, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Financial Officer of Koch Foods of Alabama, LLC ("Koch") and in all respects competent to make this Affidavit in support of Koch's Motion for Summary Judgment with respect to the counterclaim of conversion asserted by General Electric Capital Corporation ("GECC"). I am familiar with the facts in this lawsuit and the chicken deboning lines (the "Deboner") which GECC alleges that Koch converted.

2. GECC never requested that Koch return the Deboner or requested to inspect it at any time.

3. Since the date that Koch purchased the plant where the Deboner was located, Koch has been willing to surrender the Deboner if GECC agreed to repair any damages caused by removing the Deboner. Koch used the Deboner because it was an integral part of the plant, and GECC never made any demand that Koch stop using the Deboner.

4.    GECC never provided any assurance that it would reimburse Koch for the cost of repair of any physical injury caused to the plant by the removal of the Deboner.

I declare under penalty of perjury that the foregoing is true and correct.

_Mark Kaminsky_
Mark Kaminsky

Subscribed and sworn to before me on
this '7ᵗʰ day of December, 2007

_Bonnie DiViesti_
NOTARY PUBLIC
My commission Expires: 9 21- 2010

OFFICIAL SEAL
**BONNIE DIVIESTI**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-21-2010

# Exhibit 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC, <br> an Alabama limited liability company, ) | Case No. 07-cv-522-MHT |
| Plaintiff and Counter-Defendant, ) | |
| v. ) | Honorable Myron H. Thompson <br> Honorable Terry F. Moorer |
| GENERAL ELECTRIC CAPITAL <br> CORPORATION, <br> a Delaware corporation, ) | |
| Defendant and Counter-Plaintiff, ) | |

**GENERAL ELECTRIC CAPITAL CORPORATION'S RESPONSE TO KOCH FOODS
OF ALABAMA, LLC'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

Defendant and Counter-Plaintiff, General Electric Capital Corporation ("GE Capital"), responds to the First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission (collectively, the "Requests") of Koch Foods of Alabama, LLC ("Koch Foods"), as follows:

## I.    GENERAL OBJECTIONS AND RESPONSES

1.    GE Capital objects to the Requests to the extent that they seek discovery or purport to impose duties and obligations beyond the scope of, or not required by, the Federal Rules of Civil Procedure.

2.    GE Capital objects to the Requests to the extent that they seek information not relevant to the claim or defense of any party to this lawsuit or reasonably calculated to lead to the discovery of admissible evidence.

3.    GE Capital objects to the Requests to the extent that they seek information that is proprietary, confidential, sensitive, or competitive in nature.

4.    GE Capital objects to the Requests to the extent that they seek information covered by the attorney-client privilege or work product doctrine, or any other privilege or immunity, including common or joint defense and/or joint interest privileges.

5.    GE Capital reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material or information produced.  The production of any material or information does not constitute an admission by GE Capital that such material or information is relevant to this action or admissible in evidence.

6.    GE Capital objects to the Requests to the extent that they seek information generally available to the public and/or in the public domain.

7.    GE Capital objects to the Requests to the extent that they purport to require GE Capital to seek documents in the possession of third parties.

8.    GE Capital objects to the interrogatories included in the Requests to the extent that they exceed the maximum number of interrogatories permissible under Rule 33(a) of the Federal Rules of Civil Procedure.

9.    Inadvertent production of any material subject to the attorney-client privilege, prepared in anticipation of litigation or for trial, common or joint defense and/or joint interest privileges, or otherwise protected or immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to discovery of such material, its subject matter or information contained therein or of GE Capital's right to objection to the use of such material during any later proceeding.

CHILIB-2100045.2-515998-00011

10.    GE Capital objects to the Requests to the extent that they are redundant and/or duplicative.

11.    GE Capital objects to the Requests to the extent that they contain vague and undefined terms and/or overly broad requests.

12.    GE Capital objects to Koch Foods's definition of "document" to the extent that it is broader than the definition of "document" contained in the Federal Rules of Civil Procedure.

13.    GE Capital objects to the Requests to the extent that the Requests seek admissions that GE Capital has not yet been able to ascertain.

14.    GE Capital objects to the Requests to the extent that they seek admissions regarding wholly irrelevant matters.

15.    GE Capital objects to the Requests to the extent that they relate to written documents which speak for themselves, and GE Capital incorporates herein as part of its Responses, the contents of the documents produced.

16.    GE Capital objects to the Requests to the extent that they ask for the creation of documents. GE Capital will only produce documents that currently exist.

17.    GE Capital has just begun its investigation and all responsive and relevant documents may have not yet been discovered. In addition, Koch Foods has to date failed to supply it with any of the documents requested by GE Capital in its First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission, which GE Capital served upon Koch Foods and to which the responses of Koch Foods were due not later than August 13, 2007. GE Capital, therefore, reserves the right to amend and/or supplement its responses.

- 3 -

## II.    INTERROGATORIES

1.    **Identify each and every fact which you contend supports your claim of any kind of ownership interest, past or present, in the Equipment.**

**Answer to Interrogatory No. 1.**

Subject to the General Objections, GE Capital responds as follows:

- GE Capital and Sylvest Farms, Inc. ("Sylvest") were parties to a certain Master Lease Agreement dated on or about December 29, 2005 (the "Master Lease") and a Food Processing Equipment Schedule (the "Leasing Schedule"), executed the same date, pursuant to which GE Capital leased to Sylvest certain equipment identified more fully in section A of the Leasing Schedule (collectively, the "Equipment");

- Sylvest took possession of the Equipment at its chicken de-boning and processing facility located at 4530 Mobile Road, in Montgomery, Alabama (the "Facility"), on or shortly after the date of the Maser Lease. GE Capital notes, however, that certain of the Equipment may not have been delivered at that time. GE Capital continues to investigate this issue.

- The terms of the Master Lease and the Leasing Schedule are incorporated by reference into GE Capital's response to this interrogatory.

- On April 18, 2006, Sylvest filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code) in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court"), and, on May 26, 2006, the Bankruptcy Court entered its Order on Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363, and 365 for Order Authorizing (i) Sale of Certain Assets of the Estate Free and Clear of Liens, Claims and Interests (ii) Approval of Designation of Rights Agreement, and (iii) Sale, Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Order"), pursuant to which the Bankruptcy Court authorized Sylvest to enter into the Amended Asset Purchase Agreement (the "Purchase Agreement"). The terms of the Sale Order and Purchase Agreement are incorporated into this interrogatory response.

- On July 6, 2006, the Bankruptcy Court entered its Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Rejection Order"), pursuant to which the Master Lease and the Leasing Schedule were rejected.

- Following the entry of the Rejection Order, GE Capital contacted Koch Foods regarding the need to relocate the Equipment from the Facility. Koch Foods advised GE Capital that it would not be necessary to relocate the Equipment at that time, and that it could remain stored at the Facility while GE Capital marketed it for resale.

- On or about January 8, 2007, counsel to Koch Foods contacted counsel to GE Capital to inquire about purchasing the Equipment.

- In or around mid-February 2007, Koch Foods engaged in additional discussions with GE Capital about its interest in purchasing the Equipment.

- No purchase agreement was ever executed regarding the Equipment, and no sale of the Equipment ever occurred.

CHILIB-2100045.2-515998-00011

- Koch Foods failed to make an unconditional offer to return the Equipment, always seeking in conjunction with a surrender of the Equipment indemnities, a release, or both.

- GE Capital is, and at all times relevant hereto has been, the sole owner of the Equipment.

GE Capital's investigation of the facts responsive to this interrogatory continues, and GE Capital reserves the right to supplement this response if and when additional information becomes available.

**2.    Identify each and every communication between GE Capital and Koch Foods concerning the Equipment and the Lease.**

<u>**Answer to Interrogatory No. 2.**</u>

GE Capital objects to this Interrogatory on the basis that it requests information more easily obtainable through deposition testimony. Further answering, and subject to the General Objections, GE Capital asserts that, although all exact times and dates of such communications are not currently known to GE Capital, it communicated, through counsel, with Koch Foods prior to May 26, 2006, regarding Koch Foods's intention with respect to the Equipment, and whether Koch Foods would request that Sylvest assume and/or assign the Master Lease and the Leasing Schedule in conjunction with the Purchase Agreement. GE Capital's understanding from these communications was that Koch Foods was attempting to locate a third party purchaser for the Facility, and Koch Foods's need for the Equipment may be based on its success in finding a third party purchaser. Subsequently, GE Capital learned that the Master Lease and the Leasing Schedule would be rejected by Sylvest.

GE Capital also contacted Koch Foods, through their counsel, shortly after the Rejection Order was entered regarding whether the Equipment could remain in the Facility while GE Capital marketed it for resale.

GE Capital continued to engage in multiple discussions with Koch Foods about Koch Foods's contemplated purchase of the Equipment for a period of several months ranging from mid-2006 through April 2007. During that time period, Mark Kaminsky, Koch Foods's CFO, was identified by Koch Foods's counsel as the primary contact at Koch Foods to discuss the potential sale of the Equipment. Again, the exact dates and times of these communications are currently unknown, and GE Capital is continuing its investigation of these facts.

In late December 2006 or early January 2007, counsel to GE Capital sent correspondence to counsel to Koch Foods regarding the Equipment, and demanding rental payments resulting from Koch Foods's use of the same. Koch Foods did not immediately respond to this correspondence, and a follow-up voicemail was left for counsel to Koch Foods on January 5, 2007.

On January 8, 2007, counsel to Koch Foods called counsel to GE Capital and indicated that Koch Foods was interested in speaking with GE Capital about purchasing the Equipment. At that time, counsel for Koch Foods indicated that GE Capital, as opposed to GE Capital's counsel, should call Koch Foods directly.

On February 2, 2007, communications between John Sutehall at GE Capital and Koch Foods revealed that Koch Foods would prefer to purchase the Equipment outright, but no specific monetary offer was made by Koch Foods at that time.

- 5 -

On February 14, 2007, counsel for Koch Foods emailed counsel for GE Capital regarding continued negotiations over a potential sale price for the Equipment.

On or about April 18, 2007, counsel to Koch Foods sent an email to counsel for GE Capital informing GE Capital of Koch Food's decision not to purchase the Equipment, and refusing GE Capital's demand for rental payments. At that time Koch Foods requested that GE Capital remove the Equipment from the Facility.

During approximately the same time period, GE Capital left several voicemail messages for Mark Kaminsky regarding the Equipment, and received no response.

On or about May 2, 2007, counsel to Koch Foods sent an email to counsel for GE Capital confirming that several voicemails had been exchanged since the April 19, 2007 email, and requesting information on the time period in which GE Capital intended to remove the Equipment from the Facility.

GE Capital notes that some information related to the dates and times of the communications listed in this response can be found in the documents being produced in relation to the document requests below. However, many of the specific details are unknown to GE Capital at this time. GE Capital reserves the right to supplement this response as additional information becomes available. In addition, see GE Capital's response to Interrogatory No. 1 above.

**3.    Identify each and every communication between GE Capital and Sylvest Farms concerning the Equipment and the Lease.**

**Answer to Interrogatory No. 3.**

GE Capital objects to this Interrogatory on the basis that it requests information more easily obtainable through deposition testimony. Further answering, and subject to the General Objections, GE Capital asserts that, although exact times and dates of such communications are not currently known to GE Capital, it communicated with Sylvest beginning in late 2005 regarding Sylvest's desire to obtain financing through GE Capital for the Equipment. Negotiations occurred through December 2005, and resulted in the execution of the Master Lease and the Leasing Schedule.

Thereafter, GE Capital received periodic payments on the Leasing Schedule from Sylvest. When Sylvest filed for bankruptcy protection, GE Capital received notices of certain of the case filings through service effectuated by Sylvest's bankruptcy counsel.

After the bankruptcy case was filed, but before the Sale Order was entered, GE Capital communicated with Sylvest's bankruptcy counsel to determine whether Sylvest intended to assume and/or assign the Master Lease and Leasing Schedule as a component of the sale of substantially all of Sylvest's assets. In addition, during this time period, GE Capital communicated with Sylvest regarding the status of the Equipment.

On or about May 26, 2006, GE Capital reviewed email correspondence from Dave Bromley, at Sylvest, to Robert Breakstone, an appraiser hired by GE Capital, regarding the estimated value of certain items of the Equipment. Evidence of these communications are found in the documents responsive to the document request that GE Capital has responded to contemporaneously herewith.

CHILIB-2100045.2-515998-00011

On or about May 30, 2006, counsel for GE Capital spoke with Richard Robinson, counsel for Sylvest, regarding the Equipment. At that time, Sylvest confirmed it had no intention of assuming the Master Lease and the Leasing Schedule.

Again, many of the exact dates and times of the communications between Sylvest and GE Capital are currently unknown, and GE Capital's investigation continues. As indicated above, some information related to the dates and times can be found in the documents being produced in relation to the document requests below. GE Capital reserves the right to amend and/or supplement this response in the event that additional information is discovered through its investigation. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**4. Identify each and every fact which you contend supports the claim that GE Capital has made demands upon Koch Foods for return and surrender of the Equipment, including, who made the demands, to whom the demands were made, the manner in which the demands were made, contents of the demands, the times and places of the demand communications, response(s) to the demand, and any other circumstances concerning the demands.**

## Answer to Interrogatory No. 4.

GE Capital objects to this interrogatory on the basis that it seeks information that would be better obtained through deposition testimony. Subject to this objection and the General Objections, GE Capital states that it originally made no such demand on Koch Foods because Koch Foods had agreed that the Equipment could remain at the Facility while it was marketed for resale. After GE Capital determined that Koch Foods was, in fact, using the Equipment for its own benefit, GE Capital made a demand that Koch Foods remit payment to GE Capital for its use of the Equipment. At that time, Koch Foods indicated that it was interested in purchasing the Equipment. GE Capital engaged in negotiations regarding the potential purchase of the Equipment. When it became clear that Koch Foods neither intended to purchase the Equipment, nor make payments to GE Capital for its use of the Equipment, GE Capital placed several calls to Mark Kaminsky, the Chief Financial Officer of Koch Foods to arrange the return of the Equipment. These calls were not returned by Mr. Kaminsky.

GE Capital continues to investigate the factual circumstances related to this response, and will supplement the information contained herein when additional information becomes available. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**5. Identify each and every fact which you contend supports your allegation that Koch Foods advised or communicated to GE Capital that it would not be necessary to relocate the Equipment, including persons who communicated such information to GE Capital, the date and the place of the communication, and any other circumstances concerning the communication.**

## Answer to Interrogatory No. 5.

Subject to the General Objections, GE Capital states that, shortly after the entry of the Rejection Order, counsel to GE Capital contacted counsel to Koch Foods in order to inquire whether it would be possible for the Equipment to remain at the Facility while GE Capital marketed the same for resale. At that time, counsel to Koch Foods indicated that it would not be necessary for GE Capital to remove the Equipment from the Facility. During the course of that conversation, Koch Foods did not raise the issue of any storage fees that might be incurred by GE Capital as a result of GE Capital's decision to temporarily leave the Equipment in the Facility. Further, during that conversation, Koch Foods did not request permission to use the

CHILIB-2100045.2-515998-00011

Equipment or indicate to GE Capital, explicitly or implicitly, that it was already using the Equipment.

GE Capital's receipt of permission to leave the Equipment at the Facility was reiterated to Koch Foods through written correspondence directed to Koch Food's counsel in early 2007. At that time, Koch Foods voiced no objection to GE Capital's understanding of the circumstances.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new or more complete information, GE Capital will supplement its response to this interrogatory. In addition, <u>see</u> GE Capital's responses to prior interrogatories, as stated above.

**6.    Identify each and every fact which you contend supports your claim that Koch Foods began using the Equipment for the de-boning and processing of chicken and that Koch Foods continues to use the Equipment, and identify all persons with knowledge of such facts.**

<u>**Answer to Interrogatory No. 6.**</u>

GE Capital objects to this interrogatory on the basis that it requires GE Capital to provide information which is more readily available to those persons at Koch Foods that may have used the Equipment, and/or may continue to use the Equipment.

Further answering, and subject to the General Objections, GE Capital states that, in Koch Foods's Responses to GE Capital's First Set of Interrogatories, Document Requests, and Requests to Admit ("Koch's Discovery Responses"), Koch admits that it used certain portions of the Equipment, with such use starting in advance of the Rejection Order.

This comports with GE Capital's belief that the Equipment was being operated through May and June 2006. Prior to the Rejection Order, GE Capital had been informed by an appraiser, sent by GE Capital to examine the Equipment, that the Equipment was being used. Still, GE Capital was not aware of the particular party that was using the Equipment, or whether they had license from Sylvest to use the Equipment.

In Koch's Discovery Responses, Koch denies that it continues to use the Equipment. GE Capital has no basis for denying that this information is currently accurate. At the same time, GE Capital is unaware when Koch Foods discontinued its use of the Equipment.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, <u>see</u> GE Capital's responses to prior interrogatories, as stated above.

**7.    Identify each and every fact which you contend supports your claim that Koch Foods installed and used the portions of the Equipment that were not previously in use and have not even been installed and made operational at the time Koch Foods purchased the Plant, and identify all persons with knowledge of such facts.**

<u>**Answer to Interrogatory No. 7.**</u>

GE Capital objects to this interrogatory on the basis that it seeks information which has already been requested in Interrogatory No. 6. To the extent that Interrogatory No. 7 requests information regarding Koch Foods's use of the Equipment, GE Capital incorporates its answer to Interrogatory No. 6 herein. GE Capital further objects to this interrogatory to the extent that it

CHILIB-2100045.2-515998-00011

requests information from GE Capital that is more easily obtainable from Koch Foods. Further answering, GE Capital states that during April 2006 employees from Sylvest informed GE Capital that some portions of the Equipment had not yet been installed.

Pursuant to conversations with Dave Bromley and/or other Sylvest agents, in late April or early May 2006, Sylvest indicated that the deboning equipment was fully in use at that time, and the spiral freezer was fully installed and tested, but had never actually been used. In addition, at that time Sylvest reported that the overwrap line was not fully installed.

GE Capital continues to investigate which portions of the Equipment were in use prior to Koch Foods taking possession of the Facility, and whether Koch Foods took actions to install the Equipment, or make it operational. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, <u>see</u> GE Capital's responses to prior interrogatories, as stated above.

**8.    Describe how you learned that Koch Foods used or continues to use the Equipment and how you learned that Koch Foods installed part of the Equipment that had not installed and made operational before.**

**Answer to Interrogatory No. 8.**

GE Capital objects to Interrogatory No. 8 to the extent that it seeks information duplicative of that requested in Interrogatories No. 6 and 7.

Further answering, GE Capital states that, as discussed in the answers to Interrogatories No. 6 and No. 7 above, GE Capital was in communications with Sylvest regarding the status of the Equipment prior to the bankruptcy case being filed. At that time, GE Capital was informed that only portions of the Equipment had been installed for use and/or were in use. Reports from agents of GE Capital that visited the Facility after the bankruptcy filing indicated that the Equipment was being used, but did not make clear which entity was using the Equipment.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, <u>see</u> GE Capital's responses to prior interrogatories, as stated above.

**9.    Identify each and every fact which you contend supports your claim in paragraph 15 of your Counterclaim that Koch Foods has: (a) committed unauthorized acts by which GE Capital has been deprived of its personal property indefinitely; (b) made an unauthorized assumption or exercise of the right of ownership over personal chattels belonging to GE Capital through the alteration of their condition or the exclusion of GE Capital's rights; (c) exercised dominion over property inconsistent with the rights of GE Capital; and/or (d) exercised unauthorized acts of dominion or ownership over property belonging to GE Capital.**

**Answer to Interrogatory No. 9.**

Subject to the General Objections, GE Capital states that, through its use of the Equipment, Koch Foods has caused the Equipment to decrease at a faster rate than if the Equipment had not been used during the period of time since Koch Foods took possession of the Facility. This use occurred without the permission or consent of GE Capital, and may have resulted in a decrease in the value of the Equipment.

- 9 -

Furthermore, throughout the period of time that Koch Foods and GE Capital were discussing the potential sale of the Equipment, GE Capital informed Koch Foods that it expected Koch Foods to be responsible for making payments to GE Capital for its use of the Equipment. Nevertheless, Koch Foods responded that it would make no payment for its use of the Equipment, and continued to maintain possession of the Equipment and use the Equipment.

On several occasions during April 2007, GE Capital made calls to Mark Kaminsky at Koch Foods regarding its desire to retrieve the Equipment and/or arrange for its removal from the Facility. Such messages were not returned in a timely manner, and hindered GE Capital's attempts to obtain its Equipment.

Thereafter, Koch Foods has asserted that it owns the Equipment, or, in the alternative, that it has a lien over the Equipment.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**10. Identify each and every fact which you contend supports your claim that Koch Foods has acted with legal malice and identify each and every act of Koch Foods that constituted legal malice involving the Equipment.**

**Answer to Interrogatory No. 10.**

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods's mistaken understanding that the Master Lease had been assumed and/or assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in purchase negotiations is indicative of the fact that it was aware that it had no legitimate ownership interest in the Equipment. Through the use of the Equipment without permission or consent of GE Capital, and instead for the benefit of Koch Foods, Koch Foods demonstrated disregard for GE Capital's ownership interest in the Equipment. In addition, any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional actions.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**11. Identify each and every fact which you contend supports your claim that Koch Foods has acted with willfulness and identify each and every act of Koch Foods that constituted willfulness involving the Equipment.**

**Answer to Interrogatory No. 11.**

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods's mistaken understanding that the Master Lease had been assumed and/or

CHILIB-2100045.2-515998-00011

assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in purchase negotiations is indicative of the fact that it was aware that it had no ownership interest in the Equipment. Through the use of the Equipment without permission or consent of GE Capital, and instead for the benefit of Koch Foods, Koch Foods demonstrated disregard for GE Capital's ownership interest in the Equipment. Further, Koch Foods never informed GE Capital that it was using the Equipment. Any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional actions.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**12.  Identify each and every fact which you contend supports your claim that Koch Foods has acted with insult and identify each and every act of Koch Foods that constituted insult involving the Equipment.**

<u>**Answer to Interrogatory No. 12.**</u>

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods mistaken understanding that the Master Lease had been assumed and/or assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in purchase negotiations is indicative of the fact that it was aware that it had no ownership interest in the Equipment. Throughout the period in which Koch Foods used the Equipment, it demonstrated disregard for GE Capital's ownership interest in the Equipment. In addition, any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional action.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**13.  Identify each and every fact which you contend supports your claim that Koch Foods has acted with aggravated circumstances other than those listed in paragraphs from 10, 11, and 12 of these Interrogatories and identify each and every act of Koch Foods that constituted these aggravated circumstances involving the Equipment.**

<u>**Answer to Interrogatory No. 13.**</u>

Subject to the General Objections, GE Capital states that Koch Foods has used the Equipment without the permission or consent of GE Capital. This action was deliberate and not a result of Koch Foods mistaken understanding that the Master Lease had been assumed and/or assigned by Koch Foods. Furthermore, Koch Foods's desire and willingness to engage in

- 11 -

purchase negotiations is indicative of the fact that it was aware that it had no ownership interest in the Equipment. Throughout the period in which Koch Foods used the Equipment, it demonstrated disregard for GE Capital's ownership interest in the Equipment. In addition, any decrease in value that may have occurred with respect to the Equipment as a result of Koch Foods's use occurred as a result of Koch Foods's deliberate and intentional action.

Finally, Koch Foods has now asserted ownership rights over the Equipment, and has claimed, in the alternative, that it has a lien over the Equipment. These assertions are in contravention of the positions previously taken by Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**14.    Describe the fair market value and the liquidation value, and how you arrived such values, of each item of the Equipment (a) on the date when Koch Foods purchased all assets of Sylvest Farms; (b) on the date immediately before Koch Foods' alleged use of the Equipment; (c) on the date immediately after Koch Foods' alleged use of the Equipment; (d) on the date immediately before Koch Foods' alleged installation of parts of the Equipment; (e) on the date immediately after Koch Foods' alleged installation of parts of the Equipment; (f) on the date(s) when you allegedly made demand for the return or surrender of the Equipment, and (g) present.**

**Answer to Interrogatory No. 14.**

Subject to the General Objections, GE Capital states that an appraisal of certain portions of the Equipment was prepared in June 2006 by Robert Breakstone, who is affiliated with Equipment Exchange Company of America, Inc. The appraisal report is being submitted in conjunction with the document requests below, and is the best evidence of the information contained therein. This appraisal report constitutes the only appraisal that GE Capital has undertaken of the Equipment since the beginning of the Bankruptcy Case. GE Capital is currently not aware of any other official or unofficial valuations of the Equipment since that time. GE Capital's investigation continues, and GE Capital reserves the right to supplement this information with additional valuations of the Equipment.

**15.    Describe how you arrived the capital cost of the Equipment as $846,545.00.**

**Answer to Interrogatory No. 15.**

GE Capital objects to Interrogatory No. 15 on the basis that it is vague and ambiguous, and does not clearly identify in what context it asserts that GE Capital "arrived" at such a number. Further answering, GE Capital states that the $846,545.00 identified in the Answer to Complaint for Declaratory Judgment and for Unjust Enrichment and Counterclaim for Conversion (the "GE Capital Answer") as the capitalized lessor's cost is the same amount designated as the Capitalized Lessor's Cost in the Leasing Schedule for the de-boner with double cone line, product conveyors and loading bin.

**16.    Identify each and every fact which supports your contention that Koch Foods is liable to GE Capital, under the Lease or otherwise, for use of the Equipment.**

CHILIB-2100045.2-515998-00011

**Answer to Interrogatory No. 16.**

GE Capital incorporates herein its responses to each of the interrogatories included in the Requests.  Further answering, GE Capital states that Koch Foods admits to using the Equipment, or portions thereof, from a time prior to the Rejection Order.  This was done without the consent of GE Capital, and without GE Capital's permission.  GE Capital has demanded that Koch Foods make payment to GE Capital for its unauthorized use of the Equipment, and Koch Foods has rejected this demand.  Further, Koch Foods's use of the Equipment may have decreased the Equipment value, which fact GE Capital seeks to prove through the discovery process.

GE Capital continues to investigate the facts relevant to this interrogatory response.  In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

**17.  Identify each and every fact which supports your Answer that the Equipment did not become attached to the Plant.**

**Answer to Interrogatory No. 17.**

GE Capital objects to Interrogatory No. 17 on the basis that it requires GE Capital to prove a negative assertion.

**18.  Identify all your efforts, if any, to mitigate the damages that you allege are caused by Koch Foods.**

**Answer to Interrogatory No. 18.**

GE Capital objects to Interrogatory No. 18 on the basis that it seeks information which is more efficiently obtained through deposition testimony.  Further answering, GE Capital asserts that it made efforts following the Rejection Order to resell the Equipment to third parties.  Documents evidencing certain of these efforts, some of which were successful, are included in GE Capital's responses to the document requests included below.  Further, GE Capital demanded that Koch Foods provide payment for its use of the Equipment, thereby making Koch Foods aware that GE Capital did not consent to the use of the Equipment.  Further, GE Capital attempted to negotiate sale of the Equipment to Koch Foods.

GE Capital continues to investigate the facts relevant to this interrogatory response.  In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.  In addition, see GE Capital's responses to prior interrogatories, as stated above.

**19.  Identify each and every potential purchaser that GE Capital has found while marketing the Equipment for sale, including information about what items of the Equipment and at what prices the purchaser was interested in purchasing.**

**Answer to Interrogatory No. 19.**

Subject to the General Objections, GE Capital states that, in August 2006 GE Capital was in negotiations with PECO Foods, Inc. and had identified PECO Foods, Inc. as a potential purchaser for certain portions of the Equipment.  At the same time, Gold Kist had been identified as a potential purchaser for other portions of the Equipment.  In May 2006, Michael Fox International also expressed interest in bidding on the Equipment.

Documents related to these potential purchasers are included in GE Capital's responses to the document requests, and constitute the best evidence of the information requested pursuant to this Interrogatory. GE Capital objects to this interrogatory to the extent that it requires GE Capital to reiterate information already included in its responses to the document requests.

**20. Identify any communication in which you demanded that Koch Foods stop using or installing the Equipment.**

**Answer to Interrogatory No. 20.**

In late December 2006 or early January 2007, GE Capital demanded that Koch Foods remit payment to GE Capital for its use of the Equipment. Thereafter, Koch Foods attempted to negotiate a purchase of the Equipment. When these negotiations failed, GE Capital attempted to contact Koch Foods to arrange for removal of the Equipment, which attempts were unsuccessful.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory. In addition, see GE Capital's responses to prior interrogatories, as stated above. In addition, see GE Capital's responses to prior interrogatories, as stated above.

**21. To the extent not already specifically identified above, identify each and every defense, if any, which you contend you possess against the claims of Koch Foods as set forth in the Complaint, and each and every fact which you contend supports each such defense.**

**Answer to Interrogatory No. 21.**

Subject to its General Objections, GE Capital asserts that the defenses which GE Capital contends that it possess against the claims of Koch Foods are asserted in the Answer, and are incorporated herein by reference. The interrogatory responses applicable to each of the interrogatory requests above represent the facts which support each such defense. In addition, GE Capital incorporates herein the documents produced in response to the document requests.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

**22. Describe with particularity any facts relating to or supporting any denial, defense or affirmative defense made or to be made by you in your response to the Complaint.**

**Answer to Interrogatory No. 22.**

GE Capital objects to Interrogatory No. 22 on the basis that the answer to the interrogatory would be better obtained through deposition questions. Further answering, GE Capital incorporates each of the interrogatory responses and responses to document requests contained herein.

GE Capital continues to investigate the facts relevant to this interrogatory response. In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

- 14 -

23.   **Identify each person whom you have consulted with concerning, and each person who has contributed or assisted or is responsible for, the creation of all the responses to the Combined Discovery Requests and identify which documents or information each such person created or produced.**

**Answer to Interrogatory No. 23.**

William Wilson contributed, assisted, and was responsible for the creation of the responses to interrogatories and requests to admit contained in the Requests.

The source of documents produced pursuant to the document requests below are largely self-explanatory.  To the extent that there are questions about the source of specific documents, that information is available upon request to counsel for GE Capital.

24.   **Identify each and every person having knowledge of any discoverable matter relating to: (i) the Complaint; (ii) your Answer to the Complaint; (iii) the Counterclaim, (iv) Koch Foods' Answer to the Counterclaim, and (iii) your Responses to the Combined Discovery Requests.**

**Answer to Interrogatory No. 24.**

Subject to its General Objections, GE Capital asserts that those individuals included in its initial disclosures, made pursuant to Rule 26(a)(1), along with those individuals specifically mentioned herein, represent all individuals which GE Capital currently believes have knowledge of any discoverable matter.  Thus, GE Capital incorporates its Rule 26 disclosures herein by reference.

GE Capital continues to investigate the facts relevant to this interrogatory response.  In the event that GE Capital locates new, or more complete information, GE Capital will supplement its response to this interrogatory.

25.   **If you fail to unequivocally admit each request for admission in the Requests for Admission, state the factual and legal basis of your response (identified by the number of the Request for Admission which was not unequivocally admitted) and identify each and every person having knowledge relevant to that response.**

**Answer to Interrogatory No. 25.**

Subject to the General Objections, GE Capital answers as follows:

1.   The clear terms of the Purchase Agreement indicate that there were assets of Sylvest that were not purchased by Koch Foods.  See, e.g., Purchase Agreement, § 1.2, governing "Excluded Assets."

2.   The basis for GE Capital's denial of Request No. 2 is stated more fully in its response to Request No. 2, which is incorporated by reference herein.

3.   The basis for GE Capital's denial of Request No. 3 is stated more fully in its response to Request No. 3, which is incorporated by reference herein.

CHILIB-2100045.2-515998-00011

Exhibit 13

WILLIAM WILSON

Page 23

1    buyers.  Mr. Kaminsky also stated that Koch Foods

2    themselves might be interested by making an offer on

3    the equipment and that they would provide access to

4    other potential bidders.

5        Q    What did you understand him to mean when he

6    said they would provide access to other potential

7    bidders?

8        A    To allow GE to show the equipment for

9    remarketing.

10       Q    Did GE at any time ever want to or ask

11   permission to show equipment to other potential buyers?

12       A    Yes.  I do recall one instance, yes.

13       Q    When was that?

14       A    I don't recall.  It was after the

15   conversation, but I can't recall the exact date.

16       Q    And who was the potential buyer?

17       A    Peco Foods.

18       Q    And is this Peco with regard to their

19   interest in buying the Ossid lines?

20       A    I don't recall what they were interested in.

21       Q    Did Koch Foods give access to Peco to inspect

22   the equipment that Peco was interested in?

23       A    Yes, they did.

24       Q    At any time did Koch Foods deny access to any

25   potential buyers of any of the equipment?

WILLIAM WILSON

Page 24

1        A      I don't know.

2        Q      Okay.  Did Koch Foods ever deny access to any

3    GE employees who might want to inspect the equipment?

4        A      I don't know.

5        Q      Did Koch Foods at any time deny access to any

6    appraiser who wanted to inspect the equipment?

7        A      I don't know.

8        Q      Did GE at any time demand that Koch Foods

9    surrender possession of the equipment to GE?

10       A      No.

11       MR. GEEKIE:  Could you read that question back?

12              (Record read as requested.)

13   BY MR. GEEKIE:

14       Q      Did GE at any time demand that Koch Foods

15   cease using the de-bone line?

16       A      Yes, we did.

17       Q      When?

18       A      I don't recall the specific date.

19       Q      Who made that demand?

20       A      Who made it?  Through our Counsel.

21       Q      Your Counsel made that demand?

22       A      Correct.

23       Q      And is that the only time you are aware of

24   that GE demanded that Koch Foods cease using the

25   equipment?

WILLIAM WILSON

Page 25

```
 1       A     As far as I'm aware, yes.

 2       Q     And when did GE learn that Koch Foods was

 3   using the de-bone equipment?

 4       A     Shortly after Sylvest Farms had rejected the

 5   equipment.  I want to say I think it was like about a

 6   month or so after they formally rejected.  I think that

 7   was May of '06.

 8       Q     Are you aware of Koch Foods ever using the

 9   freezer that is part of the leased equipment?

10       A     I'm not aware, no.

11       Q     Paragraph 13, there's a denial that GE has

12   demanded that -- denies that it has demanded that Koch

13   Foods pay rental charges other than in the context of

14   prelitigation settlement negotiations.

15             Are you aware of any discussions or demands

16   on Koch Foods that it pay rental charges for the

17   equipment?

18       A     Can you repeat the question?

19             (Record read as requested.)

20       A     We did ask Koch Foods to pay us for the use

21   of the equipment.

22       Q     When you say "we," was this a demand through

23   your Counsel?

24       A     Yes, it was.

25       Q     Are you aware of anybody from General
```

WILLIAM WILSON

Page 42

1    Mr. Bellesheim specifics about the case, the claim of

2    conversion, Koch's claim of these being fixtures that

3    it now owns or anything like that?

4          A    I think I can answer that in part.  The

5    specifics being that I discussed with them really was

6    just being how the case was -- updates on how the case

7    was progressing.  As far as your second half of that,

8    fixtures, no, I don't think we discussed that.

9                        (Whereupon, Koch Deposition Exhibit

10                        No. 12 marked for identification.)

11          Q    Exhibit 12.  This is a letter from Ann Pille

12    to me.  Have you seen this document before?

13          A    Yes, I have.

14          Q    Okay.  Is this the document that you

15    understand where GE's Counsel demanded that Koch stop

16    using the equipment?

17          A    I'm not finding it in this letter

18    specifically.  It might be there, but I'm just reading.

19    I don't see the specific wording where we say stop

20    using the equipment.  If you see it, point it out to

21    me.

22          Q    I'm asking you because you said you know your

23    Counsel made a demand, and I'm not sure that I have

24    ever seen it, so I didn't know if this might have been

25    the letter you were referring to.  I see there is a

WILLIAM WILSON

Page 43

1    demand for rent in this.

2        A    Right.

3        Q    Was it your understanding that in this letter

4    where there was a demand for rent that GE also made a

5    demand to stop using the equipment or is it in some

6    other letter that you understand GE's Counsel made a

7    demand that Koch stop using the equipment?

8        A    Well, this letter, if I recall, this letter

9    was to -- for the demand for the rent.  As far as to

10   stop using the equipment, I don't recall.

11       Q    Do you know when that demand was made then on

12   Koch to stop using the equipment?

13       A    No, I don't.

14       Q    Now, turning to the second page of Ms.

15   Pille's letter, the first full paragraph where there is

16   a demand for rent.

17            Were you the one that provided Ms. Pille with

18   that figure of $237,493.99?

19       A    Yes, I was.

20       Q    How did you calculate that number?

21       A    It was based on the number of months.  I

22   would have to go back and ask you for the physical

23   records, but it was based on -- I think it was eight or

24   nine months times the monthly rental.  That is an

25   approximation.

WILLIAM WILSON

Page 44

1      Q      The monthly rent under the lease?

2      A      Right.

3      Q      And that included all the equipment under the

4      lease?

5      A      That is correct.

6      Q      By this time, had GE already sold the Ossid

7      equipment?

8      A      Yes, we did.

9      Q      And you are not aware of Koch ever using the

10     Ossid equipment, are you?

11     A      No, I don't know if they did or not.

12     Q      Have you ever been told by anybody that

13     almost all of the Ossid equipment had remained on skids

14     unwrapped at the Sylvest plant?

15     A      I don't recall.

16     Q      Explain to me how if GE had already been

17     given back the Ossid equipment and it sold the Ossid

18     equipment, what was the basis for GE then demanding

19     that Koch pay rent for eight or nine months for the

20     Ossid equipment?

21     A      Honestly, it was just an error.  It should

22     have been prorated out.

23     Q      What about that you were demanding that GE

24     pay rent for the freezer.  What was GE's reasoning for

25     asking Koch to pay rent for a freezer it hadn't used?

WILLIAM WILSON

Page 45

```
 1        A    I'm not sure at the time if I knew they were
 2   using it or not, so we just included that.
 3        Q    Did you or anybody on GE's behalf ever ask
 4   Koch if they were using the freezer?
 5        A    Yes, we did.  I think we asked -- I'm sure we
 6   asked Bob Breakstone in his appraisal if it was being
 7   used.
 8        Q    What did Bob Breakstone say?
 9        A    He wasn't sure.  It was like it could go
10   either way, yes or no, whether it was being used or not
11   used.  The answer he gave me is that he was not able to
12   tell if it was being used or not used.
13        Q    Did he say if he ever asked anybody?
14        A    No, I don't remember that.
15        Q    If you thought it was important enough to ask
16   Mr. Breakstone if the freezer was being used, and he
17   didn't know, did you then make any effort yourself or
18   ask somebody else from GE to make an effort to find out
19   if the freezer was being used?
20        A    Yes, we did, and I don't recall the
21   specifics, but I do recall we did find out at some
22   point that the freezer was in another part of the
23   building at the plant and that that area was rarely
24   being used.
25             So we might have assumed at the time at that
```

WILLIAM WILSON

Page 46

1    point that it wasn't being used, that it was still at

2    the location.

3         Q    If you prorated the monthly amount for the

4    de-bone line, the monthly rental amount for just the

5    de-bone equipment that Koch had been using, how much

6    would that have been per month for Koch?

7         A    I don't know.  I would have to do a

8    percentage calculation.

9         Q    Did you ever tell Koch what that amount would

10   be?

11        A    For just the de-bone line?

12        Q    Yes.

13        A    No.

14                  (Whereupon, Koch Deposition Exhibit

15                  No. 13 marked for identification.)

16        Q    Can you identify Koch Exhibit 13 for me?

17        A    It doesn't look familiar to me.

18        Q    You don't recall receiving this from

19   Mr. Reich?

20        A    No.

21        Q    Do you know who Jonathan Reich is?

22        A    Other than how he is listed on this form, no,

23   I don't.

24                  (Whereupon, Koch Deposition Exhibit

25                  No. 14 marked for identification.)

WILLIAM WILSON

Page 47

1     Q     Koch Exhibit 14, which appears to be a

2     proposal to Peco Foods, are you familiar with this

3     document?

4     A     Yes, I am.

5     Q     And how did you come to be familiar with this

6     document?

7     A     Mr. Perry provided it to me.

8     Q     What do you understand this document to be?

9     A     To be a financial proposal for the de-boning

10    line to Peco Foods.

11    Q     Was this an effort by GE to sell the

12    de-boning line to Peco Foods?

13    A     Sell or finance.

14    Q     Well, GE could have -- as I understand this,

15    correct me if I'm wrong, this was a proposal that GE

16    would sell it in a financing transaction.  They would

17    finance the purchase by Peco; is that right?

18    A     Actually, no.  It looks like it would be a

19    similar situation with Sylvest in that we retain

20    ownership.

21    Q     So it would be leased, and the monthly lease

22    amounts would be $4,322; is that right?

23    A     For the basic term, right, yes.

24                    (Whereupon, Koch Deposition Exhibit

25                     No. 15 marked for identification.)

WILLIAM WILSON

Page 48

1      Q      Next Exhibit, 15.   Have you seen this

2   document?

3      A      Yes, I have.

4      Q      And what is this?

5      A      This is a finance proposal to Koch Foods for

6   a loan on the Ossid equipment.

7      Q      This is for the Ossid equipment that was

8   eventually sold.   I think this proposal is for one

9   shrink line, but both lines were eventually sold to

10   Peco, correct?

11      A      I think so.

12      Q      Did you discuss the Peco transaction with

13   Mr. Perry or anyone else at GE?

14      A      No.   Just with Joe DiSalvo.

15      Q      What did you discuss with Mr. DiSalvo about

16   the Peco sale?

17      A      The only discussions I really had was that if

18   it had sold and for how much it was sold for, and that

19   was it.

20      Q      Did you ever attempt to reconcile or compare

21   the prices for Peco equipment against the valuation

22   that Mr. Breakstone had given you?

23      A      I was not involved in that, no.

24      Q      Were you in any way involved in the

25   negotiations with Peco about its purchase?

WILLIAM WILSON

Page 49

```
 1        A     No, I was not.

 2        Q     Have you ever had any discussions with anyone

 3   at any time regarding efforts by Michael Leonard of MTL

 4   Services to buy the spiral freezer?

 5        A     I had discussions with Joe DiSalvo.

 6        Q     What did you discuss with Mr. DiSalvo?

 7        A     That Mr. Leonard was with MTL, was a

 8   potential buyer, and he had made an offer.  That was

 9   pretty much the substance I had with Joe DiSalvo.

10        Q     Were you aware that Mr. Leonard had actually

11   submitted a deposit check that had been cashed by GE?

12        A     Very recently I have been made aware, yes.

13        Q     You weren't made aware of it

14   contemporaneously?

15        A     No, I was not.

16        Q     Were you aware that Mr. DiSalvo had sent a

17   purchase agreement to Mr. Leonard for signature?

18        A     Subsequently.

19        Q     Subsequently.  Did you at any time ever tell

20   Mr. Leonard -- I'm sorry, Mr. DiSalvo that GE couldn't

21   sell the spiral freezer to Mr. Leonard?

22        A     Yes.

23        Q     When did you tell him that?

24        A     I don't recall.

25        Q     You didn't tell him -- you weren't aware that
```

WILLIAM WILSON

Page 50

```
 1   a deposit had been received, so you never told

 2   Mr. Leonard to send the deposit or Mr. DiSalvo to send

 3   the deposit back, did you?

 4        A    Subsequently I did.

 5        Q    Okay.  What period of time is that when you

 6   say "subsequently"?

 7        A    I would say -- I don't know.

 8                    (Whereupon, Koch Deposition Exhibit

 9                    No. 18 marked for identification.)

10        Q    Exhibit 18.  I'm going to throw these on the

11   stack.  They are not documents I'm going to ask you

12   about.  I'm just going to skip over those so we can

13   keep things moving.

14             But 18, have you ever seen this document

15   before?

16        A    Not that I recall.

17                    (Whereupon, Koch Deposition Exhibit

18                    No. 19 marked for identification.)

19        Q    19, have you ever seen this document?

20        A    Not that I recall.

21                    (Whereupon, Koch Deposition Exhibit

22                    No. 20 marked for identification.)

23        Q    Okay.  20.  Do you know what this document

24   is?

25        A    I believe this is Mr. Breakstone's second
```

WILLIAM WILSON

Page 51

1    appraisal.

2        Q    Although this is dated, I see, up in the

3    upper right-hand corner May 8, 2007, it is my

4    understanding that Mr. Breakstone went in to do a

5    second appraisal sometime this past fall, not in early

6    May.

7            So I'm confused by your answer.  Is it still

8    your understanding this is Mr. Breakstone's second

9    appraisal?

10       A    Actually, no, it can't be because it still

11   listed the Ossid equipment, so I'm not sure what -- I'm

12   really not sure what this is.

13       Q    It shows the Ossid equipment as being sold in

14   the right-hand column.

15       A    I'm sorry.  You are correct.  That is

16   correct.

17       Q    And the Ossid equipment was sold before

18   May 8, 2007, correct?

19       A    That is correct.  To be honest, I just don't

20   know.  I'm just not familiar with this.  It looks

21   similar to the other appraisals, but I'm just not

22   familiar with this.

23       Q    It looks like a Breakstone appraisal.

24       A    It does.

25       Q    But you just don't know what this one is?

WILLIAM WILSON

Page 52

1      A    Correct.

2      Q    Is it possible that -- because I haven't seen

3   an appraisal from back in 2006 that Breakstone did, a

4   final appraisal, is it possible that it fell through

5   the cracks, and he sent in an appraisal a year later?

6      MR. HARRIS:  Objection, calls for speculation.

7      THE WITNESS:  I never received one.

8   BY MR. GEEKIE:

9      Q    You never received what?

10     A    The one later, like a year later.

11     Q    You didn't receive what we marked as Exhibit

12  Number 20?  Is that what you are saying?

13     A    I don't know.  That I don't know.

14     Q    Do you recall back in May of 2006, when you

15  first engaged Breakstone to do an appraisal, do you

16  recall seeing from him a final appraisal?

17     A    Yes.

18     Q    I'm not going to ask you about Number 21.

19  Could you mark that 22?

20                  (Whereupon, Koch Deposition Exhibit

21                   No. 22 marked for identification.)

22     Q    I'm going to now hand you what is marked as

23  Koch 22, which is stamped GE 722, 23, 24.

24          There's apparently a page that wasn't stamped

25  that's in the sequence, and then there's GE 725.  The

WILLIAM WILSON

Page 53

1    unstamped page is a Page 2 of 3, and it is an

2    electronic customer folder.  At the bottom, it is dated

3    12-21-07.  I think it was probably just a mistake.

4            These were produced last week to us, and it

5    was probably just missed, but it is a five-page

6    document that I understand has something to do with

7    GE's write-down of the lease, equipment lease and the

8    equipment in it.  Can you explain to me what this is?

9        A    It is a writeoff, a write-down to the

10   equipment value.

11       Q    Do you know who initiated this?

12       A    I did.

13       Q    I see in the upper right-hand corner, it is

14   dated 12-21-07.  Is that the date that this whole thing

15   was started or just when this was printed out?

16       A    Just when it was printed out.

17       Q    When did you initiate this write-down?

18       A    End of October of '06.

19       Q    Is that located on this document somewhere?

20       A    If you look at GE, the third page, and it

21   has -- you'll see in the middle of the page, Analyst

22   Approval.

23       Q    Yes.

24       A    My name, William Wilson, approved and then

25   you'll see a date, 30, October, 2006.

WILLIAM WILSON

Page 54

```
 1        Q     Was this write-down then for all the
 2  equipment subject to the lease other than the -- the
 3  Ossid was sold by now, correct?
 4        A     Correct.
 5        Q     So you're writing down the freezer and the
 6  de-boner, correct?
 7        A     Right, that's correct.
 8        Q     And it's your testimony that you initiated
 9  this process?
10        A     The writeoff, yes.
11        Q     What was the reason you initiated the
12  writeoff?
13        A     GE's internal policy is as an account becomes
14  more delinquent, we don't allow it to age over X number
15  of days, and I don't remember what X is off the top of
16  my head.  So that we then, if we have any unrecovered
17  equipment, then we write it down to the value.
18        Q     What was the value you wrote the de-bone and
19  the freezer down to?
20        A     $658,500.
21        Q     What was the basis for arriving at that
22  number?
23        A     It was approximately the OLV from one of
24  Mr. Breakstone's report.
25        Q     And the OLV is the Orderly Liquidation Value?
```

WILLIAM WILSON

Page 55

1     A     That's correct.

2     Q     Why did you choose the Orderly Liquidation

3  Value to value this equipment at this time?

4     A     That is just what GE typically does.

5     Q     Did it factor into your analysis that GE

6  hadn't been able to sell the other two pieces of

7  equipment in the approximately five months, four to

8  five months after Koch -- after Sylvest had defaulted

9  on the lease?

10     A     It was a factor.

11     Q     So as of the date of this write-down at the

12  end of October of 2006, it was your understanding or

13  belief that the combined value of the freezer and the

14  de-boner line was $658,500?

15     MR. HARRIS:  Objection, vague.

16     THE WITNESS:  Per Mr. Breakstone's report.

17     MR. GEEKIE:  I have no more questions.

18     MR. HARRIS:  Okay.  Reserved.

19                    (Proceedings concluded at

20                    3:40 p.m.)

21                    (Exhibits retained by attorneys.)

22                FURTHER DEPONENT SAITH NOT

23

24

25

Exhibit 14

**Xu, Mike Z.**

**From:**    Geekie Jr., Eugene J.
**Sent:**    Wednesday, April 18, 2007 7:25 AM
**To:**      'aterras@reedsmith.com'
**Subject:** GECC/Koch

Alex:  This email will confirm my earlier voicemail to you this morning that Koch has declined GECC's demand that Koch purchase the equipment left behind at the former Sylvest site, as well as rental value for the nearly one-year period that the equipment has been at the site.  To say the least, Koch is disappointed that GECC has taken such a heavy-handed approach to a well respected company with a long history of successful credit transactions with GECC.  Your threats of lawsuit in our last conversation were the final straw in what Koch had previously hoped were negotiations that would lead to another mutually satisfactory transaction with GECC.

Please contact me to make arrangements for GECC to remove their equipment from Koch's facility.  As I mentioned in my voicemail, prior to the removal of the equipment, Koch will require proper assurance from GECC that it will repair any damage to Koch's facility caused by the equipment removal.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

8/15/2007

KOCH 00000017

**Xu, Mike Z.**

| | |
|---|---|
| **From:** | Terras, Alexander [ATerras@ReedSmith.com] |
| **Sent:** | Monday, May 21, 2007 1:15 PM |
| **To:** | Geekie Jr., Eugene J. |
| **Subject:** | RE: GECC/Koch |

Our attempts to settle this matter have not been successful. Koch has converted the equipment. GE Capital will assert a cause of action for conversion against Koch. . Koch's return of the equipment, unconditionally, after Koch has used and operated the equipment without authorization for many, many months would, at best, be in mitigation of GE Capital's damages for a conversion which occurred a year ago, more or less. In order to mitigate its damages and for no other purpose, GE Capital is prepared to accept the equipment, sell it and apply the proceeds in reduction of its existing claim against Koch.

---

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Monday, May 14, 2007 7:16 AM
**To:** Terras, Alexander
**Subject:** FW: GECC/Koch

Alex: Can you please update me on GECC's intention with regard to the removal of its equipment? Thanks.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL 60606
312-258-5635 (direct)
312-258-5600 (fax)

---

**From:** Geekie Jr., Eugene J.
**Sent:** Wednesday, May 02, 2007 8:03 AM
**To:** 'aterras@reedsmith.com'
**Subject:** GECC/Koch

Alex: Several weeks ago Koch rejected GECC's demand that Koch pay rent for the equipment GECC left at Koch's Montgomery, AL plant since June 2006. When Koch rejected GECC's demands, we requested that GECC make arrangements to remove its equipment, and we have traded several voicemails since that time.

Please inform me when GECC intends to remove its equipment. Thank you in advance for your anticipated cooperation.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower

8/15/2007

Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)

-------------------------------------------------------------

Tax Matters: To the extent this message or any attachment concerns

tax matters, it is not intended or written to be used, and cannot

be used by a taxpayer, for the purpose of avoiding penalties

that may be imposed on the taxpayer under law.

-------------------------------------------------------------

This message and any attachments may contain confidential

information protected by the attorney-client or other privilege.

If you believe that it has been sent to you in error,

please reply to the sender that you received the message in

error. Then delete it. Thank you.

-------------------------------------------------------------

NOT FOR PENALTY PROTECTION
Unless expressly stated otherwise above: (1) nothing contained in this message was intended or written to be used, can be used, nor may be relied upon or used, by any taxpayer for the purpose of avoiding penalties that may be imposed upon the taxpayer under the Internal Revenue Code of 1986, as amended; and (2) any written statement contained in this message relating to any Federal tax transaction or matter may not be used by any person to support the promotion or marketing of, or to recommend any Federal tax transaction(s) or matter(s) addressed in, this message.
IMPORTANT NOTICE:  This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me at (312) 207-1000 and permanently delete the original and any copy of any e-mail and any printout thereof.

Disclaimer Version RS.CHI.1.01.02

8/15/2007

KOCH 00000019

Exhibit 15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC,<br>an Alabama limited liability company, | ) )<br>) | |
| Plaintiff and Counter-<br>Defendant, | ) )<br>) ) | |
| vs. | ) )<br>) | CIVIL ACTION NO.<br>2:07 CV 522-MHT |
| GENERAL ELECTRIC CAPITAL<br>CORPORATION, a Delaware corporation, | ) )<br>) )<br>) | |
| Defendant, and Counter-<br>Plaintiff, | ) )<br>) )<br>) | |

**GENERAL ELECTRIC CAPITAL CORPORATION'S RESPONSES TO
KOCH FOODS' THIRD SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

Defendant and Counter-Plaintiff, General Electric Capital Corporation ("GE Capital"), responds to the Third Set of Interrogatories, Requests for Production of Documents, and Requests for Admission (collectively, the "Requests") of Koch Foods of Alabama, LLC ("Koch Foods"), as follows:

## I.     GENERAL OBJECTIONS AND RESPONSES

1.     GE Capital objects to the Requests to the extent that the Requests seek discovery or purport to impose duties and obligations beyond the scope of, or not required by, the Federal Rules of Civil Procedure.

2.     GE Capital objects to the Requests to the extent that they seek information not relevant to the claim or defense of any party to this lawsuit or reasonably calculated to lead to the discovery of admissible evidence.

3.      GE Capital objects to the Requests to the extent that they seek information that is proprietary, confidential, sensitive, or competitive in nature.

4.      GE Capital objects to the Requests to the extent that they seek information covered by the attorney-client privilege or work product doctrine, or any other privilege or immunity, including common or joint defense and/or joint interest privileges.

5.      GE Capital reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material or information produced.  The production of any material or information does not constitute an admission by GE Capital that such material or information is relevant to this action or admissible in evidence.

6.      GE Capital objects to the Requests to the extent that they seek information generally available to the public and/or in the public domain.

7.      GE Capital objects to the Requests to the extent that they purport to require GE Capital to seek documents in the possession of third parties.

8.      GE Capital objects to the Requests to the extent that they are redundant and/or duplicative.

9.      GE Capital objects to the Requests to the extent that they contain vague and undefined terms.

10.     GE Capital objects to Koch Foods's definition of "document" to the extent that it is broader than the definition of "document" contained in the Federal Rules of Civil Procedure.

11.     GE Capital objects to the Requests to the extent that the Requests seek admissions that GE Capital has not yet been able to ascertain.

12.    GE Capital objects to the Requests to the extent that they seek admissions regarding wholly irrelevant matters.

13.    GE Capital objects to the Requests to the extent that they relate to written documents which speak for themselves.

14.    GE Capital objects to the Requests to the extent that they ask for the creation of documents.  GE Capital will only produce documents that currently exist.

15.    GE Capital continues to investigate these issues and all responsive and relevant documents may have not yet been discovered.  GE Capital, therefore, reserves the right to amend and/or supplement its responses.

## ANSWERS TO INTERROGATORIES

1.    Identify with particularity the indemnities and/or releases which you claim Koch Foods demanded when Koch Foods offered to surrender the Equipment.  Identify any person on whom such demands were made and any person who was making such demands.

**Answer to Interrogatory 1:**

In response to Interrogatory No. 1, GE Capital answers that there were multiple conversations between Koch Foods and GE Capital regarding GE Capital's efforts to regain possession of the equipment that is the subject of this litigation (the "Equipment").  Pursuant to telephone conversations that occurred between Eugene Geekie, on behalf of Koch Foods, and Alexander Terras, on behalf of GE Capital, and which took place on or about February 12, 2007, Koch Foods's position was that the Equipment would not be returned without a mutual release.  Koch Foods confirmed this position in an email from Eugene Geekie to Alexander Terras on February 14, 2007.  GE Capital continues to investigate this issue, and reserves the right to supplement this response.

2.    Describe with particularity all the details of the transaction in which GE Capital sold the Ossid equipment at the Plant in 2006.

**Answer to Interrogatory 2:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 2 on the basis that it us unduly burdensome to answer in the context of an interrogatory response, and is more properly answered as part of deposition testimony.  Further answering, GE Capital states that William Perry and Joseph DiSalvo are the individuals at GE Capital with the

most information regarding the sale of the Ossid Equipment to Peco Foods, Inc. The Ossid equipment was sold on or about August 31, 2006 for $325,000 plus $9,750.00 in sales tax, and included two complete Ossid weigh pricing lines and conveyors. Documents related to the sale are being produced herewith and offer additional evidence of the terms and conditions of the sale. The information contained therein is incorporated into this response by reference.

3.      Identify with particularity all the components of the Ossid equipment at the Plant which you sold in 2006, all the considerations that you received in the sale, and all the costs you incurred for the sale, including marketing, commission, transportation, installation, and legal costs.

**Answer to Interrogatory 3:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 3 on the basis that it us unduly burdensome to answer in the context of an interrogatory response, and is more properly answered as part of deposition testimony or by reference to documents. Further answering, GE Capital states that William Perry and Joseph DiSalvo are the individuals at GE Capital with the most information on the sale of the Ossid Equipment to Peco Foods, Inc..

GE Capital asserts that the documents being produced herewith provide information responsive to Interrogatory No. 3, and are the best evidence of that information. As such, GE Capital incorporates the information contained in those documents by reference.

4.      Identify the total amount of payments in each year for the last five years that GE Capital and its subsidiaries have made to Mr. Robert Breakstone and his company, Equipment Exchange of America, Inc.

**Answer to Interrogatory 4:**

In addition to the general objections asserted above, GE Capital objects to Interrogatory No. 4 on the basis that providing a response to the same would be unduly burdensome. GE Capital does not maintain any centralized list of the occasions on which GE Capital has retained either the services of Mr. Breakstone or his company, Equipment Exchange of America, Inc., nor does it maintain a centralized record pertaining to the payments made to Mr. Breakstone or Equipment Exchange as a result of those appraisals. This information is not available to GE Capital without contacting each of the independent divisions of GE Capital, and expending an undue amount of effort and expense. Further answering, GE Capital states that individuals at Equipment Exchange of America are more likely to have more accessible records regarding the information contained in Interrogatory No. 4. Pursuant to conversations that GE Capital and/or its agents have had with Equipment Exchange, GE Capital understands and believes that it has retained the services of Equipment Exchange approximately 15 times in the past 5 years, and that payments provided to Equipment Exchange from GE Capital amount to a nominal portion (approximately 1-2%) of Equipment Exchange's yearly gross revenue.

5.      If you fail to unequivocally admit each request for admission in the Requests for Admission, state the factual and legal basis of your response (identified by the number of the Request for Admission which was not unequivocally admitted) and identify each and every person having knowledge relevant to that response.

**Answer to Interrogatory 5:**

GE Capital asserts, in relation to Requests Nos. 1 through 3 that Peco Foods, Inc., or one of its agents, was the entity responsible for picking up the Ossid equipment in relation to the sale of the same.

In response to Request No. 4, GE Capital believes, based on deposition testimony offered by David Bromley, that portions of the Ossid equipment was uncrated.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    Please produce all the documents and communications relating to the sale of the Ossid equipment at the Plant in 2006.

**Response to Request 1:**

With the exception of those documents subject to any applicable privilege, all documents in the possession of GE Capital that are responsive to Document Request No. 1 are either being produced herewith, or have already been produced to Koch in relation to prior discovery requests.

2.    Please produce the complete and current Curriculum Vitae of Mr. Robert Breakstone, including lists of particularized skills, experiences, training, and education relating to his qualification as an expert.

**Response to Request 2:**

GE Capital objects to Document Request No. 2 to the extent that it requires GE Capital to create or obtain any document not otherwise in its possession. Further answering, GE Capital states that all documents in the possession of GE Capital that are responsive to Document Request No. 2 have already been produced to Koch in relation to prior discovery requests.

3. Please produce all contracts for services, invoices, statements, time records, retainer agreements, and billing records for this case relating to Mr. Robert Breakstone's compensation for preparation, deposition and testimony.

**Response to Request 3:**

To the extent not otherwise privileged, all documents in the possession of GE Capital that are responsive to Document Request No. 3 have already been produced to Koch in relation to prior discovery requests.

4. Please produce all reports, statements and notes; and all diagrams, charts, or other demonstrative exhibits prepared by or at the direction of Mr. Robert Breakstone in connection with this case; please produce all notes, drafts, correspondence, memoranda, data and any other documents, photographs and videos made, taken, created, reviewed, received, requested or referred to by or under the direction of Mr. Robert Breakstone in connection with this case.

**Response to Request 4:**

To the extent not otherwise privileged, all documents in the possession of GE Capital that are responsive to Document Request No. 4 have already been produced to Koch in relation to prior discovery requests.

5.    Please produce a complete and current catalog of all articles and publications, presentations and lectures, awards and recognition Mr. Breakstone has authored, given, or received, in whole or in part

**Response to Request 5:**

All documents in the possession of GE Capital that are responsive to Document Request No. 5 have already been produced to Koch in relation to prior discovery requests.

6.    Please produce a complete and current catalog of all cases in which Mr. Breakstone has testified by deposition or at trial in the past five years; and any reports or appraisals Mr. Breakstone has prepared in anticipation of litigation in the past two years; and any reports or appraisals Mr. Breakstone has prepared for GE Capital in the last five years.

**Response to Request 6:**

GE Capital objects to Document Request No. 6 to the extent that it requires GE Capital to create or obtain any document not otherwise in its possession.  In addition, GE Capital objects to Document Request No. 6 on the basis that, for the reasons stated in Interrogatory No. 4, it would be unduly burdensome to compile this information.  Further answering, GE Capital states that, with the exception of those documents that would be covered by the foregoing objections, documents in the possession of GE Capital that are responsive to Document Request No. 6 have already been produced to Koch in relation to prior discovery requests.

## REQUESTS FOR ADMISSION

1.    Admit that Koch Foods cooperated when GE Capital removed the Ossid equipment from the Plant.

**Response to Request 1:**

GE Capital objects to Request No. 1 on the basis that the term "cooperated" is vague and ambiguous. Further answering, GE Capital admits that Koch Foods permitted the Ossid equipment to be removed from the Plant. To the extent not otherwise admitted by the foregoing, GE Capital denies the remaining allegations in Request No. 1.

2.    Admit that Koch Foods made the offer that GE Capital can enter the Plant and remove the Ossid equipment.

**Response to Request 2:**

GE Capital objects to Request No. 2 on the basis that the term "made the offer" is vague and ambiguous. Further answering, GE Capital admits that Koch Foods permitted GE Capital, or a party acting on GE Capital's behalf, to enter the Plant and remove the Ossid equipment. To the extent not otherwise admitted by the foregoing, GE Capital denies the remaining allegations in Request No. 2.

3.    Admit that Koch Foods voluntarily made the Ossid equipment available for GE Capital to transport the Ossid equipment from the Plant.

**Response to Request 3:**

GE Capital admits that that Koch Foods voluntarily made the Ossid equipment available to be transported from the Plant. GE denies that it was the party that transported the Ossid equipment from the Plant. To the extent not otherwise admitted by the foregoing, GE Capital denies the remaining allegations included in Request No. 3.

4.    Admit that the Ossid equipment was never uncrated at the Plant.

**Response to Request 4:**

GE Capital denies Request No. 4.

Exhibit 16

34

```
 1      UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
 2   equipment.  Do you have any view on that
 3   subject?
 4      A.     Absolutely.  Equipment installed
 5   and in use has a huge difference than something
 6   sitting out in the parking lot, exposed to
 7   weather, not de-installed properly, not
 8   photographed, not videoed.
 9      Q.     Do you have any information on
10   whether or not the equipment when it was removed
11   wasn't de-installed properly?
12      A.     I have no knowledge of that, no.
13      Q.     And the equipment that's on the
14   parking lot right now, do you know whether or
15   not it's covered?
16      A.     No, no idea.
17      Q.     And this deboning equipment,
18   you're aware, aren't you, that it's intended for
19   use in a cold, wet environment inside the plant,
20   aren't you?
21      A.     One could assume so.  Chickens
22   were going to be cold and wet when they're being
23   deboned.
24      Q.     Does it help to maintain the value
25   of the equipment, then, when it is installed in
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

35

1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

2    the plant?

3          A.     Absolutely.

4          Q.     Okay.

5                 And if the equipment line is

6    maintained, used and maintained, maintained in

7    its ordinary course, does that help to maintain

8    the value of the equipment?

9          A.     Sure.

10         Q.     Koch Exhibit No. 3, have you seen

11   that before?

12         A.     (Examining document.)

13                I may have.  Again, I wouldn't be

14   too involved in the financing end of it.

15         Q.     Okay.

16         A.     It may be in my file just for

17   informational purposes, but I would have no

18   involvement in that proposal.

19         Q.     Are you aware of any damages

20   suffered by GE as a result of Koch's conduct?

21         A.     Not specifically what they are,

22   no.  Just in general.

23         Q.     What would your understanding be

24   in general?

25         A.     That we have no equipment to be

                    UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

57

     1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

     2          A.     I believe I got an email.  I'm not

     3     sure who it was from.  It was probably from

     4     Mr. Perry or Mr. Hanley saying that this was a

     5     cash sale that we agreed to and a bill of sale

     6     needs to be sent.

     7          Q.     Is Mr. Hanley in your group?

     8          A.     He's not in the remarketing group,

     9     no.

     10         Q.     Okay.

     11         A.     He's in what we call the

     12    redeployment group.

     13         Q.     Okay.

     14         A.     But he is in our larger group of

     15    asset management.

     16         Q.     Okay.

     17                Do you recall any conversations

     18    with Mr. Hanley about the Breakstone appraisal

     19    and the valuations he was giving the equipment

     20    that were significantly less or less than the

     21    investment cost of GE?

     22         A.     No, sir.

     23         Q.     Okay.

     24                Did you have any discussions with

     25    Mr. Hanley or anybody else about how it might be

                 UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

58

1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

2    hard to remarket the equipment because of its

3    apparent decline in value based on

4    Mr. Breakstone's June 2006 appraisal?

5          A.     I remember talking to

6    Mr. Breakstone about that.

7          Q.     Okay.

8                 What took place in that

9    conversation?

10         A.     That he didn't have any customers

11   at this time and, you know, this equipment does

12   not trade hands every day so it's not like you

13   can go to a blue book and say it's worth X.  You

14   need to find a customer and put a package

15   together.  A lot of times that involves a lot of

16   installation and a lot of other soft costs that

17   are outside the cost of the equipment.

18         Q.     Installation meaning costs above

19   and beyond what the buyer might have to pay for

20   the equipment?

21         A.     Right.

22         Q.     And did you understand that with

23   respect to the equipment here involved in this

24   matter that those installation costs could be

25   large?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

59

1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

2          A.     Yes.

3          Q.     And how did you come to that

4     understanding?

5          A.     General knowledge of equipment

6     types and just my experience.

7          Q.     Okay.  Did you discuss that with

8     Mr. Breakstone?

9          A.     Yes.

10         Q.     And what did he say about that?

11         A.     He indicated that it would be

12    costly to de-install and/or re-install this

13    equipment anywhere, and that's why we try and

14    find a user for the equipment that would be a

15    retail buyer which would, again, be able to take

16    the equipment from one facility to another, not

17    sell it to a dealer, and be able to finance the

18    new customer and all those costs involved can

19    now be rolled in to a new deal, a transaction.

20         Q.     Meaning it would be part of the

21    finance price?

22         A.     Yes.

23         Q.     And just so I understand you,

24    then, your conversation with Mr. Breakstone was

25    that because of the significant de-install or

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

60

```
 1       UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

 2   re-install prices that GE would be better off

 3   finding an end-user to buy the equipment rather

 4   than sell to an equipment dealer?

 5       A.      Absolutely.  In every instance

 6   it's better to sell it to an end-user.

 7       Q.      And was it also your

 8   understanding, then, that because of these

 9   de-install and re-install prices, that that

10   would make it harder to find a buyer for this

11   equipment?

12       A.      Absolutely.

13       Q.      Koch Exhibit 16, have you seen

14   this document before?

15       A.      (Examining document.)

16              Yes.

17       Q.      Do you recall how you came to see

18   this?  When I say this document, have you seen

19   the whole thing or just the bill of sale that

20   you talked about being involved with?

21       A.      I think I'm connected to this

22   email chain maybe further down the line.

23       Q.      Okay.

24       A.      And then this second page, 0565,

25   is a system-generated document that I produced
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

61

```
 1        UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

 2    as well as a bill of sale that I signed as

 3    remarketing manager listing the equipment.  And

 4    the last page is a background check that we do

 5    on I believe it's called Complinet.

 6        Q.     Do you do that even if a buyer is

 7    paying cash for equipment?

 8        A.     We do it on every single customer.

 9        Q.     Okay.

10        A.     It's a black list for terrorists,

11    drug dealers, and things like that.

12        Q.     And when this information came to

13    you about selling to Ossid and documenting

14    this --

15        A.     Peco.

16        Q.     Peco.  I'm sorry.  -- selling the

17    Ossid equipment to Peco, did you question

18    anybody or inquire as to whether or not that

19    purchase price had been approved or how it had

20    been approved?

21        A.     No.

22        Q.     Do you know of any policy that GE

23    has about picking up equipment after there's a

24    payment default?

25        A.     Yes.
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

62

```
 1        UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

 2        Q.      What is that policy?

 3        A.      It's pretty broad to call it a

 4   policy, but we had involved the asset management

 5   group.  The remarketing group gets involved when

 6   litigation has sent the proper notices to the

 7   customer, default notices, and our group would

 8   get involved when that equipment is legally able

 9   to be repossessed or sold in place.  We need

10   customer cooperation to be able to sell it in

11   place.

12        Q.      Okay.

13              Does GE have a policy about

14   picking up equipment versus leaving it in place

15   and how a decision is made to do that?

16        A.      I wouldn't call it a policy but I

17   would call it an understanding.

18        Q.      What is it?

19        A.      That equipment typically has a

20   large installed use that if you took it out and

21   put it in a warehouse, that it would detract

22   from its value, that we would try and sell it in

23   place as long as we got customer cooperation.

24        Q.      And how does GE obtain customer

25   cooperation?
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

63

```
 1        UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
 2        A.     It depends.
 3        Q.     Does GE get written confirmation
 4   from the customer that it will allow the
 5   equipment to be left in place?
 6        A.     Sometimes yes.  Sometimes no.
 7        Q.     How is that decision made whether
 8   or not to get it in writing?
 9        A.     It usually depends on the
10   situation and the cooperation level of the
11   customer, past experience, attitudes, gut feel,
12   things of that nature that probably no one likes
13   to hear, but you can sense someone's
14   cooperation.
15        Q.     When we're talking about large
16   equipment as you defined it where it's
17   beneficial for GE to leave it in place with the
18   customer's cooperation, does that add to or help
19   maintain the value of the equipment by leaving
20   it in place?
21        A.     Yes.  And it also benefits the
22   customer because if you had a claim against
23   them, it would be less because you would be
24   selling the equipment for more than the street
25   value.
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

64

```
 1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

 2          Q.      Okay.  So if the customer

 3    cooperates with GE and lets GE leave its

 4    equipment in place and in some cases leave the

 5    equipment operational, that is financially

 6    beneficial to GE?

 7          A.      Yes, it is.

 8          Q.      I've now handed you Exhibit 18.

 9    Have you seen this document previously?

10          A.      (Examining document.)

11                  Yes, I believe I have.

12          Q.      Do you know how you came to see

13    this document?

14          A.      I don't recall how I got this

15    document.

16          Q.      Do you recall when you got it?

17          A.      No, sir, I don't.  I know it's in

18    my file, but I typically don't get involved in

19    the proposals for refinancing.

20          Q.      Did you ever discuss this document

21    with anyone?

22          A.      No, sir.

23          Q.      Turning to page GE 373, do you see

24    where it says removal and reinstallation,

25    $175,000?
```

                    UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

65

1       UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

2       A.      Yes.

3       Q.      Did you ever discuss any specifics

4   with anyone at any time about the removal and

5   reinstallation of the freezer and what the cost

6   would be?

7       A.      I think we've had discussions with

8   Mr. Leonard on our deal why he offered us

9   $50,000 for the freezer because of the removal

10  and re-installation costs.

11      Q.      Did Mr. Leonard indicate to you

12  that the cost of the freezer to remove and

13  re-install would be $175,000?

14      A.      I don't remember specifically if

15  he did or not.

16      Q.      But it's your recollection that he

17  told you that he was willing to pay 50,000

18  because the removal and re-installation costs of

19  that freezer would be high?

20      A.      Right, correct.

21      Q.      Have you at any time discussed

22  with anyone the specific cost of removing and/or

23  re-installing the freezer?

24      A.      Just what we discussed, Michael

25  Leonard.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

66

1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

2          Q.      Okay.  Have you had any

3    discussions with anyone about --

4          A.      And maybe Bob Breakstone actually

5    about the removal costs.

6          Q.      What did you discuss with

7    Mr. Breakstone?

8          A.      In general that the cost to remove

9    equipment like this typically exceeds its value.

10         Q.      This meaning the freezer?

11         A.      Yes.

12         Q.      Did you discuss the same cost of

13   removing the debone line with Mr. Breakstone?

14         A.      No, sir.

15         Q.      So it was just your understanding

16   from conversations with Mr. Breakstone that the

17   cost of removing the spiral freezer could exceed

18   its value?

19         A.      Right.

20         Q.      I've now handed you Koch

21   Exhibit 19.  Have you seen this document before?

22         A.      (Examining document.)

23                 Yes, I believe I have.

24         Q.      Do you recall how you came to see

25   this document?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

67

```
 1        UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

 2        A.      I believe this is in our

 3   electronic file from the original deal.

 4        Q.      Did you ever have any discussions

 5   with Mr. Leonard about what his original price

 6   that he paid for the spiral freezer was?

 7        A.      No.

 8        Q.      In your conversations with

 9   Mr. Leonard did you have an understanding or did

10   you know that he had been the party or his

11   company had been the party that had originally

12   sold the spiral freezer to Sylvest?

13        A.      Yes.

14        Q.      Or sold it to GE for lease to

15   Sylvest?

16        A.      Yes.

17        Q.      But he didn't tell you what he

18   originally paid for it?

19        A.      No, he did not.

20        Q.      Describe for me how your

21   transaction with Mr. Leonard came about or your

22   incomplete transaction with Mr. Leonard came

23   about.

24        A.      Well, he called me and inquired

25   whether or not we would be interested in selling
```

68

```
 1        UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

 2   the freezer initially, and he indicated to me

 3   that he was the company that originally

 4   installed it and would be willing to make an

 5   offer on it.

 6             Initially we tried to find other

 7   buyers for it through Breakstone or through the

 8   sales force.  I did very little as far as that's

 9   concerned.

10             And then eventually he kept on

11   calling me all the time, and we had no other

12   potential sales that we could consummate so we

13   agreed to sell it to him

14        Q.    When you say we, who's we?

15        A.    GE we.

16        Q.    Okay.

17             And did he make the offer to buy

18   it for 50 or did you guys make an offer to sell

19   it to him for 450 or how did this negotiation

20   take place?

21        A.    I believe he made the offer for 50

22   and said, "That's all I'd be willing to pay."

23        Q.    And did GE counteroffer or did it

24   just accept the 50,000 offer?

25        A.    I told him I'd like to get more
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

69

```
 1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
 2     for it, but due to the fact that we had no
 3     activity on it and had no potential customers on
 4     it that we would sell it to him for 50.
 5          Q.     How long of a period of time did
 6     this conversation or negotiation take place?
 7     Was it a few days, a few weeks, a few months?
 8          A.     Well, he had been calling me since
 9     we tried to sell the freezer so since the spring
10     of 2006, late spring I guess, June or July, he
11     had been calling me until we put a document
12     together, which I don't recall what the date is
13     but I'm sure you've got it in here somewhere.
14                That's how long the conversation
15     happened.  It was over a period of several
16     months before we actually put an offer on the
17     table, and I would say within a week or two we
18     settled and he sent me a deposit check.
19          Q.     That you cashed.  Correct?
20          A.     Yes.
21          Q.     How long after receiving that
22     deposit check, then, did you have your
23     conversation with Mr. Wilson where he said we
24     can't sell it?
25          A.     Right away afterwards.
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

Exhibit 17

Mark Kaminsky    October 19, 2007

Page 90

1  from the plant?
2      A   Yes.
3      Q   Is the new stuff, the new deboning
4  equipment, is it better than the old equipment or
5  about the same?
6          MR. GEEKIE:  Objection, vague and
7  ambiguous --
8  BY MR. HARRIS:
9      Q   Worse?
10         MR. GEEKIE:  -- foundation.
11     A   It is specifically designed for how we
12  would set the line up.  So from our perspective it's
13  better.
14         MR. HARRIS:  All right.  Now's a good time
15  for lunch.
16         (Lunch recess taken from 12:00 p.m. to
17  1:00 p.m.)
18  BY MR. HARRIS:
19     Q   Mr. Kaminsky, I will remind you that you
20  are still under oath.  Understood?
21     A   Yes.
22     Q   I just want to clear up a few things from
23  this morning's session.  It's the position of Koch
24  Foods that the deboning equipment and the spiral

Page 91

1  freezer became the property of Koch Foods at the
2  time of the closing of the asset purchase agreement,
3  correct?
4          MR. GEEKIE:  Objection, asked and
5  answered.
6      A   Yes.
7  BY MR. HARRIS:
8      Q   And who owns this equipment today?
9      A   Koch Foods.
10     Q   Both Koch Foods today -- strike that.
11         The position of Koch Foods is that today
12  Koch Foods still owns the spiral freezer and still
13  owns the deboning equipment, correct?
14     A   Yes.
15     Q   And the basis of your statement is because
16  you believe it to have been a fixture, correct?
17     A   Yes.
18     Q   And that would include also the deboning
19  equipment even though it's no longer a fixture, is
20  that correct?
21         MR. GEEKIE:  Objection, calls for a legal
22  conclusion.
23     A   We still own the deboning equipment, yes.
24

Page 92

1  BY MR. HARRIS:
2      Q   Well, why do you still -- strike that.
3          Is the deboning equipment currently a
4  fixture of the building?
5          MR. GEEKIE:  Objection.  Objection, calls
6  for a legal conclusion.
7      A   From my way of looking at it, once it's a
8  fixture, it's always a fixture.  So yes, I would say
9  we still own it.
10  BY MR. HARRIS:
11     Q   And the basis is because it used to be a
12  fixture --
13     A   Correct.
14     Q   -- or still is?
15     A   Correct.
16     Q   Does Koch Foods have an in-house counsel?
17     A   No.
18     Q   No attorneys are employed by Koch Foods?
19     A   No.
20     Q   Other than outside counsel, correct?
21     A   That is correct.
22     Q   Have you ever discussed with any outside
23  counsel your belief that the equipment was a fixture
24  at the time that Koch Foods took over possession of

Page 93

1  the facility?
2          MR. GEEKIE:  I'm sorry, could you read
3  that back, please?
4          (Question read.)
5          MR. GEEKIE:  Objection, that calls for
6  privileged communications, and I'll instruct
7  you not to answer.
8          MR. HARRIS:  Just to be clear, what I'm
9  asking is not what was said but whether
10  discussions were had.
11         MR. GEEKIE:  Same objection.  I'll
12  instruct you not to answer.
13  BY MR. HARRIS:
14     Q   And are you going to follow that advice?
15     A   I am.
16     Q   Let me ask you this.  Have you ever asked
17  anyone whether that other person believes this to be
18  a fixture?
19         MR. GEEKIE:  Objection, instruct you not
20  to answer to the extent that question calls for
21  attorney-client communication.
22     A   Can't answer.
23  BY MR. HARRIS:
24     Q   Does Koch Foods desire that GE Capital

24  (Pages 90 to 93)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 118

1  BY MR. HARRIS:
2      Q   Will you answer my question?
3      A   What I'm saying is that is a legal term
4  that I do not have specific knowledge of.
5      Q   Okay.  Fifth affirmative defense, it says
6  plaintiff maintains a possessory lien that
7  equipment that defendant claimed that it owned.  Are
8  you aware of any factual bases for that defense?
9      A   Yes.
10     Q   Tell me what those are, please.
11     A   If ultimately it is deemed that I do not
12 own the equipment from a legal perspective, then I
13 am due and owed storage fees on the equipment.
14 Until I be paid such storage fees, I would maintain
15 possessory lien on the equipment.
16     Q   Okay.  So the claimed possessory lien
17 there is tied to the storage claim?
18     A   Yes.
19     Q   So it would be a lien for storage fees?
20     A   Yes.
21     Q   And then the seventh affirmative defense,
22 it states, defendant's counterclaim is barred due to
23 estoppel resulting from defendant's conduct or lack
24 thereof and by detrimental reliance on such conduct

Page 119

1  by Koch.  My question to you is are you aware of any
2  factual basis for any detrimental reliance by Koch?
3          MR. GEEKIE:  Objection, foundation, form.
4      Answer to the extent you understand the defense
5      in the question.
6      A   This is again a very specific legal
7  terminology.  And for me to sit here and try to
8  explain the intricacies of it would not be proper by
9  me.
10 BY MR. HARRIS:
11     Q   Let me ask you this question.  Has Koch
12 taken any action or failed to take any action based
13 upon GE Capital's behavior?
14     A   We've taken lots of action based on GE's
15 behavior.
16     Q   For example?
17     A   We have been unreasonably made a hostage
18 in this situation.  We have made numerous reasonable
19 offers to settle this matter.  And the last rebuff
20 from GE was if you won't pay the full dollar amount,
21 we have no interest in talking to you.  So I was
22 essentially -- a gun was put to my head to make GE
23 whole in this matter when the value of the equipment
24 to Koch was not nearly worth what it was put on the

Page 120

1  books for.
2      Q   Well, let's focus, though, on my question,
3  which was did Koch take any action --
4      A   Sure, I did.
5      Q   And what action was that?
6      A   Upon a completely unreasonable request of
7  me to pay full value for this equipment, I started
8  the process of replacing the equipment.
9      Q   So it's your testimony that Koch replaced
10 the equipment in reliance upon actions taken by GE?
11     A   Given GE's completely unreasonable
12 position in this matter, I had no choice but to
13 protect myself.  And, therefore, I started the
14 actions of replacing the equipment.
15     Q   And that was done because of GE Capital,
16 is that your testimony?
17     A   That is absolutely my testimony.
18     Q   That was my question.  Let's go to
19 Exhibit G, which is Koch Foods' Initial Disclosure
20 Pursuant to Rule 26.  And if you go to page three,
21 it says computation of damages.  You will see there
22 that Koch Foods is claiming that the calculation of
23 storage costs is based on $100 per day from May 30,
24 2006, when Koch Foods purchased all of the assets of

Page 121

1  Sylvest Farms to present.  Do you see that?
2      A   Yes.
3      Q   Is that accurate?
4      A   Yes.
5      Q   Is that accurate today?
6      A   Yes.
7      Q   Upon what is the hundred dollars a day
8  based?
9      A   It is a reasonable approximation of what
10 it would cost to store that equipment, a hundred
11 dollars, not extremely material on a per day basis
12 considering the amount of space that the equipment
13 takes up.  It's my estimation of a fair and
14 reasonable request for storage.
15     Q   And how much space does it take up?
16     A   Spiral is probably 20 by 20 at least.
17 Again, these are approximations.
18     Q   Twenty feet by twenty feet, right?
19     A   Yes, maybe 25 by 25, I don't know exactly
20 or specifically.  And the deboning equipment stacked
21 up, I don't know exactly how much space that takes.
22     Q   How about when it was in the facility?
23     A   Probably spanned a room that was 50 by a
24 hundred.

31 (Pages 118 to 121)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Exhibit 18

DLAPIPER          Fax:3122367516          Jan  2 2007  17:49      P.01



**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois, 60601-1263
www.dlapiper.com

Ann Pille
ann.pille@dlapiper.com
T  312.368.2189
F  312.630.7356

# Fax Transmission Cover Sheet

January 2, 2007

| To | Telephone | Fax Number |
|---|---|---|
| Eugene J. Geekie<br>Schiff Hardin LLP | 312.258.5835 | 312.258.5600 |

From:  Ann Pille
       312.368.2189

Client-Matter Number:

Re:    In re Sylvest Farms

Pages:  ___13___ - (including this form)     Originals:

If there is a problem with this transmission, please call  *312-368-2189*     at

Fax Operator/Ext.

Message:

## CONFIDENTIALITY NOTICE

This communication is ONLY for the person named above. Unless otherwise indicated, it contains information that is confidential, privileged or exempt from disclosure under applicable law. If you are not the person named above, or responsible for delivering it to that person, be aware that disclosure, copying, distribution or use of this communication is strictly PROHIBITED. If you have received it in error, or are uncertain as to its proper handling, please immediately notify us by collect telephone and mail the original to us at the above address. Thank you.

(Form Rev. 8/02/04)

KOCH 00000001

DLAPIPER            Fax:3122367516          Jan  2 2007  17:50      P.02



**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois  60601-1263
www.dlapiper.com

Ann Pille
ann.pille@dlapiper.com
T  312.368.2189
F  312.630.7356

January 2, 2006
*VIA FACSIMILE AND REGULAR MAIL*

Mr. Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Scars Tower
Chicago, Illinois  60606
Fax: 312.258.5600

Re:    **In re Sylvest Farms, Inc. (Case No. 06-4025-TBB11)**

Dear Mr. Geekie:

As you are aware, this firm represents General Electric Capital Corporation ("GECC") in relation to the bankruptcy proceeding initiated by Sylvest Farms, Inc. (the "Debtor"), currently pending before the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court").

On or about December 29, 2005, GECC and the Debtor entered into a Master Lease Agreement (the "Master Lease"), pursuant to which GECC leased certain equipment to the Debtor to be used in a poultry processing facility owned and operated by the Debtor (the "Facility"). The equipment leased by GECC is defined more fully on Schedule 001 ("Schedule 1") to the Master Lease, a copy of which is attached hereto.

On or about May 26, 2006, your clients, Koch Foods of Alabama LLC and Koch Farms of Alabama LLC (collectively, the "Buyers"), purchased substantially all of the assets of the Debtor, including the Facility.  Thereafter, on or about June 6, 2006, the Bankruptcy Court entered its *Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts* (the "Rejection Order"), pursuant to which the Master Lease was rejected.

Shortly after the Rejection Order was entered, representatives from this law firm discussed with you the need to relocate the GECC equipment located at the Facility.  At that time, you informed GECC that it would not be necessary to relocate the equipment while GECC conducted an inquiry to locate purchasers for the equipment.  As such, the equipment is still located at the Facility.

It has come to our attention, however, that, in addition to allowing the GECC equipment to remain at the Facility, the Buyers have also been using the equipment.  Portions of the GECC equipment that were not in use, and indeed had not even been installed at the time the Buyers purchased the Facility, are now being operated by the Buyers without the permission of GECC.

KOCH 00000002

DLAPIPER          Fax:3122367516          Jan  2 2007  17:50      P.03



Mr. Eugene J. Geekie, Jr.
January 2, 2006
Page Two

GECC believes that the use of the equipment by the Buyers, without GECC's permission, has been occurring for an extended period of time.

Consequently, GECC, by delivery of this letter, demands that the Buyers make a payment to GECC, which payment shall represent the lease payments due and owing on the Master Lease from the date of the Rejection Order to the present. Such lease payments, from June 7, 2006 through January 3, 2007, are equal to $237,493.99 (the "Overdue Rent"), and should be paid to GECC immediately by tendering a check for the amount of the Overdue Rent to the Chicago offices of DLA Piper US LLP, located at 203 N. LaSalle Street, Suite 1900, in Chicago, Illinois. This check shall be sent to the attention of Ann Pille.

In addition, GECC demands that the Buyers continue to abide by the payment and other terms of the Master Lease going forward. Failure to make payments to GECC for the use of the GECC equipment, including, but not limited to, the Overdue Rent, could subject the Buyers to an action for conversion of the Equipment.

Please call me if you have any questions, or if you would like to discuss the matter further. I look forward to hearing from you soon.

Very truly yours,

DLA Piper US LLP

Ann Pille

KOCH 00000003

Exhibit 19

EXPERT REPORT

OF

ROBERT BREAKSTONE

FOR

GENERAL ELECTRIC CAPITAL CORPORATION

IN THE MATTER OF

<u>KOCH FOODS OF ALABAMA, LLC V. GENERAL ELECTRIC
CAPITAL CORPORATION</u>

CASE NO. 07 C 522

October 1, 2007

I.      **Statement of Opinions**

The opinions on which my testimony will be based are provided in the (a) Appraisal Valuation Report of Sylvest Farms, prepared May 2006, and (b) Appraisal Valuation Report of Sylvest Farms, prepared September 2007 (collectively, the "Appraisal Reports"), copies of which are appended hereto, and incorporated by reference as though set forth fully in this Report.

II.     **Bases for Opinions**

The bases for my opinions are provided in the Appraisal Reports.

III.    **Information Considered in Forming Opinions**

In May 2006, Daniel Nicoson of Equipment Exchange Co. of America, Inc. conducted an on-site inspection of the equipment which is referenced in the Appraisal Reports. During and following this inspection he prepared certain notes and made certain photographs which I consulted in preparing and finalizing the Appraisal Reports. In addition, Mr. Nicosion consulted with me and provided information regarding the preparation and finalization of the Appraisal Report dated June 2006.

In September 2007, Mr. Nicoson and Jim Lott of Mechanical Services Company conducted an on-site inspection of the equipment which is referenced in the Appraisal Report dated September 2007. During and following the inspection they prepared certain notes and made certain photographs which I consulted in preparing and finalizing the Appraisal Reports. In addition, Messrs. Nicoson and Lott consulted with me and provided information regarding the preparation and finalization of the Appraisal Report dated September 2007.

In addition, I have approximately twenty-five (25) years of industry experience purchasing and selling machinery which assisted in the formulation of my opinions as expressed in the Appraisal Reports. In addition, I reviewed certain of the documents produced by Koch in its document production, including vendor quotes and invoices and underlying lease documentation, which assisted in my opinions.

IV.     **Exhibits to be Used as a Summary or Support**

I plan to use all or portions of the Appraisal Reports as a summary of my opinions. I plan to use the photographs included in the Appraisal Reports as support for my opinions.

2

V.      **Qualifications of the Witness**

    A.      **Employment**

        Senior Appraiser at Equipment Exchange Co. of America, Inc.
        Lake City, Pennsylvania
        (1982 to Present)

    B.      **Publications Within the Preceding Ten Years**

        None

    C.      **Education**

        Mercyhurst College, in Erie, Pennsylvania, B.A. in Business
        Administration, B.A.

    D.      **Professional Memberships and Affiliations**

        Equipment Appraisers Association of North America (EAANA), Certified
        Senior Appraiser (CSA)
        Association of Machinery and Equipment Appraisers (AMEA), Certified
        Equipment Appraiser (CEA)
        American Society of Appraisers (ASA), Candidate Member

    E.      **Experience**

        I have approximately twenty-five years of experience in the machinery
        and equipment appraisal business, and an equal number of years of
        experience purchasing and selling equipment and machinery. As part of
        my business, I regularly attend auctions where large machinery is sold,
        and I commonly record pricing data for this equipment, which is
        maintained in an internal database at the Equipment Exchange Co. of
        America, Inc. offices in order to track sales information regarding
        equipment and machinery.

    F.      **Additional**

        In addition to the qualifications stated here, I have the qualifications
        attached to those portions of the Appraisal Reports entitled "Appraiser's
        Qualifications," which, with the rest of the Appraisal Reports, are
        incorporated by reference as though set forth fully in this Report.

## VI.     Compensation

Equipment Exchange Co. of America, Inc. and I were provided compensation in the amount of $7,500.00, plus expenses in the amount of $1,477.34, for the June 2006 appraisal of the equipment and preparation of the Appraisal Report dated June 2006.   Equipment Exchange Co. of America, Inc. and I were provided compensation in the amount of $6,000.00, plus expenses which have not yet been calculated at the time of this report, for the September 2007 appraisal of the equipment and preparation of the Appraisal Report dated September 2007.   My compensation for study and testimony going forward shall be $250.00 per hour.

## VII.     Prior Testimony

I provided deposition testimony in a case involving GE Capital and Koch previously pending in Mississippi.   I provided opinion testimony consisting of appraisals of chicken processing equipment located in a facility in Jackson, Mississippi.

Robert Breakstone

CHILIB-2109943.2-515998-00011

4

INSPECTION AND VALUATION OF

# SYLVEST FARMS

### 4530 MOBILE HIGHWAY

### MONTGOMERY, AL 36108

PREFORMED FOR

# GENERAL ELECTRIC
# CAPITAL CORPORTATION

## COMMERCIAL
## EQUIPMENT FINANCING

BY

EQUIPMENT EXCHANGE COMPANY

### MAY 2006



EQUIPMENT EXCHANGE CO. OF AMERICA, INC.



ASSOCIATION OF MACHINERY AND EQUIPMENT APPRAISERS

# APPRAISAL VALUATION REPORT

OF

## SYLVEST FARMS
4530 MOBILE HWY
MONTGOMERY, AL
36108

## PREPARED JUNE 2006

BY



EQUIPMENT EXCHANGE COMPANY



AMEA
ASSOCIATION OF MACHINERY AND EQUIPMENT APPRAISERS

# APPRAISER'S OPINION LETTER



**2** APPRAISER'S CERTIFICATION & CERTIFICATION OF VALUE



**3** SCHEDULE OF DETAILED INVENTORY



**4** APPRAISAL PHOTOGRAPHS



**5** APPRAISER'S QUALIFICATIONS

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880  •
info@eeclink.com

## SUMMARY APPRAISAL REPORT
### PRIVATE & CONFIDENTIAL

Subject - Certain Assets of:

### SYLVEST FARMS
### 4530 MOBILE HIGHWAY
### MONTGOMERY, AL 36108

For the Intended Use of:

### GENERAL ELECTRIC CAPITAL
### COMMERCIAL EQUIPMENT FINANCING
### 44 OLD RIDGEBURY ROAD
### DANBURY, CT 06810-5105

### Purpose of Appraisal

The purpose of this appraisal is to provide an independent, professional opinion of the Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Sylvest Farms, 4530 Mobile Highway, Montgomery, AL.  This report is intended solely for financing and business decisions of General Electric Capital Corporation and assignees. Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is May 16, 2006.

### Intended Use of Appraisal

This report is intended solely for financial and business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts.  If a particular company or individual determined that, the concept fits a particular need and therefore could use it in a way that would be improper.  The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value.  It is up to the user to determine if the defined concept is correct for its purpose.  Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards. The appraisal is preformed at the request of a client based upon a requested concept of value.  It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value.  Users of this report must do so with the knowledge of the defined concepts of value being utilized.  If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 2 of 7
GECC/Sylvest Farms

## Scope of Appraisal

To appraise certain personal property of the subject company located at Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-Removed and Orderly Liquidation Value.

## Highest and Best Use

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Sylvest Farms are producers of fresh and frozen poultry products.  Equipment includes packaging, freezing, cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment.  This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

## Value Definitions

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises.  The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell.  This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards.  Since a physical inspection has to be preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below.  Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used.  This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove.  Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |

Value Definitions: provided by General Electric Capital Corporation Letter of Engagement.

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
GECC/Syvest Farms

Both stated value considerations represent the normal considerations for the assets being appraised. The stated values are unaffected by special or creative financing or sale considerations granted by anyone associated with a possible sale or any other special or creative terms, service fees, costs or credits.

All values stated are in United States Funds as of effective date of this report. Any users of this report must assume that the listed "OLV" is based on the fact that a qualified and experienced broker of the goods is to be used as the marketing agent.  It also does not take into account any "costs to sell" that would be involved in liquidating the assets.

<u>Approaches to Value</u>

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted approaches to value must be considered.

1) **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being appraised for the loss in value caused by physical deterioration, functional obsolescence, or economic obsolescence.  The cost approach is based on the principle of substitution: a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.  In its simplest form, the cost approach is the current cost (as if new) less all depreciation.

2) **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts the prices that have been paid for assets comparable to the asset being appraised, equating the comparables to the subject.  This involves analyzing recent sales of properties that are similar to the subject property.  If the comparables are not
identical, the prices are adjusted to equate the various characteristics of the properties. Equipment Exchange Company of America, Inc. uses an extensive in-
house database of sold and brokered equipment, auction-selling prices, and data gathered via the Internet and other used equipment dealers to establish comparables.  As in the cost approach, the basis is a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.

3) **Income Approach:** The appraiser determines the present value of the future economic benefits of owning the property.  This approach is seldom used in valuing personal property and was considered but deemed not applicable in performing this appraisal.

In this summary appraisal and review of assets from Sylvest Farms, the Sales Comparison Approach was employed to arrive at value conclusions.  Equipment Exchange Company researched the equipment installed or used at the location. We also paid particular attention to the marketability of these assets in their current geographic location and the effect that location would have in developing their probable value.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
GECC/Sylvest Farms

### Depreciation

Defined as the actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself and due to changes in design, or process resulting in inadequacy, over capacity, excess construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions. These can include such things as the economics of the industry, availability of financing, loss of material and labor sources, passage of new legislation, and changes in ordinances.

### Summary of Values Conclusions

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions and limiting conditions, which the Fair Market Value-Remove and Orderly Liquidation Value of the machinery and equipment located at Sylvest Farms, Montgomery, AL.

|  | **FAIR MARKET VALUE-REMOVE** |
|---|---|
| **TOTAL CURRENT OF EQUIPMENT VALUED** | **$1,119,500.00** |
|  | **ORDERLY LIQUIDATION VALUE** |
| **TOTAL CURRENT OF EQUIPMENT VALUED** | **$661,900.00** |

**GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS**

This is a Summary Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it might not include full discussions of the data, reasoning, and analysis that were used in the appraisal process to
develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning and analyses is retained in the appraiser's file.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 5 of 7
GECC/Sylvest Farms

This appraisal sets forth our findings and conclusions which are based upon an investigation of conditions affecting value and which are subject to the Assumptions, Statements of Limiting Conditions, and Definitions contained in the following report. *Without reading the Assumptions and Statement of Limiting Conditions and Definitions, this report could be erroneously interpreted.*

The legal description given to the appraisers and used in this report is assumed to be correct. No responsibility is assumed for matters of a legal nature affecting title to the property nor is an opinion of title rendered. The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection with such matters. Sketches in this report are included only to assist the reader in visualizing the property.

In conducting this inspection or in gathering information for this report we have assumed that no unreported or hidden conditions exist with the equipment that would render it more or less valuable then reported.

If for some reason we were unable to gather the model number, serial number, age or other pertinent information we assumed that the equipment was similar to other equipment we have appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable. A reasonable effort has been made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report. The property is appraised as though under responsible ownership and management. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported. There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all-applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined, and considered in the appraisal report.

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
GECC/Sylvest Farms

It is assumed that all required licenses, consents or other legislative or administrative authority
from any local, state or national governmental or private entity or organization have been or can be
obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the
appraiser.  No responsibility is assumed for latent defect of ANY nature whatsoever which may
affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference
or appearance required by subpoena, with reference to the property in question, unless timely
arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal,
and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value
opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous
material, which may or may not be present on the property.  I have no knowledge of the existence
of such materials on or in the property and are not qualified to detect such substances. The
presence of substances such as asbestos, urea formaldehyde foam insulation or other potential
hazardous materials may affect the value of the property.  The value estimate is predicated on the
assumption that there is no such material on or in the property that would cause a loss in value.  No
responsibility is assumed for any such conditions, or for any expertise or engineering knowledge
required to discover them.  The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate
in the appraisal if any new facts pertinent to the process are discovered which were unknown when
the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may
it be used for any purpose or any function other than the intended use, as stated in the body of the
report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report.
All conclusions and opinions concerning the analysis as set forth in the report were prepared by the
appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s).  The
appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the
analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the
report to anyone other then the client or his designee as specified in writing.



**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
GECC/Sylvest Farms

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser

**EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC**
**10042 KEYSTONE DRIVE**
**LAKE CITY, PA 16423**

Does

# -Certify-

That on May 16, 2006 that certain property of:

# SYLVEST FARMS
# 4530 MOBILE HIGHWAY
# MONTGOMERY, AL 36108

HAS WELL AND REASONABLE WORTH:

VALUE IS AS FOLLOWS:

| | FAIR MARKET VALUE-REMOVE |
|---|---|
| TOTAL CURRENT OF EQUIPMENT VALUED | $1,119,500.00 |
| | ORDERLY LIQUIDATION VALUE |
| TOTAL CURRENT OF EQUIPMENT VALUED | $661,900.00 |

EFFECTIVE DATE OF APPRAISAL: May 16, 2006

BY:    ROBERT BREAKSTONE, CEA



EQUIPMENT
EXCHANGE
CO. OF AMERICA. INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

**Appraiser's Certification:**

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____

Daniel R. Nicoson, Report Date:



**EQUIPMENT**
**EXCHANGE**
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

## Appraiser's Certification:

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

❖ I have NOT made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____
        Robert Breakstone, CEA, CSA

Private Confidential

6/8/2006

**INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:**

# SYLVEST FARMS

**4530 MOBILE ROAD, MONTGOMERY, AL 36108**

**ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE**

**PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006**

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| | | **OSSID PACKAGING EQUIPMENT** | | | |
| | | Ossid Invoice #3295-F. Invoice date 12/19/05, equipment installed in early 2006 and minimal production use. Equipment seemed to be in 'like new' condition. | | | |
| 2 | 1 | Integrated Package infeed conveyors, 10" wide x 87" long, with low-friction conveyor belt, AC variable speed drive. No ID tags, installed 2006 | $23,842.00 | | $10,700.00 |
| 2 | 2 &3 | WPL Single Head Check-Weigh System, model WPL1500xA, serial# A022106 & A023106. Units are capable of belt speeds of up to 35inches/second.  Installed 2006 | $125,000.00 | $69,000.00 | $43,800.00 |
| 2 | 4 | SATA Barcode Printers, model M-8485Se, serial# 4L0A0024 & 4L0A0017. Installed 2006, (Invoice shows Md #PA300AT- this replaces) | $35,800.00 | $16,000.00 | $9,000.00 |
| 2 | 5 | ID Technology Top Printers, model M1.5, serial# 57612-02 & 57612-03. Installed 2006. | $15,000.00 | $7,000.00 | $3,800.00 |
| 2 | 7 | Ossid Automatic Indexer (mounted to overwrapper) no separate ID plate, installed 2006. | $20,900.00 | $14,000.00 | $9,400.00 |
| 1 | 6 & 8 | Ossid Overwrap System model 500E, serial# EF 050432.  Unit appears new, possibly ran tests, remains in 'like-new' condition. Installed 2006. | $187,308.00 | $122,000.00 | $84,300.00 |
| 1 | 9 | Ossid End Seal Shrink, model ES5 550, sn: A06066-480. Unit appears new, possibly ran tests, remains in 'like-new' condition. | $37,800.00 | $25,000.00 | $17,000.00 |
| 1 | 10 | Cryovac Shrink Tunnel, model 3472G-1317, serial# 060 116155101.  Tunnel includes pneumatic blow-off discharge section.  Unit appears new, possibly ran tests, remains in 'like-new' condition. | $25,000.00 | $16,000.00 | $11,300.00 |
| 1 | 11 | Ossid Automatic Indexer (mounted to overwrapper) no separate ID plate, installed 2006. | $20,900.00 | $14,000.00 | $9,400.00 |
| 1 | 12 | Ossid Overwrap System model 500E, serial# EF 050431.  Unit appears new, possibly ran tests, remains in 'like-new' condition. Installed 2006. | $187,308.00 | $122,000.00 | $84,300.00 |
| 1 | 13 | Ossid End Seal Shrink, model ES5 550, sn: A06065-480. Unit appears new, possibly ran tests, remains in 'like-new' condition. | $37,800.00 | $25,000.00 | $17,000.00 |

Page 1 of 5

Private Confidential

6/8/2006

## INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

## SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
| --- | --- | --- | --- | --- | --- |
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 14 | Cryovac Shrink Tunnel, model 347ZG-1317, serial# 051 116032201. Tunnel includes pneumatic blow-off discharge section. Unit appears new, possibly ran tests, remains in "like-new" condition. Installed 2006. | $25,000.00 | $16,000.00 | $11,300.00 |
| | | **Frigoscandia Spiral Freezer** | | | |
| | | A reconditioned Frigoscandia spiral freezer with reconditioning and installation work done by MTL Installation Services, Proposal #051014C, December 8, 2005. Freezer has been completely installed and not used in production. | | | |
| 1 | 15, 16, 17, 18 & 19 | Frigoscandia spiral freezer, model GC-76, project# 10185, Date 6-7-95. Unit has 28' wide self-stacking product belt, 40 tiers, 3" product clearance, 3.25" per tier. Unit has North/South belt orientation, infeed low right, discharge high right, counter-clockwise rotation. Belt cross rods are 1.25" apart, mesh is 1/2" apart. Cabinet is made of 4" thick insulated panels with stainless steel skin inside and out. Cabinet is 16' wide x 28.5' long x 15.5' high. Freezer is installed on a 8" deep insulated floor that could be moved with freezer. Freezer has been installed with most wiring and plumbing completed but freezer has not been run or tested. Evaporator coil capacity is not known. Freezer appears to be in excellent condition. | $430,000.00 | $280,000.00 | $190,000.00 |
| | | D & F Equipment Sales, Inc. Invoice #53128. Invoice date: December 19, 2006. The majority of this equipment in installed and was in operation during inspection. Some items are not installed and noted on individual item. | | | |
| 1 | 28 | SERIAL# 36019-01A, 01B; DOUBLE CONE LINE, DFDC1015 | $63,820.00 | $35,000.00 | $26,000.00 |
| 2 | 32 | SERIAL# 36019-02A, 02B TENDER/FILLET INCLINE CONVEYORS, DFM500 | $10,680.00 | $5,000.00 | $2,000.00 |
| 1 | 35 & 36 | SERIAL# 36019-03A; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $3,100.00 | $1,000.00 | $0.00 |
| 1 | 35 & 36 | SERIAL# 36019-03B; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $3,100.00 | $1,000.00 | $400.00 |
| 1 | 29 | SERIAL# 36019-X1; TOTE DUMPER, DFTD276 | $4,200.00 | $2,000.00 | $1,000.00 |
| 1 | 29 | SERIAL# 36019-05; DE-ICE BIN, DFDTD276 | $700.00 | $300.00 | $100.00 |

Page 2 of 5

Private Confidential

6/8/2006

## INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 34 | SERIAL# 36019-06; LOADING BIN, DFM391, NO IS TAG ON UNIT | $1,100.00 | $600.00 | $200.00 |
| 1 | 45 | SERIAL# 36019-07 FEED CONVEYOR, DFM500 | $9,400.00 | $4,200.00 | $1,500.00 |
| 12 | 53 | SERIAL# 36019-08A; THROUGH DBL ERGO STANDS, DFESFS2100, NO ID TAGS | $4,800.00 | $2,200.00 | $800.00 |
| 1 | 42 | SERIAL# 36019-09 PRODUCT CONVEYOR, DFM500 | $7,000.00 | $3,200.00 | $1,100.00 |
| 1 | 42 | SERIAL# 36019-10-S PRODUCT CONVEYOR, DFM500 | $5,800.00 | $2,600.00 | $900.00 |
| 1 | 43 | SERIAL# 36019-11 PRODUCT CHUTE, DFC378 (NO ID TAG) | $400.00 | $400.00 | $100.00 |
| 1 | 31 | SERIAL# 36019A-01A, 01B; DOUBLE CONE LINE, DFDC1015 | $63,820.00 | $35,000.00 | $26,000.00 |
| 2 | 30 | SERIAL# 36019A-02A, 02B DOUBLE TOTE DUMPERS, DFTD275 | $15,000.00 | $8,000.00 | $2,800.00 |
| 2 | 30 | SERIAL# 36019A-03A, 03B DE-ICE BINS, DFDT1002 | $1,400.00 | $1,000.00 | $400.00 |
| 1 | 64 & 65 | SERIAL# 36019A-04A-1, D4A-2; RECIRCULATION CONVEYORS, DFM500 | $10,070.00 | $4,500.00 | $1,600.00 |
| 1 | 64 & 65 | SERIAL# 36019A-04B-1, D4B-2; RECIRCULATION CONVEYORS, DFM500 | $10,070.00 | $4,500.00 | $1,600.00 |
| 3 | 61 | SERIAL# 36019A-05A, 05B, 05C; WING TIP INCLINE CONVEYORS, DFM500 | $20,520.00 | $9,200.00 | $3,200.00 |
| 4 | 62 | SERIAL# 36019A-06A, 06B, 06C, 06D WING INCLINE CONVEYORS, DFM500, THESE UNITS ARE NOT INSTALLED, PRESENTLY OUTSIDE | $29,600.00 | $13,300.00 | $4,700.00 |
| 1 | 63 | SERIAL# 36019A-07; WING INCLINE CONVEYOR, DFM500 | $11,100.00 | $5,000.00 | $1,800.00 |
| 1 | 59 | SERIAL# 36019A-08; WING COMMON CONVEYOR, DFM500 | $17,300.00 | $7,800.00 | $2,700.00 |
| 1 | 60 | SERIAL# 36019A-09; WING COMMON CONVEYOR, DFM500 | $14,540.00 | $6,500.00 | $2,300.00 |
| 1 | 52 | SERIAL# 36019-10; SKIN INCLINE CONVEYOR, DFM500 | $9,460.00 | $4,300.00 | $1,500.00 |
| 0 | | SERIAL# 36019A-11A, 11B, 11C, 11D; FLAT TOP TABLES, DFM1382; NEVER RECEIVED | $0.00 | $0.00 | $0.00 |
| 2 | 33 | SERIAL# 36019A-12A, 12B; TENDER/BREAST INCLINE CONVEYOR, DFM500 | $21,360.00 | $9,600.00 | $3,400.00 |
| 1 | 67 | SERIAL# 36019A-13; CARCASS COMMON CONVEYOR, DFM500 | $12,200.00 | $5,500.00 | $1,900.00 |
| 1 | 68 | SERIAL# 36019A-14 TENDER/BREAST INCLINE CONVEYOR, DFM500, (THIS UNIT WAS NOT INSTALLED OR IN USE DURING INSPECTION) | $26,895.00 | $12,100.00 | $4,200.00 |
| 8 | 69 | TENDER/BREAST CONVEYORS, SERIAL# 36019A-15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H | $132,480.00 | $59,600.00 | $20,900.00 |
| 0 | | SERIAL# 36019A-16; FEED CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 46 | SERIAL# 36019A-17; FEED CONVEYOR, DFM500 | $9,400.00 | $4,200.00 | $1,500.00 |

Page 3 of 5

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

## SYLVEST FARMS

4530 MOBILE ROAD, MONTGOMERY, AL 36108

ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 71 | SERIAL# 36019A-CHUTE, DFC378 (NO ID TAG) | $430.00 | $200.00 | $100.00 |
| 4 | 72 | SERIAL# 36019A-19A, 19B, 19C, 19D; EMPLOYEE STANDS, DFMPM179 | $24,600.00 | $11,100.00 | $3,900.00 |
| 1 | 70 | SERIAL# 36019A-20; FLAT TOP TABLE, DMFT382 (NO ID TAG) | $1,800.00 | $800.00 | $300.00 |
| 4 | 73 | SERIAL# 36019A-21A, 21B, 21C, 21D; EMPLOYEE CROSSOVER STANDS, DFMPM179 | $7,400.00 | $3,300.00 | $1,200.00 |
| 0 | | SERIAL# 36019A-22, FINISHED PRODUCT INCLINE CONVEYOR, DFM500 NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 0 | | SERIAL# 36019A-23, FINISHED PRODUCT INCLINE CONVEYOR, DFM500 NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 38 | SERIAL# 36019A-24; S-36019-XS; TRIM INCLINE CONVEYOR, DFM500 | $10,580.00 | $4,800.00 | $1,700.00 |
| 12 | 58 | SERIAL# 36019A-25A THROUGH 25L; ERGO STANDS, DFESF2100, (NO ID TAGS) | $4,800.00 | $2,200.00 | $800.00 |
| 1 | 55 | SERIAL# 36019A-26; FULL BOX CONVEYOR, DFKPC900 | $14,100.00 | $6,300.00 | $2,200.00 |
| 0 | | SERIAL# 36019A-27; FULL BOX INCLINE CONVEYOR, DFKPC900; NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 56 | SERIAL# 36019A-28; FULL BOX CONVEYOR, DFKPC900 | $8,930.00 | $4,000.00 | $1,400.00 |
| 1 | 49 | SERIAL# 36019A-29; FULL BOX CONVEYOR, DFKPC900 | $5,220.00 | $2,300.00 | $800.00 |
| 1 | | SERIAL# 36019A-30; FULL BOX CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 2 | 50 | SERIAL# 36019A-31A, 31B; FULL BOX CONVEYORS, DFKPC900 | $13,420.00 | $6,000.00 | $2,100.00 |
| 2 | 54 | SERIAL# 36019A-32A, 32B; FULL BOX CONVEYORS, DFKPC900 | $15,640.00 | $7,000.00 | $2,500.00 |
| 0 | | SERIAL# 36019A-33; PORTIONING CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 8 | 44 | SERIAL# 36019A-34A, 34B, 34C, 34D, 34E, 34F, 34G, 34H; TOTE STANDS, DFM5380; PERSONNEL WORK STANDS, (NO ID TAGS) | $1,800.00 | $800.00 | $300.00 |
| 7 | 48 | SERIAL# 36019A-35A, 35B, 35C, 35D, 35E, 35F, 35G; GRAVITY CONVEYORS, DFGR50 (NO ID TAGS) | $3,780.00 | $1,700.00 | $600.00 |
| 1 | | SERIAL# 36019A-36 FULL BOX CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 51 | SERIAL# 36019A-37; FULL BOX CONVEYOR, DFM500 | $8,180.00 | $3,700.00 | $1,300.00 |
| 0 | | SERIAL# 36019A-38; FULL BOX SPUR CONVEYOR, DFFB5301, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 57 | SERIAL# 36019A-39; FULL BOX SPUR CONVEYOR, DFFB5301 | $7,600.00 | $3,400.00 | $1,200.00 |
| 0 | | SERIAL# 36019A-40; FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 0 | | SERIAL# 36019A-41, FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

## 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 0 | | SERIAL# 36019A-42, FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 39 | SERIAL# 36019A-43, FULL BOX CONVEYOR, DFKPC900 | $14,295.00 | $6,400.00 | $2,200.00 |
| 1 | 40 | SERIAL# 36019A-44, FULL BOX CONVEYOR, DFKPC900 | $17,440.00 | $7,800.00 | $2,700.00 |
| 2 | 74 | SERIAL# 36019A-45A, 45B, 90° GRAVITY CONVEYORS, DFGR50-90 (NO ID TAGS) | $2,200.00 | $1,000.00 | $400.00 |
| | | *ITEMS LISTED BELOW ARE BEING CONSIDERED AS REPLACEMENT OR SUBSTITUTION ITEMS FROM D & K FOR ITEMS LISTED 'NOT RECEIVED' ABOVE* | | | |
| 1 | 77 | SERIAL# 36019A-X44 TENDER/BREAST CONVEYOR | $17,275.00 | $7,800.00 | $2,700.00 |
| 2 | 76 | SERIAL# 36019A-X24, EMPLOYEE STANDS | $3,000.00 | $1,400.00 | $500.00 |
| 1 | 37 | SERIAL# 36019A-X6-5; NUGGET INCLINE OVER DSI CONVEYOR, DFM500 | $5,900.00 | $2,700.00 | $900.00 |
| 1 | 41 | SERIAL# 36019A-X4-5; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $9,700.00 | $4,400.00 | $1,500.00 |
| 4 | 75 | SERIAL# 36019A-X8; WING SAWS, SIGHTED FOUR UNITS | $5,800.00 | $2,600.00 | $900.00 |
| 1 | 78 | SERIAL# 36019A-X43A, X43B DOUBLE CONE LINE FRAME - NO CONES PURCHASED OR INSTALLED (INTENDED TO USE SOME CONES FROM ANOTHER PLANT) | $34,860.00 | $15,700.00 | $5,500.00 |
| 1 | 79 | SERIAL# 36019A-7A; SING INCLINE CONVEYOR | $10,000.00 | $4,500.00 | $1,600.00 |
| 1 | 82 | SERIAL# 36019A-X21; EMPTY BOX CONVEYOR W/TWO 90 DEGREE TURNS | $12,232.50 | $5,500.00 | $1,900.00 |
| 1 | 81 | SERIAL# 36019A-X22, EMPTY BOX CONVEYOR | $14,425.00 | $6,500.00 | $2,300.00 |
| 1 | 83 | SERIAL# 36019A-X23 GRAVITY CONVEYOR | $4,500.00 | $2,000.00 | $700.00 |
| 1 | 80 | SERIAL# 36019A-X20 EMPTY BOX CONVEYOR | $6,000.00 | $2,700.00 | $900.00 |
| 1 | 84 | SERIAL# 36019A-X42 EMPLOYEE STAND | $5,450.00 | $2,500.00 | $900.00 |
| | | **TOTAL OF ALL VALUES** | **$1,982,330.50** | **$1,119,500.00** | **$661,900.00** |

Page 5 of 5

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

# APPRAISAL PHOTOGRAPHS

In this appraisal report the appraiser has included a series of photographs for illustration of the equipment inspected. The appraiser has to the best of his ability properly identified the assets with an item number that corresponds to the Detailed Equipment inventory included in this report.

While descriptions are believed to be correct, the appraiser make no warranties or guarantees expressed or implied, as to the genuineness, authenticity of, any photographed item identification and will not be held responsible for discrepancies or inaccuracies. No warranties are made as to the merchantability of any items or their fitness for any purpose.

















































Item


Item #44


Item #45





Item #47



Item #48





Item #50



Item #51



Item #52



































Item #75



Item #77



Item #78



Item #79













**EQUIPMENT**
**EXCHANGE**
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX   (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

# APPRAISER'S QUALIFICATIONS

Robert Breakstone,
President



### Experience:
Mr. Robert Breakstone, CSA, CEA our Senior Appraiser, has been President of Equipment Exchange Company of America, Inc. since 1989. Our firm has been in the "used equipment" business since 1979. Having "grown up" in the process business, Robert has a wealth of experience in many facets of food production. He has toured many production plants in United States, Provinces of Canada as well as Puerto Rico and Central America.

Equipment Exchange Company specializes in buying, selling and evaluating meat process, baking, beverage, frozen foods, vegetable, dry goods and related food products and equipment. We also have extensive database of sales history for our in-house sales comparisons.

### Education:
Mr. Robert Breakstone received his Bachelors Degree from Mercyhurst College, Erie, PA in 1982. In 2001, Mr. Breakstone received his Certificate of Achievement for completing the American Society of Appraiser's (ASA) course in *Uniform Standards of Professional Appraisal Practice* (USPAP).

### Memberships:
Professional Memberships:
1) Equipment Appraisers Association on North America (EAANA) – Status: Certified Senior Appraiser (CSA).
2) Association of Machinery and Equipment Appraisers (AMEA) – Status: Certified Equipment Appraiser (CEA).
3) American Society of Appraisers (ASA) – Status: Candidate Member

Association Memberships:
Equipment Exchange Company of America, Inc. is a current member of Machinery Dealers National Association (MDNA) of the Equipment Leasing Association (ELA) American Meat Institute (AMI) as well as North American Meat Processors (NAAMP) and American Association of Meat Processors (AAMP).

### Certification:
In 2002, Mr. Breakstone completed and has been accepted by the Association of Machinery and Equipment Appraisers (AMEA) as a Certified Equipment Appraiser (CEA). In 2005, Mr. Breakstone completed the requirements for Certified Senior Appraiser (CSA) status in Equipment Appraisers Association of North America. These certifications require acceptance to conform in all respects to the designated Codes of Ethics, the appropriate Standards and Procedures of Professional Appraisal Ethics and Practice, certification in *Uniform Standards of Professional Appraisal Practice* (USPAP) as well written exams, submittal of an appraisals for review and acceptance, as well as a minimum of five years of appraisal experience. Both designation dictate on-going requirements to maintain accreditation.



# Certified
# Machinery and Equipment
# Appraiser

### Recognition Is Hereby Granted To

# *Robert  Breakstone*

by the
### Association of Machinery and Equipment Appraisers
for the period

### October 1, 2004 — September 30, 2005

_Nate Arnold_
President

License Number: _____



# The American Society of Appraisers

*555 Hemdon Parkway, Suite 125, Hemdon, VA 20170*

*presents this*

## *Certificate of Achievement*

*to*

### Robert J. Breakstone

who has attended the class and successfully completed the exam for
the American Society of Appraisers' 15-hour course

## SE100: National Uniform Standards of Professional Appraisal Practice (USPAP)



Richard T. Roche, ASA International Education Chair

July 2001
Date

SSN: _____



EQUIPMENT APPRAISERS ASSOCIATION OF NORTH AMERICA

INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA

*Membership Certificate*

THIS IS TO CERTIFY THAT

*Robert Jay Breakstone*

is a member of the above corporation incorporated under the laws of this state and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Corporation's By-Laws, Rules and Regulations.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be executed by its duly authorized officers and its corporate seal to be hereunto affixed.

Dated December 29, 2003

SECRETARY

TREASURER

Certificate Number

171



# The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

*presents this*

## *Certificate of Achievement*

*to*

### Robert J. Breakstone

who has taken the class and successfully completed the exam for
the American Society of Appraisers 30-hour course

**ME201OL: Introduction to Machinery and Equipment
Valuation - Available August and October 2002.**





Robert B. Podwalny, ASA International Education Chair

October 2002
Date

Exhibit 20

INSPECTION AND VALUATION OF

# KOCH FOODS
# FORMER SYLVEST FARMS

4530 MOBILE HIGHWAY

MONTGOMERY, AL 36108
PREFORMED FOR

# GENERAL ELECTRIC
# CAPITAL CORPORTATION
## COMMERCIAL
## EQUIPMENT FINANCING

BY

# EQUIPMENT EXCHANGE COMPANY
## SEPTEMBER 2007



EQUIPMENT EXCHANGE
CO. OF AMERICA, INC.



ASSOCIATION OF
MACHINERY AND
EQUIPMENT APPRAISERS

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

## APPRAISAL REPORT
### PRIVATE & CONFIDENTIAL

Subject - Certain Assets of:

**KOCH FOODS/FORMER SYLVEST FARMS**
**4530 MOBILE HIGHWAY**
**MONTGOMERY, AL 36108**

For the Intended Use of:

**GENERAL ELECTRIC CAPITAL**
**COMMERCIAL EQUIPMENT FINANCING**
**44 OLD RIDGEBURY ROAD**
**DANBURY, CT 06810-5105**

### Purpose of Appraisal

The purpose of this appraisal is to provide an independent, professional opinion of the Day One, Year One Fair Market Value-In Place, Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Koch Foods/ Former Sylvest Farms, 4530 Mobile Highway, Montgomery, AL. This report is intended solely for business decisions of General Electric Capital Corporation and assignees. Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Koch Foods/former Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is September 24, 2007.

### Intended Use of Appraisal

This report is intended solely for business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts. The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value. It is up to the user to determine if the defined concept is correct for its purpose. Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards. The appraisal is preformed at the request of a client based upon a requested concept of value. It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value. Users of this report must do so with the knowledge of the defined concepts of value being utilized. If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 • info@eeclink.com

Page 2 of 7
Koch Foods

<u>Scope of Appraisal</u>

To appraise certain personal property of the subject company located at Koch Foods/former Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-In Place, Fair Market Value-Removed and Orderly Liquidation Value.

<u>Highest and Best Use</u>

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Fresh and frozen poultry products. Equipment includes packaging, freezing, and cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment. This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

<u>Value Definitions</u>

**FAIR MARKET VALUE IN PLACE: (FMV -IN PLACE):** Is defined as the most probable price estimated in terms of money that the items appraised could realize if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which they are adapted and for which they are capable of being used, including the benefit of their present location including all costs to design, acquire, install and make operational. Frequently, it is referred to as the price at which a willing seller would sell and a willing buyer, neither being under abnormal pressure as of a specific date. In this report we are valuing the Fair Market Value In Place as of the actual installation and operational date in Spring 2006. This is a Day One, Year One value or a total cost of project value specific to the items valued and as of a specific date.

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises. The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell. This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards. Since a physical inspection was preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below. Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used. This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove. Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
Koch Foods

Both stated value considerations represent the normal considerations for the assets being appraised. The stated values are unaffected by special or creative financing or sale considerations granted by anyone associated with a possible sale or any other special or creative terms, service fees, costs or credits.

All values stated are in United States Funds as of effective date of this report. Any users of this report must assume that the listed "OLV" is based on the fact that a qualified and experienced broker of the goods is to be used as the marketing agent. It also does not take into account any "costs to sell" that would be involved in liquidating the assets.

### Approaches to Value

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted approaches to value must be considered.

1) **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being appraised for the loss in value caused by physical deterioration, functional obsolescence, or economic obsolescence. The cost approach is based on the principle of substitution: a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility. In its simplest form, the cost approach is the current cost (as if new) less all depreciation.

2) **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts the prices that have been paid for assets comparable to the asset being appraised, equating the comparables to the subject. This involves analyzing recent sales of properties that are similar to the subject property. If the comparables are not identical, the prices are adjusted to equate the various characteristics of the properties. Equipment Exchange Company of America, Inc. uses an extensive in-house database of sold and brokered equipment, auction-selling prices, and data gathered via the Internet and other used equipment dealers to establish comparables. As in the cost approach, the basis is a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.

3) **Income Approach:** The appraiser determines the present value of the future economic benefits of owning the property. This approach is seldom used in valuing personal property and was considered but deemed not applicable in performing this appraisal.

### Scope of Work Rule

The Scope of Work addresses the Type and Extent of Research and Analysis utilized to develop an Opinion of Value. The Data Collected in the Course of Research and Analysis may include, but is not limited to: market Data from used equipment dealers that sell comparable equipment; conversations with new equipment manufacturer's; consultation with auctioneers, liquidators and equipment brokers of comparable equipment; In-House Data Bases; Industry Data Bases; Trade Journals and Industry Periodicals.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
Koch Foods

In this appraisal and review of assets from Koch Foods/former Sylvest Farms, the Sales Comparison Approach was employed to arrive at value conclusions. Equipment Exchange Company researched the equipment formerly installed or used at the location. We also paid particular attention to the marketability of these assets in their current geographic location and the effect that location would have in developing their probable value.

## Depreciation

Defined as the actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself and due to changes in design, or process resulting in inadequacy, over capacity, excess construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions. These can include such things as the economics of the industry, availability of financing, loss of material and labor sources, passage of new legislation, and changes in ordinances.

### Summary of Values Conclusions

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions and limiting conditions, which the Fair Market Value-In Place, Fair Market Value-Remove and Orderly Liquidation Value of the machinery and equipment located at Koch Foods/former Sylvest Farms, Montgomery, AL.

<table>
<tr><td></td><td>FAIR MARKET VALUE-IN PLACE</td></tr>
<tr><td>DAY ONE-YEAR ONE OF EQUIPMENT VALUED</td><td>$1,398,068.00</td></tr>
<tr><td></td><td>FAIR MARKET VALUE-REMOVE</td></tr>
<tr><td>TOTAL CURRENT OF EQUIPMENT VALUED</td><td>$459,380.00</td></tr>
<tr><td></td><td>ORDERLY LIQUIDATION VALUE</td></tr>
<tr><td>TOTAL CURRENT OF EQUIPMENT VALUED</td><td>$260,890.00</td></tr>
</table>

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 5 of 7
Koch Foods

## GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS

This appraisal sets forth our findings and conclusions which are based upon an investigation of conditions affecting value and which are subject to the Assumptions, Statements of Limiting Conditions, and Definitions contained in the following report. *Without reading the Assumptions and Statement of Limiting Conditions and Definitions, this report could be erroneously interpreted.*

The legal description given to the appraisers and used in this report is assumed to be correct. No responsibility is assumed for matters of a legal nature affecting title to the property nor is an opinion of title rendered. The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection with such matters. Sketches in this report are included only to assist the reader in visualizing the property.

In conducting this inspection or in gathering information for this report we have assumed that no unreported or hidden conditions exist with the equipment that would render it more or less valuable then reported.

If for some reason we were unable to gather the model number, serial number, age or other pertinent information we assumed that the equipment was similar to other equipment we have appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable. A reasonable effort has been made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report. The property is appraised as though under responsible ownership and management. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported. There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all-applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined, and considered in the appraisal report.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
Koch Foods

It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the appraiser. No responsibility is assumed for latent defect of ANY nature whatsoever which may affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference or appearance required by subpoena, with reference to the property in question, unless timely arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal, and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous material, which may or may not be present on the property. I have no knowledge of the existence of such materials on or in the property and are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation or other potential hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate in the appraisal if any new facts pertinent to the process are discovered which were unknown when the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for any purpose or any function other than the intended use, as stated in the body of the report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report. All conclusions and opinions concerning the analysis as set forth in the report were prepared by the appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s). The appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the report to anyone other then the client or his designee as specified in writing.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
Koch Foods

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser

*EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC*
*10042 KEYSTONE DRIVE*
*LAKE CITY, PA 16423*

Does

## -Certify-

That on September 24, 2007 that certain property of:

## KOCH FOODS
## FORMER SYLVEST FARMS
## 4530 MOBILE HIGHWAY
## MONTGOMERY, AL 36108

HAS WELL AND REASONABLE WORTH:

VALUE IS AS FOLLOWS:

|  | FAIR MARKET VALUE-IN PLACE |
|---|---|
| DAY ONE-YEAR ONE OF EQUIPMENT VALUED | $1,398,068.00 |

|  | FAIR MARKET VALUE-REMOVE |
|---|---|
| TOTAL CURRENT OF EQUIPMENT VALUED | $459,380.00 |

|  | ORDERLY LIQUIDATION VALUE |
|---|---|
| TOTAL CURRENT OF EQUIPMENT VALUED | $260,890.00 |

EFFECTIVE DATE OF APPRAISAL: SEPTEMBER 24, 2007

BY:    ROBERT BREAKSTONE, CEA, CSA



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX   (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

## Appraiser's Certification:

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have NOT made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: Robert Breakstone, CEA, CSA



EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

**Appraiser's Certification:**

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____  9-24-2007

Daniel R. Nicoson, Report Date:

Private Confidential

9/27/2007

| | | INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT | | | | | |
|---|---|---|---|---|---|---|---|
| | | **KOCH FOOD - FORMER SYLVEST FARMS** | | | | | |
| | | 4530 MOBILE ROAD, MONTGOMERY, AL 36108 | | | | | |
| | | INSPECTION DATE: SEPTEMBER 24, 2007 | | | | | |
| | | INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. | | | | | |
| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| | | *Frigoscandia Spiral Freezer* | | | | | |
| | | A reconditioned Frigoscandia spiral freezer with reconditioning and installation work done by MTL Installation Services, Proposal #051014C, December 8, 2005. Freezer has been completely installed and not used in production. | | | | | |
| 1 | 4773 - 4780 | Frigoscandia spiral freezer, model GC-76, project# 10185, Date 6-7-95.  Unit has 28" wide self-stacking product belt, 40 tiers, 3" product clearance, 3.25" per tier.  Unit has North/South belt orientation, infeed low right, discharge high right, counter-clockwise rotation.  Belt cross rods are 1.25" apart, mesh is 1/2" apart.  Cabinet is made of 4" thick insulated panels with stainless steel skin inside and out.  Cabinet is 16' wide x 28.5' long x 15.5' high.  Freezer is installed on a 8" deep insulated floor that could be moved with freezer. Freezer has been installed with most wiring and plumbing completed but freezer has not been run or tested.  Evaporator coil capacity is not known.  Freezer appears to be in excellent condition but noting that electrical control panel is incomplete as it was in 2006. | Freezer was still in place- no change from 2006 inspection | $430,000.00 | $473,000 | $240,000 | $150,000 |
| | | D & F Equipment Sales, Inc. Invoice #53128, Invoice date: December 19, 2006. Inspection of this equipment on September 24, 2007 determined that all equipment has been disassembled and removed from operation, presently stored outside with belting removed and stored outside. | | | | | |
| | 4784 | Pallets of plastic food grade belting removed from D & F Equipment Sales Conveyor System | Multiple pallets of plastic belting from the various conveyors. No way of knowing if all the belting is present or actual condition of belting.  Belting has been used and has been taken off conveyors when system disassembled.  It has been stored outside without protection for undetermined time. | Included in costs and values of conveyors below | Included in costs and values of conveyors below | $0 | $0 |
| 1 | 4858 - 4862 | SERIAL# 36019-01A; DOUBLE CONE LINE, DFDC1015, REMOVED FROM OPERATION, BELTS REMOVED | | $63,820.00 | $73,000 | $22,000 | $11,000 |
| 2 | 4800 | SERIAL# 36019-02A, 02B TENDER/FILLET INCLINE CONVEYORS, DFM500 | | $10,680.00 | $12,000 | $2,700 | $1,400 |
| 1 | 4814 | SERIAL# 36019-03A; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | | $3,100.00 | $4,000 | $800 | $400 |
| 1 | 4814 | SERIAL# 36019-03B; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | | $3,100.00 | $4,000 | $800 | $400 |
| 1 | 4795 | SERIAL# 36019-X1; TOTE DUMPER, DFTD276 | | $4,200.00 | $5,000 | $1,000 | $500 |
| 1 | 4863 | SERIAL# 36019-05; DE-ICE BIN, DFDT0276 | | $700.00 | $1,000 | $180 | $90 |
| 1 | | SERIAL# 36019-06; LOADING BIN, DFM391, NO IS TAG ON UNIT | Not Found | $1,100.00 | $1,000 | | |
| 1 | 4869 | SERIAL# 36019-07 FEED CONVEYOR, DFM500 | 2-sections of horizontal conveyor | $9,400.00 | $11,000 | $2,400 | $1,200 |

Private Confidential

9/27/2007

INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT

# KOCH FOOD - FORMER SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### INSPECTION DATE: SEPTEMBER 24, 2007

INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|---|
| 12 | 4851, 4852 | SERIAL# 36019-08A; THROUGH 08L ERGO STANDS, DFESFS2100, NO ID TAGS | Quantity and condition of grating for stands not confirmed | $4,800.00 | $5,000 | $1,200 | $600 |
| 12 | 4851, 4852 | SERIAL# 36019A-25A THROUGH 25L; ERGO STANDS, DFESF2100, (NO ID TAGS) | Quantity and condition of grating for stands not confirmed | $4,800.00 | $5,000 | $1,200 | $600 |
| 1 | 4829 | SERIAL# 36019-09 PRODUCT CONVEYOR, DFM500 | Base frame for 36019-10-S | $7,000.00 | $8,000 | $1,800 | $900 |
| 1 | 4829 | SERIAL# 36019-10-S PRODUCT CONVEYOR, DFM500 | Mounted on 36019-09 | $5,800.00 | $7,000 | $1,500 | $800 |
| 1 | 4796 | SERIAL# 36019-11 PRODUCT CHUTE, DFC37B (NO ID TAG) | | $400.00 | $440 | $100 | $50 |
| 1 | 4858 - 4862 | SERIAL# 36019A-01B; DOUBLE CONE LINE, DFDC1015 | | $63,820.00 | $73,000 | $22,300 | $11,200 |
| 2 | 4793, 4794 | SERIAL# 36019A-02A, 02B DOUBLE TOTE DUMPERS, DFTD275 | | $15,000.00 | $17,000 | $5,300 | $2,700 |
| 2 | 4864, 4866 | SERIAL# 36019A-03A, 03B DE-ICE BINS, DFDT1002 | | $1,400.00 | $2,000 | $400 | $200 |
| 1 | 4788 | SERIAL# 36019A-04A-1, 04A-2; recirculation CONVEYORS, DFM500 | | $10,070.00 | $12,000 | $2,500 | $1,300 |
| 1 | 4789 | SERIAL# 36019A-04B-1, 04B-2; RECIRCULATION CONVEYORS, DFM500 | | $10,070.00 | $12,000 | $2,500 | $1,300 |
| 3 | 4816 | SERIAL# 36019A-05A, 05B, 05C; WING TIP INCLINE CONVEYORS, DFM500 | | $20,520.00 | $24,000 | $5,100 | $2,600 |
| 4 | 4799 | SERIAL# 36019A-06A, 06B, 06C, 06D WING INCLINE CONVEYORS, DFM500 | | $29,600.00 | $34,000 | $7,400 | $3,700 |
| 1 | 4800 | SERIAL# 36019A-07 and 36019A-07A; WING INCLINE CONVEYORS, DFM500 | | $11,100.00 | $13,000 | $2,800 | $1,400 |
| 1 | 4867 | SERIAL# 36019A-08; WING COMMON CONVEYOR, DFM500 | 3 sections | $17,300.00 | $20,000 | $4,300 | $2,200 |
| 1 | 4826, 4812 | SERIAL# 36019A-09; WING COMMON CONVEYOR, DFM500 | 3 sections | $14,540.00 | $17,000 | $3,600 | $1,800 |
| 1 | 4853 | SERIAL# 36019-10; SKIN INCLINE CONVEYOR, DFM500 | 2 sections | $9,460.00 | $11,000 | $2,400 | $1,200 |
| 2 | 4823 | SERIAL# 36019A-12A, 12B; TENDER/BREAST INCLINE CONVEYOR, DFM500 | | $21,360.00 | $25,000 | $5,300 | $2,700 |
| 1 | 4809 - 4811 | SERIAL# 36019A-13; CARCASS COMMON CONVEYOR, DFM500 | | $12,200.00 | $14,000 | $3,100 | $1,600 |
| 1 | 4813 | SERIAL# 36019A-14 TENDER/BREAST INCLINE CONVEYOR, DFM500 | Photo shows 36019A-14 which is one incline and two S-curves, also shows 36019A-X44 incline | $26,895.00 | $31,000 | $6,700 | $3,400 |
| 8 | 4820 - 4823 & 4835 | TENDER/BREAST CONVEYORS, SERIAL# 36019A-15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H | This line item represents 8 conveyor lines when installed. (22) segments on site. | $132,480.00 | $152,000 | $33,100 | $16,600 |
| 1 | 4801 | SERIAL# 36019A-17; FEED CONVEYOR, DFM500 | 2 sections | $9,400.00 | $11,000 | $2,400 | $1,200 |
| 1 | | SERIAL# 36019A-CHUTE, DFC37B (NO ID TAG) | Not Found | $430.00 | $470 | | |
| 4 | 4831 | SERIAL# 36019A-19A, 19B, 19C, 19D; EMPLOYEE STANDS, DFMPM179 | | $24,600.00 | $27,000 | $6,200 | $3,100 |
| 1 | 4854 | SERIAL# 36019A-20; FLAT TOP TABLE, DMFT382 (NO ID TAG) | | $1,800.00 | $2,000 | $500 | $300 |

Private Confidential

9/27/2007

| INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT |
|---|

# KOCH FOOD - FORMER SYLVEST FARMS

**4530 MOBILE ROAD, MONTGOMERY, AL 36108**

**INSPECTION DATE: SEPTEMBER 24, 2007**

**INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.**

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|---|
| 4 | 4818, 4819 | SERIAL# 36019A-21A, 21B, 21C, 21D; EMPLOYEE CROSSOVER STANDS, DFMPM179 | | $7,400.00 | $8,000 | $1,900 | $1,000 |
| 1 | 4804, 4805 | SERIAL# 36019A-24; S-36019-X5; TRIM INCLINE CONVEYOR, DFM500 | | $10,580.00 | $12,000 | $2,600 | $1,300 |
| | 4844, 4838, 4843 | | FULL BOX CONVEYORS - there were13 sections of the Full Box conveyor on hand. Many sections do not have a manufacturer ID plate installed | | | | |
| 1 | 4825 | SERIAL# 36019A-26; FULL BOX CONVEYOR, DFKPC900 | 2 sections | $14,100.00 | $16,000 | $2,800 | $1,400 |
| 1 | | SERIAL# 36019A-28; FULL BOX CONVEYOR, DFKPC900 | No ID plate found | $8,930.00 | $10,000 | $1,800 | $900 |
| 1 | 4830 | SERIAL# 36019A-29; FULL BOX CONVEYOR, DFKPC900 | 2-sections | $5,220.00 | $6,000 | $1,000 | $500 |
| 2 | 4839 | SERIAL# 36019A-31A, 31B; FULL BOX CONVEYORS, DFKPC900 | | $13,420.00 | $15,000 | $2,700 | $1,400 |
| 2 | 4837 | SERIAL# 36019A-32A, 32B; FULL BOX CONVEYORS, DFKPC900 | | $15,640.00 | $18,000 | $3,100 | $1,600 |
| 1 | | SERIAL# 36019A-37; FULL BOX CONVEYOR, DFM500 | No ID plate found | $8,180.00 | $9,000 | $1,600 | $800 |
| 1 | 4841 | SERIAL# 36019A-39; FULL BOX SPUR CONVEYOR, DFFBS301 | | $7,600.00 | $9,000 | $1,500 | $800 |
| 1 | 4840 | SERIAL# 36019A-43; FULL BOX CONVEYOR, DFKPC900 | | $14,295.00 | $16,000 | $2,900 | $1,500 |
| 1 | 4827 | SERIAL# 36019A-44, FULL BOX CONVEYOR, DFKPC900 | | $17,440.00 | $20,000 | $3,500 | $1,800 |
| 8 | 4848 - 4850 | SERIAL# 36019A-34A, 34B, 34C, 34D, 34E, 34F, 34G, 34H; TOTE STANDS, DFMS380; PERSONNEL WORK STANDS, (NO ID TAGS) | complete with the yellow plastic grate surfaces | $1,800.00 | $2,000 | $500 | $300 |
| 7 | 4855 | SERIAL# 36019A-35A, 35B, 35C, 35D, 35E, 35F, 35G; GRAVITY CONVEYORS, DFGR50 (NO ID TAGS) | Only (5) conveyors were found. | $3,780.00 | $4,000 | $1,100 | $600 |
| 2 | | SERIAL# 36019A-45A, 45B, 90° GRAVITY CONVEYORS, DFGR50-90 (NO ID TAGS) | Not Found | $2,200.00 | $3,000 | | |
| 1 | 4813 | SERIAL# 36019A-X44 TENDER/BREAST CONVEYOR | | $17,275.00 | $20,000 | $5,200 | $2,600 |
| 2 | 4842, 4847 | SERIAL# 36019A-X24, EMPLOYEE STANDS | | $3,000.00 | $3,000 | $900 | $500 |
| 1 | 4828 | SERIAL# 36019-X6-S; NUGGET INCLINE OVER DSI CONVEYOR, DFM500 | 2-sections | $5,900.00 | $7,000 | $1,800 | $900 |
| 1 | 4806, 4807 | SERIAL# 36019A-X4-S; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | 2-sections | $9,700.00 | $11,000 | $2,900 | $1,500 |
| 4 | 4845 | SERIAL# 36019A-X8; WING SAWS | Two units are missing their motors. | $5,800.00 | $7,000 | $1,200 | $600 |
| 1 | 4856, 4857 | SERIAL# 36019A-X43A, X43B DOUBLE CONE LINE FRAME - NO CONES PURCHASED OR INSTALLED | 3-sections | $34,860.00 | $40,000 | $12,200 | $6,000 |
| 1 | 4868 | SERIAL# 36019A-7A, 7B INCLINE CONVEYOR | | $10,000.00 | $12,000 | $3,000 | $1,500 |
| 1 | 4834, 4836 | SERIAL# 36019A-X21; EMPTY BOX CONVEYOR W/TWO 90 DEGREE TURNS, (5) STRAIGHT SECTIONS | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $12,232.50 | $12,233 | $3,700 | $1,900 |

Private Confidential

9/27/2007

| | | INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT | | | | | |
|---|---|---|---|---|---|---|---|
| | | **KOCH FOOD - FORMER SYLVEST FARMS** | | | | | |
| | | 4530 MOBILE ROAD, MONTGOMERY, AL 36108 | | | | | |
| | | INSPECTION DATE: SEPTEMBER 24, 2007 | | | | | |
| | | INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. | | | | | |
| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 4832 | SERIAL# 36019A-X22, EMPTY BOX CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $14,425.00 | $14,425 | $4,300 | $2,200 |
| 1 | 4832 | SERIAL# 36019A-X23 GRAVITY CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $4,500.00 | $4,500 | $1,400 | $700 |
| 1 | 4833 | SERIAL# 36019A-X20 EMPTY BOX CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $6,000.00 | $6,000 | $1,800 | $900 |
| 1 | 4846 | SERIAL# 36019A-X42 EMPLOYEE STAND | | $5,450.00 | $6,000 | $1,600 | $800 |
| | | TOTAL OF ALL VALUES | | $1,240,672.50 | $1,398,067.50 | $458,580 | $260,440 |



EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

# APPRAISAL PHOTOGRAPHS

In this appraisal report the appraiser has included a large series of photographs
for illustration of the equipment inspected.  The appraiser has to the best of his
ability properly identified the assets with an item number that corresponds to
the Detailed Equipment inventory included in this report.

While descriptions are believed to be correct, the appraiser make no warranties
or guarantees expressed or implied, as to the genuineness, authenticity of, any
photographed item identification and will not be held responsible for
discrepancies or inaccuracies. No warranties are made as to the merchantability
of any items or their fitness for any purpose.












Photo# 4784


Photo# 4785


Photo# 4786


Photo# 4787







Photo# 4790

Photo# 4791




Photo# 4792



Photo# 4794



Photo# 4795



Photo# 4796



Photo# 4797



Photo# 4798



Photo# 4799



Photo# 4800



Photo# 4801



Photo# 4802



Photo# 4803



Photo# 4804



Photo# 4805



Photo# 4806



Photo# 4807



Photo# 4808



Photo# 4809



Photo# 4810



Photo# 4811



Photo# 4812



Photo# 4813



Photo# 4814



Photo# 4815



Photo# 4816





Photo# 4818



Photo# 4819



Photo# 4820



Photo# 4821



Photo# 4822



Photo# 4823



Photo# 4824



Photo# 4825



Photo# 4826



Photo# 4827



Photo# 4828



Photo# 4829



Photo# 4830



Photo# 4831



Photo# 4832



Photo# 4833



Photo# 4834



Photo# 4835















Photo# 4842



Photo# 4843



Photo# 4844



Photo# 4845



Photo# 4846



Photo# 4847



Photo# 4848



Photo# 4849



Photo# 4850



Photo# 4851



Photo# 4852



Photo# 4853



Photo# 4854



Photo# 4855




























**EQUIPMENT EXCHANGE**
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

# APPRAISER'S QUALIFICATIONS

Robert Breakstone,
President



## Experience:
Mr. Robert Breakstone, CSA, CEA our Senior Appraiser, has been President of Equipment Exchange Company of America, Inc. since 1989. Our firm has been in the "used equipment" business since 1979. Having "grown up" in the process business, Robert has a wealth of experience in many facets of food production. He has toured many production plants in United States, Provinces of Canada as well as Puerto Rico and Central America.

Equipment Exchange Company specializes in buying, selling and evaluating meat process, baking, beverage, frozen foods, vegetable, dry goods and related food products and equipment. We also have extensive database of sales history for our in-house sales comparisons.

## Education:
Mr. Robert Breakstone received his Bachelors Degree from Mercyhurst College, Erie, PA in 1982. In 2001, Mr. Breakstone received his Certificate of Achievement for completing the American Society of Appraiser's (ASA) course in *Uniform Standards of Professional Appraisal Practice* (USPAP) and as per AMEA's regulations Mr. Breakstone successfully completed the 7-hour USPAP Course in October 2006.

## Memberships:
Professional Memberships:
1) Equipment Appraisers Association on North America (EAANA) – Status: Certified Senior Appraiser (CSA).
2) Association of Machinery and Equipment Appraisers (AMEA) – Status: Certified Equipment Appraiser (CEA).
3) American Society of Appraisers (ASA) – Status: Candidate Member

Association Memberships:
Equipment Exchange Company of America, Inc. is a current member of Machinery Dealers National Association (MDNA) of the Equipment Leasing Association (ELA) American Meat Institute (AMI) as well as North American Meat Processors (NAAMP) and American Association of Meat Processors (AAMP).

## Certification:
In 2002, Mr. Breakstone completed and has been accepted by the Association of Machinery and Equipment Appraisers (AMEA) as a Certified Equipment Appraiser (CEA). In 2005, Mr. Breakstone completed the requirements for Certified Senior Appraiser (CSA) status in Equipment Appraisers Association of North America. These certifications require acceptance to conform in all respects to the designated Codes of Ethics, the appropriate Standards and Procedures of Professional Appraisal Ethics and Practice, certification in *Uniform Standards of Professional Appraisal Practice* (USPAP) as well written exams, submittal of an appraisals for review and acceptance, as well as a minimum of five years of appraisal experience. Both designations dictate on-going requirements to maintain accreditation.



Certificate of Completion

for

**Robert Breakstone**

who attended the class and successfully completed the AMEA 7 Hour Refresher Course

<u>Uniform Standards of Professional Appraisal Practice (USPAP)</u>

October 13, 2006
Detroit, Michigan

AMEA President



# Certified
# Machinery and Equipment
# Appraiser

Recognition Is Hereby Granted To

# *Robert  Breakstone*

by the

## Association of Machinery and Equipment Appraisers
for the period

### October 1, 2004 — September 30, 2005

*Nate Arnold*

President

License Number: _____



# The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

*presents this*

## Certificate of Achievement

*to*

### Robert J. Breakstone

who has attended the class and successfully completed the exam for
the American Society of Appraisers' 15-hour course

**SE100: National Uniform Standards of Professional
Appraisal Practice (USPAP)**



Richard T. Roche, ASA International Education Chair

July 2001
Date

SSN: _____



EQUIPMENT APPRAISERS ASSOCIATION OF NORTH AMERICA

INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA

*Membership Certificate*

THIS IS TO CERTIFY THAT

*Robert Jay Breakstone*

is a member of the above corporation incorporated under the laws of this state and is entitled
to the full benefits and privileges of such membership, subject to the duties and obligations,
as more fully set forth in the Corporation's By-Laws, Rules and Regulations.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be executed by its
duly authorized officers and its corporate seal to be hereunto affixed.

Dated *December 29, 2003*

E. Alex Ross III
TREASURER

SECRETARY

Certificate Number

171



The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

*presents this*

*Certificate of Achievement*

*to*

Robert J. Breakstone

who has taken the class and successfully completed the exam for
the American Society of Appraisers 30-hour course

**ME201OL: Introduction to Machinery and Equipment
Valuation - Available August and October 2002.**

October 2002
Date



Robert B. Podwalny, ASA International Education Chair

Exhibit 21

EFFECTIVE DATE: OCTOBER 19, 2007

# EXPERT REPORT
# OF
# DAVID DALFONSO OF ROSEN SYSTEMS, INC.
# FOR
# SCHIFF HARDIN LLP
# IN THE MATTER OF
# <u>KOCH FOODS OF ALABAMA, LLC V. GENERAL ELECTRIC</u>
# <u>CAPITAL CORPORATION</u>

Case No. 07 C 522

4530 Mobile Highway
Montgomery
Alabama 36108

"ORDERLY LIQUIDATION VALUE"

"FAIR MARKET VALUE"

"FAIR MARKET VALUE IN PLACE"



APPRAISER:        David A. Dalfonso, CEA



# Rosen Systems, Inc.

17744 Preston Road, Suite 100
Dallas, Texas 75252-5736
Office: 972-248-2266
800-527-5134
Fax: 972-248-6887
http://www.rosensys.com

October 29, 2007

Mr. Mike Zhiyuan Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606

APPRAISAL

As requested, an inspection and appraisal of SELECTED ASSETS OF KOCH FOODS, located 4530 Mobile Highway, Montgomery, Alabama 36108, has been conducted by ROSEN SYSTEMS INC. The equipment was physically inspected OCTOBER 19, 2007, which is the effective date of the appraisal. The purpose of this appraisal is to arrive at a conclusion of Orderly Liquidation Value, Fair Market Value and Fair Market Value In Place for these assets effective the date of inspection; we do not intimate that there could not be any fluctuation of the values in the future. The fee for this report is for our expressed opinion at the time of inspection, with no warranties or guarantees of the outcome if values are tested at any future date.

This appraisal sets forth the findings and conclusions which are based upon our investigation of conditions affecting value and which are subject to the Statement of Limiting Conditions and Definition contained in the following report. Without reading the Statement of Limiting Conditions and Definition, the report could be erroneously interpreted. This is a complete summary appraisal report.

We have made a concerted effort to obtain the most recent comparable information. The values shown in this report are based upon this information and continuous conversations with industry professionals.

This report is intended for use only by the addressee listed above and is intended only for use in financing transactions. Use of this report by others is not intended by the appraiser, nor is the report intended for any other use unless express written consent is further granted.

Thank you for the opportunity to be of service in this matter.

Respectfully submitted,

ROSEN SYSTEMS INC.

David A. Dalfonso, CEA
Vice President

I N D E X

PAGE

RECAPITULATION ................................................................................ 1

STATEMENT OF LIMITING CONDITIONS ...................................................... 2

MACHINERY AND EQUIPMENT

      Definition ................................................................................ 4

      Method of Appraisal ...................................................................... 6

      Use & Interpretation ...................................................................... 11

      Appearance Codes ........................................................................ 12

      Personality

            Computer Listing ..................................................................... 13

            Computer Total ....................................................................... 21

PHOTOGRAPHS ................................................................................. 22

CERTIFICATE OF APPRAISER ................................................................... 37

QUALIFICATIONS

      Rosen Systems, Inc. ...................................................................... 38

      David A. Dalfonso, CEA .................................................................. 39

      Michael D. Rosen ........................................................................ 40

R E C A P I T U L A T I O N

SELECTED ASSETS OF KOCH FOODS

4530 Mobile Highway

Montgomery, Alabama 36108                         OCTOBER 19, 2007

"ORDERLY LIQUIDATION VALUE"

\* \* \*$175,000\* \* \*

(One Hundred Seventy-Five Thousand Dollars)

"FAIR MARKET VALUE"

\* \* \* $ 300,000\* \* \*

(Three Hundred Thousand Dollars)

"FAIR MARKET VALUE IN PLACE"

\* \* \*$450,000\* \* \*

(Four Hundred Fifty Thousand Dollars)

<u>STATEMENT OF LIMITING CONDITIONS</u>:

All facts and data set forth in this report are true and correct to the best of your appraiser's knowledge and belief.

Personal inspection of fixed assets has been made unless noted otherwise.

The fee for this appraisal report is not contingent upon the results reported.  There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

As this report has been purchased by the addressee, we assume it is to be used by the addressee in determination of value at that point in time.  This report should be used with the understanding that neither purchase of the report nor payment of the appraisal fee carries with it any guarantees of future tested value, nor does it imply absence of risk regarding possible value change.

Physical condition in most instances either has been determined by inspection or based upon information provided by others.  Any unknown or hidden conditions existing at the time of inspection could alter the value.

No consideration has been given to liens or encumbrances which may be against the property.

No investigation of legal fee or title to the property has been made, and the claim to the property has been assumed valid.

Neither the appraiser nor any officer or employee of ROSEN SYSTEMS, INC. has any financial interest in the property appraised.

This appraisal is based upon Orderly Liquidation Value, Fair Market Value and Fair Market Value In Place as defined under the Definition heading.

No additional values or appraisals have been made in regard to such intangibles as patents, rights to manufacture, trademarks, goodwill, going concern, etc.

The valuation concept used in this report is one chosen by the client and should not be considered a recommendation by ROSEN as to what might result in the application of the concept.  Concept probability and/or feasibility is beyond the scope of the appraisal.  The user of the report is to determine the probability of occurrence.  The appraisal is purchased in order to allow an opinion of value under an assumed set of circumstances, as requested and mutually agreed upon by the client and ROSEN SYSTEMS, INC.

STATEMENT OF LIMITING CONDITIONS (CONTINUED):

NO ANALYSIS, OBSERVATION, INSPECTION OR STUDY OF ANY KIND OR
CHARACTER IS MADE AND NO CONSIDERATION IS IN ANY MANNER TAKEN
INTO ACCOUNT WITH RESPECT TO THE POTENTIAL OR POSSIBLE PRESENCE
OF HAZARDOUS SUBSTANCES OR WASTE ON THE PROPERTY APPRAISED,
INCLUDING BUT NOT LIMITED TO EXAMINATION OR INVESTIGATIONS FOR
THE PRESENCE OF ASBESTOS, POLYCHLORINATED BIPHENYLS, OR ANY
OTHER SUBSTANCE WHICH IS REGULATED BY LAW OR POSES A HAZARD TO
HUMAN HEALTH OR THE ENVIRONMENT.

Court testimony shall not be required as a consequence of the performance of this appraisal
unless arrangements are made with the appraiser at additional fee.

Other limitations, if any, are clearly defined and individually signified at a point in the
appraisal relating to the subject.

## APPRAISAL
## GENERAL INFORMATION

PURPOSE OF APPRAISAL:

The purpose of this appraisal is to estimate the Orderly Liquidation Value, Fair Market Value and Fair Market Value In Place of the subject personal property.  In estimating these values, it has been necessary to make a physical inspection and listing of the property contained in this report.  The results are reported in this appraisal.

FUNCTION OF APPRAISAL:

The property interest (rights) appraised is that of ownership in fee simple (unless otherwise noted), and the subject assets are appraised as if free and clear, without liens or encumbrances (unless otherwise noted).

ORDERLY LIQUIDATION VALUE CONCEPT:

The estimated gross dollar amount derived from the sale of the assets, given limited time to find a purchaser or purchasers, and considering a completed sale of all assets.  No guarantee or warranty is made as to condition, and purchasers are responsible for removal of the purchased assets at their own risk and expense.  The concept allows only limited time for market exposure, and also considered is the physical condition, quantity, difficulty of removal, as well as the overall marketability of the asset group.  Any deletions or additions to that list could change the psychological and/or monetary appeal necessary to gain the price indicated.

The definition also assumes that all equipment would be sold on a piecemeal basis "as is" and "where is," with the buyers being responsible for the removal at their own risk and expense.  It does not assume additional values which could be generated such as product line, equipment in place, going operation, or other types of values which could or may be produced at such an auction sale but could not be realistically anticipated by an appraiser.

No consideration is given to additional value that might be obtained because of product line or other elements of value that could or might be produced at liquidation, but could not be reasonably assumed.

FAIR MARKET VALUE CONCEPT:

"The price that a willing buyer would be justified in paying and a willing seller would be warranted in accepting if each is:  (1) well informed or well advised; (2) motivated by reactions of typical users; (3) free from undue stimulus; (4) financially capable of ownership and/or use; (5) allowed a reasonable length of time in which to test the market."

For all personal property appraised, it also represents the amount a reputable and qualified appraiser, unaffected by personal interest, bias or prejudice, would recommend as a proper selling price in light

of prevailing conditions.

<u>FAIR MARKET VALUE IN PLACE CONCEPT</u>:

"Market value is the price that a willing buyer would be justified in paying and a willing seller would be warranted in accepting if each is:  (1) well informed or well advised; (2) motivated by reactions of typical users; (3) free of undue stimulus; (4) financially capable of ownership and/or use; (5) allowed a reasonable time in which to test the market."

As particularly applied to equipment, the Fair Market Value In Place is the value of a piece of equipment as installed for intended utilization of the date of the appraisal.

## ORDERLY LIQUIDATION VALUE
## PURPOSE AND METHOD OF APPRAISAL

The purpose of this appraisal is to estimate the Orderly Liquidation Value of the subject machinery and equipment.

In estimating Liquidation Value, the appraiser(s) has considered the following approaches in arriving at indicators of value.

COST APPROACH - An estimate of the present replacement cost of the machinery and equipment less accrued depreciation. Depreciation includes loss in value due to physical deterioration as well as functional and economic obsolescence. Functional obsolescence is the decreased capacity of the item to perform the function for which it is intended in terms of current standards and specifications. Functional obsolescence may stem either from a deficiency within the item such as poor design or outmoded style or may result from superadequacy or overdesign. Economic obsolescence represents a loss in value from factors outside the item appraised, such as a depressed market for the end product manufactured by the item of machinery or equipment. These factors generally are characterized as "negative external forces" which have an impact upon the item appraised. The Cost Approach is utilized primarily as a secondary value indicator since it often fails to quantify the inherent loss in value under liquidation conditions.

SALES COMPARISON APPROACH - Comparison with similar items that have sold or are currently offered for sale in the marketplace. By comparing the items appraised with similar items which have recently sold or are currently offered for sale, an estimate can be made of the Orderly Liquidation Value. In these comparable items, pertinent factors of comparison (which include capacity, age, location, and date of sale when applicable) were considered in arriving at an adjusted value for each subject item appraised. Marketability of each item of machinery and equipment is also a determinant of value. Marketability, as a measure of demand, is approximated through recent sales under liquidation conditions of comparable items of machinery and equipment. Where actual sales are not available, relationships are often established based upon used equipment prices for comparable items with subsequent adjustments for liquidation conditions.

DIRECT SALES COMPARISON of similar items of machinery and equipment under liquidation conditions is the preferable and most often used approach used in determining Liquidation Value. The assignment for any liquidation value appraised does not necessarily indicate the concept as a proper method of disposal if market test be required at a future date. These value concepts and their inherent assumptions are requested for various uses or guidelines by the addressee shown on the letter of transmittal. The assumed set of circumstances may not come together to allow the concept to be recommended when and if a liquidation should be required.

ORDERLY LIQUIDATION VALUE -
PURPOSE AND METHOD OF APPRAISAL (CONTINUED):

In certain instances, as in the case of custom machinery and equipment, a market analysis may be undertaken to ascertain current demand/marketability and subsequent value.  Market analysis may also be undertaken if functional or economic obsolescence is a key factor in a major machine tool or piece of equipment.

Certain categories of machinery and equipment are subject to routine loss in value as a result of usage (physical deterioration).  In other instances, functional obsolescence in the form of more efficient and cost effective equipment is a factor in loss of value.  These reasons, among others, are cited as major factors which limit the applicability of the values shown in regard to the effective date of this appraisal.

Note that the summary value indicated in this report represents an "aggregate" value based upon a items noted herein.  For this reason, isolation of any single element as a sole basis of comparison may be inaccurate, and subsequent isolation of any single item appraised, or group of items appraised, could result in a variance from the values reported.

Under any value concept, time plays an important role in the final estimated value.  Typically, the Forced Sale Liquidation concept compresses time to a minimum, and consequently values can reflect this.  An Orderly Liquidation, if a proper concept and utilizing an experienced liquidator, can realize higher values given the greater length of time involved when contrasted with an auction sale.  Naturally, the Fair Market Value, with its often undefined length of time for sale, can yield the highest appraisal value.


FAIR MARKET VALUE
PURPOSE AND METHOD OF APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject machinery and equipment.

In estimating Fair Market Value, the appraiser(s) has used either one or a combination of the following approaches in arriving at indicators.

COST APPROACH - An estimate of the present replacement cost of the machinery and equipment less accrued depreciation.  Depreciation includes loss in value due to physical deterioration as well as functional and economic obsolescence.  Functional obsolescence is the decreased capacity of the item to perform the function for which it is intended in terms of current standards and specifications.  Functional obsolescence may stem either from a deficiency within the item such as poor design or outmoded style or may result from superadequacy or overdesign.  Economic obsolescence represents a loss in value from factors outside the item appraised, such as a depressed market for the end product manufactured by the item of machinery or equipment.  These factors generally are

characterized as "negative external forces" which have an impact upon the item appraised.

SALES COMPARISON APPROACH - Comparison with similar items that have sold or are currently offered for sale in the marketplace. By comparing the items appraised with similar items which have recently sold or are currently offered for sale, an estimate can be made of the Fair Market Value. In these comparable items, pertinent factors of comparison (which include capacity, age, location, and date of sale when applicable) were considered in arriving at an adjusted value for each subject item appraised. Marketability of each item of machinery and equipment is also a determinant of value. Marketability, as a measure of demand, is approximated through recent sales in the marketplace of comparable items of machinery and equipment. Where actual sales are not available, relationships are often established based upon dealer "asking price" for comparable items.

DIRECT SALES COMPARISON of similar items of machinery and equipment under liquidation conditions is the preferable and most often used approach used in determining Liquidation Value. The assignment for any liquidation value appraised does not necessarily indicate the concept as a proper method of disposal if market test be required at a future date. These value concepts and their inherent assumptions are requested for various uses or guidelines by the addressee shown on the letter of transmittal. The assumed set of circumstances may not come together to allow the concept to be recommended when and if a liquidation should be required.

INCOME APPROACH – This approach was considered, but not deemed appropriate for this appraisal.

Values reflected in this report are based primarily upon one or a combination of both of the preceding methods with heavier emphasis on the Sales Comparison Approach, if sufficient data is available. In certain instances, as in the case of custom machinery and equipment, a market FAIR MARKET VALUE - PURPOSE AND METHOD OF APPRAISAL (CONTINUED): analysis may be undertaken to ascertain current demand/marketability and subsequent value. Market analysis may also be undertaken if functional or economic obsolescence is a key factor in a major machine tool or piece of equipment.

Certain categories of machinery and equipment are subject to routine loss in value as a result of usage (physical deterioration). In other instances, functional obsolescence in the form of more efficient and cost effective equipment is a factor in loss of value. These reasons, among others, are cited as major factors which limit the applicability of the values shown in regard to the effective date of this appraisal.

Finally, note that the summary value indicated in this report represents an "aggregate" value based upon all items noted herein. For this reason, isolation of any single element as a sole basis of comparison may be inaccurate, and subsequent isolation of any single item appraised, or group of items appraised, could result in a variance from the values reported.

FAIR MARKET VALUE IN PLACE
PURPOSE AND METHOD OF APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject machinery and equipment.

In estimating Fair Market Value, the appraiser(s) has used either one or a combination of the following approaches in arriving at indicators.

COST APPROACH - An estimate of the present replacement cost of the machinery and equipment less accrued depreciation. Depreciation includes loss in value due to physical deterioration as well as functional and economic obsolescence. Functional obsolescence is the decreased capacity of the item to perform the function for which it is intended in terms of current standards and specifications. Functional obsolescence may stem either from a deficiency within the item such as poor design or outmoded style or may result from superadequacy or overdesign. Economic obsolescence represents a loss in value from factors outside the item appraised, such as a depressed market for the end product manufactured by the item of machinery or equipment. These factors generally are characterized as "negative external forces" which have an impact upon the item appraised.

SALES COMPARISON APPROACH - Comparison with similar items that have sold or are currently offered for sale in the marketplace. By comparing the items appraised with similar items which have recently sold or are currently offered for sale, an estimate can be made of the Fair Market Value. In these comparable items, pertinent factors of comparison (which include capacity, age, location, and date of sale when applicable) were considered in arriving at an adjusted value for each subject item appraised. Marketability of each item of machinery and equipment is also a determinant of value. Marketability, as a measure of demand, is approximated through recent sales in the marketplace of comparable items of machinery and equipment. Where actual sales are not available, relationships are often established based upon dealer "asking price" for comparable items.

Values reflected in this report are based primarily upon one or a combination of both of the preceding methods with heavier emphasis on the Sales Comparison Approach, if sufficient data is available. In certain instances, as in the case of custom machinery and equipment, a market analysis may be undertaken to ascertain current demand/marketability and subsequent value. Market analysis may also be undertaken if functional or economic obsolescence is a key factor in a major machine tool or piece of equipment.

Certain categories of machinery and equipment are subject to routine loss in value as a result of usage (physical deterioration). In other instances, functional obsolescence in the form of more efficient and cost effective equipment is a factor in loss of value. These reasons, among others, are cited as major factors which limit the applicability of the values shown in regard to the effective date of this appraisal.

FAIR MARKET VALUE IN PLACE -
PURPOSE AND METHOD OF APPRAISAL (CONTINUED):

Finally, note that the summary value indicated in this report represents an "aggregate" value based upon all items noted herein.  For this reason, isolation of any single element as a sole basis of comparison may be inaccurate, and subsequent isolation of any single item appraised, or group of items appraised, could result in a variance from the values reported.

<u>USE AND INTERPRETATION OF REPORT</u>

Because this is a computer-generated report, minor explanations may be necessary and helpful in utilizing the report to its fullest. Thus, the following instructions are presented, as you would normally read the report from left to right.

From the left, the first number is an entry number. If used, codes appear next and these will be numeric, alpha, or alpha-numeric. Explanations for the codes appear at the top of each page and in the code directory prior to the beginning of the list. The next entry is the quantity column, indicating totals or the word "lot." Numbers greater than one have been extended by the computer.

After the quantity is a description of the item, and beyond that the value or asterisk (*). When used, the asterisk will be explained within the description.

When codes are present, a separate code directory will be entered at the end of the listing, thereby providing one additional area to reference codes and their description.

## APPEARANCE CODES

Throughout the personal property listing, the reader may have noted letters within brackets within the description portion of the listing. These were utilized as an expedient method of describing appearance. Explanations for those letters are listed below.

Please understand that each code refers to appearance of items of similar age. Thus, a 1955 vertical mill with [A] appended indicates a comparison with other mills of that production era.

[A]    Excellent or new appearance
[B]    Above average
[C]    Average
[D]    Below average - "as is" indication
[E]    Poor - No relation to condition is intended, however, our experience has been that appearance often leads to conclusions as to condition.

PERSONALTY

# APPRAISAL

Code 1:

Code 2:

KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|----|-------------|-----|-----|-----|
| 1 | | | 1 | CHICKEN BREAST DEBONING LINE, DESIGNED AND MFG. BY D & F EQUIPMENT IN CROSSVILLE, AL., MFG. AND INSTALLED LATE 2005, (6) SINGLE OR (3) DOUBLE LINES, EACH LINE SET UP FOR APPROX. (35) - (40) BIRDS PER MIN. CAP., (2) DOUBLE CONE LINES ARE COMPLETE WITH ALL RELATED COMPONENTS AND (1) CONE LINE IS INCOMPLETE WITH ONLY THE CONE SECTIONS AND SOME MINOR COMPONENTS, CURRENTLY LOCATED IN YARD AND DISASSEMBLED, VALUED IN PRESENT CONDITION *VALUED AS COMPLETE LINE | 100,000.00 | 200,000.00 | 225,000.00 |
| 2 | | | 1 | DUMPER, STAINLESS STEEL FRAME, PNEUMATICALLY OPERATED, W/ELEVATOR TYPE DUMP BIN, RELATED EQUIPMENT, COMPONENTS, #019A-02B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 3 | | | 1 | DUMPER, STAINLESS STEEL FRAME, PNEUMATICALLY OPERATED, W/ELEVATOR TYPE DUMP BIN, RELATED EQUIPMENT, COMPONENTS, #019-X1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 4 | | | 1 | DUMPER, STAINLESS STEEL FRAME, PNEUMATICALLY OPERATED, W/ELEVATOR TYPE DUMP BIN, RELATED EQUIPMENT, COMPONENTS, #019A-02A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 5 | | | 1 | DE-ICING BIN, STAINLESS STEEL CONSTRUCTED, TUBULAR MOUNTED, W/ANGLED BAR GRATING, DRIP PAN, RELATED EQUIPMENT, COMPONENTS, #019A-03B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 6 | | | 1 | DE-ICING BIN, STAINLESS STEEL CONSTRUCTED, TUBULAR MOUNTED, W/ANGLED BAR GRATING, DRIP PAN, RELATED EQUIPMENT, COMPONENTS, #019A-03A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 7 | | | 1 | DE-ICING BIN, STAINLESS STEEL CONSTRUCTED, TUBULAR MOUNTED, W/ANGLED BAR GRATING, DRIP PAN, RELATED EQUIPMENT, COMPONENTS, #019-5 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 8 | | | 1 | RECIRCULATING CONVEYOR, DOUBLE LANE, ALL STAINLESS STEEL CONSTRUCTED, HEAVY DUTY STAND MOUNTED, W/MOTOR, DRIVE, APPROX. 48"W X 12'L, D & F MDL. DFM500, S/N S36019A-04A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 9 | | | 1 | RECIRCULATING CONVEYOR, DOUBLE LANE, ALL STAINLESS STEEL CONSTRUCTED, HEAVY DUTY STAND MOUNTED, W/MOTOR, DRIVE, APPROX. 48"W X 12'L, D AND F MDL. DFM500, S/N S36019A-04B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 10 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, APPROX. 20'L INTERMEDIATE SECTION, PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, #019-01-2, W/WING CONVEYOR W/#019A-05A *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

Code 1:
Code 2:                                                                    KOCH FOODS - SELECTED ASSETS                                                    Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 11 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L #019A-X43#2 | * | * | * |
| 12 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, W/PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 25'L, DOUBLE LANE, W/MOTOR, DRIVE, #019-X43, ENTRY/IDLER SECTION | * | * | * |
| 13 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L, EXIT/DRIVE SECTION, #019X43#1, W/TENDER AND BREAST CONVEYORS W/#019A-X44#1 AND #019A-14#1, W/MOTOR, DRIVE *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 14 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, KNUCKLE CHAIN PLASTIC CONVEYOR, STAINLESS STEEL DEBONING CONES, APPROX. 20'L EXIT/DRIVE SECTION, W/MOTORS, DRIVE, #019-01-#1, W/TENDER FILLET CONVEYOR SECTIONS MOUNTED IN MIDDLE, PLATE SHOWS MDL. DFDC1015, S/N S36019A-01, #019-2A AND #0192-B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 16 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, PLASTIC KNUCKLE CHAIN CONVEYO9R, STAINLESS STEEL DEBONING CONES, APPROX. 20'L ENTRY/IDLER SECTION, W/MOTOR, DRIVE, #019-01-#3, W/MIDDLE MOUNTED A-FRAME BAR GRATING CATCH RACK *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 17 | | | 1 | CONE SECTION, ALL STAINLESS STEEL CONSTRUCTED, PLASTIC KNUCKLE CHAIN CONVEYOR, STAINLESS STEEL DEBONING CONES, DOUBLE LANE, APPROX. 20'L, INTERMEDIATE SECTION, #019A-01#2, W/WINGTIP MIDDLE MOUNTED CONVEYOR SECTION #019A-05#2 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 18 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N 36019A-05B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 19 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N 36019A-05A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 20 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N 36019-2B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 21 | | | 1 | WINGTIP CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, L-SHAPED, SINGLE LANE, MOTOR, DRIVE, PLATE SHOWS MDL. DFM500, S/N S36019-2A *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

Code 1:

Code 2:                                         KOCH FOODS - SELECTED ASSETS                                    Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 22 | | | 1 | FEED CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, EACH SECTION APPROX. 15'L, #19-07B#2, #19-07#1, W/MOTOR, DRIVE *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 23 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19A-06-B#2 AND #019A-06B#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 24 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19A-06D#2 AND #019-06D#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 26 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19-6C#2 AND #019A-06#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 27 | | | 1 | WING INCLINE CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, EACH L-SHAPED, (1) W/MOTOR, DRIVE, #19A-06A#2 AND #019A-06A#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 28 | | | 1 | FEED CONVEYOR, (2) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, DRIVE SECTION APPROX. 15'L AND OUTFEED SECTION APPROX. 20'L, W/MOTOR, DRIVE, SINGLE LANE, #019A-17#1 AND #019A-17#2 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 30 | | | 1 | TENDER/BREAST INCLINE CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, L-SHAPED, W/MOTOR, DRIVE, #019A-12A#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 31 | | | 1 | TENDER/BREAST INCLINE CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, L-SHAPED, W/MOTOR, DRIVE, #019A-12B#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 32 | | | 1 | TRIM INCLINE CONVEYOR, (2) PIECES DISASSEMBLED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, MOTOR AND DRIVE SECTION IS S-SHAPED, FEED SECTION APPROX. 15'L, PLATE SHOWS MDL. DFM500, S/N S-36019-X5, TAG SHOWS #019-X5/019-24, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 33 | | | 1 | FINISH PRODUCT CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, S-SHAPED SECTION AND APPROX. 15'L FEED SECTION W/MOTOR, DRIVE #019A-X4#2 AND #019-X4#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 34 | | | 1 | SKIN CONVEYOR, DISASSEMBLED IN (4) SECTIONS, INCLUDES S-SHAPED SECTION W/MOTOR, DRIVE, (3) APPROX. 10' FEED SECTIONS, SINGLE LANE, #017A-01#1, #019A-10, #019A-10,K #019A-10#2 *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

Code 1:

Code 2:

KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|----|-------------|-----|-----|-----|
| 35 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X88, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 36 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X8S, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 37 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X8S, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 38 | | | 1 | WING CUT OFF SAW, ALL STAINLESS STEEL CONSTRUCTED, STAND MOUNTED, APPROX. 10" BLADE, 3/4 HP MOTOR, PLATE SHOWS MDL. DFKFCS450, S/N S36019X8, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 39 | | | 1 | CARCASS CONVEYOR, DISASSEMBLED IN (5) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, DRIVE SECTION SHOWS MDL. DFM 500 WITH S/N S36019A-13, #19A-13#1, (3) SECTIONS W/#19A-13#2, (1) TOP MOUNTED HOOD SECTION W/#019A-13#3 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 40 | | | 1 | WING CONVEYOR LINE, CURRENTLY DISASSEMBLED IN (4) SECTIONS, ALL STAINLESS STEEL CONSTRUCTED, (1-1/2) SECTIONS OF SINGLE LANE AND (2-1/2) SECTIONS OF DOUBLE LANE, W/MOTOR, DRIVE, #19A-09, #019A-09#2, #19A-09 AND (1) # NOT AVAILABLE *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 41 | | | 1 | TENDER/BREAST CONVEYOR, CURRENTLY DISASSEMBLED IN (3) SECTIONS, (1) APPROX. 10'L DOUBLE LANE NON-DRIVE SECTION W/#019A-X44#2, (2) S-SHAPED SINGLE LANE CONVEYORS EACH W/MOTOR, DRIVE, #019A-14 AND #019A-X44, PLATE SHOWS MDL. DFM 500 WITH S/N S36019-14, #019A-14#2, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 42 | | | 1 | FULL BOX CONVEYOR, DISASSEMBLED IN (3) SECTIONS, EACH APPROX. 10'L, (1) W/MOTOR, DRIVE, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, APPROX. 18"W, #019A-29#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 43 | | | 1 | FINISHED PRODUCT INCLINE CONVEYOR, ALL STAINLESS STEEL, S-SHAPED, APPROX. 20' TOTAL, SINGLE LANE, APPROX. 8"W PLASTIC BELT, PLATE SHOWS MDL. DFM 500, S/N S-36019-03, #019-3A, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 44 | | | 1 | FINISHED PRODUCT INCLINE CONVEYOR, ALL STAINLESS STEEL, S-SHAPED, APPROX. 20' TOTAL, SINGLE LANE, APPROX. 8"W PLASTIC BELT, PLATE SHOWS MDL. DFM 500, S/N S-36019-03, #019-3B, *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

Code 1:

Code 2:                                                KOCH FOODS - SELECTED ASSETS                                           Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 45 | | | 1 | WING INCLINE CONVEYOR, A-SHAPED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/MOTOR, DRIVE, APPROX. 20'L, PLATE SHOWS MDL. DFM 500, S/N 36019A-07A, #019A-07A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 46 | | | 1 | WING INCLINE CONVEYOR, A-SHAPED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/MOTOR, DRIVE, APPROX. 20'L, PLATE SHOWS MDL. DFM 500, S/N 36019A-07, #019A-07B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 47 | | | 1 | WING TIP INCLINE CONVEYOR, A-SHAPED, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/MOTOR, DRIVE, MDL. DFM 500, S/N S-36019A05C W/#019A-05C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 48 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #019A-21B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 49 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #019A-21A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 50 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #19A-21C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 51 | | | 1 | CROSSOVER LADDER/PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, A-SHAPED, 3-STEP, W/HEAVY DUTY FIBERGLASS INSERTS, #019A-21D *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 52 | | | 1 | WORK PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, (4) STEPS, WORK PLATFORM, FIBERGLASS INSERTS, #019A-X24 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 53 | | | 1 | WORK PLATFORM, ALL STAINLESS STEEL CONSTRUCTED, (4) STEPS, WORK PLATFORM, FIBERGLASS INSERTS, #019A-X42 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 54 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 55 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15B *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

Code 1:

Code 2:                                          KOCH FOODS - SELECTED ASSETS                                          Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 56 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 57 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15D *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 58 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15E *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 59 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15F *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 60 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15G *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 61 | | | 1 | TENDER BREAST CONVEYOR SECTION, ALL STAINLESS STEEL CONSTRUCTED, SINGLE LANE, W/APPROX. 10'L DRIVE SECTION AND APPROX. 20'L IDLER NON-DRIVE SECTION, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, DISASSEMBLED IN PIECES IN YARD, S/N S36019A-15H *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 62 | | | 1 | WING COMMON CONVEYOR, (3) SECTIONS DISASSEMBLED, DRIVE SECTION APPROX. 20'L, INTERMEDIATE SECTION APPROX. 20'L, IDLER SECTION APPROX. 20'L, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, W/MOTOR, DRIVE, DRIVE SECTION SHOWS PLATE MDL. DFM 500 WITH S/N 36019A-08, #019A-08#1, #019A-08#2, AND #019A-08 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 63 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, 2-LANE, INCLUDES APPROX. 30'L DRIVE SECTION W/PLASTIC KNUCKLE CHAIN CONVEYOR, MOTOR, DRIVE, PLATE SHOWS MDL. DFKP0900, S/N 36019A44S, #19A-44, ALSO INCLUDES 90° AND IDLER SECTION, 10' 2-LANE INTERMEDIATE SECTION, CURRENTLY DISASSEMBLED, *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

KOCH FOODS - SELECTED ASSETS

Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 64 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, 2-LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, APPROX. 10'L DRIVE SECTION W/MOTOR, DRIVE, APPROX. 30'L IDLER SECTION, #019A-26 IDLER, 15' DRIVE SECTION W/MOTOR, DRIVE, DOUBLE LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 65 | | | 1 | NUGGET INCLINE CONVEYOR, DISASSEMBLED IN (2) SECTIONS, ALL STAINLESS STEEL, SINGLE LANE, DRIVE SECTION MOUNTED ON STANDS, W/MOTOR, DRIVE, PLATE SHOWS MDL. DFM 500, S/N 36019-X6-S, #019A-X6#1 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 66 | | | 1 | PRODUCT CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, TOP AND BOTTOM CONVEYORS, INCLUDES APPROX. 18" X 25' PLASTIC BELT CONVEYOR MOUNTED ON BOTTOM, APPROX. 12" X 20' TOP MOUNTED PLASTIC BELT CONVEYOR, W/MOTORS, DRIVES, ALL STAINLESS STEEL FRAME, STAND MOUNTED, PLATE SHOWS MDL. DFM 500, S/N S36019-09, #019-09 AND #019-10 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 67 | | | 1 | BOX CONVEYOR, APPROX. 18" X 20' PLASTIC CONVEYOR, ALL STAINLESS STEEL FRAME, STAND MOUNTED, W/MOTOR, DRIVE, #019A-37 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 68 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19A *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 69 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19B *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 70 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19C *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 71 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-19D *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 72 | | | 1 | WORK STAND, ALL STAINLESS STEEL CONSTRUCTED, TUBULAR STEEL MOUNTED, APPROX. 26" X 20' STAINLESS STEEL RIBBED FLOORING, #019A-X42 *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 73 | | | 1 | GRAVITY CONVEYOR SECTION, PLASTIC ROLLERS, APPROX. 12" X 10', ALL STAINLESS STEEL, #019A-X23, (6) TOTAL SECTIONS, CURRENTLY DISASSEMBLED IN YARD *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

KOCH FOODS - SELECTED ASSETS

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 74 | | | 1 | EMPTY BOX CONVEYOR, ALL STAINLESS STEEL, INCLUDES (4) SECTIONS OF 10" X 20' PLASTIC INTERLOCKING CONVEYOR, (1) SECTION OF APPROX. 10" X 15' PLASTIC INTERLOCKING CONVEYOR, (1) S-SHAPED SECTION OF APPROX. 10" X 20' PLASTIC INTERLOCKING CONVEYOR, ALL STAINLESS STEEL FRAME, (1) PLATE SHOWS MDL. DFX 500 WITH S/N 36019A-X22, #019A-X22 AND #019AS21, INCLUDES ALL MOTORS, DRIVES, VALUED AS COMPLETE SETUP, CURRENTLY DISASSEMBLED IN YARD, *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 75 | | | 1 | EMPTY BOX INCLINE CONVEYOR, APPROX. 16" X 15', STAND MOUNTED, ALL STAINLESS STEEL FRAME, PLATE SHOWS MDL. DFM 500, S/N S36019A-X20, (NO MOTOR OR DRIVE) *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 76 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL FRAME, 2-LANE FEED, 3-LANE OUTFEED, CURVED SECTION, PLASTIC KNUCKLE CONVEYOR, PLATE SHOWS MDL. DFFBS301, S/N S36019A-39, #019A-39, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 77 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL CONSTRUCTED, DOUBLE LANE, PLASTIC KNUCKLE CHAIN CONVEYOR, INCLUDES 10' DRIVE SECTION W/MOTOR AND DRIVE, 90° SECTION, PLATE SHOWS MDL. DFKPC900, S/N 36019A-32A, #19A-32A, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 78 | | | 1 | FULL BOX CONVEYOR, DOUBLE LANE, W/PLASTIC KNUCKLE CHAIN CONVEYOR, MOTOR, DRIVE, INCLUDES OFFSET SECTION, APPROX. 15' TOTAL, PLATE SHOWS MDL. DFKPC900, S/N S36019A-28, #019A-28 #1, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 79 | | | 1 | FULL BOX CONVEYOR, 2-LANE, ALL STAINLESS STEEL CONSTRUCTED, PLASTIC KNUCKLE CHAIN CONVEYOR, INCLUDES APPROX. 10' DRIVE SECTION W/MOTOR, DRIVE, 90° SECTION, IDLER SECTION, PLATE SHOWS MDL. DFK9C900, S/N S36019A-43, #019A-43 #1, 10' 2-LANE INTERMEDIATE SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 80 | | | 1 | FULL BOX CONVEYOR, ALL STAINLESS STEEL, DOUBLE LANE, PLASTIC KNUCKLE CHAIN CONVEYOR, PLATE SHOWS MDL. DFKPC900, S/N S36019A-3, APPROX. 4' DRIVE SECTION W/MOTOR, DRIVE, ALSO INCLUDES 10' INTERMEDIATE AND 90° SECTION *W/CHICKEN BREAST DEBONING LINE | * | * | * |
| 81 | | | LOT | ANCILLARY EQUIPMENT, INCLUDING BUT NOT LIMITED TO ASSORTED ERGO STANDS W/FIBERGLASS INSERTS, BELTING NOT LISTED W/LINES (LOCATED ON SKIDS IN YARD), (2) TABLES W/#019-11 AND #019A-18#1, ASSORTED ELECTRICS, SPARE MOTORS, DRIVES, ALL RELATED PERIPHERAL EQUIPMENT NOT OTHERWISE LISTED, CURRENTLY DISASSEMBLED IN YARD *W/CHICKEN BREAST DEBONING LINE | * | * | * |

# APPRAISAL

Code 1:
Code 2:                                    KOCH FOODS - SELECTED ASSETS                                    Date : 10/19/07

| Line | C1 | C2 | Qty | Description | ORD | FMV | FMP |
|------|----|----|-----|-------------|-----|-----|-----|
| 82 |  |  | 1 | SPIRAL FREEZER, AGA/FRIGOSCANDIA, DRAWINGS SHOWS #GC-76, PROJECT #Q101-85, GYRO COMPACT GC, DRAWING ALSO SHOWS DATE 6/10/92, LIST SHOWS MDL. GCM-76-08-26-NS-CCR, S/N 00530143, APPROX. 10'H SPIRAL CONVEYOR, APPROX. (40) TIERS, 2-1/2" SPACING, 28"W STAINLESS STEEL CONVEYOR, BOTTOM RIGHT ENTRY/TOP RIGHT EXIT, W/MOTORS, DRIVES, ALL MOUNTED INSIDE APPROX. 30' X 12' X 20'H STAINLESS STEEL PANEL CONSTRUCTED WALK-IN FREEZER, APPROX. 25' X 12' X 15'H INTERIOR DIMENSIONS, REFRIGERATION SYSTEM MOUNTED IN REAR W/REFRIGERATION COILS, BLOWER SYSTEM W/(2) APPROX. 40 HP MOTORS, SELF-STACKING BELT SYSTEM, AIR DEFROST SYSTEM AND CIP SYSTEM MOUNTED ON OUTSIDE OF PANELS, ALL RELATED PIPING, VALVES, FLANGES, ELECTRICS, ALSO INCLUDES STAND ALONE POWER SUPPLY/CONTROL W/SIEMENS COMPUTER CONTROLS, CONTROL CABINET PLATE SHOWS SUPERIOR CUSTOM CONTROLS IN SEATTLE, WA, MDL. 2323/5280, S/N 061493, RELATED HARDWARE, SOFTWARE, ELECTRICS, PRINCIPAL INDICATES NOT COMPLETELY INSTALLED, NOT IN OPERATION AT TIME OF INSPECTION, VALUED IN PRESENT CONDITION | 75,000.00 | 100,000.00 | 225,000.00 |

| **Grand Totals** | | | | | **175,000.00** | **300,000.00** | **450,000.00** |

---

PHOTOGRAPHS

---





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.













ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.





ROSEN SYSTEMS INC.













ROSEN SYSTEMS INC.

















CERTIFICATE OF APPRAISER

I certify that:

1)      I personally examined the property appraised;

2)      the statements contained in this appraisal and upon which the opinions expressed herein are based are true and correct to the best of my knowledge and belief, subject to the limiting conditions set forth;

3)      to the best of my knowledge and belief, no pertinent information has been overlooked or withheld; and

4)      I have no interest either presently or contemplated in the property appraised or in any proceeds to be derived therefrom.  My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

My analysis, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

ROSEN SYSTEMS, INC.

David A. Dalfonso, CEA
Vice President

I hereby certify that I reviewed this appraisal.

Michael D. Rosen
President

_____

QUALIFICATIONS

_____

# ROSEN SYSTEMS, INC.

Rosen Systems, Inc., is a comprehensive national appraisal organization, evolving from Ralph Rosen Associates which began operations in 1917. Through the years, there has been increasing demand for Rosen Systems, Inc.'s appraisal services as a result of asset-based lending, merger and acquisition activities, and asset management/disposition requirements.

The company's position of eminence within the profession and national acceptance has resulted from:

-Leadership and membership in the National Association of Machinery and Equipment Appraisers organization and CEA certification of M&E appraisers, along with years of practical knowledge of the marketplace and asset valuing experience.
-Commercial/Industrial Real Estate Appraisers with multi-state GREA certification and national property valuation experience.
-Appraiser versatility in multiple value concepts.

Over eighty years of sales and appraisal experience, combined with Rosen Systems, Inc.'s proven valuation techniques, have been carefully coordinated to meet the unique needs of each client. This experience level finds Rosen Systems, Inc.'s appraisals accepted by major lenders in the United States and recommended by them as one of their primary sources for asset value indications. We are particularly well organized to suit the needs of those involved in the financing community generally. We have completed numerous appraisals in both Canada and Mexico.

Rosen Systems, Inc., includes appraisal departments which focus on values for making lending decisions as well as hard asset allocations subsequent to mergers/acquisitions as follows:

-Real Estate
-Machinery and Equipment
-Inventories (Manufacturing, Wholesale and Retail)
-Market Studies

ANCILLARY SERVICES INCLUDE:

-Updating and appraisal revision
-Review of appraisals performed by others
-Desk-Top Opinions or informal value studies
-Market and Industrial Surveys

As a full service organization offering business, industry and financial institutions accurate appraisals, Rosen Systems, Inc. includes in its list of national clients many of the top institutional and commercial lenders, and numerous Fortune 500 companies.

ATLANTA · CHARLOTTE · DALLAS · FORT LAUDERDALE - HOUSTON

*For Further Information Contact:*
Rosen Systems, Inc.
17744 Preston Road, Suite 100
Dallas, Texas 75252-5736
(972) 248-2266 · (800) 527-5134 · FAX: (972) 248-6887
http://www.rosensys.com

**ROSEN SYSTEMS INC.**

# QUALIFICATIONS

David A. Dalfonso, CEA
<u>ROSEN SYSTEMS, INC.</u>

<u>EXPERIENCE & BUSINESS ASSOCIATIONS</u>:

1.  Vice President/Appraiser - Rosen Systems, Inc.
2.  Expert Witness, Federal Bankruptcy Courts
3.  Senior Market Analyst - Rosen Systems, Inc.
4.  Research and Marketing Background
5.  Consumer Finance Background
6.  Oilfield Experience
7.  Steel Production Experience

<u>EDUCATION</u>:

1.  Bachelor of Science - College of Steubenville - Business Management
2.  Additional Studies include Economics, Accounting, and Marketing

<u>MEMBERSHIPS</u>:

1.  Machinery Dealers National Association, (MDNA) Member
2.  Association of Machinery and Equipment Appraisers (AMEA) - CEA

<u>APPRAISAL & RESEARCH ASSIGNMENTS</u>:

1.  Auction Value
2.  Orderly Liquidation Value
3.  Fair Market Value
4.  Fair Market Value In Place
5.  Replacement Value

<u>ADDITIONAL INFORMATION</u>:

1.  *Demystifying The Appraisal Process*, "THE SECURED LENDER," Nov./Dec. '94, Vol. 50, Number 6.
2.  Contributor/Associate Editor, <u>Market Update Report</u> -- a value-oriented article generated for major lending institutions.
3.  Featured Speaker, Rosen Systems, Inc. - Educational Seminars.

Note:  Specific references and/or assignments can be furnished upon request.

**ROSEN SYSTEMS INC.**

### QUALIFICATIONS

Michael D. Rosen, CEA
ROSEN SYSTEMS, INC.

EXPERIENCE & BUSINESS ASSOCIATIONS:

1. President, Rosen Systems, Inc.
2. Licensed Auctioneer since 1970, TXL 6732
3. Marketing and Merchandising
4. President, Association of Machinery and Equipment Appraisers

EDUCATION:

1. BBA with Management Emphasis - University of Texas
2. Additional courses - Real Estate and Appraisal

MEMBERSHIPS:

1. Machinery Dealers National Association, Former Director
2. Association of Machinery and Equipment Appraisers - Certified Machinery and Equipment Appraiser, Past President, Director
3. Industrial Auctioneers Association - Charter Member, Director, Treasurer

APPRAISAL AND SALE ASSIGNMENTS:

1. Industrial Machinery & Equipment and Inventories

   (a) Metalworking machinery
   (b) Woodworking machinery
   (c) Contractor's equipment
   (d) Transportation
   (e) Oilfield
   (f) Printing
   (g) Electronics
   (h) Textile equipment
   (i) Office furniture and equipment

APPRAISAL VALUE EXPERIENCE:

1. Insurance Value
2. Fair Market Value
3. Fair Market Value In Place
4. Auction Value
5. Salvage Value

ADDITIONAL INFORMATION:

1. Real Estate Broker License #191785, File #92631
2. Speaker at National Commercial Finance Association Appraisal & Liquidation Workshops

Note: Specific references and/or assignments can be furnished upon request.

**ROSEN SYSTEMS INC.**



# Rosen Systems, Inc.

17744 Preston Road, Suite 100
Dallas, Texas 75252-5736
Office: 972-248-2266
800-527-5134
Fax: 972-248-6887
http://www.rosensys.com

October 30, 2007

Mr. Mike Zhiyuan Xu
Schiff Hardin, LLP
6600 Sears Tower
Chicago, IL 60606

Re:    Selected Assets of Koch Foods

Dear Mr. Xu,

This letter will serve as an addendum to the machinery and equipment appraisal of selected assets of the above referenced company recently performed by Rosen Systems, Inc. The values presented in the appraisal report are an objective opinion of values based on market research, sales comparisons (where possible) and the current condition of the assets under appraisement. We reviewed trade publications and conferred with industry professionals during the course of our research.

The chicken breast deboning line is currently disassembled and stored in the Koch Foods yard in Montgomery, Alabama. The spiral freezer is currently partially installed inside the company's plant. It lacks all the necessary piping to the ammonia compressors and the related electrics. The spiral freezer has never been in operation according to company personnel. The values presented in the report are based on the current status of these assets.

According to the same company personnel the chicken breast deboning line was purchased new and installed in late 2005. It remained in operation until May 2007, when it was dismantled and stored in the yard. We valued this as a complete line as it is our opinion that is how it would be sold to maximize its value.

The Fair Market Value In Place values assume the equipment will continue to be used at its current location. It adds value for transportation and installation. The fact that the deboning line has been dismantled limits its additional value under this concept. The Fair Market Value assumes that the equipment will be dismantled and transported to another location and is valued accordingly.

In addition to the work I performed in calculating the values, the appraisal was reviewed by Michael Rosen, President of Rosen Systems, Inc. and a past president of the AMEA. Our firm also conducts public auction sales and liquidations of many types of machinery and equipment in various industries including food processing.

For further information about this appraisal, please read carefully the appraisal report, particularly the Statement of Limiting Conditions, Definitions and Qualifications pages. If you have any further questions, please do not hesitate to call me.

Thank you for the opportunity to be of service in this matter.

Respectfully submitted,

ROSEN SYSTEMS INC.

David A. Dalfonso, CEA
Vice President

Exhibit 22

Page 12

```
 1    A.    No.

 2    Q.    I want to run through your employment since I

 3          guess you dropped out of college.  The first

 4          thing you did was took care of the farm, and

 5          that was located where?

 6    A.    In Willards, Maryland.

 7    Q.    And how long did you do that?

 8    A.    On or about four years.

 9    Q.    So you began in about '79?

10    A.    At Perdue or at the farm?

11    Q.    At the farm.

12    A.    Well, I still live there so -- I grew up on the

13          farm.

14    Q.    But you stopped attending the University of

15          Maryland in about '79; is that right?

16    A.    That's right.

17    Q.    And so your full-time occupation was farming,

18          right?

19    A.    I had to take care of the farm, yes.

20    Q.    And you did that for about four years.  So that

21          would be from '79 to about '83?

22    A.    That's correct.

23    Q.    And what did you farm?  What were your products?
```

Page 13

```
 1    A.    Poultry.

 2    Q.    And what did you do in 1983 for employment?

 3    A.    Perdue Farms.

 4    Q.    For how long?

 5    A.    Till 1988.

 6    Q.    And what was your position there?

 7    A.    I held several.

 8    Q.    What was your first?

 9    A.    Flock supervisor.

10    Q.    And then what did you do?

11    A.    Hatchery manager.

12    Q.    Anything else?

13    A.    Breeder manager.

14    Q.    Anything else?

15    A.    And plant manager.

16    Q.    Where is the plant located?

17    A.    Georgetown, Delaware.

18    Q.    Did there come a time when you left Perdue

19          Farms?

20    A.    Yes.

21    Q.    When was that?

22    A.    In '88.

23    Q.    Where did you go then?
```

Page 14

```
 1    A.    ConAgra.

 2    Q.    Where were you located?

 3    A.    Hurlock, Maryland.  H-U-R-L-O-C-K.

 4    Q.    What did you do?

 5    A.    Plant manager.

 6    Q.    What was done at that plant?

 7    A.    Poultry.

 8    Q.    What was done to the poultry?  Was it

 9          processed?  Was it killed?

10    A.    It was a slaughter plant.

11    Q.    So the chickens were killed there and then

12          shipped somewhere else for processing; is that

13          right?

14    A.    No.

15    Q.    Well, what was done after they were killed?

16    A.    Tray pack.

17    Q.    Excuse me?

18    A.    Retail tray pack.

19    Q.    Tray pat?

20    A.    Pack.

21    Q.    How do you spell that?  I'm not at all familiar

22          with that term.

23    A.    It's T --
```

Deposition of Wayne M. Jones                                    November 28, 2007

Page 15

1    Q.    Oh, the tray?

2    A.    Yes.

3    Q.    I see.  I'm sorry.  I thought that was all one

4          word.

5                And how long were you at ConAgra as a plant

6          manager?

7    A.    As a plant manager about one year.

8    Q.    And then what did you do?

9    A.    I became a general manager and vice president.

10   Q.    Still with ConAgra?

11   A.    Yes.

12   Q.    And where were you officed?

13   A.    Seaford, Delaware.

14   Q.    Can you spell Seaford?

15   A.    S-E-A-F-O-R-D.

16   Q.    Delaware?

17   A.    Yes.

18   Q.    And what were your duties then?

19   A.    I was responsible for the East Coast operations.

20   Q.    Just poultry, though?

21   A.    Yes.

22   Q.    And how long did you work for ConAgra?

23   A.    Till 1996.

Page 16

1   Q.   And when you left in '96, were you still the

2        vice president for the East Coast operations?

3   A.   When I left ConAgra in '96, I was vice president

4        of Louisiana.

5   Q.   So there came a time when your office changed

6        from Seaford, Delaware to somewhere else?

7   A.   Yes.

8   Q.   And when was that?

9   A.   On or about 1993.

10  Q.   And was that down to Louisiana?

11  A.   Yes.

12  Q.   And where were you officed then?

13  A.   In Farmerville, Louisiana.

14  Q.   And what were your job duties?

15  A.   I was responsible for the Louisiana operations.

16  Q.   Poultry?

17  A.   Yes.

18  Q.   And then in 1996 you left ConAgra; is that

19       right?

20  A.   Yes.

21  Q.   And where did you go?

22  A.   Randall Foods.

23  Q.   And where were you officed?

Page 17

| | | |
|---|---|---|
| 1 | A. | In Arcadia, Louisiana. |
| 2 | Q. | What was your position? |
| 3 | A. | Vice president. |
| 4 | Q. | And Randall Foods at least at that time was a |
| 5 | | poultry producer? |
| 6 | A. | Yes. |
| 7 | Q. | And how long were you at Randall Foods? |
| 8 | A. | Till 1998. |
| 9 | Q. | And where did you go in 1998? |
| 10 | A. | Case Foods. |
| 11 | Q. | And where were you officed? |
| 12 | A. | Winesburg, Ohio. |
| 13 | Q. | What was your position? |
| 14 | A. | I was the vice president. |
| 15 | Q. | Case Foods, did they do just poultry at the time |
| 16 | | or did they do other things? |
| 17 | A. | Poultry. |
| 18 | Q. | And how long were you there? |
| 19 | A. | Until 2002. |
| 20 | Q. | And then where did you go? |
| 21 | A. | Koch Foods. |
| 22 | Q. | And what was your first position with Koch |
| 23 | | Foods? |

Page 18

```
 1    A.    General manager.

 2    Q.    Of ...

 3    A.    Mississippi.

 4    Q.    All operations in Mississippi?

 5    A.    Yes.

 6    Q.    Where were you officed?

 7    A.    Morton, Mississippi.

 8    Q.    What is your current title?

 9    A.    Senior vice president.

10    Q.    Of Koch?

11    A.    Yes.

12    Q.    What are your duties?

13    A.    I'm responsible for the live and processing

14          operations.

15    Q.    Throughout the country?

16    A.    I have -- Yes.

17    Q.    Let me be more specific.  Wherever Koch Foods,

18          Inc. or its subsidiaries has a facility that is

19          involved in live and processing, you have the

20          oversite of that, correct?

21    A.    I'm responsible for live and processing

22          operations.

23    Q.    For whom?
```

Page 37

1    Q.    Mr. Davis is no longer there, right?

2                  MR. GEEKIE:  No longer where?

3                  MR. HARRIS:  No longer at Koch.

4    Q.    Is that correct?

5    A.    Gary Davis is still at Koch.

6    Q.    He's no longer the facility manager, correct?

7    A.    Correct.

8    Q.    Were you involved in identifying the equipment

9          with which the deboner equipment would be

10         replaced?

11                 MR. GEEKIE:  Objection.  Vague and

12                     ambiguous.

13   A.    Ask the question again.

14   Q.    Sure.

15         Did you help pick out the new stuff?

16   A.    I approved the capital.

17   Q.    Did you help select the equipment?

18   A.    No.

19   Q.    Who did that?

20   A.    Gary Davis.

21   Q.    Do you, yourself, have any knowledge with

22         respect to the value of the deboner equipment at

23         the time that Koch Foods assumed ownership of

Deposition of Wayne M. Jones                                    November 28, 2007

Page 38

1         the facility in 2006?

2    A.   No.

3    Q.   Do you have any knowledge of its value today?

4    A.   Not from a professional.

5    Q.   Some other way, though?

6    A.   Just an opinion.

7    Q.   What would that be?

8    A.   25 to 35 cents on the dollar.

9    Q.   The dollar being what, the capital cost?

10   A.   The dollar of the purchase price.

11   Q.   What is that based on?

12   A.   Use equipment value.

13   Q.   So the use of the equipment caused the equipment

14        to lose value.  Is that your understanding?

15   A.   Yes.

16   Q.   And it was 25 to 30 cents on the dollar did you

17        say?

18   A.   25 to 35.

19                  MR. HARRIS:  I don't have anything

20                     further.

21                  MR. GEEKIE:  Reserve signature.

22                     (Deposition concluded at

23                     approximately 10:00 a.m.)

Exhibit 23

**From:** Harris, Timothy S. [mailto:THarris@ReedSmith.com]
**Sent:** Tuesday, October 02, 2007 3:37 PM
**To:** Geekie Jr., Eugene J.
**Subject:** RE: Spiral Freezer

I am aware that the offered price is below the appraised valuation and have so notified GE Capital.  The difference between the appraisal value and the offer price may make further inquiry moot.

---

**From:** Geekie Jr., Eugene J. [mailto:egeekie@schiffhardin.com]
**Sent:** Tuesday, October 02, 2007 3:03 PM
**To:** Harris, Timothy S.
**Cc:** tgm@mancusofranco.com; Xu, Mike Z.; ZZ-Geekie, Gene
**Subject:** RE: Spiral Freezer

Tim:  Koch Foods has an interest in selling the equipment, and in settling this case, but the proposed price for the spiral freezer is significantly lower than your expert's appraised valuation.

Can you explain the reasons for this difference?  Also, can you please provide the correspondence or other documentation leading up to the proposed sale?  I think you may have communicated to me that there was no documentation, but Koch would also be concerned about any sale where there was no negotiation or other documentation evidencing the contract between the parties.

Gene


Eugene J. Geekie, Jr.
Schiff Hardin LLP
7500 Sears Tower
Chicago, IL  60606
312-258-5635 (direct)
312-258-5600 (fax)


1/4/2008

**From:** Harris, Timothy S. [mailto:THarris@ReedSmith.com]
**Sent:** Thursday, September 27, 2007 7:03 AM
**To:** Geekie Jr., Eugene J.
**Subject:** Spiral Freezer

Does Koch Foods still have any interest in the proposed sale I mentioned earlier?

**Timothy S. Harris**
**Attorney**

tharris@reedsmith.com
Reed<span style="color:red">Smith</span>
Sachnoff & Weaver
**312.207.2420**

Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606-7507
312.207.1000
Fax 312.651.1868

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

* * *

To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication  (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03<br>pdc1

```
----------------------------------------------------------------
Tax Matters: To the extent this message or any attachment concerns
tax matters, it is not intended or written to be used, and cannot
be used by a taxpayer, for the purpose of avoiding penalties
that may be imposed on the taxpayer under law.
----------------------------------------------------------------
This message and any attachments may contain confidential
information protected by the attorney-client or other privilege.
If you believe that it has been sent to you in error,
please reply to the sender that you received the message in
```

```
error. Then delete it. Thank you.
------------------------------------------------------------------
```

**From:** Harris, Timothy S. [mailto:THarris@ReedSmith.com]
**Sent:** Monday, September 24, 2007 4:03 PM
**To:** Geekie Jr., Eugene J.
**Subject:** Spiral Freezer

I am advised regarding the following on the Spiral Freezer:

1. The potential purchaser is MTL Services.

2. MTL apparently is willing to purchase without inspection.

3. The offer is $50,000 net, with proceeds to go into escrow pending resolution of the litigation.

4. Both GE and Koch to execute necessary documents releasing any claims to the Spiral Freezer.

Apparently there is a desire by MTL to move quickly if a deal is to be done. Please advise retarding your client's interest in these terms.

**Timothy S. Harris**
Attorney

tharris@reedsmith.com
ReedSmith
Sachnoff & Weaver
312.207.2420

Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606-7507
312.207.1000
Fax 312.651.1868

\* \* \*

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

\* \* \*

To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03
pdc1

1/4/2008

Exhibit 24

| 1. ACCOUNT NUMBER 4171238 - 002 | 2. PRODUCT | TTIREG | 3. CORP CODE 001 | 4. DATE | 12/21/07 |
|---|---|---|---|---|---|

| 5. CUSTOMER'S NAME:<br>SYLVEST FARMS, INC. | 6. OFFICE NAME<br>& NO. | ATLNTA<br>8221 | 10. ORIG EQUITY AMT:<br>AMOUNT    $ | 1,658,031.41 |
|---|---|---|---|---|
| 7. REPOSSESSION DATE:   00 / 00 / 0000 | 8. AMORT START DATE | 05/03/06 | 11. MATURITY DATE AFTER EXTENSION/# | |
| | 9. NO OF MONTHS | 1 | OF MO's. | 05/03/2006 |

**ORIGINAL CREDIT SUMMARY AND RECENT BACKGROUND**

This deal was originated in December 2005 as a single investor lease for 3 lines of new equipment related to the poultry food processing industry.  The total OEC that was financed was $1,966,203.00 with a structure of 60 payments of $35,482.95 each and an FMV purchase option.

NET INVESTMENT: $  1,658,031.41
(IF OPERLS SEE BELOW)

LESS:

ELTOOL:    $    658,500.00

QTOOL:

VOUCHER:

SECURITY DEPOSI $           -

**HISTORY OF RESTRUCTURE AND/OR COLLECTION ACTIVITY**

The debtor made the first 4 payments on the account, however on 4/18/06, they filed for chapter 11 bankruptcy due to sudden loss of business as fears of the Avian Flu virus began to spread in the U.S.

LESS:

039:

NET WRITE OFF:  $    999,531.41

$           -

TTIREG:

**LITIGATION ACTIVITY**

The debtor sold the business in a 363 sale to Koch Foods (based in Chicago) and has officially rejected the equipment. Koch Foods, as the new owner of the building that is currently housing GE's equipment, is allowing the SE region and redeployment to show the equipment to potential buyers, however Koch plans to sell the building to another major food processor, Gold Kist.  To date, the Ossid line was sold for $325,000.00 with the account being booked as a TTIREG for the current balance of $1,658,531.41, however Asset Management and Redeployment are currently working to remove and store the equipment due to 1.) the lease rejection, 2.) there being no immediate potential buyers for the Freezer and the D&F equipment and 3.) the appraiser believes that the equipment is being used, without payment, by the new owner of the building, Koch Foods.

PROPERTY TAX:  $           -

LATE CHARGES:  $    82,901.57

OTHER CHARGES: $           -

SALES TAX      $           -

ACCRUAL:       $           -

TOTAL AMOUNT WRITTEN OFF TO DATE
FOR THIS CUSTOMER:
$           -

**RECOMMENDATION**

It is the recommendation of the Collections department to write down this account to the appraised FMV of $658,500.00. The loss is to be taken at this time is $999,531.41.  The account will be monitored pending sale of the other 2 lines of equipment and the filing of a final unsecured claim filed in this debtor's bankruptcy.

IF OPERLS  WE MUST W/O RENTS IN
ADDITION TO NET INVESTMENT
$           -

*** +OPERLS OUTSTANDINGS RENTS
(109-18X)     $           -

RESERVE:   $           -

PERSON (S) APPROVING ORIGINAL CREDIT:                    **APPROVALS**

| COLLECTOR/LITIGATION SPECIALIST | DATE | CREDIT & COLLECTIONS MANAGER | DATE |
|---|---|---|---|
| COLLECTION MANAGER | DATE | SAF | DATE |
| FINANCE | DATE | SRO | DATE |
| AMO | DATE | TOM FANELLI | DATE |

**GE  722**

Pull Info

GE 723

Electronic Customer Folder                    powered by Third Pillar
                                                          Systems

Logout—Help—

Submittals    Customers    Approval Setup    My Tools    My Notifications    Events

**Submittal List**                              Create New Submittal

| Company Name | Deal Amt | Deal Type | Analyst | Sales Rep | Sales Mgr | Subdivis |
|---|---|---|---|---|---|---|
| SYLVEST FARMS, INC. | $999,532 | EWRITEOFF | Wilson | HouseAccount | HouseAccount | Collectio |

Click here to view deal classification.

Summary ☒ Details ☒ Associated Docs ☒ Open Notifications ☒ Closed Notifications ☒

Add'l Approvers        Launch Add'l Approval

Approval Level  Approver

Comments

**2 Comments**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | Wilson 30-Oct-2006 10:59:31 AM EST | Approval restarted for Add'l Approvers by William Wilson |

Level 1        1 Approvers, 0 Sponsors
Analyst
Approval       A Wilson, William    Approved  30-Oct-2006
                                              11:01:12 AM EST

Wilson
30-Oct-
2006
11:01:12
AM
EST

Previously, a $325,000.00 ELTOOL transfer was approved for this debtor due to the sale of a packaging line, with no loss being taken. At this time, approval for a $999.5M loss is being requested to write down the account to the $658M appraised value of the equipment

GE 724

Electronic Customer Folder                                                    Page 2 of 3

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  | pending Asset Management's removal and storage of the 2 remaining assets, which have been rejected under this debtor's bankruptcy. |
| **Level 2**<br>Risk Management, Pricing Approval | **2 Approvers, 0 Sponsors** | | | | |
|  | A Cummings, Paul | Approved | 30-Oct-2006 11:17:01 AM EST | **0 Comments** | |
|  | A Plumeau, Michael | Approved | 30-Oct-2006 11:45:13 AM EST | | |
| **Level 3**<br>Senior Risk Management, Field SRO Approval | **1 Approvers, 1 Sponsors** | | | | |
|  | A Underberg, Scott | Approved | 30-Oct-2006 01:08:22 PM EST | **0 Comments** | |
|  | S Sutehall, John | Supported | 30-Oct-2006 12:51:54 PM EST | | |
|  |  |  |  | **1 Comments** | writing asset down to FMV of remaining two lines, packaging line has been sold. AMO unwilling to accept into inventory so remaining investment will be carried delinquent until disposed. |
| **Level 4**<br>Business Management, Region Manager Approval | **2 Approvers, 0 Sponsors** | | | | |
|  | A Ivanov, Penko | Approved | 31-Oct-2006 04:35:59 AM EST | Bellesheim 30-Oct-2006 02:22:39 PM EST | |
|  | A Bellesheim, Noel | Approved | 30-Oct-2006 02:22:39 PM EST | | |
| **SRO**<br>Danbury SRO Approval | **1 Approvers, 0 Sponsors** | | | | |
|  | A Stewart, John | Approved | 31-Oct-2006 08:48:46 AM EST | **0 Comments** | |

Electronic Customer Folder

**Pricing**
Danbury
Pricing
Approval

0 Approvers, 0 Sponsors

0 Comments

**AMO**
Danbury Asset
Management
Approval

0 Approvers, 0 Sponsors

0 Comments

2 Approvers, 0 Sponsors

1 Comments

**Business**
Business CRO /
Pres.

A Pilot, Michael    Approved    31-Oct-2006
                                10:31:08 AM EST

A Fanelli, Tom      Approved    31-Oct-2006
                                10:30:33 AM EST

Fanelli          Decision
31-Oct-2006      taken by
10:31:07 AM      Fanelli
EST              for Pilot.

**Capital
Solutions**
C.S. CRO /
Pres.

0 Approvers, 0 Sponsors

0 Comments

**Norwalk**
GE Commercial
Finance
Approval

0 Approvers, 0 Sponsors

0 Comments

**Fairfield**
GE Corporate
Approval

0 Approvers, 0 Sponsors

0 Comments

[x] **ON FINAL
DECISION
NOTIFY**          Bhatia, Vishal

**Current Comment Level**                 Business CRO / Pres.
**Comment:** (please add comments below)

Save

GE  725