**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC, ) | |
| an Alabama Limited Liability Company, ) | Case No. 07-cv-522-MHT |
| ) | |
| Plaintiff and Counterclaim-defendant, ) | |
| ) | Honorable Myron H. Thompson |
| v. ) | Honorable Terry F. Moorer |
| ) | |
| GENERAL ELECTRIC CAPITAL ) | |
| CORPORATION, ) | |
| a Delaware corporation, ) | |
| ) | |
| Defendant and Counterclaim-plaintiff. ) | |

**KOCH FOODS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO GECC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff and Counterclaim-Defendant, Koch Foods of Alabama, LLC ("Koch"), through

its undersigned counsel, files this reply to General Electric Corporation's response ("GECC's

Response," Doc. No. 68) and reply ("GECC's Reply," Doc. No. 74), and states as follows.[1]

Koch is entitled to summary judgment on GECC's conversion claim because the

undisputed facts show that GECC never demanded and Koch never refused to surrender the

possession of the Deboner and the Freezer.[2] GECC's conversion claim must fail because none of

Koch's use, assertion of ownership, or removal of the Deboner was wrongful or in exclusion or

defiance of GECC's rights. GECC's summary judgment on Koch's fixture claim must be denied

---

[1]    Any capitalized terms not defined herein shall have the same meaning ascribed to
them in Koch's Brief/Memorandum ("Koch's Response," Doc. No. 67).

[2]    Although GECC only asserted the conversion claim for the Deboner in its
Counterclaim, GECC continues to argue that Koch converted both the Deboner and the Freezer.
While Koch may address GECC's arguments regarding the alleged conversion of the Freezer,
Koch reserves its right to object to any GECC's claims that were not pleaded in its Counterclaim.

because abundant facts show that the intention of Sylvest and GECC was to attach the Equipment to the Facility as fixtures.

      **A**.      **Koch is entitled to summary judgment on GECC's conversion claim because Koch never acted in exclusion or defiance of GECC's rights and GECC never demanded possession of the Deboner.**

      GECC's conversion claim must fail because GECC failed to prove one of the essential element of a conversion claim, which is that Koch's acts were wrongful or illegal. Conversely, Koch is entitled to summary judgment because GECC never demanded possession of the Deboner and Koch never exercised dominion or control over the Deboner in exclusion or defiance of GECC's rights.

      To constitute a conversion claim, there must be a *wrongful* taking, detention, or an *illegal* assumption of ownership or use of the property. *Ott v. Fox*, 362 So.2d 836 (Ala. 1978) (emphasis added). GECC argues that Koch converted the Deboner simply because Koch used, asserted ownership of, and moved the Deboner, dismissing all other facts as immaterial. However, the facts GECC dismisses as immaterial actually demonstrate that none of Koch's acts was wrongful or illegal. In other words, Koch's use of the Deboner was not conducted in exclusion or defiance of GECC's rights. *See Kmart Corp. v. Perdue*, 708 So.2d 106, 111 (Ala. 1997) ("[t]o establish a conversion, the plaintiff must show that the defendant wrongfully exercised dominion over property in exclusion or defiance of a plaintiff's rights").

      Koch used, maintained, and insured the Deboner for the financial benefit of GECC, not in exclusion or defiance of any GECC's rights. (Koch's Response, at 7 ¶ 19; **Exhibit A** attached hereto, Kaminsky Deposition, at 80:22-24, 81:1-12). GECC knew of Koch's use of the Deboner almost immediately after Koch acquired the possession of the Facility, but remained silent and never demanded that Koch cease using the Deboner. (Koch's Response, at 7 ¶ 20).

      GECC admitted that the costs of removing the Equipment would be prohibitively

expensive and that the Equipment would lose significant value if it was removed from operation and put in a warehouse.  (Koch's Response, at 7 ¶ 19).  GECC also admitted that, on the other hand, Koch's use and maintenance of the Deboner maintained its value.  (Koch's Response, at 7 ¶ 19).  Koch never denied GECC any access to the Equipment and, in fact, had voluntarily surrendered the Ossid lines that were also under the Equipment Lease when GECC found a buyer and requested their possession.  (Koch's Response, at 6 ¶¶ 17, 18).

This arrangement between GECC and Koch was a *quid pro quo*.  While Koch used the Deboner, GECC financially benefited, since the Deboner remained in operating condition – and was insured by Koch -- while GECC sought a buyer.  (Koch's Response, at 7 ¶ 19; Ex. A, Kaminsky Dep., at 80:22-24, 81:1-12).  Because GECC benefited from Koch's use of the Deboner and GECC never objected to Koch's use, Koch's use of the Deboner was not in exclusion or defiance of GECC's rights.

Moreover, Koch would have been willing to pay a reasonable amount of rent for its use. However, after seven months' silence and acquiescence in Koch's use of the Deboner, GECC reneged on the tacit *quid pro quo* arrangement, demanding that Koch pay rent for the use of the Deboner, the amount of which, even by GECC's own account, was unreasonable, and that Koch assume the obligations under the Equipment Lease.  (Koch's Response, at 8 ¶ 21).  GECC threatened to sue Koch if Koch did not meet GECC's exorbitant, in fact extortionate, demand. (Koch's Response, at 8 ¶ 21).  In essence, under threat of a lawsuit, GECC attempted to shake down Koch to force it to accept and agree to pay all lease amounts for all the equipment, even though Koch had only used the Deboner (which also benefited GECC), had not used the Freezer, and had *already returned the Ossid lines so that GECC could sell them*.  (Koch's Response, at 7 ¶ 21).

Furthermore, GECC's argument that Koch converted the Freezer defies all logic and common sense, not only because GECC never asserted conversion of the Freezer in its counterclaim, but also because Koch never used the Freezer.[3] The Freezer argument proves what GECC's conversion claim truly is – an effort to recover a windfall for used equipment, in a depressed industry, where GECC had no chance of selling it and would have been forced to pay a fortune to remove it from Koch's Facility.

In fact, Koch rightfully believed that the Equipment were fixtures of the Facility when Koch bought the Facility, but the Equipment was not specifically designed for Koch and, thus, had no significant value to Koch's operations.  (Koch's Response, at 7 ¶ 20).  Koch wanted to resolve any conflict with GECC in good faith and was willing to surrender the Equipment whenever GECC came to pick it up so as to avoid any unnecessary, costly litigation with GECC – the 800-pound gorilla of the secured finance industry.  (Koch's Response, at 6 ¶ 17).

Accordingly, only after GECC's attempt to extort rent from Koch and coerce Koch into assuming the Equipment Lease and the threat of a conversion lawsuit, did Koch openly assert ownership of the Equipment.[4]  What choice did it have when threatened with fire and brimstone

---

[3] Amazingly, GECC argues that its conversion claim extends to the Freezer under Fed. R. Civ. P. 15(b).  Rule 15(b), however, does not authorize GECC to make up claims as the litigation progresses and then seek summary judgment on these made-up claims.  Rule 15(b) simply allows a party to conform its pleadings to the evidence once trial begins.  Not only has trial not begun, and thus Rule 15(b) is inapplicable, GECC has never sought to amend its counterclaim to add the Freezer and thus has never pleaded any facts on which to receive relief.  An embarrassing but true situation, which GECC's counsel continues to mislead the court about.

[4] GECC misrepresented that Koch's assertion of ownership occurred from the date when Koch bought the Facility based on the following two lines from the transcript of Mr. Kaminsky's deposition taken on November 19, 2007 (GECC's Reply, at 2 ¶ B):

Q: And on what date did Koch gain ownership of the equipment? And when I say the equipment, in this instance I mean only the deboner and the spiral freezer.

A: Upon closing of the deal for Sylvest, which was approximately the end of May 2006.

by GECC?  Koch's assertion of ownership, thus, was not *wrongful* or in exclusion or defiance of any GECC's rights.

Finally, after having been threatened by GECC's extortion of rent and a lawsuit, Koch demanded that GECC remove the Equipment from its Facility.  (Koch's Response, at 8 ¶ 23).  Without receiving any response after Koch's repeated demand, Koch had no choice but to replace and remove the Deboner, knowing that it would be sued by GECC.  (Koch's Response, at 8 ¶ 23, 9 ¶ 24).

The removal of the Deboner was not wrongful because, if GECC owned the Equipment, GECC's refusal to remove the Equipment constituted a trespass on Koch's land.  *Restatement (Second) of Torts* § 160.  To terminate a trespass upon land, Koch was entitled to employ reasonable force to remove the Equipment and is not be liable for any harm to the Equipment necessarily or accidentally resulting.  *Id.* § 260 cmt. b.  The removed Deboner was placed in Koch's storage yard in a neat and orderly way and retained its worth of $218,580 according to GECC's own expert.[5]  The minimal decrease in value, if any, was a necessary and incidental result of Koch's privileged action as the owner of the Facility.  Moreover, Koch was willing to surrender the Deboner and wanted GECC to pick it up, but GECC seemed intent on getting free storage (the Deboner taking up more than 6,000 square feet of Koch's Facility).  (Koch's Response, at 4 ¶ 9).  As a result, Koch's removal of the Deboner was necessary, not *wrongful* or in exclusion or defiance of GECC's rights.

---

[5]    GECC not only misrepresented Koch's care in removing the Deboner when it used terms like"toss" and "junk," which is contrary to the evidence, but also improperly referred to a privileged document that was inadvertently produced by Koch, by arguing that Koch held GECC off until replacement equipment arrived.  (GECC Response, at 4 ¶ 7).  The document, KOCH 939, remained privileged either by Magistrate Judge's ruling or by the district court's review.  Such conduct and misrepresentations are indicative of GECC's unrestrained tactics and goal to win its windfall at any cost.

Because GECC failed to prove that Koch used, asserted ownership of, or removed the Deboner in *exclusion or defiance* of GECC's rights, which is an essential element of the conversion claim, GECC's motion for summary judgment on the conversion claim must be denied. Conversely, Koch's motion for summary judgment on the conversion claim must be granted because there is no genuine issue as to the facts that GECC never demanded, nor did Koch refuse to surrender, the possession of the Deboner, or any of the other equipment, for that matter. *See Citizens Bank Enterprise v. Coffee County Bank*, 431 So.2d 1203, 1207 (Ala. 1983) (where the defendant rightfully acquires possession of the property and has not exercised dominion and control over it in defiance of the plaintiff's right to possession, a demand and refusal to deliver the property are necessary before a conversion action can proceed).

Koch demanded that GECC remove the Deboner but received no response. (Koch's Response, at 8 ¶ 23). Koch requested a mutual release in one of its removal demand shortly after GECC's attempted extortion. This request of release from GECC's extortion is justified, given that GECC demanded that Koch assume the obligations under the Equipment Lease and pay <u>full</u> rent for all the equipment, including the Freezer, the Deboner, and the already returned and sold Ossid lines, despite the uncontested fact that Koch's use, maintenance, and insurance of the Deboner accrued to GECC's benefit by helping to retain its value. (Koch's Response, at 7 ¶ 19, 8 ¶ 21). Consequently, Koch's request for a mutual release was a reasonable qualification that would not give rise to a conversion claim. *See Gabrielson v. Healthcorp of Eufaula, Inc*., 628 So.2d 411, 414 (Ala. 1993).

GECC weakly contends that GECC's demand would be futile because of Koch's request for a release or because Koch had removed the Deboner from the indoor space. (GECC's Response, at 8). In all the cases GECC cited to support this argument, the property had been

either sold or destroyed or the defendant had told the plaintiff that it intended to keep the property. (GECC's Response, at 8). Here, based on the facts stated above, no one, except GECC, which attempted to extort Koch for an exorbitant amount of rent, would think demand for possession from Koch would be futile.

Furthermore, GECC's demand-futile argument, just like its conversion claim itself, is specious and disingenuous. GECC did not demand possession before its attempted extortion, in which case GECC's demand would not have been futile according to GECC's arguments. The reason is obvious: GECC financially benefited from Koch's insurance, maintenance, and use of the Deboner, and the cost of removal of the Equipment would be a huge money loser for GECC. This is a classic example of having your cake and eating it too – which continues to this day with GECC's conversion counterclaim.

In sum, because GECC never demanded and Koch never refused to surrender the possession of the Deboner, Koch is entitled to summary judgment. Because none of Koch's acts was wrongful, illegal, or in exclusion or defiance of GECC's rights, GECC's motion for summary judgment must be denied.

**B.**        **Mr. Breakstone's valuation is meaningless and highly inflated rather than uncontested.**

As concluded in Koch's Response, Mr. Breakstone's valuations are meaningless and highly inflated. Mr. Breakstone's "Fair Market Value – In Place Day One Year One" not only defies all logic, but also shows GECC's greed.[6] In addition, Mr. Breakstone valued the Freezer five times the true value of the Freezer -- $50,000 as manifested by the sale contract between GECC and Mr. Michael Leonard. (Koch's Response, at 10 ¶¶ 27, 29).

---

[6]    GECC pleaded $846,545 in damages in its counterclaim but argued for $1,398,068 in damages in its summary judgment motion. GECC failed to disclose to Koch that it filed a claim against Sylvest's bankruptcy estate for $2,028,989.32.

In fact, if the Court needs to measure damages, it should calculate the damages based on Mr. Dalfonso's valuation based on the "Fair Market Value – Removed" approach. GECC argue that, because Mr. Breakstone was the only expert who appraised the Deboner in May 2006, the Court should measure damages based on his valuations, no matter how meaningless and highly inflated his valuations are. Experts cannot go back in time and appraise the Deboner. Mr. Dalfonso's 2007 appraisals reflected the actual value of the Deboner in early 2006 because, *by GECC's own admission*, Koch's use, maintenance, and insurance during the ten-month period maintained the value of the Equipment. (Koch's Response, at 7 ¶ 19). Mr. Dalfonso's 2007 appraisals of the Deboner ($200,000) and the Freezer ($100,00) are reasonable and fair. (Koch's Response, at 10 ¶ 27). They are close to Wayne Jones's valuation of the Deboner in his testimony, which is between $202,000 and $283,735, and to Michael Leonard's and GECC's own valuation of the Freezer in their 2007 contract. (Koch's Response, at 10 ¶¶ 28, 29).

Because Mr. Breakstone's valuations are meaningless and fanciful, they must be rejected. On the other hand, Mr. Dalfonso's 2007 valuations are reasonable and fair and reflect the true value of the Equipment in 2006. Therefore, the damages, if any – and Koch's position is that, at most, and if it is found to not own the Equipment as fixtures, it should have to pay pro-rated monthly rent based on the correct value of the Deboner -- must be measured based on Mr. Dalfonso's valuation.

**C.    The Equipment were fixtures because sufficient facts show that GECC and Sylvest intended that the Equipment became fixtures.**

Whether an article is a chattel or a fixture depends on the relationship of the parties and the intention of the parties *shown and inferred. Walker v. Tillis*, 66 So. 54, 57 (1914) (emphasis added). The rules of fixtures are different when "applied to heirs and administrators, vendors

and vendees, mortgagors and mortgagees, and landlords and tenants." *Id*.  When a landlord-tenant relationship exists, the trade-fixture exception may be applied in the tenant's favor.  *Id*.

The Alabama Supreme Court emphasized that the trade-fixture exception was founded on the rationale that the tenant's intention of attaching his personal property was to carry out his trade and business and to remove them at his pleasure after the tenancy, not to enhance the landlord's real property.  *Id*.  Base on this reasoning, GECC, not a tenant of the Facility, cannot rely on the trade-fixture exception.

GECC cites no authority to support its proposition that a party like GECC can rely on the trade-fixture exception against the land owner or its successor in interest.  GECC misplaced its reliance on *MOCO, Inc. v. Gaines*, 484 So.2d 470 (Ala. Civ. App. 1985).  In *MOCO*, a gasoline supplier, while coming upon the land to supply gasoline to a service station on a consignment basis, installed gas pumps, tanks, and other accessories on the land owned by the station operator's landlord.  *Id*. at 471.  The court in *MOCO* reasoned that the gas supplier was a licensee because the landlord was aware of the installation of the gas supply articles, did not object to the presence of the articles, and permitted the gas supplier to remove the articles.  *Id*. at 474.  Assuming that the court in *MOCO* extended the trade-fixture exception to "licensees, tenants, or tenants-at-will," it did not extend the exception to any party like GECC, who carried on no business on the land, left its property behind, and refused to remove the property when demanded.  (Koch's Response, at 8 ¶ 23).

Regardless of whether the Equipment can be characterized as a trade fixture or not, the controlling factor in determining whether the Equipment are fixtures is the intention of the parties shown or inferred.  *Walker*, 66 So. at 57; *see also LaFarge Building Materials, Inc. v. Stribling,* 880 So.2d 415, 419 (the governing intention of the tenant determines the availability of

the trade fixture exception).  Here, the facts and circumstances have sufficiently established that Sylvest, the tenant of Facility, intended the Equipment to become fixtures and that GECC lacked any intent to object to the Equipment's becoming fixtures, and essentially abandoned the Equipment and allowed them to be fixtures.

First, reselling the Deboner and the Freezer would involve substantial removal-installation costs and other soft costs, and the removal of them would significantly decrease their value.  (Koch's Response, at 7 ¶ 19).  GECC never demanded the Equipment and never responded when Koch repeatedly demanded that GECC remove the Equipment.[7]  (Koch's Response, at 6 ¶ 17, 8 ¶ 23).  The money-losing consequences of removing the Equipment indicates that GECC had already consented to their becoming fixtures when their were installed in late 2005.  GECC's resistance to pick up the Equipment proved that GECC intended to abandon the Equipment and further acquiesced in the Equipment's becoming fixtures.

Second, against all of its standard practice, GECC did not do a fixture filing, obtain a landlord waiver, or even inspect the Equipment to determine the nature of the annexation of the Equipment to the Facility at any time.  (Koch's Response, at 5 ¶ 14).  A landlord waiver or a similar agreement is exactly what GECC needs to be able to rely on *Mobile Cab and Baggage Co. Inc. v. The Texas Co*., 261 Ala. 242, 74 So. 2d 498 (1954) (holding that equipment was not fixtures because the former land owner had agreed that the equipment would be returned to the equipment lessor at the termination of the equipment lease).  *See also Cochrane v. McDermott Advertising Agency*, 6 Ala. App. 121, 60 So. 421, 422 (holding that certain billboards were not fixtures because the former land owner had agreed that the licensees were permitted to erect the

---

[7]  GECC's later conversion lawsuit was not intended to claim ownership or possession of the Equipment, but to recover a windfall for the used equipment.  GECC did not sue conversion for the Freezer because the removal costs would exceed the value of the Freezer. (Koch's Response, at 7 ¶ 19).

billboards with the privilege to removal). Had GECC obtained a landlord waiver from the former land owner, Hodges Bonded Warehouse, GECC probably would have been able to rely on *Mobile Cab and Baggage*. Here, however, GECC's failure to do a fixture filing or obtain a landlord waiver, especially when it was its standard practice to do so, unequivocally showed that GECC lacked any intent to object to the Equipment's becoming fixtures.

Finally, in addition to GECC's complete lack of intent to object to the Equipment's becoming fixtures and GECC's apparent abandonment of the Equipment, *Sylvest*, the tenant, clearly intended that the Equipment became fixtures. The former officer of Sylvest testified that Sylvest intended to install the Equipment in a "very hostile environment" and affix the Equipment to the Facility, making it difficult and costly for GECC to remove, and, at the end of the Equipment Lease, putting GECC in a position that it would have to sell the Equipment to Sylvest for little or no consideration. (Koch's Response, at 5 ¶ 12). Furthermore, in contrast to section 19(b) of Equipment Lease, which bears no weight on inferring the parties intention because the representatives of GECC and Sylvest never discussed or negotiated it, the Facility Lease provided that any improvements on the Facility would be conveyed to Sylvest.[8] (Koch's Response, at 3 ¶ 3, 4 ¶ 8).

###    D.    Conclusion

No good deed goes unpunished. Koch insured, used and maintained the Deboner for the benefit of itself and GECC and let GECC leave the Freezer at the Facility without requiring GECC to pay for the storage costs. After seven months' silence, GECC attempted to extort an exorbitant amount of rent, and to coerce Koch into assuming a rejected lease, threatening a

---

[8]    Whether section 19(b) was enforceable against Sylvest is irrelevant in determining whether the Equipment are fixtures, because *Sylvest was not the owner of the Facility*. *See Mobile Cab and Baggage*, 74 So. 2d 499-500. Koch was not a party to and did not assume the Equipment Lease. GECC also cannot rely on *LaFarge* to dismiss the effect of the improvement provision in the Facility Lease because GECC was not the tenant. 880 So. 2d at 419.

conversion lawsuit if Koch did not capitulate. In response, and to protect itself, Koch demanded that GECC remove the Equipment, subject to a fair release from any future extortion by GECC. GECC, not surprisingly, made no response to Koch's removal demand, since it did not want the unmarketable Equipment anyway, and instead wanted a cash windfall from Koch – as it seeks in its Counterclaim.

GECC failed to prove that any of Koch's acts were wrongful. GECC's motion for summary judgment as to the conversion claim, therefore, must be denied. On the other hand, no dispute exists as to the facts that GECC never demanded and Koch never refused to surrender the possession of the Deboner. Koch's motion for summary judgment on GECC's conversion claim must therefore be granted.

Koch believed that the Equipment were fixtures and only openly asserted the ownership in its complaint after being extorted and threatened by GECC. Koch's assertion of ownership is well founded on abundant facts: GECC failed to follow its corporate procedures to prevent the Equipment from becoming fixtures, and resisted removing the Equipment after the termination of the Equipment Lease and apparently abandoned the Equipment; Sylvest intended to attached the Equipment so as to gain ownership at little or no cost; the Equipment was permanently attached and fittingly integrated to the land that had been for a food processing facility for years. Based on these facts, GECC's motion for summary judgment as to Koch's fixture claim must be denied.

Dated:  January 18, 2008                    **KOCH FOODS OF ALABAMA, LLC**

                                             By: **/s/ Zhiyuan Xu**_____
                                                    **One of Its Attorneys**

Eugene J. Geekie, Jr. (ARDC # 6195060)
Zhiyuan "Mike" Xu (ARDC # 6292094)
**SCHIFF HARDIN LLP**
6600 Sears Tower
Chicago, Illinois  60606-6473
(312) 258-5500 (phone)
(312) 258-5700 (fax)

-and-

Thomas G. Mancuso
Haskell Slaugher Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104
Telephone: 334-265-8573
Facsimile: 334-264-7945
Email: tgm@hsy.com

**Counsel for Koch Foods of Alabama, LLC**

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on January 18, 2008, copies of *Koch Foods' Reply in Support of its Motion for Summary Judgment and in Opposition to GECC's Motion for Summary Judgment* were caused to be served via e-mail to the following:

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
Email: tharris@reedsmith.com

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com


/s/ Zhiyuan Xu
Zhiyuan Xu

CH2\2267236.13

# Exhibit A

Mark Kaminsky     October 19, 2007

Page 78

1  BY MR. HARRIS:
2      Q   In what regard?
3      A   You can have a capital lease on buildings
4  as well as the real estate that the buildings sit
5  on.
6      Q   Okay.  If you look further up, I guess
7  under Total Current Assets you see Machinery,
8  Equipment and Leasehold Improvements, do you see
9  that?
10     A   Yes.
11     Q   Two numbers, one for 51 million and
12  change, the other for 47 million and change, do you
13  see that?
14     A   Yes.
15     Q   When you were analyzing the balance sheet
16  of Sylvest Farms, did you -- strike that.
17         What was your personal involvement in
18  that, in the due diligence, if any, in the Sylvest
19  Farms acquisition?
20     A   I was part of the due diligence team.
21     Q   Okay.  And as part of that, did you review
22  equipment leases?
23     A   I don't recall reviewing equipment leases.
24     Q   Did someone at Koch Foods review equipment

Page 79

1  leases?
2      A   No, we would not have -- we would not have
3  had a compelling reason to review the lease.
4      Q   And why is that?
5      A   Our standard procedure in these matters is
6  to reject leases as part of acquiring assets out of
7  bankruptcy.
8      Q   So then anything in an equipment lease you
9  would generally reject, and therefore you didn't
10  need to review them in due diligence, is that your
11  testimony?
12     A   Yes.
13     Q   And you've done this before with respect
14  to other bankruptcies?
15     A   Yes.
16     Q   Which other ones?
17     A   BC Rogers.
18     Q   Any other ones?
19     A   No.
20     Q   Okay.  But you have been through this
21  drill before acquiring through bankruptcy another
22  chicken processor?
23     A   Yes.
24     Q   Who at Koch was in charge of this deal,

Page 80

1  was that you?
2      A   Yes.
3      Q   And when I say this deal, I mean this
4  acquisition of Sylvest.
5      A   Yes, it was me.
6      Q   And at the time that Koch Foods entered
7  into the amended asset purchase agreement of the
8  various assets listed by Koch Food -- I'm sorry,
9  listed by Sylvest in that asset agreement, did you
10  believe at that point that Koch was purchasing the
11  deboning line and the spiral freezer?
12     A   Yes.
13     Q   And why was that?
14     A   Because they were fixtures attached to the
15  facility.
16     Q   And on what date then did Koch gain
17  ownership of the equipment?  And when I say the
18  equipment, in this instance I mean only the deboner
19  and the spiral freezer.
20     A   Upon the closing of the deal for Sylvest,
21  which was approximately the end of May of 2006.
22     Q   And has Koch maintained insurance with
23  respect to the deboner and the spiral freezer?
24     A   Yes.

Page 81

1      Q   And when did that insurance become
2  effective?
3      A   At closing of the Sylvest deal.
4      Q   And does it still have insurance on those
5  items?
6      A   Yes.
7      Q   And what kind of insurance does it have?
8      A   It's part of our property and casualty
9  policies.
10     Q   So it doesn't have a specific policy with
11  respect to those items?
12     A   No.
13     Q   Let me show you Exhibit C.  I show you
14  Exhibit C, which is the answer to the complaint.
15  Same question, have you seen this before?
16     A   Yes.
17     Q   Have you discussed the contents of this
18  document with anyone other than your attorneys?
19     A   No.
20     Q   Have you discussed the contents of this
21  document with anyone at Sylvest?
22     A   No.
23     Q   And let me show you Exhibit W.  My
24  question is have you seen this document before?

21 (Pages 78 to 81)