UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, | ) ) ) | |
| Plaintiff and Counter-Defendant, | ) ) ) | |
| vs. | ) ) ) | CIVIL ACTION NO. 2:07 CV 522-MHT |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendant and Counter-Plaintiff, | ) ) | |

GENERAL ELECTRIC CAPITAL CORPORATION'S OBJECTIONS TO
THE DEPOSITION DESIGNATIONS OF KOCH FOODS OF ALABAMA, LLC

General Electric Capital Corporation ("GE Capital"), through its undersigned counsel, pursuant to Section 10 of the Uniform Scheduling Order entered in the above-captioned proceeding on July 17, 2007 (Doc. No. 14), submits the following objections to the deposition designations identified by Koch Foods of Alabama, LLC ("Koch Foods") for use at trial.   In conjunction therewith, GE Capital states as follows:

### A.    General Objection To The Use Of Any Deposition Designations Where The Deponent Will Appear As A Witness At Trial

In Koch Foods's Deposition Designations (Doc. No. 86), filed in the above-captioned proceeding on March 5, 2008 (the "Initial Designations"), and Koch Foods's Responsive Counter Deposition Designations (Doc. No. 89), filed in the above-captioned proceeding on March 12, 2008 (the "Responsive Designations"), Koch Foods has designated portions of the deposition testimony for four individuals:   Michael Leonard, Mark Kaminsky, Wayne Jones, and David Bromley (collectively, the "Deponents").   In Koch Foods's Witness List (Doc. No. 85), also filed

in the above-captioned proceeding on March 5, 2008, Koch Foods indicates that it *will call* each of the Deponents as witnesses at trial.

Given the foregoing, GE Capital makes a general objection to the use of deposition testimony for any of the Deponents that will appear personally at trial. To the extent that the Deponents are available to offer live testimony, their deposition testimony fails to meet the admissibility requirements of Federal Rule of Evidence 802 and Federal Rule of Civil Procedure 32.[1]

### B.      Michael Leonard

In addition to the general objection stated above, GE Capital objects to the following designations from the deposition of Michael Leonard made by Koch Foods, portions of which are attached hereto as <u>Exhibit A</u>:

| Deposition Designation | Basis for Objection |
|---|---|
| 6:12-16 | Improper opinion testimony from an individual not designated as an expert witness pursuant to Federal Rule of Civil Procedure 26(a)(2) ("Rule 26(a)(2)"). |
| 7:3-8 | Improper hearsay related to the opinions of third-parties. |
| 10:23-11:1 11:17-21 | Improper opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 12:8-12; 12:17-13:4; 13:11-14 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 15:5-6 | Improper opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 18:24-19:22 | Improper hearsay testimony related to conversations with J. DiSalvo. |
| 20:22-21:3 | Improper hearsay testimony related to conversations with J. DiSalvo. |
| 21:4-12 | Improper hearsay testimony related to conversations with J. DiSalvo. |
| 21:13-22:10,  22:25- | Improper speculation and opinion testimony from an individual not |

---

[1] There are limited circumstances in which deposition testimony may be used at trial when the deponent is available. These include, *inter alia*, situations where the deponent makes an admission on behalf of a party. *See, e.g., Fed. R. Evid. 801(d)(2)*. Still, such an admission must be offered *against* the party. *Id.* As such, Koch Foods is not in a position to offer the testimony of its own employees under this exception.

| 24:13; 24:23 | designated as an expert witness pursuant to Rule 26(a)(2). |

### C.    Mark Kaminsky

In addition to the general objection stated above, GE Capital objects to the following designations from the deposition of Mark Kaminsky made by Koch Foods, portions of which are attached hereto as <u>Exhibit B</u>:

| Deposition Designation | Basis for Objection |
|---|---|
| 41:5-21 | Improper hearsay testimony related to conversations with GE Capital. |
| 42:18-44:11; 44:20-46:17 | Improper testimony related to settlement negotiations. |
| 43:5-44:9 | Improper hearsay testimony related to conversations with GE Capital. |
| 45:5-10 | Improper hearsay testimony related to conversations with GE Capital. |
| 46:5-12 | Improper hearsay testimony pertaining to the position of GE Capital. |
| 51:18-20 | Improper testimony related to settlement negotiations. |
| 52:4-7, 10-12 | Improper hearsay testimony related to conversations with GE Capital. |
| 53:2-5, 8-22 | Improper testimony related to settlement negotiations. |
| 55:21-56:1 | Improper testimony related to settlement negotiations. |
| 63:20-23, 64:4-5, 7-16, 18-24 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 65:1-12 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 86:8-20 | Improper testimony related to settlement negotiations. |
| 108:11-20 | Improper testimony related to conversations with GE Capital, and related to the position of GE Capital. |
| 110:4-6, 10-16 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 111:7-16 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 113:17-114:12 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 119:11-120:1 | Improper testimony related to settlement negotiations. |
| 121:7-14 | Improper speculation and opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |
| 137:4-9 | Improper opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |

### D.    David Bromley

In addition to the general objection stated above, GE Capital objects to the following designations from the deposition of David Bromley made by Koch Foods, portions of which are attached hereto as <u>Exhibit C</u>:

| Deposition Designation | Basis for Objection |
|---|---|
| 25:11-21 | Improper hearsay testimony related to conversations with M. Leonard. |
| 53:3-5, 6-9 | Improper opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2). |

### E.    Wayne Jones

In addition to the general objection stated above, GE Capital objects to the following designations from the deposition of Wayne Jones made by Koch Foods, portions of which are attached hereto as <u>Exhibit D</u>:

| Deposition Designation | Basis for Objection |
|---|---|
| 28:5-7, 10-18 | Improper hearsay testimony related to conversations with M. Kaminsky and others. |
| 29:5-13 | Improper hearsay testimony related to conversations with M. Kaminsky; improper testimony related to settlement negotiations with GE Capital. |
| 38:3-18 | Improper opinion testimony from an individual not designated as an expert witness pursuant to Rule 26(a)(2); Relevance; exclusion is necessary under Rule 403 of the Federal Rules of Evidence. |

WHEREFORE, GE Capital respectfully requests the entry of an order: (a) prohibiting Koch Foods from using any of the deposition testimony for Michael Leonard, Mark Kaminsky, David Bromley, and/or Wayne Jones, other than for the purposes of impeachment, because the portions of deposition testimony designated by Koch Foods fail to meet the conditions for admissibility under Rule 32 of the Federal Rules of Civil Procedure; and (b) granting any further relief that this Court deems to be appropriate under the circumstances.

Dated: March 31, 2008.

By:    /s/ Rusha C. Smith
        Attorney for General Electric Capital
        Corporation

OF COUNSEL:
Rusha C. Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

OF COUNSEL:
Alexander Terras
Timothy S. Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400

## CERTIFICATE OF SERVICE

     I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

     Thomas G. Mancuso, Esq.
     Thomas T. Gallion, III, Esq.
     Constance C. Walker, Esq.
     Haskell Slaughter Young & Gallion, LLC
     305 South Lawrence Street
     Montgomery, AL 36103-4660

     Eugene J. Geekie, Jr., Esq.
     Mike Xu, Esq.
     Schiff Hardin LLP
     6600 Sears Tower
     Chicago IL 60606

     /s/ Rusha C. Smith
     COUNSEL

EXHIBIT A

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF ALABAMA
 2

 3

      KOCH FOODS OF ALABAMA, LLC,          )
 4    an Alabama Limited Liability         )
      company,                             )
 5                                         )
              Plaintiff and               )
 6            Counterclaim-defendant,     )
                                           )
 7            vs.                          )
                                           ) CASE NO.:
 8                                         ) 07-cv-522-MHT
      GENERAL ELECTRIC CAPITAL             )
 9    CORPORATION, a Delaware              )
      corporation,                         )
10                                         )
              Defendant and               )
11            Counterclaim-plaintiff.     )

12                    - - -

13

14         Deposition of MICHAEL T. LEONARD, taken

15    on behalf of the Plaintiff and Counterclaim-

16    Defendant, pursuant to the stipulations agreed

17    to herein, before Steve S. Huseby, Registered

18    Professional Reporter and Notary Public, at

19    Schiff Hardin, LLP, One Atlantic Center, Suite

20    2300, 1201 West Peachtree Street, Atlanta,

21    Georgia, on the 3rd day of January, 2008,

22    commencing at the hour of 10:03 a.m.

23

24

25
```

Page 6

```
 1    sold new equipment, which was spiral freezers
 2    specifically.
 3        Q.   Okay.  And the spiral freezers, are
 4    they used in the poultry processing business?
 5        A.   Yes, they are.
 6        Q.   And with MTL Services, have you bought
 7    and sold used equipment?
 8        A.   Yes, used spiral freezers and flat
 9    products freezers and contact freezers for the
10    food freezing industry for the poultry
11    industry and beef industry.
12        Q.   Do you have knowledge about whether or
13    not poultry equipment -- or food processing
14    equipment depreciates in market value when
15    it's placed into service?
16        A.   Yes, it does.
17        Q.   And what is your knowledge of that
18    based on?
19        A.   Well, I could tell you that the first
20    unit that I purchased was a unit that I
21    purchased from Brakebush Brothers that I sold
22    later to Sylvest Farms.  This was also the
23    unit that's in question here or in litigation,
24    and that unit is a GYRoCOMPACT 76, the model
25    number is 76-08-40-26.  And that unit probably
```

Page 7

1    sells new for 650 to 700 thousand dollars.   I

2    purchased that unit for $25,000 from Brakebush

3    Brothers and then removed it.   One reason they

4    saw the value in selling it for the price that

5    it was purchased for was that my old company,

6    FMC FoodTech, was going to charge them

7    $100,000 to remove it.   So in their opinion,

8    they just made $125,000.

9         And so I purchased the unit, removed it,

10   sold it to Sylvest Farms, took the unit to

11   Arkansas, refurbished it, shipped it to

12   Sylvest and -- Sylvest Farms at the plant that

13   the unit is at now, and then reinstalled it.

14        Q.   Now, this freezer you're describing,

15   when did you purchase it from Brakebush?

16        A.   I don't have the date right here, but

17   it was back on I think in October of 2005, I

18   think.

19        Q.   And how old was that freezer when you

20   purchased it?

21        A.   It was a 1993, I believe.

22        Q.   Okay.   And at that time that you

23   purchased it, you said you purchased it for

24   $25,000?

25        A.   That's correct.

Page 10

```
 1        increased the price from the 25,000 you paid
 2        to the 430,000 you delivered it for, or sold
 3        it for?
 4            A.   Well, the first thing, of course, is
 5        that the equipment had to be removed.  And,
 6        you know, that was probably in the range of
 7        $75,000 or so to remove that unit.  And then
 8        the unit --
 9            Q.   And that's remove it from Brakebush?
10            A.   From Brakebush, correct.  And then
11        once the unit was removed, it had to be
12        trucked to Arkansas, which is four flatbed
13        trucks, which I don't remember all these
14        numbers exactly but I can give you some
15        estimates.  It was probably, you know, seven
16        or eight thousand dollars to do that.  And
17        then once the equipment was sent there, we
18        refurbished the unit, which was probably
19        another, I don't know, maybe $100,000.  We had
20        to buy several new components for the unit,
21        including a new drive system, all new what
22        they call ball rails and balls and chains,
23        which was about $50,000.  A new enclosure has
24        to be purchased every time you remove a
25        freezer, take it apart and put it back
```

Page 11

 1    together.  That was about 50 to 60 thousand

 2    dollars.  And the installation, the labor and

 3    all that was about $100,000.

 4        And you know, there's markup applied to

 5    all, this but if you look at the $430,000, all

 6    of that costs should have come up -- I have a

 7    cost sheet but didn't bring it with me.  I'm

 8    happy to get that for you guys on the project.

 9    But it came up to be about $330,000, and we

10    made about $100,000 profit, which is about a

11    25 percent gross margin; should have done

12    better.

13        Q.    Then it's your testimony that the

14    installation price at Sylvest or the

15    installation cost was approximately $100,000?

16        A.    Yes.

17        Q.    Now, I think you also said that when a

18    new freezer is removed and then installed, you

19    need to include a new housing, is that right?

20        A.    Yes, sir, you have to have a new

21    enclosure.  In this case, it was a stainless

22    steel enclosure inside and outside because

23    they were going to do par-fried products and

24    may have done fully cooked later, so we have

25    stainless steel on the inside and the outside.

1      Q.   And what did you estimate the cost of
2  a new enclosure would be?
3      A.   Well, the cost of it is, I think at
4  that time was about 38,000 or so, but with the
5  markup, it's going to be over -- a little over
6  probably $50,000.  But the cost actually is
7  37,000.
8      Q.   And if the freezer was removed from
9  the Sylvest facility where you installed it
10  and taken to another location and installed
11  there, would it need another housing, or I
12  should say enclosure?
13          MR. HARRIS:   Objection, calls for
14  speculation and opinion.
15  BY MR. GEEKIE:
16      Q.   Go ahead.
17      A.   Well, to me, that's not speculation.
18  I mean, this is what I do for a living.  And
19  every time that a unit is taken apart, it has
20  to be -- the enclosure is going to be
21  destroyed.  And the way that these units are
22  put together, they are put together with an
23  adhesive that goes between each enclosure
24  section as they are cam locked together.  And
25  that adhesive is a big time adhesive, however,

1    whatever the right word is that you want to

2    use.  And when you take these panels apart,

3    they tear all over the foam or polyurethane

4    that's in there.

5         Also, this unit was done very unique

6    because he wanted to have stainless steel up

7    the walls.  So we went up the walls about 36

8    inches with stainless steel, and then had to

9    adhere the unit with adhesive, the enclosure

10   to the unit itself, the way it was all welded

11   together and sandwiched together.  So, you

12   know, that -- people can try to take those

13   apart, but I have never seen that successfully

14   done.

15        Q.   And have you ever installed a freezer

16   without a new enclosure?

17        A.   No.

18        Q.   Can you describe -- you briefly

19   described the installation of the freezer at

20   Sylvest where you said that it was I think

21   customized with stainless steel up the wall.

22   Can you describe what was involved in

23   installing this freezer at the Sylvest

24   facility?

25        A.   Well, first off, you have to take the

Page 15

```
 1    the freezer to be installed?
 2         A.    There is a concrete pad that has to be
 3    laid down, which is 4 inches thick, that they
 4    put right down on top of the existing floor.
 5    And that's very common in all of those -- in
 6    any kind of spiral freezer that's built.
 7         Q.    Do you know anything else that was
 8    done to the building?
 9         A.    No, sir.
10         Q.    Was the freezer itself attached to the
11    building with pipes or electrical lines or
12    anything else?
13         A.    Well, I don't think that they actually
14    finished the installation on that equipment.
15    The last time I was there, the refrigeration
16    was never completely hooked up and insulated
17    because Sylvest went into bankruptcy.  So the
18    installation was never completed, with
19    electrical or with refrigeration.
20         Q.    Okay.  And I think you said that when
21    you originally trucked it to Arkansas to be
22    refurbished, it was on four truckloads, is
23    that right?
24         A.    That's correct.  And then we also, one
25    thing I didn't mention is then we had to truck
```

Page 18

1    case they sold the freezer and they wanted me

2    to -- you know, if they were interested in me

3    purchasing the unit or just moving that unit

4    for them if they found a buyer themselves.

5    And then also I had been in contact, of

6    course, with Joe DeSalvo to purchase the unit

7    outright.

8         Q.    Before we go on to your conversations

9    with Mr. DeSalvo, if you'll turn in Exhibit 18

10   to page GE 373.

11        A.    Okay.

12        Q.    And I see that there's a line that

13   says removal and installation, $175,000.

14        A.    Right.

15        Q.    Can you describe for me what that line

16   is intended to indicate?

17        A.    Well, that was for us to go into the

18   factory and completely disassemble the unit

19   and -- you know, and then I'm not sure if

20   freight was included in that or not right off

21   the top of my head.  But that was for us to

22   disassemble it and then reinstall it at

23   another location.

24        Q.    And then you mentioned conversations

25   you had with Mr. DeSalvo.  Can you describe

Page 19

```
 1    what those conversations were about?
 2         A.   Well, I've known Joe DeSalvo for a
 3    little while and, you know, called him because
 4    I knew that he was involved in the surplus
 5    equipment or whatever it should be called, and
 6    had called him up and just tried to see if I
 7    could purchase this unit from GE Capital.  And
 8    during the conversations, we went back and
 9    forth on it and agreed on a price.  And he
10    sent me a contract that stated what we had
11    agreed to.  We went back and forth on that a
12    couple of times to get all the wording
13    correct, and then agreed on a price of
14    $50,000.
15         And I sent him a deposit, which we had
16    agreed on, of $5,000 and sent that in to him,
17    and then later on was informed by Joe that
18    there was litigation between Koch Foods and GE
19    and that the equipment may not be available,
20    at which time I requested to get my deposit
21    back, which was returned to me, you know, very
22    quickly.
23         Q.   Now, you said this unit.  Are you
24    speaking about the freezer that was installed
25    at Sylvest Farms?
```

Page 20

```
 1        A.    Yes.

 2        Q.    And it was your understanding that GE,

 3   through Mr. DeSalvo, had agreed to sell that

 4   freezer to you for $50,000?

 5        A.    Yes.  I actually signed the contract

 6   and sent that back in to them with a deposit

 7   check.

 8        Q.    And what time period was this?

 9        A.    I would have to go back and -- hold

10   on, I'll look at the -- this was in May of

11   2007.

12        Q.    And if you'll turn to Koch Exhibit 21.

13        A.    Okay, I have it.

14        Q.    Can you identify that document for me?

15        A.    Yes.  That's the document that Joe

16   DeSalvo and General Electric sent to me by

17   e-mail, at which time I signed it and sent in

18   a deposit for $5,000.

19        Q.    And did General Electric cash your

20   check for $5,000?

21        A.    Yes, they did.

22        Q.    Okay.  And in discussing the purchase

23   of the freezer with Mr. DeSalvo, did

24   Mr. DeSalvo indicate to you that GE had been

25   making any other efforts to sell the freezer?
```

Page 21

1         A.    No, we really didn't discuss that.    I

2    mean, it was -- I was just trying to buy the

3    equipment.

4         Q.    When you discussed the $50,000

5    purchase price, did Mr. DeSalvo indicate to

6    you that he believed that that was the fair

7    market value of the spiral freezer located at

8    Sylvest Farms?

9         A.    Well, I took it that he did because he

10   felt very comfortable with, you know, with

11   selling it to me at that price.  And, you

12   know, I -- it was pretty clear to me.

13        Q.    Now, have you received and reviewed an

14   appraisal by a Mr. Robert Breakstone from

15   Equipment Exchange regarding the equipment

16   located at Sylvest Farms?

17        A.    I did look at it briefly, just at the

18   numbers on it, but yes, I did review it

19   quickly.

20        Q.    And are you familiar with the

21   equipment that was described in that

22   appraisal?

23        A.    My understanding is that it's the same

24   equipment that's at the Koch Foods facility in

25   Alabama that we're talking about today.

Koch Foods of Alabama, LLC v. General Electric Capital Corporation
Michael T. Leonard

07-cv-522-MHT
January 3, 2008

Page 22

 1      Q.   And have you inspected that equipment
 2   before?
 3      A.   Yes.  Yes, I went back and looked at
 4   it when I was looking at, you know, at
 5   purchasing it back, to make sure it was still
 6   in the same condition that we had left it in.
 7   And it was at that time.
 8      Q.   And do you have any reaction to or
 9   view regarding the amounts that Mr. Breakstone
10   expressed in his appraisal --
11           MR. HARRIS:  I'm sorry, go ahead.
12   BY MR. GEEKIE:
13      Q.   -- regarding this equipment?
14           MR. HARRIS:  All right.  Let me
15   re-interject my continuing objection to
16   opinion testimony.
17           MR. GEEKIE:  Tim, you made it
18   before and I'll give it to you again.  You've
19   objected to it.
20           MR. HARRIS:  I'll keep making it,
21   too.
22           MR. GEEKIE:  Okay.
23   BY MR. GEEKIE:
24      Q.   Go ahead, Mr. Leonard.
25      A.   Well, you know, I just -- you know,

Koch Foods of Alabama, LLC v. General Electric Capital Corporation
Michael T. Leonard

07-cv-522-MHT
January 3, 2008

Page 23

1    I've been in this business, as I've said, and

2    I've purchased this equipment, this type of

3    equipment a lot, whether it's that size or

4    bigger or smaller, and the one thing that I

5    just noticed was that it was an extremely high

6    price as far as I'm concerned.  You know,

7    if -- there's different values I guess

8    associated with whether it's a -- you know, a

9    third-party that actually produces food that,

10   you know, maybe there's a price that they

11   would pay, and then there's a fair market

12   value that I would pay for it.

13        But in my opinion, you know, you cannot go

14   out and purchase this equipment anywhere near

15   the pricing that they are talking about,

16   refurbish the unit, you know, remove the unit,

17   refurbish the unit, reinstall the unit and

18   make any money at all at a price of, I can't

19   remember, $280,000 or whatever that number

20   was, or even the other value, which was a

21   lower value, I can't remember what that value

22   was, a hundred and something thousand dollars.

23        I mean, by the time I got through selling

24   this unit, even if I purchased it at $50,000

25   and, you know, sold it for whatever that price

Page 24

```
 1     would be, you know, $400,000 or whatever in

 2     that range that it was, you know, if you made

 3     $100,000 or so on the unit, that would be a

 4     good price.  And at the pricing that we're

 5     talking about here, there's no way that you

 6     could make any profit whatsoever.  It would

 7     just -- it would be doing it at cost, which of

 8     course isn't good business and would never be

 9     associated with that.

10          Q.   And are your statements based upon

11     then what you knew to be the cost of

12     installation, removal and installation of this

13     freezer?

14               MR. HARRIS:  Let me restate my

15     objection again.  You're asking him for

16     opinion testimony.

17     BY MR. GEEKIE:

18          Q.   Go ahead.

19          A.   Would you repeat the question?

20               MR. GEEKIE:  Would you read it

21     back?

22               (The record was read.)

23               THE WITNESS:  Yes.

24               MR. GEEKIE:  I have no further

25     questions.  And for the record, I will state
```

EXHIBIT B

Mark Kaminsky        October 19, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

KOCH FOODS OF ALABAMA, LLC, )
An Alabama Limited Liability )
company, )
                              ) No. 07-cv-522-MHT
      Plaintiff and )
      Counterclaim-Defendant,)
                              )
   vs. )
                              )
GENERAL ELECTRIC CAPITAL ) Honorable Myron H. Thompson
CORPORATION, A Delaware )
corporation, ) Honorable Terry F. Moorer
                              )
      Defendant and )
      Counterclaim-Plaintiff.)


      The deposition of MARK KAMINSKY, taken

before Christina M. Cummins, CSR and Notary Public,

pursuant to the Federal Rules of Civil Procedure for

the United States District Courts pertaining to the

taking of depositions, at 10 South Wacker Drive,

40th Floor, in the City of Chicago, Cook County,

Illinois at 10:02 a.m. on the 19th day of October,

A.D., 2007.

Mark Kaminsky     October 19, 2007

Page 41

1     Q     Other than Koch Foods' attorneys, did you
2  discuss the contents of this complaint with anyone
3  prior to its filing?
4     A     No.
5     Q     Now, if you look at paragraph 12 of this
6  document, it states that, "Several months after Koch
7  purchased the assets of Sylvest, Koch Foods demanded
8  that GE Capital remove the equipment from the plant.
9  GE Capital has failed and refused to remove its
10 equipment from the plant."  My question to you is
11 when was the demand made by Koch to GE to remove the
12 equipment?
13    A     I don't recall the specific date we asked
14 to have the equipment removed.
15    Q     But it was sometime prior to May of 2007
16 when this was filed, right?
17    A     Yes.
18    Q     Who would have made that demand?
19    A     Gene Geekie in communication with GE.
20    Q     Anyone else?
21    A     No.
22    Q     You never made that demand?
23    A     No.
24    Q     No one that you know of other than

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 42

1    Mr. Geekie ever made that demand?

2        A    No.

3        Q    Do you know when the first demand was

4    made?

5        A    I do not recall.

6        Q    Was it in 2006?

7        A    No.

8        Q    Was it only in 2007?

9        A    Yes.

10        Q    When did Koch begin using the deboner

11    line?

12        A    June of 2006.

13        Q    So your testimony is that Koch Foods began

14    using the deboner line before it demanded that GE

15    remove it?

16        A    Yes.

17        Q    And why was that?  Strike that.

18            Why did they start using the deboner?

19        A    As is typical when you buy a company out

20    of bankruptcy, you have to settle certain matters

21    that are part of the process.  We were aware there

22    was a lease between Sylvest and GE.  And we

23    attempted to make payment to GE to settle any

24    possible conflicts regarding the property, the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 43

1    equipment, with them.

2         Q    Okay.  And when were those efforts made to

3    pay GE?

4         A    June of 2006.

5         Q    And what were those efforts, did you send

6    checks, did you call, what did you do?

7         A    I had conversations with a representative

8    of GE.

9         Q    And who is that?

10        A    I don't recall his specific name, and it

11   may have been a gentleman Mike or Michael.  I

12   believe first I was contacted by an attorney, and I

13   told him that I was attempting to contact the

14   business folks within GE and work this matter out.

15        Q    And you don't remember that gentleman's

16   name other than his first name may have been

17   Michael?

18        A    No.

19        Q    His last name may have been Michael?

20        A    No, I believe his first name was Michael,

21   but again, I don't recall his name.

22        Q    Okay.  And tell me the substance of those

23   conversations.

24        A    I basically wanted to come to some

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 44

1   mutually agreeable conclusion to the potential

2   conflict that could arise in terms of this

3   equipment.

4        Q     And did you make an offer of what that

5   might be?

6        A     At first we probably outlined what our

7   intentions were towards the equipment, specifically

8   the Ossid equipment.

9        Q     Okay.

10       A     The vast majority of it was never even

11  uncartoned.

12       Q     And what was Koch Foods' intentions with

13  respect to that equipment?

14       A     We told them to come and get it.

15       Q     And what happened, did they do that?

16       A     They came and got it.

17       Q     What was Koch Foods' intention with

18  respect to the deboner line?  And this is in June of

19  2006.

20       A     Yes, absolutely.  Being that it was

21  attached to the facility, not very easy to remove or

22  take out, but also understanding that to move the

23  process forward, some sort of offer to GE would be

24  appropriate, but also having to go through the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

1  process of what we actually wanted or needed out of

2  that deboning equipment and what we didn't want, and

3  that's basically what I communicated to the

4  gentleman at GE.

5      I said some of this stuff is useless to

6  us.  We'd like to go through the list.  We'd like to

7  indicate the stuff that we truly don't want.  If you

8  guys want it because we don't have a use for it,

9  you're more than welcome to it, and we'd like to pay

10 you some amount of money as an accommodation.

11     Q    Well, for use of the stuff you did want?

12     A    Not for use --

13     Q    For ownership?

14     A    For settlement.

15     Q    My question to you is what was it that you

16 were intending to do, to own it, to lease it?

17     A    Well, we felt we already owned it, but we

18 also understood that in these matters there's

19 usually contention.  And if we could make a payment

20 to settle the matter, that would probably be in the

21 best interest of both parties.

22     Q    And was an offer made of a precise dollar

23 amount?

24     A    Yes.

MERRILL LEGAL SOLUTIONS
Tel: (312) 263-3524    (800) 868-0061

Mark Kaminsky    October 19, 2007

Page 46

1      Q      And what was that?

2      A      I don't recall the exact dollar amount,

3  but it was probably in the 100 plus thousand dollar

4  range.

5      Q      And what was the response from GE?

6      A      Well, they basically said that we couldn't

7  pick and choose parts of the deboning equipment,

8  that they had somebody that was interested in buying

9  the whole thing.  And if we wanted it we'd have to

10  offer something on the entire line.  And that was

11  where the conversation was left.  And I didn't hear

12  from anybody for quite a long period of time.

13      Q      Okay.  They told you that.  Did you ever

14  make an offer for the entire line?

15      A      I offered an amount of money that was in

16  that hundred plus thousand dollar range and did not

17  change that offer at that time.

18      Q      Okay.  And then you began using it,

19  correct?

20      A      As previously stated we began using it in

21  June of 2006.

22      Q      Did you use all of the deboning line?

23      A      No.

24      Q      Just parts?

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 51

1    purchasers for the equipment.  As such, the
2    equipment is still located at the facility."  Do you
3    see that?
4        A    I do.
5        Q    Does it surprise you -- strike that.
6             Would it surprise you if those statements
7    were accurate?
8             MR. GEEKIE:  Objection.  That's vague and
9        ambiguous.
10       A    Again, pieces of this probably would not
11   surprise me.  We certainly probably would have
12   allowed the equipment to stay while GE -- for the
13   equipment we had no interest in keeping.  We were
14   trying to be fair in this matter.
15   BY MR. HARRIS:
16       Q    Okay.  And how about the equipment that
17   you did have an interest in keeping?
18       A    We had made a previous offer to settle the
19   matter, which I basically heard nothing between the
20   timeframe of June of 2006 and January of 2007.
21       Q    And having heard nothing, you proceeded to
22   use a portion of that equipment, correct?
23       A    We did use a portion of the equipment,
24   yes.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 52

1      Q     And you did not advise GE Capital of that,
2   correct?
3      A     No.
4      Q     Did there ever come a time when Koch Foods
5   demanded that GE Capital remove from the premises
6   that portion of the deboner equipment that it had
7   been using?
8          MR. GEEKIE:  Objection, asked and
9          answered.
10     A     We through our attorney, Gene Geekie, made
11   demands that the equipment be removed from our
12   facility.
13  BY MR. HARRIS:
14     Q     And I'm speaking of the deboner equipment
15   that had been used.
16     A     That is correct.
17     Q     On what grounds was that demand made, on
18   what basis, if Koch owned it?
19          MR. GEEKIE:  Objection, vague and
20          ambiguous, asked and answered.
21     A     We had continued to try to come to some
22   resolution with General Electric, to no avail.
23   Therefore, since we could not come to a mutually
24   agreeable resolution, we made other provisions.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 53

1    BY MR. HARRIS:

2        Q    What efforts did you personally make

3    between June of 2006 and the date this lawsuit was

4    filed in May of 2007 to come to a mutually agreeable

5    resolution with GE Capital, if any?

6            MR. GEEKIE:  Objection, asked and

7        answered, vague and ambiguous.

8        A    We made an additional offer of settlement

9    with GE to try to once and for all resolve this

10   matter.

11   BY MR. HARRIS:

12       Q    And when was that?

13       A    It would have been between January and

14   June of 2000 -- excuse me, January and May of 2007.

15       Q    And did you make that offer or was that

16   through your attorneys?

17       A    I don't recall if I made it or if it was

18   through our attorneys, but we made a renewed final

19   offer in settlement of this matter to GE.

20       Q    And how much was that for?

21       A    My recollection is it was somewhere in the

22   neighborhood of 350, $350,000.

23       Q    And you don't remember if you made that or

24   your attorneys made that?

MERRILL LEGAL SOLUTIONS
Tel: (312) 263-3524    (800) 868-0061

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 55

1    don't know who they made that demand of.  It was not

2    of me.  They never mentioned to me or demanded money

3    from me.

4        Q    But you believe that it was to someone

5    else then?

6        A    Yes.

7        Q    Now, in Count I, as I read Count I of this

8    complaint, Koch Foods is asserting ownership of all

9    of the equipment including all of the deboner line,

10   is that correct?

11       A    Less the Ossid equipment, yes.

12       Q    Understood.  Is that claim of ownership

13   still in existence today?

14       A    Yes.

15       Q    Then, again, why is GE Capital being --

16   strike that.

17            Why is Koch Foods demanding that GE

18   Capital remove the equipment?

19       A    From my perspective, while we feel we own

20   the property, we also feel that there is the

21   potential for conflict.  We attempted to resolve the

22   conflict by making an offer of settlement.  When

23   that was not accepted, another potential way to

24   settle the conflict would be for GE to pick up the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 56

1    property.

2        Q      This is after it had been used by Koch

3    Foods?

4        A      That is correct.

5        Q      And the initial demand that GE come and

6    pick up the deboner line was made when?

7        A      Would have been in the April/May

8    timeframe.  I don't know the exact date.

9        Q      And that's of 2007?

10       A      Yes.

11       Q      And that's because Koch Foods had already

12   found replacement equipment, correct?

13       A      We had replaced the deboning equipment,

14   yes.

15       Q      Now, there's a claim in this complaint

16   also for storage, correct?

17       A      Yes.

18       Q      Does that storage claim also go to the

19   deboning line?

20       A      Yes.

21       Q      So then the position of Koch is that while

22   it was using the deboning line to its benefit, GE

23   Capital is obligated to pay for storage fees?

24       A      Within the context of our conflict, yes.

MERRILL LEGAL SOLUTIONS
Tel: (312) 263-3524      (800) 868-0061

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 63

1    as the fixtures of the plant."  Is that currently

2    the position of Koch Foods?

3        A    Yes.

4        Q    How was the equipment attached to the

5    plant?  And we can break that down if you like.

6        A    Yes, please.

7        Q    Let me talk about the Ossid equipment.

8    Was that attached to the plant in any way?

9        A    No.

10        Q    None of it was, none of the Ossid

11    equipment?

12        A    No.

13        Q    Let me talk to you about the -- or let me

14    ask you about the spiral freezer, was that attached

15    to the plant?

16        A    Yes.

17        Q    Is that currently attached to the plant?

18        A    Yes.

19        Q    In what way?

20        A    It's bolted to the floor or some type of

21    foundation.  It's immovable.

22        Q    If indeed this is sold to Mr. Leonard or

23    anyone else, how could they get it out?

24        A    They'd have to be --

Mark Kaminsky    October 19, 2007

Page 64

1        MR. GEEKIE:  Objection, foundation.

2        MR. HARRIS:  Strike that.  Let me ask a

3    better question.

4    Q    If this were sold to Mr. Leonard or

5    anybody else, could it be removed?

6        MR. GEEKIE:  Objection, foundation.

7    A    Yes, it could be removed.

8    BY MR. HARRIS:

9    Q    How?

10    A    Very expensively.

11    Q    How much?

12    A    We're probably well in excess of a hundred

13    thousand dollars to move that piece of equipment.

14    Q    Just to get it onto the truck?

15    A    Yes.

16    Q    Okay.  And what would need to be done?

17        MR. GEEKIE:  Objection, foundation.

18    A    It would literally have to be completely

19    disassembled and its moorings broken away from the

20    plant.

21    BY MR. HARRIS:

22    Q    What damage if any would that cause to the

23    plant?

24    A    You'd have to take down walls --

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 65

1    Q    Even if you disassembled the freezer --
2    A    Yes.
3    Q    -- you'd still have to take down walls?
4    A    Yes.
5    Q    Permanent walls or temporary walls?
6    A    Permanent.
7    Q    Okay.  What else, what other damage?
8    A    Floor, the floor would have to be put back
9    to its original state.  There's usually some sort of
10   foundation or mooring or footing that holds this
11   equipment.  They're fairly permanent in nature and
12   very obtrusive to remove.
13   Q    Tell me about the deboning equipment.
14   That was removed, correct?
15   A    It was.
16   Q    By whom?
17   A    A service company that does such work.
18   Q    That's called what?
19   A    Fabco.
20   Q    Fabco?  Do you have an address for them?
21   A    I do not.
22   Q    Where are they located?
23   A    They're located in Alabama.
24   Q    Montgomery?

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 86

1      Q    Okay.  And where did you send them?

2      A    Forest, Mississippi.

3      Q    Okay.  Other plants --

4      A    Other Koch facilities.

5      Q    Okay.  So you had to ship them across the

6  state, correct?

7      A    Yes.

8      Q    What prompted Koch to stop using the

9  deboning equipment?

10     A    We had attempted to come to a reasonable

11  conclusion to our conflict with GE.  As part of that

12  we did some due diligence on the equipment and

13  determined that we could replace the equipment for

14  substantially less money than the gross value that

15  was placed on it.  That also was part of our thought

16  process in terms of our renewed or revised offer of

17  value to settle this matter.

18     Q    And by that you're referring to the 300

19  and some thousand?

20     A    Yes.

21     Q    It's been replaced.  My question is with

22  what, the deboning line --

23     A    With a deboning line.

24     Q    With another deboning line?

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 108

1  BY MR. HARRIS:

2      Q    My question is did Koch -- strike that.

3           As you sit here today, is the second

4  sentence of paragraph 9 accurate or not?

5           MR. GEEKIE:  Objection, asked and answered

6      several times now.

7      A    I find the second question in and of

8  itself to be vague and not descriptive of the entire

9  situation that encompasses this equipment.

10  BY MR. HARRIS:

11     Q    Well, let's talk about what is vague.

12  What part of the second sentence is vague?

13     A    Koch Foods advised GE Capital it would not

14  be necessary to relocate the equipment.  First of

15  all, I don't ever recall GE asking to come in and

16  relocate all the equipment.  So --

17     Q    The question, though --

18     A    -- I would not have told them it was

19  necessary because they never indeed asked to move

20  the equipment.

21     Q    Well, my question is are you aware of

22  whether or not your attorney told GE Capital's

23  attorney that it was not necessary to relocate the

24  equipment?

Mark Kaminsky    October 19, 2007

Page 110

1    10 was owned by it, Koch Foods, at that time,

2    correct?

3         A    Yes.

4         Q    Did the use of the deboner equipment by

5    Koch Foods increase, decrease or keep the same its

6    value?

7              MR. GEEKIE:  Objection, no timeframe

8         stated in the question.

9    BY MR. HARRIS:

10        Q    At the time of its use.

11        A    I previously testified and will continue

12   to maintain that our use of the equipment is

13   incidental as to its value.

14        Q    What does that mean, incidental?

15        A    I would not have devalued the equipment by

16   using it.

17        Q    Okay.  So it stayed the same then, is that

18   your testimony?

19             MR. GEEKIE:  Objection, that

20        mischaracterizes his testimony.

21        A    I would say --

22   BY MR. HARRIS:

23        Q    Then tell me how I'm wrong.  I'm trying to

24   understand.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

1          A      It's very simple.   I'm not saying it

2     stayed exactly the same.   I'm not saying it changed

3     dramatically.   I would say it's a -- any change

4     would have been nominal or incidental, but I'm not

5     saying that it did not have quote unquote any

6     change.

7          Q      Okay.   Would the change have been up or

8     down?   In other words, did it increase or decrease?

9          A      Depending on -- at any point in time the

10    use probably has more of a decreasing impact than

11    increasing, but again, it's fairly simple equipment.

12    It's built out of stainless steel.   Use is probably

13    not going to deteriorate the structure or the

14    soundness of the equipment.   Anything that would be

15    wear in nature would be relatively insignificant and

16    inexpensive to replace.

17         Q      How about the belts?

18         A      The belting, if there's conveyors and

19    belting, that belting is fairly strong.   And use of

20    said belting is -- probably hasn't deteriorated it

21    at all, little if at all.

22         Q      How about its exposure to the sun and

23    elements as it sits now in the parking lot?

24              MR. GEEKIE:   Objection, assumes several

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 113

1       MR. HARRIS:  I mean Mr. Kaminsky.

2       A    At the time we took over possession of the

3   equipment, no, I would not have had a number that

4   the equipment was worth.

5   BY MR. HARRIS:

6       Q    Okay.  How about Koch Foods?

7       A    No.

8       Q    Same answer?

9       A    Same answer.

10      Q    How about today?

11      A    Yes.

12      Q    Okay.  Yes what, yes, you do have a value?

13      A    Yes, I would have an understanding of the

14  value of the equipment as it relates to Koch Foods,

15  what we would deem the value of the equipment for

16  our use.

17      Q    Okay.  Fine.  Tell me about the freezer.

18  What is the value of the freezer today?

19      A    I would contend first and foremost that

20  the value of the freezer has not changed since it's

21  been sitting in that plant.  Obviously its highest

22  and best use is left there if there was a need to

23  have it there.  There is not.  So the unfortunate

24  reality is spiral freezers are worth very little if

MERRILL LEGAL SOLUTIONS
Tel: (312) 263-3524     (800) 868-0061

Mark Kaminsky      October 19, 2007

Page 114

1    you have to physically break them down and move them

2    out.

3         Q     And how much would that be, if you know,

4    if you have an estimate?

5         A     Well, I mean, the only way I could place a

6    value on it is knowing what the marketplace would

7    indeed be willing to pay.

8         Q     And do you have such knowledge?

9         A     Yes.

10        Q     And what is --

11        A     Approximately $50,000.

12        Q     Okay.  And is that the position of Koch as

13   well?

14        A     To me it's worth absolutely nothing

15   because I have no intentions of using it.

16        Q     I'm sorry, I wasn't clear.  Your personal

17   position is that the equipment has a fair market

18   value of approximately 50,000, correct?

19        A     Yes.

20        Q     Is that also the position of Koch Foods?

21        A     Yes.

22        Q     Okay.  How about the deboning equipment,

23   do you yourself have an opinion as to what the value

24   of the deboning equipment today as we sit here on

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 119

1    by Koch.  My question to you is are you aware of any

2    factual basis for any detrimental reliance by Koch?

3              MR. GEEKIE:  Objection, foundation, form.

4         Answer to the extent you understand the defense

5         in the question.

6         A    This is again a very specific legal

7    terminology.  And for me to sit here and try to

8    explain the intricacies of it would not be proper by

9    me.

10   BY MR. HARRIS:

11        Q    Let me ask you this question.  Has Koch

12   taken any action or failed to take any action based

13   upon GE Capital's behavior?

14        A    We've taken lots of action based on GE's

15   behavior.

16        Q    For example?

17        A    We have been unreasonably made a hostage

18   in this situation.  We have made numerous reasonable

19   offers to settle this matter.  And the last rebuff

20   from GE was if you won't pay the full dollar amount,

21   we have no interest in talking to you.  So I was

22   essentially -- a gun was put to my head to make GE

23   whole in this matter when the value of the equipment

24   to Koch was not nearly worth what it was put on the

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 120

1    books for.

2        Q    Well, let's focus, though, on my question,

3    which was did Koch take any action --

4        A    Sure, I did.

5        Q    And what action was that?

6        A    Upon a completely unreasonable request of

7    me to pay full value for this equipment, I started

8    the process of replacing the equipment.

9        Q    So it's your testimony that Koch replaced

10   the equipment in reliance upon actions taken by GE?

11       A    Given GE's completely unreasonable

12   position in this matter, I had no choice but to

13   protect myself.  And, therefore, I started the

14   actions of replacing the equipment.

15       Q    And that was done because of GE Capital,

16   is that your testimony?

17       A    That is absolutely my testimony.

18       Q    That was my question.  Let's go to

19   Exhibit G, which is Koch Foods' Initial Disclosure

20   Pursuant to Rule 26.  And if you go to page three,

21   it says computation of damages.  You will see there

22   that Koch Foods is claiming that the calculation of

23   storage costs is based on $100 per day from May 30,

24   2006, when Koch Foods purchased all of the assets of

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky      October 19, 2007

Page 121

1    Sylvest Farms to present.  Do you see that?
2         A    Yes.
3         Q    Is that accurate?
4         A    Yes.
5         Q    Is that accurate today?
6         A    Yes.
7         Q    Upon what is the hundred dollars a day
8    based?
9         A    It is a reasonable approximation of what
10   it would cost to store that equipment, a hundred
11   dollars, not extremely material on a per day basis
12   considering the amount of space that the equipment
13   takes up.  It's my estimation of a fair and
14   reasonable request for storage.
15        Q    And how much space does it take up?
16        A    Spiral is probably 20 by 20 at least.
17   Again, these are approximations.
18        Q    Twenty feet by twenty feet, right?
19        A    Yes, maybe 25 by 25, I don't know exactly
20   or specifically.  And the deboning equipment stacked
21   up, I don't know exactly how much space that takes.
22        Q    How about when it was in the facility?
23        A    Probably spanned a room that was 50 by a
24   hundred.

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 137

1    BY MR. HARRIS:

2        Q    Why not?

3            MR. GEEKIE:    Same objection.

4        A    I've had matters in the past where leases

5    were indeed fixtures.

6    BY MR. HARRIS:

7        Q    Tell me about those.

8        A    Lots of this poultry processing equipment

9    literally becomes part and parcel to the facility.

10        Q    So is it Koch's testimony, because you're

11    here in part as a 30(b)(6) witness, as a

12    representative of Koch Foods is it your testimony

13    that a lender can spend a million dollars on

14    equipment, lease it to a poultry company, and as

15    soon as that poultry company puts a bolt in the

16    floor it becomes the property of the poultry

17    company?

18        A    That's not what I said.

19        Q    Why not?  What part of that is wrong?

20        A    It's very simple from my perspective.

21    Again, I'm not an attorney.

22        Q    Go ahead.

23        A    In order for somebody not to be subjected

24    to the equipment being deemed a fixture when a third

c2df77b2-2f34-4fa8-b280-8970fc664af6

EXHIBIT C

# DEPOSITION OF DAVID BROMLEY

## November 27, 2007

## Pages 1 through 61

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

| | | |
|---|---|---|
| 1 | Q. | So he's only worked at Koch for three or four |
| 2 | | weeks? |
| 3 | A. | That's correct. |
| 4 | Q. | Michael Leonard, do you know who this is? |
| 5 | A. | Yes. |
| 6 | Q. | Who is that? |
| 7 | A. | He's a contractor that sold us the spiral |
| 8 | | freezer and installed it. |
| 9 | Q. | He sold it to you? |
| 10 | A. | Yes. |
| 11 | Q. | When was the last time you spoke with him? |
| 12 | A. | Probably six, seven months ago. |
| 13 | Q. | Was that in relation to his efforts to purchase |
| 14 | | a spiral freezer? |
| 15 | A. | That's correct. |
| 16 | Q. | And tell me about those conversations. |
| 17 | A. | I understood from talking to Mike he thought he |
| 18 | | was going to be able to buy it, and he just |
| 19 | | wanted to know if he did could he leave it there |
| 20 | | until it was sold before he had to take it |
| 21 | | apart. |
| 22 | Q. | His plan was to purchase it, leave it at the |
| 23 | | plant, and then resell it? |

1       in the yard?

2    A.   Yes.

3    Q.   Does exposure to the elements damage the value

4         of the equipment, reduce the value of the

5         equipment?

6              MR. GEEKIE:  Objection.  Foundation.

7    A.   I would say no.  Most of this equipment was

8         designed for a wet environment and the elements

9         of a chicken plant so it holds up rather well.

10   Q.   Tell me about the conveyor belts.  Does exposure

11        to the elements damage the conveyor belts?

12             MR. GEEKIE:  Same objection.

13   A.   It can, yes.

14   Q.   And are the conveyor belts sitting outside too?

15   A.   The belts themselves, yes.

16   Q.   Are you aware if Koch Foods maintains insurance

17        on the equipment?

18   A.   I don't know.

19   Q.   You don't know?

20   A.   I don't know.

21   Q.   The equipment that's installed there now, is it

22        better than the old stuff?

23             MR. GEEKIE:  Objection.  Vague and

EXHIBIT D

# DEPOSITION OF WAYNE M. JONES

## November 28, 2007

## Pages 1 through 40

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 28

```
 1            not familiar with it.
 2     Q.     But you weren't asked to participate in this
 3            case, correct?
 4     A.     Correct.
 5     Q.     Who at Koch Foods made the decision to replace
 6            in May of 2007 or April of 2007 the deboning
 7            equipment located at the Montgomery facility?
 8                      MR. GEEKIE:   Objection.   Form and
 9                         foundation.
10     A.     I was told by Mark Kaminsky.
11     Q.     And when were you told that?
12     A.     On or about mid or late April.
13     Q.     And what were you told?
14     A.     I was told to replace it.
15     Q.     And what was your involvement in the
16            replacement?
17     A.     I instructed the complex manager of Montgomery
18            to replace it.
19     Q.     And who is that?
20     A.     Gary Davis.
21     Q.     And you at that time were the immediate
22            supervisor of Mr. Davis?
23     A.     Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Did you ask Mr. Kaminsky why it was that it was |
| 2 | | being replaced? |
| 3 | A. | He had instructed me to take it out, and that's |
| 4 | | what I did. |
| 5 | Q. | That doesn't answer my question, though. Did |
| 6 | | you ask Mr. Kaminsky why it was that it was |
| 7 | | being replaced? |
| 8 | A. | I did not ask him, no. |
| 9 | Q. | Did he tell you? |
| 10 | A. | Yes. |
| 11 | Q. | And what did he say? |
| 12 | A. | That his communication with GE was not working |
| 13 | | out, and I needed to replace the equipment. |
| 14 | Q. | Did he say why he hadn't instructed you to do |
| 15 | | that a year before that? |
| 16 | A. | No. |
| 17 | Q. | Did you ask him why now and not before? |
| 18 | A. | No, I did not. |
| 19 | Q. | Did you ask him why today and not tomorrow? |
| 20 | A. | I did not. |
| 21 | Q. | Were you curious at the time as to why it was |
| 22 | | being replaced at that particular time? |
| 23 | A. | No. |

Page 38

| 1 | | the facility in 2006? |
|---|---|---|
| 2 | A. | No. |
| 3 | Q. | Do you have any knowledge of its value today? |
| 4 | A. | Not from a professional. |
| 5 | Q. | Some other way, though? |
| 6 | A. | Just an opinion. |
| 7 | Q. | What would that be? |
| 8 | A. | 25 to 35 cents on the dollar. |
| 9 | Q. | The dollar being what, the capital cost? |
| 10 | A. | The dollar of the purchase price. |
| 11 | Q. | What is that based on? |
| 12 | A. | Use equipment value. |
| 13 | Q. | So the use of the equipment caused the equipment |
| 14 | | to lose value.  Is that your understanding? |
| 15 | A. | Yes. |
| 16 | Q. | And it was 25 to 30 cents on the dollar did you |
| 17 | | say? |
| 18 | A. | 25 to 35. |
| 19 | | MR. HARRIS:  I don't have anything |
| 20 | | further. |
| 21 | | MR. GEEKIE:  Reserve signature. |
| 22 | | (Deposition concluded at |
| 23 | | approximately 10:00 a.m.) |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, | ) ) ) | |
| Plaintiff and Counter-Defendant, | ) ) ) | |
| vs. | ) ) ) | CIVIL ACTION NO. 2:07 CV 522-MHT |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendant and Counter-Plaintiff, | ) ) | |

ORDER SUSTAINING GENERAL ELECTRIC
CAPITAL CORPORATION'S OBJECTIONS TO THE DEPOSITION
DESIGNATIONS OF KOCH FOODS OF ALABAMA, LLC

This matter coming to be heard on the objections filed by General Electric Capital Corporation ("GE Capital") to the deposition designations (the "Deposition Designations") made by Koch Foods of Alabama, LLC ("Koch Foods"), pursuant to Section 10 of the Uniform Scheduling Order entered in the above-captioned proceeding on July 17, 2007 (Doc. No. 14), due and proper notice having been given, this Court being fully advised in the premises, and good cause appearing therefore:

IT IS HEREBY ORDERED AND ADJUDGED that Koch Foods is prohibited from using at trial any of the Deposition Designations for Michael Leonard, Mark Kaminsky, David Bromley, and/or Wayne Jones, other than for the purposes of impeachment.

Dated:  April ___, 2008

By: _____
        Honorable Myron H. Thompson