## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| KOCH FOODS OF ALABAMA, LLC,<br>an Alabama limited liability company,<br><br>Plaintiff and Counterclaim-defendant,<br><br>v.<br><br>GENERAL ELECTRIC CAPITAL<br>CORPORATION, a Delaware corporation,<br><br>Defendant and Counterclaim-plaintiff**.** | Case No. 07-cv-522-MHT<br><br>Honorable Myron H. Thompson<br><br>Honorable Terry F. Moorer |

### KOCH FOODS' OBJECTIONS TO GECC'S DEPOSITION DESIGNATIONS

Plaintiff and Counterclaim-Defendant, Koch Foods of Alabama, LLC ("Koch"), through

its undersigned counsel, pursuant to this Court's Uniform Scheduling Order dated July 17, 2007,

submits the following objections to the Deposition Designations submitted by Defendant and

Counterclaim-Plaintiff General Electric Capital Corporation ("GECC") (Doc. No. 84):

    <u>Mark Kaminsky</u>    (portions of the transcript to which the following objections apply
are attached as **<u>Exhibit A</u>**)

pp. 20:11-21:14.  Objection:  irrelevant.

p. 44:12-16.  Objection:  lack of foundation; improper form.

p. 56:11-14.  Objection: lack of foundation; improper form.

p. 67:13-19.  Objection: lack of foundation; improper form.

p. 69:9-12, 14-21.  Objection: lack of foundation; improper form.

p. 85:8-11.  Objection: lack of foundation; improper form.

p. 88:23.  Objection: lack of foundation; improper form.

p. 91:8-9.  Objection: lack of foundation; improper form.

p. 96:1-2.  Objection: lack of foundation; improper form.

p. 125:8-11.  Objection: calls for a legal conclusion.

p. 136:9-13.  Objection: lack of foundation; improper form.

p. 144:5-12.  Objection: lack of foundation; improper form.

p. 145:13-23.  Objection: irrelevant, lack of foundation; improper form.


<u>David Bromley</u>    (portions of the transcript to which the following objections apply are attached as **<u>Exhibit B</u>**)

p. 41:4-5.  Objection:  lack of foundation.

p. 43:3-16.  Objection:  lack of foundation; improper form.

p. 44:12-16.  Objection:  lack of foundation.

p. 46:1-20.  Objection:  lack of foundation; improper form.

Koch reserves its right to amend its objections in the interest of justice and for good cause shown to the Court.

Dated:  March 31, 2008                                  Respectfully submitted,


                                                        /s/ Zhiyuan Xu
                                                        Zhiyuan Xu

OF COUNSEL
Thomas G. Mancuso
Constance C. Walker
Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104
Telephone: 334-265-8573
Facsimile: 334-264-7945
Email: tgm@hsy.com

OF COUNSEL
Eugene J. Geekie, Jr.
Jonathan P. Friedland
Zhiyuan "Mike" Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois  60606
(312) 258-5500
(312) 258-5600 (Fax)
egeekie@schiffhardin.com

Counsel for Koch Foods of Alabama, LLC

<u>CERTIFCATE OF SERVICE</u>

The undersigned, an attorney, certifies that copies of the foregoing were caused to be served upon counsel of record addressed as follows by the ECF system on this 31st day March, 2008.

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
tharris@reedsmith.com
aterras@reedsmith.com

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com


<u>      /s/ Zhiyuan Xu      </u>
Zhiyuan Xu


CH1\5634351.1

4

# Exhibit A

Mark Kaminsky     October 19, 2007

Page 18

1    Q   What does the first one do, JCG
2  Industries?
3    A   It holds properties.
4    Q   Real estate?
5    A   Yes, real estate.
6    Q   This is JCG Industries?
7    A   That's correct.
8    Q   Does it do anything besides hold real
9  estate?
10   A   No. That's its function.
11   Q   And what is your position with that entity
12 or positions?
13   A   Right. Chief financial officer, secretary
14 and treasurer.
15   Q   Would you hold those same positions for
16 Koch Freezers and for JCG Properties as well?
17   A   Yes.
18   Q   And what is the business of Koch Freezers?
19   A   Koch Freezers is again a real estate
20 company. It owns property in Morton, Mississippi.
21   Q   Morton?
22   A   Morton, M-o-r-t-o-n.
23   Q   Is that near Jackson?
24   A   Not far.

Page 19

1    Q   Does it do anything else besides hold
2  property, real estate?
3    A   It is a pass-through entity that performs
4  freezer services for Koch Foods under a contract.
5    Q   And when you say a pass-through entity,
6  what do you mean by that?
7    A   It's captive. All its activities are for
8  Koch Foods.
9    Q   Tell me about JCG Properties, what does it
10 do?
11   A   It also holds real estate. It also does
12 some real estate development.
13   Q   Where at?
14   A   The properties are owned in the
15 Chicagoland area, and the real estate development is
16 in Tennessee.
17   Q   Where in Tennessee?
18   A   Chattanooga.
19   Q   Are these real estate holdings connected
20 with Koch Foods in any way? Strike that.
21      Are these real estate holdings connected
22 with the poultry business?
23   A   Within which entity?
24   Q   The last one, JCG Properties.

Page 20

1    A   Some of them are, yes.
2    Q   And some of them are not?
3    A   Correct.
4    Q   Okay. Now, let's talk about the Koch
5  Foods, Inc. side. Are you the CFO, secretary and
6  treasurer of Koch Foods, Inc.?
7    A   Yes.
8    Q   Any other positions that you hold with
9  Koch Foods, Inc.?
10   A   No.
11   Q   Now, explain to me if you would, as you
12 put it, the family of organizations of Koch Foods,
13 Inc.
14   A   Koch Foods has many facilities or
15 processing plants or complexes throughout the United
16 States. And each one has its own legal entity.
17   Q   Understood.
18   A   And each one of those funnels up
19 ultimately to the holding company.
20   Q   And when you say funnel up, what do you
21 mean by that?
22   A   Essentially the holding company -- in one
23 way or another everything eventually winds up so
24 that it's ultimately owned by Koch Foods,

Page 21

1  Incorporated.
2    Q   And Koch Foods is the company toward which
3  all these are funneled up?
4    A   Correct, except for 1 percent of some of
5  the entities that are held individually by Joseph
6  Grendys.
7    Q   Does Joseph Grendys hold individually any
8  portion of Koch Foods of Alabama, LLC?
9    A   Koch Foods of Alabama, LLC?
10   Q   Yes.
11   A   No.
12   Q   Who owns that? Is that 100 percent owned
13 by Koch Foods, Inc.?
14   A   Yes.
15   Q   When were you hired by Koch Foods, Inc.,
16 what year?
17   A   1990.
18   Q   Have you been continuously employed there
19 since that time?
20   A   Yes.
21   Q   When you were hired in 1990, what was your
22 position?
23   A   I started as -- we were a much smaller
24 company. I started as a controller.

6 (Pages 18 to 21)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 42

```
 1   Mr. Geekie ever made that demand?
 2       A   No.
 3       Q   Do you know when the first demand was
 4   made?
 5       A   I do not recall.
 6       Q   Was it in 2006?
 7       A   No.
 8       Q   Was it only in 2007?
 9       A   Yes.
10       Q   When did Koch begin using the deboner
11   line?
12       A   June of 2006.
13       Q   So your testimony is that Koch Foods began
14   using the deboner line before it demanded that GE
15   remove it?
16       A   Yes.
17       Q   And why was that?  Strike that.
18           Why did they start using the deboner?
19       A   As is typical when you buy a company out
20   of bankruptcy, you have to settle certain matters
21   that are part of the process.  We were aware there
22   was a lease between Sylvest and GE.  And we
23   attempted to make payment to GE to settle any
24   possible conflicts regarding the property, the
```

Page 43

```
 1   equipment, with them.
 2       Q   Okay.  And when were those efforts made to
 3   pay GE?
 4       A   June of 2006.
 5       Q   And what were those efforts, did you send
 6   checks, did you call, what did you do?
 7       A   I had conversations with a representative
 8   of GE.
 9       Q   And who is that?
10       A   I don't recall his specific name, and it
11   may have been a gentleman Mike or Michael.  I
12   believe first I was contacted by an attorney, and I
13   told him that I was attempting to contact the
14   business folks within GE and work this matter out.
15       Q   And you don't remember that gentleman's
16   name other than his first name may have been
17   Michael?
18       A   No.
19       Q   His last name may have been Michael?
20       A   No, I believe his first name was Michael,
21   but again, I don't recall his name.
22       Q   Okay.  And tell me the substance of those
23   conversations.
24       A   I basically wanted to come to some
```

Page 44

```
 1   mutually agreeable conclusion to the potential
 2   conflict that could arise in terms of this
 3   equipment.
 4       Q   And did you make an offer of what that
 5   might be?
 6       A   At first we probably outlined what our
 7   intentions were towards the equipment, specifically
 8   the Ossid equipment.
 9       Q   Okay.
10       A   The vast majority of it was never even
11   uncartoned.
12       Q   And what was Koch Foods' intentions with
13   respect to that equipment?
14       A   We told them to come and get it.
15       Q   And what happened, did they do that?
16       A   They came and got it.
17       Q   What was Koch Foods' intention with
18   respect to the deboner line?  And this is in June of
19   2006.
20       A   Yes, absolutely.  Being that it was
21   attached to the facility, not very easy to remove or
22   take out, but also understanding that to move the
23   process forward, some sort of offer to GE would be
24   appropriate, but also having to go through the
```

Page 45

```
 1   process of what we actually wanted or needed out of
 2   that deboning equipment and what we didn't want, and
 3   that's basically what I communicated to the
 4   gentleman at GE.
 5           I said some of this stuff is useless to
 6   us.  We'd like to go through the list.  We'd like to
 7   indicate the stuff that we truly don't want.  If you
 8   guys want it because we don't have a use for it,
 9   you're more than welcome to it, and we'd like to pay
10   you some amount of money as an accommodation.
11       Q   Well, for use of the stuff you did want?
12       A   Not for use --
13       Q   For ownership?
14       A   For settlement.
15       Q   My question to you is what was it that you
16   were intending to do, to own it, to lease it?
17       A   Well, we felt we already owned it, but we
18   also understood that in these matters there's
19   usually contention.  And if we could make a payment
20   to settle the matter, that would probably be in the
21   best interest of both parties.
22       Q   And was an offer made of a precise dollar
23   amount?
24       A   Yes.
```

12 (Pages 42 to 45)

c2df77b2-2f3a-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 54

1    A   I don't recall, no.
2    Q   If you look at paragraph 13 of
3  Exhibit B --
4        MR. GEEKIE:  Tim, the letter you just
5    showed Mr. Kaminsky as a deposition exhibit, is
6    that Exhibit U or V?
7        MR. HARRIS:  U.
8    Q   Paragraph 13 of Exhibit B, it says, "GE
9  Capital demanded and continues to demand that Koch
10  Foods pay Sylvest Farms' rental charges for the
11  equipment."  Do you see that?
12    A   Yes.
13    Q   Were those demands made on you?
14    A   No.
15    Q   Were they made on your attorneys?
16    A   I'm not aware.  If they made them, I don't
17  know in what timeframe they were made or if they
18  were made at all.  I just don't know.
19    Q   Okay.  But you approved of this complaint,
20  right?
21    A   Yes.
22    Q   But you're not sure of that paragraph?
23    A   What I am saying is I don't know who
24  specifically -- I'm sure GE demanded money.  I just

Page 55

1  don't know who they made that demand of.  It was not
2  of me.  They never mentioned to me or demanded money
3  from me.
4    Q   But you believe that it was to someone
5  else then?
6    A   Yes.
7    Q   Now, in Count I, as I read Count I of this
8  complaint, Koch Foods is asserting ownership of all
9  of the equipment including all of the deboner line,
10  is that correct?
11    A   Less the Ossid equipment, yes.
12    Q   Understood.  Is that claim of ownership
13  still in existence today?
14    A   Yes.
15    Q   Then, again, why is GE Capital being --
16  strike that.
17        Why is Koch Foods demanding that GE
18  Capital remove the equipment?
19    A   From my perspective, while we feel we own
20  the property, we also feel that there is the
21  potential for conflict.  We attempted to resolve the
22  conflict by making an offer of settlement.  When
23  that was not accepted, another potential way to
24  settle the conflict would be for GE to pick up the

Page 56

1  property.
2    Q   This is after it had been used by Koch
3  Foods?
4    A   That is correct.
5    Q   And the initial demand that GE come and
6  pick up the deboner line was made when?
7    A   Would have been in the April/May
8  timeframe.  I don't know the exact date.
9    Q   And that's of 2007?
10    A   Yes.
11    Q   And that's because Koch Foods had already
12  found replacement equipment, correct?
13    A   We had replaced the deboning equipment,
14  yes.
15    Q   Now, there's a claim in this complaint
16  also for storage, correct?
17    A   Yes.
18    Q   Does that storage claim also go to the
19  deboning line?
20    A   Yes.
21    Q   So then the position of Koch is that while
22  it was using the deboning line to its benefit, GE
23  Capital is obligated to pay for storage fees?
24    A   Within the context of our conflict, yes.

Page 57

1    Q   Did Koch ever request of GE storage fees
2  prior to filing the complaint?
3    A   No.
4    Q   And why is that?
5    A   We had attempted other ways of resolving
6  the conflict.  In my mind you can't have it both
7  ways.  You can't tell me I don't own the equipment
8  and leave it there and not pay storage.  Conversely
9  if I own the equipment and I'm willing to settle the
10  matter for a dollar amount, one way or another we
11  were hoping to come to a resolution of the problem.
12    Q   But you never did, correct?
13    A   No.
14    Q   Did Koch Foods receive any benefit as a
15  result of the presence of the equipment at the plant
16  facility?
17        MR. GEEKIE:  Objection, vague and
18    ambiguous.
19    A   What do you mean in terms of benefit?
20  BY MR. HARRIS:
21    Q   Economic benefit?
22    A   Did we receive economic benefit?  We used
23  the equipment.
24    Q   To the benefit, to the economic benefit of

15 (Pages 54 to 57)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 66

1    A    No.
2    Q    Where?
3    A    Albertville, I believe.
4    Q    Was any damage caused to the plant by its
5    removal?
6    A    Yes.
7    Q    Tell me about that.
8    A    The equipment is moored to the floor with
9    bolts. The flooring -- or those bolts would have
10   had to have been removed, the floor repaired.
11   Q    Well, was it?
12   A    Yes.
13   Q    Okay. Because, I mean, this has occurred,
14   right? It has been removed?
15   A    Yes.
16   Q    Okay. So the mooring was damaged -- I'm
17   sorry, the mooring was removed and the floor was
18   damaged?
19   A    Correct.
20   Q    And how was the floor damaged?
21   A    The bolts are secured to the floor, so
22   holes are made in the floor to hold the bolts.
23   Those bolts are then removed, and the floor needs to
24   be returned to a solid surface without the hole.

Page 67

1    Q    And has that been done?
2    A    Yes.
3    Q    And how much did that cost?
4    A    I don't know the specific dollar amount.
5    Q    Who would know that?
6    A    Wayne Jones.
7    Q    And was it repaired by the same entity
8    that removed the deboning line or do you know?
9    A    It was repaired by the same entity that
10   removed the deboning line.
11   Q    Were any walls removed?
12   A    No.
13   Q    What is the basis for the statement there
14   that Sylvest intended for the equipment to become
15   fixtures?
16        MR. GEEKIE: Are you referring to
17   paragraph 17?
18        MR. HARRIS: I am.
19   A    They affixed it to the facility.
20   BY MR. HARRIS:
21   Q    Did you have any conversations with anyone
22   at Sylvest regarding whether they intended it to
23   become fixtures?
24   A    My visual observation was that it was, not

Page 68

1    my conversation with Sylvest.
2    Q    Understood. My question is did you
3    have --
4    A    No.
5    Q    -- any conversations -- okay.
6        Did anyone at Koch that you know of have
7    any conversations with anyone at Sylvest regarding
8    whether they intended it to become fixtures?
9    A    I am not aware of anybody.
10   Q    So then the basis of that statement is
11   solely the -- in placement of the equipment at the
12   time?
13        MR. GEEKIE: Objection, foundation. The
14   complaint speaks for itself.
15   A    Yes.
16   BY MR. HARRIS:
17   Q    Who installed the equipment, if you know?
18   A    I don't know.
19   Q    Do you know when it was installed?
20   A    Prior to our closing on the purchase of
21   Sylvest.
22   Q    Okay. So it was not installed by -- none
23   of it was installed by Koch?
24   A    Not to my knowledge.

Page 69

1    Q    And when did Koch take possession of the
2    facility?
3    A    The end of May 2006.
4    Q    Now, did you see the deboning line prior
5    to its removal?
6    A    Yes.
7    Q    And have you seen the spiral freezer?
8    A    Yes.
9    Q    And are the attachments for both of those
10   items customary in the industry?
11        MR. GEEKIE: Objection, foundation.
12   A    Yes.
13   BY MR. HARRIS:
14   Q    Would it be typical to attach equipment
15   like this in the manner in which it was attached
16   even if it were leased equipment?
17        MR. GEEKIE: Same objection.
18   A    Yes, the equipment has to be attached.
19   BY MR. HARRIS:
20   Q    Whether it's leased or not, correct?
21   A    Yes.
22   Q    Has Koch Foods ever itself leased
23   equipment?
24   A    Yes.

18  (Pages 66 to 69)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky        October 19, 2007

Page 66

1    A   No.
2    Q   Where?
3    A   Albertville, I believe.
4    Q   Was any damage caused to the plant by its
5    removal?
6    A   Yes.
7    Q   Tell me about that.
8    A   The equipment is moored to the floor with
9    bolts. The flooring -- or those bolts would have
10   had to have been removed, the floor repaired.
11   Q   Well, was it?
12   A   Yes.
13   Q   Okay. Because, I mean, this has occurred,
14   right? It has been removed?
15   A   Yes.
16   Q   Okay. So the mooring was damaged -- I'm
17   sorry, the mooring was removed and the floor was
18   damaged?
19   A   Correct.
20   Q   And how was the floor damaged?
21   A   The bolts are secured to the floor, so
22   holes are made in the floor to hold the bolts.
23   Those bolts are then removed, and the floor needs to
24   be returned to a solid surface without the hole.

Page 67

1    Q   And has that been done?
2    A   Yes.
3    Q   And how much did that cost?
4    A   I don't know the specific dollar amount.
5    Q   Who would know that?
6    A   Wayne Jones.
7    Q   And was it repaired by the same entity
8    that removed the deboning line or do you know?
9    A   It was repaired by the same entity that
10   removed the deboning line.
11   Q   Were any walls removed?
12   A   No.
13   Q   What is the basis for the statement there
14   that Sylvest intended for the equipment to become
15   fixtures?
16       MR. GEEKIE: Are you referring to
17   paragraph 17?
18       MR. HARRIS: I am.
19   A   They affixed it to the facility.
20   BY MR. HARRIS:
21   Q   Did you have any conversations with anyone
22   at Sylvest regarding whether they intended it to
23   become fixtures?
24   A   My visual observation was that it was, not

Page 68

1    my conversation with Sylvest.
2    Q   Understood. My question is did you
3    have --
4    A   No.
5    Q   -- any conversations -- okay.
6        Did anyone at Koch that you know of have
7    any conversations with anyone at Sylvest regarding
8    whether they intended it to become fixtures?
9    A   I am not aware of anybody.
10   Q   So then the basis of that statement is
11   solely the -- in placement of the equipment at the
12   time?
13       MR. GEEKIE: Objection, foundation. The
14   complaint speaks for itself.
15   A   Yes.
16   BY MR. HARRIS:
17   Q   Who installed the equipment, if you know?
18   A   I don't know.
19   Q   Do you know when it was installed?
20   A   Prior to our closing on the purchase of
21   Sylvest.
22   Q   Okay. So it was not installed by -- none
23   of it was installed by Koch?
24   A   Not to my knowledge.

Page 69

1    Q   And when did Koch take possession of the
2    facility?
3    A   The end of May 2006.
4    Q   Now, did you see the deboning line prior
5    to its removal?
6    A   Yes.
7    Q   And have you seen the spiral freezer?
8    A   Yes.
9    Q   And are the attachments for both of those
10   items customary in the industry?
11       MR. GEEKIE: Objection, foundation.
12   A   Yes.
13   BY MR. HARRIS:
14   Q   Would it be typical to attach equipment
15   like this in the manner in which it was attached
16   even if it were leased equipment?
17       MR. GEEKIE: Same objection.
18   A   Yes, the equipment has to be attached.
19   BY MR. HARRIS:
20   Q   Whether it's leased or not, correct?
21   A   Yes.
22   Q   Has Koch Foods ever itself leased
23   equipment?
24   A   Yes.

18 (Pages 66 to 69)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Page 82

1    A   Yes.
2    Q   And do you know whose handwriting that is?
3    A   No.
4    Q   It's not yours?
5    A   No.
6    Q   Here's my question. Some of it says keep,
7  some of it says send back. If you could take a look
8  at this, we were talking before, you had said that
9  there are various parts of the deboning line, some
10  of which you used and some of which you did not use.
11  And my question is this. If you could look through
12  this, where it says keep, are those the items that
13  were in fact used, and when it says send back, are
14  those in fact the items that were not used?
15    A   I don't know.
16    Q   Who would know?
17    A   Wayne Jones. There are I'm sure other
18  folks, probably Gary Davis would know.
19    Q   Okay. Those two folks would know what was
20  used and what was not used?
21    A   Correct.
22    Q   But you don't?
23    A   No.
24    Q   During the summer of 2006, how many

Page 83

1  chickens per day were processed through the deboning
2  line, roughly?
3        MR. GEEKIE: Could you read that question
4    back, please?
5        (Question read.)
6        MR. GEEKIE: Objection, form, vague and
7    ambiguous. Tim, do you want an average there
8    or do you want an approximation or do you want
9    him to tell you day by day during the summer?
10        MR. HARRIS: Roughly.
11    A   Ideally we would have been attempting to
12  debone 674,000, but we were not. That would have
13  been the maximum --
14  BY MR. HARRIS:
15    Q   Let me just stop you, 674,000 a day?
16    A   No, per week, sorry.
17    Q   Per week, okay. Now, is this seasonal or
18  is it the same goal irrespective of the month?
19    A   Same goal.
20    Q   Okay. And what is that goal of 674,000
21  chickens per week based on?
22    A   That's the number of big bird chickens
23  that were slaughtered at the Sylvest facility at the
24  kill plant.

Page 84

1    Q   Okay. And so the goal is to process all
2  the ones that are slaughtered at the kill plant?
3    A   In a simplistic view of the production and
4  then what you would do with it, yes.
5    Q   Was that goal met?
6    A   No.
7    Q   And why not?
8    A   The entire facility was not staffed.
9  Sylvest had not fully staffed the facility prior to
10  us taking over.
11    Q   Okay. So not enough employees?
12    A   Correct.
13    Q   And how many in fact did get processed per
14  week roughly?
15    A   I wouldn't, wouldn't be able to -- I'd be
16  guessing.
17    Q   Was it half, at least half of that?
18    A   Again, I don't know.
19    Q   You don't know?
20    A   I don't know the specific statistics. Our
21  goal was to get them all deboned, and that did take
22  place over a period of time.
23    Q   Did there come a time when you got staff
24  up to snuff and you did start hitting that goal?

Page 85

1    A   Yes.
2    Q   And when was that?
3    A   Probably into 2007. That's how long it
4  took.
5    Q   And when, early, January, February?
6    A   January, February, that's probably
7  accurate.
8    Q   So by January or February of 2007, that
9  deboning equipment was processing approximately
10  674,000 chickens per week?
11    A   Yes.
12    Q   Now, we talked about the goal is to keep
13  up with the number of chickens being killed,
14  correct?
15    A   Yes.
16    Q   And when that was not occurring during the
17  summer, what was the result, were fewer chickens
18  then killed, did you tell the kill farm to stop --
19  or the kill plant I should say to stop killing so
20  many or did you send them to somewhere else to be
21  processed or a combination or what?
22    A   We would have sent them somewhere else.
23  We would not have slowed down the slaughter
24  facility.

22 (Pages 82 to 85)

Mark Kaminsky        October 19, 2007

Page 86

1   Q   Okay. And where did you send them?
2   A   Forest, Mississippi.
3   Q   Okay. Other plants --
4   A   Other Koch facilities.
5   Q   Okay. So you had to ship them across the
6   state, correct?
7   A   Yes.
8   Q   What prompted Koch to stop using the
9   deboning equipment?
10  A   We had attempted to come to a reasonable
11  conclusion to our conflict with GE. As part of that
12  we did some due diligence on the equipment and
13  determined that we could replace the equipment for
14  substantially less money than the gross value that
15  was placed on it. That also was part of our thought
16  process in terms of our renewed or revised offer of
17  value to settle this matter.
18  Q   And by that you're referring to the 300
19  and some thousand?
20  A   Yes.
21  Q   It's been replaced. My question is with
22  what, the deboning line --
23  A   With a deboning line.
24  Q   With another deboning line?

Page 87

1   A   Yes.
2   Q   How is that different if at all from the
3   deboning line that was in place?
4   A   In concept it's probably not dissimilar at
5   all. They're fairly simple pieces of equipment.
6   There are probably some nuances that are different,
7   but essentially it's the same.
8   Q   Same manufacturer?
9   A   I don't know if D & F manufactured the new
10  line or not. They very well could have, yes.
11  Q   And how much did the new equipment cost
12  just to purchase it, I'm not talking about install,
13  just to purchase the actual equipment and have it
14  delivered on site, how much did that cost?
15  A   I only know of one number, and I can't be
16  clear whether it was the purchase or the
17  installation or the total.
18  Q   All right. What was the number?
19  A   450,000.
20  Q   Who would know that total?
21  A   Wayne Jones.
22  Q   And this was purchased, and it's now owned
23  by Koch?
24  A   Yes.

Page 88

1   Q   It wasn't leased?
2   A   No.
3   Q   Was it financed?
4   A   No. We wrote a check.
5   Q   Okay. So there's no security agreement
6   covering it?
7   A   Well, we're subject to a blanket security
8   agreement.
9   Q   Okay.
10  A   It's part of our debt deal.
11  Q   Okay. But with respect to the
12  manufacturer, there's no lien held by the
13  manufacturer?
14  A   No.
15  Q   Is it less equipment than that which was
16  taken out?
17  A   Yes.
18  Q   So then not all of the lines of the GE
19  leased equipment were replaced, correct?
20  A   Correct.
21  Q   Only the ones that you deemed you needed?
22  A   Correct.
23  Q   And when was this new equipment purchased?
24  A   It's been purchased January, February

Page 89

1   timeframe of '07.
2   Q   And when was the, I'll call it the old
3   equipment, the deboning equipment that was being
4   replaced, when was that actually removed from the
5   plant and put out into the parking lot?
6       MR. GEEKIE: Objection, foundation as to
7   location.
8   A   I have no idea where the old equipment is.
9   BY MR. HARRIS:
10  Q   You don't know?
11  A   No.
12  Q   Okay. Well, let me ask you this. When
13  was it taken out of the plant?
14  A   April of '07.
15  Q   When was GE advised that it was taken out
16  of the plant?
17  A   April of '07.
18      MR. GEEKIE: Objection, foundation.
19  BY MR. HARRIS:
20  Q   By whom was GE advised of this?
21  A   Gene Geekie.
22  Q   So you believe that Gene Geekie advised GE
23  in April of '07 that the equipment, the deboning
24  equipment that was being replaced, was being removed

23 (Pages 86 to 89)

Mark Kaminsky      October 19, 2007

Page 90

1  from the plant?
2      A   Yes.
3      Q   Is the new stuff, the new deboning
4  equipment, is it better than the old equipment or
5  about the same?
6          MR. GEEKIE: Objection, vague and
7      ambiguous --
8  BY MR. HARRIS:
9      Q   Worse?
10         MR. GEEKIE: -- foundation.
11     A   It is specifically designed for how we
12 would set the line up. So from our perspective it's
13 better.
14         MR. HARRIS: All right. Now's a good time
15     for lunch.
16         (Lunch recess taken from 12:00 p.m. to
17     1:00 p.m.)
18 BY MR. HARRIS:
19     Q   Mr. Kaminsky, I will remind you that you
20 are still under oath. Understood?
21     A   Yes.
22     Q   I just want to clear up a few things from
23 this morning's session. It's the position of Koch
24 Foods that the deboning equipment and the spiral

Page 91

1  freezer became the property of Koch Foods at the
2  time of the closing of the asset purchase agreement,
3  correct?
4          MR. GEEKIE: Objection, asked and
5      answered.
6      A   Yes.
7  BY MR. HARRIS:
8      Q   And who owns this equipment today?
9      A   Koch Foods.
10     Q   Both Koch Foods today -- strike that.
11         The position of Koch Foods is that today
12 Koch Foods still owns the spiral freezer and still
13 owns the deboning equipment, correct?
14     A   Yes.
15     Q   And the basis of your statement is because
16 you believe it to have been a fixture, correct?
17     A   Yes.
18     Q   And that would include also the deboning
19 equipment even though it's no longer a fixture, is
20 that correct?
21         MR. GEEKIE: Objection, calls for a legal
22     conclusion.
23     A   We still own the deboning equipment, yes.
24

Page 92

1  BY MR. HARRIS:
2      Q   Well, why do you still -- strike that.
3          Is the deboning equipment currently a
4  fixture of the building?
5          MR. GEEKIE: Objection. Objection, calls
6      for a legal conclusion.
7      A   From my way of looking at it, once it's a
8  fixture, it's always a fixture. So yes, I would say
9  we still own it.
10 BY MR. HARRIS:
11     Q   And the basis is because it used to be a
12 fixture --
13     A   Correct.
14     Q   -- or still is?
15     A   Correct.
16     Q   Does Koch Foods have an in-house counsel?
17     A   No.
18     Q   No attorneys are employed by Koch Foods?
19     A   No.
20     Q   Other than outside counsel, correct?
21     A   That is correct.
22     Q   Have you ever discussed with any outside
23 counsel your belief that the equipment was a fixture
24 at the time that Koch Foods took over possession of

Page 93

1  the facility?
2          MR. GEEKIE: I'm sorry, could you read
3      that back, please?
4          (Question read.)
5          MR. GEEKIE: Objection, that calls for
6      privileged communications, and I'll instruct
7      you not to answer.
8          MR. HARRIS: Just to be clear, what I'm
9      asking is not what was said but whether
10     discussions were had.
11         MR. GEEKIE: Same objection. I'll
12     instruct you not to answer.
13 BY MR. HARRIS:
14     Q   And are you going to follow that advice?
15     A   I am.
16     Q   Let me ask you this. Have you ever asked
17 anyone whether that other person believes this to be
18 a fixture?
19         MR. GEEKIE: Objection, instruct you not
20     to answer to the extent that question calls for
21     attorney-client communication.
22     A   Can't answer.
23 BY MR. HARRIS:
24     Q   Does Koch Foods desire that GE Capital

24 (Pages 90 to 93)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky    October 19, 2007

Page 94

1  remove the deboning equipment from the facility now?
2      A    If it's a resolution to our conflict, then
3  yes.
4      Q    I'm not sure what that means, so let's
5  break that down.  You mean as part of a settlement
6  you might be agreeable to that, is that what you
7  mean?
8      A    Yes.
9      Q    Fine.  Understood.  Barring settlement, is
10  it Koch Foods' desire that GE Capital remove the
11  deboning equipment now?
12      A    Not at this time.
13      Q    And why is that?
14      A    I think we have to come to some conclusion
15  to our conflict.
16      Q    So your position is that the deboning
17  equipment, while sitting outside in the parking lot,
18  continues to be owned by Koch Foods, is that
19  correct?
20      A    Yes.
21      Q    Now, didn't you tell me this morning that
22  there came a time when Koch Foods demanded that GE
23  remove the deboning equipment?
24      A    Yes.

Page 95

1      Q    And when was that again?
2      A    April of 2007.
3      Q    And what happened between April 2007 and
4  now with respect to that demand?
5          MR. GEEKIE:  Objection, vague and
6  ambiguous.
7      A    The conflict did not resolve itself.  It's
8  escalated into legal proceedings, so --
9  BY MR. HARRIS:
10      Q    Well, let me ask you this.  Was the
11  conflict resolved in April 2007 when you say demand
12  was made on GE Capital to remove that equipment?
13      A    No.  They didn't pick it up.
14      Q    Had they picked it up, would that have
15  resolved the conflict?
16          MR. GEEKIE:  Objection, calls for a legal
17  conclusion.
18      A    Hard to say.  I mean, from my perspective,
19  if I don't have the equipment, I don't owe anything.
20  BY MR. HARRIS:
21      Q    What if you used the equipment?
22          MR. GEEKIE:  Objection, calls for a legal
23  conclusion and calls for speculation.  There's
24  no factual basis.

Page 96

1      A    My contention is my use of the equipment
2  is incidental.
3  BY MR. HARRIS:
4      Q    Is it also Koch's position that despite
5  its use of the deboner, GE owes it storage fees with
6  respect to the deboner?
7      A    Yes.
8      Q    How do you square that with its claim that
9  it owns the equipment?
10      A    That's what we're trying to determine, who
11  owns it, why, or what is owed by whom to who.
12      Q    Well, if Koch Foods owns the deboner
13  equipment, what is the basis for your belief that GE
14  owes storage fees?
15      A    Ultimately that's what we're going to
16  determine, who owns the equipment.  It is my opinion
17  that it is owned by me.  If a legal decision is made
18  that I do not, then I'm entitled to storage fees.
19      Q    Understood.  So let's be clear.  It's not
20  just your opinion, but it's the position of Koch
21  Foods that it owns the deboning equipment, correct?
22      A    It is.
23      Q    Now, it's really not true that Koch Foods
24  wanted GE to remove the equipment, and when I say --

Page 97

1  strike that.
2          It's really not true, is it, that GE
3  Capital -- strike that.
4          It's really not true that Koch Foods
5  wanted GE Capital to remove the deboning equipment
6  back in, say, May 2006, correct?
7          MR. GEEKIE:  Objection.  It's
8  argumentative and calls -- form, objection as
9  to form.
10      A    It was not our desire to have them remove
11  the equipment in May of 2006.
12  BY MR. HARRIS:
13      Q    And it wasn't the desire to have GE
14  Capital remove the deboner or the spiral freezer
15  equipment for any part of the year of 2006, correct?
16          MR. GEEKIE:  Same objection.
17      A    No, we would not have desired to have them
18  remove the equipment.
19  BY MR. HARRIS:
20      Q    In fact, you were trying to hold GE off
21  from picking up the equipment until you got the new
22  deboning equipment installed, isn't that true?
23      A    No, that is not true.
24      Q    Let me introduce a document, Exhibit D.

25  (Pages 94 to 97)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky     October 19, 2007

Page 122

1    Q    Again, we're talking feet?
2    A    Correct.
3    Q    And what knowledge do you have of storage
4  costs in Montgomery, Alabama, any?
5    A    No.
6    Q    Did you have anyone assist you in coming
7  up with that number?
8    A    It's a consensus number as to a reasonable
9  amount to be charged as storage.
10   Q    Did you have anyone assist you in coming
11 up with that number?
12   A    Yes.
13   Q    And who is that?
14   A    Collectively as a group, myself and the
15 attorneys discussed that number and came up with it.
16   Q    Anyone besides yourself and the attorneys?
17   A    No.
18   Q    And you yourself have no knowledge of
19 storage costs in Montgomery, is that correct?
20   A    That is correct.
21   Q    And is Koch Foods seeking this amount for
22 even the period in which it was using the deboning
23 equipment?
24   A    Yes.

Page 123

1    Q    Exhibit H, I used it before, I think
2  you've still got it.  If not, let me know.
3    A    Yes.
4        MR. GEEKIE:  Wait until I get mine.
5        THE WITNESS:  Is it -- since we're not
6    getting into H, I'd like to just run to the
7    restroom real quick, if that's --
8        MR. HARRIS:  Sure.  That's fine.
9        (Recess taken.)
10 BY MR. HARRIS:
11   Q    You're still under oath, you understand
12 that?
13   A    Yes, I understand that.
14   Q    We were on Exhibit H, Interrogatory No. 1.
15 If you could please review, it's on the bottom of
16 page three, if you could please review the
17 interrogatory and the answer.
18   A    Okay.
19   Q    Okay.  It states here that the equipment
20 is permanently installed in the facility.  Now, you
21 don't mean the Ossid equipment, you mean the other
22 two items, correct?
23   A    Yes.
24   Q    And this was filed on August 9th, 2007,

Page 124

1  correct?
2    A    Yes.
3    Q    And you verified these answers, correct?
4    A    Yes.
5    Q    It says here that the equipment is
6  impossible to remove without dismantling the
7  facility.  My question is was the facility ever
8  dismantled?
9    A    Specifically in terms of which equipment?
10   Q    No, no, the facility, was the facility
11 dismantled?
12   A    No.
13   Q    Has any of the equipment been removed?
14   A    Yes.
15   Q    And that would be the deboner, correct?
16   A    Correct, although may I specify --
17   Q    As you wish.
18   A    -- in terms of the facility the floors
19 would have to have been altered to get the equipment
20 out.
21   Q    Is there any equipment in the facility
22 that isn't a fixture by your definition?
23   A    Referring to the deboning equipment and
24 the spiral freezer?

Page 125

1    Q    No, I'm referring to that facility and all
2  the equipment --
3    A    Yes, there would be equipment in there
4  that would not be fixtures.
5    Q    And what would those be?
6    A    Forklifts, tables that are not bolted
7  down.
8    Q    So is it your understanding and is it the
9  position of Koch Foods that once something gets
10 bolted down it becomes a fixture?
11   A    Yes.
12   Q    And does it ever become not a fixture once
13 it's become a fixture by that definition?
14       MR. GEEKIE:  Objection, calls for a legal
15   conclusion.
16   A    I'm not sure if it could once be a fixture
17 and then not.
18 BY MR. HARRIS:
19   Q    That's my question.
20   A    Yes, I'm not sure.
21   Q    You don't know.
22   A    Don't know.
23   Q    But the facility has not to date been
24 dismantled, correct?

32 (Pages 122 to 125)

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky       October 19, 2007

Page 134

1  experiencing tremendous cash flow problems due to a
2  large devaluation in the poultry market exasperated
3  by fears of bird flu. The export market collapsed.
4  So they were under a lot of distress.
5      Q   And Koch Foods had bought assets out of
6  bankruptcy before in the Rogers matter, correct?
7      A   That's correct.
8      Q   And, in fact, in that bankruptcy got into
9  disputes with lessors very similar to this one that
10 we're here on today, correct?
11     A   Yes.
12     Q   And how were those resolved?
13     A   Various -- I mean, in the case of BC
14 Rogers we were talking, oh, numerous, very many
15 leases, and each one came to different conclusions.
16     Q   Okay. And these were for equipment
17 leases?
18     A   Not all of them.
19     Q   Some of them, though?
20     A   Yes.
21     Q   So that's my question. At the time that
22 Sylvest came to Koch in early 2006, Koch had already
23 had experience in purchasing assets out of a
24 bankruptcy, correct?

Page 135

1      A   Yes.
2      Q   And, in fact, in that bankruptcy were
3  included equipment leases, correct?
4      A   Yes.
5      Q   And Koch had had experience then in
6  resolving the issues arising out of those leases,
7  correct?
8      A   Yes.
9      Q   Based on that did -- strike that. I'll
10 start over.
11         Did there come a time when Koch Foods
12 asked Sylvest for a list of its assets?
13     A   Yes.
14     Q   And did it receive that list?
15     A   We received a listing of assets. How
16 accurate or -- we made requests and we did receive
17 responses.
18     Q   Were the GE leases listed?
19     A   As an asset?
20     Q   Yes.
21     A   I don't recall if they had those pieces
22 that were under their GE lease listed or not. I
23 just don't recall.
24     Q   Did Sylvest ever claim that it owned the

Page 136

1  equipment?
2      A   I don't recall them making that claim.
3      Q   In fact, didn't they disclose to you that
4  they were leasing the equipment from GE?
5      A   I don't recall them making any claims. I
6  mean, they -- as part of the due diligence, if there
7  was a capital lease on the books, that would have
8  been part of the balance sheet.
9      Q   And it was part of the balance sheet,
10 right?
11     A   Yes. Yes, it was.
12     Q   And they disclosed that the GE leases were
13 capital leases, correct?
14     A   They made probably no representations.
15 They gave us the balance sheet, and on its face it
16 was clear that they had debt, they had debt owed to
17 GE or to capital leases.
18     Q   Including GE?
19     A   Yes.
20     Q   Wouldn't that indicate to you that these
21 weren't fixtures owned by Sylvest?
22         MR. GEEKIE: Objection, calls for a legal
23 conclusion.
24     A   On its very face, no.

Page 137

1  BY MR. HARRIS:
2      Q   Why not?
3          MR. GEEKIE: Same objection.
4      A   I've had matters in the past where leases
5  were indeed fixtures.
6  BY MR. HARRIS:
7      Q   Tell me about those.
8      A   Lots of this poultry processing equipment
9  literally becomes part and parcel to the facility.
10     Q   So is it Koch's testimony, because you're
11 here in part as a 30(b)(6) witness, as a
12 representative of Koch Foods is it your testimony
13 that a lender can spend a million dollars on
14 equipment, lease it to a poultry company, and as
15 soon as that poultry company puts a bolt in the
16 floor it becomes the property of the poultry
17 company?
18     A   That's not what I said.
19     Q   Why not? What part of that is wrong?
20     A   It's very simple from my perspective.
21 Again, I'm not an attorney.
22     Q   Go ahead.
23     A   In order for somebody not to be subjected
24 to the equipment being deemed a fixture when a third

35 (Pages 134 to 137)

MERRILL LEGAL SOLUTIONS
Tel: (312) 263-3524     (800) 868-0061

c2df77b2-2f34-4fa8-b280-8970fc664af6

Mark Kaminsky        October 19, 2007

Page 142

1  Sylvest, inclusive of the real property and the
2  equipment used to operate the business.
3      Q   Okay. But if the equipment piece that you
4  were purchasing was not a fixture, say it was a
5  forklift, you would have that separately itemized
6  and conveyed, right?
7      A   That's what I would expect to see.
8      Q   Right. Let me show you what's been marked
9  as Exhibit O and ask if you've ever seen this
10 document before?
11     A   Yes.
12     Q   Do you recognize whose handwriting that
13 is?
14     A   No.
15     Q   Is it yours?
16     A   No.
17     Q   What is this document?
18     A   Schedule 1.3, executory contracts and
19 insurance policies.
20     Q   Schedule 1.3 to what?
21     A   On its face I, I mean, I'd be speculating.
22     Q   You don't know, is that what you're
23 saying?
24     A   I would say it's part of the asset

Page 143

1  purchase agreement, but it doesn't say on the face,
2  so...
3      Q   Okay. Now, do you see No. 6 listed, it
4  says master lease agreement undated between GE
5  Capital and Sylvest Farms, do you see that?
6      A   Yes.
7      Q   Next to it is written reject. Was this
8  lease rejected in the Sylvest bankruptcy?
9      A   Yes.
10     Q   Did Koch Foods have any impact into that
11 decision?
12     A   Yes.
13     Q   And what would that be, what impact was
14 that?
15     A   My understanding of our involvement is as
16 the purchaser out of bankruptcy we have the right to
17 either accept or reject executory contracts.
18     Q   So the rejection was made by Koch or by
19 Sylvest?
20     A   I'm not sure how it works from a legal
21 perspective. All I know is that Sylvest in and of
22 themselves would not do anything that doesn't
23 behoove them. I mean, whether it's Koch or Sylvest,
24 I just don't know. I know we have input on whether

Page 144

1  these are accepted or rejected.
2      Q   And did you yourself personally have any
3  input into those decisions?
4      A   Yes.
5      Q   And what was the extent of that input?
6      A   Reviewed the executory contracts and chose
7  to either accept them or reject them.
8      Q   So you personally did that?
9      A   Along with others, yes.
10     Q   Okay. Did you personally have any such
11 impact with respect to No. 6?
12     A   Yes.
13     Q   Okay. So there came some time when you
14 reviewed the master lease between GE --
15     A   Or certainly knew that there was a lease
16 between Sylvest and GE, and we chose to reject it.
17     Q   Well, okay. Koch Foods chose to reject
18 it. Do you agree with that choice?
19     A   Yes.
20     Q   And why is that?
21     A   Felt it was a overvalued, overmarket lease
22 that Koch did not want to be tied to.
23     Q   Okay. Other than the inquiry from Michael
24 Leonard, have you received any inquiries in the

Page 145

1  purchase of the spiral freezer?
2      A   No.
3      Q   Has anyone else at Koch that you know of?
4      A   No.
5      Q   I show you Exhibit T and ask if you
6  recognize that document?
7      A   No.
8      Q   Did you create this?
9      A   No, I did not.
10     Q   You don't recall ever seeing this before?
11     A   I may have at one time. I don't recall
12 seeing this, though, no.
13     Q   Fine. Now, I see overall results, it says
14 sales, let's just go to June '06 because that is
15 listed under the first month of Sylvest. I'm not
16 going to ask you if that number is exactly right,
17 but is it accurate to say that Koch Foods on a
18 consolidated basis had about a hundred million
19 dollars in sales in the month of June '06?
20     A   Yes.
21     Q   So it has sales per year of over a billion
22 dollars?
23     A   That is correct.
24     Q   Okay. And is that -- strike that.

37 (Pages 142 to 145)

c2df77b2-2f34-4fa8-b280-8970fc664af6

# Exhibit B

Deposition of David Bromley                                        November 27, 2007

Page 38

1    Q.   The conveyor belts that were never used, when
2         were they first moved into the yard?
3    A.   At the same time the other equipment was taken
4         out, I believe.  It showed up on site, and it
5         sat out in front of the plant.  And eventually
6         we moved it to the back with all the rest of the
7         equipment.
8    Q.   I'm a little unclear.  This stuff arrived when?
9    A.   Probably early 2006, January, something like
10        that.
11   Q.   And at that point there were certain conveyor
12        belts of the deboning line that were not
13        installed and never have been, correct?
14   A.   That's correct.
15   Q.   For a time did they sit inside the facility in
16        line?
17   A.   No, sir.
18   Q.   Did they sit in crates?
19   A.   They weren't -- never were in crates.
20   Q.   So they came and they were just kind of shoved
21        off to the side?
22   A.   We took them -- unloaded them off the truck
23        to --

Page 39

1    Q.   Put them inside?
2    A.   -- be installed later.
3             No.  We left them outside.  We unloaded them
4         and left them right outside where we unloaded
5         them.
6    Q.   I see.
7             And they never went inside the building?
8    A.   No.
9    Q.   The other portion of the deboning equipment that
10        was installed, tell me how that was installed.
11   A.   Of course, we had to remove everything that was
12        in there, but then -- and got the floor done and
13        then just bringing everything in and fastening
14        it down.  You had to line it all up, bolt it
15        together.  Everything ties together like a
16        freeway system.  All the product falls on the
17        conveyors.
18   Q.   So --
19   A.   So as these other conveyors were put in, all the
20        pans had to be welded to it.  Everything was all
21        tied together.
22   Q.   And how was the machinery, in fact, fastened to
23        the facility?

Page 40

1    A.   Bolted to the floor.  Anchored to the floor.
2    Q.   Was it done in the same manner that the
3         previously removed equipment --
4    A.   Yes.
5    Q.   So there was a bolt that was bolted through the
6         epoxy floor into the concrete floor underneath,
7         correct?
8    A.   That's correct.
9    Q.   And the installed deboning equipment was
10        installed in the same fashion as the previously
11        removed ConAgra equipment had been installed,
12        correct?
13   A.   That's correct.
14   Q.   Has the spiral freezer ever been used by
15        Sylvest?
16   A.   No.  It was never completed.  The installation
17        was never completed.
18   Q.   Has the spiral freezer ever been used by Koch
19        Foods?
20   A.   No, sir.
21   Q.   When you say it wasn't completed -- the
22        installation was not completed, in what way was
23        it not completed?

Page 41

1    A.   Mike Leonard's part was complete.  He put the
2         machine in.  The refrigeration was never tied to
3         it and the electrical was never finished.
4    Q.   And why is that?
5    A.   Bankruptcy.
6    Q.   When you say bankruptcy, you mean the bankruptcy
7         filed by Sylvest?
8    A.   By Sylvest, yes.  That's correct.
9    Q.   Were you involved in any way in the negotiation
10        of the sale of the D & F equipment to Sylvest?
11        Strike that.
12            Were you involved in negotiating the price?
13   A.   Yes.
14   Q.   And you did this with Lenny --
15   A.   Lenny Ferguson.
16   Q.   Were you involved in the documentation regarding
17        that lease?
18   A.   I didn't have anything to do with it being
19        leased, no, if that's what you're asking.
20   Q.   Thank you.  That was a bad question.
21            You purchased it from D & F, but it was done
22        in the form of a lease from GE Capital.  Is that
23        your understanding?

Deposition of David Bromley                                              November 27, 2007

Page 42

1    A.   That's correct.
2    Q.   Were you involved in the documentation of the
3         lease from GE Capital to Sylvest?
4    A.   No.  I had nothing to do with the GE Capital
5         side.
6    Q.   Have you ever seen the lease?
7    A.   No, sir.
8    Q.   Were you ever asked to review the lease?
9    A.   No.
10   Q.   Now, when did Sylvest -- did Sylvest ever use
11        any part of the deboning line?
12   A.   Yes.
13   Q.   When did it first begin using it?
14   A.   Around the end of -- I don't remember the exact
15        date, but the end of 2005, beginning of 2006.
16   Q.   And when I say use it, I mean they started
17        deboning chickens.
18   A.   That's correct.
19   Q.   How long did they use it -- did Sylvest use it?
20   A.   Until the sale to Koch.
21   Q.   And when was that?
22   A.   I believe it was May or June 2006.
23   Q.   At that time you and certain other Sylvest

Page 43

1         employees were hired by Koch; is that right?
2    A.   That's correct.
3    Q.   And did there ever come a time during that
4         transition from Sylvest to Koch where the
5         deboning line portion that was being used was
6         not being used?
7    A.   No.  It was pretty much seamless.  We just kept
8         going.
9    Q.   So you never missed a day or anything?
10   A.   No.
11   Q.   You just kept doing it every day and the
12        ownership changed, correct?
13   A.   That's correct.
14   Q.   Are you aware of any demands by Koch Foods that
15        GE Capital remove the deboning equipment?
16   A.   No.
17   Q.   Did you make any?
18   A.   No.
19   Q.   Have you ever talked to anybody from GE Capital?
20   A.   No.
21   Q.   Are you aware of any demands by Koch Foods that
22        GE Capital pay it rent for either the spiral
23        freezer or the deboning equipment?

Page 44

1    A.   No.
2    Q.   How long did Koch Foods use the deboning
3         equipment?
4    A.   I'm trying to think of when we took it out.  I
5         would guess it was probably about nine months.
6    Q.   And when was it removed?
7    A.   About four months ago, something like that.
8         Three or four months ago.
9    Q.   So early summer of 2007?
10   A.   I would say that's right.
11   Q.   Was it continuously used by Koch Foods from the
12        time that Koch Foods took over from Sylvest in
13        the late spring or early summer of 2006 until
14        the time that it was removed nine or ten months
15        later?
16   A.   Yes.
17   Q.   Was any rent paid by Koch Foods to GE for that
18        equipment?  Do you know?
19   A.   I do not know.
20   Q.   I want to talk to you about the decision to
21        remove the equipment, not the actual removal --
22        we'll get to that -- but the decision to remove
23        it.  When did you first learn that Koch Foods

Page 45

1         was thinking about removing the equipment?
2    A.   Probably about three weeks before it actually
3         happened.
4    Q.   And how did you learn?
5    A.   I was told that it was going to happen and to go
6         ahead and set up the contractors to put
7         everything together to get that change done.
8    Q.   And from whom did you learn this?
9    A.   I believe it was Gary Davis, who was the complex
10        manager at that time.
11   Q.   And he's now been replaced by ...
12   A.   David Massey.
13   Q.   Were you involved in the decision to do that or
14        were you just instructed --
15   A.   No, sir.  No, sir.
16   Q.   You weren't involved in the decision?
17   A.   No.
18   Q.   Did you ask Mr. Davis why you were being asked
19        to make the change?
20   A.   No, sir.
21   Q.   Did you talk to anybody else besides Mr. Davis
22        about the decision to make the change?
23   A.   No.

Deposition of David Bromley                                November 27, 2007

Page 46

1  Q.  Was the deboning equipment performing adequately
2      prior to its deinstallation?
3  A.  Yes.
4              MR. GEEKIE:  Objection.  Vague and
5                  ambiguous.
6  A.  Yes.
7  Q.  Did you have any complaints about it?
8  A.  No.
9  Q.  How many people are employed at that facility
10     approximately?  A hundred?
11 A.  Currently or back then?
12 Q.  Currently.
13 A.  Probably about 600.
14 Q.  How about back at the time of the transition
15     from Sylvest to Koch?
16 A.  Probably about 250, 300.
17 Q.  So it's doubled in size approximately?
18 A.  Uh-huh (positive response).
19 Q.  That's a yes?
20 A.  Yes.
21 Q.  I'm sorry.
22 A.  I'm sorry.  Yes.
23 Q.  That's fine.

Page 47

1      Tell me about the deinstallation process,
2      then.  About three weeks before you actually
3      removed the equipment, Mr. Davis told you to
4      prepare to do that.  What did you do after he
5      told you to prepare to do that?
6  A.  Contacted electricians, you know, plumbers and
7      millwrights.  Of course, the millwrights had
8      already been determined.  The same people who
9      sold the equipment were the millwrights.  They
10     would come in and actually move the equipment.
11 Q.  Who is that?
12 A.  Fabco, F-A-B-C-O.
13 Q.  Who were the electricians?
14 A.  I believe I used G T Key.
15 Q.  Plumbers?
16 A.  Peterson Industrial.
17 Q.  Anyone else you needed?
18 A.  I believe that was it.
19 Q.  And so you contacted all of these folks, and you
20     chose a date, right, a specific date?
21 A.  I think I was given a date.  I don't remember
22     what that was.
23 Q.  But Mr. Davis said on such-and-such a date, I

Page 48

1      want you to shut down and remove all this
2      equipment, right?
3  A.  Well, we don't shut down.  We do it all on the
4      weekend.  On several weekends, yes.  We came in,
5      and it took a couple of weekends to get that all
6      done.
7  Q.  So this did not interrupt the processing of the
8      deboning line?
9  A.  No.
10 Q.  On a normal schedule, like right now, no weekend
11     shifts are worked; is that correct?
12 A.  No.
13 Q.  So they are closed during the weekend?
14 A.  Yes.
15 Q.  So then for the three or four weeks then leading
16     up to the removal, you would shut down portions
17     at a time and remove it and replace it with new
18     stuff or just take out the old stuff?  How did
19     that work?
20 A.  The -- It actually took two weeks, and the first
21     week we removed all the equipment we could do
22     without.  There's some equipment that wasn't
23     running that never did run, and we got all that

Page 49

1      out of the way.  And then the second weekend we
2      came in and did a whole scale tear-out.  Took
3      everything out and replaced everything.
4  Q.  So no shifts were missed?
5  A.  No.
6  Q.  Correct?
7  A.  I don't think so.
8  Q.  Tell me about the removal process.  How was this
9      removed?
10 A.  Came in and unhooked all the electrical and all
11     the water and air.
12 Q.  When you say air, was that for the pressure?
13 A.  We use air for -- There were air cylinders and
14     air gates that directed product as it went
15     through the process.  We went in and
16     disconnected all of that, and then they would
17     come in and unbolt it from the floor.  A lot of
18     the equipment had to be cut apart.  As I said
19     before, it was all welded together to make one
20     big integral operation.
21 Q.  And these are -- the various pieces that came
22     from the factory were then welded together?
23 A.  That's correct.