**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, | ) ) ) | Case No. 07-cv-522-MHT |
| Plaintiff and Counterclaim-defendant, | ) ) | |
| v. | ) ) | Honorable Myron H. Thompson |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) ) | Honorable Terry F. Moorer |
| Defendant and Counterclaim-plaintiff**.** | ) | |

**MOTION IN LIMINE TO EXCLUDE ROBERT BREAKSTONE'S TESTIMONY,
TO EXCLUDE EVIDENCE REGARDING OTHER LITIGATION,
AND TO EXCLUDE EVIDENCE OF CONVERSION OF THE SPIRAL FREEZER**

Plaintiff and Counterclaim-Defendant, Koch Foods of Alabama, LLC ("Koch"), through its undersigned counsel, moves this court for the entry of an order *in limine*: (a) excluding any testimony by Mr. Robert Breakstone under Rules 701 or 702 of the Federal Rules of Evidence (the "Rules") regarding the value of certain equipment, which is the center of this litigation; (b) excluding evidence regarding prior litigation between a Koch's affiliate and a GECC affiliate; and (c) excluding testimony or evidence regarding any alleged conversion by Koch of the spiral freezer that is not the subject of this litigation. In support its motion, Koch states as follows:

**I. BREAKSTONE EXPERT REPORT.**

**A. Introduction.**

In December 2005, Defendant and Counterclaim Plaintiff, General Electric Capital Corporation ("GECC") and Sylvest Farms, Inc. entered into an equipment lease, under which Sylvest leased certain chick deboning cone lines (the "Deboner"), a spiral freezer (the "Freezer," collectively with the Deboner, the "Equipment"), and two Ossid shrink wrap lines. In April

2006, Sylvest filed for bankruptcy protection.  In May 2006, Koch purchased substantially all of Sylvest's assets, including the facility where the Equipment were located.

In this litigation, GECC asserted a counterclaim that Koch converted the Deboner.  On October 1, 2007, GECC served Koch with a document titled "Expert Report of Robert Breakstone for General Electric Capital Corporation In the Matter of Koch Foods of Alabama. LLC v. General Electric Capital Corporation, Case No. 07 C 522, October 1 , 2007," pursuant to Section 8 of the Uniform Scheduling Order and Rule 26(a)(2) of the Federal Rules of the Civil Procedure.  The complete document is attached hereto is **Exhibit A** ("Breakstone Rep.").

The document consists of two appraisal reports.  The first report is dated June 8, 2006 ("June 2006 Appraisal Report"), which contain appraisals of the Deboner, the Freezer, and the two Ossid shrink wrap lines as of May 16, 2006 using three valuation methods: "Costs as Shown by Invoices," "Fair Market Value - Remove," and "Orderly Liquidation Value."  The second report is dated September 27, 2007 ("September 2007 Appraisal Report"), which contains valuations of the Deboner and the Freezer as of September 24, 2007 using three valuation methods: "Fair Market – Remove," "Orderly Liquidation Value," and "Fair Market Value – In Place as of Day One Year One."

Koch anticipates that GECC will attempt to offer into evidence or to elicit opinion testimony from Mr. Robert Breakstone regarding the value of the Deboner and the Freezer.  In fact, GECC argued in its summary judgment brief that the value of the Equipment should be measured based on Mr. Breakstone's appraisal reports.  However, any testimony from Mr. Breakstone regarding the value of the Equipment must be excluded because the appraisals are untruthful and unreliable, and Mr. Breakstone has no personal knowledge regarding the Equipment.

**B.    This Court must exclude Mr. Breakstone's expert testimony under Rule 702 because his appraisals are based on untrue assumptions and his application of the valuation methods is untruthful and unreliable.**

This Court is charged to act as a gatekeeper to exclude unreliable expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).   An expert's opinion testimony is admissible only if the proponent of the testimony can show that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

The Supreme Court in *Daubert* set forth a list of non-exclusive factors for this Court to use in assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; and (4) whether the technique or theory has been generally accepted in the scientific community.  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).

Here, the facts and data that Mr. Breakstone relied on are insufficient and untrue. Moreover, his application of the valuation methods directly contradicts undisputed facts in this case.  Applying the requirements of Rule 702 and the *Daubert* test, this Court, therefore, must exclude his expert testimony regarding the value of the Equipment.

**1.    Mr. Breakstone's opinion testimony must be excluded because his opinions are based upon insufficient, untrue assumptions.**

Mr. Breakstone's expert testimony must be excluded because his opinions regarding the value of the Equipment are based on insufficient, untrue assumptions.  First, Mr. Breakstone

never personally inspected the Equipment.  In May 2006, Daniel Nicoson conducted an on-site inspection of the Equipment.  Mr. Breakstone prepared and finalized his June 2006 Appraisal Report merely by consulting certain notes and photographs that Mr. Nicoson made during and following the inspection.  (Ex. A, Breakstone Rep. at 2).

Similarly, in September 2006, Mr. Nicoson and Mr. Jim Lott conducted an on-site inspection of the Equipment.  Again, Mr. Breakstone did not personally inspect the equipment. He merely prepared his September 2007 Appraisal Report by consulting certain notes and photographs that Messrs. Nicoson and Lott made during and following the inspection.  (Ex. A, Breakstone Rep. at 2).

Second, in his report, Breakstone stated that "Fair Market Value – In Place as of Day One Year One" was the "Fair Market Value – In Place" as of "the actual installation and operational date in Spring 2006."  (Ex A, September 2007 Appraisal at Page 2 of 7).  This assumption about the installation and operational date of the Equipment is completely false.  The undisputed evidence in this case showed that the Deboner actually began operation in January 2006 and the Freezer was never completely installed, let alone operational.  *See* Deposition Transcript of Dave Bromley (p40:14-17; p42:14-18), which is attached hereto as **Exhibit B**.  Moreover, Messrs. Nicosan and Lott only inspected the Equipment in May 2006 and September 2007 and, thus, has no knowledge about the Equipment in Spring 2006.  As a result, Mr. Breakstone's opinions about the value of the Equipment on the "operational date in Spring 2006" was based on untrue assumptions.

In fact, Mr. Breakstone did not even spend sufficient time and effort to investigate the status of the Equipment that he was appraising.  His lack of investigation is demonstrated by the following excerpt from the deposition transcript of Mr. William Wilson, who is the litigation

specialist at GECC responsible for this case.

> Q.    Did you or anybody on GE's behalf ever ask Koch if they were using the freezer?
>
> A.    Yes, we did.  I think we asked – I'm sure we asked Bob Breakstone in his appraisal if it was being used.
>
> Q.    What did Bob Breakstone say?
>
> A.    He wasn't sure.  It was like it could go either way, yes or no, whether it was being used or not used.  The answer he gave me is that he was not able to tell if it was being used or not used.
>
> Q.    Did he say if he ever asked anybody?
>
> A.    No, I don't remember that.  If you thought it was important enough to ask Mr. Breakstone if the freezer was being used, and he didn't know, did you then make any effort yourself or ask somebody else from GE to make an effort to find out if the freezer was being used?
>
> A.    Yes, we did, and I don't recall the specifics, but I do recall we did find out at some point that the freezer was in another part of the building at the plant and that that area was rarely being used.  So we might have assumed at the time at that point that it wasn't being used, that it was still at the location.

Wilson Deposition (pp 45:3-46:2), which is attached hereto as **Exhibit C**.

Mr. Wilson's testimony showed that Mr. Breakstone did not know whether the spiral freezer was being used or not.  Despite the fact that he did not personally inspect the Equipment, and the fact that he did not bother to investigate whether the Freezer was being used or not, he went on and authored his opinion about the value of the Equipment.  He especially authored an opinion about the value of the Equipment with an operational status, which is untruthful due to his lack of investigation.  Not only does his careless conduct cause his opinion to be untruthful and unreliable, someone may also contend that his valuation is reckless or deceptive.

**2.    Mr. Breakstone's application of his valuation methods directly contradicts the undisputed facts in this case.**

Mr. Breakstone's valuation is inflated and unreliable because his application of the valuation methods directly contradicts the undisputed facts in this case.  First, Breakstone valued

the Equipment's "Fair Market Value – In Place as of Day One Year One" at $1,398,067.50.  (Ex A, September 2007 Appraisal Report, Page 4 of 4).  This value is about $157,395 more than the Equipment's capital costs, $1,240,672.50, which also include the installation costs.  (Ex A, September 2007 Appraisal Report, Page 4 of 4).  Mr. Breakstone's valuation means, by putting the Equipment into Koch's facility, the Equipment had been appreciating rather than depreciating over time.  In other words, simply by putting the Equipment into Koch's facility, GECC can make a profit of $157,395 plus the rents paid by Sylvest (or about 20% of the Equipment's capital costs) in a period of four months.

Common sense is that the Equipment will depreciate over time.  In fact, Mr. Breakstone's report lists depreciation as a factor in calculating the value of the Equipment.  (Ex. A, September 2007 Appraisal Report, Page 3 of 7).  In applying his valuation methods to the Equipment, not only did Mr. Breakstone completely ignore any depreciation of the Equipment, but he actually made the Equipment appreciate more than 20% over three months.  As a result, his application of the valuation methods is not only unreliable, but also untruthful.

Furthermore, Mr. Breakstone in his report claims that his "Sales Comparison" approach "involves analyzing recent sales of properties that are similar to the subject property."  (Ex. A, September 2007 Appraisal Report, Page 3 of 7).  Based on this approach, Mr. Breakstone valued the "Fair Market Value" of the Freezer at $240,000 as of September 2007 and $280,000 as of May 2006.  Mr. Breakstone defines "Fair Market Value" as "a result of a transaction between a willing buyer and willing seller, with no time limitation to sell."  (Ex. A, September 2007 Appraisal Report, Page 2 of 7).

First, these valuations of the Freezer are mere conclusory statements.  Mr. Breakstone did not provide any data about the number of sales which he had compared and how the assets in

those sales were different from the Freezer. Because no data supports his conclusion based on the "Sales Comparison" approach, his opinions regarding the fair market value cannot be subject to objective test or peer review for purpose of examining their reliability. *See Daubert*, 509 U.S.at 593. Consequently, his subjective, conclusory opinions about the Equipment based on "Sales Comparison" approach fails the *Daubert* test.

Second, the result of his "Fair Market" valuation based on the "Sales Comparison" approach directly contradicts the undisputed facts in this case. Here, GECC, the putative owner of the Freezer under no time pressure, entered into a contract to sell the Freezer to Mr. Michael Leonard for $50,000, while Mr. Breakstone opined that a prudent, willing buyer would purchase the Freezer for between $240,000 and $280,000.

In May 2007, which was a time between Mr. Breakstone's June 2006 appraisal and September 2007 appraisal, GECC entered into a contract with Mr. Leonard, under which GECC would sell him the Freezer for $50,000. *See* Deposition Transcript of Joseph DiSalvo (p73:3-25), which is attached hereto as **Exhibit D**. GECC even cashed the $5,000 deposit check from Mr. Leonard. (Ex. D, p72:19). The amount of $50,000 is the true fair market value of the Freezer, based on what a fully-informed willing seller would sell to a fully-informed willing buyer without time pressure.

GECC canceled the sale and refunded Mr. Leonard's deposit only after counsel for Koch pointed out the huge difference between Breakstone's appraisal and the sale price. According to the testimony of GECC's own remarketing team leader, Mr. DiSalvo, the transaction was canceled not because "the price was too low," but because "we couldn't accept it because of a pending lawsuit." (Ex. D, DiSalvo Transcript 35:22-24).

In sum, Mr. Breakstone's expert testimony will not meet the requirements under Rule 702, because his appraisals were based on untrue facts by incorrectly assuming that the Equipment was operational in Spring 2006, because he unreliably and untruthfully applied the valuation method leading to the appreciation of the Equipment by 20% in three months, and because his appraisals, while claiming to be a result from what a willing buyer would buy from a willing seller, are actually about five times the amount for which a willing buyer would actually purchase from a willing buyer.    Because Mr. Breakstone's appraisals fail to meet the requirements of Rule 702, and actually will mislead a jury, this Court must exclude Mr. Breakstone's expert testimony.

**3.     Mr. Breakstone's opinion testimony must be excluded under Rule 403 because its prejudicial effect substantially outweighs its probative value, if any.**

Even if Mr. Breakstone's testimony meets the requirements of Rule 702, this Court must preclude his testimony under Rule 403.  Because of powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet admissibility requirements may still be excluded, where probative value of evidence is substantially outweighed by its potential to confuse or mislead jury.  *U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).

Breakstone's testimony will undoubtedly mislead the jury because his opinions are based on untrue facts, defy common-sense, and directly contradict the undisputed facts in this case.  On the other hand, his opinion has little probative value for the same reasons.  Accordingly, his opinion testimony must be excluded under Rule 403.

**4.     This Court must exclude Breakstone's lay opinion testimony under Rule 701 because he has no personal knowledge regarding the Equipment.**

This Court must also bar Mr. Robert Breakstone from testifying as a lay witness under Rule 701 because he has no personal knowledge about the Equipment.  Rule 701 allows a lay

witness to testify in the form of opinions or inferences that are rationally based on the perception of the witness and not based on specialized knowledge.

If Mr. Breakstone testify as a lay witness, the testimony must emanate from his personal experience. Here, Mr. Breakstone did not personally inspect the Equipment, he only consulted the notes and photographs made by Nicoson and Lott, which are inadmissible hearsay. Accordingly, Mr. Breakstone should be barred from offering any lay opinion testimony.

In conclusion, Mr. Breakstone's expert testimony is unreliable and misleading and, thus, inadmissible under Rule 702. In addition, the misleading effect of his opinions substantially outweighs their probative value, and, therefore, his testimony must be excluded under Rule 403. Because Mr. Breakstone has no personal knowledge of the Equipment, he cannot offer any lay opinion testimony regarding the value of the Equipment.

WHEREFORE, Koch requests that this Court enter an order *in limine* excluding any testimony by Mr. Breakstone regarding the value of the Equipment.

## II.  EVIDENCE REGARDING OTHER LITIGATION BETWEEN KOCH AND GECC.

Koch anticipates that GECC may elicit testimony or make reference to evidence regarding prior litigation between a Koch's affiliate and a GECC's affiliate over equipment that the Koch's affiliate purchased from the bankruptcy estate of B. C. Rogers in Mississippi (the "Mississippi Litigation").

The Mississippi litigation involved two cases: *General Electric Capital Business Asset Funding Corporation vs. Koch Foods of Mississippi, LLC, et al*, in the United States District Court for the Southern District of Mississippi, Jackson Division, Case No. 3:04CV746 and *General Electric Capital Business Asset Funding Corporation vs. Ken Lefoldt, Liquidating Trustee, Koch Foods of Mississippi, LLC, et al,* in the United States Bankruptcy Court for the Southern District of Mississippi, Jackson Division, Adversary Proceeding No. 04-159.  Koch Foods of Mississippi, LLC ("Koch Mississippi") and General Electric Capital Business Asset Funding Corporation ("GE BAF") settled these two cases and agreed "to keep strictly confidential and not to disclose either the terms, fact, or the amount of this settlement."

Evidence of the prior litigation between Koch Mississippi and GE BAF is irrelevant under Rule 401.  Under Rule 401, evidence is relevant only if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *U.S. v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008).  Furthermore, Rule 403 provides that relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  *Id.*

The Mississippi Litigation, involving different facts and circumstances and different

parties, does nothing more than invade the province of the jury and interject irrelevant information into their fact finding process. No aspect of the Mississippi Litigation relates to or touches upon the questions that the jury must now address. Neither the history nor circumstances of the Mississippi Litigation has any bearing or relevance to the issues in this case. In other words, the Mississippi Litigation, which involved totally different facts, does not make the existence of any fact in this case more or less probable, and is, therefore, inherently irrelevant. Accordingly, any reference or comment to the Mississippi Litigation is of no probative value.

On the other hand, any reference or comment to the Mississippi Litigation poses a great danger of unfair prejudicial effect because the jury would think Koch has a habit of taking GECC's leased equipment. Put it in another way, any reference to the Mississippi Litigation would be as unfairly prejudicial as Koch wanting to introduce evidence that it has never been sued by anyone else claiming that it converted their leased equipment. Accordingly, any evidence regarding the Mississippi Litigation must be excluded under Rules 402 and 403.

WHEREFORE, Koch requests that this Court enter an order *in limine* excluding any reference and comment to the Mississippi Litigation between the Koch Mississippi and GE BAF.

## III.  EVIDENCE REGARDING CONVERSION OF THE SPIRAL FREEZER.

Koch anticipates that GECC will make an argument that Koch converted the Freezer by claiming the ownership of the Freezer.  However, this Court must exclude any testimony or evidence regarding any alleged conversion by Koch of the spiral freezer because GECC never asserted a conversion claim for the Freezer in its counterclaim.

On June 13, 2007, GECC filed its answer and counterclaim.  A copy of the answer and counterclaim is attached hereto as **Exhibit E**.  In its counterclaim, GECC asserted a single count of "Conversion of the Equipment by Koch Foods" against Koch (Ex E, Answer and Counterclaim, at 7 and at 8 ¶16).  GECC defined "the Equipment" in its counterclaim as "Model 2006 de-boner with double cone lure, product conveyors, and loading bin; serial number 36019-01A; manufactured by D&F Equipment Sales; and having a capitalized lessor's cost of $846,545.00."  (Ex. E, 6 ¶4).  Clearly, GECC's counterclaim did not assert conversion of the spiral freezer.

In fact, GECC's reply brief in support of its summary judgment motion admitted that its counterclaim did not make any reference to the spiral freezer.  *See* page 11 of GECC's reply brief in support of its summary judgment motion, which is attached hereto as **Exhibit F**. Nonetheless, GECC argued that GECC's conversion claim extends to the spiral freezer under Rule 15(b) of the Federal Rules of Civil Procedure (Ex. F at 11).  Rule 15(b) allows a party to conform its pleadings to the evidence once trial begins.  Not only has trial not begun, and thus Rule 15(b) is inapplicable, GECC never sought to amend its pleading to add the claim for conversion of the Freezer and thus has never pleaded any facts on which to receive relief.

Therefore, whether Koch converted the Freezer is not a question before the jury.  Koch anticipates that GECC will attempt to introduce evidence regarding the conversion of the

Freezer.  Under Rule 401, evidence is relevant only if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *U.S. v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008).

Because GECC never asserted a conversion claim for the Freezer, the evidence about conversion of the Freezer will be inherently irrelevant.  Not only irrelevant, the evidence about conversion of the Freezer will confuse the jury about the issues of the case.

Under Rule 403, evidence, even if relevant, may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Because evidence about conversion of the Freezer has no probative value to prove any issue and confuses the jury about the issues of the case, this Court must exclude any evidence regarding the conversion of the Freezer.

WHEREFORE, Koch requests that this Court enter an order *in limine* excluding any evidence or comment that Koch also converted the Freezer.

Dated:  March 31, 2008                          Respectfully submitted,


                                                _____/s/ Zhiyuan Xu_____
                                                     Zhiyuan Xu


OF COUNSEL
Thomas G. Mancuso
Constance C. Walker
Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104
Telephone: 334-265-8573
Facsimile: 334-264-7945
Email: tgm@hsy.com

OF COUNSEL
Eugene J. Geekie, Jr.
Jonathan P. Friedland
Zhiyuan "Mike" Xu
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois  60606
(312) 258-5500
(312) 258-5600 (Fax)
egeekie@schiffhardin.com

Counsel for Koch Foods of Alabama, LLC

<u>CERTIFCATE OF SERVICE</u>

The undersigned, an attorney, certifies that copies of the forgoing were caused to be served upon counsel of record addressed as follows by the ECF system on this 31st day of March, 2008.

Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
Fax: 312-207-6400
tharris@reedsmith.com
aterras@reedsmith.com

Rusha Christina Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
205-521-8010
Fax: 205-488-6010
Email: rsmith@bradleyarant.com


                            /s/ Zhiyuan Xu
                            Zhiyuan Xu

CH2\2377825.7

15

# Exhibit A

EXPERT REPORT

OF

ROBERT BREAKSTONE

FOR

GENERAL ELECTRIC CAPITAL CORPORATION

IN THE MATTER OF

<u>KOCH FOODS OF ALABAMA, LLC V. GENERAL ELECTRIC
CAPITAL CORPORATION</u>

CASE NO. 07 C 522

October 1, 2007

I.      **Statement of Opinions**

The opinions on which my testimony will be based are provided in the (a) Appraisal Valuation Report of Sylvest Farms, prepared May 2006, and (b) Appraisal Valuation Report of Sylvest Farms, prepared September 2007 (collectively, the "Appraisal Reports"), copies of which are appended hereto, and incorporated by reference as though set forth fully in this Report.

II.     **Bases for Opinions**

The bases for my opinions are provided in the Appraisal Reports.

III.    **Information Considered in Forming Opinions**

In May 2006, Daniel Nicoson of Equipment Exchange Co. of America, Inc. conducted an on-site inspection of the equipment which is referenced in the Appraisal Reports. During and following this inspection he prepared certain notes and made certain photographs which I consulted in preparing and finalizing the Appraisal Reports. In addition, Mr. Nicosion consulted with me and provided information regarding the preparation and finalization of the Appraisal Report dated June 2006.

In September 2007, Mr. Nicoson and Jim Lott of Mechanical Services Company conducted an on-site inspection of the equipment which is referenced in the Appraisal Report dated September 2007. During and following the inspection they prepared certain notes and made certain photographs which I consulted in preparing and finalizing the Appraisal Reports. In addition, Messrs. Nicoson and Lott consulted with me and provided information regarding the preparation and finalization of the Appraisal Report dated September 2007.

In addition, I have approximately twenty-five (25) years of industry experience purchasing and selling machinery which assisted in the formulation of my opinions as expressed in the Appraisal Reports. In addition, I reviewed certain of the documents produced by Koch in its document production, including vendor quotes and invoices and underlying lease documentation, which assisted in my opinions.

IV.     **Exhibits to be Used as a Summary or Support**

I plan to use all or portions of the Appraisal Reports as a summary of my opinions. I plan to use the photographs included in the Appraisal Reports as support for my opinions.

2

## V.    Qualifications of the Witness

### A.    Employment

Senior Appraiser at Equipment Exchange Co. of America, Inc.
Lake City, Pennsylvania
(1982 to Present)

### B.    Publications Within the Preceding Ten Years

None

### C.    Education

Mercyhurst College, in Erie, Pennsylvania, B.A. in Business Administration, B.A.

### D.    Professional Memberships and Affiliations

Equipment Appraisers Association of North America (EAANA), Certified Senior Appraiser (CSA)
Association of Machinery and Equipment Appraisers (AMEA), Certified Equipment Appraiser (CEA)
American Society of Appraisers (ASA), Candidate Member

### E.    Experience

I have approximately twenty-five years of experience in the machinery and equipment appraisal business, and an equal number of years of experience purchasing and selling equipment and machinery. As part of my business, I regularly attend auctions where large machinery is sold, and I commonly record pricing data for this equipment, which is maintained in an internal database at the Equipment Exchange Co. of America, Inc. offices in order to track sales information regarding equipment and machinery.

### F.    Additional

In addition to the qualifications stated here, I have the qualifications attached to those portions of the Appraisal Reports entitled "Appraiser's Qualifications," which, with the rest of the Appraisal Reports, are incorporated by reference as though set forth fully in this Report.

3

## VI.    Compensation

Equipment Exchange Co. of America, Inc. and I were provided compensation in the amount of $7,500.00, plus expenses in the amount of $1,477.34, for the June 2006 appraisal of the equipment and preparation of the Appraisal Report dated June 2006.   Equipment Exchange Co. of America, Inc. and I were provided compensation in the amount of $6,000.00, plus expenses which have not yet been calculated at the time of this report, for the September 2007 appraisal of the equipment and preparation of the Appraisal Report dated September 2007.   My compensation for study and testimony going forward shall be $250.00 per hour.

## VII.    Prior Testimony

I provided deposition testimony in a case involving GE Capital and Koch previously pending in Mississippi.  I provided opinion testimony consisting of appraisals of chicken processing equipment located in a facility in Jackson, Mississippi.

Robert Breakstone

CHILIB-2109943.2-515998-00011

4

INSPECTION AND VALUATION OF

# SYLVEST FARMS

### 4530 MOBILE HIGHWAY

### MONTGOMERY, AL 36108
PREFORMED FOR

# GENERAL ELECTRIC
# CAPITAL CORPORTATION
## COMMERCIAL
## EQUIPMENT FINANCING

BY

## EQUIPMENT EXCHANGE COMPANY
## MAY 2006



EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.



AMEA

ASSOCIATION OF
MACHINERY AND
EQUIPMENT APPRAISERS

# APPRAISAL VALUATION REPORT

OF

## SYLVEST FARMS
4530 MOBILE HWY
MONTGOMERY, AL
36108

## PREPARED
## JUNE
## 2006

BY





# APPRAISER'S OPINION LETTER



**2** APPRAISER'S CERTIFICATION & CERTIFICATION OF VALUE



**3** SCHEDULE OF DETAILED INVENTORY



**4** APPRAISAL PHOTOGRAPHS



**5** APPRAISER'S QUALIFICATIONS

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

<br>

SUMMARY APPRAISAL REPORT
PRIVATE & CONFIDENTIAL

**Subject - Certain Assets of:**

SYLVEST FARMS
4530 MOBILE HIGHWAY
MONTGOMERY, AL 36108

**For the Intended Use of:**

GENERAL ELECTRIC CAPITAL
COMMERCIAL EQUIPMENT FINANCING
44 OLD RIDGEBURY ROAD
DANBURY, CT 06810-5105

### Purpose of Appraisal

The purpose of this appraisal is to provide an independent, professional opinion of the Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Sylvest Farms, 4530 Mobile Highway, Montgomery, AL. This report is intended solely for financing and business decisions of General Electric Capital Corporation and assignees. Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is May 16, 2006.

### Intended Use of Appraisal

This report is intended solely for financial and business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts. If a particular company or individual determined that, the concept fits a particular need and therefore could use it in a way that would be improper. The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value. It is up to the user to determine if the defined concept is correct for its purpose. Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards. The appraisal is preformed at the request of a client based upon a requested concept of value. It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value. Users of this report must do so with the knowledge of the defined concepts of value being utilized. If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 2 of 7
GECC/Sylvest Farms

## Scope of Appraisal

To appraise certain personal property of the subject company located at Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-Removed and Orderly Liquidation Value.

## Highest and Best Use

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Sylvest Farms are producers of fresh and frozen poultry products.  Equipment includes packaging, freezing, cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment.  This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

## Value Definitions

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises.  The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell.  This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards.  Since a physical inspection has to be preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below.  Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used.  This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove.  Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |

Value Definitions: provided by General Electric Capital Corporation Letter of Engagement.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
GECC/Syvest Farms

Both stated value considerations represent the normal considerations for the assets being appraised. The stated values are unaffected by special or creative financing or sale considerations granted by anyone associated with a possible sale or any other special or creative terms, service fees, costs or credits.

All values stated are in United States Funds as of effective date of this report. Any users of this report must assume that the listed "OLV" is based on the fact that a qualified and experienced broker of the goods is to be used as the marketing agent. It also does not take into account any "costs to sell" that would be involved in liquidating the assets.

### Approaches to Value

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted approaches to value must be considered.

1) **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being appraised for the loss in value caused by physical deterioration, functional obsolescence, or economic obsolescence. The cost approach is based on the principle of substitution: a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility. In its simplest form, the cost approach is the current cost (as if new) less all depreciation.

2) **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts the prices that have been paid for assets comparable to the asset being appraised, equating the comparables to the subject. This involves analyzing recent sales of properties that are similar to the subject property. If the comparables are not
identical, the prices are adjusted to equate the various characteristics of the properties. Equipment Exchange Company of America, Inc. uses an extensive in-
house database of sold and brokered equipment, auction-selling prices, and data gathered via the Internet and other used equipment dealers to establish comparables. As in the cost approach, the basis is a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.

3) **Income Approach:** The appraiser determines the present value of the future economic benefits of owning the property. This approach is seldom used in valuing personal property and was considered but deemed not applicable in performing this appraisal.

In this summary appraisal and review of assets from Sylvest Farms, the Sales Comparison Approach was employed to arrive at value conclusions. Equipment Exchange Company researched the equipment installed or used at the location. We also paid particular attention to the marketability of these assets in their current geographic location and the effect that location would have in developing their probable value.

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
GECC/Sylvest Farms

## Depreciation

Defined as the actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself and due to changes in design, or process resulting in inadequacy, over capacity, excess construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions. These can include such things as the economics of the industry, availability of financing, loss of material and labor sources, passage of new legislation, and changes in ordinances.

## Summary of Values Conclusions

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions and limiting conditions, which the Fair Market Value-Remove and Orderly Liquidation Value of the machinery and equipment located at Sylvest Farms, Montgomery, AL.

|  | **FAIR MARKET VALUE-REMOVE** |
|---|---|
| **TOTAL CURRENT OF EQUIPMENT VALUED** | **$1,119,500.00** |
|  | **ORDERLY LIQUIDATION VALUE** |
| **TOTAL CURRENT OF EQUIPMENT VALUED** | **$661,900.00** |

## GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS

This is a Summary Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it might not include full discussions of the data, reasoning, and analysis that were used in the appraisal process to
develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning and analyses is retained in the appraiser's file.

**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 5 of 7
GECC/Sylvest Farms

This appraisal sets forth our findings and conclusions which are based upon an investigation of
conditions affecting value and which are subject to the Assumptions, Statements of Limiting
Conditions, and Definitions contained in the following report. *Without reading the Assumptions
and Statement of Limiting Conditions and Definitions, this report could be erroneously
interpreted.*

The legal description given to the appraisers and used in this report is assumed to be correct.  No
responsibility is assumed for matters of a legal nature affecting title to the property nor is an
opinion of title rendered.  The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection
with such matters.  Sketches in this report are included only to assist the reader in visualizing the
property.

In conducting this inspection or in gathering information for this report we have assumed that no
unreported or hidden conditions exist with the equipment that would render it more or less valuable
then reported.

If for some reason we were unable to gather the model number, serial number, age or other
pertinent information we assumed that the equipment was similar to other equipment we have
appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable.  A reasonable effort has been
made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so
specified within the report.  The property is appraised as though under responsible ownership and
management.  It is assumed that there are no hidden or unapparent conditions of the property,
subsoil, or structures, which would render it more or less valuable.  No responsibility is assumed for
such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as
leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of
the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported.  There have not been any
guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all-applicable federal, state and local environmental
regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied
with, unless a non-conformity has been stated, defined, and considered in the appraisal report.



**EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
GECC/Sylvest Farms

It is assumed that all required licenses, consents or other legislative or administrative authority
from any local, state or national governmental or private entity or organization have been or can be
obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the
appraiser.  No responsibility is assumed for latent defect of ANY nature whatsoever which may
affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference
or appearance required by subpoena, with reference to the property in question, unless timely
arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal,
and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value
opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous
material, which may or may not be present on the property.  I have no knowledge of the existence
of such materials on or in the property and are not qualified to detect such substances. The
presence of substances such as asbestos, urea formaldehyde foam insulation or other potential
hazardous materials may affect the value of the property.  The value estimate is predicated on the
assumption that there is no such material on or in the property that would cause a loss in value.  No
responsibility is assumed for any such conditions, or for any expertise or engineering knowledge
required to discover them.  The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate
in the appraisal if any new facts pertinent to the process are discovered which were unknown when
the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may
it be used for any purpose or any function other than the intended use, as stated in the body of the
report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report.
All conclusions and opinions concerning the analysis as set forth in the report were prepared by the
appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s).  The
appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the
analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the
report to anyone other then the client or his designee as specified in writing.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
GECC/Sylvest Farms

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser

**EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC**
**10042 KEYSTONE DRIVE**
**LAKE CITY, PA 16423**

Does

# -Certify-

That on May 16, 2006 that certain property of:

## SYLVEST FARMS
## 4530 MOBILE HIGHWAY
## MONTGOMERY, AL 36108

HAS WELL AND REASONABLE WORTH:

VALUE IS AS FOLLOWS:

|  | FAIR MARKET VALUE-REMOVE |
|---|---|
| TOTAL CURRENT OF EQUIPMENT VALUED | $1,119,500.00 |
|  | ORDERLY LIQUIDATION VALUE |
| TOTAL CURRENT OF EQUIPMENT VALUED | $661,900.00 |

EFFECTIVE DATE OF APPRAISAL: May 16, 2006

BY:    ROBERT BREAKSTONE, CEA



EQUIPMENT
EXCHANGE
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

**Appraiser's Certification:**

I certify that, to the best of my knowledge and belief:

- ❖ the statements of facts contained in this report are true and correct.

- ❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

- ❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

- ❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

- ❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- ❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

- ❖ I have made a personal inspection of the property that is the subject of this report.

- ❖ no one provided significant professional assistance to the person signing this report.

Signed: _____

Daniel R. Nicoson, Report Date:



**EQUIPMENT
EXCHANGE**
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX   (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

## Appraiser's Certification:

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

❖ I have NOT made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _____

Robert Breakstone, CEA, CSA

Private Confidential

6/8/2006

## INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

#### ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| | | **OSSID PACKAGING EQUIPMENT** | | | |
| | | Ossid Invoice #3295-F, Invoice date 12/19/05, equipment installed in early 2006 and minimal production use. Equipment seemed to be in 'like new' condition. | | | |
| 2 | 1 | Integrated Package Infeed conveyors, 10" wide x 87" long, with low-friction conveyor belt, AC variable speed drive. No ID tags, installed 2006 | $23,842.00 | | $10,700.00 |
| 2 | 2 & 3 | WPL Single Head Check-Weigh System, model WPL1500xA, serial# A022I06 & A023I06. Units are capable of belt speeds of up to 35inches/second. Installed 2006 | $125,000.00 | $69,000.00 | $43,800.00 |
| 2 | 4 | SATA Barcode Printers, model M-8485Se, serial# 4L0A0024 & 4L0A0017. Installed 2006, (Invoice shows Md #PA300AT- this replaces) | $35,800.00 | $16,000.00 | $9,000.00 |
| 2 | 5 | ID Technology Top Printers, model M1.5, serial# 57612-02 & 57612-03. Installed 2006. | $15,000.00 | $7,000.00 | $3,800.00 |
| 1 | 7 | Ossid Automatic Indexer (mounted to overwrapper) no separate ID plate, installed 2006. | $20,900.00 | $14,000.00 | $9,400.00 |
| 1 | 6 & 8 | Ossid Overwrap System model 500E, serial# EF 050432. Unit appears new, possibly ran tests, remains in 'like-new' condition. Installed 2006. | $187,308.00 | $122,000.00 | $84,300.00 |
| 1 | 9 | Ossid End Seal Shrink, model ES5 550, sn: A06066-480. Unit appears new, possibly ran tests, remains in 'like-new' condition. | $37,800.00 | $25,000.00 | $17,000.00 |
| 1 | 10 | Cryovac Shrink Tunnel, model 3472G-1317, serial# 060 116155101. Tunnel includes pneumatic blow-off discharge section. Unit appears new, possibly ran tests, remains in 'like-new' condition. | $25,000.00 | $16,000.00 | $11,300.00 |
| 1 | 11 | Ossid Automatic Indexer (mounted to overwrapper) no separate ID plate, installed 2006. | $20,900.00 | $14,000.00 | $9,400.00 |
| 1 | 12 | Ossid Overwrap System model 500E, serial# EF 050431. Unit appears new, possibly ran tests, remains in 'like-new' condition. Installed 2006. | $187,308.00 | $122,000.00 | $84,300.00 |
| 1 | 13 | Ossid End Seal Shrink, model ES5 550, sn: A06065-480. Unit appears new, possibly ran tests, remains in 'like-new' condition. | $37,800.00 | $25,000.00 | $17,000.00 |

Private Confidential

6/8/2006

## INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

## 4530 MOBILE ROAD, MONTGOMERY, AL 36108

## ENGAGED BY:  GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

### PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 14 | Cryovac Shrink Tunnel, model 3472G-1317, serial# 051 116032201. Tunnel includes pneumatic blow-off discharge section. Unit appears new, possibly ran tests, remains in "like-new" condition. Installed 2006. | $25,000.00 | $16,000.00 | $11,300.00 |
| | | **Frigoscandia Spiral Freezer** | | | |
| | | A reconditioned Frigoscandia spiral freezer with reconditioning and installation work done by MTL Installation Services, Proposal #051014C, December 8, 2005. Freezer has been completely installed and not used in production. | | | |
| 1 | 15, 16, 17, 18 & 19 | Frigoscandia spiral freezer, model GC-76, project# 10185, Date 6-7-95.  Unit has 28' wide self-stacking product belt, 40 tiers, 3" product clearance, 3.25' per tier.  Unit has North/South belt orientation, infeed low right, discharge high right, counter-clockwise rotation.  Belt cross rods are 1.25" apart, mesh is 1/2" apart.  Cabinet is made of 4" thick insulated panels with stainless steel skin inside and out.  Cabinet is 16' wide x 28.5' long x 15.5' high.  Freezer is installed on a 8" deep insulated floor that could be moved with freezer. Freezer has been installed with most wiring and plumbing completed but freezer has not been run or tested.  Evaporator coil capacity is not known.  Freezer appears to be in excellent condition. | $430,000.00 | $280,000.00 | $190,000.00 |
| | | D & F Equipment Sales, Inc. Invoice #53128. Invoice date: December 19, 2006. The majority of this equipment in installed and was in operation during inspection.  Some items are not installed and noted on individual item. | | | |
| 1 | 28 | SERIAL# 36019-01A, 01B; DOUBLE CONE LINE, DFDC1015 | $63,820.00 | $35,000.00 | $26,000.00 |
| 2 | 32 | SERIAL# 36019-02A, 02B TENDER/FILLET INCLINE CONVEYORS, DFM500 | $10,680.00 | $5,000.00 | $2,000.00 |
| 1 | 35 & 36 | SERIAL# 36019-03A; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $3,100.00 | $1,000.00 | $0.00 |
| 1 | 35 & 36 | SERIAL# 36019-03B; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $3,100.00 | $1,000.00 | $400.00 |
| 1 | 29 | SERIAL# 36019-X1; TOTE DUMPER, DFTD276 | $4,200.00 | $2,000.00 | $1,000.00 |
| 1 | 29 | SERIAL# 36019-05; DE-ICE BIN, DFDTD276 | $700.00 | $300.00 | $100.00 |

Page 2 of 5

Private Confidential

6/8/2006

## INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 1 | 34 | SERIAL# 36019-06; LOADING BIN, DFM391, NO IS TAG ON UNIT | $1,100.00 | $600.00 | $200.00 |
| 1 | 45 | SERIAL# 36019-07 FEED CONVEYOR, DFM500 | $9,400.00 | $4,200.00 | $1,500.00 |
| 12 | 53 | SERIAL# 36019-08A; THROUGH DBL ERGO STANDS, DFESFS2100, NO ID TAGS | $4,800.00 | $2,200.00 | $800.00 |
| 1 | 42 | SERIAL# 36019-09 PRODUCT CONVEYOR, DFM500 | $7,000.00 | $3,200.00 | $1,100.00 |
| 1 | 42 | SERIAL# 36019-10-S PRODUCT CONVEYOR, DFM500 | $5,800.00 | $2,600.00 | $900.00 |
| 1 | 43 | SERIAL# 36019-11 PRODUCT CHUTE, DFC378 (NO ID TAG) | $400.00 | $400.00 | $100.00 |
| 1 | 31 | SERIAL# 36019A-01A, 01B; DOUBLE CONE LINE, DFDC1015 | $63,820.00 | $35,000.00 | $26,000.00 |
| 2 | 30 | SERIAL# 36019A-02A, 02B DOUBLE TOTE DUMPERS, DFTD275 | $15,000.00 | $8,000.00 | $2,800.00 |
| 2 | 30 | SERIAL# 36019A-03A, 03B DE-ICE BINS, DFDT1002 | $1,400.00 | $1,000.00 | $400.00 |
| 1 | 64 & 65 | SERIAL# 36019A-04A-1, D4A-2; RECIRCULATION CONVEYORS, DFM500 | $10,070.00 | $4,500.00 | $1,600.00 |
| 1 | 64 & 65 | SERIAL# 36019A-04B-1, D4B-2; RECIRCULATION CONVEYORS, DFM500 | $10,070.00 | $4,500.00 | $1,600.00 |
| 3 | 61 | SERIAL# 36019A-05A, 05B, 05C; WING TIP INCLINE CONVEYORS, DFM500 | $20,520.00 | $9,200.00 | $3,200.00 |
| 4 | 62 | SERIAL# 36019A-06A, 06B, 06C, 06D WING INCLINE CONVEYORS, DFM500, THESE UNITS ARE NOT INSTALLED, PRESENTLY OUTSIDE | $29,600.00 | $13,300.00 | $4,700.00 |
| 1 | 63 | SERIAL# 36019A-07; WING INCLINE CONVEYOR, DFM500 | $11,100.00 | $5,000.00 | $1,800.00 |
| 1 | 59 | SERIAL# 36019A-08; WING COMMON CONVEYOR, DFM500 | $17,300.00 | $7,800.00 | $2,700.00 |
| 1 | 60 | SERIAL# 36019A-09; WING COMMON CONVEYOR, DFM500 | $14,540.00 | $6,500.00 | $2,300.00 |
| 1 | 52 | SERIAL# 36019-10; SKIN INCLINE CONVEYOR, DFM500 | $9,460.00 | $4,300.00 | $1,500.00 |
| 0 | | SERIAL# 36019A-11A, 11B, 11C, 11D; FLAT TOP TABLES, DFMT1382; NEVER RECEIVED | $0.00 | $0.00 | $0.00 |
| 2 | 33 | SERIAL# 36019A-12A, 12B; TENDER/BREAST INCLINE CONVEYOR, DFM500 | $21,360.00 | $9,600.00 | $3,400.00 |
| 1 | 67 | SERIAL# 36019A-13; CARCASS COMMON CONVEYOR, DFM500 | $12,200.00 | $5,500.00 | $1,900.00 |
| 1 | 68 | SERIAL# 36019A-14 TENDER/BREAST INCLINE CONVEYOR, DFM500, (THIS UNIT WAS NOT INSTALLED OR IN USE DURING INSPECTION) | $26,895.00 | $12,100.00 | $4,200.00 |
| 8 | 69 | TENDER/BREAST CONVEYORS, SERIAL# 36019A-15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H | $132,480.00 | $59,600.00 | $20,900.00 |
| 0 | | SERIAL# 36019A-16; FEED CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 46 | SERIAL# 36019A-17; FEED CONVEYOR, DFM500 | $9,400.00 | $4,200.00 | $1,500.00 |

Page 3 of 5

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108

ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|
| | | | | CURRENT VALUES | |
| 1 | 71 | SERIAL# 36019A-CHUTE, DFC378 (NO ID TAG) | $430.00 | $200.00 | $100.00 |
| 4 | 72 | SERIAL# 36019A-19A, 19B, 19C, 19D; EMPLOYEE STANDS, DFMPM179 | $24,600.00 | $11,100.00 | $3,900.00 |
| 1 | 70 | SERIAL# 36019A-20; FLAT TOP TABLE, DMFT382 (NO ID TAG) | $1,800.00 | $800.00 | $300.00 |
| 4 | 73 | SERIAL# 36019A-21A, 21B, 21C, 21D; EMPLOYEE CROSSOVER STANDS, DFMPM179 | $7,400.00 | $3,300.00 | $1,200.00 |
| 0 | | SERIAL# 36019A-22, FINISHED PRODUCT INCLINE CONVEYOR, DFM500 NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 0 | | SERIAL# 36019A-23, FINISHED PRODUCT INCLINE CONVEYOR, DFM500 NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 38 | SERIAL# 36019A-24; S-36019-XS; TRIM INCLINE CONVEYOR, DFM500 | $10,580.00 | $4,800.00 | $1,700.00 |
| 12 | 58 | SERIAL# 36019A-25A THROUGH 25L; ERGO STANDS, DFESF2100, (NO ID TAGS) | $4,800.00 | $2,200.00 | $800.00 |
| 1 | 55 | SERIAL# 36019A-26; FULL BOX CONVEYOR, DFKPC900 | $14,100.00 | $6,300.00 | $2,200.00 |
| 0 | | SERIAL# 36019A-27; FULL BOX INCLINE CONVEYOR, DFKPC900; NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 56 | SERIAL# 36019A-28; FULL BOX CONVEYOR, DFKPC900 | $8,930.00 | $4,000.00 | $1,400.00 |
| 1 | 49 | SERIAL# 36019A-29; FULL BOX CONVEYOR, DFKPC900 | $5,220.00 | $2,300.00 | $800.00 |
| 1 | | SERIAL# 36019A-30; FULL BOX CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 2 | 50 | SERIAL# 36019A-31A, 31B; FULL BOX CONVEYORS, DFKPC900 | $13,420.00 | $6,000.00 | $2,100.00 |
| 2 | 54 | SERIAL# 36019A-32A, 32B; FULL BOX CONVEYORS, DFKPC900 | $15,640.00 | $7,000.00 | $2,500.00 |
| 0 | | SERIAL# 36019A-33; PORTIONING CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 8 | 44 | SERIAL# 36019A-34A, 34B, 34C, 34D, 34E, 34F, 34G, 34H; TOTE STANDS, DFMS380; PERSONNEL WORK STANDS, (NO ID TAGS) | $1,800.00 | $800.00 | $300.00 |
| 7 | 48 | SERIAL# 36019A-35A, 35B, 35C, 35D, 35E, 35F, 35G; GRAVITY CONVEYORS, DFGR50 (NO ID TAGS) | $3,780.00 | $1,700.00 | $600.00 |
| 1 | | SERIAL# 36019A-36 FULL BOX CONVEYOR, DFM500, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 51 | SERIAL# 36019A-37; FULL BOX CONVEYOR, DFM500 | $8,180.00 | $3,700.00 | $1,300.00 |
| 0 | | SERIAL# 36019A-38; FULL BOX SPUR CONVEYOR, DFFB5301, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 57 | SERIAL# 36019A-39; FULL BOX SPUR CONVEYOR, DFFB5301 | $7,600.00 | $3,400.00 | $1,200.00 |
| 0 | | SERIAL# 36019A-40; FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 0 | | SERIAL# 36019A-41, FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |

Page 4 of 5

Private Confidential

6/8/2006

INSPECTION AND VALUATION OF CERTAIN ASSETS LOCATED AT:

# SYLVEST FARMS

## 4530 MOBILE ROAD, MONTGOMERY, AL 36108

### ENGAGED BY: GE CAPITAL COMMERCIAL EQUIPMENT FINANCE

PREPARED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. - INSPECTION DATE MAY 16, 2006

| QTY | PHOTO # | EQUIPMENT DESCRIPTION | COST AS SHOWN BY INVOICE | CURRENT VALUES | |
|---|---|---|---|---|---|
| | | | | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| 0 | | SERIAL# 36019A-42, FULL BOX CONVEYOR, DFKPC900, NOT RECEIVED | $0.00 | $0.00 | $0.00 |
| 1 | 39 | SERIAL# 36019A-43, FULL BOX CONVEYOR, DFKPC900 | $14,295.00 | $6,400.00 | $2,200.00 |
| 1 | 40 | SERIAL# 36019A-44, FULL BOX CONVEYOR, DFKPC900 | $17,440.00 | $7,800.00 | $2,700.00 |
| 2 | 74 | SERIAL# 36019A-45A, 45B, 90" GRAVITY CONVEYORS, DFGR50-90 (NO ID TAGS) | $2,200.00 | $1,000.00 | $400.00 |
| | | *ITEMS LISTED BELOW ARE BEING CONSIDERED AS REPLACEMENT OR SUBSTITUTION ITEMS FROM D & K FOR ITEMS LISTED 'NOT RECEIVED' ABOVE* | | | |
| 1 | 77 | SERIAL# 36019A-X44 TENDER/ BREAST CONVEYOR | $17,275.00 | $7,800.00 | $2,700.00 |
| 2 | 76 | SERIAL# 36019A-X24, EMPLOYEE STANDS | $3,000.00 | $1,400.00 | $500.00 |
| 1 | 37 | SERIAL# 36019-X6-5; NUGGET INCLINE OVER DSI CONVEYOR, DFM500 | $5,900.00 | $2,700.00 | $900.00 |
| 1 | 41 | SERIAL# 36019A-X4-5; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | $9,700.00 | $4,400.00 | $1,500.00 |
| 4 | 75 | SERIAL# 36019A-X8; WING SAWS, SIGHTED FOUR UNITS | $5,800.00 | $2,600.00 | $900.00 |
| 1 | 78 | SERIAL# 36019A-X43A, X43B DOUBLE CONE LINE FRAME - NO CONES PURCHASED OR INSTALLED (INTENDED TO USE SOME CONES FROM ANOTHER PLANT) | $34,860.00 | $15,700.00 | $5,500.00 |
| 1 | 79 | SERIAL# 36019A-7A; SING INCLINE CONVEYOR | $10,000.00 | $4,500.00 | $1,600.00 |
| 1 | 82 | SERIAL# 36019A-X21; EMPTY BOX CONVEYOR W/ TWO 90 DEGREE TURNS | $12,232.50 | $5,500.00 | $1,900.00 |
| 1 | 81 | SERIAL# 36019A-X22, EMPTY BOX CONVEYOR | $14,425.00 | $6,500.00 | $2,300.00 |
| 1 | 83 | SERIAL# 36019A-X23 GRAVITY CONVEYOR | $4,500.00 | $2,000.00 | $700.00 |
| 1 | 80 | SERIAL# 36019A-X20 EMPTY BOX CONVEYOR | $6,000.00 | $2,700.00 | $900.00 |
| 1 | 84 | SERIAL# 36019A-X42 EMPLOYEE STAND | $5,450.00 | $2,500.00 | $900.00 |
| | | TOTAL OF ALL VALUES | $1,982,330.50 | $1,119,500.00 | $661,900.00 |

Page 5 of 5

**EQUIPMENT**
**EXCHANGE**
**CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

# APPRAISAL PHOTOGRAPHS

In this appraisal report the appraiser has included a series of photographs for illustration of the equipment inspected.  The appraiser has to the best of his ability properly identified the assets with an item number that corresponds to the Detailed Equipment inventory included in this report.

While descriptions are believed to be correct, the appraiser make no warranties or guarantees expressed or implied, as to the genuineness, authenticity of, any photographed item identification and will not be held responsible for discrepancies or inaccuracies. No warranties are made as to the merchantability of any items or their fitness for any purpose.

























































Item #44



Item #45

















































Item #75



Item #77



Item #78



Item #79













### EQUIPMENT
### EXCHANGE
### CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

# APPRAISER'S
# QUALIFICATIONS

Robert Breakstone,
President



**Experience:**
Mr. Robert Breakstone, CSA, CEA our Senior Appraiser, has been President of Equipment Exchange Company of America, Inc. since 1989. Our firm has been in the "used equipment" business since 1979. Having "grown up" in the process business, Robert has a wealth of experience in many facets of food production. He has toured many production plants in United States, Provinces of Canada as well as Puerto Rico and Central America.

Equipment Exchange Company specializes in buying, selling and evaluating meat process, baking, beverage, frozen foods, vegetable, dry goods and related food products and equipment. We also have extensive database of sales history for our in-house sales comparisons.

**Education:**
Mr. Robert Breakstone received his Bachelors Degree from Mercyhurst College, Erie, PA in 1982. In 2001, Mr. Breakstone received his Certificate of Achievement for completing the American Society of Appraiser's (ASA) course in *Uniform Standards of Professional Appraisal Practice* (USPAP).

**Memberships:**
Professional Memberships:
1) Equipment Appraisers Association on North America (EAANA) – Status: Certified Senior Appraiser (CSA).
2) Association of Machinery and Equipment Appraisers (AMEA) – Status: Certified Equipment Appraiser (CEA).
3) American Society of Appraisers (ASA) – Status: Candidate Member

Association Memberships:
Equipment Exchange Company of America, Inc. is a current member of Machinery Dealers National Association (MDNA) of the Equipment Leasing Association (ELA) American Meat Institute (AMI) as well as North American Meat Processors (NAAMP) and American Association of Meat Processors (AAMP).

**Certification:**
In 2002, Mr. Breakstone completed and has been accepted by the Association of Machinery and Equipment Appraisers (AMEA) as a Certified Equipment Appraiser (CEA). In 2005, Mr. Breakstone completed the requirements for Certified Senior Appraiser (CSA) status in Equipment Appraisers Association of North America. These certifications require acceptance to conform in all respects to the designated Codes of Ethics, the appropriate Standards and Procedures of Professional Appraisal Ethics and Practice, certification in *Uniform Standards of Professional Appraisal Practice* (USPAP) as well written exams, submittal of an appraisals for review and acceptance, as well as a minimum of five years of appraisal experience. Both designation dictate on-going requirements to maintain accreditation.



# Certified
# Machinery and Equipment
# Appraiser

### Recognition Is Hereby Granted To

# *Robert  Breakstone*

by the
### Association of Machinery and Equipment Appraisers
for the period

## October 1, 2004 — September 30, 2005

*Nate Arnold*
_____
President



License Number: ___

# The American Society of Appraisers

*555 Herndon Parkway, Suite 125, Herndon, VA 20170*

*presents this*

## *Certificate of Achievement*

*to*

### Robert J. Breakstone

who has attended the class and successfully completed the exam for
the American Society of Appraisers' 15-hour course

## SE100: National Uniform Standards of Professional Appraisal Practice (USPAP)



Richard T. Roche, ASA International Education Chair

July 2001
Date

SSN: ___



INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA

# EQUIPMENT APPRAISERS ASSOCIATION OF NORTH AMERICA

## Membership Certificate

THIS IS TO CERTIFY THAT

*Robert Jay Breakstone*

is a member of the above corporation incorporated under the laws of this state and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Corporation's By-Laws, Rules and Regulations.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be executed by its duly authorized officers and its corporate seal to be hereunto affixed.

Dated *December 29, 2003*

_____
SECRETARY

_____
TREASURER

Certificate Number

171



# The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

*presents this*

## Certificate of Achievement

*to*

### Robert J. Breakstone

who has taken the class and successfully completed the exam for
the American Society of Appraisers' 30-hour course

**ME201OL: Introduction to Machinery and Equipment
Valuation - Available August and October 2002.**







Robert B. Podwalny, ASA International Education Chair

October 2002
Date

INSPECTION AND VALUATION OF

# KOCH FOODS
# FORMER SYLVEST FARMS

4530 MOBILE HIGHWAY

MONTGOMERY, AL 36108
PREFORMED FOR

# GENERAL ELECTRIC
# CAPITAL CORPORTATION
## COMMERCIAL
## EQUIPMENT FINANCING

BY

# EQUIPMENT EXCHANGE COMPANY
## SEPTEMBER 2007


EQUIPMENT EXCHANGE
CO. OF AMERICA, INC.


ASSOCIATION OF
MACHINERY AND
EQUIPMENT APPRAISERS

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

APPRAISAL REPORT
PRIVATE & CONFIDENTIAL

Subject - Certain Assets of:

KOCH FOODS/FORMER SYLVEST FARMS
4530 MOBILE HIGHWAY
MONTGOMERY, AL 36108

For the Intended Use of:

GENERAL ELECTRIC CAPITAL
COMMERCIAL EQUIPMENT FINANCING
44 OLD RIDGEBURY ROAD
DANBURY, CT 06810-5105

## Purpose of Appraisal

The purpose of this appraisal is to provide an independent, professional opinion of the Day One, Year One Fair Market Value-In Place, Current Fair Market Value-Removed and Orderly Liquidation Value of certain machinery and equipment located at Koch Foods/ Former Sylvest Farms, 4530 Mobile Highway, Montgomery, AL. This report is intended solely for business decisions of General Electric Capital Corporation and assignees. Mr. Daniel Nicoson, Vice President of Equipment Exchange Company of America, Inc. inspected these assets located at Koch Foods/former Sylvest Farms and Mr. Robert Breakstone, President prepared this report. The effective date of this report is September 24, 2007.

## Intended Use of Appraisal

This report is intended solely for business decisions of General Electric Capital Corporation for financing and business purposes and is not intended for any other use.

There are proper and improper uses for various appraisal concepts. The American Society of Appraisers has standard definitions for concepts, each concept is specifically defined and indicates a conclusion of value. It is up to the user to determine if the defined concept is correct for its purpose. Users can certainly investigate value concepts to determine their typical and known uses and are not prohibited after their investigation to choose to adapt any known concept to their purpose as considered reasonable by their standards. The appraisal is preformed at the request of a client based upon a requested concept of value. It is not uncommon for Equipment Exchange Company of America, Inc. (EEC) to develop an appraisal using one or more concepts of value. Users of this report must do so with the knowledge of the defined concepts of value being utilized. If a user has any questions as to the intended use, definitions of value or defined concepts they are advised to contact the appraiser.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 2 of 7
Koch Foods

## Scope of Appraisal

To appraise certain personal property of the subject company located at Koch Foods/former Sylvest Farms and to arrive at certain conclusion of values under the Fair Market Value-In Place, Fair Market Value-Removed and Orderly Liquidation Value.

## Highest and Best Use

The equipment was being used for the purpose as designed and engineered unless otherwise stated. It is the appraisers opinion that the equipment was being utilized: EQUIPMENT PRODUCT LINE: Fresh and frozen poultry products.  Equipment includes packaging, freezing, and cutting or portioning equipment various material handling conveyors and transportation equipment along with support equipment.  This report does not include all of the equipment and machinery, office furniture, support equipment, material handling equipment, real estate, intangible assets, ect.

## Value Definitions

**FAIR MARKET VALUE IN PLACE: (FMV -IN PLACE):** Is defined as the most probable price estimated in terms of money that the items appraised could realize if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which they are adapted and for which they are capable of being used, including the benefit of their present location including all costs to design, acquire, install and make operational. Frequently, it is referred to as the price at which a willing seller would sell and a willing buyer, neither being under abnormal pressure as of a specific date.  In this report we are valuing the Fair Market Value In Place as of the actual installation and operational date in Spring 2006.  This is a Day One, Year One value or a total cost of project value specific to the items valued and as of a specific date.

**FAIR MARKET VALUE- REMOVED (FMV-REMOVED):** The value realized from a retail sale to an end user of equipment removed from its current premises.  The value is a result of a transaction between a willing buyer and willing seller, with no time limitation to sell.  This value assumes the equipment is maintained according to the manufacture's recommendation and performance standards.  Since a physical inspection was preformed, the FMV will reflect the actual condition found.

**ORDERLY LIQUIDATION VALUE (OLV):** The value realized from an open market sale between a seller under time duress and a willing buyer who is an end user of the equipment. The buyer time duress is specified in Table 1 below.  Both the buyer and the seller have knowledge of the use and purpose for which this equipment is adapted and for which it is capable of being used.  This value also assumes the equipment will be sold "as is condition, where is location" and the buyer assumes the costs to dismantle and remove.  Additionally, this value is not discounted for assembling, cleaning, security, advertising, brokerage, or other disposal costs, if any.

TABLE 1

| Collateral Type | Day to sell Equipment |
|---|---|
| Transportation/Material Handling | 60-90 |
| Construction | 90-120 |
| Machine tools/Plastics/Graphic Computers/Arts/Mining/Telecom/Food/Textile/FF&E/ | 120-180 |



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 3 of 7
Koch Foods

Both stated value considerations represent the normal considerations for the assets being appraised. The stated values are unaffected by special or creative financing or sale considerations granted by anyone associated with a possible sale or any other special or creative terms, service fees, costs or credits.

All values stated are in United States Funds as of effective date of this report. Any users of this report must assume that the listed "OLV" is based on the fact that a qualified and experienced broker of the goods is to be used as the marketing agent. It also does not take into account any "costs to sell" that would be involved in liquidating the assets.

### Approaches to Value

In complying with Uniform Standards of Professional Appraisal Practice (USPAP), all three accepted approaches to value must be considered.

1) **Cost Approach:** The appraiser considers the replacement cost (new) of the asset being appraised for the loss in value caused by physical deterioration, functional obsolescence, or economic obsolescence. The cost approach is based on the principle of substitution: a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility. In its simplest form, the cost approach is the current cost (as if new) less all depreciation.

2) **Sales Comparison Approach:** The appraiser considers (and if not exactly identical) adjusts the prices that have been paid for assets comparable to the asset being appraised, equating the comparables to the subject. This involves analyzing recent sales of properties that are similar to the subject property. If the comparables are not identical, the prices are adjusted to equate the various characteristics of the properties. Equipment Exchange Company of America, Inc. uses an extensive in-house database of sold and brokered equipment, auction-selling prices, and data gathered via the Internet and other used equipment dealers to establish comparables. As in the cost approach, the basis is a prudent buyer will not pay more for an asset than the cost of acquiring a substitute property of equivalent utility.

3) **Income Approach:** The appraiser determines the present value of the future economic benefits of owning the property. This approach is seldom used in valuing personal property and was considered but deemed not applicable in performing this appraisal.

### Scope of Work Rule

The Scope of Work addresses the Type and Extent of Research and Analysis utilized to develop an Opinion of Value. The Data Collected in the Course of Research and Analysis may include, but is not limited to: market Data from used equipment dealers that sell comparable equipment; conversations with new equipment manufacturer's; consultation with auctioneers, liquidators and equipment brokers of comparable equipment; In-House Data Bases; Industry Data Bases; Trade Journals and Industry Periodicals.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 4 of 7
Koch Foods

In this appraisal and review of assets from Koch Foods/former Sylvest Farms, the Sales Comparison Approach was employed to arrive at value conclusions.  Equipment Exchange Company researched the equipment formerly installed or used at the location. We also paid particular attention to the marketability of these assets in their current geographic location and the effect that location would have in developing their probable value.

<u>Depreciation</u>

Defined as the actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence, and economic obsolescence.

**Physical Deterioration:**
A form of depreciation where the loss in value or usefulness of an asset is attributable solely to physical causes such as wear and tear and exposure to the elements.

**Functional Obsolescence:**
A form of depreciation were the loss in value is due to factors inherent in the property itself and due to changes in design, or process resulting in inadequacy, over capacity, excess construction, lack of functional utility, or excess operating costs.

**Economic Obsolescence:**
A form of depreciation or loss in value, caused by unfavorable external conditions.  These can include such things as the economics of the industry, availability of financing, loss of material and labor sources, passage of new legislation, and changes in ordinances.

<u>Summary of Values Conclusions</u>

Based on our investigations, analysis of data, and the methods as stated and used, it is the opinion of Equipment Exchange Company of America, Inc., considering the stated assumptions, conclusions and limiting conditions, which the Fair Market Value-In Place, Fair Market Value-Remove and Orderly Liquidation Value of the machinery and equipment located at Koch Foods/former Sylvest Farms, Montgomery, AL.

<u>FAIR MARKET VALUE-IN PLACE</u>

DAY ONE-YEAR ONE OF EQUIPMENT VALUED          $1,398,068.00

<u>FAIR MARKET VALUE-REMOVE</u>

TOTAL CURRENT OF EQUIPMENT VALUED          $459,380.00

<u>ORDERLY LIQUIDATION VALUE</u>

TOTAL CURRENT OF EQUIPMENT VALUED          $260,890.00

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 5 of 7
Koch Foods

## GENERAL COMMENTS, ASSUMPTIONS, AND STATEMENT OF LIMITING CONDITIONS

This appraisal sets forth our findings and conclusions which are based upon an investigation of conditions affecting value and which are subject to the Assumptions, Statements of Limiting Conditions, and Definitions contained in the following report. *Without reading the Assumptions and Statement of Limiting Conditions and Definitions, this report could be erroneously interpreted.*

The legal description given to the appraisers and used in this report is assumed to be correct. No responsibility is assumed for matters of a legal nature affecting title to the property nor is an opinion of title rendered. The title is assumed to be good and marketable.

The appraisers have made no survey of the property and no responsibility is assumed in connection with such matters. Sketches in this report are included only to assist the reader in visualizing the property.

In conducting this inspection or in gathering information for this report we have assumed that no unreported or hidden conditions exist with the equipment that would render it more or less valuable then reported.

If for some reason we were unable to gather the model number, serial number, age or other pertinent information we assumed that the equipment was similar to other equipment we have appraised or that is contained within this report.

Information furnished by others is assumed true, correct, and reliable. A reasonable effort has been made to verify such information; however, the appraisers assume no responsibility for its accuracy.

All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report. The property is appraised as though under responsible ownership and management. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering, which may be required to discover them.

This report in no way establishes ownership of the detailed property. If property was described as leased, rented, borrowed or subject to outstanding liens we have either noted this in the body of the report or not included the specific equipment in the report.

The fee for this report is not contingent upon the values reported. There have not been any guarantees associated with this fee and no liability can be intimated or assumed in any manner.

It is assumed that there is full compliance with all-applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a non-conformity has been stated, defined, and considered in the appraisal report.

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA  16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 6 of 7
Koch Foods

It is assumed that all required licenses, consents or other legislative or administrative authority
from any local, state or national governmental or private entity or organization have been or can be
obtained or renewed for any use on which the value estimate contained in this report is based.

The physical condition of the property described herein was not based upon visual inspection by the
appraiser.  No responsibility is assumed for latent defect of ANY nature whatsoever which may
affect its value, nor for any expertise required to disclose such conditions.

The appraiser will not be required to give testimony or to appear in court or any pretrial conference
or appearance required by subpoena, with reference to the property in question, unless timely
arrangements have been previously made therefore, at prevailing per diem rates.

No environmental impact studies were either requested or made in conjunction with this appraisal,
and the appraiser hereby reserves the right to alter, amend, revise or rescind any of the value
opinions based upon any subsequent environmental impact studies, research or investigation.

Unless otherwise stated in the report, the appraisers did not observe the existence of hazardous
material, which may or may not be present on the property.  I have no knowledge of the existence
of such materials on or in the property and are not qualified to detect such substances. The
presence of substances such as asbestos, urea formaldehyde foam insulation or other potential
hazardous materials may affect the value of the property.  The value estimate is predicated on the
assumption that there is no such material on or in the property that would cause a loss in value.  No
responsibility is assumed for any such conditions, or for any expertise or engineering knowledge
required to discover them.  The client is urged to retain an expert in this field, if desired.

The appraiser(s) reserves the right to alter statements, analyses, conclusions, or any value estimate
in the appraisal if any new facts pertinent to the process are discovered which were unknown when
the appraisal report was prepared.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may
it be used for any purpose or any function other than the intended use, as stated in the body of the
report.

This appraisal is to be used only in its entirety, and no part is to be used without the whole report.
All conclusions and opinions concerning the analysis as set forth in the report were prepared by the
appraiser(s) whose signature(s) appear(s) on the appraisal report.

No change of any item in the report shall be made by anyone other than the appraiser(s).  The
appraiser(s) and the appraisal firm shall bear no responsibility for any such unauthorized changes.

Except as provided for subsequently, neither the appraiser(s) nor the appraisal firm may divulge the
analyses, opinions, or conclusions developed in the appraisal report, nor may they give a copy of the
report to anyone other then the client or his designee as specified in writing.



**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

Page 7 of 7
Koch Foods

However, this condition does not apply to any requests made by the Appraisal Institute for purpose of confidential ethics enforcement. In addition, this condition does not apply to any order or request issued by a court of law or any other body with the power of subpoena.

No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report without adequate compensation, time and procedural requirements that allow due diligence to reflect events or conditions which occur subsequent to the date thereof.

The appraisers' duty, pursuant to his employment to make the appraisal, is complete upon delivery and acceptance of the appraisal report.

THE ACCEPTANCE AND/OR USE OF THE APPRAISAL REPORT BY THE CLIENT OF ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE *ASSUMPTIONS AND LIMITING CONDITIONS* SET FORTH IN THE PRECEDING PARAGRAPHS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. LIABILITY EXTENDS ONLY TO THE SPECIFIED CLIENT, NOT TO SUBSEQUENT PARTIES OR USERS. THE APPRAISER'S AND EQUIPMENT EXCHANGE COMPANY OF AMERICA INC., LIABILITY IS LIMITED TO THE AMOUNT OF THE FEE RECEIVED FOR THE SERVICES RENDERED.

Respectfully Submitted,

Robert Breakstone
Certified Equipment Appraiser

EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC
10042 KEYSTONE DRIVE
LAKE CITY, PA 16423

Does

# -Certify-

That on September 24, 2007 that certain property of:

## KOCH FOODS
## FORMER SYLVEST FARMS
## 4530 MOBILE HIGHWAY
## MONTGOMERY, AL 36108

HAS WELL AND REASONABLE WORTH:


VALUE IS AS FOLLOWS:

|  | FAIR MARKET VALUE-IN PLACE |
|---|---|
| DAY ONE-YEAR ONE OF EQUIPMENT VALUED | $1,398,068.00 |
|  | FAIR MARKET VALUE-REMOVE |
| TOTAL CURRENT OF EQUIPMENT VALUED | $459,380.00 |
|  | ORDERLY LIQUIDATION VALUE |
| TOTAL CURRENT OF EQUIPMENT VALUED | $260,890.00 |


EFFECTIVE DATE OF APPRAISAL: SEPTEMBER 24, 2007


BY:    ROBERT BREAKSTONE, CEA, CSA

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

## Appraiser's Certification:

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have NOT made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: 
Robert Breakstone, CEA, CSA



**EQUIPMENT
EXCHANGE**
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX   (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

**Appraiser's Certification:**

I certify that, to the best of my knowledge and belief:

❖ the statements of facts contained in this report are true and correct.

❖ the report analyses, opinions and conclusions are limited by the accompanying conditions and assumptions and are my personal, impartial and unbiased analyses, opinions, and conclusions and recommendations.

❖ I have no present or prospective interest in the property that is the subject of this report and no personal or prospective interest with respect to the parties involved with this assignment.

❖ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

❖ my compensation for completing this assignment is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

❖ my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

❖ I have made a personal inspection of the property that is the subject of this report.

❖ no one provided significant professional assistance to the person signing this report.

Signed: _Daniel R. Nicoson_   9-24-2007
_____
Daniel R. Nicoson, Report Date:

Private Confidential                                                                    9/27/2007

INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT

# KOCH FOOD - FORMER SYLVEST FARMS

### 4530 MOBILE ROAD, MONTGOMERY, AL 36108
### INSPECTION DATE: SEPTEMBER 24, 2007
### INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|---|
| | | Frigoscandia Spiral Freezer | | | | | |
| | | A reconditioned Frigoscandia spiral freezer with reconditioning and installation work done by MTL Installation Services, Proposal #051014C, December 8, 2005. Freezer has been completely installed and not used in production. | | | | | |
| 1 | 4773 - 4780 | Frigoscandia spiral freezer, model GC-76, project# 10185, Date 6-7-95. Unit has 28" wide self-stacking product belt, 40 tiers, 3" product clearance, 3.25" per tier. Unit has North/South belt orientation, infeed low right, discharge high right, counter-clockwise rotation. Belt cross rods are 1.25" apart, mesh is 1/2" apart. Cabinet is made of 4" thick insulated panels with stainless steel skin inside and out. Cabinet is 16' wide x 28.5' long x 15.5' high. Freezer is installed on a 8" deep insulated floor that could be moved with freezer. Freezer has been installed with most wiring and plumbing completed but freezer has not been run or tested. Evaporator coil capacity is not known. Freezer appears to be in excellent condition but noting that electrical control panel is incomplete as it was in 2006. | Freezer was still in place- no change from 2006 inspection | $430,000.00 | $473,000 | $240,000 | $150,000 |
| | | D & F Equipment Sales, Inc. Invoice #53128, Invoice date: December 19, 2006. Inspection of this equipment on September 24, 2007 determined that all equipment has been disassembled and removed from operation, presently stored outside with belting removed and stored outside. | | | | | |
| | 4784 | Pallets of plastic food grade belting removed from D & F Equipment Sales Conveyor System | Multiple pallets of plastic belting from the various conveyors. No way of knowing if all the belting is present or actual condition of belting. Belting has been used and has been taken off conveyors when system disassembled. It has been stored outside without protection for undetermined time. | Included in costs and values of conveyors below | Included in costs and values of conveyors below | $0 | $0 |
| 1 | 4858 - 4862 | SERIAL# 36019-01A; DOUBLE CONE LINE, DFDC1015, REMOVED FROM OPERATION, BELTS REMOVED | | $63,820.00 | $73,000 | $22,000 | $11,000 |
| 2 | 4800 | SERIAL# 36019-02A, 02B TENDER/FILLET INCLINE CONVEYORS, DFM500 | | $10,680.00 | $12,000 | $2,700 | $1,400 |
| 1 | 4814 | SERIAL# 36019-03A; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | | $3,100.00 | $4,000 | $800 | $400 |
| 1 | 4814 | SERIAL# 36019-03B; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | | $3,100.00 | $4,000 | $800 | $400 |
| 1 | 4795 | SERIAL# 36019-X1; TOTE DUMPER, DFTD276 | | $4,200.00 | $5,000 | $1,000 | $500 |
| 1 | 4863 | SERIAL# 36019-05; DE-ICE BIN, DFDTD276 | | $700.00 | $1,000 | $180 | $90 |
| 1 | | SERIAL# 36019-06; LOADING BIN, DFM391, NO IS TAG ON UNIT | Not Found | $1,100.00 | $1,000 | | |
| 1 | 4869 | SERIAL# 36019-07 FEED CONVEYOR, DFM500 | 2-sections of horizontal conveyor | $9,400.00 | $11,000 | $2,400 | $1,200 |

9/27/2007

| INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT |
| :---: |
| **KOCH FOOD - FORMER SYLVEST FARMS** |
| 4530 MOBILE ROAD, MONTGOMERY, AL 36108 |
| INSPECTION DATE: SEPTEMBER 24, 2007 |
| INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. |

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| :---: | :---: | :--- | :--- | :---: | :---: | :---: | :---: |
| 12 | 4851, 4852 | SERIAL# 36019-08A; THROUGH 08L ERGO STANDS, DFESFS2100, NO ID TAGS | Quantity and condition of grating for stands not confirmed | $4,800.00 | $5,000 | $1,200 | $600 |
| 12 | 4851, 4852 | SERIAL# 36019A-25A THROUGH 25L; ERGO STANDS, DFESF2100, (NO ID TAGS) | Quantity and condition of grating for stands not confirmed | $4,800.00 | $5,000 | $1,200 | $600 |
| 1 | 4829 | SERIAL# 36019-09 PRODUCT CONVEYOR, DFM500 | Base frame for 36019-10-S | $7,000.00 | $8,000 | $1,800 | $900 |
| 1 | 4829 | SERIAL# 36019-10-S PRODUCT CONVEYOR, DFM500 | Mounted on 36019-09 | $5,800.00 | $7,000 | $1,500 | $800 |
| 1 | 4796 | SERIAL# 36019-11 PRODUCT CHUTE, DFC378 (NO ID TAG) | | $400.00 | $440 | $100 | $50 |
| 1 | 4858 - 4862 | SERIAL# 36019A-01B; DOUBLE CONE LINE, DFDC1015 | | $63,820.00 | $73,000 | $22,300 | $11,200 |
| 2 | 4793, 4794 | SERIAL# 36019A-02A, 02B DOUBLE TOTE DUMPERS, DFTD275 | | $15,000.00 | $17,000 | $5,300 | $2,700 |
| 2 | 4864, 4866 | SERIAL# 36019A-03A, 03B DE-ICE BINS, DFDT1002 | | $1,400.00 | $2,000 | $400 | $200 |
| 1 | 4788 | SERIAL# 36019A-04A-1, D4A-2; recirculation CONVEYORS, DFM500 | | $10,070.00 | $12,000 | $2,500 | $1,300 |
| 1 | 4789 | SERIAL# 36019A-04B-1, D4B-2; RECIRCULATION CONVEYORS, DFM500 | | $10,070.00 | $12,000 | $2,500 | $1,300 |
| 3 | 4816 | SERIAL# 36019A-05A, 05B, 05C; WING TIP INCLINE CONVEYORS, DFM500 | | $20,520.00 | $24,000 | $5,100 | $2,600 |
| 4 | 4799 | SERIAL# 36019A-06A, 06B, 06C, 06D WING INCLINE CONVEYORS, DFM500 | | $29,600.00 | $34,000 | $7,400 | $3,700 |
| 1 | 4800 | SERIAL# 36019A-07 and 36019A-07A; WING INCLINE CONVEYORS, DFM500 | | $11,100.00 | $13,000 | $2,800 | $1,400 |
| 1 | 4867 | SERIAL# 36019A-08; WING COMMON CONVEYOR, DFM500 | 3 sections | $17,300.00 | $20,000 | $4,300 | $2,200 |
| 1 | 4826, 4812 | SERIAL# 36019A-09; WING COMMON CONVEYOR, DFM500 | 3 sections | $14,540.00 | $17,000 | $3,600 | $1,800 |
| 1 | 4853 | SERIAL# 36019-10; SKIN INCLINE CONVEYOR, DFM500 | 2 sections | $9,460.00 | $11,000 | $2,400 | $1,200 |
| 2 | 4823 | SERIAL# 36019A-12A, 12B; TENDER/BREAST INCLINE CONVEYOR, DFM500 | | $21,360.00 | $25,000 | $5,300 | $2,700 |
| 1 | 4809 - 4811 | SERIAL# 36019A-13; CARCASS COMMON CONVEYOR, DFM500 | | $12,200.00 | $14,000 | $3,100 | $1,600 |
| 1 | 4813 | SERIAL# 36019A-14 TENDER/BREAST INCLINE CONVEYOR, DFM500 | Photo shows 36019A-14 which is one incline and two S-curves, also shows 36019A-X44 incline | $26,895.00 | $31,000 | $6,700 | $3,400 |
| 8 | 4820 - 4823 & 4835 | TENDER/BREAST CONVEYORS, SERIAL# 36019A-15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H | This line item represents 8 conveyor lines when installed. (22) segments on site. | $132,480.00 | $152,000 | $33,100 | $16,600 |
| 1 | 4801 | SERIAL# 36019A-17; FEED CONVEYOR, DFM500 | 2 sections | $9,400.00 | $11,000 | $2,400 | $1,200 |
| 1 | | SERIAL# 36019A-CHUTE, DFC37B (NO ID TAG) | Not Found | $430.00 | $470 | | |
| 4 | 4831 | SERIAL# 36019A-19A, 19B, 19C, 19D; EMPLOYEE STANDS, DFMPH179 | | $24,600.00 | $27,000 | $6,200 | $3,100 |
| 1 | 4854 | SERIAL# 36019A-20; FLAT TOP TABLE, DMFT382 (NO ID TAG) | | $1,800.00 | $2,000 | $500 | $300 |

Private Confidential

9/27/2007

| INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT |
|---|

# KOCH FOOD - FORMER SYLVEST FARMS

4530 MOBILE ROAD, MONTGOMERY, AL 36108

INSPECTION DATE: SEPTEMBER 24, 2007

INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC.

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|---|
| 4 | 4818, 4819 | SERIAL# 36019A-21A, 21B, 21C, 21D; EMPLOYEE CROSSOVER STANDS, DFMPM179 | | $7,400.00 | $8,000 | $1,900 | $1,000 |
| 1 | 4804, 4805 | SERIAL# 36019A-24; S-36019-X5; TRIM INCLINE CONVEYOR, DFM500 | | $10,580.00 | $12,000 | $2,600 | $1,300 |
| | 4844, 4838, 4843 | | FULL BOX CONVEYORS - there were13 sections of the Full Box conveyor on hand. Many sections do not have a manufacturer ID plate installed | | | | |
| 1 | 4825 | SERIAL# 36019A-26; FULL BOX CONVEYOR, DFKPC900 | 2 sections | $14,100.00 | $16,000 | $2,800 | $1,400 |
| 1 | | SERIAL# 36019A-28; FULL BOX CONVEYOR, DFKPC900 | No ID plate found | $8,930.00 | $10,000 | $1,800 | $900 |
| 1 | 4830 | SERIAL# 36019A-29; FULL BOX CONVEYOR, DFKPC900 | 2-sections | $5,220.00 | $6,000 | $1,000 | $500 |
| 2 | 4839 | SERIAL# 36019A-31A, 31B; FULL BOX CONVEYORS, DFKPC900 | | $13,420.00 | $15,000 | $2,700 | $1,400 |
| 2 | 4837 | SERIAL# 36019A-32A, 32B; FULL BOX CONVEYORS, DFKPC900 | | $15,640.00 | $18,000 | $3,100 | $1,600 |
| 1 | | SERIAL# 36019A-37; FULL BOX CONVEYOR, DFM500 | No ID plate found | $8,180.00 | $9,000 | $1,600 | $800 |
| 1 | 4841 | SERIAL# 36019A-39; FULL BOX SPUR CONVEYOR, DFFBS301 | | $7,600.00 | $9,000 | $1,500 | $800 |
| 1 | 4840 | SERIAL# 36019A-43, FULL BOX CONVEYOR, DFKPC900 | | $14,295.00 | $16,000 | $2,900 | $1,500 |
| 1 | 4827 | SERIAL# 36019A-44, FULL BOX CONVEYOR, DFKPC900 | | $17,440.00 | $20,000 | $3,500 | $1,800 |
| 8 | 4848 - 4850 | SERIAL# 36019A-34A, 34B, 34C, 34D, 34E, 34F, 34G, 34H; TOTE STANDS, DFMS380; PERSONNEL WORK STANDS, (NO ID TAGS) | complete with the yellow plastic grate surfaces | $1,800.00 | $2,000 | $500 | $300 |
| 7 | 4855 | SERIAL# 36019A-35A, 35B, 35C, 35D, 35E, 35F, 35G; GRAVITY CONVEYORS, DFGR50 (NO ID TAGS) | Only (5) conveyors were found. | $3,780.00 | $4,000 | $1,100 | $600 |
| 2 | | SERIAL# 36019A-45A, 45B, 90° GRAVITY CONVEYORS, DFGR50-90 (NO ID TAGS) | Not Found | $2,200.00 | $3,000 | | |
| 1 | 4813 | SERIAL# 36019A-X44 TENDER/BREAST CONVEYOR | | $17,275.00 | $20,000 | $5,200 | $2,600 |
| 2 | 4842, 4847 | SERIAL# 36019A-X24, EMPLOYEE STANDS | | $3,000.00 | $3,000 | $900 | $500 |
| 1 | 4828 | SERIAL# 36019A-X6-5; NUGGET INCLINE OVER DSI CONVEYOR, DFM500 | 2-sections | $5,900.00 | $7,000 | $1,800 | $900 |
| 1 | 4806, 4807 | SERIAL# 36019-X4-5; FINISHED PRODUCT INCLINE CONVEYOR, DFM500 | 2-sections | $9,700.00 | $11,000 | $2,900 | $1,500 |
| 4 | 4845 | SERIAL# 36019A-X8; WING SAWS | Two units are missing their motors. | $5,800.00 | $7,000 | $1,200 | $600 |
| 1 | 4856, 4857 | SERIAL# 36019A-X43A, X43B DOUBLE CONE LINE FRAME - NO CONES PURCHASED OR INSTALLED | 3-sections | $34,860.00 | $40,000 | $12,200 | $6,000 |
| 1 | 4868 | SERIAL# 36019A-7A, 7B INCLINE CONVEYOR | | $10,000.00 | $12,000 | $3,000 | $1,500 |
| 1 | 4834, 4836 | SERIAL# 36019A-X21; EMPTY BOX CONVEYOR W/TWO 90 DEGREE TURNS, (5) STRAIGHT SECTIONS | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $12,232.50 | $12,233 | $3,700 | $1,900 |

Private Confidential                                                                                              9/27/2007

| INSPECTION AND VALUATION OF CERTAIN EQUIPMENT LOCATED AT |
| :---: |

# KOCH FOOD - FORMER SYLVEST FARMS

| 4530 MOBILE ROAD, MONTGOMERY, AL 36108 |
| :---: |
| INSPECTION DATE: SEPTEMBER 24, 2007 |
| INSPECTED BY EQUIPMENT EXCHANGE COMPANY OF AMERICA, INC. |

| QUANTITY | PHOTO NUMBER | EQUIPMENT DESCRIPTION | INSPECTION NOTES | COST AS SHOWN BY INVOICE | FAIR MARKET VALUE - INSTALLED DAY ONE YEAR ONE | FAIR MARKET VALUE | ORDERLY LIQUIDATION VALUE |
| :---: | :---: | :--- | :--- | :---: | :---: | :---: | :---: |
| 1 | 4832 | SERIAL# 36019A-X22, EMPTY BOX CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $14,425.00 | $14,425 | $4,300 | $2,200 |
| 1 | 4832 | SERIAL# 36019A-X23 GRAVITY CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $4,500.00 | $4,500 | $1,400 | $700 |
| 1 | 4833 | SERIAL# 36019A-X20 EMPTY BOX CONVEYOR | This equipment was never installed. Plastic belting has been outside since at least spring of 2006. | $6,000.00 | $6,000 | $1,800 | $900 |
| 1 | 4846 | SERIAL# 36019A-X42 EMPLOYEE STAND | | $5,450.00 | $6,000 | $1,600 | $800 |
| | | TOTAL OF ALL VALUES | | $1,240,672.50 | $1,398,067.50 | $458,580 | $260,440 |

**EQUIPMENT EXCHANGE CO. OF AMERICA, INC.**

10042 Keystone Drive • Lake City, PA 16423 • (814)-774-0888 • Fax (814) 774-0880 •
info@eeclink.com

# APPRAISAL PHOTOGRAPHS

In this appraisal report the appraiser has included a large series of photographs
for illustration of the equipment inspected.  The appraiser has to the best of his
ability properly identified the assets with an item number that corresponds to
the Detailed Equipment inventory included in this report.

While descriptions are believed to be correct, the appraiser make no warranties
or guarantees expressed or implied, as to the genuineness, authenticity of, any
photographed item identification and will not be held responsible for
discrepancies or inaccuracies. No warranties are made as to the merchantability
of any items or their fitness for any purpose.














Photo# 4784



Photo# 4785



Photo# 4786



Photo# 4787















Photo# 4794



Photo# 4795



Photo# 4796



Photo# 4797



Photo# 4798



Photo# 4799



Photo# 4800



Photo# 4801



Photo# 4802



Photo# 4803



Photo# 4804



Photo# 4805















Photo# 4812



Photo# 4813



Photo# 4814



Photo# 4815



Photo# 4816





Photo# 4818



Photo# 4819



Photo# 4820



Photo# 4821



Photo# 4822



Photo# 4823



Photo# 4824



Photo# 4825



Photo# 4826



Photo# 4827



Photo# 4828



Photo# 4829



Photo# 4830



Photo# 4831



Photo# 4832



Photo# 4833



Photo# 4834



Photo# 4835



Photo# 4836



Photo#



Photo#



Photo# 4839



Photo#



Photo#



Photo# 4842



Photo# 4843



Photo# 4844



Photo# 4845



Photo# 4846



Photo# 4847



Photo# 4848



Photo# 4849



Photo# 4850



Photo# 4851



Photo# 4852



Photo# 4853



Photo# 4854



Photo# 4855


























**EQUIPMENT**
**EXCHANGE**
CO. OF AMERICA, INC.

10042 Keystone Dr., Lake City, PA 16423

PHONE (814) 774-0888
FAX    (814) 774-0880
Website www.eeclink.com
Email info@eeclink.com

# APPRAISER'S QUALIFICATIONS



Robert Breakstone,
President

## Experience:
Mr. Robert Breakstone, CSA, CEA our Senior Appraiser, has been President of Equipment Exchange Company of America, Inc. since 1989. Our firm has been in the "used equipment" business since 1979. Having "grown up" in the process business, Robert has a wealth of experience in many facets of food production. He has toured many production plants in United States, Provinces of Canada as well as Puerto Rico and Central America.

Equipment Exchange Company specializes in buying, selling and evaluating meat process, baking, beverage, frozen foods, vegetable, dry goods and related food products and equipment. We also have extensive database of sales history for our in-house sales comparisons.

## Education:
Mr. Robert Breakstone received his Bachelors Degree from Mercyhurst College, Erie, PA in 1982. In 2001, Mr. Breakstone received his Certificate of Achievement for completing the American Society of Appraiser's (ASA) course in *Uniform Standards of Professional Appraisal Practice* (USPAP) and as per AMEA's regulations Mr. Breakstone successfully completed the 7-hour USPAP Course in October 2006.

## Memberships:
Professional Memberships:
1) Equipment Appraisers Association on North America (EAANA) - Status: Certified Senior Appraiser (CSA).
2) Association of Machinery and Equipment Appraisers (AMEA) - Status: Certified Equipment Appraiser (CEA).
3) American Society of Appraisers (ASA) - Status: Candidate Member

Association Memberships:
Equipment Exchange Company of America, Inc. is a current member of Machinery Dealers National Association (MDNA) of the Equipment Leasing Association (ELA) American Meat Institute (AMI) as well as North American Meat Processors (NAAMP) and American Association of Meat Processors (AAMP).

## Certification:
In 2002, Mr. Breakstone completed and has been accepted by the Association of Machinery and Equipment Appraisers (AMEA) as a Certified Equipment Appraiser (CEA). In 2005, Mr. Breakstone completed the requirements for Certified Senior Appraiser (CSA) status in Equipment Appraisers Association of North America. These certifications require acceptance to conform in all respects to the designated Codes of Ethics, the appropriate Standards and Procedures of Professional Appraisal Ethics and Practice, certification in *Uniform Standards of Professional Appraisal Practice* (USPAP) as well written exams, submittal of an appraisals for review and acceptance, as well as a minimum of five years of appraisal experience. Both designations dictate on-going requirements to maintain accreditation.



Certificate of Completion

for

**Robert Breakstone**

who attended the class and successfully completed the AMEA 7 Hour Refresher Course

**Uniform Standards of Professional Appraisal Practice (USPAP)**

October 13, 2006
Detroit, Michigan

AMEA President



# Certified
# Machinery and Equipment
# Appraiser

Recognition Is Hereby Granted To

# *Robert Breakstone*

by the
## Association of Machinery and Equipment Appraisers
for the period

## October 1, 2004 — September 30, 2005

*Nate Arnold*
President

License Number: _____



# The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

*presents this*

## Certificate of Achievement

*to*

### Robert J. Breakstone

who has attended the class and successfully completed the exam for
the American Society of Appraisers' 15-hour course

**SE100: National Uniform Standards of Professional Appraisal Practice (USPAP)**



Richard T. Roche, ASA International Education Chair

July 2001
Date

SSN: _____



INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA

EQUIPMENT APPRAISERS ASSOCIATION OF NORTH AMERICA

*Membership Certificate*

THIS IS TO CERTIFY THAT

*Robert Jay Breakstone*

is a member of the above corporation incorporated under the laws of this state and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Corporation's By-Laws, Rules and Regulations.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be executed by its duly authorized officers and its corporate seal to be hereunto affixed.

Dated December 29, 2003

E. Alex Paine III
TREASURER

SECRETARY

Certificate Number

171



# The American Society of Appraisers

555 Herndon Parkway, Suite 125, Herndon, VA 20170

*presents this*

## Certificate of Achievement

*to*

### Robert J. Breakstone

who has taken the class and successfully completed the exam for
the American Society of Appraisers 30-hour course

**ME201OL: Introduction to Machinery and Equipment Valuation - Available August and October 2002.**

October 2002
Date



Robert B. Podwalny, ASA International Education Chair

Exhibit B

Deposition of David Bromley                                          November 27, 2007

Page 38

1   Q.  The conveyor belts that were never used, when
2      were they first moved into the yard?
3   A.  At the same time the other equipment was taken
4      out, I believe.  It showed up on site, and it
5      sat out in front of the plant.  And eventually
6      we moved it to the back with all the rest of the
7      equipment.
8   Q.  I'm a little unclear.  This stuff arrived when?
9   A.  Probably early 2006, January, something like
10     that.
11  Q.  And at that point there were certain conveyor
12     belts of the deboning line that were not
13     installed and never have been, correct?
14  A.  That's correct.
15  Q.  For a time did they sit inside the facility in
16     line?
17  A.  No, sir.
18  Q.  Did they sit in crates?
19  A.  They weren't -- never were in crates.
20  Q.  So they came and they were just kind of shoved
21     off to the side?
22  A.  We took them -- unloaded them off the truck
23     to --

Page 39

1   Q.  Put them inside?
2   A.  -- be installed later.
3       No.  We left them outside.  We unloaded them
4     and left them right outside where we unloaded
5     them.
6   Q.  I see.
7       And they never went inside the building?
8   A.  No.
9   Q.  The other portion of the deboning equipment that
10     was installed, tell me how that was installed.
11  A.  Of course, we had to remove everything that was
12     in there, but then -- and got the floor done and
13     then just bringing everything in and fastening
14     it down.  You had to line it all up, bolt it
15     together.  Everything ties together like a
16     freeway system.  All the product falls on the
17     conveyors.
18  Q.  So --
19  A.  So as these other conveyors were put in, all the
20     pans had to be welded to it.  Everything was all
21     tied together.
22  Q.  And how was the machinery, in fact, fastened to
23     the facility?

Page 40

1   A.  Bolted to the floor.  Anchored to the floor.
2   Q.  Was it done in the same manner that the
3     previously removed equipment --
4   A.  Yes.
5   Q.  So there was a bolt that was bolted through the
6     epoxy floor into the concrete floor underneath,
7     correct?
8   A.  That's correct.
9   Q.  And the installed deboning equipment was
10     installed in the same fashion as the previously
11     removed ConAgra equipment had been installed,
12     correct?
13  A.  That's correct.
14  Q.  Has the spiral freezer ever been used by
15     Sylvest?
16  A.  No.  It was never completed.  The installation
17     was never completed.
18  Q.  Has the spiral freezer ever been used by Koch
19     Foods?
20  A.  No, sir.
21  Q.  When you say it wasn't completed -- the
22     installation was not completed, in what way was
23     it not completed?

Page 41

1   A.  Mike Leonard's part was complete.  He put the
2     machine in.  The refrigeration was never tied to
3     it and the electrical was never finished.
4   Q.  And why is that?
5   A.  Bankruptcy.
6   Q.  When you say bankruptcy, you mean the bankruptcy
7     filed by Sylvest?
8   A.  By Sylvest, yes.  That's correct.
9   Q.  Were you involved in any way in the negotiation
10     of the sale of the D & F equipment to Sylvest?
11     Strike that.
12       Were you involved in negotiating the price?
13  A.  Yes.
14  Q.  And you did this with Lenny --
15     Lenny Ferguson.
16  Q.  Were you involved in the documentation regarding
17     that lease?
18  A.  I didn't have anything to do with it being
19     leased, no, if that's what you're asking.
20  Q.  Thank you.  That was a bad question.
21       You purchased it from D & F, but it was done
22     in the form of a lease from GE Capital.  Is that
23     your understanding?

Page 42

1   A.   That's correct.
2   Q.   Were you involved in the documentation of the
3        lease from GE Capital to Sylvest?
4   A.   No.  I had nothing to do with the GE Capital
5        side.
6   Q.   Have you ever seen the lease?
7   A.   No, sir.
8   Q.   Were you ever asked to review the lease?
9   A.   No.
10  Q.   Now, when did Sylvest -- did Sylvest ever use
11       any part of the deboning line?
12  A.   Yes.
13  Q.   When did it first begin using it?
14  A.   Around the end of -- I don't remember the exact
15       date, but the end of 2005, beginning of 2006.
16  Q.   And when I say use it, I mean they started
17       deboning chickens.
18  A.   That's correct.
19  Q.   How long did they use it -- did Sylvest use it?
20  A.   Until the sale to Koch.
21  Q.   And when was that?
22  A.   I believe it was May or June 2006.
23  Q.   At that time you and certain other Sylvest

Page 43

1        employees were hired by Koch; is that right?
2   A.   That's correct.
3   Q.   And did there ever come a time during that
4        transition from Sylvest to Koch where the
5        deboning line portion that was being used was
6        not being used?
7   A.   No.  It was pretty seamless.  We just kept
8        going.
9   Q.   So you never missed a day or anything?
10  A.   No.
11  Q.   You just kept doing it every day and the
12       ownership changed, correct?
13  A.   That's correct.
14  Q.   Are you aware of any demands by Koch Foods that
15       GE Capital remove the deboning equipment?
16  A.   No.
17  Q.   Did you make any?
18  A.   No.
19  Q.   Have you ever talked to anybody from GE Capital?
20  A.   No.
21  Q.   Are you aware of any demands by Koch Foods that
22       GE Capital pay it rent for either the spiral
23       freezer or the deboning equipment?

Page 44

1   A.   No.
2   Q.   How long did Koch Foods use the deboning
3        equipment?
4   A.   I'm trying to think of when we took it out.  I
5        would guess it was probably about nine months.
6   Q.   And when was it removed?
7   A.   About four months ago, something like that.
8        Three or four months ago.
9   Q.   So early summer of 2007?
10  A.   I would say that's right.
11  Q.   Was it continuously used by Koch Foods from the
12       time that Koch Foods took over from Sylvest in
13       the late spring or early summer of 2006 until
14       the time that it was removed nine or ten months
15       later?
16  A.   Yes.
17  Q.   Was any rent paid by Koch Foods to GE for that
18       equipment?  Do you know?
19  A.   I do not know.
20  Q.   I want to talk to you about the decision to
21       remove the equipment, not the actual removal --
22       we'll get to that -- but the decision to remove
23       it.  When did you first learn that Koch Foods

Page 45

1        was thinking about removing the equipment?
2   A.   Probably about three weeks before it actually
3        happened.
4   Q.   And how did you learn?
5   A.   I was told that it was going to happen and to go
6        ahead and set up the contractors to put
7        everything together to get that change done.
8   Q.   And from whom did you learn this?
9   A.   I believe it was Gary Davis, who was the complex
10       manager at that time.
11  Q.   And he's now been replaced by ...
12  A.   David Massey.
13  Q.   Were you involved in the decision to do that or
14       were you just instructed --
15  A.   No, sir.  No, sir.
16  Q.   You weren't involved in the decision?
17  A.   No.
18  Q.   Did you ask Mr. Davis why you were being asked
19       to make the change?
20  A.   No, sir.
21  Q.   Did you talk to anybody else besides Mr. Davis
22       about the decision to make the change?
23  A.   No.

Exhibit C

Page 42

1  Mr. Bellesheim specifics about the case, the claim of
2  conversion, Koch's claim of these being fixtures that
3  it now owns or anything like that?
4      A   I think I can answer that in part.  The
5  specifics being that I discussed with them really was
6  just being how the case was -- updates on how the case
7  was progressing.  As far as your second half of that,
8  fixtures, no, I don't think we discussed that.
9          (Whereupon, Koch Deposition Exhibit
10         No. 12 marked for identification.)
11     Q   Exhibit 12.  This is a letter from Ann Pille
12  to me.  Have you seen this document before?
13     A   Yes, I have.
14     Q   Okay.  Is this the document that you
15  understand where GE's Counsel demanded that Koch stop
16  using the equipment?
17     A   I'm not finding it in this letter
18  specifically.  It might be there, but I'm just reading.
19  I don't see the specific wording where we say stop
20  using the equipment.  If you see it, point it out to
21  me.
22     Q   I'm asking you because you said you know your
23  Counsel made a demand, and I'm not sure that I have
24  ever seen it, so I didn't know if this might have been
25  the letter you were referring to.  I see there is a

Page 43

1  demand for rent in this.
2      A   Right.
3      Q   Was it your understanding that in this letter
4  where there was a demand for rent that GE also made a
5  demand to stop using the equipment or is it in some
6  other letter that you understand GE's Counsel made a
7  demand that Koch stop using the equipment?
8      A   Well, this letter, if I recall, this letter
9  was to -- for the demand for the rent.  As far as to
10  stop using the equipment, I don't recall.
11     Q   Do you know when that demand was made then on
12  Koch to stop using the equipment?
13     A   No, I don't.
14     Q   Now, turning to the second page of Ms.
15  Pille's letter, the first full paragraph where there is
16  a demand for rent.
17         Were you the one that provided Ms. Pille with
18  that figure of $237,493.99?
19     A   Yes, I was.
20     Q   How did you calculate that number?
21     A   It was based on the number of months.  I
22  would have to go back and ask you for the physical
23  records, but it was based on -- I think it was eight or
24  nine months times the monthly rental.  That is an
25  approximation.

Page 44

1      Q   The monthly rent under the lease?
2      A   Right.
3      Q   And that included all the equipment under the
4  lease?
5      A   That is correct.
6      Q   By this time, had GE already sold the Ossid
7  equipment?
8      A   Yes, we did.
9      Q   And you are not aware of Koch ever using the
10  Ossid equipment, are you?
11     A   No, I don't know if they did or not.
12     Q   Have you ever been told by anybody that
13  almost all of the Ossid equipment had remained on skids
14  unwrapped at the Sylvest plant?
15     A   I don't recall.
16     Q   Explain to me how if GE had already been
17  given back the Ossid equipment and it sold the Ossid
18  equipment, what was the basis for GE then demanding
19  that Koch pay rent for eight or nine months for the
20  Ossid equipment?
21     A   Honestly, it was just an error.  It should
22  have been prorated out.
23     Q   What about that you were demanding that GE
24  pay rent for the freezer.  What was GE's reasoning for
25  asking Koch to pay rent for a freezer it hadn't used?

Page 45

1      A   I'm not sure at the time if I knew they were
2  using it or not, so we just included that.
3      Q   Did you or anybody on GE's behalf ever ask
4  Koch if they were using the freezer?
5      A   Yes, we did.  I think we asked -- I'm sure we
6  asked Bob Breakstone in his appraisal if it was being
7  used.
8      Q   What did Bob Breakstone say?
9      A   He wasn't sure.  It was like it could go
10  either way, yes or no, whether it was being used or not
11  used.  The answer he gave me is that he was not able to
12  tell if it was being used or not used.
13     Q   Did he say if he ever asked anybody?
14     A   No, I don't remember that.
15     Q   If you thought it was important enough to ask
16  Mr. Breakstone if the freezer was being used, and he
17  didn't know, did you then make any effort yourself or
18  ask somebody else from GE to make an effort to find out
19  if the freezer was being used?
20     A   Yes, we did, and I don't recall the
21  specifics, but I do recall we did find out at some
22  point that the freezer was in another part of the
23  building at the plant and that that area was rarely
24  being used.
25         So we might have assumed at the time at that

WILLIAM WILSON

Page 46

1  point that it wasn't being used, that it was still at
2  the location.
3      Q    If you prorated the monthly amount for the
4  de-bone line, the monthly rental amount for just the
5  de-bone equipment that Koch had been using, how much
6  would that have been per month for Koch?
7      A    I don't know.  I would have to do a
8  percentage calculation.
9      Q    Did you ever tell Koch what that amount would
10 be?
11     A    For just the de-bone line?
12     Q    Yes.
13     A    No.
14          (Whereupon, Koch Deposition Exhibit
15          No. 13 marked for identification.)
16     Q    Can you identify Koch Exhibit 13 for me?
17     A    It doesn't look familiar to me.
18     Q    You don't recall receiving this from
19 Mr. Reich?
20     A    No.
21     Q    Do you know who Jonathan Reich is?
22     A    Other than how he is listed on this form, no,
23 I don't.
24          (Whereupon, Koch Deposition Exhibit
25          No. 14 marked for identification.)

Page 47

1      Q    Koch Exhibit 14, which appears to be a
2  proposal to Peco Foods, are you familiar with this
3  document?
4      A    Yes, I am.
5      Q    And how did you come to be familiar with this
6  document?
7      A    Mr. Perry provided it to me.
8      Q    What do you understand this document to be?
9      A    To be a financial proposal for the de-boning
10 line to Peco Foods.
11     Q    Was this an effort by GE to sell the
12 de-boning line to Peco Foods?
13     A    Sell or finance.
14     Q    Well, GE could have -- as I understand this,
15 correct me if I'm wrong, this was a proposal that GE
16 would sell it in a financing transaction.  They would
17 finance the purchase by Peco; is that right?
18     A    Actually, no.  It looks like it would be a
19 similar situation with Sylvest in that we retain
20 ownership.
21     Q    So it would be leased, and the monthly lease
22 amounts would be $4,322; is that right?
23     A    For the basic term, right, yes.
24          (Whereupon, Koch Deposition Exhibit
25          No. 15 marked for identification.)

Page 48

1      Q    Next Exhibit, 15.  Have you seen this
2  document?
3      A    Yes, I have.
4      Q    And what is this?
5      A    This is a finance proposal to Koch Foods for
6  a loan on the Ossid equipment.
7      Q    This is for the Ossid equipment that was
8  eventually sold.  I think this proposal is for one
9  shrink line, but both lines were eventually sold to
10 Peco, correct?
11     A    I think so.
12     Q    Did you discuss the Peco transaction with
13 Mr. Perry or anyone else at GE?
14     A    No.  Just with Joe DiSalvo.
15     Q    What did you discuss with Mr. DiSalvo about
16 the Peco sale?
17     A    The only discussions I really had was that if
18 it had sold and for how much it was sold for, and that
19 was it.
20     Q    Did you ever attempt to reconcile or compare
21 the prices for Peco equipment against the valuation
22 that Mr. Breakstone had given you?
23     A    I was not involved in that, no.
24     Q    Were you in any way involved in the
25 negotiations with Peco about its purchase?

Page 49

1      A    No, I was not.
2      Q    Have you ever had any discussions with anyone
3  at any time regarding efforts by Michael Leonard of MTL
4  Services to buy the spiral freezer?
5      A    I had discussions with Joe DiSalvo.
6      Q    What did you discuss with Mr. DiSalvo?
7      A    That Mr. Leonard was with MTL, was a
8  potential buyer, and he had made an offer.  That was
9  pretty much the substance I had with Joe DiSalvo.
10     Q    Were you aware that Mr. Leonard had actually
11 submitted a deposit check that had been cashed by GE?
12     A    Very recently I have been made aware, yes.
13     Q    You weren't made aware of it
14 contemporaneously?
15     A    No, I was not.
16     Q    Were you aware that Mr. DiSalvo had sent a
17 purchase agreement to Mr. Leonard for signature?
18     A    Subsequently.
19     Q    Subsequently.  Did you at any time ever tell
20 Mr. Leonard -- I'm sorry, Mr. DiSalvo that GE couldn't
21 sell the spiral freezer to Mr. Leonard?
22     A    Yes.
23     Q    When did you tell him that?
24     A    I don't recall.
25     Q    You didn't tell him -- you weren't aware that

13 (Pages 46 to 49)

Exhibit D

JOSEPH DISALVO

---

Page 34

J. DiSalvo/Geekie

1  from the building is what I was told.
2
3      Q.    Did Koch to your knowledge ever do
4  anything to prevent you from selling or
5  remarketing the freezer?
6      A.    I don't recall them doing anything
7  one way or another.  I was just told by
8  litigation that the freezer could not be sold.
9      Q.    Who told you that?
10     A.    Bill Wilson.
11     Q.    When did he tell you that?
12     A.    Slightly after I got the deposit
13  from Mr. Leonard, whenever that date is.
14     Q.    How did your conversation with
15  Mr. Wilson come about that he knew to come to
16  you to tell you they're not selling the
17  equipment?  Did you tell him hey, I have a buyer
18  for the freezer?
19     A.    I probably went to him and said I
20  have a buyer for the freezer.
21     Q.    And then he responded you can't
22  sell it?
23     A.    You can't sell it.  Let's try and
24  work something out, we have to work something
25  out with Koch.

---

Page 35

J. DiSalvo/Geekie

1
2      Q.    What did you understand him to
3  mean when he said let's try and work something
4  out with Koch?
5      A.    All I can tell you is that I
6  assume -- I hate to say that word -- but I would
7  assume that there was something going on with
8  the other piece of equipment because I was
9  always under the assumption that Koch was taking
10  the debonng line and that it was going to
11  purchase that or refinancing that with us.
12     Q.    And it's the debone lines that you
13  refer to when you say the other piece of
14  equipment?
15     A.    Yes.
16     Q.    Did Mr. Wilson say anything to you
17  when you told him the price or that you were
18  selling the equipment that the price was too
19  low?
20     A.    On the freezer?
21     Q.    On the freezer, yes.
22     A.    No, not that the price was too
23  low.  Just that we couldn't accept it because of
24  a pending lawsuit.
25     Q.    Okay.

---

Page 36

J. DiSalvo/Geekie

1
2      Q.    Did Mr. Wilson say anything to you
3  that GE was seeking more in damages from Koch
4  than the price you had agreed to sell the
5  freezer for?
6      A.    No.  Just that Koch was using the
7  equipment for a several-month period and hasn't
8  paid anything on it.
9      Q.    Regarding that use of the
10  equipment, you mean the debone line?
11     A.    Yes, sir.
12     Q.    Did Mr. Wilson tell you that he
13  demanded or ever made a demand that Koch stop
14  using the equipment?
15     A.    No.
16     Q.    Has anybody ever told you that
17  anyone from GE at any time told Koch to stop
18  using the equipment?
19     A.    Not that I recall.
20     Q.    Okay.
21         Mr. Hanley mentioned earlier today
22  of you that when Koch removed the debone lines
23  from the plant and put them on its parking lot,
24  that he thought that would have devalued the
25  equipment.  Do you have any view on that

---

Page 37

J. DiSalvo/Geekie

1
2  subject?
3      A.    Absolutely.  Equipment installed
4  and in use has a huge difference than something
5  sitting out in the parking lot, exposed to
6  weather, not de-installed properly, not
7  photographed, not videoed.
8      Q.    Do you have any information on
9  whether or not the equipment when it was removed
10  wasn't de-installed properly?
11     A.    I have no knowledge of that, no.
12     Q.    And the equipment that's on the
13  parking lot right now, do you know whether or
14  not it's covered?
15     A.    No, no idea.
16     Q.    And this deboning equipment,
17  you're aware, aren't you, that it's intended for
18  use in a cold, wet environment inside the plant,
19  aren't you?
20     A.    One could assume so.  Chickens
21  were going to be cold and wet when they're being
22  deboned.
23     Q.    Does it help to maintain the value
24  of the equipment, then, when it is installed in
25  the plant?

---

10 (Pages 34 to 37)

JOSEPH DISALVO

Page 70

J. DiSalvo/Geekie

1
2 electronic file from the original deal.
3      Q.      Did you ever have any discussions
4 with Mr. Leonard about what his original price
5 that he paid for the spiral freezer was?
6      A.      No.
7      Q.      In your conversations with
8 Mr. Leonard did you have an understanding or did
9 you know that he had been the party or his
10 company had been the party that had originally
11 sold the spiral freezer to Sylvest?
12      A.      Yes.
13      Q.      Or sold it to GE for lease to
14 Sylvest?
15      A.      Yes.
16      Q.      But he didn't tell you what he
17 originally paid for it?
18      A.      No, he did not.
19      Q.      Describe for me how your
20 transaction with Mr. Leonard came about or your
21 incomplete transaction with Mr. Leonard came
22 about.
23      A.      Well, he called me and inquired
24 whether or not we would be interested in selling
25 the freezer initially, and he indicated to me

Page 71

J. DiSalvo/Geekie

1
2 that he was the company that originally
3 installed it and would be willing to make an
4 offer on it.
5           Initially we tried to find other
6 buyers for it through Breakstone or through the
7 sales force.  I did very little as far as that's
8 concerned.
9           And then eventually he kept on
10 calling me all the time, and we had no other
11 potential sales that we could consummate so we
12 agreed to sell it to him
13      Q.      When you say we, who's we?
14      A.      GE we.
15      Q.      Okay.
16           And did he make the offer to buy
17 it for 50 or did you guys make an offer to sell
18 it to him for 450 or how did this negotiation
19 take place?
20      A.      I believe he made the offer for 50
21 and said, "That's all I'd be willing to pay."
22      Q.      And did GE counteroffer or did it
23 just accept the 50,000 offer?
24      A.      I told him I'd like to get more
25 for it, but due to the fact that we had no

Page 72

J. DiSalvo/Geekie

1
2 activity on it and had no potential customers on
3 it that we would sell it to him for 50.
4      Q.      How long of a period of time did
5 this conversation or negotiation take place?
6 Was it a few days, a few weeks, a few months?
7      A.      Well, he had been calling me since
8 we tried to sell the freezer so since the spring
9 of 2006, late spring I guess, June or July, he
10 had been calling me until we put a document
11 together, which I don't recall what the date is
12 but I'm sure you've got it in here somewhere.
13           That's how long the conversation
14 happened.  It was over a period of several
15 months before we actually put an offer on the
16 table, and I would say within a week or two we
17 settled and he sent me a deposit check.
18      Q.      That you cashed.  Correct?
19      A.      Yes.
20      Q.      How long after receiving that
21 deposit check, then, did you have your
22 conversation with Mr. Wilson where he said we
23 can't sell it?
24      A.      Right away afterwards.
25      Q.      Within a week?

Page 73

J. DiSalvo/Geekie

1
2      A.      Within a week, yes, I would think
3 so.
4           MR. GEEKIE:  This will be
5 Koch-21.  This is a new one being
6 marked for the first time.
7           (Exhibit Koch-21, 1-page
8 document entitled equipment purchase
9 invoice and bill of sale dated
10 May 11, 2007, received and marked
11 for identification.)
12      Q.      I've handed you Koch Exhibit 21,
13 which we just marked.
14      A.      Yes.
15      Q.      Can you identify this document for
16 me?
17      A.      This is the bill of sale that I
18 sent to Michael Leonard.
19      Q.      There's an invoice dated May 11,
20 2007.  Is that about the date that you sent this
21 to him?
22      A.      Yes.
23      Q.      It says the selling price is
24 50,000 and deposit of 5,000.  Do you believe you
25 already received the deposit from Mr. Leonard?

19 (Pages 70 to 73)

Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KOCH FOODS OF ALABAMA, LLC,          )
an Alabama limited liability company, )
                                      )       2007 JUN 13  A 11: 45
              Plaintiff,              )
                                      )
       v.                             )
                                      )       Case No. 2:07cv 522- MHT
                                      )
GENERAL ELECTRIC CAPITAL              )
CORPORATION,                          )
a Delaware corporation,               )       **DEMAND FOR JURY TRIAL**
                                      )
              Defendant.              )

## ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT AND FOR UNJUST ENRICHMENT AND COUNTERCLAIM FOR CONVERSION

Now comes Defendant General Electric Capital Corporation ("GE Capital") and files its Answer to Plaintiff Koch Foods of Alabama, LLC's ("Koch Foods") Complaint for Declaratory Judgment and for Unjust Enrichment (the "Complaint") and Counterclaim for Conversion (the "Counterclaim") against Koch Foods. In support thereof, GE Capital states as follows:

### ANSWER

1.      GE Capital admits the allegations contained in Paragraph 1 of the Complaint.

2.      GE Capital admits the allegations contained in Paragraph 2 of the Complaint.

3.      Paragraph 3 of the Complaint contains only a legal contention requiring no response; therefore, GE Capital makes none.

4.      Paragraph 4 of the Complaint contains only a legal contention requiring no response; therefore, GE Capital makes none.

5.      GE Capital admits the allegations contained in Paragraph 5 of the Complaint.

6.      GE Capital admits that Koch Foods was not originally a party to the Equipment Lease and denies the remaining allegations contained in Paragraph 6 of the Complaint.

7.      GE Capital admits the allegations contained in Paragraph 7 of the Complaint.

8.      GE Capital admits the allegations contained in Paragraph 8 of the Complaint.

9.      GE Capital admits the allegations contained in Paragraph 9 of the Complaint.

10.     GE Capital admits the allegations contained in Paragraph 10 of the Complaint.

11.     GE Capital admits that Koch Foods did not assume the Equipment Lease under the terms of the Bankruptcy Court Order and denies the remaining allegations contained in Paragraph 11 of the Complaint.

12.     GE Capital states that Koch Foods was aware since a time well prior to the date of the Bankruptcy Court Order (May 26, 2006) that the Equipment was owned by GE Capital as lessor under the Equipment Lease and denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.     GE Capital denies that it has demanded that Koch Foods pay rental charges (other than in the context of pre-litigation settlement negotiations in which the potential amount of such charges was discussed) and states that GE Capital has demanded that Koch Foods pay the value of items and units of the Equipment converted by Koch Foods, as is more particularly alleged in the Counterclaim, and denies the remaining allegations contained in Paragraph 13 of the Complaint.

14.     GE Capital denies the allegations contained in Paragraph 14 of the Complaint.

15.     GE Capital restates its answers to Paragraphs 1 through 14 of the Complaint as its answer to Paragraph 15 of the Complaint.

16.     GE Capital admits the allegations contained in Paragraph 16 of the Complaint.

- 2 -

17.     GE Capital admits that it is the owner of the Equipment as lessor under the Equipment Lease and denies the remaining allegations contained in Paragraph 17 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count I of the Complaint.

18.     GE Capital restates its answers to Paragraphs 1 through 17 of the Complaint as its answer to Paragraph 18 of the Complaint.

19.     GE Capital admits the allegations contained in Paragraph 19 of the Complaint.

20.     GE Capital reaffirms and restates its answer to Paragraph 13 of the Complaint as its answer to Paragraph 20 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count II of the Complaint.

21.     GE Capital restates its answers to Paragraphs 1 through 20 of the Complaint as its answer to Paragraph 21 of the Complaint.

22.     This paragraph does not require a response.

23.     GE Capital denies the allegations contained in Paragraph 23 of the Complaint.

24.     GE Capital denies the allegations contained in Paragraph 24 of the Complaint.

25.     GE Capital denies the allegations contained in Paragraph 25 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count III of the Complaint.

26.     GE Capital restates its answers to Paragraphs 1 through 25 of the Complaint as its answer to Paragraph 26 of the Complaint.

27.     This paragraph does not require a response.

28.    GE Capital denies the allegations contained in Paragraph 28 of the Complaint.

29.    GE Capital denies the allegations contained in Paragraph 29 of the Complaint.

30.    GE Capital denies the allegations contained in Paragraph 30 of the Complaint.

WHEREFORE, GE Capital prays that this Court deny Koch Foods all relief under Count IV of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Koch Foods' Complaint, and each and every count therein, fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Except as expressly admitted herein, GE Capital denies all allegations contained in Koch Foods' Complaint.

### THIRD DEFENSE

Koch Foods' claims are barred, in whole or in part, by the doctrine of unclean hands or failure to do equity.

### FOURTH DEFENSE

Koch Foods' claims are barred pursuant to the equitable doctrines of judicial estoppel, equitable estoppel, and/or collateral estoppel.

### FIFTH DEFENSE

Koch Foods' claims are barred pursuant to the doctrines of waiver and laches.

### SIXTH DEFENSE

Koch Foods' claims, in whole or in part, are barred by lack of standing or lack of capacity.

## SEVENTH DEFENSE

Koch Foods is not entitled to a possessory lien from GE Capital under Alabama law.

## EIGHTH DEFENSE

GE Capital denies that Koch Foods is entitled to damages of the nature, type, and amount sought in the Complaint.

## NINTH DEFENSE

To the extent that discovery may show or demonstrate, Koch Foods, at all relevant times herein, failed to take reasonable action to mitigate the damages alleged in the Complaint.

## TENTH DEFENSE

GE Capital hereby gives notice that it intends to rely upon such other affirmative or supplemental defenses as may become available or apparent during the course of discovery and thus reserves the right to amend its Answer to assert any such defenses.

## **COUNTERCLAIM**

1.      GE Capital is a corporation organized under the laws of Delaware with its principal place of business located in Stamford, Connecticut. At all times relevant hereto, GE Capital was in the business, inter alia, of leasing food processing equipment to food processors.

2.      Koch Foods is a limited liability corporation organized under the laws of Alabama with its headquarters located in Park Ridge, Illinois, and a production facility located in Montgomery, Alabama. At all times relevant hereto, Koch Foods was in the business of processing and selling poultry products.

GE Capital's Lease of Equipment
to Sylvest Farms

3.      On or about December 29, 2005, GE Capital, as lessor, and Sylvest Farms, Inc.

("Sylvest Farms"), as lessee, entered into a Master Lease Agreement of that date (the "Master

Lease").    Pursuant to the Master Lease, Sylvest Farms leased from GE Capital the food

processing equipment and related items listed on Schedule No. 001 to the Master Lease

("Schedule 001").   Sylvest Farms took possession of the equipment listed on Schedule 001 at

its chicken de-boning and processing facility located at 4530 Mobile Road, Montgomery,

Alabama (the "Facility"), on or shortly after the date of the Master Lease.   True and correct

copies of the Master Lease and Schedule 001 are attached to the Complaint.

4.      The equipment listed on Schedule 001 and leased by Sylvest Farms from GE

Capital includes the following:    Model 2006 de-boner with double cone lure, product

conveyors, and loading bin; serial number 36019-01A; manufactured by D&F Equipment

Sales; and having a capitalized lessor's cost of $846,545.00 (collectively, the "Equipment").

The Bankruptcy and Sale
of Sylvest Farms

5.      On or about April 18, 2006, Sylvest Farms filed a voluntary petition for

bankruptcy in Case No. 06-40525-TBB11 (the "Bankruptcy Case") in the United States

Bankruptcy Court for the Northern District of Alabama, Eastern Division (the "Bankruptcy

Court").

6.      Also on or about April 18, 2006, Sylvest Farms, as seller, and Koch Foods, as

buyer, entered into an Asset Purchase Agreement of that date, which provided for the sale of

substantially all of the assets of Sylvest Farms.  This sale included the Facility.

- 6 -

7.    On or about May 26, 2006, the Bankruptcy Court approved the Asset Purchase Agreement, and, at that time, Koch Foods purchased substantially all of the assets of Sylvest Farms.

8.    On or about June 6, 2006, the Bankruptcy Court entered its Order Granting Debtors' Motion for Entry of Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts (the "Rejection Order"). The Master Lease was rejected pursuant to the Rejection Order.

Conversion of the Equipment
by Koch Foods

9.    Following entry of the Rejection Order and the rejection of the Master Lease, GE Capital contacted Koch Foods regarding the need to relocate the Equipment from the Facility. Koch Foods advised GE Capital that it would not be necessary to relocate the Equipment at that time, and that it could remain stored at the Facility while GE Capital marketed it for resale.

10.    Following entry of the Rejection Order and the rejection of the Master Lease, and without the consent of GE Capital, Koch Foods began using the Equipment for its own purposes. Specifically, Koch Foods began using the Equipment for the de-boning and processing of chicken. This included the use by Koch Foods of portions of the Equipment that were not previously in use by Sylvest, and indeed had not even been installed and made operational, at the time Koch Foods purchased the Facility.

11.    Koch Foods continues to use the Equipment.

12.    Koch Foods has not made any payments to GE Capital for its continued and continuing use of the Equipment.

13.    Koch Foods is currently exercising dominion and control over the Equipment inconsistent with the rights of GE Capital.

14.    GE Capital owns the Equipment and has owned the Equipment at all times relevant hereto.  At no time has GE Capital consented to use of the Equipment by Koch Foods.

15.    Koch Foods has:

    (a)    committed unauthorized acts by which GE Capital has been deprived of its personal property indefinitely;

    (b)    made an unauthorized assumption or exercise of the right of ownership over personal chattels belonging to GE Capital through the alteration of their condition or the exclusion of GE Capital's rights;

    (c)    exercised dominion over property inconsistent with the rights of GE Capital; and/or

    (d)    exercised unauthorized acts of dominion or ownership over property belonging to GE Capital.

16.    GE Capital has made demand upon Koch Foods for return and surrender of the Equipment, but, despite demand, Koch Foods failed to surrender the Equipment and instead used and converted it to its own purposes.

17.    Koch Foods has knowingly violated GE Capital's rights in the Equipment and continues to do so.

18.    In its conversion of the Equipment, Koch Foods has acted with legal malice, willfulness, insult, and/or other aggravated circumstances.

19.    Under controlling law, Koch Foods is liable to GE Capital for the value of the Equipment as of the date of its conversion, the said amount being at or near its capitalized cost of $846,545.00.

20.    Under controlling law, Koch Foods is liable to GE Capital for interest at the applicable rate on the value of the Equipment as of the date of its conversion.

21.    Under controlling law, Koch Foods is liable to GE Capital for punitive damages.

WHEREFORE, GE Capital prays this Court to enter judgment in its favor and against Koch Foods in an amount equal to the value of the Equipment at the time of its conversion, plus interest at the applicable rate from the date of its conversion, plus punitive damages, said amounts to be proven at trial in this matter, together with any and all other and additional amounts to which justice and equity entitle GE Capital.  GE Capital demands a trial by jury in this matter.

Respectfully submitted,

*Rusha C. Smith*

Rusha C. Smith
Attorney for Defendant General Electric Capital Corporation

OF COUNSEL:
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL  35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

- 9 -

OF COUNSEL:
Alexander Terras
Timothy Scott Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL  60606
Telephone:  (312)207-1000
Facsimile:  (312) 207-6400

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel of record addressed as follows:

Thomas G. Mancuso, Esq.
Mancuso & Franco, P.C.
7515 Halcyon Summit Drive
Suite 301
Montgomery, AL  36117

Eugene J. Geekie, Jr., Esq.
Mike Xu, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL  60606

by placing same in the United States mail, postage prepaid, on this the <u>13th</u> day of June, 2007.



OF COUNSEL

Exhibit F

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KOCH FOODS OF ALABAMA, LLC, an Alabama limited liability company, | ) ) ) | |
| Plaintiff and Counter- Defendant, | ) ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 2:07 CV 522-MHT |
| GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendant, and Counter- Plaintiff. | ) ) ) ) | |

## GE CAPITAL'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS AND COUNTERCLAIMS

General Electric Capital Corporation ("GE Capital"), through its undersigned counsel, in further support of GE Capital's Motion for Summary Judgment as to all Claims and Counterclaims ("GE Capital's Summary Judgment Motion") (Doc. Nos. 44 and 45), and in further opposition to Koch Food's Motion for Summary Judgment With Respect to GECC's Counterclaim for Conversion ("Koch's Summary Judgment Motion") (Doc. No. 46), hereby states as follows:

## I. INTRODUCTION

Koch Foods' Brief and Evidentiary Materials in Opposition to GECC's Motion for Summary Judgment (the "Opposition") (Doc. No. 67) is noteworthy, above all, for its recitation of many, many facts.[1]  Reciting facts, however, does not make them material to the issue presented for decision, nor does presenting "facts" not in the record allow the Court to consider

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in General Electric Capital Corporation's Response to Koch Foods of Alabama LLC's Motion for Summary Judgment ("GE Capital's Response") (Doc. No. 68).

the same.  Below, GE Capital points out that neither Koch's multitude of facts, nor the law it

presents, should deter this Court from granting summary judgment in GE Capital's favor.

## II. ARGUMENT

### 1.    Almost None of the Facts Recited by Koch in the Opposition are Material.

In its Opposition, Koch recites a great number of new "undisputed facts."  Almost none

of the facts recited by Koch, however, are material.  GE Capital's case for liability is simple:

A.    Koch knew that GE Capital owned the Deboning Equipment and the
Spiral Freezer when Koch bought the Facility.

B.    Koch asserted an unlawful ownership interest in the Deboning Equipment
and the Spiral Freezer from the day Koch bought the Facility, and
continues to do so today.

C.    Koch used the Deboning Equipment from the day it bought the Facility
until the time, approximately ten months later, that replacement equipment
arrived.

D.    The Deboning Equipment is now in Koch's parking lot, having been put
there by Koch without GE Capital's knowledge.  The Spiral Freezer is still
in the Facility.

E.    Koch has paid GE Capital nothing for its use of any of the equipment.

F.    Koch made an offer to return this equipment for the first time on
February 14, 2007, and, at that time, conditioned return of the Deboning
Equipment and the Spiral Freezer on GE Capital giving Koch a general
release.

G.    Koch's first arguably unconditional offer to return the equipment was
made contemporaneously with the arrival of replacement equipment and
Koch's moving the Deboning Equipment to the parking lot.

Koch offers no material evidence to challenge any of the above.  Rather, Koch says that

Sylvest had a record year in 2005 and purchased the poultry processing operation from ConAgra,

except that ConAgra sold the real estate to Hodges Bonded Warehouse which then leased it back

to Sylvest.  Koch also tells us Sylvest's written agreement with GE Capital that the equipment

would remain personal property and not become fixtures is not really an agreement because it was just "boilerplate."[2]  Koch cites no law to exclude "boilerplate" from a written contract. Koch goes on to point out that GE Capital did not treat the equipment as fixtures by making a "fixture filing" or getting a "landlord's waiver" showing, we can only suppose, that GE Capital thought all along that the boilerplate was a part of the written contract, and that the equipment was not fixtures.  Since these sort of facts so plainly have nothing to do with the issues presented for decision (*Opposition*, ¶¶ 1, 2, 8, and 14), this Court could safely conclude that it is being distracted.

Almost everything else in Koch's lengthy factual recitation is equally immaterial to the issue of conversion to be decided, with the exception of a few facts that are just plain misstatements or inadmissible.  To wit, Koch states that it continuously demanded that GE Capital remove the Deboning Equipment and the Spiral Freezer, "subject only to the condition that GECC would reimburse Koch for any damages caused by the removal of the Equipment." *Opposition*, ¶ 23.  This is just plain wrong.  Koch's first "demand" came eight months after it began using the Deboning Equipment and was not unconditional – Koch demanded a general release from GE Capital.  *See Email from E. Geekie to A. Terras, February 14, 2007*, a copy of which is attached to GE Capital's Brief and Evidentiary Submission in Support of its Motion for Summary Judgment as to all Claims and Counterclaims ("GE Capital's Memorandum") (Doc. No. 45) as Exhibit T.  Koch's second demand came when Koch was finished with the Deboning Equipment, had installed replacement equipment, and placed the Deboning Equipment in the parking lot.  *See Email from E. Geekie to A. Terras, April 18, 2007*, a copy of which is attached to the GE Capital's Memorandum (Doc. No. 45) as Exhibit U.  On

---

[2]  Going on about the "boilerplate" question, Koch tells the Court that the "representatives of GECC and Sylvest never discussed or negotiated any substance contained in this provision during their negotiation of the Equipment Lease." *Opposition*, ¶ 8.  Since there is no statute or precedent in Alabama, or any jurisdiction, that even suggests that a provision in a written contract someone deems to be "boilerplate" is not enforceable in a commercial contract, the point of Koch's considerable factual recitations on the subject is mysterious.  This is just one of many efforts to misdirect, overstate and generalize in the Opposition, which are not deserving or susceptible of individual objection.

- 3 -

another apparently critical point, whether GE Capital consented to Koch's use of the Deboning Equipment, the Opposition is liberally sprinkled with oblique references to GE Capital's consent, which belies the fact that there is not one scrap of evidence in the record that GE Capital in fact consented to Koch's use.

After cutting through that which is not material, the undisputed and material facts demonstrate that Koch needed the Deboning Equipment to run its processing plant, did not want to pay for it, asserted without legal basis that it owned it, and then used it until its own business convenience was served by the installation of replacement equipment. Only at this point did Koch become willing to abandon its claims of ownership and cease to care what happened to the remnants in the parking lot.

### 2.    Koch's Denials That It Asserted Ownership Ring Hollow.

Koch states that it "never claimed any ownership of the Deboner before this lawsuit was filed." *Opposition,* p. 13. This is a truly remarkable statement for two reasons:

- First, Koch's Chief Financial Officer's testimony is exactly the opposite. *See, e.g., GE Capital's Response,* ¶ 4.

- Second, were Koch correct, then the equipment, apparently, became fixtures not when Koch bought the Facility, but when it filed this lawsuit, a legal position that would appear frivolous.

Koch goes on to say that its assertions of ownership did not constitute conversion because it "in no way injure[d]" GE Capital. Koch cites no Alabama case to support this qualification, but instead cites two cases that involve assertions of ownership made by a defendant who never deprived the true owner of possession and a plaintiff who had sold the goods allegedly converted on credit under a written contract and did not get paid. *See Union State Bank v. Woell,* 434 N.W.2d 712 (N.D. 1989) (summary judgment entered in favor of creditor on debtor's claim of conversion because disputed funds were under control of the court); *Desbien v. Penokee Farmers Union Coop. Assoc.,* 220 Kan. 358, 552 P.2d 917 (1976) (no conversion occurred where owner

of property maintained possession of the property consistently, and defendant did not interfere with control of the owner). Both of these cases are a far cry indeed from processing twenty-nine million chickens and then removing the property to the parking lot as soon as your business convenience dictates you no longer need it.

Koch suggests, perhaps, that the law of Alabama should be that no conversion occurs until the defendant "seriously interferes" with the true owner's rights, or that "a temporary use which does not damage the chattel or inconvenience the owner and is not intended as a defiance of the owner's rights may not be enough for conversion." *Opposition*, p. 14. To support this proposition, Koch cites to the Restatement (Second) of Torts § 227. In doing so, however, Koch fails to note that § 227 of the Restatement also provides the following illustration of when a conversion claim – resulting from use – should lie:

1. A owns a desk, which is his private property. On one occasion, without A's consent, B uses the desk to write his wife. This is not a conversion of the desk.

2. The same facts as in Illustration 1, except that B uses the desk daily for six months. This is a conversion.

3. The same facts as in Illustration 1, except that B uses the desk with the assertion of a claim that it is his own. This is a conversion.

4. The same facts as in Illustration 1, except that, with or without negligence on the part of B, the desk is seriously damaged by its use. This is a conversion.

*Restatement (Second) of Torts, § 227* (1965); *see also Miller v. Uhl*, 37 Ohio App. 276, 174 N.E. 591 (Ohio App. 1929) (defendant guilty of conversion as a matter of law after driving bus that came rightfully into his possession 2000 miles over a period of five weeks). In this case:

- the "temporary use" by Koch of the equipment was for ten months, 29,000,000 chickens, and just until Koch's business convenience was to remove the equipment. *See GE Capital's Response,* ¶ 2.

- Koch's asserted "willing[ness] to surrender the Deboner at any time" is a concoction, when the undisputed record shows that Koch's first expression of willingness to surrender the equipment came on February 14, 2007, and then only on the condition that Koch receive a general release.

More importantly, by the time conditions for return of the Deboning Equipment even became an issue, Koch's use had been substantial and continuous for ten months.

Koch further argues that GE Capital's conversion arguments are "nonsensical" because GE Capital "would inevitably have a conversion claim . . . no matter what Koch had done." *Opposition,* pp. 16-17. In reality, of course, Koch's alternative would have been obvious to any businessman -- to tell GE Capital up front that it needed to use the equipment for ten months until new equipment arrived to continue production and then ask what the price for that might be. Instead, Koch cooked up an utterly specious claim of ownership based on the "fixture" theory, used the equipment as its own and as it pleased, and figured that a big institution of "renowned reputation" would just back down in the face of litigation, take the pieces out of the parking lot, and call it a day. Koch dissembles in its vehement characterization of itself as a hapless victim.

### 3.   GE Capital's Evidence of Value as of the Date of the Conversion is Uncontested.

It is well-settled under Alabama law that the appropriate measure of damages with regard to a conversion claim is the value of the equipment at the time of the conversion. *See, e.g., Charter Hosp. of Mobile v. Weinberg,* 558 So. 2d 909, 912 (Ala. 1990) (allowing damages in the amount of the value of the property at the time of conversion, or up until the time of trial, whichever is greater, plus 6% interest from the date of the conversion to the date of the trial). In the instant case, GE Capital's properly designated expert – Robert Breakstone – offers the only evidence of the value of the equipment at the time of the conversion.

Koch's designated expert, David Dalfonso, falls short by offering opinions only as to the value of the equipment as of October 2007 – about a year and a half after the date of the

conversion.[3] The time for Mr. Dalfonso to offer new opinions has long since passed. *See Uniform Scheduling Order,* filed on July 17, 2007 (Doc. No. 14), Section 8.

Recognizing the deficiencies in its evidence, Koch tries to circumvent this shortcoming by offering the testimony of its own Senior Vice President, Wayne Jones. In its Opposition, Koch alleges that the testimony of Mr. Jones was that, "the Deboner's value was about 25 to 35 cents on the dollar of the capital cost of the Deboner. This means that the value of the Deboner in early 2006 was between approximately $202,000 and $283,735, based on the original capitalized cost of $810,672.50." *Opposition,* ¶ 28, p. 10 (internal citations omitted).

This is a misrepresentation of Mr. Jones's testimony. In reality, Mr. Jones testified that he had no knowledge of the value of the equipment at the time of the conversion:

> Q:  Do you, yourself, have any knowledge with respect to the value of the deboner equipment at the time that Koch Foods assumed ownership of the facility in 2006?
>
> A:  No.

*Jones Dep. Transcript,* 37:21-38:2, a copy of which is attached to the Opposition (Doc. No. 67) as Exhibit 22. Mr. Jones's opinion of the value of the equipment, as included in the Opposition, relates to the value of the equipment as of the date of his deposition, November 28, 2007:

> Q:  Do you have any knowledge of its value today?
>
> A:  Not from a professional.
>
> Q:  Some other way though?
>
> A:  Just an opinion.

---

[3] Koch is unable to manufacture any evidence to rebut Mr. Breakstone's established appraisal value. In its original Opposition, Koch misstated the evidence provided by Mr. Dalfonso, stating that he provided an appraisal of the equipment "In Place as of Day 1 Year 1" which was less than that established by Mr. Breakstone. *Opposition,* ¶ 27. Upon demand and request by counsel for GE Capital, Koch withdrew this misstatement, filing the Amendment to Koch Food's Brief and Evidentiary Materials in Opposition to GECC's Motion for Summary Judgment, in which Koch now concedes that Mr. Dalfonso's appraisals are effective as of October 2007 – roughly eighteen months after the conversion occurred. *Opposition,* ¶ 27.

Q: What would that be?
A: 25 to 35 cents on the dollar.
Q: The dollar being what, the capital cost?
A: The dollar of the purchase price.

*Jones Dep. Transcript* (Doc. No. 67, Ex. 22), 38:3-10 (emphasis added).   Mr. Jones went on to

acknowledge that use of the equipment caused it to lose value.   *See Jones Dep. Transcript* (Doc.

No. 67, Ex. 22), 38:13-15.   The last may not be pertinent as to the value of the equipment as of

the date it was converted, but certainly is pertinent to Koch's assertion that it was doing GE

Capital a favor by using the equipment.   *See, e.g., Opposition*, ¶ 19.   Consequently, in contrast to

Koch's assertions in its Opposition, Mr. Jones testified that, as of November 28, 2007, at a time

when the Deboning Equipment was sitting in Koch's parking lot and after Koch had devalued

the Deboning Equipment by using the same for approximately ten months, the Deboning

Equipment was worth between $202,000 and $283,735.[4]

Similarly, the Expert Report of David Dalfonso of Rosen Systems, Inc. for Schiff Hardin

LLP in the Matter of Koch Foods of Alabama, LLC v. General Electric Capital Corporation (the

"Dalfonso Expert Report") provides that the Fair Market Value In Place for the appraised

equipment was effective as of the date of his inspection, October 19, 2007.   *Dalfonso Expert*

*Report*, p. 2, a copy of which is attached to the GE Capital's Memorandum (Doc. No. 45) as

Exhibit R.

With respect to the Dalfonso testimony, in a letter to Koch's counsel on October 30,

2007, a copy of which is attached hereto as Exhibit W, Mr. Dalfonso acknowledges that:

---

[4]  The testimony of Michael Leonard cited by Koch is also misleading.   Koch notes that Mr. Leonard
originally paid $25,000 for the Spiral Freezer when he purchased the Spiral Freezer before selling it to
Sylvest.   *Opposition*, ¶ 29.   It does not, however, state that Mr. Leonard then sold the Spiral Freezer to
Sylvest, including delivery and installation, to Sylvest for $430,000.   *Leonard Dep. Transcript*, 9:18-21,
a copy of which is attached hereto as Exhibit X.

> The Fair Market Value In Place values assume the equipment will continue to be used at its current location. It adds value for transportation and installation. The fact that the deboning line has been dismantled limits its additional value under this concept.

*See Letter to M. Xu from D. Dalfonso* (Ex. W), October 30, 2007, paragraph 4. For these reasons, Koch has failed to offer any testimony regarding the value of the equipment at the time of the conversion. The actual testimony of both Mr. Jones and Mr. Dalfonso relates to the value of the equipment in late 2007, after the Deboning Equipment had been removed from the Facility, after Koch's extensive use of the Deboning Equipment, and after the exposure of the same to the elements for six months. It is unsurprising, therefore, that variations between the testimony of Mr. Breakstone and Mssrs. Dalfonso and Jones exist, but this simply buttresses the fact that the testimony of the latter is not probative of value on the date of conversion, leaving Mr. Breakstone's testimony unrebutted.[5]

### 4.    The Spiral Freezer and the Deboning Equipment are Not Fixtures.

Koch declares that GE Capital "was neither the tenant nor the landlord of the Facility though, and thus cannot rely on the trade-fixture exception." *Opposition*, p. 22. This is patently false and made up of whole cloth. In *Moco Inc. v. Gaines*, Moco, Inc. sought return of gas pumps and tanks it had installed at a mini mart and paid for. *Moco Inc. v. Gaines, Moco, Inc.,*

---

[5] In addition, even if Mr. Jones's testimony related to the appropriate time frame, that opinion testimony should be stricken from Koch's Response based on Koch's failure to comply with Section 8 of the Uniform Scheduling Order (Doc. No. 14), which provides the procedural requirements applicable to expert or opinion testimony in the current proceeding. In the Opposition, Koch repeatedly asserts that Mr. Jones conducted a "valuation" of the equipment. *See Opposition*, p. 17 ("based on the proximity of the valuations conducted by . . . Wayne Jones."), pp. 18-19 (noting that the "valuation" of Wayne Jones "using the Fair Market Value- Remove approach" is $202,000), p. 19 ("Mr. Jones's testimony that [the Deboning Equipment] was worth 25 to 35 cents on the dollar with the dollar referring to the purchase price"). However, the sole disclosure made by Koch to GE Capital regarding Mr. Jones was in Koch Food's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), and stated that Mr. Jones has or may have "information relating to the installation, the use, and the operation of the equipment at issue." *See Koch's Initial Disclosures*, p. 2, a copy of which is attached hereto as Exhibit Y. By failing to disclose Mr. Jones as an expert, Koch is barred from attempting to use his testimony as expert testimony.

484 So. 2d 470, 474 (Ala. Civ. App. 1985). The court found in favor of *Moco*, and against the successors in interest to the original tenant and the original landlord, and extended the "trade fixture doctrine" to "licensees, tenants, or tenants-at-will." *Id.* Here, Koch is a successor to either the landlord or the tenant of the Facility with full knowledge of GE Capital's ownership of the equipment. The Spiral Freezer and the Deboning Equipment are unquestionably trade fixtures, and Koch's standing argument simply finds no basis in law. There being no law to support Koch's position, Koch cites none.

This aside, GE Capital's conversion claim is not premised solely on the characterization of the Deboning Equipment and the Spiral Freezer as trade fixtures. Under Alabama law, it is well settled that:

> A lessor of chattels, intended by both the lessor and lessee for annexation to the freehold, but with an agreement for return of the chattels to the lessor at the termination of the lease agreement, the chattels being annexed to the freehold, as was contemplated, can assert and maintain his title against a subsequent bona fide purchaser of the freehold, upon a present consideration, without notice of the right and title of the lessor.

*Mobile Cab and Baggage Co. Inc. v. The Texas Co.*, 261 Ala. 242, 74 So. 2d 498 (1954). In this way, despite Koch's unsupported claims to the contrary, GE Capital owned the Spiral Freezer and the Deboning Equipment prior to the sale of the Facility to Koch, and owned the Spiral Freezer and the Deboning Equipment after the sale of the Facility to Koch. Koch's claims of ownership are unsupportable under any applicable law.

Finally, Koch's catch-all argument is that "the facts clearly demonstrate that both Sylvest and GECC intended and knew that the Equipment would and did become fixtures." *Opposition*, p. 26. In support, Koch advances: (a) a written contract between Sylvest and GE Capital which provided exactly the opposite; (b) the fact that GE Capital concluded that the equipment was not fixtures, and did not make a fixture filing; and (c) another contract, the Facility Lease, to which

GE Capital was not a party.[6]  On these points, as on all the others, this Court must determine whether any finder of fact could rationally conclude that the mouse in the courtroom is, in fact, an elephant.

### 5.    GE Capital's Conversion Claim Extends to the Spiral Freezer.

Finally, Koch argues that, despite its Chief Financial Officer's testimony that Koch has asserted ownership of the Spiral Freezer since May 2006, GE Capital's conversion claim should be confined to the Deboning Equipment because the Spiral Freezer is not referenced in GE Capital's Counterclaim.  This argument ignores the well-established rule in federal court that the pleadings shall be deemed to conform to the proofs. *See FED. R. CIV. P.* 15(b).

### III.  CONCLUSION

For the reasons stated herein, in GE Capital's Summary Judgment Motion, GE Capital's Memorandum, and GE Capital's Response, the Court should grant summary judgment in GE Capital's favor.  The only disputed facts that Koch has been able to allege are those that have no impact on the outcome of the proceeding.  As such, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

---

[6] On the point of the Facility Lease to which GE Capital was not a party, Koch also ignores established Alabama law which provides that "[a] tenant can remove trade fixtures at the end of a lease term even when the lease states that improvements and fixtures are not to be removed." *LaFarge Building Materials, Inc. v. Stribling*, 880 So. 2d 415, 419 (2003) (provisions of a lease which indicate that fixtures can not be removed do not apply to trade fixtures) (emphasis in original).

Dated:  January 11, 2008.                    Respectfully submitted,


                                        By:    /s/ Rusha C. Smith
                                               Attorney for General Electric Capital
                                               Corporation

OF COUNSEL:
Rusha C. Smith
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

OF COUNSEL:
Alexander Terras
Timothy S. Harris
Reed Smith Sachnoff & Weaver
10 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400

## CERTIFICATE OF SERVICE

        I hereby certify that on January 11, 2008, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system, which will send notification of such filing to the
following:

        Thomas G. Mancuso, Esq.
        Haskell Slaughter Young & Gallion, LLC
        305 South Lawrence Street
        Montgomery, AL  36103-4660

        Eugene J. Geekie, Jr., Esq.
        Mike Xu, Esq.
        Schiff Hardin LLP
        6600 Sears Tower
        Chicago IL 60606


                                        /s/ Rusha C. Smith
                                        COUNSEL